UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMESBURY GROUP, INC., and AMESBURY SPRINGS LTD., <br><br> Plaintiffs, <br><br> v. <br><br> THE CALDWELL MANUFACTURING COMPANY, <br><br> Defendant. | Civil Action No. 05-10020-DPW |

**PLAINTIFFS' CLAIM CONSTRUCTION BRIEF**

Plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd. (collectively, "Amesbury") submit this brief is support of their proposed construction for U.S. Patent No. 5,365,638, U.S. Patent No. 6,598,264 and U.S. Patent No. 6,820,368. The '638, '264, and '368 patents are attached as Exhibits A-C to the accompnying Declaration of Jordan M. Singer ("Singer Decl.").

The parties' preliminary claim constructions and discovery responses indicate that very few claim elements are in dispute. In its claim charts provided to Amesbury just two weeks ago, Caldwell admitted that its 86xt product contained all the elements of independent claims 1, 12, 13 and 18 of the '264 patent, except for a "bottom guide roller rotatably mounted in the bottom guide." *See* Defendant's Claim Charts (copy attached as Exhibit D to Singer Decl.). Caldwell also admitted that its Series 97EZ and Series 97i(H) products contain all the elements of independent claim 2 of the '368 patent except for a "pocket positioned in the second end of the frame adapted to mate with a rivet" and a "connecting device for attaching the balance shoe within the U-shaped channel of the window balance." *See id.* Caldwell further admitted that its Quicktilt product contains all the elements of independent claims 1 and 8 of the '638 patent,

except for the final limitation of each claim. *See id*. Accordingly, Amesbury has limited its analysis of the construction of the patents-in-suit here to these few claim elements about which there may be a dispute. Should defendant argue, contrary to the claim charts provided with its interrogatory responses, that other claim elements are disputed, Amesbury expressly reserves its right to amend or supplement its claim construction to address those claim elements.

## INTRODUCTION AND BACKGROUND

All three patents-in-suit relate to improvements for window balances. Hung windows, the type found in many residential and commercial buildings, are generally composed of a window frame and window sashes (*i.e*., the movable portions of the hung window that hold the panes of glass). The vertical sides of the window frame, called jambs, contain tracks on their interior face, in which the window sashes slide up and down. In some windows, the sashes may also be designed to tilt inward (*i.e.,* into the building) to facilitate cleaning.

Hung windows utilize window balances to offset the weight of a window sash, to allow even heavy sashes to be moved with ease. Although there are several types of balances, most share three common elements: a "shoe" or guide, a spring, and an anchor. The shoe connects the balance to the window sash and guides the sash as it slides during use. The shoe may also allow the sash to tilt inward, safely making the window's exterior pane of glass accessible from within the building. The spring, sized to counter the weight of the sash, is connected to the shoe. The anchor secures the spring in some manner in the window jamb. Amesbury manufactures a wide variety of balances used in modern window construction, including the patented devices at issue in this litigation. The three basic balances upon which the Amesbury patents improve are referred to as "coiled spring," "block and tackle," and "tiltable block and tackle" balances.

The '638 patent discloses a coiled spring window balance that is installed within a channel **16** of a window jamb track, as shown in the figure at right. The shoe **28** on a coiled spring balance may be virtually any type that slides within a jamb track, including shoes that lock in place when the sash is tilted inward. Opposed flanges **F** on the front of the jamb track prevent the shoe from inadvertently exiting the track during operation. As apparent from its name, this balance includes a coiled spring **S**, attached at one end **26** to the shoe **28**, to provide the balancing force for the sash. As the coil winds or unwinds with movement of the sash, the opposite end of the spring **S** freely rotates within the central portion of the coil **22**. A support surface **20** of a spring mounting element **M** holds the coiled portion in place near the top of the jamb. The spring support of prior art balance springs tended to rotate during use,  impeding the functionality of the balance. The '638 patent describes securing the spring mounting element in the jamb track channel. The mounting element can include a raised portion or spine on the spring mounting element which contacts the jamb track flanges, which helps inhibit unwanted rotation. Examples of such a raised spine **110** are illustrated in the figures below.

 

The '264 patent relates to a block and tackle window balance. This type of balance includes a guide attached to the bottom of a rigid channel. As shown in the figure at left, the rigid channel **305** contains a spring **320**, and a series of pulleys with a cord. The spring is fixed



at one end to the top of the rigid channel, and at the other end to the pulley system. The pulleys are configured as a block and tackle, allowing a compact spring to counter the weight of the sash over a relatively long sash travel distance. The cord is anchored to the window jamb with a hook **345** or other device. The entire balance, including guide and channel, is installed within a slot along the side of the window sash. As the sash moves, the entire balance – guide, channel, and all components therein – move with the sash, with the bottom guide **315** sliding along with the jamb track. Sashes utilizing prior art block and tackle balances were limited in their range of travel, because the lowermost roller was located in the channel, above the bottom guide and a considerable distance above the bottom of the balance. To allow greater sash travel, the '264 patent mounts the lowermost roller **350** (called the "bottom guide roller" in the patent) within the bottom guide, at the bottom of the balance.

Lastly, the tiltable block and tackle window balance, to which the '368 patent relates, shares certain functionality and elements with both of the above balances, including the spring and pulley components of the standard block and tackle balance. Unlike the standard balance, however, which is mounted to the sash, the tiltable balance is mounted within the jamb track

4



behind the flanges, allowing the sash to tilt inward. As shown in the figure at right, a locking shoe **210** is hung from or connected to the bottom of the balance channel **630**. Prior art tiltable block and tackle balances were often difficult to install because of the dimensions of the shoe, which would have to be forced between the jamb's flanges into the track, then awkwardly hung from or connected to the balance channel. The '368 patent eliminates this problem by configuring one end of the shoe to fit within the balanace channel itself, without losing the locking capability required during tilting. With this improvement, fully assembled tiltable block and tackle balance assemblies may be installed in a jamb track with ease.

## ARGUMENT

A.   **The Law Governing Claim Construction**

Claim construction is a matter of law to be decided by this Court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). Interpreting the meaning of a patent claim involves examining the patent claims, specification and prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). When interpreting a patent, the terms of a claim are given their ordinary meaning to a person having ordinary skill in the art unless the specification or prosecution history indicate that the terms are to be given a different meaning. *Id.* at 1582.

The Federal Circuit recently clarified that "the best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (internal citations omitted). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is

dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics*, 90 F.3d at 1582). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id*. at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Extrinsic evidence, such as dictionary definitions, expert testimony, and the like, "may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id*. at 1319.

**B.    The '638 Patent**

Amesbury is presently asserting Claims 1, 2, 3 and 8 of the '638 patent against Caldwell. Based on the parties' preliminary claim constructions and defendant's claim charts, it appears that the disputed terms can be addressed by referring to Claims 1 and 8, the two independent claims at issue. The table below shows Claim 1 (with disputed terms in bold italics) and Amesbury's proposed construction, which reflects, as it must, the plain and ordinary meaning of the terms to a person of ordinary skill in the art at the time of the invention. *See Phillips*, 415 F.3d at 1313.

| **Claim 1** | **Disputed Term** | **Amesbury's Construction** |
|---|---|---|
| A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having a first end engaged with said sash frame support means, and a ***means for mounting said coiled ribbon spring***, the coiled body | means for mounting said coiled ribbon spring | a body with a surface for supporting the coiled ribbon spring |
| portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a ***raised spine*** positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited. | raised spine | a raised projection or protrusion |

**1.      The term "means for mounting said coiled ribbon spring" means "a body with a surface for supporting the coiled ribbon spring"**

The term "means for mounting said coiled ribbon spring" is properly construed as a means-plus-function claim limitation. *See* 35 U.S.C. § 112, ¶ 6. Accordingly, the Court must first identify the function of the claim limitation, and then ascertain the "corresponding structure in the written description that is necessary to perform that function." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003). The recited function is mounting the coiled ribbon spring. '638 patent, col. 6, ll. 4-5. The structure corresponding to this function, as properly determined by looking to the patent's specification, *see Nomos v. BrainLAB USA, Inc.*, 357 F.3d 1364, 1368 (Fed. Cir. 2004), is a body with a surface for supporting the coiled ribbon spring. The patent specification discloses a

> mounting element compris[ing] a ***body portion having*** an aperture therein to receive, in use, a fixing screw by which the mounting element may be secured to said frame or abutment, ***an upper surface of the body portion being concavely curved to support the curved outer undersurface of the spring***, thus providing said support surface.

'638 patent, col. 2, ll. 13-20 (emphasis added).

One stated characteristic of the mounting means is that its body portion has an upper surface for supporting the undersurface of the coiled ribbon spring. *Id.*, col. 2, ll. 15-20. The shape of the upper surface of the body portion need not conform exactly to the curvature of the undersurface of the spring, because its sole purpose is to guide and support the spring. *Id.*, col. 4, ll. 10-11; *see also id.*, col. 2, ll. 20-21 ("In this inventive arrangement the spring merely rests on the mounting element"). All that is necessary here is that an upper surface of the body portion be able to support the curved outer undersurface of the spring. *See* '638 patent, col. 2, ll. 13-20.

Caldwell is plainly wrong to assert, as it does in its preliminary claim construction, that the "means for mounting the coiled ribbon spring is a structure limited to the embodiments

7

depicted in Figures 1 through 12 and their equivalents." The figures simply are not determinative; it is well settled that drawings in a patent are not meant to limit the scope of coverage defined by words used in the claims themselves. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306-07 (Fed. Cir. 2003) ("the mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration"). Furthermore, in determining the corresponding structure in a means-plus-function claim, this Court must consider every structure disclosed in the specification, not just the preferred embodiment. "[U]nder § 112 every structure disclosed in the specification and its equivalents should be considered." *Altiris*, 318 F.3d at 1377; *see also Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997) ("[d]isclosed structure includes that which is described in a patent specification").

### 2. The term "raised spine" in Claim 1 means "a raised projection or protrusion"

The parties appear to be in agreement that the term "raised spine" should be construed in accordance with its plain and ordinary meaning; that is, a raised projection or protrusion. Once again, however, Caldwell reads an improper limitation into the term by arguing that the spine is a "rectangular protrusion from the mounting element." *See* Defendant's Preliminary Claim Construction at 3 (copy attached as Exhibit E to Singer Decl.).[1] Nothing in the claims or specification requires the spine to be in the shape of a rectangle (or, for that matter, any other shape). *See* '638 patent, col. 5, line 7 (referring only to a "raised spine formation"). Indeed, Claim 1 is clear that the only requirement of the raised spine is that it is "positioned between and in the same plane as said inwardly turned opposed flanges." *Id.*, col. 6, ll. 12-13. Whether the

---

[1] For the convenience of the Court, a copy of Amesbury's Preliminary Claim Construction is also attached to the Singer Declaration, as Exhibit F.

8

raised spine has a rectangular shape or some other shape (or series of shapes) is irrelevant; a specific shape cannot be read into the claim limitation.

The Federal Circuit recently dealt with this issue under very similar circumstances, and concluded that shape-based limitations for a spine or protrusion were improper unless expressly set forth in the patent. In *Anchor Wall*, *supra*, a family of patents for interlocking masonry blocks required "a protrusion on one of said top or bottom surfaces." 340 F.3d at 1308. Although the ordinary meaning of "protrusion" is merely "something that protrudes," the district court construed the "protrusion" also to require a "central narrow portion." *Id*. The Federal Circuit reversed this determination, holding that the patent's written description did not "describe with reasonable clarity, deliberateness, and precision, that 'protrusion' requires a 'central narrow portion.'" *Id*. (internal citations omitted). The Federal Circuit further noted that the term "protrusion" "is simply not a special and particular definition created by the patent applicant," and accordingly did not provide a basis to limit the scope of the claim. *Id*. at 1309 (internal citations omitted). Similarly, there is nothing in the '638 patent here that limits the "raised spine" to a certain shape. Accordingly, the meaning of the term should not be limited beyond its ordinary meaning.

### 3. The term "projection means" in Claim 8 means "at least one projection or protrusion"

Claim 8 of the '638 patent is similar in many respects to claim 1. One difference for claim construction purposes is that instead of a "raised spine," claim 8 claims a "mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means…." '638 patent, col. 6, ll. 57-59. Turning to the patent's written description, it is clear that "projection means" in claim 8 simply means something that projects, protrudes or juts out, such as (for example) a raised spine formation. *Id*., col. 5, ll. 5-11. Extrinsic evidence confirms

9

this straightforward definition: a dictionary entry contemporaneous with the filing of the '638 patent application defines "projection" as "a jutting out" or "a part that juts out", and offers as synonyms "protrusion, protruberance, bulge." *Webster's Ninth New Collegiate Dictionary* 940 (1990) (copy attached as Exhibit G to Singer Decl.).

Although the term "projection means" obviously uses the word "means," a careful reading of the claim reveals that this is ***not*** a means-plus-function claim term because no explicit function of the "projection means" is provided in the claim language. *See Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003) ("when a claim uses the term 'means,' the focus on whether the claim term recites no function corresponding to the means or recites sufficient structure or material for performing that function"). Rather, claim 8 merely states how the "projection means" should be positioned (between the inwardly turned opposite flanges), and that the projection means cooperates with the flanges when the mounting means is positioned in the channel. '638 patent, col. 6, ll. 57-61. Nothing in the claim states a specific function for the projection means. Had the patentees intended "projection means" to be a means-plus-function claim element, they would have made explicit the desired function, as they did earlier in claim 8. *See id.*, col. 6, ll. 52-53 ("***means for mounting*** said coiled ribbon spring"). No such explicit function is discernible here; accordingly, "projection means" should be construed as an ordinary claim term and should be given its plain and ordinary meaning: something that projects or juts out.

### 4. The term "whereby rotational motion of said mounting means is inhibited" modifies different clauses in Claims 1 and 8, thereby distinguishing the scope of the claims.

The claims of the '638 patent claim a mounting assembly in which rotation of the mounting means is inhibited, either by the structure of the mounting means alone or in

10

conjunction with the way it is installed in the mounting assembly. Independent claims 1 and 8 both contain clauses directed to this improvement; however, careful reading demonstrates that the mechanism that inhibits rotation is different in each claim.

The final limitation of claim 1 reads: "said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited."[2] '638 patent, col. 6, ll. 10-15. The "whereby" clause modifies the entire claim limitation. *See Idexx Labs., Inc. v. Abaxis, Inc.*, 222 F. Supp.2d 66, 73-74 (D. Me. 2002) ("whereby" clause embraced entire claim limitation where specification did not indicate that clause was limited). Thus, the balance claimed in claim 1 inhibits rotation of the mounting means in two ways: (1) the mounting means is secured in the channel; and (2) the mounting means has a raised spine in the same plane as the inwardly turned opposed flanges. The relative contribution of these two rotation inhibiting mechanisms is not apportioned in the claim.

The final limitation of claim 8, as similarly demarcated by the conjunctive "and," differs from the final limitation of claim 1, and reads: "the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited." '638 patent, col. 6, ll. 57-62. Here again, the "whereby" clause modifies of the entire claim limitation, but in this case the mounting means secured to the channel is not part of the limitation. In claim 8, therefore, the only structure recited in the preceding clause that inhibits rotation is the projection means.

---

[2] It is evident that this claim limitation begins at "said mounting means being secured…" because it is preceded by the conjunctive term "and," which indicates that the remainder of the claim is to be construed as one complete claim element.

**C.    The '264 Patent**

Amesbury is presently asserting Claims 1-7 and 9-21 of the '264 patent against Caldwell. Once again, the meaning of most terms of the '264 patent claims do not appear to be in dispute. The key area of dispute is the phrase "bottom guide roller rotatably mounted in the bottom guide," which appears in claim 1, among others. In a block and tackle balance, a fixed pulley or roller is located at the end of the pulley system opposite the spring, and the cord from the pulley system is threaded through it and attached to the window jamb. The '264 patent refers to this roller as a "bottom guide roller" (part **350** in Figure 4A of the patent), because in the '264 patent, the roller is mounted in the bottom guide, which is in turn attached to the end of the rigid channel containing the block and tackle system. Because the bottom guide roller is mounted within the bottom guide at the bottom of the balance, the distance between the angled portion of the top guide and the bottom guide roller axle is greater than it would be in a normal block and tackle balance (where the roller is mounted higher up in the balance channel). This allows the window sash to travel a greater distance before the roller hits the jamb mounting hook. *See* '264 patent, col. 6, ll. 17-27.

The parties specifically dispute what is meant by "rotatably mounted in the bottom guide." Again, Amesbury's construction is the only one that is consistent with the plain and ordinary meaning of the terms, as informed by the patent's written description.

**1.    The term "bottom guide roller rotatably mounted in the bottom guide" means "a roller mounted, so as to permit rotation, in the portion of the bottom guide that is sized or configured to be received in and to slide in the jamb pocket, when installed"**

A bottom guide roller is "rotatably mounted" if it is mounted in a manner to permit it to rotate. *See* '264 patent, col. 5, ll. 41-42 (bottom guide roller "rotates around a bottom guide axle"). Here, the bottom guide roller is rotatably mounted in the bottom guide. The key word is

12

"in": the roller is mounted *in* the bottom guide if, after it is mounted, the roller is located at least partially within that portion of the bottom guide that would fit into the jamb pocket upon installation. *See id.*, col. 5, ll. 41-43. In other words, the bottom guide merely acts as a sheath for the bottom guide roller and "serves as a frame *for housing* the bottom guide roller." *Id.*, col. 4, line 45 (emphasis added). The patent places no restrictions on what structure, if any, the bottom guide roller is actually mounted to, as long as it is housed within the bottom guide when it is mounted.

Caldwell's preliminary construction of this term to mean that "the bottom guide roller is mounted to, and entirely within, the bottom guide with no portion of the roller or the axle being external to the bottom guide" imports unecessary limitations and simply does not accord with the plain language of the patent. Nothing in the patent requires the bottom guide roller to be mounted *to* the bottom guide; it merely must be mounted *in* it. *See* '264 patent, col. 5, lines 41-42, 65; col. 6, lines 17-18. One can easily imagine, for example, an embodiment in which the bottom guide roller is mounted to the end of the U-shaped channel but extends toward the bottom guide so that it sits at least partially within the bottom guide. By using the term "in" rather than "to," the patent makes clear that the only limitation on the bottom guide roller is that when it is rotatably mounted, it is positioned within the bottom guide. Nor is there any basis for Caldwell's assertion that the bottom guide roller be mounted "entirely within" the bottom guide. Neither the claim language nor the written description makes any such requirement.

The correctness of Amesbury's interpretation is confirmed by the language of other claims in the patent. For example, claim 2 claims "[t]he device of claim 1 wherein the bottom guide roller is located external to the channel." '264 patent, col. 6, ll. 57-58. It is a fundamental tenet of patent law that "the presence of a dependent claim that adds a particular limitation gives

13

rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. Because claim 2 specifically requires that the bottom guide roller be located external to the channel, claim 1 is presumed to have no such requirement. Accordingly, in claim 1 the bottom guide roller could be rotatably mounted anywhere – including inside the channel – as long as the roller itself sits within, and is housed by, the bottom guide. Dependent claims 14 and 19 add the same single requirement (the bottom guide roller located external to the channel) with respect to their independent claims, further confirming that the patentee intended that the bottom guide roller in the corresponding independent claims not be limited in its mounting location.

### D. The '368 Patent

Amesbury is presently asserting Claims 2-3, 6-8, and 11 of the '368 patent against Caldwell. Claim 2 is the only independent claim, and the disputed terms can all be discussed with reference to that claim. Again, a table may be helpful to demonstrate the disputed terms and Amesbury's straightforward construction:

| Claim 2 | Disputed Term | Amesbury's Construction |
|---|---|---|
| A window balance system comprising:<br>  a U-shaped channel comprising a plurality of openings;<br>  a spring connected to a system of pulleys located within the U-shaped channel;<br>  a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and<br>  a balance shoe, in which the balance shoe comprises:<br>    a frame comprising an enlarged fi[r]st end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms a ***pocket*** positioned in the second end of the frame adapted to mate with a rivet;<br>    a locking member proximal to the enlarged first end;<br>    a cam in communication with the locking member, and<br>    ***a connecting device*** for attaching the balance shoe within the U-shaped channel of the window balance. | pocket | a contour formed to mate with a rivet or fixed structure |
| | connecting device | a device that attaches one thing to another |

**1.     The term "pocket" means "a contour formed to mate with a rivet or fixed structure"**

This Court should construe the term "pocket" as "a contour formed to mate with a rivet or fixed structure." This definition is confirmed by the language of the claims and the specification. *See* '368 patent, col. 5, ll. 37-40 ("To accommodate the fastener, the snap lock balance shoe can form a connection pocket sized to receive or mate with the fastener"); col. 6, ll. 42-46 ("The next step … is to slide the snap lock balance shoe into the rigid U-shaped channel such that the fastener is received in the connection pocket of the snap lock balance shoe"); *see also id.*, Figs. 3A & 3B, part 213. There is no restriction in the patent as to the composition or shape of the fastener that mates with the pocket; it can be a rivet or any fixed structure.

Nothing in the '368 patent requires that the "pocket" have a specific shape; rather, the claim provides that the pocket be "adapted to mate with" and therefore be configured depending only on the shape and size of the rivet (or other fixed structure) with which it mates. Any contour or curvature that creates a point to mate with a fixed structure will suffice. *See id.*, col. 5, ll. 38-40 ("connection pocket *sized to receive or mate* with the fastener"), col. 6, line 45 ("fastener *is received* in the connection pocket") (emphases added).

Caldwell's definition of "pocket" as "a U-shaped channel bounded on three sides with a single opening designed to mate with a rivet" improperly introduces structural limitations where none exist. Nothing in the specification requires the "pocket" to be a U-shaped channel bounded on three sides. While such a shape might be appropriate for mating with a specific type of rivet or fastener, the term "pocket" in the '368 patent is in no way limited to that particular shape. *See generally* '368 patent; *see also Anchor Wall*, 340 F.3d at 1306-07 (limitations may not be read into claim from written description or drawings); *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1343-44 (Fed. Cir. 2001) (rejecting claim construction that would add a limitation appearing in the

15

specification and drawings, but not appearing in the umambiguous language of the claim). Simply put, the patent places no restrictions on the shape of the pocket, and any contour that is sized to receive or mate[3] with a fastener constitutes a pocket as described in the specification and claims.

### 2. The term "connecting device" means "a device that attaches one thing to another"

The term "connecting device" should be given its plain and ordinary meaning; that is, a device that attaches one thing to another. *See* '368 patent, col. 5, ll. 31-33 (connecting device is used to secure frame to rigid U-shaped channel). The patent does not limit the meaning of this term to a particular embodiment, and indeed, several different embodiments are explicitly provided. *See id.*, col. 5, ll. 29-31 (retractable tabs), col. 5, ll. 31-33 (screw), col. 9, ll. 1-2 (rivet); col. 9, ll. 3-4 (screw), col. 9, ll. 5-6 (resilient tabs). Moreover, the patent specification makes clear that these examples are merely illustrative, not exhaustive: it notes, for example, that "in other embodiments, ***other connecting devices such as*** a screw, may be used to secure the frame to the rigid U-shaped channel." *Id.*, col. 5, ll. 31-33.

Caldwell argues in its preliminary claim construction that the "connecting device" should be limited to the resilient tabs disclosed in the specification. As shown above, this position is meritless. First, the specification expressly allows for, and in fact expressly describes, multiple types of connecting devices. *See id.* "Varied use of a disputed term in the written description attests to the breadth of the term rather than providing a limiting definition." *Anchor Wall*, 340 F.3d at 1308. Second, the claims themselves also expressly describe multiple types of connecting devices, and confirm that the ordinary meaning of "connecting device" is a device

---

[3] The ordinary meaning of "mate" is "to join or fit together." *Anchor Wall*, 340 F.3d at 1309. The '368 patent does not restrict or limit the term "mate" in any way, so the plain and ordinary meaning should govern. *Id.*

that attaches one thing to another. *See* '368 patent, col. 9, ll. 1-6 (rivet, screw, or resilient tab); *Phillips*, 415 F.3d at 1314 ("Other claims of a patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term"). Finally, even if resilient tabs were considered to be the preferred embodiment of a connecting device, it is well established that an accused infringer cannot narrow a claim term's ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *Sunrace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1305 (Fed. Cir. 2003) (internal citations omitted).

Caldwell also argues that the "connecting device is separate and distinct from any device that is designed to be mated with the pocket." Once again, there is no basis for this restrictive reading in the language of the patent. While the connecting device may be separate from the fastener that mates with the pocket, Caldwell can point to nothing in the patent that requires this limitation. This Court should not read it such a limitation into its construction.

**D.    The Remaining Claim Terms Should Be Given Their Ordinary Meaning**

Amesbury offers here its claim construction of those terms in the patents that it understands to be in dispute between the parties. This Court need only construe claim terms that are in controversy, to the extent necessary to resolve the controversy. *See Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Amesbury believes the remaining claim terms should be construed consistent with the common and ordinary meaning as informed by the patent's written description. Should Caldwell's claim construction state or suggest that additional claim terms are in dispute, Amesbury reserves its right to supplement its own claim construction to address any material differences between the parties' proposed constructions.

## **CONCLUSION**

For the reasons stated above and in the submitted materials, Amesbury respectfully requests this Court to adopt Amesbury's proposed claim construction of each of the asserted claims.

Respectfully submitted,

/s/ Jordan M. Singer
Douglas J. Kline (BBO# 556680)
Jordan M. Singer (BBO# 651068)
Safraz W. Ishmael (BBO# 657881)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
Phone:  (617) 570-1000
Fax:  (617) 523-1231

Attorneys for Plaintiffs

**AMESBURY GROUP, INC.**
**AMESBURY SPRINGS LTD.**

Dated: September 15, 2005

LIBA/1583363.2