IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD,

                        Plaintiffs,

vs.                                            Civil Action No. 05-10020-DPW

THE CALDWELL MANUFACTURING
COMPANY,

_____Defendant.

**DEFENDANT'S CLAIM CONSTRUCTION BRIEF**

**HARRIS BEACH PLLC**
*Attorneys for Defendant*
99 Garnsey Road
Pittsford, NY 14534
Telephone: 585-419-8800

## PRELIMINARY STATEMENT

Defendant ("Caldwell") submits this Brief in support of its proposed construction for U.S. Patent No. 5,365,638, U.S. Patent No. 6,598,264 and U.S. Patent No. 6,820,368 (referred to as the "'638 Patent", the "'264 Patent" and the "'368 Patent" respectively). These patents are attached as Exhibits "A" through "C" to the accompanying Declaration of Laura W. Smalley.

It is axiomatic that claim terms should be given their ordinary and customary meaning. The plaintiffs' (collectively "Amesbury") proposed claim construction collides with this basic principle. For example, Amesbury asserts that a structure it called a "spine," should actually be a "projection" or "protrusion," terms that could encompass anything from a knob to a poorly-hammered nail. (Amesbury Br., p 8). Similarly, rather than adopting the customary meaning of the word "pocket," Amesbury wants to define this term as a "contour," which is nothing more than a curved surface. (Amesbury Br., p. 15).

However, the patents-in-suit were carefully drafted, and the applicants chose to use the terms "spine" and "pocket," which are unambiguous and have a plain and ordinary meaning - something its attorneys (experienced patent counsel) must have known. Amesbury should not be allowed to alter the meaning of those terms to extend to structures that the claims-in-suit were never intended to cover.

Amesbury's claim construction also ignores the file history of the patents-in-suit. In response to office actions rejecting almost all of the claims of the underlying applications, the applicants amended the rejected claims, adding substantive limitations. It is these limitations which Amesbury now ignores in construing the claims. Because its claim construction impermissibly seeks to add what was surrendered during patent prosecution, Amesbury's proposed claim construction must be rejected.

1

## ARGUMENT

### I.    LEGAL PRINCIPLES

#### A.    Claim Construction

Claim construction is the first of a two-step analysis required to determine infringement. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).  Claim construction is a question of law, which must be resolved by the Court.  Id. at 979.

The claim language is the starting point in any claim construction analysis.  N. Am. Vaccine, Inc. v. Am. Cyanamid Co., 7 F.3d 1571, 1575 (Fed. Cir. 1993).  Accordingly, "[t]he first step in claim construction is to determine the ordinary and customary meaning, if any, that would be attributed to the term by those skilled in the art."  Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1346 (Fed. Cir. 2003).  When construing the claims, the Court must also consider the intrinsic evidence, namely the surrounding claim language, the other claims, the patent specification and the file history, which is the record of the proceedings before U.S. Patent and Trademark Office ("PTO").  See Pandrol USA, LP v. Airboss Ry. Prods. Inc., 320 F.3d 1354, 1363 n.1 (Fed. Cir. 2003); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Statements made during the prosecution history govern the interpretation of the claims. See Vitronics Corp., 90 F.3d at 1582.  When a patentee represents to the PTO that his or her invention differs from a prior art reference, it necessarily disclaims the prior art as the subject matter of his or her invention.  Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").  The file history is intrinsic evidence and demonstrates "how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  Phillips v. AWH Corp., 415 F.3d 1303, 1317 (Fed. Cir. 2005).

If the meaning of the claims is not clear, the court may consider extrinsic evidence so long as it is trustworthy.  Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1369 (Fed. Cir. 2003). Extrinsic evidence is external to the patent and prosecution history, and includes expert and inventor testimony, as well as dictionaries.  Phillips, 415 F.3d at 1317.  Although extrinsic evidence is less significant than the intrinsic record, dictionaries and treatises may be useful in claim construction, so long as those sources are not used to extend the scope of patent protection beyond what should be afforded by the patent.  Id. at 1318-20.

**B.     "Means-Plus-Function" Limitations are Construed in Accordance with Section 112, Paragraph 6.**

Section 112, paragraph 6 of Title 35 allows a patentee to express a claim limitation in "means-plus-function" format by reciting a function to be performed rather than by reciting the structure or materials for performing that function.  Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1307 (Fed. Cir. 1998 discussing 35 U.S.C. §112, ¶6 [1994]). Use of the word "means" in a claim creates a heavy presumption that the claim falls within §112, ¶6.  See Unidynamics Corp. v. Automatic Prods. Int'l, Ltd., 157 F.3d 1311, 1319 (Fed Cir. 1998). The use of vague terms that only connote a function, not a structure, also cause a claim to fall within the ambit of §112, ¶6.  See, e.g., Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1213-14 (Fed. Cir. 1998) (holding that the claim language "lever element for moving the lever" invokes §112, ¶6: "even though the catch phrase ['means for'] is not used, the limitation's language does not provide any structure.  The limitation is drafted as a function to be performed rather than definite structure or materials.").

Section 112, paragraph 6 restricts claim limitations drafted in "means-plus-functions" language to those structures disclosed in the specification which perform that function. Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 703 (Fed. Cir. 1998). The inquiry is "whether the claim as properly construed recites sufficiently definite structure to

avoid the ambit of § 112, ¶ 6," or whether the claim term only states a function to be performed.
Id. at 704 (citations omitted); Mas-Hamilton Group, 156 F.3d at 1214.

A means-plus-function claim construction involves two steps.  First, the court must
identify the claimed function.  Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 296 F.3d 1106,
1113 (Fed. Cir. 2002).  Second, the court must look to the specification to determine the structure
which corresponds to the identified function, and if the structure is ascertainable, limit the means-
plus-function clause to that structure and its equivalents.  WMS Gaming Inc. v. Int'l Game Tech.,
184 F.3d 1339, 1348 (Fed. Cir. 1999).  As stated by the Federal Circuit, the "literal scope of a
properly construed means-plus-function limitation does not extend to all means for performing a
certain function.  Rather, the scope of such claim language is sharply limited to the structure
disclosed in the specification and its equivalents."  J & M Corp. v. Harley-Davidson, Inc., 269
F.3d 1360, 1367 (Fed. Cir. 2001).

## II.    THE CONSTRUCTION OF THE '638 PATENT

### A.    The Claim Defines Two Functions for the "Means for Mounting Said Coiled Ribbon Spring."

The first term to be construed is the "means for mounting said coiled ribbon spring."  As
Amesbury admits, this term is stated in a means-plus-function format; thus the Court must
determine both the claimed function and the corresponding structure identified in the
specification.  Cardiac Pacemakers, 296 F.3d at 1113.

Claim 1 reads, in pertinent part, as follows:

> ....**a means for mounting** said coiled ribbon spring, the coiled body
> portion of said coiled ribbon spring having the other end of said coiled
> ribbon spring within the coil being positioned in said mounting means,
> said other end of said coiled ribbon spring being free and unattached to
> said mounting means and **said mounting means being secured in said
> channel means**...

(Exhibit "A", at Col. 6, ll. 4-11 [emphasis added]).  Claim 8 has similar language describing the
mounting means.  (Exhibit "A", at Col. 6, ll. 52-56).

To "mount" means "to fix securely to a support." (The American Heritage Dictionary (3d ed 1992), at p. 1180, attached to the Smalley Declaration as Exhibit "D"). The claim and the specification define the term "mounting means" as consistent with the ordinary meaning of this term: they require the mounting means to mount the coiled spring in the channel.

The portions of the specification quoted by Amesbury clearly describe the structure which must perform the mounting function (which includes supporting the spring and being secured in the channel). The specification, as quoted by Amesbury, discloses:

> [A m]ounting element compris[ing] ***a body portion having an aperture therein to receive, in use, a fixing screw by which the mounting element may be secured to said frame or abutment***, ***an upper surface of the body portion being concavely curved to support the curved outer undersurface of the spring***, thus providing said support surface.

(Exhibit "A", '638 Patent, col. 2, ll. 13-20 [emphasis added]).

The black italicized portions of the specification were originally highlighted by Amesbury in its brief and relate to the supporting function of the mounting means. The phrases italicized in red are additional portions of the specification not emphasized by Amesbury. These portions of the specification state that the mounting means also contains an aperture to receive a screw. As stated in the specification, the correct construction of the term "mounting means" is a structure for mounting that has a body, an opening to receive a fixing screw, and an upper surface concavely curved to support the curved outer undersurface of the spring. (See pp. 7-8, *infra*).

Amesbury's proposed construction – "a body with a surface for supporting the coiled ribbon spring" (Amesbury's Br., at p. 6) – improperly limits the function of the mounting means to "supporting" the spring. This construction does not comport with the common and ordinary definition of the term "mount." If the mounting means simply "supports" the coiled ribbon spring but is not itself secured to the channel, then the coiled ribbon spring is not being mounted in the channel. The additional function of being "secured in the channel," which is explicitly stated in

the claim and the specification, is necessary for the "mounting means" to perform the function of "mounting" the coiled ribbon spring.

Additionally, the "mounting means" structure is limited to the corresponding structures disclosed in the specification and their equivalents. See J & M Corp., 269 F.3d at 1365. Arguing that the corresponding structure should not be limited to those depicted in Figures 1 through 12 of the '638 Patent and their equivalents, Amesbury contends that the Court "must consider every structure disclosed in the specification, not just the preferred embodiment." (Amesbury's Br., at 8).

Amesbury's misses the point. The **only** structures disclosed in the specification corresponding to the "mounting means" are depicted in Figures 1 through 12. For example, the '638 Patent describes the first embodiment of the "mounting means" as follows: "[t]he mounting assembly shown in FIG. 1 comprises a mounting element shown generally as M having a body portion **10** having a bore **12** therein to receive a fixing screw **14** by means of which the mounting element may be secured to a channel section **16** of a sash frame." (Exhibit "A", Col. 3, ll. 45-50). Another embodiment is being displayed in Figures 3 through 6, where the mounting element "is in two parts **50, 52** which inter-engage to form a body portion **54** of reel-like structure but having a tube-like hub **56** which, in use, loosely impales a body portion of the coiled ribbon spring **58** but provides no support therefor.... The hub **56** receives in use a fixing screw **64** by which the mounting may be fixed to a channel section member." (Exhibit "A", Col. 4, ll. 15-31).

The specification details other structure that corresponds to the "mounting means" claimed in the patent. These embodiments are described as being depicted in Figures 7, 8, 9, 10, 11 and 12. (Exhibit "A", Col. 4, ll. 36-41, ll. 64-69, Col. 5, ll. 1-40). All of these embodiments have a surface for supporting the coiled ribbon spring and an aperture for a screw. The "mounting means" structure is thus limited to those structures described in the drawings of the '638 Patent, and **must** contain a curved surface and an aperture for a screw by which it is secured to the channel.

6

B.    **The Term "Spine" Defines The Shape of the Claimed Element.**

Amesbury distorts the plain meaning of the term "spine", calling it a "raised projection" or "protrusion."  Those terms are vague and lack the inherent meaning of the term "spine." Words in a claim must generally be given their ordinary and customary meaning unless the specification or file history indicates that the patentee has defined the term in a special way. Vitronics Corp., 90 F.3d at 1582.  The term "spine" has an ordinary and customary meaning, and Amesbury has not shown that the patent applicant intended to deviate from that meaning. Furthermore, the case cited by Amesbury, Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc., 340 F.3d 1298 (Fed. Cir. 2003), is inappropriate because that case involves the definition of the term "projection," not "spine."

A "spine" is simply not a raised projection or protrusion.  A "raised projection" could include a poorly-hammered nail or a knob, structures that are neither claimed in the patent nor described in the specification.  As stated in claim 1: "said mounting means having a **raised spine positioned between and in the same plane as the inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited**." (Exhibit "A", at Col. 6, ll. 11-16 [emphasis added]).

The "spine" is depicted in the patent drawings as an elongated and rectangular shape that fits between the flanges of the channel.   The raised spine formation claimed by the '638 Patent is displayed in Figures 9 and 10, which are reproduced from the patent, with the flanges colored in red and the spine in blue.  See Exhibit "1" attached to this brief.

As stated in the specification, the mounting means "is provided with a raised spine formation **102** whose width W is arranged such that it is a snug fit between open lip portions **104** of a channel section sash frame member **5** (shown in broken line in FIG. 10) within which the mounting element is to be operatively received."  (Exhibit "A", at Col. 5, ll. 6-11).  Thus, the term "spine" is not broad enough to encompass any "projection" or "protrusion" such as a knob or a bump, but is defined by the specification as an elongated structure that snugly fits between

the lips (flanges) of a channel to prevent rotation.  A rectangular shape is dictated by the function of the spine because it must fit snugly between the lips of the channel, which itself shaped like a rectangle.

This definition is consistent with the common definition of the term "spine," which is "something that resembles or suggests a backbone, as: **a.** the hinged back of a book.  **b.** The crest of ridge."  (The American Heritage Dictionary (3d ed. 1992), attached to the Smalley Declaration as Exhibit "E").  Thus, Caldwell's proposed definition of the term "spine," which is a rectangular or elongated protrusion from the mounting element, should be adopted because it comports with the ordinary and customary meaning of that term, and the definition of that term set forth in the specification.

C.    <u>The Term "Projection Means" Is Limited to the Structures Disclosed in the Patent.</u>

The use of the word "means" in a claim creates a heavy presumption that the claim falls within §112, ¶6.  <u>Unidynamics Corp.</u>, 157 F.3d at 1319. Amesbury claims that the "projection means" is not a means-plus-function claim because "no explicit function of the 'projection means' is provided in the claim language" (Amesbury's Br., at 9).  It does so because it cannot identify any structure in either the claim or the specification associated with this means–plus–function language.   The Court, however, must construe this term as a means-plus-function limitation, and determine both the claimed function and the corresponding structure, if any, identified in the specification.  <u>Cardiac Pacemakers</u>, 296 F.3d at 1113.

Claim 8 reads, in relevant part, as follows:

> [T]he mounting means having projection means positioned between said inwardly turned opposed flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited.

(Exhibit "A", at Col. 6, ll. 57-62).

The function of the "projection means" is to "project" (or to "protrude") and to "cooperate" with the flanges. (See Amesbury's Br., at 9). Unlike Anchor Wall, 340 F.3d at 1308-09, which construed the term "protrusion," this means plus function term must be limited to the specific structures disclosed in the specification. WMS Gaming, 184 F.3d at 1348. The only corresponding structures disclosed in the specification are a "spine" and a "rib." (Exhibit "A", at Col. 5, ll. 6-7 & 32-35).

As noted above, the term "spine" is limited by its customary and ordinary meaning and described in the specification as a rectangular or elongated protrusion from the mounting element that snugly fits within the flanges of the channel. The specification defines the rib as "a locating rib **102** like that shown in FIGS. 9 and 10...." (Exhibit "A", Col. 5, ll. 33-35). Figures 9 and 10 (reproduced as Exhibit "1" attached) show the spine element previously claimed.

Thus, the term "rib", which generally refers to one of the bones extending from the spine to the sternum, means "a part or piece similar to a rib and serving to shape or support." (The American Heritage Dictionary 1549 (3d ed. 1992), attached to Smalley Declaration as Exhibit "F"). A rib is therefore a similar structure to the "spine" disclosed in the specification. Therefore, the term "projection means" should be construed as a means that projects from the mounting means and cooperates with the flanges of the channel, which is limited to the rectangular or elongated structure of a spine or rib. Furthermore, the spine or rib must fit snugly between the flanges.

**D.    The Plain Meaning of the Claims and the Prosecution History Demonstrate that the Rotation of the Mounting Means Is Inhibited Only By the Positioning of the "Spine" or "Projection Means."**

Claims 1 and 8 make clear that the positioning of the raised spine is the only element of the mounting means that inhibits rotation. Indeed, Amesbury admits that the "projection means" (spine) of claim 8 is the only element that inhibits rotation of the mounting means with respect to that claim. (Amesbury's Br., at 11).

With respect to claim 1, Amesbury's convoluted argument about the positioning of the term "and" does nothing to change the fact that a plain English reading of claim 1 demonstrates that the spine's position is the sole means for inhibiting rotation of the mounting means. That claim reads as follows:

> [A] means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited.

(Exhibit "A", Col. 6, ll. 1-15).

The comma after "secured in said channel means" (indicated by the yellow arrow above) indicates that the phrase "said mounting means having a raised spine…" is a separate clause from the earlier description of the means for mounting. The phrase "whereby rotational motion of said mounting means is inhibited" (in red) therefore applies solely to the "raised spine" element, which is after the comma, rather than the "being secured in said channel means" element (in blue), which is before the comma.

Furthermore, Amesbury's proposed interpretation of the claim is contradicted by the specification, which states that the mounting means: "is provided with a raised spine formation **102** whose width W is arranged such that it is a snug fit between the open lip portions **104** of the channel sash frame member **5** ... within which the mounting element is to be operatively received. Thus, rotational, pivoting or twisting motion of the element **100** within the sash frame member **5** is inhibited." (Col. 5, ll. 6-13). The specification clearly links the prevention of rotation with the positioning of the spine, not with securing the mounting means in the channel.

The prosecution history of the patent, attached as Exhibit "G" to the Smalley Declaration, also demonstrates that the rotational aspect is solely associated with the positioning of the spine.

The examiner originally rejected all nine claims of the '638 Patent application, including Claim 1, under 35 U.S.C. § 102(e).  The examiner believed that the claimed invention was anticipated by *Sterner*, U.S. Patent No. 5,157,808, a copy of which is attached as Exhibit "H" to the Smalley Declaration.  (Exhibit "G", at C000976-78).

To gain allowance of the '638 Patent, the applicant amended the claims to add the "raised spine" element along with the modifier "whereby rotational motion of said mounting means is inhibited."  (Exhibit "G", at C000986-87).   Although the original **<u>unamended</u>** claim stated that the mounting means "was secured to the channel," the original claim **<u>did not</u>** assert that securing the mounting means in the channel prohibited rotation.  (Exhibit "G", at C000986-87).

In making these amendments, the applicant emphasized the anti-rotational aspect of the spine element.  The applicant stated: "[T]he claims have been amended **<u>to include limitations directed to use of a means to prevent the rotation of the mounting means within the flanged channel means, as most clearly seen in Figures 9, 10, 11, and 12.</u>**"  (Exhibit "G", at C000900 [emphasis added]).  The applicant also distinguished the prior art on the basis that it lacked a means (the spine) that would cooperate with the flanges of the channel to prevent rotation: "While Sterner *et al*. does disclose the use of a flanged channel, **<u>there is no element such as the spine fitting within the channel which interacts with said flanges to prevent rotation.</u>**" (Exhibit "G", at C000900 [emphasis added]).

While Amesbury now asserts that claim 1 of the Patent discloses a balance that inhibits rotation of the mounting means in two ways:  (1) the mounting means is secured in the channel; and (2) the mounting means has a raised spine in the same plane as the flanges, the amendments to the claim demonstrate that the applicant associated the rotation-prevention with the spine only.  It is clear that Amesbury proposes this strained interpretation of the claim because the spine of Caldwell's product does not inhibit rotation.

Moreover, the prior art reference *Sterner*, which was attached as Exhibit "H", shows a rounded spring coil (mounting means) which is secured in the channel.  As noted by the red arrow

(see Exhibit "2", attached), the *Sterner* reference shows the coil spring as being attached to the channel with a screw as is the coil spring mounting in the '638 Patent.  As the *Sterner* patent states: "[A]t a vertical position above each of the respective lower sash frame members **26** and **28** when the corresponding upper and lower sash **12** and **14** is  therefore in the closed position, either a single or successively stacked individual coil spring sub-assemblies **20** **are securably installed to the corresponding window jam 34 by means of an insertable threadable connection of a spring bracket screw** **36** through an opening in the spring bracket cap space in post **38** and to said corresponding window jam **34.**"  (Exhibit "H", Col. 4, ll. 34-44 [emphasis added]).

As noted, the examiner believed that the *Sterner* reference anticipated claim 1, meaning that the *Sterner* reference disclosed all of the elements of claim 1, including the securing of the mounting means in the channel.  Notably, the applicant did not dispute that the "securing of the mounting means" was disclosed by *Sterner*, but nevertheless distinguished *Sterner* because that the reference did not have a means to prevent rotation in the channel.  Thus, Amesbury is estopped from claiming that the securing of the mounting means in the channel prevents rotation.  Southwall Techs., 54 F.3d at 1576.

Amesbury's proposed interpretation of claim 1, that rotation of the mounting means is inhibited both through the positioning of the spine and through the securing of the mounting means in the channel, is simply contradicted by the claim language, the specification, and the file history of the patent, and must be rejected.[1]

## III.    THE CONSTRUCTION OF THE '264 PATENT

The claim language at issue in the '264 Patent is the term "bottom guide roller rotatably mounted in the bottom guide" in claim 1 and a "bottom guide axle mounted within the bottom guide" in claim 23.  Caldwell's proposed construction of claim 23, which is attached to the

---

[1] Amesbury admits that the spine claimed in the '368 Patent prevents rotation, at least in combination with securing the mounting means in the channel.  Thus, a spine that does not prevent rotation of the mounting means at all does not fall within the scope of Claim 1, even if Amesbury's proposed construction is adopted.

Smalley Declaration as Exhibit "I", interprets claim 23 to mean that the bottom guide roller "is mounted to, and is entirely within, the bottom guide with no portion of the roller or the axle being external to the bottom guide." Amesbury did not brief a contrary interpretation, so it presumably concedes that Caldwell's proposed interpretation is correct.

With respect to Claim 1, the term "bottom guide roller rotatably mounted in the bottom guide" requires the bottom guide roller to be mounted to the bottom guide and be located entirely within the bottom guide. The placement of the bottom guide roller in the bottom guide (Figure 4A of the '264 Patent), is shown in red in Figure 4A. (See Exhibit "3" attached).

The specification confirms Caldwell's interpretation of this phrase. Indeed, Amesbury's proposed interpretation that the patent could cover an "embodiment in which the bottom guide roller is mounted to the end of the U-shaped channel but extends towards the bottom guide so that it sits at least partially within the bottom guide" (Amesbury's Br., at 13) is disingenuous. The specification flatly contradicts this proposed interpretation: "The bottom guide **315** extends beyond the rigid U-shaped channel **305**, and, therefore, the bottom guide roller **350** **is located outside of the rigid U-shaped channel 305**." (Exhibit "B", Col. 4, ll. 46-48 [emphasis added]).

The specification also states, on multiple occasions, that the bottom guide roller is located "within" the bottom guide. (Exhibit "B", Col. 5, ll. 42 & Col. 6, ll. 19). The term "within" means "inside" and not "outside." TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., LLC, 375 F.3d 1126, 1136 (Fed. Cir. 2004).

The file history of the '264 Patent, which is attached to Smalley Declaration as Exhibit "J", further confirms that the phrase "rotatably mounted in the bottom guide" means mounted to and entirely within the bottom guide. Indeed, in the original patent application, the applicant stated that the bottom guide roller was "[rotatably] mounted **to** the bottom guide." (Exhibit "J", at C000575 (emphasis added)).

The examiner rejected most of the claims, including claim 1, under 35 U.S.C. §102(b), finding that the admitted prior art, as well as other references found by the examiner, disclosed all

of the elements of the invention, including a bottom guide roller attached to the bottom guide. (Exhibit "J", at C000630-640). The examiner also rejected certain of the dependent claims because the prior art disclosed devices where "the bottom guide [roller] is located external to the channel" or "a **portion** of the bottom guide roller is external to the channel." According to the examiner, the admitted prior art, as well as other references, showed a balance where a portion of the bottom guide roller was located in the channel and a portion was located external to the channel. (Exhibit "J", at C000631-40). The Examiner also cited *Biro*, U.S. Patent No. 3,449,862, against the application. (See Exhibit "J", at C000648).

Responding to the examiner's rejection, the applicant claimed that the location of the bottom guide roller in the bottom guide was not disclosed in the prior art.[2] Notably, the applicant did not dispute the examiner's statements that the prior art, including the admitted prior art, contained a roller that was located partially within the channel and partially external to the channel.

The applicant also distinguished *Biro*, claiming that it was:

> ...silent with respect to the location and mounting details of the 'bottom guide roller' .. relative to the support slide 125; however, as shown in FIG. 4, **the roller appears to be mounted to the counterbalance housing 114 above the lower support slide 125, not in the lower support slide 124.** The lower support slide 125 is held in place by the rivets 134 and appears to terminate below the axis of the roller. See also, for example, FIGS. 2A and 2B of Applicant's specification. **Accordingly, Biro fails to disclose or suggest 'a bottom guide roller rotatably mounted in the bottom guide.'"**

(Exhibit "J", at C000656 [emphasis added]). Thus, the applicant distinguished *Biro* on the basis that the bottom guide roller was mounted to a structure <u>above</u> the bottom guide and was not in the bottom guide.

---

[2] Although the applicant claimed during the prosecution of the patent that this was the novel feature of the device, it appears that the '264 Patent was anticipated by *Thompson*, U.S. Patent No. 6,840,011 (attached to the Smalley Declaration as Exhibit "K"), whose filing date predates that of the '264 Patent. Figure 1 of the *Thompson* patent shows a balance with the bottom guide roller located below the channel. This patent was not considered by the examiner, but will form the basis of one of Caldwell's validity challenges to the '264 Patent.

In response to the rejection, the applicant amended claim 1 to include the language "a bottom guide roller rotatably [sic] mounted **in** the bottom guide." (Exhibit "J", at pp. C000654-656).  Given that applicant distinguished *Biro* because it disclosed a guide roller mounted to a structure above the bottom guide, and that it did not specifically contest the examiner's assertion that the prior art showed a guide roller located partially within the channel, the term "in the bottom guide" clearly means that the roller is entirely external to the channel and mounted to the bottom guide, not another structure.

The doctrine of "claim differentiation" cited by Amesbury does not compel a different result.  Although the presence of a dependent claim that adds an additional limitation creates a presumption that the independent claim lacks such a limitation, that presumption "will be overcome by a contrary construction dictated by the written description or prosecution history." Seachange Int'l, Inc. v. C-Cor Inc., 413 F.3d 1361, 1369 (Fed. Cir. 2005).  Thus, although dependent claim 2 states that the bottom guide roller is external to the channel, the presumption that claim 1 lacks that limitation is rebutted because both the specification and the file history demonstrate that the applicant disclaimed a bottom guide roller, any portion of which was located within the channel.  The term "rotatably mounted in the bottom guide" must therefore be construed to cover a guide roller that is entirely within the bottom guide roller and external to the channel.  Furthermore, based on the applicant's statement in the file history that the bottom guide roller is attached to the bottom guide, this claim element must be construed as requiring the bottom guide roller to be mounted to the bottom guide housing, not the channel.

Amesbury's proposed claim construction also attempts to limit the location of the bottom guide roller within the bottom guide to "the portion of the bottom guide that is sized or configured to be received in and to slide in the jamb pocket, when installed." (Amesbury's Br., at 12).  This proposed construction is wholly unsupported by the language of the claim or the specification.  Indeed, Amesbury fails to cite any language of the claims or the specification to support this interpretation.  The claim simply states that the bottom guide roller is mounted "in

15

the bottom guide" (Ex. "B", Col. 6, ll. 42-43), while the specification states that the "bottom guide roller is located within the bottom guide ...." (Id. at Col. 5, ll. 43-45).

The apparent motivation for this proposed interpretation is an attempt to distinguish the claimed device from one previously disclosed by the *Thompson* reference, which Amesbury did not bring to the examiner's attention during prosecution.   Given its unambiguous statements during prosecution, however, that the prior art failed to "disclose or suggest a 'bottom guide roller rotatably mounted in the bottom guide,'" (Ex. "J" at C000656), Amesbury cannot now limit the scope of its alleged invention to a bottom guide roller being mounted in a **specific portion** of the bottom guide, particularly when no such statements appear in the claim, the specification or the file history.  As such, claim 1 must be interpreted to cover a bottom guide roller located in any portion of the bottom guide.

## IV.    THE CONSTRUCTION OF THE '368 PATENT

### A.    The Term "Contour" Is Inconsistent With the Ordinary and Customary Definition of the Term "Pocket."

This Court should construe the term "pocket" to be a "U-shaped channel bounded on three sides with an opening designed to mate with a rivet."  Claim 2 states that the "second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame **adapted to mate with a rivet.**"   (Exhibit "C", Col. 8, ll. 60-63 [emphasis added]).  Thus, Amesbury's contention that the pocket may be shaped to mate with another "fixed structure" is flatly contradicted by the claim language itself and is therefore meritless.

Second, a pocket is not simply a "contour."  The pocket must be configured to "mate" with a rivet which is, as Amesbury concedes, to join to or fit a rivet.  (Amesbury's Br., at 16 n.3).  A structure without sides cannot mold to the rivet to join or fit with it.

The "pocket" is further defined in the specification as follows: "To accommodate the fastener **635**, the snap lock balance shoe **210** can form a connection pocket **213** sized to receive or mate with the fastener."  (Exhibit "C", Col. 5, ll. 36-39).  This statement references Figures 3A

and 3B of the Patent, which show the pocket. These figures are displayed in Exhibit "4", attached, with the pocket outlined in red.

These figures clearly show the pocket as a channel with one opening and three sides. The specification further states: "the balance shoe is slid into the U-shaped channel **630** such that the fastener is received in the connection pocket **213** of the snap lock balance shoe **210**." (Exhibit "C", Col. 6, 42-46). The referenced Figures 6A-6D (see Exhibit "C") again show the pocket as a channel with one opening and three sides. A contour, by contrast, is simply a curve that cannot be said to join or mate with a rivet and is not "sized to mate" with a rivet.

Caldwell's proposed definition of the term "pocket" is also consistent with the file history, which is attached as Exhibit "L" to the Smalley Declaration. The examiner rejected most of the pending claims in the application as anticipated by *Schmidt*, U.S. Patent No. 5,301,467, which is attached as Exhibit "M" to the Smalley Declaration. *Schmidt* disclosed a balance shoe assembly including: (1) a connecting device which connected the balance shoe to a counter-balance spring; and (2) a frame pocket that could receive a fastener. As displayed in Exhibit "5:, the *Schmidt* reference contains a pocket that is a channel with three sides having a single opening which can receive a fastener.

As stated by the examiner: "Schmidt discloses a balance shoe assembly 20 for a sash comprised of frame 24, plate-like spring locking member 34, having opposed ends 35 engageable with the sash jamb track/channel 18 when cam 32 is rotated, ... and **a frame pocket 30, which can receive a fastener.**" (Exhibit "L", at C000793 (emphasis added)). The examiner believed that the only novel elements of the claimed invention were: (1) the resilient tabs of the connecting device which are received within the openings of a U-shaped channel (claim 46); and (2) the fastener adapted to mate with the pocket formed in the second end of the frame, the fastener being a rivet (claim 48). (Exhibit "L", at C000793).

Responding to the rejection of most of the claims, the applicant argued that there were certain additional points of novelty, but did not note any points of novelty related to the pocket,

nor did it claim that the *Schmidt* reference lacked a pocket as that term was defined in the application.  (Exhibit "L", at C000808-13).  Thus, from the file history it is clear that the applicant understood the pocket as something more than a contour.  Thus, the Court should reject Amesbury's proposed construction.

**B.**    **The "Connecting Device" Is A Separate Element From the Rivet That Mates With the Pocket.**

Claim 2 discloses:  "a balance shoe, wherein the balance shoe comprises: a frame comprising an enlarged [first] end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further **forms a pocket positioned in the second end of the frame adapted to mate with a rivet**;... and a connecting device for attaching the balance shoe within the U-shaped channel of the window balance."  (Exhibit "C", Col. 8, ll. 59-63, 66-67 [emphasis added]).  The claim clearly requires two separate structures: a pocket designed to mate with a rivet and a connecting device for attaching the balance shoe.  The specification clearly labels the rivet (or fastener) that fits into the pocket and the "connecting device" as two separate elements.  For example:

> [T]he connecting device **212** is a pair of retractable tabs that snap into the rigid U-shaped channel **630**.  In other embodiments, other connecting devices such as a screw, may be used to secure the frame **211** to the rigid U-shaped channel **630**.  A fastener **635** located in the inverted window balance **622** can be used to further secure the connection between the snap lock balance shoe **210** and the inverted window balance **622**.  To accommodate the fastener **635**, the snap lock balance shoe **210** can form a connection pocket **213** sized to receive or mate with the fastener **635**.

(Exhibit "C", Col. 5, ll. 29-39 [references to "connecting device" in red and to "fastener" in blue]).

Thus, as the specification and the claim clearly demonstrate, the "connecting device" is a structure separate and distinct from the rivet that mates with the pocket.  The connecting device does not fit within the pocket, but instead secures the frame to the channel.

**C.**    **The "Connecting Device" Is Limited to A Pair of Retractable Tabs.**

Furthermore, the term "connecting device" is limited to a pair of retractable tabs.   The specification only discloses a "pair of retractable tabs" and "a screw" as possible structures for

the "connecting device." (See generally, Exhibit "C", Col. 5, ll. 29-39). As Amesbury notes in its brief, a dependent claim with an additional limitation creates the presumption that the independent claim does not contain that limitation. Dependent claim 4 discloses a device where the "connecting device" is a screw. (Exhibit "C", Col. 9, ll. 3-4). Since the dependent claim specifically limits the "connecting device" to a screw, the independent claim 2 presumptively does not encompass that structure.

Moreover, dependent claims 3 and 4, which claim a "connecting device" that is a rivet or a screw, respectively, are invalid. The patent drawings do not contain a picture of those claimed structures as required by 37 CFR § 1.83(a), and thus those claims are not enabled. Pandrol USA, 320 F.3d 1354; Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295 (Fed. Cir. 1999).

Thus, the Court should adopt the claim construction proposed by Caldwell: the "connecting device" is a structure consisting of resilient tabs which are separate and distinct from the rivet designed to mate with the pocket. The Court should also find that the claims to be construed are not enabled with respect to a rivet or a screw as the "connecting device," and thus the claimed invention does not encompass those embodiments.

## CONCLUSION

For the foregoing reasons, the proposed claim construction of defendant the Caldwell Manufacturing Company should be adopted in all respects.

Dated: October 14, 2005                    **HARRIS BEACH PLLC**

                                    By:    /s/Neal L. Slifkin
                                            Paul J. Yesawich, III
                                            Neal L. Slifkin
                                            Laura W. Smalley
                                            David J. Edwards
                                            *Attorneys for Defendant*
                                            99 Garnsey Road
                                            Pittsford, New York 14534
                                            Telephone: 585-419-8800

-and-

BROWN & MICHAELS, P.C.
Christopher A. Michaels
Eugene S. Stephens
400 M&T Bank Building
118 North Tioga Street
Ithaca, New York 14850
Telephone: 607-256-2000

*Attorneys for Defendant*

L:\LWS\ClaimConstructionBrief.doc
10/17/2005 5:08:57 PM