UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

                Plaintiffs,

   -vs-                                    Civil Action No. 05-10020-DPW

THE CALDWELL MANUFACTURING COMPANY,

                Defendant.

---

## DECLARATION

NEAL L. SLIFKIN, under penalty of perjury, declares as follows:

1.    I am a member of Harris Beach PLLC, one of the attorneys for the defendant Caldwell Manufacturing Company ("Caldwell") in this action. I submit this Declaration in opposition to Amesbury Group, Inc. and Amesbury Springs, Ltd.'s (collectively "Amesbury") motion for leave to file a supplemental memorandum in further support of Amesbury's motion to compel discovery (Docket No. 45) that was filed with this Court on November 30, 2005.

**AMESBURY HAD AMPLE OPPORTUNITY TO DEMAND THESE DOCUMENTS**

2.    Amesbury seeks to compel certain documents that it claims were not made available to it until the deposition of Jeffrey Robertson, a former Caldwell engineer, on November 29, 2005. Amesbury claims it first learned of the "original" Quick-Tilt product and the Generation I cover, at Mr. Robertson's deposition. Caldwell, however, made available the existence of the "original" Quick-Tilt product and the Generation I cover earlier in this litigation.

3.    In particular, on or about July 19, 2005, Caldwell served its response to Amesbury's document production and interrogatories. Attached as Exhibit "A" and "B" are copies of

Caldwell's responses to Amesbury's Demand for Documents and Demand for Interrogatories. As part of that document production, Caldwell served Amesbury with documents numbered C000001-21 and C000307-1356. Specifically, Caldwell served Amesbury with a Caldwell binder, Bates numbered C000744, that included references to the "original" Quick-Tilt product and the Generation I cover. Attached as Exhibit "C" is a copy of the cover letter from the Harris Beach office to Goodwin Proctor, LLP enclosing such discovery and also copies of pictures of the products.

4.      Amesbury was also advised of the existence of the "original" Quick-Tilt product and the Generation I cover at the November 8, 2005 deposition of Thomas S. Batten. <u>See</u> Ex. "D" page 149, lines 15-25, page 150, lines 1-23. The entire Batten transcript has been designated confidential for attorneys' eyes only. For the purposes of this motion, however, we are waiving confidentiality of the portions of the transcript attached and cited below. Mr. Batten unequivocally provided testimony of the existence of the "original" Quick-Tilt product and the Generation I cover. Mr. Batten testified:

A:      And then we have plain Quick Tilt.

Q:      'Plain Quick Tilt,' you said?

A:      The original Quick Tilt product.

Q:      And that is just called Quick Tilt?

A:      Just called Quick Tilt.

<u>See</u> Ex. "D" page 149, lines 23-25, page 150, lines 1-3.

Q:      Does the original Quick Tilt also have a spine?

Mr. Slifkin:    objection

A:      The original Quick Tilt covers did have a spine, yes.

2

Q:    Did it have a top cover portion that you described as being depicted in Exhibit 16?

A:    Yes.

<u>See</u> Ex. "D" page 164, lines 16-23.

Therefore, Amesbury was also aware of the "original" Quick-Tilt product and the Generation I cover as of November 8, 2005, but yet failed to request these documents.

**AMESBURY'S APPLICATION IS UNTIMELY**

5.    Pursuant to the stipulated Order that was agreed to at the October 27, 2005 scheduling conference, a copy of which is attached as Exhibit "E", discovery was to be completed on November 30, 2005.

6.    Caldwell received a letter from Amesbury requesting documents relative to the "original" Quick-Tilt product and the Generation I cover. Although that letter is purportedly dated December 1, 2005, Caldwell did not receive that letter until after the close of business on December 1, 2005. <u>See</u> Tab A, Ex. 1, Letter from Sasraz W. Ishmael, Esq. to David J. Edwards, Esq., December 1, 2005 attached to Amesbury's supplemental memorandum in support of its motion to compel.

7.    Amesbury's claim that Caldwell did not respond to the December 1, 2005 letter until Caldwell's letter dated December 15, 2005 is irrelevant and immaterial because at the time Caldwell received Amesbury's December 1, 2005 letter, discovery had already been closed.

8.    Based on the foregoing, Caldwell respectfully requests this Court deny its application for leave to file a supplemental memorandum.

Dated: December 21, 2005

/s/Neal L. Slifkin
NEAL L. SLIFKIN

210199 23465.1
12/21/2005 4:58 PM

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD,

                                    Plaintiffs,

vs.

THE CALDWELL MANUFACTURING
COMPANY,

                                    Defendant.

**DEFENDANT'S ANSWERS TO
PLAINTIFFS' FIRST REQUEST
FOR DOCUMENTS AND
THINGS (Nos. 1-34)**

Civil Action No. 05-10020-DPW

Defendant, the Caldwell Manufacturing Company ("Caldwell"), by its attorneys Harris Beach PLLC, submits the following answers to plaintiffs' First Request for Documents and Things (Nos. 1-34):

**REQUEST NO. 1**:

All documents and things that were reviewed, referred to, relied upon, consulted, or identified in connection with investigating or responding to Amesbury's First Set of Interrogatories.

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome. Subject to and without waiving these objections, Caldwell that all non-privileged documents reviewed in responding to these interrogatories will be produced subject to a protective order.

**REQUEST NO. 2**:

All documents and things referring or relating to any of the subjects of Amesbury's First Set of Interrogatories.

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome. Subject to and without waiving these objections, Caldwell states that the items used in answering

Amesbury's interrogatories were referred to in request No. 1 above, and, to the extent Caldwell is able to identify non-privileged, responses documents, the same will be produced in the manner in which they are kept in the ordinary course of business subject to a protective order.

**REQUEST NO. 3**:

All documents and things referring or relating to any of the patents-in-suit.

**ANSWER**:

Caldwell objects to this document request to the extent it seeks items "relating" to the patents-in-suit as vague, overly broad and unduly burdensome. Subject to and without waiving these objections, Caldwell states it has: (1) copies of the patents-in-suit; (2) the file histories for the patents-in-suit; and (3) correspondence from Amesbury regarding the patents-in-suit. These documents will be produced. An ongoing search of Caldwell's records may also produce additional documents, which will be made available subject to a protective order. Caldwell has withheld as privileged documents generated by counsel regarding to the patents-in-suit.

**REQUEST NO. 4**:

All documents and things referring or relating to the dates and circumstances of Caldwell first becoming aware of each of the patents-in-suit.

**ANSWER**:

Caldwell objects to this document request as vague. Subject to and without waiving this objection, Caldwell will produce non-privileged documents responsive to this request subject to a protective order. Caldwell has withheld as privileged documents generated by counsel regarding the patents-in-suit.

**REQUEST NO. 5**:

All documents and things referring or relating to any opinion, advice or comments of any person involving the validity, enforceability, infringement or scope of any of the patents-in-suit.

**ANSWER**:

Caldwell objects to this document request as overly broad, and because it seeks information subject to the attorney-client and/or work product privileges against disclosure. Caldwell has withheld as privileged documents generated by counsel regarding the patents-in-suit. Subject to and without waiving its objections, Caldwell will produce non-privileged documents responsive to this request subject to a protective order, to the extent they exist.

**REQUEST NO. 6**:

All documents and things referring or relating to the specification, claims or drawings in any of the patents-in-suit or any portion of the prosecution histories of any of the patents-in-suit.

**ANSWER**:

Caldwell objects to this document request as overly broad, and because it seeks information subject to the attorney-client and/or work product privileges against disclosure. Caldwell has withheld as privileged documents generated by counsel relating to the patents-in-suit. Subject to and without waiving these objections, Caldwell states it has: (1) copies of the patents-in-suit; and (2) the file histories for the patents-in-suit. These documents will be produced. An ongoing search of Caldwell's records may also produce additional non-privileged documents, which will be made available subject to a protective order.

**REQUEST NO. 7**:

All documents and things referring or relating to any oral or written statement made by Caldwell or anyone on Caldwell's behalf as to whether or not Caldwell was or is infringing any of the patents-in-suit or that any product of Caldwell infringes any of the patents-in-suit.

**ANSWER**:

Caldwell objects to this document request as it is vague and seeks privileged information. Subject to and without waiving this objection, Caldwell will produce correspondence relating to Caldwell's statements regarding the alleged infringement of the patents-in-suit, to the extent it exists, subject to a protective order.

**REQUEST NO. 8**:

All documents and things referring or relating to any of the Window Products identified in response to Amesbury's Interrogatory No. 1.

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome. Caldwell also objects to the definition of the term "Window Product" in that it potentially implicates hundreds of Caldwell products.    Plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd. ("Amesbury") have not limited that term to those Caldwell products which may allegedly infringe the patents-in-suit.  Caldwell will limit its responses to Request Nos. 9 through 19 and 28 below to those specific products included in the definition of the term "Window Product" and those ascertained from correspondence between the parties.    Subject to and without waiving these objections, Caldwell will produce documents and things relating to its Series 86xt, Series 97ez and Quick-Tilt*nc products, including representative specimens, sales materials, and sales records

subject to a protective order.    As to other products, Caldwell will produce certain sales materials initially and supplement its response, as needed, following Amesbury's review of same.

**REQUEST NO. 9**:

Representative specimens of each Window Product identified in response to Amesbury's Interrogatory No. 1.

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome for the reasons set forth in its response to Request No. 9 above.    Subject to and without waiving these objections, Caldwell will produce representative specimens for its Series 86xt, Series 97ez and Quick-Tilt*nc products and certain sales materials for its other products, subject to a protective order.  Caldwell will supplement its responses, as needed, following Amesbury's review of same.

**REQUEST NO. 10**:

All documents and things referring or relating to any research, design, testing or development work concerning any of the Window Products identified in response to Amesbury's Interrogatory No. 1.

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome for the reasons set forth in its response to Request No. 9 above.    Furthermore, many of the requested documents are irrelevant, as an infringement analysis of Caldwell's products can be performed without detailed research, design, testing or development documents.    Subject to and without waiving these objections, Caldwell will produce certain documents as they are kept in the ordinary course of business regarding the design and development of its Series 86xt, Series 97ez and Quick-Tilt*nc products, subject to a protective order.

HARRIS BEACH ᴾᴸᴸᶜ
ATTORNEYS AT LAW

**REQUEST NO. 11**:

All documents and things referring or relating to any search, consideration or assessment as to whether any of the Window Products identified in response to Amesbury's Interrogatory No. 1 infringe any patent, including, but not limited to, the patents-in-suit.

**ANSWER**:

Caldwell objects to this document request as overly broad, and because it seeks information subject to the attorney-client and/or work product privileges against disclosure. Caldwell also objects to this request for the reasons set forth in its response to Request No. 9 above. Caldwell has withheld as privileged documents generated by counsel relating to the patents-in-suit. Subject to and without waiving its objections, Caldwell will produce non-privileged documents responsive to this request subject to a protective order, to the extent they exist.

**REQUEST NO. 12**:

All documents and things referring or relating to all revenues and profits realized on the sale of any of the Window Products identified in response to Amesbury's Interrogatory No. 1, including but not limited to, sales records, costs records, purchase orders, invoices, receipts, bills of lading, billing ledger sheets, accounts receivable, financial statements and tax returns.

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome for the reasons set forth in its response to Request No. 9 above. Subject to and without waiving these objections, Caldwell will produce, pursuant to a protective order, documents as they are kept in the ordinary course of business relating to the revenues and profits realized on the sale for its Series 86xt, Series 97ez and Quick-Tilt*nc products, with the exception of its tax returns, which are confidential.

**REQUEST NO. 15**:

All draft and executed contracts referring or relating to any of the Window Products identified in response to Amesbury's Interrogatory No. 1.

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome for the reasons set forth in its response to Request No. 9 above. Subject to and without waiving these objections, Caldwell will produce pursuant to a protective order proposed and executed contracts relating to its Series 86xt, Series 97ez and Quick-Tilt*nc products, to the extent such contracts exist and are kept in the ordinary course of business.

**REQUEST NO. 16**:

All documents and things referring or relating to patent or product licenses or sublicenses concerning window hardware or fenestration hardware, to which Caldwell is a party or which Caldwell has contemplated or is contemplating being a party.

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome. Caldwell also objects to this interrogatory as vague if, by referring to "fenestration hardware," it seeks information in addition to that relating to "window hardware." Subject to and without waiving these objections, Caldwell will produce licenses relating to its Series 86xt, Series 97ez and Quick-Tilt*nc products, subject to a protective order, to the extent they exist.

**REQUEST NO. 17**:

All documents and things referring or relating to the original design or specifications of any of the Window Products identified in response to Amesbury's Interrogatory No. 1, any changes in

the design or specifications of said Window Products, or the reasons for any changes in the design or specifications of said Window Products.

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome for the reasons set forth in its response to Request No. 9 above. Furthermore, many of the requested documents are irrelevant, as an infringement analysis of Caldwell's products can be performed without detailed research, design, testing or development documents.    Subject to and without waiving these objections, Caldwell will produce the relevant design documents relating to its Series 86xt, Series 97ez and Quick-Tilt*nc  products subject to a protective order.

**REQUEST NO. 18**:

All documents and things referring or relating to the discontinuance of selling or manufacturing of any of the Window Products identified in response to Amesbury's Interrogatory No. 1, including but not limited to all documents having a bearing on the reason or reasons for the discontinuance of the Window Product.

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome for the reasons set forth in its response to Request No. 9 above.  Subject to and without waiving this objection, Caldwell will produce any documents kept in the ordinary course of business concerning the discontinuance of its Series 86xt products subject to a protective order.

**REQUEST NO. 19**:

All documents and things referring or relating to any recall from the market (including, but not limited to, customers, retailers, wholesalers, distributors and consumers) of any of the Window Products identified in response to Amesbury's Interrogatory No. 1.

HARRIS BEACH ꝑ
ATTORNEYS AT LAW

9

**ANSWER**:

Caldwell objects to this document request as overly broad and unduly burdensome for the reasons set forth in its response to Request No. 9 above.    Caldwell also objects to this request because it is not reasonably calculated to lead to the discovery of admissible evidence.    Subject to and without waiving these objections, Caldwell states that none of its Series 86xt, Series 97ez or Quick-Tilt*nc  products have been recalled.

**REQUEST NO. 20**:

All documents and things not heretofore specifically requested that refer or relate to any of the subjects raised in Caldwell's Counterclaims.

**ANSWER**:

Caldwell objects to this document request as overly broad, unduly burdensome and vague.  Upon information and belief, all documents currently in Caldwell's possession that relate to its counterclaims and are not privileged are being produced as they are kept in the ordinary course of business subject to a protective order.  Caldwell reserves its right to supplement this production as additional material is obtained and/or discovered.

**REQUEST NO. 21**:

All documents and things not heretofore specifically requested that refer or relate to any of the subjects raised in Caldwell's Affirmative Defenses.

**ANSWER**:

Caldwell objects to this document request as overly broad, unduly burdensome and vague. Upon information and belief, all documents currently in Caldwell's possession that relate to its affirmative defenses and are not privileged are being produced as they are kept in the ordinary

course of business subject to a protective order. Caldwell reserves its right to supplement this production as additional material is obtained and/or discovered.

**REQUEST NO. 22**:

All documents and things referring or relating to Caldwell's assertion that each of the patents-in-suit is invalid for failure to meet the requirements of the patent laws of the United States.

**ANSWER**:

Caldwell objects to this document request as overly broad, unduly burdensome and vague. Upon information and belief, all documents currently in Caldwell's possession that relate to its affirmative defenses and are not privileged are being produced as they are kept in the ordinary course of business subject to a protective order. Caldwell reserves its right to supplement this production as additional material is obtained and/or discovered.

**REQUEST NO. 23**:

All documents and things referring or relating to Caldwell's assertion that Amesbury's claims are barred by prosecution history estoppel.

**ANSWER**:

Caldwell objects to this document request as overly broad and vague. Upon information and belief, all documents currently in Caldwell's possession that relate to its estoppel defense and are not privileged are being produced as they are kept in the ordinary course of business subject to a protective order. Caldwell reserves its right to supplement this production as additional material is obtained and/or discovered.

**REQUEST NO. 24**:

All documents and things referring or relating to Caldwell's assertion that Amesbury's claims for damages are limited by 35 U.S.C. §286 or §287.

**ANSWER**:

Caldwell objects to this document request as overly broad and vague. Subject to and without waiving these objections, Caldwell states that it will seek material responsive to this request from Amesbury and/or other sources in discovery, and will supplement its production at that time.

**REQUEST NO. 25**:

All documents and things referring or relating to the charges of infringement identified in response to Interrogatory No. 11.

**ANSWER**:

Caldwell objects to this document request as overly broad and vague. Caldwell cannot respond to this request because no charges of infringement were the subject of inquiry, or identified in response to Interrogatory No. 11.

**REQUEST NO. 26**:

All documents and things referring or relating to Caldwell's denial that the infringement of the patents-in-suit is willful.

**ANSWER**:

Caldwell objects to this document request as overly broad. Subject to and without waiving this objection, Caldwell states that documents bearing on willfulness include: (1) the patents-in-suit; (2) the file histories for the patents-in-suit; (3) Prosser, U.S. Patent No. 3,091,797; (4) Thompson, U.S. Patent No. 6,840,011, and its file history; (5) DeNormand, U.S. Pat. No. 6,041,746, (6) Berndt, U.S. Patent No. 4,704,821; (7) certain sales and design documents generated by Caldwell; and (8) product information from Anderson Corporation. These documents will be produced pursuant to a protective order. Caldwell has withheld as privileged documents generated by counsel relating to the patents-in-suit.

**REQUEST NO. 27**:

     All documents and things referring or relating to any claim of damages by Caldwell against Amesbury.

     **ANSWER**:    Caldwell objects to this document request as overly broad and vague. Subject to and without waiving these objections, Caldwell has no responsive documents.

**REQUEST NO. 28**:

     All documents and things that may or will be used at trial or any evidentiary hearing in this matter.

     **ANSWER**:  Caldwell objects to this document request as overly broad, premature and because it seeks information subject to the work product privilege.  To the extent not produced in response to another request, Caldwell will produce such non-privileged documents and things at such time required by a scheduling order of the Court.

**REQUEST NO. 29**:

     All pages from Caldwell's past and present web sites referring or relating to any of the Window Products identified in response to Amesbury's Interrogatory No. 1.

     **ANSWER**:

     Caldwell objects to this document request as overly broad and unduly burdensome for the reasons set forth in its response to Request No. 9 above.   Subject to and without waiving these objections, Caldwell will produce all pages from its current websites, as well as past websites, to the extent they exist.

**REQUEST NO. 30**:

     Copies of documents which describe the corporate structure of Caldwell.

**ANSWER**:

Caldwell objects to this document request as overly broad and vague. Subject to and without waiving these objections, Caldwell will produce a current organizational chart subject to a protective order.

**REQUEST NO. 31**:

All financial statements and tax returns of Caldwell.

**ANSWER**:

Caldwell objects to this document request as overly broad, without a limitation as to time, and as seeking confidential materials. Subject to and without waiving these objections, Caldwell will produce financial statements for the fiscal years 2003 through 2004 subject to a protective order.

**REQUEST NO. 32**:

All documents and things identified in Caldwell's Rule 26(a) disclosure.

**ANSWER**:

These items will be produced subject to a protective order.

**REQUEST NO. 33**:

All documents and things referring to, relating to, or constituting the specification, claims or drawings in any Caldwell patent or patent application relating to any Window Product, or any portion of the prosecution histories relating to any Window Product.

**ANSWER**:

Caldwell objects to this document request as overly broad, unduly burdensome and vague. In addition, the request seeks information covered by the attorney-client and/or work product

privileges.   Subject to and without waiving these objections, Caldwell will produce copies of all of

its patents relating to any Window Product.

**REQUEST NO. 34:**

All documents and things referring to, relating to, or constituting any prior art to the patents-

in-suit.

**ANSWER:**

Caldwell objects to this document request as overly broad.  Subject to and without waiving

this objection, Caldwell will produce (subject to a protective order): (1) the patents-in-suit; (2) the

file histories for the patents-in-suit; (3) Prosser, U.S. Patent No. 3,091,797; (4) Thompson, U.S.

Patent No. 6,840,011, and its file history; (5) DeNormand, U.S. Pat. No. 6,041,746, (6) Berndt, U.S.

Patent No. 4,704,821; and (7) product information from Anderson Corporation. These documents

will be produced pursuant to a protective order.

Dated:  June 10, 2005                              HARRIS BEACH PLLC

                                                   By:
                                                       Paul J. Yesawich, III
                                                       Neal L. Slifkin
                                                       Laura W. Smalley
                                                       99 Garnsey Road
                                                       Pittsford, New York 14534
                                                       Telephone: 585-419-8800

                                                              -and-

                                                       BROWN & MICHAELS, P.C.
                                                       Christopher A. Michaels
                                                       Eugene S. Stephens
                                                       400 M&T Bank Building
                                                       118 North Tioga Street
                                                       Ithaca, New York 14850
                                                       Telephone: 607-256-2000

                                                       *Attorneys for Defendant*

**<u>AFFIDAVIT OF SERVICE</u>**

STATE OF NEW YORK)
COUNTY OF MONROE ) SS.:

Karen J. Jenness, being duly sworn, deposes and says that I reside in the Town of Irondequoit, New York; I am over twenty-one years of age, and am a legal secretary for the office of Harris Beach LLP. That on the 10th day of June, 2005 before five-thirty o'clock p.m., at the City of Rochester, County of Monroe and State of New York, deponent served a copy of the annexed upon the following:

GOODWIN PROCTER LLP
Douglas J. Kline, Esq.
Safraz W. Ishmael, Esq.
Exchange Place
Boston, MA 02109-2881

by causing a true copy thereof, properly and securely enclosed in a sealed wrapper for Federal Express marked for June 13th a.m. delivery.

_____
Karen J. Jenness

Sworn to before me this
10th day of June 2005

_____
Notary Public

AMY M. DANN
Notary Public, State of New York
Qualified in Monroe County
NO. 01DA5077659
Commission Expires May 12, 2007

HARRIS BEACH PLLC
ATTORNEYS AT LAW

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD,

                                 Plaintiffs,

vs.

THE CALDWELL MANUFACTURING
COMPANY,

                                 Defendant.

---

**DEFENDANT'S ANSWERS TO
PLAINTIFFS' FIRST SET OF
INTERROGATORIES (1-12)**

Civil Action No. 05-10020-DPW

Defendant the Caldwell Manufacturing Company ("Caldwell"), by its attorneys Harris Beach PLLC, submits the following answers to plaintiffs' First Set of Interrogatories (1-12):

**INTERROGATORY NO. 1**:

Identify each Window Product that, since January 1, 1994, has been used, made, offered for sale, sold in, or imported into, the United States by or on behalf of Caldwell, including, if applicable, the Window Product's product designation number, SKU number, part number, assembly designation, brand name, trademark, and any other means used by or on behalf of Caldwell to identify the Window Product.

**ANSWER:**    Caldwell objects to the definition of the term "Window Product" in that it is vague and overly broad. As defined, the term applies to every product sold or manufactured by Caldwell that includes "one or more of a: (1) block and tackle balance; (2) balance shoe, and (3) coil spring mounting element," implicating hundreds of Caldwell's products. Plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd. ("Amesbury") have not limited that term to those Caldwell products which may allegedly infringe the patents-in-suit. Caldwell will limit its responses to Interrogatory Nos. 2 through 5 below to those specific products included in the definition of the term "Window Product" and those ascertained from correspondence between the parties. Subject to and

without waiving these objections, Caldwell states that this information is ascertainable from documents Caldwell keeps in the ordinary course of business, which will be produced subject to a protective order.

**INTERROGATORY NO. 2**:

Describe separately and in detail the development of each Window Product identified in response to Interrogatory No. 1, including, but not limited to, identifying the person or persons who developed the Window Product and the earliest dates the Window Product was conceived, reduced to practice, manufactured, and sold.

**ANSWER**:     Caldwell objects to this interrogatory as overly broad and unduly burdensome for the reasons set forth in Interrogatory No. 1. Furthermore, the phrase "describe in detail the development of each window product" is vague.   Subject to, and without waiving these objections, Caldwell states that its Series 86xt balance product was substantially designed by Richard DeNormand. This product was first sold in 2003. Caldwell's Series 97ez balance product was designed by Jeff Robertson, and was first sold in 2004.   Caldwell's Quick-Tilt*nc   balance product was designed by Jeff Robertson, and was first sold in 2004.

**INTERROGATORY NO. 3**:

Separately state Caldwell's total sales figures for each Window Product identified in response to Interrogatory No. 1, including, on a monthly basis:

        (a)     gross revenue;

        (b)     all costs associated therewith;

        (c)     profits; and

        (d)     the total number of the Window Products sold and distributed.

**ANSWER**:    Caldwell objects to this interrogatory as overly broad and unduly burdensome for the reasons set forth in Interrogatory No. 1. Subject to and without waiving these objections, Caldwell will produce, subject to a protective order, documents kept in the ordinary course of business from which sales figures, including gross revenue and profits, are ascertainable for its Series 86xt, Series 97ez and Quick-Tilt*nc balance products. If Amesbury should identify additional "Window Products" that allegedly infringe the patents-in-suit based on Caldwell's response to Interrogatory No. 1 above, additional sales figures will be produced.

## INTERROGATORY NO. 4:

With respect to each of the patents-in-suit, describe how Caldwell first became aware of the patent, identifying the date that Caldwell became aware of the patent, the circumstances of how Caldwell became aware of the patent, and all documents concerning Caldwell's awareness of the patent.

**ANSWER**:    Caldwell objects to this interrogatory as overly broad and because it seeks information more readily obtainable through documents and depositions. Subject to and without waiving these objections, Caldwell will produce all relevant, non-privileged documents as they are kept in the ordinary course of business subject to a protective order.

## INTERROGATORY NO. 5:

For each Window Product identified in response to Interrogatory No. 1, separately state the full factual and legal basis for Caldwell's assertion that the Window Product does not infringe any claim of the patents-in-suit, identifying for each claim each element that Caldwell asserts is or is not present in the Window Product, either literally or under the doctrine of equivalents, and any claim construction relevant to Caldwell's assertion.

**ANSWER**:    Caldwell objects to this interrogatory in that is premature.  This Court's Order requires the parties to exchange claim charts on July 30, 2005.  Caldwell's claim charts will be produced at that time.  Caldwell will supplement this interrogatory with its non-infringement contention after claim charts are exchanged.   Additionally, Caldwell objects to this interrogatory for the reasons stated in response to Interrogatory No. 1 in that the definition of "Window Product" is vague and overly broad.

**INTERROGATORY NO. 6**:

State the full factual and legal basis for Caldwell's assertion that each of the patents-in-suit is invalid for failure to meet the requirements of the patent laws of the United States as set forth in, *inter alia*, 35 U.S.C. §§102, 103 and 112.

**ANSWER**:    Caldwell objects to this interrogatory in that it calls for legal conclusions.  Furthermore, Caldwell requires further investigation, including discovery from Amesbury, to answer this interrogatory fully, as this is a contention interrogatory.

**INTERROGATORY NO. 7**:

State the full factual and legal basis for Caldwell's assertion that the claims asserted against Caldwell are barred by prosecution history estoppel.

**ANSWER**:    Caldwell objects to this interrogatory to the extent it seeks the legal basis for Caldwell's assertions.  Caldwell also requires further investigation, including discovery from Amesbury, to answer this interrogatory fully, as this is a contention interrogatory. Furthermore, Caldwell cannot answer this interrogatory without knowing Amesbury's interpretation of the claims at issue.

**INTERROGATORY NO. 8**:

State the full factual and legal basis for Caldwell's assertion that Amesbury does not own and/or does not have the right to assert the '264 patent.

**ANSWER**:    Caldwell objects to this interrogatory in that it seeks legal conclusions. Subject to and without waiving these objections, Caldwell states that Carl Shelton, one of the inventors of the device claimed in the '264 Patent, was not named as an inventor of that patent. As he was not an Amesbury employee, he had no duty to assign the patent to Amesbury.

**INTERROGATORY NO. 9**:

State the full factual and legal basis for Caldwell's assertion that Amesbury's claims for damages are limited by 35 U.S.C. §286 or §287.

**ANSWER**:    Caldwell objects to this interrogatory to the extent that it calls for legal conclusions.    In addition, Caldwell requires further investigation, including discovery from Amesbury, to answer this interrogatory fully, as this is a contention interrogatory.

**INTERROGATORY NO. 10**:

State the full factual and legal basis for Caldwell's denial that its infringement of the patents-in-suit is willful, including, but not by way of limitation, identifying any legal advice or legal opinion relied upon by Caldwell in deciding to use, make, offer for sale, sell in, or import into, the United States, or in deciding to continue to use, make, offer for sale, sell in, or import into , the United States, any of the Window Products identified in response to Interrogatory No. 1.

**ANSWER**:    Caldwell objects to this interrogatory in that it is overly broad, calls for legal conclusions, and seeks material covered by the attorney-client privilege. Caldwell declines to produce opinions of counsel regarding the validity and/or infringement of the patents-in-suit. Subject to and without waiving these objections, Caldwell states that it believes that the patents-in-

suit are invalid and/or not infringed. Caldwell requires further investigation, including discovery from Amesbury, to answer this interrogatory fully, as this is a contention interrogatory. Caldwell also reserves the right to supplement its response. In addition, Caldwell will disclose its claim construction (and therewith its non-infringement contentions) in accordance with the Court's scheduling order.

**INTERROGATORY NO. 11**:

Identify each person who Caldwell expects to call as a witness at trial, including whether the witness will testify as a fact or an expert witness, the subject matter on which each witness is expected to testify, and each document upon which each witness will rely upon or testify about at trial.

**ANSWER**: Caldwell objects to this interrogatory as overly broad, unduly burdensome, and premature. Subject to and without waiving these objections, Caldwell states it has not yet hired a testifying expert, and but will disclose its expert witness in accordance with this Court's Scheduling Order when such witness is retained. Factual witnesses who may be called as a witness in this trial include those identified in Caldwell's Rule 26 initial disclosures. Factual witnesses who may be called at trial also include representatives of Anderson Corporation, including Roy A. Thompson, Douglas W. Kroncke, John C. Costello, David P. Chastain, Jack D. Gundlach, Timothy J. Kelly, Thomas Hanzel, Arthur R. King, IV, James R. Harger, Michael L. Doll, James L. Peterson, Dennis A. Galowitz, and Richard M. Fisher. Caldwell reserves the right to supplement this response.

**INTERROGATORY NO. 12**:

Identify each source of information that you considered in preparing your responses to these interrogatories, including, but not limited to, all persons who provided information that you

HARRIS BEACH ᴸᴸᴾ
ATTORNEYS AT LAW

6

considered in preparing your responses, all persons who you interviewed in connection with gathering information sought in these interrogatories, and all documents that you reviewed for purposes of gathering information sought in these interrogatories.

**ANSWER:**    The following persons assisted in preparing these interrogatories: attorneys at Harris Beach PLLC, 99 Garnsey Road, Pittsford, New York 14513; attorneys at Brown and Michaels, 400 M&T Bank Building, 118 North Tioga Street, Ithaca, NY 14850; and Thomas F. Batten, Vice President of Engineering at Caldwell Corporation, 2605 Manitou Road, Rochester, New York 14624. In accordance with an agreement with counsel for Amesbury, these written responses are being provided in advance of documents being available for review in connection with answering Amesbury's interrogatories.   Caldwell, therefore, reserves the right to supplement and/or amend its responses, to any and all of these interrogatories.

Dated: June _10_, 2005

HARRIS BEACH PLLC

By: _____
Paul J. Yesawich, III
Neal L. Slifkin
~~David J. Edwards~~
Laura W. Smalley
*Attorneys for Defendant*
99 Garnsey Road
Pittsford, New York 14534
Telephone: 585-419-8800

-and-

BROWN & MICHAELS, P.C.
Christopher A. Michaels
Eugene S. Stephens
400 M&T Bank Building
118 North Tioga Street
Ithaca, New York 14850
Telephone: 607-256-2000

*Attorneys for Defendant*

HARRIS BEACH ᴸᴸᶜ
ATTORNEYS AT LAW

7

TO:    GOODWIN PROCTER LLP
       Douglas J. Kline, Esq.
       Safraz W. Ishmael
       *Attorneys for Plaintiffs*
       Exchange Place
       Boston, MA 02109-2881
       Telephone: 617-570-1000

P:\CALDWELL\Ans2Int061005.doc
6/10/2005 4:14:01 PM

HARRIS BEACH ᴾᴸᴸᶜ
ATTORNEYS AT LAW

8

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK)
COUNTY OF MONROE ) SS.:


        Karen J. Jenness, being duly sworn, deposes and says that I reside in the Town of Irondequoit, New York; I am over twenty-one years of age, and am a legal secretary for the office of Harris Beach LLP.  That on the 10th day of June, 2005 before five-thirty o'clock p.m., at the City of Rochester, County of Monroe and State of New York, deponent served a copy of the annexed upon the following:

GOODWIN PROCTER LLP
Douglas J. Kline, Esq.
Safraz W. Ishmael, Esq.
Exchange Place
Boston, MA 02109-2881


by causing a true copy thereof, properly and securely enclosed in a sealed wrapper for Federal Express marked for June 13th a.m. delivery.

                             _Karen J. Jenness_
                               Karen J. Jenness

Sworn to before me this
10th day of June 2005


_Amy M. Dann_
Notary Public

AMY M. DANN
Notary Public, State of New York
Qualified in Monroe County
NO. 01DA5077658
Commission Expires May 12, 2007

HARRIS BEACH ℠
ATTORNEYS AT LAW

EXHIBIT C

**HARRIS BEACH** ⌐PLLC
ATTORNEYS AT LAW

99 GARNSEY ROAD
PITTSFORD, NY 14534
(585) 419-8800

**LAURA W. SMALLEY**

DIRECT:   585-419-8736
FAX:        (585) 419-8813
LSMALLEY@HARRISBEACH.COM

July 19, 2005

Safraz W. Ishmael, Esq.
GOODWIN PROCTER LLP
Exchange Place                                    Via Federal Express
Boston, MA 02109-2881

    Re:    Amesbury Group, Inc. and Amesbury Springs Ltd. v.
           The Caldwell Manufacturing Company

Dear Mr. Ishmael:

    Enclosed please find documents bates numbered C000001-21 and C000307-1356 in response to your document request and/or interrogatories. I have withheld certain documents that we have collected, including Caldwell's consolidated financial statements, and other financial documents as "Confidential – For Attorney's Eyes Only" until we have a stipulated protective order signed by both parties. These documents are bates numbered C000022-000306, and can be produced forthwith as soon as the protective order is in place.

                Very truly yours,

                Laura W. Smalley

lws:kjj
Enclosures

Pc:    *All Without Enclosures*
        Paul J. Yesawich, III, Esq.
        Neal L. Slifkin, Esq.
        David J. Edwards, Esq.
        Douglas J. Kline, Esq.



# Quick-Tilt
## CONSTANT FORCE SYSTEM

Quick-Tilt is quiet, corrosion-resistant and comes preassembled to easily install in residential tilt-window applications. For quick assembly, it was designed for the pivot bar to easily drop in and tie in to the carrier. Its alternating coil design prevents cantilevering or twisting of the carrier that can diminish locking performance. Quick-Tilt remains hidden during normal sash operation, requires no adjustment and, of course, performs reliably. It is rated Class 2 on the American Architectural Manufacturers Association (AAMA) Verified Components List.



**COVER (OPTIONAL)**
Encloses spring assembly. Minimizes contamination by debris.

A    B

With Triple Spacer    With Cover

**PREASSEMBLED STAINLESS STEEL SPRINGS**
Greaseless, corrosion-resistant springs uncoil against each other in opposite directions to minimize friction and maximize smooth, silent operation.

**BUMPER (OPTIONAL)**
Used in place of a stop. Prevents carrier from colliding with spring assembly.

**TAMPERLOK (RECOMMENDED)**
This safety feature, when snapped into the carrier, prevents the homeowner from accidentally detaching the sash.

**DIE CAST METAL CAM**
For strength and durability.

**TIE-IN PIVOT BAR**
When seated in the carrier, it secures the sash to the frame, preventing the sash from accidentally detaching or falling out.

C000531

EXHIBIT D

Tom F. Batten's Testimony

12/21/2005 17:40 15854198811 HARRIS BEACH PLLC 1B PAGE 02/03
Case 1:05-cv-10020-DPW Document 60-5 Filed 12/21/2005 Page 2 of 3

Alliance Shorthand, Inc.     CondenseIt™     11/08/05 - Thomas F. Batten

Page 149

THOMAS F. BATTEN - BY MR. SINGER

1
2  balances under any other name?
3     A. Yes.
4     Q. What names are those?
5     A. Roller Tilt.
6     Q. Anything else?
7     A. No.
8     Q. Can you generally describe for me the
9  difference between Quick Tilt and the Roller Tilt?
10     A. The Roller Tilt version, how can I
11  summarize, in the Roller Tilt version, the spring
12  coils travel when the sash is raised and lowered
13  with the sash. And in Quick Tilt, the coils are
14  stationary as this sash is raised and lowered.
15     Q. Are there multiple versions of the Quick
16  Tilt?
17     A. Yes.
18     Q. What are those versions?
19     A. We have an Egress version of Quick Tilt,
20  we have the standard version of Quick Tilt and we
21  have -- sorry, the standard version is called Quick
22  Tilt nc. Nc is an abbreviation for new
23  construction. And then we have plain Quick Tilt.
24     Q. "Plain Quick Tilt," you said?
25     A. The original Quick Tilt product.

Page 150

THOMAS F. BATTEN - BY MR. SINGER

1
2     Q. And that is just called Quick Tilt?
3     A. Just called Quick Tilt, yes.
4     Q. What is the difference between the
5  original plain Quick Tilt and a Quick Tilt nc?
6     A. Quick Tilt nc has an improved carrier
7  assembly and also made some changes to the covers
8  of the springs to better protect them from
9  construction -- new construction debris, dust and
10  drywall.
11     Q. What was the improvement in the carrier
12  assembly in the Quick Tilt nc?
13     A. It was to improve the ease with which the
14  pivot bar was assembled into the carrier by either
15  the homeowner or the builder of the window.
16     Q. What is the difference -- strike that.
17     I take it that the Quick Tilt nc was
18  developed after the original Quick Tilt?
19     A. Yes.
20     Q. And with respect to the Quick Tilt
21  Egress, was that developed before or after the
22  Quick Tilt nc?
23     A. I believe it was after.
24     Q. Do you know when it was brought to
25  market, Egress?

Page 151

THOMAS F. BATTEN - BY MR. SINGER

1
2     A. No, I don't.
3     Q. And what is the difference between the
4  original Quick Tilt and the Quick Tilt Egress?
5     A. Principally that the entire balance
6  assembly on the Egress version is thinner.
7     Q. And that thinner balance assembly helps
8  improve Egress?
9     A. It does.
10     Q. Looking at Exhibit 6 which is your chart
11  of dates for various products, it says there the
12  Quick Tilt nc was -- the design team for that
13  product was first formed in May, 2003?
14     A. Correct.
15     Q. And it was first sold in July of 2004?
16     A. Also correct.
17     Q. When was the original Quick Tilt first
18  sold?
19     A. I would estimate around 2000 or 2001.
20     Q. Was that the first constant force balance
21  that Caldwell had sold, the original Quick Tilt?
22     A. No.
23     Q. It had been selling the Roller Tilt
24  beforehand?
25     A. Yes.

Page 152

THOMAS F. BATTEN - BY MR. SINGER

1
2     Q. How did the design idea for the Quick
3  Tilt nc come about?
4     A. Well, again, it was as I believe we
5  talked about one of the other products, it was
6  mostly a result of having sold Quick Tilt to the
7  market for several years and obtaining feedback on
8  that product, likes and dislikes and so forth and
9  deciding that we had an opportunity to improve
10  principally the carrier and how it interfaced with
11  the pivot bar.
12     Q. Did you put together the design or
13  development team for the Quick Tilt nc?
14     A. Yes.
15     Q. Who was on that team?
16     A. The lead engineer would have been Jeff
17  Robertson and mostly the same cast, Doug Zinter,
18  Dennis O'Donnell I believe was also involved.
19     Q. Was Russ Kuitems involved in that as
20  well?
21     A. Yes, he would have been the project team
22  leader.
23     Q. Did the composition of those team members
24  that you have described to me change at all over
25  time?

11/08/05 - Thomas F. Batten — CondenseIt™ — Alliance Shorthand, Inc.

Page 161

THOMAS F. BATTEN - BY MR. SINGER

1 THOMAS F. BATTEN - BY MR. SINGER
2 spring would sit in that cylindrical pocket.
3 Q. Could you draw an arrow to the pocket you
4 are referring to and label it with a K?
5 A. (The witness complied.)
6 Q. And it would be the undersurface of the
7 coiled spring that sits in that pocket?
8 A. It would be its outside diameter.
9 Q. When the Quick Tilt nc is installed and
10 the window sash moves up and down, does the coiled
11 spring stay in that pocket?
12 A. It does.
13 Q. So it is in contact with that pocket at
14 all times as the window is moving?
15 A. That is correct.
16 Q. Look at Exhibit 16, the back side, if you
17 will, of the single nest cover. There is a raised
18 portion of that back, the back part; do you see the
19 area I am talking about?
20 A. Uh-huh, sure do.
21 Q. And we refer to that as a spine?
22 MR. SLIFKIN: Objection.
23 Q. You can answer.
24 A. Yes.
25 Q. Can you draw an arrow to that and just

Page 162

1 THOMAS F. BATTEN - BY MR. SINGER
2 label it as a spine?
3 A. (The witness complied.)
4 Q. And that spine is raised up out of the
5 rest of that part, correct?
6 A. Yes.
7 Q. At the bottom of the spine, it looks like
8 it appears to be a hole, am I right, is that a
9 hole?
10 A. That is a hole.
11 Q. What is the purpose of the hole?
12 A. That is for the fixing screw that
13 attaches the balance assembly to the window jamb.
14 Q. When the fixing screw is placed through
15 that hole and the balance assembly is properly
16 installed, the fixing screw's purpose is to hold
17 that into the jamb, correct?
18 MR. SLIFKIN: Objection.
19 A. Yes.
20 Q. When the mounting mechanism -- sorry,
21 strike that.
22 When the Quick Tilt nc is installed into
23 the window jamb, is it installed in a way that it
24 creates a tight fit or is there opportunity for it
25 to move around a little bit?

Page 163

1 THOMAS F. BATTEN - BY MR. SINGER
2 A. The roof of the nest is intended to be a
3 very tight fit to the jamb.
4 Q. Your answer is that when the Quick Tilt
5 nc is installed, there is a tight fit?
6 A. Yes.
7 Q. When the Quick Tilt nc is installed, does
8 the back portion depicted in Exhibit 16 press up
9 against any part of the window jamb?
10 A. Can you help me understand -- what do you
11 mean, back section?
12 Q. I am talking about the portion that
13 includes the spine, sort of the lighter-colored
14 gray portion?
15 A. You are on Exhibit 16?
16 Q. Yes. That portion including the spine, I
17 am just trying to understand how this is installed
18 in the window jamb. When the Quick Tilt nc is
19 installed, does that portion including the spine
20 come in contact with any part of the window jamb?
21 A. There is some incidental contact between
22 those planes that flank the spine, as you call it,
23 and the inside of the jamb but it's only incidental
24 contact.
25 Q. Where does the contact take place, on

Page 164

1 THOMAS F. BATTEN - BY MR. SINGER
2 what part of those planes?
3 A. On the lateral extremities.
4 Q. Does the spine itself ever come into
5 contact with anything?
6 A. No.
7 Q. You testified that there is a tight fit
8 when the Quick Tilt nc is installed in the jamb
9 channel. As a result of that fit, is it true that
10 the Quick Tilt nc doesn't rotate or rotation is
11 inhibited?
12 MR. SLIFKIN: Objection.
13 A. Because of the tight fit?
14 Q. As a result of the tight fit?
15 A. Yes.
16 Q. Does the original Quick Tilt also have a
17 spine?
18 MR. SLIFKIN: Objection.
19 A. The original Quick Tilt covers did have a
20 spine, yes.
21 Q. Did it have a top cover portion that you
22 described as being depicted in Exhibit 16?
23 A. Yes.
24 Q. I think you mentioned to me earlier that
25 the Quick Tilt nc had a covering or an improved

Amesbury v. The Caldwell Manufacturing Co. — Page 161 - Page 164

EXHIBIT E

F'''C'D HBW NOV 2 3 2005

AMESBURY V CALDWELL>

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3    * * * * * * * * * * * * * * *
                                  *
 4    AMESBURY GROUP, INC.        *
         AMESBURY SPRINGS, LTD.   *
 5                  Plaintiffs    *
                                  *
 6       VERSUS                   *    CA-05-10020-DPW
                                  *
 7    THE CALDWELL MANUFACTURING  *
         COMPANY                  *
 8                  Defendant     *
                                  *
 9    * * * * * * * * * * * * * * *
10         BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
11            UNITED STATES DISTRICT COURT JUDGE
12                 SCHEDULING CONFERENCE
13                   OCTOBER 27, 2005
14    APPEARANCES:
15         DOUGLAS J. KLINE, ESQ., Testa, Hurwitz &
           Thibeault, LLP, 125 High Street, High Street
16         Tower, Boston, Massachusetts  02110, on behalf
           of the Plaintiffs
17
           JORDAN M. SINGER, ESQ., Goodwin, Procter, LLP,
18         Exchange Place, Boston, Massachusetts  02109,
           on behalf of the Plaintiffs
19
           DAVID J. EDWARDS, ESQ, Harris, Beach, PLLC,
20         99 Garnsey Road, Pittsford, New York  14534,
           on behalf of the Defendant
21
           THOMAS E. LENT, ESQ., Lurie & Krupp, LLP, One
22         McKinley Square, Boston, Massachusetts  02109,
           on behalf of the Defendant
23
24
25
```

AMESBURY V CALDWELL>

**Page 3**

1
2
3           CA-05-10020-DPW
4           OCTOBER 27, 2005
5       THE COURT: I apologize for keeping you. I
6   got tied up across town.
7       I guess I really had two questions here: One,
8   what the shape of the Markman hearing is going to be
9   about. Am I simply going to have it like a regular
10  motion hearing? Do you anticipate some tutorial?
11  What do you anticipate, Mr. Kline?
12      MR. KLINE: I don't think it's incredibly
13  complex, Your Honor. There are widgets. It's window
14  balance hardware.
15      THE COURT: Right.
16      MR. KLINE: We were just trying to take stock
17  of this before we sat down. There are three patents in
18  the case. They are pretty closely related in general
19  subject matter. I've got one, two, three, four, five
20  claims or phrases that are in dispute. My associate and
21  I were just talking on the way over here. I would
22  envision it as a morning or an afternoon with legal
23  argument. We wouldn't anticipate any witnesses or
24  anything of that nature. We might have, as part of our
25  argument, some wind up that would involve tutorials and

**Page 4**

1   figures and things that show how these things fit
2   together. But I think in the context of what we've all
3   gotten a little used to on these things, it's on the
4   lower end of the complexity scale.
5       THE COURT: Is that your view as well?
6       MR. EDWARDS: I would generally agree with
7   that, Your Honor. My view, however, is that it probably
8   would -- we would begin with something along the lines
9   of a tutorial, both sides presenting a tutorial,
10  followed by attorney argument. And I agree that this
11  could be taken care of in a day.
12      THE COURT: Well, I'm not sure I'm going to be
13  talking about a day.
14      MR. EDWARDS: No, no, but certainly not the
15  much more extended hearing that's frequently part of
16  patent litigation.
17      THE COURT: Right.
18      MR. EDWARDS: No. A morning or afternoon
19  probably ought to do it.
20      THE COURT: Let me ask you another question
21  which really has to do with the schedule that you
22  propose which is making the -- or seems to make
23  disclosure of experts contingent upon the claim
24  construction. What's the reason for that?
25      MR. KLINE: Well, the only -- it's helpful to

**Page 5**

1   both sides if the experts know what the Court's claim
2   construction is.
3       THE COURT: Sure.
4       MR. KLINE: Obviously, the Court is very busy.
5   So, the difference between the competing proposals is
6   only that we, the plaintiffs, had said 30 days from the
7   Court's ruling or December 21st. Both sides have the
8   case ready for the final pretrial conference on May
9   23rd.
10      THE COURT: Well, I think I may be the source
11  of disappointment here in terms of timing when I can get
12  to you and to give you an afternoon. And I think it's
13  that -- I mean, the first that really appears is that
14  week before Christmas, which is the 21st. That's the
15  date that you're using as a turnover date. I can do
16  either the morning or the afternoon on the 21st. I can
17  do the mornings of the 19th and the 20th. Now, I also
18  am intensely aware of interfering with other people's
19  vacations or timing of vacations. So --
20      MR. EDWARDS: Judge, if I might inquire as to
21  the 22nd, one day the other way, the reason is I have
22  another hearing lined up for the 18th, 19th, and 20th
23  that would spill over into the 21st.
24      THE COURT: Mr. Kline, how does the 22nd work
25  for you, because I can actually do either the morning or

**Page 6**

1   the --
2       MR. KLINE: I think the morning of the 22nd
3   works, Your Honor.
4       THE COURT: Okay. So, why don't we say we'll
5   take up the morning -- that is, I'll carve out 9:00 to
6   1:00 for that.
7       Now, because your expert schedule is, I think,
8   properly contingent on the claim construction, I'm a
9   little cherry about providing a deadline schedule of the
10  type that you've identified unless there's some reason
11  that you want me to get to that.
12      MR. KLINE: So, are you suggesting that we
13  just table for now expert discovery, Your Honor?
14      THE COURT: Yes, unless you think that -- I
15  mean, I'd like you to make progress if you can.
16      MR. KLINE: Right.
17      THE COURT: But I don't want you to be
18  spinning wheels or deciding that, because of the
19  construction that I give, that your experts have to go
20  back and revise their reports --
21      MR. KLINE: Right.
22      THE COURT: -- as a result of that.
23      MR. KLINE: No.
24      THE COURT: And I simply don't know. I mean,
25  I did a quick walk-through of the filings to date, but I

3 (Pages 3 to 6)

OCTOBER 27, 2005>

AMESBURY V CALDWELL>

**Page 11**

1  THE CLERK: 22nd.
2  THE COURT: I'm sorry, the 22nd. If there is
3  a discovery dispute or any residual discovery dispute,
4  I'll deal with it then.
5  And, so, now let's back up to where you need
6  to be to be able to brief that properly. And I'm not
7  soliciting, by the way, the opportunity to spend my time
8  with discovery. But if you're going to do that, when do
9  you need to do it to give me at least five days to
10  review the materials? We get back to -- let's see --
11  MR. EDWARDS: Your Honor, are we still talking
12  about the motions that were pending before that were
13  brought --
14  THE COURT: Yes. Well, I'm talking about
15  every -- I want to get everything done except -- because
16  all you're going to have leftover for discovery
17  purposes, as far as I'm concerned, is expert discovery.
18  So, I would want papers filed on any discovery
19  disputes by, I would say, the 14th. That gives me five
20  business days, which means -- I mean, that's the last of
21  the papers. The papers are completed then. So, I can
22  end the discovery on November 30th, but you've got to
23  file your motions -- your discovery motions -- that day.
24  Does that work?
25  MR. KLINE: It works with us, Your Honor.

**Page 12**

1  THE COURT: Okay. So --
2  MR. EDWARDS: November 30th.
3  THE COURT: -- November 30 for any discovery
4  motions, the oppositions to be filed by the 7th, and any
5  reply by the 14th.
6  MR. KLINE: Right. I just would like to
7  clarify one thing, Your Honor. I hope we're not right
8  now then in any open-ended fashion extending discovery
9  until November 30th. Because, for example, the time
10  line for having served written discovery has long since
11  passed and we would oppose reopening that in any
12  fashion. We need to be --
13  THE COURT: I don't --
14  MR. EDWARDS: We agree.
15  THE COURT: I don't think it's anything other
16  than depositions.
17  MR. KLINE: -- finishing up.
18  MR. EDWARDS: No dispute.
19  MR. KLINE: Okay.
20  THE COURT: You can do whatever you want until
21  the 30th as to deposition discovery.
22  MR. KLINE: Okay. Very good, Your Honor.
23  THE COURT: But it makes me uncomfortable when
24  we get later than that --
25  MR. KLINE: I understand.

**Page 13**

1  THE COURT: -- because of the time frame I've
2  just set up for that. Okay. So, anything else?
3  MR. KLINE: I don't think so, Your Honor.
4  MR. EDWARDS: November 30th for the completion
5  of all depositions.
6  THE COURT: Yes.
7  MR. EDWARDS: And we do have that motion for
8  the Hague convention.
9  THE COURT: Yes. I'm prepared to sign it.
10  The only problem that I see is that the filing version
11  of it is not particularly -- it's cut off at various
12  points here. I don't know quite why, but it is. Do you
13  have a hard copy version of it that you want me to sign?
14  MR. EDWARDS: I believe we do, Your Honor.
15  THE COURT: Okay. If you'll pass it up, I'll
16  sign off on it.
17  MR. EDWARDS: And while we're on the subject,
18  again, the procedure, as I understand it, when we're
19  dealing with an application under the Hague convention
20  is we then go to the court in England and seek relief
21  from them. And I'm not certain how quickly that would
22  occur.
23  THE COURT: I don't -- you got me. I don't
24  know. But that, it seems to me, is something you should
25  do with all deliberate speed.

**Page 14**

1  MR. EDWARDS: Absolutely.
2  THE COURT: And if there's some cause to
3  extend discovery for this, I want to know about it
4  fairly quickly. I shouldn't think there would be. I
5  mean, when it happens here, if it comes to me, for
6  example, it happens almost immediately.
7  MR. EDWARDS: Simply a lack of familiarity
8  with the procedure. But we will do that with all
9  deliberate speed as you directed.
10  THE COURT: Okay. All right. I've signed off
11  on this. You may well need a certified copy and Ms.
12  Rynne can get that for you now.
13  Okay. All right. So we'll be in recess.
14  MR. EDWARDS: Thank you, Your Honor.
15  THE COURT: Thank you.
16  RECESSED AT 3:00 P.M.
17
18  C E R T I F I C A T E
19  I, PAMELA R. OWENS, Official Court Reporter,
20  U. S. District Court, do hereby certify that the
21  foregoing is a true and correct transcription of the
22  proceedings taken down by me in machine shorthand and
23  transcribed by same.
24
25

OCTOBER 27, 2005>