IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT MASSACHUSETTS

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

        Plaintiffs,

     v.

THE CALDWELL MANUFACTURING
COMPANY,

        Defendant.

Civil Action No.  05-10020-DPW

## DECLARATION OF SAFRAZ W. ISHMAEL
## IN SUPPORT OF AMESBURY'S MOTION FOR SUMMARY JUDGMENT
## OF INFRINGEMENT AND THAT THE ASSERTED CLAIMS ARE NOT INVALID

I, Safraz W. Ishmael, hereby declare as follows:

I am an associate in the law firm of Goodwin Procter LLP and counsel of record for

plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd. (collectively "Amesbury").  I make

this declaration in support of Amesbury's Motion for Summary Judgment Of Infringement And

That The Asserted Claims Are Not Invalid.

    1.      Attached as Exhibit 1 is a true and correct copy of U.S. Patent No. 6,598,264.

    2.      Attached as Exhibit 2 is a true and correct copy of U.S. Patent No. 6,820,368.

    3.      Attached as Exhibit 3 is a true and correct copy of U.S. Patent No. 5,365,638.

    4.      Attached as Exhibit 4 is a true and correct copy of Amesbury's Second

Supplemental Response to Caldwell's Interrogatories, dated January 12, 2006.

    5.      Attached as Exhibit 5 is a true and correct copy of Defendant's Supplemented

Answers to Plaintiffs' First Set of Interrogatories, dated August 31, 2005.

6.      Attached as Exhibit 6 is a true and correct copy of the Expert Witness Report of Charles E. Still, dated April 17, 2005.

7.      Attached as Exhibit 7 is a true and correct copy of excerpts from the official transcript of the May 2, 2006 deposition of Charles E. Still.

8.      Attached as Exhibit 8 is a true and correct copy of the Court's Memorandum and Order, dated January 20, 2006.

9.      Attached as Exhibit 9 is a true and correct copy of the Expert Report of Dr. Sammy Shina, dated March 23, 2006.

10.      Attached as Exhibit 10 is a true and correct copy of U.S. Patent No. 3,091,797.

11.      Attached as Exhibit 11 is a true and correct copy of Dr. Sammy Shina's Comments Regarding the Two Expert Witness Reports of Charles E. Still, dated April 18, 2006.

12.      Attached as Exhibit 12 is a true and correct copy of U.S. Patent No. 6,840,011.

13.      Attached as Exhibit 13 is a true and correct copy of Defendant's Second Supplemented Answers to Plaintiffs' First Set of Interrogatories.

14.      Attached as Exhibit 14 is a true and correct copy of Expert Witness Report of Charles E. Still, dated March 8, 2006.

15.      Attached as Exhibit 15 is a true and correct copy of excerpts from the official transcript of the November 29, 2005 deposition of Jeffrey Robertson.

16.      Attached as Exhibit 16 is a true and correct copy of excerpts from the official transcript of the November 8, 2005 deposition of Thomas F. Batten.

17.      Attached as Exhibit 17 is a true and correct copy of Expert Witness Report of Charles E. Still, dated March 13, 2006.

18.      Attached as Exhibit 18 is a true and correct copy of U.S. Patent No. 5,157,808.

19.    Attached as Exhibit 19 is a true and correct copy of a letter from Neal Slifkin,

Esq. to Jordan Singer, Esq. dated April 7, 2006.

20.    Attached as Exhibit 20 is a true and correct copy of the official transcript of the

Court's December 22, 2005 motion hearing.

21.    Attached as Exhibit 21 is a true and correct copy of U.S. Patent No. 3,114,178.

22.    Attached as Exhibit 22 is a true and correct copies of U.S. Patent No. 3,449,862.

23.    Attached as Exhibit 23 is a true and correct copy of U.S. Patent No. 4,704,821.

24.    Attached as Exhibit 24 is a true and correct copy of U.S. Patent No. 4,089,085.

25.    Attached as Exhibit 25 is a true and correct copy of Japanese Utility Model

JITUSKAI S62-194895.

26.    Attached as Exhibit 26 is a true and correct copy of U.S. Patent No. 6,041,476.

27.    Attached as Exhibit 27 is a true and correct copy of U.S. Patent No. 5,301,467.

28.    Attached as Exhibit 28 is a true and correct copy of U.S. Patent No. 5,069,001.

29.    Attached as Exhibit 29 is a true and correct copy of Japanese Utility Model

JIKKAIHE14-119083.

30.    Attached as Exhibit 30 is a true and correct copy of Japanese Utility Model

JIKKOHEI14-112279.

31.    Attached as Exhibit 31 is a true and correct copy of Japanese Utility Model

JIKKOHE18-9334.

32.    Attached as Exhibit 32 is a true and correct copy of excerpts of the official

transcript of the November 22, 2005 deposition of Robert Lelio.

33.    Attached as Exhibit 33 is a true and correct copy of assignment documents for

U.S. Patent No. 6,598,264.

34.    Attached as Exhibit 34 is a true and correct copy of assignment documents for U.S. Patent No. 6,820,368.

35.    Attached as Exhibit 35 is a true and correct copy of assignment documents for U.S. Patent No. 5,365,638.

36.    Exhibit 36 is filed under seal and is an annotated version of true and correct copies of certain engineering drawings produced by Caldwell.

37.    Exhibit 37 is filed under seal and is a true and correct copy of a portion of sales invoice data produced by Caldwell on a CD bates labeled C 002938.

38.    Exhibit 38 is a true and correct copy of a printout of a Tri-Sate Wholesale Building Supplies, Inc. website found at the URL:  http://www.tri-statewholesale.com/triweb/windows.htm.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 19, 2006.

/s/ Safraz W. Ishmael

Safraz W. Ishmael

# EXHIBIT 1

US006598264B2

(12) **United States Patent**        (10) **Patent No.:**     **US 6,598,264 B2**
Newman                               (45) **Date of Patent:**     **Jul. 29, 2003**

(54) **BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER**

(75) Inventor: **Gary Roger Newman**, Valley Springs, SD (US)

(73) Assignee: **Amesbury Group, Inc.**, Amesbury, MA (US)

(*) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 6 days.

(21) Appl. No.: **09/810,868**

(22) Filed:    **Mar. 16, 2001**

(65)    **Prior Publication Data**

US 2002/0129463 A1 Sep. 19, 2002

(51) Int. Cl.[7] ............................................. **E05D 13/00**
(52) U.S. Cl. ............................. **16/197**; 16/215; 16/401; 16/DIG. 16
(58) Field of Search ......................... 16/197, 193, 400, 16/401, DIG. 16, 210, 215; 49/445, 446, 447

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,114,178 A | * 12/1963 | Wood | 49/446 |
| 3,358,403 A | 12/1967 | Dinsmore | |
| 3,440,683 A | 4/1969 | Wood | 16/197 |
| 3,449,862 A | * 6/1969 | Biro | 49/406 |
| 4,089,085 A | 5/1978 | Fitzgibbon | 16/197 |
| 4,134,234 A | 1/1979 | Wood | 49/429 |
| 4,190,930 A | 3/1980 | Prosser | 16/197 |
| 4,238,907 A | 12/1980 | Swan | 49/446 |
| 4,300,316 A | 11/1981 | Ficurilli | 49/445 |
| 4,332,054 A | 6/1982 | Paist et al. | 16/197 |
| 4,373,295 A | 2/1983 | Starck | 49/435 |
| 4,413,445 A | 11/1983 | Trout | 49/445 |
| 4,503,641 A | 3/1985 | Swan | 49/445 |
| 4,586,291 A | 5/1986 | Swan | 49/501 |
| 4,654,928 A | 4/1987 | Flight | 16/199 |
| 4,672,713 A | 6/1987 | Newton et al. | 16/197 |
| 4,689,850 A | 9/1987 | Flight | 16/197 |
| 4,800,680 A | 1/1989 | Westfall et al. | 49/429 |
| 4,914,862 A | 4/1990 | Gregory | 49/322 |
| 4,949,425 A | 8/1990 | Dodson et al. | 16/198 |
| 5,174,064 A | 12/1992 | Stark | 49/445 |
| 5,530,991 A | 7/1996 | deNormand et al. | 16/198 |
| 5,737,877 A | 4/1998 | Meunier et al. | 49/445 |
| 6,041,476 A | 3/2000 | deNormand | 16/197 |

* cited by examiner

Primary Examiner—Anthony Knight
Assistant Examiner—William D Hutton, Jr.
(74) Attorney, Agent, or Firm—Testa, Hurwitz & Thibeault, LLP

(57)    **ABSTRACT**

Disclosed are apparatus for a block and tackle window balance to be incorporated in single and double hung window assemblies. In one embodiment the block and tackle window balance includes a roller secured within a bottom guide to increase range of travel of a window sash.

**23 Claims, 10 Drawing Sheets**





FIG. 1
PRIOR ART

200



210
202
212
203
218
221
220
207
208

225
205
230
240

245
242
235
239
243
216

215

# FIG. 2A
### PRIOR ART



FIG. 2B
PRIOR ART

200



210

202

203

212

205

206

207

208

213

214

216

215

# FIG. 3

## PRIOR ART



FIG. 4A



## FIG. 4B



FIG. 5



FIG. 6



FIG. 7B
PRIOR ART



FIG. 7A
PRIOR ART



FIG. 8B



FIG. 8A

US 6,598,264 B2

1

# BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER

## TECHNICAL FIELD

This invention relates to block and tackle window balance devices for single and double hung windows and, more particularly, to a block and tackle window balance device that provides an increased range of travel within a window frame.

## BACKGROUND INFORMATION

Hung window assemblies generally include a window frame, a lower window sash, an upper window sash, a pair of window jambs, two sets of jamb pockets, and at least one window balance device for offsetting the weight of a window sash throughout a range of travel within the window frame. Block and tackle window balance devices use a combination of a spring and pulleys located within a channel to balance the weight of the window sash at any position within the jamb pockets.

In some block and tackle window balance devices, the channel containing both the spring and pulleys is attached to the window sash, and a cord, which connects the pulleys together, is attached to a jamb mounting hook that is connected to a side jamb. A disadvantage of this type of device is that the travel distance of the window sash is limited by some of the pulleys located within the rigid channel interfering with the jamb mounting hook that attaches the window balance to the window jamb.

## SUMMARY OF THE INVENTION

In general, in one aspect, the invention relates to a block and tackle window balance device for use with single and double hung windows that affords increased window opening travel distance. In one embodiment, the block and tackle window balance device includes a channel, a spring with a first end and a second end, a translatable pulley block unit, a fixed pulley block unit, a cord, a top guide, and a bottom guide with a bottom guide roller. The top and bottom guides are connected to opposite ends of the channel. The spring, the translatable pulley block unit, and the fixed pulley block unit are all located within the channel. The first end of the spring and the fixed pulley block unit are fixed at opposite ends of the channel. The second end of the spring is connected to the translatable pulley block unit. The translatable and fixed pulley block units are connected by the cord. The cord is threaded around both the translatable and fixed pulley block units and extends around the bottom guide roller located within the bottom guide.

In another embodiment, the block and tackle window balance device includes a top guide including a top angled portion and a bottom portion. The bottom portion of the top guide is connected to one end of the channel. In still another embodiment, the top angled portion of the top guide is sized to receive a member from a window sash.

In yet another embodiment, the block and tackle window device includes a bottom guide that extends beyond the rigid channel. In still yet another embodiment, the bottom guide of the device further includes a channel to receive a portion of a window sash.

In general, in one aspect, the invention relates to a method of providing increased travel of a window sash slidably mounted in a window frame. The method includes three steps. A first step is to provide a window assembly that

2

includes a window frame with jambs with jamb pockets, an upper window sash, a lower window sash, and at least one block and tackle window balance device having a channel and a bottom roller for dispensing a cord. The channel has a first end and a second end. The bottom roller is mounted proximate to the second end of the channel with a first distance between the first end of the channel and the bottom roller. A second step is to remove the block and tackle window balance device from the window assembly. A final step is to provide and to install an increased travel window balance device. The increased window balance device has a channel with a first end and a second end and a bottom guide roller for dispensing a cord. The bottom guide roller is mounted proximate to the second end of the channel and a second distance is defined as the length between the first end of the channel and the bottom guide roller. The second distance of the increased window balance device is greater than the first distance of the removed block and tackle window balance device.

The foregoing and other objects, aspects, features, and advantages of the invention will become more apparent from the following description and from the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention.

FIG. 1 is a perspective view of a double hung window.

FIG. 2A is a perspective view of a prior art block and tackle window balance.

FIG. 2B is another perspective view of the prior art block and tackle window balance of FIG. 2A with one of two side walls of the U-shaped channel removed.

FIG. 3 is a perspective rear view of the prior art block and tackle window balance.

FIG. 4A is a perspective view of an embodiment of a block and tackle window balance of the invention.

FIG. 4B is perspective view of the block and tackle window balance of FIG. 4A with one of two side walls of the U-shaped channel removed.

FIG. 5 is a perspective view of an embodiment of a block and tackle window balance of the invention mounted within a window jamb.

FIG. 6 is an enlarged front view of a top guide of the block and tackle window balance of FIG. 4A attached to a cam.

FIG. 7A is a front view showing a closed position of a window assembly with prior art block and tackle window balances.

FIG. 7B is a front view showing an open position of the window assembly with prior art block and tackle window balances.

FIG. 8A is a front view showing a closed position of a window assembly with an embodiment of a block and tackle window balances of the invention.

FIG. 8B is a front view showing an open position of a window assembly with block and tackle window balances of the invention.

## DETAILED DESCRIPTION

Referring to FIG. 1, shown is a double hung window assembly **100** in which a block and tackle window balance constructed in accordance with the teachings of the present

US 6,598,264 B2

3

invention can be used. The double hung window assembly 100 includes a window frame 102, a lower window sash 104, an upper window sash 106, and a pair of window jambs 107. Within each window jamb 107, jamb pockets 108 are defined. The lower window sash 104 and upper window sash 106 slide vertically within the jamb pockets 108. Generally, window balances are attached to the lower and upper window sashes 104, 106 to balance the weight of the window sashes at any vertical position within the jamb pockets 108.

FIGS. 2A, 2B, and 3 show perspective views of a prior art block and tackle window balance 200. FIG. 2A shows the prior art block and tackle window balance 200 in full, whereas FIG. 2B shows the prior art block and tackle window balance 200 with one side wall of a rigid U-shaped channel 205 cut away so that components within the window balance 200 are more visible. FIG. 3 shows a rear view of the window balance 200.

The block and tackle window balance 200 includes a spring 220, a translatable pulley unit 230, a fixed pulley unit 235, a roller 239, and a cord 240 all housed with the rigid U-shaped channel 205. Attached to the two ends of the rigid U-shaped channel 205 with fasteners 212, 216 are a top guide 210 and a bottom guide 215 that are used to connect the window balance 200 to either the upper or lower window sashes 104, 106 and to help guide the vertical motion of the window balance 200 within the jamb pockets 108. The top guide 210 includes an upper portion 202 and a lower portion 203. The upper portion 202 of the top guide 210 is angled and is sized to be received by a member attached to a window sash, such as a cam. The bottom guide 215 includes a back portion 213, best seen in FIG. 3, that encases a portion of the rigid channel 205. Within the back portion 213 of the bottom guide 215 is a channel 214 sized to receive a portion of a window sash.

The rigid U-shaped channel 205 has a back wall 206 and two side walls 207, 208 that in combination form the U-shape. The rigid U-shaped channel 205 serves as an external frame to which the components of the window balance 200 can be secured. The rigid U-shaped channel 205 also keeps components located within the rigid U-shaped channel 205 free of debris and particulate matter. The spring 220, the translatable pulley unit 230, the fixed pulley unit 235, and the roller 239 are located inside the rigid U-shaped channel 205. Both of the translatable pulley unit 230 and the fixed pulley unit 235 include one or more pulleys rotatable around respective axles.

Components within the rigid U-shaped channel 205 work in combination to create a force to counterbalance the weight of the attached sash at any vertical position within the window frame 102. These components are attached to each other such that a first end 219 of the spring 220 is connected to the translatable pulley unit 230, and the translatable pulley unit 230 is connected to the fixed pulley unit 235 and the roller 239 via the cord 240. A pulley in the fixed pulley unit 235 and the roller 239 may be contained in a frame 236. To secure the components within the rigid U-shaped channel 205, the second end 221 of the spring 220 and the frame 236 are fixed to opposite ends of the rigid U-shaped channel 205 via respective fasteners 218, 243. The frame 236 is also used to secure a pulley axle 237 and a roller axle 238, around which the pulley in the fixed pulley unit 235 and the roller 239 respectively rotate. A first distance "AA" 275 is defined by a length extending between the upper portion 202 of the top guide 210 and the roller axle 238. The spring 220 and the translatable pulley unit 230 are connected together by hooking the first end 219 of the spring 220 through an upper slot

4

opening 229 in a frame 225. The frame 225 houses the translatable pulley unit 230 and a pulley axle 232 around which a pulley in the translatable pulley unit 230 rotates. The cord 240, which can be a rope, string, or cable, has a first end 241 and a second end 242. The first end 241 of the cord 240 is secured to the frame 225 and the second end 242, which is a free cord end, is threaded through the translatable pulley unit 230, the fixed pulley unit 235, and the roller 239, thereby connecting all three components together. After the cord 240 connects the three components together, a jamb mounting attachment 245 is secured to the second end 242 of the cord 240. When the prior art window balance 200 is located in the jamb pocket 108, the jamb mounting attachment 245 engages an opening 430 (FIG. 5) within one of the jamb pockets 108, securing the window balance 200 to the window jamb 107.

The spring 220 provides the force required to balance the sashes. The spring 220 is extended when the second end 242 of the cord 240 with the jamb mounting attachment 245 is pulled, causing the frame 225 to move within the rigid U-shaped channel 205 towards the frame 236, which is fixed. As the frame 225 moves towards the frame 236, the spring 220 is extended.

FIGS. 4A and 4B show an embodiment of a block and tackle window balance 300 in accordance with the teachings of the present invention. The window balances 300 act to counterbalance the weight of the window sashes 104, 106 at any vertical position within the window frame 102. FIG. 4A show one perspective view of the window balance 300 and FIG. 4B shows another perspective view of the same balance, but with a side wall of the rigid U-shaped channel 305 removed. The window balance 300 includes the rigid U-shaped channel 305, a top guide 310, a bottom guide 315, a spring 320, a translatable pulley unit 330, a fixed pulley unit 335, a bottom guide roller 350, and a cord 340. The top guide 310 and the bottom guide 315 are fixed to the rigid U-shaped channel 305 by fasteners 312, 316. The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to help guide the movement of the block and tackle window balance 300 within the jamb pocket 108. The top guide 310 may include a top angled portion 302 and a bottom portion 303 as shown in FIGS. 4A and 4B. The bottom guide 315 is also used for connection and guidance purposes, but the bottom guide 315 further serves as a frame for housing the bottom guide roller 350. The bottom guide 315 extends beyond the rigid U-shaped channel 305 and, therefore, the bottom guide roller 350 is located outside of the rigid U-shaped channel 305. A back portion 313 of the bottom guide 315 may include a channel 314 for receiving a portion of the window sash, as depicted in FIG. 5. Some windows have a groove running along a bottom rail of the sash. On conventional balances, the bottom guide can drop into this groove so a manufacturer needs to use a shorter balance to avoid dropping into the groove. This effectively reduces the amount of travel, because shorter balances have to be used. The bottom guide 315 of the present invention is configured so the contact point of the bottom guide 315 to the sash is higher on the balance 300 so the groove is avoided and a longer balance with a greater spring force can be used. This can afford increased force for balancing the sash at any vertical position, as well as increased amount of travel resulting from the longer balance.

The spring 320, the translatable pulley unit 330, and the fixed pulley unit 335 are located within the rigid U-shaped channel 305. In the embodiment shown in FIGS. 4A and 4B, the translatable pulley unit 330 includes two pulleys 326,

US 6,598,264 B2

5

327 that are rotatable about a single pulley axle 328, however, in other embodiments, the translatable pulley unit 330 may contain one or more pulleys rotatable about the pulley axle 328. Similarly, the fixed pulley unit 335, as shown in FIGS. 4A and 4B, includes two pulleys 331, 332 that rotate about a single pulley axle 333; however, in other embodiments, the fixed pulley unit 335 may contain one or more pulleys that rotate about the pulley axle 333. A first end 319 of the spring 320 is fixed with respect to the rigid U-shaped channel 305 via a fastener 318. In the disclosed embodiment, the fastener is a rivet; however the fastener could also be a support member welded between the two side walls of the rigid U-shaped channel 305, a hook secured to or formed in the rigid U-shaped channel 305, or any other device which secures the first end 319 of the spring 320 to the rigid U-shaped channel 305. The second end 321 of the spring 320 is attached to a frame 325, which houses the translatable pulley unit 330. To connect the spring 320 to the frame 325, the second end 321 of the spring 320 hooks through an opening 329 in the frame 325. The cord 340 has a first end 341 and a second end 342. The first end 341 of the cord 340 is attached to the frame 325 through a frame opening 322. The second end 342 is attached to a jamb mounting hook 345. The cord 340 is threaded through the translatable pulley unit 330, the fixed pulley unit 335, and around the bottom guide roller 350, connecting the three components together. The cord 340 in the disclosed embodiment is a string, however it may also be a rope, or a cable. Both the fixed pulley unit 335 and the bottom guide roller 350 are fixed with respect to the rigid U-shaped channel 305. The fixed pulley unit 335 is housed within a frame 336 and rotates around the pulley axle 333. The frame 336 is secured within the rigid U-shaped channel 305 with a fastener 337. In an alternative embodiment, the fixed pulley unit 335 rotates around an axle supported between side walls of the rigid U-shaped channel 305. In yet another alternative embodiment, the fixed pulley unit 335 can be integral with the bottom guide 315 and as a result, fasteners 337 and 316 can be eliminated because tension of the spring 320 will keep the bottom guide 315 engaged with or connected to the rigid U-shaped channel 305. The bottom guide roller 350 is located within the bottom guide 315 and rotates around a bottom guide axle 352. A second distance "BB" 375 is defined as the length extending between the top angled portion 302 of the top guide 310 and the bottom guide axle 352. It should be noted that the second distance "BB" 375 is greater than the first distance "AA" 275 of the window balance 200.

To use the block and tackle window balance 300 within the window assembly, the balance is connected to both the window jamb 107 and to either the lower window sash 104 or the upper window sash 106. Referring to FIG. 5, the block and tackle window balance 300 is attached to the window jamb 107 via the jamb mounting hook 345. The jamb mounting hook 345 is secured within an opening 430 within the jamb pocket 108. The window balance 300 is then connected to a window sash by inserting a portion of the window sash into the channel 314 of the bottom guide 315 and connecting a cam 405 mounted on the top of the window sash 400 to the top angled portion 302 of the top guide 310, as shown in FIG. 6.

The spring 320 of the window balance 300 creates the force required to counterbalance the weight of the window sash. However, because the bottom guide roller 350 is located in the bottom guide 315, instead of within the rigid U-shaped channel 305 as in prior art balances, window sashes with the block and tackle window balances 300 as

6

disclosed in this application provide greater travel distance. FIG. 7A is an illustration of a window assembly 500 with two prior art window balances 200 attached to a lower window sash 504. In FIG. 7A, the lower window sash 504 is in a closed position. FIG. 7B shows the window assembly 500, but with the lower window sash 504 in a fully open position. The standard travel distance of a window sash attached to the prior art window balance 200 is labeled "CC" 520 in FIG. 7B. The window sash 504, as shown in FIGS. 7A and 7B, is prevented from achieving a greater travel distance by the roller 239, located within the rigid U-shaped channel 205, hitting the jamb mounting hook 245.

FIGS. 8A and 8B show a schematic of the window assembly 600 with block and tackle balances 300 of the present invention. FIG. 8A shows the window assembly 600 in the closed position, while FIG. 8B shows the window assembly 600 in the fully open position. Because the bottom guide roller 350 is mounted within the bottom guide 315 instead of within the rigid U-shaped channel 305, the window sash 604 can travel a greater distance before the bottom guide roller 350 hits the jamb mounting hook 345, resulting in a greater travel distance, labeled "DD" 530 in FIG. 8B. It should be noted that the distance "DD" 530 is greater than the distance "CC" 520. The greater travel distance is an important feature, because it allows for an increased window clearance that will help persons who are using the window assembly as an emergency

Variations, modifications, and other implementations of what is described herein will occur to those of ordinary skill in the art without departing from the spirit and the scope of the invention as claimed. Accordingly, the invention is to be defined not by the preceding illustrative description but instead by the spirit and scope of the following claims.

What is claimed is:

1. A block and tackle window balance device comprising:

a channel comprising a first end and a second end;

a top guide connected to the first end of the channel;

a bottom guide connected to the second end of the channel;

a bottom guide roller rotatably mounted in the bottom guide;

a fixed pulley block unit connected to the channel;

a translatable pulley block unit moveable within the channel;

a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and

a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

2. The device of claim 1 wherein the bottom guide roller is located external to the channel.

3. The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash.

4. The device according to claim 1 wherein a portion of the bottom guide is external to the channel.

5. The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash.

6. The device of claim 1 wherein the fixed pulley block unit comprises a frame, an axle, and at least one pulley rotatable around the axle.

US 6,598,264 B2

7

7. The device according to claim 6 wherein the axle is located within the frame.

8. The device according to claim 1 wherein the fixed pulley block unit is connected to the channel with a support member.

9. The device according to claim 1 wherein the translatable pulley block unit comprises a frame, an axle within the frame, and at least one pulley rotatable around the axle.

10. The device according to claim 1 wherein the top guide includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel.

11. The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide.

12. A window assembly comprising:

a window frame with two jambs with jamb pockets;

at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and

at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising:
channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel;
a bottom guide roller rotatably mounted in the bottom guide;
a fixed pulley block unit connected to the channel;
a translatable pulley block unit moveable within the channel;
a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and
a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

13. A window balance device comprising:

a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and

8

a bottom guide roller rotatably mounted in the bottom guide.

14. The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto.

15. The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto.

16. The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed.

17. The device of claim 13 wherein the bottom guide further comprises a bottom guide axle for mounting the roller.

18. A window balance device comprising:

a channel comprising a first end and a second end;

a top guide connected to the first end of the channel;

a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and

a bottom guide roller rotatably mounted in the bottom guide.

19. The device according to claim 18 wherein the bottom guide roller is located external to the channel.

20. The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel.

21. The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed.

22. The device of claim 18 wherein the bottom guide further comprises a bottom guide axle for mounting the roller.

23. A window balance device comprising:

a bottom guide connected to an end of a window balance channel, the bottom guide slidable in a jamb pocket when installed in a window frame, the bottom guide including:
a bottom guide axle mounted within the bottom guide, the bottom guide axle located outside the window balance channel; and
a bottom guide roller rotatably mounted on the bottom guide axle.

* * * * *

# EXHIBIT 2



US006820368B2

(12) **United States Patent**
Uken et al.

(10) Patent No.: **US 6,820,368 B2**
(45) Date of Patent: **Nov. 23, 2004**

(54) **SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW**

(75) Inventors: **Stuart J. Uken**, Sioux Falls, SD (US); **Gary R. Newman**, Valley Springs, SD (US); **Lawrence J. VerSteeg**, Sioux Falls, SD (US)

(73) Assignee: **Amesbury Group, Inc.**, Amesbury, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/446,279**

(22) Filed: **May 23, 2003**

(65) **Prior Publication Data**

US 2003/0192257 A1 Oct. 16, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 10/044,005, filed on Jan. 11, 2002, now Pat. No. 6,679,000.

(60) Provisional application No. 60/261,501, filed on Jan. 12, 2001.

(51) **Int. Cl.**[7] .............................. **E05D 15/22**; E05F 1/00

(52) **U.S. Cl.** .............................. **49/181**; 49/176; 49/446; 16/197

(58) **Field of Search** .......................... 49/181, 183, 184, 49/185, 186, 445, 446, 449, 455, 453, 454, 176, 177, 161; 292/174, 175, DIG. 63, DIG. 47, DIG. 37; 16/197

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,007,212 A | 10/1911 | Lasersohn |
| 1,312,665 A | 8/1919 | Almquist |
| 2,178,533 A | 10/1939 | Viehweger |
| 2,952,884 A | 9/1960 | Dinsmore |
| 3,007,194 A | 11/1961 | Griswold |
| 3,105,576 A | 10/1963 | Jones et al. |
| 3,461,608 A | 8/1969 | Johnson |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| CA | 2382933 | 4/2002 |
|---|---|---|

OTHER PUBLICATIONS

BSI's Hidden Advantage: It's as Easy as 1–2–3, Balance Systems—BSI, Amesbury Group, Inc., 2001. (3 pgs.), no month available.

(List continued on next page.)

*Primary Examiner*—Hugh B. Thompson, II
(74) *Attorney, Agent, or Firm*—Testa, Hurwitz & Thibeault, LLP

(57) **ABSTRACT**

The invention relates to a snap lock balance shoe and balance systems to be incorporated in pivotable double hung windows and installation methods of such systems. In one embodiment, the snap lock balance shoe includes a pair of retractable tabs that partially extend through openings within an inverted window balance. In one embodiment of the method, an elongated end of the balance shoe is inserted into a window jamb and then rotated into position.

**11 Claims, 13 Drawing Sheets**



US 6,820,368 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,497,999 A | 3/1970 | Hendra |
| 3,529,381 A | 9/1970 | Grossman |
| 3,676,956 A | 7/1972 | Taylor et al. |
| 3,732,594 A | 5/1973 | Mills |
| 3,869,754 A | 3/1975 | Foster |
| 4,028,849 A | 6/1977 | Anderson |
| 4,068,406 A | 1/1978 | Wood ........................... 49/181 |
| 4,079,549 A | 3/1978 | Wood ........................... 49/181 |
| 4,089,085 A | 5/1978 | Fitzgibbon |
| 4,190,930 A | 3/1980 | Prosser |
| 4,300,316 A | 11/1981 | Ficurilli |
| 4,332,054 A | 6/1982 | Paist et al. ................... 16/197 |
| 4,506,478 A | 3/1985 | Anderson ................... 49/181 |
| 4,510,713 A | 4/1985 | Anderson ................... 49/175 |
| 4,610,108 A | 9/1986 | Marshik ..................... 49/181 |
| 4,697,304 A | 10/1987 | Overgard |
| 4,930,254 A | 6/1990 | Valentin ..................... 49/181 |
| 4,941,285 A | 7/1990 | Westfall ..................... 49/176 |
| 4,949,425 A | 8/1990 | Dodson et al. |
| 4,958,462 A | 9/1990 | Cross ......................... 49/181 |
| 5,069,001 A | 12/1991 | Makarowski ............... 49/176 |
| 5,127,192 A | 7/1992 | Cross ......................... 49/181 |
| 5,140,769 A | 8/1992 | Hickson et al. |
| 5,189,838 A | 3/1993 | Westfall ..................... 49/181 |
| 5,251,401 A | 10/1993 | Prete et al. ................. 49/181 |
| 5,301,467 A | 4/1994 | Schmidt et al. ............. 49/181 |
| 5,353,548 A | 10/1994 | Westfall |
| 5,371,971 A | 12/1994 | Prete |
| 5,377,384 A | 1/1995 | Riegelman ................... 16/193 |
| D355,262 S | 2/1995 | Chancy et al. |
| 5,445,364 A | 8/1995 | Tibbals, Jr. |
| 5,448,858 A | 9/1995 | Briggs et al. |
| 5,452,495 A | 9/1995 | Briggs |
| 5,463,793 A | 11/1995 | Westfall |
| 5,530,991 A | 7/1996 | deNormand et al. |
| 5,553,903 A | 9/1996 | Prete et al. ................. 292/163 |
| 5,566,507 A | 10/1996 | Schmidt et al. |
| 5,572,828 A | 11/1996 | Westfall ..................... 49/181 |
| 5,615,452 A | 4/1997 | Habbersett ................. 16/194 |
| 5,632,117 A | 5/1997 | Prete et al. ................. 49/181 |

| | | |
|---|---|---|
| 5,632,118 A | 5/1997 | Stark ............................ 49/181 |
| 5,661,927 A | 9/1997 | Polowinczak et al. ........ 49/447 |
| 5,669,180 A | 9/1997 | Maier |
| 5,697,188 A | 12/1997 | Fullick et al. ................. 49/181 |
| 5,704,165 A | 1/1998 | Slocomb et al. ............. 49/181 |
| 5,737,877 A | 4/1998 | Meunier et al. .............. 49/445 |
| 5,802,767 A | 9/1998 | Slocomb et al. ............. 49/181 |
| 5,806,243 A | 9/1998 | Prete et al. .................. 49/181 |
| 5,806,900 A | 9/1998 | Bratcher et al. ............. 292/137 |
| 5,829,196 A | 11/1998 | Maier .......................... 49/181 |
| 5,855,092 A | 1/1999 | Raap et al. |
| 5,873,199 A | 2/1999 | Meunier et al. .............. 49/181 |
| 5,924,243 A | 7/1999 | Polowinczak et al. ........ 49/181 |
| 5,927,013 A | 7/1999 | Slocomb et al. ............. 49/181 |
| 5,943,822 A | 8/1999 | Slocomb et al. ............. 49/181 |
| 6,032,417 A | 3/2000 | Jakus et al. .................. 49/181 |
| 6,041,475 A | 3/2000 | Nidelkoff ..................... 16/193 |
| 6,041,476 A | 3/2000 | deNormand .................. 16/197 |
| 6,041,550 A | 3/2000 | Tix .............................. 49/404 |
| 6,058,653 A | 5/2000 | Slocomb et al. ............. 49/181 |
| 6,119,398 A | 9/2000 | Yates, Jr. |
| D434,637 S | 12/2000 | Habeck et al. |
| 6,155,615 A | 12/2000 | Schultz ....................... 292/163 |
| 6,161,335 A | 12/2000 | Beard et al. |
| 6,178,696 B1 | 1/2001 | Liang ........................... 49/185 |
| 6,226,923 B1 | 5/2001 | Hicks et al. |
| 6,467,128 B1 | 10/2002 | Damani |
| 6,470,530 B1 | 10/2002 | Trunkle |
| D467,490 S | 12/2002 | Uken et al. |
| 6,622,342 B1 | 9/2003 | Annes et al. |
| 6,679,000 B2 | 1/2004 | Uken et al. |
| 2002/0092241 A1 | 7/2002 | Uken et al. |
| 2002/0129463 A1 | 9/2002 | Newman |

## OTHER PUBLICATIONS

BSI Tilt Balance Systems, Balance Systems—BSI, Amesbury Group, Inc., 1996–2001. (4 pgs.), no month available.

Crossbow Balance! Another New Balance in BSI's Quiver, Balance Systems—BSI, Amesbury Group, Inc., Jun. 7, 1999. (3 pgs.).



FIG. 1



PRIOR ART

FIG. 2A



FIG. 2B



FIG. 3A



FIG. 3B



FIG. 3C



210

230

FIG. 3D



210

240

250

250

FIG. 3E



210

250

FIG. 3F



FIG. 4



**FIG. 5A**



**FIG. 5B**



FIG. 6A

FIG. 6B



FIG. 6C

FIG. 6D





FIG. 9



FIG. 10A

FIG. 10B

FIG. 11A

FIG. 11B

FIG. 12A

FIG. 12B

FIG. 13A

FIG. 13B

US 6,820,368 B2

1

# SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW

## RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 10/044,005 entitled Snap Lock Balance Shoe and System for a Pivotable Window filed on Jan. 11, 2002, now U.S. Pat. No. 6,679,000, which application incorporates by reference in its entirety and claims priority to U.S. Provisional Patent Application Ser. No. 60/261,501 entitled Snap Lock Balance Shoe and System for a Pivotable Window filed on Jan. 12, 2001.

## FIELD OF THE INVENTION

This invention relates to a window balance system for use in a pivotable window assembly.

## BACKGROUND OF THE INVENTION

This invention relates to the field of tilt-in windows. More particularly this invention relates to a balance shoe of a window balance system used in conjunction with a pivot bar mounted on a window sash for rotating the window sash relative to a window frame.

Typical pivotable double hung windows include two window sashes disposed in tracks located in a window frame to allow vertical sliding movement of the sashes. Pivot bars are provided to allow rotational movement of a pivotable window sash about the pivot bars to facilitate cleaning of glazing. To control vertical movement, window balances are used so that the window sashes remain in a position in which they are placed. Balance shoes are used to guide the rotational movement of the window sashes with respect to the window frame. Typically, the balance shoes are coupled to window balances with a connecting member. See, for example, U.S. Pat. No. 6,119,398, entitled "Tilt Window Balance Shoe Assembly with Three Directional Locking" issued to H. Dale Yates, Jr., the disclosure of which is herein incorporated by reference in its entirety.

One of the problems with balance shoes and window balances for pivotable double hung windows is that they are difficult to install. In order to install a pivotable double hung window with balance shoes and window balances, the following installation steps typically must be followed. First, before the window frame is assembled, the balance shoes are inserted into jamb tracks. Next, connecting members are used to attach the balance shoes to the window balances. The balance shoes generally have an opening to accept the pivot bars that are mounted on window sashes. Finally, the sashes are made operable by inserting the pivot bars into the balance shoes and rotating the window sash up to a vertical position in the jamb tracks. The installation process is rather complex and difficult. Repair costs for replacing balance shoes are also significant. In order to change a malfunctioning or failed balance shoe, the jamb tracks either need to be deformed or replaced to gain access to the problematic balance shoe for removal and replacement.

## SUMMARY OF THE INVENTION

In general, in one aspect, the invention relates to a balance shoe. The balance shoe includes a frame, a locking member at least partially disposed within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within a window balance. Embodiments of the invention can include the

2

following features. The connecting device can include one or more retractable tabs that engage the window balance directly. The frame can further include a frame pocket sized to receive a fastener. The cam can include at least one camming surface and a keyhole opening for receiving a pivot bar attached to a window sash. The cam is at least partially housed within the frame and is disposed within a space enclosed by the locking member. Upon rotating the cam with the pivot bar, the locking member engages the window jamb. In one embodiment, the locking member includes two opposing ends integrally connected by a spring member. The cam is located within a space between the opposing ends of the locking member, and upon rotating the cam with the pivot bar, the opposing ends engage the window jamb. In another embodiment, the locking member includes a plate, which is parallel to a back surface of the frame. The cam is located within a space between the plate and the frame such that rotating the cam with the pivot bar forces the plate to engage the window jamb.

In another aspect, the invention relates to an inverted window balance system for use in a pivotable double hung window assembly. The inverted window balance system includes a rigid U-shaped channel with a plurality of openings in the channel walls for securing the contents in the channel, which include an extension spring, a system of pulleys, a cord to connect the extension spring via the system of pulleys with the window sash, and a balance shoe. The balance shoe includes a frame, a locking member at least partially disposed within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within the rigid U-shaped channel. Embodiments of this aspect of the invention can include the following features. At least a portion of the balance shoe is disposed within the rigid U-shaped channel. The connecting device can include one or more retractable tabs for engaging the rigid U-shaped channel. The retractable tabs can partially extend through at least one of the plurality of openings in the rigid U-shaped channel. The balance shoe can be further secured to the rigid U-shaped channel with a fastener that interfaces with a frame pocket in the balance shoe. The cam can include at least one camming surface and a keyhole opening for receiving a pivot bar attached to a window sash. The cam is at least partially housed within the frame and is disposed within a space enclosed by the locking member. Upon rotating the cam with the pivot bar, the locking member engages the window jamb. In one embodiment, the locking member includes two opposing ends integrally connected by a spring member. The cam is located within a space between the opposing ends of the locking member, and upon rotating the cam with the pivot bar, the opposing ends engage the window jamb. In another embodiment, the locking member includes a plate, which is parallel to a back surface of the frame. The cam is located within a space between the plate and the frame such that rotating the cam with the pivot bar forces the plate to engage the window jamb.

In still another aspect, the invention relates to a method of installing an inverted window balance system within a window jamb in a window frame. The method includes four basic steps. The first step is to provide an inverted window balance system that includes a rigid U-shaped channel with a plurality of openings in the channel walls for securing the contents in the channel, an extension spring and a system of pulleys disposed within the rigid U-shaped channel, a cord to connect the extension spring via the system of pulleys with the window sash, and a balance shoe. The balance shoe includes a frame, a locking member located at least partially

US 6,820,368 B2

3

4

within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within the rigid U-shaped channel. The frame of the balance shoe has a frame bottom surface, a frame front surface, and two frame edge surfaces. The second step is to insert the inverted window balance system into a jamb track of the window jamb, such that an axis extending along a longitudinal direction of the rigid U-shaped channel is perpendicular to a back wall of the jamb track and an axis that is perpendicular to the two frame edge surfaces is parallel to the back wall while the frame front surface faces a side wall of the jamb track. The third step is to rotate the window balance system within the jamb track 90 degrees about the axis extending along the longitudinal direction of the rigid U-shaped channel, such that the frame front surface faces in a downward direction. The final step is to rotate the window balance system 90 degrees about the axis that is perpendicular to the two frame edge surfaces, such that the frame bottom surface faces in the downward direction.

These and other features of the invention will be made apparent from the following description taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention.

FIG. 1 is a perspective view of a pivotable double hung window assembly;

FIG. 2A is a rear view of inverted window balance system for use with a prior art balance shoe;

FIG. 2B is a rear view of a window balance;

FIG. 3A is one perspective view of an embodiment of a snap lock balance shoe of the present invention;

FIG. 3B is another perspective view of the embodiment of the snap lock balance shoe of FIG. 3A;

FIG. 3C is a rear view of one embodiment of a snap lock inverted balance system;

FIG. 3D is a bottom view of one embodiment of a snap lock balance shoe;

FIG. 3E is a front view of one embodiment of a snap lock balance shoe;

FIG. 3F is a side view of one embodiment of a snap lock balance shoe;

FIG. 4 is a perspective view of an embodiment of a snap lock balance shoe of the present invention;

FIG. 5A is one perspective view of another embodiment of a snap lock balance shoe of the present invention;

FIG. 5B is another perspective view of the embodiment of the snap lock balance shoe of FIG. 5A;

FIG. 6A is a perspective view of one embodiment of a balance shoe of the invention and a rigid U-shaped channel;

FIG. 6B is a perspective view showing the first step of connecting one embodiment of the balance shoe of the invention to the rigid U-shaped channel;

FIG. 6C is a perspective view showing the second step of connecting one embodiment of the balance shoe of the invention to the rigid U-shaped channel;

FIG. 6D is a perspective view showing one embodiment of the balance shoe of the invention connected to the rigid U-shaped channel;

FIG. 7A is a front view of a prior art balance shoe attached to a rigid U-shaped channel;

FIG. 7B is a side view of the prior art balance shoe attached to the rigid U-shaped channel;

FIG. 8A is a front view of one embodiment of a snap lock balance shoe of the present invention attached to a rigid U-shaped channel;

FIG. 8B is a side view of one embodiment of the snap lock balance shoe of the present invention attached to the rigid U-shaped channel;

FIG. 9 is a front view of a window assembly including one snap lock inverted window balance system of the present invention and one prior art inverted window balance system installed in a window frame;

FIG. 10A is a side view illustrating the first step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 10B is a front view illustrating the first step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 11A is a side view illustrating the second step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 11B is a front view illustrating the second step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 12A is a side view illustrating the third step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 12B is a front view illustrating the third step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 13A is a side view illustrating the last step of installing the snap lock inverted window balance system of the invention into the jamb track; and

FIG. 13B is a front view illustrating the last step of installing the snap lock inverted window balance system of the invention into the jamb track.

## DETAILED DESCRIPTION OF THE INVENTION

Referring to FIG. 1, shown is a pivotable double hung window assembly 100 in which a snap lock balance shoe constructed in accordance with the teachings of the present invention can be used. The pivotable double hung window assembly 100 includes of a window frame 102, a pivotable lower window sash 104, a pivotable upper window sash 106, and a window jamb 107. The pivotable lower window sash 104 and the pivotable upper window sash 106 slide vertically in jamb track 108 within the window jamb 107, while also being able to pivot about a pivot bar 114, as shown in FIG. 9.

FIG. 2A shows a rear view of an inverted window balance system 120 for use in the pivotable double hung window assembly 100. The inverted window balance system 120 includes an inverted window balance 122 used for balancing the weight of either the pivotable lower window sash 104 or the pivotable upper window sash 106 at any vertical position within the window frame 102, and a prior art balance shoe 110 for guiding the rotation of the pivotable lower window sash 104 about the pivot bar 114. A hanging connector 112 connects the prior art balance shoe 110 to the inverted window balance 122. The inverted window balance 122 includes an extension spring 126 connected to a system of pulleys 128 housed within a rigid U-shaped channel 130, and a cord 132 for connecting the system of pulleys 128 to a jamb mounting attachment 134. The jamb mounting

US 6,820,368 B2

5

attachment **134** is used for connecting the inverted window balance system **120** to the window jamb **107**. One difference between the inverted window balance **122** and a window balance **140**, shown in FIG. 2B, includes the placement of the extension spring **146** above a system of pulleys **148** within the rigid U-shaped channel **150**. A cord **152** connects the system of pulleys **148** to a jamb mounting attachment **154**. Another difference is that while inverted window balances **122** travel with either the pivotable lower window sash **104** or pivotable upper window sash **106**, the window balance **140** remains in a fixed position in the window jamb **107** due to an attachment to the window jamb **107** through an attachment opening **155**.

FIGS. 3A and 3B are perspective views of a snap lock balance shoe **210** of one embodiment of the present invention. The snap lock balance shoe **210** has a frame **211** in which is housed a connecting device **212**, a locking device **214**, and a cam **218**. The connecting device **212** can be integral with the frame **211** and attaches the snap lock balance shoe **210** directly within an inverted window balance **622**, shown in FIG. 3C. The inverted window balance **622** in combination with the snap lock balance shoe **210** forms a snap lock inverted window balance system **600**. The inverted window balance **622** includes an extension spring **626** connected to a system of pulleys **628** housed within a rigid U-shaped channel **630**, and a cord **632** for connecting the system of pulleys **628** to a jamb mounting attachment **634**, such as a cord terminal or hook.

In the depicted embodiment, the connecting device **212** is a pair of retractable tabs that snap into the rigid U-shaped channel **630**. In other embodiments, other connecting devices such as a screw, may be used to secure the frame **211** to the rigid U-shaped channel **630**. A fastener **635** located in the inverted window balance **622** can be used to further secure the connection between the snap lock balance shoe **210** and the inverted window balance **622**. To accommodate the fastener **635**, the snap lock balance shoe **210** can form a connection pocket **213** sized to receive or mate with the fastener **635**.

Another element of the snap lock balance shoe **210** visible in FIG. 3A is a keyhole opening **219** located within the cam **218**. The keyhole opening **219** is sized to accept the pivot bar **114** extending from either the pivotable lower window sash **104** or the pivotable upper window sash **106**, and serves as a connection point between the pivotable lower or upper window sash **104**, **106** and the snap lock balance shoe **210**. FIG. 3B shows a perspective view of the snap lock balance shoe **210** showing another face of the cam **218**.

In the embodiment shown in FIG. 3B, the locking device **214** surrounds the cam **218** and includes of a pair of opposing ends **215** connected by a spring member **216**. When the pivotable lower window sash **104** is tilted open, the pivot bar **114** rotates, which in turn rotates the cam **218** forcing the opposing ends **215** outward to engage the jamb track **108** of the window frame **102**, thereby locking the balance shoe **210** in that location.

FIGS. 3D–3F show different views of one of the embodiments of the snap lock balance shoe **210** of the invention. FIG. 3D is a bottom view of the snap lock balance shoe **210** that shows a frame bottom surface **230**. FIG. 3E is a front view of the same embodiment of the snap lock balance shoe **210** that illustrates a frame front surface **240**, and FIG. 3F is an side view that shows one of the two frame edge surfaces **250** of the snap lock balance shoe **210**.

FIG. 4 shows another embodiment of a snap lock balance shoe **310**. The snap lock balance shoe **310** has an elongated

6

frame **311** in which is housed a connecting device **312**, a locking device **314**, and a cam **318**. Within the cam is a keyhole opening **319** sized to receive the pivot bar **114**. The elongated frame **311** has a length L **325** that is greater than about 1.25 inches. When attached to the rigid U-shaped channel **630**, the balance shoe **310** extends further outward from the rigid U-shaped channel **630** than the balance shoe **210** attached to a similar sized rigid U-shaped channel **630**. The balance shoe **310** allows a fixed-sized rigid U-shaped channel **630** to be used in a larger window having a greater travel distance by extending the length of the entire window balance system by having a longer balance shoe **310**. One of the advantages of the present invention is that an installer can create a custom window balance system for a particular window by fitting a fixed-length rigid U-shaped channel **630** with an appropriately sized snap lock balance shoe.

Referring to FIGS. 5A–5B, shown is another embodiment of the present invention of a snap lock balance shoe **410**. The snap lock balance shoe **410** has a locking member **422** which engages a back wall of the jamb track **108** locking the balance shoe **410** in that location. The locking member **422** is partially disposed in the frame **411** and includes a plate **423** that engages the back wall of the jamb track **108**. The balance shoe **410** also includes a frame **411**, a connecting device **412**, and a cam **418**. The cam **418** is partially disposed within the frame **411** in a space enclosed by the locking member **422**. The cam **418** includes a keyhole opening **419** sized to receive the pivot bar **114**. Upon rotation of the cam **418** with the pivot bar **114**, the locking member **422** is forced away from the frame **411** towards the back wall of the jamb track **108**, thereby anchoring the balance shoe **410** in that location within the window frame **102**.

FIGS. 6A–6D show one embodiment of a method for securing the snap lock balance shoe **210** within a rigid U-shaped channel **630** with multiple openings **638**. It should be noted that each opening **638** on one side of the rigid U-shaped channel **630** has a corresponding opening **638** on the other side of the rigid U-shaped channel **630** to form a pair of openings. The first step, shown in FIG. 6A, is to place a fastener **635**, such as a rivet, in one of the pairs of openings **638** in the rigid U-shaped channel **630**. The next step, as depicted in FIG. 6B, is to slide the snap lock balance shoe **210** into the rigid U-shaped channel **630** such that the fastener **635** is received in the connection pocket **213** of the snap lock balance shoe **210**. As shown in FIG. 6C, the snap lock balance shoe **210** is then rotated down so that the front frame surface **240** is aligned with a bottom wall **636** of the rigid U-shaped channel **630**. FIG. 6D shows the last step of attaching the snap lock balance shoe **210** within the rigid U-shaped channel **630**. In this step, the connecting device **212** of the snap lock balance shoe **210** snaps into one of the pairs of openings **638** located on the rigid U-shaped channel **630**. In alternative embodiments the connection device **212** of the snap lock balance shoe **210** can extend through off-set openings in the rigid U-shaped channel **630**. In some embodiments, the snap lock balance shoe **210** is attached to the rigid U-shaped channel **630** with the fastener **635**. In other embodiments, the snap lock balance shoe **210** is attached to the rigid U-shaped channel **630** without the fastener **635**. It should also be noted that in some embodiments, the snap lock balance shoe **210** can be aligned and secured to the rigid U-shaped channel **630** such that the front frame surface **240** faces upwards instead of downwards as depicted in FIG. 6D.

FIG. 7A is a front view of the prior art balance shoe **110** attached to the rigid U-shaped channel **130**. The rigid

US 6,820,368 B2

7

U-shaped channel 130 is connected to the prior art balance shoe 110 by the hanging connector 112. No part of the prior art balance shoe 110 lies within the rigid U-shaped channel 130. FIG. 7B is a side view of the prior art balance shoe 110 attached to the rigid U-shaped channel 130 illustrating channel openings 137. Fasteners (not shown) are installed through the channel openings 137 to secure the hanging connector 112 to the rigid U-shaped channel 130.

Referring to FIGS. 8A and 8B, shown is an embodiment of the snap lock balance shoe 210 of the present invention attached to the rigid U-shaped channel 630. The snap lock balance shoe 210 is directly attached within the rigid U-shaped channel 630 by a connecting device 212 located on the frame 211 of the snap lock balance shoe 210. The connecting device 212 extends through a pair of openings 638 located on the rigid U-shaped channel 630.

FIG. 9 is a front view of a pivotable double hung window assembly 800 in which an inverted window balance 122 is attached to a prior art balance shoe 110 by using the hanging connector 112, and the inverted window balance 622 is attached to the snap lock balance shoe 210 of an embodiment of the present invention. Pivot bars 114, as shown in FIG. 9, are secured to the pivotable lower window sash 104. The pivot bars 114 are slidably receivable by both the prior art balance shoe 110 and the snap lock balance shoe 210 and serve as connections between the pivotable lower window sash 104 and respective inverted window balances 122, 622.

An advantage of the type of balance shoe presently disclosed is that the snap lock balance shoe 210 is attached within the rigid U-shaped channel 630 resulting in a longer rigid U-shaped channel 630 than in the inverted balance systems 120 for a given window sash. The longer rigid U-shaped channel 630 of the inverted window balance 622 allows for the use of longer extension springs that provide greater control of the vertical positioning of the window sash than a shorter rigid U-shaped channel 130 with a shorter extension spring. Another advantage of the present invention is that the snap lock balance shoe 210 contains a smaller number of parts than prior art balance shoes 110.

One installation method used to place a snap lock inverted window balance system 600 within the jamb tracks 108 is schematically illustrated in the remaining figures. The snap lock inverted window balance system 600 includes one inverted window balance 622 and one snap lock window balance 210. FIGS. 10A, 11A, 12A, and 13A show the installation method from a side view, while FIGS. 10B, 11B, 12B, and 13B show the method from a front view. The installation method involves an orientation step, a first rotation step, and a second rotation step FIGS. 10A and 10B show the orientation step in the installation method. In the orientation step, the snap lock inverted window balance system 600 is inserted the jamb tracks 108 such that an axis CC 510 in FIG. 10A is perpendicular to a back wall 530 of the jamb tracks 108, while an axis DD 520 in FIG. 10A is parallel to the back wall 530 and the frame front surface 240 is adjacent to a side wall 532 of the jamb tracks 108. FIGS. 11A and 11B show the snap lock inverted window balance system 600 inserted in the jamb tracks 108 as well as an arrow 550 indicating the direction of rotation of the snap lock inverted window balance system 600 required to complete the first rotation step. The first rotation step involves rotating the snap lock inverted window balance system 600 90-degrees about the axis CC 510 such that the frame front surface 240 faces downward. FIGS. 12A and 12B show the snap lock inverted window balance system 600 after the

8

90-degree rotation around the axis CC 510 has been completed. The second rotation step involves a 90-degree rotation about the axis DD 520. An arrow 560 showing the direction of the second rotation step is shown in FIGS. 12A and 12B. FIGS. 13A and 13B show in two different views the snap lock inverted window balance system 600 after the installation method has been completed. The cord terminal or any other jamb mounting attachment 634 (see FIG. 9) can then be screwed or hooked into place to anchor the snap lock inverted window balance system 600.

The installation method just described can be carried out in reverse to remove the snap lock inverted window balance system 600 from the jamb track 108 of the window frame 102 to allow for easy replacement of the snap lock balance shoe 210 or the snap lock inverted window balance system 600 itself. In order to replace inverted window balance systems 120 with prior art balance shoes 110, either the jamb tracks 108 need to be warped or completely removed in order to replace the prior art balance shoe 110 of the inverted window balance system 120.

While there have been described several embodiments of the invention, other variants and alternatives will be obvious to those skilled in the art. Accordingly, the scope of the invention is not limited to the specific embodiments shown.

What is claimed is:

1. A window balance system comprising:

a U-shaped channel comprising a plurality of openings;

a spring connected to a system of pulleys located within the U-shaped channel;

a cord with a first cord end and a second cord end, the fist cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and

a balance shoe, wherein the balance shoe comprises:

a frame comprising an enlarged first end and a second end, wherein at least a portion of the second end of the frame is disposed within the U-shaped channel;

a locking member proximal to the enlarged first end;

a cam in communication with the locking member; and

a connecting device comprising one or more resilient tabs for attaching the balance shoe within the U-shaped channel of the window balance, wherein the one or more resilient tabs extend at least partially through a corresponding number of the plurality of openings in the U-shaped channel.

2. A window balance system comprising:

a U-shaped channel comprising a plurality of openings;

a spring connected to a system of pulleys located within the U-shaped channel;

a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and

a balance shoe, wherein the balance shoe comprises:

a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;

a locking member proximal to the enlarged first end;

a cam in communication with the locking member; and

a connecting device for attaching the balance shoe within the U-shaped channel of the window balance.

US 6,820,368 B2

| 9 | 10 |

3. The window balance system of claim 2 wherein the connecting device comprises a rivet.

4. The window balance system of claim 2 wherein the connecting device comprises a screw.

5. The window balance system of claim 2 wherein the connecting device comprises a resilient tab.

6. The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

7. The window balance system of claim 2 wherein the locking member comprises two opposing ends integrally connected by a spring member.

8. The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

9. The window balance system of claim 2 wherein the locking member comprises a plate, wherein the plate is parallel to a back surface of the enlarged first end of the frame.

10. The window balance system of claim 9 wherein the cam is at least partially housed within the enlarged first end of the frame wherein rotating the cam forces the plate of the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

11. The window balance system of claim 2 wherein the cam comprises at least one camming surface and a keyhole opening sized to receive a pivot bar.

* * * * *

# EXHIBIT 3

US005365638A

# United States Patent [19]

## Braid et al.

[11]    Patent Number:    **5,365,638**

[45]    Date of Patent:    **Nov. 22, 1994**

[54]    **SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS**

[76]    Inventors:    **Harold K. Braid**, The Sheilings, Braceborough, Lincolnshire, PE9 4NT; **Simon C. Braid**, 13, Crowson Way, Deeping, St. James, Lincolnshire, both of England

[21]    Appl. No.:    **7,628**

[22]    Filed:    **Jan. 21, 1993**

[30]    **Foreign Application Priority Data**

Jan. 21, 1992 [GB]    United Kingdom .............. 9201208.7
Feb. 25, 1992 [GB]    United Kingdom .............. 9204006.2
Mar. 4, 1992 [GB]    United Kingdom .............. 9204687.9

[51]    **Int. Cl.⁵** ............................................. E05D 13/00
[52]    **U.S. Cl.** ...................................................... 16/197
[58]    **Field of Search** ........................... 16/197, DIG. 16

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,732,594 | 1/1956 | Adams et al. | 16/197 |
| 2,873,472 | 2/1959 | Foster | 16/197 |
| 3,452,480 | 7/1969 | Foster | 16/197 |
| 3,992,751 | 11/1976 | Foster et al. | 16/197 |
| 4,227,345 | 10/1980 | Durham | |
| 5,157,808 | 10/1992 | Sterner | 16/197 |

### FOREIGN PATENT DOCUMENTS

825513  12/1959  United Kingdom .
1505782  3/1978  United Kingdom .
2253874  9/1992  United Kingdom .

*Primary Examiner*—P. Austin Bradley
*Assistant Examiner*—Chuck Y. Mah
*Attorney, Agent, or Firm*—Steven H. Bazerman

[57]    **ABSTRACT**

A mounting element and assembly for a sash frame tensioner used in a sash window frame to support the window in any desired open position, the assembly comprising a channel section member and a sash frame support element slidable in said channel section member. A coiled ribbon spring having a free outer end thereof engaged with said sash frame support member, and a mounting element, the mounting being disposed between the sash frame support member and a coiled body portion of said coiled ribbon spring with a free end of said coiled ribbon spring disposed alongside said mounting, said mounting being secured to said channel section member, directly or indirectly, and in use impinging upon an outer surface of said coiled body portion to retain said coiled body portion in position during uncoiling of said coiled ribbon spring as said sash support member is moved away from said coiled body portion.

**8 Claims, 4 Drawing Sheets**







FIG.1.

FIG.2.

FIG.3.



FIG.4.



FIG.5.



FIG.6.



FIG.7.



FIG.8.

95            95



FIG.9.

110

102

100

95            95

112        108



FIG.10.



FIG.11.



FIG.12.

5,365,638

1

# SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS

## BACKGROUND OF THE INVENTION

The invention relates to a mounting for a coiled ribbon spring and is particularly, though not exclusively, applicable to sash springs used in sash frame tensioning arrangements for windows.

Such coiled ribbon springs are in the form of a flat coil with an open area at their center and two free ends, an outer one on the outside of the coil and one on the inside; the springs being similar in construction to clock springs except that the inner free end is not (as in a clock spring) secured to a fixed point.

It is known in the art to mount such coiled ribbon springs on a drum within a hollow channel in a window frame by means of a screw or other fixing, about which the spring is able to uncoil as an outer free end of the spring attached to a window sash moves away from the coil as the sash is moved. The drum may be arranged to be stationary or to rotate with the spring, through the drum is provided only to guide the spring and is not operatively secured thereto (thus, if the spring were unwound too far, it would be unwound completely from the drum).

It is a feature of these known mountings that the spring is supported from the open space within the coil so that an upper part of the coil rests on the drum with a lower part of the coil slung below the drum and not supported thereby. It is, as stated above, a feature of such springs that the inner free end of the spring is not secured to any point (on the drum or elsewhere) such springs being referred to in some instances as "constant tension" springs.

The drum is merely to provide a reaction member and as a means of retaining the body of the spring loosely in position in the channel as its free outer end is uncoiled.

It has been a disadvantage of this known type of mounting that the spring is not silent in use, possibly due to relative movement between the inner, free end of the spring and the spring support drum.

The present invention seeks to overcome this disadvantage.

## SUMMARY OF THE INVENTION

The invention provides a mounting assembly comprising a channel section member, a sash frame support element slidable in said channel section member, a coiled ribbon spring having a free outer end thereof engaged with said sash frame support member, and a mounting element, the mounting being disposed between the sash frame support member and a coiled body portion of said coiled ribbon spring with a free end of said coiled ribbon spring disposed alongside said mounting, said mounting being secured to said channel section member, directly or indirectly, and in use impinging upon an outer surface of said coiled body portion to retain said coiled body portion in position during uncoiling of said coiled ribbon spring as said sash support member is moved away from said coiled body portion.

The present invention also provides a mounting element for use in the assembly set forth above, the mounting comprising a body portion having means for securing the mounting in a channel portion of a sash frame or

2

other abutment and having a support surface disposed so as to impinge upon an outer surface of the spring coil.

In normal circumstances the channel section member will in use be mounted substantially vertically and thus said mounting element will support an outer undersurface of said coiled body portion from below. Thus, normally the sash frame support member will be disposed in use beneath the mounting element which is itself disposed beneath the coiled body portion.

It will be understood that the mounting element is to be operatively disposed between the spring body portion and the sash frame support member.

Preferably, the mounting element comprises a body portion having an aperture therein to receive, in use, a fixing screw by which the mounting element may be secured to said frame or abutment, an upper surface of the body portion being concavely curved to support the curved outer undersurface of the spring, thus providing said support surface.

In this inventive arrangement the spring merely rests on the mounting element which acts as a reaction member which the spring abuts as a free outer end, attached to the sash, is unwound. (Ideally, there is a slight tension in the spring when at rest so there is no likelihood of the spring being displaced should the sash frame be inverted for any reason).

The mounting element may be provided with inter-engagement formations by which a plurality of such elements may be stackingly inter-engaged, thus enabling a plurality of coiled ribbon springs to be used at a single location, only one fixing element or screw being required to secure the said stack against movement as the sash frame support member moves. The inter-engagement formations may be in the form of tooth-like projections cooperable with corresponding complementary detentes in another such mounting element. The inter-engagement formations may in addition or as an alternative be formed so as to provide an interference fit with formations of another mounting element or a "snap fit" therewith.

Alternatively, the mounting element may be configured such that there is a hub portion having an aperture therein to receive, in use, a fixing screw by which the mounting element may be secured to the frame or abutment; the hub portion being disposed such that in use the spring encircles such hub portion, the mounting element having an arm portion slung below said hub portion and disposed so as to support said outer undersurface of said spring.

In this arrangement, the hub portion loosely impales the spring body portion but in normal circumstances the hub portion does not support the spring, all the support is rendered by the arm portion slung below the hub portion. (In fact, in certain instances, i.e., when the spring is fully extended, the hub portion may also provide some minor support, though this is not its function).

The mounting element may be provided with formations conformed so as to cooperate with a portion of the sash frame within which the element is to be received, such that contact of said formations with said sash frame inhibits in a rotational, pivoting, or twisting sense of the element relative to the sash frame.

It will be apparent that the mounting element does not rotate or otherwise move with the spring but is substantially stationary when the spring is in operation.

5,365,638

3

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention will now be described by way of example only and with reference to the accompanying drawings in which:

FIG. 1 is a schematic side elevational view shown partly broken away of an assembly according to the invention showing a coiled ribbon spring supported by a mounting element according to the invention in a vertical channel section of a sash window;

FIG. 2 is a perspective view of the mounting element shown in FIG. 1;

FIG. 3 is a schematic side elevational view shown partly broken away of a mounting assembly for a coiled ribbon spring, showing a second mounting element according to the invention;

FIG. 4 is an exploded schematic view of the mounting assembly shown in FIG. 3;

FIG. 5 is a sectional view on line V—V of FIG. 3 with the coiled ribbon spring removed;

FIG. 6 is a schematic view on an enlarged scale of a portion of the mounting assembly shown in FIGS. 3, 4 and 5;

FIG. 7 is a schematic perspective view on an enlarged scale of a third mounting element according to the invention;

FIG. 8 is a schematic front view of a fourth mounting element similar to said third mounting element, according to the invention;

FIG. 9 is a partial schematic front view of a fifth mounting element similar to said third and fourth mounting elements according to the invention;

FIG. 10 is a schematic perspective view of the element of FIG. 9 shown on a larger scale and partially broken away so as to foreshorten the element;

FIG. 11 is a schematic perspective view of a fifth mounting element according to the invention being similar to that shown in FIG. 10 with certain differences; and

FIG. 12 is a partial front elevational view of a further mounting element similar to those shown in FIGS. 7 and 8 with certain differences.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The mounting assembly shown in FIG. 1 comprises a mounting element shown generally as M having a body portion 10 having a bore 12 therein to receive a fixing screw 14 by means of which the mounting element may be secured to a channel section 16 of a sash frame. The mounting element is dimensioned so as to be capable of insertion into the channel section from the side (i.e., without the necessity to slide the mounting element in from the end of the channel section).

The mounting is shown so fixed in FIG. 1. The body portion 10 has two upstanding walls 18 and disposed therebetween is a support surface 20 which is concavely curved to receive a coiled body portion 22 of a coiled ribbon spring shown generally as S, such that the coiled body portion 22 rests on said surface 20 between said walls. An outer free end 24 of the coiled ribbon spring S is provided with a hooked end 26 engageable with a sash frame support element 28 which forms part of a sliding sash. The sash frame support element 28 is slidable in the channel section 16 back and forth in the directions of arrows A, A', to move the sash.

It is to be noted that only a few coils of the coiled ribbon spring have been shown in the figures for sim-

4

plicity. In practice, many more coils wold be provided. Also, the thickness of the coiled ribbon spring has been exaggerated.

As the sash frame support element 28 (and so the sash) is moved downwardly in the direction of arrow A the coiled ribbon spring unwinds.

It may be the case during this unwinding that the curvature of the undersurface of the coiled body portion 22 does not conform exactly to the curvature of the surface 20. This is of no particular importance as the mounting only has a guiding and support function. It will e noted that the coiled ribbon spring is not supported from within the coil (shown generally as 30) as it is in the prior art. In the embodiment shown in FIGS. 3 to 6, the mounting element is in two parts 50, 52 which inter-engage to form a body portion 54 of reel-like structure but having a tube-like hub 56 which, in use, loosely impales a body portion of the coiled ribbon spring 58 but provides no support therefor.

A support portion 60 is provided slung below (when used in vertical sash frames as is usual) the tube 56 on part 52 and is provided with a curved support surface 62 the counterpart of the support surface 20 in the first embodiment. There is then provided on part 50 a bracing portion 64 inter-engageable with the under surface of the support portion 60 (see FIG. 5). As will be seen from FIG. 3 an outer undersurface of the coiled body portion of the coiled ribbon spring rests on the support surface 62, and is supported thereby. The hub 56 receives in use a fixing screw 64 by which the mounting may be fixed to a channel section member. FIG. 6 shows portions of coils 66, 68 and 70 of the spring, coil 70 being the outermost and having its outer undersurface supported by the support surface 62.

The mounting element shown in FIG. 7 is similar to that shown in FIGS. 1 and 2 except firstly that upstanding walls 78$^a$ and 78$^b$ are dissimilar and secondly that inter-engagement formations 80 are provided to enable a plurality of said elements to inter-engage in a stacked manner.

One of the upstanding walls 78$^a$ which is intended to lie against a back surface 82 (shown in broken line) of a channel section frame (shown as 84 in part hatched line) is provided with a pair of lateral ears 86 (only one of which is shown full line) which are intended to prevent rotation of the mounting element about a fixing screw (not shown) received, in use, in recessed bore 88. A concavely curved surface 20' is provided in similar manner to the embodiment of FIGS. 1 and 2. A second upstanding wall 78$^b$ has greater thickness than upstanding wall 78$^a$ and is provided with a plurality of tooth-like inter-engagement formations 80. There is provided a rebate 89 of a depth equal to the thickness of the upstanding wall 78$^b$ and provided with a plurality of detentes 90 corresponding to formations 80 such that the formations of one element as shown in FIG. 7 can engage in detentes 90 of another identical element lying above the first element. Thus, two or more coiled ribbon springs can be mounted one above the other with their mounting elements inter-engaged and only a lower one of said mounting elements need be secured with a screw as hereinbefore described.

FIG. 8 shows a fourth mounting element in accordance with the invention. This is closely similar to that shown in FIG. 7 except that at lower corner regions shown generally as 95, the element is rounded off for ease of insertion of the element into the sash frame.

5,365,638

**5**

The mounting element 100 shown in FIGS. 9 and 10 is similar to those of FIGS. 7 and 8 and some of those portions of the element similar to those provided in the elements shown in FIGS. 7 and 8 have been labelled with the same reference numerals. The mounting element 100 is devoid of the lateral ears 86 but instead is provided with a raised spine formation 102 whose width W is arranged such that it is a snug fit between open lip portions 104 of a channel section sash frame member 5 (shown in broken line in FIG. 10) within which the mounting element is to be operatively received. Thus, rotational, pivoting or twisting motion of the element 100 within the sash frame member 5 is inhibited. The element 100 is secured in the sash frame member 5 by a screw or other suitable fixing via a bore 108 in a similar manner to that of the element shown in FIG. 7. In the mounting element 100 a single inter-engagement projection formation 110 is provided, which is cooperable with a corresponding recess formation 112 of a second such element, so that elements can be "stacked" as in previous embodiments.

The mounting element 110 shown in FIG. 11 is similar to that shown in FIG. 10 except that the upstanding wall 78[b] is provided entirely by said raised spine formation 102. This is especially useful where space is limited, i.e., the depth of the coiled ribbon spring approaches the depth of the channel section sash frame member.

The mounting element shown in FIG. 12 is similar to those shown in FIGS. 7 and 8 and the same reference numerals have been used to indicate corresponding portions thereof. It has the rounded off regions 95 of the mounting element shown in FIG. 8 but differs in that it has a locating rib 102 like that shown in FIGS. 9 and 10 and the curved surface 20' (shown in broken line) is truncated at outer regions thereof by sloping shoulders 21 (shown in broken line). These enable a free end of a spring, supported by the mounting element in use, to be more easily fed between the mounting element and a wall 17 of a channel section 16, providing a funnel-like provision.

It will readily be apparent that the inter-engagement formations need not be as shown in the Figures but may be of any suitable shape, and number.

They may also be made to be interlocking, releasable or otherwise. It is to be understood that in the channel section partly shown in broken line in FIG. 7 the front retaining flanges shown in FIG. 1 at F have not been shown.

It will be noted that in none of the embodiments does the mounting element move with the spring.

It will be apparent that other methods of securing the mountings to a frame or abutment may be used. For example, two or more screw or other fixings would prevent any tendency for the mountings to move or rotate in use. Alternatively, pegs, spigots or catches could be used.

The previous descriptions of the preferred embodiments of the present invention are for purposes of illustration and are limited only by the provisions of the following claims.

What is claimed is:

1. A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said

**6**

side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having a first end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited.

2. The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means.

3. The mounting assembly of claim 2 wherein said mounting means has a body portion having an aperture therein, a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, a surface of said body portion being concavely curved, said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion.

4. The mounting assembly of claim 2 in which the mounting means has at least one inter-engagement means by which a plurality of such mounting means may be stacked in inter-engagement.

5. The mounting assembly of claim 4 in which the inter-engagement means comprises a tooth-like projection cooperable on said first mounting means with a corresponding complementary detente in a second mounting means.

6. The mounting assembly of claim 4 in which the inter-engagement means on said first mounting means is in an interference fit with an inter-engagement means on said second mounting means.

7. The mounting assembly of claim 4 in which the inter-engagement means is formed so as to provide a snap fit.

8. A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, said mounting means being secured in said channel means and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited.

\* \* \* \* \*

65

EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

        Plaintiffs,

    v.

THE CALDWELL MANUFACTURING
COMPANY,

        Defendant.

Civil Action No. 05-10020-DPW

## AMESBURY'S SECOND SUPPLEMENTAL RESPONSE TO
## CALDWELL'S INTERROGATORIES (NOS. 1 - 2, 13 - 16)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd. (collectively, "Amesbury") hereby provide the following supplemental response to The Caldwell Manufacturing Company's ("Caldwell") Interrogatories.

### GENERAL RESPONSES AND OBJECTIONS

Amesbury hereby incorporates by reference each of the General Objections set forth in Amesbury's Objections and Responses to Caldwell's First Set of Interrogatories (Nos. 1 – 19). These General Objections are incorporated into each of the below Specific Responses and Objections as if set forth there in full, even if not repeated therein:

### SPECIFIC RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 1:

Identify each individual Caldwell product, device, system, process, or service that Amesbury alleges infringes the Patents-In-Suit, and identify the specific claims of the Patents-In-Suit that are allegedly infringed by such product, the persons most knowledgeable and all documents concerning such allegations of infringement.

### RESPONSE:

Amesbury hereby incorporates by reference its previous responses and objections to Interrogatory No. 1. Subject to and without waiving the foregoing incorporated general and

specific objections, Amesbury preliminary states that, in addition to the products previously identified:

a) Caldwell's Quick-Tilt product and its accessory covers, Quick-Tilt*nc product, and all other similarly configured products, however designated, each infringe at least claims 1, 2, 3, and 8 of the '638 Patent;

b) Caldwell's Series 86xt product, and all other similarly configured products, however designated, each infringe at least claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, and 21 of the '264 Patent;

c) Caldwell's Series 97ez product, and all other similarly configured products, however designated, each infringe at least claims 2, 3, 6, 7, 8 and 11 of the '368 Patent; and

d) Caldwell's Series 97i product, Series 97ih product, and all other similarly configured products, however designated, each infringe at least claims 2, 3, 6, 7, 8 and 11 of the '368 Patent.

The Amesbury persons most knowledgeable of the above-listed infringement are Richard Koopmann, Howard Babbitt, and Gary Newman. Furthermore, the documents concerning such infringement are in Caldwell's possession, including the Patents-In-Suit, and documents illustrating and describing the accused Caldwell products.

Amesbury's investigations are ongoing and Amesbury reserves the right to supplement or amend this response.

## INTERROGATORY NO. 2:

Separately for each Accused Caldwell Product and for each claim of the Patents-In-Suit allegedly infringed by such product, using a claim chart format, indicate the element(s) component(s), or step(s) of such Accused Caldwell Product that allegedly meet or satisfy each individual limitation of such claim and specify whether each such limitation is met literally or under the doctrine of equivalents.

## RESPONSE:

Amesbury hereby incorporates by reference its previous responses and objections to Interrogatory No. 2. Subject to and without waiving the foregoing incorporated general and specific objections, Amesbury preliminarily states that the Caldwell products listed in the responses to Interrogatory No. 1 infringe the Patents-In-Suit literally. Should the court adopt a claim construction different from that on which Amesbury relies as establishing literal infringement, Amesbury asserts that those products infringe under the doctrine of equivalents as any such construction must encompass the embodiments disclosed by the patents, and the differences between those embodiments and the accused products are insubstantial.

Subject to and without waiving the foregoing general and specific objections, Amesbury

preliminarily demonstrates this infringement using the claim charts and annotated photographs in Appendices A, B, C, and D, all attached hereto.

## INTERROGATORY NO. 13:

Separately for each Accused Caldwell Product, state the total amount of damages allegedly sustained by Amesbury due to Caldwell's alleged infringement, Amesbury's theory of damages, and the method used to calculate damages including but not limited to whether the calculation is based on lost profits, reasonable royalty, or some other measure of damages, whether Amesbury alleges it is entitled to prejudgment interest on such damages and, if so, the interest rate and how that interest rate was determined and identify the persons most knowledgeable and all documents concerning such calculations.

## RESPONSE:

Amesbury hereby incorporates by reference the general and specific objections to this Interrogatory set forth in its original responses of July 5, 2005. Subject to those general and specific objections, Amesbury supplements its response as follows:

Amesbury has suffered damages from the infringement of its patents by the Caldwell products identified in Amesbury's responses to Interrogatory No. 1. The specific calculation of Amesbury's damages is properly the subject of expert analysis and is premature at this stage. Amesbury is also awaiting from Caldwell the production of additional documents necessary for accurate calculations of its damages. However, Amesbury restates that it is entitled to no less than a reasonable royalty for the use made by Caldwell of the inventions of the patents-in-suit, together with interest and costs, pursuant to 35 U.S.C. §§ 154 and 284. Amesbury is further entitled to a tripling of damages due to Caldwell's willful infringement of Amesbury's asserted patents. Amesbury reserves the right to modify these damages calculations and theories or seek damages under different theories as appropriate in view of the information discovered in this case or expert opinion.

## INTERROGATORY NO. 14:

Separately for each product of Amesbury as to which Amesbury alleges that it suffered damages due to lost sales, lost profits, or price erosion, state all facts concerning such damages, including but not limited to how the damages were calculated, identification of each Accused Caldwell Product alleged to have caused such damages, any alleged demand for the product of Amesbury in the market, the presence or absence of acceptable non-infringing substitute(s), and Amesbury's manufacturing and marketing capability to exploit the alleged demand, and identify the persons most knowledgeable and all documents concerning such facts.

## RESPONSE:

Amesbury hereby incorporates by reference the general and specific objections to this Interrogatory set forth in its original responses of July 5, 2005. Subject to those general and specific objections, Amesbury supplements its response as follows:

Amesbury has suffered lost profits due to the infringement of its patents by the Caldwell products identified in Amesbury's responses to Interrogatory No. 1. The specific calculation of Amesbury's damages, including the calculation of lost sales, lost profits, or price erosion, is properly the subject of expert analysis and is premature at this stage. Amesbury is also awaiting from Caldwell the production of additional documents necessary for accurate calculations of lost profits. However, Amesbury anticipates that the calculation of lost profits due to lost sales or price erosion will be based on prevailing legal and accounting standards, including without limitation the factors set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978). These factors include: (1) demand for the patented products; (2) absence of acceptable non-infringing substitutes; (3) Amesbury's manufacturing and marketing capacity to exploit the demand; and (4) the amount of profit Amesbury would have made.

Pursuant to Federal Rule of Civil Procedure 33(d), Amesbury identifies the following documents as containing information relevant to the *Panduit* factors set forth above: AME 1255 – AME 1273, AME 1501 – AME 1505, AME 1538 – AME 1656, AME 2137 – 2146, AME 2168 – 2169, and AME 2193 – AME 2202.

## INTERROGATORY NO. 15:

Separately for each product of Amesbury as to which Amesbury alleges that it has suffered damages due to lost sales, lost profits, or price erosion, state for each month during the alleged damages period, the number of each such product sold; the number of each such product made; the gross revenues and net revenues on sales on each such product; the gross profits on each such product; the net income or net profit/net income before taxes on each such product; the marginal profit on each such product; the cost of goods sold on each such product; and the fixed and variable costs of each such product; and identify the three (3) persons most knowledgeable and documents sufficient to evidence such facts.

## RESPONSE:

Amesbury hereby incorporates by reference the general and specific objections to this Interrogatory set forth in its original responses of July 5, 2005. Subject to those general and specific objections, Amesbury supplements its response as follows:

Pursuant to Federal Rule of Civil Procedure 33(d), Amesbury identifies the following documents from which information responsive to this interrogatory can be obtained: AME 1501 – AME 1505, AME 1538 – AME 1656, and AME 2193 – AME 2202.

## INTERROGATORY NO. 16:

Separately for each Accused Caldwell Product as to which Amesbury alleges that it is entitled to a reasonable royalty, state all facts concerning such reasonable royalty, including but not limited to how the royalty rate and royalty base were determined, and identify the persons most knowledgeable and all documents concerning such facts.

## RESPONSE:

Amesbury hereby incorporates by reference the general and specific objections to this Interrogatory set forth in its original responses of July 5, 2005. Subject to those general and specific objections, Amesbury supplements its response as follows:

Amesbury is entitled to no less than a reasonable royalty for the infringement of its patents by the Caldwell products identified in Amesbury's responses to Interrogatory No. 1. The specific calculation of Amesbury's damages, including the calculation of a reasonable royalty, is properly the subject of expert analysis and is premature at this stage. Amesbury is also awaiting from Caldwell the production of additional documents necessary for accurate calculations of lost sales, lost profits, and/or price erosion. However, Amesbury anticipates that the calculation of a reasonable royalty will be based on prevailing legal and accounting standards, including without limitation the factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). These factors include: (1) royalties received by Amesbury for the licensing of the patents-in-suit; (2) rates paid by Caldwell for the use of other patents comparable to the patents-in-suit; (3) the nature and scope of a hypothetical license, as exclusive or non-exclusive, or as restricted or non-restricted; (4) Amesbury's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or only granting licenses under special conditions designed to preserve that monopoly; (5) the commercial relationship between Amesbury and Caldwell; (6) the existing value of the invention to Amesbury as a generator of sales of its non-patented items; (7) the duration of the patents; (8) the established profitability of the products made under the patents, their commercial success, and their current popularity; (9) the utility and advantages of the patent property over the old modes and devices; (10) the nature of the patented inventions; (11) the extent to which Caldwell has made use of the invention; (12) the portion of the profit or selling price that is customary in the business; (13) the portion of the realizable profit that should be credited to the inventions as distinguished from non-patented elements; (14) expert opinion; and (15) the amount Amesbury and Caldwell would have agreed upon if both had been voluntarily trying to reach an agreement.

Pursuant to Federal Rule of Civil Procedure 33(d), Amesbury identifies the following documents as containing information relevant to the *Georgia-Pacific* factors set forth above: AME 1501 – AME 1505, AME 1538 – AME 1656, AME 2137 – 2146, AME 2168 – 2169, AME 2193 – AME 2202, C 00022 – C 00306, and the patents-in-suit attached as exhibits to the Complaint in this case.

Respectfully submitted,

Douglas J. Kline (BBO# 556680)
Jordan M. Singer (BBO# 651068)
Safraz W. Ishmael (BBO# 657881)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
Phone: (617) 570-1000
Fax: (617) 523-1231

Attorneys for Plaintiffs

**AMESBURY GROUP, INC.
AMESBURY SPRINGS LTD**.

Dated: January 12, 2006

## CERTIFICATE OF SERVICE

I, Safraz W. Ishmael, certify that I caused the foregoing AMESBURY'S SECOND SUPPLEMENTAL RESPONSE TO CALDWELL'S INTERROGATORIES (NOS. 1 – 2, 13 – 16) to be served on January 12, 2006 on the following via Federal Express:

Neal L. Slifkin, Esq.
HARRIS BEACH LLP
99 Garnsey Road
Pittsford, NY 14534
Fax: (585)-419-8801

Attorneys for Defendant

THE CALDWELL MANUFACTURING
COMPANY

Date: January 12, 2005                         _____
                                               Safraz W. Ishmael

LIBA/1665374

*Amesbury's Second  Supplemental Response to*        7
*Caldwell's Interrogatories*

**APPENDIX A**

**INFRINGEMENT OF**
**AMESBURY'S U.S. PATENT NO. 5,365,638**
**BY CALDWELL'S QUICK-TILT PRODUCTS**

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/1 | A mounting assembly comprising | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 638/1.A | a channel means | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also present when the Quick-Tilt product is installed into the window channel of a typical window frame, as such a window channel comprises a rear wall, side walls, and inwardly turned opposed flanges at the extremities of the side walls.<br><br>This element is also annotated in Figure 1, a page from a Quick-Tilt product catalog. |
| 638/1.A.1 | having a rear wall, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is annotated in Figure 1, a page from a Quick-Tilt product catalog. |
| 638/1.A.2 | side walls | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is annotated in Figure 1, a page from a Quick-Tilt product catalog. |

1

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/1.A.3 | and at extremities of said side walls, inwardly turned opposed flanges, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is annotated in Figure 1, a page from a Quick-Tilt product catalog. |
| 638/1.B | a sash frame support means slidable in said channel means, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, and also in Figure 2, a picture of the Quick-Tilt product, attached hereto. |
| 638/1.C | a coiled ribbon spring | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto. |
| 638/1.D | having a first end engaged with said sash frame support means, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Quick-Tilt product, attached hereto. |
| 638/1.E | and a means for mounting said coiled ribbon spring, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto. The plastic molding that supports the coiled ribbon spring 1.C is a means for mounting the coiled ribbon spring. |

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/1.F | the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto. |
| 638/1.G | and said mounting means being secured in said channel means, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a page from a Quick-Tilt product catalog.<br><br>This element is present when the mounting means is attached to a window frame, typically using a screw or other securing device. |
| 638/1.H | said mounting means having a raised spine | The Quick-Tilt product has a raised spine on its mounting means. This element is annotated in Figure 3, a picture of the Quick-Tilt product, attached hereto. |
| 638/1.I | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means | When installed into a window channel of a typical window frame, the raised spine of the Quick-Tilt product is in the same plane as the inwardly turned opposed flanges of the window channel (the channel means).<br><br>This element is also annotated in Figure 1, a page from a Quick-Tilt product catalog. |

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/1.J | whereby rotational motion of said mounting means is inhibited. | When the Quick-Tilt product is installed into a window channel by securing the mounting means to the window channel, typically using a screw, this act of securing the device into the channel and also any contact between the spine and the window frame inhibits rotational motion of the mounting means.<br><br>Alternatively or additionally, the raised spine functions to stiffen the mounting means, thereby inhibiting the cupping rotation of the mounting means; without the raised spine, the mounting means tends to cup into itself and therefore rotates. |
| 638/2 | The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. | This support surface element of the mounting means is annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto.<br><br>The support surface is disposed in contact with the outer surface of the coiled body portion of the coiled ribbon spring during rotational winding and unwinding movement of the coiled ribbon spring, such movement taking place as the sash support means moves up and down in the window channel. |
| 638/3 | The mounting assembly of claim 2 | |
| 638/3.A | wherein said mounting means has a body portion | The body portion of the mounting means is annotated in Figure 2. |
| 638/3.B | having an aperture therein, | The body portion of the mounting means has an aperture and the aperture is annotated in Figures 2 and 3. |

4

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/3.C | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, | This element is present when the Quick-Tilt product is installed in a window frame. A fixing screw, or equivalent, is positioned in the aperture to secure the mounting means to the window channel.<br><br>This element is also annotated in Figure 1. |
| 638/3.D | a surface of said body portion being concavely curved, | The surface of the body portion is concavely curved, as annotated in Figure 2. |
| 638/3.E | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | The coiled body portion of the coiled ribbon spring is in contact with the curved surface of, as shown annotated in Figure 2. |
| 638/8 | A mounting assembly comprising | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 638/8.A | a channel means having | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also present when the Quick-Tilt product is installed into the window channel of a typical window frame, as such a window channel comprises a rear wall, side walls, and inwardly turned opposed flanges at the extremities of the side walls.<br><br>This element is also annotated in Figure 1. |

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/8.A.1 | a rear wall, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1. |
| 638/8.A.2 | side walls | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1. |
| 638/8.A.3 | and at extremities of said side walls, inwardly turned opposed flanges, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1. |
| 638/8.B | a sash frame support means slidable in said channel means, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 2. |
| 638/8.C | a coiled ribbon spring | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 2. |

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/8.D | having an outer end engaged with said sash frame support means, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Quick-Tilt product, attached hereto. |
| 638/8.E | and a means for mounting said coiled ribbon spring, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto. |
| 638/8.F | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto. |
| 638/8.G | said mounting means being secured in said channel means | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a page from a Quick-Tilt product catalog.<br><br>This element is present when the mounting means is attached to a window frame, typically using a screw or other securing device. |
| 638/8.H | and the mounting means having projection means | The Quick-Tilt product mounting means has a raised projection or protrusion. This element is annotated in Figure 3, a picture of the Quick-Tilt product, attached hereto. |

7

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/8.I | positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, | When installed into a window channel of a typical window frame, the projection or protrusion of the Quick-Tilt product is in the same plane as the inwardly turned opposed flanges of the window channel (the channel means).<br><br>This element is also annotated in Figure 1. |
| 638/8.J | whereby rotational movement of the mounting means is inhibited. | When the Quick-Tilt product is installed into a window channel, contact between the projection and the flanges of the window channel inhibits rotational motion of the mounting means.<br><br>Alternatively or additionally, the projection or protrusion functions to stiffen the mounting means, thereby inhibiting the cupping rotation of the mounting means; without the projection or protrusion, the mounting means tends to cup into itself and therefore rotates. |

8

Figure 1



# Quick-Tilt*nc
### CONSTANT FORCE BALANCE

CALDWELL

*"New Construction" friendly Quick-Tilt*

If new construction debris was holding you back from considering a Constant Force balance, you now have a dependable solution with Caldwell's **Quick-Tilt*nc** balance.

Caldwell's pre-assembled **Quick-Tilt** Constant Force balance just got better with its evolution to the **Quick-Tilt*nc** – or "new construction" friendly version.   Until now most Constant Force balances weren't ready for the abuse caused by construction site dust and debris.  With the launch of **Quick-Tilt*nc**, air-borne contaminants are kept from lodging inside the moving coil assembly.   The integrated coil nest and cover is specifically engineered to keep the coils dust-free and operating in the smooth, quiet manner for which **Quick-Tilt** balances are renowned.

**Call us at 585-352-3790.  Let's talk about your window.**

**Quick-Tilt Product – Figure 2**





**Quick-Tilt Product – Figure 3**

1.D, 8.D

3.B

1.H, 8.H

**APPENDIX B**

**INFRINGEMENT OF**
**AMESBURY'S U.S. PATENT NO. 6,598,264**
**BY CALDWELL'S SERIES 86XT PRODUCT**

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1 | A block and tackle window balance device comprising: | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 264/1.A | a channel comprising | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |
| 264/1.A.1 | a first end | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |
| 264/1.A.2 | and a second end; | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1.B | a top guide connected to the first end of the channel; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 2, pictures of the Series 86xt product, attached hereto. |
| 264/1.C | a bottom guide connected to the second end of the channel; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 3, pictures of the Series 86xt product, attached hereto. |

2

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1.D | a bottom guide roller rotatably mounted in the bottom guide; | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 3, a picture of the Series 97ez product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is also present under the doctrine of equivalents, because the component of Caldwell's Series 86xt product annotated as 1.D in Figure 3 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result. _See Dawn Equipment Co. v. Kentucky Farms Inc._, 140 F.3d 1009, 1016 (Fed. Cir. 1998).<br><br>The roller of this claim element functions to allow further travel of the window sash, by being positioned lower in the balance than a conventional roller positioned above the bottom guide, to achieve the result of greater window egress.<br><br>Similarly, the element annotated as 1.D is a roller that functions to allow further travel of the window sash, by being positioned lower in the Series 86xt balance (relative to the position of the bottom roller in Caldwell's Series 86 balance), achieving the same result of greater window egress. |
| 264/1.E | a fixed pulley block unit connected to the channel; | Caldwell admits that this element is present in its Series 86xt product. _See_ Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1.F | a translatable pulley block unit moveable within the channel; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/1.G | a spring comprising | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figures 2 and 4, pictures of the Series 86xt product, attached hereto. |
| 264/1.G.1 | a first end | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figures 1 and 2, pictures of the Series 86xt product, attached hereto. |
| 264/1.G.2 | and a second end, | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figures 1 and 4, pictures of the Series 86xt product, attached hereto. |
| 264/1.G.3 | wherein the first end is fixed relative to the channel | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> As shown in annotated Figure 2, the first end of the spring 1.G.1 is connected to a fixed rivet and so is fixed relative to the channel. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1.G.4 | and the second end is connected to the translatable pulley block unit; | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>As shown in annotated Figure 4, the second end of the spring 1.G.2 is connected to the translatable pulley block unit. |
| 264/1.H | and a cord comprising | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, 4, and 5, a pictures of the Series 86xt product, attached hereto. |
| 264/1.H.1 | a first cord end | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 4. |
| 264/1.H.2 | and a second cord end, | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 5. |
| 264/1.H.3 | wherein the cord is threaded through the translatable pulley block unit | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1.H.4 | and the fixed pulley block unit | Caldwell admits that this element is present in its Series 86xt product. _See_ Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/1.H.5 | and extends around the bottom guide roller, | Caldwell admits that this element is present in its Series 86xt product. _See_ Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 5, a picture of the Series 86xt product, attached hereto.  As shown the cord extends around the bottom guide roller and exits at a terminal point where it is attached to a hook. |
| 264/1.H.6 | the first cord end being attached to the translatable pulley block unit | Caldwell admits that this element is present in its Series 86xt product. _See_ Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>As shown in Figure 4, the first cord end 1.H.1 is attached to the translatable pulley block unit. |
| 264/1.H.7 | and the second cord end being attachable to a jamb. | Caldwell admits that this element is present in its Series 86xt product. _See_ Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>As shown in Figure 5, the second cord end 1.H.2 is attached to a terminal hook thereby making the second cord end attachable to a jamb. |
| 264/2 | The device of claim 1 wherein the bottom guide roller is located external to the channel. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto.  As shown, at least a part of the bottom guide roller is located outside the channel. |
|  |  |  |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/3 | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | This element is annotated in Figure 2, a picture of the Series 86xt product, attached hereto. As shown, the product has a top angled portion sized to received a member of a window sash. |
| 264/4 | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | This element is annotated in Figure 7, a picture of the Series 86xt product, attached hereto. As shown, at least part of the bottom guide is outside of the channel. |
| 264/5 | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. |
| 264/6 | The device of claim 1 wherein the fixed pulley block unit comprises | This element is annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/6.A | a frame, | This element is annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/6.B | an axle, | This element is annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/6.C | and at least one pulley rotatable around the axle. | This element is annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/7 | The device according to claim 6 wherein the axle is located within the frame. | The axle element 6.B in Figure 3, passes through the pulley 6.C and through the frame 6.A. The part of the axle 6.B that passes through the frame 6.A is located within the frame. |
| 264/9 | The device according to claim 1 wherein the translatable pulley block unit comprises | The translatable pulley block united is annotated in Figure 4. |
| 264/9.A | a frame, | This element is annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/9.B | an axle within the frame, | This element is annotated in Figure 4, a picture of the Series 86xt product, attached hereto. The axle passes through the frame and therefore is within the frame. |
| 264/9.C | and at least one pulley rotatable around the axle. | This element is annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/10.A | The device according to claim 1 wherein the top guide includes a top angled portion | This element is annotated in Figure 2, a picture of the Series 86xt product, attached hereto. |
| 264/10.B | and a bottom portion, the bottom portion being connected to the first end of the channel. | This element is annotated in Figure 2, a picture of the Series 86xt product, attached hereto. |

8

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/11 | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | This element is annotated in Figure 3. As shown, the fixed pulley block unit 1.E includes a frame that is connected directly to the bottom guide and is therefore integral with the bottom guide. |
| 264/12 | A window assembly comprising: | |
| 264/12.A | a window frame with two jambs with jamb pockets; | When installed in a window frame, the Series 86xt product window assembly includes a window frame with two jambs with jamb pockets.<br><br>This element is also annotated in Figure 8, a page from a Series 86xt product catalog. |
| 264/12.B | at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | When installed in a window frame, the Series 86xt product window assembly includes an upper window sash and a lower window sash slidably receivable in the jamb pockets.<br><br>This element is also annotated in Figure 8, a page from a Series 86xt product catalog. |
| 264/12.C | at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | When installed in a window frame, the Series 86xt block and tackle window balance device is attached an upper window sash and the lower window sash.<br><br>This element is also annotated in Figure 8, a page from a Series 86xt product catalog. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/12.D | channel comprising a first end and a second end; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |
| 264/12.E | a top guide connected to the first end of the channel; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 2, pictures of the Series 86xt product, attached hereto. |
| 264/12.F | a bottom guide connected to the second end of the channel; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 3, pictures of the Series 86xt product, attached hereto. |

10

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/12.G | a bottom guide roller rotatably mounted in the bottom guide; | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 3, a picture of the Series 97ez product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is also present under the doctrine of equivalents, because the component of Caldwell's Series 86xt product annotated as 12.G in Figure 3 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.<br><br>The roller of this claim element functions to allow further travel of the window sash, by being positioned lower in the balance than a conventional roller positioned above the bottom guide, to achieve the result of greater window egress.<br><br>Similarly, the element annotated as 12.G is a roller that functions to allow further travel of the window sash, by being positioned lower in the Series 86xt balance (relative to the position of the bottom roller in Caldwell's Series 86 balance), achieving the same result of greater window egress. |
| 264/12.H | a fixed pulley block unit connected to the channel; | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/12.I | a translatable pulley block unit moveable within the channel; | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/12.J | a spring comprising | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 2 and 4, pictures of the Series 86xt product, attached hereto. |
| 264/12.J.1 | a first end | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Series 86xt product, attached hereto. |
| 264/12.J.2 | and a second end, | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/12.J.3 | wherein the first end is fixed relative to the channel | As shown in Figure 2, the first end 12.J.1 is connected to a fixed rivet and is therefore fixed relative to the channel. |
| 264/12.J.4 | and the second end is connected to the translatable pulley block unit; | As shown in Figure 4, the second end is connected to the translatable pulley block unit. |
| 264/12.K | and a cord comprising | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 3, 4 and 5, pictures of the Series 86xt product, attached hereto. |

12

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/12.K.1 | a first cord end | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/12.K.2 | and a second cord end, | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 5, a picture of the Series 86xt product, attached hereto. |
| 264/12.K.3 | wherein the cord is threaded through the translatable pulley block unit | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/12.K.4 | and the fixed pulley block unit | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/12.K.5 | and extends around the bottom guide roller, | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 5, a picture of the Series 86xt product, attached hereto. |
| 264/12.K.6 | the first cord end being attached to the translatable pulley block unit | As shown in Figure 4, the first cord end is attached to the translatable pulley block unit. |
| 264/12.K.7 | and the second cord end being attachable to a jamb. | As shown in Figure 5, the second cord end terminates at a hook, and so is attachable to a jamb. |

13

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/13 | A window balance device comprising: | |
| 264/13.A | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | This element is annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/13.B | a bottom guide roller rotatably mounted in the bottom guide. | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 3, a picture of the Series 97ez product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is also present under the doctrine of equivalents, because the component of Caldwell's Series 86xt product annotated as 13.B in Figure 3 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.<br><br>The roller of this claim element functions to allow further travel of the window sash, by being positioned lower in the balance than a conventional roller positioned above the bottom guide, to achieve the result of greater window egress.<br><br>Similarly, the element annotated as 13.B is a roller that functions to allow further travel of the window sash, by being positioned lower in the Series 86xt balance (relative to the position of the bottom roller in Caldwell's Series 86 balance), achieving the same result of greater window egress. |

14

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/14 | The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. As shown, at least a part of the bottom guide roller is located outside the channel. |
| 264/15 | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | This element is annotated in Figure 7, a picture of the Series 86xt product, attached hereto. As shown, at least part of the bottom guide is outside of the channel. |
| 264/16 | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. |
| 264/18 | A window balance device comprising: | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 264/18.A | a channel comprising a first end and a second end; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/18.B | a top guide connected to the first end of the channel; | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |
| 264/18.C | a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 3, pictures of the Series 86xt product, attached hereto. |

16

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/18.D | a bottom guide roller rotatably mounted in the bottom guide. | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 3, a picture of the Series 97cz product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is also present under the doctrine of equivalents, because the component of Caldwell's Series 86xt product annotated as 18.D in Figure 3 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.<br><br>The roller of this claim element functions to allow further travel of the window sash, by being positioned lower in the balance than a conventional roller positioned above the bottom guide, to achieve the result of greater window egress.<br><br>Similarly, the element annotated as 18.D is a roller that functions to allow further travel of the window sash, by being positioned lower in the Series 86xt balance (relative to the position of the bottom roller in Caldwell's Series 86 balance), achieving the same result of greater window egress. |
| 264/19 | The device of claim 18 wherein the bottom guide roller is located external to the channel. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. |

17

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/20 | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. |
| 264/21 | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. |

**Series 86xt – Figure 1**



Series 86xt – Figure 2



**Series 86xt – Figure 3**



6.B

1.H.4
12.K.4

6.C

6.A

1.E, 11,
12.H

1.C, 12.F, 13.A, 18.C

1.D, 12.G, 13.B, 18.D

Series 86xt – Figure 4



1.H.3
12.K.3

1.G.2, 12.J.2

9.C

9.B

9.A

1.F, 12.I

1.H.1, 12.K.1

**Series 86xt – Figure 5**



1.H.4

1.H.5

1.H.5, 12.K.5

1.H.2, 12.K.2

1.H.7
12.K.7

Series 86xt – Figure 6



5, 16, 21

4, 20

2, 14,19

Series 86xt – Figure 7



4, 15



CALDWELL    Series 86x
BLOCK & TACKLE SYSTEM

Extended travel
for sideload applications

C000498

**APPENDIX C**

**INFRINGEMENT OF**
**AMESBURY'S U.S. PATENT NO. 6,820,368**
**BY CALDWELL'S SERIES 97EZ PRODUCT**

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/2 | A window balance system comprising: | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 368/2.A | a U-shaped channel comprising a plurality of openings; | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. This element is also annotated in Figure 1, a picture of the Series 97ez product, attached hereto. |
| 368/2.B | a spring connected to a system of pulleys located within the U-shaped channel; | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. This element is also annotated in Figure 1, a picture of the Series 97ez product, attached hereto. |

1

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/2.C | a cord with | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figure 2, a picture of the Series 97ez product, attached hereto. |
| 368/2.C.1 | a first cord end | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figure 2, a picture of the Series 97ez product, attached hereto. |
| 368/2.C.2 | and a second cord end, | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figure 3, a picture of the Series 97ez product, attached hereto. |
| 368/2.C.3 | the first cord end connected and threaded through the system of pulleys, | As shown in Figure 2, the first cord end 2.C.1 is connected and threaded through a system of pulleys |
| 368/2.C.4 | the second cord end connected to a jamb mounting attachment; and | As shown in Figure 3, the second cord end 2.C.2 is connected to a device that serves as a jamb mounting attachment. |

2

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/2.D | a balance shoe, wherein the balance shoe comprises: | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/2.D.1 | a frame comprising an enlarged first end | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/2.D.2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/2.D.3 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figures 4 and 5, pictures of the Series 97ez product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is present under the doctrine of equivalents because the component of Caldwell's Series 97ez product annotated as 2.D.3 in Figures 4 |

3

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| | | and 5 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.

One function of the pocket, claimed by this claim element, is to further secure the balance shoe in the channel and to prevent rotation of the balance shoe (carrier) during shipment, handling, and in use. Specifically, when the shoe experiences certain torque forces, the pocket is forced against a rivet or fastener, thereby inhibiting and stopping unwanted rotation of the shoe.

The component labeled 2.D.3 in Figures 4 and 5 performs the same function of preventing unwanted rotation of the shoe (carrier). It performs this function in the same way by contacting a rivet. It achieves the same result of protecting and securing the balance shoe (carrier) in the channel.

Alternatively or additionally, this claim element is literally present and is annotated as 2.D.3' in Figure 4, and this claim element is also present under the doctrine of equivalents as the component labeled as 2.D.3' in Figure 4 performs substantially the same function, in substantially the same way to achieve substantially the same result, for at least the foregoing reasons. |

4

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/2.D.4 | a locking member proximal to the enlarged first end; | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/2.D.5 | a cam in communication with the locking member, and | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |

5

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/2.D.6 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 4, a picture of the Series 97ez product, attached hereto.

Regardless of claim construction, however, this claim element is present under the doctrine of equivalents because the component of Caldwell's Series 97ez product annotated as 2.D.6 in Figure 4 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.

The connecting device of this claim element functions to attach the balance shoe within the U-Shaped channel. It performs this function by connecting the shoe to the sides of the U-shaped channel and it achieves the result of integrating the shoe with the channel and maintaining the attachment during use.

The component annotated as 2.D.6 in Figure 4 is a rivet that functions to attach the balance shoe within the U-shaped channel, the same function as the connecting device of this claim. The element annotated as 2.D.6 performs the attaching function in the same way, by connecting the shoe to the sides of the U-shaped channel. It achieves the same result as the connecting device of the claim, of integrating the shoe with the channel and maintaining the attachment during use. |

6

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | As shown in Figure 4, the connecting device 2.D.6 is a rivet. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | As shown in Figure 4, the cam is at least partially housed in the enlarged end. Rotating the cam of the Series 97ez forces the locking member to engaged to a jamb track, when the shoe is installed into a window jamb. |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | |
| 368/7.A | two opposing ends | This element is annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/7.B | integrally connected by a spring member. | This element is annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | As shown in Figure 4, the cam is at least partially housed in the enlarged end. Rotating the cam of the Series 97ez forces the locking member to engaged to a jamb track, when the shoe is installed into a window jamb. |
| 368/11 | The window balance system of claim 2 | |

7

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/11.A | wherein the cam comprises at least one camming surface | This element is annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/11.B | and a keyhole opening sized to receive a pivot bar. | This element is annotated in Figure 6, a picture of the Series 97ez product, attached hereto.  The annotated opening is sized to receive a pivot bar. |

8





Series 97ez – Figure 1

Series 97ez – Figure 2



2.C.1

2.C.3

Series 97ez – Figure 3



2.C.4

2.C.2



Series 97ez – Figure 4



2.D.3

**Series 97ez – Figure 5**



Series 97ez – Figure 6

11.B

## APPENDIX D

## INFRINGEMENT OF
## AMESBURY'S U.S. PATENT NO. 6,820,368
## BY CALDWELL'S SERIES 97I(H) PRODUCTS

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97i(h) Products' |
|---|---|---|
| 368/2 | A window balance system comprising: | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 368/2.A | a U-shaped channel comprising a plurality of openings; | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a picture of the Series 97i(h) product, attached hereto. |
| 368/2.B | a spring connected to a system of pulleys located within the U-shaped channel; | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a picture of the Series 97i(h) product, attached hereto. |

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97i(h) Products |
|---|---|---|
| 368/2.C | a cord with | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 2 and 3, pictures of the Series 97i(h) product, attached hereto. |
| 368/2.C.1 | a first cord end | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Series 97i(h) product, attached hereto. |
| 368/2.C.2 | and a second cord end, | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 97i(h) product, attached hereto. |
| 368/2.C.3 | the first cord end connected and threaded through the system of pulleys. | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Series 97i(h) product, attached hereto. |

2

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 971i(h) Products |
|---|---|---|
| 368/2.C.4 | the second cord end connected to a jamb mounting attachment; and | Caldwell admits that this element is present in its Series 971i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 971i(h) product, attached hereto. |
| 368/2.D | a balance shoe, wherein the balance shoe comprises: | Caldwell admits that this element is present in its Series 971i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 971i(h) product, attached hereto. |
| 368/2.D.1 | a frame comprising an enlarged first end | Caldwell admits that this element is present in its Series 971i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 971i(h) product, attached hereto. |

3

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97i(h) Products |
|---|---|---|
| 368/2.D.2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. |
| 368/2.D.3 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | This element is annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. Each sidewall of the frame forms an opening through which the rivet passes and a central element forms a further opening with an endwall, and a central extension thereof, through which the rivet also passes. |
| 368/2.D.4 | a locking member proximal to the enlarged first end; | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. |

4

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 971(h) Products |
|---|---|---|
| 368/2.D.5 | a cam in communication with the locking member, and | Caldwell admits that this element is present in its Series 971(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 971i(h) product, attached hereto. |

5

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97i(h) Products |
|---|---|---|
| 368/2.D.6 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is present under the doctrine of equivalents because the component of Caldwell's Series 97ez product annotated as 2.D.6 in Figure 4 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.<br><br>The connecting device of this claim element functions to attach the balance shoe within the U-Shaped channel. It performs this function by connecting the shoe to the sides of the U-shaped channel and it achieves the result of integrating the shoe with the channel and maintaining the attachment during use.<br><br>The component annotated as 2.D.6 in Figure 4 is a rivet that functions to attach the balance shoe within the U-shaped channel, the same function as the connecting device of this claim. The element annotated as 2.D.6 performs the attaching function in the same way, by connecting the shoe to the sides of the U-shaped channel. It achieves the same result as the connecting device of the claim, of integrating the shoe with the channel and maintaining the attachment during use. |

6

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97i(h) Products |
|---|---|---|
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | This element is annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | As shown in Figure 4, the cam is at least partially housed in the enlarged end. Rotating the cam forces the locking member to engage a jamb track when the shoe is installed in a window jamb. |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | |
| 368/7.A | two opposing ends | This element is annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. |
| 368/7.B | integrally connected by a spring member. | This element is annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. |

7

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 971(h) Products |
|---|---|---|
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | As shown in Figure 4, the cam is at least partially housed in the enlarged end. Rotating the cam forces the locking member to engage a jamb track when the shoe is installed in a window jamb |
| 368/11 | The window balance system of claim 2 | |
| 368/11.A | wherein the cam comprises at least one camming surface | This element is annotated in Figure 5, a picture of the Series 971(h) product, attached hereto. |
| 368/11.B | and a keyhole opening sized to receive a pivot bar. | This element is annotated in Figure 5, a picture of the Series 971(h) product, attached hereto. |

**Series 97ih – Figure 1**



2.A

2.B



Series 97ih – Figure 2



Series 97ih – Figure 3



Series 97ih – Figure 4



Series 97ih – Figure 5

11.B

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD,

**DEFENDANT'S SUPPLEMENTED
ANSWERS TO PLAINTIFFS' FIRST
SET OF INTERROGATORIES**

Plaintiffs,

vs.

THE CALDWELL MANUFACTURING
COMPANY,

Civil Action No. 05-10020-DPW

Defendant.

Defendant the Caldwell Manufacturing Company ("Caldwell"), by its attorneys Harris Beach

PLLC, submits the following supplemental answers to plaintiffs' First Set of Interrogatories:

**INTERROGATORY NO. 4**:

For each Window Product identified in response to Interrogatory No. 1, separately state the

full factual and legal basis for Caldwell's assertion that the Window Product does not infringe any

claim of the patents-in-suit, identifying for each claim each element that Caldwell asserts is or is not

present in the Window Product, either literally or under the doctrine of equivalents, and any claim

construction relevant to Caldwell's assertion.

  **ANSWER**: Amesbury objects to this interrogatory in that is premature in that the

court has not construed the claims at issue.  Additionally, Caldwell objects to this interrogatory for

the reasons stated in response to Interrogatory No. 1 in that the definition of "Window Product" is

vague and overly broad.    Caldwell's preliminary claim charts are attached as Exhibit "A".

Caldwell reserves the right to supplement or amend these responses based on further discovery,

investigation or the Court's claim construction.

HARRIS BEACH ⅛
ATTORNEYS AT LAW

**INTERROGATORY NO. 6**:

State the full factual and legal basis for Caldwell's assertion that each of the patents-in-suit is invalid for failure to meet the requirements of the patent laws of the United States as set forth in, *inter alia*, 35 U.S.C. §§102, 103 and 112.

**ANSWER**:    Caldwell objects to this interrogatory in that it calls for legal conclusions.  Furthermore, Caldwell requires discovery from Amesbury to answer this interrogatory fully.  Subject to and without waiving these objections, Caldwell states as follows:

(1)    U.S. Patent No. 6,598,264:  The file history indicates that the only potentially novel element of this patent is the location of the bottom guide roller within the bottom guide.  This element is disclosed, or is obvious in light of, the following prior art references, either singly or in combination: (1) Prosser, U.S. Patent No. 3,091,797; (2) Thompson, U.S. Patent No. 6,840,011, (3) Wood, U.S. Patent No. 3,114,178, (4) Biro, U.S. Patent No. 3,449,862, (5) DeNormand, U.S. Patent No. 6,041,746, (6) Berndt, U.S. Patent No. 4,704,821, (7) Fitzgibbon, U.S. Patent No. 4,089,085, (8) a window balance product manufactured by or for Anderson Corporation that, upon information and belief, incorporated a part sold by Amesbury to Anderson as early as 1999, (9) Japanese Utility Model No. JITSUKAI S62-19485, (10) United Kingdom Patent No. GB1219927, (11) United Kingdom Patent No. GB1244324, and (12) additional prior art cited during the prosecution of the patent.  Additional prior art references may be found through additional prior art searches or in discovery, and Caldwell reserves the right to supplement this response.   Also, the patent is invalid to the extent that Amesbury seeks to construe the claims of this patent to cover rollers that are not attached directly to the bottom guide because, during prosecution of the patent, Amesbury distinguished certain prior art references, including *Biro*, supra, which disclosed a roller indirectly mounted to the bottom guide.

(2)    <u>U.S. Patent No. 6,820,368</u>: The file history indicates that the only potentially novel element of this patent is enlarged end of the balance shoe. The patent also discloses a "pocket" element. These elements are disclosed, or are obvious in light of, the following prior art references, either singly or in combination: (1) DeNormand, U.S. Pat. No. 6,041,746, (2) Berndt, U.S. Patent No. 4,704,821, (3) Schmidt, U.S. Patent No. 5, 301, 467, (4) additional prior art cited during the prosecution of the patent, (5) United Kingdom Patent Application No. 2280697A, (6) United Kingdom Patent Application No. 2236786A, (7) United Kingdom Patent Application No. 2292168A, (8) United Kingdom Patent No. 740223, (9) Japanese Utility Model JITSUKAI S56-171982, and (10) Japanese Utility Model JITSUKAI S63-3785. Additional references may be discovered, and Caldwell reserves the right to supplement this response. In addition, this patent is invalid to the extent that Amesbury argues that Caldwell's 97ez product infringes this patent because this argument requires a construction of the patent that would require two claim elements to correspond to a single part of Caldwell's product. Caldwell's products do not have both a "pocket ... adapted to mate with a rivet" **and** a "connecting device" as claimed, even assuming that the Caldwell device has any of those elements as those terms are defined by the patent claims and specification. To argue otherwise would render the patent ambiguous and invalid.

(3)    <u>U.S. Patent No. 5,365,638</u>: The file history indicates that the only potentially novel element of this patent is the raised spine that inhibits rotation of the mounting means. This element is disclosed, or is obvious in light of, the following prior art references, either singly or in combination: (1) Makarowksi, U.S. Patent No. 5,069,001, (2) Patterson, U.S Patent No. 2,088,866, (3) Osten, U.S. Patent No. 2,774,119, (4) Arlauskas, U.S. Patent No. 3,069,152, (5) Jones, U.S. Patent No. 3,105,576, (6) Anderson, U.S. Patent No. 3,711,995, (7) Anderson, U.S. Patent No. 3,795,076, (8) Anderson, 4,028,849, (9) Japanese Utility Model No. JIKKOHEI8-9334,

(9) Japanese Utility Model No. JIKKAIHEI4-119083, (10) Japanese Utility Model No. JIKKAIHEI41-112279, (11) additional prior art cited during the prosecution of the patent, (12) United Kingdom Patent No. 1287756, and (13) United Kingdom Patent No. 329996. Additional references may be discovered, and Caldwell reserves the right to supplement this response. Furthermore, to the extent that Amesbury claims a spine that does not inhibit rotation is covered by the claims, the patent is anticipated and/or obvious in light of Sterner, U.S. Patent No. 5,157,808, and is invalid for lack of enablement in that the specification only discloses a spine that inhibits rotational movement.

**INTERROGATORY NO. 10**:

State the full factual and legal basis for Caldwell's denial that its infringement of the patents-in-suit is willful, including, but not by way of limitation, identifying any legal advice or legal opinion relied upon by Caldwell in deciding to use, make, offer for sale, sell in, or import into, the United States, or in deciding to continue to use, make, offer for sale, sell in, or import into, the United States, any of the Window Products identified in response to Interrogatory No. 1.

**ANSWER**:    Caldwell objects to this interrogatory in that it is overly broad, calls for legal conclusions, and seeks material covered by the attorney-client privilege. Caldwell will not rely upon the opinion of counsel at trial. Caldwell declines to produce opinions of counsel regarding the validity and/or infringement of the patents-in-suit. Subject to and without waiving these objections, Caldwell states that it has a good faith basis for arguing that the patents-at-issue are invalid and/or not infringed, as outlined in its responses to Interrogatories Nos. 5 and 6 above, and as is evident from a comparison of Caldwell's products with the claims of the patents-in-suit. In addition, after Amesbury accused Caldwell of infringement, Caldwell withdrew its 97ez and 86xt products from the market, although Caldwell denies that those products infringed any of the patents-in-suit. Testimony

of Caldwell employees, including those disclosed in Caldwell's Rule 26 disclosures and Thomas E.

Batten, also are evidence of non-willfulness.

Dated: August _3/_, 2005

HARRIS BEACH PLLC

By: _____

Paul J. Yesawich, III
Neal L. Slifkin
David J. Edwards
Laura W. Smalley
*Attorneys for Defendant*
99 Garnsey Road
Pittsford, New York 14534
Telephone: 585-419-8800

-and-

BROWN & MICHAELS, P.C.
Christopher A. Michaels
Eugene S. Stephens
400 M&T Bank Building
118 North Tioga Street
Ithaca, New York 14850
Telephone: 607-256-2000

*Attorneys for Defendant*

TO:    GOODWIN PROCTER LLP
       Douglas J. Kline, Esq.
       Safraz W. Ishmael
       *Attorneys for Plaintiffs*
       Exchange Place
       Boston, MA 02109-2881
       Telephone: 617-570-1000

P:\CALDWELL\SuppIntResponses.doc
8/30/2005 2:57:26 PM

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK)
COUNTY OF MONROE ) SS.:


        Karen J. Jenness, being duly sworn, deposes and says that I reside in the Town of Irondequoit, New York; I am over twenty-one years of age, and am a legal secretary for the office of Harris Beach LLP.  That on the 31st day of August, 2005 before five-thirty o'clock p.m., at the City of Rochester, County of Monroe and State of New York, deponent served a copy of the annexed upon the following:

        Safraz W. Ishmael, Esq.
        Douglas J. Kline, Esq.
        GOODWIN PROCTER LLP
        Exchange Place
        Boston, MA  02109-2881


by causing a true copy thereof, properly and securely enclosed in a sealed wrapper for Federal Express marked for September 1, a.m. delivery.


                                           Karen J. Jenness

Sworn to before me this
31st day of August 2005

                                      HEATHER MCCURTY
Notary Public                         Notary Public, State Of New York
                                     Qualified In Monroe County
                                     Commission Expires March 9, 2006

HARRIS BEACH PLLC
ATTORNEYS AT LAW

**EXHIBIT A**

| Patent Claims 6,820,368 | Caldwell Series 97EZ | Caldwell Series 97i(H) |
|---|---|---|
| 1. A window balance system comprising: | Yes | Yes |
| a U-shaped channel comprising a plurality of openings; | Yes | Yes |
| a spring connected to a system of pulleys located within the U-shaped channel; | Yes | Yes |
| a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and | Yes | Yes |
| a balance shoe, wherein the balance shoe comprises: | Yes | Yes |
| a frame comprising an enlarged first end and a second end, wherein at least a portion of the second end of the frame is disposed within the U-shaped channel; | Yes | Yes |
| a locking member proximal to the enlarged first end; | Yes | Yes |
| a cam in communication with the locking member; and | Yes | Yes |
| a connecting device comprising one or more resilient tabs for attaching the balance shoe within the U-shaped channel | No -- the Caldwell balance does not have resilient tabs | No -- the Caldwell balance does not have resilient tabs |

| | | |
|---|---|---|
| of the window balance, wherein the one or more resilient tabs extend at least partially through a corresponding number of the plurality of openings in the U-shaped channel. | | |
| 2.   A window balance system comprising: | Yes | Yes |
| a U-shaped channel comprising a plurality of openings; | Yes | Yes |
| a spring connected to a system of pulleys located within the U-shaped channel; | Yes | Yes |
| a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and | Yes | Yes |
| a balance shoe, wherein the balance shoe comprises: | Yes | Yes |
| a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | No. The Caldwell balance does not have a pocket adapted to mate with a rivet. | Caldwell cannot state whether its 97(h) product has this claim element until the court construes the term "pocket." |
| | Yes | Yes |

| | | |
|---|---|---|
| a locking member proximal to the enlarged first end; a cam in communication with the locking member, and a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Yes<br><br>No -- the Caldwell balance does not have a connecting device as that term is/will be defined by the claims and specification. To the extent Amesbury claims that this product infringes, Amesbury's construction violates the "all elements" rule in that Amesbury is claiming that two elements of the claim correspond to a single part of Caldwell's product. | Yes<br><br>No -- the Caldwell balance does not have a connecting device as that term is/will be defined by the claims and specification. To the extent Amesbury claims that this product infringes, Amesbury's construction violates the "all elements" rule in that Amesbury is claiming that two elements of the claim correspond to a single part of Caldwell's product. |
| 3. The window balance system of claim 2 wherein the connecting device comprises a rivet. | Noh | No |
| 4. The window balance system of claim 2 wherein the connecting device comprises a screw. | No | No |
| 5. The window balance system of claim 2 wherein the connecting device comprises a resilient tab. | No | No |
| 6. The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; | No | No |

| | | |
|---|---|---|
| wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | | |
| 7. The window balance system of claim 2 wherein the locking member comprises two opposing ends integrally connected by a spring member. | No | No |
| 8. The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, <br><br> wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | No | No |
| 9. The window balance system of claim 2 wherein the locking member comprises a plate, <br><br> wherein the plate is parallel to a back surface of the enlarged first end of the frame. | No | No |

| | | |
|---|---|---|
| 10. The window balance system of claim 9 wherein the cam is at least partially housed within the enlarged first end of the frame | No | No |
| wherein rotating the cam forces the plate of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | No | No |
| 11. The window balance system of claim 2 wherein the cam comprises at least one camming surface and a keyhole opening sized to receive a pivot bar. | No | No |

P:\CALDWELL\Claim Chart 682\0368.doc
8/30/2005 2:59:18 PM

| Patent Claims 5,365,638 | | Caldwell Quicktilt |
|---|---|---|
| 1. | A mounting assembly comprising | Yes |
| | a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, | Yes |
| | a sash frame support means slidable in said channel means, | Yes |
| | a coiled ribbon spring having a first end engaged with said sash frame support means, | Yes |
| | and a means for mounting said coiled ribbon spring, | Yes |
| | the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, | Yes |
| | said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, | Yes |
| | said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited. | **No. The spine does not inhibit rotational motion. Rotational motion is inhibited through an entirely different mechanism.** |
| 2. | The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. | No |

| | |
|---|---|
| 3.    The mounting assembly of claim 2 wherein said mounting means has a body portion having an aperture therein,<br><br>a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means,<br><br>a surface of said body portion being concavely curved,<br><br>said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | No |
| 4.    The mounting assembly of claim 2 in which the mounting means has at least one inter-engagement means by which a plurality of such mounting means may be stacked in inter-engagement. | No |
| 5.    The mounting assembly of claim 4 in which the inter-engagement means comprises a tooth-like projection cooperable on said first mounting means with a corresponding complementary detente in a second mounting means. | No |
| 6.    The mounting assembly of claim 4 in which the inter-engagement means on said first mounting means is in an interference fit with an inter-engagement means on said second mounting means. | No |
| 7.    The mounting assembly of claim 4 in which the inter-engagement means is formed so as to provide a snap fit. | No |

| | |
|---|---|
| 8.    A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, | Yes |
| a sash frame support means slidable in said channel means, | Yes |
| a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, | Yes |
| the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | Yes |
| said mounting means being secured in said channel means and | Yes |
| the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited. | No.    The projection means does not inhibit rotational motion. Rotational motion is inhibited through an entirely different mechanism. |

| | Patent Claims 6,598,264 | Caldwell 86xt Product |
|---|---|---|
| 1. | A block and tackle window balance device comprising: | Yes |
| | a channel comprising a first and a second end; | Yes |
| | a top guide connected to the first end of the channel; | Yes |
| | a bottom guide connected to the second end of the channel; | Yes |
| | a bottom guide roller rotatably mounted in the bottom guide; | **No – Bottom roller is attached to channel separately from bottom guide** |
| | a fixed pulley block unit connected to the channel; | Yes |
| | a translatable pulley block unit moveable within the channel; | Yes |
| | a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and | Yes |
| | a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. | Yes |
| 2. | The device of claim 1 wherein the bottom guide roller is located external to the channel. | No |
| 3. | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | No |
| 4. | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | No |

1

| | | |
|---|---|---|
| 5. | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | No |
| 6. | The device of claim 1 wherein the fixed pulley block unit comprises a frame, an axle, and at least one pulley rotatable around the axle. | No |
| 7. | The device according to claim 6 wherein the axle is located within the frame. | No |
| 8. | The device according to claim 1 wherein the fixed pulley block unit is connected to the channel with a support member. | No |
| 9. | The device according to claim 1 wherein the translatable pulley block unit comprises a frame, an axle within the frame, and at least one pulley rotatable around the axle. | No |
| 10. | The device according to claim 1 wherein the top guide includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel. | No |
| 11. | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | No |
| 12. | A window assembly comprising: | |
| | a window frame with two jambs with jamb pockets; | |
| | at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | |

| | |
|---|---|
| at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | |
| channel comprising a first end and a second end; | Yes |
| a top guide connected to the first end of the channel; | Yes |
| a bottom guide connected to the second end of the channel; | Yes |
| a bottom guide roller rotatably mounted in the bottom guide; | **No - Bottom roller is attached to channel separately from bottom guide** |
| a fixed pulley block unit connected to the channel; | Yes |
| a translatable pulley block unit moveable within the channel; | Yes |
| a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and | Yes |
| a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. | Yes |
| | |
| 13.  A window balance device comprising: | |
| a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | Yes |
| a bottom guide roller rotatably mounted in the bottom guide. | **No - Bottom roller is attached to channel separately from bottom guide** |

3

| 14. | The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | No |
| 15. | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | No |
| 16. | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | No |
| 17. | The device of claim 13 wherein the bottom guide further comprises a bottom guide axle for mounting the roller. | No |
| 18. | A window balance device comprising:<br>a channel comprising a first end and a second end;<br>a top guide connected to the first end of the channel;<br>a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and<br>a bottom guide roller rotatably mounted in the bottom guide. | Yes<br>Yes<br>Yes<br>Yes<br><br>No - Bottom roller is attached to channel separately from bottom guide |
| 19. | The device of claim 18 wherein the bottom guide roller is located external to the channel. | No |
| 20. | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | No |
| 21. | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | No |

4

| 22. | The device of claim 18 wherein the bottom guide further comprises a bottom guide axle for mounting the roller. | No |
| --- | --- | --- |
| | | |
| 23. | A window balance device comprising: | |
| | a bottom guide connected to an end of a window balance channel, the bottom guide slidable in a jamb pocket when installed in a window frame, the bottom guide including: | Yes |
| | a bottom guide axle mounted within the bottom guide; the bottom guide axle located outside the window balance channel; and | **No - Bottom roller is within channel** |
| | a bottom guide roller rotatably mounted on the bottom guide axle. | No |

P:\CALDWELL\Claim Chart 6,598,264.doc
8/30/2005 2:58:02 PM

5

# EXHIBIT 6



**CHARLES E. STILL, CONSULTING SERVICES**

Charles E. Still
*Specialist in Fenestration*

2914 PARTRIDGE CIRCLE
BRYAN, TEXAS 77802
PHONE: 979-731-1130
FAX: 979-731-1070
EMAIL: cestill@cox-internet.com

April 17, 2006

### Expert Witness Report of Charles E. Still

I, Charles E. Still, have been retained by Harris Beach PLLC to render expert services in conjunction with a patent infringement lawsuit. I hereby provide the following report involving Amesbury's U.S Patent 5,365,638 "Spring Mounting For Sash Frame Tensioning Arrangements", U.S. Patent 6,598,264 B2 "Block And Tackle Window Balance With Bottom Guide Roller" and U.S. Patent 6,820,368 "Snap Lock Balance Shoe And System For A Pivotable Window" pursuant to Rule 26 of the Federal Rules of Civil procedure.

I received a Bachelor of Architecture Degree in 1962 from Texas A&M University in College Station, Texas. I am a graduate of Overton High School, Overton, Texas.

I am the owner of Charles E. Still, Consulting Services based in Bryan, Texas. I have held this position since the inception of the company in July 2001. CES, Consulting Services specializes in fenestration. Windows and Doors are included in the term "fenestration" as well as curtain walls, storefronts and skylights. During my career, I have designed in excess of 200 fenestration products including single hung and double hung windows in aluminum, vinyl and composite materials for Residential, Manufactured Housing and Commercial Window Companies in New Construction and Replacement Markets. I am an expert in all phases of window design. I am a member of AAMA, American Architectural Manufacturers Association. AAMA is a professional trade organization including window manufacturers and suppliers to the window and door industry.

**Prior work history:**

**July 2000-July 2001** *Product Engineering Manager*, Alenco Building Products, Inc. Responsibilities include all phases of Engineering, Design and Development, Tooling and Certification and Documentation for four Manufacturing Plants. Primary products developed



including windows, for new construction residential and commercial industry as well as residential replacement/remodeling market and manufactured housing industry. Primary window materials consists of extruded aluminum, extruded PVC vinyl and wood. Served on the AAMA Southeast Region and Western Boards of Directors. Active in Installation Task Group in AAMA Western Region. Active in AAMA "Installation Masters" certified installers program.

**March 1999-July 2000** *Director of Engineering Support*, Reliant Building Products, Inc. Responsibilities include all product liability case investigations and resolution, giving depositions and court testimony. Search for new product, including window technologies, in design, materials and equipment. Company voting representative to all member trade associations and building codes groups (AAMA, NFRC and IGMA). Responsible for Product Certification and Testing. Licensed Glazing Contractor in the State of California and Arizona.

**1982-1999** *Vice President of Engineering*, Reliant Building Products, Inc., formerly known as Redman Building Products, Inc. Responsibilities includes managing product design and development and installation, product liability and codes compliance to national and state building codes. Active member of AAMA (American architectural manufacturing Association) and served as chairman of numerous task groups and served three times on the National AAMA Board of Directors. Active member of NFRC (National Fenestration Rating Council) involving thermal performance of windows and doors and IGMA, Insulating Glass Manufacturers Association (formerly known as SIGMA, Sealed Insulating Glass Manufacturers Association).

**1979-1982** *Director of Product Design*, Redman Building Products, Inc.. Responsibilities include product design, including windows and development of new construction and replacement/remodeling windows, doors and skylights. Company owned and operated 5 manufacturing plants and 7 sales outlets.

**1974-1979** *Chief Engineer*, Alenco, A Division of Redman Building Products, Inc. Responsibilities include design and development, testing, quality control department, plant maintenance department, plant tooling department, shop drawings department and warranty service department.

**1968-1974** *Chief Design Engineer*, Alenco, a Division of Redman Building Products, Inc.. Responsibilities include all designs of aluminum windows and doors for Residential and Commercial construction as well as Manufactured Housing.

**1964-1968** *Design Engineer*, Alenco, Albritton Engineering Corporation. Responsibilities include design and development of new aluminum windows and doors. Responsible for Office and Plant Expansion Program in Bryan, Texas Facility. Prepared architectural working drawings for Office and Plant Facilities (3 expansions).

2
1

The following documents and Samples have been made available to me by the attorneys at Harris Beach.

- U.S. Patent  329,996. A Spring Sash Balance, February 25, 1929
- G.B. Patent 1,218,827. Sash Control Mechanism, July 17, 1967
- G.B. Patent 1,244,324. A Sliding Sash Window, August 11, 1968
- G.B. Patent 1,287,756. Improvements In Or Relating To Doors, August 25, 1969
- U.K. Patent 2,236,786. A. Guide Assembly, September 27, 1989
- U.S. Patent 2,262,990. Window Sash Counterbalance, September 2,1939
- U.S. Patent 2,279,600. Sash Balance, March 30, 1940
- U.K. Patent 2,280,697. Tiltable To Slide Windows, July 27, 1993
- U.K. Patent 2,292,168 A. Pivoting Sash Slide Locking Mechanism, July 31, 1995
- U.S. Patent 2,635,282. Spring Counterbalance, October 2, 1950
- U.S. Patent 2,826,090. Sash Balance Coupling Device, March 21, 1955
- U.S. Patent 3,055,044. Foot Attachment For Block And Tackle Type Spring Counterbalances, September 25, 1960
- U.S. Patent 3,449,862. Window Structure, August 21, 1967
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 3,091,797. Window Structure, April 26, 1961
- U.S. Patent 3,114,178. Sliding Window And Counterbalancer Combination, February 6, 1961
- U.S. Patent 3,358,403. Heavy Window Balance Assembly, January 28, 1966
- U.S. Patent 3,358,404. Readily Removable Double Hung Window, January 28, 1966
- U.S. Patent 3,440,683. Sash Control Mechanism, July 17, 1967
- U.S. Patent 3,449,862. Window Structures, August 11, 1967
- U.S. Patent 3,452,480. Spring Sash Counterbalance, September 14, 1967
- U.S. Patent 3,711,995. Building Structure, June 22, 1070
- U.S. Patent 3,869,754. Bracket For A Spring Sash Counterbalance, September 10, 1973
- U.S. Patent 4,079,549. Balance Spring Lock For Tilt Out Sash, August 26, 1976
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 4,227,345. Tilt-Lock Slide For Window Sash, January 26, 1979
- U.S. Patent 4,300,316. Sash Balance Foot Seal Mechanism, October 17, 1979
- U.S. Patent 4,610,108. Balance Spring Locking Slide Block For Tilt-Out Windows, December 20, 1984
- U.S. Patent 4,654,928. Adjustable Friction Block And Tackle Window Balance System, April 11, 1986
- U.S. Patent 4,704,821. Compression Seals In A Double Hung Style Window, July 3, 1986
- U.S. Patent 4,949,425. Spring Loaded Block And Tackle Window Sash Balance Assembly, October 19, 1988
- U.S. Patent 5,069,001. Pivotable Window Sash Assembly, November 21, 1990
  U.S. Patent 5,157,808. Coil Spring Counterbalance Hardware Assembly And Connection Method Therefore, February 18, 1992

3
1

- U.S. Patent 5,210,976. Window Balance Assembly, June 26, 1992
- U.S. Patent 5,243,783. Locking Slide Block, June 24, 1992
- U.S. Patent 5,301,467. Locking Slide Block, September 2, 1993
- U.S. Patent 5,353,548. Curl Spring Shoe Based Window Balance System, April 1, 1993
- U.S. Patent 5,365,638. Spring Mounting For Sash Frame Tensioning Arrangements, January 21, 1993
- U.S. Patent 5,371,971. Sash Balance Brake And Pivot Pin Assembly, May 4, 1993
- U.S. Patent 5,530,991. Block And Tackle Window Balance, January 21, 1994
- U.S. Patent 5,632,117. Sash Balance Brake Assembly, January 13, 1995
- U.S. Patent 5,661,927. Sliding Counterbalance Assembly For A Sash Window, March 6, 1996
- U.S. Patent 5,669,180. Window Balance Brake Shoe And Pivot Assembly, May 29, 1996
- U.S. Patent 5,737,877. Block And Tackle Balance With Integral, Non-Rotating Pulley System, July 26, 1996
- U.S. Patent 5,806,243. Sash Balance Brake Assembly, May 21, 1997
- U.S. Patent 5,829,196. Window Balance Brake Shoe And Pivot Assembly, May 30, 1997
- U.S. Patent 6,041,476. Inverted Block And Tackle Window Balance, November 21, 1997
- U.S. Patent 6,088,880. Adjustable Shoe For Awning Window Hinge, July 7, 1997
- U.S. Patent 6,151,832. Window Balance Cam Housing, February 19, 1999
- U.S. Patent 6,230,443 B1. Hardware Mounting, May 5, 1999
- U.S. Patent 6,467,128 B1. Block And Tackle Sash Counter Balance, September 11, 2000
- U.S. Patent 6,550,184 B1. Brake Shoe For Sash Window Or Door Assembly, February 9, 2001
- U.S. Patent 6,598,264 B2. Block And Tackle Window Balance With Bottom Guide Roller, March 16, 2001
- U.S. Patent 6,606,761 B2. Spring Mounting Arrangement For A Sash Window Counterbalance Arrangement, October 8, 2001
- U.S. Patent 6,622,342 B1. Block And Tackle Balance Assembly With Brake Shoe, June 6, 2001
- U.S. Patent 66,679,000 B2.
- U.S. Patent 6,820,368 B2. Snap Lock Balance Shoe And System For A Pivotable Window, May 23, 2003
- U.S. Patent 6,840,011 B2. Window Panel Balance Apparatus And Method, December 13, 2000
- U.S. Patent 6,990,710 B2. Counterbalance System For A Tilt-In Window Having An Improved Shoe Assembly And Anchor Mount, November 5, 2003
- Japanese Patent 62-194,895. Title and filing date unknown.
- Caldwell Fenestration Hardware Product Information, Bates C00477 thru C00542.
- Defendant's Second Supplemented Answers To Plaintiffs' First Set Of Interrogatories.

4
1

- Memorandum And Order, January 20, 2006.
- Amesbury's First Supplemental Response To Caldwell's Interrogatories (Nos.1-2)
- Amesbury's Second Supplemental Response To Caldwell's Interrogatories (Nos. 1-2,13-16).
- Defendant's Supplemented Answers To Plaintiffs' First Set Of Interrogatories
- Joint Motion to Set Schedule.
- Patent '264 File History, Bates C000543 thru C000690.
- Patent '638 File History, Bates C000921 thru C001116.
- Case Documents Bates AME 01931 through 01948
- CD files: Documents Produced in Response to Plaintiffs' First Request for documents and Things, dated September 28, 2005
- Expert Report of Dr. Sammy Shina Submitted on Behalf of Plaintiffs in Civil Action No. 05-10020-DPW
- Declaration of Prior Invention in the United States by Jason Annes To Overcome cited Publication Pursuant to 37 C.F.R.1.131
- Caldwell Sales Brochure
- Caldwell Physical Samples of Balance Hardware.

Other documents include:

- Voluntary Specifications for Aluminum, Vinyl (PVC) and Wood Windows and Glass Doors, AAMA/NWWDA 101/I.S.2-97.
- International Residential Code for One and Two Family Dwellings-2000.
- U.S Patent 4,961,247. Balancing Arrangements For Double Hung Windows. December 7, 1989

**U.S. Patent 5,365,638**

**Amesbury's Patent 5,365,638 – Spring Mounting For Sash Frame Tensioning Arrangements** involves a Constant Force Balance that is used in Single Hung and Double Hung Windows with a Tilting Sash. Constant force balances have been available for years and offer an economical solution to counter-balancing sash weight. Constant force balances include a stainless steel coiled spring, a coiled spring mounting in the frame jamb of the window with an attaching screw and a sash carrier (shoe). The window design must have certain design features in order to receive a constant force balance. It must have jamb tracks in the shape of a channel with one side of the channel open, creating flanges on each side. It must have at least one removable operating sash to be pivoted at the lower corner of the sash for tilting the sash inwards for sash removal or for cleaning the exterior sash glass surface from the interior. The mounting that cradles the coiled spring is fastened to the frame jamb inside the open channel. One outer end of the coiled spring is attached to a sliding sash carrier that connects to the bottom corners of the operating sash. The inner end of the coiled spring is left free and unattached inside the coil. When the sash is lifted upwards towards an open position, the coiled spring retracts inside the mounting and counter-balances the weight of the sash and allows the sash to

remain open for ventilation. Coil springs can be added in dual or triple configuration to increase the lifting force for a heavier sash.

Prior art demonstrates that there is nothing unique or novel about the **'638 Patent**. Amesbury contends that Caldwell infringed on their **'638 Patent** in claim elements 1,2,3 & 8.

The **'638 Patent** Claims describe the window frame jamb channel, sash frame support (shoe), a coiled ribbon spring, a mounting for the coil and a raised spine as part of the spring mounting.

Claims 1 & 8 of the **'638 Patent** describe .. *"whereby rotational motion of said mounting means is inhibited"*, which Caldwell denies is contained in its products. Amesbury's **'638 Patent** design calls for a raised spine as part of the mounting means to inhibit rotational motion of the mounting inside the window frame jamb according to the claims. The mounting depends on the inwardly turned flanges of the open jamb channel to help support the mounting. Caldwell's Quick Tilt design does not depend on the inwardly turned flanges of the open jamb channel for the mounting support and does not infringe the **'638 Patent**. The molded nylon body of the Caldwell Quick-Tilt spring mounting fits snug <u>inside</u> the open jamb channel to prevent rotation of the mounting. Caldwell's Quick Tilt raised outer spine portion of the mounting is designed to help support the screw fastener, coil nest and aperture through the mounting and does nothing to inhibit rotation of the mounting under load. Standard window designs allow a gap between either side of the raised spine and the ends of the inwardly turned flanges from .050" to .109" (See Exhibits A, G & H).

Therefore, in Caldwell's Quick Tilt product, the spine cannot contact the flanges and cannot prevent rotation of the mounting element.

_____

### U.S. Patent 6,598,264 B2

**Amesbury's Patent 6,598,264 B2- Block And Tackle Window Balance With Bottom Guide Roller** involves a Block and Tackle Balance that is used in Single Hung and Double Hung Windows with a removable sash. Block and Tackle Balances have been used in windows for the past 67 years and have a good track record. The window industry calls this traditional type of balance a "side load" because the sash must be installed and removed by moving the sash to one side of the window to clear the jamb from the opposite side of the window. Block and Tackle balances are popular and are known for their sash weight carrying capacity, long reliable service and are user friendly.

The Block and Tackle Balance described in the **'264 Patent** has a "C" channel as the main body member, an angled top guide, a bottom guide with a roller, a spring, a fixed pulley block, a translatable pulley block and a cord. One end of the cord is attached to the translatable pulley block and the other end attaches to the frame jamb of the window

giving the operating sash a mechanical advantage of lifting the sash weight when the sash is being opened or closed.

Prior art demonstrates that there is nothing unique or novel about the '264 Patent. Amesbury contends that Caldwell infringed the '264 Patent, specifically patent claims 1,2,3,4,5,6,7,9,10,11,12,13,14,15,16,18,19,20 & 21.

Claims 1,2,12,13,18 & 19 of the '264 Patent describe... *"a bottom guide roller rotatably mounted in the bottom guide" and..." the bottom guide roller is located external to the channel"* which Caldwell denies is contained in its products. Caldwell's 86XT balance does not have a roller mounted in the bottom guide, and therefore, does not infringe the '264 Patent. Caldwell's 86XT balance has a bottom fixed pulley block with 3 pulleys, the third larger pulley being located immediately below the smaller pulleys and has a portion internal and external to the channel. (See Exhibit B, J & K). Therefore, Caldwell's 86XT balance does not have a roller in the bottom guide and does not infringe the '264 Patent claims.


**U.S. Patent 6,820,368 B2**

**Amesbury's Patent 6,820,368 B2 –Snap Lock Balance Shoe And System For A Pivotable Window** involves a Block and Tackle Balance that is used in Single Hung and Double Hung Windows with a removable tilt-in sash. Tilt-in sash windows are popular because they allow the sash to be rotated inward to enable the exterior glass face of the sash to be cleaned from the interior. This type of balance is especially convenient on above grade floors, eliminating the use of ladders when double hung windows are installed.

The '368 Patent is designed with an "inverted" balance concept (see Exhibit E on Prior Art in U.S. Patent 6,041,476 and in '368 Patent Fig. 2A, 7A & 7B) wherein the fixed pulley block is located at the top end of the channel and the spring is located at the bottom end of the channel. The balance shoe is inverted ("T" shaped) and joined to the bottom end of the channel by way of two molded plastic tabs that snap into punched holes in the walls of the channel. The pivoting axis of the shoe is located 13/16" from the end of the channel where a rivet acts as an axle allowing the shoe to rotate. This allows the shoe to be removed for replacement after the window is constructed without modification to the window. The lower portion of the shoe has a cam with a recess for a pivot bar and brake pads.

Caldwell's Series 97I w/ Short Carrier (Shoe) is "T" shaped and is directly connected to the end of the balance channel with one rivet. It does not have snap tabs and does not rotate around a rivet. During factory assembly, a connecting rivet is threaded through a clearance through both outer walls of the carrier. It is designed to be non-removable and does not have a snap-in capability (See Exhibit C, E, F,L & N).
Amesbury contends that Caldwell infringed the '368 Patent, specifically Claims 2, 3,6,7,8, & 11.Claim 2 of the '368 Patent describes ... *"and wherein the second end of the*

7
1

*frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate the balance with a rivet;"* which Caldwell denies is contained in its products. Caldwell's Series 97I w/Short Carrier does not infringe the '368 Patent because Caldwell's 97I w/ Short Carrier does not have a pocket in its balance carrier (shoe) frame. It has a clearance on both walls of the carrier (shoe) for a connecting rivet.

Caldwell's Series 97EZ w/ Long Carrier (Shoe) is "T" shaped. During factory assembly, a connecting rivet is threaded through an aperture molded into the frame of the carrier. A second rivet through the end of the channel holds the end of the spring as well as supports two legs of the carrier to prevent outward rotation. The carrier is designed to be non-removable and does not have a snap-in capability (See Exhibits D, E, F,M & N). Claims 2 of the '368 Patent describes ... *"and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;"* which Caldwell denies is contained in its products. Caldwell's Series 97EZ w/Long Carrier does not infringe the '368 Patent because Caldwell's 97EZ w/ Long Carrier does not have a pocket in its balance carrier (shoe) frame. It has an aperture for a rivet and, at the extreme end of the carrier, it has two legs supported by a second rivet (that holds the end of the spring) to prevent outward rotation. Further, the second rivet does not connect the carrier to the channel and does not mate with the carrier legs.

## Opinions

Based upon my research, past experience and knowledge, it is my opinion that Caldwell's Quick Tilt Products do not infringe Amesbury's Patent 5,365,638.

Based upon my research, past experience and knowledge, it is my opinion that Caldwell's 86XT Balance does not infringe Amesbury's Patent 6,598,264 B2.

Base upon my research, past experience and knowledge, it is my opinion that Caldwell's Series 97EZ Products do not infringe Amesbury's Patent 6,820,368.

I reserve the right to add additional opinions in my investigations and /or upon review of additional discovery materials. Opinions herein are within a reasonable degree of professional certainty.

Signed this17th day of April, 2006

*Chs. E. Still*

Charles E. Still, Consulting Services
2914 Partridge Circle
Bryan, Texas 77802

8
1

Attachments:
Exhibit A-Comparison Chart
Exhibit B-Comparison Chart
Exhibit C-Comparison Chart
Exhibit D-Comparison Chart
Exhibit E- Caldwell Patent 6,041,476
             Amesbury Patent 6,820,368 B2
Exhibit F- Caldwell Pulley Drawing
Exhibit G- Photo
Exhibit H- Photo
Exhibit J- Photo
Exhibit K- Photo
Exhibit L- Photo
Exhibit M- Photo
Exhibit N- Photo

**Charles E. Still**    **Testimony Given in Depositions and Trials**

| Type | Parties | Type of Claim | Location | Date |
|---|---|---|---|---|
| Deposition | VBP v. Royal Plastic | Patent Infringement | Oakland, New Jersey | |
| Trial | VBP v. Royal Pastics | Patent Infringement | Newark, New Jersey | |
| Deposition | Redman v. ? | Forced Entry/Injury | Albuquerque, New Mexico | |
| Deposition | Redman v. ? | Forced Entry/Injury | Houston, Texas | |
| Deposition | Thiokol v. ? | Glass Breakage | Denver, Colorado | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Trial | Redman v. ? | Personal Injury | Savannah, Georgia | |
| Trial | Redman v. ? | Water Infiltration | Little Rock, Arkansas | |
| Trial | Redman v. ? | Scratched Glass | Waco, Texas | |
| Arbitration | Redman v.? | Glass Breakage | Alexandria, Louisiana | |
| Trial | Redman v. ? | Water Infiltration | Baton Rouge, Louisiana | |
| Deposition | Inmont v. ? | Glass Breakage | Rockwall, Texas | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Deposition | Lamkin v. Gapco | Personal. Injury | Madison County, Illinois | |
| Deposition | Pace v. Gapco | Personal Injury | Madison County, Illinois | |
| Trial | Redman v. ? | Glass Breakage | Salt Lake City, Utah | |
| Deposition | Redman v. ? | Condensation | Baytown, Texas | |

| | | | | |
|---|---|---|---|---|
| Deposition | Redman v. ? | Personal Injury | Detroit, Michigan | |
| Deposition | Redman v. ? | Personal Injury | South Padre Island, Texas | |
| Deposition | Gapco v. ? | Personal Injury | St. Louis, Missouri | |
| Trial | Unique v. Beard | Business Ethics | Roanoke, Virginia | |
| Deposition | Redman v. Somerset | Water Infiltration | Silver Springs, Maryland | |
| Deposition | Reman v. ? | Water Infiltration | San Francisco, California | |
| Deposition | Redman v. ? | Water Infiltration | Fresno, California | |
| Deposition | Bolander v. Champlor | Water Infiltration | Houston, Texas | 8/29/2003 |
| Trial | Jason Lamkin v. Gapco | Personal Injury | Belleville, Illinois | 3/15/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, Texas | 4/2/2004 |
| Deposition | All Seasons v. Tradewinds Condo | Code Compliance | Orange Beach, AL | 5/19/2004 |
| Deposition | All Seasons v. Royal Palms Condo | Code Compliance | Gulf Shores, AL | 6/24/2004 |
| Deposition | W.S. Phillips v. Hope Lumber | Water Infiltration | College Station, TX | 10/27/2004 |
| Deposition | W.S. Phillips v. Alenco | Water Infiltration | College Station, TX | 11/30/2004 |
| Deposition | Sungate Development v. All Seasons | Water Infiltration | McAllen, TX | 12/7/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, TX | 2/23/2005 |

| | | | |
|---|---|---|---|
| Deposition | Cavalier Homes v. Larson Doors | Product Quality | Haleyville, AL | 5/26/2005 |
| Deposition | Grand Pointe HOA V. All Seasons | Product Liability | Orange Beach, AL | 6/29/2005 |
| Deposition | Donn v. Turner v. General Aluminum | Water Infiltration | Aubrey, TX | 9/9/2005 |
| Arbitration | Hilcorn v. Moore | Water Infiltration | Houston, TX | 10/19/2005 |
| Trial | Sandhu v. Wellington | Personal Injury | Toronto, Canada | 11/18/2005 |
| Deposition | Planter's Place HOA v.All Seasons | Water Infiltration | Mt. Pleasant, S.C. | 12/20/2005 |

## EXHIBIT A

### NON-INFRINGEMENT OF
### AMESBURY'S U.S. PATENT NO. 5,365,638
### BY CALDWELL'S QUICK-TILT PRODUCTS

| Claim Element | [claim language] | [How Caldwell's Quick-Tilt Products Do Not Infringe] |
|---|---|---|
| 638/1 | A mounting assembly comprising | A mounting assembly comprising |
| 638/1 | a channel means | a channel means |
| 638/1 | having a rear wall, | having a rear wall, |
| 638/1 | side walls | side walls |
| 638/1 | and at extremities of said side walls, inwardly turned opposed flanges, | and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/1 | a sash frame support means slidable in said channel means, | a sash frame support means slidable in said channel means, |
| 638/1 | a coiled ribbon spring | a coiled ribbon spring |
| 638/1 | having a first end engaged with said sash frame support means, | having a first end engaged with said sash frame support means, |
| 638/1 | and a means for mounting said coiled ribbon spring, | and a means for mounting said coiled ribbon spring, |

| Claim Number | Claim Language | Corresponding structure or Prior Art features |
|---|---|---|
| 638/1 | the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means | the coiled body of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means (See Prior Art in '638 Pat. Fig.1 & Fig.3) |
| 638/1 | and said mounting means being secured in said channel means, | And said mounting means being secured in said channel means, (See Prior Art in '638 Pat. Fig.1,Fig.3, Fig.4 and Fig.5) |
| 638/1 | said mounting means having a raised spine | Said mounting means having a raised spine |
| 638/1 | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means |
| 638/1 | whereby rotational motion of said mounting means is inhibited. | The raised spine of Caldwell's Quick Tilt does not inhibit rotation . |
| 638/2 | The mounting assembly of claim 1 wherein the mounting means has a | Caldwell's Quick Tilt has a mounting means that has a |

| Claim | U.S. Patent | Prior Art |
|---|---|---|
| | support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said sash support means moves in said channel means. | support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said sash support means moves in said channel means. (See Prior Art in '638 Pat. Fig. 1, Fig. 2, Fig. 3, Fig.4, Fig.5 & Fig. 6) |
| 638/3 | The mounting assembly of claim 2 | Caldwell's Quick Tilt has a mounting assembly (See Prior Art in '368 Pat. Fig.1, Fig.2, Fig.3, Fig.4 & Fig.5) |
| 638/3 | wherein said mounting means has a body portion | wherein said mounting means has a body portion |
| 638/3 | Having an aperture therein, | having an aperture therein, |
| 638/3 | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, |
| 638/3 | a surface of said body portion being concavely curved, | a surface of said body portion being concavely curved, |
| 638/3 | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion |

3

| Claim Numbers | U.S. Patent No. 4,987,638 | U.S. Patent No. (other patent) |
|---|---|---|
| 638/8 | a mounting assembly comprising | a mounting assembly comprising |
| 638/8 | a channel means having | a channel means having |
| 638/8 | a rear wall, | a rear wall, |
| 638/8 | side walls | side walls |
| 638/8 | and at extremities of said side walls, inwardly turned opposed flanges, | and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/8 | a sash frame support means slidable in said channel means, | a sash frame support means slidable in said channel means, |
| 638/8 | a coiled ribbon spring | a coiled ribbon spring |
| 638/8 | having an outer end engaged with said sash frame support means, | having an outer end engaged with said sash frame support means, |
| 638/8 | and a means for mounting said coiled ribbon spring, | and a means for mounting said coiled ribbon spring, |
| 638/8 | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, |

4

| Claim Element | U.S. Patent No. 4,638,misc | Caldwell's Quick Tilt Products |
|---|---|---|
| 638/8 | Said mounting means being secured in said channel means | Said mounting means being secured in said channel means |
| 638/8 | and the mounting means having projection means | and the mounting means having projection means |
| 638/8 | positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, | positioned between said inwardly turned opposite flanges of the channel means. The projection means in Caldwell's Quick Tilt products is independent of said flanges of the channel means within which the mounting means is positioned, |
| 638/8 | whereby rotational movement of the mounting means is inhibited. | The raised spine of Caldwell's Quick Tilt does not inhibit rotation. |

**EXHIBIT B**

NON-INFRINGEMENT OF
AMESBURY'S U.S. PATENT NO. 6,598,264
BY CALDWELL'S SERIES 86XT PRODUCT

| Claim '264 No. ('264) | Amesbury's U.S. Patent No. 6,598,264 | Prior Art Series 86XT Balance System |
|---|---|---|
| 264/1 | A block and tackle window balance device comprising: | A block and tackle window balance device comprising: |
| 264/1 | a channel comprising | a channel comprising (See Prior Art in '264 Pat. Fig.2A,2B & Fig.3) |
| 264/1 | a first end | a first end  (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and a second end; | and a second end; (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel (See Prior Art in '264 Pat. Fig.2A, 2B & Fig.3 & 3); |
| 264/1 | a bottom guide connected to the second end of the channel; | a bottom guide connected to the second end of the channel (See Prior Art in '264 Pat. Fig. 2A, 2B & Fig.3); |
| 264/1 | a bottom guide roller rotatably mounted in the bottom guide; | Caldwell's Series 86XT bottom pulley is not a roller and is not mounted in the bottom guide; the bottom pulley is joined with 2 other pulleys in the fixed pulley block. |
| 264/1 | a fixed pulley block unit connected to the channel; | a fixed pulley block unit connected to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B ); |
| 264/1 | a translatable pulley block unit | a translatable pulley block unit moveable within the channel |

1

| Claim Element | Accused Device Element | |
|---|---|---|
| | moveable within the channel; | ( See Prior Art in '264 Pat. Fig.2A & 2B); |
| 264/1 | a spring comprising | a spring comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | a first end | a first end ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | and a second end, | and a second end, ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/1 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit (See Prior Art in '264 Pat. Fig. 2A & 2B); |
| 264/1 | and a cord comprising | and a cord comprising (See Prior Art in '264 Pat. Fig.2A & 2B); |
| 264/1 | a first cord end | a first cord end (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and a second cord end, | and a second cord end, (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and the fixed pulley block unit | and the fixed pulley block unit (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and extends around the bottom guide roller, | and extends around the pulley block bottom pulley, not a roller, |
| 264/1 | the first cord end being attached to | the first cord end being attached to |

| Claim Element | Accused Device | |
|---|---|---|
| | the translatable pulley block unit | the translatable pulley block unit ( See Prior Art in '264 Fig.2B) |
| 264/1 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. (See Prior Art in '264 Pat. Fig. 7A) |
| 264/2 | The device of claim 1 wherein the bottom guide roller is located external to the channel. | Caldwell's Series 86XT fixed pulley block bottom pulley is not a roller and is partially located internal and external to the channel. |
| 264/3 | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | Caldwell's Series 86XT top guide is angled to received a member of a window sash (See Prior Art in '264 Pat. Fig 2A, 2B, Fig. 3 & Fig.7A). |
| 264/4 | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | Caldwell's Series 86XT bottom guide has a portion internal and external to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B). |
| 264/5 | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | Caldwell's Series 86XT bottom guide forms a channel to receive a portion of a window sash (See Prior Art in '264 Pat. Fig. 3). |
| 264/6 | The device of claim 1 wherein the | Caldwell's Series 86XT fixed pulley block unit comprises (See Prior Art in |

3

| | | '264 Pat. Fig.2A & 2B) |
|---|---|---|
| | fixed pulley block unit comprises | |
| 264/6 | a frame, | a frame, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/6 | an axle, | an axle, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/6 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. |
| 264/7 | The device according to claim 6 wherein the axle is located within the frame. | Caldwell's Series 86XT has an axle located within the fixed pulley block unit frame. (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | The device according to claim 1 wherein the translatable pulley block unit comprises | Caldwell's Series 86XT has a translatable pulley block unit that comprises (See Prior Art in'264 Pat. Fig. 2A & 2B) |
| 264/9 | a frame, | a frame ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | an axle within the frame, | an axle within the frame (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/10 | The device according to claim 1 wherein the top guide includes a top | Caldwell's 86XT has a top guide including a top angled portion (See Prior Art in '264 Pat. Fig. 2A & 2B) |

4

| Claim Element | Claim Language | Prior Art | 
|---|---|---|
| | angled portion | |
| 264/10 | and a bottom portion, the bottom portion being connected to the first end of the channel. | And a bottom portion, the bottom portion being connected to the first end of the channel. (See Prior Art in '264 Pat. Fig.2A, 2B, 3 & 7A) |
| 264/11 | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | Caldwell's 86XT has a fixed pulley block unit that is independent of the bottom guide. |
| 264/12 | A window assembly comprising: | A window assembly comprising: |
| 264/12 | a window frame with two jambs with jamb pockets; | a window frame with two jambs with jamb pockets; (See Prior Art in '264 Pat. Fig.1) |
| 264/12 | At least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | At least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and (See Prior Art in '264 Pat. Fig.1 & 7A) |
| 264/12 | At least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | at least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising: (See Prior Art in '264 Pat. Fig.7A) |
| 264/12 | channel comprising a first end and a second end; | a channel comprising a first end and a second end;( See Prior Art in '264 Pat. Fig.2A, 2B, 3 & 7A) |

5

| Claim Element | Accused Product - 86XT Infringement Analysis | Caldwell's 86XT System Does Not Infringe the '264 Patent / Invalidity |
|---|---|---|
| 264/12 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel; (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/12 | a bottom guide connected to the second end of the channel; | a bottom guide connected to the second end of the channel; (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/12 | a bottom guide roller rotatably mounted in the bottom guide; | Caldwell's 86XT has a bottom pulley that is not a roller and is mounted in the fixed pulley block unit. |
| 264/12 | a fixed pulley block unit connected to the channel; | a fixed pulley block unit connected to the channel; (See Prior Art in Fig.2A, & 2B) |
| 264/12 | a translatable pulley block unit moveable within the channel; | a translatable pulley block unit moveable within the channel; (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a spring comprising | a spring comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a first end | a first end ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and a second end | and a second end (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit; (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and a cord comprising | and a cord comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a first cord end | a first cord end, (See Prior Art in '264 Pat. Fig.2A & 2B) |

| Claim Element | | |
|---|---|---|
| 264/12 | and a second cord end, | and a second cord end, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/12 | and the fixed pulley block unit | and the fixed pulley block unit (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and extends around the bottom guide roller, | and extends around the bottom fixed pulley block bottom pulley which is not a roller, |
| 264/12 | the first cord end being attached to the translatable pulley block unit | the first cord end being attached to the translatable pulley block unit (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. (See Prior Art in '264 Pat. Fig. 7A) |
| 264/13 | A window balance device comprising: | A window balance device comprising: (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/13 | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/13 | a bottom guide roller rotatably mounted in the bottom guide. | Caldwell's 86XT has a bottom pulley that is not a roller mounted in the fixed pulley block and that is independent of the bottom guide. |

7

| Claim Number | Claim Text | Caldwell's 86XT Window Balance System |
|---|---|---|
| 264/14 | The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | Caldwell's 86XT has a bottom pulley that is not a roller located internal and external to the channel. |
| 264/15 | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | Caldwell's 86XT has a portion of the bottom guide internal and external to the channel. |
| 264/16 | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of window sash when installed. | Caldwell's 86XT has a bottom guide that forms a channel to receive a portion of a window sash when installed (See Prior Art in '264 Pat. Fig. 3). |
| 264/18 | A window balance device comprising: | A window balance device comprising: |
| 264/18 | a channel comprising a first end and a second end; | a channel comprising a first end and a second end; (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/18 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel; (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/18 | a bottom guide connected to the second end of the channel and | a bottom guide connected to the second end of the channel and (See Prior Art in '264 Pat. Fig. 2A, 2B & 3) |

8

| Claim Element | Asserted Claim No. | Identical/Literal Corresponding Witness Version |
|---|---|---|
| | adapted to slide in a jamb pocket when installed in a window frame; and | adapted to slide in a jamb pocket when installed in a window frame; and (See Prior Art in '264 Pat. Fig.1) |
| 264/18 | a bottom guide roller rotatably mounted in the bottom guide. | Caldwell's 86XT has a bottom pulley that is not a roller in the fixed pulley block and is independent of the bottom guide. |
| 264/19 | The device of claim 18 wherein the bottom guide roller is located external to the channel. | Caldwell's 86XT has a bottom pulley located internal and external to the channel. |
| 264/20 | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | Caldwell's 86XT has a bottom guide that is internal and external to the channel. (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/21 | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | Caldwell's 86XT has a bottom guide that forms a channel to receive a portion of a window sash when installed (See Prior Art in '264 Pat. Fig.3). |

EXHIBIT C

NON-INFRINGEMENT OF
AMESBURY'S U.S. PATENT NO. 6,820,368
BY CALDWELL'S SERIES 971 PRODUCT

| Claim Element | Claim Language | 971 Product |
|---|---|---|
| 368/2 | A window balance system comprising: | A window balance system comprising: |
| 368/2 | a U-shaped channel comprising a plurality of openings; | a U-shaped channel comprising a plurality of openings (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B); |
| 368/2 | a spring connected to a system of pulleys located within the U-shaped channel; | a spring connected to a system of pulleys located within the U-shaped channel (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a cord with | a cord with (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a first cord end | a first cord end (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | and a second cord end, | and a second cord end, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the first cord end connected and threaded through the system of pulleys, | the first cord end connected and threaded through the system of pulleys, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the second cord end connected to a jamb mounting attachment; and | the second cord end connected to jamb mounting attachment; and (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a balance shoe, wherein the balance shoe comprises: | a balance carrier (shoe), wherein the balance carrier comprises (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B): |

| Claim Element | Anthony's U.S. Patent No. 368,928 | Caldwell's Series of Infringing Window Channel Balances |
|---|---|---|
| 368/2 | a frame comprising an enlarged first end | a frame comprising an enlarged first end |
| 368/2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | and a second end, wherein the second end is adapted to be received by the U-shaped channel, |
| 368/2 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | Caldwell's Series 97I second end of the balance carrier forms a clearance for a rivet that attaches the balance carrier to the U-shaped channel. A center support leg of the carrier rest against the rivet. The carrier is non-removable from the U-shaped channel; |
| 368/2 | a locking member proximal to the enlarged first end; | a locking member proximal to the enlarged first end; |
| 368/2 | a cam in communication with the locking member, and | a cam in communication with the locking member, and |
| 368/2 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Caldwell's Series 97I has no connecting device between the U-shaped channel and the balance carrier |
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | Caldwell's Series 97I balance carrier has no connecting device. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to | Caldwell's Series 97I window balance system has a cam housed within the enlarged first end of the carrier; wherein rotating the cam forces the locking member to engage a jamb track when the balance carrier is |

| Claim Citation | | |
|---|---|---|
| | engage a jamb track when the balance shoe is installed in a window jamb. | installed. (See Prior Art in '368 Pat. Fig. 2A, 7A. & 7B) |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | Caldwell's Series 97I balance system has a locking member comprising (See Prior Art '368 Pat. Fig. 2A, 7A & 7B) |
| 368/7 | two opposing ends | two opposing ends (See Prior Art '368 Pat. Fig. 2A, 7A & 7B) |
| 368/7 | integrally connected by a spring member | integrally connected by a spring member (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | Caldwell's Series 97I balance system has a cam that is partially housed within the enlarged first end of the carrier frame, wherein the cam forces the opposing ends of the locking member to engage a jamb track when the balance carrier is installed in a window jamb (See Prior Art in '368 Pat. Fig.2A, 7A & 7B). |
| 368/11 | The window balance system of claim 2 | Caldwell's Series 97I balance system |
| 368/11 | wherein the cam comprises at least one camming surface | has a cam comprising at least one camming surface (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/11 | and a keyhole opening sized to receive a pivot bar. | and a keyway opening sized to receive a pivot bar. (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |

**EXHIBIT D**

NON-INFRINGEMENT OF
AMESBURY'S U.S. PATENT NO. 6,820,368
BY CALDWELL'S SERIES 97EZ PRODUCT

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97EZ Product Using Caldwell's Prior Art '368 Patent |
|---|---|---|
| 368/2 | A window balance system comprising: | A window balance system comprising: |
| 368/2 | a U-shaped channel comprising a plurality of openings; | a U-shaped channel comprising a plurality of openings (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a spring connected to a system of pulleys located within the U-shaped channel; | a spring connected to a system of pulleys located within the U-shaped channel (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a cord with | a cord with (See Prior Art in '368 Fig.2A) |
| 368/2 | a first cord end | a first cord end (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | and a second cord end, | and a second cord end, (See Prior Art in '368 Fig.2A) |
| 368/2 | the first cord end connected and threaded through the system of pulleys, | the first cord end connected and threaded through the system of pulleys, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the second cord end connected to a jamb mounting attachment; and | the second cord end connected to jamb mounting attachment; and (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a balance shoe, wherein the balance shoe comprises: | a balance carrier (shoe), wherein the balance carrier comprises (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B): |

| | | |
|---|---|---|
| 368/2 | a frame comprising an enlarged first end | a frame comprising an enlarged first end |
| 368/2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | and a second end, wherein the second end is adapted to be received by the U-shaped channel, |
| 368/2 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | Caldwell's Series 97EZ second end of the frame of the balance carrier further forms two legs which are not a pocket for a supporting rivet, which does not mate with the legs. This product has an aperture for a second rivet that attaches the balance carrier to the U-shaped channel. The balance carrier is non-removable from the U-shaped channel. |
| 368/2 | a locking member proximal to the enlarged first end; | A locking member proximal to the enlarged first end; |
| 368/2 | a cam in communication with the locking member, and | a cam in communication with the locking member, and |
| 368/2 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Caldwell's Series 97EZ has a rivet between the U-shaped channel and the balance carrier. |
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | Caldwell's Series 97EZ balance is connected to the U-shaped channel with a rivet. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein | Caldwell's Series 97EZ window balance system has a cam housed within the enlarged first end of the carrier; wherein rotating the cam forces the locking member to |

| Claim Element | [Claim Language] | [Prior Art Reference / Response] |
|---|---|---|
| | rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | engage a jamb track when the balance carrier is installed in a window jamb. (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | Caldwell's Series 97EZ balance system has a locking member comprising (See Prior Art in '368 Pat. Fig. 2A 7A & 7B) |
| 368/7 | two opposing ends | two opposing ends (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/7 | integrally connected by a spring member | integrally connected by a spring member (See Prior Art in '368 Pat. 2A, 7A & 7B) |
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | Caldwell's Series 97EZ balance system has a cam that is partially housed within the enlarged first end of the carrier frame, wherein the cam forces the opposing ends of the locking member to engage a jamb track when the balance carrier is installed in a window jamb (See Prior Art in '368 Pat. Fig.2A, 7A & 7B). |
| 368/11 | The window balance system of claim 2 | Caldwell's Series 97EZ balance system |
| 368/11 | wherein the cam comprises at least one camming surface | has a cam comprising at least one camming surface (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B) |
| 368/11 | and a keyhole opening sized to receive a pivot bar. | and a keyway opening sized to receive a pivot bar. (See Prior Art in '368 Fig.2A, 7A & 7B) |

US006041476A

# United States Patent [19]

## deNormand

| | |
|---|---|
| [11] Patent Number: | 6,041,476 |
| [45] Date of Patent: | Mar. 28, 2000 |

[54] **INVERTED BLOCK AND TACKLE WINDOW BALANCE**

[75] Inventor: **Richard S. deNormand**, Rochester, N.Y.

[73] Assignee: **Caldwell Manufacturing Company**, Rochester, N.Y.

[21] Appl. No.: **08/975,728**

[22] Filed: **Nov. 21, 1997**

[51] Int. Cl.[7] .......................................... B66D 3/08
[52] U.S. Cl. .......................... 16/197; 16/196; 49/445; 254/393
[58] Field of Search ........................... 16/193, 196, 197, 16/198, 401, 402; 49/445, 446; 492/30, 47; 254/393, 404, 416

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 6,584 | 7/1849 | Hoffman . | |
| 138,944 | 5/1873 | Shaw | 16/213 |
| 329,005 | 10/1885 | Blodgett | 16/213 |
| 464,795 | 12/1891 | Dodge . | |
| 527,306 | 10/1894 | Wers | 254/393 |
| 1,523,733 | 1/1925 | Trout | 254/404 |
| 1,668,497 | 5/1928 | Flabbeck . | |
| 1,713,586 | 5/1929 | Wright | 254/404 |
| 1,800,700 | 4/1931 | Patton . | |
| 2,196,948 | 4/1940 | Tremblay | 16/215 |
| 2,262,990 | 11/1941 | Cross et al. . | |
| 2,336,426 | 12/1943 | Kreuscher . | |
| 2,459,290 | 1/1949 | Rozner . | |
| 2,625,447 | 1/1953 | Dereeter, III | 254/393 |
| 2,663,896 | 12/1953 | Trammell, Sr. et al. | 49/445 |
| 3,055,044 | 9/1962 | Dinsmore . | |
| 3,150,420 | 9/1964 | Bremer . | |
| 4,078,336 | 3/1978 | Prosser . | |
| 4,190,930 | 3/1980 | Prosser . | |
| 4,240,614 | 12/1980 | Comer, Jr. | 254/393 |
| 4,332,054 | 6/1982 | Peist et al. | 16/197 |
| 4,503,641 | 3/1985 | Swan . | |
| 4,586,291 | 5/1986 | Swan . | |
| 4,654,928 | 4/1987 | Flight . | |
| 4,689,850 | 9/1987 | Flight | 16/197 |
| 4,914,862 | 4/1990 | Gregory | 49/445 |
| 4,949,425 | 8/1990 | Dodson et al. | 16/DIG. 20 |
| 5,530,991 | 7/1996 | deNormand et al. . | |

*Primary Examiner*—Chuck Y. Mah
*Assistant Examiner*—Donald M. Gurley
*Attorney, Agent, or Firm*—Eugene Stephens & Associates

[57] **ABSTRACT**

Pulleys of a block and tackle window balance include hub steps that interact with other components to reduce the introduction of dirt and dust particles into areas vulnerable to wear. The hub steps of some of the pulleys are recesses formed about the axial bores of the pulleys that mate with protrusions on an axle and a washer. The hub steps of other pulleys are protrusions that abut a support plate and heads of rivets that act as axles. The hub steps allow inverse mounting of the window balance so that the balance can be mounted in a shoe channel for movement with a sash of the window, attached to the sash shoe, and the cord can be attached to the jamb or frame, thus increasing sash travel.

**23 Claims, 2 Drawing Sheets**



**EXHIBIT E**

**U.S. Patent**    Mar. 28, 2000    Sheet 1 of 2    6,041,476



FIG. 1



FIG. 2



FIG. 3

C000458



## FIG. 4



## FIG. 5



## FIG. 6

C000459

6,041,476

**1**

# INVERTED BLOCK AND TACKLE WINDOW BALANCE

## TECHNICAL FIELD

The invention relates to the field of block and tackle window balances for offsetting the weight of a window sash throughout a range of travel within a window frame.

## BACKGROUND OF THE INVENTION

Block and tackle window balances have become popular because of their compact size and ease of installation. They combine a system of pulleys with an extension spring to convert high spring tension applied over a short working distance to a lower spring tension applied over a longer working distance. The extension spring and pulley system are arranged within a rigid balance channel, with the extension spring anchored at one end of the balance channel and the pulley system anchored at the other end. In most block and tackle balances, the balance channel is mounted in the jamb of the window frame; and a cord, which is reeved through the pulley system, is attached to a sash shoe that slides in the jamb with the sash. The extension spring and pulley system are sized so that a desired lifting force is applied to the window sash throughout the entire range of sash travel within the window frame. A disadvantage of this type of balance is that the movement of the sash is limited by the presence of the balance in the jamb. In some cases, the travel is limited so much that the lower sash of the open window blocks egress through the window in escaping a fire.

To solve the problem of limited sash movement, the balance can be mounted upside down in the window sash with the balance channel attached to the sash shoe and the cord attached to the window jamb or frame. However, prior art window balances of this kind tend to be susceptible to contamination from dirt and dust, especially when mounted upside down. Particles work their way between the pulley bores and the pulley axles, increasing friction and wear. Thus, prior art block and tackle window balances are not as durable or reliable as is desired.

Some prior art block and tackle window balances that are less susceptible to contamination require the use of bushings and other parts. This is disadvantageous in that the use of additional parts increases the complexity of the machines and the likelihood of their failure. Also, the additional parts increase the cost of manufacture and assembly of the window balances.

## SUMMARY OF THE INVENTION

My inventive block and tackle window balance greatly reduces the invasion of the hub/axle interface by particulate contaminants. I form the pulleys with steps in their hubs so that they can engage mating steps on the rivets that serve as their axles. In addition, I mount the two pulleys at the open end of the balance so that they run against each other, effectively sealing the space between the pulley hubs. The steps in the pulley hubs can be recesses or protrusions, depending on their location and particular duty. My window balance provides better protection from dirt and dust contamination without the extra parts required by prior art window balances, keeping the balance relatively simple and less costly to manufacture and assemble. Additionally, because my window balance is less susceptible to contamination, it can be mounted to move with the sash of a window or to remain fixed relative to the frame of a window, depending on the requirements of a particular

**2**

installation, and can be mounted invertedly without significantly reducing its useful life.

## DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top schematic view of the invention.

FIG. 2 is a cross section taken along line II—II in FIG. 1 showing the first pair of pulleys.

FIG. 3 is a cross section taken along line III—III in FIG. 1 showing the second pair of pulleys.

FIG. 4 is a view taken along line IV—IV in FIG. 2 to illustrate the flats of a preferred pulley axle and the groove in which the axle is mounted.

FIG. 5 is a side view of a portion of the invention as shown in FIG. 1.

FIG. 6 is a schematic representation of the placement of my invention in a window.

## DESCRIPTION OF THE INVENTION

As seen in the accompanying Figures, my block and tackle window balance 1 includes a balance channel 2 preferably mounted in the shoe channel 55 of a window 51 and attached at one end to a sash shoe 50 that moves with the sash 53 in the shoe channel 55. I mount the shoe channel 55 on the jamb 54 of the window between the jamb 54 and the sash 53. The balance channel 2 supports a series of pulleys 11, 12, 31, 32 over which I reeve a cord 6. I attach an attachment end 8 of the cord 6 to the window jamb 54 or to the window frame 52. I attach a support plate end 7 of the cord 6 to a sliding support plate 35. The support plate 35 is biased against movement from a rest position by a spring 4 attached to the balance channel 2. Alternatively, a more conventional mounting arrangement can be used with the balance channel 2 fixed relative to the window jamb 54 and the attachment end 8 of the cord attached to the sash shoe 50.

As seen particularly in FIG. 2, an axle 15 mounted in grooves 24 in one end of the balance channel 2 supports a first pair 10 of pulleys 11, 12. The pulleys 11, 12 in the first pair 10 sit adjacent one another and include hub steps 13 in the form of recesses about the axial bores 14 of the pulleys 11, 12. The sides or rims 23 of the pulleys 11, 12 adjacent one another can slide or rub against each other and effectively seal the cavity 22 formed by their hub steps 13 against contamination from dirt and dust.

The axle 15 is preferably a rivet including flats 16 formed over portions of the circumferential surface of the axle 15 such that the flats 16 engage the grooves 24 in the balance channel 2, holding the axle 15 against rotation. The preferred rivet 15 also includes heads 17 that prevent axial movement of the axle 15. As shown in FIG. 4, I prefer to use a hexagonal arrangement of the flats 16 similar to that used in common nuts and bolt heads. The axle 15 can also include a flange 18 with a protruding flange step 19 that mates with a hub step 13 on one of the pulleys of the first pair, such as the first pulley 11. I prefer to mount a washer 20 on the axle 15 between the other of the pulleys of the first pair 10 (the second pulley 12) and the wall 3 of the balance channel. The washer 20 can include a protruding washer step 21 that mates with a hub step 13 of the second pulley 12. The mating steps 13, 19, 21 effectively seal the washer/pulley, flange/pulley, and pulley/axle bearing surfaces from contamination by dirt and dust particles, reducing wear of these parts and increasing the effective life of the window balance.

A second pair 30 of pulleys 31, 32 is mounted on the support plate 35. The pulleys 31, 32 of the second pair 30 also include hub steps 33, but I prefer to form these hub steps

C000460

6,041,476

**3**

33 as protrusions about the axial bores 34 of the pulleys 31, 32. Axles 37, 38, preferably in the form of rivets, rotatably mount the pulleys 31, 32 on the support plate 35, the heads 39 of the rivets engaging or abutting respective hub steps 33 of the pulleys 31, 32. I prefer to form the hub steps 33 so that they have substantially the same diameter as the heads 39 of the rivets 37, 38. The hub steps 33 of the pulleys 31, 32 farthest from the rivet heads 39 abut the support plate 35. As with the first pair of pulleys 10, the mating steps 33 and rivet heads 39 effectively seal the pulley/axle bearing surfaces from contamination by dirt and dust particles, reducing wear of these parts and increasing the effective life of the window balance.

When installed, one end 8 of the cord 6 is preferably attached to the window frame 52 or the window jamb 54, the other being attached to the support plate 35. In this arrangement, I slidingly mount the balance channel 2 in the shoe channel 55 with one end connected to the sash shoe 50 so that the balance channel 2 can move with the sash 53 in the shoe channel 55. Alternatively, the end 8 of the cord 6 can be attached to the sash shoe 50 mounted in the conventional manner, the other end 7 of the cord being attached to the support plate 35. In the conventional arrangement, the balance channel 2 is fixed with respect to the frame 52. In either arrangement, the support plate 35 slides in the balance channel 2. I prefer to run the cord 6 from the support plate 35 to the first pulley 11, then to the fourth pulley 32, then to the second pulley 12, then to the third pulley 31, and then out the end of the balance channel 2 in which the first pair of pulleys 10 is mounted. The end 8 of the cord 6 not attached to the support plate 35 includes a limit stop 9 to prevent the cord 6 from being pulled into the balance channel 2 when it is free.

The support plate 35 carries a guide 36 that keeps the support plate 35 properly aligned and oriented in the balance channel 2 while sliding and while resting. The support plate 35 also includes a spring attachment point 40, such as a hole, to which an end of a biasing spring 4 is attached. The other end of the biasing spring 4 is attached to the balance channel 2 via, for example, a support rivet 5. The spring 4 provides the force that balances the weight of the window sash 53. As the window sash 53 is moved, the cord 6 moves and rolls over the pulleys 11, 12, 31, 32, which rotate accordingly, and the support plate 35 slides. Travel of the support plate 35 is limited between its resting position and its extended position by the limit stop 9 on the cord 6 and the first pair of pulleys 10, respectively.

Parts List

1 Window balance
2 Balance channel
3 Walls of balance channel
4 Spring
5 Spring support/rivet
6 Cord
7 Support plate end of cord
8 Free end/attachment end of cord
9 Limit stop of cord
10 First pulley pair
11 First pulley
12 Second pulley
13 Hub steps/recesses of pulleys of first pair of pulleys
14 Axial bores of pulleys of first pair
15 Axle/rivet supporting first pair
16 Flats of axle
17 Heads of axle
18 Flange of axle

**4**

19 Flange step/protrusion
20 Washer
21 Washer step/protrusion
22 Cavity/space formed by hub steps of first pair
23 Rims of pulleys of first pair
24 Mounting groove of axle of first pair
30 Second pulley pair
31 Third pulley
32 Fourth pulley
33 Hub steps/protrusions of pulleys of second pair of pulleys
34 Axial bores of pulleys of second pair
35 Support plate
36 Guide for support plate
37 Support/rivet for third pulley
38 Support/rivet for fourth pulley
39 Heads of rivets for third and fourth pulleys
40 Attachment point for spring; hole in support plate
50 Pivot block or sash shoe
51 Window
52 Window frame
53 Window sash
54 Window jamb

I claim:

1. A block and tackle window balance comprising:
hub steps on each side of a pulley, the hub steps being formed coaxially with an axial bore of the pulley;
an axle on which the pulley is rotatably mounted so that the hub steps act to inhibit introduction of contaminants into the axial bore of the pulley;
a balance channel in which the axle is mounted, the balance channel being configured for mounting in one of a shoe channel, a sash, and a jamb of a window;
an end of the balance channel being attached to one of a sash shoe and a frame of a window;
a cord reeved over the pulley, a first end of the cord being attached to the other of the sash shoe and the frame of the window;
a spring having a first end attached to the balance channel and a second end connected to a second end of the cord; and
wherein the hub steps are recesses and the axle includes an axle step that protrudes toward and mates with a hub step of the pulley.

2. The window balance of claim 1 wherein the axle step is a protrusion extending from a flange formed in the axle.

3. The window balance of claim 1 wherein flats formed on a circumferential surface of the axle engage grooves formed in the balance channel to hold the axle against rotation.

4. The window balance of claim 1 wherein the mating axle step and hub step form two substantially right angles in a path to the axial bore of the pulley, substantially reducing introduction of dust into the axial bore of the pulley.

5. The window balance of claim 1 wherein the axle step is a protrusion formed on a washer mounted on the axle.

6. The window balance of claim 1 wherein the pulley is one of a substantially identical pair of pulleys mounted adjacent each other on the axle so that they can rotate relative to one another, a rim of one pulley substantially engaging a rim of the other pulley such that facing recesses form a cavity between the pulleys.

7. A block and tackle window balance comprising:
hub steps on each side of a pulley, the hub steps being formed coaxially with an axial bore of the pulley;
an axle on which the pulley is rotatably mounted so that the hub steps act to inhibit introduction of contaminants into the axial bore of the pulley;

6,041,476

5

a balance channel in which the axle is mounted, the balance channel being configured for mounting in one of a shoe channel, a sash, and a jamb of a window;

an end of the balance channel being attached to one of a sash shoe and a frame of a window;

a cord reeved over the pulley, a first end of the cord being attached to the other of the sash shoe and the frame of the window;

a spring having a first end attached to the balance channel and a second end connected to a second end of the cord; and

wherein the hub steps are protrusions and one of the hub steps engages a rivet head of an axle on which the pulley is rotatably supported, the axle being carried by a support plate that slides within the balance channel as the cord is played out of or drawn into the balance, the support plate being interposed between and attached to the second ends of the spring and the cord, the cord being biased by the spring against being played out of the balance.

8. The window balance of claim 7 wherein a pair of substantially identical axles carrying substantially identical pulleys is mounted on the support plate such that longitudinal axes of the axles are offset from one another.

9. The window balance of claim 7 wherein the support plate carries a guide that engages the balance channel to maintain the plate in proper alignment within the balance channel.

10. A block and tackle window balance comprising:

flats on a circumferential surface of an axle on which a pulley is rotatably mounted;

a balance channel in which the axle is mounted, the flats engaging a groove formed in the balance channel so that the axle is held against rotation, the balance channel being mounted for one of movement with a window sash and remaining fixed with respect to a window frame;

a cord reeved over the pulley, a first end of the cord being connected to the window frame when the balance channel is mounted for movement with the window sash, the first end of the cord being connected to the window sash when the balance channel is mounted for remaining fixed with respect to the window jamb;

a spring configured to provide a bias against withdrawal of the cord from the block and tackle window balance, a first end of the spring being connected to a second end of the cord, a second end of the spring being connected to the balance channel; and

one of an end of the balance channel and the first end of the cord being configured for attachment to a shoe shoe mounted in a shoe channel on the window jamb, the sash shoe being configured to slide in the shoe channel with the window sash as the window sash is moved, the end of the balance channel being configured for attachment to the sash shoe when the balance channel is mounted for movement with the window sash, and the first end of the cord being configured for attachment to the sash shoe when the balance channel is mounted for remaining fixed with respect to the window frame.

11. The window balance of claim 10 wherein the axle is a rivet and further comprises a flange arranged between the flats and the pulley.

12. The window balance of claim 11 wherein the flange includes a flange step on a pulley side of the flange, the flange step engaging a mating hub step of the pulley.

13. The window balance of claim 10 wherein a washer is mounted between a side of the pulley and a wall of the balance channel, the washer including a washer step that engages a mating hub step of the pulley.

6

14. The window balance of claim 10 wherein first and second pulleys are mounted adjacent one another on the axle in the balance channel, each pulley including hub steps such that a hub step of the first pulley faces a hub step of the second pulley and a hub step of each pulley faces a respective wall of the balance channel.

15. The window balance of claim 14 wherein the axle includes a step mating with a hub step of one of the pulleys.

16. The window balance of claim 14 further comprising a washer with a washer step thereon mating with a hub step of one of the pulleys.

17. The window balance of claim 14 further comprising third and fourth pulleys rotatably mounted on respective rivets on a support plate slidably mounted in the balance channel, the support plate being interposed between the spring and the cord such that the first ends of the spring and the cord are attached thereto, the pulleys including hub steps each engaging one of a respective rivet head and the support plate.

18. The window balance of claim 17 wherein the balance channel is mounted for movement with the window sash, an end of the balance channel being attached to the sash shoe, the cord running over each of the first, second, third, and fourth pulleys so that the first end of the cord can be attached to the window frame.

19. A block and tackle window balance comprising:

first hub steps on each side of a first pulley;

second hub steps on each side of a second pulley;

a first axle on which the first and second pulleys are rotatably mounted, the first and second pulleys lying adjacent one another on the axle so that they rub together;

third hub steps on each side of a third pulley;

fourth hub steps on each side of a fourth pulley;

second and third axles carrying the third and fourth pulleys, respectively, and being mounted on a support plate;

a balance channel non-rotatably supporting the first axle and slidably supporting the support plate, the balance channel including first and second side walls and a bottom wall;

a cord reeved over the pulleys and having a first end attached to the support plate and a second end extending from a first end of the balance channel; and

a spring having a fixed end attached to the balance channel and a movable end attached to the support plate.

20. The window balance of claim 19 wherein the first axle is mounted in grooves in the side walls of the balance channel and includes flats formed on a circumferential surface of the first axle corresponding to a region in which the first axle engages one of the grooves, the flats engaging the one of the grooves so that the axle is held against rotation.

21. The window balance of claim 19 wherein the first hub steps are recesses and the first axle includes a flange with a flange step formed thereon, the flange step engaging and mating with one of the first hub steps of the first pulley.

22. The window balance of claim 19 wherein the second hub steps are recesses and the first axle carries a washer adjacent the second pulley, the washer including a washer step facing the second pulley and mating with an adjacent second hub step of the second pulley.

23. The window balance of claim 19 wherein the hub steps of one of the third and fourth pulleys are protrusions, the axle of the one of the third and fourth pulleys comprising a rivet with a head engaging one of the protrusions, the other protrusion running against the support plate.

* * * * *

C000462



PRIOR ART

FIG. 2A

Case 1:05-cv-10020-DPW     Document 79-7     Filed 05/19/2006     Page 15 of 23



FIG. 7A

FIG. 7B

FIG. 8A

FIG. 8B



**NOTES:**

1. MATERIAL: KOCETAL K300 ACETAL NATURAL OR CALDWELL ENGINEERING APPROVED EQUIVALENT. 25% MAXIMUM REGRIND ALLOWED.

2. MAXIMUM ALLOWABLE GATE VESTIGE TO BE .005" ABOVE ADJACENT PULLEY FACE.

3. MAXIMUM ALLOWABLE PROTRUSION OF FLASH TO BE .010".

4. DIMENSIONS SHOWN SYMMETRICAL ABOUT ℄ ARE TO BE CENTERED WITHIN .005" UNLESS OTHERWISE SPECIFIED.

SECTION A-A

CHAMFER .015 x 45° TYP(2)

R.012

R.010 TYP(2)

R.040

10° REF. TYP

Ø 52

Ø 420

Ø 33

Ø 126±.002

.150

.130

SUB-GATE LOCATION (SEE NOTE 2)

CAVITY IDENTIFICATION RAISED .007" MAX

**INSPECTION-PRINT**

⊚ = INSPECTION NUMBER

▢CTF = CRITICAL TO FUNCTION

△CTP = CRITICAL TO PROCESS

LAST NUMBER USED – 18

| MATERIAL: SEE NOTE 1 | NEXT ASSY 15R504 |
| TREATMENT/FINISH | |

NOTE: DO NOT SCALE DRAWING! ALL TOLERANCES UNLESS OTHERWISE SPECIFIED ARE:
TWO DECIMAL PLACES ±.010
THREE DECIMAL PLACES ±.005
FOUR DECIMAL PLACES ±.002
ANGULAR ±1°
FRACTIONS ±1/64

Datum identification symbols:
▣ = DATUM IDENTIFICATION
○ = ROUNDNESS
// = PARALLELISM
⊥ = PERPENDICULARITY
∠ = ANGULARITY
⊕ = TRUE POSITION
◎ = CONCENTRICITY
⌖ = FLATNESS

THIS IS THE PROPERTY OF CALDWELL MANUFACTURING CO. ANY USE OR REPRODUCTION WITHOUT AUTHORIZATION BY THIS COMPANY IS PROHIBITED.

Mass Properties - REFERENCE ONLY
PART # 15R503 REV 0

DENSITY        0.0507 LBS./CU.IN.
MASS           0.0011 LBS.
VOLUME         0.0221 CU.IN.

**CALDWELL** MANUFACTURING COMPANY
2006 MANITOU ROAD    ROCHESTER, NEW YORK
SERIES 96 XT

TITLE
END PULLEY-LARGE

THIRD ANGLE PROJECTION    DRWN  K.J.C.    DATE 2/11/03
CHKD                      DATE
APPRVD                    DATE

SIZE A    EX NO 5998    DWG NO 15R503    REV 0

SCALE 4:1    SHEET 1 OF 1

EXHIBIT F

| REVISIONS | | | | |
| NUMBER | DATE | REV. | DESCRIPTION | DATE | BY |
| DEVIATIONS | | | | |



# EXHIBIT G

## Caldwell's Quick Tilt Constant Force Balances



Dust Cover

Cover (Mounting Element)

Coil Nest

Aperture For Screw Fastener

Coiled Spring

Coil Nest

Aperture For Screw Fastener

Sash Balance Carrier (Shoe)

Caldwell's Quick Tile Constant Force Balances

EXHIBIT H



EXHIBIT J

Bottom Giude w/ Roller
Amesbury's 264 Pat.

Balance Fixed Pulley Block
Caldwell's Series 86X

End of Cord

Bottom Giude

Bottom Guide
w/ Roller

Roller in Bottom
Guide

Pulleys (3)

Fixed Pulley Block

Fixed Pulley Block

Pulleys (2)

Channel

Cord



Channel

Fixed Pulley Block

Pulleys (3)

Bottom Guide

Caldwell's Series 86XT
Balance Detail

EXHIBIT K



Amesbury's Snap Lock
Balance Shoe

Caldwell's Series 971
w/ Short Carrier

EXHIBIT L



Amesbury's Snap Lock
Balance Shoe

Caldwell's Series 97EZ
w/ Long Carrier

EXHIBIT M



# EXHIBIT 7

00001

1

2          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS

3  - - - - - - - - - - - - - - - - - - -x
   AMESBURY GROUP, INC., and
4  AMESBURY SPRINGS LTD.,
        Plaintiffs,

5
        v.    Civil Action No. 05-10020-DPW

6
   THE CALDWELL MANUFACTURING
7  COMPANY,
        Defendant.

8  - - - - - - - - - - - - - - - - - - -x
        C O N F I D E N T I A L

9
   Deposition Upon Oral Examination Of:
10         Charles E. Still

11
   Location:    Harris Beach PLLC
12         99 Garnsey Road
         Pittsford, New York  14534

13

14  Date:      May 2, 2006

15

16  Time:      9:11 a.m.

17

18

19  Reported By:  Joanne N. Pero

20         Alliance Shorthand, Inc.

21         Suite 1500 - The Penthouse

22         Alliance Building

23         183 Main Street East

24         Rochester, New York  14604

25

**Still, Charles E., 5/2/06**                    **Page 1**

00005
1

2    Q.  Did you understand it to be a subpoena

3  requesting you to collect and produce certain

4  documents concerning this matter?

5    A.  Yes.

6    Q.  What did you do with respect to

7  collecting documents when you received this

8  subpoena?

9    A.  I collected emails and I collected all

10  the printed data that I had reference to -- or that

11  I had referenced in my report and I had it copied

12  and sent to your office.

13    Q.  Where did you look for email?

14    A.  In my computer.

15    Q.  What computer was that?

16    A.  It's my office computer.

17    Q.  Is it a desktop computer or laptop

18  computer?

19    A.  It's a desktop.

20    Q.  Is it connected to a server?

21    A.  No.

22    Q.  Did you search your computer for anything

23  other than email in connection with collecting

24  documents responsive to the subpoena we have marked

25  as Still Exhibit 1?

00006

1

2    A.  I did.

3    Q.  What else did you search your computer

4 for?

5    A.  That's the only thing.

6    Q.  Did you prepare your expert -- strike

7 that.

8       You understand you have submitted three

9 expert reports in this case, correct?

10    A.  I have.

11    Q.  Did you prepare those expert reports on

12 the computer in your office that you referred to?

13    A.  I did.

14    Q.  Did you search your computer for any

15 drafts of those reports in connection with

16 responding to the subpoena?

17    A.  I didn't have any drafts.

18    Q.  Do you ever back that computer up?

19    A.  No.

20    Q.  What did you do with the documents that

21 you identified that you collected in response to

22 the subpoena?

23    A.  Well, I had them printed and sent to you

24 but I still have the originals with me here.

25    Q.  That's the box behind you?

00007

1

2   A.   That's correct.

3   Q.   With respect to Still Exhibit 2, do you

4  understand you are testifying here today in

5  response to a subpoena that we have marked as Still

6  Exhibit 2?

7   A.   Yes.

8   (The following exhibit was marked for

9   identification:  Still 3.)

10   Q.   Mr. Still, we have marked as Still

11  Deposition Exhibit 3 a three-page document.  You

12  have the original one that you handed me this

13  morning.  Do you recognize it?

14   A.   Yes, I do.

15   Q.   What is it?

16   A.   It's my time log sheet that I assign time

17  spent on a project.

18   Q.   Does it concern your work as an expert in

19  the Amesbury against Caldwell matter?

20   A.   It does.

21   Q.   Does it describe all of the time that you

22  have put in on this matter?

23   A.   It does.

24   Q.   Is it correct that the first time you

25  recorded for this work was January 5 of 2005?

00008
1

2    A.  Yes.

3    Q.  There is a reference to "conference"; do

4  you see that?

5    A.  Yes.

6    Q.  Was that a conference with other people?

7    A.  Yes, it was.

8    Q.  With whom?

9    A.  With Neal and Laura.

10    Q.  And anybody else?

11    A.  There may have been Dave in there.  I am

12  not sure.  It was a conference call to me and I

13  didn't know all the parties.

14    Q.  I was going to ask you that, was it a

15  telephone call?

16    A.  It was a telephone call, yes.

17    Q.  That call took about two hours; is that

18  right?

19    A.  Yes.

20    Q.  What do you remember discussing at that

21  telephone discussion?

22    A.  They were describing the case to me and

23  what was involved.

24    Q.  What did they tell you about the case?

25    A.  That Caldwell was being sued by Amesbury

**Still, Charles E., 5/2/06**                              **Page 8**

00009

1

2  and there was a patent infringement on three

3  patents.

4     Q.  Do you remember anything else anybody

5  said during that discussion?

6     A.  No, I really don't.

7     Q.  Did anybody express any opinion during

8  that discussion concerning the merits of the case?

9     A.  No.

10    Q.  Did you take any notes in relation to

11  that discussion?

12    A.  I may have written some names down.

13  That's about all.

14    Q.  It appears from your time sheets that you

15  conducted some research on January 6 of 2005; is

16  that correct?

17    A.  Yes.

18    Q.  What research did you conduct on that

19  day?

20    A.  I don't recall.

21    Q.  I see you have a lot of entries here for

22  research.  Is that fair to say?

23    A.  It is just a general allocation.  It

24  involves many things.

25    Q.  What does it involve?

00040

1

2  Q.  I see.  But that's different from the

3  moment arm generated in Braid; isn't that correct?

4  A.  Slightly different, yes.

5  Q.  Because Braid is secured from below the

6  spring, right?

7  A.  Yes.

8  Q.  And Sterner is secured from within the

9  center of the spring, correct?

10  A.  Yes.

11  Q.  There is no reference in Sterner to

12  rotation of the mounting element at all, is there?

13  A.  No.

14  Q.  And there is no description in Sterner of

15  the need to prevent that rotation, is there?

16  A.  No.

17  Q.  The sample, could I have that, please,

18  that we have marked as Exhibit 5.  Do you have any

19  information concerning whether the balance included

20  in Still Exhibit 5 has ever been sold?

21  A.  I do not know.

22  Q.  Other than the patent, the Sterner

23  patent, do you have any information concerning

24  whether the balance that forms part of Still

25  Exhibit 5 has ever been publicly used in the United

**Still, Charles E., 5/2/06**                    **Page 40**

00053

1

2 ordinary person skill of the art.

3    Q.   Now, if we look at the Braid patent, for

4 example, and your report that we have designated as

5 Exhibit 6.  At the end of page 6, there is a

6 paragraph in your report where you have written

7 "Braid U.S. patent 5,365,638 based upon my findings

8 is not novel and/or is obvious and therefore not

9 valid"; do you see that?

10    A.   Yes.

11    Q.   So I want to understand your opinion, is

12 it your opinion that the claims of the Braid patent

13 lack novelty over the prior art?

14    A.   Yes, it's just not novel.

15    Q.   And is it in addition your opinion that

16 the claims of the Braid patent are obvious in view

17 of the prior art?

18    A.   Yes.

19    Q.   And the prior art that we focused on is

20 the Sterner '808 patent; is that correct?

21    A.   Yes.

22    Q.   Let me ask you this:  Do you have an

23 understanding of what would be required of the

24 disclosure of the Sterner '808 patent for it to

25 anticipate any claim of the Braid patent?

00054
1

2     A.   Well, as I first looked at this, it had

3  all the elements of '638.

4     Q.   But it doesn't show the face of the

5  mounting element in the same plane as any flanges,

6  correct?

7     A.   In their drawings, they don't do a good

8  job of that.

9     Q.   I am sorry?

10    A.   As an ordinary skilled person, I would

11  look at this and know what it is and what it means.

12    Q.   But again, the drawings don't show that,

13  right?

14    A.   That is correct.

15    Q.   And the specification doesn't describe

16  it, correct?

17    A.   That's right.

18    Q.   So when you reach your opinion that

19  Sterner anticipates the Braid '638 patent, you are

20  adding to the disclosure of Sterner your knowledge

21  and expertise; is that fair to say?

22    A.   It is what it is.  It's a raised spine.

23    Q.   What is a raised spine, I am sorry, I

24  didn't understand that.

25    A.   Well, the projection or the raised spine

00057

1

2 Quick-Tilt products"; did I read that correctly?

3   A.  Yes, sir.

4   Q.  Do you recognize the '638 patent to be

5 the Braid patent that we have marked as Exhibit 8?

6   A.  Yes.

7   Q.  Again, did you prepare these, is it fair

8 to call these, claim charts?

9   A.  I prepared the right side of the claim

10 charts and the title.

11   Q.  So did you prepare these from blank claim

12 charts that you received from Harris Beach firm?

13   A.  Yes.

14   Q.  So all the information that is in the

15 right-most column of Exhibit A, is that information

16 that you placed into that column?

17   A.  It is.

18   Q.  And is it meant to describe your

19 understanding of various features of Caldwell's

20 Quick-Tilt products?

21   A.  Yes, sir.

22   Q.  So in the first column, for example, the

23 first entry says "a mounting assembly comprising,"

24 is that to express your view that Caldwell's

25 Quick-Tilt products are a mounting assembly?

00058
1

2    A.  Yes.

3    Q.  And they include a channel means; is that

4  correct?

5    A.  Yes.

6    Q.  Having a rear wall, correct?

7    A.  Yes.

8    Q.  Side walls, correct?

9    A.  Yes.

10    Q.  And Caldwell Quick-Tilt products include

11  at the extremities of the side walls inwardly

12  turned opposed flanges; is that correct?

13    A.  Yes, sir.

14    Q.  They include a sash frame support means

15  slideable in said channel means, correct?

16    A.  Yes.

17    Q.  And a coiled ribbon spring, correct?

18    A.  Yes.

19    Q.  The coiled ribbon spring includes a first

20  end engaged with the sash frame support means,

21  correct?

22    A.  Yes.

23    Q.  And Quick-Tilt products further include a

24  means for mounting the coiled ribbon spring; is

25  that correct?

00059

1

2    A.  Yes.

3    Q.  And Caldwell's Quick-Tilt products -- at

4  the top of page 2 of your claim chart now, you

5  wrote "The coiled body portion of said coiled

6  ribbon spring having the other end of said coiled

7  ribbon spring within the coil being positioned in

8  said mounting means, said other end of said coiled

9  ribbon spring being free and unattached to said

10  mounting means"; is that your description of your

11  understanding of the feature of Caldwell's

12  Quick-Tilt products?

13    A.  Also in parentheses "see prior art in

14  '638 patent, figure 1 and figure 3."

15    Q.  I understand that but is it also a

16  description of your understanding of the feature of

17  the Caldwell's Quick-Tilt products?

18    A.  Yes.

19    Q.  You further describe the products as

20  including said mounting means being secured in said

21  channel means; is that correct?

22    A.  Yes.

23    Q.  You said further that, the mounting means

24  includes a raised spine; is that correct?

25    A.  Yes.

00060

1

2    Q.  The raised spine is positioned between

3    and in the same plane as the inwardly-turned

4    opposed flanges of the channel means, correct?

5    A.  Yes.

6    Q.  And then you wrote the raised spine of

7    Caldwell's Quick-Tilt does not inhibit rotation; is

8    that correct?

9    A.  Yes.

10    Q.  How did you determine that the raised

11    spine of Caldwell's Quick-Tilt does not inhibit

12    rotation?

13    A.  By examining the samples and trying the

14    samples out in the different window jambs and also

15    studying the dimensions of the entire assembly.

16    Q.  When you say "different window jambs,"

17    did you inspect the sample in window jambs in

18    addition to those we have marked as Exhibit 4-A,

19    4-B?

20    A.  Yes.

21    Q.  How many?

22    A.  There is one that was shown to me by this

23    office and it is here.

24    Q.  Could I see that, please?

25    A.  Yes.

**Still, Charles E., 5/2/06**                    **Page 60**

00072

1

2  yes.

3    Q.  So whether -- strike that.

4        Independent of whether additional

5  features of the Caldwell balance inhibit rotation,

6  in this assembly, this spine also inhibits rotation

7  of the balance, correct?

8    A.  It can.

9    Q.  Do you know whether Caldwell sold

10 Quick-Tilt balances to any customer installing

11 those balances in jambs configured like those we

12 have marked as Still Exhibit 10?

13   A.  I do not.

14   Q.  So can we agree that in some applications

15 it's your opinion that -- strike that.

16       So it's your opinion that in certain

17 installations, the spine on Caldwell's Quick-Tilt

18 does not inhibit rotation because it's narrower

19 than the gap defined by the flanges, correct?

20       MR. SLIFKIN:  Objection.

21   Q.  And in other installations having

22 narrower gaps, the spine can inhibit rotation,

23 correct?

24       MR. SLIFKIN:  Objection.

25   A.  It does not.  Let me show you.  When you

**Still, Charles E., 5/2/06**                    **Page 72**

00078
1

2  point under Concept 5 that you read about the slot

3  in the channel, do you know what that means?

4      MR. REFERMAT:  Objection.

5    A.  Not specifically.

6    Q.  Do you recall any instance generally in

7  the design process where a slot in the channel or

8  where there was a concern that a slot in the

9  channel may give customers the perception that

10  Caldwell was copying BSI's design?

11      MR. REFERMAT:  Objection.

12    A.  I don't understand the question.

13    Q.  Let me rephrase it.  The slot in the

14  channel referred to in this document, does that

15  refresh your recollection about a slot in the

16  channel of any of the concept designs that may have

17  given customers the perception that Caldwell was

18  copying BSI's designs?

19      MR. REFERMAT:  Objection.

20    A.  I guess I am not familiar with the BSI

21  design that this may have referred to.  So --

22      MR. REFERMAT:  He is asking whether you

23  have any recollection of it.

24      THE WITNESS:  No.

25      MR. REFERMAT:  Can we go off the record

**Robertson, Jeffrey, 11/29/05**                    **Page 78**

00097

1

2    Q.  And there is a description of the first

3  cord end being attached to the translatable pulley

4  block unit; do you see that?

5    A.  Yes.

6    Q.  Now, Prosser does not have a first cord

7  end attached to a translatable pulley block unit,

8  correct?

9    A.  That is true.

10    Q.  And the next claim 1 of the '264 patent

11  describes that the second cord end being attachable

12  to a jamb; do you see that?

13    A.  Yes.

14    Q.  Prosser does not include a second cord

15  end attachable to the frame jamb, right?

16    A.  It says "the jamb."  Attach it to a sash

17  jamb.

18    Q.  Well, let me ask you this, did you read

19  the '264 patent?

20    A.  I did.

21    Q.  When the '264 patent uses the term

22  "jamb," what is it referring to?

23    A.  The mainframe, frame jamb.

24    Q.  The frame jamb?

25    A.  Yes.

00100
1

2  patent shows a bottom guide, you had in mind the

3  bottom tongues 25 and 26, correct?

4    A.  Yes.

5    Q.  Is there any other feature of the Prosser

6  patent that you understand to constitute a top

7  guide as the term is used in the Newman '264

8  patent?

9    A.  No.

10    Q.  Is there any other feature shown in the

11  Prosser patent that you understand to constitute a

12  bottom guide as the term is used in the Newman '264

13  patent?

14    A.  No.

15    Q.  The top guide in the Newman patent rides

16  with the sash, correct?

17    A.  Yes, it does.

18    Q.  The top tongues in the Prosser patent are

19  fixed to the jamb, correct?

20    A.  Yes.

21    Q.  The bottom guide in the Newman patent

22  rides with the sash, correct?

23    A.  Yes.

24    Q.  And the bottom tongues in the Prosser

25  patent are fixed to the jamb, correct?

**Still, Charles E., 5/2/06**                    **Page 100**

00101

1

2    A.  Yes.

3    Q.  The bottom tongues in the Prosser patent

4 do not include any slot for mating with any portion

5 of a window sash, correct?

6    A.  No.

7    Q.  I will ask it again:  Is it correct that

8 the bottom tongues shown in the Prosser patent do

9 not include any sash -- strike that.

10        Is it correct that the bottom tongues in

11 the Prosser patent do not include any slot for

12 mating with any portion of a window sash?

13        MR. SLIFKIN:  Objection.

14    A.  It could.  I am not sure.

15    Q.  Well, I am asking you -- I think we are

16 on the same page but the way that the question and

17 answer came, the transcript is not going to be

18 clear.  I am not asking you what could or could not

19 happen.  I am asking what is described in the

20 Prosser patent.  Does the Prosser patent depict in

21 a figure or describe in the specification the

22 bottom tongues that you say constitute a bottom

23 guide having a slot for mating with a portion of a

24 window sash?

25    A.  No.

**Still, Charles E., 5/2/06**                    **Page 101**

00102

1

2    (The proceeding recessed at 11:45 a.m.)

3    (The proceeding reconvened at 12:07 p.m.;

4    appearances as before noted.)

5  C H A R L E S  S T I L L, resumes:

6    EXAMINATION BY MR. KLINE CONTINUING:

7      Q.  Mr. Still, quick question.  Have you

8  discussed with any of your counsel today any of the

9  subjects that I have asked you about this morning?

10     A.  No.

11     Q.  We were talking about the Newman '264

12  patent before the break and do you understand that

13  patent discloses top and bottom guides?

14     A.  Yes.

15     Q.  Do you know the purpose of the top and

16  bottom guides described in the Newman '264 patent?

17     A.  I do.

18     Q.  What is the purpose?

19     A.  To keep the metal jacket channel of the

20  balance from rubbing either the sash or the frame

21  jamb as it's operated.  That is one purpose.

22     Q.  Is another purpose to center the sash

23  within the window frame?

24     A.  It is and also to activate the takeout

25  feature at the head end of the channel.

**Still, Charles E., 5/2/06**                    **Page 102**

00103

1

2    Q.  And that takeout feature involves sliding

3  the sash to one side and pulling one side out from

4  within the frame, correct?

5    A.  It does.

6    Q.  Now, the tongues in Prosser do not serve

7  to center the window sash within the frame,

8  correct?

9    A.  Yes, sir.

10    Q.  And in fact, in figure 4 of Prosser, you

11  can see that the window sashes need to include

12  recesses to clear the balances shown, for example,

13  in figure 5 of Prosser, correct?

14    A.  Yes.

15    Q.  So the sashes in Prosser actually slide

16  against the back of the jambs in Prosser, correct?

17    A.  Yes.

18    Q.  And the tongues in Prosser do not enable

19  the takeout feature of the window sash like you

20  described with respect to the Newman assembly,

21  correct?

22    A.  They do not.

23    Q.  And just generally, the balance in

24  Prosser does not apply any sideways force to the

25  window sash; isn't that correct?

00104

1

2    A.  It doesn't appear that it does -- it does

3  not appear that it does.

4    Q.  Now, the Thompson patent that we have

5  identified as Exhibit 14; do you have that before

6  you?

7    A.  I do.

8    Q.  The Thompson patent describes a tilt-in

9  balance, correct?

10    A.  Yes, it does.

11    Q.  And the balance described in Thompson

12  could not be used in a window designed for a

13  sideload balance, correct?

14    A.  That is correct.

15    Q.  And I believe you testified that you

16  thought the Prosser balance is a sideload balance,

17  correct?

18    A.  Yes.

19    Q.  And we can agree, I am sure, that the

20  Newman balance is a sideload balance, correct?

21    A.  Yes.

22    Q.  And in Thompson, the tilt-in balance

23  slides up and down with the window sash, correct?

24    A.  It does.

25    Q.  And it includes a cord, one end of which

00110

1

2  the same thing?

3     A.  No.  A wheel and pulley is the same.

4  Roller is different.

5     Q.  So you understand that element of the

6  Thompson balance that you have just indicated to me

7  to be a roller, correct?

8     A.  It is termed as a roller when

9  described -- compared to '264 but in my opinion it

10  is a pulley wheel.

11     Q.  What if any differences are there in your

12  opinion between a pulley wheel and a roller as the

13  '264 patent uses the term?

14     A.  There is really not much difference.  The

15  patent calls for bottom roller and bottom guide.

16  If I were describing that, I would call it a

17  pulley.

18     Q.  Did you bring with you one of the

19  Caldwell 86xt balances?

20     A.  Yes.

21     Q.  Could I see that, please.

22        MR. KLINE:  If we could mark this as

23  Deposition Exhibit 16, please.

24     (The following exhibit was marked for

25     identification:  Still 16.)

**Still, Charles E., 5/2/06**                    **Page 110**

00121

1

2    A.  To extend the sash travel upwards for

3  egress.  To extend the upward sash travel for

4  egress.

5    Q.  Now, in Still Deposition Exhibit 16, can

6  we agree that part of the bottom guide is located

7  external to the channel?

8    A.  Yes.

9    Q.  And part of the bottom guide is located

10  internal to the channel?

11    A.  Yes, sir.

12    Q.  Can we agree that the bottom pulley in

13  Still Deposition Exhibit 16 is arranged within the

14  channel?

15    A.  Yes.

16    Q.  In fact, it's within the bottom guide,

17  isn't it?

18    A.  Yes.

19    Q.  Do you know whether -- strike this.

20      This Thompson balance that we have marked

21  Still Deposition 15, do you know who manufactured

22  this?

23    A.  I do.

24    Q.  Who?

25    A.  Amesbury.

**Still, Charles E., 5/2/06**                    **Page 121**

00123

1

2    Q.  So do you have Exhibit B before you?

3    A.  I do.

4    Q.  That is a claim chart, portions of which

5   you prepared concerning your opinion of

6   non-infringement of Amesbury's '264 patent by

7   Caldwell's 86xt balance; is that correct?

8    A.  Yes.

9    Q.  Am I correct that you received blank

10   claim charts from the Harris Beach firm and you

11   prepared Exhibit B based on those blank claim

12   charts?

13    A.  Yes, sir.

14    Q.  And am I correct you filled in the

15   right-hand column in these claim charts?

16    A.  Yes.

17    Q.  Did you intend by doing so to describe

18   your understanding of the Caldwell Series 86xt

19   balance system in that right-hand column?

20    A.  Yes, sir.

21    Q.  So just for example, in the first box,

22   you described Caldwell's Series 86xt balance system

23   as a block and tackle window balance; isn't that

24   correct?

25    A.  Yes.

00124

1

2    Q.  And the balance includes a channel,

3 right?

4    A.  Yes.

5    Q.  And the channel has a first end and a

6 second end; is that right?

7    A.  Yes.

8    Q.  And Caldwell's 86xt further includes a

9 top guide connected to the first end of the

10 channel; isn't that right?

11    A.  Yes.

12    Q.  And it includes a bottom guide connected

13 to the second end of the channel, right?

14    A.  Yes.

15    Q.  I understand that in your view the bottom

16 pulley of Caldwell's 86xt balance does not

17 correlate to the bottom guide roller described in

18 the '264 patent claim; is that right?

19    A.  It's not a roller.  It's not mounted in

20 the bottom guide.

21    Q.  It is arranged within the bottom guide,

22 though, correct?

23    A.  Within, yes.

24    Q.  It is mounted to the fixed -- strike

25 that.

**Still, Charles E., 5/2/06**              **Page 124**

00125
1

2          It is mounted to -- what did you call

3  that device?

4      A.  That is a fixed pulley block.

5      Q.  Caldwell's 86xt bottom pulley is mounted

6  to its fixed pulley block; is that right?

7      A.  Yes.

8      Q.  And that fixed pulley block is arranged

9  to place the bottom pulley within the bottom guide,

10  correct?

11     A.  Yes.

12     Q.  And in your Exhibit B to your report you

13  further describe Caldwell's Series 86xt balance as

14  including a fixed pulley block unit connected to

15  the channel; is that correct?

16     A.  Yes.

17     Q.  It includes a translatable pulley block

18  unit moveable within the channel, correct?

19     A.  Yes.

20     Q.  It includes a spring, correct?

21     A.  Yes.

22     Q.  The spring has first and second ends,

23  correct?

24     A.  Yes.

25     Q.  The first end of the spring is fixed

00126

1

2  relative to the channel, correct?

3     A.  Yes.

4     Q.  The second end of the spring is connected

5  to the translatable pulley block unit, correct?

6     A.  Yes.

7     Q.  Caldwell's 86xt further includes a cord,

8  correct?

9     A.  Yes.

10    Q.  The cord includes first and second ends,

11  correct?

12    A.  Yes.

13    Q.  The cord is threaded through the

14  translatable pulley block unit, correct?

15    A.  Yes.

16    Q.  And the fixed pulley block unit, correct?

17    A.  Yes.

18    Q.  And the cord extends around the pulley

19  block bottom pulley, right?

20    A.  Yes.

21    Q.  And you contend that pulley is not a

22  roller, right?

23    A.  That is correct.

24    Q.  The first end of the cord is attached to

25  the translatable pulley block unit, correct?

00127

1

2  an extension of the cover, the independent cover of

3  Quick Tilt 1, simply combining two plastic parts or

4  the features of two plastic parts into a single

5  part.  As opposed to putting two parts together --

6    (There was a discussion off the record.)

7    Q.  Mr. Robertson, can you clarify what you

8  meant by an extension of the cover of the Quick

9  Tilt, the original Quick Tilt?

10      MR. REFERMAT:  Objection.

11    A.  I simply meant that the desire to design

12  a single part containing all of the features became

13  an extension, a furthering of the design of the

14  independent parts in Quick Tilt 1.

15    Q.  And so one of the independent parts of

16  Quick Tilt 1 was this raised protrusion I?

17      MR. REFERMAT:  Objection.

18    A.  Was the cover with the raised protrusion

19  section in the middle.

20    Q.  So you simply combined that design --

21    A.  That object, those features.

22      MR. REFERMAT:  Let him, please, finish

23  the question.

24    Q.  So let me ask you:  So you simply

25  combined the cover from Quick Tilt 1 with the

00132

1

2     Q.  You received the rest of the chart from

3  Harris Beach; is that correct?

4     A.  I did.

5     Q.  Does the right-hand column express your

6  understanding of the structure and function of

7  Caldwell Series 97i balance?

8     A.  Yes.

9     Q.  For example, you described it as a window

10  balance, correct?

11    A.  Yes, sir.

12    Q.  And you describe Caldwell's 97i as

13  including a U-shaped channel comprising a plurality

14  of openings; is that correct?

15    A.  Yes.

16    Q.  And it includes a spring connected to a

17  system of pulleys located within the U-shaped

18  channel, correct?

19    A.  Yes.

20    Q.  The 97i balance includes a cord having

21  first and second ends, correct?

22    A.  Yes.

23    Q.  The first cord end is connected and

24  threaded through a system of pulleys; is that

25  right?

00133

1

2    A.  Yes.

3    Q.  And the second cord end is connected to a

4  jamb mounting attachment; is that right?

5    A.  Yes.

6    Q.  The 97i balance includes a balance

7  carrier which you describe as a shoe wherein the

8  balance carrier includes certain features; is that

9  right?

10    A.  Yes.

11    Q.  And the shoe includes a frame comprising

12  an enlarged first end, right?

13    A.  Yes.

14    Q.  And it further includes a second end

15  wherein the second end is adapted to be received by

16  the U-shaped channel, correct?

17    A.  Yes.

18    Q.  The 97i balance includes a locking member

19  proximal to the enlarged first end, correct?

20    A.  Yes.

21    Q.  It includes a cam in communication with

22  the locking member, right?

23    A.  Yes.

24    Q.  And now there are two elements of

25  Amesbury's '368 patent claim 2 that you contend are

**Still, Charles E., 5/2/06**                    **Page 133**

00134

1

2  omitted from Caldwell's 97i balance, correct?

3      A.  Yes.

4      Q.  In your view, the 97i balance omits any

5  pocket in the shoe, right?

6      A.  Yes.

7      Q.  And it omits a connecting device for

8  attaching the balance shoe within the U-shaped

9  channel; is that correct?

10     A.  Yes.

11     Q.  Now, the balance shoe is connected within

12  the U-shaped channel, isn't it?

13     A.  It is.

14     Q.  What holds it there?

15     A.  A rivet.

16     Q.  So is it fair to call that rivet a

17  connecting device?

18     A.  I wouldn't.

19     Q.  Why not?

20     A.  That is a connecting rivet.

21     Q.  Any difference between a connecting rivet

22  and a connecting device in your view?

23     A.  A device could mean a number of things

24  but a rivet is a rivet.

25     Q.  Could a rivet be a device?

00135

1

2    A.  You could probably put it in the

3 category, yes.

4    Q.  So a rivet connects the shoe to the

5 channel, correct?

6    A.  Yes.

7    Q.  And a rivet can be a device, right?

8    A.  It could be, yes.

9    Q.  You also say that the device -- strike

10 that.

11      Your report expresses the view that the

12 shoe in Caldwell's 97i balance omits any pocket; is

13 that correct?

14    A.  That is correct.

15    Q.  What definition of pocket did you have in

16 mind when you reached that conclusion?

17    A.  Well, something that is -- that is going

18 to hook around the balance like it does in the

19 Amesbury balance where it creates a pivot point for

20 the sash shoe to be rotated.

21    Q.  So when you concluded that Caldwell's 97i

22 balance omits any pocket, that is the definition of

23 pocket you had in mind; is that right?

24    A.  That is my explanation of a pocket, yes.

25    Q.  Describe for me in your words how the

00139

1

2  the question.

3       MR. ISHMAEL:  I am just clarifying

4  because -- could we go off the record for a second.

5   (There was a discussion off the record.)

6     Q.  Mr. Robertson, did Caldwell -- sorry,

7  strike that.

8       Did anyone at Caldwell ever distribute

9  information about BSI products to you?

10       MR. REFERMAT:  Objection.

11    A.  Define "information."

12    Q.  I'll rephrase.  Did anyone at Caldwell

13  ever distribute BSI product brochures or literature

14  to you?

15       MR. REFERMAT:  Objection.

16    A.  No.

17    Q.  Did anyone at Caldwell ever distribute

18  BSI products themselves to you?

19       MR. REFERMAT:  Objection.

20    A.  Yes.

21    Q.  Do you remember what BSI products?

22    A.  No.

23    Q.  Do you remember who gave you the BSI

24  product?

25    A.  No.

**Robertson, Jeffrey, 11/29/05**                    **Page 139**

00140
1

2  balance that we designated as Still Deposition

3  Exhibit 21, correct?

4      A.  Yes.  In addition to the fact it does not

5  rotate and it is not replaceable in the field.  The

6  97ez is not replaceable in the field, you have to

7  replace the entire balance.

8      Q.  Now, in the 97ez includes a channel,

9  correct?

10      A.  Yes.

11      Q.  And it includes a shoe, correct?

12      A.  Yes.

13      Q.  And the shoe is connected to the channel,

14  correct?

15      A.  Yes.

16      Q.  And it's connected with a rivet?

17      A.  Yes.

18      Q.  And we have confirmed that a rivet can be

19  a device, have we not?

20      A.  Yes.

21      Q.  If you could further describe for me

22  generally how the shoe of the 97ez is connected to

23  the channel of the 97ez?

24      A.  There is one rivet that goes through both

25  walls of the steel channel that passes through an

00142

1

2     Q.  How does it do that?

3     A.  When you put those two legs underneath

4  the rivet, it keeps -- inhibits it from rotating.

5  It does have nothing to do with the connection to

6  the channel.

7     Q.  I understand that.  I am just asking,

8  it's the interaction between the end of the shoe,

9  the legs and the rivet that prevent the rotation,

10  correct?

11     A.  Yes.  Once the balance is in place, it

12  serves no purpose.

13     Q.  Well, prevents the rotation, right?

14     A.  It won't rotate in a window.

15     Q.  I am sorry.  I didn't get the end of

16  that.

17     A.  I am sorry, it won't rotate in a window.

18  Once a balance is in place inside the jamb channel,

19  it cannot rotate.

20     Q.  Why is it necessary, then?

21     A.  Just to keep the part from swinging out

22  during shipment or during assembly, just to keep it

23  straight.

24     Q.  So when you concluded that Caldwell's

25  97ez balance omits any pocket, did you have in mind

**Still, Charles E., 5/2/06**                    **Page 142**

00143

1

2  the same definition of pocket that you described to

3  me earlier?

4    A.  Yes.

5    Q.  Have you ever considered any other

6  definition of pocket in connection with your

7  analysis in this matter?

8    A.  No.

9  (The proceeding recessed at 1:03 p.m.)

10  (The proceeding reconvened at 1:09 p.m.;

11  appearances as before noted.)

12  C H A R L E S  S T I L L, resumes:

13  EXAMINATION BY MR. KLINE CONTINUING:

14    Q.  Just a couple more questions.  Still

15  Deposition Exhibit 20, we looked at that clearance

16  in the shoe before through which the rivet passes?

17    A.  Yes.

18    Q.  Can we agree that that clearance helps to

19  secure the shoe in cooperation with the rivet to

20  the channel?

21    A.  No.

22    Q.  Why not?

23    A.  The wall of the rivet is actually

24  supported in the base of the part and also the

25  third leg that goes under the rivet to support it.

**Still, Charles E., 5/2/06**                    **Page 143**

# EXHIBIT 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMESBURY GROUP, INC., and    )
AMESBURY SPRINGS LTD.,       )
          Plaintiffs,        )
                             )          CIVIL ACTION NO.
          v.                 )          05-10020-DPW
                             )
THE CALDWELL MANUFACTURING   )
COMPANY,                     )
          Defendant.         )

MEMORANDUM AND ORDER
January 20, 2006

Amesbury Group, Inc. and Amesbury Springs Ltd.
(collectively, "Amesbury") commenced this action against The
Caldwell Manufacturing Company ("Caldwell") for allegedly
infringing three of Amesbury's patents related to window
balances.  These are: United States Patents numbered 5,365,638
(the "'638 patent") for "Spring Mounting for Sash Frame
Tensioning Arrangements"; 6,598,264 (the "'264 patent") for
"Block and Tackle Window Balance with Bottom Guide Roller"; and
6,820,368 (the "'368 patent") for "Snap Lock Balance Shoe and
System for a Pivotable Window".  In response, Caldwell has filed
counterclaims seeking a declaration that it has not infringed any
of the patents at issue and that Amesbury's patents are invalid
in any event.

In order to frame the issues in this litigation, I resolve

-1-

in this Memorandum the threshold dispute between the parties regarding the construction of various claim terms in this Memorandum and Order. See Watts v. XL Systems, Inc., 232 F.3d 877, 880 (Fed. Cir. 2000)("The determination of infringement is a two-step process. First, this court construes the claims and, second, we compare the properly construed claims to the accused device.")

## I.   CLAIM CONSTRUCTION

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corporation, 415 F.3d 1303, 1312 (Fed. Cir. 2005) quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Federal Circuit in Phillips recently set out a comprehensive framework for construing claims.

Claim construction, notwithstanding its evidentiary underpinnings, is a question of law to be determined by a judge. Markman v. Westview Instruments, Inc., 517 U.S. 370, 384, 390 (1996). Courts are to give claim terms "their ordinary and customary meaning." Phillips, 415 F.3d at 1312 quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (1996). However, the ordinary and customary meaning of a claim is not necessarily the meaning understood by a layperson, but "the meaning that the term would have to a person of ordinary skill in the art in

question at the time of the invention."[1] <u>Id.</u> at 1313.  This

understanding provides "an objective baseline from which to begin

claim interpretation."  <u>Id.</u>

"In some cases, the ordinary meaning of claim language as

understood by a person of skill in the art may be readily

apparent even to lay judges, and claim construction in such cases

involves little more than the application of the widely accepted

meaning of commonly understood words."  <u>Id.</u> at 1314.  "In such

circumstances, general purpose dictionaries may be helpful."  <u>Id.</u>

However, where the ordinary meaning of claim language as

understood by a person of skill in the art is not readily

apparent, <u>Phillips</u> directs district courts to a hierarchy of

sources to aid in claim construction.  The intrinsic record,

including the claim terms themselves, the remainder of the

specification, and the prosecution history, provides the best

guidance as to the meaning of the claims.  <u>Id.</u> at 1313-14.

Extrinsic evidence, such as dictionaries, expert testimony, and

learned treatises, may also play a valuable role in claim

construction.  However, in a departure from the line of cases led

by <u>Texas Digital Systems, Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193

(Fed Cir. 2002), <u>Phillips</u> urges caution in their use.  <u>Id.</u> at

1319-1324.

Among the sources of intrinsic evidence, <u>Phillips</u> places

_____

[1] For purposes of claim construction, the "time of the
invention" is the effective filing date of the patent
application.  <u>Phillips v. AWH Corporation</u>, 415 F.3d 1303, 1313
(Fed. Cir. 2005).

primary importance on the claims themselves and the
specification.  The context in which a term is used in the
asserted claim and the use of the term in other claims can be
"highly instructive."  Id. at 1314.  The claims, "of course, do
not stand alone."  Id. at 1315.  They "must be read in view of
the specification, of which they are a part."  Id. quoting
Markman, 52 F.3d at 978.  Thus, Phillips reaffirmed the long-
standing principle that the specification "is the single best
guide to the meaning of a disputed term."  Id. at 1303.  In
addition to its statutory role as a "full" and "exact"
description of the claimed invention, the specification may
reveal a patentee's distinctive definition of a term or a
disavowal of claim scope.  Id. at 1316.  The specification is
such a valuable tool that it is "entirely appropriate for a
court, when conducting claim construction, to rely heavily on the
written description for guidance as to the meaning of the
claims."  Id. at 1317.  Nevertheless, Phillips warned of "the
danger of reading limitations from the specification into the
claim."  Id. at 1323.  The purpose of the specification is to
enable one skilled in the art to make and use the invention.  Id.
Specific embodiments of the invention described for teaching
purposes should not be imported into the claim as a limitation.
Id.  The distinction between proper claim construction and
improper limitation turns on "whether a person of skill in the
art would understand the embodiments to define the outer limits
of the claim term or merely to be exemplary in nature."  Id. at

-4-

1323.

A court may also consult the prosecution history, which "consists of the complete record of the proceedings before the PTO [the Patent and Trademark Office] and includes the prior art cited during the examination of the patent", when construing a claim. Id. at 1317. Like the specification, the prosecution history "can inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. See Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'"), quoting ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1580 (Fed. Cir. 1988). However, the prosecution history is not a final product; it "represents an ongoing negotiation between the PTO and the applicant." Phillips, 415 F.3d at 1317. As such, it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.

Although the Phillips court attached greater value to intrinsic evidence, it approved the use of extrinsic evidence in a limited fashion. Specifically, technical dictionaries are helpful to the extent that they assist a court to "'better understand the underlying technology' and the way in which one of skill in the art might use the claim terms." Id. at 1318 quoting

-5-

<u>Vitronics</u>, 90 F.3d at 1344. Expert testimony is also valuable for providing background on the technology at issue, explaining how an invention works, or describing a distinctive use of a term in a particular field. However, neither dictionaries nor expert testimony, are entirely reliable sources for claim interpretation for a variety of reasons. The <u>Phillips</u> court's greatest concern with extrinsic evidence, particularly dictionaries, is that it may lead judges to construe terms in an overbroad manner:

> The problem is that if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.

<u>Id</u>. at 1321. Because dictionaries provide a broad array of definitions, "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract." <u>Id</u>. The <u>Texas Digital</u> line of cases adopted this "dictionary down" approach, thereby reducing the role of the specification to a mere "check on the dictionary meaning of a claim term." <u>Id.</u> at 1320. In contrast, <u>Phillips</u> articulated a "claims up" approach, instructing courts to focus "at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down." <u>Id.</u> at 1321.

Ultimately, there is no "magic formula" for conducting claim construction when the ordinary meaning of the disputed terms as

understood by a person of skill in the art is not readily apparent. Id. at 1324. The key lies in giving appropriate weight to each "source in light of the statutes and policies that inform patent law." Id. Accordingly, the claims and the specification are most significant, followed by prosecution history, and finally by extrinsic sources. Id.

Having set out the general principles, I now turn to explain the particular interpretative approach that is required for "means-plus-function" claims that invoke 35 U.S.C. § 112, ¶ 6. Such claim[s] shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. This mandatory interpretative approach "restrict[s] a functional claim element's 'broad literal language ... to those means that are 'equivalent' to the actual means shown in the patent specification.'" Al-Site Corp. v. VSI Int'l, 174 F.3d 1308, 1320 (Fed. Cir. 1999) quoting Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 28 (1997).

The Federal Circuit "has established a framework for determining whether the elements of a claim invoke means-plus-function treatment." Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 194 F.3d 1250, 1257 (Fed. Cir. 1999).

> If the word "means" appears in a claim element in
> association with a function, this court presumes that
> § 112, ¶ 6 applies. This presumption collapses,
> however, if the claim itself recites sufficient
> structure, material, or acts to perform the claimed

> function.  Without the term "means," a claim element is
> presumed to fall outside means-plus-function
> strictures.  Once again, however, that presumption can
> collapse when an element lacking the term "means"
> nonetheless relies on functional terms rather than
> structure or material to describe performance of the
> claimed function.

Id. (internal citations omitted).

If a claim invokes means-plus-function treatment, the first step in construing it is to identify the function.  ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1087 (Fed. Cir. 2003).  "The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations.  It is improper to narrow the scope of the function beyond the claim language.  It is equally improper to broaden the scope of the claimed function by ignoring clear limitations in the claim language.  Ordinary principles of claim construction govern interpretation of the claim language used to describe the function."  Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 296 F.3d 1106, 1113 (Fed. Cir. 2002).

The second step is to "examine the written description to determine the structure that corresponds to and performs that function."  ACTV, 346 F.3d at 1087.  "In order to qualify as corresponding, the structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function."  Cardiac, 296 F.3d

at 1113.

With these principles in mind, I may proceed to consideration of the disputed claim terms in the '638, '264, and '368 patents respectively.

## II.  DISPUTED TERMS

**A.  '638 patent**

**1. <u>Background</u>** - The '638 patent entitled "Spring Mounting for Sash Frame Tensioning Arrangements" was created to improve on a basic "coiled spring" window balance by eliminating the noise created by such springs when they are in use.  [Amesbury's Brief, p. 2; '638 Patent Background, col. 1, l. 46-47.]

Window balances are secured by an anchor in the hollow channels within the window jambs (the vertical sides of the window frame that contain tracks on their interior for the windows to slide up and down).  A basic coiled spring window balance is sized to counter the weight of the window "sash" (the movable portion of the hung window that holds the panes of glass), allowing the sash to move up and down the window jamb and remain in any desired open position. ['638 Patent Abstract.]  The outer end of the coiled spring balance is attached to the "shoe" or "sash frame support element", which is connected to the sash. This outer end of the spring uncoils and recoils as the sash slides up and down during use.

In the older spring balances the inner end of the spring was

-9-

not secured to anything.  ['638 Patent Background, col. 1, ll.
24-26, 34.] Instead the spring was mounted on a drum in the open
space within the coil around which the spring rotated as the
outer free end uncoiled and recoiled.  The upper part of the
inside of the coil rested on the drum with the lower part of the
coil slung below the drum and not supported by it.  ['638 Patent
Background, col. 1, ll. 30-32.] The drum was either arranged to
be stationary or to rotate with the spring as a guide, ['638
Patent Background, col. 1, ll. 22-23], but in either case the
drum provided only a "reaction member" that "retain[ed] the body
of the spring loosely in a position in the channel" of the window
jamb as the outer end uncoils. ['638 Patent Background, col. 1,
ll. 37-39.] Securing the coiled spring in place in this way
created the disadvantage "that the spring [was] not silent in
use, possibly due to relative movement between the inner, free
end of the spring and the spring support drum." ['638 Patent
Background, col. 1, ll. 41-45.]

The '638 Patent alters how the coiled spring balance is held
in place to eliminate the noise.  Instead of being supported from
within the coil, the patent allows the spring to rest on a
mounting element, ['638 Patent Summary, col. 2, ll. 20-24], which
appears to support the spring "from below" (when the springs are
"used in vertical sash frames as is usual") by means of a
"surface" or "arm" underneath the spring "being concavely curved

to support the curved outer undersurface of the spring." ['638
Patent, col. 2, ll. 4-6, 17-18, 48-50, col. 4, ll. 20-21, 22-23.]
The patent also envisions the possibility of having a "tube-like
hub which, in use, loosely impales" the center of "the coiled
ribbon spring", but the hub would not provide any support to the
spring (except that it might provide minor support if the spring
was fully extended, but that is not the function of the hub).
['638 Patent, col. 4, ll. 17-19; col. 2, ll. 55-58.]

The patent describes that the mounting element would
preferably be secured to the frame by a fixing screw through "an
aperture" in the mounting element.  ['638 Patent, col. 2, ll. 14-
16; See also Claim 2, col. 6, ll. 23-25.] If the mounting element
had the tube-like hub, an "aperture" could run through the hub
portion and thus through the middle of the coil "to receive ... a
fixing screw by which the mounting element may be secured to the
frame".  ['638 Patent, col. 2, ll. 43-45.]

The patent describes how the mounting element is to include
"formations" that cooperate with the "inwardly turned opposed
flanges"[2] of the window jamb channel to inhibit the rotation or
twisting of the mounting element relative to the sash frame so

---

[2] The inwardly turned opposed (or opposite) flanges of the
channel correspond to inwardly-turned protruding edges that run
along both sides of the window jamb track (or channel).  The
mounting element for the coiled spring balance appears to fit
inside the window jamb track or channel with the flanges
partially closing off the side opposite the back of the track or
channel.

that the mounting element remains "substantially stationary when
the spring is in operation." ['638 Patent Summary, col. 2, ll.
59-67; Claim 1, cl. 6, 11-15; Claim 8, col. 6, ll. 56-63.]  The
patent also allows for stacking or "inter-engagement" of mounting
assembly units where more than one coiled spring is required.

Based on the parties' proposed claim constructions, there
are only four disputed terms, all of which are part of the two
independent claims at issue - Claims 1 and 8 set out below with
the disputed terms in bold face italics.

<u>Claim 1</u>

A mounting assembly comprising a channel means having a
rear wall, side walls and at extremities of said side
walls, inwardly turned opposed flanges, a sash frame
support means slidable in said channel means, a coiled
ribbon spring having a first end engaged with said sash
frame support means, and ***a means for mounting said
coiled ribbon spring***, the coiled body portion of said
coiled ribbon spring having the other end of said
coiled ribbon spring within the coil being positioned
in said mounting means, said other end of said coiled
ribbon spring being free and unattached to said
mounting means and said mounting means being secured in
said channel means, said mounting means having a ***raised
spine*** positioned between and in the same plane as said
inwardly turned opposed flanges of said channel means
**whereby rotational motion of said mounting means is
inhibited**.

<u>Claim 8</u>

A mounting assembly comprising a channel means having a
rear wall, side walls and at extremities of said side
walls, inwardly turned opposed flanges, a sash frame
support means slidable in said channel means, a coiled
ribbon spring having an outer end engaged with said
sash frame support means, and **a means for mounting said
coiled ribbon spring**, the coiled body portion of said

-12-

coiled ribbon spring with the other end of said coiled
ribbon spring positioned in said mounting means, said
mounting means being secured in said channel means and
the mounting means having **_projection means_** positioned
between said inwardly turned opposite flanges of the
channel means within which the mounting means is
positioned, **whereby rotational movement of the mounting
means in inhibited**.

2. **"<u>a means for mounting said coiled ribbon spring</u>"** - Both
parties agree that this term is a means-plus-function term.
Nonetheless, Amesbury suggests that the term means "a body with a
surface for supporting the coiled ribbon spring," whereas
Caldwell argues that the correct construction of the term is a
structure for mounting the coiled ribbon spring to the channel
that has "a body with an opening to receive a fixing screw [or
its equivalent] and an upper surface concavely curved to support
the curved outer undersurface of the spring."  I note that the
patent refers to the disputed term as "mounting means" in
subsequent parts of Claims 1 and 8.

The first step in construing a means-plus-function term is
to identify the function.  <u>ACTV</u>, 346 F.3d at 1087.  Amesbury and
Caldwell seem to agree that the recited function is simply
"mounting the coiled ribbon spring" to the channel as stated in
the claim.  However, the parties dispute the degree to which the
idea of "being secured" in the channel and the fixing screw
itself must be incorporated into the meaning of the term.

To "construe the meaning of the words used to describe the

-13-

claimed function" I must use "ordinary principles of claim construction." <u>Lockheed Martin Corp. v. Space Systems/Loral, Inc.</u>, 324 F.3d 1308, 1319 (Fed. Cir. 2003). Thus, I must give the term 'mounting' "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." <u>Phillips</u>, 415 F.3d at 1312. In this case, I am satisfied that the ordinary meaning of "mounting" as understood by a person of skill in the art is readily apparent. This is not the case where the term has a "particular meaning in [the relevant] field of art", nor does it appear that the term is being used "idiosyncratically". <u>Id.</u> at 1315. Consequently, I will construe the term according to the "widely accepted meaning" of these "commonly understood words". <u>Phillips</u>, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." <u>Id.</u>

Caldwell cites the definition of "mount" in the American Heritage Dictionary (3d ed 1992) at p. 1180 - "to fix securely to a support" - which I find to be the ordinary meaning of the verb as understood by a person of skill in the art. However, in this claim, the "mounting means" is secured, in the passive voice sense, to the channel according to a later phrase in Claims 1 and 8. As a result, I conclude that it is readily apparent that the disputed term describes a means for enabling the coiled ribbon spring to be fixed to the window frame channel.

This function is consistent with the section of the

specification cited by both parties.  That section uses two verbs
to describe the dual purposes of the 'mounting element' - "to
receive, in use, a fixing screw by which the mounting element may
be secured [to the window] frame" and "to support the curved
outer undersurface of the spring".  ['638 Patent, col. 2, ll. 13-
19.] Together these enable the "mounting element" to 'mount' the
coil spring.  In drawing this conclusion, I note that the
"mounting element" or "mounting means" alone does not "secure"
the mounting element to the channel as suggested by Caldwell
[Caldwell Brief, p. 5], nor is the fixing screw or its equivalent
part of the element called a "mounting means".  Rather, the
"mounting means" "receive[s] a fixing screw by which the mounting
element may be secured [to the window] frame or abutment". ['638
Patent, col. 2, ll. 13-20] Thus, according to this patent, the
fixing screw or its equivalent is the element that actually
secures the "mounting element" to the wall and it is distinct
from the "mounting element".  This interpretation of the patent
does not ignore the presence of the screw or its equivalent, but
recognizes the relationship between the "mounting means" and the
idea of securing the "mounting means" implicit in Claims 1 and 8.

The second step in the means-plus-function analysis is to
identify "what structures disclosed in the written description
correspond to the 'means' for performing that function,"
Lockhead Martin, 324 F.3d at 1319, and the "equivalents" of those

-15-

structures.  <u>Altiris, Inc. v.</u>

<u>Syman</u>

<u>tec Corp.</u>, 318 F.3d 1363, 1377 (Fed.

Cir.

2003).  Here, both parties agree

that

the corresponding structure is the

"moun

ting element" described in the

follo

wing paragraph of the patent

speci

fication:

> **Preferably**, the <u>**mounting**</u>
>
> <u>**element**</u> comprises a **body** portion having an **aperture**
> therein to receive, in use, a fixing screw by which the
> mounting element may be secured to said frame or
> abutment, an **upper surface of the body** portion being
> **concavely curved** to support the curved outer
> undersurface of the spring, thus providing said support
> surface.

['648 Patent, col. 2, ll. 13-19 (emphasis added).]

This generic description fits all of the preferred

embodiments.  See for

 example Fig. 2 and 7 shown below, both of which have a

body, an aperture or a bore to receive a fixing screw

or something similar (noted as **12** in Fig. 2 and **88** in Fig. 7),
and a concavely curved surface to support the spring coil (noted
as **20** in Fig. 2 and **20'** in Fig. 7).



FIG.7.



Another description of the "mounting element" builds on the more generic description referenced above.

> **Alternatively**, the <u>**mounting element**</u> may be configured
> such that there is a **hub portion** having an **aperture**
> therein to receive, in use, a fixing screw by which the
> mounting element may be secured to the frame or
> abutment; the hub portion being disposed such that in
> use the spring encircles such hub portion, the mounting
> element having an **arm** portion slung below said hub
> portion and disposed so as to support said outer
> undersurface of said spring.

['648 Patent, col. 2, ll. 42-50 (emphasis added).] This

alternative is depicted in the preferred embodiments in Figures

3-5 with Fig. 4 shown below.  Again there is a body and an

aperture to receive a fixing screw and the "arm portion slung

below said hub portion" (noted as **62**) in these figures is

described as the "curved support surface" which is "the

counterpart of the support surface in the first [and other]

embodiments" (noted as **20** in Figs. 2 and 7). ['638 Patent, col.

4, ll. 22-24.]

-19-



FIG.4.

Formations that cooperate with the inwardly turned opposed
flanges of the window jamb channel and inter-engagement
formations are also envisioned as possible characteristics of the
"mounting element."

Since an aperture (or bore) allowing a fixing screw to pass
through the "mounting element" to secure it to the window frame
is common to the simplest description and all of the preferred
embodiments and drawings, Caldwell seeks to include "an aperture
for a screw" as part of the construction of the term "mounting
means".  Amesbury does not adopt the addition of this phrase.

I agree with Amesbury; the term "mounting element", and
therefore the disputed term, does not necessarily require an
aperture for a fixing screw because the second last paragraph of
the patent specification explains that "other methods of securing
the mountings to a frame or abutment may be used."  ['638 Patent,
col. 5, ll. 51-52.]  Thus, the body of the "mounting element" can
be designed to receive a fixing screw, "two or more screw[s]
[*sic*] or other fixings", or "[a]lternatively, pegs, spigots or
catches could be used." ['638 Patent, col. 5, ll. 53-56.]  As a

result, Claims 1 and 8 encompass mounting elements similar to the ones depicted in the drawings that correspond to the 'means' for performing the 'mounting' function, but which use catches, for instance, to attach the back of the mounting element to the window jamb channel wall instead of a screw.  Consequently, I disagree with Caldwell that the "only structures disclosed in the specification corresponding to the 'mounting means' are depicted in Figures 1 through 12." [Caldwell Brief, p. 6.]

This conclusion is supported by the doctrine of claim differentiation, which "'create[s] a presumption that each claim in a patent has a different scope.'" Free Motion Fitness, Inc. v. Cybex Intern., Inc., 423 F.3d 1343, 1351 (Fed. Cir. 2005) quoting Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998).  "The difference in meaning and scope between claims is presumed to be significant '[t]o the extent that the absence of such difference in meaning and scope would make a claim superfluous.'" Free Motion Fitness, 423 F.3d at 1351 quoting Tandon Corp. v. United States Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987).  The presumption applies in interpreting means-plus-function terms, even though "the stringencies of a means-plus-function limitation are not to be avoided by the mere addition of a dependent claim that recites the corresponding structure disclosed in the specification." Wenger Manufacturing, Inc. v. Coating Machinery Systems, Inc.,

239 F.3d 1225, 1234 (Fed. Cir. 2001).

Here, Claim 3 describes a "mounting assembly" where the "mounting means has a body portion having an aperture therein, a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means[.]" This claim describes the "aperture" element that Caldwell seeks to include in the general term "mounting means" in Claim 1. I find that the dependent claim limiting Claim 3 to a body with an aperture to receive a fixing screw confirms that the independent claims may encompass other methods of fixing. See Free Motion Fitness, 423 F.3d at 1351 (holding that the "dependent claims limiting the claim to a single cable confirm that the independent claims may encompass more than one cable").

Both parties seek to include the idea of a surface for supporting the coiled ribbon spring in the definition, but Caldwell argues that the definition should be more specific, suggesting that the phrase "upper surface concavely curved to support the curved outer undersurface of the spring" is more appropriate. In the hearing, Amesbury did not press the curvature issue except to say that the curvature of the surface is not required, important, and does not need to conform exactly to the curvature of the spring. I understand and adopt Amesbury's argument that the corresponding curvatures of the support surface and the spring do not need to conform exactly.

[638 Patent, col. 4, ll. 8-10.]  Since Claim 3 also specifies
that the support surface of the mounting element is to be
"concavely curved", the doctrine of claim differentiation also
suggests that I should not limit the surface of the structure
referenced by "mounting means" to those with surfaces that are
"concavely curved".  However, claim differentiation "is a 'guide,
not a rigid rule'".  Nomos Corp. v. Brainlab USA, Inc., 357 F.3d
1364, 1368 (Fed. Cir. 2004) quoting Autogiro Co. of Am. v. United
States, 181 Ct.Cl. 55, 384 F.2d 391, 404 (1967).  It "does not
override the requirements of § 112, ¶ 6 when the 'claim will bear
only one interpretation."  Id. quoting Autogiro, 384 F.2d at 404.
Here there is no comparable disclaimer anywhere in the
specification that the mounting element can incorporate a surface
to hold a coiled ribbon spring that is anything other than
concavely curved.  The only disclaimer is that the corresponding
curvatures of the support surface and the spring do not need to
conform exactly. ['638 Patent, col. 4, ll. 8-10.] Thus, I find
that the claim will only bear one interpretation - the mounting
element must include a concavely curved surface to support the
spring, but the corresponding curvatures do not need to conform
exactly.

**Construction**: The term "mounting means" or "a means for mounting
said coiled ribbon spring" in Claims 1 and 8 describes a
structure for mounting a coiled ribbon spring to the window jamb
channel.  The structure has a body with a surface concavely
curved to support the curved outer undersurface of the spring,
but the corresponding curvatures of the two surfaces do not need

-23-

to conform exactly.  The design of the body also includes some
method of fixing, such as aperture to receive a fixing screw, to
secure the structure to a window jamb channel.

   3. **"raised spine"** - Amesbury argues that "the term 'raised

spine' should be construed in accordance with its plain and

ordinary meaning; that is, a raised projection or protrusion."

Caldwell argues for a more precise construction - "a raised,

elongated, rectangular shape that fits snugly between the flanges

of the channel means" - which it argues better corresponds with

the ordinary and customary meaning for the term "spine".

   Here again, I feel confident that the ordinary meaning of

"raised spine" as understood by a person of skill in the art is

readily apparent.  This is not the case where the term has a

"particular meaning in [the relevant] field of art", nor does it

appear that the term is being used "idiosyncratically".

Phillips, 415 F.3d at 1315.  Thus, I will construe the term

according to the "widely accepted meaning" of this metaphor.  Id.

at 1314.

   It is unclear how Amesbury determined that "a raised

projection or protrusion" is the plain and ordinary meaning of

"raised spine".  Caldwell, on the other hand, points me again to

the American Heritage Dictionary (3d ed 1992), which includes the

following definition for 'spine' - "Something that resembles or

suggests a backbone, as: a. The hinged back of a book.  b. The

crest of a ridge."  I find that this definition more accurately

describes the ordinary meaning of this term as used in the
context of Claim 1 and I agree with Caldwell that the words
"raised projection or protrusion" do not sufficiently capture the
concept of "raised spine" intended by the patentee's choice of
that term in both Claim 1 and the specification.  Rather, the
ordinary meaning of the term "spine" is more specific than the
broader terms "projection" or "protrusion", which may encompass
simple knobs, bumps, or even a "poorly-hammered nail".  The
Federal Circuit gave some guidance in International Rectifier
Corp. v. IXYS Corp., a pre-Phillips case, where it disapproved of
the district court's adoption of a synonym of the claim term as
the definition because it "disregard[ed] entirely the distinction
between the two terms set forth in the usage note."  The court
observed that "[h]ad the inventor meant [the synonym], he could
have used that word.  However, we must consider the word that the
inventor actually chose and use the definitions of that term that
are consistent with the written description."  International
Rectifier Corp. v. IXYS Corp., 361 F.3d 1363, 1374 (Fed. Cir.
2004).

Having recognized the importance of fully capturing the
proposed usage, I must disagree with Caldwell that the disputed
term is necessarily limited to the elongated and rectangular
shapes depicted in the patent drawings.  To do so "would be to
impermissibly read a limitation into the claims from the written

-25-

description", <u>Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.</u>, 340 F.3d 1298, 1308 (Fed. Cir. 2003) <u>citing</u> <u>Comark</u>, 156 F.3d at 1186, and "the patent drawings depict[ing] a particular embodiment". <u>Id.</u> at 1306-07. <u>See also</u> <u>Phillips</u>, 414 F.3d at 1323.[3]

Here Caldwell argues for the inclusion of the adjectives elongated and rectangular because in Claim 1 the "raised spine" is supposed to be "positioned between and in the same plane as the inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited." ['638 Patent, col. 6, ll. 12-15.] Similarly, an embodiment corresponding to this description is depicted in Figures 9, 10 and 11 and described as having a width "arranged such that it is a snug fit between open lip portions ... of a channel section sash frame member ... within which the mounting element is to be operatively received." ['638 Patent, col. 5, ll. 8-11.] Neither the Claim nor the description in the specification require the raised formation to be 'elongated' as it is depicted in Figures 9, 10 and 11 except to the degree that the term 'spine' imports such a characteristic.  Furthermore, the raised formation in

―――――――――――――――

[3] Amesbury points to the Federal Circuit's reversal on the meaning of "protrusion" in <u>Anchor Wall</u> for the proposition that shape-based limitations should not be included in the definition unless expressly set forth in the patent.  However, I find the general principle re-affirmed in <u>Phillips</u> that claims should not be confined to the specific embodiments in the specification more compelling for purposes of construing the patent before me.

Figures 9, 10 and 11 is not even a true rectangle because of the inter-engagement projections sculpted into it. The Claim encompasses variously shaped raised formations that could be designed to have at least some of the edges positioned between and in the same plane as the inwardly turned opposed flanges with the requisite width thereby inhibiting rotation. A rectangular shape is not necessarily required, and I note that the crest of a ridge is not normally rectangular. Furthermore, a rectangular shape would only fit snugly in the channel if the inwardly turned opposed flanges had straight edges. If for some reason a window jamb channel were designed with jagged flanges, for instance, a rectangular shape would not fit. Rather, the raised spine of the mounting element would have to have a shape that corresponds and cooperates with the jagged flanges, which is at bottom the defining characteristic of this component.



FIG.10.

In conclusion, in an attempt to deconstruct the metaphor of "raised spine" I will not limit its meaning with descriptors not included in either the Claims or the specification.  However, simply analogizing "raised spine" with "raised projection or protrusion" loses the ordinary meaning implicit in this common usage of spine.  To the extent that Caldwell is suggesting that the meaning of the term "raised spine" ought to embody the qualifier that it be "positioned between and in the same plane as [the] inwardly turned opposed flanges of [the] channel ... whereby rotational motion of [the] mounting means is inhibited", I decline the invitation.  To do so would make the remainder of the Claim just quoted redundant and unnecessary.

**Construction** - A raised portion of the mounting element that resembles or suggests the spine of the mounting element, shaped to cooperate with the window jamb flanges to inhibit the rotational motion of the mounting means.

4. **"projection means"** - Amesbury contends that the term "projection means" in Claim 8 is not a means-plus-function term. Rather, the term ought to be interpreted as though it just said "projection".  In that respect, Amesbury argues that the term connotes "at least one projection or protrusion", with the word "projection" meaning "a part that juts out".  By contrast, Caldwell argues that the term is a mean-plus-function claim and that the term should be construed more narrowly as "a means that projects from the mounting means and cooperates with the flanges

of the channel, which is limited to the rectangular or elongated structure of a spine or rib.  Furthermore, the spine or rib must fit snugly between the flanges."[4]

The Federal Circuit has observed that "[i]f the word 'means' appears in a claim element in association with a function, this court presumes that § 112, ¶ 6 applies.  This presumption collapses, however, if the claim itself recites sufficient structure, material, or acts to perform the claimed function." Micro Chemical, 194 F.3d at 1257; accord Allen Engineering Corp. v. Bartel Industries, Inc., 299 F.3d 1336, 1347 (Fed. Cir. 2002); but see Cole v. Kimberly-Clark Corp., 102 F.3d 524, 531 (Fed. Cir. 1997)("Patent drafters conventionally [invoked the means-plus-function statute] by using only the words 'means for' followed by a recitation of the function performed.  Merely because a named element of a patent claim is followed by the word 'means,' however, does not automatically make that element a 'means-plus-function' element under 35 U.S.C. § 112, ¶ 6.").

In submissions following the *Markman* hearing, both parties cited to several more decisions of the Federal Circuit regarding the issue of whether a particular claimed term invokes the means-

---

[4] At the hearing, Caldwell proposed the following definition on page 18 of its handout:
> Function:  projecting between the inwardly
> turned opposed flanges and cooperating with
> the flanges of the channel means (jamb).  The
> corresponding structure is a spine or rib.

plus-function statute, and more particularly, whether a term that includes the word "means" recites sufficient structure or material for performing the claimed function to rebut the presumption.  See e.g. Altiris, 318 F.3d at 1375-76 (finding that "*means of booting*"[5] is a means-plus-function even though "commands" represent structure and the claim states a location); Cole, 102 F.3d at 531 (finding that "*perforation means*"[6] is not a means-plus-function because the claim "describes the structure supporting the tearing function (ie. perforations) ... [and] also its location (extending from the leg band to the waist band) and extent (extending through the outer impermeable layer)"); Wenger, 239 F.3d at 1237 (finding that "*means defining a plurality of separate product coating zones*"[7] is not a means-plus-function because, even assuming sufficient function, the "claim specifically recites structure including spray nozzles that are directed toward the sidewall of the reel, which" accomplish the

---

[5] The relevant claim stated: "*means of booting* including a first set of commands ... resident on said storage device of said digital computer ..., and a second set of commands resident on a storage device external to said digital computer..." Altiris, 318 F.3d at 1368.

[6] The relevant claim stated: "*perforation means* extending from the leg band means to the waist band means through the outer impermeable layer means..." Cole, 102 F.3d at 526.

[7] The relevant claim stated: "*means defining a plurality of separate product coating zones* ..., each of said zones including at least one spray nozzle directed toward said sidewall..." Wenger, 239 F.3d at 1229.

-30-

function); <u>Envirco Corp. v. Clestra Cleanroom, Inc.</u>, 209 F.3d

1360, 1365 (Fed. Cir. 2000)(finding that "*second baffle means*"[8]

is not a means-plus-function because the term 'baffle' itself

imparts structure and further, the "claims describe the

particular structure of this particular baffle ('having inner

surfaces for directing airflow ... radially outward ... and

thereafter ... between said first baffle means and said air

filter means')" and the claims describe "details about the

location and formational details"); <u>TI Group Automotive Systems</u>

<u>(North America) v. VDO North America, L.L.C.</u>, 375 F.3d 1126, 1135

(Fed. Cir. 2004)(finding that "*pumping means*"[9] is not a means-

plus-function because the claim recites "its structure

('including a nozzle and a venturi tube in alignment with the

nozzle'), location ('being located within the reservoir in the

_____

[8] The relevant claim stated: "*second baffle means* disposed
radially outwardly of said centrifugal fan means ... [and] having
inner surfaces for directing the airflow from said centrifugal
fan means inwardly of said primary housing and between said first
baffle means and said filter means whereby air being introduced
into said housing by said centrifugal fan means will be directed
radially outwardly of said centrifugal fan means and guided by
said first baffle means towards said second baffle means and
thereafter by said second baffle means between said first baffle
means and said air filter means." <u>Envirco Corp.</u>, 209 F.3d at
1363.

[9] The relevant claim stated: "*pumping means* for pumping fuel
into the reservoir, said means being located within the reservoir
in the region of the opening and including a nozzle and a venturi
tube in alignment with the nozzle, the passage of fuel out of the
nozzle and through the venturi tube causing fuel to be entrained
through the opening into the interior of the reservoir;" <u>TI</u>
<u>Group</u>, 375 F.3d at 1131.

region of the opening'), and operation ('the passage of fuel out
of the nozzle and through the venturi tube causing fuel to be
entrained through the opening into the interior of the
reservoir')").

Turning to the patent at issue, I find that this is not a
case where the drafter of the patent was as "clearly enamored of
the word 'means'" as in Allen Engineering, 299 F.3d at 1348,
where the Court ignored the word 'means', which appeared 32 times
in the relevant claim, in all but one of the twelve 'means'
limitations, or in Cole, 102 F.3d at 531, where the Court
declined to construe any of the six elements that included the
word 'means', which occurred in the claim 14 times, as means-
plus-function terms.  The '368 Patent used the word "means" 13
times, but only with respect to four limitations: channel means,
sash frame support means, mounting means/means for mounting, and
projection means.  And as discussed above, at least "mounting
means" or "means for mounting" is a means-plus-function.  The
question, therefore, is whether Claim 8 recites sufficient
structure or material associated with 'projection means' to rebut
the means-plus-function presumption.

Amesbury argues that the presumption is overcome in Claim 8
because the claim describes the structure carrying out the
function of inhibiting the rotational movement of the mounting
means (ie. a 'projection' or a 'thing or part that extends

-32-

outward beyond a prevailing line or surface'), its location ("positioned between said inwardly turned opposite flanges of the channel"), and its extent (sufficient to cooperate with the channel flanges). See Cole, 102 F.3d at 531; Amesbury's Post Markman Hearing Brief, p. 2.

Claim 8 does not articulate the 'extent' of the "projection means", although the 'extent' suggested by Amesbury could be inferred. It is clear, however, that Claim 8 describes the location or position of the "projection means", namely "positioned between said inwardly turned opposite flanges of the channel." Location is a relevant factor and part of the structure according to the Federal Circuit. See Cole, 102 F.3d at 531; TI Group, 375 F.3d at 1135; and Envirco, 209 F.3d at 1365 (holding that "the claims recite sufficient structure, including details about the location and formational details"). However, as suggested by Caldwell, one could interpret Altiris, 318 F.3d at 1376, as implying that a location alone will not necessarily provide sufficient structure. Consequently, I find that the crucial question is whether the term "projection" imports sufficient structure like the term "perforation" in Cole, or whether the term is, as Caldwell argues, "functional and inherently meaningless" as "any three-dimensional object will project from the surface to which it is attached." [Caldwell's Supplemental Submission, p. 1.] As to this issue, I agree with

-33-

Amesbury; "projection" imports sufficient structure to overcome the presumption.

The ordinary meaning of "projection" as understood by a person of skill in the art is readily apparent.  In Amesbury's initial submissions, they suggested the definition of "a part that juts out", and in the supplemental submission, Amesbury suggested the definition of a "thing or part that extends outward beyond a prevailing line or surface."  I do not believe that it is necessary to adopt one or the other definition, because the debate seems to be whether or not "projection means" should be limited to the structures in the specification that correspond to and perform the function, namely the "raised spine" and the "locating rib", not over the definition of "projection".[10]

**Construction** - Projection(s).

5. **"whereby rotational movement of the mounting means is inhibited"** - This term appears in both Claims 1 and 8.  The parties agree that the "whereby" clause only modifies the preceding clause describing the "projection means" in Clause 8, but the parties disagree about what the clause modifies in Claim 1.

---

[10] In construing "raised spine", Caldwell argued that "'spine' is not broad enough to encompass any 'projection' or 'protrusion' such as a knob or a bump." [Caldwell's Brief, p. 7.] Thus, it appears that Caldwell shares Amesbury's understanding of the term.

Claim 1: "... and a means for mounting said coiled ribbon spring, ... and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means **whereby rotational motion of said mounting means in inhibited.**"

Claim 8: "... and a means for mounting said coiled ribbon spring, ..., said mounting means being secured in said channel means and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means within which the mounting means is positioned, **whereby rotational movement of the mounting means in inhibited.**"

I find that as a matter of syntax, the "whereby" clause only modifies the preceding clause describing the raised spine. Amesbury's citation to <u>Idexx Laboratories, Inc. v. Abaxis, Inc.</u>, 222 F.Supp.2d 66, 73-74 (D. Me. 2002) is unavailing. There is no rule that a "whereby" clause must modify the entire claim limitation. In fact, the Court in <u>Idexx</u> concluded that the "syntax of the sentence alone does not answer [the] debate" of whether the "whereby" clause at issue in that case modified only the three steps explicitly recounted or the entire description of the claimed method. <u>Id.</u>

"What controls here is no legal 'test' derived from some different fact situation **but common sense interpretation of language according to the rules of grammar in the context in which it occurs.**" <u>Application of Dean</u>, 48 C.C.P.A. 1072, 291 F.2d 947, 952-53 (1961)(emphasis added). It seems clear that the

-35-

"whereby" clause only modifies the description of the "raised
spine", not that description and the preceding clause which is
set off by a comma.  There is certainly no basis in the syntax of
Claim 1 to conclude, as Amesbury argues, that the rotation of the
mounting means is inhibited "**either** by the structure of the
mounting means alone **or** in conjunction with the way it is
installed in the mounting assembly."  It would actually make more
sense if the "whereby" clause in Claim 8 modified both the of
requirement of being secured in the channel and having projection
means positioned in a certain way.  However, the parties agree
that even in Claim 8, the "whereby" clause only modifies the
"projection means".

    To the degree that there is any confusion or ambiguity in
the syntax of Claim 1, I find that on balance the prosecution
history supports my conclusion that the "whereby" clause only
applies to the "raised spine" described in Claim 1.  I look to
the prosecution history as urged by Caldwell, because the
specification could be interpreted to add to the confusion and
ambiguity Amesbury is attempting to exploit.

    Some sections of the specification clearly link the
prevention of rotation with the positioning of the "raised
spine".  For example, the description of the mounting element in
Figures 7 and 8 explains that the width of the raised spine
formation is arranged such that it is a snug fit between the open

-36-

lip portions of a channel to inhibit a rotational, pivoting or twisting motion. ['638 Patent, col. 5, ll. 7-13.] The specification makes this point even more clearly with respect to the "lateral ears" formation, which has the same purpose as the "raised spine", since the "lateral ears... are intended to prevent rotation of the mounting element **about a fixing screw** ... received, in use, in recessed bore." ['638 Patent, col. 4, ll. 44-47.]

In contrast, other parts can be read to mean that the fixing screw is also supposed to prevent rotation.  According to the specification, "[t]he mounting element **may** be provided with formations conformed so as to cooperate with a portion of the sash frame within which the element is to be received, such that contact of said formations with said sash frame inhibits in a rotational, pivoting, or twisting sense of the element relative to the sash frame." ['638 Patent, Summary, col. 2, ll. 59-64 (emphasis added).]  The use of the word "may" in this description is confusing and misleading because both of the independent claims require respectively a "raised spine" or "projection means" that inhibits rotation.  The Summary of the Invention then sets out in a separate paragraph that "[i]t will be apparent that the mounting element does not rotate or otherwise move with the spring but is substantially stationary when the spring is in operation."  ['638 Patent, Summary, col. 2, ll. 65-67.] The fact

that the two sentences are separate paragraphs could be read to mean that even without the formation described in the first paragraph, the mounting element does not rotate.  And the only explanation for non-rotation is that the mounting element is be secured to the window frame by a fixing screw.

Despite the ambiguity in the specification, the prosecution history "inform[s] the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  Phillips, 415 F.3d at 1317.  Originally Claim 1 made no mention of the "raised spine ... whereby rotational motion of said mounting means is inhibited."  The patent examiner denied the patent, rejecting Claims 1-5 and 8-9 because they were clearly anticipated by Sterner's "Coil spring counterbalance hardware assembly and connection method therefor", U.S. Patent No. 5,157,808 and Foster's "Spring sash counterbalance", U.S. Patent No. 3,992,751.  It is only when the patentee sought to amend the claims in light of the rejection that he added "said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited."  In explaining the change, the patentee emphasized that "[n]one of the cited art show anti-rotational means which interact with flanged channels to prevent rotation of the

mounting means."  Consequently, I find that the "whereby" clause
only modifies the description of the "raised spine", not that
description and the preceding clause which is set off by a comma.

Having reached this conclusion, however, I do not mean that
the fixing screw or other fixing method that secures the mounting
element to the window jamb channel cannot contribute to the
substantially stationary position of the mounting element when
the spring is in operation.  There is nothing in the Claims or
the specification that would prohibit attributing any anti-
rotational effect to the method of fixing or securing the
mounting element to the window jamb channel.  The Claims
recognize, for instance, that if a mounting element without a
raised spine was fixed to the channel, it might not rotate or
pivot under minimal stress.  But when the window sash was opened
with a certain amount of force or opened a certain distance, the
force might overcome the anti-rotational inertia effect of simply
being secured by a fixing screw.  Therefore, it is the addition
of the "raised spine" in this patent that inhibits any rotation
of the mounting element under any normal condition.


**Construction** - The mounting means is to be secured in the channel
means.  And the mounting means is to have a raised spine
positioned between and in the same plane as said inwardly turned
opposed flanges of said channel means whereby rotational motion
of said mounting means is inhibited.

**B.  '264 patent**

-39-

**1. Background** - The '264 Patent entitled "Block and tackle window balance with bottom guide roller" improves on the basic block and tackle window balance, and is an alternative to the coiled spring balance.  Block and tackle balances use a combination of a spring and pulleys located within a U-shaped channel[11] to balance the weight of the window sash at any position within the jamb pockets. ['264 Patent, col. 1, ll. 19-22.]  In a basic block and tackle window balance, the channel holds a spring, two pulleys (one that moves pulling the spring and a fixed one) and a roller.  A cord, which connects the pulleys together, is attached to a hook that connects to an opening in a window jamb pocket to secure the balance to the window jamb. ['264 Patent, col. 1, ll. 25-27.]  The assembled channel is attached to the window sash by a "top guide" and a "bottom guide", which help guide the vertical motion of the window balance within the jamb. ['264 Patent, col. 3, ll. 23-27.]  The components within the channel work in combination to allow the spring to provide the force to counterbalance the weight of the attached sash at any vertical position within the window frame. ['264 Patent, col. 3, ll. 48-51.]

---

[11] This patent uses the word "channel" in a different way than the '638 patent.  With respect to the coiled spring balance patent, "channel" referred to the window jamb track.  Here, "channel" refers to an actual piece of the block and tackle balance that contains the springs and pulleys.  A window jamb "pocket" in this patent seems to correspond with the window jamb "channel".

The travel distance of the window sash is limited by the length of the window balance. The '264 Patent increases the distance a window sash can travel by reconfiguring the placement of the bottom guide roller "in" or "within" the bottom guide, instead of "within" the channel as in prior art balances. This allows the sash to travel a greater distance before the bottom guide roller hits the jamb mounting hook.

Based on the parties' proposed claim constructions, it appears that there is only one disputed term and it is part of the independent Claim 1.[12]   That claim is identified by bold face in the claim language set out below.

<u>Claim 1</u>

A block and tackle window balance device comprising:

 a channel comprising a first end and a second end;

 a top guide connected to the first end of the channel;

 a bottom guide connected to the second end of the channel;

 **a bottom guide roller rotatably mounted in the bottom guide**;

 a fixed pulley block unit connected to the channel;

 a translatable pulley block unit moveable within

---

[12]   Caldwell initially argued that the term "bottom guide axle mounted within the bottom guide", which is part of Claim 23 is disputed. However, Amesbury is only asserting Claims 1-7 and 9-21 of the '264 patent against Caldwell and does not make any arguments regarding the proper construction of this term.

the channel;

a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and

a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

2. **"bottom guide roller rotatably mounted in the bottom guide"** - Amesbury argues that this phrase should be construed as meaning "a roller, mounted so as to permit rotation, in the portion of the bottom guide that is sized or configured to be received in and to slide in the jamb pocket, when installed." Caldwell has construed the phrase as requiring "the bottom guide roller to be mounted to the bottom guide and be located entirely within the bottom guide" and "external to the channel". This definition is both more limiting and more general than Amesbury's construction.

The parties do not appear to dispute the meaning of the term "bottom guide roller", rather they argue over the placement requirements implicitly included in Claim 1. In this case, the ordinary meaning of the claim language as understood by a person of skill in the art is not readily apparent. Consequently, I consider the Claim terms, the specification, and the prosecution history as to each of the disputed proposed elements of the

-42-

definition.

a) **"Mounted in" or "Mounted to"**: Claim 1 specifically uses the preposition "in" and Caldwell has not pointed to anything in the specification that requires the bottom guide roller to be mounted to the bottom guide.  The focus of the specification is on where the roller is to be mounted, not on what.  For instance, in the Summary of the Invention the patentee describes how the bottom roller "mounted proximate to the second end of the channel." ['264 Patent, col. 2, ll. 5-6, 14-15.] But, the use of "proximate" in the Summary does not impose the limitation suggested by Caldwell that the roller must be mounted to the bottom guide.  It is possible that the bottom roller could be "in", even entirely within, the bottom guide, yet be mounted to the channel via some link rather than being mounted to the bottom guide itself.

In addition, Claim 1 was initially rejected as being anticipated by *Fitzgibbon's* "Sash balances and components thereof", U.S. Patent No. 4,089,085, which disclosed a block and tackle window balance device comprising "a bottom guide roller rotatably mounted to the bottom guide".  To read "mounted in" as "mounted to" would not distinguish '264 Patent from *Fitzgibbon's* patent and would ignore the distinguishing feature of the invention, namely the location of the roller as discussed more thoroughly in the next sub-section.

-43-

b) **"in the Bottom Guide" or "entirely within the bottom guide and external to the channel"**: The ordinary meaning of being mounted "in" an area could encompass the idea that the object may be both partially inside and outside the area. For example, a trash bag is "in" a trashcan even though a portion of it is hanging outside of the trashcan.[13] Thus, the ordinary meaning of the roller being mounted in the bottom guide could encompass the idea that the roller is "in" the bottom guide, yet not necessarily mounted directly to the bottom guide, with part of the roller sticking out of the bottom guide and/or part of it within the overlapping section of the channel. This interpretation makes sense when one compares Claims 1 and 23, which describes a window balance device comprising a bottom guide including "a bottom guide axle mounted **within** the bottom guide, the bottom guide axle located **outside** the window balance channel; and a bottom guide roller rotatably mounted **on** the bottom guide axle." ['264 Patent, col. 8, ll. 40-44.] Nonetheless, Caldwell argues that "in the bottom guide" should be construed more

---

[13] In Amesbury's Post *Markman* Hearing Brief filed on January 6, 2006, counsel for Amesbury brought the unreported and non-precedential opinion of <u>Cannon Rubber Ltd. v. The First Years, Inc.</u>, No. 05-1063, 2005 WL 3542910 (Fed. Cir. December 28, 2005) to this Court's attention. Under Fed. Cir. R. 47.6, this order is not citable as precedent. Consequently, I do not consider this case as precedent. Nonetheless, I incorporate the trashcan example and acknowledge that I have thought about the arguments considered in the case.

narrowly as "entirely within the bottom guide and external to the
channel" based on the specification and alleged disclaimers in
the prosecution history.

With respect to the prosecution history, Caldwell argues
that the patentee disclaimed the idea of being mounted partially
in and partially out of the bottom guide, and partially in the
channel.  I disagree.

Prosecution history "can inform the meaning of the claim
language by demonstrating how the inventor understood the
invention and whether the inventor limited the invention in the
course of prosecution, making the claim scope narrower than it
would otherwise be."  Phillips, 415 F.3d at 1317.  Here, as
mentioned above, it appears that Claim 1 was initially rejected
as being anticipated by Fitzgibbon's "Sash balances and
components thereof", U.S. Patent No. 4,089,085, which disclosed a
block and tackle window balance device comprising "a bottom guide
roller rotatably mounted to the bottom guide", by which the
Patent Examiner meant that "the bottom guide roller 239 is
rotatably mounted to bottom guide 215 in that roller 239 is
rotatably mounted within fixed pulley unit 235, which is fixed to
channel 205, which is fixed to bottom guide 215; thus, bottom
guide roller 239 is 'rotatably mounted to' bottom guide 215." See
Figures 2A and 2B of the Prior Art below.  [Smalley Declaration,
Exhibit J, at 000630, 000639.]

-45-



FIG. 2A
PRIOR ART

FIG. 2B
PRIOR ART

As Caldwell discusses in its Brief, dependent Claim 2 of the
Patent, which claims "the device of claim 1 wherein the bottom
guide roller is *located external to the channel*", was also
initially rejected because the *Fitzibbon's* patent showed that the
"bottom guide roller 239 is located 'external' to channel 205 in
that <u>a portion of roller</u> 239, *the portion that strikes mounting
hook* 245 *when lower sash* 104 *is raised*, <u>is located outside of
channel</u> 205, see Figures 2A and 7A." [Smalley Declaration,
Exhibit J, at 000631, 000640.] However, the Examiner accepted
Claim 2 after the patentee amended Claim 1.  As an aside, this
comment also shows that the Examiner and the patentee had in
their minds during the prosecution that at least the phrase
"located external to the channel" includes the manifestation
where only a portion of the object is external to the channel.

-46-

During a telephone interview, the Examiner also called attention to Fig. 4 in *Biro*, U.S. Patent No. 3,449,862 as anticipating the present invention.  The patentee distinguished his invention from *Biro*, claiming that:

> Biro is silent with respect to the location and mounting details of the 'bottom guide roller' (unnumbered) relative to the support slide; however as shown in FIG. 4, the roller appears to be mounted to the counterbalance housing above the lower support slide, not in the lower support slide.  The lower support slide is held in place by rivets and appears to terminate below the axis of the roller. See also, for example, FIGS. 2A and 2B of Applicant's specification. Accordingly, Biro fails to disclose or suggest 'a bottom guide roller rotatably mounted in the bottom guide.'[14] [Smalley Declaration, Exhibit J, at 000656]

The patentee then amended "Claims 1, 12, 14, and 19 ... to more clearly define the subject matter of Applicant's invention. Specifically, the claims are amended to clarify that the bottom guide roller is rotatably mounted *in* the bottom guide." [Smalley Declaration, Exhibit J, at 000656]

Given this prosecution history, it appears that the Examiner approved Claim 1 of the patent after the patentee explained that the subject matter of his invention was the relocation of the roller into the bottom guide, rather than mounting it in the channel above the bottom guide as in the prior art.  From this response, it is not possible to conclude that the patentee

---

[14] In the *Biro* Patent, the "support slide" is equivalent to the "bottom guide" in the '264 Patent, and the "counterbalance" is equivalent to the "U-shaped channel".

explicitly disclaimed the ordinary meaning of "in" or limited his
invention to configurations where the roller is entirely within
the bottom roller and completely below the channel.  Thus, this
is not the case where the claim was narrowed in the way suggested
by Caldwell in order for the patentee to obtain issuance over the
prior art.  Elekta Instrument S.A. v. O.U.R. Scientific Intern.,
Inc., 214 F.3d 1302, 1308 (Fed. Cir. 2000).  Nonetheless, I turn
to the specification to determine whether the written description
shows an "express intent to impart a novel meaning" to the
commonly understood word "in", and whether the written
description "clearly redefine[s] [the] claim term 'so as to put a
reasonable competitor or one reasonably skilled in the art on
notice that the patentee intended to so redefine that claim
term.'" Id. at 1307 quoting Process Control Corp. v. HydReclaim
Corp., 190 F.3d 1350, 1357 (Fed. Cir. 1999).

As I understand Caldwell's argument, Claim 1 should be
construed in the narrow sense suggested because of the repeated
references in the patent supporting the idea that the invention
allows the sash to travel a greater distance "because the bottom
guide roller is located in the bottom guide, instead of within
the rigid U-shaped channel as in prior art balances."  ['264
Patent, col. 5, ll. 64-66.] In particular, Caldwell points to the
repeated references in the specification to the instruction that
the bottom guide roller is to be located "within the bottom

-48-

guide." ['264 Patent, Abstract, col. 1, l. 51, col. 2, l. 52,
col. 5, l. 42, col. 6, l. 18].  The use of "within" is
significant, according to Caldwell, because of the Federal
Circuit's reasoning in TI Group, 375 F.3d at 1136, with respect
the claim term "[the pumping] means being *located within* the
reservoir".  In that pre-Phillips case, the Federal Circuit
affirmed the district court's construction of the term "within"
as meaning "inside", because "[c]ertainly, in ordinary and
customary usage, what is not outside is on the inside." Id.  The
Federal Circuit drew this conclusion because the dictionary
definition proposed by the alleged infringer ("on the inside")
and the one adopted by the district court ("inside") "are not so
different as the definition" proposed by the patentee ("within
the limits of, not outside or beyond.")

Here, it is true that the patent specifically describes the
roller as mounted within the bottom guide four times. [The '264
Patent, Abstract, col. 1, l. 51, col. 2, l. 52, col. 5, l. 42,
col. 6, l. 18.] However, I do not think it is appropriate to
simply adopt the conclusion in TI Group, where both parties were
essentially proposing the same limitation and where the claim
itself used the words "located within".  Looking further, then, I
note that the '264 Patent also states that the bottom guide
serves as "a frame for housing the bottom guide roller", ['264
Patent, col. 4, ll. 44-45], that it "is located in the bottom

-49-

guide, instead of within the rigid U-shaped channel as in prior
art balances" ['264 Patent, col. 5, ll. 64-66], and that it "is
located outside of the rigid U-shaped channel." ['264 Patent,
col. 4, ll. 46-48.]   Thus, in my opinion, the issue is whether or
not these expressions in the specification show that the patentee
intended to assign a more narrow definition to the phrase
"mounted *in* the bottom guide".

As explained above in Section I, Phillips warned of "the
danger of reading limitations from the specification into the
claim." Id. at 1323.   Specific embodiments of the invention
described for teaching purposes should not be imported into the
claim as a limitation.   Id.   The distinction between proper claim
construction and improper limitation turns on "whether a person
 of skill in the art would understand the embodiments to define
the outer limits of the claim term or merely to be exemplary in
nature." Id. at 1323.



FIG. 4A                    FIG. 4B

Given these principles, I will not import the limitation of
"external to the channel", despite the parts of the written
description cited above.  Although the roller in Figures 4A and
4B shown above is certainly not "within" the channel in the way
the rollers in Figures 2A and 2B are, it would be perfectly
consistent with the patent for the roller to be within the
section of the bottom guide that is itself fastened to the
overlapping section of the channel also shown in Figures 4A and
4B.  In such a configuration, the roller would not be "external"
to the channel.  In addition, Claim 2 specifically provides that
"the bottom guide roller is located external to the channel."
['264 Patent, col. 6, ll. 57-58; see also Claims 14 and 19.]
Given the possibility that a portion of the roller might actually
be located inside the part of the bottom guide that overlaps with
the channel, I will apply the doctrine of claim differentiation,

-51-

which "is at its strongest 'where the limitation sought to be 'read into' an independent claim already appears in a dependent claim,'" Seachange Int'l, Inc. v. C-Cor, Inc., 413 F.3d 1361, 1368-69 (Fed. Cir. 2005) quoting Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004), with respect to this aspect of Claims 1 and 2. Thus, I exclude the proposed addition of "external to the channel" from the definition.

With respect to the idea of limiting "in" in Claim 1 to "entirely within", I also disagree with Caldwell.  The focus of this patent is the relocation of the roller from the channel above the bottom guide, as in the prior art, to the bottom guide. This relocation "provides an increased range of travel within a window frame", ['264 Patent, col. 1, ll. 9-10], because it is the roller hitting the jamb mounting hook that limits the travel distance in these kinds of window balance assemblies. ['264 Patent, col. 6, ll. 11-12.] Thus, by moving the roller down into the bottom guide instead of above it, the "sash can travel a greater distance before the bottom guide roller **239/350** hits the jamb mounting hook **245/345**, resulting in a greater travel distance." ['264 Patent, col. 6, ll. 20-22.] Compare Figures 7B and 8B below.

Relocating the roller "in" the bottom guide with either the portion that strikes the jamb mounting hook when the sash is raised extending partially outside the bottom guide, or even with a portion of the roller extending slightly above or below the bottom guide, would still allow one skilled in the art to make use of the invention and take advantage of the greater travel distance.  In these configurations, one could not say that the roller would be "entirely within" the bottom guide. Consequently, while the specification describes or depicts an embodiment where the roller is "within" or framed by the bottom guide and while there is nothing in the specification describing or depicting the roller as partially outside the bottom guide, I am not convinced that "a person of skill in the art would

-53-

understand the embodiments to define the outer limits of the claim term" rather than merely being "exemplary in nature." Phillips, 415 F.3d at 1323.  Thus, I adopt the common meaning of the term "mounted in", namely that mounting the roller in the bottom guide does not exclude the possibility that the roller may not be entirely within the piece of the apparatus called a bottom guide.

c) **"so as to permit rotation"**: Caldwell does not contest the addition of this phrase in the definition.

d) **"in the portion of the bottom guide that is sized or configured to be received in and to slide in the jamb pocket when installed"**: There is nothing in the Claims, the specification, or the prosecution history that limits the location of the roller within the bottom guide.  Claims 13 and 18 do describe a window balance device comprising "a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and a bottom guide roller rotatably mounted in the bottom guide." ['264 Patent, col. 7, ll. 43-45; col. 8, ll. 1-2, 19-23; See also Claim 23, col. 8, ll. 36-38.] However, the specific references in these Claims, undermine Amesbury's attempt to include this additional limitation in Claim 1.

**Construction** - A roller mounted in the bottom guide in a way that permits its rotation.

C.    '368 patent

1. **Background** - The '368 Patent entitled "Snap Lock Balance
Shoe and System for a Pivotable Window" improves the balance shoe
element and details a method of assembling and installing the
components of the inverted window balance system for tilt-in
windows.

Tiltable or pivotable windows use a combination of balances
and pivot bars to allow the window sashes to slide up and down in
the window jamb and to rotate or tilt in to facilitate the
cleaning of the outside surface of the sash glass.

Similar to the block and tackle balance, this model uses an
inverted window balance that includes an extension spring
connected to a system of pulleys housed within a rigid U-shaped
channel, and a cord for connecting the system of pulleys to a
jamb mounting attachment (ie. hook).  A pivot bar connects with a
balance shoe that is connected to the inverted window balance to
allow the window sash to tilt in.

Balance shoes are used to guide the rotational movement of
the window sashes with respect to the window frame when the sash
is tilted in.  The balance shoe includes a frame, a locking
device that engages with the jamb track of the window frame when
the pivot bar rotates, thereby locking the balance shoe in that
location, a cam in communication with the locking device that has
a keyhole opening for receiving a pivot bar attached to a window

-55-

sash, and a "connecting device" for attaching the balance shoe
within a window balance.  The frame may also include a frame
"pocket" sized to receive a fastener, which can further secure
the balance shoe to the rigid U-shaped channel of the window
balance.

Based on the parties' proposed claim constructions, it
appears that there are only two disputed terms, both of which are
part of the independent claim at issue - Claim 2.  Based upon
this independent Claim, Amesbury is asserting Claims 2-3, 6-8,
and 11 against Caldwell.


<u>Claim 2</u>

A window balance system comprising:
            a U-shaped channel comprising a plurality of
            openings;
            a spring connected to a system of pulleys
            located within the U-shaped channel;
            a cord with a first cord end and a second
            cord end, the first cord end connected and
            threaded through the system of pulleys, the
            second cord end connected to a jamb mounting
            attachment; and
            a balance shoe, wherein the balance shoe
            comprises:
                    a frame comprising an enlarged fist end
                    and a second end, wherein the second end
                    is adapted to be received by the
                    U-shaped channel, and wherein the second
                    end of the frame of the balance shoe
                    further forms a **pocket** positioned in the
                    second end of the frame adapted to mate
                    with a rivet;
            a locking member proximal to the enlarged
            first end;
            a cam in communication with the locking
            member, and

-56-

a **connecting device** for attaching the balance
shoe within the U-shaped channel of the
window balance.

2. **"pocket"** - Amesbury argues that this phrase should be
construed as meaning "a contour formed to mate with a rivet or
fixed structure", whereas Caldwell has construed the phrase as "a
U or C-shaped channel bounded on three sides with an opening
designed to mate with a rivet."

The parties agree that, however described structurally, the
"pocket" must be shaped to "mate" with something, which the
parties agree means "to join or fit together" with that
something. As to the 'something', Amesbury argues that the
"pocket" must be "formed to mate *with a rivet or fixed
structure*". However, Claim 2 specifically says that the "pocket"
is "adapted to mate with a rivet". Thus, even though, the
specification describes a "fastener, such as a rivet", ['368
Patent, col. 6, l. 41], I find that the Claim is clear - the
"pocket" must be shaped to mate (ie. "to join or fit together")
with a rivet.

The crux of the debate revolves around what shape dimensions
and descriptors should be included in the reference to "pocket"
in Claim 2. I will consider the Claim terms, the specification,
and the prosecution history to determine the structural
description implicit in yet another metaphor.

Claim 2 states that the "second end of the frame of the

-57-

balance shoe further forms a pocket positioned in the second end
of the frame *adapted to mate with a rivet*." ['368 Patent, col. 8,
ll. 60-63.] In the Summary of the Invention, the patent describes
a "frame pocket *sized to receive a fastener*", ['368 Patent, col.
2, ll. 3-4], and how "[t]he balance shoe can be further secured
to the rigid U-shaped channel with a fastener that *interfaces
with a frame pocket* in the balance shoe." ['368 Patent, col. 2,
ll. 38-41.]  The specification mentions the "pocket" four times.
In the detailed description of the invention, the patent
describes how "[t]o *accommodate the fastener*, the snap lock
balance shoe can form a connection pocket *sized to receive or
mate with the fastener*", ['368 patent, col. 5, ll. 37-40], and
how during installation one of the steps "is to slide the snap
lock balance shoe into the rigid U-shaped channel such that the
*fastener is received* in the connection pocket of the snap lock
balance shoe." ['368 patent, col. 6, ll. 42-46.]

     Amesbury argues that nothing in the specification requires
the "pocket" to have a specific shape, other than a shape capable
of mating with a rivet.  Thus, while conceding it may not be the
best choice of words, Amesbury proposes the term "contour".  On
the other hand, Caldwell argues that describing the "pocket" as a
"contour" shaped to mate with a rivet insufficiently describes
what the patentee meant by "pocket".  Instead "pocket" should be
construed as "a U or C-shaped channel bounded on three sides with

-58-

an opening" shaped to mate with a rivet.

Caldwell's reference to the file history and the deposition of the inventor, Gary Newman, to elucidate the patentee's understanding of the term "pocket" is unavailing.  While some of the patentee's initial claims were rejected as being anticipated by *Schmidt*'s "Locking Slide Balance", U.S. Patent No. 5,301,467,[15] that patent did not have a "pocket" to fasten the balance shoe *inside* the U-shaped channel of the window balance with a horizontal rivet as is described in the '368 Patent. Rather, the *Schmidt* '467 Patent described a new design for the "locking slide block", the component referred to as the "balance shoe" in the '368 Patent.  The figures and the specification in the '467 Patent do not demonstrate how the "counter-balance spring", which is not shown, is attached to the metal plate at the top of the "locking slide block".  It is clear from the

---

[15] The Examiner wrote that "Schmidt discloses a balance shoe assembly 20 ["locking slide block" in the patent] for a sash comprised of a frame 24 ["housing" in the patent], ..., a connecting device 28 ["metal plate" in the patent], which connects the shoe to a counter-balance spring **and has a pocket therein**, and is received within the frame 24, ... , and a **frame pocket**, which can receive a fastener." [Smalley Declaration, Exhibit L, at C000793] The "frame pocket" does not refer to the same component or element as the "pocket" in the '368 Patent; it refers to a "channel" at the 'bottom' of the block/shoe that receives the locking cam.  The Examiner's other use of "pocket" seems to refer to the "pocket" in the "metal plate" at the 'top' of the "locking slide block" that attaches to the counter-balance spring.  The *Schmidt* '467 Patent itself never uses the term "pocket".  The patentee seems to have understood this distinction when responded to the rejection.

patentee's response to the initial rejection, that what
distinguishes the '368 Patent from the '467 Patent is that the
'top' or "second end" of the balance shoe is "adapted to be
received by a U-shaped channel of a window balance."  The mating
of the "pocket" and a rivet through the U-shaped channel
referenced in Claim 2 is part of the design for securing the
balance shoe within the U-shaped channel of the window balance.[16]
Consequently, neither party has identified anything in the file
history that aids in the interpretation of the term "pocket".  As
to Mr. Newman's deposition, I will not treat a non-lawyer's
response as an admission as to the proper construction, even
though "[testimony agaist a patentee's own interest . . . is
perhaps the most persuasive extrinsic evidence." Bristol-Myers
Squibb Co. v. Tera Pharmaceutical USA, Inc, 288 F.Supp.2d 562,
585 (S.D.N.Y. 2005).  I have only been provided with a snippet of
Mr. Newman's deposition testimony and I credit Amesbury's
suggestion at the hearing that Mr. Newman may have been
describing the "pocket" in the patent's figures rather than
explaining what he as the inventor meant by choosing to use the
term "pocket" in Claim 2.

    Returning back to the specification, I find that the
function of the "pocket" is clear - to receive a rivet, thereby

───────────────

    [16] The other way that the shoe is attached within the window
balance is by the "connecting device", also referred to in Claim
2.

-60-

aiding to secure the balance shoe within the U-shaped channel of the inverted window balance. This function defines the shape. Consequently, I find that the shape of the "rivet" in effect defines the shape of the interfacing pocket.

Neither of the parties has presented any argument on how the term "rivet" should be construed. However, I find that the ordinary meaning of "rivet" as understood by a person of skill in the art is readily apparent. Thus, I will construe the term according to the "widely accepted meaning" of these "commonly understood words". <u>Phillips</u>, 415 F.3d at 1314. The term "rivet" encompasses a variety of fasteners consisting of a shaft with heads on either end. Typically the shaft is a smooth cylinder, as depicted as **635** in Figure 6A shown below, for instance.



FIG. 6A

FIG. 3B

As a result, the "pocket" would typically have to be shaped to
receive a smooth cylinder through the shoe.  However, the patent
does not require that the "pocket" and rivet match perfectly.  As
a result, the "pocket" could have a cylindrical contour with a
diameter long enough to fit the rivet or the "pocket" could be a
"U-shaped channel bounded on three sides", as depicted as **213** in
Figure 3B shown above, with a height and depth long enough to fit
the rivet.  The problem with Caldwell's suggestion is that it
requires the pocket to have sides, which denies the possibility
that the indent might actually be a cylindrical match to the
rivet without sides per se.  Consequently, to the extent any
ambiguity remains about the shape of the "pocket", I will adopt
as a definition a notch shaped to mate with a rivet, thereby
aiding to secure the balance shoe within the U-shaped channel of
the inverted window balance.

Nevertheless, I will adopt Caldwell's suggestion that the
definition of "pocket" must incorporate the idea that the rivet
slides into the "pocket" through an opening.  The installation
discussion in the specification explains that "the snap lock
balance shoe ["is to slide"] into the rigid U-shaped channel such
that the fastener is received in the connection pocket of the
snap lock balance shoe". ['368 patent, col. 6, ll. 42-46.] In
order for the balance shoe to be installed in this way, the
"pocket" must have an opening into which the rivet can slide.

Without incorporating the idea of an opening, one could erroneously interpret the term "pocket" to include a fully enclosed channel through the balance shoe, in which the rivet would have to be thread through rather than snapping in. However, it is clear from the specification that this is not what the patentee understood the term to connote.

**Construction** - A notch with an opening shaped to mate (ie. "to join or fit together") with a rivet, thereby aiding to secure the balance shoe within the U-shaped channel of the inverted window balance.

　　3. **"connecting device"** - The parties are in disagreement about what kinds of "things" can be considered a "connecting device" as understood in Claim 2 and about whether the "connecting device" must be construed as a separate element from the rivet that mates with the pocket.

　　As to the first issue, I agree with Amesbury that the term "connecting device" should not be limited to "retractable tabs", also referred to as "resilient tabs," as suggested by Caldwell in its written submissions.[17]　Claim 2 describes a window balance comprising a "connecting device for attaching the balance shoe within the U-shaped channel of the window balance" without including any specifics about the "connecting device".　This

---

[17] At the hearing, Caldwell proposed the following definition on page 33 of its handout:
　　　　A pair of retractable tabs or a screw used for attaching the balance shoe in the channel, separate from the pocket that mates with a rivet.

-63-

wording contrasts with the specific description set out in Claim
1 (which is not at issue here) that defines a "connecting device"
as one "comprising one or more resilient tabs for attaching the
balance shoe within the U-shaped channel of the window balance,
wherein the one or more resilient tabs extend at least partially
through a corresponding number of the plurality of openings in
the U-shaped channel."  In addition, there are three claims that
are dependant on Claim 2 that limit the scope of the "connecting
device" in those claims.  Claim 3 refers to "[t]he window balance
system of claim 2 wherein the connecting device comprises a
rivet"; Claim 4 refers to "[t]he window balance system of claim 2
wherein the connecting device comprises a screw"; and Claim 5
refers to "[t]he window balance system of claim 2 wherein the
connecting device comprises a resilient tab".  Given this
important overlap, I turn again to the doctrine of claim
differentiation.

    As discussed above, "[t]he doctrine of claim differentiation
'create[s] a presumption that each claim in a patent has a
different scope.'"  Free Motion Fitness, 423 F.3d at 1351 quoting
Comark, 156 F.3d at 1187.  "The difference in meaning and scope
between claims is presumed to be significant '[t]o the extent
that the absence of such difference in meaning and scope would
make a claim superfluous.'"  Id. quoting Tandon Corp., 831 F.2d at
1023.  Caldwell misunderstands the law in stating that "[s]ince

the dependent claim specifically limits the 'connecting device'
to a screw, the independent claim 2 presumptively does not
encompass that structure." See id. (holding that the "dependent
claims limiting the claim to a single cable confirm that the
independent claims *may encompass more than one cable*")

Here, Claims 3-5 incorporate Claim 2 and limit "connecting
device" to three different types of fastening devices - rivet
(Claim 3), screw (Claim 4), and resilient tabs (Claim 5).
Consequently, these specific references support Amesbury's
construction that "connecting device" in Claim 2 ought to be
given the broader meaning described in the specification.  The
specification explains that the "connecting device" "can include
one or more retractable tabs for engaging the right U-shaped
channel" ['368 Patent, col. 2, ll. 35-36] or "other connecting
devices such as a screw." ['368 Patent, col. 5, ll. 31-32.]

In addition, since Claim 1 specifically defines the
connecting device as one comprising "one or more resilient tabs
... , [which] extend at least partially through a corresponding
number of the plurality of openings in the U-shaped channel" and
Claim 2 does not specify any limits, the term in Claim 2 should
be given the broad meaning suggested by the specification.

Caldwell also incorrectly argues that "connecting device"
should be limited to resilient tabs because dependent claims 3
and 4 are invalid for lack of enablement.  As a basis for this

-65-

argument, Caldwell cites to <u>Pandrol USA, LP v. Airboss Ry.</u>
<u>Products, Inc.</u>, 320 F.3d 1354 (Fed. Cir. 2003) and <u>The Toro</u>
<u>Company v. White Consolidated Industried</u>, 199 F.3d at 1295 (Fed.
Cir. 1999) without pin cites for the proposition that because
"[t]he patent drawings do not contain a picture of those claimed
structures as required by 37 CFR § 1.83(a)[18], ... those claims
are not enabled."  In doing so, Caldwell misinterprets <u>Pandrol</u>
and <u>Toro</u>, the later of which actually stands for the proposition
that a claim may be limited to the embodiment depicted if that is
the only embodiment and "no other structure is illustrated **or**
**described**." <u>Toro</u>, 199 F.3d at 1301.  "It is well established
that the preferred embodiment does not limit broader claims that
are supported **by the written description**." <u>Id.</u>

The enablement requirement in 35 U.S.C. § 112, ¶ 1,
"provides in pertinent part that the specification shall describe
'the manner and process of making and using [the invention], in
such clear and concise, and exact terms as to enable any person
skilled in the art to which it pertains, or with which it is most

_____

[18] 37 C.F.R. § 1.83 Content of drawing. (a) The drawing in a
nonprovisional application must show every feature of the
invention specified in the claims. However, conventional features
disclosed in the description and claims, where their detailed
illustration is not essential for a proper understanding of the
invention, should be illustrated in the drawing in the form of a
graphical drawing symbol or a labeled representation  (e.g., a
labeled rectangular box). In addition, tables and sequence
listings that are included in the specification are, except for
applications filed under 35 U.S.C. 371, not permitted to be
included in the drawings.

nearly connected, to make and use [the invention].'"  AK Steel

Corp. v. Sollac and Ugine, 344 F.3d 1234, 1243-44 (Fed. Cir.

2003) quoting 35 U.S.C. § 112, ¶ 1.  "The enablement requirement

is satisfied when one skilled in the art, after **reading** the

specification, could practice the ["full scope of the"] claimed

invention without undue experimentation."  Id. at 1244 quoting In

re Wands, 858 F.2d 731, 736-37 (Fed. Cir. 1988).

　　　The requirement for drawings, on the other hand, is set out

in 35 U.S.C. § 113, which provides that:

> The applicant shall furnish a drawing where necessary
> for the understanding of the subject matter sought to
> be patented. When the nature of such subject matter
> admits of illustration by a drawing and the applicant
> has not furnished such a drawing, the Director may
> require its submission within a time period of not less
> than two months from the sending of a notice thereof.
> Drawings submitted after the filing date of the
> application may not be used (i) to overcome any
> insufficiency of the specification due to lack of an
> enabling disclosure or otherwise inadequate disclosure
> therein, or (ii) to supplement the original disclosure
> thereof for the purpose of interpretation of the scope
> of any claim.

35 U.S.C. § 113.  Consequently, it appears to me, that drawings

in a patent may help overcome any insufficiency of the

specification due to lack of an enabling disclosure, but they are

not to be scrutinized for proper "enablement" or depiction of

every "claimed structure" under 35 U.S.C. § 112, ¶ 1 as suggested

by Caldwell.  Although 37 CFR § 1.83(a) of the PTO rules require

that applications include drawings that "show every feature of

the invention specified in the claims", I will not limit my

construction of "connecting device" to retractable or resilient

tabs because Claims 3 and 4 are not "enabled".  "[T]he fact that

the drawings are limited to a particular embodiment does not

similarly limit the scope of the claims.  Rather, [the patentee]

is entitled to the full breadth of claim scope supported by the

**words of the claims** and the **written description**."  TI Group, 375

F.3d at 1138 citing Anchor, 340 F.3d at 1306-07 ("[T]he mere fact

that the patent drawings depict a particular embodiment of the

patent does not operate to limit the claims to that specific

configuration.")  Here, it is clear that the written description

supports a broader meaning of the claimed term "connecting

device" than the depicted embodiment, which uses retractable or

resilient tabs.  Thus, Caldwell has failed to convince me that 37

C.F.R. § 1.83(a) requires me to find that the other embodiments

are not sufficiently "enabled."

As to the second issue, I am inclined to disagree with

Caldwell that the "connecting device" must be a separate and

distinct component of the window balance assembly from the

fastener (rivet) that mates with the frame "pocket".

Claim 2 describes a window balance comprising a "connecting

device for attaching the balance shoe within the U-shaped channel

of the window balance" in addition to a balance shoe comprising a

frame "wherein the second end of the frame of the balance shoe

further forms a pocket positioned in the second end of the frame

adapted to mate with a rivet." ['368 Patent, col. 8, ll. 59-62.]
This compares with Claim 1 where the frame of the balance does
not have a pocket and the connecting device is specifically
described as "one or more resilient tabs [that] extend at least
partially through a corresponding number of the plurality of
openings in the U-shaped channel." ['368 Patent, col. 8, ll. 44-
46.]  It is clear that in "one embodiment of a method for
securing the snap lock balance shoe within a rigid U-shaped
channel with multiple openings" depicted in Figures 6A-6D shown
below, ['368 Patent, col. 6, 34-36], the fastener (the rivet) and
the connecting device (resilient tabs) are different structures.
The specification explains that under this method:

> The first step, shown in FIG. 6A, is to place a
> fastener **635**, such as a **rivet**, in one of the pairs of
> openings in the rigid U-shaped channel. The next step,
> as depicted in FIG. 6B, is to slide the snap lock
> balance shoe into the rigid U-shaped channel such that
> the fastener is received in the connection pocket of
> the snap lock balance shoe. As shown in FIG. 6C, the
> snap lock balance shoe is then rotated down so that the
> front frame surface is aligned with a bottom wall of
> the rigid U-shaped channel. FIG. 6D shows the last step
> of attaching the snap lock balance shoe within the
> rigid U-shaped channel. In this step, the **connecting
> device 212** of the snap lock balance shoe **snaps** into one
> of the pairs of openings located on the rigid U-shaped
> channel.  ['368 Patent, col. 6, 40-53.]



Furthermore, in Figures 3A and 3B shown below, the patent depicts the connecting device **212** as "a pair of retractable tabs that snaps into the rigid U-shaped channel", ['368 Patent, col. 5, ll. 29-31], and a connection pocket **213** that is sized to receive a "fastener located in the inverted window balance [that] can be used to **further secure** the connection between the snap lock balance shoe and the inverted window balance." ['368 Patent, col. 5, ll. 34-36.] This suggests that the rivet (**635** in Figs. 6A-6D) is only supposed to *help* the separate and distinct component called the connecting device secure the balance shoe.

-70-



FIG. 3A                              FIG. 3B

However, Figs. 3A and 3B only depict one embodiment of the
snap lock balance shoe and Figs. 6A-6D only depict "one
embodiment of a method for securing the snap lock balance shoe
within the rigid U-shaped channel with multiple openings." ['638
Patent, col. 6, ll. 34-36.] The patent also explains that in
"some [other] embodiments, the snap lock balance shoe is attached
to the rigid U-shaped channel **with the fastener 635**.  In other
embodiments, the snap lock balance shoe is attached to the rigid
U-shaped channel **without the fastener 635**." ['368 Patent, col. 6,
54-61.] The latter alternative embodiment appears to be captured
by Claim 1 since that claim omits the "pocket" from the
description of the balance shoe's frame.  The former alternative
embodiment appears to describe a balance shoe consisting of a

-71-

pocket "adapted to mate with a rivet", wherein the rivet (the fastener) acts as the "connecting device for attaching the balance shoe within the U-shaped channel of the window balance." ['368 Patent, col. 8, ll. 62, 66-67.]

Since the function of the "connecting device" is to "attach[] the snap lock balance shoe directly within an inverted window balance", ['368 Patent, col. 5, ll. 19-21], Claim 2 ought to be construed to include the possibility that the rivet could serve as the "connecting device" when it locks into the frame "pocket" shaped to mate with it. Furthermore, the specification explains that the "connecting device can be integral with the frame", suggesting that as just described, the connecting device may not be integral to the frame and may be a "screw", ['368 Patent, col. 5, l. 32], or the rivet in addition to or instead of resilient tabs. As a result, I will not construe "connecting device" in Claim 2 as a structure necessarily distinct from the rivet that mates with the pocket.

**Construction** - A device, such as a rivet, screw, or resilient tabs, that connects the balance shoe to the U-shaped channel of the inverted window balance.

/s/ Douglas P. Woodlock

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

-72-

**APPENDIX: Summary of Claim Construction**

**I. The '638 Patent**

| Disputed Term | Court's Construction |
|---|---|
| "means for mounting said coiled ribbon spring" (Claims 1 & 8) | The term "mounting means" or """"a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvatures of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to a window jamb channel. |
| "raised spine" (Claims 1 & 8) | A raised protrusion that resembles or suggests a spine of the mounting element, shaped to cooperate with the window jamb flanges to inhibit the rotational motion of the mounting means. |
| "projection means" (Claim 8) | Projection(s) |
| "whereby rotational motion of said mounting means is inhibited" (Claims 1 & 8) | The mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited. |

**II. The '264 Patent**

| Disputed Term | Court's Construction |
|---|---|
| "bottom guide roller rotatably mounted in the bottom guide" (Claim 1) | A roller mounted in the bottom guide in a way that permits its rotation. |

-73-

### III. The '368 Patent

| Disputed Term | Court's Construction |
|---|---|
| "pocket" (Claim 2) | A notch with an opening shaped to mate (ie. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U-shaped channel of the inverted window balance. |
| "connecting device" (Claim 2) | A device, such as a rivet, screw, or resilient tabs, that connects the balance shoe to the U-shaped channel of the inverted window balance. |

# EXHIBIT 9

**Shina Consulting**

March 23, 2006

Jordan Singer
Attorney at Law
Goodwin|Procter LLP
Exchange Place
Boston, MA 02109

Re: Expert Report of Dr. Sammy Shina Submitted on Behalf of Plaintiffs in Civil Action No. 05-10020-DPW

I have been retained on behalf of the plaintiffs: Amesbury Group Inc., and Amesbury Springs Ltd. as an expert to review patents, patent applications, file histories, product brochures, depositions and oral examinations, design drawings, and the US District Court claim construction and comment on them, including analyzing whether products made by the defendant, the Caldwell Manufacturing Company, infringe on three of the plaintiffs' patents.

Chronological listing of the information reviewed by Sammy G Shina:

The following Patents and legal documents:
- US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994
- File history, US Patent 5,365,638
- US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003
- File history, US Patent 6,598,264 B2
- US Patent 6,820,368, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004
- File history, US patent 6,820,368 B2
- US District Court, Massachusetts District, Civil Action 05-10020-DPW; Memorandum and Order, dated January 20th, 2006.

The following Caldwell Physical Products:
- Physical Caldwell product for spring mounting "constant force system", moving coil preassembled option.
- Physical Caldwell product for block and tackle with bottom guide roller mounted outside the U shaped channel.
- Physical Caldwell product block and tackle inverted balance for windows with balance shoe for tilt operation, labeled as the 97ez on the back on the channel.

The following Caldwell Brochures:
- Caldwell brochure package entitled "Quick-Tilt Constant Force System, Smooth silent operation for tilt applications; containing 6 pages of front  or title page(C000530), 2nd page describing the constant force system (C000531); 3rd page of technical specifications, accessories and installation(C000532), 4th page of options, warranty and contact information(C000533); 5th page entitled "Egress–Friendly Quick-Tilt for new construction

1

windows" for Quick-Tilt*eg balances(C000534); and 6[th] page entitled "New construction friendly Quick-Tilt" for "Caldwell preassembled Quick-Tilt constant force balance just got better with its evolution into Quick-Tilt*nc (C000535)."

- Caldwell brochure package series 86xt Block and Tackle System, Extended travel for sideload applications containing 4 pages of front or title\ page (C000498), 2nd page of component parts layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000498).
- Caldwell brochure package series 97ez Block and Tackle System Easy installation for tilt applications; containing 4 pages of front or title page (C000514), 2nd page of component part layout and description (C000515), 3rd page of technical specifications, accessories and installation  (C000516); and 4th page of warranty and contact information (C000517).
- Caldwell brochure package series 97i Block and Tackle System Inverted Operation for tilt application; containing 4 pages of front or title page (C000490), 2nd page of component part layout and description (C000491), 3rd page of technical specifications, accessories and installation  (C000492); and 4th page of warranty and contact information (C000493).

The following depositions and oral examinations:
- Deposition of Douglas Zinter, Dated October 20, 2005
- Deposition of Richard deNormand, Dated October 21, 2005
- Deposition of Wilbur Kellum, dated October 28, 2005
- Deposition of Thomas Batten, dated November 8, 2005
- Deposition of Jeffery Robertson, Dated November 29, 2005

The following Caldwell drawings on paper:
- Egress End Carriage Assembly including, (CW0114):
    - Egress End Plate, EX5939, rev0,  drawn/approved on 6/10/02, (CW0115)
    - Egress End Plate, EX5939, rev0,  drawn 9/24/02, (CW0116)
    - Channel, EX5957, rev 0, drawn, 09/23/02, approved?, (CW0128)
    - Terminal-V stage 5956-Vstage, rev 0, drawn/approved 9/24/02, (CW0129)
    - Axel, EX5959, rev 0, drawn/approved 9/24/02, (CW0130)
    - Channel, EX5970, drawn/approved 10/17/02, (CW0117)
    - Carriage (4.0), EX5975, rev 0, drawn/approve 10/29/02, (CW0118)
    - Carriage (4.0), EX5975, rev 0, drawn/approve 10/29/02, (CW0119)
    - Channel (4.0), EX5979, rev 0, drawn/approved 10/29/02, (CW0120)
    - Channel (4.0), EX5979, rev 0, drawn/approved 10/29/02, (CW0121)
    - Carriage (4.1) , EX5984, rev 0, drawn/approved 11/06/02, (CW0122)
    - Carriage (4.1) , EX5984, rev 0, drawn/approved 11/06/02, (CW0123)
    - Axel (4.1), EX5985, rev 0, drawn 11/05/02, approved 11/6/02, (CW0124)
    - Axel (4.1), EX5985, rev 0, drawn 11/05/02, approved 11/6/02, (CW0125)
    - Channel (4.1), EX5983, rev 0, drawn 11/5/02/approved 11/06/02, (CW0126)
    - Channel (4.1), EX5983, rev 0, drawn 11/5/02/approved 11/06/02, (CW0127)
- R/T (Roller Tilt) assembly (CW0131); including:
    - .270 Locking Case Half (Roller Tilt), 24A01 drawn ?/16/93, approved 6/19/03, (CW0132)
    - .270 Locking Case Half (R/T), 24A41 rev 2, drawn 3/25/02, approved 9/16/02, (CW0142)
    - .270 Locking Case Half-Tie in (R/T), 24A42 rev 1, drawn 2/27/04, (CW0143)
    - Cam (C.F.B.), 24A02, 24A03, drawn 2/18/93, (CW0133)

2

- o Tandem Spg. (Roller Tilt), Case. 24A04, drawn 2/10/93, approved 8/17/01
- o Tandem Spg. Case (Roller Tilt), Case. 24A04, rev 8, drawn 3/25/02, approved 9/16/02, (CW0134)
- o Tandem Spg. Case (Roller Tilt), Case. 24A44, rev 1, drawn 3/25/02, approved 8/16/02, (CW0144)
- o Spring (Roller Tilt), 24A05, rev 17, drawn 3/17/93, approved 1/14/04, (CW0135)
- o .340 Locking Case Half (Roller Tilt), 24A08 rev 10, drawn 2/16/93, checked 12/13/01, (CW0136)
- o .130 Locking Collar (Roller Tilt), 24A30 rev 3, drawn on 5/9/02, approved 4/29/03, (CW0137)
- o .130 Locking Collar (Roller Tilt), 24A30 rev 5, drawn on 5/9/02, approved 4/29/03, (CW0138)
- o Carrier (Roller Tilt), 24A32-33 rev 3, drawn 10/17/01, (CW0139)
- o Carrie4r Body (Roller Tilt) 24A34, 24A64, 24A69, 24A84, rev 9, drawn 10/19/96, (CW0140)
- o Wiper (Roller-Tilt), 24A40 rev1, drawn 01/20/04, approved 1/27/04, (CW0141)
- o Cam Tie-In (Roller/Tilt), 24A45-46-47, drawn 3/8/04, approved 5/3/04, (CW0145)
- o .340 Locking Case Half (Roller Tilt), 24A48 rev 2, drawn 3/25/02, checked 9/16/02, (CW0146)
- o Mounting Bracket (Roller Tilt); 24A56 rev 2, drawn on 925/95, approved 7/31/97, (CW0156)
- o 625-090/110/130Locking Case Assembly, 24A53/54/55 rev 2, drawn on 3/25/02, approved 2/06/04, (CW0147)
- o 625-090/110/130Tie-in Case Assembly, 24A58/59/60 rev 0, drawn on 2/06/04, approved 4/07/04, (CW0149)
- o 625-090/110/130Tie-in Case Assembly, 24A78/79/80 rev 0, drawn on 2/06/04, approved 4/07/04, (CW0150)
- Quick-Tilt assembly, (CW0152), including:
  - o Locking Ramp 16Y07-10, rev 13, drawn ?/15/96, (CW0153)
  - o Carrier Body .548/610 (24B01/08, rev 4, drawn 10/14/99 approved 5/7/02, (CW0154)
  - o Spring Nest, (Quick Tilt), 24B02, rev 3, drawn 10/05/99 checked 4/16/02, (CW0155)
  - o Spring (Quick Tilt), 24B05, rev 12, drawn 11-30-99, checked 1/20/04, (CW0156)
  - o Tamperlock (Quick Tilt), 24B10, rev 10, drawn 7/23/01, approved 9/18/01, (CW0157)
  - o Tamperlock (Quick Tilt), 24B21, rev 1, drawn 3/8/04, approved 4/5/04, (CW0163)
  - o Single Nest Cover (Quick Tilt), 24B14, rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, (CW0158)
  - o Tandem Nest Cover, 24B15 (Quick Tilt), rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, (CW0159)
  - o Triple Nest Cover (Quick Tilt), 24B16, rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, with upper nest screw, (CW0160)
  - o Egress Nest Cover-Triple, (QT) 24B19, rev 1, drawn 03-29-04, approved 3/10/04, shown integrated, (CW0161)
  - o Spring-3/8 (Quick Tilt), rev 0, 24B20, drawn 02-17-04, checked 1/20/04, (CW0162)
  - o Carrier (QT), 24B22, rev 0, drawn 4-5-04, approved 4/?/05, (CW0164)
  - o Cam (Q/T), 24B24, rev 0, drawn 2/26/04, approved 3/9/04, (CW0165)
  - o Cam (Q/T), 24B25, rev 0, drawn 6/8/01, approved 8/6/01, (CW0166)

- o Carrier Lock (QT II), 24B26, drawn 4/6/04, approved 4/27/04, (CW0167)
- o N/C Balance Assembly .562 (Q/T), 24B42, 24B43, rev 0, drawn 4/13/04, approved 5/14/04, shown integrated, (CW0169)
- o N/C Balance Assembly (Quick-Tilt), 24B52, 24B53, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0172)
- o N/C Balance Assembly (Quick-Tilt), 24B54, 24B55, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0173)
- o N/C Balance Assembly (Q/T), 24B50, 24B51, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated, (CW0170)
- o Balance Assembly .562 (Q/T), 24B46, 24B47, rev 0, drawn 4/15/04, approved 5/4/04, no cover Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0171)
- o Balance Assembly (Quick-Tilt), 24B56, 24B57, rev 02, drawn 8/10/01, approved 10/24/02, spacer or cover for triple, no cover for single or tandem Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0174)
- o Balance Assembly (Quick-Tilt), 24B58, 24B59, rev 02, drawn 8/10/01, approved 10/24/02, spacer or cover for triple, no cover for single or tandem. Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0175)
- o Balance Assembly (Quick-Tilt), 24B60, 24B61, rev 1, drawn 4/25/02, approved 10/24/02, spacer or cover for triple, no cover for single or tandem Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0176)
- o Carrier Assembly (drop-in R/T), 24B65 rev 1, drawn 1/5/01, approved 8/10/01 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0177)
- o Carrier Assembly (drop-in R/T), 24B70, rev 0, drawn 4/25/01, approved 4/25/02 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0178)
- o Carrier Assembly (drop-in R/T), 24B85, rev 2, drawn 4/10/00, approved 8/10/01 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0179)
- o Constant Force Spring Tester (Roller-Tilt), QA-RTLT-011, rev 4, 7/24/97, approved 4/23/02
- o Friction Adjuster (QT II), 24B31, rev 0, drawn 04/05/04 approved 4/5/04, (CW0168)
- o Pivot bar, Winged, (Q/T and Spirex series), 99C48, rev 10, drawn 5/14/01, approved 6/21/03, (CW0181)
- o Pivot bar (Quick-Tilt), 99C48, rev 1, drawn 2/10/04, approved 3/19/04, (CW0182)
- • Quick-Tilt Triple spacer, (CW0196)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 0, drawn 11/27/00, approved 1/18/01, (CW0197)
  - o Triple spacer screw mount Quick-Tilt, 24B09, Rev 1, drawn 11/27/00, approved 1/22/01, (CW0198)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 1, drawn 11/27/00, approved 1/22/01, (CW0199)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0200)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0201)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0202)
- • Quick-Tilt Spring Nest (carrier), (CW0215)

4

- o Spring Nest Drop-in R/T, (proposed), no Part #, Drawn 10-05-99, (CW0214)
- Quick-Tilt Cover Design, (CW0210)
  - o Single Spring Cover (Quick-Tilt), rev 0, EX5803, drawn 10/26/00, (CW0211)
  - o Tandem Spring Cover (Quick-Tilt), EX5804, rev 0, drawn 10/26/00, (CW0212)
  - o Triple Spring Cover (Quick-Tilt), EX5805, rev 0, drawn 10/26/00, (CW0213)
- Quick-Tilt Bumper (CW0203)
  - o Unmarked drawing (CW0204)
  - o Bumper (Quick-Tilt), 24B07, (rev 2); drawn 02-01-00, approved 10/18/00, (CW0209)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0206)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0207)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0208)
  - o Bumper (Quick-Tilt), 24B07, (rev 4); drawn 02-01-00, approved 04/06/00, (CW0205)
- Inverted 1-2-3 Carrier, (CW0183)
  - o Lock 1.292 (series 97ez), 15N39 Rev 1, Drawn 7/9/03, approved 5/5/04, (CW0193)
  - o Lock 1.292 (series 97ez), 15N39 Rev 2, Drawn 7/9/03, approved x/x/04, (CW0184)
  - o Lock 1.0 (series 97), 15N30 Rev 3, Drawn 9/30/02, approved 1/20/03, (CW0186)
  - o Lock 1.25 (series 97), 15N29 Rev 2, Drawn 9/30/02, approved 1/15/04, (CW0187)
  - o EX 5937-K, (shoe, my notations), no additional info, (CW0188)
  - o EX 5937-I, (shoe, my notations), no additional info, (CW0190)
  - o IE7 Travel Characteristics, no part number, drawn 9/2/03, (CW0185)
  - o Hemless Square Channel(series(Series 97), rev 4, drawn 7/12/02, approved 8/9/02, (CW0189)
  - o Carrier Body (1.25" Inverted); (series 97), 15N27, rev 2, drawn 10-01-02, approved 1/16/03, (CW0191)
  - o Carrier Body (1.0" Inverted); (series 97), 15N28, rev 2, drawn 10-01-02, approved 1/16/03, (CW0192)
  - o Channel (series 97ez), 15N400, 401, Rev 3, drawn 10/24/04, approved 5/6/04, (CW0194)
  - o Sash Pin, x no part #, rev 2, drawn 6/3/04 approved 10/15//04, (CW0195)
- Math Model, Series 97ez (CW0001 - CW0015), [Travel Characteristics]
- Inverted Terminal (Block and Tackle), (CW0040 – CW0053)
- Hook Mounted – Inverted, Series 97i (CW0016 – CW 0039)
- .019 Channel, reduced SKU, (CW0056 – CW0063), [86 Side Takeout]
- .0335 Channel, reduced SKU, (CW0054 – CW0055), [series 86xt channel]
- Guide, reduced SKU, (CW0100 – CW0113), [series 86xt guides]
- Experimental Documentation, reduced SKU, (CW0092 – CW0099), [series 86xt]
- End Carriage Plate, series 86xt, (CW0070 – CW0083)
- Hook Terminal, series 86xt, (CW0064 – CW0069)
- Math Model, Series 86xt (CW0084 - CW0091), [Travel Characteristics]

Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories, dated 8/31/2005

Qualifications of the Witness

The following items are excerpts from my Curriculum Vitae which are relevant to this opinion. My Curriculum Vitae in full is attached.

1. I am the professor of Mechanical Engineering at the University of Massachusetts Lowell (UML), and have been teaching there full time since 1988. I have college degrees in Electrical Engineering, Industrial Management, Computer Science and a PhD in Mechanical Engineering from MIT, WPI and Tufts Universities.

2. Throughout my engineering career, I have worked at several companies while part time teaching at UML. While employed in industry, I worked on the design and manufacture of mechanical and electro-mechanical parts and products. I designed, modified and improved several automatic machines for manufacturing and testing of parts and products.

3. In industry, I held several engineering and management positions, including production engineer; manufacturing process engineer, Computer Aided Design (CAD) Manager, Tool Engineering Manager and Manufacturing Technology Manager. I also introduced CAD to the Hewlett Packard (HP) Medical Group and trained their engineers in the use of Design for Manufacturing tools and techniques as well as Mechanical CAD design. I have also given seminars on behalf of HP and Motorola to their customers on the use of CAD and Concurrent Engineering in the design of their products.

4. After joining the University, I began teaching courses there in Design Theory and Constraints as well as Engineering Principles. I am also the coordinator for the Mechanical Engineering Capstone Program where senior engineering students work with industrial companies to design mechanical products and assemblies. In addition, I performed research and consulting on a variety of technical subjects including product design, quality and the supply chain (design and/or manufacturing contracting services). I held seminars on these topics and trained thousands of working engineers. I published my work in over 90 publications, including in 5 books.

5. I also consulted for companies on their product design and manufacturing, including those in mechanical, electromechanical and medical instruments, devices and products.

6. I was a founding member of an Innovative Products Research and Services Incorporated (IPRS), a non-profit educational, scientific and charitable 501(c) (3) organization incorporated in the Commonwealth of Massachusetts. IPRS is an inventor support service, which performs early stage market and manufacturing evaluations. IPRS was able to obtain two grants from the Department of Energy in 1991 and 1992 as part of DOE's States' Inventors Initiative.

7. A list of all publications I authored in the preceding ten years is included in the attached Curriculum Vitae.

Compensation Statement

As a technical expert in this case my fees are $300/hour for technical work, opinions, and sworn testimony. In addition my expenses for travel are reimbursed at cost. My compensation is not affected by the outcome of this case and is based solely on the time spent in the development of my opinion.

Prior Deposition and Trial Experience

My deposition experience in the last four years can be found in my full CV, attached to this report as exhibit A.

<u>Summary of Patents</u>

I have been asked to review three patents. U.S. Patent No. 5,365,638 was granted on November 22, 1994 and is entitled "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS." The patent "relates to a mounting for a coiled ribbon spring and is particularly, though not exclusively, applicable to sash springs used in sash frame tensioning arrangements for windows." '638 patent, column 1, lines 6-9. The patent describes an arrangement in which "the spring merely rests on the mounting element which acts as a reaction member which the spring abuts as a free outer end, attached to the sash, is unwound." '638 patent, column 2, lines 21-24. The device described in the patent also has a spine, projection, or other "formations conformed so as to cooperate with a portion of the sash frame within which the [mounting] element is to be received, such that contact of said formations with said sash frame inhibits in a rotational, pivoting, or twisting sense of the element relative to the sash frame." '638 patent, column 2, lines 60-65.

U.S. Patent No. 6,598,264 B2 was granted on July 29, 2003 and is entitled, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER." The patent relates particularly "to a block and tackle window balance device that provides an increased range of travel within a window frame." '264 patent, column 1, lines 8-10. The device described in the patent locates a bottom guide roller within the bottom guide of the balance instead of in the within the rigid U-shaped channel of the balance. Because the bottom guide roller is located within the bottom guide, "the window sash can travel a greater distance before the bottom guide roller hits the jamb mounting hook, resulting in a greater travel distance." '264 patent, column 6, lines 20-22.

U.S. Patent No. 6,820,368 B2 was granted on November 23, 2004 and is entitled, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW." The patent particularly relates to "a balance shoe of a window balance system used in conjunction with a pivot bar mounted on a window sash for rotating the window sash relative to a window frame." '368 patent, column 1, lines 21-24. "The balance shoe includes a frame, a locking member at least partially disposed within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within a window balance." '368 patent, column 1, lines 63-67. The patent also describes a method of installing the inverted window balance system claimed.

<u>Summary of Opinions.</u>

The opinions expressed in this report are based on my understanding of what constitute an infringement. Each patent has a claim section, which must be interpreted by the court (claim construction). In my analysis, I compare each accused product against the each claim as interpreted by the court. To be literally infringing, the accused product must meet every element in a claim. In addition, I understand that an accused product may also infringe a claim element under the doctrine of equivalents if the accused product performs substantially the same function in substantially the same way to achieve substantially the same result.

I. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994.

Upon reviewing all information listed in the top of the report; I conclude the following:

The defendant Caldwell Manufacturing Company's "Quick-Tilt constant force system" and Quick-Tilt*nc products are infringing on claims 1, 2, 3 and 8 in the plaintiffs' US Patent 5,365,638.

II. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.
    Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20 and 21 in the plaintiffs' US Patent 6,598,264 B2.

III. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.
    Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 97ez products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US Patent 6,820,368 B2.

IV. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.
    Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 97ih products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US patent 6,820,368 B2.

V. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.
    Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 97i products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US patent 6,820,368 B2.

Support for Opinions
I. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994.

    Upon reviewing all information listed in the top of the report, I conclude the following:
The defendant's "Quick-Tilt constant force system" and Quick-Tilt*nc products are infringing on claims 1, 2, 3 and 8 in the plaintiffs' US Patent 5,365,638. My reasoning for the basis of my opinion is stated for each claim numbered below:

Claim 1. This claim states as follows ('638 patent, column 5, line 62 - column 6, line 16)

    "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having first end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled spring having the other end of said coiled ribbon spring within the coil being

positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited."

Upon examining the physical Caldwell spring balance product Quick-Tilt*nc, the deposition testimony referenced above, the Caldwell 6-page brochure entitled "Quick-Tilt Constant Force System" (C000530-C000535) and the Caldwell engineering drawings (CW0152 - CW0215); it is my opinion that the Caldwell Quick-Tilt system and Quick-Tilt*nc products are infringing on the Plaintiffs' US Patent 5,365,638 claim 1 by virtue of the following observations:

    a. The first element of this claim describes the use environment where the patented device is to be mounted; quote, "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, ('638 patent, column 5, line 62 - column 6, line 1), is identical to the use environment for the Caldwell products. *See* Fig. 1.1.A; Fig. 3.1.A. (all referenced figures are collected as exhibit B to this report).

    b. The next element of this claim identifies the frame to support the device which is slidable in the sash channel; quote, "a sash frame support means slidable in said channel means", ('638 patent, column 6, lines 1-2). This sash frame support means is used in the Caldwell products and is referred to in their brochures (page 3, C000532) as the "carrier"; which is offered to Caldwell customers in 3 different product sizes to match recommended channel sizes. *See* Fig. 1.1.B; Fig. 3.1.B.

    c. The next element of this claim which identifies the coiled ribbon spring and one of its ends; quote, "a coiled ribbon spring having first end engaged with said sash frame support means," ('638 patent, column 6, lines 3-4), is identical to the coiled ribbon spring and one of its ends used in the physical Caldwell product I examined. In the Caldwell brochures, the coiled ribbon spring end is engaged to the frame support means which Caldwell calls the carrier (page 3, C000532). *See* Fig. 1.1.C.; Fig. 3.1.C.

    d. The next element of this claim which specifies a mounting means for the coiled ribbon spring; quote; "and a means for mounting said coiled ribbon spring," ('638 patent, column 6, lines 4-5), is also found in the Caldwell product. The Caldwell brochure describes this support means as the "coil nest" (page 5, C000535). In the memorandum and order of the US District Court for the District of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in the '638 patent. The court construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". I note the following according to the Court claim construction:

        i. The court's definition references a structure for mounting a coiled ribbon spring to the window jamb channel. Based upon examination of the Caldwell

9

Quick-Tilt brochure (page 2, C000531), I find that the Caldwell "coil nest" satisfies this definition in the claim construction of the court.

ii.  The court's definition references a structure that has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell coil nest geometry satisfies this definition in the claim construction of the court.

iii. The court's definition references that the design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the design of the Caldwell coil nest includes a countersink hole to allow the coil nest to be secured to the to a window jamb channel, through a fixing screw.

I find the Caldwell mounting means for the Quick-Tilt and Quick-Tilt*nc products, which Caldwell calls the "coil nest," conforms to the Court's claim construction of the term "mounting means". *See* Fig 1.1.D; Fig. 4.1.D.

e.  The next element of this claim specifies the other end of the coiled ribbon spring being within the spring, being free and unattached to the support means, quote, "the coiled body portion of said coiled spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means" ('638 patent, column 6, lines 5-10). The physical Caldwell product I examined and the Caldwell brochure (page 2, C000531), show the Caldwell product coiled ribbon spring to be of exactly the same construction, based on the following observations:

i.  The other end of the coiled ribbon spring being within the spring

ii.  The other end of the coiled ribbon spring being free and unattached to the support means, which is called the coil nest by Caldwell. *See* Fig 1.1.E; Fig. 4.1.E.

f.  The next element of this claim describes the need for securing the mounting means to the channel means; quote "and said mounting means being secured in said channel means," ('638 Patent, column 6, lines 10-11). Several alternatives are shown in the patent "DESCRIPTION OF THE PREFERRED EMBODIMENTS": in Figure 4; a "fixing screw" as shown by item 64 can secure the mounting means. In figures 7, 8 and 9; the mounting means is secured by a screw (not shown). The screw is attached through a recessed bore 88 in Figure 7 and a bore 108 in Figure 9. I also note in the court's claim construction for the '638 patent the use of the term "fixing screw" for securing the mounting means: "....method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to the window jamb channel." I find the above discussions in the preferred embodiment for the '638 patent matches all of the installation information of the Quick-Tilt and Quick-Tilt*nc products: in the Caldwell Quick-Tilt brochure (page 3, C000532), a fixing screw is clearly shown to be used to fasten the Caldwell products to the window jamb channel. *See* Fig. 2.1.F; Fig 3.1.F.

10

g. The next element in this claim specifies a raised spine of the mounting means, with a following qualification explaining the need for such a feature in the device, quote, "said mounting means having raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means," ('638 patent, column 6, lines 11-13). I also note in the claim construction by the US District Court of Massachusetts dated January 20th, 2006 and mentioned in item (d) above, a construction for the term "raised spine" as follows: "A raised protrusion that resembles or suggests a spine of the mounting means, shaped to cooperate with the window jamb flanges to inhibit the rotational motion of the mounting means." I note in the Caldwell physical product and in the Caldwell Quick-Tilt brochure (C000530-C00535), the following observations:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, in page 2 (C000531), the cover of the Quick-Tilt product, which is clearly shown with a spine feature integrated in the plastic body of the cover, is available for single, double or triple coiled spring configurations (page 3, accessories, C000532). This cover is supplied as optional to the Caldwell product in page 2, (C000531). The cover is secured to the mounting means, called by Caldwell as the "coil nest", by a fastening screw. Once secured by the screw, the cover fastened to the coil nest acts as an integrated assembly of a raised spine of the mounting means defined as the coil nest in the Caldwell brochure. *See* Fig 2.1.G.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing the Quick-Tilt *nc product, that the Caldwell mounting means, called the "coil nest" and the plastic cover are integrated, by molding both features in the same product, with a "spine" running lengthwise across the back side of the molded part. Fig. 3.1.G

h. The final element of claim 1 is the reason given for the raised spine in item g; quote: "whereby rotational motion of said mounting means is inhibited." ('638 patent, column 6, lines 14-15). In the claim construction by the US District Court of Massachusetts, dated January 20th 2006, this element of the claim 1 in the '638 patent is construed as the "mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges and said channel means whereby rotational motion of said mounting means is inhibited." I note the following:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, I note in page 2 (C000531) that the cover fastened to the coil nest acts as an integrated assembly of a raised spine of the mounting means defined as the coil nest in the Caldwell brochure. The geometry of this assembly consisting of a coil nest fastened together to a cover will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing Quick-Tilt *nc product, the Caldwell mounting means called the "coil nest" and the cover are integrated, by molding both features in the

11

same product, with a "spine" or "projection" running lengthwise across the back side of the molded part. The geometry of this Caldwell coil nest molded together with a cover assembly will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel. For example, I note that when the physical Caldwell device was installed in a sample window jamb channel, the spine fitted snugly between channel flanges thereby inhibiting rotation of the Caldwell balance while allowing the balance to ride smoothly inside the channel.

iii.  In order to explain the need for the spine or projection features; but not for preventing rotation, the Caldwell representatives that were deposed had differing opinions:

1. According to the testimony of Jeffrey Robertson (beginning page 112, line 20), ....the raised portion labeled as "I", has two functions, one to provide enough material thickness so that the proper countersink for the screws, mounting screws can be provided without breaking through the inside of the cover. [np] The second function is to provide a flow passage for the plastic in the injection molding process to fill the tool, fill the mold cavity...."

2. According to the testimony of Wilbur Kellum (beginning page 93, line 10), in a series of answers by Mr. Kellum about the function of the protrusion "or spine/projection": "It is to help in the plastic molding....", and then Mr. Kellum adds in his testimony (page 94 lines 4-5); "...it serves to maintain straightness of the part during shipping...." Mr. Kellum answers the questions (page 94 lines 6-8) Q. does it serve to maintain the straightness of the part when installed? A: "No."

It is my opinion that these explanations for the need of the spine other than to inhibit rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1) There are many geometries that can serve to allow for a flow passage for the plastic injection molding process to fill the mold cavity for the Quick-Tilt covers. The spine, when specified by the Caldwell engineers at the time of design, could be made deeper, wider or shorter than the geometry selected by them. I note that in the physical Caldwell Quick-Tilt*nc product that I reviewed, the spine's geometry matches, within a tight tolerance, the front opening of the channel in the window jamb pocket, and hence prevents rotation of the coil nest. Of all the many possible geometries for the spine available to satisfy the plastic flow requirements, Caldwell chose the specific one that will inhibit rotation of the mounting means.

2) There are many geometries to provide enough material thickness so that the proper countersink for the mounting screws can be provided without breaking through the inside of the cover. The thicker material could be made around the screw only and not to extend the full length of the cover. In addition, another alternative could be to make a recessed bore inside the coil nest to allow for more plastic material on the inside as opposed to the outside of the cover. Of all the many possible geometries for the spine available to satisfy the need for

12

more material for the countersink of the fixing screw, Caldwell chose the specific one that will inhibit rotation of the mounting means.

3) The purpose of the spine to maintain straightness of the part during shipping appears to be unusual, There are two instances of shipping possibilities:

1) Since the balances are shipped as part of assembled windows. It is customary in the business and engineering practices for the end product supplier to maintain the integrity of their product during shipping, and not rely on individual suppliers to provide the integrity of each individual part. For a product such as windows, which contains fragile glass, the end product supplier will certainly be very careful in providing for proper support and packaging of the window during shipping and transportation, and not rely on their part suppliers such as the balance manufacturer.

2) When a part in an assembly such as a balance is shipped from the (balance) supplier to the end product (window) manufacturer, the requirement for the integrity of the product during shipping is normally achieved through the design of the shipping container of the part, including the use of packing materials.

iv. In order to show that the Caldwell Quick-Tilt and Quick-Tilt*nc products will prevent rotation other than through the spine or projection mentioned in the '638 patent, a Caldwell representative that was deposed, as well as the Caldwell brochure for Quick-Tilt, provided the following:

1. According to the testimony of Jeffrey Robertson (beginning page 115, line 13), "….the top portion [of the Quick-Tilt*nc] is large in length and width dimension than the opening into which the balance is inserted, so it is …the top portion is held by the interference between the top and the vinyl lineal, the bottom portion is held in place by the screw Those two attachments, or the attachment at the bottom and the interference at the top prevent any rotation of the cover…"

2. In the Quick-Tilt brochure; page 2 (C000531), describing the constant force system, in the top of the page…"Its alternating coil design prevents the cantilevering or twisting of the carrier that can diminish locking performance…."

It is my opinion that these explanations for inhibiting rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1) The top portion of the Quick Tilt *nc cover is too thin to adequately inhibit the rotation of the coil nest, with a thickness ranging from 0.025" to 0.011" (see drawings CW0158, CW0159 and CW 0160). There are two diagonal thin cutouts at the top of the covers to allow for twisting of the cover.

2) The alternating coil design mentioned in the top of page 2 of the Quick-Tilt brochure (C000531) will only apply to tandem coiled ribbon springs. I note the following:

a. For single nest cover this does not apply at all.

13

   b. For tandem covers, the length of each extended spring during window sash is mounted on top of the other, resulting in the tandem springs not equal in length. Therefore, there will be an offset moment forcing some rotation of the coil nest for tandem coiled ribbon spring configurations.

   c. For triple nest covers, there is a fixing screw to attach the upper triple spacer as shown in the Quick-Tilt brochure page 2 (C000531) that could work in conjunction with the coil nest screw to inhibit rotation. I note that there are no instructions for the recommended amount of torque to apply for each of these two screws. Repeated sash operations during the useful lifetime of the windows might reduce the integrity of the Caldwell fastening method due to the constant pressure applied by the rotation of the coil nest due to the triple coiled ribbon spring configuration.

As a conclusion to item (h), I find that the reasons for having the spine feature according to Caldwell are inadequate. The Caldwell explanations for their techniques for inhibiting rotation, might contribute partially to reduce rotation. The spine feature they adopted based on the '638 patent, will perform the primary function of inhibiting the rotation. Therefore, I find that the Quick-Tilt and Quick-Tilt*nc series of products that contain the spine or projection along the longitudal axis of the mounting means will prevent rotation of the mounting means.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's balance system option for constant force moving coil system, called Quick-Tilt products, and the New construction friendly Quick-Tilt*nc products, are infringing on claim 1 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements."

Claim 2. This claim states as follows: ('638 patent, column 6, lines 17-22) "The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of coiled ribbon spring as said sash support means moves in said channel means."

This claim on the mounting means is also affected by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in patent '638. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". The Caldwell brochure describes this support means as the "coil nest." I find the mounting

14

means for the Caldwell devices, which they call "coil nest," conforms to the court's claim construction of the term "mounting means" for claims 1 & 8.

I examined the 6 page Caldwell Quick-Tilt brochure (C000530-C000535) and I also examined the physical Caldwell product that matches this invention. I conclude that in the Caldwell Quick-Tilt series, the support surface of the mounting means (coil nest) is in contact with the outer surface of the coiled body portion of the coiled ribbon spring during the movement of coiled ribbon spring as sash support means moves in the channel means.

Based on the above observations and supporting materials, it is my opinion that the Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the new construction-friendly Quick-Tilt*nc products made by the defendant are infringing on claim 2 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements"

Claim 3. This claim states as follows: ('638 patent, column 6, lines 23-30) "The mounting assembly of claim 2 wherein said mounting means has a body portion having an aperture therein, a fixing screw position in said aperture by which the mounting means is secured relative to said channel means, a surface of said body portion being concavely curved, said coil body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion."

This claim on the mounting means is also affected by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in patent '638. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". The Caldwell brochure describes this support means as the "coil nest." I find the mounting means for the Caldwell devices, which they call "coil nest," conforms to the court's claim construction of the term "mounting means" for claims 1 & 8.

I examined the 6 page Caldwell Quick-Tilt brochure (C000530-C000535) and I also examined the physical Caldwell product that matches this invention. I observe the following:

1. That the coil nest has a body portion with an aperture.
2. Wherein a fixing screw is used to attach the coil nest to the window channel jamb.
3. The upper surface of the coil nest is concavely curved.
4. The coil body portion of the coiled ribbon spring is in contact with and supported by the upper surface of the coil nest.

15

Based on the above observations and supporting materials, it is my opinion that the Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the new construction-friendly Quick-Tilt*nc products made by the defendant are infringing on claim 3 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements"

Claim 8. This claim states as follows ('638 patent, column 6, lines 47-62): "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, said mounting means being secured in said channel means and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited."

Upon examining the physical Caldwell spring balance product that matches the invention recorded in Patent 5,365,638, as well as the Caldwell 6-page brochure entitled "Quick-Tilt Constant Force System" (C000530-C000535), the Caldwell depositions listed in the top of the report and the Caldwell engineering drawings (CW0152 -CW0215), it is my opinion that the Caldwell Manufacturing Company Quick-Tilt system and Quick-Tilt*nc products are infringing on the Plaintiffs' US patent 5,365,638 claim 8 by virtue of the following observations:

a. The first element of this claim describes the use environment where the patented device is to be mounted, quote, ('638 patent, column 6, lines 47-49); "a mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges," is identical to the use environment for the Caldwell products. See Fig. 1.8.A; Fig. 3.8.A.
b. The next element of this claim identifies the frame to support the device which is slidable in the sash channel, quote, ('638 patent, column 6, lines 49-50); "a sash frame support means slidable in said channel means." This sash frame support means is used in the Caldwell products and is referred to in their brochures (page 3, C000532) as the "carrier"; which is offered to Caldwell customers in 3 different product sizes to match recommended channel sizes. See Fig. 1.8.B; Fig. 3.8.B.
c. The next element of this claim which identifies the coiled ribbon spring and one of its ends, quote, ('638 patent, column 6, lines 51-52); "a coiled ribbon spring having an outer end engaged with said sash frame support means" is identical to a coiled ribbon spring and one of its ends used in the Caldwell products. In the Caldwell brochure (page 2, C00531), the coiled ribbon spring end is engaged to the frame support means which they call the carrier. See Fig. 1.8.C; Fig. 3.8.C.
d. The next element of this claim which specifies a mounting means for the coiled ribbon spring; quote, ('638 patent, column 6, lines 53-54) "and a means for mounting said coiled ribbon spring" is also found on the Caldwell products. The Caldwell brochure (page 6, C00535) describes this support means as the "coil nest." In the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 &8 in the '638 patent. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows; "'mounting

means' or 'a means for mounting said coiled ribbon spring' describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". I note the following according to the Court claim construction:

    i.   The court's definition references a structure for mounting a coiled ribbon spring to the window jamb channel. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell "coil nest" satisfies this definition in the court's claim construction.

    ii.  The court's definition references a structure that has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell coil nest geometry satisfies this definition in the court's claim construction.

    iii. The court's definition references that the design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the design of the Caldwell coil nest includes a countersink hole to allow the coil nest to be secured to the to a window jamb channel, through a fixing screw.

I find the Caldwell mounting means for the Quick-Tilt and Quick-Tilt*nc products, which Caldwell calls the "coil nest," conforms to the Court's claim construction of the term "mounting means". *See* Fig. 1.8.D; Fig. 4.8.D.

e.  The next element of this claim specifies the other end of the coiled ribbon spring as to being within the spring, being free and unattached to the support means; quote, ('638 patent, column 6, line 55), "the coiled body portion of said coiled spring with the other end of said coiled ribbon spring positioned in said mounting means." The physical Caldwell product I examined and the Caldwell brochure (page 2, C000531) show the Caldwell product coiled ribbon spring to be of exactly the same construction, based on the following observations:

    i.   The other end of the coiled ribbon spring being within the spring

    ii.  The other end of the coiled ribbon spring being free and unattached to the support means, which is called the coil nest by Caldwell. *See* Fig. 1.8.E; Fig. 4.8.E.

f.  The next element of this claim describes the need for securing the mounting means to the channel means, quote, ('638 patent, column 6, lines 56-57); "and said mounting means being secured in said channel means". Several alternatives are shown in the patent "DESCRIPTION OF THE PREFERRED EMBODIMENTS": in Figure 4; a "fixing screw" as shown by item 64 can secure the mounting means. In figures 7, 8 and 9; the mounting means is secured by a screw (not shown). The screw is attached through a recessed bore 88 in Figure 7 and bore 108 in Figure 9. I also note in the Court's claim construction of patent '638 stated in item d the use of term fixing screw for securing the mounting means: "….method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to the jamb channel." I find the above discussions in the preferred embodiment for the '638 patent matches all of the installation instructions of the Quick-Tilt and Quick-Tilt*nc

17

products: in the Caldwell Quick-Tilt brochure (page 3, C000532), a fixing screw is clearly shown to be used to fasten the Caldwell products to the window jamb channel. *See* Fig 2.8.F.

g. The next element in this claim specifies a projection means of the mounting means, with a following qualification explaining the need for such a feature in the device, quote, ('638 patent, column 6, lines 57-61) "and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with the channel means within which the mounting means is positioned." I also note in the court's construction by the US District Court of Massachusetts dated January 20th, 2006 and mentioned in item (d), a construction for the term "projection means" as "projection(s)." I note in the Caldwell physical product and in the Caldwell brochure (C000530-C000535) the following observations:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, in page 2 (C000531), the cover of the Quick-Tilt product, which is clearly shown with a spine or projection feature integrated in the plastic body of the cover, is available for single, double or triple coiled spring configurations (page 3, accessories, C000532). This cover is supplied as (optional) to the Caldwell product in page 2, (C000531). The cover is secured to the mounting means, called by Caldwell as the "coil nest", through a fastening screw. Once secured by the screw, the cover fastened to the coil nest acts as an integrated assembly of a raised spine or projection of the mounting means defined as the coil nest in the Caldwell brochure. *See* Fig 2.8.G.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing the Quick-Tilt *nc product, that the Caldwell mounting means, called the "coil nest" and the plastic cover are integrated, by molding both features in the same product, with a "spine" or projection running lengthwise across the back side of the molded part. *See* Fig. 3.8.G.

h. The final element of claim 8 is the reason given for the projection means in item (g); quote, ('638 patent, column 6, lines 61-62); "whereby rotational motion of said mounting means is inhibited." In the claim construction by the District Court of Massachusetts, dated January 20th 2006, this element of the claims 1 and 8 in patent '638 was construed to mean the "mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges and said channel means whereby rotational motion of said mounting means is inhibited." I note the following:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, I note in page 2 (C000531), that the cover fastened to the coil nest acts as an integrated assembly of a raised spine or projection of the mounting means defined as the coil nest in the Caldwell brochure. The geometry of this assembly consisting of a coil nest fastened together to a cover will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell

18

brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing Quick-Tilt *nc product, The Caldwell mounting means, called the "coil nest" and the cover are integrated, by molding both features in the same product, with a "spine" or "projection" running lengthwise across the back side of the molded part. The geometry of this Caldwell coil nest molded together with a cover assembly will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel. For example, I note that when the physical Caldwell device was installed in a sample window jamb channel, the spine or projection fitted snugly between channel flanges thereby inhibiting rotation of the Caldwell balance while allowing the balance to ride smoothly inside the channel.

iii.   In order to explain the need for the spine or projection features; but not for preventing rotation, the Caldwell representatives that were deposed had differing opinions:

   1.  According to the testimony of Jeffrey Robertson (beginning page 112, line 20), ….the raised portion labeled as "I", has two functions, one to provide enough material thickness so that the proper countersink for the screws, mounting screws can be provided without breaking through the inside of the cover...The second function is to provide a flow passage for the plastic in the injection molding process to fill the tool, fill the mold cavity…."

   2.  According to the testimony of Wilbur Kellum (beginning page 93, line 10), in a series of answers by Mr. Kellum about the function of the protrusion "or spine/projection": "It is to help in the plastic molding….", and then Mr. Kellum adds in his testimony (page 94 lines 4-5); "…it serves to maintain straightness of the part during shipping…." Mr. Kellum answers the questions (p94 lines 6-8) Q: does it serve to maintain the straightness of the part when installed? A: "No.".

It is my opinion that these explanations for the need of the spine or projection other than to inhibit rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

   1)  There are many geometries that can serve to allow for a flow passage for the plastic injection molding process to fill the mold cavity for the Quick-Tilt covers. The spine or projection, when specified by the Caldwell representatives, can be made deeper, wider or shorter than the geometry selected by them. I note that the physical Caldwell Quick-Tilt*nc products' spine geometry matches, within a tight tolerance, the front opening of the channel in the window jamb pocket, and hence prevents rotation of the coil nest. Of all the many possible geometries for the spine or projection available to satisfy the plastic flow requirements, Caldwell chose the specific one that will inhibit rotation of the mounting means.

   2)  There are many geometries to provide enough material thickness so that the proper countersink for the mounting screws can be provided without breaking through the inside of the cover. The thicker material could be made around the screw only and not to extend the full length of the cover. In addition, another alternative could be to make a recessed bore inside the coil nest to allow for more plastic material

on the inside as opposed to the outside of the cover. Of all the many possible geometries for the spine or projection available to satisfy the need for more material for the countersink of the fixing screw, Caldwell chose the specific one that will inhibit rotation of the mounting means.

3) The purpose of the spine or projection to maintain straightness of the part during shipping appears to be unusual; since the balances are shipped as part of assembled windows. It is customary in the business and engineering practices for the end product supplier to maintain the integrity of their product during shipping, and not rely on individual suppliers to provide the integrity of each individual part. For a product such as windows, which contains fragile glass, the end product supplier will certainly be very careful in providing for proper support and packaging of the window during shipping and transportation, and not rely on the balance manufacturer.

iv. In order to show that the Caldwell Quick-Tilt and Quick-Tilt*nc products will prevent rotation other than through the spine or projection mentioned in the '638 patent, a Caldwell representative that was deposed, as well as the Caldwell brochure for Quick-Tilt, provided the following :

1. According to the testimony of Jeffrey Robertson (beginning page 115, line 13), "….the top portion [of the Quick-Tilt*nc] is large in length and width dimension than the opening into which the balance is inserted, so it is …the top portion is held by the interference between the top and the vinyl lineal, the bottom portion is held in place by the screw Those two attachments, or the attachment at the bottom and the interference at the top prevent any rotation of the cover…"

2. In the Quick-Tilt brochure; page 2 (C000531), describing the constant force system, in the top of the page…"Its alternating coil design prevents the cantilevering or twisting of the carrier that can diminish locking performance…."

It is my opinion that these explanations for inhibiting rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1. The top portion of the Quick Tilt *nc cover is too thin to adequately inhibit the rotation of the coil nest, with a thickness ranging from 0.025" to 0.011" (drawings CW0158, Cw0159 and CW 0160). There are two diagonal thin cutouts at the top of the covers to allow for twisting of the cover.

2. The alternating coil design mentioned in the top of page 2 of the Quick-Tilt brochure (C000531) will only apply to tandem coiled ribbon springs. I note the following:

a. For single nest cover this does not apply at all.

b. For tandem covers, the length of each extended spring during window sash operations will vary since one spring is mounted on top of the other, resulting in the tandem springs not equal in length. Therefore , there will a be an offset moment forcing some rotation of the coil nest for tandem spring configurations

c. For triple nest covers, there is a fixing screw to attach the upper triple spacer as shown in the Quick-Tilt brochure page 2 (C000531) that could work in conjunction with the coil nest screw to inhibit rotation. I note that there are no instructions for the recommended amount of torque to apply for each of these two screws. Repeated sash operations during the useful lifetime of the windows might reduce the integrity of the Caldwell fastening method due to the constant pressure applied by the rotation of the coil nest due to the triple coiled ribbon spring configuration.

As a conclusion to item (h), I find that the reasons for having the spine or projection feature according to Caldwell are inadequate. The Caldwell explanations for their techniques for inhibiting rotation might contribute partially to reducing rotation. The spine or projection feature they adopted based on the '638 patent, will perform the primary function of inhibiting the rotation. Therefore, I find that the Quick-Tilt and Quick-Tilt*nc series of products that contain the spine or projection along the longitudal axis of the mounting means will prevent rotation of the mounting means.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the New construction friendly Quick-Tilt*nc products are infringing on claim 8 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements."

21

**II. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.**

Upon reviewing all information listed in the top of the report, I conclude the following: The defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20 and 21 of plaintiffs' U.S. Patent 6,598,264 B2. My reasoning for the basis of my opinion is stated for each claim numbered below:

Claim 1. This claim states as follows, quote, ('264 patent, column 6, lines 35-56):
A block and tackle window balance device comprising:
a channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel;
a bottom guide roller rotatably mounted in the bottom guide;
a fixed pulley block unit connected to the channel;
a translatable pulley block unit moveable within the channel;
a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and
a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

Upon examining the physical Caldwell block and tackle product that matches U.S. Patent 6,598,264 B2; the Caldwell brochure entitled "Series 86xt Block and Tackle System, Extended travel for sideload applications," containing 4 pages of front or title page (C000498), 2nd page of component part layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000501); the Caldwell depositions listed at the top of the report; and the Caldwell engineering drawings (CW0054 -CW099), it is my opinion that the defendant Caldwell Manufacturing Company's block and tackle system Series 86xt products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 1 by virtue of the following observations:

    a. The Caldwell product Series 86xt contains a channel comprising a first end and a second end;  See Fig. 5.1.A.

    b. The Caldwell product Series 86xt contains a top guide connected to the first end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (C000500) shows 2 part numbers of top guides.   See Fig. 5.1.B.

    c. The Caldwell product Series 86xt contains a bottom guide connected to the second end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (C000500) shows 2 part numbers of bottom guides.  See Fig 5.1.C.

    d. The Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide.  See Fig 6.1.D.  In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term "bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in

a way that permits its rotation." in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

e. The Caldwell Series 86xt product contains a fixed pulley block unit connected to the channel; See Fig 5.1.E

f. The Caldwell product Series 86xt contains a translatable pulley block unit moveable within the channel; See Fig 5.1.F.

g. The Caldwell product Series 86xt contains a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and; See Fig. 5.1.G.

h. The Caldwell product Series 86xt contains a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. See Fig 5.1.H.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company 86xt Block and Tackle System products are infringing on claim 1 of the Plaintiffs'' US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 2. The device in claim 1 wherein the bottom guide roller is located external to the channel ('264 patent, column 6, lines 57-58).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called series 86xt, that it contains a bottom guide roller located in the bottom guide and visibly extends beyond the channel.

Based on the above observations, it is my opinion that the defendant's Caldwell Manufacturing Company series 86xt Block and Tackle System products are infringing on claim 2 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 3. The device according to claim 2 where in the top angled portion is sized to receive a member of the window sash ('264 patent, column 6, lines 59-60).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called series 86xt, that it contains a top angled portion is sized to receive a member of the window sash. The top angled portion is sized to cooperate with a window sash

cam, as shown in the Caldwell brochure cover page (C000498). This top angled portion is formed by the assembly of the top guide and the top end of the channel through a fastening means of a rivet.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle products are infringing on claim 3 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 4. The device according to claim 1 wherein a portion of the bottom guide is external to the channel ('264 patent, column 6, lines 61-62).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that a portion of the bottom guide is external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 4 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 5. The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of the window sash ('264 patent, column 6, lines 63-64).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt that it contains a bottom guide that forms a channel to receive a portion of the window sash. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front or title page (C000498), the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 5 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 6. The device in claim 1 wherein the fixed pulley block unit comprises a frame, an axle, and at least one pulley rotatable around the axle ('264 patent, column 6, lines 65-67).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a fixed pulley block unit comprising a frame, an axle and 2 pulleys rotatable around the axle.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 6 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 7. The device according to claim 6 wherein the axle is located within the frame ('264 patent, column 7, lines 1-2).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains an axle is located at least partially within the frame.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 7 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 9. The device in claim 1 wherein the translatable pulley block unit comprises a frame, an axle within the frame, and at least one pulley rotatable around the axle ('264 patent, column 7, lines 6-8).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a translatable pulley block unit comprising a frame, an axle at least partially within the frame and 2 pulleys rotatable around the axle.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 9 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 10. The device according to claim 1 wherein the top guide includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel ('264 patent, column 7, lines 9-12).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a top guide that includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel to form an integrated assembly.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 10 of the Plaintiffs'' US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 11. The device according to claim 1 wherein the fixed pulley block unit is integral within the bottom guide ('264 patent, column 7, lines 13-14).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a fixed pulley block that is integral within the bottom guide to form an assembly.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 11 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 12. A window assembly comprising ('264 patent, column 7, lines 15-42):

A window frame with two jambs with jamb pockets;

at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets, and;

at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising:

channel comprising a first end and a second end;

a top guide connected to the first end of the channel;

a bottom guide connected to the second end of the channel;

a bottom guide roller rotatably mounted in the bottom guide;

a fixed pulley block unit connected to the channel;

a translatable pulley block unit moveable within the channel;

a spring comprising a first end and a second, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and

a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

Upon examining the physical Caldwell Block and tackle device that matches the U.S. Patent 6,598,264 B2; the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications containing 4 pages of front or title page (C000498), 2nd page of component part layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000501); the Caldwell engineering drawings (CW0054 -CW0099); and depositions of the Caldwell representatives, it is my opinion that the defendant Caldwell Manufacturing Company's Block and tackle Series 86xt products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 12 by virtue of the following observations:

    a. The Caldwell product Series 86xt is to be used in a window assembly with a window frame with 2 jambs and with jamb pockets; as shown in the Caldwell series 86xt Block and Tackle system brochure front page (C000498). *See* Fig. 7.12.A.

    b. The Caldwell product Series 86xt is to function with at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets, as shown in the Caldwell series 86xt Block and Tackle system brochure (C000498). *See* Fig. 7.12.B.

    c. The Caldwell product Series 86xt is a block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, as shown in the Caldwell series 86xt Block and Tackle system brochure (C000498). *See* Fig. 7.12.C.

    d. The Caldwell physical product Series 86xt contains a channel comprising a first end and a second end; *See* Fig. 5.12.D.

    e. The Caldwell physical product Series 86xt contains a top guide connected to the first end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories, C000500) shows 2 part numbers of top guides. *See* Fig. 5.12.E.

    f. The Caldwell physical product Series 86xt contains a bottom guide connected to the second end of the channel. In addition, the Caldwell brochure entitled Series

86xt Block and Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories,C000498) shows 2 part numbers of bottom guides.  *See* Fig 5.12.F.

g.  The Caldwell physical product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide.  *See* Fig 6.12.G.  In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term '"bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 12 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.  The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

h.  The Caldwell physical product Series 86xt contains a fixed pulley block unit connected to the channel;  *See* Fig 5.12.H.

i.  The Caldwell physical product Series 86xt contains a translatable pulley block unit moveable within the channel;  *See* Fig 5.12.I.

j.  The Caldwell physical product Series 86xt contains a spring comprising a first end and a second, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and;  *See* Fig 5.12.J.

k.  The Caldwell physical product Series 86xt contains a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the to the translatable pulley block unit and the second cord end being attachable to a jamb.  *See* Fig. 5.12.K.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 12 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 13. A window balance system comprising: ('264 patent, column 7, line 46 – column 8, line 2)

a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and
a bottom guide roller rotatably mounted in the bottom guide.

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, the Caldwell engineering drawings (CW0054 - CW0099); and the corresponding Caldwell brochure (C000498-C000501) that it contains

a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame. *See* Fig. 5.13.A. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front or title page (C000498), the bottom guide is shown adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame.

I also observe that the Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide. *See* Fig. 6.13.B. In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term "bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 13 of the Plaintiffs'' US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 14. The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto ('264 patent, column 8, lines 3-5).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-C000501), that it contains a bottom guide roller located at least partially external to the channel when the bottom guide is attached thereto.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 14 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 15. The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto ('264 patent, column 8, lines 6-8).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-

C000501), that it contains at least a portion of the bottom guide which is external to the channel when attached thereto.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 15 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 16. The device according to claim 13, wherein the bottom guide forms a channel to receive a portion of a window sash when installed ('264 patent, column 8, lines 3-11).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt and the corresponding Caldwell brochure (C000498-C000501), that it contains a bottom guide that forms a channel to receive a portion of the window sash when installed. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front (title) page, the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 16 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 18. A window balance device comprising: ('264 patent, column 8, lines 15-23):
a channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel; and adapted to slide in a jamb
   pocket when installed in a window frame; and
a bottom guide roller rotatably mounted in the bottom guide.

Upon examining the physical Caldwell Block and tackle device that matches the U.S. Patent 6,598,264 B2; the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications containing 4 pages of front or title page (C000498), 2nd page of component part layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000501); the depositions of the Caldwell representatives; and the Caldwell engineering drawings (CW0054 -CW0099), it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system Series 86xt products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 18 by virtue of the following observations:
   a. The Caldwell product Series 86xt contains a channel comprising a first end and a second end; *See* Fig. 5.18.A.
   b. The Caldwell product Series 86xt contains a top guide connected to the first end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories, C000500) shows 2 part numbers for top guides. See Fig.5.18.B.
   c. The Caldwell product Series 86xt contains a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame. In addition, the Caldwell brochure entitled Series 86xt Block and

Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories, C000500) shows 2 part numbers of bottom guides. See Fig.5.18.C.

d.   The Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide. In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term '"bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation. See Fig.6.18.D.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 18 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 19. The device of claim 18 wherein the bottom guide roller is located external to the channel ('264 patent, column 8, lines 25-26);

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-000501), that it contains a bottom guide roller located at least partially external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 19 of the Plaintiffs" US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 20. The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel ('264 patent, column 8, lines 27-28).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-C000501), that it contains at least a portion of the bottom guide which is external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 20 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 21.</u> The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of the window sash when installed ('264 patent, column 8, lines 29-30).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt and the corresponding Caldwell brochure, (C000498-C000501) that it contains a bottom guide that forms a channel to receive a portion of the window sash when installed. In the Caldwell brochure series 86xt Block and Tackle System, Extended travel for sideload applications front or title (C000498) page, the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant's Caldwell Manufacturing Company Series 86xt Block and Tackle System products are infringing on claim 21 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

31

**III. Infringement by Caldwell systems of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97ez products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' U.S. Patent No. 6,820,368 B2.

Claim 2. This claim states as follows: ('368 patent, column 8, lines 48-67):
A window balance system comprising:
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

Upon examining the physical Caldwell product, as well as the Caldwell 4-page brochure entitled "Series 97ez Block and Tackle System, Easy Installation for Tilt Applications" (C000514-C000517) and the Caldwell engineering drawings (CW0001 -CW0015 and CW0183-CW0195), it is my opinion that the defendant Caldwell Manufacturing Company's Series 97ez system products are infringing on the Plaintiffs' U.S. Patent 6,820,368 B2 claim 2 by virtue of the following observations:

    a. The Caldwell product Series 97ez contains a U shaped channel comprising a plurality of openings;  See Fig 8.2.A.
    b. The Caldwell product Series 97ez  contains a spring connected to a system of pulleys located within the U shaped channel;  See Fig 8.2.B.
    c. The Caldwell product Series 97ez  contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment;  See Fig 8.2.C.
    d. The Caldwell product Series 97ez  contains a balance shoe (Fig 8.2.D), wherein the balance shoe comprises:
        a frame comprising an enlarged first end (Fig 9.2.E) and a second end (Fig. 9.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 9.2.G). The disputed term "pocket" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening

32

shaped to mate (i.e., to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell balance shoe is called in their 97ez brochure page 3 (C00516) as the "side locking pivot shoe". The Caldwell shoe forms a notch adapted to mate with a rivet in the U shaped channel. I observe that the notch located physically in the Caldwell device at the narrow end of the plastic carrier.

I observe that the Caldwell product 97ez has two rivets in the U shaped channel. The first rivet, located at the end of the channel, is enclosed completely by the shoe and the shoe can rotate freely around the first rivet. The second rivet, located near the first rivet but towards the center of the channel, prevents the free rotation of the shoe. This is confirmed by the testimony given during the deposition of Mr. Jeffrey Robertson, a Caldwell design engineer familiar with the design of the 97ez, where he confirms the connecting scheme as follows: In his testimony, as shown in Exhibit 6 to his deposition, the first rivet (near the channel end) is called E, and the second rivet (towards the center of the channel) is called D. The plastic feature that forms the pocket or "notch" in the shoe in the District Court of Massachusetts definition is called F in exhibit 6 of the Robertson deposition. The feature called F mates (i.e., joins together) with the rivet D.

In the Robertson deposition, beginning on page 53 line 25, Mr. Robertson answered the following question:

Q. If I removed the plastic portion F and forcibly rotated the bottom of the carrier into the page, would the carrier rotate about the rivet E?
A. Yes.

In the Robertson deposition beginning on page 73, line 14, Mr. Robertson answered the following question:

Q. Now the rivet labeled "E" in exhibit 6, would allow the carrier to rotate about itself; is this correct?
A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97ez shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance."

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ez product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: a possible function of the pocket in claim 2 is to prevent displacement or rotation of the balance shoe during shipping, handling and in use. When the shoe is under a force directed at the enlarged end, the pocket touches a fastener (i.e. rivet) in order to stop the displacement (rotation) of the shoe.

In Mr. Robertson's deposition, on page 49, Mr. Robertson answered the following question:

33

Q. Now in the 97ez, what is the purpose of the plastic part you labeled as "F"?
A. Prevent rotation in the carrier in the channel.
Q. Is this to prevent rotation of the carrier while in operation?
A. During handling of the balance or shipping of the balance.

Mr. Robertson also testified on page 51:
Q. Is there any circumstance in which F would touch the rivet D?
A. If the shoe is rotated forcibly in the direction opposite to that we were just discussing.
Q. And when would that happen?
A. Possibly in shipping and handling.

Given Mr. Robertson's testimony and my own examination of the Series 97ez, I conclude that the part of the Caldwell 97ez shoe that forms a notch shaped to mate with a rivet performs the same function of preventing unwanted rotation of the balance shoe as the invention. The 97ez will stop displacement (rotation) in the same manner as the invention by contacting a rivet, thus achieving the same result of securing the balance shoe in the channel during shipment, handling, and usage.

e. The Caldwell product Series 97ez contains a locking member proximal to the enlarged first end. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to "**Rotate** cam to lock shoe in place…." *See* Fig. 8.2.H.

f. The Caldwell product Series 97ez contains a cam in communications within the locking member. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to "**Rotate** cam to lock shoe in place…." *See* Fig. 9.2.I.

g. The Caldwell product Series 97ez contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

The Caldwell 97ez product contains a rivet that connects the balance shoe to the U shaped channel of the inverted window balance. *See* Fig. 9.2.J.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ez product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel. In the Caldwell 97ez product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

34

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 3. The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock construed the term as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97ez has a rivet as the connecting device. I also refer to section (g) in my discussion of claim 2 of the '368 patent above as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on the plaintiffs' claim 3 of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 6. The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez that it contains a cam at least partially housed within the enlarged end of the frame, called the "carrier" in page 3 (C000516) of the Caldwell brochure for system 97ez, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:

> **Slide** the series 97ez Block and tackle balance into the frame pocket.
> **Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
> **Rotate** cam to lock shoe in place...

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 7. The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent, column 9, lines 12-14).

I observe from examining the physical Caldwell series 97ez that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 8. The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from examining the physical Caldwell product 97ez that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:
> **Slide** the series 97ez Block and tackle balance into the frame pocket.
> **Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
> **Rotate** cam to lock shoe in place...

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 11. The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from examining the physical Caldwell Series 97ez that it contains a cam comprises of at least one camming surface (the observed Caldwell product has 2 camming surfaces) and a keyhole opening sized to receive a pivot bar. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:
> **Slide** the series 97ez Block and tackle balance into the frame pocket.
> **Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
> **Rotate** cam to lock shoe in place....
> **Install** the sash by dropping the bottom corner pivot bar into the shoe opening....

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for

tilt applications called Series 97ez products are infringing on claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

**IV. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97ih products are infringing on claims 2, 3, 6, 7, 8 and 11 of plaintiffs' U.S. Patent 6,820,368 B2.

Claim 2. This claim states as follows:
A window balance system comprising
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received  by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

('368 patent column 8, lines 48-67)

I examined photos of the device, including the one denoted in the Robertson deposition as Exhibit 3. I also examined three engineering drawings included as Exhibit 12 to the Batten deposition. They are:
1. 97i(H) Channel, Caldwell drawing ## 15A10/15A11, rev 2, drawn 05-20-04, approved 01-07-05
2. 97i(H) Balance assembly-screw mounted, Caldwell drawing ##15A50/15A51 rev 2, drawn 05-21-04, approved 01-10-05. The drawing is clearly marked with the location of the locking mechanism and the cam by Mr. Batten during his testimony in his deposition (page 146, line 21, and page 147 line 21).
3. 97i(H) Balance assembly-short/screw mounted, Caldwell drawing ##15A52, rev 1, drawn 08-13-04, approved 01-10-05.

According to the Batten Deposition, the Caldwell 97ih product preceded the 97ez product (Batten deposition, page 72, line 1). The 97i preceded the 97ih, and both products were very similar, with the same shoe. Quote from the Batten deposition page 74, lines 13- 24.
A. There was a predecessor product to the [97]ih called 97i. It was a predecessor to the I hybrid, otherwise known as ih.
Q. What is the difference between the [97]ih or i hybrid and the 97i?
A. The principal difference is the weight and range of the two products. The sash weight ranges that each carries is a little bit different.
Q. Is there any difference in the shoe between the 97i and the 97ih?
A. No.

38

Another quote from the Batten deposition compares the 97ih to the 97ez; quote (page 147, beginning line 22)

Q. Does the locking mechanism for the 97ih work in the same way as the 97ez's locking mechanism?

A. Yes.

Q. So if you rotate the cam, it forces the ends out and they engage in the jamb tracks?

A. That is correct.

Q. Did the 97i, the original 97i, prior to the introduction of the 97ih have the same carrier as what is depicted here in Exhibit 12?

A. I have to make sure we get our i's straight here

Q. I am talking with reference to the 97i that you testified earlier was a predecessor to the 97ih, that 97i, the one no longer on the market, was replaced sometime in 2004.

A. Yes.

Q. Did the carrier for that balance, was it the same carrier as what is shown here as the 97ih?

A. I believe it was, yes.

Based on the above discussion, it is my opinion that the defendant Caldwell Manufacturing Company's Series 97ih system products are infringing on claim 2 of U.S. Patent 6,820,368 B2 by virtue of the following observations:

a.  The Caldwell product Series 97ih contains a U shaped channel comprising a plurality of openings;  *See* Fig. 10.2.A.
b.  The Caldwell product Series 97ih  contains a spring connected to a system of pulleys located within the U shaped channel;  *See* Fig. 10.2.B.
c.  The Caldwell product Series 97ih  contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; *See* Fig. 10.2.C.
d.  The Caldwell product Series 97ih  contains a balance shoe (Fig. 10.2.D), wherein the balance shoe comprises:
    a frame comprising and enlarged first end (Fig. 10.2.E) and a second end (Fig 10.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 11.2.G). The disputed term "pocket" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance."  The Caldwell shoe forms a notch adapted to mate with a rived in the U shaped channel. More of my observations on this issue are noted in element (h).
e.  The Caldwell product Series 97ih contains a locking member proximal to the enlarged first end. *See* Fig. 10.2.H.
f.  The Caldwell product Series 97ih contains a cam in communications within the locking member. *See* Fig. 11.2.I.

g. The Caldwell product Series 97ih contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. *See* Fig. 11.2.J. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) and engineering drawings of two shoe sizes (called the carrier) in the Batten deposition, exhibits 12 and 13 (C004553 and C004554), that the Caldwell 97ih has two rivets in the U shaped channel.

The first rivet, located towards the center of the channel, is used to anchor the spring. The second rivet is used to connect the carrier to the balance. This is collaborated for the first rivet by the Robertson deposition, page 26, lines 2-5, quote:

Q. As you are looking at it. What is the purpose of this rivet [to the right of the page?

A. It is to anchor the spring.

The second rivet function is also collaborated by the Robertson deposition, page 26, lines 15-19, quote:

Q. Is it also correct to say the leftmost rivet connects the carrier to the channel?

A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97ih shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The notch is indicated by the letter H in the Batten deposition Exhibit 13 (Batten deposition, page 142, line 24).

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ih product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this claim element of the claim, it also infringes based on the Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel. In the Caldwell 97ih product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle Series 97ih products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 3. The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97ih has a rivet as the connecting device. I also refer to section (g) in my discussion of claim 2 of the '368 patent above as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 3 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 6. The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a cam at least partially housed within the enlarged end of the frame, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 7. The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent, column 9, lines 12-14).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle 97ih products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 8. The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of

41

the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97ih that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 11. The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97ih that it contains a cam comprises of at least one camming surface (the observed Caldwell product has 2 camming surfaces) and a keyhole opening sized to receive a pivot bar.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

42

**V. Infringement by defendant, Caldwell Manufacturing Company, of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant's Caldwell Manufacturing Company Series 97i products are infringing on claims 2, 3, 6, 7, 8 and 11 of plaintiffs' U.S. Patent 6,820,368 B2.

Claim 2. This claim states as follows:
A window balance system comprising:
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

('368 patent, column 8, lines 48-67):

Upon examining Caldwell brochure package Series 97i Block and Tackle System Inverted Operation for tilt application, containing 4 pages of front or title page (C000490), 2nd page of component part layout and description (C000491), 3rd page of technical specifications, accessories and installation (C000492), and 4th page of warranty and contact information (C000493); and the Caldwell engineering drawings (CW0016 -CW0039), it is my opinion that the defendant Caldwell Manufacturing Company's Series 97i system products are infringing on the Plaintiffs' U.S. Patent 6,820,368 B2 claim 2 by virtue of the following observations:

a. The Caldwell product Series 97i contains a U shaped channel comprising a plurality of openings; *See* Fig. 12.2.A.
b. The Caldwell product Series 97i contains a spring connected to a system of pulleys located within the U shaped channel; *See* Fig 12.2.B.
c. The Caldwell product Series 97i contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; *See* Fig 12.2.C.
d. The Caldwell product Series 97i contains a balance shoe (Fig. 12.2.D), wherein the balance shoe comprises:
    a frame comprising and enlarged first end (Fig. 12.2.E) and a second end (Fig. 12.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 11.2.G). The disputed term "pocket" was clarified by the

43

memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell balance shoe is called in their 97i brochure page 3 (C00492) as the "locking pivot shoe". The Caldwell shoe forms a notch adapted to mate with a rived in the U shaped channel. More of my observations on this issue are noted in element (g).

e. The Caldwell product Series 97i contains a locking member proximal to the enlarged first end. *See* Fig. 12.2.H. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to "**Rotate** cam to lock shoe in place…."

f. The Caldwell product Series 97i contains a cam in communications within the locking member. *See* Fig. 11.2.I. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to "**Rotate** cam to lock shoe in place…."

g. The Caldwell product Series 97i contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. *See* Fig. 11.2.J. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

I note from the Batten deposition page 74, lines 13- 24:

A. There was a predecessor product to the [97]ih called 97i. It was a predecessor to the I hybrid, otherwise known as ih.
Q. What is the difference between the [97]ih or i hybrid and the 97i?
A. The principal difference is the weight and range of the two products. The sash weight ranges that each carries is a little bit different.
Q. Is there any difference in the shoe between the 97i and the 97ih?
A. No.

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) and engineering drawings of two shoe sizes (called the carrier) in the Batten deposition, exhibits 12 and 13 (C004553 and C004554), that the Caldwell 97i has two rivets in the U shaped channel.

The first rivet, located towards the center of the channel, is used to anchor the spring. The second rivet is used to connect the carrier to the balance. This collaborated for the first rivet by the Robertson deposition, page 26, lines 2-5, quote:

Q. As you are looking at it. What is the purpose of this rivet [to the right of the page]?
A. It is to anchor the spring.

The second rivet function is also collaborated by the Robertson deposition, page 26, lines 15-19, quote:

Q. Is it also correct to say the leftmost rivet connects the carrier to the channel?

A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97i shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The notch is indicated by the letter H in the Batten deposition Exhibit 13 (Batten deposition, page 142, line 24).

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97i product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the  Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel. In the Caldwell 97i product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 3. The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97i has a rivet as the connecting device. I also refer to section (g) in claim 2 of the '368 patent as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing on the plaintiffs' claim 3 of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 6. The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to

engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, exhibit 3), that it contains a cam at least partially housed within the enlarged end of the frame, called the "carrier" in page 3 (C000492) of the Caldwell brochure for system 97i, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to perform the following functions:

> **Slide** the series 97i Block and tackle balance into the frame jamb pocket.
> **Insert** a mounting screw through the terminal and fasten securely to the jamb.
> **Rotate** cam to lock shoe in place…

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 7. The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent column 9, lines 12-14).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 8. The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, exhibit 3) for the Caldwell product 97i that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to perform the following functions:

> **Slide** the series 97i Block and tackle balance into the frame jamb pocket.
> **Insert** a mounting screw through the terminal and fasten securely to the jamb.

**Rotate** cam to lock shoe in place…

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 11. The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97i that it contains a cam comprises of at least one camming surface (the observed Caldwell product has two camming surfaces) and a keyhole opening sized to receive a pivot bar. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:

**Slide** the series 97i Block and tackle balance into the frame jamb pocket.
**Insert** a mounting screw through the terminal and fasten securely to the jamb.
**Rotate** cam to lock shoe in place…
**Install** the sash by guiding the bottom corner pivot bars into their respective carrier opening….

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Sincerely yours

Dr. Sammy G. Shina, P.E.
19 Swanson Road
Framingham, MA 01701
Sammy_shina@uml.edu
Home 508 877 6109, Work 978 934 2590;
cell 508 934 9176

47

# TAB A

**Dr. Sammy G. Shina, Ph.D., PE**

**OFFICE:** College of Engineering
University of Massachusetts Lowell
1 University Avenue
Lowell, MA 01854

Phone:     (978) 934 2590
Fax:       (978) 934 3048
Cell       (508) 934 6777
Sammy_Shina@UML.edu
DOB        9/28/ 44

**HOME:**    19 Swanson Road
Framingham, 01701
Phone and fax
(508) 877-6109

## A. EDUCATION AND ACADEMIC QUALIFICATIONS

### 1. Education (Degrees, with fields, institutions and dates).

| | | |
|---|---|---|
| Ph.D. | MECHANICAL ENGINEERING | TUFTS, 1998 |
| M.S. | COMPUTER SCIENCE | WPI, 1972 |
| B.S. | INDUSTRIAL MANAGEMENT - | MIT, 1966 |
| B.S. | ELECTRICAL ENGINEERING- | MIT, 1966 |

Completed 6 courses in the Computer Engineering graduate program at Boston University.

### 2. Academic Experience

| | |
|---|---|
| 1999 - Current | University of Massachusetts Lowell, College of Engineering Full time Professor, Department of Mechanical Engineering |
| 2003 | Coordinator of the Graduate Certificate Program: Design and Manufacturing Engineering |
| 2000 | e-Engineering lectures, National Technological University, and PBS Business Network |
| 1992 - Current | University of Massachusetts Lowell, College of Engineering Full time Associate Professor, Department of Mechanical Engineering |
| 1989- 1995 | Adjunct Professor, University of California Irvine |
| 1993 - 1995 | Adjunct Professor, University of Pennsylvania EXMSE program for business executives |
| 1994 - 1995 | Lecturer, Six Sigma Institute on Quality and Concurrent |

Engineering, Motorola University for Motorola and Texas
Instrument Six Sigma Black Belt Engineers.

1988-1992    University of Lowell, College of Engineering
Full time Associate Professor, Department of Industrial
Technology

1970-1990    University of Lowell, Continuing Education
Adjunct Faculty, Industrial Technology Department

1985-1988    Technical Education Coordinator for Hewlett Packard
Corporation, Waltham MA
Set up the training courses for the different tools and systems such as
Mechanical and Electrical CAD/CAM. Introduced Masters of Engineering
Programs from the National Technological University and Boston University
engineering schools for 400 engineers.

1967-1968    The Technical Education Institute, Florence, SC
Taught Computer Programming, Mechanical and Electrical
Engineering courses in the Institute.

2

## B. PROFESSIONAL ACTIVITIES

### 1. Professional Association

Secretary and Past chairman for the Robotics Chapter of the SME (Society of Manufacturing Engineers), Chapter 293, Region 5. Chairman elect 1998.
*Member(current or past) of the following professional societies:*
Society of Quality Engineers (ASQC)  - Senior Member
Society of Manufacturing Engineers (SME) - Senior Member
American Society for Engineering Education (ASEE) - Senior Member
Institute of Electrical and Electronics Engineers (IEEE) - Senior Member
Member of the Board of Directors, Massachusetts Quality Award
Quality Examiner, Massachusetts Quality Award
Registered Professional Engineer (EE) in Massachusetts, No. 345922.
Senior Member of the Surface Mount Technology Association (SMTA) No 13849

### 2. Work Experience

Summer of 2000     CoCreate CAD Software, Fort Collins, Colorado
        I was engaged by CoCreate to develop the concepts and strategies of collaborative engineering by researching and interviewing companies engaged in the design of mechanical products using distributed design teams as well as distributed supply chains. The results of the research are to be documented in case studies and future publication in journals and a fifth book.

Summers of 1997/1998     Lecroy Corporation, Chestnut Ridge, NY
        I was engaged by the Lecroy Corporation Network Products Group to select an outside manufacturing contracting services for PCB, Instrument and system assembly and test. Evaluated several potential contractors and helped select the manufacturing plan and the contractor.

Summer of 1992     Phillips Kommunication Industrie AG, Nuremberg, Germany.
During the summer of 1992, I was engaged by the company to help transition the product creation process from a serial (throw it over the fence) to concurrent engineering. I worked with the management and engineering teams of the company to effect that transition, My work at the company formed the basis of the first chapter in my second book on concurrent engineering.

1971-1988   HEWLETT PACKARD WALTHAM DIVISION, Waltham, MA
        I worked for the company in many positions, both at the division and the corporate levels.  I filled many diverse assignments: manufacturing engineer and manager, in the process, production and tool engineering departments. I have successfully built and turned on a $10 million automated electronic manufacturing plant and associated wastewater treatment system in 1980. I have received an award from the MDC for the design of the plant, which was featured on the front cover of their annual report.
        As a production manager, I understood how to manage and ship more than $50 million of medical electronics instruments in 1985, and managed an

3

organization of 300 workers, including ten supervisors, manufacturing and process engineers. This position gave me a unique perspective on the congruence of design, manufacturing, operational and engineering issues.

A significant assignment was the Waltham division productivity manager in 1986, where I investigated the methodologies on how to increase engineers' productivity and quality. I was in charge of capital equipment and training for 400 engineers. I spend more than $7 million on CAD and associated equipment, especially automatic links to manufacturing and CAM. One of the visitors to Hewlett Packard described my efforts in the field of Design - Manufacturing connection in 1986 as the most complete he has seen outside of Detroit. This assignment led me to formulae my opinions about concurrent engineering, which I published in my first book 1991.

Engineering Assignments:
Surface Mount Technology (SMT) Coordinator
Computer Aided Design (CAD) Manager
Prototype-In-Production (PIP) Program Manager
Automatic Test of PC Boards Systems Designer/Manager
Automatic N/C generation for Punch Press equipment
Printed Circuit Board Fabrication System Designer
Automatic PC Solder and Wash System Designer
Automatic Insertion of Components Systems designer/Manager

Line Management Experience:
Auto Insertion Department Manager.
Medical Monitoring Instruments Assembly and Test Manager
Central Station Monitoring Assembly and Test Manager
Oximeter and Capnometer Assembly and Test Manager
Engineering Services Manager
Productivity Manager
Tool Engineering Manger
Manufacturing Technology Manager

1968-1971   RCA COMPUTER SYSTEMS DIVISION, Marlborough MA
Designed an automatic manufacturing / test systems for computer peripherals, including magnetic tape storage and high speed disc storage devices. I was slated to become the manufacturing engineering manager before RCA decided to quit the IBM mainframe compatible market in 1971, and closed the plant.

1966-1968   UNION CARBIDE COOPERATION LINDE DIVISION, Florence, SC
I introduced computer technology to the plant that was newly built in the south. I designed computer based inventory control and material handling systems, including working with one of the first IBM bill of materials processors.

## C. RESEARCH

### 1a. Awarded Grants and Contracts

<u>Funded</u> (^$750,000)

| | |
|---|---|
| 001402-001 | Lead Free Solder Testing, EPA work order #4w-1362-NAEX, 9/2004, $25,000. |
| 05-8011 | Income Account for Lead Free Consortium Schneider Automation, MACOM; and Analog Devices 2000-2004= $8,500 |
| UML Turi | Support for Lead Free Consortium $6000; in 5/02 and 5/03 |
| UML Turi | Research Fellowships for Lead Free Soldering, $20,000 9/99; $6,000 9/00; $20,000 9/01 Total = $46,000 |
| Corporate Education | *Skills Training – Machine Controls and XY Movement) Lucent Technology , Summer 2000, $13,000 |
| 99-348 | Parlex Corporation Student Internship, June 1999 $14,450 |
| 05- 08225 | Resin Technology, MFG. Evaluation, January 1999, $3,844 |
| Corporate Education | *Skills Training – Machine Controls and XY Movement) Lucent Technology , Fall  1999, $32,000 |
| 05- 08112 | Microtouch Corporation, MFG. Evaluation, July 1998, $13,908 |
| UML TURI | MFG Research Fellowship for Sunny Grover, in Additive PCB's  Build Up Vias, September 1998, $25,000 |
| 05-08011 | Coop and Internship Income Account, March 1998, $2,100 |
| UML TURI | MFG Research Fellowship for Val Carvalho, May 1997, in Additive PCB Fabrication Technology, $25,000.00 |
| CITA | Conception, Product Development and Environmentally Appropriate Technology, with Maas, Fiddy, Geiser and McCarthy, May 1997, $4190 |
| UML TURI | MFG Research Fellowship for Dennis Gagne, 9/1996, Additive PCB Fabrication Technology, $15,345.00 |

| | |
|---|---|
| Continuing Education | "Manufacturing and Total Quality Management and Control", USCI Baird with Stephen Driscoll, June 1996, $50,000. |
| 05 -07433-F | "Undergraduate Faculty Development in New Product Realization", National Science Foundation, June 1996, $44,000 |
| 05- 07212 | EASNE Design for Quality, UML-UGC2-5, May 1996, $68,000; Co-PI with R. Giglio, UMA. |
| 05-07362 | "Practical Statistics for Engineers", USCI Baird, December 1995; with Professor McKelliget, $5,000 |
| UML TURI | MFG Research Fellowship for Doug Sommer, in NO Clean Paste for PCB Assembly, September 1995, $15,345.00 |
| UML TURI | MFG Research Fellowship for Paul Haley, in NO Clean SMT Paste for PCB Assembly, September 1994, $15,645.22 |
| 05 - 6450-F | "Undergraduate Faculty Development in Concurrent Engineering and Design for Manufacture", National Science Foundation.  June 1993, $77,810. |
| Continuing Education | "Concurrent Engineering, Quality Management and Control", Baush & Lomb Corporation, July 1992, $16,000. |
| 05 - 6222 | "Faculty and Course Development", GE Aircraft Engines Education Fund, February 1992, $10,000 |
| 05 - 5850 | "Faculty and Course Development", GE Aircraft Engines Education Fund, February 1991, $10,000 |
| 05 - 5807-F | "Undergraduate Faculty Development in DFM", National Science Foundation. January 1991, $54,924. |
| 05 - 5636 | "Concurrent Engineering and Design for Manufacturing", Genrad Corporation, June 1990, $1,500. |
| 05 - 5792 | "Faculty and Curriculum Development", Society of Manufacturing Engineering Education Foundation, May 1990, $ 9,500. |
| 16 - 5336 | "Technology Transfer Grant in Manufacturing Engineering", Costa Rica Educational Development Center, with John Colluccini. May 1989, $ 8,404. |

6

| 16 - 5257 | "Process Quality Improvements Using SPC and Taguchi Methods", Wang Labs Incorporated, April 1989, $48,334. |
| 16 - 5260 | "Factory Process and material handling optimization using simulation tool",  Wang Labs Incorporated, April 1989, $ 58,939 |
| Continuing Education | More than $100,000 in seminars on quality an Concurrent Engineering, 1989-1993 |

## 1b. Equipment and Software Grants ($178,000)

GENRAD Tester, $140,000, 12/ 1998; Hewlett Packard, Optical Laser Measurement System, $15,000, 5/ 1996; Storm Software, Manufacturing Software, $2000, 5/1995.; AMTX Corporation, Screening Stencils, $1,000, March 1995; AT&T, Merrimack Valley Works, for 2 ADEPT Robots, book value: $15,000, 11/1993; UTZ Corporation, Screening Stencil, $1,000, 12/1993; CACI Products Company, SIMFACTORY Software training, $4,000, 12/ 1993.

## 1c. Consultancy:

### University and Technical Conference Based Seminars and Training

University of Massachusetts, Lowell, University of California, Irvine, University of Pennsylvania, ExMSE Program, Motorola University Six Sigma Institute, Bellevue Community College, Washington, Brunel University, London, NEPCON Conferences and Expositions, NEPCON College of Manufacturing, SMT International Conference and Exposition, Hong Kong Productivity Council, Singapore Center for Management Technology, American Society for Quality Control (ASQC), Puerto Rico Chapter, Society of Manufacturing Engineering (SME), New England Region, Iteso, University, Guadalajaro, Mexico, Mexican Branch of the IEEE, Australian SMCBA Association, Technical University of Costa Rica, Technical University of Puerto Rico, Arab School of Science and Technology, Society of Manufacturing Engineers(SME), SMTI Chicago

### Consultancy, US

Omnisonis, CoCreate, Lucent, BTU, Phoenix International; Teradyne, Bose, Lecroy, General Scanning, Lockheed Martin Sanders, General DataCom, MicroTouch Systems, Leybold Inficon,  PictureTel, USCI Baird, Hewlett Packard, Motorola, Pensar Corporation, AT&T Corporation, AMETEK Corporation, M/ACom Corporation, GTE Sylvania, Atlanta Scientific, U.S. Navy, Port Hueneme and Pt. Mugu; Xerox Corporation, Polymer Technology, National Science Foundation, General Electric Aircraft Engines, Genrad Corporation, Tredgar Plastics, C&K electronics, Parker Brothers, Wang Incorporated

### Consultancy, International

Havelsan Company, Ankara, Turkey, Hong Kong Productivity Council Fisher and Paykel, Switchtek Power Systems, Tait Electronics and Dynamic in New Zealand. Phillips Kommunication Industrie AG, (Nurenberg, Germany),

7

Australian Electronics Development Center, Victoria Australia, Surface Mount and Circuit Board Association, Hughesdale, Australia; NISTEC (Advanced Technologies in the Electronics Industry), Petah Tikva, Israel; R&D Network Devices, Efrat Technology and ECI Telecom, Petah Tikvah, Israel; NECPON Singapore, NPCON Europe, Puerto Rico ASQC, Mexicon, Mexico

**EXPERT WITNESS/ Litigation Support Experience**

1. Xyratics Design v AB circuits v Eltek, 1999: The case involved quality issues in the electronics supply chain. The plaintiffs and defendants were value added manufacturers that worked on a product originated in a South Korean Company, which had hidden defects in the product. The Korean company went bankrupt, and the other companies in the supply chain sued each. I advised on the issues of proper testing and quality procedures in the electronics industry, especially when related to the supply chain. I wrote several expert reports on test and quality for the solicitors and barristers in the case. Case was settled out of court. *INCE and Company; Solicitors; 11 Byward Street; London EC3; England*

2. Vial, Inc., v. Triple S. Plastics, Inc., CV 97-499 (Dist. AZ); CV 98-102 (Dist. AZ): Patent infringement case involving molding of plastics injected parts, with two companies making plastic containers for the Dairy and consumer food industries. The patent included closing of plastic containers in the mold for the defendant, while the other company used similar techniques for closing the cap by a robotic arm. I help the plaintiff lawyers research the prior art to find instances of use of robotics in the plastics industry. *Morgan and Finnegan, L.L.P., Attorneys at Law, 345 Park Avenue, New York, NY 10154*

3. Fuji Machine Manufacturing Company, Ltd. V. Hoover-Davis Inc.; Civil Action No. 96-CV-5087I: Patent infringement case involving pick and place Feeder design. I worked with the lawyers of the plaintiff (FUJI) to explain the workings of the feeder, and how the design of the defendants (Hover-Davis) feeder design had similarity in function. *Oliff & Berridge, P.L.C, Attorneys at law; 700 South Washington Street, Alexandria, Virginia 22314*

4. US District Court Of Maine 05-32 –PC, RFT Technology Corporation V Applied Microwave Technology: Case including conversion, breach of contract and misappropriation of trade secrets. Case involved using the same design strategy and copying of CAD files versus reverse engineering claims by the defendants. I wrote an expert report, and was deposed in the discovery process. Case was settled out of court. *Hamilton, Brook, Smith & Reynolds, P.C. , 530 Virginia Road, P.O. Box 9133, Concord, Massachusetts 01742*

## 2a. Academic & Professional Publications (94 publications)

8

**Text and Reference Books (5 published)**

1. S. Shina, "Six Sigma for Electronics Design and Manufacturing McGraw Hill, May 2002
2. Shina S. and Saigal A., "Manufacturing Costs for electronic Products", Volume 3 of the Encyclopedia of Materials, Elesevier Press, November 2001, pp 2727-2735.
3. S Shina , "Design Of Experiments", chapter 25 to "Environment Friendly Electronics: Lead-Free Technology" by J. Hwang, Electrochemical Publications Ltd, 2001.
4. S. Shina, editor and co-author, "Successful Implementation of Concurrent Engineering Products and Processes", published by Van Nostrand Reinhold N.Y., 1994, reprinted by Wiley Press.
5. S. Shina, "Concurrent Engineering and Design for Manufacture of Electronic Products", published by Van Nostrand Reinhold N.Y., 1991. Reprinted by Kluwer Academic Publishers.

**Papers published in refereed Journals and publications (10 papers published):**

1. Shina S. and Saigal A., "Using Cpk as a Design Tool for New System Development", Journal of Quality Engineering, Volume XII, Number 4, 2000, pp. 333-349.
2. Shina S. and Saigal A., "A design Quality Based Cost Model for New Electronic Systems and Products," Journal Of Materials, April 1998, pp 29-33.
3. Shina S. and Saigal A., "Technology Cost Modeling for the Manufacture of Printed Circuit Boards in New Electronic Products," Journal of Manufacturing Science and Engineering, May, 1998, pp 368- 375.
4. Shina, S., Gagne D. and Quaglia, M., "Methods for paste Selection and Process Optimization for Fine Pitch SMT, Journal of the SMART (Surface Mount and Related Technologies) Group, No. 24, October 1996, pp. 8-11.
5. Shina, S., W. Eaton W., et all, "Using circuit simulation with Taguchi Design of Experiment Techniques to optimize the performance of a digital half-adder integrated circuit", Quality Progress, Journal of Quality Engineering, 1993, Vol. 5, Number 4, pp. 589-600.
6. Shina, S., "Taguchi Experiments for Improving Solder Quality", Journal of Surface Mount Technology, July 1992, pp. 4-13.
7. Shina, S., "Developing a course in Design for Manufacture", Journal of Industrial Technology, Volume 7, Number 2, 1991. pp. 7 - 11
8. Shina, S., "The successful use of the Taguchi Method to Increase Manufacturing process Capability", Journal of Quality Engineering, Volume III, Number 3, 1991, pp. 333-349.
9. Shina, S., "New Rules for World Class Companies", IEEE Spectrum, July 1991. pp. 23-26
10. Shina, S., "The use of the Taguchi Method to Optimize Manufacturing", Technologia en Marsha, published by the Instituto Technologico de Costa Rica, Volume 10, Number 2, 1990.  pp. 3-7.

Comment:

Comment:

9

**Papers published in refereed Conferences (50 papers published/accepted)**

1. Shina S., Morose G. et al; "Visual and Reliability Testing Results of Surface Mounted Lead Free Soldering Materials and Processes in a Simulated Production Environment"; paper to be presented at the IPC Printed Circuits Expo, APEX and the Designers Summit, Anaheim, CA, February 2006

2. Shina S. et al, "Summary of New England Lead Free Consortium Implementation Plan of High Volume Assembly of Printed Wiring Boards", paper to be presented as the keynote speech at the Pan Pacific Microelectronics Symposium", Kona, Hawaii, January 2006

3. Shina et al; Consortium authors. "Analysis of Testing Results of Surface Mounted Lead Free Solders and Materials in Production Environments", paper accepted for the SMTI International, Chicago, IL, September 2004

4. Shina et al; Consortium authors. "Lead Free Consortium Update for Process Conversion", accepted for IPC/JEDEC 8th International Conference on Lead Free Electronic Assemblies and Components San Jose, California, April 2005

5. Shina et al; Consortium authors. "Lead Free Conversion Analysis for Multiple PWB/Component Materials and Finishes using Quality and Reliability Testing", APEX conference, Anaheim, CA, February 2005

6. Shina et al; "Analysis of Testing Results of Surface Mounted Lead Free Soldering Materials and Processes", Pan Pacific Conference, Kauai, January 2005.

7. Shina et al; "Summary of Visual and Reliability Testing Results of Surface Mounted Lead Free Soldering Materials and Processes"; 7th International IPC/JEDEC conference, Frankfurt, Germany, October 2004

8. Shina et al; Consortium authors. "Lead Free Conversion Analysis for Multiple PWB/Component Materials and Finishes using Quality and Reliability Testing", APEX conference, Anaheim, CA, February 2004

9. Shina et al; Consortium authors. "A Comparative Analysis of Lead Free Materials and Processes Using Design of Experiments Techniques", SMTI International, Chicago, IL, September 2003

10. Shina et al; "Testing Results for Lead-Free PWB's by the Massachusetts Lead-Free Electronics Research Consortium"; 2003 IEEE International; Symposium on Electronics and the Environment (ISEE); Boston, MA, May 2003.

11. Shina et al; " Materials and Processes for Surface Mount Lead Free Soldering", proceedings of the APEX Conference, Anaheim, CA, March 2003, pp.s20-2-1/9

12. Shina S; "A Cpk-Based Toolkit for Tolerance Analysis and Design," Engineering Design Conference; London; July 2002.

13. Shina et al, "Process and Material Selection for zero defects and superior adhesion Lead Free SMT soldering", SMTA International Conference, Chicago, IL., September 2001, pp 651 -656

14. Previous paper translated into Chinese by the Hong Kong SMT society for their annual conference 2004.

15. Shina et al, Reliability Testing Techniques For Lead Free Soldering Of SMT Technology", ETRONIX Conference, Anaheim, CA, March 2001.

16. Above paper translated into Japanese Journal ANBE, SMT, Kanagawa, Japan, July 2001

17. Shina et al, "Selecting Material and Process Parameters for Lead Free SMT Soldering Using Design of Experiments Techniques", Apex Conference, January 2001, San Diego, CA

18. Shina et al, "Design Of Experiments For Lead Free Materials, Surface Finishes And Manufacturing Processes Of Printed Wiring Boards", SMTA International Conference; Chicago, IL., September 2000

19. Previous paper translated into Chinese by the Chinese Electronics Association Journal. June 2001.

20. Previous paper translated into Chinese by the Hong Kong SMT society for their annual conference 2004.

21. S. Shina and M. Grover, "Developing Vias For Additive Technologies In Printed Wiring Board Fabrication", NEPCON East , Boston, June 1999, pp.77-83

22. Shina, "When Global Manufacturing Does not Work" , International Mechanical Engineering Congress and Exposition (IMECE), November 1999, Nashville, Tennessee, MED VOL. 10, MFG Science and Engineering, pp 557-562.

23. Shina S. and Saigal A., "Using Cpk as Design Tool for New System Development," International Conference on Engineering Design (ICED), Vol. 1, pp. 357-360, Munich, August 1999.

24. Shina, Callahan, Sutera, McCrillis and Geogapoulos, "Methodology for Applying Specifications in Electronics Manufacturing Equipment", NEPCON East 1998, Boston, MA June 1998, pp. 3-10

25. Shina, S., and Carvalho, V., "Additive Technologies: An Examination of Polymer Film Technology in Comparison to Etched Copper Circuitry", NEPCON East 1998, Boston, MA, June 1998, pp. 11-17

26. Shina S., and A Saigal, "A Design Cost Model for New Products Development", ASME Winter Annual Conference, Dallas, TX, November 1997.

27. Shina S., and Saigal, A.,"A Design Cost Model for New Products Development", American Society of Metals Annual Conference, Indianapolis, Indiana, September 1997

28. Shina S., et al., "Paste Qualification for SMT process", NEPCON East 1997, Boston, MA June 1997, pp 23-35

29. Shina, S., "Paperless Tooling System for PCB Fabrication", NEPCON East 1997, Boston, MA June 1997, pp 35-48

30. Shina S., and Calvarho, V., "Evaluation of SMT Paste and Stencil Technologies", NEPCON WEST 97, Anaheim California, February, 1997

31. Shina, S., and Saigal, A., Concurrent Engineering and the Virtual Factory: Developing Products with Contract Manufacturers, ASME Winter Annual Conference, Atlanta GA, November 1996.

32. Shina S., and Saigal, A., "An Algorithm for selecting the electronic design implementation in Printed Circuit Board Fabrication based on cost factors", ASME Winter Annual Conference, Atlanta GA, November 1996.

11

33. Shina, S., "Design For Manufacture of Electronic Products", Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996, pp. 79-100

34. Shina, S., "Product Realization Process in a Global Environment", Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996, pp. 79-100

35. Shina, S., Kissinger D. and Crocker, K., "Process Development for SMT Stencil Adhesive Application", NEPCON East 1996, Boston, MA June 1996.

36. Shina, S., "Laboratory Exercises to Support Manufacturing Engineering Curriculum", International Conference on Education in Manufacturing, San Diego, CA, March 1996.

37. Shina S., and Saigal, A., "Technology Based Cost Modeling for Manufacturing and Material Selection in New Product Development", ASME Winter Annual Meeting, Chicago, IL November 1994, pp 85-92

38. Shina, S., Gagne D. and Qualiglia, M., "Method for Paste Selection and Process Optimization for Fine Pitch SMT", NEPCON WEST 1996, Anaheim CA, February 1996, pp 61-70

39. Shina, S., "Achieving World Class Quality in PCB Manufacturing through Concurrent Engineering", Proceeding of the Technical Program, NEPCON WEST 1993, pp 1818- 1826

40. Shina S., and Kurpad, R., "Performance Improvements: Application to Aerospace Rivets Installation", paper presented at the Winter Annual Meeting of the ASME, Anaheim, California, November 1992.

41. Shina S., and Wils, J., "Tuning a Large Data base Using Robust Design Techniques", paper presented at the Winter Annual Meeting of the ASME, Anaheim, California, November 1992.

42. Shina, S., "Optimizing Surface Mount Technology Soldering", presented at Surface Mount International Conference, San Jose CA, August 1991.

43. Shina, S., "Using the Taguchi Method to optimize Solder Processing", IPC Conference, San Diego CA, October 1990.

44. Shina S., and Capulli, K., "Optimized Processing and Cleaning of Hybrid Integrated Circuits", NEPCON EAST Conference Proceedings, Boston Ma, June 1990. pp 931-940.

45. Shina, S., "Quality Improvement Methods for Printed Circuit Fabrication & Assembly", NEPCON SOUTHEAST Conference Professional Advancement, Orlando Florida, November 1989.

46. Shina, S. Wu J. and Lowell, C., "Optimizing the new HOLLIS wave solder machine", American Supplier Institute Seventh Symposium Proceedings, Phoenix, Arizona, October 1989. pp 101-115.

47. Shina, S., "Reducing Defects in a Printed Circuit Wave Soldering Process using the Taguchi Method". NEPCON EAST Conference Proceedings, Boston, MA, June, 1989. pp 205-224.

48. Shina, S., " An Algorithm for selecting soldering flux for cleaning and surface conductivity", NEPCON WEST Conference Proceedings, Los Angles, California, March, 1989. pp 1064-1070.

49. Shina, S., "Reducing Solder Wave defects in a Printed Circuit Board Wave Soldering Process", <u>American Supplier Institute's Sixth Symposium Proceedings</u>, Dearborn Michigan, October 1988. pp 123-144.
50. Shina, S., "Justification for Dry-Film Photoresist Process", <u>American Electroplater's Society Sixth Annual PC Conference</u>, March 1977.

## Papers published In general conferences and magazines (29 papers published)

1. Shina S and Morose G., "Transitioning to Lead-Free Electronics: Now a Business Necessity", New England Environmental Journal, September 2005.
2. Shina S. and Morose, G., "Lead Free Conversion Analysis for multiple PWB materials and processes", SMT Journal, January 2005
3. Shina S. And MacFadden T., "lead Free Conversion issues in Component and PWB Surface Finishes", SMT Journal, May 2004, p73
4. Previous paper translated to Korean for Chomdan Publishing Company in Korea.
5. Shina, S., "Process Changes Face Industry", Mass High Tech, June 2-8, 1997
6. Shina, S., "UMASS Lowell Students team with Business", Mass High Tech, June 2-8, 1997
7. Shina S. and Christafides, S., "Putting Quality Tools to Good Use, A Practical Approach", Printed Circuit Fabrication, Vol. 15, No 10, October 1992, pp 36-39
8. Shina, S., "Benefits of Concurrent Product/Process Development", <u>HP Corporation Executive Conferences</u>, Palo Alto CA, June, September, December 1986.
9. Shina, S., "Mechanical Engineers go CAD", <u>HP Monitor Magazine</u>; March 1986
10. Shina, S., "Mechanical Design and Test", <u>HP engineering Symposium</u>, Lexington MA, December 1985.
11. Shina, S., "A PIP of a Process", <u>HP Engineer</u>, June 1985
12. Shina, S. and Peschier, R., "CAD/CAM, A revolutionary way of the future", <u>HP Monitor Magazine</u>, October 1984.
13. Shina, S., "The Technologist", paper presented at <u>Keeping Pace with Change, The Challenge for Engineers</u>, a joint conference of Northeastern University College of Engineering in Collaboration with the Massachusetts High Technology Council, September 1984. Proceedings pp 103-108
14. Shina, S., "Trendshot Release, A Bold Change for the 1980's", <u>HP Monitor Magazine</u>, September 1982
15. Shina, S., "Water Purification Project at MED", <u>HP Monitor Magazine</u>, 7/1977.
16. Shina, S., "Automatic Insertion of Components", <u>IEEE Manufacturing Technology Conference</u>, Waltham MA, February 1976.
17. Shina, S., "Optimized Soldering processes using the Taguchi Method", presented at the <u>British Electronics Conference</u>, Birmingham, England, 3/1991.

13

18. Shina, S., "Automatic Testing at HP Medical", <u>IEEE Manufacturing Technology Conference</u>, Waltham Ma, March 1975
19. Shina, S., "Cleaning PC Boards", <u>Circuits Manufacturing</u>, July 1974
20. Shina, "Manufacturing technology at MED", <u>HP Monitor Magazine</u>, February 1974.

Co authored the following Hewlett Packard Manufacturing Standards: (1977-81).
21. PC Design for Manufacurability Guideline
22. PC Design and layout Guidelines
23. PC Pin/Receptacle system Guidelines
24. PC Assembly Process Guidelines
25. PC Assembly Workmanship Guidelines
26. PC Automatic Component Insertion Guidelines
27. Shina, S.,Tufts Ph.D. Thesis. "Technology Based Cost Modeling of Printed Circuit Boards", Professor Anil Saigal, Advisor, June 1998
28. Shina, S., WPI Masters of Science Thesis, " Microprogramming, Design Considerations", Professor N. Sondak, Advisor, September 1972.
29. Shina, S., MIT Senior Thesis, "Simulation of the Massachusetts Transportation Authority (MTA) System", Professor E. Roberts, Advisor, August, 1967.

**2b. Papers/Talks presented at conferences as invited speaker (60 total).**
1. Keynote speaker, Pan Pacific conference sponsored by the SMTA, Kona, HI, January 2006
2. Speaker for the American Society of Quality, Manchester NH, February 2005
3. Speaker at he September meeting of the Toronto Chapter of the SMTA, Toronto, Canada, November 5th, 2004
4. Speaker for the ME department technical forums, October 2004
5. Speaker at he September meeting of the Boston Chapter of the SMTA, Boxborough, MA, September 16, 2003
6. Quoted in The Mass High Tech Journal editorial, Bay State takes the lead out", Nov 11, 2002
   http://www.masshightech.com/displayarticledetail.asp?art_id=61052&sec_id=43
7. Quoted in the Lowell Sun article on "Lead Free Electronics", published November 7th, 2002,
   http://www.lowellsun.com/Stories/0,1413,105%257E4744%257E976553,00.html?search=filter
8. Quoted in the Mass High Tech Journal about lead free electronics, published on November 11th, 2003
9. Lead Free Research Summary, TURA Coordinators Conference, Best Western Royal Plaza and Trade Center, Marlborough, April 23th 2002.
10. Lead Free Electronics Workshop hosted by Schnieder Electric Wilmington, MA, April 10, 2002.

14

11. "Lead Free UMASS Consortium", conference sponsored by the Strategic Envirotechnology Partnership (STEP), Boston MA , November 2nd, 2001
12. "Lead Free at UMASS Lowell", Workshop on Modeling and Data Needs for Lead-Free Solders, sponsored NEMI, NIST, NSF, and TMS, Thursday, February, 2001, New Orleans, LA, lead free research summary  by Dr. Shina
13. Speaker to the State of Massachusetts Legislative committee on education policy, UMASS President Bulger's Office, May 4th, 2000.
14. Seminar speaker on Lead Free Electronics, TURI Planner continuing education conference, Marlboro, MA. April 26th, 2000
15. Career and Skill Upgrade Seminar Leader on Design for Quality using Six Sigma and Cpk Methods, ASME April 18th, 2000 Meeting, Cambridge, MA
16. Panelist, Lead Free Electronics Symposium, Sponsored by TURI, at Lucent Corporation, Haverhill, MA, April 13, 2000.
17. Speaker to the Havestan Technical Facility, Turkish Airforce, Ankara, Turkey, August 1999.
18. Speaker to the Mechanical Engineering Department, Cape Tecknicon University, CapeTown, South Africa, March 1999.
19. Speaker to the Boston Chapter SMTA, "Applying SPC to the SMT Manufacturing Process", November 1998
20. Symposium Panelist, American Loudspeaker Manufacturers Conference, Las Vegas Nevada, January 1998.
21. Keynote Speaker, Electronics Industries Forum, IEEE, May 1997
22. Speaker to the Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996
23. Speaker to the Globatronics Conference, Singapore, October 1996.
24. Keynote Speaker, NAFEM Association, Cincinnati Ohio, January 1996
25. Speaker to the UMASS Lowell SME Student branch, on recruiting for the SME, February, 1994.
26. Speaker to the UMASS Lowell ASME Student branch, on future employment opportunities, November 1993.
27. Speaker, Mortorola Incorporated Six Sigma Institute Conference, Dallas Texas, October 1993.
28. Keynote Speaker, Australian Surface Mount and Printed Circuit Board Association SM93 Conference, Sydney, Australia, August 1993.
29. Panelist for the session on Concurrent Engineering: Innovation, Speed and Service, Western Regional Conference, sponsored by the American Society of Quality Control and the American Society of Naval Engineers, Oxnard California, February 1993.
30. Speaker for on Concurrent Engineering, Advanced Technologies in the Electronics Industry Conference, Tel Aviv, Israel, January 1993.
31. Guest speaker on Concurrent Engineering, ,Joint Meeting of the ASQC - APICS - SME societies of  Danbury Connecticut, January 1993.
32. Plenary speaker at the MEXICON 92 conference in Guadalajara, Mexico on October 1992.
33. Colloquium speaker on Concurrent Engineering to the Engineering faculty of Iteso University Guadalajara, Mexico, October 1992.

34. Speaker to the IEEE Guadalajara chapter, October 1992.
35. Invited to be keynote speaker at the International Society for Hybrid Microelectronics (ISHIM) Southern California Chapter Conference, May 1992.
36. Speaker on Concurrent Engineering to the University of Pennsylvania MSME program, November 1991
37. Symposium Speaker on Concurrent Engineering, IEEE Advanced Semiconductor Manufacturing Conference, Boston MA, 10/91
38. Invited to speak to the Hong Kong Productivity Council and the Hong Kong Branch of SME on "Concurrent Engineering", 11/91.
39. Invited to speak on "Robust Design" at the Quality Conference sponsored by the Technical University in Medellin, Columbia on TQM, 8/91.
40. Speaker on "Concurrent Engineering", delivered to Itek Corporation, 7/91
41. Speaker on "Total Quality Management", MACOM Waltham on 4/91
42. Speaker on "Concurrent Engineering", delivered to the SME CASA/CIM professional societies in March 1991.
43. Speaker on "Concurrent Engineering and Design for Manufacture ", IEEE Boston Chapter, Minuteman Lexington High School, January 1991.
44. Speaker on "University of Lowell Engineering Students' activities," Leadership Conference, Society of Manufacturing Engineering, Ludlow MA, 12/ 1990
45. Invited to critique United Technologies, Hamilton Standard Division Program on Concurrent Engineering, Windsor Locks, Connecticut, December 1990.
46. Speaker to the student chapter of the Society of Manufacturing Engineers (SME) on Design for Manufacture, November 1990.
47. Invited to critique Parker Brothers "World Class Manufacturing Program", October 1990.
48. Speaker on "Printed Circuit Design for Manufacture", Valid Users Group Northeast Region Meeting, October 1990
49. Interviewed by Electronic Products and Packaging (EPP) Magazine on Design for Manufacture, September 1990 issue.
50. Invited to critique GENRAD Corporation Quality Program in September 1990.
51. Speaker on "Design for Manufacturing", Distinguished Speaker lecture Series Gordon Institute, June 1990.
52. Session leader on "Total Quality for the Manufacturing Enterprise", Company Wide Quality Conference sponsored by the University of Lowell, April 1990.
53. Speaker on Quality Methods for Engineers and their Managers, Company Wide Quality Conference, sponsored by the University of Lowell, 11/ 1989.
54. Speaker on Quality and Productivity, Digital Equipment Corporation Senior Executives, November 1989.
55. Lecture on Taguchi Methods in the University of Lowell Seminar series on the Assurance Sciences and Technologies, October 1989.
56. Speaker on "Design for Manufacturing, " Manufacturing Technology Conference sponsored by Bay State Skills Corporation and Associated Industries of Massachusetts, May 1989.
57. Speaker on Industry/Academic Corporation, joint meeting with Wang Incorporated, Presented to the Brookings Institute guests at the University of Lowell, May 1989.

16

58. Speaker on Taguchi Methods, Hollis Automation, Nashua NH, January 1990.
59. Speaker on Quality Methods, Wang Incorporated, Lowell MA, 12/1989
60. Speaker on Taguchi Methods, Boston University Manufacturing Engineering faculty, November 1988.

17

## SERVICE ACTIVITIES

### 1. Professional Leadership and Achievements

1. I established the **Umass Lowell Lead Free consortium**, consisting of several local and national companies to sponsor and assist in the research. The original companies included BTU International, North Billerica, MA, Sanmina (formerly Hadco) Corporation; Tech Center East, Ward Hill MA; Multicore Solders; Richardson, Texas; Raytheon Corporation;, Lexington, MA; Solectron Massachusetts Corporation, Westborough, MA and Texas Instruments, Attleboro, MA. Companies that joined the consortium this year include MACOM of Lowell, MA, a division of AMP, which has been acquired by Tyco Industries and Shneider Automation (formerly Modicon) of North Andover, MA. I was funded by various sources for this research including TURI for sponsoring graduate students and research activities, and from companies in the consortium. The total amount exceeds $50,000. I helped TURI with annual conferences to the local supplier base area on the conversion issues of Lead free electronics. These were offered free to local companies to assist then with lead free conversion process. New additions in phase III (2004/5) include Skyworks Solutions (Woburn, MA), Teradyne Inc. (North Reading, MA), Textron Systems (Wilmington, MA), DDI Inc. (Newburyport, MA), American Power Conversion (West Kingston, RI) and Benchmark Electronics (Hudson, NH)
2. Design Judge, USA First Robotics Comnpetition; Manchester NH, March 2003, 2004 and 2005
3. Symposium Chair, Manufacturing Enigneering Division, International Mechanical Engineering Congress and Exposition (IMECE), November 1999, Nashville, Tennessee.
4. Design Judge - Milton S. Kiver Awards Competition sponsored by the Electronic Packaging and Production Magazine, 1995, 1999
5. Professor of the Year, ME Department, 1997
6. Awarded a Certificate of Appreciation, for Dedication and Service during the 1995 School Year, from Lowell High School, May 1995.
7. Chaired a session in the Symposium on Production Engineering Division at the Winter Annual Meeting of the American Society of Mechanical Engineers (ASME), in Chicago, Illinois during the month of November 1992: Session PE 4A, Symposium of New Product introduction.
8. Chaired two sessions in the Symposium on Design, Management, and Computers at the Winter Annual Meeting of the American Society of Mechanical Engineers (ASME), in Anaheim, California during the month of November 1992: Session PE 11A: Product Process Interactions, and session PE 6A, Group Technology and Knowledge Management.
9. Invited as the plenary speaker at the MEXICON 92 conference in Guadalajara, Mexico on October 19 - 21, 1992. While in Guadalajara, lectured to the faculty of Iteso University and the IEEE chapter there.

18

10. Founding member and a member of the Board of Directors, Massachusetts Quality Award, 1991- 1993
11. Nominated to the Board of directors for the Society of manufacturing Engineering (SME) Electronics Manufacturing Committee, 1992, 1993.

*Journal Reviewer for the Following 7 Journals:*
12. "Computer Magazine",
13. "Journal of Manufacturing Science and Engineering"
14. "TAPI magazine"
15. University of Road Island Transportation Center Peer Review
16. IEEE Publications
17. IEEE Spectrum Magazine
18. Machine Vision and Applications
*Book reviewer for the following 8 books and manuscripts*
19. "Design Process", by
20. "Evolvable Design of Experiments: Applications for Printed Circuit Boards", by Octavian Iordache, CRC Press
21. " A Facilitator's Guide to Usability Testing," J. McWane, to be published by Prentice Hall, Upper Saddle River, NJ
22. "Concurrent Project Management", by Q. Turtle, to be published by Van Nostrand Reinhold, New York.
23. "Introduction to Control Systems Technology" by R. Bateson, to be published by Merrill Publishing Company, Columbus Ohio.
24. "Concurrent Engineering" by J. Torino, published by Van Nostrand Reinhold, NY
25. Tool and Manufacturing Engineers Handbook (TMEH) Volume 6 Handbook, Design for Manufacturability, published by the SME (Society of Manufacturing Engineers), Dearborn Michigan.
26. "Handbook of Electronics Manufacturing Engineering", 2nd edition, by Richard Matisoff, to be published by Van Nostrand Reinhold, New York.
27. Founding member of an Innovative Products Research and Services Incorporated (IPRS), a non-profit educational, scientific and charitable 501(c) (3) organization incorporated in the Commonwealth of Massachusetts. IPRS is an inventor support service, which performs early stage market and manufacturing evaluations. IPRS was able to obtain two grants from the Department of Energy in 1991 and 1992 as part of DOE's States' Inventors Initiative.
28. Appointed as a founding member of the student activities' team of the Society of Manufacturing Engineering (SME), New England Region.
29. Appointed in 1992 as an examiner for the Massachusetts Quality Award, having been a founding member of the Massachusetts Quality Award Council.
30. Chairman of the SME (Society of Manufacturing Engineers) Robotics Chapter 293, New England Region, 1991-1997

31. Chairman of the Quality Function Deployment for NEPCON (National Electronic Packaging Conference), annually attracting over 30,000 design, quality and manufacturing engineers from throughout the country.
32. Selected as the Speaker on Engineering Productivity for Hewlett Packard Corporation to Senior Management (CEO's and VP's) of Customer Corporations in 1986, 1987.
33. "Excellence in Design" Award for the HP Waltham Waste Water Treatment plant from the Metropolitan District Commission of Massachusetts in 1982.

## 2. Service to the University

### 2.1 Student advising
1. Advisor to the Industrial Technology Classes of 1988-1994.
2. Advisor to Mechanical Engineering Students, Freshman Classes 1996-Present

### 2.2 Committee Membership
1. In working with the curriculum committee, I developed a proposed program for a Manufacturing Engineering Curriculum. This was part of a proposal to convert the Industrial Technology Department to Manufacturing Engineering.
2. Manufacturing Engineering Course Development Committee
3. Member of the Mechanical Engineering Department Graduate Committee.
4. Developed three courses in the MMS graduate programs.
   - A. 20.525 Computer Integrated Manufacturing (CIM)
   - B. 20.572 Design for Manufacture (DFM)
   - C. 20.575 Robust Design
D. Developed Two courses for the Mechanical Engineering Department
   - A. 22.571 Concurrent Engineering /Quality; renamed Collaborative Engineering
   - B. 22.575 Industrial Design of Experiments

### 2.3 Service to the Department
1. Developed the microelectronics manufacturing laboratory for manufacturing education, research and training for students, faculty and the local manufacturing companies. Selected, ordered and installed the equipment in a competitive bidding process.
2. Member of the Mechanical Engineering department graduate committee.
3. Chairman of the ME advisory Committee 4th and 5th annual Conferences.
4. Coordinated the Mechanical Engineering series of seminars offered to the Industrial Community, summer of 1993
5. Assisted in the ARPA grant development for Manufacturing Engineering Education.
6. Advisor to ME freshman students.
7. Capstone Course Coordinator
8. Active in developing and tabulating Graduating Students and Alumni Surveys

20

## 2.4 Service to the College of Engineering

1. Member of the College Rank and Tenure Committee; Spring 2003
2. Member of the College of Engineering Repositioning Task Force, Spring 2002
3. Graduate coordinator for the Manufacturing Systems Engineering Option for all the graduate students in the College of Engineering. All the graduate coordinators in the Engineering Departments approved this program. The programs are explained in several memos attached to this package and have been in operation in 1989-1994. This option was be replaced by the new manufacturing concentration in Mechanical Engineering under the direction of professor Parking.
4. Company Wide Quality Seminars, University of Lowell Continuing Education

Provided technical assistance, recruited faculty and coordinated activities in the Total Quality Management and The Productivity/Quality tools in Engineering and Manufacturing Seminars, which are short and intensive versions of the courses I teach. A list of the seminars provided is as follows:

1. *Taguchi Methods*, offered March 1989, March 1990 and June 1990.
2. *Design for Manufacturing*, offered March 1989, May 1989, January 1990, June 1990 and January 1991.
3. *Total Quality Management* offered January 1991.
4. *Soldering Methods* offered November 1989.

Other Activities

5. Member of the Graduate Faculty membership committee.
6. Member of the College of Engineering Computer Needs Committee.
7. College representative in the Watertown Arsenal Manufacturing Development Park Committee.

## 2.4.1 College of Engineering COOP Coordinator

1. Coordinated the revival of the College of Engineering COOP program 1997
2. Ran several meetings with the department managers to outline rules/procedures
3. Coordinated with the Dean and the Office of Career Services on issues of policy and administration of the COOP program
4. Worked with the department coordinators on issues of students activities and jobs
5. Worked with local companies on advertising and recruitment of students and jobs
6. Published the first coop manuals for students and companies
7. Ran the COOP and Internship Fair in April 98. More than 400 students and 30 companies participated.
8. The program achieved its initial goal of 10% of students in the engineering college during the first year of its implementation

## 2.5 Service to the University

1. Faculty Senate representative from the ME department Spring 2005

21

2. Coordinator of the Graduate Certificate Program: Design and Manufacturing Engineering
3. Member of the Committee for "Strategic Plan to Strengthen Lowell 1998-2005 Development Plan", Chaired By Professor Best.
4. Member of the Committee for Manufacturing option for the MBA degree for the College of Management
5. Member of the Chancellor's Federation for the Industrial Economy
6. Member of the ARPA Technology Reinvestment Program proposal Committee of Industrial Extension, Commonwealth of Mass.
7. Member of the ARPA Technology Reinvestment Program proposal Committee, Southern New England Academy
8. Member of the Work Environment Pilot effort on technology review of fatal accidents
9. Assisted in the College of Management Re accreditation process

# E. TEACHING
## 1. Principal Thesis / Project Advising:
### 1a. Completed, Mechanical Engineering Department (19 students)

1. *Optimal Reliability Design Method for Remote Solar Systems*", Nuchida Suwaparet, Doctor of Mechanical Engineering Thesis, September, 2005
2. "Bio Solar House", Ittipon Tungaray, Master's of Mechanical Engineering Thesis, September 2004; Committee Member
3. "Comparison Of The Performance Of U.S. And Japanese Aluminum Bats Using U.S. And Japanese Test Protocols", Shintaro Nabeshima, Master's of Mechanical Engineering Thesis, May 2004; Committee Member
4. "Experimental and Finite Element Study of the Design Parameters of Baseball Bas", Gayatri Vedula, Master's of Mechanical Engineering Thesis, May 2004; Committee Member
5. "Characterization of the effects of use and Moisture Content on Baseball Bats..."; Patrick Drane; Master's of Mechanical Engineering Thesis, March 2003; Committee Member
6. "Design for Reliability, Remote Communication system using solar power", Nuchida Suwapaet, ; Master's of Mechanical Engineering Thesis, November 2002; Committee Member
7. "Lead Free Soldering". Hemant Belbase, Master's of Mechanical Engineering Thesis, September 2000.
8. Terence Lee Master's of Mechanical Engineering Thesis, Committee Member; 1999
9. "Additive PCB Fabrication Technology", Dennis, Gagne, Master's of Mechanical Engineering Thesis, May 1998.
10. "NO Clean SMT Paste for PCB Assembly,", Doug Summer, Master's of Mechanical Engineering Thesis, May 1997.
11. "Failure Prediction Analysis in Machining Pin Fin Heat Sinks, Hoke Bullard, Master's of Mechanical Engineering Thesis, May 1997 (committee member)

22

12. "A study of high speed, high volume product assembly process with respect to scrap reduction issues", Lisa Silva, Master's of Mechanical Engineering Project, December 1996

13. "A paperless system for manufacturing assembly automation", Farzad Majzoubi , Master's of Mechanical Engineering Project, December 1996

14. "Optimization of a touchscreen sensor manufacturing process", Julie Kimble, Master's of Mechanical Engineering Project, December 1996

15. "Experimental design of an injected mold RF insulation Material ", Steve Paradis,  Master's of Mechanical Engineering Project, May 1996

16. "Development of a no clean soldering flux", Paul Hailey, Master's of Mechanical Engineering Thesis, completed May 1994.

17. "Developing a tolerance analysis methodology with case studies", Sreedhar Godula, Master's of Mechanical Engineering Project, completed 8/93.

18. "Design of an aircraft industry riveting system", Kurpad Ram, Master's of Mechanical Engineering Thesis, completed 6/92.

19. "Optimization of the performance of the weldlines in injection molded products using robust design methods", Srinath Narayan, Master's of Mechanical Engineering Thesis, completed 5/92.

**1b. In Progress, Mechanical Engineering Department (1 student)**

1. "Developing Vias Build Up Methodology for Additive Technologies in the Printed Circuit Wiring Board (PWB) Fabrication Industry", Manmeet Grover

**1c. Completed, MMS In Manufacturing Engineering Program (17 students)**

1. "Just-In-Time Manufacturing in a regulated industry", Nasser Heshmatpour, Master of Manufacturing Engineering Project, completed 5/92

2. " Concurrent Engineering for the Defense Industry", John Hart, Masters of Manufacturing Engineering Thesis, completed May 1992

3. "Implementation of ISO 9000 in American Manufacturing Companies", Mark Alpert, Masters of Manufacturing Engineering Project, completed December 1991

4. "Optimizing IC Welding", Bob Mullins, Masters of Manufacturing Engineering Project, completed December 1991

5. "Simulation of Assembly Systems using SAIMAN", Bill Guest, Masters of Manufacturing Engineering Thesis, completed December 1991

6. "Simulation Language Applications in Job Shop Scheduling", Nancy Barnes, Masters of Manufacturing Engineering Project, completed December 1991

7. "Design for Robotics Assembly", George Lloyd, Masters of Manufacturing Engineering Project, completed December 1991

8. "An Algorithm for conversion of Printed Circuit Board from Through Hole to Surface Mount Technology", Suzan Lanza, Masters of Manufacturing Engineering Project, completed December 1991.

9. "Eliminating CFC's from Electronic Manufacturing Processes", Betty Drake, Masters of Manufacturing Engineering Project, completed December 1991

10. "Technical training program for engineering computer tools", Norm Fisk, Masters of Manufacturing Engineering Project, completed May 1991

23

11. "Process Optimization in Distribution Systems", Ven Cen Chang, Masters of Manufacturing Engineering Project. completed May 1991. Mr Chang was nominated the outstanding graduate student in the Industrial Technology Department.
12. "Optimization of Stress Testing using Taguchi Method", Sana Wakim, Masters of Manufacturing Engineering Project, completed May 1991
13. "Expediting in a Job Shop", Jean Shine, Masters of Manufacturing Engineering Thesis, Completed 9/90.
14. "Evaluations and Implementation of Terpene as a Printed Circuit Cleaning Solvent" Greg Hamblet, Masters of Manufacturing Engineering Thesis, Completed 5/90.
15. "Optimized Processing and Cleaning of Hybrid Integrated Circuits", Keith Capulli, Masters of Manufacturing Engineering Project, Completed 4/90.
16. "Optimizing The Wave Soldering Process for Mixed Technology of Through Hole and SMT Components", James Wu, Masters of Manufacturing Engineering Project, Completed 12/89.
17. "Design of a Wheel Chair Carry-On", James Jollife, Masters of Manufacturing Engineering Project , Completed 4/89.

**1d. Thesis / Project Advising, other Engineering Departments**
1. "A study on the effect of process parameters on the spring constant of a manometer spring", Samir Seth, master of Plastics Engineering, Thesis Committee, April 2001

**2. Courses taught**
**2.1 Graduate**

| | | |
|---|---|---|
| 22. 571 | Concurrent Engineering | 7 years |
| 22.575 | Industrial Design of Experiments | 7 years |
| 20 525 | Computer Integrated Manufacturing (CIM) | 3 years |
| 20.572 | Design for Manufacture | 3 years |
| 20.575 | Robust Design | 1 year |
| 20.710 | Graduate Seminar | 1 year |

**2.2 Undergraduate Courses**

| | | |
|---|---|---|
| 22.424 | Capstone Projects | 2 years |
| 22.472 | Manufacturing Systems & Processes | 2 years |
| 22.473 | Design for Manufacture | 3 years |
| 22. 202 | Mechanical Design Laboratory II | 1 year |
| 20.202 | Industrial Computer Science. | 10 years |
| 20.303 | Manufacturing Systems | 5 years |
| 20.407 | Instrumentation and Process Control ( IPC )) | 5 years |
| 20.314 | Motion and Time Study | 5 years |
| 20.309 | Process control | 20 years |
| 20.408 | Microprocessors | 23 years |
| 20.315 | Plant Layout and Material handling | 7 years |
| | Inventory Control and Material Handling | (discontinued) |
| | Tool Engineering | (discontinued) |

24

**2.3 Courses Upgraded/developed**

Undergraduate Courses

25.108 Introduction to Engineering II. Completely revamped this course since taking it over in the spring semester 2004. Included modules for Microsoft word, excel and powerpoint as well as a module for matlab. Provided for several projects for the first ear students to practice computer programming and presentation tools in a fun and rewarding experience.

25.108 Freshman Manufacturing Module. This a 4week introduction to manufacturing for freshman engineering students

22.472 Manufacturing Systems: New undergraduates course that I developed for Mechanical Engineering Department, Manufacturing Option, spring 1993.

22.473 Design Theory and constraints: New undergraduate course developed for Mechanical Engineering Department, Manufacturing Option, taught in fall 1991.

20.202. Industrial Computer Science. I have changed this course from a FORTRAN Programming course to a one of solving engineering problems.

20.407 Instrumentation and process control (IPC): This course is divided into two sections: traditional control theory and microprocessor programming.  I have completely revamped the microprogramming portion with plc.'s

**Graduate Courses**

22. 571. Collaborative Engineering and Quality: A new course that I developed for the Manufacturing Engineering Option for the Mechanical Engineering Masters Program, combining elements of the following graduate courses that I taught at the MMS program.

20. 525 Computer Integrated Manufacturing (CIM). This course was previously taught over two semesters by guest lectures.  Using my notes, I have revamped and consolidated the course into one semester.

20.575. Robust Design.  The course deals with the subject of Design of Experiments and the Taguchi Method.

**2.4 Teaching Load**

| Course | Course Title | Contct Hours | Credit Hours | Enrol ment | Total StudentH | Total Credit Hours |
|--------|-------------|-------|-------|------|------|------|
| 2004/2005 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 Design Constraints | 3 | 3 | 27 | 81 | 81 |
| IG | 22.571 CE/Quality | 3 | 3 | 7 | 21 | 21 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 2003/2004 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 Design Constraints | 3 | 3 | 31 | 93 | 93 |
| IG | 22.571 CE/Quality | 3 | 3 | 7 | 21 | 21 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 2nd semester | | | | | | |
| 1U | 25.108 Freshman Design | 2 | 2 | 65 | 130 | 130 |
| 4U | 22.423 Capstone | 3 | 3 | 16 | 48 | 48 |

25

| | | | | | | |
|---|---|---|---|---|---|---|
| 1G | 22.575 Ind. Design Expts | 3 | 3 | 14 | 42 | 42 |

**2002/2003**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 36 | 108 | 108 |
| IG | 22.571 CE/Quality | 3 | 3 | 16 | 48 | 48 |
| 4U | 22.423 Capstone | 3 | 3 | 2 | 6 | 6 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.423 Capstone | 3 | 3 | 20 | 60 | 60 |
| 1G | 22.575 Ind. Design Expts | 3 | 3 | 26 | 78 | 78 |

**2001/2002**
1st semester
Sabbatical

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 20 | 60 | 60 |
| 4U | 22.423 Capstone | 3 | 3 | 4 | 15 | 15 |
| 4U | 22.473 Design Constraints | 3 | 3 | 16 | 48 | 48 |

**2000/2001**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 20 | 60 | 60 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 30 | 90 | 90 |
| 4U | 22.423 Capstone | 3 | 3 | 5 | 15 | 15 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.108 Intro Eng DFQ (3w) | 3 | 2 | 50 | 100 | 100 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 1G | 22.571 CE/Quality | 3 | 3 | 18 | 54 | 54 |

**1999/2000**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 28 | 71 | 71 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 12 | 36 | 36 |
| 4U | 22.423 Capstone | 3 | 3 | 12 | 36 | 36 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.108 Intro Eng DFQ (3w) | 3 | 2 | 42 | 84 | 84 |
| 4U | 22.424 Capstone | 3 | 3 | 7 | 21 | 21 |
| 1G | 22.571 CE/Quality | 3 | 3 | 27 | 91 | 91 |

**1998/1999**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 20 | 60 | 60 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 15 | 45 | 45 |
| 4U | 22.423 Capstone | 3 | 3 | 5 | 15 | 15 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 3 | 9 | 36 | 27 |
| 1G | 22.571 CE/Quality | 3 | 3 | 15 | 45 | 45 |

**1997/1998**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 DFM | 3 | 3 | 20 | 60 | 60 |

26

| 4U | 22.424 Capstone | 2 | 2 | 30 | 60 | 60 |
| 4U | 22.423 Capstone | 4 | 4 | 10 | 40 | 40 |

2nd semester

| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 4 | 8 | 32 | 32 |
| 1G | 22.571 CE/Quality | 3 | 3 | 25 | 75 | 75 |

Summer semester

| 4U | 22.423 Capstone | 2 | 2 | 10 | 20 | 20 |

1996/1997

1st semester

| 4U | 22.473 DFM | 3 | 3 | 23 | 69 | 69 |
| 4U | 22.423 Capstone | 2 | 2 | 13 | 26 | 26 |

2nd semester

| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 4 | 7 | 28 | 28 |
| 1G | 22.575 DoE | 3 | 3 | 25 | 75 | 75 |

Summer

| 4U | 22.423 Capstone | 2 | 2 | 10 | 20 | 20 |

1995/1996

1st semester

| 1U | 25.105 Intro Eng DFM (3w) | 3 | 2 | 170 | 72 | 48 |
| 4U | 22.473 DFM | 3 | 3 | 33 | 99 | 99 |
| 4U | 22.423 Capstone | 2 | 2 | 7 | 14 | 14 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 25 | 75 | 75 |

2nd semester

| 1U | 25.105 Intro Eng DFQ (4w) | 3 | 2 | 170 | 145 | 97 |
| 4U | 22.423 Capstone | 4 | 4 | 7 | 28 | 28 |
| 4U | 22.473 DFM | 3 | 3 | 16 | 48 | 48 |
| 1G | 22.575 DoE | 3 | 3 | 25 | 75 | 75 |

1994/1995

1st semester

| 1U | 25.105 Intro Eng DFM (3w) | 3 | 2 | 170 | 109 | 73 |
| 4U | 22.473 DFM | 4 | 3 | 17 | 68 | 51 |
| 4U | 22.423 Capstone | 2 | 2 | 4 | 26 | 26 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 19 | 57 | 57 |

2nd semester

| 1U | 25.105 Intro Eng DFQ (4w) | 3 | 2 | 170 | 145 | 97 |
| 1U | 25.105 Fortran (6w, 2 cls) | 3 | 2 | 30 | 39 | 26 |
| 4U | 22.483 Capstone | 4 | 4 | 4 | 52 | 52 |
| 2U | 22.211 Statics | 3 | 3 | 22 | 66 | 66 |

1993/1994

1st semester

| 4U | 22.473 DFM | 4 | 3 | 17 | 68 | 51 |
| 4U | 22.483 Capstone | 2 | 2 | 13 | 26 | 26 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 19 | 57 | 57 |

2nd semester

27

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.472 Manuf Systems | | 3 | 3 | 17 | 68 | 51 |
| 4U | 22.423 Capstone | | 4 | 4 | 13 | 52 | 52 |
| 2U | 22.202 Mech. Design Lab. | | 3 | 2 | 60 | 180 | 180 |

1992/1993 1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 20.407 IPC | | 3 | 3 | 37 | 111 | 111 |
| 4U | 20.407 IPC Lab | | 2 | 1 | 37 | 37 | 37 |
| 4U | 22.473 DFM | | 3 | 3 | 17 | 51 | 51 |
| 4U | 22.483 Capstone | | 4 | 2 | 4 | 8 | 8 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.472 Manuf Systems | | 3 | 3 | 8 | 24 | 24 |
| 4U | 22.423 Capstone | | 4 | 2 | 4 | 8 | 8 |

1991/1992
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 CIM | | 3 | 3 | 28 | 84 | 84 |
| 4U | 20.407 IPC | | 3 | 3 | 55 | 165 | 165 |
| 4U | 20.407 IPC Lab | | 2 | 1 | 55 | 110 | 55 |
| 4U | 22.473 DFM | | 3 | 3 | 12 | 36 | 36 |

2nd semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.573 | DFM | 3 | 3 | 45 | 135 | 135 |
| G | 20.575 | Robust | 3 | 3 | 42 | 126 | 126 |
| G | 20.710 | Seminar | 3 | 3 | 15 | 45 | 45 |

1990/1991
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 26 | 78 | 78 |
| 4U | 20.407 | IPC | 3 | 3 | 60 | 180 | 180 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 60 | 180 | 60 |

2nd semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.573 | DFM | 3 | 3 | 32 | 96 | 96 |
| G | 20.575 | Robust | 3 | 3 | 25 | 75 | 75 |

1989/1990
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 25 | 75 | 75 |
| 4U | 20.407 | IPC | 3 | 3 | 35 | 105 | 75 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 35 | 105 | 35 |

2nd Semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.572 | DFM. | 3 | 3 | 30 | 90 | 90 |
| 2U | 20.202 | Ind. Comp. | 3 | 3 | 16 | 48 | 48 |

1988/1989
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 19 | 57 | 57 |
| 4U | 20.407 | IPC | 3 | 3 | 45 | 135 | 135 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 45 | 135 | 45 |
| 2U | 20.202 | Ind. Comp.. | 3 | 3 | 55 | 165 | 165 |

2nd Semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.572 | DFM. | 3 | 3 | 27 | 81 | 81 |

28

| 4U | 20.407 | IPC* | 3 | 3 | 30 | 45 | 45 |
| 4U | 20.407 | IPC Lab* | 2 | 1 | 30 | 45 | 15 |
| 2U | 20.202 | Ind. Comp. | 3 | 3 | 18 | 54 | 54 |

29

**2.5 Specific programs in which faculty member participated to improve teaching and competence.**

**In the last 3 years**

Attended following Seminars and training courses:

1. Apex Conference; Anaheim, CA, February 2004-05
2. ASME Manufacturing Conference, Chicago; March 2003
3. Product Life Management (PLM) , Chicago, IL, November 2002
4. SMT International, Chicago IL, September 1999-2005
5. Engineering Design Conference; London; July 2002

**In prior years**

1. Technicon University, Cape town South Africa March 1999
2. ICED, Munich Germany, August 1999
3. ASME WAM, Nashville, November 1999
4. CEA, (Coop Education Association); Salt lake City, UT, June  2000
5. Workshop on Modeling and Data Needs for Lead-Free Solders, sponsored NEMI, NIST, NSF, and TMS, Thursday, February, 2001, New Orleans, LA,
6. Etronix Conference, Anaheim, CA , February 2001
7. CEA (Coop Education Association), Atlanta, GA, March 2001
8. MRS (Materials Research Society), Boston, MA, November 2001
9. SMT soldering, SUNY, Binghampton, New York, 5/88.
10. Witness Simulation Training, Lowell MA, 4/89
11. Computer Integrated Manufacturing, Hewlett Packard, 6/88
12. Axiomatic Theory of Design, MIT, 7/88
13. Taguchi Methods Conference, ASI, Detroit MI, 1989-1990
14. NEPCON West, Los Angles, California, 1989 - 1999
15. NEPCON Singapore, 1991, 1993
16. NEPCON Australia, 1998
17. NEPCON EAST, Boston, 1989-1999
18. NEPCON SOUTHEAST, Florida and Texas, 1989, 1998
19. IPC, San Diego CA, 1990
20. British Electronic Week, Birmingham, England, 1991
21. SMT International, San Jose CA, 1991-1995
22. IEEE Advanced Semiconductor Manufacturing Conference, 1991
23. SME International Conference on Education, San Diego, 1996
24. Puerto Rico Technical University SMT Conference, 1995-1997
25. ASME Winter Annual Conference, 1991-1999

**2.6 Teaching Effectiveness**

Rated in the highest rank by students and fellow faculty members from the University of Massachusetts Lowell and other engineering faculty from around the country. I submit he following facts in this session and in appendix C to substantiate this claim

1. Undergraduate and graduate student feedback is always rated at the top of all items.

30

2. All my undergraduate manufacturing option courses in the Mechanical
Engineering Program are heavily oversubscribed.

### 2.6.1 Ratings by UML ME Students evaluations in the last 4 years:

My students always gave me excellent reviews of my courses, both at the Under-
graduate and the graduate levels. I am enclosing the results of the my students
evaluations for last two years to demonstrate. These are the summaries of
student evaluations taken at the last day of the semester. The y were collected
by fellow students and delivered to the department according to the rules.

As can be seen by the many positive comments, my students rate my
efforts as well as my courses as being mostly exceptional and very effective. For
the last three years I received the following evaluations:

**1997**
22.473 Design Theory and Constraints; Undergraduate (19 students):
Rating of instructor **14** excellent    **4** good    **1** average    **0** bad
22.423 capstone; Undergraduate (8 students):
Great experience, Thank you very much
**1998**
22.473 Design Theory and Constraints; Undergraduate (29 students):
Rating of instructor **19** excellent    **9** good    **1** average    **0** bad
Rating of course   **22** Effective    **7** relative Eff.    **0** Barely Eff.    **0** not
worth it
22.423 capstone; Undergraduate (5 students) :
Great capstone, found it information and educational, applied studies to real
world solutions. I enjoyed working with Professor Shina, This was a great
experience.
22.575 Design of Experiments; Graduate (16 students)
Rating of instructor **9** excellent    **6** good    **2** average    **0** bad
Rating of course   **11** Effective   **5** relative Eff. **0** Barely Eff.    **0** not worth it
**1999**
22.473 Design Theory and Constraints; Undergraduate (27 students):
Rating of instructor **12** excellent    **6** good    **9** average    **0** bad
Rating of course   **13** Effective   **9** relative Eff.    **4** Barely Eff.   **0** not
worth it
22.423 capstone; Undergraduate (11 students) :
Great experience, Shina was helpful; structured meetings, thanks for being open;
I found out that this is not the type of manufacturing career I want
22.575 Design of Experiments; Graduate (11 students)
Rating of instructor **4** excellent    **7** good    **0** average    **0** bad
Rating of course   **6** Effective   **5** relative Eff. **0** Barely Eff.    **0** not worth
**2000**
22.423 capstone; Undergraduate (5 students):
Great Capstone, found it informational and educational, applied studies to real
world solutions, I enjoyed working with professor Shina, This is a great industrial
experience

31

## 2.7. Mentoring of students

The best proof of appreciation by the students is their letters of support obtained during a long teaching career. **Some comments and quotes written by former students:**

-You did an excellent job of keeping us up to date on recent trends in the areas of PCB

-I was impressed with the hands on project work you encouraged them to do

-Shina is far more than a great professor. His ambition, loyalty and dedication to his students reaches beyond that which my education at Lowell has lead me

-I can honestly say that without personal support, encouragement, advice and coaching I received from Dr. Shina during and after my college career, I would never have made so far in business so quickly

-You are one of the most talented instructors at UML. It is very rare to see instructors care for their students as you have

-Shina enabled me to gain the experience and knowledge I needed to seek employment. He is sincerely concerned about his students, and goes out of his way to help them in any way he can, either in the classroom, or a professional work environment. (he) is an excellent professor, advisor and friend to many students.

- His teaching style created and maintained interest by the students. He welcomed comments and dissenting opinion which were always grounds for further class discussions....(He) is an advocate for the students and a credit to the profession and the University.

-I benefited from his vast knowledge of the latest manufacturing trends....He also extended himself to reach students beyond the classroom and help them in their professional career.

-Shina is a credit to the academic excellence of the faculty....Thank you for the time and for the education you have provided me with...

-My successes are a direct result of Shina understanding of how real world industry works and what types of skills employers desire. He is able to skillfully guide a hard working student along a path that allows them to piece the experience and academics together necessary to become an immediate contributor to world class manufacturers.

-Professor Shina works to ensure that his students take the initiative in their professional growth before they leave the university and uses his industry contacts

to assist in placing students in (jobs).

-he has not only been an excellent professor, but also a supportive friend

-I feel that he had taught me many different tools that I still use today in everyday work... (he) also found me an internship as an ME through his many contacts...

-My success in the semi-conductor industry is in many ways attributable to Shina's instruction at UML...His (courses) gave me insight into ...techniques that I have put to practical use countless times. My boss...cited my experience ...gained during capstone project as one of the actor that convinced him to hire me

32

-He helped me with my resume, helped to build to build my personality, and directed me in a career path that I travel to this day….(his) characteristics are…intelligence, patience, integrity, knowledge, dependability and ability to teach…

-Shina is concerned with the welfare of his students, and he has taken time to counsel them and support them in their career research. He provided advice to many of my classmates individually on improving their resumes, and he was an invaluable resource because f his industry knowledge and networking contacts at many different local companies. He has assisted many of his students with finding successful careers.

-My association with Shina has continued throughout my professional career. He has been involved at work projects at two of my post graduate companies…his knowledge of state of the art PC assembly and design techniques has made him a valuable resource to myself and many of my colleagues over the years.

-his class was very instructional and well taught, and I have used many of these principles and methods he emphasized in my work as a design engineer.

-I have seen Shina help so many of his students obtain jobs. He makes the whole process so much easier for he students, He has helped in so many ways and I am sure he will continue to help me in the future. Students in the ME department are very fortunate to have a professor like him.

-My employment opportunity was due to a large part to the courses I was fortunate enough to partake with professor Shina (courses)

-Only after completing my course of study at Lowell did it became aware to me just how important these (shina) courses are..

-Not only is he clear, up to date on current industrial concepts and trends, and very open to questions and discussions, but he also displays a genuine interest and concern for his students after they have moved on to pursue their careers

- Dr. Shina has a magical presence in the class.  Classes were very lively with interaction between everyone in the class.  As a student with "zero" industry experience I had a wonderful opportunity to meet and interact with dozens of students from industry .

### 2.8 Help with Industry Contacts to secure Manufacturing Jobs for UML ME Students

I have made it a personal goal of mine to make sure that UML ME graduates are gainfully employed in the local economy. Approximately 50 % of the ME undergraduate students become directly employed in manufacturing or manufacturing related industries. I am enclosing the job survey for the ME graduates for the last four years. My thesis or capstone students and those who went to manufacturing jobs are highlighted. The list shows that I have advised the largest number of students in the manufacturing area in the Master's program.

### 2.9 ME Personnel Committee Academic Review  (PMYR 2001)

Received an accepted rank as follows:

33

**Teaching**: He has a heavy load primarily at the graduate level. He is invaluable in teaching and coordinating our capstone design courses

**Service**: He is the College COOP coordinator. He also does a lot of unsung work connecting our students and graduates up with contacts in industry. He is active in the professional societies

**Research**: He has an extensive record of funded research and publications. He is the author or two books and completing a third.

34

TAB B

FIG. 1.



## CONSTANT FORCE SYSTEM

Quick-Tilt® is quiet, corrosion-resistant and comes preassembled to easily install in residential, tilt-window applications. For quick assembly, it was designed for the pivot bar to easily drop-in and tie-in to the carrier. Its alternating coil design prevents cantilevering or twisting of the carrier that can diminish locking performance. Quick-Tilt® remains hidden during normal sash operation, requires no adjustment and, of course, performs reliably. It is rated Class 2 on the American Architectural Manufacturers Association (AAMA) Verified Components List.

**COVER (OPTIONAL)**
Encloses spring assembly.
Minimizes contamination by debris.

A    B

With Triple Sander    With Cover

8.G
1.G

8.F
1.F

**PREASSEMBLED STAINLESS STEEL SPRINGS**
Greaseless, corrosion-resistant springs uncoil against each other in opposite directions to minimize friction and maximize smooth, silent operation.

**BUMPER (OPTIONAL)**
Used in place of a stop. Prevents carrier from colliding with spring assembly.

**TAMPERLOK (RECOMMENDED)**
This safety feature, when snapped into the carrier, prevents the homeowner from accidentally detaching the sash.

**DIE CAST METAL CAM**
For strength and durability.

**TIE-IN PIVOT BAR**
When seated in the carrier, it secures the sash to the frame, preventing the sash from accidentally detaching or falling out.

Fig. 2.

# Quick-Tilt*nc
## CONSTANT FORCE BALANCE



**Build on it.**

## *"New Construction" friendly Quick-Tilt©*

If new construction debris was holding you back from considering a Constant Force balance, you now have a dependable solution with Caldwell's **Quick-Tilt*nc** balance.



Caldwell's pre-assembled **Quick-Tilt** Constant Force balance just got better with its evolution to the **Quick-Tilt*nc** – or "new construction" friendly version.   Until now most Constant Force balances weren't ready for the abuse caused by construction site dust and debris.  With the launch of **Quick-Tilt*nc**, air-borne contaminants are kept from lodging inside the moving coil assembly.   The integrated coil nest and cover is specifically engineered to keep the coils dust-free and operating in the smooth, quiet manner for which **Quick-Tilt** balances are renowned.

**Call us at 585-352-3790.  Let's talk about your window.**

FIG. 3.

www.caldwellmfgco.com



Fig 4.



# Series 86xt
# BLOCK & TACKLE SYSTEM

The Caldwell Series 86xt is a result of our long tradition of continuous improvement in design, engineering and manufacturing. It is built for sideload applications in both residential and commercial windows and is rated Class 2 on the American Architectural Manufacturers Association (AAMA) Verified Component List. The Series 86xt is designed to allow for quick and easy removal of the sash. Because it rides with the sash, the balance is hidden from view during operation. In addition, the Series 86xt is engineered to allow for an additional 1" of sash opening (egress). Often this can reduce inventory by serving an all-even or all-odd channel lengths.



**GALVANIZED STEEL CHANNEL**
Provides maximum strength, corrosion resistance and durability.

**HEMMED EDGES**
For greater safety when handling.

**RE-ENGINEERED BOTTOM GUIDE**
Specially designed to allow for application advantages in PVC welded sash. The sash side contact area has been lengthened, creating an option to increase sash opening.



**SPRINGS BY CALDWELL**
We've made our own springs for over 100 years, continually improving our manufacturing process to deliver high quality and consistent performance.

**MUSIC WIRE**
This high-quality material is more fatigue-resistant and has a greater consistency of performance than the hard-drawn and oil-tempered steel commonly used by other balance manufacturers.

**STAMPED METAL**
Our parts are made of stamped metal for maximum durability.

**GUIDE BLOCK**
Designed to dampen sound during operation and prevent twisting of the tackle.

**INDEPENDENTLY ROTATING PULLEY WHEELS**
Selected specifically for their lubricity, low frictional characteristics and resistance to developing flat spots, allowing for remarkably smooth and consistent operation.

**SELF-ALIGNING STAINLESS STEEL HOOK**
The balance mounting hook is positively parked in a fixed position when retracted. Installation into the window is easier than ever. Pull-off strength of the corrosion-resistant crimped terminal exceeds maximum load by more than 2 times. The low profile of the hook minimizes clearance issues, and only requires a single jamb punch.

Fig.5.

C000499

1.D
12.G
13.B
18.D

FIG. 6.



**CALDWELL**

Series 86xt
BLOCK & TACKLE SYSTEM

Extended travel
for sideload applications

C000498



FIG. 8.





FIG. 10.7

Confidential – Attorneys' Eyes Only

CL017418



Fig 11.



### Series 97i
# BLOCK & TACKLE SYSTEM

The Caldwell Series 97i is a result of our long tradition of continuous improvement in design, engineering and manufacturing. It is built for fit applications in both residential and commercial windows and is rated Class 2 by the American Architectural Manufacturers Association (AAMA). Caldwell invented the Inverted Balance design, which brings significant benefits to the Block & Tackle user. Designed to ride with the sash, the balance is hidden from view during operation. So, no jambliner is required. The attached carrier provides for faster installation, thereby reducing labor costs. And, the design maximizes the all-important egress opening.

**ATTACHED CARRIER DESIGN**
No assembly required. Design allows for faster installation and easier field change-out.

**GALVANIZED STEEL CHANNEL**
Provides maximum strength, corrosion resistance, and durability.

**ROUNDED CORNERS**
For handling safety, our steel channel has gently rounded corners.

**SPRINGS BY CALDWELL**
We've made our own springs for over 100 years, continually improving our manufacturing process to deliver high quality and consistent performance.

**GUIDE BLOCK**
Designed to dampen sound during operation and prevent twisting of the tackle.

**INDEPENDENTLY ROTATING PULLEY WHEELS**
Selected specifically for their lubricity, low frictional characteristics and resistance to developing flat spots, allowing for remarkably smooth and consistent operation.

**SELF-ALIGNING STAINLESS STEEL TERMINAL**
The terminal automatically aligns itself for quick installation. This corrosion-resistant material is crimped onto the cord ends. Pull-off strength exceeds maximum load by more than 2 times.

**STAMPED METAL**
Our parts are made of stamped metal for maximum durability.

**MUSIC WIRE**
This high-quality material is more fatigue-resistant and has a greater consistency of performance than the hard-drawn and oil-tempered steel commonly used by other spring manufacturers.

Fig 12

C000491

# EXHIBIT 10

# United States Patent Office

**3,091,797**
**Patented June 4, 1963**

---

**1**

3,091,797
**WINDOW STRUCTURE**
Dwight M. Prosser, Mansfield, Ohio, assignor to Shiloh
Tool & Die Manufacturing Company
Filed Apr. 26, 1961, Ser. No. 105,594
3 Claims. (Cl. 16—197)

This invention relates to a window component, more particularly a jamb facing that has detachably secured thereto one or more housings incorporating spring-and-sheave assemblies.

A principal object of the invention is to provide an inexpensive jamb facing usable, inter alia, for weather stripping purposes in which jamb facing are incorporated the parting stop, the sash-receiving ways, and replaceable housings containing spring-and-sheave assemblies. The construction is such that when replacement of one or both of the housings becomes necessary, due, for example, to mechanical failure, the facing may be separated from the jamb by removing the screws by which it is held in place, after which, the facing being then in a more convenient position, the housing or housings may be manually detached. To this end, the invention provides tongue-and-slot connections for the housings, making it a simple matter to attach and detach them. Within the housings themselves, the invention further provides tongue-and-slot connections by which certain of the elements of the spring-and-sheave assembly are held in place.

Other objects, advantages and features of the invention will be apparent from the description which follows and from the accompanying drawings, in which:

FIGURE 1 is a perspective of a portion of a window structure in which the invention is incorporated, such figure showing the window frame, the jamb, the facing carried by the jamb, and the upper and lower sash elements.

FIGURE 2 is an elevation of the jamb facing showing the housings for the spring-and-sheave assemblies.

FIGURE 3 is a similar elevation of the jamb facing without the housings for the spring-and-sheave assemblies, the scale being twice that of FIGURE 2.

FIGURE 4 is a top plan on a still larger scale of the jamb facing and housings.

FIGURES 5 and 6 are, respectively, rear and side elevations of the housings, the scale being the same as that of FIGURE 4.

FIGURE 7 is an enlarged section on line 7—7 of FIGURE 2.

FIGURE 8 is an enlarged detail of the upper end of the jamb facing.

FIGURE 9 is an exploded view showing details of the lower end of one of the housings.

In the drawings, the window structure as a whole is designated 1. Along with conventional components that are not important for present purposes, it includes a jamb 2 of wood which in FIGURE 1 is largely concealed by a metal jamb facing 3. The latter is coextensive as regards length with the jamb itself, extending from end to end lengthwise of the jamb. It also extends laterally across the jamb as indicated at *a*, FIGURE 1, its width being somewhat less than that of the jamb. It is adapted to serve as a weatherstrip, if desired. Although it may be made of other materials, facing 3 may conveniently be made of a non-rusting sheet metal such as stainless steel, aluminum or the like. If of aluminum, it can be formed as an extrusion; preferably, however, it is made of rolled stock.

Facing 3 incorporates a channel-shaped parting stop 4, the opening in which faces toward the jamb; i.e., away from the sash elements. Flanking parting stop 4 are two similar sash-receiving ways 5 and 6 the bottoms of which

**2**

(5*a* and 6*a*) are depressed to provide laterally spaced tracks (5*b* and 6*b*) for the sash elements. Parting stop 4 and end flanges 7 and 8 determine the effective widths of sash-receiving ways 5 and 6. Where feasible, as, for example, in a rolled facing, parting stop 4, sash-receiving ways 5 and 6, and end flanges 7 and 8 will normally be formed in one piece: see FIGURES 4 and 8.

Facing 3 is held to jamb 2 by means of screws 9, which, if desired, may pass through holes 10 in parting stop 4 (FIGURES 2 and 3); however, they may be located elsewhere, if preferred.

As shown in FIGURE 1, the usual lower and upper sash elements, respectively designated 11 and 12, are in their open positions. They should be understood to have been moved to these positions from closed positions which, respectively, are at the bottom and top of the window structure. The arrows in FIGURE 1 indicate the direction of movement bringing the two sash elements into their closed positions, at which time check rail 11*a* on sash element 11 will engage check rail 12*a* on sash element 12. For reasons that will be apparent, sash elements 11 and 12 are cut away as indicated at 11*b* and 12*b* (FIGURE 4).

Fixed to jamb facing 3 in the path of travel of sash elements 11 and 12 are channel-shaped housings 13 and 14 for the spring-and-sheave assemblies. At the lower ends of housings 13 and 14, respectively, are stepped bottom plates 15 and 16, constructed as shown in FIGURE 9, each of which forms part of one of the spring-and-sheave assemblies. Bottom plates 15 and 16 are connected to the remainder of the spring-and-sheave assemblies by cables 17, one of which appears in FIGURE 1. They engage the lowermost portions of sash elements 11 and 12 and move up or down, as the case may be, in conformity with the movements of the sash elements which they respectively engage.

Housings 13 and 14 are held detachably in place in sash-receiving ways 5 and 6 by means of tongue-and-slot connections. To this end, there are slots in the upper portions and other slots near the middle portions of each of sash-receiving ways 5 and 6. In the case of sash-receiving way 5, the slots are formed by off-setting rectangular tabs from the general plane of depressed area 5*a*; similarly, in the case of sash-receiving way 6, the slots are formed by off-setting rectangular tabs 19 from the general plane of depressed area 6*a*. As best seen in FIGURE 8, the result of so offsetting tabs 18 and 19, respectively, is to form L-shaped slots 20 and 21. Appropriately located tongues on housings 13 and 14 can enter into and will be retained in place in these slots.

In order to provide suitably located tongues, housings 13 and 14 are formed with laterally extending flanges 22: see FIGURES 5 and 6, which show housing 13 as seen from the rear and one side. Those parts which appear in FIGURES 5 and 6 occur also in housing 14, which is identical with housing 13. It will be noted from FIGURE 4 that flanges 22 on housings 13 and 14 are so proportioned as to fit snugly within depressed areas 5*a* and 6*a* of sash-receiving ways 5 and 6, respectively.

Flanges 22 are interrupted near their upper and lower ends by relatively long cut-away portions 23 and by relatively short cut-away portions 24: see FIGURE 5. By introducing cut-away portions 23 and 24, four tongues 25 and four stops 26 are formed in flanges 22. Tongues 25, of which there is a first pair at the upper end and a second pair at the lower end of each of housings 13 and 14, are adapted to enter into L-shaped slots 20 and 21 and, when they do enter into them, interlock with rectangular tabs 18 and 19. The manner in which this is accomplished will be apparent from FIGURE 7.

Referring again to FIGURES 5 and 6, it will be noted

3,091,797

| 3 | 4 |

that there is a transversely extending spring anchor 27 at the upper end of housing 13 at substantially the level of cut-away portions 24. Spring anchor 27 takes the form of a pin the ends of which are headed over against the side walls of housing 13. The upper end of a stout coil spring 28 is hooked over spring anchor 27, such spring comprising one of the principal components of the spring-and-sheave assembly. It is attached at its lower end to a movable sheave holder 29 made up of two spaced plates 30, a first connecting pin 31 over which the end of the spring is hooked, a second connecting pin 32, and two nylon sheaves 33.

Cable 17, to which reference has already been made, passes a number of times between movable sheave holder 29 and a stationary sheave holder 34 at the lower end of housing 13. Sheave holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38. One end of cable 17 is made fast to pin 36; the other end extends through bottom plate 15, being knotted against its lower face. When bottom plate 15 moves with sash element 11 on movement of the latter toward closed position, the spring-and-sheaves assembly releases the needed length of cable. It is taken up by the spring-and-sheave assembly on movement of the sash element 11 in the opposite direction.

As will be apparent from FIGURES 5, 6 and 9, stationary sheave holder 34 is intended to coact with bottom plate 15 when the bottom plate is in its retracted position. To this end, bottom plate 15 is provided with a hole for cable 17 (one of two holes 40) and an elongated slot 41 for receiving two end tangs 42 that depend from the lower ends of plates 35. Plates 35 are further provided with holes 43 and 44 for pins 36 and 37, respectively. At their outer ends, pins 36 and 37 are headed over against the exposed outer faces of plates 35, thus forming a rigid assembly.

Each of the two plates 35 is provided with an outwardly projecting tongue 45 in the space between holes 43 and 44. These tongues, which are offset from the planes of the stock of which plates 35 are formed, are adapted to enter into slots 46 in the side walls of housing 13. As appears from FIGURE 9, these slots are produced by slitting plates 35 and pressing inwardly tablike portions 47. The manner in which tongues 45 and tabs 47 cooperate is shown in FIGURE 5. Inasmuch as cable 17 exerts a constant upward pull on pin 36, there is little likelihood of displacement of sheave housing 34.

Thus the invention provides a sash balancing system

in and by which one or more spring-and-sheave assemblies are held in place in suitable housings by means of tongue-and-slot connections. Each such housing is itself held in place in one of the sash receiving ways by means of tongue-and-slot connections at the upper and lower ends of the housing. These tongue-and-slot connections permit of easy replacement of worn or defective parts in the spring-and-sheave assembly and, if desired, replacement of the housing itself. Once the necessary replacement has been accomplished, the housing may be returned to its position on jamb facing 3 and the latter restored to its intended position in the window structure.

It is evident that changes in and departures from what has been described may readily be made by those skilled in the art. For example, it is not necessary that the facing be formed in one piece, as shown. Being made of sheet metal, it may be built up of a plurality of pieces attached to each other in suitable fashion. At the sides of the facing, the end flanges may, if desired, project toward rather than away from the jamb. Numerous other changes of like nature can be expected from those versed in the art to which the invention relates.

It is intended that the patent shall cover, by summarization in appended claims, all features of patentable novelty residing in the invention.

What is claimed is:

1. A window component comprising a metal housing of channel-shaped cross-section; a spring-and-sheave assembly in the housing, said spring-and-sheave assembly extending lengthwise from one end of the housing to the other; an anchor for one end of the spring-and-sheave assembly at one end of the housing; and, at the opposite end of the housing, tongue-and-slot connections for holding in place the opposite end of the spring-and-sheave assembly, the slots being in the housing and the tongues forming part of a sheave holder that itself forms part of the spring-and-sheave assembly.

2. A window component according to claim 1 in which the sheave holder takes the form of spaced side pieces held together by pins.

3. A window component according to claim 2 in which the side pieces are provided with end tanks that project out of the housing into a movable end plate.

References Cited in the file of this patent

UNITED STATES PATENTS

| 2,715,747 | Prosser et al. | Aug. 23, 1955 |
| 2,722,723 | Mears | Nov. 8, 1955 |
| 2,912,726 | Goellner | Nov. 17, 1959 |

June 4, 1963

Filed April 26, 1961

D. M. PROSSER

WINDOW STRUCTURE

3,091,797

2 Sheets-Sheet 1



Fig.1.

Fig.2.

Fig.3.

INVENTOR.
DWIGHT M. PROSSER
BY Bosworth, Sessions,
Nerhem & Dumba
ATTORNEYS.

June 4, 1963

D. M. PROSSER

3,091,797

WINDOW STRUCTURE

Filed April 26, 1961

2 Sheets—Sheet 2



INVENTOR.
DWIGHT M. PROSSER
BY Bosworth, Sessions,
Herrstrom & Knowles
ATTORNEYS.

# EXHIBIT 11

**Shina Consulting**

April 18, 2006

Jordan Singer
Attorney at Law
Goodwin|Procter LLP
Exchange Place
Boston, MA 02109

Re: Dr. Sammy Shina's comments regarding the two expert witness reports of Charles E. Still
in civil action no. 05-10020-DPW

I have been retained on behalf of the plaintiffs: Amesbury Group INC., and Amesbury Springs LTD.
as an expert to review and comment on two expert witness reports of Mr. Charles Still dated March 8
and March 13 2006. I had previously rendered my own expert Report Submitted on Behalf of Plaintiffs
in civil action no. 05-10020-DPW dated March 23, 2006.

**I. My comments regarding Mr. Still's opinion of the invalidity of Amesbury Patent No 5,365,638.**

In forming my opinion, I examined Mr. Still's expert witness report on behalf of the defendants, dated
March 13, 2006 including the Patent mentioned in his report: Sterner, U. S. Patent 5,157,808. I
understand that Mr. Still's report also addressed Leitzel, US Patent 4,961,247 and mentioned Cripps,
US Patent 5,219,976, and that Caldwell has notified Amesbury that it will not rely on the Leitzel and/or
Cripps Patents in their invalidity arguments. Accordingly, I will not address these Patents in my
comments.

     I examined Mr. Still's expert witness report on behalf of the defendant, dated March 13, 2006,
where he states that the **"Sterner, U. S. Patent 5,157,808**-filed February 18, 1992 (see Exhibits A&B)
clearly shows a constant spring force coil spring balance with a spring mounting that incorporates a
raised spine and in the same plane as the inwardly opposed flanges of the frame jamb channel. It
also clearly shows a concave support surface in the spring mounting to support the coil spring. It also
clearly shows an aperture with a screw to attach the spring mounting to the frame jamb of the
window. These components perform the same function as in the **'638 Patent."** I disagree.

**Exhibits A & B for the case involving Amesbury Patent No 5,365,638**
     Based on my knowledge of the case that I summarized in my own expert witness report
entitled "On Behalf of Plaintiffs in Civil Action No. 05-10020-DPW", dated March 23, 2006, I disagree
with many of Mr. Still's assumptions in Exhibit A in his report, where he attempts to point out that the
elements (components) mentioned in the Sterner U. S. Patent 5,157,808 exist and/or perform the
same function as in the plaintiffs '638 Patent.

     In Exhibit A, Mr. Still lists some claim elements of Amesbury's '638 Patent, then attempts to
show corresponding elements (components) in the '808 Patent that might satisfy these claim
elements. These elements (components) are labeled (sometimes) with a particular letter (A-H) in
Exhibit B.  Since some of the '638 Patent claim elements are not matched with corresponding
"labeled" elements (components) in Exhibit B, I am therefore forced to make assumptions as to Mr.
Still's intentions. I note at least the following discrepancies in Mr. Still's report Exhibit A, where he

1

does not present a proper reason for a claim element in the '638 Patent to have a corresponding element (component) in the '808 Patent. In addition, there is a lack of proper referencing of the '808 elements (components) that match the '638 claim elements. In my analysis below, I record Mr. Still's comments on each '638 Patent claim element and the alleged corresponding component in the '808 Patent as they appear in his Exhibit A, then I note my own opinion to these comments directly underneath Mr. Still's statements, as to their lack of applicability, irrelevance or incorrectness.

| 1. Page #<br>Ex A, p2 | '638 Claim Element and description<br>638/1 said mounting means having a<br>raised spine | Corresponding '808 component<br>See Exhibit B, item F said mounting<br>means having a raised spine. |
|---|---|---|

In examining Exhibit B item F, I find that the mounting means are defined by the memorandum and order of the US District Court for the District of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in the '638 Patent. The court construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel." I also note in the claim construction by the US District Court of Massachusetts dated January 20th, 2006, a construction for the term "raised spine" as follows: "A raised protrusion that resembles or suggests a spine of the mounting means, shaped to cooperate with the window jamb flanges to inhibit the rotational motion of the mounting means."

Item (component) F as shown in Exhibit B as shown in the '808 Patent, and referred to by the number 68 on the '808 Patent does not have a raised spine. In fact the whole back side of F in the '808 Patent is smooth and does not appear to have any raised features such as a protrusion or spine. Please refer to Figure 12 in the '808 Patent shown here. In addition, I found no language in the '808 Patent referring to a protrusion or raised spine.



2. Page #    '638 Claim Element and description            Corresponding '808 component
   Ex A, p2   638/1 positioned between and in the same     positioned between and in the same
              plane as said inwardly turned opposed        plane as said inwardly turned opposed
              flanges of channel means                     flanges of channel means.

In examining Sterner, U. S. Patent 5,157,808, it shows the front elevation view of the coil
spring sub-assembly 20 installed in a window frame (Figure 3) and another front elevation view of
a typical heavy duty window frame with multiple coil spring sub-assemblies 20 installed (Figure 6).
It is clear to me that the component 68 (item F) alleged to be the mounting means does not come
into the same plane as the inwardly turned opposed flanges of the channel means. As can be
seen from Figure 3 and Figure 6 in the '808 Patent, it is clear that the mounting means does not
extend to the inwardly turned opposed flanges of the channel means, but rather is located behind
the flanges.





3

3. Page #   '638 Claim Element and description
   Ex A, p2  638/1 whereby rotational motion of said
             mounting means is inhibited

Corresponding '808 component
whereby rotational motion of said
mounting means is inhibited, because
the spine shown in the '808 Patent is
sized such that it would have a close
tolerance with the flanges.

In examining Sterner, U. S. Patent 5,157,808, showing all the side elevation views of the
balance (figures 2, 5, 7 and 10), it is not clear to me that there is a close tolerance between the
component 68 (item F) and the flanges. I found no mention in the '808 Patent that indicates any
tolerance between the component 68 and the flanges or even use the word "tolerance". Even if
the tolerance was close, the component 68 does not extend into the plane of the flanges in order
to inhibit the rotation of the component 68. Please note the discussion related to Figures 3 and 6
above.





4



FIG. 5



FIG. 7

PRIOR ART

4. I also note that Mr. Still alleges that dependant claims 2 and 3 are also invalid based on the '808 Patent. I have shown that claim 1 of the '638 Patent is not invalid, therefore claims 2 and 3 are not invalid as well. This is because the missing elements in claim 1 are also necessarily missing in claims 2 and 3.

5. Page #        '638 Claim Element and description          Corresponding '808 component
   Ex A, p5    638/8 and the mounting means having        and the mounting means having
               projection means                           projection means.

In examining Exhibit B item F, I find that the mounting means are defined by the memorandum and order of the US District Court for the District of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in the '638 Patent. The court construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure

5

for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel." I also note in the court's construction by the US District Court of Massachusetts dated January 20th, 2006 for a construction for the term "projection means" as "projection(s)."

Mr. Still did not identify which element in Exhibit B corresponds to the claimed projection means. For the purposes of my report, I am assuming he is referring to Item (component) F as shown in Exhibit B, and referred to by the number 68 on the '808 Patent. Component 68 does not have a projection means. In fact the whole back side of item F is smooth and does not appear to have any features such as a protrusion or projection. Please refer to Figure 12 in the 808 Patent. In addition, I found no language in the '808 Patent referring to a protrusion or projection.



6.  Page #    '638 Claim Element and description          Corresponding '808 component
    Ex A, p5   638/8 positioned between said inwardly      positioned between said inwardly
               turned opposite flanges of the channel means   turned opposed flanges of the channel
               which cooperate with said flanges of the      means which cooperate with said
               channel means within which the mounting      flanges of the channel means within
               means is positioned                          which the mounting means is
                                                            positioned.

In examining Sterner, U. S. Patent 5,157,808, it shows the front elevation view of the coil spring sub-assembly 20 installed in a window frame (Figure 3) and another front elevation view of a typical heavy duty window frame with multiple coil spring sub-assemblies 20 installed (Figure 6). It is clear to me that the component 68 (item F) alleged to be the mounting means does not contact the inwardly turned opposed flanges of the channel means. As can be seen from Figure 3 and Figure 6 in the '808 Patent, it is clear that the mounting means does not extend to the

6

inwardly turned opposed flanges of the channel means, but rather is located behind the flanges. Therefore, as shown in the '808 Patent, component 68 will not cooperate with the flanges of the channel means within which the component 68 is positioned.

7.  Page #    '638 Claim Element and description          Corresponding '808 component
    Ex A, p5   638/8 whereby rotational movement of the    whereby rotational movement of the
               mounting means is inhibited                  mounting means is inhibited.

In examining Sterner, U. S. Patent 5,157,808, showing all the side elevation views of the balance (figures 2, 5, 7 and 10), it is clear to me that there is no possibility of contact between component 68 and the flanges. Therefore since there is no cooperation of the component 68 with the flanges, rotational movement of the component 68 is not inhibited by the flanges.

In summary, I note that the analysis by Mr. Still regarding the alleged existence of the components of the '808 Patent that perform the same function as in the '638 Patent is incorrect. I note the following claim elements in the '638 Patent are not present in the '808 Patent, as I indicated above:

1.  638/1 said mounting means having a raised spine
2.  638/1 positioned between and in the same plane as said inwardly turned opposed flanges of said channel means
3.  638/1 whereby rotational motion of said mounting means is inhibited
4.  638/2 and 638/3 (dependent claims of 638/1 for the same reasons as 638/1)
5.  638/8 the mounting means having projection means
6.  638/8 positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned
7.  638/8 whereby rotational movement of the mounting means is inhibited.

**My comments regarding Mr. Still's opinions of Braid U.S. 5,365,638 Patent infringement by the defendant.**

Mr. Still states in his opinions regarding the '638 Patent that:
"based on my findings, [the '638 Patent] is not novel and/or is obvious and therefore, not valid.
Prior art proves that all components of '638 Patent existed before '638 Patent was filed. US Patent 5,157,808 contains all of the elements disclosed in claims 1, 2, 3, & 8 of the '638 Patent, thereby anticipating those claims. All of the claims would have been obvious to one of ordinary skill in the art to which this invention pertains based on (1) Sterner, U. S. Patent 5,157,808 …. Therefore the claims are invalid. Detailed comparisons of the claims of the Patent to the prior art are attached as Exhibits A, B, C & D."

I disagree with Mr. Still opinions for the following reasons:
1.  The Patent office has reviewed the filing for the '638 Patent in light of prior art including Sterner, U. S. Patent 5,157,808 and concluded that the Patent is worthy of being granted. In the prosecution history of Patent '638, the communication between Patent office and the Patent applicant initially rejected '638 claims based on the '808 Patent. Then in the Amendment under Rule 1.11 dated October 15, 1993, the Patent applicant amended the claims and distinguished the '808 Patent based on
    a.  '808 Patent did not have a means of preventing rotation
    b.  '808 Patent did not have an element such as a spine that prevent rotation

7

After the claims were amended, the Patent Office granted the '638 Patent.

2. The statement "US Patent 5,157,808 contains all of the elements disclosed in claims 1, 2, 3, & 8 of the '638 Patent, thereby anticipating all of those claims," is incorrect; as I indicated in my analysis of Exhibits A, B, C & D above, since many claims of the '638 Patent do not have a corresponding element (component) in the '808 Patent, they are:
   1) 638/1 said mounting means having a raised spine
   2) 638/1 positioned between and in the same plane as said inwardly turned opposed flanges of channel means
   3) 638/1 whereby rotational motion of said mounting means is inhibited
   4) 638/2 and 638/3 (dependent claims of 638/1 for the same reasons as 638/1)
   5) 638/8 the mounting means having projection means
   6) 638/8 positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned
   7) 638/8 whereby rotational movement of the mounting means is inhibited.

Therefore the claims of '638 Patent cannot be anticipated from the components of the '808 Patent. My understanding of the concept of "anticipation" is based on AIPLA Model Jury Instructions (revised 2005). Quote: "to prove anticipation the defendant must present clear and convincing evidence showing that the claimed invention is not new… To anticipate a claim, each and every one of the elements in the claim must be present in a single item of prior art. You may not combine two or more items of prior art to prove anticipation." I have noted in my report many instances where the claimed invention (Patent '638) contains elements that are not present in the prior art mentioned by Mr. Still. ('808 Patent)

3. The statement that: "All of the claims would have been obvious to one of ordinary skill in the art to which this invention pertains based on (1) Sterner, U. S. Patent 5,157,808 …." is incorrect, because of the following:

   a. The ordinary skill in the art required to design new balances at the time the '638 Patent invention was made is not specific to fenestration design, but is part of the general engineering skills acquired by graduates of any accredited engineering college or university or the equivalent industrial experience in the field. In fact, most of the defendant "Caldwell" principals that were deposed came from other industries: Mr. Douglas Zinter (marketing) came from fertilizer products, and Mr. Thomas Batten (engineering) and Mr. Wilbur Kellum came from the medical industry, and Mr. Jeffery Robertson (engineering) came from the consumer photography business, while Mr. deNormand worked directly for Caldwell after graduating as an engineer. Most of the Caldwell principals shared the fact that they were mechanical engineering graduates.

   b. The '638 Patent and the '808 Patent describe different objectives:
      i. The '638 Patent seeks to overcome the "….disadvantage of this known type of mounting that the spring is not silent in use, possibly due to relative movement between the inner, free end of the spring and the spring supporting drum." ('638 Patent column 1 lines 41-44)
      ii. The '808 Patent background specifies that the "present invention relates to an improved …counterbalance assembly…which substantially enhance the smoothness of counterbalance sash operation as well as the ease of and facility which one may install and connect multiple spring components…when more than one spring is required…" ('808 Patent column 1 lines 5-18)

8

c. I observe that many claims of the '638 Patent do not have a corresponding element (component) in the '808 Patent, they are:

1. 638/1 said mounting means having a raised spine
2. 638/1 positioned between and in the same plane as said inwardly turned opposed flanges of channel means
3. 638/1 whereby rotational motion of said mounting means is inhibited
4. 638/2 and 638/3 (dependent claims of 638/1 for the same reasons as 638/1)
5. 638/8 the mounting means having projection means
6. 638/8 positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned
7. 638/8 whereby rotational movement of the mounting means is inhibited.

Mr. Still provides no basis or reasoning why a person of ordinary skill in the art would modify the prior art to pick and choose some elements and not others, and combine them to arrive at the invention claimed in the '638 Patent.

d. I note that one of ordinary skill in the art cannot simply pick and choose elements (components) at will from the '808 Patent and invent the claimed invention of the '638 Patent, while at the same time ignoring other components of the '808 Patent that are not found in the '638 Patent claims. Further as described above, many of the claim elements are not found in the '808 Patent.

My understanding of the concept of "Obviousness" is based on the AIPLA Model Jury Instructions (revised 2005). Quote: "for obviousness, a person of ordinary skill in the art may combine two or more items of prior art...before determining...obviousness...you must determine .... 1. The scope and content of prior art relied upon by the defendant; 2. The difference or differences, if any between each claim of the Patent... and the prior art...when doing so, each claim must be considered in its entirety and separately from other claims...Although you should consider any differences between the claimed invention and the prior art, you must still determine the obviousness or non obviousness of the entirety of the invention, not merely some portion of it."

In conclusion, Mr. Still is incorrect in his Obviousness declaration since there are many differences between many of the claims of the '638 Patent and the '808 Patent, in fit, function as well as in form or geometric features. In addition the total invention in the '638 Patent performs a particular function that is distinctly different from the '808 Patent. The total invention of the '638 Patent uses a methodology to inhibit rotation by a raised spine or projection that is entirely absent in the '808 Patent. In addition, it is wrong to use hindsight for obviousness, to attempt to combine the structural elements of the '808 Patent to achieve the results of the '638 Patent claims.

In addition, there are other indicators of non-obviousness of the '638 Patent invention: my understanding of the commercial success of the Amesbury products based on this invention, and the copying of this invention by Caldwell. If this invention is so obvious, then competitors of Amesbury such as Caldwell would have made products based on this invention before it was patented by Amesbury, and not afterwards.

9

**II. My comments regarding Mr. Still's opinion of the invalidity of Amesbury Patent No 6,598,264.**

In forming my opinion, I examined Mr. Still's expert witness report of behalf of the defendants, dated March 8, 2006 as well as the two Patents mentioned in his report: Thompson U. S. Patent 6,840,011 and Prosser, U.S. Patent 3,091,797.

I examined Mr. Still's expert witness report of behalf of the defendant, dated on March 8, 2006, where he states that the

> "**Thompson U. S. Patent 6,840,011**-filed December 13, 2000 (see Exhibits A&B) clearly shows a block and tackle balance with a bottom guide roller within the bottom guide. During the '**264 Patent** search, the Primary Examiner Anthony Knight, and Assistant Examiner, William D. Hutton Jr. was not made aware of the existence of '011 Patent being filed prior to '**264 Patent** filing. The remaining major components in '011 Patent are commonplace and can be found in Prior Art illustrated in '264 Patent, Fig. 2A and Fig. 2B. These components perform the same function as in the '264 Patent."

I will make my remarks on Mr. Still's comments on the '011 Patent after I have noted my own observations on Exhibits A, B, C & D of his March 8, 2006 report.

**Exhibits A & B for the case involving Amesbury Patent No 6,598,264**

Based on my knowledge of the case that I summarized in my own expert witness report entitled "On Behalf of Plaintiffs in Civil Action No. 05-10020-DPW", dated March 23, 2006, I disagree with many of Mr. Still's assumptions in Exhibit A in his report, where he attempts to point out that the elements (components) mentioned in the Thompson U. S. Patent 6,840,011 exist and/or perform the same function as in the Amesbury '264 Patent.

In Exhibit A, Mr. Still lists some claim elements of the Amesbury '264 Patent, then attempts to show corresponding elements (components) in the '011 Patent that might satisfy these claims. These elements (components) are labeled (sometimes) with a particular letter (A…R) in Exhibit B. Since some of the '264 Patent claim elements are not matched with a corresponding "labeled" component in Exhibit B, I am therefore forced to make assumptions as to Mr. Still's intentions. I note at least the following discrepancies in Mr. Still's report Exhibit A, where he does not present a proper reason for a claim element in the '264 Patent to have a corresponding element (component) in the '011 Patent. In addition, there is a lack of proper referencing of the '011 elements (components) that match the '264 claim elements. In my analysis below, I record Mr. Still's comments on each '264 Patent claim element and the alleged corresponding component in the '011 Patent as they appear in his Exhibit A, then I note my own opinion to these comments directly underneath Mr. Still's statements, as to their lack of applicability, irrelevance or incorrectness.

10

| 1. | Page # | '264 Claim Element and description | Corresponding '011 component |
|---|---|---|---|
| | Ex A, p1 | 264/1 a top guide, connected to the first end of the channel; | '011 Pat. has no top guide connected to the first end of the channel; Prior art is established in '264 Pat. Figure 2A, 2B and Fig. 3 which shows the top guide. |

Mr. Still is referring to another Patent since he cannot find a corresponding component to a top guide in Patent '011. The two Patents perform different functions: Patent '011 describes a balancer used for tilted window operation, where "A balancer 208 is secured to the sash side 212 by a screw 213" (Column 5, Line 8-9). The top of the sash is secured in the jamb channel by a set of levers, such as: "When the sash 200 is in its vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from the plane of the frame 202." (Patent '808 column 5 lines 61-66 and Figure 2). Therefore no balancer top guide is required for the '011 Patent, and there is no motivation to combine a top guide from any other reference to the '011 Patent balancer.  Patent '264 describes the function of the top guide as follows (column 4, lines 38-41); "The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to guide the movement of the block and tackle window balance 300 within the jamb pocket 108." Accordingly, the claimed invention is not obvious. Please note my further comments down below regarding Mr. Still's opinions.



2. Page #        '264 Claim Element and description         Corresponding '011 component
   Ex A, p1      264/1 a bottom guide, connected to the      See Exhibit B item G, a bottom guide
                 second end of the channel;                  connected to the second end of the
                                                             channel;

In Exhibit B, Mr. Still points to item G as the bottom guide; referred to as the housing extension 423 in the '011 Patent, as in column 6 lines 55-56 "a housing extension 423 attached to one end of the elongated U-shaped housing 403". In the '011 Patent Figure 4, I note a pin 206 on the back of the housing extension, as follows; "A first pivot pin 206 and a second pivot pin (not shown) provide the titling mechanism. The pivot pin preferably slides in a groove in a jamb liner…" (Patent '011 column 5 lines 13-15 and figure 2). In the '264 Patent, "the bottom guide 315 is also used for connections and guidance purposes."(Column 4 lines 43-44). The function of the corresponding elements is different for the two inventions: the '011 Patent describes a tilt window and the housing extension includes a pin to provide the tilting mechanism, while the '264 Patent describes a non-tilt window and the bottom guide is used for sash connection and guidance. Therefore the housing extension 423 should not be considered as the claimed bottom guide. Accordingly, the claimed invention is not obvious.



12

3.  Page #      '264 Claim Element and description        Corresponding '011 component
    Ex A, p1    264/1  a bottom guide roller rotatably     See Exhibit B, item R, a bottom guide
                mounted in the bottom guide              roller rotatably mounted in the bottom
                                                          guide.

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide and therefore, the '011 Patent roller is not mounted in a claimed bottom guide.

4.  Page #      '264 Claim Element and description        Corresponding '011 component
    Ex A, p3    264/2 The device in claim 1 wherein the    The device of the '011 Patent has a
                bottom guide roller is located external to   bottom guide roller located
                the channel                                external to the channel

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide and therefore, the '011 Patent roller is not located external to the channel in a bottom guide.

5.  Page #      '264 Claim Element and description        Corresponding '011 component
    Ex A, p3    264/3 The device according to claim 2      '011 Pat. has no top angled portion
                wherein the top angled portion is sized    Prior art is established in '264 Pat.
                to receive a member of a window sash       Figure 2A, 2B and Fig. 3 which shows
                                                          the top angled portion.

Mr. Still is referring to another Patent since he cannot find a corresponding component to a top guide in Patent '011, and therefore no top guide with an angled portion. The inventions in the two Patents perform different functions: Patent '011 describes a balancer used for tilted window operation, where "A balancer 208 is secured to the sash side 212 by screw 213" (Column 5, Line 8-9). The top of the sash is secured in the jamb channel by a set of levers, such as: "When the sash 200 is in its vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from the plane of the frame 202." (Patent '808 column 5 lines 61-66 and Figure 2). Therefore no balancer top guide is required for the '011 Patent, and there is no motivation to combine a top guide from any other reference to the '011 Patent balancer. Patent '264 describes the function of the top guide as follows (column 4, lines 38-42): "The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to guide the movement of the block and tackle window balance 300 within the jamb pocket 108.The top guide 315 may include a top angled portion 302 ...." Please note my further comments down below regarding Mr. Still's opinions.

6.  Page #      '264 Claim Element and description        Corresponding '011 component
    Ex A, p3    264/4 The device according to claim 1      The device of the '011 Patent has a
                Wherein a portion of the bottom guide is    portion of the bottom guide external
                external to the channel                    to the channel

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide. Therefore, the housing extension 423 is not a bottom guide with a portion external to the channel.

13

7. Page #      '264 Claim Element and description          Corresponding '011 component
   Ex A, p3    264/5 The device according to claim 1      The device according to claim 1
               wherein the bottom guide forms a channel   wherein the bottom guide forms a
               to receive a portion of a window sash      channel to receive a portion of a
                                                          window sash.

   In Exhibit B, Mr. Still points to item G as the bottom guide; referred to as the housing extension
423 in the '011 Patent column 6 lines 55-56: "a housing extension 423 attached to one end of the
elongated U-shaped housing 403". In the '011 Patent figure 4, I note a pin 206 on the back of the
housing extension. The housing extension does not form a channel to receive a window sash. In
fact the entire balancer 208 is received in a groove 210 in the sash side 212. (Patent '011 column
5 lines 6-10 and figure 2).

8. Page #      '264 Claim Element and description          Corresponding '011 component
   Ex A, p4    264/10 The device according to claim 1     '011 Pat. has no top guide
               wherein the top guide includes a top       Prior art is established in '264 Pat.
               angled portion                             Figure 2A, 2B and Fig. 3 which has a
                                                          top guide.

   Mr. Still is referring to another Patent since he cannot find a corresponding component to a top
guide in Patent '011, and therefore no top guide with an angled portion. The two Patents perform
different functions: Patent '011 describes a balancer used for tilted window operation, where "A
balancer 208 is secured to the sash side 212 by screw 213 (Column 5, Line 8-9). The top of the
sash is secured in the jamb channel by a set of levers, such as: "When the sash 200 is in its
vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side
member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from
the plane of the frame 202." (Patent '808 column 5 lines 61-66 and Figure 2). Therefore no
balancer top guide is required for the '011 Patent, and there is no motivation to combine a top
guide from any other reference to the '011 Patent balancer.  Patent '264 describes the function of
the top guide as follows (column 4, lines 38-42); "The top guide 310 is used to help connect the
block and tackle window balance 300 to the window sash 104, 106 and to guide the movement of
the block and tackle window balance 300 within the jamb pocket 108.The top guide 315 may
include a top angled portion 302 ...." Please note my further comments down below regarding Mr.
Still's opinions.

9. Page #      '264 Claim Element and description          Corresponding '011 component
   Ex A, p5    264/10 and a bottom portion, the bottom    '011 Patent has a bottom portion,
               portion being connected to the first end   the bottom portion being connected
               of the channel                             to the first end of the channel.

   I believe Mr. Still is confused. This claim item refers to the bottom portion of the top guide, not
the bottom guide. Patent '011 has no top guide. Please note my previous comments about the top
guide and my further comments down below regarding Mr. Still's opinions.

10. Page #     '264 Claim Element and description          Corresponding '011 component
    Ex A, p4   264/11 The device according to claim 1     The device of the '011 Pat. has a fixed
               wherein the fixed pulley block unit        fixed pulley block unit integral with
               is integral with the bottom guide          the bottom guide.

   The fixed pulley block mentioned in the '264 Patent may be equivalent to the second pulley
member 422 (item H in Exhibit B) in the '011 Patent, since both are fixed and do not move with the
spring. In Figure 4 of Patent '011, it appears that second pulley member 422 is inside the U

14

shaped channel, and is not necessarily part of the housing extension 423 in Patent '011. I note in '011 Patent column 7 lines 33-36: "the housing extension 423 which is integral with the pin 206 is attached to the housing 402 by rivet pins 440 and 442 that extend through the second pulley member 422."

11. I also note that in addition to dependant claims 2, 3, 4, 5 10 and 11 that I addressed above, Mr. Still alleges that dependant claims 6, 7, and 9 are also invalid based on the '011 Patent and the alleged admitted prior art. I have shown that claim 1 of the '264 Patent is not invalid, therefore all dependant claims 2, 3, 4, 5, 6, 7, 9, 10 and 11 are not invalid as well. This is because the missing elements in claim 1 are also necessarily missing in these claims.

| 12. Page #<br>Ex A, p5 | '264 Claim Element and description<br>264/12 At least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | Corresponding '011 component<br>In use, the device of the '011 Patent has at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: |
|---|---|---|

The attachment method for the balance is different in the two Patents. In the '264 Patent, I note the following (column 5, lines 56-61): "The window balance 300 is then connected to a window sash by inserting a portion of the window sash into the channel 314 of the bottom guide 315 and connecting a cam 405 mounted on the top of the window sash 400 to the top angled portion 302 of the top guide 310 as shown in Figure 6." In the '011 Patent, the attachment is quite the opposite (column 5, lines 8-11): "A balancer 208 is secured to the sash 212 by a screw 213. The balancer 208 is preferably positioned within a groove 210 in the side sash 212." Accordingly, the claimed invention is not obvious. Please note my further comments down below regarding Mr. Still's opinions.

| 13. Page #<br>Ex A, p6 | '264 Claim Element and description<br>264/12 a top guide, connected to the first end of the channel; | Corresponding '011 component<br>'011 Pat. has no top guide.<br>Prior art is established in '264 Pat. Figure 2A, 2B and Fig. 3. |
|---|---|---|

Mr. Still is referring to another Patent since he cannot find a corresponding component to a top guide in Patent '011. The two Patents perform different functions: Patent '011 describes a balancer used for tilt window operation, where "A balancer 208 is secured to the sash side 212 by screw 213 (Column 5, Line 8-9). The top of the sash is secured in the jamb channel by a set of levers, such as "When the sash 200 is in its vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from the plane of the frame 202." (Patent '808 column 5 lines 61-66 and Figure 2). Therefore no balancer top guide is required for the '011 Patent, and there is no motivation to combine a top guide from any other reference to the '011 Patent balancer. Patent '264 describes the function of the top guide as follows(column 4, lines 38-41); "The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to guide the movement of the block and tackle window balance 300 within the jamb pocket 108." Accordingly, the claimed invention is not obvious. Please note my further comments down below regarding Mr. Still's opinions.

14.  Page #    '264 Claim Element and description       Corresponding '011 component
     Ex A, p6   264/12 a bottom guide, connected to the   a bottom guide connected to the
                second end of the channel;               connected to the second end of the
                                                         channel;

     In Exhibit B, Mr. Still points to item G as the bottom guide; referred to as the housing extension 423 in the '011 Patent, as in column 6 lines 55-56 "a housing extension 423 attached to one end of the elongated U-shaped housing 403". In the '011 Patent Figure 4, I note a pin 206 on the back of the housing extension, as follows; "A first pivot pin 206 and a second pivot pin (not shown) provide the titling mechanism. The pivot pin preferably slides in a groove in a jamb liner…" (Patent '011 column 5 lines 13-15 and figure 2). In the '264 Patent, "the bottom guide 315 is also used for connections and guidance purposes."(Column 4 lines 43-44). The function of the corresponding elements is different for the two inventions: the '011 Patent describes a tilt window and the housing extension includes a pin to provide the tilting mechanism, while the '264 Patent describes a non-tilt window and the bottom guide is used for sash connection and guidance. Therefore the housing extension 423 should not be considered as the claimed bottom guide. Accordingly, the claimed invention is not obvious.

15.  Page #    '264 Claim Element and description       Corresponding '011 component
     Ex A, p6   264/12 a bottom guide roller rotatably   a bottom guide roller rotatably
                mounted in the bottom guide              mounted in the bottom guide.

     As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide, and therefore the '011 Patent roller is not rotatably mounted in a claimed bottom guide.

16.  Page #    '264 Claim Element and description       Corresponding '797 component
     Ex A, p7   264/13 a bottom guide adapted to be      a bottom guide adapted to be connected
                connected to an end of a window balance   to an end of a window balance
                channel and adapted to slide in a jamb    channel and adapted to slide in a jamb
                pocket when installed in a window frame;  pocket when installed in a window
                and                                       frame; and

     As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide.

     Even if the housing extension was the bottom guide as Mr. Still claims, I note the following: In the '011 Patent figure 4, I note a pin 206 on the back of the housing extension, which is not adapted to slide in a jamb pocket when installed in a window frame. In fact the entire balancer 208 is received in a groove 210 in the sash side 212. (Patent '011 column 5 lines 6-10 and figure 2).

17.  Page #    '264 Claim Element and description       Corresponding '011 component
     Ex A, p7   264/13 a bottom guide roller rotatably   a bottom guide roller rotatably
                mounted in the bottom guide              mounted in the bottom guide.

     As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide, and therefore, the '011 Patent roller is not is not mounted rotatably in a claimed bottom guide.

16

18. Page #    '264 Claim Element and description          Corresponding '011 component
    Ex A, p7    264/14 The device in claim 13 wherein the    The device of the '011 Patent has a
                bottom guide roller is located external to    bottom guide located
                the channel when the bottom guide         external to the channel when the
                is attached thereto                        bottom guide is attached.

    Mr. Still is confused, the claim has a bottom guide **roller** which is not mentioned in the corresponding '011 component. Instead, Mr. Still refers just to the bottom guide.

19. Page #    '264 Claim Element and description          Corresponding '011 component
    Ex A, p8    264/15 The device in claim 13 wherein      The device of the '011 Patent has a
                at least a portion of the bottom guide is    has a bottom guide at least a portion of
                external to the channel when attached thereto  of which is external to the channel when
                                                           attached thereto

    As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide. Therefore, Mr. Still in incorrect in stating that at least a portion of housing extension 423 is external to the channel when attached thereto.

20. Page #    '264 Claim Element and description          Corresponding '011 component
    Ex A, p8    264/16 The device according to claim 13     The device of the '011 Patent has a
                wherein the bottom guide forms a channel    bottom guide that forms a
                to receive a portion of a window sash        channel to receive a portion of a
                when installed                              window sash when installed.

    As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide.
    Even if the housing extension was the bottom guide as Mr. Still claims, I note the following: In the '011 Patent figure 4, I note a pin 206 on the back of the housing extension, which does not form a channel to receive a window sash. In fact the entire balancer 208 is received in a groove 210 in the sash side 212. (Patent '011 column 5 lines 6-10 and figure 2).

21. I have shown that claim 13 of the '264 Patent is not invalid, based on the '011 Patent and the alleged admitted prior art, therefore all asserted dependant claims 14, 15, and 16 are not invalid as well. This is because the missing elements in claim 13 are also necessarily missing in these claims.

22. Page #    '264 Claim Element and description          Corresponding '011 component
    Ex A, p8    264/18 a top guide, connected to the        '011 Pat. has no top guide connected to
                first end of the channel;                   the first end of the channel; Prior art is
                                                           established in '264 Pat. Figure 2A, 2B
                                                           and Fig. 3 which shows the top guide.

    Mr. Still is referring to another Patent since he cannot find a corresponding component to a top guide in Patent '011. The two Patents perform different functions: Patent '011 describes a balancer used for tilt window operation, where "A balancer 208 is secured to the sash side 212 by screw 213 (Column 5, Line 8-9). The top of the sash is secured in the jamb channel by a set of levers such as: "When the sash 200 is in its vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from the plane of the frame 202." (Patent '808 column 5 lines 61-66 and Figure 2). Therefore no balancer top guide is required for the '011 Patent, and

17

there is no motivation to combine a top guide from any other reference to the '011 Patent balancer.  Patent '264 describes the function of the top guide as follows(column 4, lines 38-41); "The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to guide the movement of the block and tackle window balance 300 within the jamb pocket 108." Accordingly, the claimed invention is not obvious. Please note my further comments down below regarding Mr. Still's opinions.

| 23. | Page # | '264 Claim Element and description | Corresponding '011 component |
|---|---|---|---|
| | Ex A, p8 | 264/18 a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and | a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket |

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide.
Even if the housing extension was the bottom guide as Mr. Still claims, I note the following: In the '011 Patent figure 4, I note a pin 206 on the back of the housing extension, which is not adapted to slide in a jamb pocket when installed in a window frame. In fact the entire balancer 208 is received in a groove 210 in the sash side 212. (Patent '011 column 5 lines 6-10 and figure 2). Accordingly, the claimed invention is not obvious.

| 24. | Page # | '264 Claim Element and description | Corresponding '011 component |
|---|---|---|---|
| | Ex A, p9 | 264/18 bottom guide roller rotatably mounted in the bottom guide | a bottom guide roller rotatably mounted in the bottom guide. |

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide and therefore, the '011 Patent roller is not mounted rotatably in a claimed bottom guide.

| 25. | Page # | '264 Claim Element and description | Corresponding '011 component |
|---|---|---|---|
| | Ex A, p9 | 264/19 The device in claim 18 wherein the bottom guide roller is located external to the channel | The device of the '011 Patent has a bottom guide roller located external to the channel |

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide and therefore, the '011 Patent roller is not located external to the channel in a claimed bottom guide.

| 26. | Page # | '264 Claim Element and description | Corresponding '011 component |
|---|---|---|---|
| | Ex A, p9 | 264/20 The device in claim 18 wherein at least a portion of the bottom guide is external to the channel | The device of the '011 Patent has a has a bottom guide at least a portion of of which is external to the channel |

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide, and therefore housing Patent '011 does not have a portion of the bottom guide external to the channel.

| 27. | Page # | '264 Claim Element and description | Corresponding '011 component |
|---|---|---|---|
| | Ex A, p9 | 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed | The device of the '011 Patent has a bottom guide forms a channel to receive channel to receive a portion of a window sash when installed. |

18

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide.

Even if the housing extension was the bottom guide as Mr. Still claims, I note the following: In the '011 Patent figure 4, I note a pin 206 on the back of the housing extension, which does not form a channel to receive a window sash. In fact the entire balancer 208 is received in a groove 210 in the sash side 212. (Patent '011 column 5 lines 6-10 and figure 2).

28. I have shown that claim 18 of the '264 Patent is not invalid, based on the '011 Patent and the alleged admitted prior art, therefore all asserted dependant claims 19, 20, and 21 are not invalid as well. This is because the missing elements in claim 18 are also necessarily missing in these claims.

In summary, I note that the analysis by Mr. Still regarding the components of Patent '011 that perform the same function as in the '264 Patent is incorrect. I note the following elements (components) in the '264 Patent are not present in the '011 Patent, as I indicated above:

1. 264/1 a top guide, connected to the first end of the channel;
2. 264/1 a bottom guide, connected to the second end of the channel;
3. 264/1 a bottom guide roller rotatably mounted in the bottom guide
4. 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel
5. 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash
6. 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel
7. 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash
8. 264/10 The device according to claim 1 wherein the top guide includes a top angled portion
9. 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel
10. 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide
11. Dependant claims 6, 7 and 9 (dependent claims of 264/1 for the same reasons as 264/1)
12. 264/12 At least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising:
13. 264/12 a top guide, connected to the first end of the channel;
14. 264/12 a bottom guide, connected to the second end of the channel;
15. 264/12 a bottom guide roller rotatably mounted in the bottom guide
16. 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and
17. 264/13 a bottom guide roller rotatably mounted in the bottom guide.
18. 264/14 The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto
19. 264/15 The device according to claim 13 wherein at least a portion of the bottom bottom guide is external to the channel when attached thereto
20. 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed
21. Dependant claims 14, 15, and 16 (dependent claims of 264/13 for the same reasons as 264/13)
22. 264/18 a top guide, connected to the first end of the channel
23. 264/18 a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and
24. 264/18 a bottom guide roller rotatably mounted in the bottom guide

19

25. 264/19 The device in claim 18 wherein the bottom guide roller is located external to the channel
26. 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel
27. 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed
28. Dependant claims 19, 20, and 21 (dependent claims of 264/18 for the same reasons as 264/18)


**Exhibits C & D for the case involving Amesbury Patent No 6,598,264**

Based on my knowledge of the case that I summarized in my own expert witness report entitled "On Behalf of Plaintiffs in Civil Action No. 05-10020-DPW", dated March 23, 2006, I disagree with many of Mr. Still's assumptions in Exhibit C in his report, where he attempts to point out that the elements (components) mentioned in the Prosser U.S. Patent 3,091,797 perform the same function as in the plaintiffs '264 Patent.

In Exhibit C, Mr. Still lists some claim elements of the plaintiff's '264 Patent, then attempts to show corresponding elements (components) in the '797 Patent that might satisfy these claims. Theses elements (components) are labeled (sometimes) with a particular letter (A…R) in Exhibit D. Since some of the '264 claims are not matched with a corresponding "labeled" element (component) in Exhibit D, I am therefore forced to make assumptions as to Mr. Still's intentions. I note the following discrepancies in Mr. Still's report Exhibit C, where he does not present a proper reason for a claim by the '264 Patent to have a corresponding element (component) in the '797 Patent. In addition, there is a lack of proper referencing of the '797 components that match the '264 claims. In my analysis below, I record Mr. Still comments on each '264 Patent claim element and the alleged corresponding component in the '797 Patent as they appear in his Exhibit C, then I note my own opinion to these comments directly underneath Mr. Still statements, as to their lack of applicability, irrelevance or incorrectness:

1. Page #  '264 Claim Element and description            Corresponding '797 component
   Ex C, p1  264/1 a top guide connected to the            See Exhibit D, Item E, a top guide
             first end of the channel;                     connected to the first end of the
                                                           channel;

I note that Mr. Still argues that Exhibit D item E is the claimed top guide. I disagree since item E refers to tongue and stop attachment features formed integrally with one end of the housing and does not constitute a top guide connected to the first end of the channel. Exhibit D item E are features in the flanges of the U-shaped channel used to interlock the balancer to the jamb facing in the following manner in Patent '797: [the balance] "housings 13 and 14 are formed with laterally extending flanges 22 (column 2, line 51-52)… Flanges 22 are interrupted near their upper and lower ends by relatively long cut-away portions 23, and by relatively short cut-away portion 24, see FIGURE 5. By introducing cut-away portions 23 and 24; four tongues 25 and four stops 26 are formed in flanges 22. Tongues 25, of which there is a first pair at the upper end and a second pair at the lower end of the housings 13 and 14 are adapted to enter into L-shaped slots 20 and 21, and when they do enter into them, interlock with rectangular tabs 18 and 19." Patent '797 Colum 2 lines 60-70.

The top guide in Patent '264 is attached to the U shaped channel, and is used in this manner: "the top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to help guide the movement of the block and tackle window balance 300 within the jamb pocket 108." Column 4, lines 37-41.

20

The component mentioned by Mr. Still as Exhibit D item E is a feature of the laterally extending flanges 22 that is stationary in the jamb facing that is totally different from the '264 claim of a top guide which is a distinct part connected to the U-shaped channel and rides up and down with the sash, such that "Attached to the two ends of the rigid U-shaped channel 205 with fasteners 212, 216 are a top guide 210 and a bottom guide 215 that are used to connect the window balance 200 to either the upper or lower window sashs 104, 106 and to help guide the vertical motion of the window balance 200 within the jamb pockets 108" (Patent '264 column 3 lines 22-27).

Therefore the tongue and stop features (Exhibit D item E) do not constitute the claimed top guide, since they are structurally and functionally different. Therefore no window balance top guide is required for the '797 Patent, and there is no motivation to combine a top guide from any other reference to the '797 Patent window balance. Accordingly, the claimed invention is not anticipated and/or obvious.



Filed April :

FIG. 5.

2.  Page #     '264 Claim Element and description          Corresponding '797 component
    Ex C, p1    264/1 a bottom guide connected to the       See Exhibit D, Item G, a bottom guide
                second end of the channel;                  connected to the second end of the
                                                            channel;

I note that Mr. Still argues that Exhibit D item G is the claimed bottom guide. I disagree since item G refers to tongue and stop attachment, features formed integrally with one end of the housing, and does not constitute a bottom guide connected to the second end of the channel. Exhibit D item G are features in the flanges of the U-shaped channel used to interlock the balancer to the jamb facing in the following manner in Patent '797: [the balance] "housings 13 and 14 are formed with laterally extending flanges 22" (column 2, line 51-52) … "Flanges 22 are interrupted near their upper and lower ends by relatively long cut-away portions 23, and by relatively short cut-away portion 24, see FIGURE 5. By introducing cut-away portions 23 and 24; four tongues 25 and four stops 26 are formed in flanges 22. Tongues 25, of which there is a first pair at the upper end and a second pair at the lower end of the housings 13 and 14 are adapted to enter into L-shaped slots 20 and 21, and when they do enter into them, interlock with rectangular tabs 18 and 19." Patent '797 Column 2 lines 60-70.

The bottom guide in Patent '264 is attached to the U shaped channel, and is used in this manner: "the bottom guide 315 is also used for connection and guidance purposes, but the bottom guide 315 further serves as a frame for housing the bottom guide roller 350." Column 4, lines 43-46. The component mentioned by Mr. Still as Exhibit D item G is a feature being stationary in the jamb facing that is totally different from the '264 claim of a bottom guide which is a distinct part connected to the U-shaped channel and rides up and down with the sash, such that "Attached to the two ends of the rigid U-shaped channel 205 with fasteners 212, 216 are a top guide 210 and a bottom guide 215 that are used to connect the window balance 200 to either the upper or lower window sashs 104, 106 and to help guide the vertical motion of the window balance 200 within the jamb pockets 108 (Patent '797 column 2 lines 22-27). Therefore the tongue and stop features (Exhibit D item G) do not constitute the claimed bottom guide, since they are structurally and functionally different. Therefore no window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance. Accordingly, the claimed invention is not anticipated and/or obvious.

3.  Page #     '264 Claim Element and description          Corresponding '797 component
    Ex C, p1    264/1 a bottom guide roller rotatably        See Exhibit D, Item R, a bottom guide
                mounted in the bottom guide;                roller rotatably mounted in the bottom
                                                            guide;

As I noted earlier, there is no bottom guide in the '797 Patent and the bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable pulley, it should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): ".....a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38." Please refer to the next item.

4.  Page #     '264 Claim Element and description          Corresponding '797 component
    Ex C, p1    264/1 a fixed pulley block unit connected   See Exhibit D, Item H, a fixed pulley
                to the channel                              block unit connected to the channel.

I believe Mr. Still is incorrect in labeling item H as the fixed pulley lock unit and R as the bottom guide roller rotatably mounted in the bottom guide. I note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 36, which is defined in the '797 Patent as a pin. I also note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 38, which is defined in the '797 Patent as a nylon sheave and part of the fixed (stationary) holder 34. This is a result from the fact that Patent '797 has two sheaves (pulley blocks) in its embodiment: the stationary and moveable sheaves. While the '264 Patent has two pulley blocks in it: fixed, translatable and a separate rotatable pulley mounted on a separate axle in the bottom guide. The '797 Patent describes it this way (column 3 lines 14-18): ".....a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38." There are no other sheaves (pulleys) in the '797 embodiment i.e. it has no bottom guide roller.

| 5. | Page # | '264 Claim Element and description | Corresponding '797 component |
|----|--------|-----------------------------------|------------------------------|
|    | Ex C, p2 | 264/1 and extends around the bottom guide roller, | and extends around the bottom guide roller, |

As I noted earlier, there is no bottom guide in the '797 Patent. The bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable (bottom guide roller) pulley, it should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): ".....a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38."

| 6. | Page # | '264 Claim Element and description | Corresponding '797 component |
|----|--------|-----------------------------------|------------------------------|
|    | Ex C, p3 | 264/1 and the second cord end being attachable to a jamb | and the second cord end being attachable to a jamb. |

The second cord end in the '797 Patent is attached to the bottom of the sash, based on the '797 Patent column 3, lines 18-22: "one end of cable 17 is made fast to pin 36, the other end extends through bottom plate 15, being knotted against its lower face. When bottom plate 15 moves with sash element 11, on movement of the latter towards closed position...." It is clear that the second cord end is not attached to a jamb.

| 7. | Page # | '264 Claim Element and description | Corresponding '797 component |
|----|--------|-----------------------------------|------------------------------|
|    | Ex C, p3 | 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel | The device of the '797 Patent has a bottom guide roller located internal to the channel |

I note that Mr. Still states that the claim element does not have a corresponding component in the '797 Patent, by the use of the terms "external" in the '264 Patent and "internal" in the '797 Patent. I also noted that there is no bottom guide in the '797 Patent. I also note that that the bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jam as in the '264 Patent. I believe Mr. Still is incorrect in labeling item H as the fixed pulley lock unit and R as the bottom guide roller rotatably mounted in the bottom guide. I note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 36, which is defined in the '797 Patent as a pin. I also note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 38, which is defined in the '797 Patent as a nylon sheave and part of the fixed

23

(stationary) holder 34. This is a result from the fact that Patent '797 has two sheaves (pulley blocks) in its embodiment: the stationary and moveable sheaves. While the '264 Patent has two pulley blocks in it: fixed, translatable and a separate rotatable pulley mounted on a separate axle in the bottom guide. The '797 Patent describes it this way (column 3 lines 14-18): "...a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38." There are no other sheaves (pulleys) in the '797 embodiment i.e. it has no bottom guide roller.

| 8. | Page # | '264 Claim Element and description | Corresponding '797 component |
|----|--------|-----------------------------------|------------------------------|
|    | Ex C, p3 | 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash | '797 Pat. has no top angled portion Prior art is established in '264 Pat. Figure 2A, 2B & Fig. 3, which has a top angled portion. |

Mr. Still is referring to another Patent since he cannot find a corresponding component to the claim of a top angled portion which is sized to receive a member of a window sash in Patent '797. As I noted earlier, there is no top guide in the '797 Patent, and therefore there is no top angled portion sized to receive a member of a window sash. Therefore no window balance top guide with a top angled portion is required for the '797 Patent, and there is no motivation to combine a top guide from any other reference to the '797 Patent window balance

| 9. | Page # | '264 Claim Element and description | Corresponding '797 component |
|----|--------|-----------------------------------|------------------------------|
|    | Ex C, p3 | 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel | The device of the '797 Patent has a portion of the bottom guide external to the channel. |

As I noted earlier, the tongue and stop features (Exhibit D item G) do not constitute the claimed bottom guide, since they are structurally and functionally different. No window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance.

| 10. | Page # | '264 Claim Element and description | Corresponding '797 component |
|-----|--------|-----------------------------------|------------------------------|
|     | Ex C, p3 | 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash | The device of the '797 Patent has no channel to receive a portion of a window sash in the bottom guide. Prior art is established in Pat. '264 Fig. 2A, 2B and Fig. 3 which shows the bottom guide to receive a portion of a window sash when installed. |

As I noted earlier, the tongue and stop features (Exhibit D item G) do not constitute the claimed bottom guide, since they are structurally and functionally different. Even if item G was the bottom guide as Mr. Still claims, it does not have a channel to receive a portion of a window sash. No window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance.

| 11. | Page # | '264 Claim Element and description | Corresponding '797 component |
|-----|--------|-----------------------------------|------------------------------|
|     | Ex C, p4 | 264/10 The device according to claim 1 wherein the top guide includes a top angled portion | '797 Pat. has no angled portion on the top guide. Prior art is established in Pat. '264 Fig. 2A, 2B & Fig. 3. |

Mr. Still is referring to another Patent since he cannot find a corresponding component to an angled portion of the top guide in Patent '797. As I noted above, there is no top guide in the '797 Patent, and therefore there is no top angled portion. Therefore no window balance top guide with a top angled portion is required for the '797 Patent, and there is no motivation to combine a top guide from any other reference to the '797 Patent window balance

| 12. Page # Ex C, p5 | '264 Claim Element and description 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel | Corresponding '797 component The device of '797 Patent has a bottom portion, the bottom portion being connected to the first end of the channel. |

This claim item refers to the bottom portion of the top guide. As I noted earlier, Patent '797 has no top guide, and so there is no bottom portion of a top guide.

| 13. Page # Ex C, p4 | '264 Claim Element and description 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide | Corresponding '797 component The device of the '797 Pat. has a fixed fixed pulley block unit integral with the bottom guide. |

As I noted earlier, there is no bottom guide in the '797 Patent. Therefore, there is no fixed pulley block integral with a bottom guide.

14. I also note that in addition to dependant claims 2, 3, 4, 5 10 and 11 that I addressed above, Mr. Still alleges that dependant claims 6, 7, and 9 are also invalid based on the '797 Patent and the alleged admitted prior art. I have shown that claim 1 of the '264 Patent is not invalid, therefore all dependant claims 2, 3, 4, 5, 6, 7, 9, 10 and 11 are not invalid as well. This is because the missing elements in claim 1 are also necessarily missing in these claims.

| 15. Page # Ex C, p5 | '264 Claim Element and description 264/12 At least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | Corresponding '797 component In use, the device of the '797 Patent is a block and tackle window balance attached to the at least one of the upper window sash and the lower window sash, the device comprising: |

The attachment method for the balance is different in the two Patents. In the '264 Patent, I note the following (column 5, lines 56-61): "The window balance 300 is then connected to a window sash by inserting a portion of the window sash into the channel 314 of the bottom guide 315 and connecting a cam 405 mounted on the top of the window sash 400 to the top angled portion 302 of the top guide 310 as shown in Figure 6." In the '797 Patent, the attachment is rigid and therefore quite the opposite (column 2, lines 37-39): "housing 13 and 14 are held detachably in place in sash receiving ways 5 and 6 by means of a tongue and slot connections" Accordingly, the claimed invention is not obvious. Please note my further comments down below regarding Mr. Still's opinions.

| 16. Page # Ex C, p6 | '264 Claim Element and description 264/12 a top guide connected to the first end of the channel; | Corresponding '797 component a top guide connected to the first end of the channel. |

25

As I noted earlier, there is no top guide in the '797 Patent. Therefore no window balance top guide is required for the '797 Patent, and there is no motivation to combine a top guide from any other reference to the '797 Patent window balance.

| 17. | Page # Ex C, p6 | '264 Claim Element and description 264/12 a bottom guide connected to the second end of the channel; | Corresponding '797 component a bottom guide connected to the second end of the channel. |
|---|---|---|---|

As I noted earlier, there is no bottom guide in the '797 Patent. Therefore no window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance.

| 18. | Page # Ex C, p6 | '264 Claim Element and description 264/12 a bottom guide roller rotatably mounted in the bottom guide | Corresponding '797 component a bottom guide roller rotatably mounted in the bottom guide. |
|---|---|---|---|

As I noted earlier, there is no bottom guide in the '797 Patent and the bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable pulley, it should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): "…..a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38."

| 19. | Page # Ex C, p7 | '264 Claim Element and description 264/12 and extends around the bottom guide roller | Corresponding '797 component and extends around the bottom guide roller. |
|---|---|---|---|

As I noted earlier, there is no bottom guide in the '797 Patent. The bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable (bottom guide roller) pulley, it should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): "…..a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38."

| 20. | Page # Ex C, p7 | '264 Claim Element and description 264/12 and the second cord end being attachable to a jamb | Corresponding '797 component and the second cord end being attachable to a jamb. |
|---|---|---|---|

The second cord end in the '797 Patent is attached to the bottom of the sash, based on the '797 Patent column 3, lines 18-22: "one end of cable 17 is made fast to pin 36, the other end extends through bottom plate 15, being knotted against its lower face. When bottom plate 15 moves with sash element 11, on movement of the latter towards closed position…" It is clear that the second cord end is not attached or attachable to a jamb. If the second cord end was attached to the jamb, the balance would not function.

21. Page #       '264 Claim Element and description        Corresponding '797 component
    Ex C, p7     264/13 a bottom guide adapted to be       a bottom guide adapted to be connected
                 connected to an end of a window balance    to an end of a window balance
                 channel and adapted to slide in a jamb     channel and adapted to slide in a jamb
                 pocket when installed in a window frame;    pocket when installed in a window
                 and                                         frame; and

     As I noted earlier, there is no bottom guide in the '797 Patent. The tongue and stop feature referred to by Mr. Still in Exhibit D item G does not slide in the window jamb, but in fact are held stationary in through the tongue and stop connections: in Column 4 lines 4-6 as "Each such housing is itself held in place by one of sash receiving ways by means of a tongue and slot connection at the upper and lower end of the housing."

22. Page #       '264 Claim Element and description        Corresponding '797 component
    Ex C, p7     264/13 a bottom guide roller rotatably    a bottom guide roller rotatably
                 mounted in the bottom guide              mounted in the bottom guide.

     As I noted earlier, there is not bottom guide in the '797 Patent. Even if there is, the bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable pulley, it should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): ".....a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38."

23. Page #       '264 Claim Element and description        Corresponding '797 component
    Ex C, p8     264/14 The device of claim 13 wherein the  The device of the '797 Patent has a
                 bottom guide roller is located external    bottom guide located external to the
                 to the channel when the bottom guide       to the channel.
                 is attached thereto.

     Mr. Still is confused.  The claim has a bottom guide **roller** which is not mentioned in the corresponding '011 component. Instead, Mr. Still refers just to the bottom guide. In addition, as I mentioned earlier, there is no bottom guide and no bottom guide roller in the '797 Patent.

24. Page #       '264 Claim Element and description        Corresponding '797 component
    Ex C, p8     264/15 The device according to claim 13    The device of the '797 Patent has a
                 wherein at least a portion of the bottom   bottom guide external and internal
                 guide is external to the channel when      to the channel.
                 attached thereto

     As I noted earlier, there is no bottom guide in the '797 Patent. The tongue and stop feature that Mr. Still refers to as Exhibit D item G is integral in the channel in the '797 Patent, therefore it cannot be at the same time external and internal to the channel, since it is a part of the channel.

25. Page #       '264 Claim Element and description        Corresponding '797 component
    Ex C, p8     264/16 The device according to claim 13    The device of the '797 Patent has no
                 wherein the bottom guide forms a channel   channel to receive a portion of a
                 to receive a portion of window sash        window sash in the bottom guide.
                 when installed                             Prior art is established in '264 Pat.

Fig. 2A, 2B & Fig. 3 which shows
the bottom guide channel to receive a
portion of a window sash when installed.

Mr. Still is referring to another Patent since he cannot find a corresponding component to a
bottom guide channel in Patent '797.  As I noted earlier, there is no bottom guide in the '797
Patent. Even if Exhibit D item G is the bottom guide as Mr. Still claims, it does not form a channel
to receive a portion of the window sash when installed. Therefore no window balance bottom
guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from
any other reference to the '797 Patent window balance.

26. I have shown that claim 13 of the '264 Patent is not invalid, based on the '797 Patent and the
alleged admitted prior art, therefore all asserted dependant claims 14, 15, and 16 are not invalid
as well. This is because the missing elements in claim 13 are also necessarily missing in these
claims.

27. Page #     '264 Claim Element and description          Corresponding '797 component
    Ex C, p8   264/18 a top guide connected to the         a top guide connected to the
               first end of the channel;                    first end of the channel;

As I noted earlier, there is no top guide in the '797 Patent. Therefore no window balance top
guide is required for the '797 Patent, and there is no motivation to combine a top guide from any
other reference to the '797 Patent window balance.

28. Page #     '264 Claim Element and description          Corresponding '797 component
    Ex C, p8   264/18 a bottom guide connected to the      a bottom guide connected to the
               second end of the channel;                   second end of the channel;

As I noted earlier, there is no bottom guide in the '797 Patent. Therefore no window balance
bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide
from any other reference to the '797 Patent window balance.

29. Page #     '264 Claim Element and description          Corresponding '797 component
    Ex C, p9   264/18 a bottom guide roller rotatably      a bottom guide roller rotatably
               mounted in the bottom guide                  mounted in the bottom guide.

The bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist
in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be
reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is
incorrect in labeling item R as the rotatable pulley.  It should be labeled as the fixed pulley, since the
'797 Patent describes it this way (column 3 lines 14-18): "…..a moveable sheave [pulley] holder 29
and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates
35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38."

30. Page #     '264 Claim Element and description          Corresponding '797 component
    Ex C, p9   264/19 The device of claim 18 wherein       The device of the '797 Patent has a
               the bottom guide roller is located external  bottom guide roller located internal
               to the channel                               to the channel

I note that Mr. Still states that the claim element does not have a corresponding component in
the '797 Patent, by the use of the term "external" in the '264 Patent and "internal" in the 797 Patent.

28

The bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jam as in the '264 Patent. I believe Mr. Still is incorrect in labeling item H as the fixed pulley block unit and R as the bottom guide roller rotatably mounted in the bottom guide. I note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 36, which is defined in the '797 Patent as a pin. I also note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 38, which is defined in the '797 Patent as a nylon sheave and part of the fixed (stationary) holder 34. This is a result from the fact that Patent '797 has two sheaves (pulley blocks) in its embodiment: the stationary and moveable sheaves. While the '264 Patent has two pulley blocks in it: fixed, translatable and a separate rotatable pulley mounted on a separate axle in the bottom guide. The '797 Patent describes it this way (column 3 lines 14-18): "…..a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38." There are no other sheaves (pulleys) in the '797 embodiment i.e. it has no bottom guide roller.

| 31. Page #<br>Ex C, p9 | '264 Claim Element and description<br>264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel | Corresponding '797 component<br>The device of the '797 Patent has a bottom guide at least a portion of which is external to the channel. |
|---|---|---|

    As I noted earlier, there is no bottom guide in the '797 Patent. The tongue and stop feature that Mr. Still refers to as Exhibit D item G is integral in the channel in the '797 Patent and therefore no portion is external to the channel. This feature is a cutaway portion of the balance flanges 22. I note in the '797 Patent "Flanges 22 are interrupted near their upper and lower ends by relatively long cut-away portions 23 and by relatively short cut-away portions 24: see FIGURE 5. By introducing cut-away portions 23 and 24, four tongues 25 and four stops 26 are formed in flanges 22." (column 2, lines 60-64).

| 32. Page #<br>Ex C, p9 | '264 Claim Element and description<br>264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed | Corresponding '797 component<br>The device of the '797 Patent has no channel to receive a portion of a window sash in the bottom guide. Prior art is established in '264 Patent Fig. 2A, 2B & Fig. 3 which shows the bottom guide channel to receive a portion of a window sash |
|---|---|---|

    Mr. Still is referring to another Patent since he cannot find a corresponding component to a bottom guide channel in Patent '797. As I noted earlier, there is no bottom guide in the '797 Patent. Even if Exhibit D item G is the bottom guide as Mr. Still claims, it does not form a channel to receive a portion of the window sash when installed. Therefore no window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance. Accordingly, the claimed invention is not anticipated and/or obvious.

33. I have shown that claim 18 of the '264 Patent is not invalid, based on the '797 Patent and the alleged admitted prior art, therefore all asserted dependant claims 19, 20, and 21 are not invalid as well. This is because the missing elements in claim 18 are also necessarily missing in these claims.

29

In summary, I note that the analysis by Mr. Still regarding the components of Patent '797 that perform the same function as in the '264 Patent is incorrect. I note the following elements (components) in the '264 Patent are not present in the '797 Patent, as I indicated above:

1. 264/1 a top guide, connected to the first end of the channel;
2. 264/1 a bottom guide, connected to the second end of the channel;
3. 264/1 a bottom guide roller rotatably mounted in the bottom guide
4. 264/1 a fixed pulley block unit connected to the channel
5. 264/1 and extends around the bottom guide roller
6. 264/1 and the second cord end being attached to a jamb
7. 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel
8. 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash
9. 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel
10. 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash
11. 264/10 The device according to claim 1 wherein the top guide includes a top angled portion
12. 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel
13. 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide
14. Dependant claims 6, 7 and 9 (dependent claims of 264/1 for the same reasons as 264/1)
15. 264/12 At least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising:
16. 264/12 a top guide, connected to the first end of the channel;
17. 264/12 a bottom guide, connected to the second end of the channel;
18. 264/12 a bottom guide roller rotatably mounted in the bottom guide
19. 264/12 and extends around the bottom guide roller
20. 264/12 and the second cord end being attached to a jamb
21. 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and
22. 264/13 a bottom guide roller rotatably mounted in the bottom guide.
23. 264/14 The device of claim 13 wherein the bottom guide roller is located external    to the channel when the bottom guide is attached thereto
24. 264/15 The device according to claim 13 wherein at least a portion of the bottom    bottom guide is external to the channel when attached thereto
25. 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed
26. Dependant claims 14, 15, and 16 (dependent claims of 264/13 for the same reasons as 264/13)
27. 264/18 a top guide, connected to the first end of the channel
28. 264/18 a bottom guide, connected to the second end of the channel;
29. 264/18 a bottom guide roller rotatably mounted in the bottom guide
30. 264/19 The device in claim 18 wherein the bottom guide roller is located external    to the channel
31. 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel
32. 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed
33. Dependant claims 19, 20, and 21 (dependent claims of 264/18 for the same reasons as 264/18)

**My comments regarding Mr. Still's opinions of Newman U.S. 6,598,264 Patent infringement by the defendant.**

Mr. Still states in his opinions regarding '264 Patent as:

"based on my findings, [the '264 Patent] is not novel and/or is obvious and therefore, not valid.
Prior art proves that all components of '264 Patent existed before '264 was filed. US Patent 3,091,797 contains all of the elements disclosed in claims 1, 4, 6, 7, 9, 11, 12, 13, 14, 15, 18 & 20 of the '264 Patent, thereby anticipating all of those claims. All of the claims would have been obvious to one of ordinary skill in the art to which this invention pertains based on (1) the admitted prior art and Thompson, U. S. Patent 6,840,011 and/or (2) the admitted prior art and Prosser, U.S. Patent 3,091,797. Therefore the claims are invalid. Detailed comparisons of the claims of the Patent to the prior art are attached as Exhibits A, B, C & D."

I disagree with Mr. Still opinions for the following reasons:

1. The Patent office has reviewed the filing for the '264 Patent in light of prior art, and concluded that the '264 Patent is worthy of being granted.

2. The statement "US Patent 3,091,797 contains all of the elements disclosed in claims 1, 4, 6, 7, 9, 11, 12, 13, 14, 15, 18 & 20 of the '264 Patent, thereby anticipating all of those claims." is incorrect; as I indicated in my analysis of Exhibits A, B, C & D above, since many claims of the '264 Patent do not have a corresponding element (component) in the '797 Patent, they are :

1. 264/1 a top guide, connected to the first end of the channel;
2. 264/1 a bottom guide, connected to the second end of the channel;
3. 264/1 a bottom guide roller rotatably mounted in the bottom guide
4. 264/1 a fixed pulley block unit connected to the channel
5. 264/1 and extends around the bottom guide roller
6. 264/1 and the second cord end being attached to a jamb
7. 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel
8. 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash
9. 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel
10. 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash
11. 264/10 The device according to claim 1 wherein the top guide includes a top angled portion
12. 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel
13. 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide
14. Dependant claims 6, 7 and 9 (dependent claims of 264/1 for the same reasons as 264/1)
15. 264/12 At least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising:
16. 264/12 a top guide, connected to the first end of the channel;
17. 264/12 a bottom guide, connected to the second end of the channel;
18. 264/12 a bottom guide roller rotatably mounted in the bottom guide
19. 264/12 and extends around the bottom guide roller
20. 264/12 and the second cord end being attached to a jamb

31

21. 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and

22. 264/13 a bottom guide roller rotatably mounted in the bottom guide.

23. 264/14 The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto

24. 264/15 The device according to claim 13 wherein at least a portion of the bottom bottom guide is external to the channel when attached thereto

25. 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed

26. Dependant claims 14, 15, and 16 (dependent claims of 264/13 for the same reasons as 264/13)

27. 264/18 a top guide, connected to the first end of the channel

28. 264/18 a bottom guide, connected to the second end of the channel;

29. 264/18 a bottom guide roller rotatably mounted in the bottom guide

30. 264/19 The device in claim 18 wherein the bottom guide roller is located external to the channel

31. 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel

32. 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed

33. Dependant claims 19, 20, and 21 (dependent claims of 264/18 for the same reasons as 264/18)

Therefore the claims of '264 Patent cannot be anticipated from the components of the '797 Patent. My understanding of concept of "anticipation" is based on AIPLA Model Jury Instructions (revised 2005). Quote: "to prove anticipation the defendant must present clear and convincing evidence showing that the claimed invention is not new... To anticipate a claim, each and every one of the elements in the claim must be present in a single item of prior art. You may not combine two or more items of prior art to prove anticipation." I have noted in my report many instances where the claimed invention ('264 Patent) contains elements (components) that are not present in the prior art ('797 Patent) mentioned by Mr. Still.

3. The statement "All of the claims would have been obvious to one of ordinary skill in the art to which this invention pertains based on (1) the admitted prior art and Thompson, U. S. Patent 6,840,011 and/or (2) the admitted prior art and Prosser, U.S. Patent 3,091,797" is incorrect because of the following:

   a. The ordinary skill in the art required to design new balances at the time the '638 Patent invention was made is not specific to fenestration design, but is part of the general engineering skills acquired by graduates of any accredited engineering college or university or the equivalent industrial experience in the field. In fact, most of the defendant "Caldwell" principals that were deposed came from other industries: Mr. Douglas Zinter (marketing) came from fertilizer products, and Mr. Thomas Batten (engineering) and Mr. Wilbur Kellum came from the medical industry, and Mr. Jeffery Robertson (engineering) came from the consumer photography business, while Mr. deNormand worked directly for Caldwell after graduating as an engineer. Most of the Caldwell principals shared the fact that they were mechanical engineering graduates.

   b. That each prior art Patent cited was made for a specific purpose: the '011 Patent background and disclosure specified that the '011 Patent has solved many problems with balance such as the balancer not located and/or secured in the jamb or jamb liner. Patent '011 claims that it solves this problems by "A balancer 208 is secured to the sash side 212

32

by a screw 213" (column 5 lines 8-9), allowing the window to tilt, with an extensive tilt system allowing the window sash to be locked in place while it is tilted. The '797 Patent claims that " A principal object of the invention is to provide an inexpensive jamb facing usable, inter alia, for weather stripping purposes in which jam facing are incorporated the parting stop, the sash receiving ways, and replaceable housing containing spring and sheave assemblies (column 1, lines 11-16). Each of the Patents cited by Mr. Still operate quite differently than the plaintiffs' Patent '264:

    I.   The '264 Patent allows for an expanded egress window through the use of a bottom guide roller for non tilt windows, which addressed limitations of prior art balances of this type. In addition, it allows for side load through top and bottom guides but is not tilt-able.

    II.   Patent '011 is tilt-able, but cannot be tilted until the "user must lift the sash 200 until the lever end 224 can be rotated into groove 21 without the interference of anchor 218 (column 6 lines 31-33).

    III.   Patent '797 allows for the balancer housing to be manually detached (column 1 lines 25-28): "within the housing housings themselves, the invention further provides a tongue and slot connections by which certain elements of the spring-and-sheave [pulley] assembly are held in place." It is not tilt-able and differs from the other two Patents by being attached in place in the upper jamb pocket, and therefore can be visible to the user when the sash is down.

    IV.   None of the two Patents '011 or '797 address expanded egress capability provided by the '264 Patent or suggest that egress is an issue with the balances of the '011 or '797 Patents.

c.  I noted that many of the components of prior art Patents '011 and '797 do not reflect the claims of Patent '264 as indicated by Mr. Still. They are :

The following elements (components) in the '264 Patent are not present in the '011 Patent, as I indicated above:

1) 264/1 a top guide, connected to the first end of the channel;
2) 264/1 a bottom guide, connected to the second end of the channel;
3) 264/1 a bottom guide roller rotatably mounted in the bottom guide
4) 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel
5) 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash
6) 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel
7) 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash
8) 264/10 The device according to claim 1 wherein the top guide includes a top angled portion
9) 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel
10) 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide
11) Dependant claims 6, 7 and 9 (dependent claims of 264/1 for the same reasons as 264/1)
12) 264/12 At least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising:
13) 264/12 a top guide, connected to the first end of the channel;

14) 264/12 a bottom guide, connected to the second end of the channel;
15) 264/12 a bottom guide roller rotatably mounted in the bottom guide
16) 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and
17) 264/13 a bottom guide roller rotatably mounted in the bottom guide.
18) 264/14 The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto
19) 264/15 The device according to claim 13 wherein at least a portion of the bottom bottom guide is external to the channel when attached thereto
20) 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash        when installed
21) Dependant claims 14, 15, and 16 (dependent claims of 264/13 for the same reasons as 264/13)
22) 264/18 a top guide, connected to the first end of the channel
23) 264/18 a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and
24) 264/18 a bottom guide roller rotatably mounted in the bottom guide
25) 264/19 The device in claim 18 wherein the bottom guide roller is located external to the channel
26) 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel
27) 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed
28) Dependant claims 19, 20, and 21 (dependent claims of 264/18 for the same reasons as 264/18)

I also noted the following elements (components) in the '264 Patent are not present in the '797 Patent, as I indicated above:

1) 264/1 a top guide, connected to the first end of the channel;
2) 264/1 a bottom guide, connected to the second end of the channel;
3) 264/1 a bottom guide roller rotatably mounted in the bottom guide
4) 264/1 a fixed pulley block unit connected to the channel
5) 264/1 and extends around the bottom guide roller
6) 264/1 and the second cord end being attached to a jamb
7) 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel
8) 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash
9) 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel
10) 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash
11) 264/10 The device according to claim 1 wherein the top guide includes a top angled portion
12) 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel
13) 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide
14) Dependant claims 6, 7 and 9 (dependent claims of 264/1 for the same reasons as 264/1)

34

15) 264/12 At least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising:

16) 264/12 a top guide, connected to the first end of the channel;

17) 264/12 a bottom guide, connected to the second end of the channel;

18) 264/12 a bottom guide roller rotatably mounted in the bottom guide

19) 264/12 and extends around the bottom guide roller

20) 264/12 and the second cord end being attached to a jamb

21) 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and

22) 264/13 a bottom guide roller rotatably mounted in the bottom guide.

23) 264/14 The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto

24) 264/15 The device according to claim 13 wherein at least a portion of the bottom bottom guide is external to the channel when attached thereto

25) 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed

26) Dependant claims 14, 15, and 16 (dependent claims of 264/13 for the same reasons as 264/13)

27) 264/18 a top guide, connected to the first end of the channel

28) 264/18 a bottom guide, connected to the second end of the channel;

29) 264/18 a bottom guide roller rotatably mounted in the bottom guide

30) 264/19 The device in claim 18 wherein the bottom guide roller is located external to the channel

31) 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel

32) 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed

33) Dependant claims 19, 20, and 21 (dependent claims of 264/18 for the same reasons as 264/18)

Even when Mr. Still admits differences, he provides no basis or reasoning why a person of ordinary skill in the art would modify the prior art to pick and choose some elements and not others, and combine them to arrive at the invention claims of Patent '264

d. I note that one of ordinary skill in the art cannot simply pick and choose elements (components) at will from the '011 and '797 Patents and invent the claimed invention of the '264 Patent, while at the same time ignoring other components of the '011 and '797 Patents that are not found in the '264 Patent claims. Further as described above, many of the claim elements are not found in the '011 and '797 Patents.

My understanding of the concept of "Obviousness" is based on the AIPLA Model Jury Instructions (revised 2005). Quote: "for obviousness, a person of ordinary skill in the art may combine two or more items of prior art...before determining...obviousness...you must determine .... 1. The scope and content of prior art relied upon by the defendant; 2. The difference or differences, if any between each claim of the Patent... and the prior art...when doing so, each claim must be considered in its entirety and separately from other claims...Although you should consider any differences between the claimed invention and the prior art, you must still determine the obviousness or non obviousness of the entirety of the invention, not merely some portion of it."

In conclusion, Mr. Still is incorrect in his Obviousness declaration since there are many differences between many of the claims of the '264 Patent and the prior art, in fit, function as well as

in form or geometric features. In addition the total invention (Patent '264) performs a particular function that is distinctly different from the prior art (Patents '011 and '797) claimed by Mr. Still. The total invention of Patent '264 uses a methodology to increase egress that is entirely absent in the prior art, while the prior art is using different methodologies, one for tilt windows ('011 Patent) and the other ('797 patent) is an older (by 20 years) design for a fixed balancer mounted in the jamb and not hidden from the user. In addition, it is wrong to use hindsight for obviousness, to attempt to combine the structural elements of the '011 and '797 Patents to achieve the results of the '264 Patent claims.

In addition, there are other indicators of non-obviousness of the '264 Patent invention: my understanding of the commercial success of the Amesbury product based on this invention, and the copying of this invention by Caldwell. If this invention is so obvious, then competitors of Amesbury such as Caldwell would have made products based on this invention before it was patented by Amesbury, and not afterwards.

I reserve the right to add additional opinion in investigations and/or upon review of additional discovery materials.

Sincerely yours

Dr. Sammy G. Shina, P.E.
19 Swanson Road
Framingham, MA 01701
Sammy_shina@uml.edu
Home 508 877 6109, Work 978 934 2590;
cell 508 934 9176

36

# EXHIBIT 12

US006840011B2

(12) **United States Patent** (10) Patent No.: **US 6,840,011 B2**

Thompson et al. (45) Date of Patent: **Jan. 11, 2005**

(54) **WINDOW PANEL BALANCE APPARATUS AND METHOD**

(75) Inventors: **Roy A. Thompson**, Dorchester, MA (US); **Douglas W. Kroncke**, Boston, MA (US); **John C. Costello**, Wellesley, MA (US); **David P. Chastain**, Acton, MA (US); **Jack D. Gundlach**, Acton, MA (US); **Timothy J. Kelley**, Stillwater, MN (US); **Larry Versteeg**, Sioux Falls, SD (US); **Thomas Hansel**, Rockford, IL (US); **Arthur R. King, IV**, River Falls, WI (US); **James R. Harger**, Rockford, IL (US); **Michael L. Doll**, Osceola, WI (US); **James L. Peterson**, New Richmond, WI (US); **Dennis A. Galowitz**, Stillwater, MN (US); **Richard M. Fischer**, Stillwater, MN (US)

(73) Assignee: **Andersen Corporation**, Bayport, MN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/149,181**

(22) PCT Filed: **Dec. 13, 2000**

(86) PCT No.: **PCT/US00/33789**

§ 371 (c)(1),
(2), (4) Date: **Oct. 24, 2002**

(87) PCT Pub. No.: **WO01/42605**

PCT Pub. Date: **Jun. 14, 2001**

(65) **Prior Publication Data**

US 2003/0226317 A1 Dec. 11, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/170,307, filed on Dec. 13, 1999.

(51) Int. Cl.[7] ................................................ E05D 15/22
(52) U.S. Cl. .......................................... 49/181; 49/445
(58) Field of Search ......................... 49/176, 181, 445, 49/446, 447; 16/196, 197, 198, 199

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,262,990 A    11/1941    Cross et al.
2,952,884 A    9/1960    Dinmore

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

GB        2 276 655        10/1994

OTHER PUBLICATIONS

The 'Invisible' Balance for Custom Wood Windows, *SHELTER Magazine*, describing Strybuc Industries' concealed balance as being on the market since before Dec. 13, 1998, p. 37 (Jul. 2000).

(List continued on next page.)

*Primary Examiner*—Jerry Redman
(74) *Attorney, Agent, or Firm*—Womble Carlyle Sandridge & Rice, PLLC

(57) **ABSTRACT**

A window having a window panel that slides in a frame and at least one balancer that is secured to the window panel is disclosed. The window is of the tiltable hung type having a vertical operating position in which the balancer slides with the window panel in the frame and a tilted position in which the balancer remains secured to the window panel. The balancer includes an extensible member having a first end operatively coupled to the balancer and a second end operatively coupled to a frame so that the balancer can exert a force on the window panel to assist against the force of gravity when the window panel is in the vertical operating position. A method of constructing a tiltable hung window with a balancer secured to the window panel is also disclosed.

**18 Claims, 7 Drawing Sheets**



**US 6,840,011 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,054,152 A | | 9/1962 | Trammell, Jr. |
| 3,055,044 A | | 9/1962 | Dinsmore |
| 3,091,797 A | | 6/1963 | Prosser |
| 3,114,178 A | | 12/1963 | Wood |
| 3,147,517 A | | 9/1964 | Dinsmore |
| 3,358,403 A | | 12/1967 | Dinsmore |
| 3,676,956 A | | 7/1972 | Taylor et al. |
| 4,078,336 A | | 3/1978 | Prosser |
| 4,089,085 A | | 5/1978 | Fitzgibbon |
| 4,190,930 A | | 3/1980 | Prosser |
| 4,332,054 A | * | 6/1982 | Paist et al. .............. 16/197 |
| 4,642,845 A | * | 2/1987 | Marshik .............. 16/194 |
| 4,654,928 A | | 4/1987 | Flight |
| 4,675,948 A | | 6/1987 | Bengtsson |
| 4,704,821 A | | 11/1987 | Berndt |
| 4,718,194 A | | 1/1988 | FitzGibbon et al. |
| 4,724,577 A | | 2/1988 | Langley |
| 4,763,447 A | | 8/1988 | Haltof et al. |
| 4,949,425 A | | 8/1990 | Dodson et al. |
| 5,542,212 A | | 8/1996 | Erickson et al. |
| 5,544,450 A | | 8/1996 | Schmidt et al. |
| 5,615,452 A | | 4/1997 | Habbersett |
| 5,737,877 A | | 4/1998 | Meunier et al. |
| 5,784,840 A | | 7/1998 | Dodson |
| 5,873,199 A | | 2/1999 | Meunier et al. |
| 6,467,128 B1 | * | 10/2002 | Damani .............. 16/197 |
| 6,622,342 B1 | * | 9/2003 | Annes et al. .............. 16/197 |

## OTHER PUBLICATIONS

Take Out System for Single/Double Hung Windows 100 Series brochure (color copy submitted, 6 pages) This balancer product is believed to have been sold since before Dec. 13, 1998.

Take Out System for Single/Double Hung Windows 400 Series brochure (color copy submitted, 6 pages) This balancer product is believed to have been sold since before Dec. 13, 1998.

Take Out System for Single/Double Hung Windows 650 Series brochure (color copy submitted, 6 pages) This balancer product is believed to have been sold since before Dec. 13, 1998.

* cited by examiner



Fig. 1

Fig. 6

Fig. 5



**Fig. 2**

**Fig. 3**

**Fig. 4**



**Fig. 7**



**Fig. 8**



**Fig. 9**

**Fig. 10**



**Fig. 11**



**Fig. 12**



**Fig. 13**    **Fig. 14**



**Fig. 15**



**Fig. 16**



**Fig. 17**



**Fig. 18**



**Fig. 19**

**Fig. 20**



Fig. 23

Fig. 22

Fig. 21

US 6,840,011 B2

1

## WINDOW PANEL BALANCE APPARATUS AND METHOD

This application is being filed as a PCT International Patent Application in the name of Andersen Corporation, a U.S. national corporation and resident, (Applicant for all countries except US), Roy A. Thompson, a U.S. citizen (Applicant for US only), Douglas W. Kroncke a U.S. citizen (Applicant for US only), John C. Costello, a U.S. citizen (Applicant for US only), David P. Chastain, a U.S. citizen (Applicant for US only), Jack D. Gundlach, a U.S. citizen (Applicant for US only), Timothy J. Kelley, a U.S. citizen (Applicant for US only), Larry Versteeg, a U.S. citizen (Applicant for US only), Thomas Hansel, a U.S. citizen (Applicant for US only), Arthur R. King IV, a U.S. citizen (Applicant for US only), James R. Hager, a U.S. citizen (Applicant for US only), Michael L. Doll, a U.S. citizen (Applicant for US only), James L. Peterson, a U.S. citizen (Applicant for US only), Dennis A. Galowitz, a U.S. citizen (Applicant for US only), and Richard M. Fischer, a U.S. citizen (Applicant for US only) on 13, Dec. 2000, designating all countries.

### FIELD OF THE INVENTION

This invention relates generally to tilting hung windows. More specifically, this invention relates to a tilting hung window having a balancer secured to the window panel.

### BACKGROUND OF THE INVENTION

This invention relates generally to double and single hung windows. Specifically, this invention relates to balancers secured to the window panel.

Hung windows such as double and single hung windows typically include a balancer secured to the frame such that the balancer assists the sash against gravity. The balancer typically includes a spring which provides the lifting force. Many balancers also include a block and tackle assembly which provides a combination of the necessary internal friction and mechanical advantage such that a relatively limited change in the compression of the spring provides a much larger range of movement of the sash itself.

In the prior art, the balancer is located and secured in the jamb or jamb liner. Balancers in jamb liners cause jamb liners to be thick and complex in shape. Furthermore, the complex shape makes it difficult to appropriately color the jamb liner. The jamb/jamb liner combination must be disassembled to gain access to the balancer for service or replacement. When a window is replaced, it is sometimes necessary to install an additional jamb liner so that the balancer can be placed in the jamb liner. This added jamb liner takes space away from the clear glass area.

Many hung windows include a sash that can be tilted inward for ease of cleaning. Typically, the lower rail of the sash remains in the plane of the window while the top rail tilts inward. The sash typically pivots about a pivot mechanism that is a separate component from the balancer. This separate component requires additional assembly time when constructing the window.

On the tilting type hung windows, it is important to prevent the lower rail from vertical movement during cleaning or replacement. Different mechanisms have been used to "lock" the vertical position of the sash when in its tilted position. However, these prior art mechanisms are bulky and costly and are separate components that must be assembled to the window separately from the balancer. This separate assembly results in time consuming construction of the window.

2

### SUMMARY OF THE DISCLOSURE

In accordance with this invention the above and other problems have been solved by a hung window having a frame, a window panel and a balancer secured to one of the sides of the window panel. The frame includes two oppositely disposed side members. The window panel includes two oppositely disposed sides such that the window panel is slidably mounted in the frame. The window panel has a vertical operating position and a tilted position. The balancer includes a housing, extensible member and latching mechanism. The housing is secured to the first side member of the window panel. The housing includes a pivot end about which the housing pivots when the window moves from its vertical position to its tilted position. The first end of the extensible member is operatively coupled to the balancer and the second end of the extensible member is operatively coupled to the first side member of the frame wherein the balancer exerts a force on the window panel through the extensible member in the direction substantially opposite the force of gravity when the window panel is in the vertical operating position. The latching mechanism communicates with the balancer to prevent the pivot end of the housing from moving vertically in the direction of gravity when the window panel is in the tilted position.

In accordance with another aspect of the invention, a spring loaded block and tackle balance assembly is provided. The spring loaded block and tackle assembly includes a housing having a first and second end and defining an elongated chamber. A pulley wheel is operatively coupled to the second end of the housing wherein the pulley wheel includes a first and second circumferential edge portions defining a groove there between. The block and tackle balance assembly includes a biasing member positioned in the elongated chamber. A block and tackle are located in the housing and are operatively coupled to each other and to the housing. The block and tackle include an extensible member that has two positions relative to the pulley wheel. The first position of the extensible member is in the groove of the pulley wheel. The extensible member is extensible when in the first position. The second position of the extensible member is between one of the first and second circumferential edge portions and a pinching member that is operatively coupled to the housing. The extensible member is not extensible when in the second position. The first position of the extensible member occurs when the window panel is in its vertical position within the frame. When the window panel is tilted from the vertical position to the tilted position the extensible member moves from the first position to the second position.

In accordance with another aspect of the invention, a balancer including a housing, an extensible member, a pulley wheel having a circumferential portion, a brake and a rotatable cam member is disclosed. The extensible member passes partially around the circumferential portion of the pulley wheel. The brake includes a braking surface adjacent the extensible member and an oppositely disposed force receiving surface. The brake has a locked position and an unlocked position. In the unlocked position the braking surface is not in forceful contact with the extensible member. In the locked position the brake is in contact with the extensible member such as to compress the extensible member between the circumferential portion of the pulley wheel and the braking surface. The rotatable cam includes a camming surface that when rotated contacts the force receiving surface of the brake forcing the brake into the locked position.

US 6,840,011 B2

3

In accordance with another aspect of the invention, a balancer for a hung window is provided. The balancer includes a housing, extensible member, rotatable block and pulley wheel. The housing includes a first pinching surface defining an opening. The extensible member includes a first end connected to the housing. The rotatable block is rotationally coupled to the housing and includes a second pinching surface substantially parallel to the first pinching surface. The rotatable block is configured to communicate with a frame side member such that tilting of the housing relative to the frame side member results in rotation of the rotatable block relative to the housing along an axis perpendicular to the first and second pinching surfaces. The pulley wheel is rotatably coupled to the rotatable block. The extensible member passes through the opening in the first pinching surface and partially around the circumferential surface of the pulley wheel. When the balancer is in a vertical upright position, the opening in the first pinching surface and the circumferential portion of the pulley wheel are aligned to allow the movement of the extensible member there through. When the balancer is in a tilted non-vertical position relative to an associated window frame, the rotatable block rotates to place the opening and the pulley wheel out of alignment such that longitudinal movement of the extensible member is prevented.

In accordance with another aspect of the invention a balancer having a housing, extensible member, pivot pin, pulley wheel and rotatable pinching member is provided.

In accordance with another aspect of the invention, a balance, pin and latch mechanism for attachment to a window panel is provided. The mechanism includes balance means for applying force to the window panel. The mechanism also includes a pivot pin connected to balance means such that the window panel can be pivoted about the pivot pin. A latch means is also provided for preventing vertical motion of the window panel when in its tilted position. The latch means is also connected to balance means.

In accordance with another aspect of the invention, a method of constructing a hung window is provided. The method includes building a frame, obtaining a window panel and securing a pair of balancers to respective sides of the window panel. The balancers include an extensible member. The method also includes the step of coupling the extensible member to the frame wherein the pair of balancers bias the window panel in a direction substantially opposite the force of gravity when the window panel is in the vertical untilted position.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is front view of a hung window in accordance with the principles of the invention.

FIG. 2 is a perspective view of a portion of a hung window of a first embodiment in accordance with the principles of the invention.

FIG. 3 is a side sectional view of a bottom rail of a sash and its interaction with the frame bottom member.

FIG. 4 is a perspective view of a balancer and a portion of a jamb liner and frame of a first embodiment in accordance with the principles of the invention.

FIG. 5 is a side sectional view of a latching mechanism of a balancer of a first embodiment in accordance with the principles of the invention.

FIG. 6 is a side sectional view of a latching mechanism of a first embodiment in accordance with the principles of the invention.

4

FIG. 7 is a front sectional view of a latching mechanism of a balancer of a second embodiment in accordance with the principles of the invention.

FIG. 8 is a front sectional view of a latching mechanism of a balancer of a second embodiment in accordance with the principles of the invention.

FIG. 9 is a side sectional view of latching mechanism of a balancer of a second embodiment in accordance with the principles of the invention.

FIG. 10 is a top sectional view of a brake of a second embodiment in accordance with the principles of the invention.

FIG. 11 is a front sectional view of a latching mechanism of a balancer of a third embodiment in accordance with the principles of the invention.

FIG. 12 is a front sectional view of a latching mechanism of a balancer of a third embodiment in accordance with the principles of the invention.

FIG. 13 is a top sectional view of a brake of a third embodiment in accordance with the principles of the invention.

FIG. 14 is a side sectional view of a housing of a third embodiment in accordance with the principles of the invention.

FIG. 15 is a side sectional view of a latching mechanism of a balancer of a fourth embodiment in accordance with the principles of the invention.

FIG. 16 is a side sectional view of a latching mechanism of a balancer of a fourth embodiment in accordance with the principles of the invention.

FIG. 17 is a front sectional view of a latching mechanism of a balancer of a fourth embodiment in accordance with the principles of the invention.

FIG. 18 is a side sectional view of a rotatable block of a balancer of a fourth embodiment in accordance with the principles of the invention.

FIG. 19 is a perspective view of a rotatable pinching member of a balancer of a fifth embodiment in accordance with the principles of the invention.

FIG. 20 is a perspective view of an end of a housing of a fifth embodiment in accordance with the principles of the invention.

FIG. 21 is a perspective view of a latching mechanism of a balancer of a fifth embodiment in accordance with the principles of the invention.

FIG. 22 is a perspective view of a latching mechanism of a balancer of a fifth embodiment in accordance with the principles of the invention.

FIG. 23 is a perspective view of a latching mechanism of a balancer of a fifth embodiment in accordance with the principles of the invention.

DETAILED DESCRIPTION

In the following description of preferred embodiments, reference is made to the accompanying drawings which form a part hereof, and in which is shown by way of illustration specific embodiments in which the invention may be practiced. It is to be understood that other embodiments may be utilized and structural changes may be made without departing from the scope of the preferred embodiments of the present invention.

FIG. 1 is a front view of a hung window 100 of this invention. The window 100 includes a frame 102 having oppositely disposed side members 104 and 106. The frame

US 6,840,011 B2

| 5 | 6 |

102 also has a top member 108 and a bottom member 110. A sash 112 supports a window panel 114. The sash 112 has two oppositely disposed sides 116 and 118 parallel to the frame side members 104 and 106. The sash also includes a top rail 120 and a bottom rail 122.

FIG. 2 illustrates a preferred embodiment of the invention in which a sash 200 that supports a window panel 201 is shown in a tilted position with respect to the frame 202. A balancer 208 is secured to the sash side 212 by a screw 213. The balancer 208 is preferably positioned within a groove 210 in the sash side 212. The sash 200 is tilted along an axis substantially along the bottom rail 204. A first pivot pin 206 and a second pivot pin (not shown) provide the tilting mechanism. The pivot pin preferably slides in a groove in a jamb liner (not shown in FIG. 2) but it could also slide directly in the frame. The second pivot pin is positioned opposite the first pivot pin 206 on the side 207. The first pivot pin is operatively coupled to the balancer 208. The balancer 208 is further secured to the sash side 212 by a screw or other fastener through hole 215 in the pivot pin 206. Alternatively, the balancer 208 may be secured to the sash side 212 by a snap mechanism.

A balancer includes a pivot end. A pivot end is an end of a balancer around which the remainder of the balancer pivots when the balancer and its associated window panel rotate from a vertical operating position to a tilted position. One embodiment of a pivot end is pivot end 299 shown in FIGS. 2 and 4.

A second pivot pin (not shown) is coupled to a second balancer (not shown). The second balancer (not shown) is secured to the sash side 207 symmetrically to the way first balancer 208 is secured to the sash side 212. Since the structure and operation of the second balancer is symmetric to the first balancer 208, this discussion is limited to the first balancer 208.

An extensible member such as a cord 214 or a chain, cable or other member that is extensible extends from the first balancer 208 at a location near the bottom rail 204. The portion of the cord 214 outside the balancer 208 extends substantially parallel to the frame side member 216 and is secured to the frame side member 216 by an anchor 218. The anchor 218 is preferably located in the same groove of the jamb liner or frame side member as the pivot pin 206 slides in. The anchor 218 may be a block that is attached to the side member 216 with a screw or other fastener. The cord 214 is held in the anchor 218 by being knotted on the opposite side of a hole in the anchor 218.

The balancer 208, secured to the sash 200, in conjunction with the cord 214 and its anchor 218 applies a biasing force to the sash 200 in an upward direction against the direction of gravitational acceleration. This biasing force augments the force applied by a user of the window in lifting the sash 200 upward in the frame 202 when the window panel is in the vertical untilted position.

In a preferred embodiment of the invention the sash may be tilted from a vertical position to a tilted position. When it is desired to tilt the sash 200, the top rail 220 is disengaged from the frame 202 or jamb liner (not shown) by operation of the lever 222 and its symmetrical counterpart (not shown) located on the opposite end of the top rail 220. When the sash 200 is in its vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from the plane of the frame 202. By lifting the lever handle 223 up and away from the top rail 220, the lever end 224 is rotated downward such that

the lever end 224 becomes positioned within the groove 210. When the lever end 224 is so positioned in the groove 210, the top of the sash 200 including the top rail 220 can be tilted from its vertical position to its tilted position as shown in FIG. 2. Note that as positioned in FIG. 2 the lever handle 223 is substantially down near the surface of the top rail 220 and hence the lever end 224 is not located in the groove 210. This position of the lever is the position that would be associated with the untilted or vertical position of the sash 200.

FIG. 3 illustrates a cross section of one embodiment of the bottom rail 204 and its interaction with the bottom member 203 of the frame when the sash 200 is in its vertical position. As shown in FIG. 3 the bottom rail 204 of the sash 200 defines a groove 300 that is substantially an upside down U shape. The bottom member 203 of the frame 202 has a U shaped extension 302 that mates with the groove 300. When the sash 200 is at its lowest vertical position in the frame 202, the extension 302 is mated with the groove 300 for insulation and other purposes. It is important that the person operating the window not be allowed to tilt the sash 200 when the extension 302 is mated into the groove 300 because tilting in this position would result in the extension 302 or part of the bottom rail 204 being broken. To avoid this problem, a preferred embodiment of the present invention requires placement of the anchor 218 in a specific vertical location on the frame side member 216. The general idea is to place the anchor 218 in such a position that when the extension 302 is mated even partially with the groove 300, the lever end 224 cannot be rotated into the groove 210 because the lever end 224 physically contacts the anchor 218. The user must lift the sash 200 vertically upward until the lever end 224 can be rotated into groove 210 without interference by the anchor 218. The anchor is vertically positioned such that the distance the sash 200 must be lifted corresponds with the vertical distance required to remove the extension 302 from the groove 300 sufficiently such that the sash can be tilted without interference between the extension 302 and the sash bottom rail 204.

FIG. 4 is a perspective view of a preferred embodiment of a balancer 208 of this invention. A balancer is defined as being any mechanism that provides a biasing force to a window sash. The balancer could be a spring biased block and tackle mechanism or it could be some other mechanism such as a weight and pulley system. While the preferred embodiments of this invention relate to a spring biased block and tackle mechanism, this invention is not so limited.

A housing is any structural member that supports the elements of a balancer. A housing may be made of steel or other materials including plastic. A housing may have multiple components or it may be one integral piece. A housing may include a housing extension which may be a separate member secured to the main part of the housing.

In a preferred embodiment, the balancer 208 includes a housing 402 that includes an elongated U-shaped housing 403 and a housing extension 423 attached to one end of the elongated U-shaped housing 403. The elongated U-shaped housing 403 is made of steel having a pair of parallel, laterally spaced sidewalls 404 and 406 and an outer wall 408 interconnecting the side walls 404 and 406 together. The elongated U-shaped housing 403 defines an elongated chamber 410. The housing 402 is secured to a side of sash such as sash 200 by means of screw 213 which is held in place by fastening block 412 which in turn is fastened to the housing 402 by a press fit. The housing extension 423 can be made of any structural material including steel and plastic.

A coil spring 414 has an anchored end connected to a pin 416 by a hook that hooks around the pin 416. The pin 416

US 6,840,011 B2

7                                                                    8

is riveted or otherwise fastened to the side walls 404 and 406 of the housing 402. The opposite end of the spring 414 is connected to a block and tackle 418. The block and tackle 418 includes a first pulley member 420 and a second pulley member 422 that are conventionally interconnected by a cord 214 that passes back and forth between the two pulley members. The cord has a first end that is connected to the block and tackle 418. The cord 420 exits the block and tackle 418 by extending around the circumference of a pulley wheel 426 that is adjacent second pulley member 422. In a preferred embodiment of the invention, the pulley wheel 426 is slightly elliptical in shape. Preferably, pulley wheel 426 is supported at its axis by a pin 428 that is supported by housing extension 423 that is integral with second pulley member 422. The pulley wheel 426 changes the direction of the cord 214 by approximately 180 degrees. After this 180 degree turn, the cord extends parallel to the balancer 208 and a second end 219 of the cord 214 is anchored to the frame side member 216. The cord 214 is anchored to the frame side member 216 by attaching the cord 214 to anchor 218 as described above and then screwing the anchor 218 through the jamb liner 432 and into the frame side member 216 with screw 434.

The pin 206 is made of plastic and is an integral part of the housing extension 423 and second pulley member 422. During normal vertical up and down movement of the sash in the frame, the pin 206 slides up and down with the sash in the groove 436 of the jamb liner 432. The large head 438 on the pin 206 prevents the pin from being removed from the groove 436. When the sash is tilted out of the plane of the frame, the tilt axis is along the line between the pin 206 and its counterpart pin (not shown) located on the opposite side of the sash near the bottom rail. The housing extension 423 which is integral with the pin 206 is attached to the housing 402 by rivet pins 440 and 442 that extend through the second pulley member 422.

A latching mechanism is a component of a balancer, which operates to prevent a pivot end of a balancer from moving in a vertical downward direction when the window panel to which the balancer is attached is in a tilted position relative to the frame. Various embodiments of latching mechanisms are provided below. However, the scope of this invention is not limited to the specific embodiments provided. Other latching mechanisms including commercially available mechanisms may be used.

One embodiment of a latching mechanism is shown in FIGS. 5 and 6 taken along the line 5—5 of FIG. 4. FIG. 5 illustrates the unlocked position of the cord 214 with respect to pulley wheel 426 and housing extension 423 that occurs when the sash 200 is in a vertical untilted position. Note that housing extension 423 is part of the housing 402. FIG. 6 illustrates a locked position of the cord 214 with respect to the pulley wheel 426 and the housing extension 423 that occurs when the sash 200 is in its tilted position.

As can be seen in both FIGS. 5 and 6, the pulley wheel has a first and second circumferential edge portions 502 and 504 and a groove 506 between them. These circumferential edge portions have a larger radius than the groove 506. As shown in FIG. 5, when the sash is in its vertical position the cord 214 rides in the groove 506 and because of the circumferential edge portions 502 and 504 cannot be displaced out of the groove 506. When the sash is in its vertical position, the cord 214 is extensible such that it may freely be drawn and withdrawn during rotation of pulley wheel 426 as the window panel is moved vertically.

In FIG. 6 the cord 214 is pinched or caught between the circumferential edge portion 502 and the housing extension

423. Tilting the sash 200 relative to the frame causes this position of the cord 214 shown in FIG. 6. The second end 219 of the cord 214 is anchored to the frame and so the tilting action pulls the cord 214 out of the groove 506 and into a position in which it is between the pulley wheel and the housing extension 423. In the position shown in FIG. 6, the cord may not be extended in or out of the pulley wheel because the cord 214 is frictionally engaged between the pulley wheel 426 and the pinch point 510. The housing extension 423 is preferably shaped as shown in FIGS. 5 and 6. The housing extension 423 includes a right-angled pinch point 510 and a recess 512. The recess 512 is located closer to the axis of the pulley wheel 426 than is the pinch point 510. When the sash is tilted, the cord 214 is pulled into the recess 512 and necessarily between the circumferential edge portion 502 of the pulley wheel 426 and the pinch point 510.

A preferred embodiment of the circumferential edge portions discussed throughout the various embodiments of the invention is chamfered or rounded so that damage to the extensible member is minimized when the extensible member is pinched against a circumferential edge portion. Such a chamfered or rounded edge is shown in the drawing figures.

The latching mechanisms shown in FIGS. 7-23 may be utilized within the same window construction as discussed above with respect to FIGS. 1-4. The latching mechanisms shown in FIGS. 7-23 are possible replacements for the latching mechanism identified in FIGS. 5-6. The remaining portion of the balancers not shown in FIGS. 7-23 is the same as those balancer portions as described above with regard to both general concepts and specific embodiments.

One embodiment of a latching mechanism of a balancer is shown in FIGS. 7-9. Specifically a portion of balancer 600 is provided. As described above, the portions of balancer 600 not shown in FIGS. 7-9 would be the same as described above and shown in FIGS. 1-4. FIGS. 7 and 8 are side views with a portion of the housing extension cut away so that the underlying brake can be seen. FIG. 9 is a rear sectional view taken along lines 9—9 of FIG. 8.

The balancer 600 shown in FIGS. 7-9 includes a housing 602 that includes an elongated U-shaped housing (not shown but the same as described above and shown in FIGS. 1-4) and a housing extension 604. Balancer 600 includes a pulley wheel 606 that is rotatably coupled to housing extension 604 by axis 608. Pulley wheel 606 includes a first circumferential edge portion 610 and a second circumferential edge portion 612. The portion of the outer circumference of the pulley wheel 606 between the circumferential edge portions 610 and 612 is referred to as the circumferential portion 614. It should be noted that a circumferential portion might in general be any shape that will accommodate passage of an extensible member around the circumferential portion. Circumferential portion 614 is but one embodiment of a circumferential portion.

Extensible member 616 is centered on the circumferential portion 614 between the first and second circumferential edge portions 610 and 612 as it wraps around the pulley wheel 606. End 618 of the extensible member is configured to be secured to a frame side member as described above with respect to earlier embodiments. End 617 of the extensible member 616 continues to be utilized by the block and tackle also as described above with respect to earlier embodiments.

A brake is any member having a braking surface wherein the braking surface is configured so that when forceful contact is made between the braking surface and the exten-

US 6,840,011 B2

9

sible member supported by a pulley wheel, longitudinal movement of the extensible member is prevented. A brake may be stationary such that the extensible member and pulley wheel move toward and away from the stationary brake. Alternatively, the brake may move.

FIGS. 7 and 8 illustrate one embodiment of a brake, namely brake 620. Brake 620 includes an anchored end 622 and an oppositely disposed braking end 624. Anchored end 622 is nonrotatably secured to housing extension 604. Braking end 624 includes a braking surface 626 and a force-receiving surface 628. A braking surface is any surface which when forcefully made to contact an extensible member is configured to prevent longitudinal movement of the extensible member because of frictional contact and/or pinching of the extensible member between the braking surface and another member. The braking surface 626 is rounded to a radius that approximates the radius of the circumferential portion 614 of the pulley wheel 606. This shaping of the braking surface to match the shape of the pulley wheel increases the surface area of contact between the braking surface and the extensible member.

Balancer 600 includes a pivot pin 630 that is the same as pivot pin 206 except that pivot pin 630 is made of steel. Pivot pin 630 performs the same function as pivot pin 206.

A camming surface is any surface that rotates about an axis and which has at least one point of varying distance from the axis. A rotatable cam member is a rotatable member that includes a camming surface configured to contact a brake upon rotation of the rotatable cam member.

Rotatable cam member 634 shown in FIG. 9 is one embodiment of a rotatable cam member. Pivot pin 630 provides an axis 632 about which rotatable cam member 634 rotates. Rotatable cam member 634 includes a circular section 636 that travels less than the full circumference of the cam member 634. The radius from circular section 636 to the axis 632 is constant. Rotatable cam member 634 also includes a notch defined by a recessed edge 638. A recessed edge is an edge comprising points that are a shorter distance to the axis of rotation than the circular section. The transition from the recessed edge 638 to the circular section 636 is a smooth transition to provide camming surface 640.

Note that many alternative designs for a rotatable cam member and its associated camming surface are possible. For example, a rotatable cam member could be a generally circular member with a bulge or bump along which the radius or distance from the outer edge of the rotatable cam member to the axis of rotation is greater than along the generally circular portion. Many other shapes for the camming surface are possible.

Rotatable cam member 634 includes transferring end 642, which is designed to be slidably received by a jamb liner channel. If a window panel secured to this embodiment of a balancer is moved from its vertical operating position to a tilted position, the sides of the jamb liner channel will prevent the transferring end 642, and hence the rotatable cam member 634, from tilting with the window panel thereby causing rotation of the rotatable cam member relative to and about the pivot pin 630.

FIG. 8 shows the positioning of the brake 620 and other elements of the balancer 600 when the associated window panel is in its vertical operating position. As shown in FIG. 8, the notch formed by the recessed edge 638 is aligned with the brake 620. In this vertical operating position, there is a gap between the braking surface 626 and the extensible member 616. As the window panel is moved from its vertical operating position to the tilted position, the camming surface

10

640 comes into forceful contact with the force-receiving surface 628 of the brake 620. The force applied by the rotatable cam member 634 onto the brake 620 causes the brake to flex in the direction of the extensible member 616 and the pulley wheel 606. Continued tilting of the window panel eventually results in the braking surface of the brake 620 forcefully pressing the extensible member against the circumferential portion 614 of the pulley wheel 606. Such pressure on the extensible member prevents longitudinal movement of the extensible member 616 and hence prevents the window panel from dropping downward by the force of gravity or by the force of any washing action on the window panel. FIG. 7 illustrates brake 620 in forceful contact with extensible member 616 as would be seen when the window panel is in its tilted position.

FIG. 10 is a sectional view of brake 620 taken along lines 10—10 in FIG. 8. Brake 620 is generally T-shaped having ends 621 and 623. The ends 621 and 623 are designed to be inserted into receiving slots 625 and 627 in the housing extension 604 shown in FIG. 9.

Turning now to FIGS. 11 and 12, another embodiment of a latching mechanism for a balancer is provided. Balancer 650 is the same as balancer 600 except that the brake utilized in balancer 650 has a rotational end instead of an anchored end. A rotational end is an end of a brake designed and positioned so that it can pivot about an axis. Brake 652 includes a rotational end 654 and a braking end 656. Braking end 656 is the same as braking end 624 of the embodiment shown in FIGS. 7-9. Rotational end 654 is not anchored, as was anchored end 622 in FIGS. 7-9. Rotational end 654 is designed to rotate about axis 658.

Operation of brake 652 is similar to brake 620 except that brake 652 rotates around axis 658 instead of flexing along the length of the brake when the rotatable cam member presses on the brake.

FIG. 13 is a sectional view of brake 652 taken along lines 13—13 in FIG. 12. As can be seen in FIG. 13, brake 652 in this view is T-shaped.

FIG. 14 is a portion of the balancer 650 taken along lines 14—14 in FIG. 12. Rotational end 654 of brake 652 can be seen positioned in a slot formed by slot edge 659 in housing extension 660.

FIGS. 15-18 illustrate another embodiment of a balancer. FIGS. 15-18 do not show the entire balancer but rather components of the balancer. Components of the balancer not shown in FIGS. 15-18 are the same as shown in the earlier discussed embodiments.

FIGS. 15 and 16 are sectional views as would be viewed from an adjacent frame side member when the balancer is secured to a window panel. Balancer 700 includes housing extension 702 configured with an opening 704 for receipt of a rivet for attaching housing extension 702 to an elongated U-shaped housing (not shown).

A pivot pin 706 is integrally connected to housing extension 702. Pivot pin 706 is configured for sliding interaction with a channel in a frame jamb liner that would be adjacent to the balancer.

A rotatable block is a rotatable member configured to rotate about a pivot pin when a window panel to which the associated balancer is attached is moved from a vertical operating position to a tilted position or vice versa. Rotatable block 708 is one embodiment of a rotatable block. Rotatable block 708 rotates about pivot pin 706. In its normal operating position, rotatable block 708 is situated in a groove of a jamb liner such as groove 436 in FIG. 4. Therefore, as the window panel is moved from its vertical operating position

US 6,840,011 B2

11

to its tilted position, rotatable block 708 rotates about pivot pin 706 relative to housing extension 702. FIG. 15 shows rotatable block 708 in the position associated with the vertical operating position of the window panel and balancer. FIG. 16 illustrates the position of the rotatable block 708 when the window panel and balancer are in a tilted position.

A pinching surface is any surface capable of compressing or pinching an extensible member between itself and another member. Housing extension 702 includes one embodiment of a pinching surface, specifically first pinching surface 710. First pinching surface 710 is a planar surface.

Housing extension 702 is shown with a cutaway view in FIG. 16 to show the positioning of pulley wheel 714. Housing extension 702 defines an opening 712 for passage of the extensible member 720 there through. Pulley wheel 714 receives the extensible member from the block and tackle (not shown). Extensible member passes partially around pulley wheel 714 and through the opening 712 and around pulley wheel 716 that is rotationally mounted to the rotatable block 708. As can be seen in FIG. 15, the opening 712 in extension housing 702 is aligned with pulley wheel 716 when the rotatable block is aligned with the housing extension 702. In FIG. 16, the rotation of rotatable block 708 causes the circumferential portion 718 of the pulley wheel 716 to move out of alignment with the opening 712.

Rotatable block 708 includes a second pinching surface 722 as shown in FIG. 17. As rotatable block 708 moves into a position in which it is not aligned with the housing extension as shown in FIG. 16, extensible member 720 is pressed or pinched between the first pinching surface 710 and the second pinching surface 722. The pinching of extensible member 720 between the first and second pinching surfaces 710 and 722 when the balancer 700 is in the tilted position prevents the extensible member 720 from longitudinal movement which prevents the pivot pin 706 and the connected window panel from moving downward in the direction of gravity during tilting of the window panel and balancer.

Rotatable block 708 includes hinge clasp 724. Hinge clasp 724 allows for removable attachment of the rotatable block 708 to the pivot pin 706. Hinged clasp 724 includes hinge portion 726 and attachment end 728. Hinge clasp 724 hingably rotates about the hinged portion 726. Attachment end 728 is removably attached to lip 730 of rotatable block 708.

Rotatable block 708 is preferably made of plastic. Housing extension 702 is preferably made of steel. However other materials and combinations of materials may be used.

Housing extension 702 includes jag 732. Jag 732 is a protrusion in the housing extension. Rotatable block 708 includes jag 734, which is a protrusion in the rotatable block 708. The purpose of jags 732 and 734 is twofold. First, the jags 732 and 734 provide the desired spacing between the first pinching surface and the second pinching surface 722. The desired distance between the first and second pinching surfaces which is set by the height of the jags 732 and 734 varies depending on the type and size extensible member used and should be engineered to prevent slippage of the extensible member when the window panel is in the tilted position without causing unnecessary damage to the extensible member. A distance between first pinching surface and second pinching surface of between 0.1 and 1.0 mm is preferred. More preferably, a distance between 0.2 and 0.4 mm is used. But of course these dimensions can vary outside these ranges, as they are heavily dependant on the type of extensible member used.

12

Jags 732 and 734 also perform the function of preventing the rotatable block 708 from being moved more than a small distance away from the pivot pin 706. If the rotatable block 708 begins to move away from the pivot pin 706 the jags 732 and 734 will contact each other to prevent further movement of the rotatable block 708.

Housing extension 702 includes hemispherically shaped bumps 736 and 738 on the first pinching surface 710. The hemispherical bumps 736 and 738 are approximately the same height as the jags 732 and 734. The bumps 736 and 738 provide a more discrete movement of the rotatable block 708 from an aligned position as shown in FIG. 15 to a nonaligned or tilted position as shown in FIG. 16 and vice versa. Because of the frictional fit between the hemispherical bumps 736 and 738 and the surface 740 of the rotatable block 708, the rotatable block 708 is prevented from too easily sliding from an aligned position to a nonaligned or tilted position. The bumps 736 and 738 help prevent pre-installation accidents wherein the rotatable block 708 may accidentally be moved from a nonaligned position to an aligned position causing release of a loaded spring.

Pulleys 742 and 744 form the pulleys for a block in the block and tackle (tackle not shown and extensible member not shown in relation to pulleys 742 and 744) the same as in block and tackle 418 disclosed earlier.

FIG. 18 is a view of a rotatable block 708 taken along the lines 18—18 in FIG. 17. Rotatable block 708 defines an opening 748 for placement of pulley wheel 716. Rotatable block 708 also defines an opening 746 for passage of the extensible member 720 there through where the extensible member 720 would then pass through the opening 712 in the housing extension 702. Second pinching surface 722 can be seen adjacent to the opening 746. Jag 734 extends across the rotatable member 708 with a curvature.

Hinge clasp 728 can be seen in its open position wherein the rotatable member 708 is ready to be placed on the pivot pin 706.

Turning now to FIGS. 19-23, another embodiment of a latching mechanism for a balancer is disclosed. FIGS. 19-23 do not show the entire balancer but rather illustrate a portion of the housing extension and the latching mechanism that would be utilized by replacing the latching mechanism shown in FIGS. 5 and 6.

FIGS. 19 and 20 illustrate two components of a balancer shown separately. FIG. 19 illustrates one embodiment of a rotatable pinching member 806 and FIG. 20 illustrates one embodiment of a housing extension 802 and related parts. The components in FIGS. 19 and 20 are combined, as they would be in normal operation in FIGS. 21-23.

Turning first to FIG. 20, a portion of housing extension 802 is provided. Housing extension 802 is configured to be secured to an elongated U-shaped housing as disclosed above with respect to embodiments shown in FIGS. 1-5. Housing extension 802 defines an opening along surface 804. The opening defined by surface 804 is generally cylindrical and is shaped for receipt of a rotatable pinching member 806 shown in FIG. 19. A pivot pin 808 is integrally secured to the housing extension 802 and passes through the opening defined by surface 804. Pivot pin 808 serves the same function with respect to sliding interaction with a jamb liner as described above with respect to the embodiments disclosed with respect to FIGS. 1-5. Pulley wheel 810 is rotatably secured to housing extension 802 along axis 812 by axle 813. Pulley wheel 810 includes a first circumferential edge portion 814 and a second circumferential edge

US 6,840,011 B2

13

14

portion 816. The circumferential edge portions 814 and 816 extend into the opening past the surface 804 so as to provide an appropriate pinching surface with the rotatable pinching member as will be described below.

Turning now to FIG. 19, rotatable pinching member 806 includes a pivot pin-engaging end 818 and a locking 820 opposite the pivot pin engaging end 818.

A pivot pin-engaging end of a rotatable pinching member may be any shape or design capable of rotatably interacting with the pivot pin so that the rotatable pinching member can rotate about the pivot pin.

Pivot pin engaging end 818 is one embodiment of a pivot pin-engaging end. Pivot pin engaging end 818 defines a generally circular opening 822 that is approximately the same diameter as the post portion 824 of the pivot pin 808. Rotatable pinching member 806 is attached to the pivot pin 808 with the opening 822 surrounding the post portion 824 of the pivot pin 808. Locking end 820 is positioned in the opening of the housing extension 802 formed by surface 804.

A locking end of a rotatable pinching member is any surface shaped such that rotation of the locking end within a housing extension causes pinching of an extensible member against its associated pulley wheel. Locking end 820 is generally a truncated cone-shape with a first edge 826 and a second edge 828 forming a channel 830 there between.

FIG. 21 illustrates the positioning of the rotatable pinching member 806 with the housing extension 802 when the balancer 800 is in a vertical operating position. As can be seen, pivot-engaging end 818 receives pivot pin 808 around post portion 824. In the position shown in FIG. 21, channel 830 is aligned with the pulley wheel 810. The alignment of channel 830 with the pulley wheel 810 allows the extensible member 832 to pass around the pulley wheel 810 without interference from the rotatable pinching member 806.

Pivot pin engaging end 818 of the rotatable pinching member 806 is slidably received by a groove in a jamb liner such as groove 436 as described above with respect to FIG. 4. Therefore, as the balancer 800 is tilted with respect to its associated frame side member, the rotatable pinching member 806 rotates relative to the housing extension 802 and the pulley wheel 810. Since end 834 of extensible member 832 is attached to the frame side member, the extensible member 832 is pulled out of alignment with the pulley wheel 810 when the balancer is moved to a tilted position.

FIG. 22 illustrates the positioning of the various components of the balancer 800 when the balancer 800 is moving from a vertical operating position to a tilted position. FIG. 23 illustrates the components of balancer 800 and their positions when the balancer 800 is in a tilted position. As can be seen in FIG. 23, rotation of the rotatable pinching member 806 relative to the housing extension 802 and the pulley wheel 810 results in the extensible member 832 becoming pinched or compressed between edge 828 and first circumferential edge portion 814 of pulley wheel 810. This pinching or compression of the extensible member 832 prevents longitudinal movement of the extensible member 832 when in the tilted position.

As with all of the embodiments of this invention, as the balancer 800 is moved back from a tilted position to a vertical operating position, the extensible member moves back from a pinched or compressed state to its normal operating state in which longitudinal movement is allowed.

It should be noted that if the rotatable pinching member 806 is designed with two edges such as edges 826 and 828, the balancer could be used for either side of a window panel.

It should also be noted that in a preferred embodiment, edges 826 and 828 are chamfered as shown in FIG. 19. The chamfered edge allows for pinching of the extensible member without unnecessary abrasion or damage to the extensible member.

It should be noted that in one preferred embodiment of this invention, the balancer is operatively coupled to the window panel. The window panel may be a pane of glass or it may be an insulated glass assembly. The balancer may also be operatively coupled to the window panel through connection to a sash as has been illustrated above.

The foregoing description of preferred embodiments of the invention has been presented for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. It is intended that the scope of the invention be limited not by this detailed description, but rather by the claims appended hereto.

What is claimed is:

1. A hung window comprising:
   (a) frame having a first vertical side member and an oppositely disposed second vertical side member wherein the first and second side members define a plane;
   (b) a sash housing a window panel, the sash having a first side member and an oppositely disposed second side member, the sash having a first substantially vertical operating position in which the sash is slidably mounted in the frame with the first and second side members substantially parallel to the first and second frame side members, and the sash having a tilted position wherein the sash is positioned at an angle with respect to the plane of the frame; and
   (c) balancer comprising:
      (i) housing secured to the first side of the sash wherein the housing comprises a pivot end about which the housing pivots when the sash rotates from the vertical operating position to the tilted position;
      (ii) extensible member having a first end operatively coupled to the balancer and a second end operatively coupled to the first side member of the frame, wherein the balancer exerts a force on the sash through the extensible member in the direction substantially opposite the force of gravity when the sash is in the vertical operating position; and
      (iii) latching mechanism communicating with the balancer wherein the latching mechanism prevents the pivot end of the housing from moving vertically in the direction of gravity when the sash is in the tilted position.

2. The window of claim 1 wherein the housing comprises an elongated housing defining an elongated chamber, the housing comprising a second end opposite the pivot end, and wherein the balancer further comprises:
   (a) biasing member for providing a biasing force, the biasing member having an anchored end and an opposite movable end, wherein the anchored end is connected to the second end of the housing and located in the elongated chamber;
   (b) block and tackle located in the elongated chamber, the block secured to the housing near the pivot end, the tackle operatively coupled to the movable end of the biasing member, wherein the extensible member operatively connects the block to the tackle; and
   (c) pulley wheel operatively coupled to the housing substantially near the pivot end of the housing, the

US 6,840,011 B2

15

16

pulley wheel comprising a circumferential portion wherein the extensible member passes partially around the circumferential portion of the pulley wheel wherein the pulley wheel causes a change in direction of the extensible member of about 180 degrees.

**3.** The window of claim **1** wherein the biasing member is a spring.

**4.** The window of claim **1** comprising a second balancer secured to the side of the sash opposite the first balancer.

**5.** The window of claim **4** wherein a first sash groove is defined in the first sash side member and a second sash groove is defined in the second sash side member wherein the first balancer is mounted in the first sash groove and the second balancer is mounted in the second sash groove.

**6.** The window of claim **1** wherein the housing comprises an elongated housing defining an elongated chamber, the elongated housing having a second end wherein the balancer further comprises:

  (a) pulley wheel operatively coupled to the housing substantially near the pivot end of the housing, the pulley wheel including a first and second circumferential edge portion defining a groove there between;

  (b) biasing member located in the elongated chamber for providing a biasing force, the biasing member having an anchored end and an oppositely disposed movable end, wherein the anchored end of the biasing member is connected to the second end of the housing;

  (c) block and tackle located in the elongated chamber, wherein the tackle is operatively coupled to the movable end of the biasing member and the block is operatively coupled to the pivot end of the housing, wherein the extensible member operatively connects the block to the tackle, wherein the extensible member has a first end, second end and central portion, wherein the first end of the extensible member is operatively coupled to the block and tackle, the central portion connects the block to the tackle and the central portion is operatively coupled to the pulley wheel wherein the central portion has a first position relative to the pulley wheel in which the central portion of the extensible member is in the groove of the pulley wheel, the extensible member being in the first position when the sash is in the vertical position, wherein the second end of the extensible member is anchored to the first frame side member, wherein the extensible member is extensible when in the first position;

  (d) pinching member adjacent one of the first and second edge portions of the pulley wheel wherein the extensible member has a second position relative to the pulley wheel in which the extensible member has a second position relative to the pulley wheel in which the extensible member is positioned between the pinching member and one of the first and second edge portions wherein the extensible member is not extensible when in the second position, and the extensible member is in the second position when the sash is in the tilted position.

**7.** The window of claim **6** further comprising a jamb liner substantially parallel to and operatively coupled to the first frame side member, the jamb liner having a front face, and the front face having an elongate channel, and wherein a pivot pin that slides in the elongate channel is operatively coupled to the balancer wherein the sash can be pivoted at the pivot pin from the vertical position to the tilted position, and wherein the extensible member moves from the first position to the second position when the sash is moved from the vertical position to the tilted position.

**8.** The hung window of claim **1** wherein the latching mechanism comprises:

  (a) pulley wheel rotatably connected to the pivot end of the housing, the pulley wheel comprising a circumferential portion wherein the extensible member passes partially around the circumferential portion of the pulley wheel;

  (b) brake comprising a braking surface adjacent the extensible member and the circumferential portion of the pulley wheel wherein the pulley wheel and brake have a first relative position wherein a space is provided between the braking surface and the extensible member, and wherein the pulley wheel and brake have a second relative position wherein the extensible member is pinched between the circumferential portion and the braking surface; and

  (c) rotatable cam member comprising a camming surface, wherein the rotatable cam member operatively interacts with the first frame side member such that movement of the sash from the vertical operating position to the tilted position causes rotation of the cam member wherein movement of the sash from the vertical operating position to the tilted position results in the camming surface contacting one of the pulley wheel and brake wherein the pulley wheel and brake are moved from the first relative position to the second relative position.

**9.** The hung window of claim **1** wherein the latching mechanism comprises:

  (a) pulley wheel rotatably connected to the pivot end of the housing, the pulley wheel comprising a circumferential portion wherein the extensible member passes partially around the circumferential portion of the pulley wheel;

  (b) brake having an unlocked position and a locked position relative to the extensible member, the brake comprising:

    (i) braking surface wherein the braking surface is adjacent but not in forceful contact with the extensible member when the brake is in the unlocked position, and the braking surface is in contact with the extensible member such as to compress the extensible member between the circumferential portion of the pulley wheel and the braking surface to prevent longitudinal movement of the extensible member when the brake is in the locked position; and

    (ii) force receiving surface opposite the braking surface; and

  (c) rotatable cam member comprising a camming surface, wherein the rotatable cam member operatively interacts with the first frame side member such that movement of the sash from the vertical operating position to the tilted position causes rotation of the cam member wherein movement of the sash from the vertical operating position to the tilted position results in the camming surface contacting the force receiving surface of the brake forcing the brake into the locked position.

**10.** The hung window of claim **9** wherein the brake comprises a rotational end and an oppositely disposed braking end, wherein the braking surface and the force receiving surface are on the braking end, and the rotational end is in pivotal engagement with the housing such that the brake rotates around the rotational end when the camming surface of the cam member contacts the force receiving surface of the brake.

**11.** The hung window of claim **9** wherein the brake comprises an anchored end and an oppositely disposed

US 6,840,011 B2

17

braking end, wherein the braking surface and the force receiving surface are on the braking end, and the anchored end is nonpivotally anchored to the housing such that the brake bends in the direction of the pulley wheel when the camming surface of the cam member contacts the force receiving surface of the brake.

12. The hung window of claim 9 wherein the cam member comprises:

(a) center axis wherein the cam member rotates around the center axis;

(b) circular section comprising a circular outer edge wherein the distance from the center axis to the circular outer edge is constant along the circular outer edge; and

(c) recessed edge forming a notch wherein the distance from the center axis to the recessed edge is less than the distance from the center axis to the circular outer edge and is wherein the camming surface comprises the recessed edge.

13. The hung window of claim 1 wherein the housing further comprises a first pinching surface at the pivot point end, wherein the pinching surface defines an opening and wherein the latching mechanism further comprises:

(a) rotatable block rotatably coupled to the pivot end of the housing wherein the rotatable block comprises a second pinching surface substantially parallel to the first frame side member such that movement of the sash from the vertical operating position to the tilted position causes rotation of the rotatable block relative to the housing along an axis perpendicular to the first and second pinching surfaces; and

(b) pulley wheel rotatably coupled to the rotatable block, wherein the pulley wheel comprises a circumferential portion, wherein the extensible member passes through the opening in the housing and partially around the circumferential portion of the pulley wheel, wherein the opening in the housing and the circumferential portion of the pulley wheel are aligned when the sash is in its vertical operating position, and the opening in the housing and the circumferential portion of the pulley wheel are out of alignment when the sash is moved into the tilted position wherein the extensible member is pinched between the first pinching surface and the second pinching surface wherein longitudinal movement of the extensible member is prevented when the sash is moved to the tilted position.

14. The hung window according to claim 13 wherein the rotatable block comprises plastic.

15. The hung window according to claim 13 wherein the balancer further comprises a pivot pin connected to the pivot end of the housing wherein the pivot pin is configured for sliding interaction with the frame side member adjacent the

18

balancer and wherein the rotatable block is rotatably coupled to the pivot pin to provide rotation of the rotatable block relative to the housing.

16. The hung window according to claim 1 wherein the housing is configured to further define an opening, wherein the balancer further comprises a pivot pin connected to the pivot end of the housing wherein the pivot pin is configured for sliding interaction with the first frame side member, and wherein the latching mechanism further comprises:

(a) pulley wheel rotatably coupled to the pivot end of the housing, wherein the pulley wheel comprises a circumferential edge portion extending into the opening defined by the housing; and

(b) rotatable pinching member rotatably coupled to the pivot pin, the rotatable pinching member operatively interacting with the first frame side member such that movement of the sash from the vertical operating position to the tilted position causes rotation of the rotatable pinching member relative to the housing along an axis parallel to the pivot pin, wherein the rotatable pinching member comprises:

(i) pivot pin engaging end defining a pivot pin receiving opening for receiving the pivot pin wherein the rotatable pinching member operatively interacts with the frame side member adjacent the balancer to pivot around the pivot pin when the sash is moved from the vertical operating position to the tilted position;

(ii) locking end opposite the pivot pin engaging end wherein the locking end is positioned in the housing opening, wherein the locking end includes a first edge and a second edge wherein the first and second edges define a channel therebetween, wherein when the sash is in the vertical operating position the channel is aligned with the pulley wheel to allow longitudinal movement of the extensible member through the channel, and when the sash is in the tilted position the channel is not aligned with the pulley wheel wherein the extensible member is pinched between the circumferential edge portion of the pulley wheel and one of the first and second edges of the locking end of the rotatable pinching member wherein longitudinal movement of the extensible member is prevented.

17. The hung window according to claim 16 wherein one of the first and second edges of the rotatable pinching member is chamfered.

18. The hung window of claim 1 wherein the latching mechanism prevents longitudinal movement of the extensible member when the sash is tilted.

* * * * *

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMESBURY GROUP, INC., and AMESBURY SPRINGS LTD, | **DEFENDANT'S SECOND SUPPLEMENTED ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| Plaintiffs, | |
| vs. | |
| THE CALDWELL MANUFACTURING COMPANY, | Civil Action No. 05-10020-DPW |
| Defendant. | |

Defendant the Caldwell Manufacturing Company ("Caldwell"), by its attorneys Harris Beach PLLC, submits the following supplemental answers to plaintiffs' First Set of Interrogatories, which are intended to supplement, not replace, its previous answers:

**INTERROGATORY NO. 6**:

State the full factual and legal basis for Caldwell's assertion that each of the patents-in-suit is invalid for failure to meet the requirements of the patent laws of the United States as set forth in, *inter alia*, 35 U.S.C. §§102, 103 and 112.

**ANSWER**:   Caldwell objects to this interrogatory in that it calls for legal conclusions and requires expert testimony to answer fully.   Caldwell reserves the right to supplement its answers after it obtains expert analysis on invalidity.   Caldwell also incorporates by reference its prior answers to this interrogatory.   Subject to and without waiving these objections, Caldwell provides the following additional information:

(1)   U.S. Patent No. 6,598,264: The file history indicates that the only potentially novel element of this patent is the location of the bottom guide roller within the bottom guide.   This element is disclosed, or is obvious in light of, the prior art references

previously disclosed, either singly or in combination.   Attached as Exhibit "A" is a further analysis of which elements are present in certain previously-cited art references.   Caldwell further specifically states that the '264 Patent is anticipated and/or obvious in light of Thompson, U.S. Patent No. 6,840,011 (and the Anderson 200 Series balance previously disclosed) and/or Fitzgibbon, U.S. Patent No. 4,089,085, either singly or in combination.

       (2)     U.S. Patent No. 6,820,368:   The file history indicates that the only potentially novel element of this patent is enlarged end of the balance shoe.   This element is disclosed, or is obvious in light of, the prior art references previously disclosed, either singly or in combination.   Attached as Exhibit "A" is a further analysis of which elements are present in certain previously-cited art references.

       (3)     U.S. Patent No. 5,365,638:   The file history indicates that the only potentially novel element of this patent is the raised spine that inhibits rotation of the mounting means.   This element is disclosed, or is obvious in light of, the prior art references previously disclosed, either singly or in combination.   Attached as Exhibit "A" is a further analysis of which elements are present in certain previously-cited art references.

## Analysis of '264 Patent

| Claim Element | Designation |
|---|---|
| 1.  A block and tackle window balance device comprising: | A |
| a channel comprising a first end and a second end; | channel (B) with first end (C) and second end (D) |
| a top guide connected to the first end of the channel; | E |
| a bottom guide connected to the second end of the channel; | F1 |
| a bottom guide roller rotatably mounted in the bottom guide; | bottom guide roller (G1) |
| a fixed pulley block unit connected to the channel; | H |
| a   translatable   pulley   block   unit   moveable   within   the   channel; | I |
| a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and | spring (J), with a first end (K) and a second end (L) |
| a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. | cord (M) with a first end (N) and a second end (O) |
| 2. The device of claim 1 wherein the bottom guide roller is located external to the channel. | G2 |
| 4. The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | F3 |
| 12. A window assembly comprising: | A window assembly (P) and a block and tackle window balance (A) |
| a window frame with two jambs with jamb pockets; | |
| at least one of an upper window sash and a lower window sash slideably receivable in the jamb pockets; and | |
| at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | |
| a channel comprising a first end and a second end; | channel (B) with first end (C) and second end (D) |
| a top guide connected to the first end of the channel; | E |
| a bottom guide connected to the second end of the channel; | F1 |
| a bottom guide roller rotatably mounted in the bottom guide; | bottom guide roller (G1) |
| a fixed pulley block unit connected to the channel; | H |
| a   translatable   pulley   block   unit   moveable   within   the   channel; | I |
| a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and | spring (J), with a first end (K) and a second end (L) |

| Claim Element | Designation |
|---|---|
| a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. | cord (M) with a first end (N) and a second end (O) |
| 13. A window balance device comprising: | A |
| a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | F2 |
| a bottom guide roller rotatably mounted in the bottom guide. | bottom guide roller (G1) |
| 14. The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | bottom guide roller (G2) |
| 15. The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | F3 |
| 18.    A    window    balance    device    comprising: | A |
| a    channel    comprising    a    first    end    and    a    second    end; | channel (B) with first end (C) and second end (D) |
| a    top    guide    connected    to    the    first    end    of    the    channel; | E |
| a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and | F2 |
| a bottom guide roller rotatably mounted in the bottom guide. | bottom guide roller (G) |
| 19. The device of claim 18 wherein the bottom guide roller is located external to the channel. | G2 |
| 20. The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | F3 |
| 22. The device of claim 18 wherein the bottom guide further comprises a bottom guide axle for mounting the roller. | Q1 |
| 23.    A    window    balance    device    comprising: | A |
| a bottom guide connected to an end of a window balance channel, the bottom guide slidable in a jamb pocket when installed in a window frame, the bottom guide including: a bottom guide axle mounted within the bottom guide, the bottom guide axle located outside the window balance channel; and | a bottom guide (F1), window balance channel (B) and axle (Q2) |
| a bottom guide roller rotatably mounted on the bottom guide axle. | bottom guide roller (G5) and axle (Q2) |

4

Comparison of '264 Patent to Prosser, U.S. Patent No. 3,091,797

Element P
not shown in
these drawings
but is present in
both systems



FIG. 4A

Fig. 5.

5

Comparison of '264 Patent to Wood, U.S. Patent No. 3,114,178

Element P is not shown in these drawings (F is the frame), but is present in both systems.



See Prosser analysis for analysis of FIG. 4A

FIG. 4A

Fig. I

* Bottom guide roller positioned in the channel.

Comparison of '264 Patent to Biro, U.S. Patent No. 3,449,862



*See prosser analysis for discussion of FIG. 4A.*

FIG. 4A

*The spring has a second end (L) not shown in drawing.*

FIG. 3.

*Element P is not shown in these drawings, but is present in both systems*

*If Amesbury contends that the patent covers a roller partially external to the guide, these elements are present in Biro.*

7

Comparison of '264 Patent to Berndt, U.S. Patent No. 4, 704,821

Element P is not shown in these drawings, but is present in both systems



300

302
310
312
303
318
319
320
305
325
326
330
327
340
335
332
331
345
337
316
342
352
350
315

See Prosser Analysis for discussion of FIG. 4A

FIG. 4A



FIG.6
37
40
34
35
36
38
39
42
31
45
30
42
32
48
33

E(34)

C
B
A
D

F1,F2,F3 (32)

Spring (J) and Cord (M) are present in the Berndt patent, but are not pictured in this drawing.

8

Comparison of '264 Patent to Fitzgibbon, U.S. Patent No. 4,089,085

Element P is not pictured in these drawings, but is present in both systems

See Prosser analysis for analysis of FIG. 4A



**FIG. 4A**



9

Comparison of '264 Patent to Thompson, U.S. Patent No. 6,840,041 (also applies to Anderson 200 Series balance).

Element P is not shown in these drawings, but is present in both systems.

See Prosser analysis for analysis of FIG. 4A



FIG. 4A

Fig. 4

Comparison of '264 Patent to Japanese Utility Model JITUSKAI S62-19485  (Figure 3)



This reference shows a mounting structure consisting of a slider (13) attached to the lower end of a twisting plate (9). The rotating adjuster (17) is mounted in a similar fashion to the bottom guide roller of the patent.

11

| Claim Element | Designation |
|---|---|
| 1. A window balance system comprising: | A |
| a U-shaped channel comprising a plurality of openings; | B |
| a spring connected to a system of pulleys located within the U-shaped channel; | spring (C) and system of pulleys (D) |
| a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and | a cord (E) with a first end (F) and a second end (G) connected to a jamb mounting attachment (H) |
| a balance shoe, wherein the balance shoe comprises: | I |
| a frame comprising an enlarged first end and a second end, wherein at least a portion of the second end of the frame is disposed within the U-shaped channel; | a frame (J) with an enlarged first end (K) and a second end (L) |
| a locking member proximal to the enlarged first end; | M |
| a cam in communication with the locking member; and | N |
| a connecting device comprising one or more resilient tabs for attaching the balance shoe within the U-shaped channel of the window balance, wherein the one or more resilient tabs extend at least partially through a corresponding number of the plurality of openings in the U-shaped channel. | O |
| 2. A window balance system comprising: | A |
| a U-shaped channel comprising a plurality of openings; | B |
| a spring connected to a system of pulleys located within the U-shaped channel; | spring (C) and system of pulleys (D) |
| a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and | a cord (E) with a first end (F) and a second end (G) connected to a jamb mounting attachment (H) |
| a balance shoe, wherein the balance shoe comprises: | I |

| Claim Element | Designation |
|---|---|
| a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | a frame (J) with an enlarged first end (K) and a second end (L) forming a pocket positioned in the second end of the frame (P) |
| a locking member proximal to the enlarged first end; | M |
| a cam in communication with the locking member, and | N |
| a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | O |
| 3. The window balance system of claim 2 wherein the connecting device comprises a rivet. | The use of a rivet to connect two parts is not novel. |
| 4. The window balance system of claim 2 wherein the connecting device comprises a screw. | The use of a screw to connect two parts is not novel. |
| 5. The window balance system of claim 2 wherein the connecting device comprises a resilient tab. | The use of a tab to connect two parts is not novel. |

Comparison of '368 Patent to DeNormand, U.S. Patent No. 6,041,746



\* This is Fig. 1 of the
DeNormand Patent and
Fig. 2A of the '368 Patent

Comparison of '368 Patent With Berndt, U.S. Patent No. 4,704,821



See DeNormand
Analysis for
analysis of
FIG. 3C ──→

FIG.6

Element C is
pictured in Fig. 7 of
the Berndt patent,
as are elements
E (45), F, 5 and H(31)

15

Comparison of '368 Patent with Schmidt, U.S. Patent No. 5,301,467



* locking member attaching balance to sash

The elements A, B and C are referred to by Schmit (Col. 3, ll. 4-17) but are not depicted here.

**FIG. 2**

* connecting device engaging the cam

**FIG. 3A**

| Claim Element | Depiction |
|---|---|
| 1 A mounting assembly comprising | A |
| a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, | a channel (B) with: (1) a rear wall (C); (2) side walls (D); and (3) inwardly turned opposed flanges (E) |
| a sash frame support means slidable in said channel means, | F |
| a coiled ribbon spring having a first end engaged with said sash frame support means, | a coiled ribbon spring (G) and first end (H) |
| and a means for mounting said coiled ribbon spring, | I |
| the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, | the coiled body portion of the coiled ribbon spring (J) has a second end (K) |
| said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, | K |
| said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited. | a raised spine (L) |
| 8. A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, | A mounting assembly (A) and a channel (B) with: (1) a rear wall (C); (2) side walls (D); and (3) inwardly turned opposed flanges (E) |
| a sash frame support means slidable in said channel means, | F |
| a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, | a coiled ribbon spring (G) having an outer end (M) and having a means for mounting the coiled ribbon spring (I). |

| Claim Element | Depiction |
|---|---|
| the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | the coiled body portion of the coiled ribbon spring (J) has a second end (K) |
| said mounting means being secured in said channel means and | I |
| the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited. | Projection means (L) |

Comparison of claims of '638 Patent with Makarowski, U.S. Patent No. 5,069,001



19

Comparison of '638 Patent with Japanese Utility Model No. JIKKOHE18-9334



The sliding means (c) has a spine or projection means (L) that is positioned between flanges of the channel and inhibits rotation

Comparison of '638 Patent with Japanese Utility Model No. JIKKAIHEI4-119083



【図5】                【図6】



21

Comparison of '638 Patent with Japanese Utility Model No. JIKKOHEI14-112279



This drawing shows
a spine or projection
that interacts with
flanges of a channe
to prevent
rotation.

22

Comparison of '638 Patent with Sterner, U.S Patent No. 5,157,808



FIG. 2

# EXHIBIT 14



**CHARLES E. STILL, CONSULTING SERVICES**

Charles E. Still
*Specialist in Fenestration*

2914 PARTRIDGE CIRCLE
BRYAN, TEXAS 77802
PHONE: 979-731-1130
FAX: 979-731-1070
EMAIL: cestill@cox-internet.com

March 8, 2006

### Expert Witness Report of Charles E. Still

I, Charles E. Still, have been retained by Harris Beach PLLC to render expert services in conjunction with the patent infringement lawsuit. I hereby provide the following report involving U.S Patent 6,598,264 pursuant to Rule 26 of the Federal Rules of Civil procedure.

I received a Bachelor of Architecture Degree in 1962 from Texas A&M University in College Station, Texas. I am a graduate of Overton High School, Overton, Texas

I am the owner of Charles E. Still, Consulting Services based in Bryan, Texas. I have held this position since the inception of the company in July 2001. CES, Consulting Services specializes in fenestration. Windows and Doors are included in the term "fenestration" as well as curtain walls, storefronts and skylights. During my career, I have designed in excess of 200 fenestration products including single hung and double hung windows in aluminum, vinyl and composite materials for Residential, Manufactured Housing and Commercial Window Companies in New Construction and Replacement Markets. I am an expert in all phases of window design. I am a member of AAMA, American Architectural Manufacturers Association. AAMA is a professional trade organization including window manufacturers and suppliers to the window and door industry.

**Prior work history:**

**July 2000-July 2001** *Product Engineering Manager*, Alenco Building Products, Inc. Responsibilities include all phases of Engineering, Design and Development, Tooling and Certification and Documentation for four Manufacturing Plants. Primary products developed including windows, for new construction residential and commercial industry as well as residential replacement/remodeling market and manufactured housing industry. Primary window materials consists of extruded aluminum, extruded PVC vinyl and wood. Served on

*Member of American Architectural Manufacturers Association* 

the AAMA Southeast Region and Western Boards of Directors. Active in Installation Task Group in AAMA Western Region. Active in AAMA "Installation Masters" certified installers program.

**March 1999-July 2000** *Director of Engineering Support*, Reliant Building Products, Inc. Responsibilities include all product liability case investigations and resolution, giving depositions and court testimony. Search for new product, including window technologies, in design, materials and equipment. Company voting representative to all member trade associations and building codes groups (AAMA, NFRC and IGMA). Responsible for Product Certification and Testing. Licensed Glazing Contractor in the State of California and Arizona.

**1982-1999** *Vice President of Engineering*, Reliant Building Products, Inc., formerly known as Redman Building Products, Inc. Responsibilities includes managing product design and development and installation, product liability and codes compliance to national and state building codes. Active member of AAMA (American architectural manufacturing Association) and served as chairman of numerous task groups and served three times on the National AAMA Board of Directors. Active member of NFRC (National Fenestration Rating Council) involving thermal performance of windows and doors and IGMA, Insulating Glass Manufacturers Association (formerly known as SIGMA, Sealed Insulating Glass Manufacturers Association).

**1979-1982** *Director of Product Design*, Redman Building Products, Inc.. Responsibilities include product design, including windows and development of new construction and replacement/remodeling windows, doors and skylights. Company owned and operated 5 manufacturing plants and 7 sales outlets.

**1974-1979** *Chief Engineer*, Alenco, A Division of Redman Building Products, Inc. Responsibilities include design and development, testing, quality control department, plant maintenance department, plant tooling department, shop drawings department and warranty service department.

**1968-1974** *Chief Design Engineer*, Alenco, a Division of Redman Building Products, Inc.. Responsibilities include all designs of aluminum windows and doors for Residential and Commercial construction as well as Manufactured Housing.

**1964-1968** *Design Engineer*, Alenco, Albritton Engineering Corporation. Responsibilities include design and development of new aluminum windows and doors. Responsible for Office and Plant Expansion Program in Bryan, Texas Facility. Prepared architectural working drawings for Office and Plant Facilities (3 expansions).

The following documents have been made available to me by the attorneys at Harris Beach.

- U.S. Patent 329,996. A Spring Sash Balance, February 25, 1929
- G.B. Patent 1,218,827. Sash Control Mechanism, July 17, 1967
- G.B. Patent 1,244,324. A Sliding Sash Window, August 11, 1968

2
1

- G.B. Patent 1,287,756. Improvements In Or Relating To Doors, August 25, 1969
- U.K. Patent 2,236,786. A. Guide Assembly, September 27, 1989
- U.S. Patent 2,262,990. Window Sash Counterbalance, September 2, 1939
- U.S. Patent 2,279,600. Sash Balance, March 30, 1940
- U.K. Patent 2,280,697. Tiltable To Sash Windows, July 27, 1993
- U.K. Patent 2,292,168 A. Pivoting Sash Slide Locking Mechanism, July 31, 1995
- U.S. Patent 2,635,282. Spring Counterbalance, October 2, 1950
- U.S. Patent 2,826,090. Sash Balance Coupling Device, March 21, 1955
- U.S. Patent 3,055,044. Foot Attachment For Block And Tackle Type Spring Counterbalances, September 25, 1960
- U.S. Patent 3,449,862. Window Structure, August 21, 1967
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 3,091,797. Window Structure, April 26, 1961
- U.S. Patent 3,114,178. Sliding Window And Counterbalancer Combination, February 6, 1961
- U.S. Patent 3,358,403. Heavy Window Balance Assembly, January 28, 1966
- U.S. Patent 3,358,404. Readily Removable Double Hung Window, January 28, 1966
- U.S. Patent 3,440,683. Sash Control Mechanism, July 17, 1967
- U.S. Patent 3,449,862. Window Structures, August 11, 1967
- U.S. Patent 3,452,480. Spring Sash Counterbalance, September 14, 1967
- U.S. Patent 3,711,995. Building Structure, June 22, 1070
- U.S. Patent 3,869,754. Bracket For A Spring Sash Counterbalance, September 10, 1973
- U.S. Patent 4,079,549. Balance Spring Lock For Tilt Out Sash, August 26, 1976
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 4,227,345. Tilt-Lock Slide For Window Sash, January 26, 1979
- U.S. Patent 4,300,316. Sash Balance Foot Seal Mechanism, October 17, 1979
- U.S. Patent 4,610,108. Balance Spring Locking Slide Block For Tilt-Out Windows, December 20, 1984
- U.S. Patent 4,654,928. Adjustable Friction Block And Tackle Window Balance System,
- April 11, 1986
- U.S. Patent 4,704,821. Compression Seals In A Double Hung Style Window, July 3, 1986
- U.S. Patent 4,949,425. Spring Loaded Block And Tackle Window Sash Balance Assembly, October 19, 1988
- U.S. Patent 5,069,001. Pivotable Window Sash Assembly, November 21, 1990 U.S. Patent 5,157,808. Coil Spring Counterbalance Hardware Assembly And Connection Method Therefore, February 18, 1992
- U.S. Patent 5,210,976. Window Balance Assembly, June 26, 1992
- U.S. Patent 5,243,783. Locking Slide Block, June 24, 1992
- U.S. Patent 5,301,467. Locking Slide Block, September 2, 1993
- U.S. Patent 5,353,548. Curl Spring Shoe Based Window Balance System, April 1, 1993

3
1

- U.S. Patent 5,365,638. Spring Mounting For Sash Frame Tensioning Arrangements, January 21, 1993
- U.S. Patent 5,371,971. Sash Balance Brake And Pivot Pin Assembly, May 4, 1993
- U.S. Patent 5,530,991. Block And Tackle Window Balance, January 21, 1994
- U.S. Patent 5,632,117. Sash Balance Brake Assembly, January 13, 1995
- U.S. Patent 5,661,927. Sliding Counterbalance Assembly For A Sash Window, March 6, 1996
- U.S. Patent 5,669,180. Window Balance Brake Shoe And Pivot Assembly, May 29, 1996
- U.S. Patent 5,737,877. Block And Tackle Balance With Integral, Non-Rotating Pulley System, July 26, 1996
- U.S. Patent 5,806,243. Sash Balance Brake Assembly, May 21, 1997
- U.S. Patent 5,829,196. Window Balance Brake Shoe And Pivot Assembly, May 30, 1997
- U.S. Patent 6,041,476. Inverted Block And Tackle Window Balance, November 21, 1997
- U.S. Patent 6,088,880. Adjustable Shoe For Awning Window Hinge, July 7, 1997
- U.S. Patent 6,151,832. Window Balance Cam Housing, February 19, 1999
- U.S. Patent 6,230,443 B1. Hardware Mounting, May 5, 1999
- U.S. Patent 6,467,128 B1. Block And Tackle Sash Counter Balance, September 11, 2000
- U.S. Patent 6,550,184 B1. Brake Shoe For Sash Window Or Door Assembly, February 9, 2001
- U.S. Patent 6,598,264 B2. Block And Tackle Window Balance With Bottom Guide Roller, March 16, 2001
- U.S. Patent 6,606,761 B2. Spring Mounting Arrangement For A Sash Window Counterbalance Arrangement, October 8, 2001
- U.S. Patent 6,622,342 B1. Block And Tackle Balance Assembly With Brake Shoe, June 6, 2001
- U.S. Patent 6,820,368 B2. Snap Lock Balance Shoe And System For A Pivotable Window, May 23, 2003
- U.S. Patent 6,840,011 B2. Window Panel Balance Apparatus And Method, December 13, 2000
- U.S. Patent 6,990,710 B2. Counterbalance System For A Tilt-In Window Having An Improved Shoe Assembly And Anchor Mount, November 5, 2003
- Japanese Patent 62-194,895. Title and filing date unknown.
- Caldwell Fenestration Hardware Product Information, Bates C00477 thru C00542.
- Defendant's Second Supplemented Answers To Plaintiffs' First Set Of Interrogatories.
- Memorandum And Order, January 20, 2006.
- Amesbury's First Supplemental Response To Caldwell's Interrogatories (Nos.1-2)
- Amesbury's Second Supplemental Response To Caldwell's Interrogatories (Nos. 1-2,13-16).
- Defendant's Supplemented Answers To Plaintiffs' First Set Of Interrogatories
- Joint Motion to Set Schedule.

4
1

- Patent '264 File History, Bates C000543 thru C000690.
- Patent '638 File History, Bates C000921 thru C001116.
- Case documents Bates AME 01931 through 01948
- CD files: Documents Produced in Response to Plaintiffs' First Request for documents and Things, dated September 28, 2005

Other documents include:

- Voluntary Specifications for Aluminum, Vinyl (PVC) and Wood Windows and Glass Doors, AAMA/NWWDA 101/I.S.2-97.
- International Residential Code for One and Two Family Dwellings-2000.
- U.S Patent 4,961,247. Balancing Arrangements For Double Hung Windows. December 7, 1989

This case involves windows and window balance hardware. Single, double and triple hung windows are best described as vertically operating windows in which the sash weight is offset by a counter-balancing mechanism mounted in the window. One or more locking devices are furnished to secure the sash in the closed position. Single and double hung windows are the most common types in the United States and Canada. They allow light and ventilation into a dwelling. A window balance is a mechanical device (normally spring loaded) used in hung type windows as a means of counter-balancing the weight of the sash during opening and closing. Balances are most often furnished in pairs. The role of balances in today's windows are critically important due to the increased demand for insulating glass which increases the sash weight by twice the amount of a traditional single glazed window. In coastal areas, laminated glass in impact-tested windows also increases the sash weight of hung windows. Balances are required to maintain the sash in any open position without drifting or falling down.

There are different types of window balances. Spiral, block and tackle and constant force. **Newman, U.S. Patent 6,598,264** involves a block and tackle balance. Block and tackle balances have been used in windows for the past 67 years. They are simple to install and are reliable. Traditional block and tackle balances are mounted inside the frame jamb pockets of the window and the operating sash is loaded, laterally, into one vertical main frame of the window and then the other side of the window. The vertical sash jambs "straddle" the balance channel during this maneuver and engage the sash to the main frame of the window via the balance. This type of window is termed "side load". Another popular type of block and tackle is the "tilt-in" whereby the operating sash is rotated inward by pivoting at the bottom corners of the sash. The **'264 Patent** is designed for a "side load" window. One of the **'264 Patent** features claims to increase the vertical sash travel by placing a roller near the bottom of the balance. When installed in a single or double hung window, the additional sash travel could conceivably allow a smaller window in frame height to qualify for emergency egress by allowing a greater opening height when the sash is fully open in a given window height.

5
1

According to the International Residential Code for One and Two –Family Dwellings, 2000 Edition, Section R310, Emergency Escape And Rescue Openings, "Basements with habitable space and every sleeping room shall have at least one openable emergency escape and rescue window or exterior door opening for emergency escape and rescue". All emergency escape and rescue openings shall have a minimum net clear opening of 5.7 square feet, Exception; grade floor openings shall have a minimum net clear opening of 5 square feet. The minimum net clear opening height shall be 24 inches.

Other types of window balances, including traditional block and tackle balances, offer the same increased vertical sash travel and meet Local, State, National and International emergency egress codes. I have designed numerous hung type windows that meet egress without the use of a roller near the bottom end of the balance. Extended sash travel can be achieved with a traditional block and tackle balance by moving the balance cord hook upwards along the frame jamb pocket, thereby allowing the sash to travel upward until the sash head bottoms out under the frame head, giving maximum height for a given sash. Selection of locking hardware mounted on top of the sash head plays an important role in the vertical distance achieved. Sash locks located on the top surface of the sash head often reduce the vertical sash travel. Spiral and constant force balances can achieve the same maximum sash clear opening for a given window height.

**Thompson, U.S. Patent 6,840,011**- Filed December 13, 2000 (see Exhibits A & B) clearly shows a block and tackle balance with a bottom guide roller within the bottom guide. During the **'264 Patent** search, the Primary Examiner, Anthony Knight, and Assistant Examiner, William D. Hutton, Jr. was not made aware of the existence of '011 Patent being filed prior to **'264 Patent** filing. The remaining major components in '011 Patent are commonplace and can be found in Prior Art illustrated in **'264 Patent**, Fig. 2A & Fig. 2B. These components perform the same function as in the **'264 Patent**.

I have studied and examined a sample balance taken from an Series 200 Andersen wood window. It is a block & tackle balance identified with the markings BSI 430/ 022305. The sample is almost identical to the '011 Pat. drawings and drawings shown in case documents AME 01932, 01933, 01941, 01942, 01943, 01944 & 01945. I have also studied and examined a sample block & tackle balance as manufactured by BSI, identified with the markings BSI 2630/OM. The sample is identical to the drawings shown in the **'264 Patent**. I have also studied and examined a block & tackle balance as manufactured by Caldwell, identified with markings 11 1 CX CMC 11.

**Prosser, U.S. Patent 3,091,797**- Filed April 26, 1961 (see Exhibits C & D) clearly shows a block and tackle balance with a bottom roller within the bottom guide. The remaining major components in '797 Patent perform the same function as in the **'264 Patent**.

Other Prior Art can be found in (1) Wood, U.S. Patent No. 3,114,178, (2) Biro, U.S. Patent No. 3,449,862, (3) DeNormand, U.S. Patent No. 6,041,476, (4) Bernt, U.S. Patent No. 4,704,821 and ((5) Fitzgibbon, U.S. Patent No. 4,089, 085.

6
1

**Opinions**

**Newman, U.S. Patent 6,598,264,** based upon my findings, is not novel and/or is obvious and therefore, not valid.

Prior Art proves that all components of **'264 Patent** existed before **'264 Patent** was filed. U.S. Patent 3,091,797 contains all of the elements disclosed in claims 1,4,6,7,9,11,12,13,14, 15,18, & 20 of the '264 Patent, thereby anticipating those claims. All of the claims would have been obvious to one of ordinary skill in the art to which this invention pertains based on a combination of: (1) the admitted prior art and Thompson U.S. Patent 6,840,011; and/or (2) the admitted prior art and Prosser U.S. 3,091,797. Therefore the claims are invalid. Detailed comparisons of the claims of the patent to the prior art are attached as Exhibits A,B,C& D.

I reserve the right to add additional opinions in my investigations and/or upon review of additional discovery materials. Opinions herein are within a reasonable degree of professional certainty.

*Chas E. Still*

Charles E. Still

Attachments:
CES Deposition Records
Comparison Chart-'264 Patent- Exhibit A
Comparison Drawing-'264-Exhibit B
Comparison Chart-'264 Patent-Exhibit C
Comparison Drawing-'264 Exhibit D

7
1

**Charles E. Still**          **Testimony Given in Depositions and Trials**

| Type | Parties | Type of Claim | Location | Date |
|------|---------|---------------|----------|------|
| Deposition | VBP v. Royal Plastic | Patent Infringement | Oakland, New Jersey | |
| Trial | VBP v. Royal Pastics | Patent Infringement | Newark, New Jersey | |
| Deposition | Redman v. ? | Forced Entry/Injury | Albuquerque, New Mexico | |
| Deposition | Redman v. ? | Forced Entry/Injury | Houston, Texas | |
| Deposition | Thiokol v. ? | Glass Breakage | Denver, Colorado | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Trial | Redman v. ? | Personal Injury | Savannah, Georgia | |
| Trial | Redman v. ? | Water Infiltration | Little Rock, Arkansas | |
| Trial | Redman v. ? | Scratched Glass | Waco, Texas | |
| Arbitration | Redman v.? | Glass Breakage | Alexandria, Louisiana | |
| Trial | Redman v. ? | Water Infiltration | Baton Rouge, Louisiana | |
| Deposition | Inmont v. ? | Glass Breakage | Rockwall, Texas | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Deposition | Lamkin v. Gapco | Personal. Injury | Madison County, Illinois | |
| Deposition | Pace v. Gapco | Personal Injury | Madison County, Illinois | |
| Trial | Redman v. ? | Glass Breakage | Salt Lake City, Utah | |
| Deposition | Redman v. ? | Condensation | Baytown, Texas | |
| Deposition | Redman v. ? | Personal Injury | Detroit, Michigan | |
| Deposition | Redman v. ? | Personal Injury | South Padre Island, Texas | |
| Deposition | Gapco v. ? | Personal Injury | St. Louis, Missouri | |
| Trial | Unique v. Beard | Business Ethics | Roanoke, Virginia | |
| Deposition | Redman v. Somerset | Water Infiltration | Silver Springs, Maryland | |
| Deposition | Reman v. ? | Water Infiltration | San Francisco, California | |
| Deposition | Redman v. ? | Water Infiltration | Fresno, California | |

| Deposition | Bolander v. Champion | Water Infiltration | Houston, Texas | 8/29/2003 |
| Trial | Jason Lamkin v. Gapco | Personal Injury | Belleville, Illinois | 3/15/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, Texas | 4/2/2004 |
| Deposition | All Seasons v. Tradewinds Condo | Code Compliance | Orange Beach, AL | 5/19/2004 |
| Deposition | All Seasons v. Royal Palms Condo | Code Compliance | Gulf Shores, AL | 6/24/2004 |
| Deposition | W.S. Phillips v. Hope Lumber | Water Infiltration | College Station, TX | 10/27/2004 |
| Deposition | W.S. Phillips v. Alenco | Water Infiltration | College Station, TX | 11/30/2004 |
| Deposition | Sungate Development v. All Seasons | Water Infiltration | McAllen, TX | 12/7/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, TX | 2/23/2005 |
| Deposition | Cavalier Homes v. Larson Doors | Product Quality | Haleyville, AL | 5/26/2005 |
| Deposition | Grand Pointe HOA V. All Seasons | Product Liability | Orange Beach, AL | 6/29/2005 |
| Deposition | Donn v. Turner v. General Aluminum | Water Infiltration | Aubrey, TX | 9/9/2005 |
| Arbitration | Hilcom v. Moore | Water Infiltration | Houston, TX | 10/19/2005 |
| Trial | Sandhu v. Wellington | Personal Injury | Toronto, Canada | 11/18/2005 |
| Deposition | Planter's Place HOA v.All Seasons | Water Infiltration | Mt. Pleasant, S.C. | 12/20/2005 |

EXHIBIT A

INVALIDATION OF
AMESBURY'S U.S. PATENT NO. 6,598,264

| Claim | Amesbury's U.S. Patent No. 6,598,264 | Illustration of the Invalidity of the '264 Patent |
|-------|--------------------------------------|----------------------------------------------------|
| 264/1 | A block and tackle window balance device comprising: | See Exhibit B, item A, a '011 Pat. is a block and tackle window balance device comprising; |
| 264/1 | a channel comprising | See Exhibit B, item G, a channel comprising |
| 264/1 | a first end | See Exhibit B, item C, a first end |
| 264/1 | and a second end; | See Exhibit B, item D, and a second end; |
| 264/1 | a top guide connected to the first end of the channel; | '011 Pat. has no top guide connected to the first end of the channel; Prior art is established in '264 Pat., Fig. 2A, 2B & Fig.3, which shows the top guide. |
| 264/1 | a bottom guide connected to the second end of the channel; | See Exhibit B, item G, a bottom guide connected to the second end of the channel; |
| 264/1 | a bottom guide roller rotatably mounted in the bottom guide; | See Exhibit B, item R, a bottom guide roller rotatably mounted in the bottom guide; |
| 264/1 | a fixed pulley block unit connected to the channel; | See Exhibit B, item H, a fixed pulley block unit connected to the channel; |
| 264/1 | a translatable pulley block unit moveable within the channel; | See Exhibit B, item K, a translatable pulley block unit moveable within the channel; |

1

| Claim | Amendment to U.S. Patent No. 4,695,264 | Interpretation during prosecution |
|---|---|---|
| 264/1 | a spring comprising | See Exhibit B, item J, a spring comprising |
| 264/1 | a first end | a first end |
| 264/1 | and a second end, | and a second end, |
| 264/1 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel |
| 264/1 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit |
| 264/1 | and a cord comprising | See Exhibit B, item N, and a cord comprising |
| 264/1 | a first cord end | a first cord end |
| 264/1 | and a second cord end, | and a second cord end |
| 264/1 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit |
| 264/1 | and the fixed pulley block unit | and the fixed pulley block unit |
| 264/1 | and extends around the bottom guide roller, | and extends around the bottom guide roller, |
| 264/1 | the first cord end being attached to the translatable pulley block unit | the first cord end being attached to the translatable pulley block unit |

| Claim | PTO/Amendment, U.S. Patent No. 6,598,264 | Description of the Prior Art in U.S. Patent No. 6,840,011 |
|---|---|---|
| 264/1 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. |
| 264/2 | The device of claim 1 wherein the bottom guide roller is located external to the channel. | The device of the '011 Patent has a bottom guide roller located external to the channel. |
| 264/3 | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | '011 Pat. has no top angled portion. Prior art is established in '264 Pat., Fig. 2A, 2B & Fig.3, which has the top angled portion. |
| 264/4 | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | The device of the '011 Patent has a portion of the bottom guide external to the channel. |
| 264/5 | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | The device of the '011 Patent has a bottom guide which forms a channel to receive a portion of a window sash. |
| 264/6 | The device of claim 1 wherein the fixed pulley block unit comprises | The device, of the '011 Patent has a fixed pulley block unit comprising |

3

| Claim | Amended U.S. Patent No. 6,598,264 | Thompson Patent No. '011 |
|---|---|---|
| 264/6 | a frame, | a frame, |
| 264/6 | an axle, | an axle, |
| 264/6 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. |
| 264/7 | The device according to claim 6 wherein the axle is located within the frame. | The device of the '011 Patent has an axle located within the frame. |
| 264/9 | The device according to claim 1 wherein the translatable pulley block unit comprises | The device of the '011 Patent has a translatable pulley block unit comprising |
| 264/9 | a frame, | a frame, |
| 264/9 | an axle within the frame, | an axle within the frame, |
| 264/9 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. |
| 264/10 | The device according to claim 1 wherein the top guide includes a top angled portion | '011 Pat. has no top guide. Prior art is established in '264 Pat., Fig.2A,2B &Fig.3, which has a top guide. |

4

| Claim | Anticipating U.S. Patent No. 4,593,284 | International Patent No. 0,016,009 |
|---|---|---|
| 264/10 | and a bottom portion, the bottom portion being connected to the first end of the channel. | '011 Patent has a bottom portion, the bottom portion being connected to the first end of the channel. |
| 264/11 | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | The device of the '011 Patent has a fixed pulley block unit integral with the bottom guide. |
| 264/12 | A window assembly comprising: | A window assembly comprising: |
| 264/12 | a window frame with two jambs with jamb pockets; | The device of the '011 Patent is used in connection with a window frame with two jambs and two jamb pockets; |
| 264/12 | At least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | The device of the '011 Patent is used in conjunction with an upper window sash and a lower window sash slidably receivable in the jamb pockets; and |
| 264/12 | At least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | In use, the device of the '011 Patent has at least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising: |
| 264/12 | channel comprising a first end and a second end; | channel comprising a first end and a second end; |

5

| Claim | Am. Injury., U.S. Patent No. 6,059,264 | Discussion and Applicant No. 5,850,863 |
|---|---|---|
| 264/12 | a top guide connected to the first end of the channel; | '011 Pat. has no top guide. Prior art established in '264 Pat. Fig. 2A, 2B & Fig. 3 |
| 264/12 | a bottom guide connected to the second end of the channel; | a bottom guide connected to the second end of the channel; |
| 264/12 | a bottom guide roller rotatably mounted in the bottom guide; | a bottom guide roller rotatably mounted in the bottom guide; |
| 264/12 | a fixed pulley block unit connected to the channel; | a fixed pulley block unit connected to the channel; |
| 264/12 | a translatable pulley block unit moveable within the channel; | a translatable pulley block unit movable within the channel; |
| 264/12 | a spring comprising | a spring comprising |
| 264/12 | a first end | a first end |
| 264/12 | and a second end | and a second end |
| 264/12 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel |
| 264/12 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit; |
| 264/12 | and a cord comprising | and a cord comprising |
| 264/12 | a first cord end | a first cord end |
| 264/12 | and a second cord end, | and a second cord end, |

6

| U.S Claim Number | Amendment U.S Patent No. 6,598,264 | Infringing U.S Patent No. 6,860,312 |
|---|---|---|
| 264/12 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit |
| 264/12 | and the fixed pulley block unit | and the fixed pulley block unit |
| 264/12 | and extends around the bottom guide roller, | and extends around the bottom guide roller, |
| 264/12 | the first cord end being attached to the translatable pulley block unit | the first cord end being attached to the translatable pulley block unit |
| 264/12 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. |
| 264/13 | A window balance device comprising: | The device of the '011 Patent  is a window balance device comprising: |
| 264/13 | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and |
| 264/13 | a bottom guide roller rotatably mounted in the bottom guide. | a bottom guide roller rotatably mounted in the bottom guide. |
| 264/14 | The device of claim 13 wherein the bottom guide roller is located | The device of the '011 Patent has a bottom guide located external to the channel when the bottom guide is attached. |

7

| Claim | Ambiguity of U.S. Patent No. 6,598,264 | Thompson U.S. Patent No. 6,840,011 |
|---|---|---|
| | external to the channel when the bottom guide is attached thereto. | |
| 264/15 | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | The device of the '011 Patent has a bottom guide at least a portion of which is external to the channel when attached thereto. |
| 264/16 | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of window sash when installed. | The device of the '011 Patent has a bottom guide that forms a channel to receive a portion of window sash when installed. |
| 264/18 | A window balance device comprising: | The device of the '011 Patent is a window balance device comprising: |
| 264/18 | a channel comprising a first end and a second end; | a channel comprising a first end and a second end; |
| 264/18 | a top guide connected to the first end of the channel; | '011 Patent has no top guide connected to the first end of the channel; Prior art is established in '264 Pat., Fig. 2A, 2B and Fig. 3, which shows the top guide. |
| 264/18 | a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; | a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; |

8

| Claim | Amesbury U.S. Patent No. 4,593,926 | Plaintiff's 5,996,283 Patent ('011) |
|---|---|---|
| | and | |
| 264/18 | a bottom guide roller rotatably mounted in the bottom guide. | a bottom guide roller rotatably mounted in the bottom guide. |
| 264/19 | The device of claim 18 wherein the bottom guide roller is located external to the channel. | The device of the '011 Patent has a bottom guide roller located external to the channel. |
| 264/20 | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | The device of the '011 patent has a bottom guide, at least a portion of which is external to the channel. |
| 264/21 | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | The device of the '011 Patent has a bottom guide that forms a channel to receive a portion of a window sash when installed. |

9

B

# U.S.6,598,264
Newman: Filed March16,2001

# U.S.6,840,011
Thompson: Filed Dec.13,2000



EXHIBIT B

**EXHIBIT C**

INVALIDATION OF
AMESBURY'S U.S. PATENT NO. 6,598,264

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Fischbach U.S. Patent No. 5,033,1974 |
|---|---|---|
| 264/1 | A block and tackle window balance device comprising: | See Exhibit D, item A, '797 Patent is a block and tackle window balance device comprising; |
| 264/1 | a channel comprising | See Exhibit D, item B, a channel comprising |
| 264/1 | a first end | See Exhibit D, item C, a first end |
| 264/1 | and a second end; | See Exhibit D, item D, and a second end; |
| 264/1 | a top guide connected to the first end of the channel; | See Exhibit D, item E, a top guide connected to the first end of the channel; |
| 264/1 | a bottom guide connected to the second end of the channel; | See Exhibit D, item G, a bottom guide connected to the second end of the channel; |
| 264/1 | a bottom guide roller rotatably mounted in the bottom guide; | See Exhibit D, item R, a bottom guide roller rotatably mounted in the bottom guide; |
| 264/1 | a fixed pulley block unit connected to the channel; | See Exhibit D, item H, a fixed pulley block unit connected to the channel; |
| 264/1 | a translatable pulley block unit moveable within the channel; | See Exhibit D, item K, a translatable pulley block unit moveable within the channel; |

1

| Claim Element | Amadio's U.S. Patent No. 6,598,264 | Rupley's U.S. Patent No. 6,098,68? |
| --- | --- | --- |
| 264/1 | a spring comprising | See Exhibit D, item J, a spring comprising |
| 264/1 | a first end | a first end |
| 264/1 | and a second end, | and a second end, |
| 264/1 | wherein the first end is fixed relative to the channel | Wherein the first end is fixed relative to the channel |
| 264/1 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit |
| 264/1 | and a cord comprising | See Exhibit D, item N, and a cord comprising |
| 264/1 | a first cord end | a first cord end |
| 264/1 | and a second cord end, | and a second cord end |
| 264/1 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit |
| 264/1 | and the fixed pulley block unit | and the fixed pulley block unit |
| 264/1 | and extends around the bottom guide roller, | and extends around the bottom guide roller, |
| 264/1 | the first cord end being attached to | the first cord end being attached to the |

| Claim Element | Amesbury II U.S. Patent No. 6,598,264 | Corresponding Disclosure in 5,054,597 |
|---|---|---|
| | the translatable pulley block unit | translatable pulley block unit |
| | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. |
| 264/1 | The device of claim 1 wherein the bottom guide roller is located external to the channel. | The device of the '797 Patent has a bottom guide roller located internal to the channel. |
| 264/2 | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | '797 Patent has no top angled portion. Prior art is established in Pat. '264, Fig. 2A, 2B & Fig.3, which has a top angled portion. |
| 264/3 | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | The device of the '797 Patent has a portion of the bottom guide external to the channel. |
| 264/4 | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | The device of the '797 Patent has no channel to receive a portion of a window sash in the bottom guide. Prior art is established in Pat. '264, Fig. 2A, 2B & Fig. 3, which shows the bottom guide to receive a portion of a window sash when installed. |
| 264/5 | The device of claim 1 wherein the | The device of the '797 Patent has a fixed pulley |

3

| Claim Element | Amchury's U.S. Patent No. 6,598,264 | Prior Art U.S. Patent No. 5,490,791 |
|---|---|---|
| | fixed pulley block unit comprises | block unit which comprises |
| 264/6 | a frame, | a frame, |
| 264/6 | an axle, | an axle, |
| 264/6 | and at least one pulley rotatable around the axle. | And at least one pulley rotatable around the axle. |
| 264/7 | The device according to claim 6 wherein the axle is located within the frame. | The device of the '797 Patent has an axle located within the frame. |
| 264/9 | The device according to claim 1 wherein the translatable pulley block unit comprises | The device of the '797 Patent has a translatable pulley block unit which comprises |
| 264/9 | a frame, | A frame, |
| 264/9 | an axle within the frame, | an axle within the frame, |
| 264/9 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. |
| 264/10 | The device according to claim 1 wherein the top guide includes a top | '797 Patent has no angled portion on the top guide. Prior art is established in Pat'264, Fig.2A,2B &Fig.3 |

4

| Claim Element | Amended U.S. Patent No. 6,598,760 | [Device of the '797 Patent No. 6,244,787] |
|---|---|---|
| | angled portion | |
| 264/10 | and a bottom portion, the bottom portion being connected to the first end of the channel. | The device of '797 Patent has a bottom portion, the bottom portion being connected to the first end of the channel |
| 264/11 | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | The device of the '797 Patent has a fixed pulley block unit integral with the bottom guide. |
| 264/12 | A window assembly comprising: | The device of the '797 Patent is used in conjunction with a window assembly comprising: |
| 264/12 | a window frame with two jambs with jamb pockets; | a window frame with two jambs and two jamb pockets; |
| 264/12 | At least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | an upper window sash and a lower window sash slidably receivable in the jamb pockets; and |
| 264/12 | At least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | In use, the device of the '797 Patent is a block and tackle window balance attached to at least one of the upper window sash and the lower window sash, the device comprising: |
| 264/12 | channel comprising a first end and a | channel comprising a first end |

| Claim Element | Amesbury U.S. Patent No. 6,598,266 | [Patent No. 5,904,197] |
|---|---|---|
|  | second end; | and a second end; |
| 264/12 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel; |
| 264/12 | a bottom guide connected to the second end of the channel; | a bottom guide connected to the second end of the channel; |
| 264/12 | a bottom guide roller rotatably mounted in the bottom guide; | a bottom guide roller rotatably mounted in the bottom guide; |
| 264/12 | a fixed pulley block unit connected to the channel; | a fixed pulley block unit connected to the channel; |
| 264/12 | a translatable pulley block unit moveable within the channel; | a translatable pulley block unit moveable within the channel; |
| 264/12 | a spring comprising | a spring comprising |
| 264/12 | a first end | a first end |
| 264/12 | and a second end | and a second end |
| 264/12 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel |
| 264/12 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit; |
| 264/12 | and a cord comprising | and a cord comprising |
| 264/12 | a first cord end | a first cord end |

6

| Claim Element | Anderson et al. US Patent No. 6,598,264 | Bratton et al. US Patent No. 5,099,5(?) |
|---|---|---|
| 264/12 | and a second cord end, | and a second cord end, |
| 264/12 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit |
| 264/12 | and the fixed pulley block unit | and the fixed pulley block unit |
| 264/12 | and extends around the bottom guide roller, | and extends around the bottom guide roller, |
| 264/12 | the first cord end being attached to the translatable pulley block unit | the first cord end being attached to the fixed pulley block unit |
| 264/12 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. |
| 264/13 | A window balance device comprising: | The window balance device of '797 Patent comprises: |
| 264/13 | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and |
| 264/13 | a bottom guide roller rotatably mounted in the bottom guide. | a bottom guide roller rotatably mounted in the bottom guide. |

7

| Claim Element | Armstrong U.S. Patent No. 6,598,264 | Pioneer's U.S. Patent No. 5,095,797 |
|---|---|---|
| 264/14 | The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | The device of the '797 Patent has a bottom guide located external to the channel . |
| 264/15 | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | The device of the '797 Patent has a bottom guide external and internal to the channel. |
| 264/16 | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of window sash when installed. | The device of the '797 Patent has no channel to receive a portion of a window sash in the bottom guide. Prior art is established in 264 Pat, Fig. 2A, 2B & Fig. 3, which shows the bottom guide channel to receive a portion of a window sash when installed. |
| 264/18 | A window balance device comprising; | The window balance device of the '797 Patent comprises: |
| 264/18 | a channel comprising a first end and a second end; | a channel comprising a first end and a second end; |
| 264/18 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel; |
| 264/18 | a bottom guide connected to the second end of the channel and | a bottom guide connected to the second end of the channel and |

8

| Claim Element | Anebuda's U.S. Patent No. 6,598,264 | Prior Art U.S. Patent No. 5,091,797 |
|---|---|---|
|  | adapted to slide in a jamb pocket when installed in a window frame; and | adapted to the slide in a jamb pocket |
| 264/18 | a bottom guide roller rotatably mounted in the bottom guide. | a bottom guide roller rotatably mounted in the bottom guide |
| 264/19 | The device of claim 18 wherein the bottom guide roller is located external to the channel. | The device of the '797 Patent has a bottom guide roller located internal to the channel. |
| 264/20 | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | The device of the '797 Patent has a bottom guide, at least a portion of which is external to the channel. |
| 264/21 | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | The device of the '797 Patent has no channel to receive a portion of a window sash in the bottom guide. Prior art is established in '264 Pat. Fig. 2A,2B & Fig.3, which shows the bottom guide channel to receive a portion of a window sash. |

9

D

U.S. 6,598,264                    U.S. 3,091,797

Newman: Filed March 16, 2001      Prosser: Filed April 26, 1961



EXHIBIT D

# EXHIBIT 15

00001
 1

 2            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
 3   - - - - - - - - - - - - - - - - - - - -x
     AMESBURY GROUP, INC., and
 4   AMESBURY SPRINGS LTD.,
          Plaintiffs,

 5
          v.   Civil Action No. 05-10020-DPW
 6
     THE CALDWELL MANUFACTURING
 7   COMPANY,
          Defendant.
 8   - - - - - - - - - - - - - - - - - - - -x
          CONFIDENTIAL
 9
     Videotaped Deposition Upon Oral Examination Of:
10        Jeffrey Robertson

11
     Location:   Alliance Shorthand, Inc.
12        183 East Main Street
          Rochester, New York  14604
13

14   Date:      November 29, 2005

15

16   Time:      9:35 a.m.

17

18

19   Reported By:  Joanne N. Pero

20        Alliance Shorthand, Inc.

21        Suite 1500 - The Penthouse

22        Alliance Building

23        183 Main Street East

24        Rochester, New York  14604

25

**Robertson, Jeffrey, 11/29/05**                    **Page 1**

00051

1

2  in the picture.

3      Q.  Is it possible that the carrier part F

4  would also rotate to touch the rivet D in such

5  circumstances?

6          MR. REFERMAT:  Objection.

7      A.  It would rotate away from the rivet D in

8  such circumstances.

9      Q.  Is there any circumstance in which F

10  would touch the rivet D?

11          MR. REFERMAT:  Objection.

12      A.  If the shoe is rotated forcibly in the

13  direction opposite to that we were just discussing.

14      Q.  And when would that happen?

15          MR. REFERMAT:  Objection.

16      A.  Possibly in shipping or in handling.

17      Q.  Is it fair to say part of the function of

18  the rivet D is also to prevent rotation in shipping

19  and handling of the carrier?

20          MR. REFERMAT:  Objection.

21      A.  It's not its intended purpose.  Its

22  intended purpose is the spring anchor.

23      Q.  Is it fair to say that an unintended

24  purpose or unintended function of the rivet D is to

25  prevent rotation of the carrier during shipping?

00049
1

2    A.  Below.  In the picture?

3    Q.  Right.

4    A.  Okay.

5    Q.  Can you label that as "G"?

6    A.  (The witness complied.)

7    Q.  Can I take a look?

8    A.  (The witness complied.)

9    Q.  Now, in the 97ez, what is the purpose of

10   the plastic part you labeled as "F"?

11       MR. REFERMAT:  Objection.

12    A.  Prevent rotation in the carrier in the

13   channel.

14    Q.  Is this to prevent rotation of the

15   carrier while in operation?

16    A.  No.

17    Q.  When is it to prevent rotation?

18    A.  During handling of the balance or

19   shipping of the balance.

20       MR. REFERMAT:  Objection.

21    Q.  What is the purpose of the plastic part

22   labeled "G" in Exhibit 6?

23       MR. REFERMAT:  Objection.

24    A.  It bears the load that the sash puts on

25   the balance carrier against the rivet labeled "E."

**Robertson, Jeffrey, 11/29/05**                    **Page 49**

00026

1

2   Q.  As you are looking at it.  What is the

3  purpose of this rivet?

4       MR. REFERMAT:  Objection.

5   A.  It is to anchor the spring.

6   Q.  As you are looking at the picture, the

7  left-most rivet, what is the purpose of that rivet?

8       MR. REFERMAT:  Objection.

9   A.  To attach the carrier to the balance, to

10  the channel.

11   Q.  So the left-most rivet -- strike that.

12       You would agree that the left-most rivet

13  connects the carrier to the balance?

14   A.  Yes.

15   Q.  Is it also correct to say that the

16  left-most rivet connects the carrier to the

17  channel?

18       MR. REFERMAT:  Objection.

19   A.  Yes.

20   Q.  Now, do you see between the two rivets on

21  the surface of the carrier, there is a protrusion?

22   A.  Yes, it's evident in the picture.

23   Q.  Can you mark that protrusion with a pen

24  with the letter A?

25   A.  (The witness complied.)

**Robertson, Jeffrey, 11/29/05**                    **Page 26**

# EXHIBIT 16

00001

1

2          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
3    - - - - - - - - - - - - - - - - - - -x
     AMESBURY GROUP, INC., and
4    AMESBURY SPRINGS LTD.,
           Plaintiffs,
5
           v.    Civil Action No. 05-10020-DPW
6
     THE CALDWELL MANUFACTURING
7    COMPANY,
           Defendant.
8    - - - - - - - - - - - - - - - - - - -x
           C O N F I D E N T I A L
9
     Videotaped Deposition Upon Oral Examination Of:
10         Thomas F. Batten

11
     Location:    Harris Beach PLLC
12          99 Garnsey Road
            Pittsford, New York  14534
13

14   Date:       November 8, 2005

15

16   Time:       9:37 a.m.

17

18

19   Reported By:   Joanne N. Pero

20          Alliance Shorthand, Inc.

21          Suite 1500 - The Penthouse

22          Alliance Building

23          183 Main Street East

24          Rochester, New York  14604

25

**Batten, Thomas S., 11/08/05**                    **Page 1**

00074

1

2    A.  In the last several days.

3    Q.  Did you put it together specifically for

4  this deposition?

5    A.  Yes.

6    Q.  We were talking previously about dates

7  for the 97ih, so let's stick with that for a

8  minute.  I see from looking at this document that

9  the design team for the 97ih was formed in

10  approximately October of 2002?

11    A.  Not entirely accurate, no.

12    Q.  What is inaccurate about that statement?

13    A.  There was a predecessor product to ih

14  called 97i.  It was a predecessor to the i hybrid,

15  otherwise known as ih.

16    Q.  What is the difference between the ih or

17  i hybrid and the 97i?

18      MR. SLIFKIN:  Objection.

19    A.  The principal difference is the weight

20  and ranges of the two products.  The sash weight

21  ranges that each carries is a little bit different.

22    Q.  Is there any difference in the shoe

23  between the 97i and the 97ih?

24    A.  No.

25    Q.  So the design team for the 97i was formed

**Batten, Thomas S., 11/08/05**               **Page 74**

00128

1

2 difference.

3    Q.  And the second and the narrower end of

4 the carrier is designed to connect to the channel

5 of the inverted balance, correct?

6    A.  Connect to the channel?

7    Q.  Connect into the channel of the inverted

8 balance?

9    A.  Inserted into the channel, yes.

10    Q.  When the carrier is inserted into the

11 channel of the inverted balance, does it connect or

12 lock into place in that balance?

13       MR. SLIFKIN:  Objection.

14    A.  Not by itself, no.

15    Q.  How does it connect to the balance?

16       MR. SLIFKIN:  Form.

17    A.  It is connected with a rivet that passes

18 through the carrier body and through the side walls

19 of the channel.

20    Q.  Looking at Exhibit 10, can you taking the

21 pen, and I think that is next to you, can you draw

22 an arrow to the portion of the carrier through

23 which the rivet is placed on any of those drawings

24 where you feel it is a clear depiction of that?

25    A.  Sorry?

**Batten, Thomas S., 11/08/05**                    **Page 128**

# EXHIBIT 17



CHARLES E. STILL, CONSULTING SERVICES

Charles E. Still
*Specialist in Fenestration*

2914 PARTRIDGE CIRCLE
BRYAN, TEXAS 77802
PHONE: 979-731-1130
FAX: 979-731-1070
EMAIL: cestill@cox-internet.com

March 13, 2006

### Expert Witness Report of Charles E. Still

I, Charles E. Still, have been retained by Harris Beach PLLC to render expert services in conjunction with a patent infringement lawsuit. I hereby provide the following report involving U.S Patent 5,365,638 pursuant to Rule 26 of the Federal Rules of Civil procedure.

I received a Bachelor of Architecture Degree in 1962 from Texas A&M University in College Station, Texas. I am a Graduate of Overton High School, Overton, Texas

I am the owner of Charles E. Still, Consulting Services based in Bryan, Texas. I have held this position since the inception of the company in July 2001. CES, Consulting Services specializes in fenestration. Windows and Doors are included in the term "fenestration" as well as curtain walls, storefronts and skylights. During my career, I have designed in excess of 200 fenestration products including single hung and double hung windows in aluminum, vinyl and composite materials for Residential, Manufactured Housing and Commercial Window Companies in New Construction and Replacement Markets. I am an expert in all phases of window design. I am a member of AAMA, American Architectural Manufacturing Association. AAMA is a professional trade organization including window manufacturers and suppliers to the window and door industry.

**Prior work history:**

**July 2000–July 2001** *Product Engineering Manager*, Alenco Building Products, Inc. Responsibilities include all phases of Engineering, Design and Development, Tooling and Certification and Documentation for four Manufacturing Plants. Primary products developed including windows, for new construction residential and commercial industry as well as residential replacement/remodeling market and manufactured housing industry. Primary window materials consist of extruded aluminum, extruded PVC vinyl and wood. Served on

*Member of American Architectural Manufacturers Association*  

the AAMA Southeast Region and Western Boards of Directors. Active in Installation Task Group in AAMA Western Region. Active in AAMA "Installation Masters" certified installers program.

**March 1999-July 2000** *Director of Engineering Support*, Reliant Building Products, Inc. Responsibilities include all product liability case investigations and resolution, giving depositions and court testimony. Search for new product, including window technologies, in design, materials and equipment. Company voting representative to all member trade associations and building codes groups (AAMA, NFRC and IGMA). Responsible for Product Certification and Testing. Licensed Glazing Contractor in the State of California and Arizona.

**1982-1999** *Vice President of Engineering*, Reliant Building Products, Inc., formerly known as Redman Building Products, Inc., Responsibilities include managing product design and development and installation, product liability and codes compliance to national and state building codes. Active member of AAMA (American Architectural Manufacturers Association) and served as chairman of numerous task groups and served three times on the National AAMA Board of Directors. Active member of NFRC (National Fenestration Rating Council) involving thermal performance of windows and doors and IGMA, Insulating Glass Manufacturers Association (formerly known as SIGMA, Sealed Insulating Glass Manufacturers Association).

**1979-1982** *Director of Product Design*, Redman Building Products, Inc.. Responsibilities include product design, including windows and development of new construction and replacement/remodeling windows, doors and skylights. Company owned and operated 5 manufacturing plants and 7 sales outlets.

**1974-1979** *Chief Engineer*, Alenco, A Division of Redman Building Products, Inc. Responsibilities include design and development, testing, quality control department, plant maintenance department, plant tooling department, shop drawings department and warranty service department.

**1968-1974** *Chief Design Engineer*, Alenco, a Division of Redman Building Products, Inc.. Responsibilities include all designs of aluminum windows and doors for Residential and Commercial construction as well as Manufactured Housing.

**1964-1968** *Design Engineer*, Alenco, Albritton Engineering Corporation. Responsibilities include design and development of new aluminum windows and doors. Responsible for Office and Plant Expansion Program in Bryan, Texas Facility. Prepared architectural working drawings for Office and Plant Facilities (3 expansions).

The following documents have been made available to me by the attorneys at Harris Beach.

- U.S. Patent 329,996. A Spring Sash Balance, February 25, 1929
- G.B. Patent 1,218,827. Sash Control Mechanism, July 17, 1967
- G.B. Patent 1,244,324. A Sliding Sash Window, August 11, 1968

2
1

- G.B. Patent 1,287,756. Improvements In Or Relating To Doors, August 25, 1969
- U.K. Patent 2,236,786. A. Guide Assembly, September 27, 1989
- U.S. Patent 2,262,990. Window Sash Counterbalance, September 2,1939
- U.S. Patent 2,279,600. Sash Balance, March 30, 1940
- U.K. Patent 2,280,697. Tiltable To Sash Windows, July 27, 1993
- U.K. Patent 2,292,168 A. Pivoting Sash Slide Locking Mechanism, July 31, 1995
- U.S. Patent 2,635,282. Spring Counterbalance, October 2, 1950
- U.S. Patent 2,826,090. Sash Balance Coupling Device, March 21, 1955
- U.S. Patent 3,055,044. Foot Attachment For Block And Tackle Type Spring Counterbalances, September 25, 1960
- U.S. Patent 3,449,862. Window Structure, August 21, 1967
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 3,091,797. Window Structure, April 26, 1961
- U.S. Patent 3,114,178. Sliding Window And Counterbalancer Combination, February 6, 1961
- U.S. Patent 3,358,403. Heavy Window Balance Assembly, January 28, 1966
- U.S. Patent 3,358,404. Readily Removable Double Hung Window, January 28, 1966
- U.S. Patent 3,440,683. Sash Control Mechanism, July 17, 1967
- U.S. Patent 3,449,862. Window Structures, August 11, 1967
- U.S. Patent 3,452,480. Spring Sash Counterbalance, September 14, 1967
- U.S. Patent 3,711,995. Building Structure, June 22, 1070
- U.S. Patent 3,869,754. Bracket For A Spring Sash Counterbalance, September 10, 1973
- U.S. Patent 4,079,549. Balance Spring Lock For Tilt Out Sash, August 26, 1976
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 4,227,345. Tilt-Lock Slide For Window Sash, January 26, 1979
- U.S. Patent 4,300,316. Sash Balance Foot Seal Mechanism, October 17, 1979
- U.S. Patent 4,610,108. Balance Spring Locking Slide Block For Tilt-Out Windows, December 20, 1984
- U.S. Patent 4,654,928. Adjustable Friction Block And Tackle Window Balance System, April 11, 1986
- U.S. Patent 4,704,821. Compression Seals In A Double Hung Style Window, July 3, 1986
- U.S. Patent 4,949,425. Spring Loaded Block And Tackle Window Sash Balance Assembly, October 19, 1988
- U.S. Patent 5,069,001. Pivotable Window Sash Assembly, November 21, 1990
  U.S. Patent 5,157,808. Coil Spring Counterbalance Hardware Assembly And Connection Method Therefore, February 18, 1992
- U.S. Patent 5,210,976. Window Balance Assembly, June 26, 1992
- U.S. Patent 5,243,783. Locking Slide Block, June 24, 1992
- U.S. Patent 5,301,467. Locking Slide Block, September 2, 1993
- U.S. Patent 5,353,548. Curl Spring Shoe Based Window Balance System, April 1, 1993

3
1

- U.S. Patent 5,365,638. Spring Mounting For Sash Frame Tensioning Arrangements, January 21, 1993
- U.S. Patent 5,371,971. Sash Balance Brake And Pivot Pin Assembly, May 4, 1993
- U.S. Patent 5,530,991. Block And Tackle Window Balance, January 21, 1994
- U.S. Patent 5,632,117. Sash Balance Brake Assembly, January 13, 1995
- U.S. Patent 5,661,927. Sliding Counterbalance Assembly For A Sash Window, March 6, 1996
- U.S. Patent 5,669,180. Window Balance Brake Shoe And Pivot Assembly, May 29, 1996
- U.S. Patent 5,737,877. Block And Tackle Balance With Integral, Non-Rotating Pulley System, July 26, 1996
- U.S. Patent 5,806,243. Sash Balance Brake Assembly, May 21, 1997
- U.S. Patent 5,829,196. Window Balance Brake Shoe And Pivot Assembly, May 30, 1997
- U.S. Patent 6,041,476. Inverted Block And Tackle Window Balance, November 21, 1997
- U.S. Patent 6,088,880. Adjustable Shoe For Awning Window Hinge, July 7, 1997
- U.S. Patent 6,151,832. Window Balance Cam Housing, February 19, 1999
- U.S. Patent 6,230,443 B1. Hardware Mounting, May 5, 1999
- U.S. Patent 6,467,128 B1. Block And Tackle Sash Counter Balance, September 11, 2000
- U.S. Patent 6,550,184 B1. Brake Shoe For Sash Window Or Door Assembly, February 9, 2001
- U.S. Patent 6,598,264 B2. Block And Tackle Window Balance With Bottom Guide Roller, March 16, 2001
- U.S. Patent 6,606,761 B2. Spring Mounting Arrangement For A Sash Window Counterbalance Arrangement, October 8, 2001
- U.S. Patent 6,622,342 B1. Block And Tackle Balance Assembly With Brake Shoe, June 6, 2001
- U.S. Patent 6,820,368 B2. Snap Lock Balance Shoe And System For A Pivotable Window, May 23, 2003
- U.S. Patent 6,840,011 B2. Window Panel Balance Apparatus And Method, December 13, 2000
- U.S. Patent 6,990,710 B2. Counterbalance System For A Tilt-In Window Having An Improved Shoe Assembly And Anchor Mount, November 5, 2003
- Japanese Patent 62-194,895. Title and filing date unknown.
- Caldwell Fenestration Hardware Product Information, Bates C00477 thru C00542.
- Defendant's Second Supplemented Answers To Plaintiffs' First Set Of Interrogatories.
- Memorandum And Order, January 20, 2006.
- Amesbury's First Supplemental Response To Caldwell's Interrogatories (Nos. 1-2)
- Amesbury's Second Supplemental Response To Caldwell's Interrogatories (Nos. 1-2, 13-16).
- Defendant's Supplemented Answers To Plaintiffs' First Set Of Interrogatories
- Joint Motion to Set Schedule.

4
1

- Patent '264 File History, Bates C000543 thru C000690.
- Patent '638 File History, Bates C000921 thru C001116.
- Case documents Bates AME 01931 through 01948
- CD files: Documents Produced in Response to Plaintiffs' First Request for Documents and Things

Other documents include:

- Voluntary Specifications for Aluminum, Vinyl (PVC) and Wood Windows and Glass Doors, AAMA/NWWDA 101/I.S.2-97.
- International Residential Code for One for Two Family Dwellings – 2000
- U. S. Patent 4,961,247. Balancing Arrangements For Double Hung Windows. December 7, 1989

This case involves windows and window balance hardware. Single, double and triple hung windows are best described as vertically operating windows in which the sash weight is offset by a counter-balancing mechanism mounted in the window. One or more locking devices are furnished to secure the sash in the closed position. Single and double hung windows are the most common types in the United States and Canada. They allow light and ventilation into a dwelling. A window balance is a mechanical device (normally spring loaded) used in hung type windows as a means of counter-balancing the weight of the sash during opening and closing. Balances are most often furnished in pairs. The role of balances in today's windows are critically important due to the increased demand for insulating glass which increases the sash weight by twice the amount of a traditional single glazed window. In coastal areas, laminated glass in impact-tested windows also increases the sash weight of hung windows. Balances are required to maintain the sash in any open position without drifting or falling down.

There are different types of window balances: Spiral, Block & Tackle and Constant Force.

**Braid, U.S. Patent 5,365,638** involves a constant force coil balance. Constant force coil balances have been used in windows for the past 76 years in the United States. They are simple to install and are reliable. Constant force coil balances are popular in today's single and double hung windows with a "tilt-in" sash, making it easy to clean the exterior side of the sash glass from the interior side of the window whereby the operating sash is rotated inward by pivoting at the bottom corners of the sash. The **'638 Patent** is designed for a "tilt-in" window. It features a coil spring mounted in a housing that supports the bottom curvature of the coil spring and is fastened to the frame jambs of the window inside a channel that is partially open on the exposed side. The other end of the coil spring is attached to a sash frame support, generally termed as a balance pivot shoe. The pivot shoe travels inside the frame jamb channel allowing the coil spring to retract towards its original position and thus assisting the vertical sash lift. Multiple coils can be added to the window for heavier sash loads. The pivot shoe includes a keyway or socket for the pivot bar connected to the sash, which can be rotated inward when the sash is ready to be removed from the window frame. When the pivot shoe is rotated, it

5
1

automatically locks the pivot shoe inside the jamb channel to prevent sash travel while removing the sash.

The previously described sash frame support (pivot shoe) is not described in the '638 Patent. It is typically found in all tilt-in windows.

**Sterner, U.S. Patent 5,157,808**- Filed February 18, 1992 (see Exhibits A& B) clearly shows a constant force coil spring balance with a spring mounting that incorporates a raised spine positioned between and in the same plane as the inwardly opposed flanges of the frame jamb channel. It also clearly shows a concave support surface in the spring mounting to support the coil spring. It also clearly shows an aperture with a screw to attach the spring mounting to the frame jamb of the window. These components perform the same function as in the **'638 Patent**.

I have studied and examined a coil spring balance mounting sample as manufactured by Product Design and Development and is identical to the drawings noted in Sterner, '808 Patent. I have also studied and examined samples of Caldwell's "Quick-Tilt" coiled balances.

**Leitzel, U.S. Patent 4,961,247**- Filed December 7, 1989 (see Exhibits C & D) clearly shows a constant force coil spring balance with a spring mounting that incorporates a raised spine positioned between and in the same plane as the inwardly opposed flanges of the frame jamb channel. It is also clearly shows an aperture with a screw to attach the spring mounting to the frame jamb of the window. The remaining major components in '247 Patent perform the same function as in the **'638 Patent**.

Other Prior Art can be found in Cripps, U.S. Patent 5,219,976, filed June 26, 1992.

**Opinions**

**Braid, U.S. Patent 5,365,638**, based upon my findings, is not novel and/or is obvious and therefore, not valid.

Prior Art proves that all components of **'638 Patent** existed before **'638 Patent** was filed. U.S. Patent 5,157,808 contains all of the elements disclosed in claims 1,2,3, & 8 of the **'638 Patent**, thereby anticipating those claims. All of the claims would have been obvious to one of ordinary skill in the art to which this invention pertains based on: (1) Sterner U.S. Patent 5,157,808; and/or (2) Leitzel U.S. Patent 4,961,247. Therefore, the claims are invalid. Detailed comparisons of the claims of the patent to the prior art are attached as Exhibits A, B,C, & D.

6
1

I reserve the right to add additional opinions in my investigations and/or upon review of additional discovery materials. Opinions herein are within a reasonable degree of professional certainty.

Charles E. Still

Attachments:
CES Deposition Records
Comparison Chart-'638 Patent- Exhibit A
Comparison Drawing-'638-Exhibit B
Comparison Chart-'638 Patent-Exhibit C
Comparison Drawing-'638 Exhibit D

7
1

**Charles E. Still**    ## Testimony Given in Depositions and Trials

| Type | Parties | Type of Claim | Location | Date |
|------|---------|---------------|----------|------|
| Deposition | VBP v. Royal Plastic | Patent Infringement | Oakland, New Jersey | |
| Trial | VBP v. Royal Pastics | Patent Infringement | Newark, New Jersey | |
| Deposition | Redman v. ? | Forced Entry/Injury | Albuquerque, New Mexico | |
| Deposition | Redman v. ? | Forced Entry/Injury | Houston, Texas | |
| Deposition | Thiokol v. ? | Glass Breakage | Denver, Colorado | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Trial | Redman v. ? | Personal Injury | Savannah, Georgia | |
| Trial | Redman v. ? | Water Infiltration | Little Rock, Arkansas | |
| Trial | Redman v. ? | Scratched Glass | Waco, Texas | |
| Arbitration | Redman v.? | Glass Breakage | Alexandria, Louisiana | |
| Trial | Redman v. ? | Water Infiltration | Baton Rouge, Louisiana | |
| Deposition | Inmont v. ? | Glass Breakage | Rockwall, Texas | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Deposition | Lamkin v. Gapco | Personal. Injury | Madison County, Illinois | |
| Deposition | Pace v. Gapco | Personal Injury | Madison County, Illinois | |
| Trial | Redman v. ? | Glass Breakage | Salt Lake City, Utah | |
| Deposition | Redman v. ? | Condensation | Baytown, Texas | |
| Deposition | Redman v. ? | Personal Injury | Detroit, Michigan | |
| Deposition | Redman v. ? | Personal Injury | South Padre Island, Texas | |
| Deposition | Gapco v. ? | Personal Injury | St. Louis, Missouri | |
| Trial | Unique v. Beard | Business Ethics | Roanoke, Virginia | |
| Deposition | Redman v. Somerset | Water Infiltration | Silver Springs, Maryland | |
| Deposition | Reman v. ? | Water Infiltration | San Francisco, California | |
| Deposition | Redman v. ? | Water Infiltration | Fresno, California | |

| Deposition | Bolander v. Champion | Water Infiltration | Houston, Texas | 8/29/2003 |
| Trial | Jason Lamkin v. Gapco | Personal Injury | Belleville, Illinois | 3/15/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, Texas | 4/2/2004 |
| Deposition | All Seasons v. Tradewinds Condo | Code Compliance | Orange Beach, AL | 5/19/2004 |
| Deposition | All Seasons v. Royal Palms Condo | Code Compliance | Gulf Shores, AL | 6/24/2004 |
| Deposition | W.S. Phillips v. Hope Lumber | Water Infiltration | College Station, TX | 10/27/2004 |
| Deposition | W.S. Phillips v. Alenco | Water Infiltration | College Station, TX | 11/30/2004 |
| Deposition | Sungate Development v. All Seasons | Water Infiltration | McAllen, TX | 12/7/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, TX | 2/23/2005 |
| Deposition | Cavalier Homes v. Larson Doors | Product Quality | Haleyville, AL | 5/26/2005 |
| Deposition | Grand Pointe HOA V. All Seasons | Product Liability | Orange Beach, AL | 6/29/2005 |
| Deposition | Donn v. Turner v. General Aluminum | Water Infiltration | Aubrey, TX | 9/9/2005 |
| Arbitration | Hilcom v. Moore | Water Infiltration | Houston, TX | 10/19/2005 |
| Trial | Sandhu v. Wellington | Personal Injury | Toronto, Canada | 11/18/2005 |
| Deposition | Planter's Place HOA v. All Seasons | Water Infiltration | Mt. Pleasant, S.C. | 12/20/2005 |



**EXHIBIT A**

**INVALIDATION OF**
**AMESBURY'S U.S. PATENT NO. 5,365,638**

| Claim Element | U.S. Patent No. 5,365,638 | Identity in U.S. Patent No. 4,089,808 |
|---|---|---|
| 638/1 | A mounting assembly comprising | See Exhibit B, item A, '808 Patent is a mounting assembly comprising |
| 638/1 | a channel means | See Exhibit B, item B, a channel means |
| 638/1 | having a rear wall, | Having a rear wall, |
| 638/1 | side walls | side walls |
| 638/1 | and at extremities of said side walls, inwardly turned opposed flanges, | See Exhibit B, item C, and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/1 | a sash frame support means slidable in said channel means, | See Exhibit B, item D, a sash frame support means slidable in said channel means, |
| 638/1 | a coiled ribbon spring | See Exhibit B, item E, a coiled ribbon spring |
| 638/1 | having a first end engaged with said sash frame support means, | having a first end engaged with said sash frame support means, |
| 638/1 | and a means for mounting said coiled ribbon spring, | and a means for mounting said coiled ribbon spring, |

1

| Claim Element | U.S. Patent No. 5,465,938 | Siemens Trash Deflector No. 5,765,706 |
|---|---|---|
| 638/1 | the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means | the coiled body portion, coiled ribbon spring has another end and positioned in said mounting means, |
| 638/1 | and said mounting means being secured in said channel means, | and said mounting means being secured in said channel means, |
| 638/1 | said mounting means having a raised spine | See Exhibit B, item F, said mounting means having a raised spine |
| 638/1 | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means |
| 638/1 | whereby rotational motion of said mounting means is inhibited. | whereby rotational motion of said mounting means is inhibited, because the spine shown in the '808 Patent is sized such that it would have a close tolerance with the flanges. |
| 638/2 | The mounting assembly of claim 1 wherein the mounting means has a | See Exhibit A, item G, the device of the '808 Patent has a mounting means that |

2

| Claim Element | U.S. Patent No. 4,683,694 | Alleged '808 Patent [illegible] |
|---|---|---|
| | support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. | has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. |
| 638/3 | The mounting assembly of claim 2 | The device of '808 Patent has a mounting assembly |
| 638/3 | wherein said mounting means has a body portion | wherein said mounting means has a body portion |
| 638/3 | Having an aperture therein, | See Exhibit B, item H, having an aperture therein, |
| 638/3 | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, | The device of '808 Patent has a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, |
| 638/3 | a surface of said body portion being concavely curved, | The device has a surface of said body portion that is concavely curved, |
| 638/3 | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | The device has a coiled body portion of said coiled ribbon in contact with and supported by said curved surface of said body portion. |

3

| Claim Element | The U.S. Patent No. 5,165,661 | Number 1035 Device for Spring 600 |
|---|---|---|
| 638/8 | a mounting assembly comprising | The device has a mounting assembly comprising |
| 638/8 | a channel means having | a channel means having |
| 638/8 | a rear wall, | a rear wall, |
| 638/8 | side walls | side walls |
| 638/8 | and at extremities of said side walls, inwardly turned opposed flanges, | and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/8 | a sash frame support means slidable in said channel means, | a sash frame support means slidable in said channel means, |
| 638/8 | a coiled ribbon spring | the device includes a coiled ribbon spring |
| 638/8 | having an outer end engaged with said sash frame support means, | having an outer end engaged with said sash frame support means, |
| 638/8 | and a means for mounting said coiled ribbon spring, | the device includes a means for mounting said coiled ribbon spring, |
| 638/8 | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | the coiled body portion, coiled ribbon spring has another end positioned in said mounting means, |

4

| Claim Element | U.S. Patent No. 4,365,638 | Stone 1959, U.S. Patent No. 3,012,802 |
|---|---|---|
| 638/8 | Said mounting means being secured in said channel means | Said mounting means being secured in said channel means |
| 638/8 | and the mounting means having projection means | and the mounting means having projection means |
| 638/8 | positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, | positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, |
| 638/8 | whereby rotational movement of the mounting means is inhibited. | whereby rotational movement of the mounting means is inhibited. |

5

**B**

U.S.5,365,638

Braid: Filed January 21, 1993

U.S.5,157,808

Sterner: Filed February 18, 1992



Added to drawing by CES 3/15/06

EXHIBIT B

**EXHIBIT C**

**INVALIDATION OF**
**AMESBURY'S U.S. PATENT NO. 5,365,638**

| '638 Claim Language Element No. | U.S. Patent No. 5,365,638 | Languages of U.S. Patent No. 4,683,747 |
|---|---|---|
| 638/1 | A mounting assembly comprising | See Exhibit D, item A, a '247 Patent is a mounting assembly comprising |
| 638/1 | a channel means | See Exhibit D, item B, a channel means |
| 638/1 | having a rear wall, | Having a rear wall, |
| 638/1 | side walls | side walls |
| 638/1 | and at extremities of said side walls, inwardly turned opposed flanges, | See Exhibit D, item C, and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/1 | a sash frame support means slidable in said channel means, | See Exhibit D, item D, a sash frame support means slidable in a said channel means, |
| 638/1 | a coiled ribbon spring | See Exhibit D, item E, a coiled ribbon spring |
| 638/1 | having a first end engaged with said sash frame support means, | having a first end engaged with said sash frame support means, |
| 638/1 | and a means for mounting said coiled ribbon spring, | and a means for mounting said coiled ribbon spring, |

1

| Claim Element(s) | U.S. Patent No. 5,375,035 | | |
|---|---|---|---|
| 638/1 | the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means | the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means | |
| 638/1 | and said mounting means being secured in said channel means, | and said mounting means being secured in said channel means, | |
| 638/1 | said mounting means having a raised spine | See Exhibit D, item F, said mounting means having a raised spine | |
| 638/1 | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means | |
| 638/1 | whereby rotational motion of said mounting means is inhibited. | whereby rotational motion of said mounting means is inhibited. | |
| 638/2 | The mounting assembly of claim 1 wherein the mounting means has a | See prior art in Sterner, U.S. Patent 5,157,808 | |

2

| Claim Element | U.S. Patent No. 5,365,638 | Infringing Device |
|---|---|---|
| | support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. | |
| 638.3 | The mounting assembly of claim 2 | The device of '247 Patent has a mounting assembly |
| 638.3 | wherein said mounting means has a body portion | wherein said mounting means has a body portion |
| 638.3 | Having an aperture therein, | See Exhibit D, item H, having an aperture therein, |
| 638.3 | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, |
| 638.3 | a surface of said body portion being concavely curved, | a surface of said body portion being concavely curved, |
| 638.3 | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | See prior art in Sterner, U.S Patent 5,157,808 |

3

| Claim Element | U.S. Patent No. 4,516,593 | The device of the '247 Patent has a mounting assembly comprising |
|---|---|---|
| 638/8 | A mounting assembly comprising | a channel means having |
| 638/8 | a channel means having | a rear wall, |
| 638/8 | a rear wall, | side walls |
| 638/8 | side walls | and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/8 | and at extremities of said side walls, inwardly turned opposed flanges, | a sash frame support means slidable in said channel means, |
| 638/8 | a sash frame support means slidable in said channel means, | a coiled ribbon spring |
| 638/8 | a coiled ribbon spring | having an outer end and engaged with said sash frame support means, |
| 638/8 | having an outer end and engaged with said sash frame support means, | and a means for mounting said coiled ribbon spring, |
| 638/8 | and a means for mounting said coiled ribbon spring, | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, |
| 638/8 | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | |

4

| Claim Element | U.S. Patent No. 5,305,593 | U.S. '[illegible] U.S. Patent No. [illegible] |
|---|---|---|
| 638/8 | Said mounting means being secured in said channel means | Said mounting means being secured in said channel means |
| 638/8 | and the mounting means having projection means | and the mounting means having projection means |
| 638/8 | positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, | positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, |
| 638/8 | whereby rotational movement of the mounting means is inhibited. | whereby rotational movement of the mounting means is inhibited. |

5

D

# U.S.5,365,638

Braid: Filed January 21, 1993

# U.S. 4,961,247

Leitzel: Filed December 7, 1989



*FIG. 1*

*FIG. 2*

*FIG. 3*

Added to Drawing by CES 3/15/06

EXHIBIT D

# EXHIBIT 18

US005157808A

# United States Patent [19]

Sterner, Jr.

[11] Patent Number: 5,157,808

[45] Date of Patent: Oct. 27, 1992

[54] COIL SPRING COUNTERBALANCE HARDWARE ASSEMBLY AND CONNECTION METHOD THEREFOR

[75] Inventor: Maurice E. Sterner, Jr., Spring Grove, Pa.

[73] Assignee: Product Design & Development, Inc., York, Pa.

[21] Appl. No.: 836,565

[22] Filed: Feb. 18, 1992

[51] Int. Cl.⁵ ............................................. E05D 13/00
[52] U.S. Cl. ...................................... 16/197; 267/156; 49/445
[58] Field of Search ................... 16/197, 77, DIG. 16, 16/DIG. 36; 267/156; 49/445, 446

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,732,594 | 1/1956 | Adams et al. | 16/197 |
| 2,817,872 | 12/1957 | Foster | 16/197 |
| 3,150,420 | 9/1964 | Brenner . | |
| 3,452,480 | 7/1969 | Foster . | |
| 3,475,865 | 11/1969 | Arnes | 16/197 |
| 4,227,345 | 10/1980 | Durham, Jr. . | |

4,935,987   6/1990   Sterner, Jr. .

Primary Examiner—John Sipos
Assistant Examiner—Carmine Cudo
Attorney, Agent, or Firm—Samuel M. Learned, Jr.

[57]            ABSTRACT

An improved coil spring counterbalance assembly embodying a coil spring support structure that provides a cooperatively radiused restraining shoe against which the uninterrupted smooth external circumferential surface of the coil spring ribbon rotationally operates in extension and retraction thereof during counterbalanced sash movement, thereby eliminating both the clicking sound and spring rotational cyclic vibrational shocks otherwise caused by the spring interior ribbon core tail ending riding over the top of a spring core support hub, in addition to a multiple coil spring connection method for improved successive affixment of extended coil spring ribbons one to the other and in turn to the sash attached balance shoe connector therefor when more than on coil spring is required in order to effect proper sash counterbalancing.

3 Claims, 5 Drawing Sheets



FIG. 1





FIG. 2

FIG. 3

FIG. 4



FIG. 5

FIG. 6



FIG. 7

PRIOR ART

FIG. 8

PRIOR ART

FIG. 9

PRIOR ART



FIG. 11

FIG. 10

FIG. 12

5,157,808

**1**

COIL SPRING COUNTERBALANCE HARDWARE
ASSEMBLY AND CONNECTION METHOD
THEREFOR

BACKGROUND OF THE INVENTION

The present invention relates to an improved coil spring counterbalance assembly for use on vertically sliding window sashes wherein the improved assembly hereof incorporates structural embodiments which substantially enhance the smoothness of counterbalance sash operation as well as the ease and facility with which one may install and connect multiple spring components one to the other and to the sash attached balance shoe connector when more than one spring component is required in order to adequately counterbalance a particular sash.

As shown in Applicant's previous teaching, in U.S. Pat. No. 4,935,987 dated Jun. 26, 1990, to Sterner, and in particular as illustrated in FIGS. 2, 3 and 4 thereof, the respective counterbalance springs are each supported by a hub insertably installed through the core openings thereof, upon which hub a coil spring rotates in feeding out and retracting the coil ribbon thereof during vertical movement of a sash in opening and closing operations. Each of the coil spring ribbons has a ribbon core tail ending that in consequence cyclically snaps over the support hub in radius adjustment as the coil spring radius decreases or increases upon sash movement whereby the coil spring radius snapping adjustment effect in turn causes both a distinct and audibly distracting sound in addition to any annoying sash vibration, which sound and vibration effects become more pronounced with the use of multiple coil springs to balance a sash. The counterbalance coil spring sub-assembly as taught in U.S. Pat. No. 4,227,345 to Durham, Jr., dated Oct. 14, 1980, and best illustrated in FIG. 5 thereof, shows a structure in some respects similar to that herein taught but is distinguished in that the coil spring of Durham, Jr., is attached to and supported by the mounting bracket hub thereof.

Other coil spring sash balance hardware apparatus provide for coil support about the external circumferential surface of the spring, such as those respectively taught in U.S. Pat. No. 3,150,420 to Brenner, dated Sept. 29, 1964, and U.S. Pat. No. 3,452,480 to Foster, dated Jul. 1, 1969.

Prior art coil spring counterbalance devices of the external circumferential support category do avoid the snapping sound and sash vibration effects, but do not adapt well to use in applications requiring multiple springs for the counterbalancing of heavier sashes.

The applicant's improved coil spring counterbalance assembly, however, mechanically provides a structural capability to both enhance the ease and smoothness of sash operation as well as at the same time providing a connection method for joining successive coil spring ribbons in sash counterbalancing applications requiring a use of multiple coil springs, all in a manner as hereinafter more fully detailed and described.

SUMMARY OF THE INVENTION

It is the principal object of the present invention to provide an improved coil spring counterbalance hardware assembly which operates by means of a coil spring ribbon that extends and retracts about the uninterrupted external coil circumferential surface thereof compressively against a cooperatively radiused restraining shoe

**2**

to thereby enhance the smoothness of sash raising and lowering by eliminating both the clicking sound and spring rotational cyclic vibrational shocks otherwise caused by the spring component interior ribbon core tail ending riding over the top of a spring core support hub as is characteristically common of prior art coil spring counterbalance assemblies.

It is another object of the present invention to provide an improved spring ribbon connection method for affixing an extended coil spring ribbon to the sash attached balance shoe connector therefor, or in the event of multiple coil spring assembly employment, an improved method for affixing the extended coil spring ribbons one to the other successively to the lead coil spring ribbon which is in turn affixed to the sash attached balance shoe connector therefor.

A further object of the present invention is to provide an improved counterbalance hardware assembly which is adapted to cooperatively accommodate the addition of individual coil spring elements as may be necessary to achieve the proper counterbalance effect for the weight of a particular sash to be supported.

It is also an object of the present invention to provide an improved coil spring counterbalance hardware assembly spring ribbon connection slot structure which facilitates the ease and convenience of affixing multiple coil springs to connect one with the other and to the sash attached balance shoe connector.

It is a further object of the present invention to provide an improved coil spring counterbalance hardware assembly spring ribbon connection method which optimizes the effective range of multiple coil spring utility and efficiency in providing a substantially constantaly uniform counterbalance force effect throughout the raising and lowering limits of any particular sash to which said assembly is affixed in achieving the counterbalance thereof.

Still another object of the present invention is to provide an improved coil spring counterbalance hardware assembly adapted to be installably utilized within both the conventional modern and traditional older sash and jamb structures as either a retrofit or replacement sash counterbalance means, without the costly need or necessity to re-design or reconstruct either the sash or supporting jamb and frame structures therefor.

Yet another object of the present invention is to provide an improved coil spring counterbalance hardware assembly which when operationally installed is hidden from view, and is yet easily accessible for maintenance, repair, or removal as may from time to time be necessary.

It is an additional object of the present invention to provide an improved coil spring counterbalance hardware assembly which is efficient in design, economical in cost, and easy to install and maintain.

The foregoing, and other objects hereof, will be readily evident upon a study of the following specification and accompanying drawings comprising a part thereof.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a front elevation view of a typical double hung window embodying upper and lower vertically sliding sash members, therein showing an exemplary installation of improved coil spring counterbalance hardware assemblies comprising the instant invention.

5,157,808

3

FIG. 2 is an enlarged foreshortened side elevation view of the improved coil spring counterbalance hardware assemblies as taken along the line 2—2 of FIG. 1.

FIG. 3 is a front elevation view of the coil spring sub-assembly component of the instant invention as seen along the line 3—3 of FIG. 2.

FIG. 4 is a front elevation view of the balance shoe sash connector sub-assembly component of the instant invention as seen along the line 4—4 of FIG. 2.

FIG. 5 is a partial side elevation view of a typical heavy duty window frame and sash assembly showing an exemplary installation therein of an improved coil spring counter balance hardware assembly embodying the employment of successively connected multiple coil spring sub-assembly components to thereby accommodate counterbalancing of a heavier sash.

FIG. 6 is an front elevation view of the typical heavy duty window frame and sash assembly and exemplary hardware installation as shown in FIG. 5.

FIG. 7 is a partial side elevation view of a typical window frame and sash assembly showing installation therein of exemplary prior art multiple and single coil spring counterbalance hardware assemblies.

FIG. 8 is an enlarged side elevation view of an exemplary prior art coil spring counterbalance component therein showing the spring interior ribbon core tail ending to spring core support hub relationship.

FIG. 9 is an exploded perspective view of an exemplary prior art coil spring counterbalance hardware assembly.

FIG. 10 is a partial side elevation view of a typical window frame and sash assembly showing installation therein of the improved coil spring counterbalance hardware assembly of instant invention.

FIG. 11 is an enlarged side elevation view of the coil spring counterbalance component of instant invention therein showing the external coil ribbon diameter relationship to the cooperative radiused restraining shoe as well as the spring interior ribbon core tail ending clearance of the core support hub.

FIG. 12 is an exploded perspective view of the improved coil spring counterbalance hardware assembly of instant invention.

## DETAILED DESCRIPTION OF THE INVENTION

Referring to FIG. 1, a front elevation view of a typical double hung window 10 embodying an exemplary set of upper and lower vertically sliding sash members, comprised of an upper sash 12 and a lower sash 14 both of which sashes are cooperatively installed within and supported by a typical window frame encasement structure 16, said sashes 12 and 14 being respectively shown counterbalanced by a spaced set of the improved coil spring counterbalance hardware assemblies 18 of instant invention which are illustrated and installed in a manner typical of that for either an original equippage or retrofit application. It should be noted, however, as would be determined by the size and weight of a sash to be counterbalanced in each particular use circumstance, as well as the counterbalance coil spring force rating of an individual coil spring sub-assembly 20, there may be a requirement to employ multiple numbers of the individual coil spring sub-assemblies 20 of said hardware assembly 18 joined by the respective coil spring ribbons 22 thereof in successive coil spring connection one to the other and to the sash attached balance shoe connector 24 therefor by the method as hereinafter taught by

4

illustration and description. Thus, each improved coil spring counterbalance hardware assembly 18 is comprised of at least one individual coil spring sub-assembly 20 connected by means of the coil spring ribbon 22 thereof to a sash attached balance shoe connector sub-assembly 24.

Referring again to FIG. 1 to discuss general considerations of the method for installing the improved coil spring counterbalance hardware assemblies 18, wherein it will be noted for purposes of obtaining optimum sash 12 and 14 operational balance within the frame encasement structure 16 an installation of said hardware assemblies 18 is preferably comprised of a spaced set thereof for each sash 12 and 14 to thereby minimize any tendency for a sash to cant or cock and thereby bind within the encasement structure sash guide tracks during sash raising or lowering operations. Installation of said hardware assemblies 18 is simply and efficiently accomplished by first affixing a balance shoe connector sub-assembly 24 to either lateral lower side of the upper and lower sash 12 and 14 respective lower sash frame members 26 and 28 by means of a set of connector bracket screws 30 insertable installed through openings therefor in the balance shoe connector bracket 32 and threadably secured into the opposingly spaced outer lateral underside surfaces of said lower sash frame members 26 and 28, wherein it should be noted, regardless of the number of individual coil spring sub-assemblies 20 to be employed in achieving proper sash 12 and 14 counterbalancing, whether it be either single or successive such coil spring sub-assemblies 20, only one sash attached balance shoe connector sub-assembly 24 is required.

Next, at a vertical position above each of the respective lower sash frame members 26 and 28 when the corresponding upper and lower sashes 12 and 14 therefore are in the closed position, either a single or successively stacked individual coil spring sub-assemblies 20 are securably installed to the corresponding window jamb 34 by means of insertable threadable connection of a spring bracket screw 36 through an opening in the spring bracket cap spacing post 38 and to said corresponding window jamb 34.

As also shown in FIG. 1, the respective sashes 12 and 14 are adapted to be pivotally opened inward and are therefore each provided with a set of spring loaded jamb latches 40 assembled to the upper sash frame member 42 and the lower sash upper frame member 44, which jamb latches 40 function to retain the respective sashes 12 and 14 within the encasement structure sash guide tracks respectively by means of engagement of the jamb latch lugs 46 of said latches 40 within said guide tracks for normal vertically slidable displacement of said sashes 12 and 14 within said encasement structure guide tracks. Upon manual retraction of a set of the jamb latch lugs 46 for either sash 12 or 14, by means of simultaneous sash inward displacement of the jamb latch push pads 48, said lugs 46 are thereby retracted from the subject guide tracks and the sash 12 or 14 as the case may be is then pivotally rotated inwardly about the rotation hub 50 of the sash attached balance shoe sub-assembly for purposes of window pane 52 cleaning or the like. Afterwards the pivotally opened sash may be returned and secured in a normally vertical position within the window frame encasement structure 16 simply by means of reverse rotation thereof about the rotation hub 50 and re-engagement of the latch lugs 46 within the encasement structure guide tracks. Addition-

5,157,808

5

ally, the window 10 is provided with a locking means typically consisting of a cam latch assembly 54 which is installed upon the upper mid-point surface of the lower sash upper frame member 44, which cam latch assembly 54 is cooperatively operable pivotally to lockably and releasably engage a cam latch retainer 56 which is assembled to the upper mid-point of the upper sash lower frame member 26.

At this point it should be noted that although the sash attached balance shoe connector sub-assembly 24 is shown and illustrated in a typical tilt window hardware component profile, this is exemplary only and the sash attached balance shoe connector sub-assembly 24 could just as well be provided in a standard non-tilt window hardware component profile with equally beneficial and satisfactory results.

Considering now FIG. 2, which shows greater structural detail of the improved coil spring counterbalance hardware assembly 18 and the coil spring 20 and balance shoe connector 24 sub-assembly components thereof. Particularly shown is connection of the coil spring ribbon 22 by means of the ribbon tail slot 58 in cooperative engagement within the balance shoe connector coil spring ribbon receiving slot 60, which is also illustrated in corresponding FIG. 4. Additionally shown in FIG. 2 as well as in corresponding FIG. 3 is the coil spring 62 interior ribbon core 64 circumferential clearance "X" with respect to the outer circumference of the spring bracket cap spacing post 38, and the uninterrupted external coil spring circumferential surface 66 support by the cooperatively radiused coil spring restraining shoe 68 whereby low noise level and nonvibrational coil spring 62 extension and retraction is achieved upon sash 12 or 14 vertical displacement. It will be noted, as best shown in FIG. 3, the cooperatively radiused coil spring restraining shoe 68 is a sectional piece so as to facilitate coil spring 62 assembly within the coil spring sub-assembly 20 as will hereinafter be more fully explained, wherein one sectioned piece of said radiused coil spring restraining shoe 68 is a shoe base 74 which is registerably interconnected to a shoe base cover 76 by means of register connecting pins 78 whereby a smooth cooperative radiused coil spring support surface 80 is provided against which the uninterrupted external coil spring circumferential surface 66 smoothly operates in extension and retraction of the coil spring 62 upon vertical displacement of a sash 12 or 14.

Referring now to FIG. 4, wherein is shown greater sectional detail of assembly of the sash attached balance shoe connector sub-assembly 24 to the lower sash lower frame member 28 by means of threadable connection therewith of connector bracket screws 30 through openings in the balance shoe connector bracket 32. Also shown as previously described is interconnected assembly of the coil spring ribbon 22 by means of the coil spring ribbon tail slot 58 insertably within the balance shoe connector coil spring ribbon receiving slot 60 whereby the coil spring sub-assembly 20 of the hardware assembly 18 is made operationally functional with the balance shoe connector sub-assembly 24 thereof in providing low noise level vibration free counterbalancing of a sash 12 or 14 on vertical displacement thereof within the window frame encasement structure 16. Additionally shown in FIG. 4 is the coil spring ribbon interconnecting slot 82 which is employed for assembling coil spring ribbons 22 to each other and to the balance shoe connector sub-assembly 24 when it is necessary to employ an in-series plurality of individual coil

6

spring sub-assemblies 20 in achieving proper sash 12 or 14 operational counterbalance within the window frame encasement structure 16.

Turning now to a consideration of FIGS. 5 and 6 to explain in greater detail the assembly method for interconnecting an in-series plurality of individual coil spring sub-assemblies 20 in achieving heavy or large size sash 12 or 14 operational counterbalance, wherein it is to be understood that the specific number of individual coil spring sub-assemblies 20 that may be required is determined by the coil spring 62 force ratings in relation to the sash 12 or 14 weight to be counterbalanced, and the illustration in FIGS. 5 and 6 of four such coil springs 62 is to be regarded as exemplary only for purposes of explaining the connection method.

Referring to FIGS. 5 and 6, an improved coil spring counterbalance hardware assembly 18 embodying a plurality of coil spring sub-assemblies 20 is shown, which sub-assemblies 20 are installed respectively by means of spring bracket screw 36 threadable connection to the window jamb 34 as was previously described for installation of a single such sub-assembly 20, in series, so that the respective coil spring ribbons 22 thereof may be drawn down and cumulatively assembled one to the other by successive coil spring ribbon tail slot 58 interconnection to coil spring ribbon interconnecting slot 82. The assembly sequence as aforesaid being first an interconnection of the coil spring ribbon tail slot 58 of the lowermost coil spring 62 with the balance shoe connector coil spring ribbon receiving slot 60, followed by interconnection of the coil spring ribbon tail slot 58 of the next most lowest coil spring 62 of said plurality with the coil spring ribbon interconnecting slot 82 of the lowermost coil spring 62 thereof, and thereafter progressively upward in a similar such successive coil spring 62 tail slot 58 to interconnecting slot 82 assemblage pattern. Such a method of successive in-series coil spring 62 interconnection maximizes operational efficiency of the cumulative coil spring counterbalancing effect as well as easing the manual aspects of effecting coil spring interconnection since the amount of coil spring ribbon 22 that must be withdrawn to effect interconnection is minimal as compared to interconnecting each such separate coil spring ribbon 22 separately to the balance shoe connector sub-assembly 24 as is typically done in prior art hardware assemblies of the type herein dealt with and as more particularly shown in FIGS. 7 through 9 next to be considered.

The exemplary prior art coil spring counterbalance hardware assembly 84 as illustrated in FIG. 7 shows upper sash counterbalancing with two coil spring assemblies 86, which are interconnected to the balance shoe connector component 88 in a manner typical of such prior art hardware assemblies 84 which is by individual spring ribbon 90 affixment thereto. With respect to the prior art lowermost coil spring assembly 86 spring ribbon 90 extension for connection to the balance shoe component 88 there is no appreciable difference between that and that of the present invention 18, whether a single or a plurality of coil spring assemblies 86 are involved. However, in the case of a plurality of coil spring assemblies 86 in series in successive interconnection to the balance shoe component 88, each subsequent spring ribbon 90 as shown must be correspondingly increased in extension to effect balance shoe 88 connection which incrementally decreases the overall counterbalance efficiency of a multiple springed hardware assembly 84 by successively increasing the respective spring ribbon

5,157,808

7

90 extensions and consequent pre-loads on the corresponding coil spring assemblies 86. Secondly, installation of such a prior art multiple springed hardware assembly 84 is more difficult since the spring ribbon 90 of each successively removed coil spring assembly 86 must in turn be successively increased in extension by a correponding amount in order to effect balance shoe 88 interconnection. Thus is the difference and distinction of methodology for coil spring to balance shoe interconnection between that of a typical prior art coil spring counterbalance hardware assembly 84 embodying the use of a successive plurality of coil springs in series and that of a corresponding improved coil spring counterbalance hardware assembly 18 as previously illustrated and explained on the earlier consideration of FIGS. 5 and 6.

The enlarged side elevation view illustration of FIG. 8 shows the manner of support provided for a prior art coil spring 92, which is the source for noise and vibration effects as previously mentioned and evidenced upon vertical displacement of a sash counterbalanced by a prior art coil spring hardware assembly 84. As shown, the coil spring 92 interior coil spring circumferential surface 94 is supported by and rotates upon the coil spring mounting bracket bushing 96 as the spring ribbon 90 is extended or retracted upon vertical displacement of a sash to which said coil spring 92 is interconnectedly assembled. As the coil spring 92 rotates upon the bushing 96, the interior circumferential coil spring tail ending 98 in rotationally riding over the bushing mid-point support surface arc 100 snaps thereagainst on each rotational cycle when the coil spring 92 radius automatically compensates for a change thereof upon spring ribbon 90 extension or retraction during attached sash vertical displacement. It is this coil spring 92 cyclical radius compensating snap effect which causes the annoying noise and sash vibration during vertical displacement thereof. Since in the instant invention, as previously explained, the uninterrupted external coil spring circumferential surface 66 is supported by and rotates upon the smooth cooperative radiused coil spring support surface 80 of the cooperatively radiused coil spring restraining shoe 68 during coil spring ribbon 22 extension or retraction upon sash attached vertical displacement, there is no cyclical radius compensating snap effect as otherwise described for the typical prior art coil spring counterbalance hardware assembly 84 and therefore no annoying clicking sound or sash vibrational effects are produced.

Directing attention now to FIG. 9, which is an exploded perspective view of the exemplary prior art coil spring counterbalance hardware assembly 84, therein showing the physical assembly relationships of the various component elements thereof, and particularly the coil spring 92 core opening insertion upon the mounting bracket bushing 96 for coil spring 92 supportable retention between the mounting bracket bushing collar 102 and the bushing cap collar 104 when the two are insertably joined and retained by the bracket screw 106 and installed in affixment to a window jamb 34 as previously shown in FIG. 7. Also shown is the manner of connectably assembling the spring ribbon 90 to the balance shoe component 88, which is by means of individual coil spring 92 spring ribbon 90 retainable insertion within one of the plurality of balance shoe spring ribbon connection slots 108 and stoppable retention therewithin by means of the spring ribbon loop 110. Mounting of the balance shoe component 88 to a lower sash frame mem-

8

ber is as was before, with insertion of connector bracket screws 30 through openings in the balance shoe connector bracket 32 and then threadable assembly to the lower sash frame member.

Considering lastly the series of improved coil spring counterbalance hardware assembly 18 views shown in FIGS. 10 through 12, wherein FIG. 10 depicts an exemplary hardware assembly 18 installation within a typical window frame encasement structure 16. The enlarged side elevation coil spring sub-assembly 20 view shown in FIG. 11 illustrates clearly the interior ribbon core cumferential clearance "X" between the coil spring interior ribbon core 64 and the spring bracket cap spacing post 38 so there is no operational contact of any hardware assembly 18 structure with the interior coil spring circumferential tail ending 112 whereby neither cyclical noise or vibrational effects are brought into play during vertical displacement movement of a sash. The exploded perspective hardware 18 assembly view shown in FIG. 12 illustrates how the various component parts thereof fit together, and the structural relationship of the uninterrupted external coil spring circumferential surface 66 to the supportable retention thereof by the smooth cooperative radiused coil spring support surface 80 whereby noise and vibration free operation is achieved.

Although the invention has been herein shown and described in what is conceived to be the most practical and preferred embodiment and method, it is recognized that departures may be respectively made therefrom within the scopes thereof, which are not to be limited to the specific details disclosed herein but are to be accorded the full scope of the claims so as to embrace any and all equivalent improved coil spring counterbalance hardware assemblies and the connection methods therefor.

I claim:

1. An improved coil spring counterbalance hardware assembly adapted for counterbalancing a vertically displaceable sash within a window frame encasement structure, said assembly comprising in combination at least one coil spring sub-assembly having a coil spring supportably retained about the uninterrupted external coil spring circumferential surface thereof within said coil spring sub-assembly by means of a cooperatively radiused coil spring restraining shoe said coil spring sub-assembly being adapted for installation connection to a window jamb of said window frame encasement structure, a sash attached balance shoe connector sub-assembly adapted for installation connection to the lower frame member of said sash the same side thereof as the installation connection of said coil spring sub-assembly to said window jamb, and a coil spring ribbon of said coil spring of said coil spring sub-assembly extendable therefrom and connectable to a balance shoe slot within said balance shoe connector sub-assembly by means of a first cooperatively complementary slot means on one side edge of said coil spring ribbon and inward from the end thereof, wherein said coil spring is further provided with a second cooperatively complementary slot means on the opposite side edge of said coil spring ribbon as said first cooperatively complementary slot means and at a greater inward distance from the end than said first slot means.

2. The improved coil spring counterbalance hardware assembly according to claim 1 having a plurality of coil spring sub-assemblies connected to said window jamb in a sucessively removed cooperative in-series

5,157,808

9

relation with respect to said sash attached balance shoe connector sub-assembly.

3. The improved coil spring counterbalance hardware assembly according to claim 2 wherein the respective coil spring ribbons of the respective coil springs of said plurality of coil spring sub-assemblies are connectably assembled one to the other in series and to said sash

10

attached balance shoe connector sub-assembly by means of successive coil ribbon interconnection of the first cooperatively complementary slot means respectively therein with the second cooperatively complementary slot means respectively therein.

\* \* \* \* \*

# EXHIBIT 19

04/07/2006  15:13    15854198812                HARRIS BEACH PLLC 1C              PAGE  01/01

**HARRIS BEACH** PLLC

ATTORNEYS AT LAW

99 GARNSEY ROAD
PITTSFORD, NY 14534
(585) 419-8800

NEAL L. SLIFKIN

DIRECT:  585-419-8636
FAX:    (585) 419-8813
NSLIFKIN@HARRISBEACH.COM

April 7, 2006

*By Facsimile*

Jordan Singer, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA  02109-2881

    Re:    <u>Amesbury v. Caldwell Manufacturing</u>

Dear Jordy:

    I am writing in response to your request made in our telephone conversation today regarding our validity expert's report.  Frankly, we view the references as cumulative and in order to avoid additional motion practice before a Court already overburdened with motions, we confirm that our expert will not rely on the Leitzel or Cripps references raised in his report.

            Sincerely,

            Neal L. Slifkin

NLS:nac
Enclosures
cc:    Douglas J. Kline, Esq.
       Safraz W. Ishmael, Esq.
       Paul J. Yesawich, III, Esq.

# EXHIBIT 20

AMESBURY V CALDWELL>

```
 1                 UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MASSACHUSETTS
 3     * * * * * * * * * * * * * * * *
                                      *
 4     AMESBURY GROUP, INC., ET AL    *
                    Plaintiff         *
 5                                    *
            VERSUS                    *    CA-05-10020-DPW
 6                                    *
       CALDWELL MANUFACTURING CO.     *
 7                  Defendant         *
                                      *
 8     * * * * * * * * * * * * * * * *
 9          BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
10             UNITED STATES DISTRICT COURT JUDGE
11                     MOTION HEARING
12                   DECEMBER 22, 2005
13     APPEARANCES:
14         DOUGLAS J. KLINE, ESQ., JORDAN M. SINGER, ESQ.
           AND SAFRAZ W. ISHMAEL, ESQ., Goodwin, Procter,
15         LLP, Exchange Place, Boston, Massachusetts  02109,
           on behalf of the Plaintiff
16
           PAUL J. YESAWICH, III, ESQ. AND NEAL SLIFKIN,
17         ESQ., Harris, Beach, 99 Garnsey Road, Pittsford,
           New York  14534, on behalf of the Defendant
18
           THOMAS E. LENT, ESQ., Lurie & Krupp, LLP,
19         One McKinley Square, Boston, Massachusetts
           02109, on behalf of the Defendant
20
21                              Courtroom No.  1 - 3rd Floor
                                1 Courthouse Way
22                              Boston, Massachusetts 02210
                                11:00 A.M. - 11:50 A.M.
23
                Pamela R. Owens - Official Court Reporter
24             John Joseph Moakley District Courthouse
                   1 Courthouse Way - Suite 3200
25                   Boston, Massachusetts  02210
```

AMESBURY V CALDWELL>

Page 2

1  CA-05-10020-DPW
2  DECEMBER 22, 2005
3  THE COURT:   Well, I really didn't know how
4  best to address these motions. They frankly are quite
5  unseemingly back and forth, late in the day filings
6  being the rule of the day. I guess all I can say is
7  I'm glad I don't have to participate in this kind of
8  activity except to rule on it. And what appears to be
9  the case, stepping back and viewing this more broadly,
10  is people waited until the last minute to do discovery
11  that seems to have been indicated earlier on and now
12  want the Court to pull their chestnuts out of the fire
13  or throw some additional ones in. But I'm not going to
14  do that. We have scheduling orders. In fact, I changed
15  the schedule for your benefit. And, so, somebody who
16  says they want to amend the answer with a telephone call
17  at 4:55 doesn't receive a lot of sympathy -- in fact,
18  none. If you wanted to raise a question as serious in
19  my mind as inequitable conduct, there was enough there
20  to get into it early on. People didn't bother to do it,
21  didn't bother to raise the issue after hearing the
22  deposition. And the idea that you have to wait for the
23  transcript? Please.
24      So, the short of it is I'm denying the motion
25  for leave to amend the answer. Of course, that leaves

Page 3

1  open the anticipation or obviousness invalidity
2  arguments that are present in the answers that exist
3  now.
4      Similarly, the so-called supplemental
5  memorandum, a ruse by any other name, but it's still a
6  ruse. And that's a ruse. You didn't bother to file a
7  motion to compel in a timely fashion. And, so, thinking
8  about it afterwards, you decided to style it as a
9  supplemental memorandum. I don't know what people
10  expect. I suppose clients pay for this sort of thing.
11  That's one·of the audiences and perhaps the most
12  important one. But you're trying to persuade a Judge.
13  And this kind of nunc pro tunc antic is not something
14  that I'm sympathetic to. So, to the degree that there
15  is some desire for supplemental discovery compulsion,
16  it's too late. I generally don't strike things. I read
17  everything that comes across my table. Sometimes that
18  makes me the victim. It did here, including this flurry
19  of resort to electronic case filing which, frankly, has
20  its own problems since it permits people to file things
21  at 4:55 and then at 5:45 without the process of actually
22  putting the papers together and thinking about it, I
23  guess. But the short of it is after careful
24  consideration of all the supplemental material, I'm
25  simply not going to permit that to be part of motion to

Page 4

1  compel practice.
2      Now, turning to this designation of the
3  30(b)(6) witness, which frankly I guess was something
4  that you'd have to call switch-and-bait by tendering
5  somebody when you could say that that somebody was going
6  to be the 30(b)(6) witness as to a certain subject
7  matter, it's beneath contempt to be perfectly candid.
8  That's why trials are conducted with adult supervision
9  in contra-distinction to depositions. But it's not
10  going to happen in this courtroom. Any kind of
11  foolishness like that isn't going to happen here. So,
12  your clients may be excited about the opportunity to
13  pay attorney's fees for you to gnaw at each other's
14  ankles, but it does nothing to advance the case to a
15  disposition on the merits to have that kind of conduct.
16      So, let me go back to the more fundamental
17  question with respect to the motion to compel and
18  designation of a 30(b)(6) witness here. Why aren't the
19  answers to the contention interrogatories enough?
20      MR. SLIFKIN: Your Honor, it may be a little
21  difficult to demonstrate this. But if you look at the
22  plaintiff's opposition to 30(b)(6) --
23      THE COURT: Yes.
24      MR. SLIFKIN: -- attached to that are the
25  interrogatory responses. And on page 21 of those

Page 5

1  responses is a good example of why we just don't know
2  the basis for their infringement position.
3      THE COURT: Why don't you explain it to me?
4      MR. SLIFKIN: Sure. There is --
5      THE COURT: Why don't you just explain it?
6  I mean, really, this is frankly just foolishness,
7  foolish posturing on both sides.
8      MR. SLIFKIN: Your Honor, I apologize for the
9  -- I mean, there was a lot of last-minute activity on
10  both sides. Unfortunately, the depositions were all
11  done within a six-week period and --
12      THE COURT: Whose fault is that?
13      MR. SLIFKIN: It is the parties' fault, Your
14  Honor.
15      THE COURT: And that six-week period was
16  beyond the time period that I had actually designated
17  for the schedule here.
18      MR. SLIFKIN: Yes, Your Honor.
19      THE COURT: So people weren't paying attention
20  or enough attention at an earlier point.
21      MR. SLIFKIN: Yes. I apologize, Your Honor.
22      THE COURT: Okay. So now we're dealing with
23  the question of contention interrogatories which are the
24  customary mechanism, as far as I'm concerned, for
25  dealing with this sort of thing.

2 (Pages 2 to 5)

DECEMBER 22, 2005>

AMESBURY V CALDWELL>

Page 6

1    MR. SLIFKIN: They are, Your Honor. As you'll
2    see this afternoon, one important issue is what is a
3    pocket and where is the pocket. Or what is the pocket
4    should be answered today. Where is the pocket is an
5    infringement issue to be answered later. If you look
6    at their claim chart, they've listed the element which
7    includes the pocket and a whole lot of other stuff
8    in the chart itself which is page 21 of their
9    interrogatory responses. They have the word "yes" in
10   the column indicating the element is present. And then
11   if you go to the drawings, on the left-hand side, it
12   purports to indicate where you can find the pocket in
13   Caldwell's product. It says element 2(e). And then you
14   go to look for element 2(e) on the drawings that are
15   attached, and the first page -- this is two pages after
16   that chart that I was referring to. Element 2(e) points
17   to three different things on a drawing which is nearly
18   indecipherable. So, when you're looking for the pocket,
19   you can't find it in the drawings. If you go to the
20   next page, it's the same thing. There's no -- 2(e) is
21   pointing to three different locations on a Caldwell
22   balance. The next page is maybe a little better. But
23   still given the quality of the drawings and just a
24   general indication of a line, you cannot tell where the
25   pocket is that they are alleging is found in all of

Page 7

1    those products. That's just one example.
2    Another example deals with the spine and its
3    rotation inhibiting function. And although they point
4    to the spine, nowhere do they say how the spine inhibits
5    rotation, which is an element of the claim. So you go
6    to look at the drawings and you see what they point to,
7    what they believe is the spine. And then you try to
8    figure out how they contend it inhibits rotation and
9    there's absolutely no information in these interrogatory
10   responses on that issue. So, yes, at first blush, it
11   looks like they have done a lot of work. They have
12   labeled things A, B, C, D and E with some arrows, but
13   you can't understand the position from these drawings.
14   And this is the format in which they produced it.
15       THE COURT: So, why didn't you compel them
16   with contention interrogatories?
17       MR. SLIFKIN: Pardon me?
18       THE COURT: Why didn't you compel them with
19   contention interrogatories? Well, I assumed.
20       MR. SLIFKIN: Well, Your Honor, I had assumed
21   -- and maybe that was my mistake -- that we would get
22   more detail in the depositions. And that's why we asked
23   for it. Because it is difficult to -- well, as you
24   know, Your Honor, interrogatories are written by
25   responses written by interrogatories.

Page 8

1        THE COURT: And so are these claims, you know,
2    what the real contentions are of infringement. And
3    that's what the poor beknighted Mr. Koopman, is it --
4        MR. SLIFKIN: Koopman.
5        THE COURT: -- was saying. He doesn't know.
6    His lawyers will do it. They're the ones who make
7    the identification of this sort of thing. And that's
8    why contention interrogatories are probably the best way
9    to deal with it rather than get some in-house person to
10   lumber along.
11       MR. SLIFKIN: Yes, Your Honor. In many cases,
12   that's true. Contention interrogatories are done in a
13   way that have useful information. I had counted on
14   taking the 30(b)(6) deposition to flesh out details not
15   present in this response. And that's why we followed
16   that procedure. And as you know, there was a bit of
17   perhaps confusion as to whether or not they were going
18   to actually produce somebody on the issue. And there
19   was an issue as to whether what that person would have
20   said, had they produced him, clearly Mr. Koopman was not
21   that person because he hadn't even read the patents.
22       THE COURT: I can see that. I can see that.
23   That's why I started with this overture about what I
24   find to be conduct beneath contempt.
25       MR. SLIFKIN: Again, Your Honor, I apologize

Page 9

1    for the activity. I would have -- if I were on their
2    side, I would have designated a technical person such as
3    Mr. Newman, who was the inventor on at least two of
4    these patents, to be the witness who could testify as to
5    what in Caldwell's product is a pocket. It's not a
6    difficult question to answer. Either we have a pocket
7    or we don't and can you please point to it.
8        THE COURT: All right. Well, let me hear from
9    Amesbury.
10       MR. SINGER: Your Honor, Amesbury's
11   interrogatory responses were served on July 5th.
12       THE COURT: So your response is they may not
13   have been very good, but too bad, it's too late?
14       MR. SINGER: No, no. Let me step back. The
15   point I want to make on July 5th is if Caldwell felt
16   that they were not good, they could have asked us to
17   supplement.
18       THE COURT: Right. I think I brought that
19   out.
20       MR. SINGER: There was nothing along those
21   lines. The drawings used in the contention
22   interrogatories are Caldwell's own product literature.
23   And, again, if you look at page 22.3 where the pocket
24   is labeled as 2(3), there I think it is actually pretty
25   clearly labeled where the pocket is on that product

3 (Pages 6 to 9)

DECEMBER 22, 2005>

AMESBURY V CALDWELL>

| Page 10 | Page 12 |
|---|---|
| 1 literature. Caldwell is familiar with its own product. | 1 sides. And you both appear to conceive the role of the |
| 2 THE COURT: 22 -- | 2 Judge as being very much similar to the fellow who |
| 3 MR. SINGER: 3. | 3 follows behind the elephant. That's not the function I |
| 4 THE COURT: -- point 3. | 4 perform, at least not all the time and in gross. |
| 5 MR. SINGER: And the small drawing in the left | 5 MR. SINGER: Yes. |
| 6 bottom corner -- | 6 THE COURT: This case should be teed up. It |
| 7 THE COURT: Right. | 7 isn't because of this fooling around. and now I'm |
| 8 MR. SINGER: -- 2(e) on both of those items is | 8 dealing with a kind of fundamental, like what are your |
| 9 pretty clearly labeled given the size of the drawings. | 9 contentions. And you play a game with the witnesses |
| 10 THE COURT: Which are miniscule. | 10 saying, "well, they wrote to us, we wrote to them." |
| 11 MR. SINGER: Yes. | 11 There is an argument to be made that the modification |
| 12 THE COURT: Right. | 12 of the Federal Rules of Civil Procedure providing |
| 13 MR. SINGER: But Caldwell is familiar with its | 13 discovery undermine the prompt disposition of cases |
| 14 own literature. Caldwell is familiar with its own | 14 because people can spend their time fooling around on |
| 15 products. At any point -- | 15 these discovery disputes rather than getting to the core |
| 16 THE COURT: Of course they are. They are | 16 of it. And that's what happened here. So, the question |
| 17 going to figure out what it is that you say infringes. | 17 is what do I do about it. That's really the question. |
| 18 That's the whole point. Yes, they are familiar with it. | 18 This is fundamental enough for me that I want to do |
| 19 But the idea is to give them some clear identification | 19 something about it. |
| 20 of what's at issue. | 20 Now, I can say you rest on your contention |
| 21 MR. SINGER: Yes. | 21 interrogatories. To the degree that they are |
| 22 THE COURT: And if it is your contention that | 22 incomprehensible, you're put in an awkward position. To |
| 23 a human being looking at that would immediately | 23 the degree I look at this thing and say nobody in the |
| 24 recognize pocket, I'm going to have to have my eyes | 24 world could figure out what 2(e) means looking at this |
| 25 examined again. | 25 lilliputian picture, but that's not the way I want to |

| Page 11 | Page 13 |
|---|---|
| 1 MR. SINGER: I'm not contending that this | 1 get the case tried and resolved. So, what do you |
| 2 alone is everything that Amesbury is standing on. | 2 propose? |
| 3 In addition to this, Caldwell did take | 3 MR. KLINE: Can I offer, Your Honor, that |
| 4 -- aside from a 30(b)(6) -- took a number of depositions | 4 we'll supplement the contention interrogatory responses |
| 5 of Amesbury's technical people. | 5 within a very short period of time and get better |
| 6 THE COURT: Why didn't you produce the | 6 photographs that are larger and try to annotate them in |
| 7 30(b)(6) witness under these circumstances? Why the | 7 a manner that's more straightforward than counsel has |
| 8 elaborate gavotte? | 8 viewed these? |
| 9 MR. SINGER: Well, Your Honor, with all due | 9 THE COURT: And the Court. |
| 10 respect, I don't think this was a charade or a | 10 MR. KLINE: And the Court. I'm sorry. |
| 11 bait-and-switch. | 11 THE COURT: All right. That's the way I'm |
| 12 THE COURT: Switch-and-bait. | 12 going to do it, at least initially. If it's |
| 13 MR. SINGER: Excuse me, switch-and-bait. | 13 incomprehensible, then I'm going to give them writ to go |
| 14 Amesbury took the position in September when the initial -- | 14 up and down Amesbury's office and perhaps their |
| 15 THE COURT: When did they learn that you were | 15 attorneys to figure out what it is. |
| 16 tendering a witness on this subject? | 16 MR. SLIFKIN: Your Honor -- and that's a fair |
| 17 MR. SINGER: On November 2nd. On November 1st, | 17 compromise. I do want to point out that some of these |
| 18 they asked us to tender a witness. On October 31st was | 18 elements are not physical parts, but functional, for |
| 19 the first time the issue was raised. | 19 example. |
| 20 THE COURT: Okay. So you gave it to them | 20 THE COURT: I'm giving them a chance to |
| 21 within 24 hours? | 21 supplement. I think they understand what I think is |
| 22 MR. SINGER: Yes. Our objections had been | 22 fairly important here. In similar circumstances, I |
| 23 standing since September 14th and it was not until | 23 don't think I'd want to play fast and loose. But, you |
| 24 October 31st that the issue was raised. | 24 know, such things happen. And when they do, they're |
| 25 THE COURT: It's a mess. And it's on both | 25 dealt with. |

4 (Pages 10 to 13)

AMESBURY V CALDWELL>

| Page 14 | Page 16 |
|---|---|

**Page 14**

1  MR. SLIFKIN: Thank you, Your Honor.
2  THE COURT: So, three weeks --
3  MR. KLINE: That will be fine, Your Honor.
4  THE COURT: -- given the holiday.
5  MR. KLINE: Thank you.
6  THE COURT: So that's the 12th.
7  Now, I have the Caldwell motion to compel,
8  number 47. And I guess the first question to ask is was
9  there any consultation before?
10  MR. SLIFKIN: On the motion to compel?
11  THE COURT: Right.
12  MR. SLIFKIN: Yes. There was a letter
13  exchange that occurred admittedly briefly before the
14  motion was filed.
15  THE COURT: And you view that as full and fair
16  consultation?
17  MR. SLIFKIN: Your Honor, again, I know there
18  was a lot of activity at the very last minute. And we
19  are willing to work with them -- I mean, they have
20  supplemented and they continue to offer to supplement.
21  And we are willing to withdraw the motion if we get some
22  representations that we will get what we're asking for
23  -- and I think they will agree to that -- and also a
24  representation that they will not rely at trial on
25  things that are not produced. Given the timing, I

**Page 16**

1  other documents that are sought in this motion, Amesbury
2  produced them in most cases before the motion was filed.
3  THE COURT: What's outstanding apart from
4  those invoices?
5  MR. SLIFKIN: Your Honor, there are -- apart
6  from the CDs?
7  THE COURT: Right.
8  MR. SLIFKIN: I don't believe anything, Your
9  Honor. As long as we get a representation that they
10  have produced -- when Mr. Singer, with all due respect,
11  says that everything was produced before the motion,
12  that's not correct. It was mailed on the 29th, the day
13  before the motion was filed. It was received after the
14  motion was filed. And we had no indication that it was
15  on its way and we had no -- even if we did, we wouldn't
16  know what it was on its way until after the deadline to
17  file motions.
18  THE COURT: Ordinarily I'm interested in
19  history, but now I'm interested in current events.
20  MR. SLIFKIN: Yes, Your Honor. We believe
21  that -- it's difficult for us to understand what they
22  have. If they represent to us in the courtroom here
23  that they will produce all documents that are responsive
24  and that they won't rely on documents that have not been
25  produced, we're fine with that. But I don't know what

| Page 15 | Page 17 |
|---|---|

**Page 15**

1  realize that there wasn't a lot of time to have an
2  in-depth discussion with them. But we are willing to
3  compromise.
4  THE COURT: There was plenty of time to have
5  that. You chose not to do it. I mean, it's as simple
6  as that. There was plenty of time to do discovery in
7  this case. You even got additional time from Judge
8  Bowler and then from me. So, saying having squeezed it
9  at the end, that there wasn't enough time is putting
10  yourself a little bit in the role of Pogo, "I have seen
11  the enemy and he is us."
12  MR. SLIFKIN: Yes, Your Honor.
13  THE COURT: So, what is the story with these
14  last group of motions? What's Amesbury's response on
15  this? In a supplement?
16  MR. SINGER: Supplement on Caldwell's motion
17  to compel? Well, Your Honor, Amesbury has produced all
18  responsive documents at this stage that's left with the
19  exception of one batch of invoices that are on CD. And
20  the parties have reached what I understand to be an
21  agreement on that. There's a vast number of invoices.
22  Amesbury has produced one CD with approximately 72,000
23  invoices and has offered to make 30 additional CDs
24  available to Caldwell once those -- we're certainly
25  willing to produce those. And as far as all of the

**Page 17**

1  they have.
2  THE COURT: I don't know what that means, but
3  maybe, Mr. Singer, you do.
4  MR. SINGER: Your Honor, we've represented to
5  the defendant before, and we'll represent it again here,
6  that all responsive documents of which we are aware have
7  already been produced. They were produced either on
8  November 29th or December 6th. With the exception of
9  the CDs, everything has been produced.
10  THE COURT: Okay. And as a consequence,
11  nothing that is responsive will be used at trial that
12  hasn't been produced?
13  MR. SINGER: Yes, Your Honor.
14  MR. SLIFKIN: That's acceptable, Your Honor.
15  THE COURT: All right. So you're going to
16  clean that up.
17  MR. SLIFKIN: We do have the issue of the CDs
18  and they have not been produced.
19  MR. SINGER: We're certainly willing to
20  produce -- Your Honor, we left it with Caldwell that
21  we'd let them look at one CD, determine --
22  THE COURT: They say they want them.
23  MR. SINGER: We're happy to produce it. We'll
24  have it for them as soon as we can. Now that was the
25  same three-week deadline.

5 (Pages 14 to 17)

AMESBURY V CALDWELL>

Page 18

1    THE COURT: All right.
2    MR. SLIFKIN: Thank you, Your Honor.
3    THE COURT: Okay. Now we've got these
4    Amesbury motions to compel. Again, I go back to
5    this view with respect to what I call contention
6    interrogatories in this context. To the degree that
7    this is interrogatory answers, aren't you better off --
8    MR. SINGER: Yes. That's fine, Your Honor.
9    We're happy to at this stage let Caldwell be held to its
10   current interrogatories.
11   THE COURT: They will be. They will be.
12   MR. SLIFKIN: Your Honor, we would like like
13   the ability to supplement or point out the fact that
14   some of this on the validity issue requires expert
15   analysis just like on the damages issue, they have not
16   produced any analysis on the damages claiming expert
17   testimony is necessary. We believe on the validity
18   side, there must be expert analysis.
19   THE COURT: It may well. It may well. But
20   those experts are only going to be speaking about things
21   that you've disclosed right now -- as of right now.
22   MR. SLIFKIN: Your Honor, we would ask again
23   for the opportunity to supplement. They have three
24   weeks to provide more on the interrogatories on
25   infringement. We would like to have time to supplement

Page 19

1    on the issue of validity.
2    THE COURT: Would that mean add some more
3    prior art?
4    MR. SLIFKIN: No, no. No, Your Honor. The
5    prior art has all been disclosed. What they are asking
6    about is some -- I'm not sure what they are asking
7    about. The prior art has all been disclosed, Your Honor.
8    THE COURT: There will be no more prior art.
9    MR. SLIFKIN: There will be no additional
10   prior art beyond what's listed in our responses.
11   THE COURT: So, why did you have to wait for
12   me to come out on the bench?
13   MR. SLIFKIN: Your Honor, we had produced --
14   we had produced the list of prior art early on in the
15   case.
16   THE COURT: Then why is it that you want to
17   supplement now?
18   MR. SLIFKIN: If Your Honor is saying that
19   we're bound by the list of prior art that we produced,
20   there is no need to supplement. The prior art listed
21   was given early on in this case and has not changed.
22   The only thing that changed is we provided a little more
23   detail on the timing of the sales of products to
24   Anderson Corporation which we became aware of during Mr.
25   Newman's deposition.

Page 20

1    THE COURT: No. You became aware of it or should
2    have been aware of it earlier than that.
3    MR. SLIFKIN: Your Honor, with all due
4    respect, the documents came from Anderson Corporation.
5    Amesbury did not produce those documents to us until
6    after we received them from Anderson with some wrangling
7    over what Anderson would give to us as a third party.
8    The timing, the dates --
9    THE COURT: This is -- you know, you were
10   either vigilant and diligent or you weren't. And we've
11   already dealt with that part.
12   MR. SLIFKIN: And the information is in the
13   responses, Your Honor. The timing of the --
14   THE COURT: So, what is it that you want to
15   supplement?
16   MR. SLIFKIN: Your Honor, again, if you're
17   saying to me are we bound by our list of prior art, I
18   say yes. That's perfectly acceptable. There's no need
19   to say "if." Mr. Singer is claiming that somehow
20   we're bound by the entire analysis in those and how that
21   prior art applies to the claims. The analysis -- we'd
22   like an opportunity to go back through the analysis
23   and compare the prior art with the claims. But if we're
24   talking about simply the list of prior art, it's in
25   there. It's been in there from the first responses that

Page 21

1    we gave months ago.
2    MR. SINGER: Your Honor, Caldwell has had the
3    opportunity for the past several months to put together
4    a chart comparing the prior art to the claims. That's
5    what our initial motion to compel was about. When
6    Caldwell sat in front of Magistrate Bowler, they
7    explained to Magistrate Bowler that they needed
8    additional fact discovery to do that precise
9    supplementation. We asked for that discovery, will they
10   do the claim charts. No. Now, Mr. Slifkin is saying
11   that it's an opportunity. I think they should be held
12   to what they've currently produced. They've been asked
13   three times to do that.
14   MR. SLIFKIN: Your Honor, that's not correct.
15   THE COURT: What's that going to mean in this
16   context, that you get an expert who provides a nuanced
17   explanation of how the prior art applies here, that
18   you're going to move to exclude it; is that what it
19   means?
20   MR. SINGER: Essentially yes.
21   THE COURT: Well, I'm not really that excited
22   about policing inadequacies. I'm giving you the
23   opportunity to supplement. I'll give them an
24   opportunity to supplement here to address the concerns
25   that are expressed here. So, same opportunity with

6 (Pages 18 to 21)

AMESBURY V CALDWELL>

Page 22

1 respect to that
2     As to the documents that are sought here --
3     MR. SLIFKIN: Yes, Your Honor. We have agreed
4 and are ready in a writing to produce the documents that
5 were identified in Mr. Levio's deposition. We are
6 gathering those documents. We have agreed to supplement
7 our privilege log. We have a very thick privilege log
8 because we produced thousands and thousands of e-mails
9     THE COURT: There was a columnist for the New
10 Yorker in the '50s, I think. His name was A J Liebman
11 He used to write under the Wayward Pressman. He wrote
12 about the press. And one of his targets frequently was
13 Colonel McCormick who ran the Chicago Tribune who was
14 a convenient target because he would make remarkable
15 statements from time to time, one of which was that
16 the Chicago Tribune was the world's greatest newspaper,
17 because if you took the Sunday newspaper and weighed it,
18 it was heavier than any other Sunday newspaper anywhere
19 in the world. Liebman them proceeded to demonstrate
20 that Queens was a more important borough than Manhattan
21 by using the telephone book weight analysis. So,
22 telling me that it's a thick privilege log tells me
23 nothing at all
24     MR. SLIFKIN: I understand, Your Honor. We
25 have produced a privilege log which identifies the

Page 23

1 documents that are claimed to be privileged. I think we
2 have given them a list of all -- we have a list to give
3 them of all people that are attorneys, to the extent
4 they don't know it, which will let them determine why
5 the document is being withheld, although the list of
6 attorneys is not long and they should know
7     THE COURT: So, these attorneys, are they
8 either the recipients or the drafters of all of these?
9     MR. SLIFKIN: In most cases, yes, Your Honor.
10 There's some work that was done at the request of an
11 attorney. It's work product privilege where the
12 attorney is not necessarily the recipient of the
13 document. But in many cases, it is --
14     THE COURT: Did the attorney ask for the work
15 to be done, but didn't want to look at it?
16     MR. SLIFKIN: Well, Your Honor, the documents
17 are created at one place and sent to -- perhaps sent to
18 an attorney in a different communication. So, when you
19 take the thousands of e-mails and you look at all of
20 them, there will be internal e-mails saying, "Mr.
21 Stevens, the attorney, had asked us to look at such and
22 such and here's the analysis" whereas perhaps --
23     THE COURT: Who is that addressed to?
24     MR. SLIFKIN: Well, there were many meetings
25 between Eugene Stevens or his associate, Stephen Scott,

Page 24

1 where he would say to Caldwell, "Here's the issue, and
2 we have some analysis." Perhaps they were verbal. It's
3 not always written communications. And the analysis
4 would be done looking at the patents looking at the
5 products
6     THE COURT: And then this wouldn't go to an
7 attorney for use?
8     MR. SLIFKIN: It might at some point. Yes,
9 Your Honor. It might be another -- it might be an oral
10 discussion followup to analyze the issues. There was a
11 lot of activity. There are three patents involved and a
12 lot of charges of infringement. And Amesbury has
13 additional unasserted patents. So there was a lot of
14 activity by the engineers trying to determine what it
15 was that Amesbury was claiming infringing and how to
16 understand their claim. Can I say that in every case
17 there was a written work product that went to the
18 attorney? I don't know that, Your Honor.
19     THE COURT: Well, it ought to be not merely
20 long, but comprehensive enough to be able to identify
21 whether or not there is a colorable claim.
22     MR. SLIFKIN: Yes, Your Honor. We have agreed
23 to give that to them. As I said, we are working on it
24 and it is quite a task because there were many, many
25 e-mails. Some companies correspondend by e-mail quite a

Page 25

1 bit. There has been generated a privilege log
2 electronically. We've edited it and gave it to them.
3 They want some more details. We plan to supplement it,
4 edit it more with more substance. And I think it should
5 satisfy their needs for detail.
6     THE COURT: When is it going to be completed?
7     MR. SLIFKIN: I think within two weeks -- in
8 two weeks.
9     THE COURT: I'm going to use the three-week
10 deadline for all of this.
11     MR. SLIFKIN: That's fine, Your Honor.
12     THE COURT: So, as I understand it, the
13 representations, if not the realization, are adequate.
14     MR. SINGER: Yes. I just want to be clear
15 that the supplementation of the actual descriptions will
16 allow Amesbury not only to determine whether an attorney
17 was involved for attorney/client privilege, but really
18 to understand the basis of the work product.
19     THE COURT: That's my understanding as well
20     MR. SLIFKIN: Your Honor, there is a danger
21 that the description, in fact, discloses the legal
22 advice.
23     THE COURT: There's always that danger. But
24 it's your obligation to make sufficiently clear how the
25 attorney/client privilege applies under these

7 (Pages 22 to 25)

AMESBURY V CALDWELL>

Page 26

1   circumstances.
2           MR. SLIFKIN:  Understand, Your Honor.
3           THE COURT:  That's the role of a properly
4   constructed privilege log.
5           MR. SLIFKIN:  I understand.
6           THE COURT:  And I expect that to be complied
7   with here.  Now I think that takes care of all of the
8   Amesbury motion matters, doesn't it?
9           MR. SINGER:  Your Honor, the only matter that
10  I think is left is the issue of tax returns which I
11  don't believe Caldwell has agreed to produce.  Those
12  were clearly asked for.  Caldwell, as I understand it,
13  is arguing that there are confidential questions in a
14  protective order in this case.  Confidentiality should
15  not be an issue and we would ask that those be produced.
16          THE COURT:  What's your view about that?
17          MR. SLIFKIN:  Your Honor, we have produced
18  audited financial statements which will include more
19  information on their tax returns.  Tax returns,
20  obviously, are highly-sensitive documents which --
21          THE COURT:  Well, I mean, I understand that as
22  a general proposition.  But why here once you've
23  disclosed all of that other stuff?
24          MR. SLIFKIN:  Well, it would include the
25  information on the amount of taxes being paid to the

Page 27

1   Government.  It would include --
2           THE COURT:  So what?  I mean, your audited
3   financials don't show that?
4           MR. SLIFKIN:  Your Honor, I don't know.  The
5   -- I think it's --
6           THE COURT:  You mean they don't disclose the
7   expenditures that the company has made?
8           MR. SLIFKIN:  Most likely they would.  Yes,
9   Your Honor.
10          THE COURT:  Okay.  So --
11          MR. SLIFKIN:  Is it not duplicative then of
12  what's already been produced?
13          THE COURT:  Probably.  But what's the issue?
14          MR. SLIFKIN:  The issue is simply of
15  sensitivity of tax returns.
16          THE COURT:  Well, what's the source of the
17  sensitivity?  I just don't understand with some greater
18  particularity what it is.
19          MR. SLIFKIN:  It's a -- Your Honor, frankly, I
20  don't know.  The tax returns generally are guarded
21  closely by the people filing them.  Our client is
22  concerned about producing its tax returns, especially
23  when the information has been provided elsewhere.  I
24  would ask --
25          THE COURT:  Where the information has been

Page 28

1   provided elsewhere.  What do you mean?
2           MR. SLIFKIN:  The audited financial
3   statements.
4           THE COURT:  Oh, you mean, that there are -- we
5   have all of the relevant stuff being out there already.
6           MR. SLIFKIN:  I would ask Mr. Singer why he
7   needs tax returns from these.
8           THE COURT:  Or perhaps I will.
9           MR. SLIFKIN:  Thank you, Your Honor.
10          THE COURT:  So, Mr. Singer?
11          MR. SINGER:  Your Honor, tax returns -- tax
12  returns represent -- help fill out a financial picture.
13  They represent --
14          THE COURT:  What is it that you haven't gotten
15  now?
16          MR. SINGER:  Tax returns, more than anything,
17  they allow us to compare the audited financial
18  statements to formal representations that have been
19  made to the Government to help us fill out the entire
20  damages.
21          THE COURT:  Like what?  Like what?
22          MR. SINGER:  The tax returns represent --
23          THE COURT:  I mean, this is, you know, this
24  battle to the death over something that neither one of
25  you knows anything about.  You can't tell me what it is

Page 29

1   that's particularly sensitive and you can't tell me what
2   it is that it fills out, except to say it fills out.
3   Under these circumstances, I'm not going to order the
4   tax returns turned over.  So, anything else?
5           MR. SLIFKIN:  No, Your Honor.
6           MR. SINGER:  No, Your Honor.
7           THE COURT:  So, what that means, I think, if I
8   can recapitulate for Ms. Rynne, is that I have denied
9   motion 42 which was the motion for leave to amend the
10  answer.
11          I have allowed so much of motion 34 to require
12  that by January 12th, the contention interrogatories
13  will be supplemented and revised so that they are fully
14  comprehensible and embody it is that Amesbury wishes to
15  contend with respect to infringement.
16          With respect to number 47, which is the
17  Caldwell motion to compel, with respect to documents, my
18  understanding is that the representations made here
19  today are sufficient.  And, so, it's allowed to that
20  extent.  We really, I think, are dealing solely with
21  invoices -- remaining invoices under those circumstances
22  -- that the rest of the material has been turned over at
23  this point.
24          With respect to motion number 45, which is
25  the Amesbury motion to compel, Caldwell will be

8 (Pages 26 to 29)

DECEMBER 22, 2005>

AMESBURY V CALDWELL>

Page 30

1  supplementing its invalidity interrogatories with the
2  recognition that they will be held to that interrogatory
3  answer understanding, of course, that nuance may be
4  added by expert reports and so on. But we're not going
5  beyond the theories nor the claimed prior art.
6       With respect to the revised privilege log,
7  that also will be provided by January 12th. And I
8  believe that all of the documents, with the exception of
9  the tax returns, were turned over. And I decline on the
10  basis of this record to turn over the tax returns here
11  or order the tax returns to be turned over. I will not
12  consider the so-called supplemental memorandum which I
13  view as a belatedly filed motion to compel masquerading
14  as a supplemental memorandum to a previously filed one.
15       Now, is there anything else that we need to
16  take up on these discovery matters?
17       MR. KLINE: I don't think so, Your Honor.
18       THE COURT: For my sake, I hope that this
19  resolves discovery matters. I think that you probably
20  hope so for your sake as well. So, get it done without
21  further ado. So, we're on for 1 o'clock for Markman.
22  Okay. We'll be in recess.
23       RECESSED AT 11:50 A.M.
24
25

Page 31

1
2       C E R T I F I C A T E
3
4       I, PAMELA R. OWENS, Official Court Reporter,
5  U. S. District Court, do hereby certify that the
6  foregoing is a true and correct transcription of the
7  proceedings taken down by me in machine shorthand and
8  transcribed by same.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

9 (Pages 30 to 31)

DECEMBER 22, 2005>

AMESBURY V CALDWELL>

## A

ability 18:13
able 24:20
absolutely 7:9
acceptable 17:14 20:18
activity 2:8 5:9 9:1
  14:18 24:11,14
actual 25:15
add 19:2
added 30:4
addition 11:3
additional 2:13 15:7,23
  19:9 21:8 24:13
address 24 21:24
addressed 23:23
adequate 25:13
admittedly 14:13
ado 30:21
adult 4:8
advance 4:14
advice 25:22
afternoon 6:2
ago 21:1
agree 14:23
agreed 22:3,6 24:22
  26:11
agreement 15:21
AL 1:4
alleging 6:25
allow 25:16 28:17
allowed 29:11,19
amend 2:16,25 29:9
Amesbury 1:4 9:9 11:2
  11:14 15:17,22 16:1
  18:4 20:5 24:12,15
  25:16 26:8 29:14,25
Amesbury's 9:10 11:5
  13:14 15:14
amount 26:25
analysis 18:15,16,18
  20:20,21,22 22:21
  23:22 24:2,3
analyze 24:10
Anderson 19:24 20:4,6
  20:7
ankles 4:14
annotate 13:6
answer 2:16,25 9:6
  29:10 30:3
answered 6:4,5
answers 3:2 4:19 18:7
antic 3:13
anticipation 3:1
apart 16:3,5
apologize 5:8,21 8:25
appear 12:1
APPEARANCES 1:13
appears 2:8

applies 20:21 21:17
  25:25
approximately 15:22
arguing 26:13
argument 12:11
arguments 3:2
arrows 7:12
art 19:3,5,7,8,10,14,19
  19:20 20:17,21,23,24
  21:4,17 30:5
aside 11:4
asked 7:22 9:16 11:18
  21:9,12 23:21 26:12
asking 14:22 19:5,6
associate 23:25
assumed 7:19,20
attached 4:24 6:15
attention 5:19,20
attorney 23:11,12,14
  23:18,21 24:7,18
  25:16
attorneys 13:15 23:3,6
  23:7
attorney's 4:13
attorney/client 25:17
  25:25
audiences 3:11
audited 26:18 27:2
  28:2,17
available 15:24
aware 17:6 19:24 20:1
  20:2
awkward 12:22
A.J 22:10
A.M 1:22,22 30:23

## B

B 7:12
back 2:5,9 4:16 9:14
  18:4 20:22
bad 9:13
bait-and-switch 11:11
balance 6:22
basis 5:2 25:18 30:10
batch 15:19
battle 28:24
Beach 1:17
behalf 1:15,17,19
beknighted 8:3
belatedly 30:13
believe 7:7 16:8,20
  18:17 26:11 30:8
bench 19:12
beneath 4:7 8:24
benefit 2:15
best 2:4 8:8
better 6:22 13:5 18:7
beyond 5:16 19:10 30:5

bit 8:16 15:10 25:1
blush 7:10
book 22:21
borough 22:20
Boston 1:15,19,22,25
bother 2:20,21 3:6
bottom 10:6
bound 19:19 20:17,20
Bowler 15:8 21:6,7
briefly 14:13
broadly 2:9
brought 9:18

## C

C 7:12 31:2,2
Caldwell 1:6 6:21 9:15
  10:1,13,14 11:3 14:7
  15:24 17:20 18:9
  21:2,6 24:1 26:11,12
  29:17,25
Caldwell's 6:13 9:5,22
  15:16
call 2:16 4:4 18:5
candid 4:7
care 26:7
careful 3:23
case 2:9 3:19 4:14 12:6
  13:1 15:7 19:15,21
  24:16 26:14
cases 8:11 12:13 16:2
  23:9,13
CA-05-10020-DPW
  1:5 2:1
CD 15:19,22 17:21
CDs 13:23 16:6 17:9,17
certain 4:6
certainly 15:24 17:19
certify 31:5
chance 13:20
changed 2:14 19:21,22
charade 11:10
charges 24:12
chart 6:6,8,16 21:4
charts 21:10
chestnuts 2:12
Chicago 22:13,16
chose 15:5
circumstances 11:7
  13:22 26:1 29:3,21
Civil 12:12
claim 6:6 7:5 21:10
  24:16,21
claimed 23:1 30:5
claiming 18:16 20:19
  24:15
claims 8:1 20:21,23
  21:4
clean 17:16

clear 10:19 25:14,24
clearly 8:20 9:25 10:9
  26:12
client 27:21
clients 3:10 4:12
closely 27:21
Colonel 22:13
colorable 24:21
column 6:10
columnist 22:9
come 19:12
comes 3:17
communication 23:18
communications 24:3
companies 24:25
company 27:7
compare 20:23 28:17
comparing 21:4
compel 3:7 4:1,17 7:15
  7:18 14:7,10 15:17
  18:4 21:5 29:17,25
  30:13
completed 25:6
complied 26:6
comprehensible 29:14
comprehensive 24:20
compromise 13:17 15:3
compulsion 3:15
conceive 12:1
concerned 5:24 27:22
concerns 21:24
conduct 2:19 4:15 8:24
conducted 4:8
confidential 26:13
Confidentiality 26:14
confusion 8:17
consequence 17:10
consider 30:12
consideration 3:24
constructed 26:4
consultation 14:9,16
contempt 4:7 8:24
contend 7:8 29:15
contending 11:1
contention 4:19 5:23
  7:16,19 8:8,12 9:21
  10:22 12:20 13:4
  18:5 29:12
contentions 8:2 12:9
context 18:6 21:16
continue 14:20
contra-distinction 4:9
convenient 22:14
core 12:15
corner 10:6
Corporation 19:24
  20:4
correct 16:12 21:14

31:6
correspondend 24:25
counsel 13:7
counted 8:13
course 2:25 10:16 30:3
Court 1:1,10,23 2:3,12
  4:23 5:3,5,12,15,19
  5:22 7:15,18 8:1,5,22
  9:8,12,18 10:2,4,7,10
  10:12,16,22 11:6,12
  11:15,20,25 12:6 13:9
  13:9,10,11,20 14:2,4
  14:6,11,15 15:4,13
  16:3,7,18 17:2,10,15
  17:22 18:1,3,11,19
  19:2,8,11,16 20:1,9
  20:14 21:15,21 22:9
  23:7,14,23 24:6,19
  25:6,9,12,19,23 26:3
  26:6,16,21 27:2,6,10
  27:13,16,25 28:4,8,10
  28:14,21,23 29:7
  30:18 31:4,5
Courthouse 1:21,24,24
courtroom 1:21 4:10
  16:22
created 23:17
current 16:19 18:10
currently 21:12
customary 5:24

## D

D 7:12
damages 18:15,16
  28:20
danger 25:20,23
dates 20:8
day 2:5,6 16:12
deadline 16:16 17:25
  25:10
deal 8:9
dealing 5:22,25 12:8
  29:20
deals 7:2
dealt 13:25 20:11
death 28:24
December 1:12 2:2
  17:8
decided 3:8
decline 30:9
defendant 1:7,17,19
  17:5
degree 3:14 12:21,23
  18:6
demonstrate 4:21
  22:19
denied 29:8
denying 2:24

AMESBURY V CALDWELL>

Page 33

deposition 2:22 8:14
  19:25 22:5
depositions 4:9 5:10
  7:22 11:4
description 25:21
descriptions 25:15
designated 5:16 9:2
designation 4:2,18
desire 3:15
detail 7:22 19:23 25:5
details 8:14 25:3
determine 17:21 23:4
  24:14 25:16
different 6:17,21 23:18
difficult 4:21 7:23 9:6
  16:21
diligent 20:10
disclose 27:6
disclosed 18:21 19:5,7
  26:23
discloses 25:21
discovery 2:10 3:15
  12:13,15 15:6 21:8,9
  30:16,19
discussion 15:2 24:10
disposition 4:15 12:13
disputes 12:15
District 1:1,2,10,24
  31:5
document 23:5,13
documents 15:18 16:1
  16:23,24 17:6 20:4,5
  22:2,4,6 23:1,16
  26:20 29:17 30:8
DOUGLAS 1:9,14
drafters 23:8
drawing 6:17 10:5
drawings 6:11,14,19,23
  7:6,13 9:21 10:9
due 11:9 16:10 20:3
duplicative 27:11

_____ E _____
E 1:18 7:12 31:2,2
earlier 2:11 5:20 20:2
early 2:20 19:14,21
edit 25:4
edited 25:2
either 9:6 17:7 18:12
  20:10 23:8
elaborate 11:8
electronic 3:19
electronically 25:2
element 6:6,10,13,14
  6:16 7:5
elements 13:18
elephant 12:3
embody 29:14

enemy 15:11
engineers 24:14
entire 20:20 28:19
especially 27:22
ESQ 1:14,14,14,16,17
  1:18
Essentially 21:20
ET 1:4
Eugene 23:25
events 16:19
examined 10:25
example 5:1 7:1,2
  13:19
exception 15:19 17:8
  30:8
exchange 1:15 14:13
excited 4:12 21:21
exclude 21:18
Excuse 11:13
exist 3:2
expect 3:10 26:6
expenditures 27:7
expert 18:14,16,18
  21:16 30:4
experts 18:20
explain 5:3,5
explained 21:7
explanation 21:17
expressed 21:25
extent 23:3 29:20
eyes 10:24
e-mail 24:25
e-mails 22:8 23:19,20
  24:25

_____ F _____
F 31:2
fact 2:14,17 18:13 21:8
  25:21
fair 13:16 14:15
fairly 13:22
familiar 1:13,14,18
far 5:24 15:25
fashion 3:7
fast 13:23
fault 5:12,13
Federal 12:12
fees 4:13
fellow 12:2
felt 9:15
figure 7:8 10:17 12:24
  13:15
file 3:6,20 16:17
filed 14:14 16:2,13,14
  30:13,14
filing 3:19 27:21
filings 2:5
fill 28:12,19

fills 29:2,2
financial 26:18 28:2,12
  28:17
financials 27:3
find 6:12,19 8:24
fine 1:14 16:25 18:8
  25:11
fire 2:12
first 6:15 7:10 11:19
  14:8 20:25
flesh 8:14
Floor 1:21
flurry 3:18
followed 8:15
follows 12:3
followup 24:10
fooling 12:7,14
foolish 5:7
foolishness 4:11 5:6
foregoing 31:6
formal 28:18
format 7:14
forth 2:5
found 6:25
frankly 2:4 3:19 4:3 5:6
  27:19
frequently 22:12
front 21:6
full 14:15
fully 29:13
function 7:3 12:3
functional 13:18
fundamental 4:16 12:8
  12:18
further 30:21

_____ G _____
game 12:9
Garnsey 1:17
gathering 22:6
gavotte 11:8
general 6:24 26:22
generally 3:16 27:20
generated 25:1
getting 12:15
give 10:19 13:13 20:7
  21:23 23:2 24:23
given 6:23 10:9 14:4,25
  19:21 23:2
giving 13:20 21:22
glad 2:7
gnaw 4:13
go 4:16 6:11,14,19 7:5
  13:13 18:4 20:22
  24:6
going 2:13 3:25 4:5,10
  4:11 8:17 10:17,24
  13:12,13 17:15 18:20

  21:15,18 25:6,9 29:3
  30:4
good 5:1 9:13,16
Goodwin 1:14
gotten 28:14
Government 27:1
  28:19
greater 27:17
greatest 22:16
gross 12:4
group 1:4 15:14
guarded 27:20
guess 2:6 3:23 4:3 14:8

_____ H _____
happen 4:10,11 13:24
happened 12:16
happy 17:23 18:9
Harris 1:17
hear 9:8
hearing 1:11 2:21
heavier 22:18
held 18:9 21:11 30:2
help 28:12,19
highly-sensitive 26:20
history 16:19
holiday 14:4
Honor 4:20 5:8,14,18
  5:21 6:1 7:20,24 8:11
  8:25 9:10 11:9 13:3
  13:16 14:1,3,17 15:12
  15:17 16:5,9,20 17:4
  17:13,14,20 18:2,8,12
  18:22 19:4,7,13,18
  20:3,13,16 21:2,14
  22:3,24 23:9,16 24:9
  24:18,22 25:11,20
  26:2,9,17 27:4,9,19
  28:9,11 29:5,6 30:17
HONORABLE 1:9
hope 30:18,20
hours 11:21
human 10:23

_____ I _____
idea 2:22 10:19
identification 8:7 10:19
identified 22:5
identifies 22:25
identify 24:20
III 1:16
immediately 10:23
important 3:12 6:2
  13:22 22:20
inadequacies 21:22
include 26:18,24 27:1
includes 6:7
including 3:18

incomprehensible
  12:22 13:13
indecipherable 6:18
indicate 6:12
indicated 2:11
indicating 6:10
indication 6:24 16:14
inequitable 2:19
information 7:9 8:13
  20:12 26:19,25 27:23
  27:25
infringement 5:2 6:5
  8:2 18:25 24:12
  29:15
infringes 10:17
infringing 24:15
inhibiting 7:3
inhibits 7:4,8
initial 11:14 21:5
initially 13:12
interested 16:18,19
internal 23:20
interrogatories 4:19
  5:23 7:16,19,24,25
  8:8,12 9:22 12:21
  18:6,10,24 29:12 30:1
interrogatory 4:25 6:9
  7:9 9:11 13:4 18:7
  30:2
invalidity 3:1 30:1
inventor 9:3
invoices 15:19,21,23
  16:4 29:21,21
involved 24:11 25:17
in-depth 15:2
in-house 8:9
ISHMAEL 1:14
issue 2:21 6:2,5 7:10
  8:18,19 10:20 11:19
  11:24 17:17 18:14,15
  19:1 24:1 26:10,15
  27:13,14
issues 24:10
items 10:8

_____ J _____
J 1:14,16
January 29:12 30:7
John 1:24
JORDAN 1:14
Joseph 1:24
Judge 1:10 3:12 12:2
  15:7
July 9:11,15

_____ K _____
kind 2:7 3:13 4:10,15
  12:8

AMESBURY V CALDWELL>

**KLINE** 1:14 13:3,10
14:3,5 30:17
**know** 2:3 3:9 5:1 7:24
8:1,5,16 13:24 14:17
16:16,25 17:2 20:9
23:4,6 24:18 27:4,20
28:23
**knows** 28:25
**Koopman** 8:3,4,20
**Krupp** 1:18

_____ **L** _____
**labeled** 7:12 9:24,25
10:9
**larger** 13:6
**last-minute** 5:9
**late** 2:5 3:16 9:13
**lawyers** 8:6
**learn** 11:15
**leave** 2:25 29:9
**leaves** 2:25
**left** 10:5 15:18 17:20
26:10
**left-hand** 6:11
**legal** 25:21
**LENT** 1:18
**letter** 14:12
**Levio's** 22:5
**Liebman** 22:10,19
**lilliputian** 12:25
**line** 6:24
**lines** 9:21
**list** 19:14,19 20:17,24
23:2,2,5
**listed** 6:6 19:10,20
**literature** 9:22 10:1,14
**little** 4:20 6:22 15:10
19:22
**LLP** 1:15,18
**locations** 6:21
**log** 22:7,7,22,25 25:1
26:4 30:6
**long** 16:9 23:6 24:20
**look** 4:21 6:5,14 7:6
9:23 12:23 17:21
23:15,19,21
**looking** 6:18 10:23
12:24 24:4,4
**looks** 7:11
**loose** 13:23
**lot** 2:17 5:9 6:7 7:11
14:18 15:1 24:11,12
24:13
**lumber** 8:10
**Lurie** 1:18

_____ **M** _____
**M** 1:14

**machine** 31:7
**Magistrate** 21:6,7
**mailed** 16.12
**Manhattan** 22:20
**manner** 13:7
**MANUFACTURING**
1:6
**Markman** 30:21
**masquerading** 30:13
**Massachusetts** 1:2,15
1:19,22,25
**material** 3:24 29:22
**matter** 4:7 26:9
**matters** 26:8 30:16,19
**McCormick** 22:13
**McKinley** 1:19
**mean** 5:6,9 14:19 15:5
19:2 21:15 26:21
27:2,6 28:1,4,23
**means** 12:24 17:2
21:19 29:7
**mechanism** 5:24
**meetings** 23:24
**memorandum** 3:5,9
30:12,14
**merely** 24:19
**merits** 4:15
**mess** 11:25
**mind** 2:19
**miniscule** 10:10
**minute** 2:10 14:18
**mistake** 7:21
**Moakley** 1:24
**modification** 12:11
**months** 21:1,3
**motion** 1:11 2:24 3:7
3:25 4:17 14:7,10,14
14:21 15:16 16:1,2,11
16:13,14 21:5 26:8
29:9,9,11,17,24,25
30:13
**motions** 2:4 15:14
16:17 18:4
**move** 21:18

_____ **N** _____
**name** 3:5 22:10
**NEAL** 1:16
**nearly** 6:17
**necessarily** 23:12
**necessary** 18:17
**need** 19:20 20:18 30:15
**needed** 21:7
**needs** 25:5 28:7
**neither** 28:24
**New** 1:17 22:9
**Newman** 9:3
**Newman's** 19:25

**newspaper** 22:16,17,18
**November** 11:17,17
17:8
**nuance** 30:3
**nuanced** 21:16
**number** 11:4 14:8
15:21 29:16,24
**nunc** 3:13

_____ **O** _____
**objections** 11:22
**obligation** 25:24
**obviously** 26:20
**obviousness** 3:1
**occurred** 14:13
**October** 11:18,24
**offer** 13:3 14:20
**offered** 15:23
**office** 13:14
**Official** 1:23 31:4
**Oh** 28:4
**Okay** 5:22 11:20 17:10
18:3 27:10 30:22
**once** 15:24 26:22
**ones** 2:13 8:6
**open** 3:1
**opportunity** 4:12 18:23
20:22 21:3,11,23,24
21:25
**opposition** 4:22
**oral** 24:9
**order** 26:14 29:3 30:11
**orders** 2:14
**Ordinarily** 16:18
**other's** 4:13
**ought** 24:19
**outstanding** 16:3
**overture** 8:23
**Owens** 1:23 31:4
**o'clock** 30:21

_____ **P** _____
**P** 1:9
**page** 4:25 6:8,15,20,22
9:25
**pages** 6:15
**paid** 26:25
**Pamela** 1:23 31:4
**papers** 3:22
**Pardon** 7:17
**part** 3:25 20:11
**participate** 2:7
**particularity** 27:18
**particularly** 29:1
**parties** 5:13 15:20
**parts** 13:18
**party** 20:7
**patents** 8:21 9:4 24:4

24:11,13
**PAUL** 1:16
**pay** 3:10 4:13
**paying** 5:19
**people** 2:10,20 3:9,20
5:19 11:5 12:14 23:3
27:21
**perfectly** 4:7 20:18
**perform** 12:4
**period** 5:11,15,16 13:5
**permit** 3:25
**permits** 3:20
**person** 8:9,19,21 9:2
**persuade** 3:12
**photographs** 13:6
**physical** 13:18
**picture** 12:25 28:12
**Pittsford** 1:17
**place** 1:15 23:17
**Plaintiff** 1:4,15
**plaintiff's** 4:22
**plan** 25:3
**play** 12:9 13:23
**please** 2:23 9:7
**plenty** 15:4,6
**pocket** 6:3,3,3,4,7,12
6:18,25 9:5,6,23,25
10:24
**Pogo** 15:10
**point** 5:20 7:3,6 9:7,15
10:4,15,18 13:17
18:13 24:8 29:23
**pointing** 6:21
**points** 6:16
**policing** 21:22
**poor** 8:3
**position** 5:2 7:13 11:14
12:22
**posturing** 5:7
**practice** 4:1
**precise** 21:8
**present** 3:2 6:10 8:15
**press** 22:12
**Pressman** 22:11
**pretty** 9:24 10:9
**previously** 30:14
**prior** 19:3,5,7,8,10,14
19:19,20 20:17,21,23
20:24 21:4,17 30:5
**privilege** 22:7,7,22,25
23:11 25:1,17,25 26:4
30:6
**privileged** 23:1
**pro** 3:13
**probably** 8:8 27:13
30:19
**problems** 3:20
**procedure** 8:16 12:12

**proceeded** 22:19
**proceedings** 31:7
**process** 3:21
**Procter** 1:14
**produce** 8:18 11:6
15:25 16:23 17:20,23
20:5 22:4 26:11
**produced** 7:14 8:20
14:25 15:17,22 16:2
16:10,11,25 17:7,7,9
17:12,18 18:16 19:13
19:14,19 21:12 22:8
22:25 26:15,17 27:12
**producing** 27:22
**product** 6:13 9:5,22,25
10:1 23:11 24:17
25:18
**products** 7:1 10:15
19:23 24:5
**prompt** 12:13
**properly** 26:3
**propose** 13:2
**proposition** 26:22
**protective** 26:14
**provide** 18:24
**provided** 19:22 27:23
28:1 30:7
**provides** 21:16
**providing** 12:12
**pull** 2:12
**purports** 6:12
**put** 12:22 21:3
**putting** 3:22 15:9

_____ **Q** _____
**quality** 6:23
**Queens** 22:20
**question** 2:18 4:17 5:23
9:6 12:16,17 14:8
**questions** 26:13
**quite** 2:4 24:24,25

_____ **R** _____
**R** 1:23 31:2,4
**raise** 2:18,21
**raised** 11:19,24
**ran** 22:13
**reached** 15:20
**read** 3:16 8:21
**ready** 22:4
**real** 8:2
**realization** 25:13
**realize** 15:1
**really** 2:3 5:6 12:17
21:21 25:17 29:20
**recapitulate** 29:8
**receive** 2:17
**received** 16:13 20:6

AMESBURY V CALDWELL>

Page 35

recess 30:22
RECESSED 30:23
recipient 23:12
recipients 23:8
recognition 30:2
recognize 10:24
record 30:10
referring 6:16
relevant 28:5
rely 14:24 16:24
remaining 29:21
remarkable 22:14
Reporter 1:23 31:4
reports 30:4
represent 16:22 17:5
   28:12,13,22
representation 14:24
   16:9
representations 14:22
   25:13 28:18 29:18
represented 17:4
request 23:10
require 29:11
requires 18:14
resolved 13:1
resolves 30:19
resort 3:19
respect 4:17 11:10
   16:10 18:5 20:4 22:1
   29:15,16,17,24 30:6
response 8:15 9:12
   15:14
responses 4:25 5:1 6:9
   7:10,25 9:11 13:4
   19:10 20:13,25
responsive 15:18 16:23
   17:6,11
rest 12:20 29:22
returns 26:10,19,19
   27:15,20,22 28:7,11
   28:12,16,22 29:4 30:9
   30:10,11
revised 29:13 30:6
right 9:8,18 10:7,12
   13:11 14:11 16:7
   17:15 18:1,21,21
Road 1:17
role 12:1 15:10 26:3
rotation 7:3,5,8
rule 2:6,8
Rules 12:12
ruse 3:5,6,6
Rynne 29:8

_____ S _____

S 31:5
SAFRAZ 1:14
sake 30:18,20

sales 19:23
sat 21:6
satisfy 25:5
saying 8:5 12:10 15:8
   19:18 20:17 21:10
   23:20
says 2:16 6:13 16:11
schedule 2:15 5:17
scheduling 2:14
Scott 23:25
see 6:2 7:6 8:22,22
seen 15:10
sensitive 29:1
sensitivity 27:15,17
sent 23:17,17
September 11:14,23
serious 2:18
served 9:11
short 2:24 3:23 13:5
shorthand 31:7
show 27:3
side 6:11 9:2 18:18
sides 5:7,10 12:1
similar 12:2 13:22
Similarly 3:4
simple 15:5
simply 3:25 20:24
   27:14
Singer 1:14 9:10,14,20
   10:3,5,8,11,13,21
   11:1,9,13,17,22 12:5
   15:16 16:10 17:3,4,13
   17:19,23 18:8 20:19
   21:2,20 25:14 26:9
   28:6,10,11,16,22 29:6
six-week 5:11,15
size 10:9
Slifkin 1:16 4:20,24 5:4
   5:8,13,18,21 6:1 7:17
   7:20 8:4,11,25 13:16
   14:1,10,12,17 15:12
   16:5,8,20 17:14,17
   18:2,12,22 19:4,9,13
   19:18 20:3,12,16
   21:10,14 22:3,24 23:9
   23:16,24 24:8,22 25:7
   25:11,20 26:2,5,17,24
   27:4,8,11,14,19 28:2
   28:6,9 29:5
small 10:5
solely 29:20
somebody 2:15 4:5,5
   8:18
soon 17:24
sorry 13:10
sort 3:10 5:25 8:7
sought 16:1 22:2
source 27:16

so-called 3:4 30:12
speaking 18:20
spoke 12:14
spine 7:2,4,4,7
Square 1:19
squeezed 15:8
stage 15:18 18:9
standing 11:2,23
started 8:23
statements 22:15 26:18
   28:3,18
STATES 1:1,10
step 9:14
Stephen 23:25
stepping 2:9
Stevens 23:21,25
story 15:13
straightforward 13:7
strike 3:16
stuff 6:7 26:23 28:5
style 3:8
subject 4:6 11:16
substance 25:4
sufficient 29:19
sufficiently 25:24
Suite 1:24
Sunday 22:17,18
supervision 4:8
supplement 9:17 13:4
   13:21 14:20 15:15,16
   18:13,23,25 19:17,20
   20:15 21:23,24 22:6
   25:3
supplemental 3:4,9,15
   3:24 30:12,14
supplementation 21:9
   25:15
supplemented 14:20
   29:13
supplementing 30:1
suppose 3:10
sure 5:4 19:6
switch-and-bait 4:4
   11:12,13
sympathetic 3:14
sympathy 2:17

_____ T _____

T 31:2,2
table 3:17
take 11:3 23:19 30:16
taken 31:7
takes 26:7
talking 20:24
target 22:14
targets 22:12
task 24:24
tax 26:10,19,19 27:15

27:20,22 28:7,11,11
   28:16,22 29:4 30:9,10
   30:11
taxes 26:25
technical 9:2 11:5
teed 12:6
telephone 2:16 22:21
tell 6:24 28:25 29:1
telling 22:22
tells 22:22
tender 11:18
tendering 4:4 11:16
testify 9:4
testimony 18:17
Thank 14:1,5 18:2 28:9
theories 30:5
thick 22:7,22
thing 3:10 5:25 6:20
   8:7 12:23 19:22
things 3:16,20 6:17
   7:12 13:24 14:25
   18:20
think 9:18,24 11:10
   13:21,21,23 14:23
   21:11 22:10 23:11
   25:4,7 26:7,10 27:5
   29:7,20 30:17,19
thinking 3:7,22
third 20:7
THOMAS 1:18
thousands 22:8,8 23:19
three 6:17,21 14:2
   18:23 21:13 24:11
three-week 17:25 25:9
throw 2:13
time 5:16 11:19 12:4,14
   13:5 15:1,4,6,7,9
   18:25 22:15,15
timely 3:7
times 21:13
timing 14:25 19:23
   20:8,13
today 6:4 29:19
transcribed 31:8
transcript 2:23
transcription 31:6
trial 14:24 17:11
trials 4:8
Tribune 22:13,16
tried 13:1
true 8:12 31:6
try 7:7 13:6
trying 3:12 24:14
tunc 3:13
turn 30:10
turned 29:4,22 30:9,11
turning 4:2
two 6:15 9:3 25:7,8

_____ U _____

U 31:5
unasserted 24:13
undermine 12:13
understand 7:13 13:21
   15:20 16:21 22:24
   24:16 25:12,18 26:2,5
   26:12,21 27:17
understanding 25:19
   29:18 30:3
Unfortunately 5:10
UNITED 1:1,10
unseemingly 2:5
use 24:7 25:9
useful 8:13

_____ V _____

validity 18:14,17 19:1
vast 15:21
verbal 24:2
VERSUS 1:5
victim 3:18
view 14:15 18:5 26:16
   30:13
viewed 13:8
viewing 2:9
vigilant 20:10

_____ W _____

W 1:14
wait 2:22 19:11
waited 2:10
want 2:12,16 9:15
   12:18,25 13:17,23
   17:22 19:16 20:14
   23:15 25:3,14
wanted 2:18
wasn't 15:1,9
way 1:21,24 8:8,13
   12:25 13:11 16:15,16
Wayward 22:11
weeks 14:2 18:24 25:7
   25:8
weighed 22:17
weight 22:21
went 24:17
weren't 5:19 20:10
we'll 13:4 17:5,23
   30:22
we're 5:22 14:22 15:24
   16:25 17:19,23 18:9
   19:19 20:20,23 30:4
   30:21
we've 17:4 18:3 20:10
   25:2
willing 14:19,21 15:2
   15:25 17:19
wishes 29:14

DECEMBER 22, 2005>

AMESBURY V CALDWELL>

withdraw 14:21
withheld 23:5
witness 4:3,6,18 9:4
    11:7,16,18
witnesses 12:9
WOODLOCK 1:9
word 6:9
work 7:11 14:19 23:10
    23:11,14 24:17 25:18
working 24:23
world 12:24 22:19
world's 22:16
wouldn't 16:15 24:6
wrangling 20:6
writ 13:13
write 22:11
writing 22:4
written 7:24,25 24:3,17
wrote 12:10,10 22:11

——— Y ———
YESAWICH 1:16
York 1:17
Yorker 22:10

0
02109 1:15,19
02210 1:22,25

——— 1 ———
1 1:21,21,24 30:21
1st 11:17
11:00 1:22
11:50 1:22 30:23
12th 14:6 29:12 30:7
14th 11:23
14534 1:17

2
2nd 11:17
2(e) 6:13,14,16,20 10:8
    12:24
2(3) 9:24
2005 1:12 2:2
21 4:25 6:8
22 1:12 2:2 10:2
22.3 9:23
24 11:21
29th 16:12 17:8

——— 3 ———
3 10:3,4
3rd 1:21
30 15:23
30(b)(6) 4:3,6,18,22
    8:14 11:4,7
31st 11:18,24
3200 1:24

34 29:11

——— 4 ———
4:55 2:17 3:21
42 29:9
45 29:24
47 14:8 29:16

——— 5 ———
5th 9:11,15
5:45 3:21
50s 22:10

——— 6 ———
6th 17:8

——— 7 ———
72,000 15:22

9
99 1:17

# EXHIBIT 21

Dec. 17, 1963          E. H. WOOD          3,114,178

SLIDING WINDOW AND COUNTERBALANCER COMBINATION

Filed Feb. 8, 1961



Fig.2

Fig.4

Fig.5

Fig.3

Fig.1

INVENTOR.
Edward H. Wood
BY
Curtis, Morris & Safford
ATTORNEYS

C 003848

# United States Patent Office

3,114,178

Patented Dec. 17, 1963

1

3,114,178

**NG WINDOW AND COUNTERBALANCER COMBINATION**

**d H. Wood,** Sanford, N.C., assignor to General
Bronze Corporation, Garden City, N.Y.
Filed Feb. 3, 1951, Ser. No. 87,920
9 Claims.    (Cl. 20—52.2)

This invention relates to a window sash balancer which
may be used in either single hung or double hung window
sashes.

For convenience I shall describe the counter-balancers
in connection with a single hung sash since the counter-
balancers of a double hung sash duplicate those of a
single hung sash.

A primary object of the invention resides in the pro-
vision of a counterbalancer that will at all times and at all
positions of the sash be housed completely between the
sash and the jamb of the window frame and which is so
constructed and arranged that the complete counterbal-
ancer may be locked to and within the jamb and completely
disconnected from the sash to permit the removal of the
sash while the counterbalancer remains secured to the
jamb of the frame.

A further object of the invention is to provide a counter-
balancer of the above described type which will act to
counterbalance the weight of the sash in its various posi-
tions of opening and closing.

A further object of the invention is to provide a coun-
terbalancer of the above described type which is formed
as a self-contained unit which may be sold as such and
installed on the jamb of the window frame ready for the reception
of the window sash by simple manual emplacement and
which may thereafter be easily attached and correlated
with the sash by a second simple manual operation.

Other objects of the invention will appear as the de-
scription of the embodiment which I have chosen to il-
lustrate my invention progresses.

The embodiment of the invention illustrated in the
drawings comprises essentially an elongated casing or
housing which is located between the edge of the sash
and the jamb of the frame and which is attached at its
upper and lower ends to the jamb and to the upper end
of which the sash is releasably attached. Within this
housing a sash counterbalancing arrangement is located.
This in the form illustrated in the drawings is comprised
by a spring attached to the upper end of the housing, with
which spring is associated an arrangement to create a
mechanical advantage, that is to say, to multiply the
action of the spring. This arrangement is constituted by
a series of pulleys over which a cable passes in much the
same manner as a block and fall which cable is at its end
attached to the adjacent jamb of the frame. The sash
at its upper rail is releasably connected to the upper end
of the casing in such manner that when the sash is raised
or lowered the casing with its housed parts will travel
with the sash and be covered by the sash in all of the
various operative positions.

At the upper end of the casing or housing, a latch is
mounted which is engageable with the complemental ele-
ment of the jamb of the frame to lock the balancer to
the jamb and thus permit the sash to travel upwardly in-
dependently of the balancer to a position where the sash
may be removed from the window frame independently
of the counterbalancer.

In the drawing,

FIGURE 1 is a vertical view, partly in section and partly
in elevation, showing a portion of a window frame and
of a sash with the associated window balancer, the sash
being in its closing position and free to be moved verti-
cally into various open positions;

2

FIGURE 2 is a similar view showing, however, the sash
balancer locked to the window frame and the sash partly
raised to a position which will enable it to be removed
from the window frame;

FIGURE 3 is a horizontal sectional view, partly in
perspective, taken on the plane indicated by the line 3—3
and looking in the direction of the arrows;

FIGURE 4 is a sectional view, taken on the plane of
line 4—4, and looking in the direction of the arrow;

FIGURE 5 is a perspective view, partly in broken away
elevation and partly in section, showing the latching
means at the upper end of the balancer.

The drawing represents an actual embodiment of the
invention, but it to be understood that the disclosure of
this embodiment is for the purpose of illustrating the
application of the invention, for various modifications
may be made in the details of construction within the
spirit of the invention and the scope of the claims.

Referring to the drawing, a window frame "F" and a
sash "S" are illustrated. The jamb of the frame forms a
sash-receiving channel "C" which is defined by a base
1 and flanges 2 and 3.

The side rails of the sash are of open channel form
and each is constituted by a base web 4 and flanges 5
and 6, the base web being provided with glazing means.

The space between flange 3 of the frame and the flange
6 of the adjacent side wall of the sash is sealed by a
plastic seal 7 which also acts to prevent a metal-to-metal
surface contact. The flange 5 of the side rail of the
sash carries a weather seal 8.

The side rails of the sash extend only partially into
the channels "C" of the frame on both sides of the window
so that the sash may be moved deeper into one of the
channels to permit its removal from the frame, it being
normally prevented from removal except when in a par-
tially open position by a construction which later will be
described.

In order that the weight of the sash may be balanced
there is provided a sash balancer which is mounted in
the jamb on each side of the frame and is attachable to
the sash. This balancer comprises a housing 9 which in
the illustration embodiment is preferably U-shaped in
cross section, having an open face 10 adjacent the base 1
of the frame jamb and having a continuous wall 11 fac-
ing the sash, the housing being substantially co-extensive
in length with that of the sash.

This casing is removably and slidably mounted in the
channel "C" of the frame jamb, being attached at its
lower end to a block 12 which is provided with ribs 13
that slide vertically in grooves 14 adjacent the base 1 of
the frame jamb. Flanges 14' which are carried by the
housing in the manner later described slide in the grooves
14 to hold the upper end of the housing in the frame
"F" while permitting it to slide.

The upper end of this housing may be secured to or
detached by a latch 15, whose structure and operation
later will be described. When the sash is closed it will
be centered in the window opening by the face 16 of the
block 12 at its lower end and by a spring member 17 at
its upper end which spring member is attached at 18 to
the sash. As the sash is raised the lower end will pass
over and above the inclined surface 16' of the block 12
and the spring 17 will pass beyond the upper end of the
housing 9 to such a position, for example, as shown in
FIGURE 2. The sash will then have freedom of lateral
movement at which time it may more deeply be moved
into a jamb channel and then swing to a removal position.

It is of course to be understood that the structure here
is shown in the drawing is duplicated on the other side of
the window.

In order that the housing may be anchored to the frame

C 003849

3,114,178

3

against sliding movements in the jamb the latch 15 is provided and is pivotally mounted adjacent the upper end of the housing.

In the form illustrated in the drawing, this latch device comprises a slide member 16 carrying the rib 14' which slide in the grooves 14 in the window frame. The slide member is attached rigidly to the housing 9 at 13' and is located in the channel "C" of the frame jamb. The slide member 16 is comprised by spaced side plates 19. The latch member 15 is pivoted between the plates 19 at 20 on a sliding pivot which is capable of sliding vertically in slots 21. The latch member 15 is biased into either of the positions shown in FIGURES 1 and 2 by a spring 21' which surrounds a pin 22 that is pivotally attached at 23 to an extension 24 of the latch member. The pin freely operates in a guide member 25 and the spring 21' bears against this guide member and the end of the annular projection 24.

Thus the housing 9, comprise, with its attachments at its upper and lower ends in effect, one complete unit which is movable within the channel "C" of the frame jamb.

A counterbalancing spring 26 is located within the housing 9 and is attached at 27 to the housing at the upper end of the spring. The lower end of the spring is attached at 28 to a slide 29 that is located within the housing 9 and is slidable vertically therein. This slide 29 carries a pulley 30 which is movable with the slide. A pair of pulleys 31 and 32 are mounted within the housing 9 on fixed axes.

A flexible elongated member, such as a wire or cable 33, is attached at 34 to the slide 29. This member 33 passes around the pulley 31, thence upwardly and around the pulley 30 and thence downwardly and around the pulley 32. Thence it extends upwardly within the channel "C" of the frame jamb and is detachably engaged at 35 to the base member 1 of the frame jamb.

This spring 26 with its mechanism for creating a mechanical advantage normally forces the upper end of the housing 9 into contact with a projection 36 which is rigid with the upper end of the sash "S" and extends into the channel "C" of the jamb to a slight extent.

The latch member 15 is provided with a toe portion 37 and a slot 38. The upper edge of the flange 16 is adapted to engage the slot 38 and the toe portion 37 is adapted to engage the abutment 40 on the frame "F." When the latch member is in the position shown in FIGURE 2 engaging the abutment 40 it is held in this engagement by the reaction of the spring 26. This latch member 15 is provided with a thumb-piece 41 so that it conveniently may be manually operated to swing to operative and inoperative positions.

Describing now the operation of this combination, when the latch member 15 is in the position shown in FIGURE 1, that is to say disengaged from the frame jamb, the spring mechanism forces the housing 9 into contact with the projection 36 on the upper rail of the sash "S," thus tending to move the sash upwardly with itself.

When manual force is applied to the sash to move the same vertically upwardly the spring mechanism will cause the housing 9 with its latch 15 and spring mechanism to move upwardly with the sash, while the latch 15 remains in the position shown in FIGURE 1, free from the frame "F." Thus the sash will be counterbalanced in its various positions.

It is to be noted that the entire housing with its spring mechanism is at all times and in all positions of the sash located between the sash and the jamb and is substantially co-extensive with the vertical dimension of the sash. This is important because no matter what the position of the sash, the counterbalancer will be covered by the sash and will not be visible either on the outside or inside of the window.

When it is desired, however, to remove the sash completely from the window frame, the sash is lowered to

4

its lowermost position and the latch member 15 is manually moved into position to engage the frame "F." As the sash is moved upwardly the toe portion 37 of the latch 15 engages the abutment 40 on the frame "F" and the edge 39 engages in the slot 38. The movement of the sash balancer is thus arrested and it is locked in the channel of the window frame "F" against further upward or longitudinal movement. When in its movement upwardly, the lower end of the sash moves to a position above the block 16 and the spring 17 moves beyond the upper edge of the then stationary housing, the sash may be removed from the frame by moving it toward the housing more deeply into the adjacent frame channel to free it from the opposite frame channel.

It will be realized that it is necessary to lock the upper ends of both of the counterbalancers to the opposite jambs of the frame before the sash is removed. However, it might be that an operator would lock one of the balancers to one jamb and forget to lock the other to its adjacent jamb. To prevent the removal of the sash when and if this condition exists the projections 36 on the opposite sides of the sash are provided with downwardly extending projections 36' which are adapted to engage the upper end of the balancer, preferably the wall of the housing, when an attempt is made to move the sash laterally. These projections are so co-related with each other and with the springs 17 that the lateral movement of the sash will be limited to such an extent that the sash may not be removed until the other unlocked sash balancer has been locked and the sash has been moved upwardly to disengage the projections 36' from the upper end of the counterbalancer.

It will be realized that if one of the counterbalancers is locked to the jamb of the frame in the position shown in FIGURE 2, for instance, and the other is unlocked from the frame as shown in FIGURE 1, the sash may be moved upwardly and downwardly with the benefit of only one balancer and the finger 36' that is still engaged with the upper end of the operating balancer will prevent lateral movement of the sash sufficient to permit its accidental removal.

Thus it will be seen that a sash balancer combination is provided wherein the sash balancer is completely housed in the channel of the frame jamb and is substantially coextensive with the vertical dimension of the sash. When the sash is moved upwardly or downwardly the sash balancer moves with it and maintains its same relationship so with all positions of the sash, the sash balancer is hidden from view. Moreover, the sash balancer may selectively be connected to the sash, or to the frame; to the sash when it is desired to have it counterbalance the weight of the sash and to the frame when it is desired to remove the window. Being attached to the frame and detached from the sash, the sash itself may be removed without removing the sash balancer, and the sash balancer will remain secured in the channel of the frame jamb ready for re-attachment to the sash when the latter is emplaced.

In the drawing, there is illustrated the presently preferred embodiment of the invention and the specification describes this embodiment, but it is to be understood that the claims define that which comprises the invention.

What I claim is:

1. In a window construction a frame having opposite channeled jambs, a sash slidable in said channeled jambs to positions toward opposite ends of the frame, a sash balancer comprising an elongated housing slidably mounted in the channel of one of said jambs to slide toward opposite ends of said frame, means on said housing for maintaining said housing within said channel, means for releasably latching said housing to the adjacent jamb against movement longitudinally of said jamb, means on said housing engaging with said latching means to urge it toward its latching position when said sash is moved in one direction and a spring assembly attached to said housing and to said frame biasing said hous-

C 003850

5

...on to cause engagement between said ...djacent end of said housing.

...mbination of elements recited in claim 1, ...d housing and said spring assembly including ...attachment to said frame is located within the ...f said sash.

...The combination of elements recited in claim 1, ...in said latching means comprises a latch pivoted to ...d housing and having a portion engageable with an ...butment on said frame to limit the movement of said housing in one direction and wherein said latch is pro- ...ided with a notch and said housing with a portion en- ...ageable with said notch to prevent the movement of said ...atch in one direction.

4. In a window construction, a frame having opposite channeled jambs, a sash slidable in said channeled jambs to positions toward opposite ends of the frame, a sash balancer comprising an elongated housing permanently and longitudinally slidably mounted in a channel of one of said jambs, means spacing said sash from said housing comprising a block member carried by the housing adjacent one of its ends and a spring member carried by the sash adjacent the opposite end, means urging said housing longitudinally into engagement with said sash and to bias said sash and said housing in an upward direction, means to arrest the movement of said housing while permitting said sash to continue an upward movement to such extent that said spring member is moved beyond said housing and said sash is moved out of contact with said block to permit lateral movement of said sash.

5. A sash balancer comprising an elongated housing, oppositely extending guiding flanges carried by said housing adjacent one end thereof, a latch member carried by said housing adjacent the other end thereof, a tension spring assembly located within said housing and attached thereto at one of its ends and an elongated flexible member connected with the opposite end of said spring member and having means on one end thereof for attachment to a window frame, said latch member being pivoted relative to said housing and having means for maintaining said latch member in either of two positions.

6. The combination recited in claim 5, wherein means is provided to permit said latch to have slidable motion on said housing.

7. In a window construction, a frame having opposite channeled jambs, a sash slidable in said channeled jambs to positions toward opposite ends of the frame, a sash balancer comprising an elongated housing permanently and slidably mounted in a channel of one of said jambs, a spring assembly attached to said housing and to said last mentioned jamb to slide said housing in one direction, means on one end of said housing for selectively attaching said end to said frame against sliding movements and releasing said end from said frame to permit such movements, and an abutment on said sash engageable by the last mentioned end of said housing under the influence of the spring assembly whereby to restrain relative movement between said housing and said sash when said last mentioned end of said housing is released from said frame for sliding movements, said spring assembly being effective

6

to move said housing with said sash when said end of said housing is released from attachment against sliding movements to said frame.

8. In a window construction, a frame having opposite channeled jambs, a sash slidably mounted in said channeled jambs to move to positions toward opposite ends of the frame, a sash balancer comprising an elongated housing permanently mounted in a channel of one of said jambs and slidable in the directions of movement of said sash, means spacing said sash from said housing comprising an abutment member carried by the housing adjacent one of its ends and contacting the sash when the sash is in one position and a spring member carried by the sash adjacent the opposite end of said housing and contacting the same when the sash is in said one position, resilient means urging said housing longitudinally into engagement with said sash in one direction of the movement of said housing and to bias said sash and said housing in said direction, and means arresting the movement of said housing in a longitudinal direction while permitting said sash to continue its movement in said one direction to such extent that said spring member is moved beyond said housing and said sash is moved beyond said abutment member to permit lateral movement of said sash.

9. In a window construction, a frame having opposite channeled jambs, a sash slidably mounted in said channeled jambs to move to positions toward opposite ends of the frame, a sash balancer comprising an elongated housing permanently mounted in a channel of one of said jambs and slidable in the directions of movement of said sash, means spacing said sash from said housing comprising an abutment member carried by the housing adjacent one of its ends and contacting the sash when the sash is in one position and a spring member carried by the sash adjacent the opposite end of said housing and contacting the same when the sash is in said one position, resilient means urging said housing longitudinally into engagement with said sash in one direction of the movement of said housing and to bias said sash and said housing in said direction, means arresting the movement of said housing in a longitudinal direction while permitting said sash to continue its movement in said direction to such extent that said spring member is moved beyond said housing and said sash is moved beyond abutment member to permit lateral movement of said sash, and co-acting means on said frame and said housing latching said housing to said frame and rendering said resilient means ineffective to bias said sash.

### References Cited in the file of this patent
#### UNITED STATES PATENTS

| | | |
|---|---|---|
| 1,587,831 | Heine | June 8, 1926 |
| 2,279,600 | Tappan | Apr. 14, 1942 |
| 2,791,796 | Haas | May 14, 1957 |
| 2,825,090 | Osten | Mar. 4, 1958 |
| 2,952,048 | Graham | Sept. 13, 1960 |
| 3,054,152 | Trammell | Sept. 18, 1962 |
| 3,055,044 | Dinsmore | Sept. 25, 1962 |

C 003851

# EXHIBIT 22

June 17, 1969

A. J. BIRO

3,449,862

WINDOW STRUCTURE

Filed Aug. 11, 1967

Sheet _1_ of 3



Fig.6

Fig.7



Fig.1

INVENTOR.
ALEXANDER J. BIRO
BY
CAROTHERS & CAROTHERS
HIS ATTORNEYS

C 003835

June 17, 1969                A. J. BIRO                3,449,862

WINDOW STRUCTURE

Filed Aug. 11, 1967                                    Sheet 2 of 3

Fig.2

Fig.4

Fig.2a

INVENTOR.
ALEXANDER J. BIRO
BY
CAROTHERS & CAROTHERS
HIS ATTORNEYS

C 003836

June 17, 1969

A. J. BIRO

3,449,862

WINDOW STRUCTURE

Filed Aug. 11, 1967

Sheet _3_ of 3



Fig. 3





Fig. 2b





Fig. 5

INVENTOR.
ALEXANDER J. BIRO
BY
CAROTHERS & CAROTHERS
HIS ATTORNEYS

C 003837

# States Patent Office

**3,449,862**

Patented June 17, 1969

---

**1**

**3,449,862**

**DOW STRUCTURE**

.......... Pa., assignor to Season-All ........ a corporation of Pennsylvania ...... 11, 1967, Ser. No. 660,100 ...... 15/16, 15/02; E06b 7/16

**29 Claims**

**ABSTRACT OF THE DISCLOSURE**

...able window structure having removable sash ...... with an interlock therebetween adapted to be ...... sash channel in parallel jamb members con- ...... a lintel and sill member. At least one counter- ...... provided for each sash member to bias the ...... movement of the sash member within the jamb ...... and to removably interlock with the sash mem- ...... the counterbalance traveling with the sash member ...... guided movement between the parallel jamb mem- bers until interrupted by abutment means in the sash channel which holds the counterbalance to permit the sash member to travel on to be interlocked from the former. Jamb tensioning devices or stabilizers are provided to permit proper placement of the window in the open window frame or shell, as well as place the sash members in a state of tension in their travel within the jamb members to (a) permit proper guidance of the sash members in the sash channels of the jamb members, and (b) seal the sash members relative to the sill, lintel and jamb members, especially when the sash members are in their closed position.

---

## BACKGROUND OF THE INVENTION

### (1) Field of Invention

This invention relates to removable closures, such as window structures, with means for mounting the closure for reciprocation wherein a diverse material guide cooperates with counterbalance hardware, the latter of which is within a jamb-guide guide. Where more than one closure is provided, an interlock means is provided therebetween to provide a seal.

### (2) Description of prior art

In the window art, specifically the double-hung window, the use of interengaging flanges as an interlock between sash members is well-known. However, there has always been a need to provide in such window structures the removal of the sash members from between the parallel jamb members. This need was principally based upon easy cleaning of both sash members, which may be easily removed from the window jambs for inside cleaning.

In order to permit the removal of the sash members from between the jamb members, a jamb structure is provided to release the sash from a counterbalance and slide in the jamb members to permit lateral movement of the sash in the jamb members and removal of the sash therefrom.

In order to be able to remove the sash in such cases, a cut-out or gap has to be provided in the interengaging flanges of the interlook, the interlook being as deep as the jamb sash channel. Sash cut-outs or gaps present a problem in double-hung windows in properly sealing between the sash members from the outside weather, dust, etc.

Another well-known area that has plagued the double-hung window art for many years is the provision of tensioning devices (other than a conventional counter-

---

**2**

balance) in the jamb members or between the jamb members and window shell to provide the necessary biasing sash guide support to permit frictional movement of the sash members along the vertical jamb sash channels. Thus, the sash members may be selectively positioned anywhere along their guided path in the channeled jambs, due to frictional support.

A most recent example of such a resilient sash guide support is the patent to Trout, 3,228,068 (20–12) wherein the supports are urged against the jamb sash guide to provide frictional engagement of and support for the vertically movable sash members. These resilient guide supports are provided as part of the window guide support or jamb, eliminating the need of properly adjusting, boring, recessing, etc., the supports in the window frame or shell. However, the problem with such support members as presently found in the art, is that no alignment is provided wherein plumb-line straightness is assured of the window structure in the window frame or shell.

Other references in the prior art which provide the functions for resilient sash guide supports as mentioned above and at the same time, permit the removal of the sash members from between the jamb members but do not permit proper alignment of the window upon installation are:

| | | |
|---|---|---|
| Schairer | 530,660 | |
| Basham | 1,879,026 | |
| Dantrick | 2,203,427 | (49–423) |
| Vose | 2,288,558 | (49–417) |
| Gardner | 2,613,403 | (49–440) |

The structure comprising the present invention employs spring-loaded balances or counterbalances of the type shown in Patent No. 2,952,884 (49–430), Patent No. 3,114,178 (49–446), and Patent No. 3,358,404 (49–446). However, in order for these counterbalances to be properly employed in the present invention, they have been constructed to have supporting slides at each end of the counterbalance spring assembly housing, the upper of which is constructed to removably interengage with guide slides on the side stiles of the sash members. None of the structures of these patents employ an interengaging structure of the type found herein. In this connection, it is important to note that the counterbalance housing is actually located within the sash side stile of the present invention, the supporting slides so constructed to bring the sash member, upon downward movement of the sash on the counterbalance located initially in the jamb, into slidable interlocking engagement with the counterbalance. Thus, the counterbalance directly supports the sash member actually from beneath the same, which is one of the principal reasons why the window construction of the present invention does not necessitate at all a counterbalance in each sash guide channel per sash member.

In other words, the sash member will not become "cocked" or "jammed" in the jamb sash guide channels even where only one counterbalance is provided on a single side stile of the sash member.

## SUMMARY OF INVENTION

A principal object of the present invention relates to provision of an interlock between adjacent sash members of a window construction generally referred to as a double-hung window, wherein the interlock is provided with an interengaging longitudinally disposed flange on one of sash rail members to interengage with a corresponding flange on an adjacent rail member and is laterally movable relative to its rail member to permit its lateral movement upon removal of the sash member from between adjacent jamb members of the window structure. The laterally movable interlock may be spring

C 003838

3,449,862

3

biased to be maintained in its normal position between the jamb members and centered relative to the length of the sash rail member to which it is slidably secured.

The principal advantage of a laterally movable sash interlock eliminates the necessity of cut-outs or gaps in fixed interlocks between the removable sash members found in the double-hung windows presently available, permitting the formation of a window draft since such interlock gaps are necessary if the sash is permitted to have freedom of lateral movement between the parallel jamb members, wherein the sash is moved further into the channeled jambs and then swung from the window frame.

Another provision in the sash interlock comprising this invention is the provision of adjustable abutments positioned at the ends of the interlock to provide an abutment for said spring means to laterally bias the interlock within specific limits and at the same time, provide means to selectively adjust the normally biased position of the interlock relative to its sash rail member.

Another object of the present invention is the provision of an interlock member that is laterally adjustable relative to the sash rail member to permit the positioning of the sash member in the sash guide channels of parallel jamb members for engagement with and support upon counterbalance members supported in the sash guide channels and received in longitudinal grooves provided in the side stiles of the sash members.

Another provision of the present invention is the provision of sealing means on the interengaging flanges of the sash interlock to engage and seal when the flanges are brought into their cooperative interengaging position.

Another object of the present invention is the provision of laterally movable and adjustable interengaging flanges on adjacent rail members of the sashes of a double-hung window to form an interlock between the sashes to completely fill the gap therebetween without any cut-outs necessitated in a portion of the flanges to permit the removal of sashes from between the jamb members of the window.

The second principal object of the present invention are stabilizers positioned intermediate of each of the jamb members to assure that the window is plumb-line straight within the window frame or shell and at the same time, to initially resiliently bias the window structure relative to the window shell to permit adjustment of the allowed spacing between the sides of the window shell relative to the window jamb members.

Another object of the present invention is the provision of stabilizers biasedly secured to and intermediate of the jamb members of a window structure, each stabilizer having a head which projects into a receiving channel or slot in the jamb member, the stabilizer head and jamb member slot being provided with cooperatively engaging flanges to prevent the removal of the stabilizer from the jamb member and provide transverse guided movement of the stabilizer relative to the longitudinal jamb member for self-aligned plumbing of the window structure in a window frame or shell.

Another object of the present invention is the provision of stabilizers biasedly secured to and intermediate of the jamb members of a window structure to selectively adjust the tension applied to the sash members in their guided movement in jamb sash guide channels to not only improve the operating characteristics of the sash members in their movement with the counterbalance members along the sash channels but also provide the greatest tensioning force to the jamb members of the window structure relative the sash members when the sash members are in their closed position to sufficiently seal the sash members relative to the window jamb, sill and lintel members from the intrusion of outside atmosphere including the passage of dust, etc.

The third principal object of the present invention is the provision of a counterbalance member in the sash

4

guide channel of one jamb member of a sliding sash window structure and an inturned flange or track in the sash guide channel of the other jamb member, the sash member being provided with a sash cam or guide on one side stile to ride on the inturned flange or track and a sash cam or guide on the other side stile of the sash member to removably interengage with a support guide on the end of the counterbalance member. The counterbalance member will travel upwardly with the sash member until releasably detached from the same by a counterbalance engaging member positioned in the bottom of the sash guide channel of the jamb member. The counterbalance member is partially housed in a longitudinal slot provided in the sash side stile in order that the sash members, together with the sash guides, may be directly supported on the counterbalance member.

The positioning of the counterbalance members well within the side stiles of the sash members, is believed to be an important feature of the present invention not only because the sash members are directly supported upon the counterbalance members, but also each sash member may be completely supported by a single counterbalance member housed in one of the jamb member sash guide channels, while the opposite side of the sash member is supported by the sash guide to ride on the inturned flange or track provided in the opposite sash guide channel. The structure of the present invention eliminates any binding of the sash member in its travel between the parallel jamb members caused by the sash member being cocked or jammed in the sash guide channels. The structure comprising the present invention eliminates such cocking or jamming which is present in the window structures of the prior art, wherein if an attempt is made to operate the sash members with a single counterbalance member, the sash member will not operate satisfactorily in its movement between the parallel jamb members.

Another object of the present invention is the provision of a sliding window structure and counterbalance combination, wherein a sash member may be either operated by a single counterbalance from one of the window jamb members or operated by the employment of two counterbalance members from each of the window jamb members.

Another object of the present invention is the provision of supporting slides secured to each end of the counterbalance members adapted to cooperate with a track and a sash guide slide, respectively, in and on the stiles of the sash members in order that the counterbalance may readily be releasably connected to the sash member, and to support as well as travel with the sash member in its movement in the guide channels of the parallel jamb members. A resilient abutment protruding from the upper supporting slide on each counterbalance member is permitted to resiliently pass over, and the outwardly extended abutment on the sash guide slide thereby engaging the counterbalance member with the sash member for relative movement therewith. The lower supporting slide of the counterbalance member is provided with an inclined surface to permit the same to ride up and upon a track provided in the base of the longitudinal slot of the sash member stiles, in order to properly position the counterbalance member in a parallel aligned relationship with the sash member stile and position its upper end directly below its sash guide slide or cam. The bottom ends of the stile track are canted to permit the counterbalance lower supporting slide to ride up upon the track when the counterbalance is being interengaged with the sash member.

The stile tracks function to permit the counterbalance to be aligned properly flush relative to the outside edge of the sash side stile which aids in the easy removal of the sash member from between the window jamb members. The stile tracks also improve the interengaging qualities of the sash member with the counterbalance members by (a) eliminating frictional contact of the counterbalance member with the sash screwings connecting the side stiles with sash upper and lower rail members, the screw heads

3,449,862

5

... level of the stile track and (b) providing ... minimal amount, frictional contact surface ... these two members are brought into inter...

... fourth principal object of the present invention is ... provision of a releasably sliding window construction having a sill and lintel structure readily adjustable for variations in the size of window shells into which the replacement window is to be secured.

It is well-known in the replacement window industry that the original frame sill of a window shell may be disposed at any number of angles. The present invention provides for an adjustable sill angle which may be adjusted to the angle of the original frame sill for supporting a replacement window in a vertical position. An important feature of the sill angle resides in the provision of longitudinal scoring of both sides of the metallic angle to readily permit the stripping off of various incremental sections of the angle to permit the window to set more perfectly in a vertical position within the window opening or sill.

Thus, the sill angle with its scored sections provides a convenient structure for obtaining the proper sill pitch in installing the replacement window comprising the present invention.

Another object of the present invention is the provision of an adjustably slideable header adapted to be received on the lintel of the replacement window to be adjusted and secured in position therewith and thus, take up the difference in space existing between the replacement window lintel and the header of the window opening or shell in which the replacement window is being installed.

Another feature of the present invention is the provision of a jamb filler to be installed along the jambs of the window opening or shell in order to properly align and plumb the replacement window upon installation of the same in the window opening. The jamb filler also may be provided with sealing means in order to seal the edges of the replacement window, relative to the window opening in which the same is being inserted, from the outside atmosphere.

Another feature of the present invention is the provision of a replacement window provided with dual weather seals between all operative parts of the window structure to eliminate the existence of drafts caused by the difference between atmospheric conditions outside the replacement window and those found inside the building structure into which the replacement window has been installed. In this connection air infiltration tests have been conducted on the window structure comprising this invention and it was found that a static air pressure equivalent to that pressure exerted by a wind velocity of 25 miles per hour was exerted on the sash crack perimeter of 21.88 feet with a result that air infiltration was determined to be 0.60 cubic feet per minute per foot of crack length. The maximum permissible air infiltration is 0.75 cubic feet per minute per foot.

Another feature of the present invention is the provision of a replacement window which assures a weather tight draft-free installation, and at the same time can be readily installed from inside the building structure, per se. Also, each replacement window can be installed in groups with a special mullion provided therebetween.

Other objects and advantages of this invention appear hereinafter in the following description and claims.

The accompanying drawings show for the purpose of exemplification, without limiting the invention thereto, certain practical embodiments of the present invention wherein:

FIG. 1 is a perspective of the window structure comprising this invention.

FIG. 2 is a vertical cross-section of the window structure of FIG. 1 with the sash members in place.

FIG. 2a is a vertical cross-section in part of the window

6

structure of FIG. 1 showing cross-sectional detail of the sash interlock comprising this invention.

FIG. 2b is a detail of the construction of the sill angle shown in the window structure of FIG. 2.

FIG. 3 is a horizontal cross-section of the window structure of FIG. 1 with the sash members in place and showing detail of the window stabilizers.

FIG. 4 is a vertical view, partly in section and partly in elevation, showing a portion of a window frame and of a sash member interengaged with a counterbalance member for guided movement therewith.

FIG. 5 is a plan view, partly in section and partly in elevation, showing the detail of the sash interlock comprising this invention.

FIG. 6 is a modified form of the biasing structure that may be used with the window stabilizers comprising this invention.

FIG. 7 is a perspective view of an end cap for the sash interlock comprising this invention.

Referring now to FIG. 1 there is shown the window structure 1 comprising this invention having the jamb members 2 and 3 connected together by the sill 4 and the lintel 5. The structure 1 is the type of window generally referred to as a double hung window having the upper and lower sash members 6 and 7, respectively, for vertical guided movement between the jamb members 2 and 3. In this connection it should be understood that there are certain features of this invention which may be readily applicable to window structures other than double hung windows. An example of this is the stabilizers 8 used properly center and plumb a window structure in a window shell or frame, the detail of which is explained further below.

The principal application of the window structure 1 is as a replacement window. Upon old wooden constructed windows becoming deteriorated due to environmental conditions, such as outside weather or inside excessive moisture and abusive treatment, as well as becoming inoperative, these windows may be easily removed from their window shells and a new window placed in the shell. The use of a metallic window structure, as is the window structure 1 of the present invention, eliminates future replacement due to deterioration, whether from natural or unnatural causes. At the same time the sash members 6 and 7 are easily removed from between the jamb members 2 and 3 to permit their glass sections 9 to be easily cleaned as well as permit the whole window structure 1 to be properly maintained, if necessary, inside and out through the window opening after removal of the sash members 6 and 7.

Each sash member 6 and 7 is essentially the same and therefore reference hereinafter being made one sash member has equal application to its counterpart.

The sash members have side rails 10 and 11 and are connected at their ends by the upper and lower rail members 12 and 13, respectively. The ends of the upper rail member 13 are provided with what may be termed sash cams 14, but also may properly be referred to as sash guide slides. The sash cams or slides 14 perform an important feature of the present invention in permitting not only simple guided movement of the sash members between the jamb members 2 and 3 but also properly guide the sash members in their movement therebetween where only one side of the sash member is counterbalanced.

The sash cams 14 extend over the ends of the rail members 13 for aesthetic purposes as well as forming a blocking member to act as an abutment or stop when the sash member is raised to its highest position in the window structure 1. The body portion 15 of the sash cams is lodged and secured within the longitudinal stile channel 16 of the side stiles 10 and 11.

As will be explained in more detail hereinafter, each sash member is provided with one counterbalance 17 housed in one of the jamb members in this instance jamb member 2 and the sash side stile 10. The other sash stile

3,449,862

<div style="display:flex">
<div>

**7**

is not supported on a counterbalance member but rather rides on the track 18 in the jamb member 3. The sash stile 11 contacts the single track 18 at the points of the sash cam 14 and the marginal edge slide 20.

The lower sash member 6 is provided with a sash lock or latch 21 which engages the sash lock hook 22 to pull together tightly the sash members to assure weather-tight draft-free securance of the members.

The lower sash member 6 has the sash handle 23 to easily raise and lower the lower sash member.

As shown in FIG. 1 and FIG. 2, the lintel 5 may be provided with a channeled head expander 24 for vertical adjustment on the lintel 5 of the replaceable window structure 1 to selectively position the same to meet the exact dimensions of the window shell 25 in which the window structure 1 is to be installed. This is one of the many adjustment features of the window structure comprising this invention to take up excess clearance and space which is variable from one window shell to another where the replacement window is to be installed.

As shown in FIGS. 2 and 3 the window structure 1 is in position in a window shell or casing 25 having a header 26, a frame sill 27 provided with a window sill 28 and side jambs 30 and 31. At the frame sill 27, the rear edge 32 of the sill 4 is slightly curved inwardly under the sill to firmly seat on the frame sill 27 and, more importantly, to provide adequate clearance for excess sill paint found to have been built up over years of painting the frame sill.

The other or front edge 33 of the sill 4 is provided to engage the sill angle 34 secured to the frame sill 27 by screws 35. Since the angle of the frame sill 27, relative to the horizontal, varies from window frame to window frame in which the window structure 1 is to be placed, the sill angle 34 is provided to mate with the front sill edge 33 to position the window structure 1 within the shell 25 in a vertical upright position. The sill angle 34 may be easily bent at 36 to the proper angle 37 which is the complementary angle of the sill angle noted as 38. For this purpose the angular corner 36 may be scored on its inside, as at 40, for its full length.

As shown in FIG. 2b, the upwardly extended flange 41 of the sill angle 34 may be provided with spaced scoring 42 on both sides thereof so that longitudinal strips 43 may be removed from flange 41 as necessary to permit the window structure 1 to be held at a vertical upright position. Thus, the end of the flange 41 seats against the sill 4 and adjacent to the front sill edge 33. Due to the flexible rigidity of the sill angle 34, the flange 41 may be made to biasly embrace the edge 33 so as to hold firmly against the sill 4 and firmly support the window structure 1. This is especially desired when the window structure 1 is being installed in the shell 25.

The scoring 42 is unique in that it permits removal of the strips 43, when necessary, by the application of a pair of pliers. The strip 43 may be stripped from the flange 41 by pulling on one end of the strip. The scored area, being small in cross-section, can be easily torn by hand with the aid of pliers.

Scoring may be provided on other parts of the window structure 1 such as on the upwardly extending flanges 44 and 45 of the lintel 5 or on the front sill edge 33 of the sill 4. In the case of the lintel 4, this permits adjustment between the lintel and the header 26 where the over-all length of the window structure 1 is slightly larger than the height of the shell or casing 25. Thus, the window structure 1 has the quality of being versatile, in that it can be applied to window casings 25 of various and irregular sizes. In addition, the head expander 24 is outwardly adjustable on the lintel 5 to efficiently take up the clearance room that may be existing between the header 26 and the replacement window structure 1.

The lintel flange 44 may be slightly curved at 46 for the same purpose as the rear sill flange 32. If the strip having this curved portion need be removed, the next

</div>
<div>

**8**

successive strip can be easily bent inwardly to serve the same function.

Each of the sash members is provided with a glass insert 9 held by the sash glass supporting channels 47 formed on the rail members 12 and 13 and the side stiles 10 and 11. The glass inserts 9 are maintained in position by the U-shaped glazing strips 48 which have ribs 50 to grip in the channels 47. Thus, the rail members and the side stiles cannot be pulled away from the glass inserts 9.

It should be noted that the sash member side stiles and rails, as well as the sash members 2 and 3 and the sill 4 and lintel 5 are secured together by screws 51 which are of the self-treading type and thread themselves into the arcuate expandable sockets 52.

As shown in FIG. 2, upon installation of the window structure 1, the same is initially held in its proper upright position by means of the jamb fillers 53 which are secured to the window casing jambs 30 and 31 by means of the screws 54. The jamb fillers 53 also take up the excess space previously occupied by the window structure 1 comprising this invention. The upper end of the jamb fillers 53 support the forward edge and shoulder 55 of the head expander 24. Thus the jamb fillers are cut to their proper length to fit along the length of the jambs 30 and 31 to include the height of the expander 24.

As noted in FIG. 3, the jamb fillers 53 are provided with a shouldered groove 49 for their full length to receive the resilient seal member 59 to seal the space between the jamb fillers 53 and the outer surface of jamb members 2 and 3.

From FIG. 2 it will be noted that the window structure 1 is completely double weather stripped relative to the sash members 6 and 7, the interlock 75 therebetween and the jamb members 2 and 3, sill 4 and lintel 5. For the upper sash member 6, pile seals 57 are provided in the shouldered grooves 56 formed along the edges of the downwardly depending flanges 58 and 60 of the lintel 5. The flanges 58 and 60 form a channel 61 into which the rail member 12 of the upper sash member 7 may recede into upon being raised to its highest position between the jamb members 2 and 3.

The lower rail member 13 of the lower sash member 6 is adapted to engage the pile seals 57, one lodged in the pile groove 62 of the upwardly extending flange 63, and the other lodged in the pile groove 63 formed in the shoulder or step 64 of the sill 4.

As noted in FIG. 3, double weather stripping is also formed along the sash side stiles 10 and 11 which are provided with the shouldered pile grooves 65 to receive the pile seals 57.

The interlock 75 is also provided with a pair of aligned pile grooves 66 and 67 to receive pile seals 57.

Thus from the foregoing, the window structure 1 is completely provided with double weather stripping between all sealing parts of the structure to prevent the intrudance of weather, dust, drafts, etc.

From the description of the structure shown in FIG. 2, the installation of the window structure 1 in the window casing 25 is commenced by securing the sill angle 34 to the frame sill 27 by the screws 35, after the sill angle has been properly angularly adjusted and stripped along its flange 41, if necessary, to be supported in a vertical position on the sill 27.

The jamb fillers 53 are then cut to their proper length to be secured along the jambs 30 and 31, as shown. As mentioned previously, the jamb filler length is dependent upon the inside length of the jambs 30 and 31 and whether a head expander 24 is used. The jamb fillers are then secured to the jamb members by the screws 54.

The head expander 24 is placed over the flanges 44 and 45 of the lintel 5 and pushed downwardly thereon until the ends of the flanges 44 and 45 contact the upper surface of the expander 24.

Next, the window structure 1 is placed on the frame sill 27 against the forward edge of the window sill 28

</div>
</div>

C 003841

3,449,862

9                                                                                                10

and swung into position from the frame sill 27 until the head expander contacts the window frame member 68 and the jamb members 2 and 3 engage the seal members 59. The head expander 24 may, at the same time, be lifted from the lintel 5 to extend the same to take up any excess space between the lintel 5 and the header 26 and also to position its forward shoulder 55 over the upper ends of the jamb fillers 35 so that the front surfaces of the jamb members 2 and 3 will directly engage the seal members 59 and compress the same to form a tight seal between the jamb members 2 and 3 and the jamb fillers 53.

The head expander may then be held in its proper position by means of the metal screws 69.

To complete the installation of the window structure 1, the stabilizers 8 plumb the window structure as well as equally align the same between the jambs 30 and 31. The screws 70 secure the window structure 1 to the shell or casing 25.

The sash lock 21 is of a conventional type and is secured to the upper rail 12 of the lower sash member 6 by means of the screws 71. The sash lock hook 22 is secured to the lower rail 13 of the upper sash member by means of the screw 72.

As shown in detail in FIG. 2a, the lower sash rail member 12 is provided with a horizontal flange projection 73 which has a head portion 74 to form a cross-sectional configuration of a T to slideably receive the longitudinal slot 76 of the interlock member 75. The interlock 75 fills the gap formed between the rail members 12 and 13 of the adjacent sash members 6 and 7. The longitudinal slot 76 is in the form of two opposed inwardly facing flange members 79 supported on base 77 forming a slot therebetween and a channel 78 therein to receive the projection head 74. The pile groove 66 is formed on the opposite side of the channel 78 on the base 77. The other pile groove 67 is formed on the downwardly but angularly disposed flange member 80. Thus, the flange 78 together with the adjacent base 77 form a longitudinal slot 81 to receive the upwardly extended right-angle flange 82 of the upper sash rail member 13.

The pile seal 57 of the pile groove 66 seals against the right-angle flange 82 while the pile seal 57 of the pile groove 67 seals against the upper sash rail member 13.

The interlock 75 is an independent element of the sash members 6 and 7 and as such forms an important feature of the present invention since the interlock is shorter in length than the rail members 12 and 13 and is permitted to have lateral movement on interengaging support means in this instance in the form of the flange projection 73 and the interlock channel 78.

In window structures of the prior art, where double hung windows are concerned, the interlock between the sash members had to be notched if the sash members were to be removable from between the window jamb members. In order for the sash member to be removed from between the jamb members, it is necessary that the sash member be readily receivable in a channel of one of the jamb members so that the sash member could be laterally swung from the window structure after the same has been moved laterally into the jamb member. In such cases, the interlock between the sash members is permanently notched, as mentioned above, in order that the sash interlock would not interfere with the removal of the sash member. The notched interlock is undesirable in such window structures since a tight seal against outside elements cannot possibly be provided for in the gap between the sash members. The "floating" interlock of the present invention eliminates this undesirable structural necessity in such prior art windows.

The "floating" feature of the interlock 75 is best shown in FIG. 5 wherein the spacing shown by the arrow 83 represents the required distance to laterally move the sash member 6 deeper into the channel of the jamb member for laterally swinging the sash member away from

between the jamb members 2 and 3. The interlock 75 is shown in FIG. 5 in its normal position. Stop means are provided on the ends of the interlock member 75 to limit the movement of the same on the flange projection 73. The stop means, as shown, consists of the adjustable set screw 84 provided at one end of the interlock being threadably secured in the interlock channel 78. The set screw 84 abuts one end of the interlock member 75. The stop means at the other end of the interlock channel 78 is also in the form of an adjustable set screw 85 threadably secured in that end. The set screw 85 abuts the spring means 87 housed in the interlock channel 78, the other end which abuts the other end of the flange projection 73.

The adjustable set screws 84 and 85 are self-threadable into the ends of the interlock channel 78, the set screws cutting threads into the small longitudinal abutment surfaces 86 along the inner edges of the inwardly facing flange members 79 as well as the back surface of interlock channel 78.

The set screws 84 and 85 are stop means engaging the horizontal flange projection 73 to retain the interlock thereon. When the spring means 87 is inserted in the channel 78, the set screw 84 may be adjusted to centrally locate the interlock 75 relative to the rail member 12. This adjusted position would be the normal location of the interlock with the sash member 6 in position between the jamb members 2 and 3. Thus, the interlock 75, upon viewing FIG. 5, would be biased in the direction shown by the arrow 88, the inner end of set screw 84 resting against the end of the flange projection 73, as shown. The interlock 75 may readily be moved in a direction opposite to the arrow 88 compressing the spring 87, the energy of which will return the interlock to its normal position as shown in FIG. 5. The set screw 85 may be used to adjust for the desired spring tension of the interlock by threading the set screw inwardly in the channel 78 to further compress the spring 87. Upon lateral movement of the sash member 6 deeper into the channel of the adjacent jamb member, the interlock 75 will be forceably moved to the extent represented by the arrow 83 so that the sash member can be swung laterally away from and removed from the window structure 1, only to return to its normal adjusted position as shown in FIG. 5. This normal adjusted position would be that as shown in FIG. 3 wherein the interlock 75 is centrally located between the divider strips 90 of the jamb members 2 and 3.

The interlock 75 is provided with end caps 91 and 92. End cap 92 is shown in detail in FIG. 7, end cap 91 being opposite in detail. Each of the end caps 91 and 92 are provided with an opening 93 through which the set screw 84 or 85 passes to engage within the channel 78. The fingers 94 of the end caps 91 and 92 are formed for insertion into the ends of the interlock channel 78 to be received by the inwardly facing opposed flange members 79 and under the abutment surfaces 86. Thus, the adjustable set screws 84 and 85 threadably set into the end cap fingers 94 as well as the abutment surfaces 86 to maintain tightly the caps 91 and 92 on the ends of the interlock 75. In this connection, it should be noted that the caps 91 and 92 are also held in firm position by the expansion and separation of the fingers 94, by the set screws 84 and 85, against the flange members 79.

The flanges 95 and 96 of the end caps 91 and 92 fit over the ends of the interlock. As mentioned, end cap 92 is the opposite to that of end cap 91, and this in respect to the reverse opposite positioning of the flanges 95 and 96.

In connection with the interlock 75, it should be noted that there are many possible variations for interengaging support means to provide for a laterally movable interlock. For example, a longitudinal groove could easily be provided in the lower sash rail member 12 to slideably receive and retain the interengaging base or projection on the

3,449,862

11

interlock member 75. Stop means in the form of the adjustable set screws 84 and 85 could be provided in the ends of rail member groove to limit the movement of the interlock 75 within the confines of the rail member groove.

From FIG. 2, it will be noted that the sash lock 21 is fastened to the lower sash rail member 12 by means of the screws 71 with a substantial portion of the sash lock 21 overlapping the interlock 75. The sash lock 21 may therefore properly engage the sash lock hook 22 and also perform as a back support for the interlock 75 upon interengagement of the interlock downward depending flange 80 with the upwardly extending right-angle flange 82, since the interlock 75 does not intentionally fit tightly on the flange projection 73. Thus the sash lock 21 firmly supports the interlock 75 for firm interengagement with the flange 82 of the adjacent sash member 7 to insure that the cooperative flanges 80 and 82 engage their full extent one into the other as shown in FIG. 2.

The construction of the stabilizers 8 is clearly shown in FIG. 3. These stabilizers form another important feature comprising this invention. As previously mentioned in part, the jamb members 2 and 3 have a divider strip 90, which forms an inverted slot 97 ending in the extended sides 98 having along their length the inturned flanges 100. Connected to the sides 98 are the panels 101 which each form the bottom of the sash channels 102 of the jamb members 2 and 3. The outer face flanges 103 are, thus, secured to the other side of the panels 101. The panels 101, the divider strip 90 and the outer face flanges 103 form the sash channels 102 for each jamb member.

From FIG. 3 it will be noted that the primary difference between the jamb members 2 and 3 is that jamb member 3 is provided with the sash tracks 15 secured along the sides of the divider strip 90.

The inner facing ends of the face flanges 103 are provided with a longitudinal groove 104 and thickened portion 105 to aesthetically improve the appearance of the window structure 1, while giving it also an appearance of rigidity.

The stabilizers 8 are housed in the outwardly open slots 97 and held therein by means of the stabilizer adjustment screw 106. The adjustment screw 106 is threadably secured to the projecting head 107 of each stabilizer 8, the head 107 having a base 108 comprising the two oppositely extending flanges 110. The stabilizer head 107 is provided with outturned flanges 111 on each side thereof and for its full length. The flanges 111 cooperate with the divider strip flanges 100 to limit the outward movement of the stabilizer within the divider strip 90. Thus, the stabilizers 8 are retained within the jamb member whether the adjustment screw 106 is completely removed or not from the stabilizer head 107.

The coil spring 112 provides a resilient bias means for the stabilizers 8 to forceably maintain them outwardly of the divider strip 90. The flanges 110 and 111 would thus be in engagement except for the positioning of the adjustment screw 106 to forceably retract, against the force of the spring 112, the stabilizer 8 into the outwardly open slot 97.

In FIG. 6 there is shown a modified form of the biasing means that may be used to provide the outward tensioning of the stabilizers 8 relative to the jamb members 2 and 3. Here, the leaf spring 113 not only provides this biasing means but also maintains alignment of the stabilizer relative to the jamb member to permit better plumbing of the window structure 1 within the casing 25.

As noted in FIG. 1, the stabilizers 8 are of substantially smaller length than the overall length of the jamb members 2 and 3.

In operation, the stabilizer adjustment screws 106 are tightened up as far as possible so that the stabilizers are drawn as far as possible into the jamb member slot 97. As explained previously above, the window structure 1 is then lifted into vertical position in the window casing

12

25 so that the outer facing flanges 103 engage the jamb fillers 53 and the head expander 24 is placed in its proper position over the ends of the fillers 53 as shown in FIG. 2. With the window structure thus positioned, the adjusting screws 106 of the stabilizers 8 may be let out by turning them counter-clockwise to permit the stabilizer bases 108 to extend and engage the casing jabs 30 and 31, taking up the spacing that may exist between the casing jambs 30 and 31 and the jamb members 2 and 3, respectively. Thus, the stabilizers function to permit the window structure comprising this invention to easily and adjustably fit various sizes of window casings into which the window structure is to be installed.

Also, the stabilizers 8 function to plumb the window structure relative to the casing 25. It is not uncommon to find that the casing jambs 30 and 31 are not perfectly plumb relative to the ground, especially in older homes and buildings. As such, the stabilizers 8 can temporarily support the window structure 1 from the frame sill 27 and the sill angle 34 to permit the installer to adjust the stabilizer screws 106 to permit the replacement window to be plumb irrespective of inaccurate positioning of the original casing jambs 30 and 31 or sill frame 27. In this connection, the flanges 111 alone, or together with the biasing means in the form of the spring 113, if utilized, prevent the window structure 1 from becoming misaligned relative to the already installed jamb fillers 53 and sill angle 34. Thus, the window structure may be readily plumbed in the plane of the window while not interfering with the plumb of the window structure in plane normal to the same.

Another function to be performed by the stabilizers 8 is to provide jamb tensioning means. The closing position of the sash members 6 and 7 should be made the tightest sealed position as far as the slideable parts of the window structure 1 are concerned. Thus, the stabilizers 8 are positioned substantially midway of the jamb members 2 and 3 for this purpose as well as to properly plumb the window structure 1 in the casing 25 as explained above. While the stabilizers 8 are extended to meet and engage the casing jambs 30 and 31 and to properly plumb the window relative to the casing 25, tension is also placed against the jamb members 2 and 3 which are engaging the sash members 6 and 7. Optimum sealing of the sash members 6 and 7 relative to the jamb members will be provided for the sash members in these closed positions. Also the tensioning of the jamb members 2 and 3 improves the guided engagement of the sash members 6 and 7 within the sash channels 102 of the jamb members.

Reference is now made to FIG. 4 where there is illustrated another important feature comprising this invention. The counterbalance 17 is shown in cooperative relationship with the sash members, which may be either of said sash members 6 and 7. The general structure of the counterbalance 17 is shown and described in E. H. Wood Patent No. 3,114,178 (20–52.2) and D. J. Dinsmore 3,358,404 (49–446) and, therefore, need not be repeated here in detail. The counterbalance 17 is provided with an elongated housing 114 having a tension spring assembly 115 comprising a coil spring 116 associated with a pulley arrangement 117 to provide a mechanical advantage. The inner end of the flexible cable 118 is secured at 120 and its outer end is secured to the hook 121 which clips on the shoulder 122 provided by the opening 123 in the bottom of the channel 102. Thus, the sash member places the associated spring assembly 115 under tension after the counterbalance 17 has been interengaged with the sash guide slide 14.

The ends of the counterbalance housing 114 are provided with supporting slides 124 and 125. The upper supporting slide 124 is secured to the housing 114 at 126 and has a toe portion 127 with an inclined surface 128. The slide 124 has a shoe 129 which engages the panel 101 in the sash channel 102. A resilient abutment 130 extends from the slide 124 into the sash guide slide 14. At this

C 003843

3,449,862

13

point it should be noted that the sash guide cam is provided with a beveled surface 132 and also has an outwardly extended abutment 133.

The lower support slide 125 is secured to the lower end of the counterbalance housing 114 by the rivets 134 and is provided with a toe portion 135 having an inclined surface 136. A shoe 137 is provided on the opposite side of the toe 135 of the supporting slide 125 to engage the panel 101 of the sash channel 102.

The side stile member 10 of the sash members provided with a longitudinal slot or channel 138 the bottom of which is provided with a counterbalance track 140. The track 140 is needed in the bottom of the channel 138 in order to permit the counterbalance 17 to be flush with the outside edge of the sash stile member 10. Also the track 140 being raised from the bottom surface of the stile channel 138 eliminates the interference of the counterbalance member with the head of the sash member screws 141.

As shown in FIG. 3, the track 140 as well as the supporting slides 124 and 125 consist of pairs. The track 140 consists of inturned opposed flange members from the said walls of the stile member channel 138. The use of the support slides 124 and 125 in the counterbalance track 140 in the sash stile member 10 greatly improves the operation of the sash member in the sash channels 102 of the jamb members 2 and 3 since there is less friction contact of the movement of the counterbalance relative to the sash member and the jamb members.

As shown in FIG. 4, the ends of the counterbalance track 140 are canted downwardly at 142 toward the bottom of the side stile member channel 138 to provide minimal resistance of the counterbalance member supporting slide 125 when brought into position on the track 140. Thus, upon the sash member being brought downwardly to position in the sash channels 102 of the jamb members, the inclined surface 136 is permitted to ride up upon the canted surface 142 while, at the same time, the inclined surface 128 of the upper supporting slide rides up upon the inclined surface 132 of the sash guide 14 until the resilient abutment 130 of the supporting slide 124 rides over the outwardly extending abutment 133 of the sash guide 14, thus, interlocking with the same. The counterbalance member 17 takes the position as shown in FIG. 4 wherein the counterbalance member is parallel to the sash stile member 10 and adjacent thereto taking up the space provided in the sash channels 102. The supporting slide shoes 129 and 137 engage the panel 101 of the jamb members for slideable movement therealong. The counterbalance member 17 remains interlocked with the sash guide 14 and thus counterbalances the sash member through its tension spring assembly 115 to permit the sash member to be placed in any selected position along the length of the jamb members.

In order to disengage the sash member from the counterbalance member 17, the counterbalance engaging means in the form of a spring clip 143 is housed in the openings 144 and 145 of the panel 101 of the jamb members 2 and 3. The spring clip 143 is provided with a flange 146 having an abutment 147 in order to maintain the flange 146 in the opening 144. The other end of the spring clip 143 is provided with the U-shaped spring member 148 which through the reverse turn 151 continues as the body portion 150 of the spring clip 143. As shown in FIG. 4, the spring clip 143 as to selective positions, one shown in solid lines and the other in the dotted outline 152. The two possible positions of the spring clip 143 are selectively controlled by the U-shaped spring member 148 wherein the upper portion 153 of the spring 148 may be permitted to biasly pass and rest against the sides of the opening 145.

When the spring clip 143 is in the dotted line position 152, the reverse inturn end 151 will engage the brace 154, as shown in FIG. 3, of the shoe 129 of the upper support slide 124. The counterbalance member 17 will be thus

14

stopped in its movement along the sash channel 102 and at the same time locked in the sash channel of the jamb member against further longitudinal movement within the sash channels 102. If the sash member is continually raised, the resilient abutment 130 will be permitted to pass over the abutment 133 of the sash guide slide 14 with the counterbalance 17 riding down the inclined surface 132 of the guide slide 14 as well as the canted or beveled surface 142 of the counterbalance track 140. In reality, the guide slide 14 of the sash member and the lower supporting slide 125 of the counterbalance member 17 are moved away from engagement with the upper supporting slide 124 and the sash track 140 of the sash member, respectively. Thus, additional space is provided in the sash channels 102 to permit the lateral movement of the sash member deeper into the sash channel in order that the same may be laterally swung away and removed from the window structure 1.

With the removal of the sash member between the channel members 2 and 3, if need be, the counterbalance member 17 may be removed from its corresponding jamb member by pushing the counterbalance member downwardly along the sash channel 102 to disengage the brace 154 from beneath the spring member 148 and reverse inturn portion 151 of the spring clip 143. The hook 121 of the counterbalance tension spring assembly 115 may then be readily removed from the opening 123 in the channel 102. This procedure is merely reversed in order to properly reinsert the counterbalance member 17 in the sash channel 102 of the jamb member.

As shown in FIG. 3, the upper sash member 7 is provided with two counterbalance members 17, one in each of its sash channels 102. The lower sash member 6 is provided with only one counterbalance member 17 and thus the sash guide slide 14 on the opposite side of the sash member from the counterbalance member 17 is permitted to engage the sash track 18. The sash guide slides 14 are provided with the abutments 155 for the purpose of engaging the track 18.

In view of the nature of the supporting arrangement of the counterbalance member 17 substantially within the side stile channel 138, as above explained, it has been found that it is only necesary to provide one counterbalance member 17 to permit efficient operation of a sash member 6 or 7 in the sash channels 102. The sash member supported only on one counterbalance member 17, as shown in FIG. 3 in connection with the lower sash member 6, does not permit the sash members from becoming cocked or jammed in the sash guide channels 102. The elimination of any binding of the sash member in its travel between the parallel jamb members in view of the positioning of the counterbalance member in interengagement with the support slide 14, a substantial portion of the counterbalance member being directly under the guide slide 14 and thus carrying a substantial portion of the weight of the sash member. The counterbalance member in its interengaged position with the sash member does not thrust the sash member against the opposite sash channel wherein the sash member guide slide 14 on this opposite side is in slideable engagement with the sash track 18. For these reasons, two counterbalance members 17 are not needed for a single sash member although the same is illustrated in FIG. 3 in connection with the upper sash member 7.

The use of two counterbalance members will permit the removal of the sash member upon the disengagement of one of the counterbalance members from its corresponding sash guide slide. In view of the sash track 18 as shown in FIG. 3, in connection with the lower sash member 6 and its positioning well above the panel 101 of the sash channel 102, the sash member 6 cannot be removed from between the jamb members until disengagement of the counterbalance on the opposite side of the sash member from its corresponding sash guide slide.

C 003844

3,449,862

15

16

I claim:

1. A sliding sash window frame having lintel and sill members connected to parallel jamb members, cooperative slideably adjacent sash members having top and bottom rail members with side stiles slideably guided in sash channels in said jamb members, said sash members in their closed position in the frame forming a gap between adjacent rail members characterized by a laterally movable interlock member positioned between said adjacent rail members closing said gap, interengaging support means on one of said adjacent rail members and said interlock to slideably support the latter, a cooperative flange member on the other of said adjacent rail members to interengage with said interlock member, and stop means on the ends of said interlock member to limit the movement of the same on said support means.

2. The sliding sash window frame of claim 1 characterized in that said interengaging support means comprises a horizontal flange projection on one of said adjacent rail members extending into said gap toward the other of said adjacent rail members, said interlock member having a longitudinal slot slideably receivable on said horizontal flange projection, and stop means positioned in the ends of said interlock member slot to engage the ends of said flange projection.

3. The sliding sash window frame of claim 1 characterized by adjustable abutments included in said stop means in each end of said interlock, and spring means between one of said abutments and one end of said interengaging support means to bias the lateral movement of said interlock member on said support means in one direction relative to said window frame jamb members.

4. The sliding sash window frame of claim 3 including opposed sash channels in said jamb members between outer face flanges and a divider strip of said jamb members, characterized by a counterbalance member in each channel of one jamb member, inturned flange means in each channel of the other jamb member, guides on one side stile of each of said sash members to ride on said inturned flange means, a longitudinal slot in the other side stiles of said sash members to operatively receive their respective counterbalance members, one end of said interlock member engaging said divider strip between said jamb sash channels containing said counterbalance members to move said interlock member toward the opposite jamb member containing said inturned flange means upon insertion of said sash member in said jamb sash channels to receive said counterbalance members and position said sash member guides on said inturned flange means, said interlock member thereafter retained between said jamb divider strips.

5. The sliding sash window frame of claim 1 characterized by a downwardly depending flange on said interlock member, and an upwardly extending flange on the other said adjacent rail members to overlap and engage said downwardly depending flange to close said gap between said adjacent sash rail members.

6. The sliding sash window frame of claim 5 characterized by seal means on the faces of said downward depending flange to engage and seal against the faces of said upwardly extending flange on said other sash frame cooperative rail member.

7. The sliding sash window frame of claim 5 characterized by a second interengaging support means on said other adjacent rail member, said upward extending flange slideably receivable on said second interengaging support means, and stop means on the ends of said upwardly extending flange to limit the movement of the same on said second support means.

8. The sliding sash window frame of claim 7 characterized by adjustable abutments included in said stop means at each end of said second interengaging support means, spring means between one of said abutments and one end of said second support means to bias the lateral movement of said upward extending flange on second sup-

port means in one direction relative to said window frame jamb members.

9. The sliding sash window frame of claim 7 characterized in that said second interengaging support means comprises a horizontal flange projection on the other of said adjacent rail members extending into said gap toward said one adjacent rail member, said upward extending flange having a longitudinal slot slideably receivable on said horizontal flange projection, said stop means positioned in the ends of said slot to engage the ends of said flange projection.

10. A window frame having lintel and sill members connected to parallel jamb members each of which has opposed sash channels between outer face flanges and a divider strip, characterized by an outwardly open slot in at least a portion of each jamb member divider strip, a pair of stabilizers each having a base with a projecting head, one for each of said jamb members and with its head extending into a respective outwardly open slot of said divider strip, said stabilizers being of a fraction of the length of said jamb members, and securing means to fasten said stabilizers intermediate of said jamb members to plumb the window frame within a window opening.

11. The window frame of claim 10 characterized by resiliently biased means in said securing means to self-adjust said window frame relative to each side of said window opening.

12. The window frame of claim 11 characterized by inturned flanges along the longitudinal edges of said divider strip slots, cooperating outturned flanges on said stabilizer heads to limit the outward biased position of said stabilizers in said slots by said resiliently biased means.

13. The window frame of claim 12 characterized in that said stabilizer outturned flanges are disposed longitudinally along the head of each of said stabilizers to permit the latter to move in said divider strip slots in a direction substantially normal relative to the longitudinal extent of said jamb members.

14. The window frame of claim 10 characterized by a counterbalance member in each channel in one of said jamb members, inturned flange means in each channel in the other of said jamb members, a sash member for each opposed pair of channels in said jamb members, guides on one side stile of said sash member to ride on said inturned flanges, a longitudinal slot in each of the other side stiles of said sash members to operatively receive their respective counterbalance member, a supporting slide on each end of said counterbalance members to ride in its respective channel in said one jamb member, and resiliently biased means in said stabilizer securing means to selectively adjust the tension applied to said sash members in their guided movement in said opposed sash channels of said jamb members.

15. A sliding sash window frame including lintel and sill members connected to parallel jamb members having opposed sash channels between outer face flanges and a divider strip, characterized by a counterbalance member in each channel in one jamb member, inturned flange means in each channel in the other jamb member, a sash member for each opposed pair of channels in said jamb members, guides on one side stile of said sash frame to engage and ride on said inturned flanges, and a longitudinal slot in the other side stile of said sash frames to operatively receive their respective counterbalance member.

16. The sliding sash window frame of claim 15 characterized by a supporting slide on each end of each counterbalance member to ride in its respective channel in said one jamb, and a sash guide slide at one end of each of said other side stile longitudinal slots to cooperatively interengage with the corresponding supporting slide of its respective counterbalance member.

17. The sliding sash window frame of claim 16 characterized by an abutment on and an opening in each of

C 003845

3,449,862

17

said cooperating slides to interengage with one another, and a cam surface on at least one of said cooperating slides to guide the abutment of one of said cooperating slides into the opening of the other of said cooperating slides when the sash frame is moved into operative position on its respective counterbalance member.

**18.** The sliding sash window frame of claim 17 characterized by a cam surface on both of said co-operating slides to guide their respective abutments into interengaging position and support the sash frame in said opposed sash channels for movement therealong.

**19.** The sliding sash window frame of claim 17 characterized by a counterbalance engaging means in each channel of said one jamb member to engage the supporting slide on one end of said counterbalance members to disengage the same from its co-operating sash cam and permit the removal of the sash frame from between said parallel jamb members.

**20.** In a window frame having lintel and sill members connected to opposite parallel jamb members having sash guide channels to receive a sash member, the stiles of said sash members adapted to receive sash counterbalance means for travel engagement with said sash member to permit slidable movement and selective fixed positioning of said sash member between said parallel jamb members, said window construction characterized by sash guide slides in each upper corner of said sash member, said sash counterbalance means comprising an elongated housing, a tension spring assembly secured within said housing to biasly engage said sash guide slides, a counterbalance supporting slide secured to each end of said housing for slidable engagement in said sash guide channels, a resilient abutment protruding from the upper of said supporting slide to resiliently pass over an outwardly extended abutment on said sash guide slides to removably interlock said sash counterbalance means with said sash member for relative movement therewith.

**21.** The window structure of claim 20 characterized in that said upper supporting slides have a toe portion, counterbalance engaging means positioned in the bottom of said sash guide channels to engage said toe to disengage said sash counterbalance means for said sash member and permit the removal of the latter from within between said parallel jamb members.

**22.** The window structure of claim 21 characterized by a track in the bottom of the sash member stile channels and inclined at its lower extent to meet with the bottom of said stile channels to receive said counterbalance supporting slides, the lower of said counterbalance supporting slides having an inclined surface to permit the same to ride up and on said track and substantially align said sash counterbalance means within and parallel with said sash member stile channels below said sash guide slides for direct aligned and biased engagement therewith.

**23.** The window structure of claim 20 characterized by a sash counterbalance means in only one of said sash guide channels of one of said parallel jamb members to biasly support said sash member between said jamb members, an inturned flange means in said opposite jamb guide channel, abutment means on said sash guide slide to engage said inturned flange means for slidable movement therealong.

18

**24.** The window structure of claim 23 characterized in that said upper supporting slide in said counterbalance means has a toe portion, counterbalance engaging means positioned in the bottom of said sash guide channel of said one parallel jamb member to engage said toe to disengage said sash counterbalance means from said sash member and permit the removal of the latter from within between said parallel jamb members.

**25.** The window structure of claim 23 characterized by a track in the bottom of the sash stile channels and beveled at its lower extent to meet the bottom of said stile channels to receive said counterbalance supporting slides, said counterbalance supporting slides having an inclined surface to ride up on said sash guide slide and said track bevel, respectively, to adjacently align said counterbalance in parallel alignment with said sash stile channel below said sash guide slide for direct aligned and biased engagement therewith.

**26.** In a window structure having an upper sash and a lower sash each having upper and lower rails and side stiles and counterbalanced between parallel jamb members, an interlock between said sashes to provide a weather tight seal when said sashes are in their farthest most extended positions relative to one another, said interlock characterized by a laterally movable interlock member slidably supported on one of said sashes and having an interengaging longitudinally disposed flange, an interengaging longitudinally disposed flange on the other of said sashes to interengage with said interlock member interengaging flange, said interlock member laterally movable relative to said jamb members to permit the removal of the interlock carrying sash from within between said jamb members.

**27.** The window structure of claim 26 characterized by spring means to bias said interlock in a selected position relative to said supporting sash, adjustable abutments included in said interlock member to select the tension of said spring means.

**28.** The window structure of claim 26 characterized by adjustable abutments included in said interlock member to adjustably center said interlock member relative to said sashes and said parallel jamb members.

**29.** The window structure of claim 26 characterized by seal means on said interengaging flanges to engage and seal therebetween in their cooperative interengaging position.

### References Cited

UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 1,246,346 | 11/1917 | Stephens | 49—453 X |
| 1,833,766 | 11/1931 | Westerheim | 49—432 |
| 2,032,726 | 3/1936 | Storck | 49—432 X |
| 2,781,111 | 2/1957 | Kunkel | 49—434 |
| 3,169,283 | 2/1965 | Gerulis | 49—422 |
| 3,206,804 | 9/1965 | Perry | 49—418 |
| 3,239,892 | 3/1966 | Johnson | 49—417 X |
| 3,290,825 | 12/1966 | Adams | 49—431 |

DAVID J. WILLIAMOWSKY, *Primary Examiner.*

J. K. BELL, *Assistant Examiner.*

U.S. Cl. X.R.

49—418, 430, 446, 453

C 003846

**Disclaimer**

3,449,862.—*Alexander J. Biro*, Indiana, Pa. WINDOW STRUCTURE. Patent dated June 17, 1969. Disclaimer filed Dec. 18, 1969, by the assignee, *Season-All Industries, Inc.*

Hereby enters this disclaimer to claims 20 and 21 of said patent.
    [*Official Gazette March 31, 1970.*]

C 003847

# EXHIBIT 23

# United States Patent [19]

## Berndt

[11]  Patent Number:  **4,704,821**

[45]  Date of Patent:  **Nov. 10, 1987**

[54]  **COMPRESSION SEALS IN A DOUBLE HUNG STYLE WINDOW**

[76]  Inventor:  **Lawrence Berndt,** P.O. Box 211, Harrington Rd., Cornish, N.H.

[21]  Appl. No.:  **881,912**

[22]  Filed:  **Jul. 3, 1986**

[51]  Int. Cl.⁴ .......................... E05F 1/00; E05D 15/10
[52]  U.S. Cl. ........................................ 49/446; 49/209; 49/406
[58]  Field of Search ................. 49/445, 446, 406, 209

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,108,000 | 2/1938 | Holt et al. | 49/406 X |
| 2,761,173 | 9/1956 | Dinsmore | 49/445 X |
| 3,499,248 | 3/1970 | Baer | 49/446 X |
| 4,078,336 | 3/1978 | Prosser | 49/445 |
| 4,464,864 | 8/1984 | Yackiw | 49/406 X |
| 4,503,641 | 3/1985 | Swan | 49/445 |
| 4,580,366 | 4/1986 | Hardy | 49/406 |

*Primary Examiner*—Philip C. Kannan
*Attorney, Agent, or Firm*—Henry C. Nields

[57]  **ABSTRACT**

A double-hung window includes a lower sash and balances having components which cooperate with weatherstripping on the window frame and other components to provide a compression seal when the window is closed.

**4 Claims, 9 Drawing Figures**



**U.S. Patent**    Nov. 10, 1987    Sheet 1 of 3    4,704,821



FIG.3

FIG.2

FIG.1

FIG.4



8



FIG.5

FIG.6

FIG.8

FIG.9

FIG.7

4,704,821

1

## COMPRESSION SEALS IN A DOUBLE HUNG STYLE WINDOW

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

This invention relates to windows of the so-called double-hung type, which are characterized by a frame enclosing two sashes, either or both of which are capable of vertical movement so as to open and close the window. If only the lower sash is movable, the window is strictly speaking a single-hung window. However, the term "double-hung window" usually includes such a window also. Since movement is vertical, some sort of counter weight or balance is required in conjunction with the movable sash or sashes.

#### 2. Description of the Prior Art

The double-hung window is probably the most common of the various window types. However, because of the relatively simple technique employed for movement of the sashes, such windows rely on friction for weather tightness when the window is closed. Representative U.S. patents relating to double-hung windows include U.S. Pat. Nos. 4,503,641 to Swan; 4,570,382 to Suess; and 4,580,366 to Hardy.

### SUMMARY OF THE INVENTION

The present invention comprehends a window of the double-hung type wherein at least one of the sashes operates. The construction of the window of the invention includes mechanisms which provide a very tight compression seal when the window is closed and locked. The compression seal is accomplished by lateral movement of the sash against weather seals. In a preferred embodiment of the invention, a standard block-and-tackle spring balance is modified by riveting thereto a shoe adapted to provide lateral movement when the window is closed. However, my invention is not limited to such a block-and-tackle spring balance, but includes use of any sort of counter weight or balance, including (but not limited to) spring balances, friction balances, reel balances, rope-and-pulley balances, etc. Also, a fixture which includes a bolt mechanism for fixing the position of the balance when the sash is removed to facilitate cleaning. Each of the shoe fixtures and bolt fixtures include a stud on which the sash is removably supported.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an interior view of a complete double-hung window constructed in accordance with the invention in the closed position;

FIG. 2 is a view similar to that of FIG. 1 with the lower or movable sash removed;

FIG. 3 is a top view of a cross section of the window of FIG. 1 on an enlarged scale;

FIG. 4 is a close-up view of a corner piece which allows the continuous corner seal shown in FIG. 1; and

FIGS. 5 through 9 are a multi-view display showing the mechanisms for providing a very tight compression seal in accordance with the invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to the drawings, and first to FIGS. 1 and 2 thereof, therein is shown a "double-hung" window 1 made according to the present invention. The window 1 comprehends a window frame 2, an upper sash 3 and a

2

lower sash 4. In the window 1 only the lower, or inner, sash 4 moves, and so, properly speaking, the window 1 is a single-hung window. The upper sash 3 is held to a blind stop (shown at 9 in FIG. 3) on the outside by screw plates or angles on the inside (not shown). A stop 5 (shown in FIG. 2) under the top (outer) sash 3 holds continuous weather seals 6 against which the bottom sash 4 presses when closed. When the window is closed, the lower sash 4 is locked in position by means of one or more conventional locks 7, each consisting of a rotatable clasp mounted on the inner sash 4 and a hook mounted on the outer sash 3. When the lock 7 is in the locked position, vertical movement of the sashes 3,4 is prevented. Moreover, in accordance with the present invention, locking the lock 7 provides a complete weather-tight seal in a manner to be described hereinafter. In FIG. 2, the lower sash 4 has been removed, and so the weatherstripping 6 in the stop 5 is shown. An important feature of the invention is the corner piece 8 (FIG. 4) which is mounted at each lower corner of the upper sash 3. By mounting the weatherstripping in the curved troughs of such corner pieces 8, the leakage which generally accompanies any split in the weather-stripping (such as occurs at joints) is avoided.

Referring now to FIG. 3, the outside stop (blind) is shown at 9. The frame 2 includes side jambs 10. Interior stops 11 form, in conjunction with the side jambs 10, a space 12 for each of the two balance assemblies to be described hereinafter.

During the years after World War II, manufacturers of double-hung windows discarded the sash-weight balancing system previously used. In its place, they began to install several varieties of less expensive spring-loaded balances. One example of such a spring-loaded balance is a channel balance. In normal construction, such a channel balance has sheet-metal or vinyl tracks which are nailed to the side jambs of the window frame. Tabs protruding from the tracks hold the sashes up; the tabs, in turn, are supported by tension springs hidden behind the tracks.

The present invention makes use of a so-called block-and-tackle balance spring. Rather than having the balances a fixed part of a jamb liner, the balances are removably affixed to the lower sash. As the lower sash is lowered, the spring of the balance is extended. At a fixed location of the lower sash (for example at about 3 inches above its lowermost position), a bolt mounted in an attachment to the balance may be slid into a special receptacle in the interior stops, thereby fixing the spring of the balance in the extended position. This operation renders it safe to remove the lower sash from the balance and from the frame, so that both sides of the glass of the window may easily be cleaned.

Conventional sashes rely not only on the balance as a counter-weight but also relies on friction in part to support the sash and in part to reduce air leaks. In accordance with the invention the lower sash has complete freedom to move laterally, and air leaks are prevented by the provision of stripping comprehensively placed in the vertical plane. The lower sash of the invention is cammed laterally for a pressure seal. Thus the window of the invention eliminates the customary jamb liner, and the invention works a compression seal into the window. Thus the spring balance used in the invention must be a true balance and capable of supporting the weight of the lower sash. The key feature of the invention is the lateral movement of the lower sash to

4,704,821

3

provide a compression seal. There is no track for the sash itself, nor is there a track for the balance supported on the lower sash. The sash moves between the exterior and interior stops (9,11).

The details of the mechanisms associated with the balance are shown in FIGS. 5 through 9. FIG. 5 shows a receiver plate 40 and a bumper plate 41, which are affixed to the interior stop 11 (FIG. 3) within the space 12. FIG. 6 shows a block-and-tackle spring balance 30 mounted on the receiver plate 40 by means of a balance activating hook 31, all as viewed from the lower sash 4. (Consequently, in the transition from FIG. 5 to FIG. 6, the receiver plate 40 and the bumper plate 41 are effectively rotated 90 degrees, as indicated by the arrow.) FIG. 7 shows the interior mechanism of the balance 30 as viewed from the lower sash 4. FIG. 8 shows the balance 30 as viewed from the lower sash 4. FIG. 8 shows the balance 30 as viewed from the interior side of the window 1. (Consequently, in the transition from FIGS. 6 and 7 to FIG. 8, the balance 30 is effectively rotated 90 degrees, as indicated by the arrow.) FIG. 9 shows the lower sash 4 as viewed from the balance 30, upon which it is to be mounted.

Referring to FIGS. 5 through 9, the block and tackle spring balance 30 therein shown is of conventional design and has a balance-activating hook 31. In accordance with the invention, the balance 30 is modified by turning it 90 degrees from its normal use (as exemplified by the aforementioned U.S. Pat. No. 4,503,641 to Swan) and by having riveted thereto at the bottom end thereof a bottom balance shoe 32 having a bottom locating stud 33. In addition, riveted to the top end of the balance 30 is a top balance shoe 34. Said top balance shoe includes a housing 35, a sliding bolt 36, a lever 37, a spring and ball catch 38, and a top-locating stud 39.

Support for the balance 30 is provided by a receiver plate 40 of stainless steel. The receiver plate 40 and the bumper plate 41 are affixed to the interior stop 11 within the space 12 by screws 42. The receiver plate 40 includes a balance hook receiving aperture 43 and a hook connector relief aperture 44. The balance 30 is supported on the receiver plate 40 by virtue of the placement of the balance activating hook 31 in the balance hook receiving aperture 43. As in the conventional block and tackle spring balance, a cord 45 which forms part of the block and tackle is tied to an aperture in the balance hook 31 and the resultant knot or other member would press against the receiver plate 40 were it not for the provision of the hook connector relief aperture 44. During normal operation the balance 30 is connected to the lower sash 4 which maintains the spring 46 of the balance 30 under tension so that the balance hook 31 engages the balance hook receiving aperture 43, as described hereinafter. In order that the lower sash 4 may be readily removed, the receiver plate 40 also includes a bolt receiving slot 47. Prior to removal of the lower sash 4, the sliding bolt 36 is moved into the slot 47 by appropriate movement of the lever 37, and the spring and ball catch 38 grips the bolt 36 to hold it in position. In this position the balance 30 is affixed to the interior stop 11 by means of the bolt 36 and the balance hook 31.

The bumper plate 41 includes a bumper 48 against which the bottom balance shoe 32 presses when the lower sash 4 is closed, and the action of the bumper 48

4

is to move the bottom balance shoe 32 (and therefore also the sash 4) away from the interior stop 11 and towards the weather stripping 6.

The studs 33, 39 on the bottom and top balance shoes are provided in order that the lower sash 4 may be affixed to the balance 30. To this end, there are provided on the sides of the lower sash 4 a top sash shoe 49 and a bottom sash shoe 50. The bottom sash shoe 50 includes a simple vertical slot 51 adapted to engage the bottom locating stud 33. The top sash shoe 49 has an L-shaped slot 52 so that a horizontal portion 53 initially engages the top locating stud 39 and then the lower sash 4 slides downward slightly so that the top locating stud 39 engages the vertical portion 54 of the L-shaped slot 52.

During normal operation the balance 30 is connected to the lower sash 4 by means of said studs 33 and 39, and the lower sash maintains the spring 46 of the balance 30 under tension so that the balance hook 31 engages the balance hook receiving aperture 43. The balance, not the sash, travels in space 12 and carries the sash 4. In order that the lower sash 4 may be readily removed, the receiver plate 40 also includes a bolt receiving slot 47. Prior to removal of the lower sash 4, the sliding bolt 36 is moved into the slot 47 by appropriate movement of the lever 37, and the spring and ball catch 38 grips the bolt 36 to hold it in position. In this position the balance 30 is affixed to the interior stop 11 via the receiver plate 40 by means of the bolt 36 and the balance hook 31, rendering it stationary, and the lower sash 4 can be readily removed by appropriate movements which disengage slots 51 and 52 from studs 33 and 39, respectively.

Having thus described the principles of the invention, together with an illustrative embodiment thereof, it is to be understood that, although specific terms are employed, they are used in a generic and descriptive sense, and not for purposes of limitation, the scope of the invention being set forth in the following claims.

I claim:

1. A window assembly comprising a frame; an upper sash; a moveable sash assembly comprising a moveable lower sash having a first face facing said upper sash and a second face facing away from said first face, and a balance removably connected to said lower sash, said balance having means for gripping said frame, said gripping means facing away from said first face; a stop below said upper sash to support weatherstripping; continuous weatherstripping mounted in said stop; and means for moving said lower sash laterally against said weatherstripping to compress it only when the window is closed.

2. A window assembly according to claim 1, wherein said continuous weatherstripping also includes weatherstripping mounted in said upper sash.

3. A window assembly according to claim 1, wherein each said balance is a block-and-tackle spring balance.

4. A window assembly according to claim 3, wherein each said balance has associated therewith means including said gripping means for affixing said balance relative to said frame while the spring of said balance is under tension.

* * * * *

65

# United States Patent [19]

## Berndt

[11] Patent Number: **4,704,821**

[45] Date of Patent: **Nov. 10, 1987**

[54] **COMPRESSION SEALS IN A DOUBLE HUNG STYLE WINDOW**

[76] Inventor: Lawrence Berndt, P.O. Box 211, Harrington Rd., Cornish, N.H.

[21] Appl. No.: **881,912**

[22] Filed: **Jul. 3, 1986**

[51] Int. Cl.⁴ .......................... E05F 1/00; E05D 15/10
[52] U.S. Cl. ......................................... 49/446; 49/209; 49/406
[58] Field of Search ................. 49/445, 446, 406, 209

[56]     **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,108,000 | 2/1938 | Holt et al. | 49/406 X |
| 2,761,173 | 9/1956 | Dinsmore | 49/445 X |
| 3,499,248 | 3/1970 | Baer | 49/446 X |
| 4,078,336 | 3/1978 | Prosser | 49/445 |
| 4,464,864 | 8/1984 | Yackiw | 49/406 X |
| 4,503,641 | 3/1985 | Swan | 49/445 |
| 4,580,366 | 4/1986 | Hardy | 49/406 |

*Primary Examiner*—Philip C. Kannan
*Attorney, Agent, or Firm*—Henry C. Nields

[57]     **ABSTRACT**

A double-hung window includes a lower sash and balances having components which cooperate with weatherstripping on the window frame and other components to provide a compression seal when the window is closed.

**4 Claims, 9 Drawing Figures**





FIG.3

FIG.2

FIG.1

**U.S. Patent**    Nov. 10, 1987    Sheet 2 of 3    **4,704,821**

FIG.4





4,704,821

1

## COMPRESSION SEALS IN A DOUBLE HUNG STYLE WINDOW

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to windows of the so-called double-hung type, which are characterized by a frame enclosing two sashes, either or both of which are capable of vertical movement so as to open and close the window. If only the lower sash is movable, the window is strictly speaking a single-hung window. However, the term "double-hung window" usually includes such a window also. Since movement is vertical, some sort of counter weight or balance is required in conjunction with the movable sash or sashes.

2. Description of the Prior Art

The double-hung window is probably the most common of the various window types. However, because of the relatively simple technique employed for movement of the sashes, such windows rely on friction for weather tightness when the window is closed. Representative U.S. patents relating to double-hung windows include U.S. Pat. Nos. 4,503,641 to Swan; 4,570,382 to Suess; and 4,580,366 to Hardy.

### SUMMARY OF THE INVENTION

The present invention comprehends a window of the double-hung type wherein at least one of the sashes operates. The construction of the window of the invention includes mechanisms which provide a very tight compression seal when the window is closed and locked. The compression seal is accomplished by lateral movement of the sash against weather seals. In a preferred embodiment of the invention, a standard block-and-tackle spring balance is modified by riveting thereto a shoe adapted to provide lateral movement when the window is closed. However, my invention is not limited to such a block-and-tackle spring balance, but includes use of any sort of counter weight or balance, including (but not limited to) spring balances, friction balances, reel balances, rope-and-pulley balances, etc. Also, a fixture which includes a bolt mechanism for fixing the position of the balance when the sash is removed to facilitate cleaning. Each of the shoe fixtures and bolt fixtures include a stud on which the sash is removably supported.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an interior view of a complete double-hung window constructed in accordance with the invention in the closed position;

FIG. 2 is a view similar to that of FIG. 1 with the lower or movable sash removed;

FIG. 3 is a top view of a cross section of the window of FIG. 1 on an enlarged scale;

FIG. 4 is a close-up view of a corner piece which allows the continuous corner seal shown in FIG. 1; and

FIGS. 5 through 9 are a multi-view display showing the mechanisms for providing a very tight compression seal in accordance with the invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to the drawings, and first to FIGS. 1 and 2 thereof, therein is shown a "double-hung" window 1 made according to the present invention. The window 1 comprehends a window frame 2, an upper sash 3 and a lower sash 4. In the window 1 only the lower, or inner, sash 4 moves, and so, properly speaking, the window 1 is a single-hung window. The upper sash 3 is held to a blind stop (shown at 9 in FIG. 3) on the outside by screw plates or angles on the inside (not shown). A stop 5 (shown in FIG. 2) under the top (outer) sash 3 holds continuous weather seals 6 against which the bottom sash 4 presses when closed. When the window is closed, the lower sash 4 is locked in position by means of one or more conventional locks 7, each consisting of a rotatable clasp mounted on the inner sash 4 and a hook mounted on the outer sash 3. When the lock 7 is in the locked position, vertical movement of the sashes 3,4 is prevented. Moreover, in accordance with the present invention, locking the lock 7 provides a complete weather-tight seal in a manner to be described hereinafter. In FIG. 2, the lower sash 4 has been removed, and so the weatherstripping 6 in the stop 5 is shown. An important feature of the invention is the corner piece 8 (FIG. 4) which is mounted at each lower corner of the upper sash 3. By mounting the weatherstripping 6 in the curved troughs of such corner pieces 8, the leakage which generally accompanies any split in the weatherstripping (such as occurs at joints) is avoided.

Referring now to FIG. 3, the outside stop (blind) is shown at 9. The frame 2 includes side jambs 10. Interior stops 11 form, in conjunction with the side jambs 10, a space 12 for each of the two balance assemblies to be described hereinafter.

During the years after World War II, manufacturers of double-hung windows discarded the sash-weight balancing system previously used. In its place, they began to install several varieties of less expensive spring-loaded balances. One example of such a spring-loaded balance is a channel balance. In normal construction, such a channel balance has sheet-metal or vinyl tracks which are nailed to the side jambs of the window frame. Tabs protruding from the tracks hold the sashes up; the tabs, in turn, are supported by tension springs hidden behind the tracks.

The present invention makes use of a so-called block-and-tackle balance spring. Rather than having the balances a fixed part of a jamb liner, the balances are removably affixed to the lower sash. As the lower sash is lowered, the spring of the balance is extended. At a fixed location of the lower sash (for example at about 3 inches above its lowermost position), a bolt mounted in an attachment to the balance may be slid into a special receptacle in the interior stops, thereby fixing the spring of the balance in the extended position. This operation renders it safe to remove the lower sash from the balance and from the frame, so that both sides of the glass of the window may easily be cleaned.

Conventional sashes rely not only on the balance as a counter-weight but also relies on friction in part to support the sash and in part to reduce air leaks. In accordance with the invention the lower sash has complete freedom to move laterally, and air leaks are prevented by the provision of stripping comprehensively placed in the vertical plane. The lower sash of the invention is cammed laterally for a pressure seal. Thus the window of the invention eliminates the customary jamb liner, and the invention works a compression seal into the window. Thus the spring balance used in the invention must be a true balance and capable of supporting the weight of the lower sash. The key feature of the invention is the lateral movement of the lower sash to

4,704,821

3

provide a compression seal. There is no track for the sash itself, nor is there a track for the balance supported on the lower sash. The sash moves between the exterior and interior stops (9,11).

The details of the mechanisms associated with the balance are shown in FIGS. 5 through 9. FIG. 5 shows a receiver plate 40 and a bumper plate 41, which are affixed to the interior stop 11 (FIG. 3) within the space 12. FIG. 6 shows a block-and-tackle spring balance 30 mounted on the receiver plate 40 by means of a balance activating hook 31, all as viewed from the lower sash 4. (Consequently, in the transition from FIG. 5 to FIG. 6, the receiver plate 40 and the bumper plate 41 are effectively rotated 90 degrees, as indicated by the arrow.) FIG. 7 shows the interior mechanism of the balance 30 as viewed from the lower sash 4. FIG. 8 shows the balance 30 as viewed from the lower sash 4. FIG. 8 shows the balance 30 as viewed from the interior side of the window 1. (Consequently, in the transition from FIGS. 6 and 7 to FIG. 8, the balance 30 is effectively rotated 90 degrees, as indicated by the arrow.) FIG. 9 shows the lower sash 4 as viewed from the balance 30, upon which it is to be mounted.

Referring to FIGS. 5 through 9, the block and tackle spring balance 30 therein shown is of conventional design and has a balance-activating hook 31. In accordance with the invention, the balance 30 is modified by turning it 90 degrees from its normal use (as exemplified by the aforementioned U.S. Pat. No. 4,503,641 to Swan) and by having riveted thereto at the bottom end thereof a bottom balance shoe 32 having a bottom locating stud 33. In addition, riveted to the top end of the balance 30 is a top balance shoe 34. Said top balance shoe includes a housing 35, a sliding bolt 36, a lever 37, a spring and ball catch 38, and a top-locating stud 39.

Support for the balance 30 is provided by a receiver plate 40 of stainless steel. The receiver plate 40 and the bumper plate 41 are affixed to the interior stop 11 within the space 12 by screws 42. The receiver plate 40 includes a balance hook receiving aperture 43 and a hook connector relief aperture 44. The balance 30 is supported on the receiver plate 40 by virtue of the placement of the balance activating hook 31 in the balance hook receiving aperture 43. As in the conventional block and tackle spring balance, a cord 45 which forms part of the block and tackle is tied to an aperture in the balance hook 31 and the resultant knot or other member would press against the receiver plate 40 were it not for the provision of the hook connector relief aperture 44. During normal operation the balance 30 is connected to the lower sash 4 which maintains the spring 46 of the balance 30 under tension so that the balance hook 31 engages the balance hook receiving aperture 43, as described hereinafter. In order that the lower sash 4 may be readily removed, the receiver plate 40 also includes a bolt receiving slot 47. Prior to removal of the lower sash 4, the sliding bolt 36 is moved into the slot 47 by appropriate movement of the lever 37, and the spring and ball catch 38 grips the bolt 36 to hold it in position. In this position the balance 30 is affixed to the interior stop 11 by means of the bolt 36 and the balance hook 31.

The bumper plate 41 includes a bumper 48 against which the bottom balance shoe 32 presses when the lower sash 4 is closed, and the action of the bumper 48

4

is to move the bottom balance shoe 32 (and therefore also the sash 4) away from the interior stop 11 and towards the weather stripping 6.

The studs 33, 39 on the bottom and top balance shoes are provided in order that the lower sash 4 may be affixed to the balance 30. To this end, there are provided on the sides of the lower sash 4 a top sash shoe 49 and a bottom sash shoe 50. The bottom sash shoe 50 includes a simple vertical slot 51 adapted to engage the bottom locating stud 33. The top sash shoe 49 has an L-shaped slot 52 so that a horizontal portion 53 initially engages the top locating stud 39 and then the lower sash 4 slides downward slightly so that the top locating stud 39 engages the vertical portion 54 of the L-shaped slot 52.

During normal operation the balance 30 is connected to the lower sash 4 by means of said studs 33 and 39, and the lower sash maintains the spring 46 of the balance 30 under tension so that the balance hook 31 engages the balance hook receiving aperture 43. The balance, not the sash, travels in space 12 and carries the sash 4. In order that the lower sash 4 may be readily removed, the receiver plate 40 also includes a bolt receiving slot 47. Prior to removal of the lower sash 4, the sliding bolt 36 is moved into the slot 47 by appropriate movement of the lever 37, and the spring and ball catch 38 grips the bolt 36 to hold it in position. In this position the balance 30 is affixed to the interior stop 11 via the receiver plate 40 by means of the bolt 36 and the balance hook 31, rendering it stationary, and the lower sash 4 can be readily removed by appropriate movements which disengage slots 51 and 52 from studs 33 and 39, respectively.

Having thus described the principles of the invention, together with an illustrative embodiment thereof, it is to be understood that, although specific terms are employed, they are used in a generic and descriptive sense, and not for purposes of limitation, the scope of the invention being set forth in the following claims.

I claim:

1. A window assembly comprising a frame; an upper sash; a moveable sash assembly comprising a moveable lower sash having a first face facing said upper sash and a second face facing away from said first face, and a balance removably connected to said lower sash, said balance having means for gripping said frame, said gripping means facing away from said first face; a stop below said upper sash to support weatherstripping; continuous weatherstripping mounted in said stop; and means for moving said lower sash laterally against said weatherstripping to compress it only when the window is closed.

2. A window assembly according to claim 1, wherein said continuous weatherstripping also includes weatherstripping mounted in said upper sash.

3. A window assembly according to claim 1, wherein each said balance is a block-and-tackle spring balance.

4. A window assembly according to claim 3, wherein each said balance has associated therewith means including said gripping means for affixing said balance relative to said frame while the spring of said balance is under tension.

* * * * *

65

# EXHIBIT 24

# United States Patent [19]

**Fitzgibbon**

[11] **4,089,085**

[45] **May 16, 1978**

[54] **SASH BALANCES AND COMPONENTS THEREOF**

[75] Inventor: **Jack R. Fitzgibbon**, Sioux Falls, S. Dak.

[73] Assignee: **Balance Systems, Inc.**, Sioux Falls, S. Dak.

[21] Appl. No.: **781,976**

[22] Filed: **Mar. 28, 1977**

[51] Int. Cl.$^2$ ............................................. E05D 17/00
[52] U.S. Cl. ................................... 16/197; 16/211; 16/213; 74/230.01
[58] Field of Search ................ 16/197, 198, 210, 215, 16/211, 213, DIG. 31; 49/445, 446; 254/188, 189; 74/230.01, 230.3, 230.05

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 126,019 | 4/1872 | Clark | 16/211 |
| 253,005 | 1/1882 | Clark | 16/211 |
| 347,508 | 8/1886 | Phillips | 16/211 |
| 3,055,044 | 9/1962 | Dinsmore | 16/197 |
| 3,358,403 | 12/1967 | Dinsmore | 16/197 X |
| 3,440,683 | 4/1969 | Wood | 16/197 |
| 3,651,704 | 3/1972 | Chapman et al. | 74/230.01 |
| 4,034,616 | 7/1977 | Rauscher | 74/230.05 |

**FOREIGN PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 20,173 of | 1895 | United Kingdom | 16/213 |

Primary Examiner—James Kee Chi

Attorney, Agent, or Firm—James T. FitzGibbon

[57] **ABSTRACT**

An improved window sash balance and components thereof. The balance includes a spring fixed with respect to the frame and a pair of pulley blocks, each containing one or more pulleys. One block is fixed with respect to the frame and the other is disposed on the end of the spring. A cord is secured to one pulley block and trained over the pulleys. The other end of the cord terminates in a hook adapted to be received in an opening in the window jamb channel. The pulley block unit includes a pulley-receiving frame, one, two or three pulleys received therein, and at least one axle for rotatably supporting the pulleys within the frame. The block has one or more pulley-receiving openings therein, and suitable openings for reception and positioning of the axle. The block includes first and second pairs of assembly reference surfaces forming a part of the block and spaced radially from the axle opening. The axle-receiving opening in the pulley and in the block each include outwardly tapering guide or pilot surfaces and the axle includes one or two inwardly tapering pilot surfaces. The size of the pulley and the positioning of the reference surfaces are arranged so that when an outer edge of the pulley is in coplanar alignment with the reference surface, the tapering margins on the axle and the pulley will engage and serve to align the pulley as positioned in the block.

**17 Claims, 8 Drawing Figures**



C 003852

Case 1:05-cv-10020-DPW    Document 79-19    Filed 05/19/2006    Page 3 of 50



*FIG.-1.*

*FIG.-2.*

*FIG.-3.*

*FIG.-4.*

C 003853



1

...ALANCES AND COMPONENTS THEREOF

## ...ACKGROUND OF THE INVENTION

...The present invention relates generally to window
...ash balances, and more particularly, to window sash
...balances having improved components and subassem-
...blies forming parts thereof.

The invention provides components which are
adapted for more economical and rapid manufacture,
simplified assembly, and greater reliability in use. The
components provided by the invention also have other
desirable characteristics, including ease of positioning
for installation.

Substantially all windows which open vertically,
including both so-called single-hung and double-hung
windows, use a balance apparatus of some sort to insure
that the window sash will remain in the position in
which it is placed by the person manipulating it. While
certain low cost window assemblies rely only on fric-
tion to maintain the sash in a desired position, the better
window assemblies include a balance for this purpose.
The balance serves to reduce the effort required to open
and close the window, and to move it to a desired posi-
tion where it will remain supported by the balance.

A number of different types of window balance sys-
tems are currently in use, including older systems rely-
ing merely on counterbalance weights affixed to the
ends of chains or ropes and trained over stationary
pulleys. However, with the advent of modern original
equipment and so-called replacement windows, there
has been a demand for windows which contain high
quality balances and which are also capable of ready
removal, either partial or complete, from the accompa-
nying window jambs. For example, many windows of
today are able to be tilted out of the jamb channels in
which they are received for purposes of cleaning. Still
other windows are able to be totally removed by a
variety of different mechanisms.

Windows of this type must rely on balances which
are substantially self-contained. Balances which are
suitable for windows of this type tend to become more
sophisticated in construction, and have been character-
ized by the imposition of more exacting standards. In
the meantime, there has been a demand for window sash
balances and components which are able to be manufac-
tured easily, and which are highly reliable and long
lasting in use. Some known window sash balances pro-
vide a number of advantages, but these balances include
block and tackle or pulley block assemblies which must
undesirably be made individually for each set of bal-
ances. In such constructions, a pulley block is literally
formed around the pulleys after the pulleys are posi-
tioned in a machine or the like.

In such constructions, the axles supporting the pul-
leys are staked or riveted in position after a metal hous-
ing is formed and wrapped around one or more pulleys
in an operator-controlled machine operation. In such a
case, the assembly of pulley blocks or sheaves has re-
quired the attention of an individual operator in each
stage of manufacture, and accordingly, such designs are
not readily subject to automated manufacture.

In addition, other pulley block assemblies of this type
are, because of their method of manufacture, made from
aluminum or steel. In such cases the possibility of unde-
sirably high friction levels existing between the side
plates of the pulley blocks and the balance frame chan-
nel constitutes a drawback of the balance assembly.

2

This is particularly true because, where a coil type
spring is used, there must be minimal working clear-
ances between the sides of the pulley block and the
interior surfaces of the frame channel to avoid undesir-
able torsional rotation of the block assembly.

In certain cases, the balance is called upon to support
considerable weight, and this in turn calls for pulley
supporting axles of significant diameter. As the diame-
ter of the pulley supporting axles increases, the ability to
form riveted or flatened heads on the axles easily and at
low cost is diminished.

Because balance assemblies of the type with which
the invention is concerned are sometimes utilized in
unusual positions, or are assembled differently for spe-
cial purposes, it is also desirable to have a pulley block
which is symmetrical in one or more planes, and in
which, therefore, either end may be used interchange-
ably. It is also desirable that the surfaces made in form-
ing the balance pulley block not present sharp corners
or radii which limit the ability of the balance to receive
a cord or other unit, inasmuch as such sharp edges
subject the cord to wear by fraying or the like.

In view of the foregoing and other drawbacks and
disadvantages of known types of window sash balances
and components thereof, it is an object of the present
invention to provide an improved sash balance.

A further object is to provide a sash balance which
includes a pulley block component having a number of
desirable advantages and characteristics.

Another object is to provide a pulley block assembly
for a block and tackle type window balance in which
the block itself may be manufactured in a single, rela-
tively simple, high production operation, such as by
injection molding the same from a moldable resinous
material.

Another object is to provide a sash blance which
includes components thereof which are readily adapted
for automated or semi-automated assembly.

Still another object is to provide a pulley block for a
window sash balance unit wherein the block contains
certain reference surfaces which enable the pulleys to
be positioned in a desirable position in the block without
sacrifice of the working clearances needed for operation
of the blance.

A still further object is to provide a unitary block
assembly which is adapted to receive a set of two pul-
leys in one portion thereof and a single pulley in another
portion thereof, and which includes guide surfaces
adapted to facilitate positioning of pulleys within the
block prior to assembly.

Yet another object of the invention is to provide a
block and tackle assembly which includes specially
designed pulleys adapted for easy, economical position-
ing within a pulley block.

Another object is to provide a block and tackle as-
sembly in which the pulleys include beveled or tapered
axle-receiving portions and in which the axles include
beveled or tapered end portions, both tapers thus pro-
viding pilot diameters to aid in assembly of the unit as a
whole.

A still further object is to provide a pulley block unit
for a sash balance assembly which includes a tapered
pilot or guiding surfaces to assist positioning the axle
within the pulley block during assembly thereof.

A still further object is to provide a window sash
block and tackle assembly which includes a pulley
block having additional guide surfaces for aligning the
hook or other cord attachment means so as to position

3
4

the same for easy reception by a slot in the jamb channel of the window assembly.

A still further object of the invention is to provide a one piece, pre-formed pulley block assembly which includes assembly reference surfaces and guide members positioned so as to add strength to the assembled pulley block, and to provide clearance for the cords or tackel used to support the block and the pulleys received therein without interfering therewith in use.

A still further object is to provide a pulley block assembly which is capable of achieving the foregoing and other advantages in use, and which uses the minimum material required consistent with possessing the requisite strength.

Another object of the invention is to provide a pulley block assembly which uses large diameter axle units which are readily positioned and assembled, and which include pilot surfaces arranged so that the axles may be inserted into the block from either side thereof.

A still further object is to provide a pulley block assembly which is symmetrical for purposes of installation along one or more planes, but which still retains characteristic end portions for proper assembly.

The foregoing and other objects and advantages of the invention are achieved in practice by providing a pulley block assembly which includes a frame and surfaces defining a pulley-receiving slot therein, a pulley receivable in the slot, and an axle adapted to extend through an opening in the sidewalls of the block and to support and position the pulley therein, with such units including assembly reference or guide surfaces and various tapers or bevels adapted to permit positioning of the parts for assembly merely by placing them in the desired position against a reference surface and inserting the axle through the opening provided.

The invention is also carried into practice by providing a pulley block assembly which includes guide surfaces for directing the pulley into the pulley-receiving opening, and which may further include surfaces for positioning the hook by reason of engagement between a portion of the guide surfaces and one side of the hook when the balance assembly is positioned for installation.

The manner in which the foregoing objects and advantages of the invention are carried into practice will become more clearly apparent when reference is made to the following detailed description of the preferred embodiments of the invention set forth by way of example and shown in the accompanying drawings, in which like reference numerals indicate corresponding parts throughout.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side view, partly in elevation and partly in section, showing a portion of a window sash and a window jamb, with a balance embodying the improved components of the invention shown disposed between the jamb and the sash, and showing the window sash in the lowered position;

FIG. 2 is a front elevational view of the sash balance of the invention, taken along lines 2—2 of FIG. 1;

FIG. 3 is an enlarged front elevational view, with portions broken away, showing an assembled form of the movable pulley block made according to the invention;

FIG. 4 is a side elevational view of the pulley block assembly of FIG. 3;

FIG. 5 is an enlarged front elevational view of a preferred form of stationary pulley block of the invention, showing a larger single pulley received in one opening thereof and a pair of smaller pulleys received in the other opening therefor;

FIG. 6 is a side elevational view of the pulley block of FIG. 5, additionally showing the cord trained over the pulleys and showing the jamb-engaging hook positioned for ready installation;

FIG. 7 is a vertical sectional view, taken along the line 7—7 of FIG. 5, and showing portions of the interior of the pulley block of FIG. 5; and

FIG. 8 is a perspective exploded view, showing the manner of assembly of the pulley block of the invention and showing the manner in which the pulleys are inserted into the pulley-receiving openings with the help of the guide surfaces, and showing the manner of inserting the axles in their openings to secure the pulleys in place within the pulley block.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS OF THE INVENTION

While it will be understood that the principles of the invention are applicable to forms of sash balances other than those shown herein, a description of the preferred form of the invention will be given with respect to a sash balance assembly used with a vertically movable window which is positioned for vertical movement within a channel formed in the jamb structure, and in which the sash balance assembly includes a frame in the form of a channel, a coil spring unit supporting a first or movable pulley block, a second pulley block fixed to one end of the channel frame, and a cord trained over the pulleys. The cord terminates at one end thereof in a hook which is adapted to be secured over a holder in the jamb channel, and at the other end thereof in an opening in the movable pulley block.

Referring now generally to FIG. 1, it will be understood that there is shown only the right hand frame portion of a window assembly, namely, a part of the jamb and a part of the sash, without showing the window pane. A mirror image left hand counterpart of these elements exists on the opposite side of the window, so that the window sash moves in identical jamb channels and is supported by two identical but oppositely directed balance units.

Referring now to the drawings in greater detail, FIG. 1 shows the invention to be embodied in an improved sash greater unit generally designated 20, and shown to be installed in place between a right hand wooden member 22 forming a portion of the window jamb and a left hand wooden member comprising a window sash 24. In use, the balance assembly 20 is disposed in a kerf or cut-out portion generally designated 26 within the sash 24, while the window sash 24 as a whole reciprocates within a channel in the jamb 24 of the window assembly. Thus, it will be seen that the surface 28 shown on the jamb 22 is actually the bottom surface of the channel which serves to locate and establish the plane of movement of the window sash 24 within the window assembly as a whole. As far as placement is concerned, the improved balance of the present invention functions in the same way as prior art balance assemblies.

Referring now to the balance unit 20 in more detail, the balance will be seen to include balance frame means in the form of a channel generally designated 30 and shown to include a bottom or bight portion 32, and a pair of opposed sidewalls 34. Means in the form of an upper profiled sash-attaching fixture generally designated 36 is provided for aid in locking the balance to the

C 003856

4,089,085

jamb when the window sash is removed. The removal fixture 36 is shown to be attached to the frame 30 by fastening means in the form of a rivet 38 extending between the sidewalls 34 of the frame 30. A lower counterpart fixture 40, secured by a rivet 42, is shown to be affixed to the lower end of the frame or channel 30, with such fixture having the normal purpose of centering the window sash with respect to the balances.

FIG. 1 also shows that a small recess 44 is provided in the jamb, and that a hook supporting pin 46 extends transversely across the recess to receive the bight portion 48 of a balance cord hook 50.

As is further shown in FIG. 1, a knot 52 in one end of the balance cord 54 secures the cord to the hook 50. The cord 54 extends downwardly and is trained over the pulleys in the lower or fixed pulley-receiving block 56, and then extends upwardly where the other end 58 thereof is secured as by a knot 60, into an opening 62 in the upper or movable pulley block 64. The upper block 64 includes a nose portion 66 through which a lower hooked end 68 of the balance spring 70 extends. The upper or fixed end 72 of the balance spring 70 extends between opposed sidewall portions 34 of the channel 30 and rests on a support pin 73. Lower pulley block holding means in the form of a pin 76 extends through the openings 78 in the lower or fixed pulley block 56, thus securing it firmly to the sidewalls 34 of the channel 30.

Referring now to the operation of the elements of the block and tackle balance, it can be understood with reference to FIGS. 1 and 2 that, with the sash 24 in a lowered position, and the hook 50 in a relatively raised position, the upper or movable pulley block 64 has been pulled downwardly into a position closely adjacent that of the lower pulley block 66, thus extending and tensioning the spring 70. When the window sash 24 is raised, the channel 30 and the elements associated therewith, including the fixed lower pulley block 56, move upwardly, thus shortening the extent of the cord 54 which lies outside the pulley block 56. This, in turn, allows the spring to shorten or relax.

Accordingly, it will be understood that when the sash and balance are installed within the window jamb channel, alternate upward and downward movement of the window sash causes the spring 70 to be tensioned and relaxed and causes the movable pulley block 64 to move upwardly and downwardly with respect to the channel 30, while the lower pulley block 56, the upper spring anchor 74, and the pin 76, all remain fixed with respect to the frame channel 30 of the balance 20.

Referring now in detail to FIGS. 3 and 4, there is shown the construction of the upper or movable pulley block 64 which, in the illustrated orientating is shown to include an upper or nose portion 80 and a lower or tail portion 82, each including a transversely extending opening 84, 86 for receiving respectively the lower hook 68 on the spring 70 and the other end of cord 54. The pulley block 64 includes a frame generally designated 88, and is shown to include a pair of sidewalls 90, 92 spaced apart and defining therebetween an opening 94 in which are received left and right hand pulleys 96, 98. The opening 94 is partially defined by a pair of end walls 100, which are contoured with circular reentrants to accommodate the cord, and partially by a pair of opposed sidewalls 102.

The pulley-receiving 94 opening also includes beveled end surfaces 104 which join with the end walls 100 and tapered side surfaces 106, which blend into the sidewalls 102.

The outer portion of the block 64 is partially defined by the exterior sidewall surfaces 108 which are parallel to each other and which form the maximum width portion of the block 64. Referring particularly to FIG. 4, it will be noted that pairs of upper and lower tapered reinforcing webs 110 are provided to add stiffness in bending as well as tension to the nose and tail portions 80, 82 of the movable pulley block 64.

In addition to the elements just described, it will be noted that the sidewalls 92 include raised elements generally designated 112 which serve, in a manner to be described in detail later, as assembly reference surfaces for assembly of the pulleys 96, 98. These raised elements 112 also include tapered or beveled inner margins 114 which join the surfaces 106 and which, as will be described in detail, serve to guide the pulleys 96, 98 during insertion thereof into the pulley-receiving opening 94 of the block 64.

Referring now to FIG. 5, there is shown a double pulley block generally designated 56, and shown to include first and second pulley-receiving openings 116, 118, each defined by a plurality of inner end walls 120, some of which include reentrants 122 providing a working clearance for the balance cord. A pair of smaller pulleys 124 are disposed in the upper pulley-receiving opening 118 and a single, larger diameter pulley 125 is disposed in the other opening 116. The parallel exterior sidewall surfaces 126 partially define the sidewall 128, the interior surfaces 130 of which in turn partially define the pulley-receiving openings 116, 118. Opposed parallel pairs of elements 132 are provided adjacent the openings 116, 118, and these elements 132 include downwardly and inwardly beveled guide surfaces 134. In the case of the pair of raised elements 132 shown as the lower pair in FIGS. 5-7, it will be noted that the lower end portions thereof terminate in relatively squared-off shoulders 136, for purposes which will be described later.

FIGS. 5-7 show the opening 78 for receiving the pin 76 (FIG. 1) which holds the block 56 in place within the channel 30. When the block is assembled with the pulleys in place therein, it will be seen that the axles 140 extend through the openings 142 in the block 56, and will retain the pulleys in their desired positions therein.

Referring now to FIG. 8, a very important feature of the invention is shown, namely, the greatly simplified manner of assembly of the pulley blocks of the invention. FIG. 8 shows the pair of pulleys 124 of smaller diameter to be positioned above the opening 118, and the larger diameter pulley 125 to be disposed above the single opening 116. Each pulley includes circumferentially extending edge portions generally designated 114, and each pulley 124 also includes an axially extending, axle-receiving opening or bore 146 centrally disposed therein. A beveled surface 148 provides an enlarged diameter lead-in or pilot surface for each pulley 124.

FIG. 8 also shows the orientation of the axles 140 and shows each axle to include a principal or outer diameter surface 150, and an end face portion 156 of a reduced or pilot diameter and shows a taper or bevel 158 extending between the end 156 and outer diameter surface 150.

As is also shown in FIG. 8, a pair of axially extending, axle-receiving sidewall openings 142 are provided, and each opening 142 includes a beveled or tapered surface 160 terminating in an enlarged outer diameter 162.

Referring now to the block 56 itself, the various guide surfaces on the raised elements 132 may be seen, and it will also be appreciated that each element 132 includes

C 003857

4,089,085

8

faces spaced farthest apart from the opening 142 and generally designated 164. These surfaces serve as reference surfaces for assembly in a manner which will now be described.

Bearing in mind that the pulley block of the invention is intended to be adapted for mass production assembly, it will be assumed that the block has been placed in the position shown in FIG. 8 and is resting on a flat surface. Any flat surface thus will extend between those assembly references 132 lying in a common plane, it being understood that the upwardly extending surfaces shown in FIG. 8 have identical counterparts extending on the other side of the block 56, as shown in FIGS. 6 and 7, for example. Inasmuch as the diameter of each of the sets of pulleys 124, 125 is just larger than the distance between opposed pairs of reference surfaces 132, the pulleys, when inserted along the axis shown by the dotted line in FIG. 8, will rest slightly above a vertically centered position with respect to the block.

However, according to the invention, the axles 140, when inserted so as to extend through the axle-receiving openings 142 in the block 56, will have the beveled surfaces 158 thereon engage the counterpart bevel surfaces 148 on the axle-receiving openings 146 on the pulleys. This will cause the pulleys to move relatively downward, or the block 56 to move relatively upward, although the amount of movement will be very slight. The distance will be no greater than the sum of the radial extent of each of the two beveled surfaces. It will also be noted by reference to FIG. 5, that there is also a slight but definite clearance between the end walls 120 of the pulley-receiving openings 116, 118, and that the pulleys, when so received will also inherently be guided from left to right, if necessary, by mutual engagement between the tapers or beveled lead-ins extending between the respective pilot diameters of the parts to be assembled. Consequently, the pulleys are self-centering and self-aligning within the cavity, except to an intentionally small degree, and the slight degree of misalignment is overcome by the provision of the beveled surfaces used for piloting the axle into the pulley and for centering the pulleys within the block 56.

Referring now to another feature of the invention, the downwardly and inwardly extending beveled surfaces on the pulley blocks themselves serve to create, in effect, a funnel or series of guides which insure that the pulleys will find their respective ways into the pulley-receiving openings even though there might be slight misalignment between the holding and indexing means (not shown) from which they are dropped into the pulley block itself. These reference guide surfaces serve not only to facilitate hand assembly, but also automated assembly, inasmuch as the pulleys are guided by gravity and these surfaces into their desired positions of assembly.

A further feature of the invention resides in providing, in the sidewalls 108 or 126, the countersunk, beveled or tapered margins 160 leading into the axle-receiving openings 142 in the pulley block 56. In automated assembly, assuming that the block 56 is being indexed to a predetermined position along an assembly line and subsequently moved longitudinally thereof, and assuming that the axles are pushed into the pulley block in the direction shown by the phantom lines in FIG. 8, it will be understood that these bevels permit minor degrees of axle-to-block misalignment to be tolerated, and that the same self-centering action is provided which is present with respect to the axles and the pulleys. With the vari-

ous sets of beveled or tapered pilot or guide surfaces, the block may be thus assembled by inserting the axles into the pulley block a predetermined axial distance less than that required to engage the pulleys, subsequently inserting the pulleys in the openings, and thereafter pushing the axles until the faces 160 thereof are flush with the surface 126 of the block 56.

On the other hand, the pulleys and the axles may be inserted at the same station, or the pulleys may be inserted first and the block with the pulleys therein indexed to the axle inserting station. The order of assembly is not important; however, the design is intended to possess the advantages of versatility which reside in optional assembly procedures.

It will also be noted that the pulleys are symmetrical, that the axles are symmetrical, that all the axles and openings therefor are preferably of the same size, with the axles being a light press fit and the housing or block 56 and a slightly looser fit within the pulleys. In a preferred embodiment of the invention, the different size pulleys 124, 125 are color coded so as to facilitate assembly. The single-opening pulley block 64 may move in either direction during assembly, inasmuch as it contains an imaginary vertically extending plane of symmetry in the orientation shown in FIG. 8. The block may also be turned upside down without losing its orientation, and the axles may be inserted from either the right or the left. The double form of block may be inverted, but all blocks of this type must maintain a head-to-tail orientation if the pulleys are fed automatically, because the pulleys are fed singly for opening 116 and in pairs for opening 118.

While the advantages of the pulley block of the invention are best realized by disposing the block 56 in a horizontal position as shown in FIG. 8 prior to assembly, the reference surfaces 132 are arranged in respect to the pulley block body so that a vertically extending wall may also serve as the surface extending coplanar with the outermost edges of these surfaces. Other orientations may be also used, if desired, and the advantages of the invention reside not so much in the preferred orientation of the block upon assembly, but upon the cooperative arrangement of the surfaces and their dispositions so that any object providing a rest or extending plane will serve to orient the pulleys when such an object is placed in contact with the assembly reference surfaces 132, or surfaces 112 in the case of the block 64.

Referring now to FIGS. 6 and 7, the pair of shoulders 136 are shown to be provided for an additionally advantageous function. When the cord 54 is reeved or trained around the pulleys or sheaves, normally by a hand feeding operation, one end thereof is tied through an opening in the movable pulley and the other end is tied, as by a knot 52, to an opening in the shank 51 of the hook 50.

When the balance assembly is ready to be installed, a certain preload is applied to the hook 50 inasmuch as the spring is initially tensioned to a slight extent during manufacture. Consequently, the end of the cord 54 tends to pull the base portion 53 of the hook towards the block 56.

By disposing the shoulders just above the exit point of the cord, as shown in FIG. 6, the hook may be held in the position of FIG. 6 by reason of the tension on the cord, with an intermediate portion of the hook resting against the shoulder 136 and the base 53 of the hook 50 resting against a rounded corner 180 of the block 56. This positions the hook with the nose portion 55 thereof extending outwardly.

C 003858

4,089,085

10

As a consequence, when assembling the window sash and balance combination with the jamb, the hook extends outwardly so as to extend initially into the recess 44 for engagement with the pin 46, against which it will exert a force when the window is raised. It will be understood that the window may be typically installed by inserting it, while raised, into the jamb channel and, as the window is lowered, the hook 50 engages the pin 46 as just described, after which when the window is further lowered to its normally closed position. This withdraws the cord to the maximum extent and tensions the spring 70 to the greatest extent.

In the embodiment shown, the cord extends downwardly over one of the uppermost pulleys 124 in the lower block 56, then up and over one of the pulleys 96 in the movable block 64, thence downwardly over the second upper pulley 124 in the lower block, again upwardly over the second pulley 98 in the upper block 64, then downwardly again and around the lower pulley 125 in the lower block 56, then upwardly and out of the frame and toward the supporting pin 46. Accordingly, in a balance which is rigged as shown in FIGS. 1 and 2, five strands are disposed so as to support the movable pulley, and this arrangement provides a mechanical advantage of five to one. While such a feature is not novel per se, a preferred type of balance having a mechanical advantage of four or five to one is advantageous inasmuch as it permits a relatively compact, high rate spring to be used with a long cord; the spring moves only one-fifth or one-fourth as much as the cord moves. This provides a good range of forces for supporting the window throughout a long range of vertical movement. Tranining the cords over a number of pulleys involves a certain frictional loss which is used to advantage, because friction serves to permit the window to remain in any desired position rather than in a single position at which exact balance is achieved.

Referring now to another advantage of the invention, the provision of the guides 132 having the edge portions 132 which serve to position the pulleys during assembly also serve to increase the cross section of the block in the area of the axle openings, thus providing increased strength without loss of material. The upper end of the lower pulley block 56 and the lower end of the movable or upper pulley block 64 are of a reduced extent with respect to the ribbed portions of the block; this provides clearance for the cords so that they do not rub against an end portion of the pulley block. Bearing in mind that the upper block shown in FIGS. 3 and 4 is reversible, both ends are of a reduced extent in relation to the ribs provided for assembly reference and strength.

In the use of the present invention, block and tackle assemblies have been provided which have been shown to tolerate a greater range of loads, to last longer and, very importantly, to be very economical to assemble and to permit assembly by semi-automated or automated techniques. According to the invention, pulley blocks of the type shown herein may be assembled with one-fifth to one-tenth the amount of labor required to assemble prior art pulley block assemblies.

While the type of material used does not constitute a part of the invention which is novel per se, excellent results have been obtained by molding the pulleys from polyamide material such as nylon or an acetal plastic such as "Delrin", and forming the pulley blocks from a reinforced resinous material such as a glass filed nylon (polyamide) resin. The relatively enlarged axles are fitted into the pulleys with only a slight working clearance, and the increased bearing surface provided thereby adds strength, reliability and smoothness in respect to prior art designs utilizing axles which were made as small as possible for ease of staking or riveting.

FIGS. 1 and 2 show the presence of an upper removal fixture 36 and a counterpart lower or centering fixture 40. FIG. 1 shows that both the sash and the jamb are made from wood. However, it will be understood that the fixtures 36 and 40 are shown merely to illustrate the existence of typical accessory hardware which is sometimes used with balances of the invention. The elements shown are not needed for use with the improved balance of the invention, although they are useful therewith, as are other types of accessory hardware. Such hardware is commonly used to provide ready sash removal, either partial or complete, or to provide other functions. Accordingly, it will be understood that the balance of the invention is useful with accessory hardware but is also useful without such hardware.

The illustration of the use of wood is also made merely for purpose of convenience. It is well known to those skilled in the art that a larger variety of window types exist, and these include not only wood windows, but also aluminum windows, coated aluminum windows, steel windows, or windows made from any of the above materials, with or without plastic or other additional materials. The balance of the invention does not depend on what type of windows with which it is used for its utility. However, because of the great versatility the balance of the invention, a single balance design is useful with a large variety of windows, and a very large variety of applications can be served by merely changing the length of balance cord, the length and size of the spring, and the length and crosssectional area of the balance frame or jamb.

It will thus be seen that the present invention provides a novel block and tackle type balance assembly and components thereof having a number of advantages and characteristics including those hereinbefore pointed out and others which are inherent in the invention.

A preferred embodiment of the invention having been described by way of example, it is anticipated that modifications and changes to the type of assembly shown may be made without departing from the spirit of the invention or the scope of the appended claims.

I claim:

1. A pulley block unit adapted for increased ease of assembly and for cooperation, in the assembled state thereof, with a force exerting element to form a window sash balance assembly, said pulley block unit including a pulley-receiving frame, at least one pulley receivable therein, and at least one axle for rotatably supporting said pulley within said frame, said frame having a pair of side walls with exterior wall surfaces and a pulley-receiving opening extending transversely through said pulley block unit and being defined by inner side and end wall surfaces, said inner wall surfaces being joined to first and second pairs of assembly reference surfaces which are spaced apart from each other by the transverse extent of said pulley-receiving opening, an axle-receiving opening disposed in and extending through said side walls and into said pulley-receiving opening, said axle-receiving opening being disposed generally centrally between said pairs of assembly reference surfaces, said pulley having a given diameter and having circumferentially extending outer edge portions and an axle-receiving opening extending therethrough generally centrally thereof, said axle-receiving opening in

11 12

pulley including a main diameter portion and an enlarged pilot diameter portion joined to said main diameter portion by a tapering margin extending between said diameters, said axle including a main diameter portion and a reduced pilot diameter portion joined to said main diameter by a tapering margin, said axle and pulley margins, said given pulley diameter, said extent between said pairs of assembly reference surfaces and the distance between said end wall surfaces of said pulley-receiving opening being sized, constructed and arranged so that when said pulley is positioned in said pulley-receiving opening, with said outer edge of said pulley in substantially coplanar alignment with one of said pairs of assembly reference surfaces, said tapering margins on said axle and said pulley will mutually engage each other upon movement of said axle through said side wall and into said pulley-receiving opening and said axle-receiving opening in said pulley, respectively.

2. A pulley block unit as defined in claim 1 which includes two substantially identical pulleys disposed within said pulley-receiving opening, said pulleys being axially aligned and received in use over a common axle.

3. A pulley block unit as defined in claim 1 in which two pulley-receiving openings are provided, with a single axle-receiving opening being provided for said pulley-receiving opening.

4. A pulley block unit as defined in claim 1 which includes two pulley-receiving openings, each opening having its own axle-receiving opening, with a pair of said pulleys being received in one of said openings and a single pulley received in the other opening, said pair of pulleys being received over one of said axles and said single pulley being received over another of said axles.

5. A pulley block as defined in claim 1 in which said inner side wall surfaces defining said pulley-receiving opening include, at the outer ends thereof, tapered guide surfaces tapering outwardly towards said exterior wall surfaces.

6. A pulley block unit as defined in claim 1 in which said inner end wall surfaces defining said pulley-receiving opening further include guide surfaces at the outer ends thereof, tapering outwardly from said side walls.

7. A pulley block assembly as defined in claim 1 in which said frame includes pairs of longitudinally extending ribs disposed radially outwardly of said axle-receiving openings, and wherein said assembly reference surfaces comprise outer edge portions of said ribs.

8. A pulley block assembly as defined in claim 1 in which said frame includes pairs of longitudinally extending reinforcing ribs, said assembly reference surfaces comprising the outermost edge portions of said ribs, said ribs further including, on the inner surfaces thereof, pairs of guide surfaces tapering toward each other and toward said axle-receiving openings, whereby a pulley directed toward said opening will be guided toward said pulley-receiving opening by engagement between the periphery of said pulley and said tapered surfaces.

9. A pulley block unit adapted for increased ease of assembly and for cooperation, in the assembled state thereof, with a force exerting element to form a window sash balance assembly, said pulley block unit including a pulley-receiving frame, at least one pulley receivable therein, and at least one axle for rotatably supporting said pulley within said frame, said frame having means defining at least one pulley-receiving opening in said block, at least one opening in said block for reception

and positioning of said axle so that said axle extends through said pulley-receiving opening, first and second pairs of assembly reference surfaces forming a part of said block and spaced radially from said axle opening, said pulley having a given diameter, an outer edge and an axle-receiving opening therein, said opening in said pulley including an outwardly tapering margin, and said axle including an inwardly tapering margin, said axle and pulley margins, said given pulley diameter, and said pairs of assembly reference surfaces being sized, constructed and arranged so that when said pulley is positioned in said pulley-receiving opening, and said outer edge of said pulley is in substantially coplanar alignment with one of said pairs of assembly reference surfaces, said tapering margins on said axle and said pulley will mutually engage each other upon movement of said axle into said pulley-receiving opening and into said axle-receiving opening in said pulley respectively.

10. A pulley block unit as defined in claim 9 which includes two pulley-receiving openings, with each such opening having its own axle-receiving opening, and a pair of said pulleys being received in one of said pulley-receiving openings and a single pulley received in the other of said pulley-receiving openings, said pair of pulleys being received over one of said axles and said single pulley being received over another of said axles.

11. A pulley block unit as defined in claim 9 in which said means defining said pulley-receiving opening include guide surfaces tapering inwardly toward said pulley-receiving opening and adapted to engage outer edge portions of said pulley during insertion thereof into said pulley-receiving opening.

12. A pulley block unit as defined in claim 9 in which said axle-receiving opening in said pulley block frame includes outer guide surfaces which taper toward an enlarged outer diameter, said tapered guide surfaces being adapted for guiding engagement with said tapering margin on said axle during insertion of said axle into said frame.

13. A pulley block unit as defined in claim 9 in which said frame includes pairs of ribs extending parallel to the side surfaces of said pulley, and in which said assembly reference surfaces comprise a portion of the outer edges of said ribs.

14. A pulley block unit as defined in claim 9 in which said assembly reference surfaces comprise pairs of ribs forming squared-off shoulders at one end of said ribs, said shoulders lying adjacent an end of said pulley-receiving opening and being adapted to engage a portion of a sash cord hook so as to position said hook in an outwardly inclined orientation in relation to said pulley frame.

15. A window sash balance assembly comprising, in combination, a sash balance frame, spring means received within said frame, with one end of said spring means being fixed in relation to said frame, a pair of pulley block assemblies disposed within said balance frame, with each pulley block assembly including a frame portion, at least one pulley and at least one axle supporting said pulley for rotation, one of said pulley block assemblies being fixed with respect to said frame and the other being a movable pulley block assembly and having said frame portion thereof affixed to the other end of said spring means, an extensible and retractable balance cord having one end thereof fixed to one of said pulley block frame portion, the other end thereof terminating in means for engaging a portion of a window jamb opening, and an intermediate portion of

C 003860

trained over said pulleys in said pulley block assemblies so as to provide a mechanical advantage in the movement of said movable pulley block assembly relative to said fixed pully block assembly during extension and retraction of said cord, said frame portions of said pulley block assemblies each having means defining at least one pulley-receiving opening in said frame portion, at least one opening in said frame portion for reception and positioning of said axle so that said axle extends through said pulley-receiving opening, first and second pairs of assembly reference surfaces forming a part of said frame portion and spaced radially from said axle opening, said pulley having a given diameter, an outer edge and an axle-receiving opening therein, said axle-receiving opening in said pulley including an outwardly tapering margin, and said axle including an inwardly tapering margin, said axle and pulley margins, said given pulley diameter, and said pairs of assembly reference surfaces being sized, constructed and arranged so that when said pulley is positioned in said

pulley-receiving opening, and said outer edge of said pulley is in substantially coplanar alignment with one of said pairs of assembly reference surfaces, said tapering margins on said axle and said pulley will mutually engage each other upon movement of said axle into said pulley-receiving opening and into said axle-receiving opening in said pulley respectively.

16. A balance assembly as defined in claim 15 in which one of said pulley blocks includes two pulley-receiving openings, each such opening having its own axle-receiving opening, a pair of said pulleys received in one of said openings over one axle and a single pulley received in said other opening and received over a single axle.

17. A balance assembly as defined in claim 15 in which said balance frame comprises a metal channel member and in which said pulley block assemblies include frames made from a resinous material which is relatively lubricous relative to said metal balance frame.

        * * * * *

# EXHIBIT 25

# 公開実用 昭和62− 194895

⑩ 日 本 国 特 許 庁 （ J P ）　　　　⑪実用新案出願公開

## ⑫ 公開実用新案公報 （ U ）　　昭62− 194895

| ⑤Int.Cl.⁴ | 識別記号 | 庁内整理番号 | ⑭公開 昭和62年(1987)12月11日 |
|---|---|---|---|
| E 06 B　3/50 | | 8405−2E | |
| 　　　　　3/44 | | 8405−2E | |

審査請求 未請求 （全 頁）

㉝考案の名称　　上げ下げ窓

　　　　　　　　　㉑実　顧　昭61−84551
　　　　　　　　　㉒出　顧　昭61(1986) 6 月 3 日

| ㉒考 案 者 | 竹 本　　重 雅 | 東大阪市御厨北ノ町12番地　新関西ベアリング株式会社内 |
|---|---|---|
| ⑦出 願 人 | 新関西ベアリング株式会社 | 東大阪市御厨北ノ町12番地 |
| ㉔代 理 人 | 弁理士 折審　武士 | |

C 004249

公開実用 昭和62— 194895

第 1 図

7 カウンタバランス 機構

7 チャンネル

twisted plate 9

5 紐帯

38a アーム上端

rotating adjuster 17

16

20

22

sliding piece 39

2

38

stopper 40

15

slider 13

アーム 38

glass window 2

アーム下端 38b



代理人 弁理士
出願人
新興製機株式会社
ナショナルジャー
株式会社

C 004250

公開実用 昭和62— 194895



第 4 図

glass window 2

27

2b

1 サッシュ

縦溝5

カウンタバランス 7
機構

twisted plate 9

spiral spring 11

パイプ8

10 ナット部材

rotating adjuster 17

16

19

支軸12

2a

15

slider 13

実開62— 194

C 004251



明　細　書

1　考案の名称

　上げ下げ窓

2　実用新案登録請求の範囲

(1)　少なくとも室内側に位置するガラス戸2が，サッシュ1の左右の縦溝5に沿って上下動し，かつ内倒し可能になった上げ下げ窓において，

　左右の各縦溝5内にスライダ13が上下動自在に挿嵌されており，

　この各スライダ13にガラス戸2の下端部の左右から延出した支軸12がつながり，ガラス戸2が支軸12まわりに内倒し回動自在であり，

　前記縦溝5に摺動体39が上下摺動自在に支持されており，

　上端38aが摺動体39に，下端38bがガラス戸4の横側壁2cにそれぞれ回動自在に連結されるアーム38を有し，

　縦溝5内において，前記摺動体39と前記スライダ13との一方ないし双方から規制片40が連出されており，

（1）　　　　　975

実開62-194895

C 004252

公開実用 昭和62— 194895



　摺動体３９とスライダ１３とが規制片４０を介
して衝当することにより，ガラス戸２の最大内倒
し角度をこれがほぼ水平姿勢をとるよう接当規制
したことを特徴とする上げ下げ窓。

⑵　左右の各縦溝５にガラス戸２を上下の任意高
さ位置に停止させるためのカウンタバランス機構
７が配備されている実用新案登録請求の範囲第１
項記載の上げ下げ窓。

⑶　支軸１２の延出端にスライダ１３が一体に形
成されており，このスライダ１３が縦溝５内で水
平軸まわりに回動自在であってカウンタバランス
機構７に連係されている実用新案登録請求の範囲
第２項記載の上げ下げ窓。

⑷　スライダ１３に支軸１２が回動自在に連結さ
れている実用新案登録請求の範囲第１項記載の上
げ下げ窓。

　３　考案の詳細な説明

〔産業上の利用分野〕

　この考案は少なくとも室内側に位置するガラス
戸が上下動自在であって，かつ該ガラス戸がこれ

（２）　　　　　976

C 004253



の清掃用や換気などのために内倒し可能な上げ下
げ窓を対象とし，ガラス戸の最大内倒し角度を規
制する手段に特徴を有する。

〔従来の技術〕

　この種のカウンタバランス機構および内倒し機
構を兼ね備えた従来技術として，実開昭５９－１
３５７５号公報に示すものがある。

　これは第１０図に示すごとくサッシュ１の左右
の縦枠４に形成した縦溝５内にスライダ１３を上
下動のみ可能に装着し，後述するカウンタバラン
ス機構７のねじ板９の下端をスライダ１３に連結
する。そして，室内側に位置するガラス戸２の下
端の左右に支軸１２を固定し，該支軸１２の遊端
をスライダ１３に回動自在に連結した形態を採る。
これによれば，縦溝５内を摺動するスライダ１３
を介してガラス戸２が上下動し，支軸１２まわり
にガラス戸２が内倒し可能となる。

〔考案が解決しようとする問題点〕

　しかし，上下動するガラス戸２において，任意
の上下高さ位置でガラス戸２の内倒し角度を規制

（３）　　　　９７７

C 004254

公開実用 昭和62— 194895



することは極めて困難である。なぜなら，サッシュ1の縦枠4とガラス戸2との間に，第1図に示すごときアーム38を掛け渡そうとしたとき，第1に縦枠4とこれに連結すべきアーム38の上端38aとの連結点が上下動する形態にしなければならない。第2に，縦枠4にアーム38の上端38aを上下動自在に連結し，その上端38aを縦枠4に，下端38bをガラス戸2にそれぞれ回動自在に連結したとしても，アーム38の上下端38a・38bが回動自在であるから，これだけではアーム38でガラス戸2の内倒し角度を規制できないからである。

　このような背景があってか，従来では上下動自在のガラス戸2において，任意の上下高さ位置でガラス戸2の最大内倒し角度を規制する手段が採られていなかった。そのため，重量のあるガラス戸2が下端の支軸12まわりに必要以上に内倒しされ，これの清掃が却って不便になったり，内倒し時にガラス戸2が他物に当たってガラスの割れを招くなど危険であった。

C 004255

〔考案の目的〕

　本考案は，かかる観点から室内側に位置するガラス戸が上下動自在であって，かつ内倒し可能な上げ下げ窓において，ガラス戸がほぼ水平の内倒し姿勢を維持してそれ以上に倒れないようにすることを目的とする。

　本考案の他の目的は，ガラス戸の最大内倒し角度を規制する手段が簡単で故障のないものとするにある。

　本考案の更に他の目的は，一切の面倒な操作を要さず，自動的にガラス戸の内倒し角度が規制できるものとするにある。

〔問題点を解決するための手段〕

　本考案は，少なくとも室内側に位置するガラス戸2が，サッシュ1の縦溝5に沿って上下動自在であり，かつ内倒し可能になった上げ下げ窓を前提とする。

　ここではガラス戸2をいかにして上下動自在とし，かつ内倒し回動自在にするかの具体的手段を問わない。しかし，少なくとも左右の各縦溝5内

（5）　　　979

公開実用 昭和62− 194895



にスライダ13を上下動自在に挿嵌してあり，各スライダ13にガラス戸2の下端部の左右から延出した支軸12をつないであって，ガラス戸2が該支軸12まわりに内倒し回動自在であることを要件とする。そのうえで，後述するカウンタバランス機構7を介してガラス戸2が任意の上下高さ位置で停止できるものとすることが望ましい。

かくして，本考案では前記縦溝5に摺動体39を上下摺動自在に支持し，アーム38の上端38aを該摺動体39に，アーム38の下端38bをガラス戸2の横側壁2cにそれぞれ回動自在に連結する。更に，前記摺動体39と前記スライダ13の一方ないしは双方から規制片40を連出したものである。

〔作用〕

そして，カウンタバランス機構7でガラス戸2を任意の上下高さ位置で停止させ，ガラス戸2を内側に倒して行くと，摺動体39が縦溝5に沿って下降して該摺動体39とスライダ13とが規制片40を介して衝当し，これでガラス戸2がそれ

（6）    980

C 004257



以上は内倒れしない。摺動体39とスライダ13とはガラス戸2がほぼ90度つまりほぼ水平姿勢に倒れたときに衝当する。

〔考案の効果〕

　以上のようにした本考案によれば、サッシュ1の縦溝5に摺動体39が上下動自在に取着されており、アーム38も上端38aが摺動体39に、下端38bがガラス戸2にそれぞれ連結されており、これらアーム38および摺動体39を取り外したり、掛け変えたりする操作を要しない。ただ、ガラス戸2をほぼ水平姿勢になるまで内倒しすれば、摺動体39とスライダ13とが規制片40を介して衝当し合うことにより、ガラス戸2がほぼ水平姿勢の最大内倒し角度を越えて回動することを自動的に接当規制できる。したがって、重量のあるガラス戸2を内倒しする操作が婦女子でも安全かつ手軽に行え、構造も簡単であって安価に実施でき、長期間使用するも故障の発生がなく、よく所期の目的を達成できる。

〔実施例〕

（7）　　　981

C 004258

公開実用 昭和62− 194895

第1図ないし第9図は本考案に係る上げ下げ窓
の実施例を示す。

① 上げ下げ窓の基本構成.

第1図ないし第3図において，対象の上げ下げ
窓はサッシュ1に嵌まる内外のガラス戸2・3を
有する。このうち，室外側のガラス戸3はサッシ
ュ1の上半分に固定されている。室内側のガラス
戸2はサッシュ1の左右の縦枠4・4に形成した
縦溝5・5に沿って上下動自在であって，かつ室
内側に内倒し可能である。

② カウンタバランス機構

左右の各縦溝5にガラス戸2を任意の上下高さ
位置に停止させるためのカウンタバランス機構7
を備えている。

第4図において，カウンタバランス機構7は合
成樹脂からなる縦長角筒状のパイプ8と，帯板を
緩やかに捩って形成したリード角の大きいねじ板
9と，ナット部材10と，帯板をコイル状に巻回
してなる螺旋ばね11とからなる。パイプ8は上
端を縦溝5の上部に固定する。ねじ板9はパイプ

（8）    982



　８内に上下動自在に挿嵌してあり，ねじ板９の下端がパイプ外に突出している。ナット部材１０はパイプ８内の下端部に配置され，ねじ板９に螺合して回転する。螺旋ばね１１はパイプ８内にあって，ねじ板９の外周に装着し，上端をパイプ８の上部に連結するとともに，下端をナット部材１０に連結してあり，ナット部材１０の回転で巻き締められる。

⑧　ガラス戸の支軸とスライダ

　第５図ないし第７図において，ガラス戸２の下框２ａの左右に支軸１２の扁平な基端部１２ａをそれぞれ固定してある。左右の各縦溝５に挿嵌されて上下動するスライダ１３を有する。図では各支軸１２の先端に，ガラス戸２の横外側方に水平に延びるスライダ１３が一体に形成されている。

　このスライダ１３は下面を開口した実質的に半円筒状に形成されていて，サッシュ１の縦溝５に内側方からそれぞれ差し込み嵌合される。この縦溝５内において，スライダ１３は前後方向と左右方向に必要以上に遊動することが接当規制される

（９）　　　　983

C 004260

# 公開実用 昭和62− 194895



　よう寸法設定されており，上下方向には摺動自在
であって水平軸まわりには回動自在である。
　スライダ13の上壁部には周方向に走る逃がし
溝15が貫通形成されている。この逃がし溝15
の前端はスライダ13の中心を通る鉛直線から反
時計方向に少し偏位した位置にあり，後端は鉛直
線から時計方向に90度より少し大きい角度だけ
偏位した位置，つまり軸中心を通る水平線から時
計方向に少し偏位した位置にある。
④　ばね圧調整機構
　カウンタバランス機構7はガラス戸2を最上位
に引き上げた状態において，ガラス戸2を落下し
ないように保持しなければならない。そのために
は，ガラス戸2の組付け時にカウンタバランス機
構7の螺旋ばね11の初期ばね圧をガラス戸2の
重量に応じて適正値に設定する必要があり，その
ためのばね圧調整機構16がスライダ13内に組
み込まれている。
　第1図，第5図ないし第7図において，ばね圧
調整機構16は回転操作具17と，これの下面を

C 004261



除く外周を覆う筒体19と，操作具17の逆転防止を図るコイルばね20と，該ばね20による逆転防止を解除するための部材21とからなる。

回転操作具17は上端部17aが径小に形成された縦長状であり，下端にドライバの係入を許す操作溝22を有する。筒体19は下面が開口しており，その上面壁19aの中央に通孔23が透設されている。

スライダ13の内部に筒体19を，ついで該筒体19内に操作具17をそれぞれ下方から嵌め込み，該操作具17の径小上端部17aを筒体19の通孔23ついでスライダ13の逃がし溝15に挿通し，この径小上端部17aの上端に前記ねじ板9の下端を差し込んで相対回転不能にビス止め連結する。

この組付け状態において，操作具17の下端の操作溝22が開放状態にある下方に臨む。そして，ねじ板9と操作具17とが一体化し，スライダ13と操作具17との間で筒体19を挟持する。但し，筒体19の上面壁19aは前後の角落とし部

（11）　　　985

C 004262

公開実用 昭和62— 194895



　がスライダ１３の内面に接触して相対摺動可能で
ある。
　操作具１７と筒体１９との間には，該操作具１
７の中間径大部の円形外周面に前記コイルばね２
０を密着状に嵌装する。このコイルばね２０のコ
イル径は自由状態において操作具１７の外径とほ
ぼ一致しており，操作具１７に密着状に嵌装され，
かつその巻き方向が前記螺旋ばね１１のそれとは
逆向きになっている。
　更に，操作具１７と筒体１９との間には，下端
寄り部位に前述の逆転防止解除部材２１を水平面
で回動操作可能であるように位置決め保持する。
図の逆転防止解除部材２１は，円筒状に形成され
ていて，操作具１７と筒体１９との双方に凹凸係
合している。
　かくして，コイルばね２０は上端２０ａを筒体
１９に，下端２０ｂを前記解除部材２１にそれぞ
れ連結する。
　しかるときは，操作具１７はコイルばね２０を
巻き緩める方向，即ちこれの内径を拡径するＰ方

（１２）　　　　９８６

C 004263



向にのみ回転でき，該ばね２０を巻き締めるＱ方
向には回転できない。
⑤　ガラス戸とカウンタバランス機構とばね圧調
整機構とのそれぞれの動き
　ガラス戸２を支軸１２を介してばね圧調整機構
１６およびカウンタバランス機構７にそれぞれ連
係して組付けたのち，ガラス戸２をカウンタバラ
ンスさせて最上位でも下方にずれ落ちないように
保持するために，螺旋ばね１１に初期ばね圧を付
与する。
　この初期ばね圧付与に際しては，回転操作具１
７の下端の操作溝２２にドライバを差し込み，操
作具１７をコイルばね２０が拡径するＰ方向に回
転操作する。すると，この回転操作量に対応して
ねじ板９，次にこれに螺合したナット部材１０が
螺旋ばね１１を巻き締める方向に回転し，ガラス
戸２の重量に応じた初期ばね圧を螺旋ばね１１に
付与する。
　このとき，操作具１７はこれに連結したねじ板
９を介して螺旋ばね１１の反発力による周方向分

（１３）　　　987

C 004264

公開実用　昭和62— 194895



力を受け，コイルばね２０を巻き締めるＱ方向に
逆転しようとする。しかし，コイルばね２０は操
作具１７の外周に密着状態で嵌装されており，こ
れ以上は縮径できないので，両者１７・２０の摩
擦係合で操作具１７は該ばね２０を縮径させるＱ
方向に逆回転できない。従って，螺旋ばね１１に
付与した初期ばね圧は維持される。なお，長期の
使用で螺旋ばね１１のばね圧が低下したときも，
同じ要領で該ばね１１のばね圧を再調整する。

　螺旋ばね１１の初期ばね圧を強く設定し過ぎた
場合や，ガラス戸２を外す必要を生じた場合など
には，逆転防止解除部材２１を手にして前述のＰ
方向に僅かに回す。すると，コイルばね２０が拡
径し，該ばね２０と操作具１７との摩擦係合が解
けて操作具１７およびねじ板９が一気に逆転し，
ナット部材１０も逆転して螺旋ばね１１のばね圧
がゼロないしそれに近くなる。

　つぎに，螺旋ばね１１に初期ばね圧を付与した
使用状態において，ガラス戸２を押し下げて行く
と，これに伴いねじ板９が下降し，これの下降量

（１４）　　　　988



に対応する分だけナット部材１０が回転して螺旋
ばね１１を次第に巻き締め，この巻き締めによる
螺旋ばね１１の反発力でねじ板９とナット部材１
０とが更に摩擦係合し，この摩擦係合力が螺旋ば
ね１１の反発力によるガラス戸２の引き上げ分力
およびガラス戸４の重量に打ち勝ち，ガラス戸２
を常に任意の上下高さ位置に止めて支持する。

　ガラス戸２は上下の任意高さ位置において，第
１図に示すごとく下端左右の支軸１２まわりにほ
ぼ９０度内倒しできる。すなわち，各支軸１２の
スライダ１３には周方向の逃がし溝１５を設け，
操作具１７の上端部１７ａが該逃がし溝１５に遊
嵌状に挿通されているので，スライダ１３が水平
軸まわりに縦溝５内で回動すると，操作具１７は
そのままで上端部１７ａが逃がし溝１５内を相対
的に移動する。回動するのはスライダ１３すなわ
ち支軸１２だけである。

⑥　ラッチ機構

　ガラス戸２はこれが不測に内倒れしないように
する必要がある。図示例では，そのためのラッチ

（１５）　　　　９８９

C 004266

公開実用 昭和62— 194895



　機構25がガラス戸2の上框2bの左右に装置されている。

　第8図および第9図はそのラッチ機構25を示しており、これは左右方向にスライド可能にしたロッド26の先端に係止片27を設け、この係止片27が縦溝5の内壁前端5aに係合した状態においてガラス戸2を鉛直姿勢に保持する。ロッド26を中央側（図上右側）へ移動させると、係止片27と内壁前端5aとの係合が解除され、ガラス戸2が支軸12まわに傾動可能になる。

　すなわち、ラッチボックス29内にロッド26の後端に連設したスライドブロック30を左右方向にスライド自在に配置してあり、ラッチボックス29の上壁31に設けた上下動自在のラッチボタン32を押すと、これが該ブロック30に形成した左右の傾斜面33・33に接当し、該ブロック30を中央側へ移動させ、係止片27と内壁前端5aとの係合が外れる。ラッチボックス29内にスライドブロック30を左右の外側方（ロック方向）へ付勢するばね部材35を有し、これの付

C 004267



勢力により常態では係止片27と内壁前端5aと
が常に係合するよう働く。なお，係止片27の先
端部の外側面は傾斜案内面36に形成してあり，
内倒し状態にあるガラス戸2を鉛直姿勢に復帰さ
せると，係止片27が内壁前端5aにこれの突端
縁を内側方からを乗り越えて再び係合する。

⑦　ガラス戸の最大内倒し角度の規制手段

ガラス戸2は90度を越えて内倒し自在である
と，ガラスが他物に触れて割れるなどの不都合を
招きやすくなる。

そこで，本考案ではガラス戸2の最大内倒し角
度をこれが水平姿勢になるほぼ90度に接当規制
する手段を備えており，この点に特徴を有する。

すなわち，第1図，第3図および第8図におい
て，各縦溝5の前後側壁5b・5b間にコ字形の
摺動体39を中央側への抜け止めおよび前後ガタ
を規制して上下摺動自在に装着する。別に摺動体
39とガラス戸2とをつなぐ左右一対のアーム3
8を有する。そして，アーム38の上端38aを
各摺動体39に，下端38bをガラス戸2の左右

（17）　　　991

C 004268

公開実用 昭和62— 194895



　の各横側壁cにそれぞれ回動自在に連結する。更に，各縦溝5内において，摺動体39から規制片40を下向きに連出した。

　　しかるときは，ガラス戸2を水平姿勢に内倒しすると，規制片40の下端が第1図に示すごとくスライダ13に衝当し，これでガラス戸2の内倒し角度がほぼ90度すなわちほぼ水平姿勢に接当規制され，それ以上回動しない。

　　なお，ガラス戸2を第2図に示すように最上位に引き上げたとき，摺動体39は第8図および第9図に示すごとくカウンタバランス機構7のパイプ8の外周にこれと接当干渉しないように嵌合する状態となる。

〔別実施態様例〕

　　図示例の全容は以上の通りであるが，本考案はこれに限られるものではない。

　　例えば，規制片40はスライダ13側から上向きに連出されていてもよいし，摺動体39とスライダ13の双方から互いに衝当し合うように規制片40がそれぞれ連出されていてもよい。


　　　　　　　　（18）　　　　992


C 004269



　ガラス戸2の支軸12と縦溝5内を上下動する
スライダ13とは，第10図の従来例に示すごと
く別体であってもよい。

　カウンタバランス機構7も図示例のものに限定
されず，要はガラス戸2を任意の上下高さ位置で
停止できる形態のものを全て含む。ガラス戸2が
電動式で上下動するものであってもよい。

　アーム38は図示例のように左右一対有れば強
度的に有利であるが，左右の一方にのみ設けてあ
ってもよい。

4　図面の簡単な説明

　第1図ないし第9図は本考案の実施例を示す。
第1図はガラス戸を下げて内倒し状態にしたとき
の要部の縦断側面図である。第2図および第3図
はガラス戸の動きを説明するいずれも正面図であ
り，第2図は該ガラス戸を引き上げた状態，第3
図は該ガラス戸を上下の中間高さ位置に置いて内
倒しする途中の状態をそれぞれ示す。第4図はカ
ウンタバランス機構を示す縦断正面図である。第
5図および第6図はガラス戸の支軸とスライダま

（19）　　　993

C 004270

公開実用 昭和62- 194895



わりを主に示しており，第5図は縦断正面図，第6図は縦断側面図，第7図は分解斜視図である。第8図および第9図はラッチ機構および摺動体を主に示しており，第8図は横断平面図，第9図はその縦断正面図である。

　第10図は従来例を示す要部の縦断正面図である。

1・・・・・サッシュ，

2・・・・・ガラス戸，

2c・・・・ガラス戸の横側壁，

5・・・・・縦溝，

7・・・・・カウンタバランス機構，

8・・・・・パイプ，

9・・・・・ねじ板，

10・・・・ナット部材，

11・・・・螺旋ばね，

12・・・・支軸，

13・・・・スライダ，

25・・・・ラッチ機構，

38・・・・アーム，

C 004271



３８ａ・・・アームの上端．

３８ｂ・・・アームの下端，

３９・・・・摺動体，

４０・・・・規制片。

考　案　者　　竹　本　垂　雅

実用新案登録出願人　新関西ベアリング株式会社

代理人　　弁理士　折　窰　武　士

995

（２１）

C 004272

公開実用 昭和62− 194895

第 1 図







C 004273

公開実用 昭和62— 194895

第 3 図



第 2 図



C 004274

公開実用　昭和62— 194895

第 4 図



27
ガラス戸2
2b
1 サッシュ
縦溝5
カウンタバランス 7
機構
9 ねじ板
11 螺旋ばね
パイプ8
10 ナット部材
17
16
2a
支軸12
19
13 スライダ
15

実開62—194

C 004275

公開実用 昭和62-194895

第6図



9ねじ板
5b
5縦溝
15
17
20
16
17a
23
22
21
19
スライダ13
4
5a

第5図



2ガラス戸
5縦溝
15
12支軸
16
13スライダ
9ねじ板
17a
20
21
17
19
19a
4
2a
実開昭62-194895



公開実用 昭和62—194895

第 7 図



1000

C 004277

公開実用 昭和62−194895



第 8 図

第 9 図

実開62−194895

C 004278

公開実用 昭和62— 194895

第 10 図



1002

実開62—194

# EXHIBIT 26



US006041476A

# United States Patent [19]

## deNormand

[11] **Patent Number:** 6,041,476

[45] **Date of Patent:** Mar. 28, 2000

[54] **INVERTED BLOCK AND TACKLE WINDOW BALANCE**

[75] Inventor: **Richard S. deNormand**, Rochester, N.Y.

[73] Assignee: **Caldwell Manufacturing Company**, Rochester, N.Y.

[21] Appl. No.: **08/975,728**

[22] Filed: **Nov. 21, 1997**

[51] Int. Cl.⁷ ........................................ B66D 3/08

[52] U.S. Cl. ................... 16/197; 16/196; 49/445; 254/393

[58] Field of Search ........................... 16/193, 196, 197, 16/198, 401, 402; 49/445, 446; 492/30, 47; 254/393, 404, 416

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,584 | 7/1849 | Hoffman . |
| 138,944 | 5/1873 | Shaw ..................................... 16/213 |
| 329,005 | 10/1885 | Blodgett ............................... 16/213 |
| 464,795 | 12/1891 | Dodge . |
| 527,306 | 10/1894 | Wern ................................... 254/393 |
| 1,523,733 | 1/1925 | Troul ................................... 254/404 |
| 1,668,497 | 5/1928 | Fishback . |
| 1,713,586 | 5/1929 | Wright ................................. 254/404 |
| 1,800,700 | 4/1931 | Patton . |
| 2,196,948 | 4/1940 | Tremblay ............................. 16/215 |
| 2,262,990 | 11/1941 | Cross et al. . |
| 2,336,406 | 12/1943 | Kreuscher . |
| 2,459,290 | 1/1949 | Rozner . |

| | | |
|---|---|---|
| 2,625,447 | 1/1953 | Derenter, III ...................... 254/393 |
| 2,663,896 | 12/1953 | Trammell, Sr. et al. ............ 49/445 |
| 3,055,044 | 9/1962 | Dinsmore . |
| 3,150,420 | 9/1964 | Bremer . |
| 4,078,336 | 3/1978 | Prosser . |
| 4,190,930 | 3/1980 | Prosser . |
| 4,240,614 | 12/1980 | Comer, Jr. .......................... 254/393 |
| 4,332,054 | 6/1982 | Paist et al. .......................... 16/197 |
| 4,503,641 | 3/1985 | Swan . |
| 4,586,291 | 5/1986 | Swan . |
| 4,654,928 | 4/1987 | Flight . |
| 4,689,850 | 9/1987 | Flight ................................. 16/197 |
| 4,914,862 | 4/1990 | Gregory ............................. 49/445 |
| 4,949,425 | 8/1990 | Dodson et al. ................. 16/DIG. 20 |
| 5,530,991 | 7/1996 | deNormand et al. . |

*Primary Examiner*—Chuck Y. Mah
*Assistant Examiner*—Donald M. Gurley
*Attorney, Agent, or Firm*—Eugene Stephens & Associates

[57] **ABSTRACT**

Pulleys of a block and tackle window balance include hub steps that interact with other components to reduce the introduction of dirt and dust particles into areas vulnerable to wear. The hub steps of some of the pulleys are recesses formed about the axial bores of the pulleys that mate with protrusions on an axle and a washer. The hub steps of other pulleys are protrusions that abut a support plate and heads of rivets that act as axles. The hub steps allow inverse mounting of the window balance so that the balance can be mounted in a shoe channel for movement with a sash of the window, attached to the sash shoe, and the cord can be attached to the jamb or frame, thus increasing sash travel.

**23 Claims, 2 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6

C000459

6,041,476

| 1 | 2 |

# INVERTED BLOCK AND TACKLE WINDOW BALANCE

## TECHNICAL FIELD

The invention relates to the field of block and tackle window balances for offsetting the weight of a window sash throughout a range of travel within a window frame.

## BACKGROUND OF THE INVENTION

Block and tackle window balances have become popular because of their compact size and ease of installation. They combine a system of pulleys with an extension spring to convert high spring tension applied over a short working distance to a lower spring tension applied over a longer working distance. The extension spring and pulley system are arranged within a rigid balance channel, with the extension spring anchored at one end of the balance channel and the pulley system anchored at the other end. In most block and tackle balances, the balance channel is mounted in the jamb of the window frame; and a cord, which is reeved through the pulley system, is attached to a sash shoe that slides in the jamb with the sash. The extension spring and pulley system are sized so that a desired lifting force is applied to the window sash throughout the entire range of sash travel within the window frame. A disadvantage of this type of balance is that the movement of the sash is limited by the presence of the balance in the jamb. In some cases, the travel is limited so much that the lower sash of the open window blocks egress through the window in escaping a fire.

To solve the problem of limited sash movement, the balance can be mounted upside down in the window sash with the balance channel attached to the sash shoe and the cord attached to the window jamb or frame. However, prior art window balances of this kind tend to be susceptible to contamination from dirt and dust, especially when mounted upside down. Particles work their way between the pulley bores and the pulley axles, increasing friction and wear. Thus, prior art block and tackle window balances are not as durable or reliable as is desired.

Some prior art block and tackle window balances that are less susceptible to contamination require the use of bushings and other parts. This is disadvantageous in that the use of additional parts increases the complexity of the machines and the likelihood of their failure. Also, the additional parts increase the cost of manufacture and assembly of the window balances.

## SUMMARY OF THE INVENTION

My inventive block and tackle window balance greatly reduces the invasion of the hub/axle interface by particulate contaminants. I form the pulleys with steps in their hubs so that they can engage mating steps on the rivets that serve as their axles. In addition, I mount the two pulleys at the open end of the balance so that they run against each other, effectively sealing the space between the pulley hubs. The steps in the pulley hubs can be recesses or protrusions, depending on their location and particular duty. My window balance provides better protection from dirt and dust contamination without the extra parts required by prior art window balances, keeping the balance relatively simple and less costly to manufacture and assemble. Additionally, because my window balance is less susceptible to contamination, it can be mounted to move with the sash of a window or to remain fixed relative to the frame of a window, depending on the requirements of a particular installation, and can be mounted invertedly without significantly reducing its useful life.

## DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top schematic view of the invention.

FIG. 2 is a cross section taken along line II—II in FIG. 1 showing the first pair of pulleys.

FIG. 3 is a cross section taken along line III—III in FIG. 1 showing the second pair of pulleys.

FIG. 4 is a view taken along line IV—IV in FIG. 2 to illustrate the flats of a preferred pulley axle and the groove in which the axle is mounted.

FIG. 5 is a side view of a portion of the invention as shown in FIG. 1.

FIG. 6 is a schematic representation of the placement of my invention in a window.

## DESCRIPTION OF THE INVENTION

As seen in the accompanying Figures, my block and tackle window balance 1 includes a balance channel 2 preferably mounted in the shoe channel 55 of a window 51 and attached at one end to a sash shoe 50 that moves with the sash 53 in the shoe channel 55. I mount the shoe channel 55 on the jamb 54 of the window between the jamb 54 and the sash 53. The balance channel 2 supports a series of pulleys 11, 12, 31, 32 over which I reeve a cord 6. I attach an attachment end 8 of the cord 6 to the window jamb 54 or to the window frame 52. I attach a support plate end 7 of the cord 6 to a sliding support plate 35. The support plate 35 is biased against movement from a rest position by a spring 4 attached to the balance channel 2. Alternatively, a more conventional mounting arrangement can be used with the balance channel 2 fixed relative to the window jamb 54 and the attachment end 8 of the cord attached to the sash shoe 50.

As seen particularly in FIG. 2, an axle 15 mounted in grooves 24 in one end of the balance channel 2 supports a first pair 10 of pulleys 11, 12. The pulleys 11, 12 in the first pair 10 sit adjacent one another and include hub steps 13 in the form of recesses about the axial bores 14 of the pulleys 11, 12. The sides or rims 23 of the pulleys 11, 12 adjacent one another can slide or rub against each other and effectively seal the cavity 22 formed by their hub steps 13 against contamination from dirt and dust.

The axle 15 is preferably a rivet including flats 16 formed over portions of the circumferential surface of the axle 15 such that the flats 16 engage the grooves 24 in the balance channel 2, holding the axle 15 against rotation. The preferred rivet 15 also includes heads 17 that prevent axial movement of the axle 15. As shown in FIG. 4, I prefer to use a hexagonal arrangement of the flats 16 similar to that used in common nuts and bolt heads. The axle 15 can also include a flange 18 with a protruding flange step 19 that mates with a hub step 13 of one the pulleys of the first pair, such as the first pulley 11. I prefer to mount a washer 20 on the axle 15 between the other of the pulleys of the first pair 10 (the second pulley 12) and the wall 3 of the balance channel. The washer 20 can include a protruding washer step 21 that mates with a hub step 13 of the second pulley 12. The mating steps 13, 19, 21 effectively seal the washer/pulley, flange/pulley, and pulley/axle bearing surfaces from contamination by dirt and dust particles, reducing wear of these parts and increasing the effective life of the window balance.

A second pair 30 of pulleys 31, 32 is mounted on the support plate 35. The pulleys 31, 32 of the second pair 30 also include hub steps 33, but I prefer to form these hub steps

C000460

6,041,476

3

33 as protrusions about the axial bores 34 of the pulleys 31, 32. Axles 37, 38, preferably in the form of rivets, rotatably mount the pulleys 31, 32 on the support plate 35, the heads 39 of the rivets engaging or abutting respective hub steps 33 of the pulleys 31, 32. I prefer to form the hub steps 33 so that they have substantially the same diameter as the heads 39 of the rivets 37, 38. The hub steps 33 of the pulleys 31, 32 farthest from the rivet heads 39 abut the support plate 35. As with the first pair of pulleys 10, the mating steps 33 and rivet heads 39 effectively seal the pulley/axle bearing surfaces from contamination by dirt and dust particles, reducing wear of these parts and increasing the effective life of the window balance.

When installed, one end 8 of the cord 6 is preferably attached to the window frame 52 or the window jamb 54, the other being attached to the support plate 35. In this arrangement, I slidingly mount the balance channel 2 in the shoe channel 55 with one end connected to the sash shoe 50 so that the balance channel 2 can move with the sash 53 in the shoe channel 55. Alternatively, the end 8 of the cord 6 can be attached to the sash shoe 50 mounted in the conventional manner, the other end 7 of the cord being attached to the support plate 35. In the conventional arrangement, the balance channel 2 is fixed with respect to the frame 52. In either arrangement, the support plate 35 slides in the balance channel 2. I prefer to run the cord 6 from the support plate 35 to the first pulley 11, then to the fourth pulley 32, then to the second pulley 12, then to the third pulley 31, and then out the end of the balance channel 2 in which the first pair of pulleys 10 is mounted. The end 8 of the cord 6 not attached to the support plate 35 includes a limit stop 9 to prevent the cord 6 from being pulled into the balance channel 2 when it is free.

The support plate 35 carries a guide 36 that keeps the support plate 35 properly aligned and oriented in the balance channel 2 while sliding and while resting. The support plate 35 also includes a spring attachment point 40, such as a hole, to which an end of a biasing spring 4 is attached. The other end of the biasing spring 4 is attached to the balance channel 2 via, for example, a support rivet 5. The spring 4 provides the force that balances the weight of the window sash 53. As the window sash 53 is moved, the cord 6 moves and rolls over the pulleys 11, 12, 31, 32, which rotate accordingly, and the support plate 35 slides. Travel of the support plate 35 is limited between its resting position and its extended position by the limit stop 9 on the cord 6 and the first pair of pulleys 10, respectively.

Parts List

1 Window balance
2 Balance channel
3 Walls of balance channel
4 Spring
5 Spring support/rivet
6 Cord
7 Support plate end of cord
8 Free end/attachment end of cord
9 Limit stop of cord
10 First pulley pair
11 First pulley
12 Second pulley
13 Hub steps/recesses of pulleys of first pair of pulleys
14 Axial bores of pulleys of first pair
15 Axle/rivet supporting first pair
16 Flats of axle
17 Heads of axle
18 Flange of axle

4

19 Flange step/protrusion
20 Washer
21 Washer step/protrusion
22 Cavity/space formed by hub steps of first pair
23 Rims of pulleys of first pair
24 Mounting groove of axle of first pair
30 Second pulley pair
31 Third pulley
32 Fourth pulley
33 Hub steps/protrusions of pulleys of second pair of pulleys
34 Axial bores of pulleys of second pair
35 Support plate
36 Guide for support plate
37 Support/rivet for third pulley
38 Support/rivet for fourth pulley
39 Heads of rivets for third and fourth pulleys
40 Attachment point for spring; hole in support plate
50 Pivot block or sash shoe
51 Window
52 Window frame
53 Window sash
54 Window jamb

I claim:

1. A block and tackle window balance comprising:

hub steps on each side of a pulley, the hub steps being formed coaxially with an axial bore of the pulley;

an axle on which the pulley is rotatably mounted so that the hub steps act to inhibit introduction of contaminants into the axial bore of the pulley;

a balance channel in which the axle is mounted, the balance channel being configured for mounting in one of a shoe channel, a sash, and a jamb of a window;

an end of the balance channel being attached to one of a sash shoe and a frame of a window;

a cord reeved over the pulley, a first end of the cord being attached to the other of the sash shoe and the frame of the window;

a spring having a first end attached to the balance channel and a second end connected to a second end of the cord; and

wherein the hub steps are recesses and the axle includes an axle step that protrudes toward and mates with a hub step of the pulley.

2. The window balance of claim 1 wherein the axle step is a protrusion extending from a flange formed in the axle.

3. The window balance of claim 1 wherein flats formed on a circumferential surface of the axle engage grooves formed in the balance channel to hold the axle against rotation.

4. The window balance of claim 1 wherein the mating axle step and hub step form two substantially right angles in a path to the axial bore of the pulley, substantially reducing introduction of dust into the axial bore of the pulley.

5. The window balance of claim 1 wherein the axle step is a protrusion formed on a washer mounted on the axle.

6. The window balance of claim 1 wherein the pulley is one of a substantially identical pair of pulleys mounted adjacent each other on the axle so that they can rotate relative to one another, a rim of one pulley substantially engaging a rim of the other pulley such that facing recesses form a cavity between the pulleys.

7. A block and tackle window balance comprising:

hub steps on each side of a pulley, the hub steps being formed coaxially with an axial bore of the pulley;

an axle on which the pulley is rotatably mounted so that the hub steps act to inhibit introduction of contaminants into the axial bore of the pulley;

C000461

6,041,476

5

a balance channel in which the axle is mounted, the balance channel being configured for mounting in one of a shoe channel, a sash, and a jamb of a window;

an end of the balance channel being attached to one of a sash shoe and a frame of a window;

a cord reeved over the pulley, a first end of the cord being attached to the other of the sash shoe and the frame of the window;

a spring having a first end attached to the balance channel and a second end connected to a second end of the cord; and

wherein the hub steps are protrusions and one of the hub steps engages a rivet head of an axle on which the pulley is rotatably supported, the axle being carried by a support plate that slides within the balance channel as the cord is played out of or drawn into the balance, the support plate being interposed between and attached to the second ends of the spring and the cord, the cord being biased by the spring against being played out of the balance.

8. The window balance of claim 7 wherein a pair of substantially identical axles carrying substantially identical pulleys is mounted on the support plate such that longitudinal axes of the axles are offset from one another.

9. The window balance of claim 7 wherein the support plate carries a guide that engages the balance channel to maintain the plate in proper alignment within the balance channel.

10. A block and tackle window balance comprising:

flats on a circumferential surface of an axle on which a pulley is rotatably mounted;

a balance channel in which the axle is mounted, the flats engaging a groove formed in the balance channel so that the axle is held against rotation, the balance channel being mounted for one of movement with a window sash and remaining fixed with respect to a window frame;

a cord reeved over the pulley, a first end of the cord being connected to the window frame when the balance channel is mounted for movement with the window sash, the first end of the cord being connected to the window sash when the balance channel is mounted for remaining fixed with respect to the window jamb;

a spring configured to provide a bias against withdrawal of the cord from the block and tackle window balance, a first end of the spring being connected to a second end of the cord, a second end of the spring being connected to the balance channel; and

one of an end of the balance channel and the first end of the cord being configured for attachment to a sash shoe mounted in a shoe channel on the window jamb, the sash shoe being configured to slide in the shoe channel with the window sash as the window sash is moved, the end of the balance channel being configured for attachment to the sash shoe when the balance channel is mounted for movement with the window sash, and the first end of the cord being configured for attachment to the sash shoe when the balance channel is mounted for remaining fixed with respect to the window frame.

11. The window balance of claim 10 wherein the axle is a rivet and further comprises a flange arranged between the flats and the pulley.

12. The window balance of claim 11 wherein the flange includes a flange step on a pulley side of the flange, the flange step engaging a mating hub step of the pulley.

13. The window balance of claim 10 wherein a washer is mounted between a side of the pulley and a wall of the balance channel, the washer including a washer step that engages a mating hub step of the pulley.

6

14. The window balance of claim 10 wherein first and second pulleys are mounted adjacent one another on the axle in the balance channel, each pulley including hub steps such that a hub step of the first pulley faces a hub step of the second pulley and a hub step of each pulley faces a respective wall of the balance channel.

15. The window balance of claim 14 wherein the axle includes a step mating with a hub step of one of the pulleys.

16. The window balance of claim 14 further comprising a washer with a washer step thereon mating with a hub step of one of the pulleys.

17. The window balance of claim 14 further comprising third and fourth pulleys rotatably mounted on respective rivets on a support plate slidably mounted in the balance channel, the support plate being interposed between the spring and the cord such that the first ends of the spring and the cord are attached thereto, the pulleys including hub steps each engaging one of a respective rivet head and the support plate.

18. The window balance of claim 17 wherein the balance channel is mounted for movement with the window sash, an end of the balance channel being attached to the sash shoe, the cord running over each of the first, second, third, and fourth pulleys so that the first end of the cord can be attached to the window frame.

19. A block and tackle window balance comprising:

first hub steps on each side of a first pulley;

second hub steps on each side of a second pulley;

a first axle on which the first and second pulleys are rotatably mounted, the first and second pulleys lying adjacent one another on the axle so that they rub together;

third hub steps on each side of a third pulley;

fourth hub steps on each side of a fourth pulley;

second and third axles carrying the third and fourth pulleys, respectively, and being mounted on a support plate;

a balance channel non-rotatably supporting the first axle and slidingly supporting the support plate, the balance channel including first and second side walls and a bottom wall;

a cord reeved over the pulleys and having a first end attached to the support plate and a second end extending from a first end of the balance channel; and

a spring having a fixed end attached to the balance channel and a movable end attached to the support plate.

20. The window balance of claim 19 wherein the first axle is mounted in grooves in the side walls of the balance channel and includes flats formed on a circumferential surface of the first axle corresponding to a region in which the first axle engages one of the grooves, the flats engaging the one of the grooves so that the axle is held against rotation.

21. The window balance of claim 19 wherein the first hub steps are recesses and the first axle includes a flange with a flange step formed thereon, the flange step engaging and mating with one of the first hub steps of the first pulley.

22. The window balance of claim 19 wherein the second hub steps are recesses and the first axle carries a washer adjacent the second pulley, the washer including a washer step facing the second pulley and mating with an adjacent second hub step of the second pulley.

23. The window balance of claim 19 wherein the hub steps of one of the third and fourth pulleys are protrusions, the axle of the one of the third and fourth pulleys comprising a rivet with a head engaging one of the protrusions, the other protrusion running against the support plate.

*   *   *   *   *

C000462

# EXHIBIT 27



US005301467A

# United States Patent [19]

## Schmidt et al.

[11] Patent Number: **5,301,467**

[45] Date of Patent: **Apr. 12, 1994**

[54] **LOCKING SLIDE BLOCK**

[75] Inventors: Melvin J. Schmidt, Lakeland, Minn.; Gary J. Marshik, Canton, S. Dak.

[73] Assignee: Andersen Corporation, Bayport, Minn.

[21] Appl. No.: 116,039

[22] Filed: Sep. 2, 1993

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 903,368, Jun. 24, 1992, Pat. No. 5,243,783.

[51] Int. Cl.$^5$ .................................... E05D 15/22
[52] U.S. Cl. .................................... 49/181; 49/176
[58] Field of Search .................. 49/161, 176, 177, 181, 49/380, 453, 454, 455; 16/197

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,720,682 | 10/1955 | Perry | 20/12 |
| 2,731,287 | 1/1956 | Haynes | 292/76 |
| 2,883,226 | 4/1959 | Haynes | 292/76 |
| 3,044,062 | 9/1962 | Peters et al. | 20/42 |
| 3,195,174 | 7/1965 | Nobes | 16/202 |
| 3,377,747 | 4/1968 | Donkin | 49/414 |
| 3,399,490 | 9/1968 | Hettinger | 49/414 |
| 3,434,236 | 3/1969 | Weidner et al. | 49/176 |
| 3,524,282 | 8/1970 | Kraft et al. | 49/181 |
| 3,676,956 | 7/1972 | Taylor et al. | 49/446 |
| 3,789,549 | 2/1974 | Yip | 49/181 |
| 3,797,168 | 3/1975 | Trout | 49/181 |
| 3,842,540 | 10/1974 | Anderson | 49/181 |
| 3,844,066 | 10/1974 | Nobes | 49/182 |
| 4,068,406 | 1/1978 | Wood | 49/181 |
| 4,079,549 | 3/1978 | Wood | 49/181 |
| 4,115,973 | 9/1978 | Anderson | 52/773 |
| 4,137,671 | 2/1979 | Miller | 49/417 |
| 4,226,050 | 10/1980 | Kessler | 49/181 |
| 4,363,190 | 12/1982 | Anderson | 49/181 |
| 4,364,199 | 12/1982 | Johnson et al. | 49/181 |
| 4,452,012 | 6/1984 | Deal | 49/181 |
| 4,590,708 | 5/1986 | Campodonico | 49/181 |
| 4,610,108 | 9/1986 | Marshik | 49/181 |
| 4,683,676 | 8/1987 | Sterner | 49/181 |
| 4,718,194 | 1/1988 | Fitzgibbon et al. | 49/446 |
| 4,799,333 | 1/1989 | Westfall et al. | 49/446 |
| 4,813,180 | 3/1989 | Scalzi | 49/181 X |
| 4,922,657 | 5/1990 | Foss | 49/181 |
| 4,941,285 | 7/1990 | Westfall | 49/176 |
| 4,958,462 | 9/1990 | Cross | 49/181 |
| 5,077,939 | 1/1992 | Erickson | 49/380 |
| 5,243,783 | 9/1993 | Schmidt et al. | 49/181 |

#### FOREIGN PATENT DOCUMENTS

2121099 12/1983 United Kingdom .

*Primary Examiner*—Peter M. Cuomo
*Assistant Examiner*—Jerry Redman
*Attorney, Agent, or Firm*—Merchant, Gould, Smith, Edell, Welter & Schmidt

[57] **ABSTRACT**

The present invention is directed to a locking slide block slidably and pivotably mounting a window sash to a side member of a window frame having a vertical jamb channel. The locking slide block has a housing with oppositely disposed sliding surfaces for guiding the housing in the jamb channel. Operably connected to the housing is a locking means for selectively engaging the jamb channel and locking the housing in a fixed position, and a cam for selectively operating the locking means. A sash pivot operatively connected to the cam is operably connectable to the sash. The housing also has a sash pivot retainer spring. A retaining means is utilized to protect a free second end of the retainer spring from bowing and deforming due to forces applied to the window sash in operation.

**14 Claims, 4 Drawing Sheets**



C 004138



FIG. 1

FIG. 3

FIG. 2

C 004139



FIG.5

FIG.4



FIG.6

FIG.7

FIG.8

C 004140



**FIG. 9**



FIG. 10



FIG. 11

C 004142

5,301,467

1

## LOCKING SLIDE BLOCK

This application is a continuation-in-part of U.S. Ser. No. 07/903,368 filed on Jun. 24, 1992 by Melvin J. Schmidt et al, now U.S. Pat. No. 5,243,783.

### FIELD OF THE INVENTION

This invention generally relates to a locking slide block for double-hung tilt-out type windows.

### BACKGROUND OF THE INVENTION

Double-hung, tilt-out type windows have become increasingly popular. Much of this popularity is due to the tilt-out feature which allows both inside and outside surfaces of the window to be cleaned from the inside.

Tilt-out windows have been equipped with locking slide blocks such as the one disclosed in U.S. Pat. No. 4,610,108 to Marshik. Marshik discloses a double-hung window having a frame with a set of parallel jamb channels on opposite sides of the frame. Within each jamb channel is a slidably mounted locking block. A spring counter-balance mechanism is attached to a headplate on each block. A pivot extends from proximate the lower end of opposite sides of a sash into a locking cam housed within the block. The pivots allow the sash, which holds a window pane, to be rotated or tilted toward the inside. As the pivots rotate, the cam forces serrated ends of a spring into opposite sides of the jamb channel to prevent the counter-balance spring from pulling up the blocks and sash while cleaning.

U.S. Pat. No. 4,813,180 to Scalzi discloses another locking sliding block for double-hung windows. Like the '108 patent, a locking block is slidably mounted within jamb channels and a pivot extends from opposite sides of the sash into a pivot button or cam in each locking block. Unlike the '108 patent, however, the pivot has a slot which engages a retaining ridge in the pivot button. This is intended to prevent dislocation of the pivots during transport and installation of the window due to deflection or bowing of the frame away from the sash. The locking block disclosed by Scalzi, although allowing the sash to pivot inside for easy cleaning of the window pane, does not allow the window to be conveniently removed from the inside.

### SUMMARY OF THE INVENTION

The invention addresses many of the problems associated with the prior art in providing a locking slide block which enables the sash of a double-hung, tilt-out type window to be tilted to the inside to facilitate the cleaning, insertion and removal of the window sash and panes from a window frame. A sash pivot retaining spring configuration is utilized thereon to provide reliable, simple and relatively effortless operation of a locking slide block during shipping and installation, as well as in normal use.

In accordance with the invention, a locking slide block is provided for slidably and pivotably mounting a window sash to a side member of a window frame having a vertical jamb channel with oppositely disposed sides. The block has a housing with oppositely disposed sliding surfaces for guiding the housing in the jamb channel. Within the block is a locking means for selectively engaging the oppositely disposed sides of the jamb channel to lock the block in a fixed position relative to the jamb channel. A cam is disposed within the housing. The cam has at least one camming surface

2

which selectively operates the locking means. The cam also has a sash pivot opening with an open top slot, for attaching a sash pivot thereto. Sash pivots are operatively connectable to each lower opposite side of a sash, for operatively connecting the sash to the cam.

The locking slide block also has a sash pivot retainer spring having a first end operatively connected to the housing and a second end proximate the cam. The second end has a first position for allowing the sash pivot to be inserted or removed from the sash pivot opening through the open top slot. The second end also has a second position for preventing removal of the sash pivot through the open top slot. The second end is normally biased to the second position, and may be depressed to the first position.

The locking slide block also preferably includes a second end retaining means. The second end retaining means is operatively connected to the housing, and it operates to restrict movement of the second end of the retainer spring past the second position in a direction opposite that of the first position. This protects the second end from deforming due to forces applied to the window sash in operation, and thus increases the overall reliability of the slide block.

In a preferred embodiment, the second end retaining means utilizes at least one spring retaining flange which extends across a portion of a spring receiving recess to cooperatively abut the second end of the spring in its second position. Further, cooperative flanges may also be utilized on the retainer spring to facilitate this abutting relationship between the spring and the spring retaining flange.

These and other advantages and features, which characterize the invention, are pointed out with particularity in the claims annexed hereto and forming a part hereof. However, for a better understanding of the invention, its advantages and objectives attained by its use, reference should be made to drawing which forms a further part hereof and to the accompanying descriptive matter, in which there is described a preferred embodiment of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a double-hung window with a partially tilted sash.

FIG. 2 shows an exploded perspective view of a locking slide block with sash pivot consistent with the invention, for use in the double-hung window in FIG. 1.

FIG. 3 shows an assembled locking slide block without sash pivot with the invention.

FIG. 4 shows a perspective view of the sash pivot.

FIG. 5 shows a locking slide block in an unlocked position a jamb channel.

FIG. 6 shows a locking slide block in a locked position a jamb channel.

FIG. 7 shows a mirror image of the locking slide block of FIG. 5.

FIG. 8 shows parallel jamb channels, one with a counter-balance spring cover and the other having a locking slide block with sash pivot.

FIG. 9 shows a cross-section of the locking slide block shown in FIG. 6.

FIG. 10 shows an exploded perspective view of an alternative housing and retaining spring consistent with the invention.

FIG. 11 shows a perspective view of an assembled locking slide block without sash pivot, and with the housing and retaining spring of FIG. 10.

C 004143

5,301,467

| 3 | 4 |

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawing, wherein like referenced numerals designate identical or corresponding parts throughout the several views, FIG. 1 shows a double-hung tilt-out window 10. The window 10 has a frame 12 and an upper sash 14 and a lower sash 16 supporting window panes 15 and 17, respectively. The frame 12 also has four jamb channels 18, one of which is shown in FIG. 1, on a side member 13 of frame 12. One jamb channel is proximate opposite sides of the upper sash 14, and one is proximate opposite sides of lower sash 16. As shown in FIG. 1, the lower sash 16 is partially tilted so that both sides of the window pane 17 within the lower sash 16 are accessible for cleaning from the same side of window 10.

FIG. 2 shows an exploded view of a locking slide block, generally referred to as 20, and sash pivot 22 of the present invention. One locking slide block 20 is slidably mounted within each jamb channel 18. Fastened to lower opposite sides of each sash 14 and 16 is one sash pivot 22. These sash pivots 22 are supported for rotation by the locking slide blocks 20. Each sash is tiltable about a longitudinal axis through pivots 22 disposed on opposite sides of sashes 14 and 16.

As shown in FIG. 2, locking slide block 20 has a housing 24, preferably of rigid plastic. This housing 24 has sliding surfaces 25 with slots 27. The housing 24 has an aperture 49 and a plate groove 51 for attaching a sash pivot retainer spring 26 and a metal plate 28, respectively. A counter-balance spring (not shown) is attached to metal plate 28. The housing 24 has a circular channel 30, which extends into housing 24 generally parallel to sliding surfaces 25, for receiving a locking cam 32 having camming surfaces 31. Housing 24 also has a box-like area for receiving locking spring 34 which has serrated end portions 35. Locking cam 32 has a head 35 which, as known to those skilled in the art, retains spring 34 in the box-like area of housing 24.

Sash pivot retainer spring 26, as shown in FIG. 2, has a hooked first end 48 which is received by aperture 49 to operably connect retainer spring 26 to housing 24. Retainer spring 26 also has a free end 50. Retainer spring 26 is preferably constructed of spring steel.

Locking cam 32, as shown in FIG. 2, has a sash pivot opening 33 with an open top slot 37. Located proximate a front side of locking cam 32, on opposite sides of sash pivot opening 33 are inwardly disposed cam flanges 39.

FIG. 3 shows a perspective view of the assembled locking slide block 20 without sash pivot 22. Retainer spring 26 and plate 28 are shown installed within housing 24. Free end 50 of spring 26 is in a normal position proximate the front side of locking cam 32. Locking cam 32 is shown inserted within circular channel 30, and is retained within block 20 by a tab 38. FIG. 3 also shows one serrated end portion 35 of spring 34 retracted within slot 27 in sliding surface 25.

FIG. 4 is a front view of sash pivot 22 having oppositely disposed flanges 21 at one end of an elongated portion 29, and a back 23. Sash pivots 22 are fastened to the lower opposite sides of sashes 14 and 16 so that the lengthwise axis of back 23 is parallel to the lengthwise axis of the sash side.

FIG. 5 shows locking slide block 20 inserted in jamb channel 18 having sides 40. Sliding surfaces 25 of sliding locking block 20 are proximate side 40 of jamb channel 18. Locking slide block 20 is held within jamb channel

18 by a flexible raised jamb channel face 42 having opening 44.

As shown in FIG. 6, the serrated portions of spring 34 are engaged with sliding surfaces 25 to prevent the counter-balance spring from pulling locking slide block 20 and sash 14 or 16 upward when sash 14 or 16, respectively, is tilted. When sash 14 or 16 and, thus back 23, is rotated from vertical, locking cam 32 rotates so that camming surfaces 31 force serrated end portions 35 of spring 34 out slots 27. In FIG. 6, back 23 is tilted to a horizontal position at approximately 90° to jamb channel 18. This position also corresponds to sash 14 or 16 tilted at 90° to jamb channel 18.

Also shown in FIG. 6, sash pivot 22 is operably connected to locking cam 32 by rotating cam 32 (by a tool not shown) so that open top slot 37 opens upward beneath retainer spring 26. Sash pivot 22 is inserted into sash pivot opening 33 by depressing the free end 50 of retainer spring 26 inwardly away from the front side of locking cam 32 to a first depressed position. After sash pivot 22 is inserted in sash pivot opening 33, the free end of retainer spring 26 moves back to a normal, second position over opening 33. Once retainer spring 26 moves back over opening 33, sash pivot 22 cannot slip out of opening 33. Without retainer spring 26, sash pivot 22 might slip out of opening 33 when sash 14 or 16 is tilted.

As best shown in FIG. 9, a cross-sectional view of cam 32 and sash pivot 22 taken from FIG. 6, when sash pivot 22 is inserted into sash pivot opening 33, the elongated portion 29 extends into the opening beyond cam flanges 39. Flanges 21 of sash pivot 22 are disposed widely enough that when sash pivot 22 is inserted in this manner, flanges 21 engage with cam flanges 39 so that sash pivot 22 cannot be pulled out of the pivot opening in a direction proximately parallel to a longitudinal axis of the elongated portion 29. This feature is particularly important during transport and installation of window 10. During transport and installation, side members 13 of frame 12 may bow outwardly away from sashes 14 and/or 16 so that without the engagement of flanges 21 with cam flanges 39, elongated portion 29 of sash pivot 22 could be pulled out of sash pivot opening 33.

FIG. 7 shows back 23 of sash pivot 22 oriented vertically. This position of back 23 corresponds to the closed or vertical position of sash 14 or 16. Serrated end portions 35 of spring 34 are not engaged with sides 40 of jamb channel 18. Locking slide block 20 and sash 14 or 16 is thus free to slide vertically within jamb channel 18. The counter-balance spring (not shown) attached to plate 28 assists in sliding locking slide blocks 20 and sashes 14 or 16 upward in jamb channels 18.

FIG. 8 shows a cross-sectional view of parallel jamb channels 18. In one of the jamb channels 18 is shown locking slide block 20 without serrated end portions 35 of spring 34 extending beyond sides 25 of locking slide block 20. As previously shown in FIG. 7, back 23 of sash pivot 22 is positioned vertically. Flexible jamb channel face 42 is engaged with a sash groove 46 to retain sash 16 vertically within frame 12 (not shown).

FIGS. 10 and 11 show an alternative embodiment of the locking slide block consistent with the invention. It has been discovered that in certain instances, forces applied to a sash may be applied by a sash pivot to the retainer spring in a locking slide block, causing the retainer spring to "buckle" and bow outward from the force. In certain circumstances, this may result in the sash pivot becoming partially dislodged from the sash

C 004144

5,301,467

| 5 | 6 |

pivot opening in the cam, thereby jamming the slide block and preventing the sash from moving up or down in the jamb channel.

For example, as best seen in FIG. 6, when sash 14 or 16 is tilted, open top slot 37 may be oriented upward and directly opposite retainer spring 26. An upward force on sash 14 or 16, for instance applied by gripping the sash on the sides near sash pivots 22, tends to urge elongated portion 29 of sash pivot 22 against the free end 50 of retainer spring 26. Since spring 26 extends generally away from housing 24 at the hooked first end 48, any force applied to free end 50 may induce this end to bow outward from housing 24. Given a sufficient force, free end 50 may buckle outward and allow sash pivot 22 to become partially dislodged from its operating position.

The alternative embodiment shown in FIGS. 10 and 11 includes a retaining means for protecting the free end of a retainer spring from the upward forces that could possibly cause failure of the locking slide block. As shown in FIG. 10, locking slide block 20' includes an alternative housing 24' and retainer spring 26'.

Housing 24' has a spring receiving recess 62 which extends into housing 24' for housing retainer spring 26' in operation. This recess 62 is integrally joined to the cam receiving channel 30' which, in operation, houses the locking cam. In order to protect retainer spring 26' from the above-described forces, a pair of spring retaining flanges 61a and 61b are provided which extend across a portion of recess 62. In the preferred embodiment, flanges 61a and 61b extend outward from walls 60a and 60b of recess 62. Other flange configurations may also be used in lieu of that shown for flanges 61a and 61b.

Sash pivot retainer spring 26' has a hooked first end 48' which is received by aperture 49' to operably connect retainer spring 26' to housing 24'. Further, retainer spring 26' includes a free end 50', which has a pair of oppositely disposed and outwardly projecting spring flanges 52a and 52b.

FIG. 11 shows an assembled locking slide block 20' without a sash pivot installed. Here, retainer spring 26' is installed, with metal plate 28' holding the spring in position. Free end 50' is housed within recess 62, proximate flanges 61a and 61b, and proximate cam 32'. In the configuration shown, when free end 50' is not depressed and in the normal position, spring flanges 52a and 52b cooperatively abut spring retaining flanges 61a and 61b. This cooperatively abutting relationship protects spring 26' when upward forces are applied to free end 50' by a sash pivot. Free end 50' is not capable of bowing outward in a direction opposite the normal direction in which free end 50' is depressed (such as when inserting or removing a sash pivot). Thus, the free end is substantially protected from deforming due to these forces.

Returning to FIG. 10, it may also be seen that it is preferable to leave sufficient space, i.e., a channel 63, in between flanges 61a and 61b. This enables a sash pivot to be inserted and removed from locking slide block 20' through channel 63.

One skilled in the art will appreciate that various modifications may be made without departing from the scope of the invention. For example, a number of different sizes and configurations of spring retaining flanges may be used to abut with free end 50' to protect it from bowing outward. In addition, other spring flanges could be incorporated into free end 50' to cooperatively abut with the flanges over recess 62. Further, spring flanges

52a and 52b could be eliminated altogether as long as flanges 61a and 61b extend a sufficient distance across recess 62 to abut with free end 50' during normal use. It is further not necessary that flanges 52a and 52b abut flanges 61a and 61b in normal operation, as the normal operating position of free end 50' may be disposed away from the plane of flanges 61a and 61b in its normal position.

Although characteristics and advantages, together with details of structure and function, have been described in reference to the preferred embodiments herein, it is understood that the disclosure is illustrative. To that degree, various changes made, especially in matters of shape, size and arrangement, to the full extent extended by the general meaning of the terms in which the appended claims are expressed, are within the principles of the present invention.

We claim:

1. A locking slide block for slidably and pivotally mounting a window sash to a side member of a window frame having a vertical jamb channel, the slide block comprising:

(a) a housing having oppositely disposed sliding surfaces for guiding the housing in a jamb channel;

(b) locking means for selectively engaging the jamb channel and locking the slide block in a fixed position relative to the jamb channel;

(c) a cam disposed in the housing, the cam having at least one camming surface arranged and configured to selectively operate the locking means, and wherein the cam includes a sash pivot opening having an open top slot;

(d) a sash pivot operatively connected to the cam in the sash pivot opening, and wherein the sash pivot is operatively connectable to a window sash;

(e) a sash pivot retainer spring, the retainer spring having a first end operatively connected to the housing and a second end proximate the cam, wherein the second end has a first position for allowing the sash pivot to be inserted or removed from the sash pivot opening through the open top slot and a second position for preventing removal of the sash pivot through the open top slot, the second end being normally biased to the second position and depressible to the first position; and

(f) second end retaining means, operatively connected to the housing, for restricting movement of the second end past the second position in a direction opposite the first position; whereby the second end is protected from deforming due to forces applied to the window sash in operation.

2. The locking slide block of claim 1, wherein the retaining spring is disposed within a spring receiving recess extending into the housing, and wherein the second end retaining means comprises at least one spring retaining flange, extending across at least a portion of the spring receiving recess, and arranged and configured to cooperatively abut the second end of the retaining spring when the retaining spring is in the second position.

3. The locking slide block of claim 2, wherein the retainer spring comprises at least one spring flange, disposed on the second end, and arranged and configured to cooperatively abut with the at least one spring retaining flange when the second end is in the second position.

4. The locking slide block of claim 1, wherein the second end is disposed proximate the sash pivot open-

C 004145

5,301,467

7

ing, and wherein the second position at least partially covers the open top slot for preventing removal of the sash pivot through the open top slot.

5. The locking slide block of claim 1, wherein the locking means is a locking spring having oppositely disposed serrated end portions.

6. The locking slide block of claim 1, further comprising a plate for attaching a counterbalance spring.

7. The locking slide block of claim 1, wherein:
(a) the sash pivot has a longitudinal axis and two flanges, located at one end of an elongated portion of the sash pivot and oppositely and outwardly disposed from the longitudinal axis of the sash pivot;
(b) the open top slot is defined by a bottom, a first side and a second side, the first and second sides each having a cam flange, wherein the elongated portion of the sash pivot may be inserted into the open top slot such that the flanges of the sash pivot engage with the cam flanges to prevent the sash pivot from being pulled out of the sash pivot opening in a direction generally parallel to the longitudinal axis of the elongated portion of the pivot.

8. A locking slide block for slidably and pivotably mounting a window sash to a side member of a window frame having a vertical jamb channel, the slide block comprising:
(a) a housing having:
   (i) oppositely disposed sliding surfaces for guiding the housing in a jamb channel;
   (ii) a cam receiving channel extending into the housing generally parallel to the sliding surfaces;
   (iii) a spring receiving recess extending into the housing and integrally joined to the cam receiving channel; and
   (iv) at least one spring retaining flange, extending across at least a portion of the receiving recess proximate the cam receiving channel;
(b) locking means for selectively engaging the jamb channel and locking the slide block in a fixed position relative to the jamb channel;
(c) a cam disposed in the cam receiving channel, the cam having at least one camming surface arranged and configured to selectively operate the locking means, and wherein the cam includes a sash pivot opening having an open top slot;
(d) a sash pivot operatively connected to the cam in the sash pivot opening, and wherein the sash pivot is operatively connectable to a window sash; and
(e) a sash pivot retainer spring disposed in the spring receiving recess, the retainer spring having a first end operatively connected to the housing and a second end proximate the at least one spring retaining flange, wherein the second end has a first position for allowing the sash pivot to be inserted or

8

removed from the sash pivot opening through the open top slot and a second position for preventing removal of the sash pivot through the open top slot, the second end being normally biased to the second position and depressible to the first position, and wherein the second end is arranged and configured such that the at least one spring retaining flange restricts movement of the second end past the second position in a direction opposite the first position; whereby the second end is protected from deforming due to forces applied to the window sash in operation.

9. The locking slide block of claim 8, wherein the retainer spring comprises at least one spring flange, disposed on the second end, and arranged and configured to cooperatively abut with the at least one spring retaining flange on the housing when the second end is in the second position.

10. The locking slide block of claim 8, wherein the housing comprises two oppositely disposed spring retaining flanges, each spring retaining flange extending across at least a portion of the receiving recess proximate the cam receiving channel, wherein the spring retaining flanges define a channel therebetween, the channel being sized such that the sash pivot is capable of passing through the channel when the sash pivot is being inserted or removed from the sash pivot opening through the open top slot.

11. The locking slide block of claim 8, wherein the second end is disposed proximate the sash pivot opening, and wherein the second position at least partially covers the open top slot for preventing removal of the sash pivot through the open top slot.

12. The locking slide block of claim 8, wherein the locking means is a locking spring having oppositely disposed serrated end portions.

13. The locking slide block of claim 8, further comprising a plate for attaching a counterbalance spring.

14. The locking slide block of claim 8, wherein:
(a) the sash pivot has a longitudinal axis and two flanges, located at one end of an elongated portion of the sash pivot and oppositely and outwardly disposed from the longitudinal axis of the sash pivot; and
(b) the open top slot is defined by a bottom, a first side and a second side, the first and second sides each having a cam flange, wherein the elongated portion of the sash pivot may be inserted into the open top slot such that the flanges of the sash pivot engage with the cam flanges to prevent the sash pivot from being pulled out of the sash pivot opening in a direction generally parallel to the longitudinal axis of the elongated portion of the pivot.

* * * * *

C 004146

# EXHIBIT 28

# United States Patent [19]

## Makarowski

[11] Patent Number: 5,069,001

[45] Date of Patent: Dec. 3, 1991

[54] **PIVOTABLE WINDOW SASH ASSEMBLY**

[75] Inventor: Anthony Makarowski, Syosset, N.Y.

[73] Assignee: Insul-Lite Window Manufacturing, Inc., Garden City, N.Y.

[21] Appl. No.: 616,642

[22] Filed: Nov. 21, 1990

[51] Int. Cl.⁵ ........................................... E05D 15/22
[52] U.S. Cl. ........................................... 49/176; 49/181
[58] Field of Search ............... 49/176, 181, 182, 161, 49/430, 446

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,844,066 | 10/1974 | Nobes | 49/181 |
| 3,861,082 | 1/1975 | Dau | 49/181 |
| 3,959,926 | 6/1976 | Noecker et al. | 49/181 |
| 4,363,190 | 12/1982 | Anderson | 49/181 |
| 4,581,850 | 4/1986 | Simpson . | |
| 4,590,708 | 5/1986 | Campodonico | 49/181 |
| 4,683,676 | 8/1987 | Sterner | 49/176 X |
| 4,718,194 | 1/1988 | FitzGibbon et al. | 49/181 |
| 4,763,445 | 8/1988 | Silverman | 49/176 |
| 4,785,581 | 11/1988 | Abramson et al. | 49/176 |
| 4,926,524 | 5/1990 | Owens | 49/176 X |
| 4,930,254 | 6/1990 | Valentin | 49/176 X |
| 4,958,462 | 9/1990 | Cross | 49/181 |

**FOREIGN PATENT DOCUMENTS**

1388819 3/1975 United Kingdom .................. 49/176

*Primary Examiner*—Gary L. Smith
*Assistant Examiner*—Jerry Redman
*Attorney, Agent, or Firm*—Bauer & Schaffer

[57] **ABSTRACT**

A tiltable window sash mounted in a channelled window frame having a T-shaped bar projecting from the sash into the window frame channel, with the wings of the T-Bar engaging the inside of the window frame channel so that sash to frame alignment is maintained. The bar simultaneously provides a pivotal axis about which the sash is tilted. The bar engages a sliding pivot shoe located in the window frame channel to provide a guide for sliding of the sash. The pivot shoe has a cam operated dial acting brake; the cam is coupled to the T-shaped bar, so that the sash is tilted; the cam operates a first brake preventing sliding of the tilted sash, and when a predetermined angle of sash tilt is reached, a second brake is operated by the cam preventing further tilting of the sash, thus supporting the sash in a tilted position.

9 Claims, 2 Drawing Sheets





FIG. 1

FIG. 2

FIG. 3

FIG. 9A

FIG. 9B

C 003696



5,069,001

1

# PIVOTABLE WINDOW SASH ASSEMBLY

## BACKGROUND OF THE INVENTION

The present invention relates to double-hung window assemblies and particularly to such windows having pivotally mounted sashes.

Pivoting sashes have become quite common in double-hung window assemblies as they have the usual advantage of being able to be raised and lowered as well as the special advantage of being tiltable to make cleaning of the window pane easier. Attention is directed to U.S. Pat. No. 4,581,850 which illustrates a double hung pivotal window assembly. While the structure of this patent and other similar commercial double hung pivoting assemblies have overcome many of the disadvantages of the prior window assemblies, several disadvantages still exist.

For example, a problem still arises where, during manufacturing and installation of the conventional assemblies, a "belly band" or similar elastic constriction must be used to maintain the assembly together so that the assembly remains truly square when installed in the window opening. Such "belly bands" while necessary, are a particular nuisance during transport and storage, since they must be kept in place during and after installation.

Another disadvantage occurs as a result of the inability to mount the sash to the sash frame, so that binding and warping of the sash frame are prevented. Still another problem arises out of the inability of locking the pivot sash in an open position so as to remove any stress on the pivot joint caused by its weight.

It is the object of the present invention to provide an improved pivotal sash assembly to overcome the aforementioned disadvantages as well to provide numerous other advantages will be obvious to persons skilled in the art from contemplation of the following disclosure.

## SUMMARY OF THE INVENTION

According to the present invention, a sash retaining and pivot assembly is provided which engages cooperatively with the sash weight slide. The pivot assembly is provided with a connecting T-Bar having wings which fit together with the slide, within the jamb frame channel so as to hold the jamb frame and sashes in a unitary manner. Further, the pivot assembly and the weight slide cooperate to effect locking of the sash in pivoted position.

The sash retaining pivot assembly of the present invention, when used within a window constructed with a "tilt in to clean" feature, will provide integral locking of the window sash within the window frame at the pivot location. While still allowing removal of the sash at a 90 degree tilt, the self aligning locking mechanism will engage and secure the sash within the frame at approximately a 60 degree tilt.

A window incorporating the sash retaining pivot assembly will provide advantages during window installation, as well as after window installation. During window installation, the sash retaining pivot assembly will retain alignment of the sash with the frame without the use of a "belly band". This will allow for easier shimming and squaring of the window within the opening.

After the window is installed within the opening, the sash retaining pivot assembly will continue to benefit the window construction by maintaining the alignment

2

of frame to sash, which will provide the window with a constant and proper spacing between frame and sash.

## BRIEF DESCRIPTION OF THE DRAWINGS

In The Drawings:

FIG. 1 is a fragmentary front elevational view of a double hung window assembly of a type to which the present invention is applied;

FIG. 2 is a sectional view along lines 2—2 of FIG. 1 showing the sash retaining assembly and weight slide assembly connecting the sash and jamb frame;

FIG. 3 is a fragmentary perspective view of the bottom corner of the window sash of FIG. 1 showing the sash retaining assembly extending from the sash;

FIG. 4 is an enlarged view of the sash retaining assembly removed from the sash and the mounting bracket for securing the same to the sash;

FIG. 5A is a bottom plan view of the unitary embodiment of the T-Bar and guide of the sash retaining assembly;

FIG. 5B is an end view of the T-Bar guide of FIG. 5.

FIG. 6A is a detailed view of the T-Bar looking at its end;

FIG. 6B is a side elevational detail of the T-Bar;

FIG. 6C is a top plan view in detail of the T-Bar;

FIG. 7 is a perspective view of the pivot shoe showing the T-Bar inserted therein;

FIG. 8A is a plan view of the pivot shoe;

FIG. 8B is a sectional view along line 8—8 of FIG. 8A;

FIG. 9A is an elevational view of the rotary cam used in the slide; and

FIG. 9B is a plan view of the rotary cam.

## DESCRIPTION OF THE INVENTION

The present invention is depicted in connection with double-hung windows of the type illustrated in FIG. 1, by the numeral 10. Such windows include a rectangular main jamb frame 12, forced of elongated channel sections, and a pair of sashes 14 and 16. The sashes have opposing vertical stiles 18, a top and bottom header 20 and a glass pane 22. The frame 12 and sashes 14 and 16 can be formed of metal although strong rigid plastic is currently preferred because of its thermal properties, ease of fabrication, strength and decorative durability. In general, the form of the sashes and jamb will follow conventional structure and form. Those features not of a conventional nature will be described herein and reference can be made to the aforementioned patent and others as well as commercial windows for the conventional features.

According to the present invention, the frame 12 as seen in FIG. 2 comprises an elongated continuous extrusion having in cross-section a inner sash channel 24 and an outer sash channel 26, each of which is cross sectionally C-shaped to provide an inwardly directed flange 28 defining a constriction slot 30. The exterior surfaces of the flanges 28 provide straight, smooth guides 32 against which the stiles 18 of the associated sash slide. If desired, as seen in FIG. 3 a pad of fabric, rubber or the like forming a slidable seal member 34 is adhered to the stile 18 to seal the space between the sash and the frame.

The sashes 14 and 16 are not only independently movable up and down within the frame, but are pivotal with respect to the frame to facilitate cleaning, maintenance and replacement of parts. To this end, the opposite sides of each sash is provided with a sash retaining

C 003698

5,069,001

**3**

assembly 36, fixed to the sash, and a slidable pivot-shoe assembly 38 located in the associated frame channel. Although only one such pair of retaining assemblies 36 and pivot shoe assemblies 38 are shown, it will be understood that each sash has two pairs, one pair on each of the right and left sides of the sash.

As seen in FIGS. 3 and 4, the sash retaining assembly 36 comprises an enlarged box-like body 40 from the forward end of which extends a T-Bar 42. The body 40 and T-Bar 42 may be unitarily molded or cast as depicted in FIGS. 5A–5B or may be formed of two parts that frictionally fit together using the T-Bar of FIGS. 6A–6C. Preferably, as seen in detail, the T-Bar is separate so that it may be adjusted longitudinally. T-Bar 42 has a generally rectangular cross-section with a longitudinally directed groove 44 on its upper side forming a keyed front end 46. Set back from the forward end of the T-Bar 42 and extending perpendicular to its axis are a pair of oppositely extending lateral wings 48 having arcuate extreme edges 50 and a back surface 52 which 20 has beveled ramps 53 on at least one edge. At least one hole 54 is formed in bottom of the body 40 between the two larger sides.

Returning to FIGS. 3 and 4 the body 40 of the assembly 36 is inserted within a receiving hole 56 formed in 25 the stile or header of the sash (14, 16) and held fixedly in place by a bolt 58 so the arms 48 are spaced predeterminately from the surface of the stile 18 or the associated header 20. The body 40 may be shaped and provided with enlarged embossment to such walls 60, etc. 30 so that when so inserted, will not twist within the receiving hole 56.

The slidable pivot shoe assembly 38, as shown in FIG. 7 consists of a flat molded plastic slide 64 of substantially rectangular shape and of width and thickness 35 so as to be closely and slidably received in channels 24, 26. The upper approximately two thirds of the slide 64 is provided with an enlarged window 66 bounded at its upper edge with a number of slots and fingers 68. The slots 68 and window 66 cooperate to receive and hold 40 the ends of any sash balance and weighted cords (not shown).

Turning now to FIGS. 8A and 8B, the remaining portion of the slide 64 is formed with a web 70 and both front and back faces 72 and 74 respectively. Front face 45 72 is cut back to form a recessed area. Passing through the slide 64 is a central bearing hole 76. Extending from the web 70 are a pair of brake shoes or flaps 78 located on either side of the central bearing hole 76. Each retaining flap 78 is integrally attached at its interior ends 50 80 to the web 70 at the front of slide 64, while the open end of each flap 78 is freely extending and enlarged to form a depending stop 82 so that the flap is resiliently liftable when an object is inserted between the flap and the recessed front face. In the preferred embodiment of 55 the instant invention, the back face 74 is formed with a recessed portion 86, so that the wings 48 of T-Bar 42 can be fitted and rotated within the dimensional envelope of pivot shoe assembly 38, allowing the wings 48 of T-Bar 42 to be positioned within same channel 24, 60 26 with the pivot shoe.

Set within the bearing hole 76 from the front recessed face 72 is a rotary cam 88 (FIGS. 9A and 9B) having a cylindrical hub 90 in which is formed a rectangular bore 92, of sufficient size to permit entry of the extending 65 forward end 46 of the T-Bar 42. An elongated key 94 extends the length of the bore 92 so as to mate with the keyway 46 in the T-Bar 42 insuring only proper entry of

**4**

the T-Bar into the cam. A semi-circular flange 96, extends radially from the front end of cylinder hub 90. The flange having beveled lateral wings 100 are being integrally formed at one side of the front end of cylindrical hub 90 while the opposite side has a straight edge 98.

The cam 88 is set within the central bearing hole 76 so that the arcuate flange 96 lies interiorly in the recessed area of front face 72 and the wings 100 lie between recessed front face 72 and the flaps 78. In this manner the straight edge 98 lies between the flaps 78 against the stops 82 in a resiliently locked position. Upon exertion of rotary force on the cam 88, the beveled wings 100 of the flange 96 wedge beneath the stops 82 of flaps 78 forcing the flaps 78 away from front face 72 allowing the cam to rotate until the opposing square corners of the straight edge 98 abut against stops 82. The locked position and the rotated position define the extreme positions in which the sash is pivoted.

Mounting of the sash within the frame should now be clear. The pivot shoe assembly 38 is prepared i.e., the slide 64 and the cam 88 are assembled. Thereafter, the forward keyway 46 of the T-Bar 42 is inserted in the rectangular bore 92 of the cam 88 and the window sash with the entire retaining assembly placed between the opposed jamb frame 12. In making this placement, the pivot shoe assembly 38 and the lateral wings 48 of the T-Bar 40 are placed within the appropriate slot 30 in the jamb frame 12, as seen in FIG. 2, so that the pivot shoe assembly is slidable therein. Since the back face 74 of the slide 64 is cut back to form a recess, both the slide 64 and the lateral wings 48 of the T-Bar sit between the inner surface of the flange 28 and the bottom wall of the channel 30, holding the sashes and the jamb frame 12 square with each other. Attachment of the bolt 58 in this condition joins the retaining assembly 36, including the T-Bar 42 to the sash and attaches the entire unit to the jamb frame in a unitary manner for transport and storage. As a result, the entire window assembly becomes a single unit obviating the need for the conventional "belly band" or other strapping.

Because the flaps 78 pivot only in response to the turning of the cam from the back side of the slide 64, the slide may move freely along the length of the channel until the beveled edge 98 is forced beneath the flaps 78. When this occurs, the flaps frictionally engage the bottom wall of the channel and acts like a shoe brake arresting movement of the slide and thus of the window. Because the T-Bars are firmly fixed to the sash and the wings 48 fit behind the flanges 28 of the channels, the frames are captivated to the sash, and cannot belly out i.e., bow or warp, during or after installation, nor during storage and transportation when there is no jambs support for them.

In operation, the installed double hung window assembly of the present invention functions in the generally conventional manner, in that the sashes are freely movable upward and downward against their balance weights. When desired, either one of the sashes may be pivoted inwardly causing the retaining assembly 36 to be rotated resulting in rotation of T-Bar 42, and thus, the cam 88. As cam 88 rotates, its flange 96 causes the flaps 78 to pivot outwardly, forcing them to press with great frictional force against the inside wall of the channel 30 until this force overcomes any desire for the sash to move upwardly or downwardly or to further pivot. Thus, in this tilted position, the pivot window is held

C 003699

5,069,001

<table>
<tr><td>5</td><td>6</td></tr>
</table>

fast and securely against inadvertent movement. It may be washed or repaired etc., without fear of change.

It will be clear that the slide and T-Bar can be assembled with either the upper or lower sash, and merely by adjusting the extension of the T-Bar from the stile will fit into either the front or rear channel of the jamb frame 12. In either situation the pivot assembly will function in the same way. Likewise, the pivot assembly is obviously applicable to windows with horizontally slidable/rotatable sashes.

Various modifications, changes and embodiments have been disclosed herein. Others will be obvious to those skilled in the art. Accordingly, it is to be understood that the foregoing disclosure is illustrative only and not limiting of the invention.

What is claimed is:

1. An apparatus for mounting a tilt window sash to a channeled window frame, comprising a pivot shoe, said pivot shoe having a side with a recessed area facing the sash, said pivot shoe being slidably located in the channel of the window frame, and a T-Bar having an elongated body with inner and outer ends and a pair of radially extending wings near the outer end of said body, the inner end of said body being adapted for mounting to the window sash, the outer end and wings of said T-Bar projecting from the sash into said pivot shoe so that the wings of said T-Bar lie rotatably within the recess of said pivot shoe in the window frame channel, the body of said T-Bar providing a pivotal axis for tilting the sash, the outer end of said body engaging said pivot shoe and said wings engaging the window frame channel to maintain alignment of the window frame and sash assembly.

2. The apparatus as set forth in claim 1, further comprising means for adjusting the mounted position of said T-Bar.

3. The apparatus as set forth in claim 1, wherein said body has walls of sufficiently large dimensions so that rotation of said body relative to the sash is prevented when said body is mounted in the sash and the sash is tilted relative to the window frame.

4. The apparatus as set forth in claim 1, wherein said pivot shoe has a bore transversely therethrough and a rotatable cam in the bore, said cam having a cylindrical hub, said hub being adapted to engage the outer end of said T-Bar so that said pivot shoe, when engaged with said T-Bar, provides a guide for the sliding and tilting of the sash in the window frame.

5. The apparatus as set forth in claim 4, wherein said pivot shoe has an upper edge and one or more fingers extending from said upper edge, said one or more fingers being adapted for cooperatively engaging a window counterbalance means.

6. The apparatus as set forth in claim 4, wherein the outer end of said T-Bar has a longitudinal slot, and said hub has a key adapted to engage said slot so that when said T-Bar and said hub are engaged, said slot and said key engage, and said T-Bar and said hub are locked together so as to rotate conjointly in said pivot shoe when the sash is tilted.

7. The device as recited in claim 6, wherein said pivot shoe further comprises brake means for frictionally engaging the window frame channel, said brake means being responsive to tilting of the sash in the window frame, so that when the sash is tilted in the window frame, said brake means frictionally engages the window frame channel preventing said pivot shoe, and thus the sash from sliding in the window frame.

8. The device as recited in claim 7, wherein said pivot shoe brake means comprises:

a) one or more outward facing brake flaps, each of said brake flaps having a first end joined to said pivot shoe, and a second end freely extending from said first end, said brake flap being positioned alongside the bore in said pivot shoe; and

b) a beveled semicircular flange extending radially from a first end of said hub of said cam, said semicircular flange being positioned underneath said second end of said brake flap, so that when the sash is tilted, said T-Bar causes said cam to rotate, forcing said second end of said brake flap to slide up the beveled edge of said semicircular flange, said brake flap being spread outwardly from said pivot shoe, and said second end of said brake flap frictionally engages the window frame channel, preventing sliding of said pivot shoe in the channel, and consequently preventing the sliding of the sash in the window frame.

9. The device as recited in claim 8, wherein said cam further has a squared flange extending radially from said first end of said hub, said squared flange being diametrically opposite said semicircular flange, said squared flange having dimensions selected so that said squared flange engages underneath said brake flap substantially at a predetermined angle of sash tilt, so that further tilting of the sash is prevented and the sash is supported substantially at said predetermined angle.

* * * * *

# EXHIBIT 29

(19)日本国特許庁（ＪＰ）　　(12)**公開実用新案公報**（Ｕ）　　(11)実用新案出願公開番号

# 実開平4−119083

(43)公開日　平成4年(1992)10月23日

(51)Int.Cl.⁵　　　　　　識別記号　　庁内整理番号　　　　ＦＩ　　　　　　　　　　技術表示箇所
　Ｅ０５Ｆ　　7/04　　　　　　　　　　9024−2Ｅ
　Ｅ０５Ｄ　13/00　　　　　　　Ｋ　9024−2Ｅ

審査請求　未請求　請求項の数1（全 3 頁）

(21)出願番号　　　実願平3−30663

(22)出願日　　　　平成3年(1991) 4月5日

(71)出願人　390005267
　　　ワイケイケイアーキテクチュラルプロダク
　　　ツ株式会社
　　　東京都千代田区神田和泉町1番地
(72)考案者　西江　孚
　　　富山県黒部市若栗2902−26
(74)代理人　弁理士　久門　知

---

(54)【考案の名称】　上げ下げ窓

(57)【要約】
【目的】　摺動ブロックを固定するためのビスの室内側
への露出をなくすと同時に、内障子の上框の上面を平坦
にし、その意匠性，清掃作業性及び安全性を高める。
【構成】　内障子$S_1$と外障子$S_2$を、その上框の両側に設
置され、縦枠$F_1$, $F_1$の収納溝$F_2$, $F_2$内に差し込まれる摺
動ブロック1，1をガイドとして昇降させる上げ下げ窓
であり、摺動ブロック1を内障子$S_1$の上框$f_1$に連結する
平板部1aと、これから垂下する垂下片1bとから構成し、
垂下片1bを内障子$S_1$の縦框$f_2$内に上方より挿入して設置
することにより、内障子$S_1$の上框$f_1$に案内溝を形成せ
ず、ビス2を縦框$f_2$の室外側から締め付けることにより
ビス2の室内側への露出をなくし、内障子$S_1$の意匠性，
清掃作業性及び安全性を高めたものである。



C 004280

〈2〉　　　　　　　　実開平4－119083

*1*

【実用新案登録請求の範囲】
【請求項1】　窓枠Fの室内側と室外側にそれぞれ内障子$S_1$と外障子$S_2$が建て入れられ、内障子$S_1$と外障子$S_2$が、上框の両側から張り出して縦枠$F_1$、$F_1$の収納溝$F_2$、$F_2$内に差し込まれる摺動ブロック1をガイドとして昇降する上げ下げ窓であり、内障子$S_1$の摺動ブロック1は、上框$f_4$の上面に連続する平板部1aと、その下面から垂下する垂下片1bとからなり、内障子$S_1$へは垂下片1bが縦枠$f_1$内に上方から差し込まれて設置され、縦枠$f_1$の室外側から締め付けられるビス2で固定されていることを特徴とする上げ下げ窓。
【図面の簡単な説明】
【図1】摺動ブロックの縦框への設置の様子を示した斜視図である。
【図2】摺動ブロックの縦框と縦枠への納まり状態を示

*2*

したもので、図3のX－X線の断面図である。
【図3】摺動ブロックの上框への納まり状態を示したもので、上げ下げ窓の縦断面図である。
【図4】上げ下げ窓の外観を示した立面図である。
【図5】摺動ブロックの製作例を示した平面図である。
【図6】図5のY－Y線の矢視図である。
【図7】図5のZ－Z線の矢視図である。
【符号の説明】
F……窓枠、$F_1$……縦枠、$F_2$……収納溝、$S_1$……内障子、$f_1$……縦框、$f_2$……張出片、$f_3$……差込み溝、$f_4$……上框、$S_2$……外障子、$f_6$……下框、$f_5$……縦框、1……摺動ブロック、1a……平板部、1b……垂下片、1c……ビスホール、1d……張出片、1e……開口、2……ビス、3……バランサ、4……鼠間。

【図1】



【図3】



【図5】　　　【図6】



－256－

C 004281

(3)　　　　　　　　　　実開平4－119083

【図2】



【図4】



【図7】



C 004282

実開平4－119083

【考案の詳細な説明】

【0001】

【産業上の利用分野】

この考案は上框の両側に設置される摺動ブロックによりガイドされながら昇降する上げ下げ窓に関するものである。

【0002】

【従来技術及び考案が解決しようとする課題】

従来の上げ下げ窓には、室内側と室外側に配置される内障子と外障子とを、予め方形状に組まれた窓枠の縦枠内にけんどん式に建て入れ、上框の両側から張り出し、縦枠の収納溝に内接して障子の面外移動を拘束する摺動ブロックによって案内させながら昇降させる形態がある。

【0003】

この障子の昇降を案内する摺動ブロックは、上記の通り組み立ての都合上、障子の建て入れ後に取り付けられ、また取付作業上、障子の上框に上方からビスによって固定されるが、内障子は平常時、外障子より常に下側に位置するためビスは室内に露出する状態となり、従来の摺動ブロックの取り付け方は窓の意匠性を低下させているのが実情である。

【0004】

例えば実開昭63-46577号に示されている摺動ブロックのように、一旦上框上に載せた後にこれに沿って縦枠側へスライドさせられることにより所定位置に固定されるタイプでは、上框にはこのスライドをガイドする案内溝が付けられるが、この案内溝は自身でも見栄えが悪いことに加え、上框と摺動ブロックとの間に段差を与えるため、ビスと同様に意匠性と清掃作業性の低下を招き、摺動ブロックもそのスライドする量に対応してある程度の大きさを持つため上框上で目立つ存在となっている。

【0005】

更にこの上框内で摺動自在な取付方法では、長年の使用によりビスの緩みが生じた際に摺動ブロックが移動し、障子が窓枠から離脱する可能性がある等の問題も指摘される。

－4－

C 004283

実開平4－119083

【0006】

この考案はこうした従来の上げ下げ窓の、摺動ブロックの設置に伴う実情を踏まえてなされたもので、意匠性や清掃作業性，及び安全性の問題を解消する形態の上げ下げ窓を新たに提案しようとするものである。

【0007】

【課題を解決するための手段】

本考案では摺動ブロックを内障子の縦框内に上方から差し込んで設置し、縦框に室外側からビスで固定することによりビスの室内への露出をなくすと同時に、上框の上面を平坦にし、内障子の意匠性と清掃作業性，及び安全性を高める。

【0008】

摺動ブロックは、上面が平坦となった平板部と、その下方から垂下する垂下片とからなり、垂下片が開口した縦框内に上方から単に差し込まれることにより所定位置に設置され、この垂下片の位置で縦框を室外側から障子の面外方向に貫通するビスによって縦框に固定される。このとき、平板部が縦框の小口を塞ぎ、その、外部に露出する上面が上框の上面に連続する。

【0009】

ビスは室内側への露出を避けるために室外側に位置するが、平常時は常に上側に位置する外障子によって、また外障子と内障子の閉鎖時には外障子の下框によって完全に隠蔽され、施錠状態では防犯性は保たれる。

【0010】

上框の上面は、摺動ブロックが上記の通り、縦框の内部に落とし込まれて取り付けられることによって案内溝が不要な平坦面でよく、整然とした外観となり、また清掃を容易にする。

【0011】

更に摺動ブロックは縦框内に挿入されて安定することによりビスの緩みが生じた際にも面内方向への移動はなく、障子の脱落の発生は防止される。

【0012】

【実施例】

以下本考案を一実施例を示す図面に基づいて説明する。

C 004284

実開平4−119083

【0013】

この考案の上げ下げ窓は、図3，図4に示すように窓枠Fの室内側と室外側にそれぞれ内障子$S_1$と外障子$S_2$を、それぞれの上框の両側から張り出して縦枠$F_1$，$F_1$の収納溝$F_2$，$F_2$内に差し込まれる摺動ブロック1をガイドとして昇降自在に建て入れたもので、特に内障子$S_1$の摺動ブロック1を固定するためのビス2を室外側に位置させ、内障子$S_1$の上框$f_4$の意匠性を向上させたものである。

【0014】

内障子$S_1$の摺動ブロック1はその設置の様子を示す図1，及び製作例を示す図5〜図7のように上框$f_4$に連続する平板部1aと、その下面から垂下する垂下片1bとからなり、垂下片1bが縦枠$f_1$の内部に上端から挿入されて所定位置に設置され、室外側から締め付けられるビス2によって縦枠$f_1$に固定される。

【0015】

摺動ブロック1の垂下片1bは図1，及び図3のX−X線の断面図である図2に示すように縦框$f_1$の外周側に並列して張り出す張出片$f_2$，$f_2$によって形成される差込み溝$f_3$に内接する断面形状をし、この差込み溝$f_3$内に、内障子$S_1$の建て入れ後に上方から挿入される。垂下片1bの長さは差込み溝$f_3$内で安定する大きさを持ち、その室外側の側面には図5のY−Y線の矢視図である図6に示すように縦框$f_1$の室外側の張出片$f_2$を貫通して締め付けられるビス2を受けるビスホール1cが1箇所，もしくは複数箇所明けられる。

【0016】

ビス2は図1に示すように縦框$f_1$の室外側から、また高さ方向には図3に示すように外障子$S_2$の下框$f_5$の見付け幅の範囲内で締め付けられ、室内からは完全に隠れると同時に、室外からも内障子$S_1$の開放時には外障子$S_2$のいずれかの部分で塞がれ、内障子$S_1$と外障子$S_2$の閉鎖時にも外障子$S_2$の下框$f_5$によって完全に遮断され、ビス2の位置が室外側を向くことによる防犯上の問題は生じない納まりとなっている。

【0017】

平板部1aは図1，図2，及び図5に示すように垂下片1bの上端から縦枠$F_1$側へ張り出してその収納溝$F_2$の断面形状に対応し、これに内接する平面形状をし、収

—6—

C 004285

実開平4-119083

納溝F2に2方向に係止しながら摺動して内障子S1の昇降をガイドする。平板部1a
の上框f4側には図5～図7に示すように上框f4の上に重なる張出片1dが突設され
ている。

【0018】

　平板部1aの上面は張出片1dを含めて平坦に形成されており、張出片1dによって
上框f4の上面に連続する。この平板部1aの上框f4側の見込み幅は図5のZ-Z線
の矢視図である図7に示すように垂下片1bの幅、すなわち縦框f1の見込み幅方向
の内法寸法より大きく、その室外側の端面は図2，図3に示すように外障子S2の
縦框f8に接して摺動する。

【0019】

　平板部1aの縦枠F1側の半円状の開口1eは、図2に示すように縦枠F1の内周に鉛
直に懸垂して架設され、障子の荷重を支持しながら、これを任意の位置で停止さ
せるためのバランサ3との衝突を回避するための切欠きである。

【0020】

　摺動ブロック1，1は内障子S1を、上框f4の両側の収納溝F2，F2と外障子S2の
縦框f8，f8に沿って摺動させ、面外移動を拘束しながら昇降させるとともに、内
外障子S1，S2の縦框f1，f8間に形成されている隙間4を塞ぎ、風雨の浸入を防止
している。

【0021】

【考案の効果】

　この考案は以上の通りであり、摺動ブロックを内障子の縦框内に上方より差し
込んで設置し、ビスを縦框の室外側から締め付けることにより固定するものであ
るため、室内側へのビスの露出はなくなり、同時に上框への案内溝の形成が不要
であるため上框の上面を平坦に形成することができ、内障子の意匠性と清掃作業
性を高めることができる。

【0022】

　また摺動ブロックの多くの部分は縦框内に納まるため、内障子の外部への露出
が少なく、障子の意匠へ与える影響も少ない。

【0023】

C 004286

実開平4−119083

　加えて摺動ブロックは縦框内に挿入されるため、ビスの緩みが生じた際に、これが障子の面内方向に移動することはなく、障子の脱落は防止され、安全性が保たれる。

C 004287

# EXHIBIT 30

# 公開実用平成 1—112279

⑲ 日 本 国 特 許 庁（ＪＰ）　　　　⑪実用新案出願公開

⑫ **公開実用新案公報（Ｕ）**　　平1−112279

| ⑤Int.Cl.⁴ | 識別記号 | 庁内整理番号 | ㊸公開　平成1年(1989)7月28日 |
|---|---|---|---|
| E 05 C 17/64 | | 8604−2E | |

審査請求　未請求　請求項の数 3 （全　頁）

㉠考案の名称　　上げ下げ窓

㉗実　　願　　昭63−6447
㉒出　　願　　昭63(1988)1月20日

㉞考 案 者　　墨 田　　　進　　石川県加賀市上野町ツ6番地
㉞考 案 者　　北 島　　一 憲　　石川県加賀市大聖寺上福田町ニ44−3
⑪出 願 人　　墨 田　　　進　　石川県加賀市上野町ツ6番地
⑪出 願 人　　北 島　　一 憲　　石川県加賀市大聖寺上福田町ニ44−3
㉞代 理 人　　弁理士 平崎　彦 治

C 004288



明　　細　　書

1・考案の名称

　　上げ下げ窓

2・実用新案登録請求の範囲

（1）外枠に入れられ、上・下動する可動障子や窓を有す上げ下げ窓において、該可動障子等の内枠にクランプ装置を装着したことを特徴とする上げ下げ窓。

（2）上記クランプ装置として自動摩擦固定型チェーンクランプ装置を装着し、該自動摩擦固定型チェーンクランプ装置とは、リンクの両サイドに突出したチェーンを階段状に屈曲してその一端をケースに固定し、他端にはクランプ解除用の解除金具を連結するとともに、該チェーンを上下方向に引き伸ばすためのバネ力を作用させ、上記外枠に形成したガイド片を突出した両ピン列でもって挟持した実用新案登録請求の範囲第1項記載の上げ下げ窓。

（3）上記ピン列とガイド間に座板を介在した実用

1

968

C 004289

公開実用平成 1—112279



新案登録請求の範囲第2項記載の上げ下げ窓。

3・考案の詳細な説明

（産業上の利用分野）

　本考案は障子等を上下に移動して任意の開度で停止できるようにした上げ下げ窓に関するものである。

（従来技術）

　障子を上下半分に分割して、下方に位置する障子を上下動させて適当な高さに停止させるようにした上げ下げ窓は、従来から使用されている形式の窓である。例えば電車窓もそうであり、懊等住宅にもこのような上げ下げ窓は用いられている。ところで、従来形式の上げ下げ窓は開閉時に可動障子に設けた操作装置で爪を進退させ、サッシの縦枠に形成したストッパーに係脱させるタイプのもので、該上げ下げ窓は、開度がストッパーの位置に合わせて階段的となり、任意の開度を得ることができない。又このタイプの上げ下げ窓は可動障子を持ち上げておいてから不用意に手を放す

2

969

C 004290

と、該可動障子は自重によって直下のストッパー位置まで即座に下降し危険なことがある。特にこの障子がガラス障子の様に比較的重量があって下降に弾みが付いたりすると直下のストッパーでは止まらずに下枠にまで落下してしまい、非常に危険なことがある。

　一般に上げ下げ窓では開く時に重く、下げる時に加速されて危険なため、カウンターウエイトを用いたり（バランサー方式）、室内側と室外側の障子を滑車を介してワイヤーで連結し相互に自重を均衡させたり（吊り車方式）、あるいはスパイラルスプリングで可動障子の自重を均衡させている（スパイラルバランサー方式）。しかし、これらは何れも可動障子の移動に伴なって、カウンターウエイト或いはカウンターウエイト相当部材が移動するためのスペースとか、スパイラルスプリングを収納するためのスペースを必要とし、サッシの縦枠や横枠の見込み、見付け寸法が大きくなり、壁厚の小さな箇所に用いられることの多い前記した爪とストッパーを用いているタイプの

3

970

C 004291

# 公開実用平成 1— 112279

上げ下げ窓に適用することは困難であった。

（本考案の目的）

このように従来の上げ下げ窓には上記のごとき問題が存在する訳であり、本考案はこれら問題点の解決を目的として開発されたもので、可動障子が如何なる位置（高さ）においても停止し、任意の開度を持ち得る、しかもスペースをとらない上げ下げ窓を提供するものである。

（本考案の構成）

本考案に係る上げ下げ窓は上記問題点の解決を図るため、次の特徴をもって構成されている。すなわち、可動障子の左右縦框に自動摩擦固定型チェーンクランプ装置等を装着し、クランプ装置の摩擦固定を解くための操作部を可動障子の内枠に配置し、該可動障子の上下動をガイドする外枠には、上記クランプ装置に係合するガイド片を形成していて、該ガイド片に沿って上下動する上げ下げ窓である限り、その形式は任意である。

ここで自動摩擦固定型チェーンクランプ装置とは、チェーンを用いた装置であって、該チェーン

4

971

C 004292

は一定ピッチをもって屈曲する多節体であって、屈曲の中心となるピンをリンクの両サイドに突出させ、チェーンを階段状に屈曲させた状態で上端をケースに固定し、下端には摩擦固定を解くための操作部となる解除金具を連結している。そして、屈曲させることで一定間隔をおいて並列された両ピンの列の間には上記外枠のガイド片が位置していて、ピンの外周面が該ガイド片と接した状態にあって、可動障子の移動を阻止する。又各ピンをガイド片に直接接触させることなく、間に座板を介在させることもでき、更にチェーンの固定端を上・下端に設け、中間に摩擦固定を解くための操作部を連結することで、上・下方向のクランプを得るように構成してもよい。上記自動摩擦固定型チェーンクランプ装置は、窓の上下動を固定するための一手段であって、磁石やその他適当な方法を採用することも可能となる。

　以下、本考案に係る上げ下げ窓の実施例を図面に基づいて詳細に説明する。

（実施例）

5

972

C 004293

# 公開実用平成 1— 112279



　第1図はたてげ下げ窓の具体例であって、1は可動障子、2は固定障子、3は外枠を示し、上記可動障子1及び固定障子2は外枠3に収まっていて、該可動障子1のみ外枠3に形成されたガイド片に沿って上下動可能に案内されている。可動障子1はガイド片に沿って如何なる高さでもクランプされ、任意の開度を得ることが出来るように、該可動障子1の両サイドには自動摩擦固定型チェーンクランプ装置（以下、クランプ装置と省略）を装着している。

　第2図は該クランプ装置4を可動障子1に装着した状態であって、可動障子1は外枠3に沿って上下可能に内枠5を形成し、該内枠5にはガラス6が止着され、上記クランプ装置4は該内枠5の一部を切欠いて装着されている。ところで、該クランプ装置4は上・下方向の移動をクランプするための両サイドクランプ方式であって、摩擦固定を解くための解除片7、7が内枠5の一部を切り欠いた箇所から突出し、該解除片7にはアンクランプ用ツマミ8、8を連結している。

6

973

第3図、第4図はクランプ装置の詳細図であって、ケース9内には左右にチェーン10a、10bが階段状に屈曲して収納され、その一端は固定端11a、11bとしてケース9に固定されている。そして該チェーン10は複数枚のリンク12、12・・・をピン13を屈曲中心として連結したもので、これら各ピン13、13・・・は該リンク12から両側に突出している。突出したピン13には座板14がそれぞれ内側に面して付着された状態にあり、又チェーン10の両サイドのピンは自由端15a、15bとなっていて、該自由端15a、15bは解除金具16に連結されている。更にケース9の中央にはコイルバネ17が収められ、該コイルバネ17のバネ力は、上記解除金具16を両方向に押し拡げるよう作用している。

第5図は該クランプ装置が内枠5に装着され、外枠3に収められた状態の断面であって、該外枠3のガイド片18の両面に上記座板14が密着し、該座板14にはチェーン10の突出したピン

7

974

C 004295

公開実用平成 1ー112279



　１３からの圧力が作用している。したがって、ク
ランプを解除する場合には上記解除金具１６の解
除片７、７を互いに接近させることで屈曲した
チェーン１０を更に屈曲させて各ピン１０、
１０・・・を座板１４から外すことで、該座板
１４を介してガイド片１８に作用する面圧を除去
する。

　ところで、該クランプ装置４は上・下方向の同
時クランプする機能を持つものであるが、可動障
子１は下方に降下する動きを阻止するだけでもよ
く、この場合には上方向に固定端１１を設けた
１本のチェーン１１を用いればよく、すなわち、
第３図、第４図の中立軸の片側で機能させること
ができる。

　更に一方、上記座板１４はガイド片１８がアル
ミ等の比較的軟らかい材質であって、接触ピン
１３を接触させる場合に、該ガイド片１８表面に
キズが発生する事態を防止する役目を成すもので
あって、該ガイド片１８が非常に硬くて、ピン
１３の圧縮力により発生するヘルツ圧に耐え得る

8

975

C 004296



ものであるならば、該座板１４を必要とするもの
ではない。

　可動障子１の内枠５にこのようなクランプ装置
を装着することで、該可動障子１を任意の開度で
開くことが出来るもので、該可動障子１を開く場
合には、解除片７と連結しているツマミ８を動か
してクランプを解除し、適当な位置で該ツマミ
８を放せば再び自動的にクランプする。すなわ
ち、該クランプ装置４にはコイルバネ１７が内蔵
されていて、常時チェーン１０を引き伸ばし、ピ
ン１３、１３が座板１４に接触するように作用し
ている。したがって、座板１４はガイド片１８と
接することになり、該クランプ装置４が移動しよ
うとすれば、該チェーン１０をより一層引き伸ば
そうとし、該ピン１０、１０・・・は大きな力で座
板１４すなわちガイド片１８を圧縮し、大きな摩
擦力を生じる。

　上記実施例は可動障子１と固定障子２を外枠
３に装着し、該可動障子１のみを上・下動させて
窓の開閉を行なったものであるが、第６図ａ、

976

C 004297

公開実用平成 1ー112279



　ｂ、ｃは窓の中央を境として上・下方向に両開き
を行なうことのできる上げ下げ窓である。同図に
示すごとく、上窓１９及び下窓２０が外枠３に形
成された開口部２３を閉じ、該開口部２３の中央
にて凹凸部２４を介して接し合っていて、該上・
下窓１９、２０は一連のワイヤー２１にて連結さ
れ、該ワイヤー２１は外枠３の上端に軸支された
滑車２２に巻き掛けられている。したがって、上
・下窓１９、２０は重量的にはバランスされて、
外枠３に形成されているガイド片１８に沿って上
下動可能に装着され、しかも、如何なる位置にて
も開度を固定出来るクランプ装置４が取着されて
いる。同図においてａ、ｂは上・下窓１９、
２０が閉じた状態であるが、ｃは開いた状態を示
している。

　第７図は外枠３の上・下に開口部２３ａ、
２３ｂを有し、該開口部２３を開閉する上窓
１９と下窓２０がそれぞれ装着されていて、同じ
く上・下窓１９、２０はワイヤー２１にて連結さ
れ、該ワイヤー２１は滑車２２に巻き掛けられて

１０

977



いる。更に第8図は前記第6図に示す実施例に類

似するもので、下窓に代ってウエイト２５を装着

し、上窓１９と該ウエイト２５がワイヤー２１に

て連結され、滑車２２に巻き掛けられている。勿

論、該ウエイト２５、ワイヤー２１及び滑車

２２を除去した場合が前記第１図に示す上げ下げ

窓であるが、該上窓１９の重量が大きい場合で

も、該ウエイト２５とバランスさせることによ

り、容易に開閉操作を行ない得る。。同じように

第9図の場合には、外枠３の下方に開口部２３を

形成し、該開口部２３には窓２６が装着され、該

窓２６とウエイト２５とが重量的にバランスさ

れ、ワイヤー２１によって連結されている。した

がって、クランプ装置４を解除すればウエイト

２５とのバランスにより、該窓２６は容易に開口

でき、任意の開度にて再びクランプすることがで

きる。

これら実施例で述べたクランプ装置４は単なる

一例に過ぎず、該実施例に限定するものではない

が、次のような効果を得ることができる。

１１

978

C 004299

公開実用平成 1— 112279

（効果）

（1）可動障子の内枠にクランプ装置を装着することで、該可動障子は任意の高さで停止することができ、最適な開度を得ることができる。しかも、開閉操作は単にツマミを持って上・下移動でき、至って簡単である。

（2）又該クランプ装置は、従来から用いられている可動障子の内枠の一部を切り欠いて装着できるもので、上げ下げ窓における縦枠の身付けや見込み寸法を変更する必要が無い。

（3）窓の開閉時には、可動障子のツマミを持つだけで該可動障子を上・下動可能な状態にでき、逆に手をツマミから離すだけで直ちにクランプ状態となるため、該可動障子が不用意に落下する等の危険を無くし得る。更に重量的にバランスした対向窓、若しくはウエイトと連結作動させることにより、開閉操作は容易となり、クランプ装置も簡易なもので十分である。


4・図面の簡単な説明

1 2

979

C 004300



　第1図は上げ下げ窓の具体例を、第2図は可動障子にクランプ装置を装着した状態を、第3図、第4図はクランプ装置の1例であって、第3図は正面からの断面図を、第4図は一部断面を含む平面図を、更に第5図は内枠にクランプ装置を装着し、外枠に収まった状態の断面図をそれぞれ示し、第6図〜第9図は上げ下げ窓の他の実施例である。


| 1・・・・・可動障子 | 2・・・・・固定障子 |
|---|---|
| 3・・・・・外枠 | 4・・・・・クランプ装置 |
| 5・・・・・内枠 | 6・・・・・ガラス |
| 7・・・・・解除片 | 8・・・・・ツマミ |
| 9・・・・・ケース | 10・・・・・チェーン |
| 11・・・・・固定端 | 12・・・・・リンク |
| 13・・・・・ピン | 14・・・・・座板 |
| 15・・・・・自由端 | 16・・・・・解除金具 |
| 17・・・・・コイルバネ | 18・・・・・ガイド片 |
| 19・・・・・上窓 | 20・・・・・下窓 |
| 21・・・・・ワイヤー | 22・・・・・滑車 |

13

C 004301

公開実用平成 1 — 112279

23‥‥‥ 開口部              24‥‥‥ 凹凸部

25‥‥‥ ウエイト            26‥‥‥ 窓

実用新案登録出願人      黒 田      進

　　　　　〃          北 島 一 憲

代　　理　　人   平 崎 彦 治

1 4          981

C 004302

公開実用平成 1－112279





第 1 図





第 2 図

実公 1－112279

1982

C 004303

公開実用平成 1―112279



第 3 図

第 4 図

9l83

C 004304

公開実用平成 1—112279



第 5 図

C 004305



C 004306

公開実用平成 1—112279



第 7 図

986

C 004307



第 8 図

C 004308



公開実用平成 1—112279

第 9 図

988

C 004309

公開実用平成 1— 112279

手　続　補　正　書

昭和６３年９月１日 

特許庁長官　吉田文毅殿

１．事件の表示

　　　昭和６３年実用新案登録願第６４４７号

２．考案の名称

　　　上げ下げ窓

３．補正をする者

　　　事件との関係　　実用新案登録出願人

　　　住　所　　　石川県加賀市上野町ツ６番地

　　　氏　名　　　　墨田　進　外１名

４．代理人

　　　住　所　　〒910 福井県福井市日の出1-18-6

　　　　　　　　☎(0776) 22-7450

　　　氏　名　　弁理士（8716）平崎彦治

５．補正命令の日付

　　　昭和６３年３月３０日　　（発送日63.4.19）

６．補正の対象

　　　「図　面」

７．補正の内容

　　　別紙の通り

989

C 004310

# EXHIBIT 31

JIKKOHEI 8-9334

(19)日本国特許庁（ＪＰ）　　　　(12) **実用新案公報** (Y2)　　　　(11)実用新案出願公告番号

# 実公平8−9334

(24)(44)公告日　平成8年(1996) 3月21日

| (51)Int Cl.⁶ | 識別記号 | 庁内整理番号 | ＦＩ | 技術表示箇所 |
|---|---|---|---|---|
| E05D 13/00 | | A | | |

請求項の数1（全 4 頁）

| | | |
|---|---|---|
| (21)出願番号 | 実願平2−97315 | (71)出願人　999999999<br>ワイケイケイアーキテクチュラルプロダクツ株式会社<br>東京都千代田区神田和泉町1番地 |
| (22)出願日 | 平成2年(1990) 9月17日 | |
| (65)公開番号 | 実開平4−53986 | (72)考案者　髙橋　省司<br>香川県三豊郡大野原町中姫1689 |
| (43)公開日 | 平成4年(1992) 5月8日 | (74)代理人　弁理士　久門　知 |
| | | 審査官　山田　忠夫 |
| | | (56)参考文献　実開　昭53−108069（ＪＰ，Ｕ）<br>実公　平1−37079（ＪＰ，Ｙ2） |

(54)【考案の名称】　障子の外れ止め具付き摺動部

**1**

【実用新案登録請求の範囲】

【請求項1】障子Aの竪框1の上方に取り付けられた摺動片Cに窓枠Bの垂下レール3より障子Aが離脱するのを防止する外れ止め具Dを上下方向に調節可能に付設してある外れ止め具付き摺動部において、前記外れ止め具Dは、水平片5と、その水平片5の後端に連続し、上下方向に長孔7を形成し、下端に抱持部8を有する垂下片6とからなる略L字形状のものであり、前記摺動片Cは、上方に垂下レール3の係合するレール溝9とそのレール溝9の下部にビス10の貫通するビス貫通穴11とを形成する基体12と、基体12から垂下し前記外れ止め具Dの　　10　抱持部8により抱持される弾性片13を有し、この弾性片13にはその垂下方向の中間部に側面より膨出する突起部14と垂下方向の端部に抱持部8の下方への摺動を規制する規制部15とを設け、抱持部8が弾性片13の突起部14と

**2**

規制部15との間に保持されるとともに、水平片5を操作することで弾性片13が弾発変形し抱持部8が突起部14と基体12との間に移送されるとともに、上下方向に調節可能に保持し、外れ止め具を摺動片のビス貫通穴11および外れ止め具Dの長孔7を挿通するビス10により摺動片Cに固着しうるようにしてあることを特徴とする障子の外れ止め具付き摺動部。

【考案の詳細な説明】

〔産業上の利用分野〕

　この考案は障子の外れ止め具付き摺動部の構造に係るものである。

〔従来技術と考案が解決しようとする課題〕

　窓枠の垂下レールに嵌合する障子の外れ止めに関しては多くの考案が提案されている。その一例として実公昭64−1417号公報に示されているものが知られている。

(2)　　　　　　　実公平８－９３３４

3

　すなわち　障子の竪框上端に嵌着され上枠の垂下レールと係合する係合溝を備えた振れ止め部材とこの振れ止め部材に上下動可能に保持される操作片を設けた外れ止め部材とからなり、振れ止め部材と外れ止め部材に障子の竪框と上框との連結用ビスの通し穴を設け、外れ止め部材に設けた通し穴を上下方向の長孔に形成することを特徴とするものである。

　この構造であると、外れ止め部材は振れ止め部材に対して上下動自在となっているので、大量生産下での手作業による障子の組立てにおいては、外れ止め部材の長孔の任意の位置にビス止めにより外れ止め部材を振れ止め部材に取り付け、外れ止め部材の上下方向の取付け位置は必ずしも一定とはならず、外れ止め部材が振れ止め部材に対して、上方または下方などの様々な位置に保持されているものが生産される。しかし、外れ止め部材が上方の位置に保持されているものであると、開口枠に傾倒式に障子を建込もうとしても、開口枠内に障子が嵌め込みできず、障子を開口枠から一度取り出し外れ止め部材を下方に納め直してから、もう一度開口枠内に障子を建込むように作業を繰り返さなくてはならない。したがって、開口枠に障子を建込もうとする作業が少なくとも二度繰り返さなくてはならず、面倒であるとともに作業能率が悪い。

　そこで、この考案は前述の課題を解決できるようにした外れ止め具付き摺動部の提供を目的とする。

〔課題を解決するための手段〕

　この考案の構造は障子の竪框の上方に取り付けられた摺動片、窓枠の垂下レールより障子が離脱するのを防止する外れ止め具を上下方向に調節可能に付設してある外れ止め具付き摺動部材において、前記外れ止め具は、水平片と、その水平片の後端に連続し、上下方向に長孔を形成し、下端に抱持部を有する略Ｌ字形状のものであり、前記摺動片は、上方に垂下レールの係合する係合溝とこのレール溝の下部にビスの貫通するビス貫通穴とを形成する基体と、基体から垂下し前記外れ止め具の抱持部により抱持される弾性片を有し、この弾性片には、その上下方向の中間部に側面より膨出する突起部と垂下方向の端部に抱持部の下方への摺動を規制する規制部を設け、開口枠への障子の挿入時には、抱持部が弾性片と規制部との間に保持されるとともに、外れ止め具の調節時には水平片を操作することで弾性片が弾発変形し抱持部が突起部と基体との間に移送するとともに、調節後に外れ止め具を摺動片のビス貫通穴および外れ止め具の長孔を挿通するビスにより摺動片に固着しうるようにしてある。

〔実施例〕

　図においてＡは障子、Ｂは窓枠、Ｃは摺動片、Ｄは外れ止め具を示している。そして障子Ａは竪框１と横框２を有し、障子Ａの竪框１の上方に取付けられた摺動片Ｃ

4

は、窓枠Ｂの垂下レール３より障子Ａが離脱するのを防止する外れ止め具Ｄを上下方向に調節可能に付設してある。

　前記外れ止め具は略Ｌ字形状のものであり、その先端に操作部４を取付けた水平片５と、その水平片５の後端に連続して垂下片６を設け、垂下片６には上下方向に長い長孔７を形成し、かつ下端部コ状片を相対向させた抱持部８を設けてある。

　前記摺動片Ｄに上方に垂下レール３の係合するレール溝９と、このレール溝９の下部にビス１０の貫通するビス貫通穴１１とを形成した基体１２があり、この基体１２から垂下し、前記外れ止め具８の抱持部８により抱持される弾性片１３があり、この弾性片１３には、その垂下方向の中間部に側面より膨出する突起部１４と垂下方向の端部に抱持部８の下方への摺動を規制する突起状の規制部１５を設けてある。

　障子Ａの窓枠Ｂへの挿入時には抱持部８が弾性片１３の突起部１４と規制部１５との間に保持される。そして外れ止め具Ｄの調節時には操作片４を持って操作することにより弾性片１３が弾発変形し抱持部８が突起部１４と基体１２との間に移動し、外れ止め具Ｄの調節可能に保持される。

　次いでそれらの調節後に外れ止め具Ｄを摺動片Ｃのビス貫通穴１１および外れ止め具Ｄの長孔７を挿通するビス１０により摺動片Ｃに固着するものである。

　図面中水平片５は框内部より外部に突出し、その突出部分に操作部４が取り付けられているが、この操作部は必ずしも必要とせず、水平片を框内部に納めてもよい。この場合　ドライバー等で框内部の水平片を操作し、外れ止め具Ｄを上下方向に調節させればよい。

〔考案の効果〕

　この考案は外れ止め具を摺動片に対して上下動調節可能に取付け、摺動片の基体から垂下し、外れ止め具の抱持部が抱持する弾性片において、障子の開口枠への建込み時には、抱持部が突起部と規制部間に保持され、外れ止め具の水平片が摺動片のレール溝の下方に支持されるようになっているので、開口枠に傾倒式に障子を建込む際に、一度で嵌め込むむことができるとともに、その後、弾性片を弾発変形させることにより抱持部が突起部より上方に保持され、障子の開口枠からの外れを防止させるように外止め具が調節でき、障子の開口枠への建込み作業が容易であるとともに作業能率がよい。

〔図面の簡単な説明〕

　第１図はこの考案の障子の外れ止め具付き摺動部の分解斜視図、第２図、第３図は弾性片及び外れ止め具の斜視図、第４図は要部の斜視図、第５図、第６図は要部の断面図である。

　Ａ…障子、Ｂ…窓枠、Ｃ…摺動片、Ｄ…外れ止め具
　１…竪框、２…横框、３…垂下レール、４…操作部、５…水平片、６…垂下片、７…長孔、８…

(3)    実公平8-9334

5    6

抱持部、9……レール溝、10……ビス、11……ビス貫    ＊……規制部
通穴、12……基体、13……弾性片、14……突起部、15……＊



【第1図】



【第2図】    【第3図】

【第4図】    【第5図】



（4）                     実公平8－9334

【第6図】



# EXHIBIT 32

00001

1

2       UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
3   - - - - - - - - - - - - - - - - - - -x
    AMESBURY GROUP, INC., and
4   AMESBURY SPRINGS LTD.,
        Plaintiffs,
5
        v.   Civil Action No. 05-10020-DPW
6
    THE CALDWELL MANUFACTURING
7   COMPANY,
        Defendant.
8   - - - - - - - - - - - - - - - - - - -x
        C O N F I D E N T I A L
9
    Videotaped Deposition Upon Oral Examination Of:
10        Robert J. Lelio

11
    Location:   Harris Beach PLLC
12          99 Garnsey Road
        Pittsford, New York  14534
13

14   Date:       November 22, 2005

15

16   Time:       9:06 a.m.

17

18

19   Reported By:   Joanne N. Pero

20          Alliance Shorthand, Inc.

21          Suite 1500 - The Penthouse

22          Alliance Building

23          183 Main Street East

24          Rochester, New York  14604

25

00074

1

2     Q.  Do you know if Strybuc sends Caldwell any

3  documents relating to the products at issue?

4        MR. EDWARDS:  Object to the form.

5     A.  I don't know.

6     Q.  Let's start talking about the individual

7  products.  Let's begin with the Series 86xt.  When

8  did Caldwell begin selling the Series 86xt?

9     A.  I believe it was 2003.

10    Q.  Do you know a month?

11    A.  No, I don't.

12    Q.  Is Caldwell still selling this product?

13    A.  No, it is not.

14    Q.  When did Caldwell stop selling it?

15    A.  I believe it was November or December of

16  2004.

17    Q.  Who manufactured this product?

18    A.  Caldwell manufactured this product.

19    Q.  And where was this product manufactured?

20    A.  It was manufactured in Caldwell's

21  Jackson, Mississippi plant.

22    Q.  Any other plants?

23    A.  I don't believe so.

24    Q.  Was it shipped from the Jackson,

25  Mississippi plant to customers?

00082

1

2      A.   Yes, for 2005 up through February of

3  2005.

4      Q.   Are the rebates or discounts applied to

5  the Series 86xt reflected in any documents?

6      A.   Yes.

7      Q.   Which documents?

8      A.   They would be reflected in Exhibit 5.

9  They would be reflected in our total -- our

10  consolidated financial statements from the

11  independent accountants, they would be reflected in

12  the Exhibit 2 analysis that you have.

13      Q.   Let's move to the Series 97ih product.

14  When did Caldwell begin selling the Series 97ih?

15      A.   I believe it was 2004.

16      Q.   Do you remember the month?

17      A.   No, I don't.

18      Q.   Is Caldwell still selling this product?

19      A.   No, it is not.

20      Q.   When did it stop selling the Series 97ih?

21      A.   I am not certain of the date.

22      Q.   Do you know year?

23      A.   2005.

24      Q.   Not certain of the month?

25      A.   No, I am not.

00083

1

2  Q.  Who manufactured the 97ih?

3  A.  Caldwell Manufacturing Company.

4  Q.  And where was the 97ih manufactured?

5  A.  I believe it was manufactured in both

6  Williamsport, Maryland and in Jackson, Mississippi.

7  Q.  Where was it shipped from?

8  A.  It would have been shipped from either

9  one of those plants.

10   Q.  If I wanted to know what customers bought

11  the 97ih, would Exhibit 5 be a good place for me to

12  look?

13  A.  Yes, it would.

14   Q.  Would Exhibit 5 be a complete list of the

15  customers that bought the 97ih?

16  A.  Yes, it would up through the February,

17  2005 period that report summarizes.

18   Q.  Is the pricing of the product determined

19  in the same way as you explained that the pricing

20  of the Series 86 is determined?

21  A.  Yes.

22   Q.  So the Sales Department would handle that

23  in cooperation with the president and the vice

24  president?

25  A.  That is correct.

**Lelio, Robert J., 11/22/05**          **Page 83**

00088
1

2    A.  Yes, there would be.

3    Q.  Would that be reflected in any of the

4 exhibits we saw today?

5    A.  The amounts would be; yes, they would.

6    Q.  Which exhibit?

7    A.  Exhibit 5 would reflect any rebates that

8 were applied to customers for Series 97ih as well

9 as in exhibit -- they would be reflected in Exhibit

10 2 and Exhibit 4 and Exhibit 3.

11    Q.  Now let's talk about Series 97ez.

12        MR. EDWARDS:  Before you do that, it's up

13 to you, but I believe that lunch is over there if

14 this is a convenient time to break.  If you are

15 switching to a new topic.

16        MR. ISHMAEL:  How about we'll do the ez

17 and then we'll break after that.

18        MR. EDWARDS:  That is fine with me.

19    Q.  When did Caldwell begin selling the 97ez?

20    A.  I believe it was 2004.

21    Q.  Do you remember a month?

22    A.  No, I don't.

23    Q.  Is Caldwell still selling the 97ez?

24    A.  I believe we have not -- we stopped

25 selling that.

00089

1

2    Q.  Do you know when?

3    A.  No, I don't.

4    Q.  Do you know who would know?

5    A.  Yes.  We could probably see it from

6  looking at the sales information.  Someone in sales

7  would clearly know, any one of the sales managers.

8    Q.  Who manufactured the 97ez?

9    A.  Caldwell Manufacturing.

10   Q.  Where was the 97ez manufactured?

11   A.  I believe that one also was made both in

12  Williamsport and in Jackson, Mississippi.

13   Q.  Was it also shipped from both those

14  locations?

15   A.  Yes.

16   Q.  Was it shipped from any other locations?

17   A.  Not to my knowledge.

18   Q.  Does Exhibit 5 reflect the complete

19  customer list for the 97ez?

20   A.  Yes, up through February of 2005.

21   Q.  Was the pricing for the 97ez determined

22  by the Sales Department in a similar fashion as you

23  described with respect to the Series 86xt?

24   A.  Yes.

25   Q.  Do you know what factors contributed to

00094

1

2 R O B E R T  J.  L E L I O, resumes:

3   EXAMINATION BY MR. ISHMAEL CONTINUING:

4    Q.  Let's talk a little bit about Quick Tilt

5 nc product.  When did Caldwell first begin selling

6 this product?

7    A.  2004.

8    Q.  Do you remember a particular month in

9 2004?

10    A.  No, I don't.

11    Q.  Is Caldwell still selling the Quick Tilt

12 nc?

13    A.  Yes, it is.

14    Q.  Who manufactures the Quick Tilt nc?

15    A.  Caldwell Manufacturing.

16    Q.  Where is this product manufactured?

17    A.  It is manufactured in Williamsport,

18 Maryland.

19    Q.  Any other plants?

20    A.  No.

21    Q.  Is it also shipped from Williamsport,

22 Maryland?

23    A.  Yes, it is.

24    Q.  Does Exhibit 5 reflect all the customers

25 of the Quick Tilt nc up to February 23, 2005?

00101

1

2 trying to -- I am familiar -- I know of the 97ih

3 and our standard 97. I don't believe we are

4 selling any other versions of the 97i.

5    Q. There was a product called the 97i,

6 though, right?

7    A. Yes, I guess.

8    Q. So at some point, Caldwell stopped

9 selling the product?

10    A. I don't know. I don't recall.

11    Q. The 97ez, are you familiar with the part

12 of it known as the shoe?

13    A. Yes.

14    Q. Does Caldwell sell the shoe separately

15 from the balance itself?

16    A. I believe that we sometimes would.

17    Q. Are there documents reflecting those

18 sales?

19    A. Any sales of that shoe would have been --

20 let me restate that because I believe that -- I

21 believe in our block and tackle products, the shoes

22 are attached to a balance, so I think I would have

23 to change it to say I don't think that the block

24 and tackles would have a shoe sold separately.

25    Q. Back to the 97i product and not the 97ih

00102

1

2  but the 97i itself, do you know where this product

3  was manufactured?

4      A.  It would have been manufactured -- would

5  definitely have been manufactured in Jackson,

6  Mississippi and was likely also manufactured in

7  Williamsport from 2004 on.

8      Q.  Was it shipped from those two locations?

9      A.  Yes.

10     Q.  Was it shipped from any other locations?

11     A.  No.

12     Q.  Is there an invoice spreadsheet

13  reflecting the 97i invoices?

14         MR. EDWARDS:  Object to the form.

15     A.  Those invoices would be included in the

16  CUSINVID2 file which is note number 1 on C 000141.

17     Q.  But those invoices are not reflected in

18  Exhibit 5; is that correct?

19         MR. EDWARDS:  Object to the form.

20     A.  That is correct.

21     Q.  Do you know where -- strike that.

22         Do you know what countries the 97i was

23  sold in?

24     A.  I know it would have been sold in the

25  U.S.  I don't know anything else.

# EXHIBIT 33



UNITED STATES DEPARTMENT OF COMMERCE
**Patent and Trademark Office**
ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

BS1-015

AUGUST 01, 2001

PTAS

TESTA, HURWITZ & THIBEAULT, LLP
PATENT ADMINISTRATOR
HIGH STREET TOWER
125 HIGH STREET
BOSTON, MA 02110



*101721923A*

## UNITED STATES PATENT AND TRADEMARK OFFICE
## NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF
THE U.S. PATENT AND TRADEMARK OFFICE.  A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE.  THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM.  IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 703-308-9723.
PLEASE SEND REQUEST FOR CORRECTION TO:  U.S. PATENT AND TRADEMARK OFFICE,
ASSIGNMENT DIVISION, BOX ASSIGNMENTS, CG-4, 1213 JEFFERSON DAVIS HWY,
SUITE 320, WASHINGTON, D.C. 20231.

RECORDATION DATE: 05/14/2001                REEL/FRAME: 011799/0760
                                            NUMBER OF PAGES: 5

BRIEF:  ASSIGNMENT OF ASSIGNOR'S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
    NEWMAN, GARY R.                         DOC DATE: 03/15/2001

ASSIGNEE:
    AMESBURY GROUP, INC.
    57 HUNT ROAD
    AMESBURY, MASSACHUSETTS 01913

SERIAL NUMBER: 09810868                     FILING DATE: 03/16/2001
PATENT NUMBER:                              ISSUE DATE:

KIMBERLY WHITE, EXAMINER
ASSIGNMENT DIVISION
OFFICE OF PUBLIC RECORDS

**No Docketing Necessary**

_KM_                    _8-7-01_
**Administrator**        **Date**

**Reviewed & Approved**

_JPS_                    _8/8/01_
**Resp. Atty**           **Date**

AME 00004

05-18-2001

101721923

## RECORDATION FORM COVER SHEET
## PATENTS ONLY

PATENT
RECEIVED
MAY 14 2001

5-14-01

TO: Commissioner of Patents and Trademarks:  Please record the attached original document(s) or copy(ies).

**Submission Type**

☒ New

☐ Resubmission (Non-Recordation)

Document ID#: [_____]

☐ Correction of PTO Error

Reel #: [_____]  Frame #: [_____]

☐ Corrective Document

Reel #: [_____]  Frame #: [_____]

**Conveyance Type**

☒ Assignment        ☐ Security Agreement

☐ License           ☐ Change of Name

☐ Merger            ☐ Other [_____]

**U.S. Government**

(For use ONLY by U.S. Government Agencies)

☐ Departmental File    ☐ Secret File

**Conveying Party(ies)**          ☐ Mark if additional names of conveying parties attached

| | | Execution Date |
|---|---|---|
| | | Month  Day  Year |
| Name | Gary R. Newman | 03/ 15 /2001 |
| Name | | / / |
| Name | | / / |
| Name | | / / |
| Name | | / / |

**Receiving Party**          ☐ Mark if additional names of receiving parties attached

Name (line 1) | Amesbury Group, Inc.

Name (line 2) | 

Address (line 1) | 57 Hunt Road

Address (line 2) | 

Address (line 3) | Amesbury    MA    01913
                    City     State/Country   Zip Code

☐ If document to be recorded is an assignment and the receiving party is not domiciled in the United States, an appointment of a domestic representative is attached. *(Designation must be a separate document from Assignment)*

**Domestic Representative Name and Address**     Enter for the first Receiving Party only.

Name | 

Address (line 1) | 

Address (line 2) | 

Address (line 3) | 

Address (line 4) | 

**FOR OFFICE USE ONLY**

05/17/2001 LNGUELLER 00009203 09610848
01 FC:9105                     40.00 0

AME 00005

**Page 2**                                                                    PATENT

## Correspondent Name and Address

**Area Code and Telephone Number** [                                    ]

**Name** [ Patent Administrator                                        ]

**Address (line 1)** [ Testa, Hurwitz & Thibeault, LLP                ]

**Address (line 2)** [ High Street Tower                               ]

**Address (line 3)** [ 125 High Street                                 ]

**Address (line 4)** [ Boston, MA 02110                                ]

| Pages | Enter the total number of pages of the attached conveyance document including any attachments. | 2 |
|---|---|---|

## Application Number(s) or Patent Number(s)

☐ Mark if additional numbers attached

*Enter either the Patent Application Number or the Patent Number (DO NOT ENTER BOTH numbers for the same property).*

**Patent Application Number(s)**                     **Patent Number(s)**

[ 09/810,868 ]  [          ]  [          ]     [          ]  [          ]  [          ]

[          ]  [          ]  [          ]     [          ]  [          ]  [          ]

[          ]  [          ]  [          ]     [          ]  [          ]  [          ]

[          ]  [          ]  [          ]     [          ]  [          ]  [          ]

## Patent Cooperation Treaty (PCT)

Enter PCT application number **only** if a U.S. Application Number has been assigned.

PCT [          ]   PCT [          ]   PCT [          ]

PCT [          ]   PCT [          ]   PCT [          ]

| Number of Properties | Enter the total number of properties involved. | # 1 |
|---|---|---|

## Fee Amount

Fee Amount for Properties Listed (37 CFR 3.41):  $ 40.00

**Method of Payment:**    Enclosed ☒          Deposit Account ☐

**Deposit Account**
(Enter for payment by deposit account or if additional fees can be charged to the account)

Deposit Account Number  # 20-0531

Authorization to charge additional fees:   Yes ☒   No ☐

## Statement and Signature

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document. Charges to deposit account are authorized, as indicated herein.*

| Joseph P. Sullivan , Reg. No. 45,349 | *[signature]* | May 9, 2001 |
|---|---|---|
| **Name of Person Signing** | **Signature** | **Date** |

VER 12/00
2085009

AME 00006

Attorney Docket No.BSI-015

## ASSIGNMENT

WHEREAS, I, **GARY R. NEWMAN,** have invented one or more improvements in **BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER**

described in an application (or provisional application) for Letters Patent of the United States:

☐      identified by Attorney Docket No. <u>BSI-015</u>, and/or executed by me of even date herewith and about to be filed in the United States Patent Office;

☒      Serial No. <u>09/810,868</u> filed in the United States Patent Office on <u>March 16, 2001</u>; and

WHEREAS, AMESBURY GROUP, INC. (hereinafter "ASSIGNEE"), a corporation organized and existing under the laws of the State of Delaware, and having a usual place of business at 57 Hunt Road, Amesbury, MA 01913 desires to acquire an interest therein, in accordance with agreements duly entered into with me;

NOW, THEREFORE, to all whom it may concern be it known that for and in consideration of said agreements and of other good and valuable consideration, the receipt of which is hereby acknowledged, I have sold, assigned and transferred and by these presents do hereby sell, assign and transfer unto said ASSIGNEE, its successors, assigns, and legal representatives, my entire right, title and interest in and throughout the United States of America, its territories and all foreign countries, in and to the inventions described in said application, together with my entire right, title and interest in and to said application and such Letters Patent as may issue thereon or claim priority under international convention, including but not limited to continuations, divisionals, reissues, and reexaminations of said application or such Letters Patent; said inventions, applications and Letters Patent to be held and enjoyed by said ASSIGNEE for its own use and behalf and for its successors, assigns and legal representatives, to the full end of the term for which said Letters Patent may be granted as fully and entirely as the same would have been held by me had this assignment and sale not been made; I hereby convey all of my rights arising under or pursuant to any and all international agreements, treaties or laws relating to the protection of industrial property by filing any such applications for Letters Patent. I hereby acknowledge that this assignment, being of my entire right, title and interest in and to said invention, carries with it the right in ASSIGNEE to apply for and obtain from competent authorities in all countries of the world any and all Letters Patent by attorneys and agents of ASSIGNEE's selection and the right to procure the grant of all Letters Patent to ASSIGNEE for its own name as assignee of my entire right, title and interest therein.

AND, I hereby further agree for myself and my executors and administrators to execute upon request any other lawful documents and likewise to perform any other lawful acts which may be deemed necessary to secure fully the aforesaid invention to said ASSIGNEE, its successors, assigns, and legal representatives, but at its or their expense and charges, including: the execution of applications for patents in foreign countries; the execution of substitution, reissue, divisional or continuation applications; and preliminary or other statements or the giving of testimony in any interference or other proceeding in which said invention or any application or patent directed thereto may be involved; and I further hereby authorize ASSIGNEE or its attorneys or agents to insert the correct serial number and filing date into this assignment if none is indicated on that date of my execution of this assignment;

AME 00007

**Sole Assignment**
**Page**

AND, I do hereby authorize and request the Commissioner of Patents of the United States to issue such Letters Patent as shall be granted upon said application or applications based thereon to said ASSIGNEE, its successors, assigns, and legal representatives.

*IN TESTIMONY WHEREOF*, I have hereunto set my hand and affixed my seal the date set forth below.

Inventor: *Gary R Newman*
         _____
         Gary R. Newman

State of South Dakota          )
County of Minnehaha            ) ss

Subscribed and sworn to before me, by the above-named Gary R. Newman this **15** day of **MARCH**, 2001.

                           *Myrna L. Goldammer*
                           _____
                           Notary Public
                           My Commission Expires: **3/7/02**

[SEAL — MYRNA L. GOLDAMMER, NOTARY PUBLIC, STATE OF SOUTH DAKOTA]

2043410_1

# EXHIBIT 34

BSI-018CI



RECEIVED

FEB 17 2004

PATENT DEPARTMENT
TESTA, HURWITZ & THIBEAULT, LLP

## UNITED STATES PATENT AND TRADEMARK OFFICE

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

FEBRUARY 10, 2004

                    PTAS

PATENT ADMINISTRATOR
TESTA, HURWITZ & THIBEAULT, LLP
JOHN V. FORCIER
125 HIGH STREET HIGH STREET TOWER
BOSTON, MA 02110

*102511348A*

          UNITED STATES PATENT AND TRADEMARK OFFICE
          NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF
THE U.S. PATENT AND TRADEMARK OFFICE.  A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE.  THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM.  IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 703-308-9723.
PLEASE SEND REQUEST FOR CORRECTION TO:  U.S. PATENT AND TRADEMARK OFFICE,
ASSIGNMENT DIVISION, BOX ASSIGNMENTS, CG-4, 1213 JEFFERSON DAVIS HWY,
SUITE 320, WASHINGTON, D.C. 20231.

RECORDATION DATE: 07/28/2003          REEL/FRAME: 014318/0665
                                      NUMBER OF PAGES: 4

BRIEF:  ASSIGNMENT OF ASSIGNOR'S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
     UKEN, STUART J.              DOC DATE: 01/10/2002

ASSIGNOR:
     NEWMAN, GARY R.              DOC DATE: 01/10/2002

ASSIGNOR:
     VERSTEEG, LAWRENCE J.        DOC DATE: 01/10/2002

ASSIGNEE:
     AMESBURY GROUP, INC.
     57 HUNT ROAD
     AMESBURY, MASSACHUSETTS 01913

SERIAL NUMBER: 10446279           FILING DATE: 05/23/2003
PATENT NUMBER:                    ISSUE DATE:

BSI-018CI

No Docketing Necessary

PSA                    2-25-04
Administrator          Date
CPI updated
Reviewed & Approved

AHJ                    2/25/04
Resp. Atty             Date

AME 00501

014318/0665 PAGE 2


LAZENA MARTIN, EXAMINER
ASSIGNMENT DIVISION
OFFICE OF PUBLIC RECORDS

AME 00502

07-30-2003

**PATENT**
**BSI-018C1**

RECORD... 102511348 ...EET

7-28-03

**PATENTS ONLY**

**TO: Commissioner of Patents and Trademarks: Please record the attached original document(s) or copy(ies).**

| Submission Type | Conveyance Type |
|---|---|
| ☒ New | ☒ Assignment ☐ Security Agreement |
| ☐ Resubmission (Non-Recordation) | ☐ License ☐ Change of Name |
| Document ID#: | ☐ Merger ☐ Other |
| ☐ Correction of PTO Error | **U.S. Government** |
| Reel #: Frame #: | (For use ONLY by U.S. Government Agencies) |
| ☐ Corrective Document | |
| Reel #: Frame #: | ☐ Departmental File ☐ Secret File |

**Conveying Party(ies)**   ☐ Mark if additional names of conveying parties attached

Execution Date
Month  Day  Year

| | | |
|---|---|---|
| Name | Stuart J. Uken | 01/10/02 |
| Name | Gary R. Newman | 01/10/02 |
| Name | Lawrence J. VerSteeg | 01/10/02 |
| Name | | / / |
| Name | | / / |

**Receiving Party**   ☐ Mark if additional names of receiving parties attached

| | |
|---|---|
| Name (line 1) | Amesbury Group, Inc. |
| Name (line 2) | |
| Address (line 1) | 57 Hunt Road |
| Address (line 2) | |
| Address (line 3) | Amesbury   MA   01913 |

☐ If document to be recorded is an assignment and the receiving party is not domiciled in the United States, an appointment of a domestic representative is attached. (Designation must be a separate document from Assignment)

City  State/Country  Zip Code

**Domestic Representative Name and Address**   Enter for the first Receiving Party only.

| | |
|---|---|
| Name | |
| Address (line 1) | |
| Address (line 2) | |
| Address (line 3) | |
| Address (line 4) | |

07/29/2003 ECOOPER  00000213 10446279

01 FC:8021                    40.00 OP

**FOR OFFICE USE ONLY**

Mail documents to be recorded with required cover sheet(s) information to:
Mail Stop Assignment Recordation Services, Director of the US Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450

AME 00503

**Page 2**                                          **PATENT**

## Correspondent Name and Address
**Area Code and Telephone Number**  617 248 7000

**Name**  Patent Administrator

**Address** (line 1)  Testa, Hurwitz & Thibeault, LLP

**Address** (line 2)  High Street Tower

**Address** (line 3)  125 High Street

**Address** (line 4)  Boston, MA 02110

**Pages**    Enter the total number of pages of the attached conveyance document
including any attachments.                                      **2**

## Application Number(s) or Patent Number(s)    ☐ Mark if additional numbers attached
*Enter either the Patent Application Number or the Patent Number (DO NOT ENTER BOTH numbers for the same property).*

**Patent Application Number(s)**                    **Patent Number(s)**

10/446,279

## Patent Cooperation Treaty (PCT)
Enter PCT application number    PCT [        ]  PCT [        ]  PCT [        ]
**only** if a U.S. Application Number
has not been assigned.          PCT [        ]  PCT [        ]  PCT [        ]

## Number of Properties          Enter the total number of properties involved.  # 1

## Fee Amount          Fee Amount for Properties Listed (37 CFR 3.41):  $ 40.00

**Method of Payment:**    Enclosed ☒          **Deposit Account** ☐
**Deposit Account**
(Enter for payment by deposit account or if additional fees can be charged to the account)
**Deposit Account Number**  # 20-0531
**Authorization to charge additional fees:**    Yes ☒    No ☐

## Statement and Signature
*To the best of my knowledge and belief, the foregoing information is true and correct and any
attached copy is a true copy of the original document.  Charges to deposit account are authorized,
as indicated herein.*

John V. Forcier, Reg. No. 42,545                                   7/24/03
_____            _____    _____
**Name of Person Signing**              **Signature**              **Date**

2656656                                                    AME 00504

**Mail documents to be recorded with required cover sheet(s) information to:**
**Mail Stop Assignment Recordation Services, Director of the US Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450**

Attorney Docket No. BSI-018

## ASSIGNMENT

WHEREAS, We, Stuart J. Uken, Gary R. Newman, and Lawrence J. VerSteeg have invented one or more improvements in:

### SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW

described in an provisional application for Letters Patent of the United States:

☐     identified by Attorney Docket No. _____, and/or executed by us of even date herewith and about to be filed in the United States Patent Office;

☒     Serial No. **10/044,005** filed in the United States Patent Office on **January 11, 2002**; and

WHEREAS, Amesbury Group, Inc. (hereinafter "ASSIGNEE"), a corporation organized and existing under the laws of the State of Delaware, and having a usual place of business at 57 Hunt Road, Amesbury, Massachusetts, 01913, desires to acquire an interest therein, in accordance with agreements duly entered into with us;

NOW, THEREFORE, to all whom it may concern be it known that for and in consideration of said agreements and of other good and valuable consideration, the receipt of which is hereby acknowledged, we have sold, assigned and transferred and by these presents do hereby sell, assign and transfer unto said ASSIGNEE, its successors, assigns, and legal representatives, our entire right, title and interest in and throughout the United States of America, its territories and all foreign countries, in and to the inventions described in said application, together with our entire right, title and interest in and to said application and such Letters Patent as may issue thereon or claim priority under international convention, including but not limited to continuations, divisionals, reissues, and reexaminations of said application or such Letters Patent; said inventions, applications and Letters Patent to be held and enjoyed by said ASSIGNEE for its own use and behalf and for its successors, assigns and legal representatives, to the full end of the term for which said Letters Patent may be granted as fully and entirely as the same would have been held by us had this assignment and sale not been made; we hereby convey all of our rights arising under or pursuant to any and all international agreements, treaties or laws relating to the protection of industrial property by filing any such applications for Letters Patent. We hereby acknowledge that this assignment, being of our entire right, title and interest in and to said inventions, carries with it the right in ASSIGNEE to apply for and obtain from competent authorities in all countries of the world any and all Letters Patent by attorneys and agents of ASSIGNEE's selection and the right to procure the grant of all Letters Patent to ASSIGNEE for its own name as assignee of our entire right, title and interest therein.

AND, we hereby further agree for ourselves and our executors and administrators to execute upon request any other lawful documents and likewise to perform any other lawful acts which may be deemed necessary to secure fully the aforesaid invention to said ASSIGNEE, its successors, assigns, and legal representatives, but at its or their expense and charges, including: the execution of applications for patents in foreign countries; the execution of substitution, reissue, divisional or continuation applications; and preliminary or other statements or the giving of testimony in any interference or other proceeding in which said inventions or any application or patent directed thereto may be involved; and we further hereby authorize ASSIGNEE or its attorneys or agents to insert the correct serial number and filing date into this assignment, if none is indicated on that date of our execution of this assignment;

AND, we do hereby authorize and request the Commissioner of Patents of the United States to issue such Letters Patent as shall be granted upon said application or applications based thereon to said ASSIGNEE, its successors, assigns, and legal representatives.

AME 00505

Joint Assignment
Attorney Docket No. BSI-018
Page 2

*IN TESTIMONY WHEREOF*, we have hereunto set our hands and affixed our seals the date set forth below.

Inventor: _____
Stuart J. Uken

Commonwealth of South Dakota      )
County of   Minnehaha              ) ss

Subscribed and sworn to before me, by the above-named Stuart J. Uken this _10th_ day of ___January___, 2002.

Myrna J. Goldammer
Notary Public
My Commission Expires: 3/17/02

Inventor: _____
Gary R. Newman

Commonwealth of South Dakota      )
County of   MINNEHAHA              ) ss

Subscribed and sworn to before me, by the above-named Gary R. Newman this __10__ day of ___JANUARY___, 2002.

Myrna J. Goldammer
Notary Public
My Commission Expires: 3/17/02

Inventor: _____
Lawrence J. VerSteeg

Commonwealth of South Dakota      )
County of   Lincoln               ) ss

Subscribed and sworn to before me, by the above-named Lawrence J. VerSteeg this _10th_ day of ___January___, 2002.

Myrna J. Goldammer
Notary Public
My Commission Expires: 3/17/02

VERNON\...\...\..._1

AME 00506

# EXHIBIT 35



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

SEPTEMBER 11, 2004                    RECEIVED                    *102703203A*
                                      PTAS

TESTA, HURWITZ & THIBEAULT, LLP
JOHN V. FORCIER                       SEP 17 2004
HIGH STREET TOWER
125 HIGH STREET
BOSTON, MA 02110                      TESTA, HURWITZ & THIBEAULT, LLP
                                      PATENT DEPARTMENT

        UNITED STATES PATENT AND TRADEMARK OFFICE
        NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF
THE U.S. PATENT AND TRADEMARK OFFICE.  A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE.  THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM.  IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 703-308-9723.
PLEASE SEND REQUEST FOR CORRECTION TO:  U.S. PATENT AND TRADEMARK OFFICE,
ASSIGNMENT DIVISION, BOX ASSIGNMENTS, CG-4, 1213 JEFFERSON DAVIS HWY,
SUITE 320, WASHINGTON, D.C. 20231.


RECORDATION DATE: 03/22/2004          REEL/FRAME: 015108/0864
                                      NUMBER OF PAGES: 3

BRIEF:  CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
    OMEGA INTERNATIONAL LIMITED       DOC DATE: 07/23/2003

ASSIGNEE:
    AMESBURY SPRINGS LIMITED
    NORTHFIELDS INDUSTRIAL ESTATE
       BLENHEIM WAY
    MARKET DEEPING
    PETERBOROUGH, UNITED KINGDOM

    PE6 8LD

SERIAL NUMBER: 08007628               FILING DATE: 01/21/1993
PATENT NUMBER: 5365638                ISSUE DATE: 11/22/1994
TITLE: SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS


                                                      AME 01052

015108/0864 PAGE 2


SEDLEY PYNE, PARALEGAL
ASSIGNMENT DIVISION
OFFICE OF PUBLIC RECORDS

AME 01053

03-24-2004

102703203

PATENT

RE                              SHEET

**PATENTS ONLY**

TO: Commissioner of Patents and Trademarks: Please record the attached original document(s) or copy(ies).

| **Submission Type** | **Conveyance Type** |
|---|---|
| ☒ New | ☐ Assignment  ☐ Security Agreement |
| 3-22-04 | |
| ☐ **Resubmission (Non-Recordation)** | ☐ License  ☒ Change of Name |
| **Document ID#:** [_____] | ☐ Merger  ☐ Other [_____] |
| ☐ **Correction of PTO Error** | **U.S. Government** |
| Reel #: [____]  Frame #: [____] | (For use ONLY by U.S. Government Agencies) |
| ☐ **Corrective Document** | |
| Reel #: [____]  Frame #: [____] | ☐ Departmental File  ☐ Secret File |

**Conveying Party(ies)**    ☐ Mark if additional names of conveying parties attached

Execution Date
Month  Day  Year

| Name | Omega International Limited | 07/23/03 |
|---|---|---|
| Name | | / / |
| Name | | / / |
| Name | | / / |
| Name | | / / |

**Receiving Party**    ☐ Mark if additional names of receiving parties attached

| Name (line 1) | Amesbury Springs Limited | ☐ If document to be recorded |
|---|---|---|
| Name (line 2) | | is an assignment and the |
| | | receiving party is not |
| | | domiciled in the United |
| Address (line 1) | Northfields Industrial Estate Blenheim Way | States, an appointment of a |
| | | domestic representative is |
| Address (line 2) | Market Deeping | attached. (Designation must |
| | | be a separate document from |
| Address (line 3) | Peterborough | United Kingdom | PE6 8LD | Assignment) |
| | City | State/Country | Zip Code | |

**Domestic Representative Name and Address**    Enter for the first Receiving Party only.

| Name | |
|---|---|
| Address (line 1) | |
| Address (line 2) | |
| Address (line 3) | |
| Address (line 4) | |

**FOR OFFICE USE ONLY**

/23/2004 DBYRNE    00000080 5365638

FC:8021                40.00 OP

Mail documents to be recorded with required cover sheet(s) information to:
Mail Stop Assignment Recordation Services, Director of the US Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450

AME 01054

Page 2                                             PATENT

## Correspondent Name and Address

Area Code and Telephone Number | 617-248-7000 |

Name | Patent Administrator |

Address (line 1) | Testa, Hurwitz & Thibeault, LLP |

Address (line 2) | High Street Tower |

Address (line 3) | 125 High Street |

Address (line 4) | Boston, MA 02110 |

**Pages**  Enter the total number of pages of the attached conveyance document including any attachments.   | **1** |

## Application Number(s) or Patent Number(s)

*Enter either the Patent Application Number or the Patent Number (DO NOT ENTER BOTH numbers for the same property).*

☐ Mark if additional numbers attached

### Patent Application Number(s)                  Patent Numbers(s)

| 5,365,638 |

## Patent Cooperation Treaty (PCT)

Enter PCT application number **only** if a U.S. Application Number has not been assigned.

PCT | | PCT | | PCT | |
PCT | | PCT | | PCT | |

## Number of Properties

Enter the total number of properties involved.   # | 1 |

## Fee Amount

Fee Amount for Properties Listed (37 CFR 3.41):   $ | 40.00 |

**Method of Payment:**   Enclosed ☒          Deposit Account ☐
**Deposit Account**
(Enter for payment by deposit account or if additional fees can be charged to the account)

Deposit Account Number   # | 20-0531 |

Authorization to charge additional fees:   Yes ☐   No ☒

## Statement and Signature

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document. Charges to deposit account are authorized, as indicated herein.*

John V. Forcier (42,545)
**Name of Person Signing**          Signature          3/18/04   **Date**

'846

**Mail** documents to be recorded with required cover sheet(s) information to:
Mail Stop Assignment Recordation Services, Director of the US Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450

AME 01055



# CERTIFICATE OF INCORPORATION

## ON CHANGE OF NAME

## Company No. 2666071

The Registrar of Companies for England and Wales hereby certifies that

OMEGA INTERNATIONAL LIMITED

having by special resolution changed its name, is now incorporated

under the name of

AMESBURY SPRINGS LIMITED

Given at Companies House, Cardiff, the 23rd July 2003



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES



*Companies House*
—— *for the record* ——

HC006A

AME 01056

**PATENT**
**Atty. Docket No. BSI-029**
(354/64)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

INVENTORS:        Braid et al.

PATENT NO.:       5,365,638

ISSUE DATE:       November 22, 1994

TITLE:            Spring Mounting for Sash Frame Tensioning Arrangements

---

### *CERTIFICATE OF FIRST CLASS MAILING UNDER 37 C.F.R. 1.8*

I hereby certify that this correspondence, and any document(s) referred to as enclosed herein, is/are being deposited with the United States Postal Service as first class mail, postage prepaid, in an envelope addressed to Mail Stop Assignment Recordation Services, Director of the US Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 on this *17*th day of March, 2004.

*Shawna Boudreau*
Shawna Boudreau

---

Mail Stop Assignment Recordation Services
Director of the US Patent and Trademark Office
P.O. Box 1450
Alexandria, VA  22313-1450

Attached hereto is/are:

1. Recordation Form Cover Sheet (2 pgs.);
2. Copy of Certificate of Incorporation on Change of Name (1 pg.);
3. Check in the amount of $40.00;
4. A return receipt postcard; and this
5. Certificate of First Class Mailing (1 pg.).

3039810

AME 01057



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

SEPTEMBER 29, 1996                    PTAS

BAZERMAN & DRANGEL, P.C.
STEVEN H. BAZERMAN
60 EAST 42ND STREET
RM 1158
NEW YORK, NEW YORK 10165

*100229786A*

**RECEIVED**

OCT 0 7 1996

BAZERMAN & DRANGEL, P.C.

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF THE
U.S. PATENT AND TRADEMARK OFFICE. A COMPLETE MICROFILM COPY IS AVAILABLE
AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER REFERENCED
BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE. THE INFORMATION
CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA PRESENT IN THE
PATENT AND TRADEMARK ASSIGNMENT SYSTEM. IF YOU SHOULD FIND ANY ERRORS OR
HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY CONTACT THE EMPLOYEE WHOSE
NAME APPEARS ON THIS NOTICE AT 703-308-9723. PLEASE SEND REQUEST FOR
CORRECTION TO: U.S. PATENT AND TRADEMARK OFFICE, ASSIGNMENT DIVISION,
BOX ASSIGNMENTS, NORTH TOWER BUILDING, SUITE 10C35, WASHINGTON, D.C. 20231.

RECORDATION DATE: 07/08/1996        REEL/FRAME: 8013/0465
                                    NUMBER OF PAGES: 2

BRIEF: ASSIGNMENT OF ASSIGNOR'S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
  BRAID, HAROLD K.                  DOC DATE: 07/01/1996

ASSIGNOR:
  BRAID, SIMON C.                   DOC DATE: 07/01/1996

ASSIGNEE:
  OMEGA BALANCE CO. LTD.
  NORTHFIELDS INDUSTRIAL ESTATE
  BLENHEIM WAY, MARKET DEEPING
  PETERBOROUGH PE6 8LD, ENGLAND

SERIAL NUMBER: 07875233             FILING DATE: 04/28/1992
PATENT NUMBER: 5232208              ISSUE DATE: 08/03/1993

SERIAL NUMBER: 08007628             FILING DATE: 01/21/1993
PATENT NUMBER: 5365638              ISSUE DATE: 11/22/1994

AME 01045

8013/0465 PAGE 2


DIANE RUSSELE, EXAMINER
ASSIGNMENT DIVISION
OFFICE OF PUBLIC RECORDS

AME 01046

FORM PTO-1595
(Rev. 6-93)
OMB No. 0651-0011 (exp. 4/94)

**RECEIVED**ECORD

**JUL 08 1996**

RECEIPT ACCTING DIV.

Tab settings ⇨ ⇨ ⇩ ▼ ▼

To the Honora... ...ents an...

**07-09-1996**

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
100229786

T   **U.S. DEPARTMENT OF COMMERCE**
Patent and Trademark Office

80 ▼ ▼

...riginal documents or copy thereof.

MRO 7-8-96

1. Name of conveying party(ies):

   Harold K. Braid
   Simon C. Braid

   Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No

2. Name and address of receiving party(ies)

   Name: Omega Balance Co. Ltd.

   Internal Address:
   Northfields Industrial EstaTe
   Blenheim Way, Market Deeping

   Street Address:
   Peterborough PE6 8LD ENGLAND

   City:_____ State:_____ ZIP:_____

3. Nature of conveyance:

   ☒ Assignment              ☐ Merger

   ☐ Security Agreement       ☐ Change of Name

   ☐ Other _____

   Execution Date: July 1, 1996

   Additional name(s) & address(es) attached? ☐ Yes ☒ No

4. Application number(s) or patent number(s):

   If this document is being filed together with a new application, the execution date of the application is: _____

   A. Patent Application No.(s)

   B. Patent No.(s)
   5,232,208
   5,365,638

   Attorney Docket No. X755-1    Additional numbers attached? ☐ Yes ☒ No

5. Name and address of party to whom correspondence concerning document should be mailed:

   Name: Steven H. Bazerman

   Internal Address:
   BAZERMAN & DRANGEL, P.C.

   Street Address:
   60 East 42nd Street, Rm 1158

   City: New York   State: NY   ZIP: 10165

6. Total number of applications and patents involved: 2

7. Total fee (37 CFR 3.41)............$ 80.00

   ☒ Enclosed

   ☐ Authorized to be charged to deposit account

8. Deposit account number:

   (Attach duplicate copy of this page if paying by deposit account)

| DO NOT USE THIS SPACE | | |
|---|---|---|
| 050 TL 07/09/96 5232208 | 2 581 | 80.00 CK |

9. Statement and signature.
   To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.

   Steven H. Bazerman
   Name of Person Signing   Reg.No. 24653   Signature

   July 5, 1996
   Date

   Total number of pages including cover sheet, attachments, and document: 2

Mail documents to be recorded with required cover sheet information to:   AME 01047
Commissioner of Patents & Trademarks, Box Assignments

## ASSIGNMENT

In consideration of the sum of One Dollar ($1.00) in hand paid and other good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, **Harold K Braid** , a citizen of the United Kingdom having an address of The Sheilings, Braceborough, Lincolnshire, PE9 4NT England and **Simon C Braid**, a citizen of the United Kingdom having an address of 13 Crowson Way, Deeping St James, Lincolnshire, England hereby sell, assign and transfers to **Omega Balance Co Ltd**, a corporation organised and existing under the laws of the United Kingdom and having a place of business at Northfields Industrial Estate, Blenheim Way, Market Deeping, Peterborough PE6 8LD England, (hereinafter called the Assignee), the entire right, title and interest in and to any and all improvements which are disclosed in the following United States Letters Patent:

| US Patent No | Issued | Title |
|---|---|---|
| 5,232,208 | August 3, 1993 | SPRINGS FOR SASH FRAME TENSIONING ARRANGEMENTS |
| 5,365,638 | November 22, 1994 | SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS |

and any and all extensions, divisions, reissues, substitutes, renewals or continuations thereof and the right to all benefits under the International Convention for the Protection of Industrial Property.

Further it is agreed that when requested, without charge but at the expense of said Assignee, the undersigned will execute all divisional, continuing, substitute, renewal, and reissue patent applications; execute all rightful other papers, and generally do everything possible for aiding in securing and maintaining proper patent protection.

Signed at: BLENHEIM WAY MARKET DEEPING ENGLAND ......... this 1ST day of JULY ............ 1996

**HAROLD K. BRAID**

**SIMON C BRAID**

Witnesses:

Jackie C. Betts

Judith A. Whitsed.

RECORD AND RETURN TO:
BAZERMAN & DRANGEL, PC
Lincoln Building
60 East 42nd Street
New York, New York 10165

Our Ref: X755-1

AME 01048

# EXHIBIT 36

**Filed Under Seal**

# EXHIBIT 37

**Filed Under Seal**

EXHIBIT 38



1550 Central Avenue • Cincinnati, OH 45214
Phone: 513-381-1231 • Toll Free: 888-381-1231 • Fa
Email: sales@tri-statewholesale.com



**New Construction and Replacement Windows**

Earthwise
Lincoln
Carefree
Peachtree

**Siding, Soffit and Accessories**

Alcoa
Variform
Wolverine
Accessories

**Doors**

Masonite
Lincoln
Peachtree

**Custom Railing and Decking**

Kodiak
Sheerline
Style Rite
Superior Aluminum

**Screen Enclosures**

**Marquee and Step-Down Awnings**

**Storm Windows**

**Window and Door Accessories**

**Enclosure Accessories**

**Custom Painting**

**Gutters**

**Home**

**Quick News**

2006/2007 Energy
Tax Credit Eligibility
(download PDF 20 KB)


**New Construction and Replacement Windows**


**Siding, Soffit and Accessories**


**Doors**


**Custom Railing and Decking**


**Scr**

## New Construction and Replacement Windows

**Tri-State is a founding member of the Earthwise window group**

Tri-State's Earthwise windows are:

- Locally manufactured in Cincinnati
- NFRC tested
- Energy Star rated
- Fully welded frames and sashes using the latest in 4-point welding technology
- Available with PPG Solarban® 60 soft coat low E-glass - optional argon gas filling
- Heavy-duty Caldwell constant force balance system
- All new construction windows, except casements, have built-in J-channel
- Available in Euro White and Desert Sand - Optional painted exteriors
- Between-the-glass grids available in Classic 5/8" x 3/16", contour 5.5mm x 18mm, decorative brass or pewter pencil designs


Earthwise windows are Energy Star rated. Click the Energy Star to learn more.


We can offer our lifetime warranty on all Earthwise window seals with Edgetech's Super Spacers.

**PrimeLOK Windows**
are new construction windows available in double-hung, single 2-Lite sliders, 3-Lite sliders, picture windows and hoppers. Half-roll-formed or option-extruded screens, night latches and dual latches are available as options.



**1800 Windows**
are cost-effective replacement windows
hung, 2- and 3-Lite sliders, picture wind
1800-Series Windows come standard w
screens, Low-E, obscure glass, grids ar
some available options.



**SingleLO**
are new c
available
2-Lite slid
picture wi
Half roll fo
fiberglass
standard.
options, c
shapes an
single-hur

**SwingLOK Windows**
are designed for replacement or new construction application. These windows are available as casement, awning and picture windows. Full roll formed screen with fiberglass screen cloth and folding handles are standard.



**TruLOK Windows**
are our most popular line of replacement windows. They can either be double-hung, 2-Lite or 3-Lite sliders, picture windows or hoppers. TruLOK is available with standard half extruded screens with fiberglass screen cloth (full screen and aluminum cloth is optional). All TruLOK windows are available with all glass or grid options. Double-hung windows come with dual night latches and dual locks over 32".



Tri-State's Window Warranty 2006
(Download PDF 52 KB)



The Good Housekeeping Seal is an emblem of the magazine's Consumer Policy, which promises a refund or replacement for defective products within two-years of purchase.

- TRUTH Maxim Casement and A
- TRUTH Multi Point Locking Har
  Windows
- TRUTH Dual Locks on Awning V

**Additional window products availab**
EARTHWISE WINDOWS
LINCOLN WOOD WINDOWS
CAREFREE VINYL WINDOWS
PEACHTREE WOOD WINDOWS
SOFT-LITE VINYL WINDOWS
PELLA WOOD WINDOWS
KOLBE & KOLBE
ANDERSON WOOD AND COMPOSITE W
MALTA WOOD WINDOWS
WASCO SKYLIGHTS
VENTANA ARCHITECTURAL SHAPE W
GLASS AND ACRYLIC BLOCK WIND

**Additional products available throu**
Brakes and Tools
Doors
Gutters
Siding, Soffit, Shutters and Accessorie
Storm Windows and Doors
Window and Door Accessories
Enclosure Accessories

1550 Central Avenue • Cincinnati, OH 45214 • Phone: 513-381-1231 • Fax: 513-381-8706 • Email: sales@tri-statewholesale.co