**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

      Plaintiffs,

                                            Civil Action
   v.                                         No. 05-CV-10020

THE CALDWELL MANUFACTURING CO.,

      Defendant.

_____

**DEFENDANT CALDWELL MANUFACTURING COMPANY'S**
**MEMORANDUM OF LAW IN SUPPORT ITS MOTION TO DISQUALIFY**
**SAMMY SHINA AS AMESBURY'S EXPERT WITNESS AND STRIKE**
**PORTIONS OF AMESBURY'S MOTION FOR SUMMARY JUDGMENT**

                                           LURIE & KRUPP, LLP
                                           David E. Lurie (BBO #542030)
                                           Thomas E. Lent (BBO #644970)
                                           One McKinley Square
                                           Boston, MA  02109
                                           Telephone:  (617) 367-1970

                                           HARRIS BEACH PLLC
                                           Paul J. Yesawich, III
                                           Neal L. Slifkin
                                           David J. Edwards
                                           99 Garnsey Road
                                           Pittsford, New York  14534
                                           Telephone:  (585) 419-8800

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of defendant The Caldwell Manufacturing Company ("Caldwell") in support of its motion to exclude the testimony and reports of Sammy Shina ("Shina"), who has been designated as an expert by the plaintiffs, Amesbury Group, Inc. and Amesbury Springs, Ltd. (collectively, "Amesbury"). Shina is not qualified to render an expert opinion, in either testimonial or written form, as to whether Caldwell has infringed any of the patents at issue; nor is he qualified to opine on their validity. Shina has no expertise, either from professional experiences or study, in the field of window design, engineering or manufacture. At most, he can claim to have looked at an installed window balance once, albeit briefly and not of the type at issue here, while in a Home Depot. Further, he has never seen a Caldwell window balance properly installed in a window. Accordingly, Shina is neither qualified to render an expert opinion; nor does his proposed testimony meet the reliability requirement of Federal Rule of Evidence 702. It should, therefore, be excluded from consideration on Amesbury's summary judgment motion, and from consideration at trial.

## BACKGROUND

Amesbury has been issued three patents (No. 5,365,638, No. 6,598, 264 B2 and No. 6,820,368 B2), all of which relate to window balances. In its complaint, Amesbury contends that several products manufactured by Caldwell infringe a number of the claims asserted in these patents. Infringement of U.S. Patent No. 5,365,638 (the "'638 Patent") may occur, among other things, if the housing of the accused balance, the Quick-Tilt, were to rotate such that its spine would come in contact with the flanges of the channel in which the balance is installed. Thus, the forces which cause and resist such rotation are of critical significance to this infringement analysis. Similarly, an infringement analysis of the claims relating to U.S. Patent Nos.

6,598,264B2 (the "'264 Patent") and U.S. Patent 6,820,368 B2 (the "'368 Patent") involve the study of mechanical parts, such as pulleys, fasteners, springs and their position, function and operation within a window. Having a working knowledge of windows and window hardware, therefore, is also a logical prerequisite to being an expert on the subject of window balance design and function.

Pursuant to F.R.C.P. Rule 26, Amesbury has identified Mr. Shina as its expert witness. Shina has submitted two reports, dated March 23, 2006 and April 18, 2006 which, *inter alia*, conclude that the patents at issue have been infringed by Caldwell (annexed to the Declaration of Neal L. Slifkin, as Exhibits B and C). The basis for Shina's conclusions were explored at a deposition, which was conducted on May 3, 2006 (Slifkin Declaration, Exhibit A). Remarkably, however, Shina knows next to nothing about window balances, the specific products at issue in the case, or even the mechanical forces which act upon the type of window balances at issue, as to which he professes to be an expert.

## FACTS

### A.    Shina is Not Qualified by Education to Serve as an Expert.

Although Shina holds a Ph.D., in mechanical engineering, the true focus of his education has been non-mechanical subjects. He holds degrees in electrical engineering, industrial management, computer science and mechanical engineering. (Shina Deposition, page 6, hereinafter "Shina at ___"). His degrees were not, however, in the "nuts and bolts" of product design; rather they focused on the financial elements of product and industrial engineering:

> **Q:**    You then have a Ph.D. from Tufts in mechanical engineering. Did you write a thesis for that?
> **A:**    Yes, I did.
>
> **Q:**    What was the topic of the Thesis?
> **A:**    A modeling of -- a cost model for products. (Shina at 8.)

With respect to his undergraduate degree in industrial management, Mr. Shina again testified that he concentrated on areas of study other than traditional engineering subjects.

> **Q:** What is industrial management?
> **A:** The science of combining management of a company making products.
>
> **Q:** It's not what we would call industrial engineering?
> **A:** It is –

MR. SINGER:  Objection.  You can answer.

> **A:** It is not industrial engineering, its industrial management.
>
> \*       \*       \*       \*
>
> **Q:** I'm just trying to get an understanding of what industrial management is. Is it more of a business-type degree or an engineering-type degree?
> **A:** It's a combination of business and engineering.  (Shina at 8)

## B.   Shina is Not Qualified by Experience or Training.

Shina lists a number of positions on his CV, some of which involved work as an engineer.  None of those positions, however, involved windows or window balances.

> **Q:** Did any of your work at Union Carbide involve design, construction or manufacture of window balances?
> **A:** No.  (Shina at 10)
>
> \*       \*       \*       \*
>
> **Q:** Did you work on the design, construction of window balances at RCA?
> **A:** No.  (Shina at 11)
>
> \*       \*       \*       \*
>
> **Q:** Okay.  Did you design any window balances at Hewlett-Packard?
> **A:** No.  (Shina at 13)

In fact, Shina has never worked in or for the window industry.

> **Q:** Prior to your engagement as an expert in this case, did you ever consult in the field of window balances?
> **A:** No.
>
> **Q:** Prior to your engagement as an expert in this case, did you ever consult in the field of fenestration?
> **A:** No.

3

> **Q:** Have you ever designed a window balance?
> **A:** No.  (Shina at 17-18)

Further, Shina testified:

> **Q:** Have you ever worked in the fenestration industry?
> **A:** No.
>
>                 *      *      *      *
>
> **Q:** Can you name any trade publications in the field of fenestration?
> **A:** No.[1]  (Shina at 18-19)
>
> **Q:** Prior to your engagement as an expert in this case, have you ever read any publication in the field of fenestration?
> **A:** No.
>
> **Q:** Prior to your engagement in this case, have you ever read any publication on the subject matter of window balances?
> **A:** No.  (Shina at 21)

## C.   Shina Doesn't Do Windows.

Shina testified that he has never examined a window, and, interestingly, regarded the idea

of actually working on a window as amusing.

> **Q:** Prior to your engagement as an expert in this case, have you ever examined a window balance?
> **A:** No.
>
> **Q:** Prior to your engagement as an expert in this case, have you ever seen a window balance?
> **A:** In my own windows I've seen a portion of a window balance, yes.
>
> **Q:** What portion do you recall seeing in your own windows?
> **A:** That was actually a roller in the bottom -- in the bottom of my window.  A roller that I could see coming out of it.  Excuse me.
>
> **Q:** The windows in your own home, did you see any other part of the balance besides the roller?
> **A:** No.

---

[1]   A partial list of trade publications relevant to the field would include at least the following:  Door & Window Manufacturer (Key Communications); Window & Door (National Glass Association); and Fenestration (Ashlee Publishing).

> **Q:**   Have you ever disassembled a window prior to your engagement as an expert in this case?
> **A:**   No.
>
> **Q:**   Have you ever replaced a window yourself prior to your engagement as an expert in this case?
> **A:**   No.  That's funny.  (Shina at 18)

In fact, the only time Shina ever actually examined a fully assembled window was by pure happenstance.  As he testified, "[t]he only time that I looked at it, I was in Home Depot on another matter and I happened to pass by the window section and I examined that."  (Shina at 24)

*     *     *     *

> **Q:**   Do you know what brand?
> **A:**   No.
>
> *     *     *     *
>
> **Q:**   Do you recall what style of balance or type of balance it was?
> **A:**   It was none of the ones that I looked at or the patents that I looked at at that time.  It was in the middle of the case so I've seen patents at different times so it was none that I recognized at that time.
>
> **Q:**   Do you recall any details of the construction of the balance of that window?
> **A:**   No, no.  I just examined a few seconds.  (Shina, page 24-25)

**D.**   **Shina Lacks the Knowledge or Skill to be Qualified as an Expert.**

During his deposition, Shina admitted substantial confusion over the correct mechanical formula to apply for calculating the force produced by the different types of springs used in the balances at issue in this case, an issue which is key to his conclusion that Caldwell's Quick-Tilt balance will rotate even when properly installed in a window.  Initially he testified as follows:

> **Q:**   Do you know why they call it a Constant Force spring?
> **A:**   Produces constant force throughout its extension.
>
> **Q:**   Is there an equation generally used to describe forces that a spring exerts?
> **A:**   Yes.
>
> **Q:**   What is that equation?
> **A:**   $F = K X$.  (Shina at 27)

5

*          *          *          *

**Q:**      In the coil spring, does the equation apply?
**A:**      Yes.  (Shina at 28)

Shina then contradicted himself, testifying as follows:

**Q:**      So you said that the coil spring has a constant force.  Does that mean that the longer you stretch that spring the greater the force or does it mean the force is constant regardless of how long you stretch the spring?

MR. SINGER:  Objection.

**A:**      I guess it would mean the force is constant as long as you stretch the spring.

**Q:**      So in other words, if the spring is stretched an inch compared to the spring being stretched two inches, is the force the same?
**A:**      Yes.

**Q:**      So then the equation you gave me F = K X does not apply to coil springs; is that correct?
**A:**      That's correct, yes.  (Shina at 28)

Shina then back-flipped several more times:

**Q:**      When you say "spring constant," what does that mean?
**A:**      The resistance that the spring gives to an outside force.  It tries to change its position.

**Q:**      Is that used in some equation?
**A:**      Yes, it is.

**Q:**      What's that equation?
**A:**      F = K X.  K being the spring constant.

**Q:**      Didn't we earlier conclude that equation does not apply to coil springs?
**A:**      We had a discussion about that.  I cannot –

**Q:**      Well, the equation indicates that the bigger X is, the bigger the force is –
**A:**      Correct.

**Q:**      Because K is constant, correct?
**A:**      Correct.

6

> **Q:** But you told me earlier in a coil spring the force does not increase as X increases, correct?
>
> **A:** Correct.
>
> **Q:** So then to do your calculation that you discussed a minute ago in terms of the difference in forces, you wouldn't need the spring constant, would you?
>
> **A:** I would have to consult my books on that.
>
> **Q:** Have you consulted your books in preparing your expert report?
>
> **A:** No.
>
> **Q:** Have you done any research into the forces that are present with a coil spring?
>
> **A:** No.  (Shina at 69-71)

Finally, he admitted that he really does not understand the mechanics of a coil spring:

> **Q:** As you sit here today, you don't know the proper formula to use, do you, to calculate the forces?
>
> **A:** On what?
>
> **Q:** On the coil spring.
>
> **A:** I would have to consult my books to look it up.
>
> **Q:** The answer is you do not know without consulting your books; is that correct?
>
> **A:** That's correct.
>
> **Q:** As you sit here today, you don't know whether $F = KX$ for a coil spring, do you?
>
> **A:** Correct.  (Shina at 71)

Much of Shina's infringement analysis of Caldwell's constant force balances hinged on something Shina calls the "rotational moment" of the coil spring, which he maintains is different for each of the springs in a Caldwell Two- or Three-Spring Quick Tilt assembly.  As Mr. Shina testified "It's equal to the center but the rotational force or the rotational moment is applied to the supporting means, which is not equal."  (Shina at 66.)  Although the concept of rotational force is a central assumption underlying Shina's conclusions, he testified:

> **Q:** Did you calculate the difference in the rotational moments caused by the first coil compared to the second coil?
>
> **A:** No, I did not.
>
> *    *    *    *
>
> **Q:** Do you know what the exact value of the difference is?
>
> **A:** No.
>
> **Q:** Do you know what the approximate value of the difference is?
>
> **A:** No.  (Shina at 67-68)

**E.** **Shina's "Opinion" is Pure Conjecture.**

In addition to a complete lack of knowledge about windows and window balances, Shina

has not actually studied the products in this case.  As he testified:

> **Q:** So you have never actually seen rotation of a Caldwell Quick-Tilt Balance inside a jamb channel have you?
>
> **A:** No, I have not.  (Shina at 60)

He further testified:

> **Q:** How many window jams did you examine prior to rendering your reports in this case?
>
> **A:** One.
>
> **Q:** Was the 86xt that you examined installed in any window jam?
>
> **A:** No.
>
> **Q:** Was the 97ez that you examined installed in a window jamb?
>
> **A:** No.
>
> **Q:** Did you examine a 97i or a 97ih product of Caldwell?
>
> **A:** No.  Physical products you mean?
>
> **Q:** Yes, yes.
>
> **A:** No.
>
> *    *    *    *
>
> **Q:** Did you ever examine a fully assembled window prior to rendering your expert reports?
>
> **A:** Fully --?
>
> **Q:** Assembled window assembly.
>
> **A:** The only time that I looked at it, I was in Home Depot on another matter and I happened to pass by the window section and I examined that.

8

\*   \*   \*   \*

**Q:**    Do you know what brand?
**A:**    No.

\*   \*   \*   \*

**Q:**    Do you recall what style of balance or type of balance it was?
**A:**    It was none of the ones that I looked at or the patents that I looked at at that time.  It was in the middle of the case so I've seen patents at different times, so it was none that I recognized at that time.

**Q:**    Do you recall any details of the construction of the balance of that window?
**A:**    No, no.  I just examined it a few seconds.  (Shina at 23-25)

He further admitted:

**Q:**    So you have never examined a Quick-Tilt Balance of Caldwell as it is properly installed in a channel; is that correct?
**A:**    Correct.  (Shina at 45)

Shina has made no attempt to investigate the products at issue, but, instead, relied on Amesbury's lawyers:

**Q:**    Do you know that there is a range of gaps between the flanges on actual channels found in the field?
**A:**    Yes.

**Q:**    How do you know that?
**A:**    I asked the Amesbury lawyers if there was a standard to govern the width.

**Q:**    And the answer was?
**A:**    There was no standard.

**Q:**    Do you know who made the jamb channel that you examined while you were here at the office of Goodwin Procter?
**A:**    No.

**Q:**    Do you know if that was a production model of a jamb channel or a nonproduction model?
**A:**    No.  (Shina at 56-57)

Finally, Shina admitted that knows virtually nothing about the products at issue:

9

**Q:**    Other than the single instance in which you saw the Caldwell balance in that channel, you don't know if a Caldwell balance has ever been put in a jamb channel made by that company that made the sample, do you?

**A:**    I only saw the one instance, that's correct.

**Q:**    Right.  In other words, Caldwell sells balances to a number of companies that make window products, correct?

**A:**    I assume.

MR. SINGER:  Objection.

**Q:**    You don't really know, do you?

**A:**    I do not.

**Q:**    And the jamb channels you've stated have varying flange separations, correct?

**A:**    Correct.

**Q:**    So I'm asking you if you know whether a Caldwell balance has ever been installed in a jamb channel having the flange separation equal to or less than the flange separation of the sample you looked at.

**A:**    I only looked at that one sample.  I cannot make a statement about others. (Shina at 58)

Shina's own testimony compels the conclusion that he is not qualified to offer an opinion in this case, and, not having actually examined and studied the products at issue, the opinions he does offer have no foundation whatsoever.

## ARGUMENT

## POINT I

### SHINA LACKS THE QUALIFICATIONS TO SERVE AS AN EXPERT

Fed.R.Evid. 702 mandates that a trial court assess an expert witness's qualifications to determine whether the expert's opinions "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed.R.Evid. 702; *see* <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 592 (1993).  In the seminal <u>Daubert</u> and <u>Kumho Tire</u> decisions, the Supreme Court directed District Court judges to perform a screening function to ensure that evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence.

See <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999); <u>Daubert v. Merrell Dow Pharm.,</u> <u>Inc.</u>, 509 U.S. 579 (1993), at 592, n. 10.

A trial court considering expert testimony engages in a three part test requiring that "(1) expert testimony be based upon sufficient facts or data, (2) expert testimony be the product of reliable principals and methods, and (3) those principals and methods be applied reliably to the facts of the case." <u>Huber v. JLG Industries, Inc.</u>, 344 F.Supp. 769, 773 (D. Mass. 2003); Rule 702. In conducting this inquiry, the court must determine whether the proposed expert is "qualified by knowledge, skill, experience, training, or education." <u>Ed Peters Jewelry Co. v. C &</u> <u>J Jewelry Co.</u>, 124 F.3d 252, 259 (1st Cir. 1997), *judgment entered by* 51 F.Supp.2d 81 (D.R.I. 1999), *aff'd* 215 F.3d 182 (1st Cir. 2000); *citing* <u>Bogosian v. Mercedez-Benz of N.A., Inc.</u>, 104 F.3d 472, 476 (1st Cir. 1997). Second, the court must inquire whether the proffered testimony concerns scientific, technical, or other specialized knowledge. <u>Id.</u> (citation omitted). Lastly, the court acts as a "gatekeeper" to assess whether the testimony, including the methodology used, "rests on a reliable foundation and is relevant to the facts of the case." <u>Id.</u> The Supreme Court describes the objective of this gatekeeping role as making "certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. at 152. Shina's testimony fails on all three grounds.

In evaluating proffered expert evidence, this Court must assess whether or not Shina possesses the requisite knowledge, skill, experience, training, or education to render opinions or give testimony in this action. <u>Alvarez v. R.J. Reynolds Tobacco Co.</u>, 405 F.3d 36, 40 (1st Cir. 2005), *citing* <u>Ed Peters Jewelry Co. v. C&J Jewelry Co.</u>, 124 F.3d 252, 259 (1st Cir. 1997) (internal citations omitted). In deciding such questions, the First Circuit, and other courts, have

held that a person may be qualified as an expert in a related field, but not qualified as an expert in the subject matter at issue, and thus not permitted to testify.

In <u>Tokio Marine & Fire Insurance Co. v. Grove Manufacturing Co.</u>, 958 F.2d 1169, 1173-74 (1st Cir. 1992), the First Circuit held that a civil engineer was not qualified to render expert opinions on cranes and on crane accident investigations and safety. The court concluded that the proffered expert lacked relevant education and training because he had a civil, not a mechanical, engineering degree and did not possess relevant industry experience such as operating, designing, or performing maintenance on cranes. <u>Id.</u> at 1174. Additionally, the proffered expert had not written any publications or conducted an in-depth study on the subject of cranes. <u>Id.</u>

Similarly, in <u>Bogosian v. Mercedes-Benz of North America, Inc.</u>, 104 F.3d 473, 477 (1st Cir. 1997), the First Circuit held that a master mechanic was unqualified to render expert opinions about an alleged transmission design defect in an automobile. The court explained that, although the proffered expert was well qualified to testify as a master mechanic, he did not possess an engineering degree, his formal education in engineering was insufficient (limited to three semesters of basic engineering), and had never professionally designed a transmission component in an automobile. <u>Id.</u> The proffered expert had also only testified on one prior occasion with respect to the alleged design defect. <u>Id.</u>

District courts in Massachusetts and other federal courts have made similar rulings. *See* <u>Jesionowsky v. Beck</u>, 955 F.Supp. 149, 150 (D. Mass. 1997) (holding that a polygraph examiner who was qualified to testify as an expert about the reliability of polygraph examinations in general, was unqualified to testify as an expert about the scientific theory underlying polygraph tests); <u>Perkins v. Volkswagen of Am., Inc.</u>, 596 F.2d 681, 682 (5th Cir. 1979) (affirming the trial court's ruling that a mechanical engineering specialist without any experience in designing entire

automobiles was qualified to express expert opinions on general mechanical engineering principles, but unqualified to testify as an expert on automotive design); Smith v. Ford Motor Co., 882 F.Supp. 770, 772 (N.D. Ind. 1995) (holding that a former automotive collision industry worker was unqualified to render expert opinions about the design of the fuel and electrical systems of an automobile); Polaino v. Bayer Corp., 122 F.Supp.2d   63, 68-69 (D. Mass 2000)(chemist not qualified to render opinion with respect to alleged discharge of fumes by mixing machine where he had no education in field of mechanical engineering, had never designed a mechanical device with moving parts and had never inspected working model of mixer); Hochen v. Bobst Group, 290 F.3d 446 (1st Cir. 2002) (expert in electronic controls unqualified to render opinion as to cause of explosion).

Thus, the controlling law in this jurisdiction requires that Amesbury's proffer of Dr. Shina as an expert witness must be rejected due to his lack of qualification. Although Dr. Shina has some limited experience and education in the general field of mechanical engineering, he has never: 1) been involved in the design or manufacture of window balances (Shina at 17-18); 2) consulted or been employed in the field of window balances or fenestration (Shina at 11-17); 3) published any articles or spoken on the topics of window balances or fenestration (Shina at19); 4) read any publications on the subjects of window balances or fenestration (Shina at 21); or 5) testified as an expert concerning window balances or fenestration (Shina at 5).   Indeed, prior to being retained by the plaintiffs, Shina had never even examined a window balance (Shina at 18).

Not only is Dr. Shina's practical experience of dubious relevance, his knowledge of the applicable science is demonstrably deficient.  Thus, upon examination by Caldwell's counsel, Shina first stated that a particular mathematical formula applied to describe the forces that a spring exerts (Shina at 27).  Upon further examination, Shina maintained that this formula was

inapplicable (Shina at 27).  Finally, Dr. Shina admitted that he did not know the proper formula to determine the forces on a coil spring of the type found in the patent-in-suit or the accused product (Shina at 70-71).

While Dr. Shina may hold a degree in mechanical engineering, this does not, *ipso facto*, qualify him to give expert testimony concerning window balances.  As this Court has observed, to be sufficiently qualified as an expert a witness must have knowledge, skill, training or education "in the specific subject for which his testimony is offered." Whiting v. Boston Edison Co., 891 F.Supp. 12, at 24 (D. Mass. 1995).  "Just as a lawyer is not by general education and experience qualified to give an expert opinion on every subject of the law, so too a scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease." Id.  Based upon Dr. Shina's admitted lack of training, education or experience in the fields of window balances or fenestration, and, indeed, his general knowledge of the relevant mechanical engineering principles, he is unqualified to render expert testimony in this case.

## POINT II

### EVEN IF QUALIFIED TO SERVE AS AN EXPERT SHINA'S OPINION LACKS FOUNDATION

In addition to evaluating Dr. Shina's qualifications to serve as an expert, the Court must determine whether his conclusions rest upon a "reliable foundation."  "It is fundamental that expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion." Damon v. Sun Co., 87 F.3d 1467, 1474 (1st Cir. 1996) (internal quotations omitted).  As part of its gatekeeping function, a court must ensure that the underlying data used by an expert to form an opinion is trustworthy and not "based on conjecture or speculation from an insufficient evidentiary foundation." Id. at 1474; *see also* Quinones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 6 (1st Cir. 1992) (1st Circuit agreeing with District Court that it was

14

proper to exclude expert's opinion because [expert's] analysis was predicated on assumptions not supported by the record); Casas Office Machs. v. Mita Copystar Am., 42 F.3d 668, 681 (1st Cir. 1994) (explaining that a District Court may exclude expert testimony where it finds that the testimony has no foundation or rests on obviously incorrect assumptions or speculative evidence); req. Elcock v. Kmart Corp., 233 F.3d 734, 754 (3rd Cir. 2000) (stating that expert testimony should be excluded where the underlying data supporting the opinion was not consistent with the factual record); Quiles v. Sikorsky Aircraft, 84 F.Supp.2d 154, 164 (D. Mass, 1999) (experts affidavits rejected because they did not demonstrate use of reliable scientific theories or techniques).

Mr. Shina's conclusions have no reliable basis; instead they are based on several outright guesses.  As noted, one of the principal contentions of the plaintiff is that the housing of the Caldwell Quick-Tilt balance would rotate such that its spine would come in contact with the flanges of the channel in which the balance is mounted.  Particularly significant is that Mr. Shina has never seen one of Caldwell's window balances properly mounted in a window channel and affixed by a mounting screw (Shina at 39, 44-45), although the mounting screws are an integral part of the Quick-Tilt balance.  (Without mounting screws) the balance simply will not work and the window won't stay open.)

Mr. Shina could also not state what effect a properly installed mounting screw would have upon the operation of the balance (Shina at 108-109).  Although Shina conceded that a window balance whose dust cover and "wings," as he called the sides of the balance housing, had not degraded would not infringe the claims of the '638 patent, he nevertheless concluded that such degradation would occur, even though he had never observed any such degradation and never calculated the extent to which these parts of the balance might degrade, thereby allowing the spine to contact the flanges (Shina at 107-108, 115-116, 130).  Moreover, Shina readily

admits that he has no idea, and made no attempt to calculate, the forces necessary to cause the spring in the balance to rotate, or resist rotation (Shina at 76-77). He has never observed any rotation (Shim at 60). He nevertheless reached the conclusion — without, apparently, any factual predicate — that the forces creating rotation were greater than the forces resisting rotation.

In short, little more than Mr. Shina's conjecture and assumptions connect the underlying factual data with his ultimate conclusion that the housing of the window balance would rotate in such a manner as to infringe the plaintiff's patent claims. As the Supreme Court has observed: "nothing in <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).

## POINT III

### THE COPIES OF SHINA'S REPORTS AND ALL PORTIONS OF AMESBURY'S STATEMENT OF UNDISPUTED FACTS WHICH RELY ON THOSE REPORTS MUST BE STRICKEN FROM AMESBURY'S MOTION FOR SUMMARY JUDGMENT

Mr. Shina's reports must also be stricken because they rely on inadmissible evidence.

Local Rule 56.1 provides, in pertinent part:

> Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation.

Further, Federal Rule 56(e) requires supporting affidavits to be made "upon personal knowledge" and "shall set forth such facts as would be admissible in evidence." Specifically, Rule 56(e) provides:

> **Form of Affidavits; Further Testimony; Defense Required**. *Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.* Sworn or certified copies of all papers or parts

thereof referred to in the affidavit shall be attached thereto or served therewith (Emphasis Added).

Taken together, Local Rule 56.1 and Federal Rule 56(e) restrict a Court's consideration to pleadings and admissible evidence when evaluating a motion for summary judgment, e.g. Cummings v. Pearson Educ., Inc., No. Civ. 03-12183, 2006 WL 151880 (D. Mass. January 18, 2006) (Woodlock, J., holding that Local Rule 56.1 and Federal Rule 56(e) require that evidence in a summary judgment motion must be "shown admissible"), and a bare report from a party's expert is nothing more than a hearsay statement, which the court may not consider in deciding the motion.  Absent admissible evidence, then, a summary judgment motion must be denied.  See generally Moos v. Hampshire College, No. Civ. 97-30262, 1999 WL 377259 (D. Mass. June 8, 1999) citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)("[h]earsay evidence inadmissible at trial cannot be considered on a motion for summary judgment").

The record contains no affidavit by Shina confirming that the reports are, in fact, true and accurate; that the matters asserted therein are true to best of his knowledge; and that his conclusions were made to a reasonable degree of professional certainty.  In its present form, this evidence amounts to nothing more than inadmissible hearsay.  See generally Blair Foods Inc. v. Ranchers Cotton Oil, 610 F.2d 665 (9th Cir. 1980)(hearsay evidence "is inadmissible and may not be considered by this court on review of a summary judgment").

Accordingly, the Court must strike Shina's March 23 and April 18 Reports in their entirety, including any "material fact" in Amesbury's Statement of Material Facts which relies, in whole or in part, upon his opinions.  This includes, but is not limited to, the material facts recited in the following paragraphs:  8-19; 21-34; 36-49; 51-64; 66-76; 79, 81 and 85-89.

It is well settled that a party may move to strike any portion of an affidavit that violates Federal Rule 56(e).  See Great Northern Ins. Co. v. Paino Associates., 364 F.Supp.2d 7 (D. Mass. 2005) (holding that an expert reports, submitted without an authenticating affidavit, would

ordinarily be stricken);  Bolen v. Paragon Plastics Inc., 754 F. Supp. 221 (D. Mass. 1990); Moos

v. Hampshire College, No. Civ. 97-30262, 1999 WL 377259 (D. Mass. June 8, 1999).

("[h]earsay evidence inadmissible at trial, cannot be considered on a motion for summary

judgment).   Here, the above evidence lacks appropriate authentication and, therefore, is

improperly before this Court. As such, it must be disregarded.

**POINT IV**

**ALL HEARSAY REFERENCES IN AMESBURY'S MOTION
FOR SUMMARY JUDGMENT TO A WEBSITE MAINTAINED
BY TRI-STATE WHOLESALE BUILDING SUPPLIES, INC.
MUST ALSO BE STRICKEN**

Amesbury claims that customers of the Quick-Tilt*nc balance, including Tri-State

Wholesale Building Supplies, Inc. of Cincinnati Ohio ("Tri-State"), use the Caldwell Quick-

Tilt*nc balance product" in window jambs of the same relevant configuration as that of Still

deposition Exhibit 10."  (See Amesbury Statement of Material Facts ¶105).  In support of this

assertion Amesbury points to a copy of what purports to be Tri-State's company website which

advertises that Tri-State "currently uses and is offering for sale the Caldwell constant force

balance system in its Earthwise brand of double hung windows."  (See Amesbury Brief at 36

citing SOF at ¶¶ 104, 105).

There are, however, multiple problems with Amesbury's reliance on this page from the

World-Wide-Web: 1) it is not authenticated; 2) it, like Shina's reports, is simply hearsay; and

3) it is impossible to tell what window jamb is actually depicted on Tri-State's website, assuming

– a rather large assumption at that – that the jamb is in fact a product which Tri-State sells and

not some piece of computer clip-art.

Amesbury's motion papers do not include an affidavit by a Tri-State representative

authenticating the website, or otherwise validating Amesbury's speculative conclusions about

what the website purports to show.  Amesbury's Statement of Material Facts merely cites to the

18

"printout" of the Tri-State website.  (See ¶¶ 104 and 105 of Statement of Material Facts).  As this printout is offered for the truth of the matters asserted (i.e. that Tri-State uses the Quick-Tilt*nc balance in window jambs of the "same geometry and configuration" as the window jamb marked as Still deposition Exhibit 10), this evidence, then, is nothing more than inadmissible hearsay.

It is well settled that affidavits composed of hearsay evidence do not satisfy Rule 56(e) and must be disregarded.  See Miller v. Solem, 728 F.2d 1020, 1026 (8th Cir. 1984)(affidavits containing hearsay statements failed to comply with Rule 56(e) requirement "that the facts set forth in affidavits be admissible in evidence"); Pan-Islamic Trade Corp. v. Exxon Corp., 632 F.2d 539 (5th Cir. 1980)("hearsay evidence in [Rule 56] affidavits is entitled to no weight"). Amesbury merely attaches the web page of an unrelated party to its papers and asks the Court to fill in the blanks.  It, along with all similar references in Amesbury's motion papers, must be stricken.  Blair Foods Inc. v. Ranchers Cotton Oil, 610 F.2d 665, 667 (9th Cir. 1980)(hearsay evidence "is inadmissible and may not be considered by this court on review of a summary judgment"); State Mut. Life Insurance Co. of Am. v. Deer Creek Park, 612 F.2d 259 (6th Cir. 1979)("[a]ffidavits composed of hearsay and opinion evidence do not satisfy Rule 56(e) and must be disregarded").  Thus:

- There is no evidence of record that Still Exhibit 10 includes a window jamb manufactured by or for Tri-State Wholesale Building Supplies, Inc., of Cincinnati, Ohio;

- There is no evidence of record that the channel geometry of Still Exhibit 10 is the same as is found in the Tri-State window product shown on Tri-State's website;

- The channel geometry on the window jamb shown in Amesbury's statement of facts Ex. 38 cannot be determined from Tri-State's website;

- There is no evidence of record that the window jamb shown in Ex. 38 is the same relevant configuration as that of Still deposition Exhibit 10.

In short, just as Amesbury would be precluded at trial from offering such an inherently unreliable document into evidence so, too, is it precluded from offering such evidence in

connection with this summary judgment motion.  Accordingly, the court must strike Amesbury's Exhibit 38 in its entirety, as well as paragraphs 104 and 105 of Amesbury's Statement of Material Facts.

## CONCLUSION

By reason of the foregoing, plaintiffs' proposed expert, Mr. Shina, should be precluded from testifying on the grounds that he lacks the requisite education, training or experience in the fields of window balances and fenestration to allow him to render expert testimony in this matter. In addition, Mr. Shina's proposed testimony lacks an adequate factual foundation and, therefore, fails to meet the reliability requirement of Federal Rule of Evidence 702.  Accordingly, his reports should be stricken from Amesbury's motion for summary judgment, and his testimony should be excluded.

The portions of Amesbury's motion for summary judgment that rely on hearsay statements in Shina's reports and unauthenticated Tri-State web-site must also be stricken.


Dated:  June 7, 2006                               Respectfully submitted,


                                                   /s/ Thomas E. Lent
                                                   David E. Lurie (BBO #542030)
                                                   Thomas E. Lent (BBO #644970)
                                                   LURIE & KRUPP, LLP
                                                   One McKinley Square
                                                   Boston, MA  02109
                                                   Telephone:  (617) 367-1970
                                                           -and-
                                                   Paul J. Yesawich, III
                                                   Neal L. Slifkin
                                                   David J. Edwards
                                                   HARRIS BEACH PLLC
                                                   99 Garnsey Road
                                                   Pittsford, New York  14534
                                                   Telephone:  (585) 419-8800
                                                   ***Attorneys for Defendant***
                                                   ***The Caldwell Manufacturing Co.***

210199 69099.2
6/7/2006 2:31 PM