UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

        Plaintiffs,

           v.

THE CALDWELL MANUFACTURING CO.,

        Defendant.

———————————————————————

Civil Action
No. 05-CV-10020

DECLARATION OF THOMAS E. LENT

I, THOMAS E. LENT, hereby declare as follows:

1.      I am an attorney duly admitted to practice before this Court and counsel of record for The Caldwell Manufacturing Company ("Caldwell").  I make this declaration in support of Caldwell's motion to exclude the testimony of the plaintiffs' designated expert, Sammy G. Shina, at trial and strike portions of plaintiffs' motion for summary judgment, including Mr. Shina's expert reports and certain hearsay statements from Amesbury's motion for summary judgment.

2.      Attached is a true and correct copy of the transcript of the May 3, 2006, deposition of Mr. Shina.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 7, 2006.

/s/ Thomas E. Lent
Thomas E. Lent, BBO #644970
Lurie & Krupp, LLP
One McKinley Square
Boston, MA 02109
Tel: 617-367-1970
Fax: 617-367-1971
Email: tlent@luriekrupp.com

210199 70210.1
6/7/2006

1            UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3

4

                    NO. 05-CV-10020 (DPW)

5

6

    ****************************************

7   AMESBURY GROUP, INC., and AMESBURY     *

    SPRINGS LTD.,                          *

8                                          *

            Plaintiffs,                    *

9                                          *

    v.                                     *

10                                         *

    THE CALDWELL MANUFACTURING COMPANY,    *

11          Defendant.                     *

    ****************************************

12

13

14

15          DEPOSITION OF SAMMY G. SHINA, Ph.D., PE,

    taken pursuant to the applicable provisions of

16  the Federal Rules of Civil Procedure, before

    Susan L. Prokopik, Registered Merit Reporter and

17  Notary Public in and for the Commonwealth of

    Massachusetts, at the offices of Goodwin Procter

18  LLP, Exchange Place, Boston, Massachusetts, on

    Wednesday, May 3, 2006, at 9:07 a.m.

19

20

21

                KACZYNSKI REPORTING

22          72 CHANDLER STREET, SUITE 3

23          BOSTON, MASSACHUSETTS 02116

24               (617) 426-6060

```
 1    APPEARANCES:

 2

          ON BEHALF OF THE PLAINTIFFS:

 3

          JORDAN M. SINGER, ESQ.

 4        Goodwin Procter LLP

          Exchange Place

 5        Boston, MA  02109

          (617) 570-1000

 6

 7

          ON BEHALF OF THE DEFENDANT:

 8

          NEAL L. SLIFKIN, ESQ.

 9        Harris Beach PLLC

          99 Garnsey Road

10        Pittsford, NY  14534

          (585) 419-8800

11

12        ALSO PRESENT:

13        Charles E. Still

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    I N D E X
2
       EXAMINATION BY MR. SLIFKIN.............Page 4
3
       EXAMINATION BY MR. SINGER.............Page 273
4
5
6                  E X H I B I T S
7      No.    Description              Page No.
8      1    3/23/06 report               29
       2    4/18/06 report               34
9      3    Quick-Tilt*nc document       45
       4    US Patent 5,365,638          95
10     5    Frame jamb                  101
       6    Constant Force balance      102
11     7    Frame jamb                  110
       8    Triple coil balance         144
12     9    US Patent 5,157,808         161
       10   Caldwell Series 86xt brochure  186
13     11   US Patent 6,598,264 B2      202
       12   US Patent 6,840,011 B2      227
14     13   Caldwell Series 97ez brochure  233
       14   US Patent 6,820,368 B2      235
15     15   Time sheet                  266
16
17
18
19
20
21
22
23
24
```

```
 1                    P R O C E E D I N G S

 2                          - - - - -

 3                    SAMMY G. SHINA, Ph.D.,PE

 4        having been satisfactorily identified and duly

 5        sworn by the Notary Public, was examined and

 6        testified as follows:

 7

 8     EXAMINATION BY MR. SLIFKIN:

 9     Q.  Would you state your name for the record, please?

10     A.  Sammy G. Shina.

11     Q.  Is Sammy a nickname or is it your full name?

12     A.  That's my legal name.

13     Q.  Mr. Shina, my name is Neal Slifkin.  I represent

14        Caldwell Manufacturing Company in the lawsuit in

15        which you have been engaged as an expert on

16        behalf of Amesbury.  I'm going to ask you a

17        number of questions today.  If you don't

18        understand the question, don't hear the question,

19        please let me know.  If you answer the question,

20        I'll assume you heard it, understood it.  But if

21        you have an issue with a question, I would be

22        glad to repeat it or rephrase it for you.

23     A.  Thank you.

24     Q.  Mr. Shina, have you ever testified before as an
```

```
 1         expert witness?

 2   A.    I testified in a situation like this.

 3   Q.    A deposition?

 4   A.    Deposition, correct.

 5   Q.    Okay.  Have you ever testified in a courtroom

 6         before?

 7   A.    No.

 8   Q.    How many times have you been deposed?

 9   A.    Just once.  The previous one.

10   Q.    Okay.  Was that a patent infringement case?

11   A.    No.  It was a trade secret case.

12   Q.    Can you tell me just generally the subject matter

13         of the case?

14   A.    It's in my CV.  Could I read it to you?

15   Q.    If you could find it, just point it out to me.

16   A.    Sure.  I think it's page eight of my CV.  The

17         bottom one.  Number four.

18   Q.    Okay.  And in numbers one, two and three on page

19         eight, did you not give a deposition in any of

20         those?

21   A.    Correct.  I did not give a deposition.

22   Q.    Do you have the transcript from your deposition

23         for item number four on page eight?

24   A.    No.
```

```
 1   Q.   Which party did you work on behalf of in item
 2        number four?
 3   A.   RFT Technology.
 4   Q.   And the opposing party was Applied Microwave
 5        Technology?
 6   A.   Correct.
 7   Q.   How many times have you been engaged as an expert
 8        witness in litigation?
 9   A.   The numbers that you see here in page number
10        eight.
11   Q.   Okay.  Could you briefly go through your
12        educational background for me?
13   A.   Sure.  Again, it's in my CV.  And it's in the
14        first page of my CV.  And it's BS in electrical
15        -- starting from further away.  BS in electrical
16        engineering, MIT, 1966.  Want me to continue?
17   Q.   Yes, please.
18   A.   BS in industrial management, MIT, 1966.  Master's
19        of Science, computer science, WPI, 1972.  And
20        Ph.D. in mechanical engineering, Tufts, 1998.
21   Q.   Starting back with the first degree you listed
22        there, the first two degrees, were those received
23        at the same time?  Did you receive a joint degree
24        from MIT?
```

```
 1    A.  Yes.

 2    Q.  Those are two separate majors, areas of study?

 3    A.  Correct.

 4    Q.  What is industrial management?

 5    A.  The science of combining management of a company

 6        making products.

 7    Q.  It's not what we would call industrial

 8        engineering?

 9    A.  It is --

10              MR. SINGER:  Objection.  You can

11        answer.

12    A.  It is not industrial engineering.  It's

13        industrial management.

14    Q.  There is a field of study called industrial

15        engineering?

16    A.  I'm very familiar with it.

17    Q.  It involves human factors, manufacturing

18        processes, interaction of humans with

19        manufacturing processes.  Is that a general

20        statement of the area of study?

21              MR. SINGER:  Objection.

22    A.  Yes.  I taught in industrial technology in my CV.

23    Q.  Right.  I'm just trying to get an understanding

24        of what industrial management is.  Is it more of
```

```
 1         a business-type degree or an engineering-type

 2         degree?

 3    A.   It's a combination of business and engineering.

 4    Q.   Okay.  For either of those two degrees, were you

 5         required to take mechanical engineering classes?

 6    A.   Yes.

 7    Q.   Do you know approximately how many?

 8    A.   One or two.  I can't remember.

 9    Q.   Did you take any architectural courses?

10    A.   No.

11    Q.   Computer science degree you have from WPI, did

12         you take any mechanical engineering courses for

13         that?

14    A.   No.

15    Q.   Did you take any architectural courses for that?

16    A.   No.

17    Q.   You then have a Ph.D. from Tufts in mechanical

18         engineering.  Did you write a thesis for that?

19    A.   Yes, I did.

20    Q.   What was the topic of the thesis?

21    A.   A modeling of -- a cost model for products.

22    Q.   Was there course work involved in obtaining the

23         Ph.D. in addition to that?

24    A.   Yes.
```

1    Q.  Did you have courses in mechanical engineering?

2    A.  Yes.

3    Q.  Did you have courses in architecture?

4    A.  No.

5    Q.  I would like to move on to your work history.

6    A.  Sure.

7    Q.  Did there come a time when you were employed

8        full-time as an engineer in the workplace?

9    A.  Yes.

10   Q.  What was the first position you had working as an

11       engineer?

12   A.  In page four of my resume, Union Carbide

13       Corporation, Linde Division, Florence, South

14       Carolina.

15   Q.  And did that position involve mechanical

16       engineering?

17   A.  Partially.

18   Q.  What types of mechanical engineering did you do

19       in that position?

20   A.  The company products were welding equipment.  And

21       I was a manufacturing engineer in that company

22       involved in aspects of manufacturing for the

23       equipment.

24   Q.  Okay.  Did you do any engineering design as part

1        of that job?

2    A.  Yes, I did.

3    Q.  What types of equipment or items did you design

4        in?

5    A.  I designed fixtures for assembly of the welding

6        equipment.

7    Q.  So are you speaking about jigs and fixtures for

8        manufacturing?

9    A.  Correct.

10   Q.  You designed those for the process --

11   A.  Correct.

12   Q.  -- to improve the manufacturing process --

13   A.  Correct.

14   Q.  -- for use of standardized jigs and fixtures?

15   A.  Correct.

16   Q.  Did any of your work at Union Carbide involve

17       design, construction or manufacture of window

18       balances?

19   A.  No.

20   Q.  Your next position listed on your CV, can you

21       describe that position, please?

22   A.  I was working in RCA Computer Systems Division in

23       Marlborough, Massachusetts.  Involved design of

24       automatic manufacturing/test systems for computer

```
 1          peripherals, including magnetic tape storage and

 2          high-speed storage disk devices.

 3    Q.    In your role at RCA, did part of it involve

 4          mechanical engineering?

 5    A.    Yes.  The assembly of the devices so mentioned.

 6    Q.    So like the position at Union Carbide, you worked

 7          on the manufacturing process --

 8    A.    Correct.

 9    Q.    -- at RCA?

10    A.    Correct.

11    Q.    What percentage of your time working at RCA was

12          involved in mechanical engineering-type work as

13          opposed to other types?

14    A.    I would say somewhere between 25 to 50 percent.

15    Q.    And at Union Carbide, what percentage of your

16          work was devoted to mechanical engineering-type

17          work compared to other types of engineering work?

18    A.    I would say more than 50 percent.

19    Q.    Did you work on window balances -- strike that.

20          Did you work on the design, construction of

21          window balances at RCA?

22    A.    No.

23    Q.    Following your position at RCA in 1971, did you

24          work as a full-time engineer at any place?
```

1   A.  As you can see from my CV, in 1971 to 1988, I

2       worked as an engineer at Hewlett-Packard, Waltham

3       division.

4   Q.  Was that a full-time position?

5   A.  Yes, it is.

6   Q.  What were your job responsibilities at

7       Hewlett-Packard?

8   A.  I'll read from my resume.

9           "I worked for the company in many

10      positions, both at the division and the corporate

11      levels.  I filled many diverse assignments:

12      manufacturing engineer and manager, in the

13      process, production and tool engineering

14      departments.  I have successfully built and

15      turned on a $10 million automatic electronic

16      manufacturing plant and associated wastewater

17      treatment system in 1980."

18  Q.  That's fine.  Did your work at Hewlett-Packard

19      involve mechanical engineering?

20  A.  Yes.

21  Q.  What percentage of the time you spent working at

22      Hewlett-Packard was devoted to mechanical

23      engineering?

24  A.  I was there for 17 years so obviously it varied.

```
 1            It varied from 100 percent to 25 percent.

 2    Q.   Okay.  Did you design any window balances at

 3            Hewlett-Packard?

 4    A.   No.

 5    Q.   Did you work on the manufacturing processes

 6            related to window balances at Hewlett-Packard?

 7    A.   No.

 8    Q.   Following your position at Hewlett-Packard, it

 9            looks like you had three different summer

10            positions; is that correct?

11    A.   Correct.

12    Q.   Were you in school at the same time that you were

13            taking those summer -- in the years in which you

14            had the summer positions?

15    A.   Correct.

16    Q.   In those three positions listed on page three

17            under "work experience" that are summer

18            positions, did any of them involve mechanical

19            engineering?

20    A.   I'll go through them.

21    Q.   Okay.

22    A.   In 1992, I worked for Phillips Kommunication in

23            Germany.  And I was assisting the company in

24            designing of products.
```

```
 1    Q.  What types of products?

 2    A.  The products were telephone communication

 3        products.

 4    Q.  When you say "design," you're talking about the

 5        electrical design of those products?

 6    A.  All design.  Mostly mechanical actually.

 7    Q.  Housings for the products?

 8    A.  Housings.  Scheduling of the design.  All aspects

 9        of the mechanical and -- of the design, including

10        mechanical.

11    Q.  When you say "scheduling," what do you mean by

12        that?

13    A.  How do you design a part and how do you schedule

14        when different parts come together.

15    Q.  In the manufacturing process?

16    A.  No.  In the design process.

17    Q.  I mean, the bringing the parts together, is that

18        for when it's manufactured or --

19    A.  Scheduling, what resources are required in

20        mechanical design, what kind of analysis is

21        required, when would the analysis come in, when

22        would you make commitments to suppliers and

23        things like that.

24    Q.  I see.  Any of the other positions involve
```

```
 1          mechanical engineering?

 2     A.   Yes.  In the next assignment, Lecroy Corporation

 3          of New York, I helped them develop an outside

 4          manufacturing contracting -- contracting -- let's

 5          see.  Supplier.

 6     Q.   That involved mechanical engineering?

 7     A.   Yes.

 8     Q.   Can you explain how, please?

 9     A.   How the parts are procured, how the parts are put

10          together, how the parts are assembled and how the

11          parts are tested.

12     Q.   Okay.

13     A.   Make the product.

14     Q.   And your final summer position listed there,

15          which is the summer of 2000 --

16     A.   Mm-hmm.

17     Q.   Could you describe that position for me, please?

18     A.   I worked with a company called CoCreate of

19          Colorado.  And in that position, I helped them

20          develop a system that would connect CAD systems

21          together.  Mech -- mostly mechanical CAD systems

22          together.  Systems used to design mechanical

23          parts and products.

24     Q.   When you say "system designed to make mechanical
```

```
 1          parts," we're talking about the software system

 2          that enables that; is that correct?

 3    A.    That's correct.

 4    Q.    The CAD system is software, right?

 5    A.    The CAD system is called Computer Aided Design.

 6          It's a mechanical design system.

 7    Q.    But did you work on the actual designs that were

 8          output from the CAD system or did you work on the

 9          CAD system itself that enabled others to do the

10          mechanical work?

11    A.    I worked on the output of the CAD system and how

12          the output of the CAD system would fit into the

13          design process.

14    Q.    Did you design parts using the CAD system

15          yourself?

16    A.    At CoCreate you mean?

17    Q.    Yes.

18    A.    No.

19    Q.    You facilitated the design of parts by others who

20          would then -- who would use the CAD system; is

21          that correct?

22    A.    That's correct.

23    Q.    Are there other work positions that we have not

24          yet discussed that you've had?
```

```
 1                    MR. SINGER:  Objection.
 2   A.   What do you mean by "work"?  University is also
 3        work.
 4   Q.   I'm sorry.  I understand that.
 5   A.   Academic --
 6   Q.   My wife is a professor.  Believe me.  I
 7        understand that.
 8   A.   Good.
 9   Q.   What I meant to say is, are there other
10        nonacademic positions you've held that are not
11        listed on your CV?
12   A.   Okay.  In my CP, I have listed consulting and
13        that's on page seven.  Consulting for US
14        companies, university and technical conferences
15        and international consulting.
16   Q.   Prior to your engagement as an expert in this
17        case, did you ever consult in the field of window
18        balances?
19   A.   No.
20   Q.   Prior to your engagement as an expert in this
21        case, did you ever consult in the field of
22        fenestration?
23   A.   No.
24   Q.   Have you ever designed a window balance?
```

```
 1    A.   No.

 2    Q.   Prior to your engagement as an expert in this

 3         case, have you ever examined a window balance?

 4    A.   No.

 5    Q.   Prior to your engagement as an expert in this

 6         case, have you ever seen a window balance?

 7    A.   In my own windows I've seen a portion of a window

 8         balance, yes.

 9    Q.   What portion do you recall seeing in your own

10         windows?

11    A.   That was actually a roller in the bottom -- in

12         the bottom of my window.  A roller that I could

13         see coming out of it.  Excuse me.

14    Q.   The windows in your own home, did you see any

15         other part of the balance besides the roller?

16    A.   No.

17    Q.   Have you ever disassembled a window prior to your

18         engagement as an expert in this case?

19    A.   No.

20    Q.   Have you ever replaced a window yourself prior to

21         your engagement as an expert in this case?

22    A.   No.  That's funny.

23    Q.   Have you ever worked in the fenestration

24         industry?
```

```
 1    A.  No.

 2    Q.  Out of the nearly 100 publications in your

 3        curriculum vitae, do any of them relate to window

 4        balances?

 5    A.  No.

 6    Q.  Do any of them relate to fenestration?

 7    A.  No.

 8    Q.  Out of the numerous talks you've given that are

 9        listed in your curriculum vitae, do any of them

10        relate to the field of window balances?

11    A.  No.

12    Q.  Do any of the talks that you have given relate to

13        the field of fenestration?

14    A.  No.

15    Q.  Can you name any trade publications in the field

16        of fenestration?

17    A.  No.

18    Q.  Do you subscribe to any trade publications in the

19        field of fenestration?

20    A.  No.

21    Q.  Have you written any articles for trade

22        publications in the field of fenestration?

23    A.  No.

24    Q.  Do you edit any trade journals in the field of
```

1          fenestration?

2     A.   No.

3     Q.   Do you belong to any organizations relating to

4          the field of fenestration?

5     A.   No.

6     Q.   Do you belong to any architectural organizations?

7     A.   No.

8     Q.   Do you belong to any professional societies?

9     A.   Yes.

10    Q.   Which societies do you belong to?

11    A.   I believe they're listed here.

12              In here on page -- this is my CV.  On

13         page 19, I was chairman of the SME, Society --

14         I'm sorry.  Page 19.  Chairman of the SME,

15         Society of Manufacturing Engineers, Robotics

16         Chapter 293, New England Region, 1991-1997.  And

17         let's see.

18              And throughout my career, I was a

19         member of many societies.  Also on page 19, item

20         11.  Nominated to the Board of Directors for the

21         Society of Manufacturing Engineering, SME,

22         Electronics Manufacturing Committee, 1992 and

23         1993.  Let's see.

24              Item seven on page 18, chaired a

1          session in the Symposium on Production

2          Engineering Division at the winter annual meeting

3          of the American Society of Mechanical

4          Engineering, ASME.  Item three, Symposium Chair,

5          Manufacturing Engineering Division, International

6          Mechanical Engineering Congress and Exposition.

7          IMECE.  Gives you an idea of my --

8     Q.   Are you a member of the ASME?

9     A.   Yes.

10    Q.   Do you receive publications from ASME?

11    A.   Yes.

12    Q.   Do you recall any of those publications having

13         anything in them related to fenestration?

14    A.   No.

15    Q.   Prior to your engagement as an expert in this

16         case, have you ever read any publication in the

17         field of fenestration?

18    A.   No.

19    Q.   Prior to your engagement in this case, have you

20         ever read any publication on the subject matter

21         of window balances?

22    A.   No.

23    Q.   Mr. Shina, did you bring with you today all of

24         the documents and things that you examined and

```
 1            relied upon in preparing your expert reports in

 2            this case?

 3    A.      I believe the documents are in a box right there.

 4    Q.      Does that box contain everything that you

 5            reviewed in connection with rendering your expert

 6            reports in this case?

 7    A.      Correct.

 8    Q.      Did you, other than documents, did you review any

 9            physical objects in preparing your expert reports

10            in this case?

11    A.      While I was in this building, I did review some

12            products that the plaintiff lawyers have shown

13            me.

14    Q.      Can you tell me from your recollection what those

15            products were?

16    A.      They were examples of Caldwell's products.  I

17            think one was a Quick-Tilt.  One was an 86xt.

18            And one was a 97ez.

19    Q.      Did you see only one of each of those items or

20            did you see more than one of each?

21    A.      I might have seen more than one Quick-Tilt.

22    Q.      Do you know how many Quick-Tilt products you

23            examined?

24    A.      I believe it was two.  One of them I had seen
```

1       very, very quickly.

2    Q.  Do you remember how the two Quick-Tilt balances

3       differed that you examined?

4    A.  One was a single coil and one was a multiple

5       coil.

6    Q.  Did the multiple coil have two coils or three

7       coils?

8    A.  Two coils.

9    Q.  Were either of those Quick-Tilt products placed

10       inside a window jamb?

11    A.  Yes, they were.

12    Q.  Were both of them placed inside a window jamb?

13    A.  My recollection is only one.

14    Q.  How many window jambs did you examine while you

15       -- I'm sorry.  Let me rephrase it.

16             How many window jambs did you examine

17       prior to rendering your reports in this case?

18    A.  One.

19    Q.  Was the 86xt that you examined installed in any

20       window jamb?

21    A.  No.

22    Q.  Was the 97ez that you examined installed in a

23       window jamb?

24    A.  No.

```
1    Q.  Did you examine a 97i or a 97ih product of

2        Caldwell?

3    A.  No.   Physical products you mean?

4    Q.  Yes, yes.

5    A.  No.

6    Q.  Were there any other physical things other than

7        paper documents that you examined in rendering

8        your expert reports?

9    A.  No.

10   Q.  Did you ever examine a fully assembled window

11       prior to rendering your expert reports?

12   A.  Fully --

13   Q.  Assembled window assembly.

14   A.  The only time that I looked at it, I was in Home

15       Depot on another matter and I happened to pass by

16       the window section and I examined that.

17   Q.  Could you tell me what you saw there at Home

18       Depot?

19   A.  The window that I saw was a tilt window.

20   Q.  Do you know what brand?

21   A.  No.

22   Q.  Do you know if it was single hung or double hung?

23   A.  It was double hung.

24   Q.  Did you examine the balance that was used in
```

```
 1        connection with that tilt window?

 2   A.   Yes, I did.

 3   Q.   Do you recall what style of balance or type of

 4        balance it was?

 5   A.   It was none of the ones that I looked at or the

 6        patents that I looked at at that time.  It was in

 7        the middle of the case so I've seen patents at

 8        different times so it was none that I recognized

 9        at that time.

10   Q.   Do you recall any details of the construction of

11        the balance of that window?

12   A.   No, no.  I just examined it a few seconds.

13   Q.   Are you familiar with the three main types of

14        window balances?

15                  MR. SINGER:  Objection.

16   A.   I am familiar with only the physical models that

17        I saw in the patents.

18   Q.   Do you understand that in the window balance

19        industry there are different combinations of

20        mechanical parts that may be used to accomplish

21        the same result to balance a window?

22                  MR. SINGER:  Objection.

23   A.   Could you repeat that question?  I'm not exactly

24        sure.
```

```
 1                    MR. SLIFKIN:  Read that, please.

 2                    (Question read.)

 3                    MR. SINGER:  I renew that objection.

 4      A.   That would be normal in any industry.

 5      Q.   Are there types of, different types of springs?

 6      A.   Yes.

 7      Q.   Are the different types of springs used in window

 8           balances?

 9      A.   Yes.

10      Q.   Can you describe for me the different types of

11           springs that you're aware of that are used in

12           window balances?

13      A.   Well, from the brochure of the Caldwell, I saw a

14           circular.  And I saw a -- what they call Constant

15           Force.  I saw also a length spring.  A regular

16           spring.  And I also saw a twist spring.

17      Q.   When you say "twist spring," what do you mean by

18           that?

19      A.   A spring.  When you rotate it, it produces a spin

20           force.

21      Q.   I think you said length spring; is that correct?

22      A.   A length.  A longitudinal spring.  Typical what

23           you think of as a spring.

24      Q.   Helical, would that be an accurate description of
```

```
 1        a --

 2   A.   Yes.  That would be accurate.

 3   Q.   And the Constant Force spring, what type of

 4        spring is that?

 5   A.   That's a coil spring.

 6   Q.   Do you know why they call it a Constant Force

 7        spring?

 8   A.   Produces constant force throughout its extension.

 9   Q.   Is there an equation generally used to describe

10        forces that a spring exerts?

11   A.   Yes.

12   Q.   What is that equation?

13   A.   F = KX.

14   Q.   In that equation, what does K represent?

15   A.   Spring constant.

16   Q.   What does X represent?

17   A.   Displacement.

18   Q.   The distance the spring is displaced?

19   A.   Correct.

20   Q.   And F, what does that indicate?

21   A.   Force.

22   Q.   Does that equation apply equally to all three

23        types of springs that you described?

24   A.   Well, a torsional spring, which is rotation, the
```

1        X would be more for rotation than an X in a

2        displacement, which is XY.

3   Q.  In a helical spring, does that equation apply?

4   A.  Yes.

5   Q.  In the coil spring, does that equation apply?

6   A.  Yes.

7   Q.  So you said that the coil spring has a constant

8        force.  Does that mean that the longer you

9        stretch that spring the greater the force or does

10       it mean the force is constant regardless of how

11       long you stretch the spring?

12            MR. SINGER:  Objection.

13  A.  I guess it would mean the force is constant as

14       long as you stretch the spring.

15  Q.  So in other words, if the spring is stretched an

16       inch compared to the spring being stretched two

17       inches, is the force the same?

18  A.  Yes.

19  Q.  So then the equation you gave me F = KX does not

20       apply to coil springs; is that correct?

21  A.  That's correct, yes.

22  Q.  That equation does apply to helical springs, does

23       it not?

24  A.  Yes.

```
 1   Q.   In the helical spring case, then the further you

 2        displace the spring, the greater the force,

 3        correct?

 4   A.   Correct.

 5             MR. SLIFKIN:  Mark that, please.

 6             (3/23/06 report marked Exhibit No. 1.)

 7   Q.   Mr. Shina, I'll place before you what's been

 8        marked as Shina Exhibit 1.  Do you recognize that

 9        document?

10   A.   Yes.

11   Q.   What is that document?

12   A.   That is my expert report on behalf of the

13        plaintiffs.

14   Q.   And is that the expert report you were looking at

15        when you examined your CV in the earlier line of

16        questioning?

17   A.   That's correct.

18   Q.   Could you turn to page 47 of that report?

19   A.   Sure.

20   Q.   Do you recognize your signature on that page?

21   A.   Yes, I do.

22   Q.   And was that signed on or about March 23, 2006?

23   A.   That's correct.

24   Q.   In preparing your expert report, did you create
```

```
1          any drafts of that report?

2     A.   How do you define "draft"?

3     Q.   Did you ever print out an earlier version of this

4          report?

5     A.   No.

6     Q.   How many times did you print out the report?

7     A.   This particular report was printed once before

8          this one.  Just prior to the submittal of the

9          report.  And when I leafed through it, some of

10         the columniation was not accurate so I requested

11         that we fix -- that I would fix that and print it

12         out again.

13    Q.   When you went from that version you just

14         described to the version you have in front of

15         you, were any of the words changed?

16    A.   No.

17    Q.   Did you draft that report on a computer?

18    A.   Yes, I did.

19    Q.   Did you save any electronic versions of the

20         report?

21    A.   Other than the final versions, no.

22    Q.   So in other words, you changed the words as you

23         progressed through the report and didn't save the

24         earlier versions; is that correct?
```

1    A.  That's correct.

2    Q.  Did you ever send an electronic copy of the

3        report to anyone?

4    A.  No.

5    Q.  Where were you physically sitting when you

6        drafted the report on the computer?

7                    MR. SINGER:  Objection.

8    A.  I was sitting in my home.

9    Q.  Was it done on a desktop computer or laptop

10       computer?

11   A.  Laptop computer.

12   Q.  Did you ever bring that laptop to the offices of

13       Goodwin Procter to work on the report?

14   A.  Work.  Define "work."

15   Q.  Did you ever input words into the computer that

16       became part of the report while you were sitting

17       in the offices of Goodwin Procter?

18   A.  Correct.

19   Q.  You did?

20   A.  I did, yes.  Sorry.

21   Q.  Were others present in the room when you did

22       that?

23   A.  Yes.

24   Q.  Who was present in the room?

```
 1   A.  Different folks.  The principal person would be
 2       Mr. Singer.  There were others.
 3   Q.  Did Mr. Singer ever tell you what to type into
 4       the report?
 5   A.  No.
 6   Q.  Did Mr. Singer ever ask you to make changes to
 7       the report?
 8   A.  Yes, he did.
 9   Q.  Did you make the changes that he requested?
10   A.  Depending on the changes.  When I brought the
11       report here, some changes were grammatical
12       changes or -- so that was not a problem.  Some
13       changes were not grammatical and we had a
14       discussion.
15   Q.  Did you have any disagreements with Mr. Singer
16       over the content of the report?
17   A.  I would call it more discussions that came to a
18       conclusion.
19   Q.  Do you remember what you discussed?
20   A.  There were many, many issues.
21   Q.  Are you familiar with the term "cupping
22       rotation"?  Cupping rotation.
23   A.  No.
24   Q.  Does anything in your report refer to cupping
```

```
 1           rotation?

 2    A.    I do not recall such a term.

 3    Q.    Do you recall any of the discussions you had

 4           relating to your expert report with Mr. Singer?

 5    A.    There were many discussions.

 6    Q.    Do you remember the subjects you discussed?

 7    A.    There were many subjects.  I would be glad to --

 8           if you ask me a specific question, I can answer

 9           it.

10    Q.    Just I would like to hear your recollection on

11           the subjects you discussed with Mr. Singer.

12    A.    Well, some had to do with legal issues that I was

13           not familiar with.

14    Q.    Mr. Singer gave you legal standards that you used

15           in preparing your report?

16    A.    Correct.

17    Q.    Other than legal standards, did Mr. Singer and

18           you discuss the subject matter of your report?

19    A.    Yes.

20    Q.    What do you recall about the discussions of those

21           nonlegal standard issues in your report?

22    A.    A lot of discussions had to do with my style of

23           writing.  As you know, I'm a prolific writer and

24           I write in scientific journals.  And the
```

```
 1              discussion is to present the facts and let the

 2              reader make the conclusion.  In the legal sense,

 3              Mr. Singer was always helping me make that

 4              argument, presenting the fact and also presenting

 5              the conclusion, which is not usual in my style of

 6              writing.

 7     Q.   Did Mr. Singer suggest to you what the

 8          conclusions should be?

 9     A.   No.  These were my conclusions.

10                   MR. SLIFKIN:  Could we mark this as

11          well?

12                   (4/18/06 report marked Exhibit No. 2.)

13     Q.   Mr. Shina, I place before you Shina Exhibit 2.

14          Do you recognize that document?

15     A.   Yes, I do.

16     Q.   What is that document?

17     A.   That is my comments regarding the two expert

18          witness reports of Charles E. Still.

19     Q.   And I ask you to turn to the signature page of

20          that report.

21     A.   Yes.  Page 36.

22     Q.   Do you recognize the signature on that?

23     A.   Mm-hmm.

24     Q.   Is that your signature?
```

```
 1   A.  Yes.

 2   Q.  Did you sign that on or about April 18, 2006?

 3   A.  Yes.

 4   Q.  Are there any paper drafts of this report other

 5       than the one that you have in front of you?

 6   A.  No.

 7   Q.  Did you print out from your computer any other

 8       versions of this report other than the one that

 9       you have in front of you?

10   A.  No.

11   Q.  Did you draft this report on your laptop

12       computer?

13   A.  Correct.

14   Q.  Did you save any electronic versions of the

15       report other than the final version?

16   A.  No.

17   Q.  Is it fair to say that you edited the report in

18       the one single version and made changes only to

19       that one single electronic copy?

20   A.  Correct.  In technical terms I would work on it,

21       save it, work on it, save it.

22   Q.  When it was saved, it was always saved over the

23       existing report?

24   A.  Correct.
```

```
 1    Q.  Not as a new version?

 2    A.  Correct.

 3    Q.  Did some of that writing and saving occur in the

 4        offices of Goodwin Procter?

 5    A.  Yes.

 6    Q.  Was anyone present while you were doing the

 7        writing of your report at Goodwin Procter?

 8    A.  Yes.

 9    Q.  Who was present?

10    A.  Various folks at various times.

11    Q.  I should have followed up.  In the Exhibit 1 --

12    A.  This one here.

13    Q.  We talked about Mr. Singer and you sitting in the

14        room together.  Were others present other than

15        Mr. Singer who discussed your report with you?

16    A.  Yes.

17    Q.  Who was that?

18    A.  At various times, there was Mr. Frazard

19        (phonetic), I believe.

20                THE WITNESS:  You can help me with the

21        spelling.  Frazard Ishmael.

22                MR. SINGER:  Safraz.

23    A.  Sorry.

24                MR. SINGER:  S A F R A Z.
```

```
 1    Q.   Any other attorneys present while you were

 2         working on your report here?

 3    A.   There was one other attorney by the name -- I'm

 4         sorry.  He told me.  I was told his first -- his

 5         last name but I don't recall it.

 6    Q.   Was that Mr. Kline?

 7    A.   Is that Doug is the first name?

 8    Q.   Yes.

 9    A.   Yes.  That was the person, yes.

10    Q.   Did Mr. Ishmael or Mr. Kline have discussions

11         with you while you were preparing either of your

12         two expert reports in this case?

13    A.   You mean these two reports?

14    Q.   Yes.

15    A.   While I was preparing the report?

16    Q.   Yes.

17    A.   I know Mr. Kline met me in the original

18         discussion.  I can't recall if he was involved.

19         I cannot recall that.  Mr. Ishmael definitely, he

20         would be there sometimes when Mr. Singer was in

21         there also.

22    Q.   Can you recall any information Mr. Ishmael

23         conveyed to you while you were drafting either of

24         your two reports?
```

```
 1                    MR. SINGER:  Objection.

 2      A.   Information?  Any information?

 3      Q.   Concerning the subject matter of your reports.

 4      A.   He gave me some legal information.

 5      Q.   Did he give you any nonlegal information?

 6      A.   Not other than discussion -- involved in

 7           discussions of the report.

 8      Q.   Discussions while the report was in progress?

 9      A.   Correct.

10      Q.   Do you recall any of those discussions, the

11           specific subject matter of those discussions?

12      A.   I recall grammatical corrections.

13      Q.   Do you recall any nongrammatical and nonlegal

14           subject matter that was discussed between you and

15           Mr. Ishmael?

16      A.   In the preparation of the exhibits here in -- I

17           guess Exhibit 1, he was helping me number the --

18           the exhibits.  Mainly because we were running out

19           of time.

20      Q.   When you say -- you're talking about Shina

21           Exhibit 1 and the drawings that are attached to

22           the back?

23      A.   Correct.  He was helping me with that.  That I

24           remember distinctly.
```

```
 1    Q.   Some of the numbers that are written on that

 2         figure 1 in Exhibit 1, are they put there by Mr.

 3         Ishmael?

 4    A.   No.  They're put there by me.

 5    Q.   So your handwriting --

 6    A.   That's my handwriting.  That's correct.

 7    Q.   Any of the other attachments to Shina Exhibit 1,

 8         do any of them have any of Mr. Ishmael's writing

 9         on them?

10    A.   No.

11    Q.   Do any of them have any of Mr. Singer's writing

12         on them?

13    A.   No.

14    Q.   When you examined the Quick-Tilt balances as they

15         were placed inside of a window jamb, were they

16         screwed in place or was there no screw present?

17    A.   There was no screw present.

18    Q.   Have you ever examined a Quick-Tilt window

19         balance that has been screwed into the window

20         jamb?

21    A.   No.

22    Q.   When the window balance is placed in an

23         installation in a building, do you have an

24         understanding of whether a screw is used or not
```

```
1            to install that window balance?

2                    MR. SINGER:  Objection.

3    A.  This is a general question.  Do you want to be a

4        little bit more specific to the case?

5    Q.  You're not able to answer that question?

6    A.  I don't understand the question.  Maybe you can

7        rephrase it.

8    Q.  When a window balance is installed in a window --

9    A.  Right.

10   Q.  When that window balance is a Caldwell Quick-Tilt

11       balance --

12   A.  Oh, okay.

13   Q.  Is that balance screwed into the window jamb?

14   A.  Caldwell window balance.  Okay.  Could I -- could

15       I use my report here or use some of the material?

16   Q.  Sure.

17   A.  This is --

18                    Yes.  The balance -- I'm having trouble

19       -- I'm having a moment here.  May I look at the

20       full brochure that's in the --

21   Q.  Let's just stick with what we have in front of us

22       for now.

23   A.  Okay.

24   Q.  We'll get to that.
```

```
 1    A.  All right.

 2    Q.  You understand the operation of the Quick-Tilt

 3        window balance?

 4    A.  I understand the operation based on the patent.

 5    Q.  Do you understand how it works?

 6    A.  Yes.

 7    Q.  Could you describe for me how the window balance

 8        works?

 9    A.  The window balance -- and I can read the -- from

10        my Exhibit 1.

11    Q.  Before you refer to the exhibit, can I just get

12        your general understanding of how the Quick-Tilt

13        window balance works?

14    A.  Sure.  It balances -- it allows the window to

15        stay when you move the sash up and down.  To stay

16        in position.

17    Q.  Are there moving parts in that window balance?

18    A.  Yes, there are.

19    Q.  Could you tell me what parts move in that window

20        balance?

21    A.  There is two parts in it and when you -- when the

22        window goes up and down, it extends.  The spring.

23        The Constant Force spring.

24    Q.  Are there two sections of the window balance that
```

```
1              separate from one another in the operation of the

2              window?

3     A.       Correct.

4     Q.       Do you have a name for those two sections?

5     A.       According to the name given in the patent -- and

6              let's make sure I got the right patent number

7              here.  I don't want to say anything fast.

8                   Okay.  According to patent '638, which

9              refers to it as "spring mounting for sash frame

10             tensioning arrangements," there is a mounting

11             means.  There is a mounting means and there is --

12             mounting means where the coil spring sits on.

13    Q.       When the window balance is installed in a

14             functioning window, is that mounting means

15             attached to anything?

16    A.       That mounting means is attached by a fixing

17             screw.  I'll tell you where it is in the page if

18             you give me a moment.

19                  Okay.  Just one second.

20                  I refer to page nine of my report.

21             Court construction.  "'Mounting means' or 'a

22             means for mounting said coil ribbon spring'

23             describes a structure for mounting a coiled

24             ribbon spring to the window jamb channel."
```

1    Q.   Okay.  When installed in a window, would the

2         Caldwell Quilt-Tilt balance work if there is no

3         fixing screw in the balance?

4              MR. SINGER:  Objection.

5    A.   I assume that the patent allows for a fixing

6         screw.

7    Q.   That's not what I asked you.  I'm speaking about

8         the Caldwell Quick-Tilt balance.

9    A.   Okay.

10   Q.   Would the balance operate if the balance were not

11        fixed to the channel with a fixing screw?

12   A.   I refer to page ten of my report.  Item iii on

13        the top.

14              "The court's definition references that

15        the design of the body also includes a method of

16        fixing, such as an aperture to receive a fixing

17        screw, to secure the structure to a window jamb

18        channel."

19   Q.   Maybe we're not understanding one another.

20   A.   Okay.

21   Q.   Not speaking of the patent.  I'm speaking of the

22        Caldwell product and its function and operation.

23   A.   Okay.

24   Q.   You examined that, correct?

```
 1   A.   I examined that without being attached -- as a
 2        free device.
 3   Q.   If both parts of the Caldwell Quick-Tilt window
 4        balance were able to move freely up and down in
 5        the channel, would the balance operate properly?
 6   A.   If both parts are not secured, no, it would not
 7        operate correctly.
 8   Q.   So one part at a minimum must be fixed in some
 9        way to the channel; is that correct?
10   A.   Correct.
11   Q.   And why is that?
12   A.   To allow for the function of the invention or of
13        the device, which is to give counterbalance.
14   Q.   If both parts moved, there would be nothing
15        counteracting the weight of the window sash; is
16        that correct?
17   A.   If both parts moved freely you mean?
18   Q.   Yes.
19   A.   Yes.  That's correct.
20   Q.   Okay.  Now, the balance that you examined here at
21        the office of Goodwin Procter had no fixing
22        screw; correct?
23   A.   Correct.
24   Q.   It was not fixed to the channel in which you
```

1          examined it, correct?

2    A.    Correct.

3    Q.    So you have never examined a Quick-Tilt balance

4          of Caldwell as it is properly installed in a

5          channel; is that correct?

6    A.    Correct.

7                MR. SLIFKIN:  Mark that, please.

8                (Quick-Tilt*nc document marked Exhibit

9          No. 3.)

10   Q.    Mr. Shina, I'll place before you what's been

11         marked as Shina Exhibit 3.  Ask you if you

12         recognize that document.

13   A.    Yes.

14   Q.    Is that document the same as the page that is

15         attached to your Exhibit 1 listed as figure 3

16         towards the back?

17   A.    Yes.

18   Q.    It's a color copy of the black and white figure 3

19         you have in your report; is that correct?

20   A.    Mm-hmm.   Mm-hmm.

21   Q.    I would like to see if we can agree on some

22         terminology.  What I would like to do is have you

23         take a pen.  Do you have one?

24   A.    No.

1    Q.   If you could take on Exhibit Shina 3 and draw a

2         line to the fixing screw we've discussed.  Just

3         draw a line pointing to the fixing screw on

4         Exhibit 3, the color copy.

5    A.   Okay.

6    Q.   And label it with an A.  Could you do that,

7         please?

8    A.   Okay.

9    Q.   We've discussed coil springs.  Could you draw a

10        line to the coil spring or springs in that

11        exhibit and mark that with a B, please?

12   A.   (Witness complies.)

13   Q.   Are --

14   A.   There's two.

15   Q.   Are there two?

16   A.   Yeah.

17   Q.   In the three drawings that appear on that page,

18        there's a left-most drawing.  Do you see that?

19   A.   This one?

20   Q.   Yes.

21   A.   Okay.

22   Q.   There's a vertical projection in the center of

23        that drawing.  Do you see that?

24   A.   Mm-hmm.

```
 1    Q.  Do you have a name for that part?

 2    A.  Spine.

 3    Q.  Could you draw --

 4    A.  Spine or projection.  Depending on the claim.

 5    Q.  Could you draw onto that and mark that with a C,

 6        please?

 7    A.  Mm-hmm.

 8    Q.  To the left and right of that spine, C, are two

 9        other vertical formations.  Do you see those?

10    A.  Mm-hmm.

11    Q.  Do you have a name for those parts?

12    A.  There would be many names.  If I may examine

13        this, I'll find out.

14    Q.  I'm trying to agree on some terminology here.  If

15        we can just come up with a name we can agree on

16        that makes sense.

17    A.  Wings?

18    Q.  Wings.  Okay.  That's fine.

19    A.  Would you agree with that term?

20    Q.  That's fine.  Wings.  Mark that with a D, please.

21    A.  Okay.

22    Q.  Are there two of those wings?

23    A.  Yes.

24    Q.  Okay.  And on the top of that figure, there
```

```
 1            appears to be a horizontal piece?

 2    A.   Mm-hmm.

 3    Q.   Do we have a name for that part?

 4              Could we call it a dust cover?

 5    A.   Dust cover is fine.

 6    Q.   Could you mark the dust cover with E, please?

 7    A.   I'm sorry.  I was going to say dust cover.

 8    Q.   In the center drawing, the one that shows the

 9         spring, there is a bottom piece?

10    A.   Mm-hmm.

11    Q.   Do you have a name for that part?

12    A.   Mounting means.

13    Q.   Okay.  Can you label that with an F, please?

14    A.   (Witness complies.)

15              I'm sorry.  I made a mistake.  That is

16         the mounting means here.  That's called something

17         else.

18    Q.   That's fine.

19    A.   I apologize for that.

20    Q.   That's fine.  When you say "that is the mounting

21         means," which part are you referring to?

22    A.   That's a mounting means.

23    Q.   Can you draw a line to the mounting means?

24    A.   Okay.
```

```
1    Q.  And give that a G, please.

2    A.  Okay.

3    Q.  What is F then?

4    A.  I'll have to examine the report.  Some of the

5        brochures.

6    Q.  Okay.

7    A.  There's one here.  And it's called -- where is

8        it?

9               They call it here a bumper.

10              No.  Yeah.  Bumper is what they call

11       it.  I'm not sure.  If I have the original

12       report, I will give it to you.  The brochure I

13       received from Caldwell.

14   Q.  Okay.

15   A.  Can I have that?

16   Q.  Yes.  Go ahead and take a look.

17   A.  Okay.

18              I'm sorry.  They positioned it

19       differently than I gave it to them so --

20   Q.  Take your time.

21   A.  Just give me one second.

22   Q.  Let's go off the record.

23              MR. SINGER:  Yeah.

24              (Off the record.)
```

1    A.  It's called the carrier.

2    Q.  Mr. Shina, you referred to a brochure that has

3         allowed you to answer the question.  What

4         document is that?

5              Okay.  You have handed me a document

6         which is labeled C 000530.  Did you review that

7         document in connection with rendering your expert

8         report?

9    A.  Yes, I did.

10   Q.  Is that a brochure of Caldwell on the Quilt-Tilt

11        product?

12   A.  Yes.

13   Q.  In that brochure, do you see a copy of Exhibit 3

14        anywhere in that brochure?

15   A.  Exhibit 3.  You mean figure 3.

16   Q.  No, no.  Exhibit 3.

17   A.  Okay.  Hold on.

18              No.  But I've seen --

19   Q.  You've seen what is in Exhibit 3?

20   A.  Yes.

21   Q.  So the Caldwell document number 530 appears to

22        have a somewhat different product than the one

23        shown in Exhibit 3; is that correct?

24   A.  Correct.

```
 1    Q.   Just in general terms, what's the difference

 2         between the products in those two brochures?

 3    A.   This one says "Quick-Tilt*nc."

 4    Q.   And the one that you have in the other document?

 5    A.   Quick-Tilt only.

 6    Q.   Okay.  Different number of springs as well

 7         between the two documents?

 8    A.   In the C 00533, it shows three different springs.

 9    Q.   And the Constant Force balance, it's also in that

10         brochure, on a different page than you have in

11         your hand, is there a Quick-Tilt balance with a

12         number of coiled springs?

13    A.   (Witness indicates.)

14    Q.   Yes.  So the witness is indicating a drawing of

15         three different Quick-Tilt balances on page 532.

16              Which balances are shown in that page?

17    A.   I'm sorry?

18    Q.   Can you describe the difference between the three

19         balances on that page that's in front of you?

20    A.   They're called single, tandem and triple.

21    Q.   So in general terms, that page from the document

22         number 532 shows the single, double and triple

23         coil balances; is that correct?

24    A.   Correct.
```

1    Q.   And Shina Exhibit 3 shows a detail of a double

2         coil balance; is that correct?

3    A.   Correct.

4    Q.   So back to Shina Exhibit 3, what are we calling

5         the bottom piece that's labeled F?

6    A.   It's called a carrier.  According to the Caldwell

7         brochure.

8    Q.   Are you comfortable using that term?

9    A.   Sure.

10   Q.   Did you examine any Amesbury balances in

11        connection with rendering your report?

12   A.   I might have seen one.  Yes.

13   Q.   Which one?  Do you recall?

14   A.   No.

15   Q.   Do you recall if it was a Constant Force-type

16        balance or a different type of balance?

17   A.   A Constant Force.

18   Q.   Do you have that with you today?

19   A.   I do not.

20            MR. SINGER:  I'll represent that we do

21        have that.  I thought it had been passed to you.

22        If not, we'll get that to you.

23            MR. SLIFKIN:  The Amesbury Constant

24        Force balance?

```
1                    MR. SINGER:  Was it?

2                        MR. SLIFKIN:  I have not seen it.

3                        MR. SINGER:   I'll make sure you get it

4          after the next break.

5                        MR. SLIFKIN:   Okay.

6      Q.  Did you examine any of the other Amesbury

7          balances in connection with rendering your

8          report?

9      A.  Of this type?

10     Q.  Yes.

11     A.  No.

12     Q.  Did you examine any Amesbury balances that had a

13         helical spring in connection with rendering your

14         report?

15     A.  No.

16     Q.  Did you examine any Amesbury Block & Tackle

17         balances, physical balances in connection with

18         rendering your report?

19     A.  No.

20     Q.  Are you familiar with the term "Block & Tackle

21         balance"?

22     A.  Yes.

23     Q.  What does it refer to?

24     A.  It refers to a type of balance that is in my
```

```
 1           report.  And it's in the 86xt, the 97ez and the

 2           97i and the 97ih.

 3    Q.    That's a different configuration than we had in

 4           front of us in Shina Exhibit 3; is that correct?

 5    A.    Correct.

 6    Q.    One of the main differences is the type of spring

 7           used; is that correct?

 8    A.    Correct.

 9    Q.    Back to Shina Exhibit 3, there's one major

10           component that we have not labeled and that major

11           component has some sub parts.  Those are visible

12           in the right-hand drawing on that page.  Do you

13           see the right-hand drawing?

14    A.    Yes.

15    Q.    There is a darker piece surrounding the balance.

16           Do you see that part?

17    A.    Mm-hmm.

18    Q.    Can we generally label that entire darker piece

19           with an arrow and a line and a letter, please?

20    A.    Okay.  What letter would you prefer?

21    Q.    We're up to H, I believe.

22    A.    H.

23    Q.    What do you call that part?

24    A.    Jamb channel.
```

1    Q.  Jamb channel?

2    A.  Mm-hmm.

3    Q.  Now, there is an interior to that jamb channel

4        and exterior; is that correct?

5    A.  Yes.

6    Q.  The exterior has two parts that are on either

7        side of the mounting means.  Do you see that?

8    A.  Yes.

9    Q.  And do you have names for those two parts that's

10        to the left and to the right of the spine?

11    A.  Are you talking about this part?  Would you point

12        to it, please?

13    Q.  Sure.  This part.

14    A.  And this part?

15    Q.  And that part.

16    A.  I would say left and right.

17    Q.  Left and right what?

18    A.  Flanges.

19    Q.  Could you label the left and right flanges with

20        an "I," please?

21    A.  Mm-hmm.

22    Q.  I think you just labeled one.

23    A.  Okay.

24    Q.  Okay.  I think we have agreed now on the major

```
 1            terminology of this and I would like to ask you
 2            some questions about its operation.
 3   A.   Mm-hmm.
 4   Q.   Did you measure the spacing between the flanges,
 5            I, on the physical part?
 6   A.   The flanges themselves?
 7   Q.   Yes.  They define a gap, do they not?
 8   A.   Yes, they do.
 9   Q.   Did you measure the size of that gap?
10   A.   No.
11   Q.   Do you know the range of gaps that are found on
12            actual jambs in the field?
13   A.   No.
14                MR. SINGER:  Objection.
15   Q.   Do you know that there is a range of gaps between
16            the flanges on actual channels found in the
17            field?
18   A.   Yes.
19   Q.   How do you know that?
20   A.   I asked the Amesbury lawyers if there was a
21            standard to govern the width.
22   Q.   And the answer was?
23   A.   There was no standard.
24   Q.   Do you know who made the jamb channel that you
```

```
1              examined while you were here at the office of

2              Goodwin Procter?

3      A.      No.

4      Q.      Do you know if that was a production model of a

5              jamb channel or a nonproduction model?

6      A.      No.

7      Q.      Do you know if, other than the single instance in

8              which you saw the Caldwell Quick-Tilt balance

9              placed in that jamb channel, do you know if

10             Caldwell has ever sold a Constant Force balance?

11     A.      Caldwell?

12     Q.      Yes.  That fits -- that is used with that jamb

13             channel.

14     A.      Could you rephrase that?  I'm not exactly sure

15             what you are looking for.

16     Q.      You saw a single example of a jamb channel here

17             at the office of Goodwin Procter?

18     A.      Correct.

19     Q.      You don't know who makes it, do you?

20     A.      That is correct.

21     Q.      You don't know if it's made for use in a window

22             in which the owner of that jamb channel would use

23             a Caldwell balance, do you?

24     A.      No, I do not.
```

```
 1   Q.  Other than the single instance in which you saw

 2       the Caldwell balance in that channel, you don't

 3       know if a Caldwell balance has ever been put in a

 4       jamb channel made by that company that made the

 5       sample, do you?

 6   A.  I only saw the one instance, that's correct.

 7   Q.  Right.  In other words, Caldwell sells balances

 8       to a number of companies that make window

 9       products, correct?

10   A.  I assume.

11               MR. SINGER:  Objection.

12   Q.  You don't really know, do you?

13   A.  I do not.

14   Q.  And the jamb channels you've stated have varying

15       flange separations, correct?

16   A.  Correct.

17   Q.  So I'm asking you if you know whether a Caldwell

18       balance has ever been installed in a jamb channel

19       having the flange separation equal to or less

20       than the flange separation of the sample you

21       looked at.

22   A.  I only looked at that one sample.  I cannot make

23       a statement about others.

24   Q.  Right.  What are the forces that are tending to
```

```
 1          make the housing rotate in a proper installation

 2          of the Caldwell balance inside of a jamb channel?

 3    A.    The forces are rotational forces.

 4    Q.    I'm sorry.  Go ahead.

 5    A.    Caused by the extension of the spring.

 6    Q.    Could you just describe mechanically how the part

 7          in your opinion is caused to rotate by the

 8          spring?

 9    A.    There is more force on one side as there is on

10          the other.  And that would force the rotation.

11    Q.    What causes that force?

12    A.    The pulling of the spring.

13    Q.    Does the spring act on some part inside the

14          mounting means that causes the mounting means to

15          tend to rotate?

16    A.    The -- as was described in the patent -- and I

17          could refer to it --

18    Q.    I'm not asking about the patent.  I'm asking you

19          about the Caldwell product.

20    A.    The Caldwell product that I saw I was not able to

21          extend so I can only answer from the patent.

22    Q.    So you --

23    A.    Since it was not fixed.

24    Q.    You did not extend the spring in the Caldwell
```

```
 1        sample that you examined, correct?
 2   A.   I extended it but not to a -- it required a lot
 3        of strength.  I did not extend it to a great
 4        extent.
 5   Q.   When you extended it, to the extent you could,
 6        did you see the -- did you observe rotation?
 7   A.   I was holding it very rigid.
 8   Q.   Did you observe rotation of the mounting means
 9        inside the channel?
10   A.   The force that I was using was so great I could
11        not feel if there was a rotation or not.
12   Q.   So you have never actually seen rotation of a
13        Caldwell Quick-Tilt balance inside a jamb
14        channel, have you?
15   A.   No, I have not.
16   Q.   But you theorize that it happens, correct?
17   A.   Correct.
18   Q.   What forces in a properly installed Caldwell
19        Quick-Tilt balance resist rotation?
20   A.   I've only seen one.  I can only comment on that
21        one.
22   Q.   Tell me in the one you saw, what forces resist
23        rotation.
24   A.   There was a spine on the back of the one that I
```

```
 1        saw.

 2   Q.   Any other forces that resist rotation?

 3   A.   In my opinion, that would be the primary force.

 4        The primary feature.

 5   Q.   I'm asking for all features.

 6   A.   That would be the primary feature.

 7   Q.   Are there secondary features?

 8   A.   On the one I saw?

 9   Q.   Yes.

10   A.   No.

11   Q.   Looking at the Shina Exhibit 3, are you able to

12        determine other forces that would exist in an

13        actual working model made according to this

14        drawing that would resist rotation?

15   A.   In this drawing -- I commented on this on my

16        report.  I would like you to read that.

17   Q.   I read it.  I'm asking for your opinion looking

18        at the exhibit.

19   A.   The opinion is in the report and I would like to

20        read --

21   Q.   I understand.

22   A.   -- from the report so that I would not make a

23        statement that is not to the spirit of the

24        report.
```

```
1   Q.   Before you do that, let's talk about this drawing

2        and I'll give you an opportunity to look at the

3        report and correct anything that you --

4   A.   Sure.

5   Q.   -- misstated.

6             What forces can you observe in this

7        drawing in Shina Exhibit 3 that would resist

8        rotation in a properly installed window balance?

9   A.   In this particular Shina Exhibit 3, which is a

10       double coil, there is two coils so there is

11       forces to each coil mounted on top of each other.

12  Q.   The sources oppose each other?

13  A.   Yes, they do.  Not equally.

14  Q.   Why not equally?

15  A.   Because one is longer than the other.

16  Q.   One has been extended further than the other?

17  A.   Correct.

18  Q.   Did you testify earlier that the reasons it's

19       called a Constant Force balance is because

20       regardless of the length of the extension of the

21       spring, the forces are equal?

22  A.   The forces, which is -- I believe are the forces

23       -- not forces for rotation but forces for

24       resistance to stretching this spring.
```

 1   Q.   Well, mathematically how would you calculate the

 2        rotational moment caused by the springs?

 3   A.   Force times -- the force is equal to -- F equals

 4        to the moment, which is the length -- the moment

 5        is the length times force.

 6   Q.   Okay.  The length is the length from the center

 7        point of the spring to the -- center point of the

 8        coil to the point where the spring turns

 9        downward; is that correct?

10   A.   Correct.

11   Q.   And for the upper and lower coils, that length is

12        equal, is it not?

13   A.   Which length?  The length --

14   Q.   The moment arm.

15   A.   The moment arm.  From the center of the coil to

16        the outward bound of the spring, yes.  But the --

17        one is at -- one moment is located at the center

18        of one coil and the other moment's located in the

19        center of the other coil.

20   Q.   Okay.  Now, the equation you gave me, length

21        times the force, is the moment arm, correct?

22   A.   Correct.

23   Q.   Okay.  So the moment arm is from the center point

24        of the spring to the outside edge of the spring,

```
 1        correct?

 2    A.  Okay.  Yes.

 3    Q.  Okay.  And the coils are the same size, are they

 4        not?

 5    A.  Correct.

 6    Q.  They both must fit inside this restricted channel

 7        that's on the right-hand side of the drawing,

 8        correct?

 9    A.  Correct.

10    Q.  Okay.  So the moment arm is equal, right?

11    A.  The moment arm is equal but the distance from --

12        the distance from it -- the centers are not

13        located the same location.

14    Q.  I understand that.  There is a force exerted,

15        which we concluded is the moment caused by the

16        length of the moment arm times the force, right?

17    A.  Right.

18    Q.  Okay.  Is the moment arm and coil, the top coil,

19        different than the moment arm in the bottom coil?

20    A.  The moment is the same but it's located in

21        different locations.

22    Q.  What do you mean "the moment is the same"?

23    A.  The moment value.  One moment is referenced to

24        one center of a coil and the other moment is
```

1          referenced to the other center of the coil.

2    Q.    I understand.  The moment arm we concluded is

3          from the center of the coil to the outer edge of

4          that coil; isn't that correct?

5    A.    That's correct.

6    Q.    Okay.  Is the center of the top coil to the outer

7          edge of that top coil equal to the center of the

8          bottom coil to the outer edge of the bottom coil?

9    A.    Correct.

10   Q.    So the moment arm is the same, correct?

11   A.    It's the same from each center of each coil.

12   Q.    From the center to the upper coil edge and from

13         the center of the lower coil to the -- I'm sorry.

14         Let me start over.

15                 From the center of the upper coil to

16         that coil's edge is the first moment arm,

17         correct?

18   A.    Correct.

19   Q.    From the center of the lower coil to that coil's

20         edge is the second moment arm, correct?

21   A.    Correct.

22   Q.    Those lengths are equal, correct?

23   A.    Correct.

24   Q.    Okay.  And we have already concluded that the

1       force on the spring is equal regardless of how

2       far that spring is displaced; is that correct?

3  A.   I'm sorry.  Say that again.

4  Q.   We have already concluded that the force exerted

5       by the spring is always the same regardless of

6       how long that spring has been stretched, correct?

7  A.   Correct.

8  Q.   Okay.  So in the equation, F equals L times D,

9       distance -- I'm sorry.  No.  Length times force

10      --

11 A.   Length times force, yes.

12 Q.   It's equal.  The top force is equal to the bottom

13      force; isn't that correct?

14 A.   It's equal to the center but the rotational force

15      or the rotational moment is applied to the

16      supporting means, which is not equal.

17 Q.   Okay.  So what causes the force to be unequal

18      when the item is fully assembled and installed?

19 A.   That the distance from the center of each coil to

20      the mounting means is different.

21 Q.   What is the direction of the force in each of

22      those coils when the coil is extended?

23 A.   The force is in the direction of the extension.

24 Q.   So there's a downward force in the direction that

1        the spring is extended for each of those,

2        correct?

3    A.  Correct.

4    Q.  And those forces, it's your view, cause an

5        unequal moment around the pivot point of the

6        housing; is that correct?

7    A.  The pivot point of the housing where the -- where

8        the mounting means is located.

9    Q.  What is the pivot point?

10   A.  The pivot point is where the screw is attached.

11   Q.  Okay.  Did you calculate the difference in the

12       rotational moments caused by the first coil

13       compared to the second coil?

14   A.  No, I did not.

15   Q.  Does your opinion discuss anywhere the difference

16       in those forces?

17   A.  Mm-hmm.  Yes.

18   Q.  The value of the difference?

19   A.  I discuss the difference, not the exact value of

20       the difference.

21   Q.  Do you know what the exact value of the

22       difference is?

23   A.  No.

24   Q.  Do you know what the approximate value of the

 1        difference is?

 2    A.  No.

 3    Q.  What units of measure do you use to measure

 4        force?

 5    A.  Measure force?  Pounds.

 6    Q.  Pounds force?

 7    A.  Pounds force.

 8    Q.  Okay.  Do you typically work in English units or

 9        metric?

10    A.  English units.

11    Q.  Okay.  Do you know how many pounds force is

12        present caused by the upper coil in that drawing?

13    A.  No.

14    Q.  In an actual item that's made according to that

15        drawing, do you know what the pounds force would

16        be caused by the upper coil?

17    A.  I could calculate it but I did not.

18    Q.  What would you need to calculate it?

19    A.  I need to know the spring constant.  I would need

20        to know the diameter of the coil spring.

21    Q.  Do you know what the spring constant is?

22    A.  No.

23    Q.  Do you know what the diameter of the spring is?

24    A.  No.

```
 1    Q.   In preparing your expert report, did you measure

 2         the spring constant?

 3    A.   No.

 4    Q.   When you examined the actual Caldwell balance,

 5         did you measure the spring constant?

 6    A.   No.

 7    Q.   Did you measure the diameter of the spring in the

 8         actual Caldwell Constant Force balance that you

 9         examined?

10    A.   No.

11                   MR. SINGER:  Neal, when you get a

12         chance, we have been going about an hour and a

13         half.

14                   MR. SLIFKIN:  Let me just --

15                   MR. SINGER:  I would like to take a

16         break when it's convenient.

17                   MR. SLIFKIN:  Maybe ten, 15 minutes if

18         you can go?

19                   MR. SINGER:  Fine.

20    Q.   When you say "spring constant," what does that

21         mean?

22    A.   The resistance that the spring gives to an

23         outside force.  It tries to change its position.

24    Q.   Is that used in some equation?
```

1   A.  Yes, it is.

2   Q.  What's that equation?

3   A.  F = KX.  K being the spring constant.

4   Q.  Didn't we earlier conclude that equation does not

5       apply to coil springs?

6   A.  We had a discussion about that.  I cannot --

7   Q.  Well, the equation indicates that the bigger X

8       is, the bigger the force is --

9   A.  Correct.

10  Q.  Because K is constant, correct?

11  A.  Correct.

12  Q.  But you told me earlier in a coil spring the

13      force does not increase as X increases, correct?

14  A.  Correct.

15  Q.  So then to do your calculation that you discussed

16      a minute ago in terms of the difference in

17      forces, you wouldn't need the spring constant,

18      would you?

19  A.  I would have to consult my books on that.

20  Q.  Have you consulted your books in preparing your

21      expert report?

22  A.  No.

23  Q.  Have you done any research into the forces that

24      are present with a coil spring?

```
 1    A.   No.

 2    Q.   So when you reached your conclusion in your

 3         report, you really didn't know what formula to

 4         apply in calculating forces, did you?

 5    A.   I did not use any formulas to calculate anything

 6         in the report.

 7    Q.   As you sit here today, you don't know the proper

 8         formula to use, do you, to calculate the forces?

 9    A.   On what?

10    Q.   On the coil spring.

11    A.   I would have to consult my books to look it up.

12    Q.   The answer is you do not know without consulting

13         your books; is that correct?

14    A.   That's correct.

15    Q.   As you sit here today, you don't know whether F =

16         KX for a coil spring, do you?

17    A.   Correct.

18    Q.   And you reached your conclusions in your report

19         without knowing the answer to that question;

20         isn't that correct?

21    A.   I did not feel I needed that information to write

22         my report.

23    Q.   Okay.  We can take a break.

24              MR. SINGER:  Okay.
```

1                   (Recess.)

2    Q.   All right.  Mr. Shina, we've discussed the forces

3         in the Caldwell balance appearing in Shina

4         Exhibit 3 caused by the spring.  I would like to

5         now examine forces that counteract the force of

6         the spring.

7    A.   Okay.

8    Q.   Looking at that Shina Exhibit 3, can you identify

9         all the forces that you can think of that would

10        counteract the force caused by the spring?

11   A.   There's two springs.

12   Q.   I'm sorry.  Correct.  I stand corrected.

13   A.   Okay.  Well, I see that there's a spine and the

14        spine fits snugly between the channel flanges and

15        that's -- the spine being in the channel would

16        counteract the rotational moment on the -- caused

17        by the extension of the spring.

18   Q.   Now, you used the word "snug."  What is your

19        definition of "snug"?

20   A.   That's a relative definition.  It is -- the way I

21        think of snug is not too tight as to inhibit up

22        and down motion and not to be too loose so that

23        the device would flop in the flanges.

24   Q.   Now, as I look at that spacing in the drawing, it

```
 1        appears to me that there's somewhere on the order

 2        of an eighth of an inch spacing on either side of

 3        the spine between the spine and its corresponding

 4        flange.  Is that a fair characterization of the

 5        scale?

 6                    MR. SINGER:  Objection.

 7   A.   I can't tell.  I don't know if it's to life or

 8        whatever.

 9   Q.   Okay.  We'll look at some balances later.

10   A.   Sure.

11   Q.   Other than the spine, what other forces can you

12        see that would resist the rotational force caused

13        by the spring in your opinion?

14   A.   I think the spine is the primary force.

15   Q.   I understand that.  I'm looking for the secondary

16        forces.

17   A.   Well, we discussed that the two coils as I see

18        could act differently on different sides of the

19        mounting means.

20   Q.   What else?

21   A.   That's it.

22   Q.   Okay.  There's nothing else in that drawing that

23        you would see that would cause the balance to

24        resist rotation?
```

```
 1    A.   There might be a possibility that there is a

 2         portion E that sits inside the channel.  Could

 3         exert a force, a secondary force.

 4    Q.   "E" I think is what we called the dust cover

 5         earlier, correct?

 6    A.   That's correct.

 7    Q.   How would that resist rotation?

 8    A.   I can't tell how it fits into the channel but it

 9         would resist the rotation by the fact that if it

10         rotates one way or the other way, it could have

11         some slight effect.

12    Q.   And how would that effect be manifested?

13    A.   By the -- by the fact that E would hit against

14         one of the sides and will prevent further

15         rotation.

16    Q.   Okay.  Anything else in the drawing in Shina

17         Exhibit 3 that would hit against the sides to

18         prevent rotation that you can see?

19    A.   I can't see from what I can see here.

20    Q.   Okay.  Are there any other things that are shown

21         in Shina Exhibit 3 that would act to resist

22         rotation of that part?

23    A.   Not that I can see.

24    Q.   Does the screw that's shown in Shina Exhibit 3
```

```
 1        force the mounting means against the back of the

 2        channel?

 3   A.   Yes.

 4   Q.   Is there frictional force caused by the touching

 5        of those two parts?

 6   A.   There might be.

 7   Q.   Is the frictional force dependent on how tight

 8        that screw is?

 9   A.   Could be.

10   Q.   Could be or is?

11   A.   Is.

12   Q.   The tighter the screw, the greater the friction

13        force, correct?

14   A.   Correct.

15   Q.   So we've now identified at least two secondary,

16        to use your terminology, forces that act to

17        oppose rotation of that part, those being the

18        dust cover hitting the sides and the frictional

19        force from the screw, correct?

20   A.   Mm-hmm.  Yes.

21   Q.   Okay.  There may be others but you can't tell

22        from this drawing?

23   A.   Correct.

24   Q.   In rendering your opinion, did you compare the
```

```
 1          sum of the forces in the Caldwell balance tending

 2          to make the part rotate compared to the sum of

 3          the forces in the Caldwell balance tending to

 4          resist rotation?

 5   A.     In my report, I have made mention of that.

 6   Q.     Can you show me where that is, please?

 7   A.     Sure.  I would direct you to page 13 of my report

 8          and to the bottom of the page 13.

 9   Q.     Okay.

10   A.     May I read it to you?

11   Q.     Sure.

12   A.     Okay.  "The top portion of the Quick-Tilt*nc

13          cover is too thin to adequately inhibit the

14          rotation of the coil nest, with a thickness

15          ranging from .025 to .011 inches.  There are two

16          diagonal thin cutouts at the top of the covers to

17          allow for twisting of the cover.

18                  "Two, the alternating coil design

19          mentioned in the top of page two of the

20          Quick-Tilt brochure (C 000531) will only apply to

21          tandem coiled ribbon spring.  I note the

22          following:

23                  "For single nest cover, this does not

24          apply at all."
```

1    Q.  I see there is more.

2    A.  Sure.

3    Q.  Thank you for that.

4            Did you measure the forces that allowed

5        you to reach this conclusion?

6    A.  No.

7    Q.  So how do you know that the forces causing

8        rotation are greater than the forces resisting

9        rotation on an actual Caldwell balance as

10       properly installed in a channel?

11   A.  I tried physically to pull the balance and the

12       force looked very, very -- looked large.  And the

13       top portion of the cover looked very thin to me.

14   Q.  That balance you examined did not have a screw,

15       correct?

16   A.  Did not have a screw, that's correct.

17   Q.  And you don't know what the value of the

18       frictional force resisting rotation is in a

19       properly installed Caldwell balance, do you?

20   A.  No, I do not.  But my experience tells me -- I

21       inspected the brochure by Caldwell on the

22       Quick-Tilt and I did not see any specification as

23       to the force of the screw to be applied so

24       therefore, I am not sure what the force would be

```
 1            since no specification is given in the brochures.
 2     Q.     So you simply don't know the value of the
 3            frictional force caused by the screw in a
 4            properly installed balance, do you?
 5     A.     I could not determine it based on the lack of
 6            specification in the Caldwell brochure.
 7     Q.     And so you don't know whether it's larger or
 8            smaller than the force tending to cause rotation,
 9            do you?
10     A.     I do not know since I have no idea what it is.
11     Q.     And if the frictional force plus the force caused
12            by the dust cover are greater than the force
13            tending to make the part rotate, the part would
14            not rotate, correct?
15     A.     Given that statement only, the way you stated it,
16            that is correct.  As -- sorry.
17     Q.     You're a professor of engineering, correct?
18     A.     Correct.
19     Q.     This is a setup that you could give to a student
20            of engineering and have him calculate the forces
21            acting on a part, couldn't you?
22     A.     Correct.
23     Q.     And there would be a series of equations?
24     A.     Correct.
```

```
 1    Q.   And you would have on one side force tending to

 2         cause rotation and on the other side you could

 3         have a series of equations that added up the

 4         force resisting rotation, correct?

 5    A.   Correct.

 6    Q.   And if you knew all those values, you could tell

 7         whether the part would rotate or not, correct?

 8    A.   The only -- I do not know the value --

 9    Q.   I'm asking --

10    A.   Sure.

11    Q.   -- theoretically --

12    A.   Yeah.

13    Q.   -- if you knew the values of the forces, if the

14         student knew the value of the forces, the student

15         could calculate whether that part would rotate or

16         not, right?

17    A.   If all the values are present and all the

18         measurements are made and available to the

19         student, the student could do that.  That's

20         correct.

21    Q.   Were all those measurements made by you?

22    A.   I did not make those measurements.

23    Q.   Did you know the values of those forces?

24    A.   I did not calculate the values of those forces.
```

```
 1    Q.   You simply do not know whether the forces in this
 2         Caldwell balance are sufficient to cause rotation
 3         of the part, do you?
 4    A.   I used my opinion in page 13.  And that is the
 5         cover is too thin and I add to that that the
 6         force or the torsion to apply to the screw is not
 7         available.
 8    Q.   So there is not enough information in your report
 9         then to reach a conclusion as to whether or not
10         the mounting means would rotate, is there?
11                   MR. SINGER:  Objection.
12    A.   I'm also considering one other factor that I
13         would not -- that I would not use in the example
14         to the student.  And that is over time with many
15         repeated operations of this device, whether the
16         screw will tend to unravel because if a force is
17         -- the force is on it and also whether the cover
18         will tend to twist with time so that the
19         operation would degrade with time.
20    Q.   How much time would that take?
21    A.   I would have to make calculations on this but
22         this would be in the normal lifetime of a
23         balance.
24    Q.   Have you made those calculations anywhere?
```

```
 1    A.   No, I did not.

 2    Q.   Are those calculations in your report?

 3    A.   The calculations are not in my report.

 4    Q.   What's the normal lifetime of a balance?

 5    A.   I can only use my own house.  And it was 25 years

 6         when I replaced my windows.

 7    Q.   So were the balances operating in your windows at

 8         that 25-year point?

 9    A.   Yes.

10    Q.   The windows still stayed where you left them when

11         you opened them?

12    A.   That's correct.

13    Q.   So is it fair to say that the lifetime of a

14         balance is on the order of 25 years?

15    A.   In an industry such -- in my experience, such

16         building, buildings are designed to last for 40

17         years.

18    Q.   How many -- when you use the term "repeated

19         opening," how many is "repeated"?

20    A.   I can only speak for myself.

21    Q.   Go ahead.

22    A.   Once a day.

23    Q.   Are there certain windows in your house you never

24         open?
```

1    A.  Are you saying every day?

2    Q.  Yes.

3    A.  In some cases every day would be a large number.

4        Would be too large a number.

5    Q.  Are there some windows in your house you may open

6        once a year?

7    A.  No.

8    Q.  Are there some windows in your house you may open

9        a handful of times a year?

10                  MR. SINGER:  Objection.

11   Q.  Let me rephrase that.

12   A.  Sure.

13   Q.  Bad question.  Are there some windows in your

14       house you may open ten times or less in a given

15       year?

16   A.  There might be.

17   Q.  Would you consider the ten times or less a year

18       repeated operation?

19   A.  I'm only -- I'm only basing my experience on one

20       person.  If you ask me this to form an opinion, I

21       could research it.

22   Q.  Have you researched it?

23   A.  No.

24   Q.  Have you referred in your report to the meaning

1       of "repeated operation of the window" anywhere?

2  A.  No.

3  Q.  Okay.  As we sit here today, you don't know what

4       "repeated operation" means?

5  A.  I would say -- I would summarize repeated

6       operation in terms of normal lifetime of a window

7       as expressed.  Somewhere between 25 and 40 years.

8       And repeated operation of a window of sometimes

9       between once a day and maybe perhaps once a week

10      or once a month.  I'm not exactly sure.  It is

11      certainly repeated.

12  Q.  And during that lifetime of the -- useful

13      lifetime of the balance, at what point does the

14      screw become so loose that it no longer inhibits

15      rotation?

16              MR. SINGER:  Objection.

17  A.  Well, you're asking me this question based on the

18      fact that you will inhibit rotation.

19  Q.  Yes.

20  A.  I'm not sure I could make that statement.

21  Q.  Didn't we conclude there is a frictional force

22      between the parts that acts in counter to the

23      force causing rotation?

24  A.  Yes.  But that, as I indicated earlier, that

```
 1            force is not defined since there is nothing in

 2            the brochure that I can find as to the amount of

 3            torque to be applied to the -- to the screw.

 4    Q.      So we already concluded you don't know whether

 5            the frictional force is greater or less than the

 6            force tending to cause the part to rotate?

 7    A.      Frictional force due to what?

 8    Q.      The screw.  Pushing the pieces together.

 9    A.      I cannot make that determination.

10    Q.      Okay.  But you testified that over time the screw

11            will loosen?

12    A.      Correct.

13    Q.      And when it loosens, does that increase or reduce

14            the frictional force?

15    A.      Reduce.

16    Q.      Okay.  Do you have any way to determine over what

17            period of time it would take for the screw to

18            loosen such that its frictional force becomes

19            less than the force causing rotation?

20    A.      I would disagree with your premise it would

21            become less.  It would diminish over time.

22    Q.      You don't know if it would become less or not.

23            You don't know if it's greater or less at this

24            point than the force causing rotation, do you?
```

```
 1   A.  I do not since I do not know what the torque

 2       required to put the screw in and it's not

 3       specified anywhere.

 4   Q.  Okay.  In page 14 of your first report, which is

 5       Exhibit 1 --

 6   A.  Yeah.

 7   Q.  In item C --

 8   A.  Okay.

 9   Q.  The last sentence of that says, "Repeated sash

10       operations during the useful lifetime of the

11       windows might reduce the integrity of the

12       Caldwell fastening method due to the constant

13       pressure applied by the rotation of the coil nest

14       due to the triple coiled ribbon spring

15       configuration."

16               Do you see that?

17   A.  Yes, I do.

18   Q.  When you use the word "might," does that mean it

19       might not?

20   A.  I would use it in the -- in the meaning of there

21       is a strong possibility.

22   Q.  There is also a possibility it might not,

23       correct?

24   A.  That's correct.
```

```
 1    Q.   And if the repeated sash operation during the

 2         useful lifetime does not reduce the integrity of

 3         the fastening method, the part will not rotate,

 4         correct?

 5              MR. SINGER:  Objection.

 6    A.   No.  You're putting words in my mouth.

 7    Q.   Go ahead.  Explain it in your own words, please.

 8    A.   Okay.  I will read from my report.

 9    Q.   We have already read the report.

10    A.   You read part of the report.

11    Q.   Go ahead.

12    A.   Okay.  If I go earlier, "I note that there are no

13         instructions for the recommended amount of torque

14         to apply for each of these two screws.  Repeated

15         sash operations" -- and then the sentence.  So --

16    Q.   So you cannot conclude that repeated sash

17         operations during the useful lifetime of the

18         windows will reduce the integrity of the mounting

19         method, can you?

20    A.   I think, as I mentioned earlier, when I say

21         "might," I mean a high degree of probability.

22    Q.   Okay.  There is a degree of probability that it

23         will not reduce the integrity and that in fact it

24         will not rotate; is that correct?
```

1    A.  That's correct.

2    Q.  How many of these triple coil balances have you

3        examined?

4    A.  None physically.

5    Q.  Okay.  Mr. Shina, I'm going to place before you

6        what's already been marked as Braid Exhibit 9 in

7        a previous deposition.

8    A.  Okay.

9    Q.  Have you seen that before?

10   A.  I've seen one.  I really -- I'll have to ask the

11       counsel.

12           THE WITNESS:  Is this something -- I've

13       seen one only.  This is not the one I've seen, is

14       it?  When it says "Braid"?

15           MR. SINGER:  You have to answer that to

16       the best of your recollection.

17   A.  I have to answer it?  Well, I have not seen the

18       channel.  Okay?  And I'm not sure -- I've seen

19       something -- I don't know what Braid 8 means.  I

20       might be seeing this for the first time.

21   Q.  It's Braid 9.

22   A.  Braid 9.  Sorry.

23   Q.  I'll represent to you that that exhibit has been

24       in the possession of my office since Mr. Braid's

```
1          deposition on November 30, 2005.

2    A.    Okay.

3    Q.    So you have not in fact seen it.

4    A.    Okay.  Thank you.

5    Q.    Okay.  Do you recognize the balance that's

6          installed in that exhibit?

7    A.    You tell me it's Braid Exhibit 9 and that's what

8          I recognize.

9    Q.    Does it appear to be a balance that you have seen

10         in any of the documents you reviewed?

11   A.    May I take it out?

12   Q.    It is screwed in place.  You may examine it to

13         the extent that you can.

14   A.    Okay.  All righty.  Well, it looks like the one

15         that's shown -- I don't know how many coils it

16         has.  It's not clear.  Shown in Shina Exhibit 3.

17   Q.    Other than the number of coils, do you see any

18         differences between what's in Shina Exhibit 3 and

19         what's in Braid Exhibit 9?

20   A.    I can't -- I'm seeing it for the first time so I

21         cannot see -- I cannot readily see any

22         differences between Exhibit -- Shina Exhibit 3

23         and -- you call this Braid 9?

24   Q.    Yes.  If you look at the sticker on the other
```

1       side, you see the man's name?

2   A.  That's fine.

3   Q.  Mr. Braid is one of the inventors of the Amesbury

4       patent.

5   A.  Okay.

6   Q.  The major components that you've identified by

7       letter designations in Shina 3, do you see those

8       components in Braid Exhibit 9?

9               MR. SINGER:  Objection.

10  A.  From what I can see here, which I'm seeing for

11      the first time, I can see most of the elements --

12      most of the components that are in Exhibit, Shina

13      Exhibit 3.

14  Q.  Do you see a clearance between the spine and the

15      flanges in Braid Exhibit 9?

16  A.  Yes, I do.

17  Q.  Can you give me the approximate size of that

18      clearance?

19  A.  Without my scale, I cannot really give you that.

20      If you have a scale available, I could help you.

21  Q.  Is it an inch?

22  A.  No.

23  Q.  Half inch?

24  A.  No.

```
 1    Q.  Is it an eighth of an inch?

 2    A.  Somewhere around an eighth and a quarter.

 3    Q.  Okay.  Now, we talked about rotation?

 4    A.  Mm-hmm.

 5    Q.  And we talked about inhibition of rotation,

 6        correct?

 7    A.  Correct.

 8    Q.  Without reference to that exhibit but just

 9        generally, how does the spine inhibit rotation?

10        What's the mechanism?  I'm not asking you to show

11        me on that exhibit.  Just generally first.

12    A.  Thanks.

13    Q.  Here.

14    A.  I'm sorry.  I lost my --

15    Q.  Let me take that back.  I don't want to confuse

16        you.

17                You mentioned the spine as the primary

18        force inhibiting rotation?

19    A.  Correct.

20    Q.  What is the mechanism by which the spine inhibits

21        rotation?

22    A.  Okay.  In the example that I saw in Amesbury's

23        lawyer's office, the spine was running -- running

24        in the channel and it definitely would -- would
```

```
 1          run, as I describe, in kind of a snug fit.  And
 2          it would definitely would inhibit rotation
 3          because it's long and it would give you a good
 4          moment to inhibit rotation.
 5     Q.   When you say "a moment," is there some physical
 6          interaction of parts that causes the inhibition
 7          of rotation?
 8     A.   When the spine goes up and down and it is -- I
 9          use the word "snug."  It is -- fits nicely
10          between the two flanges.  The device cannot
11          rotate because the spine is there.
12     Q.   What is happening that's preventing the rotation?
13     A.   The spine interacts or conflicts, whichever word
14          you want to use, with the flanges and inhibits
15          rotation.
16     Q.   Is another word "touch" perhaps?
17     A.   Touch is a possibility, yes.
18     Q.   So the spine touches the flange and prevents
19          rotation, correct?
20     A.   Correct.
21     Q.   Can the spine prevent rotation without touching
22          the flange?
23     A.   Depends on the amount of -- the snugness of the
24          fit so to speak.  Certainly if the spine is far
```

```
 1            away from the flanges, then it would not act in

 2            that manner.

 3     Q.     I'm asking you in terms of inhibiting rotation,

 4            to conclude that the spine has inhibited

 5            rotation, must we conclude that the spine has

 6            touched the flange?

 7     A.     Correct.

 8     Q.     It doesn't inhibit rotation by its presence alone

 9            between flanges but must touch the flange in

10            order to stop rotation, correct?

11     A.     Correct.

12     Q.     There is a force between the spine and the flange

13            when the spine touches the flange that acts

14            opposite the force causing rotation, correct?

15     A.     Correct.

16     Q.     So in order to infringe the claim, must we

17            conclude that the spine touches the flange?

18                    MR. SINGER:  Objection.

19     A.     The spine has to be in contact with the flange.

20     Q.     If the spine doesn't touch the flange, the spine

21            doesn't inhibit rotation, correct?

22     A.     Only to the effect that let's say if rotation

23            does begin and the spine would rotate, then it

24            would touch it and it would then inhibit
```

```
1              rotation.

2       Q.     The spine must touch the flange in order for the

3              spine to inhibit rotation, correct?

4       A.     The spine must be in contact with the flange to

5              inhibit rotation.

6       Q.     If the spine does not contact the flange, the

7              spine does not inhibit rotation, correct?

8       A.     Correct.

9       Q.     If the spine does not inhibit rotation, there is

10             no infringement of Amesbury's '638 patent, is

11             there?

12                  MR. SINGER:  Objection.

13      A.     In the wording of the -- let me read the wording

14             so we can be absolutely sure.

15      Q.     Mm-hmm.

16      A.     Okay?

17                  I refer to my report, page 11, item H.

18             This is the outcome of the spine "whereby

19             rotational motion of said mounting means is

20             inhibited."

21                  That's the outcome of the spine.  And

22             now I'm going to look at the -- and then the

23             previous claim is the definition of the spine

24             itself.
```

```
1    Q.   Is the spine different than the projection used

2         in claim eight of the Braid patent, do you know?

3    A.   Right.   The -- there was a court construction of

4         both claims.   I can read it to you if you like.

5    Q.   Yes.   Sure.

6    A.   Sure.   Let me find it.

7                   Refer to my report, page 11, item H.

8         This is claim construction by the US District

9         Court.   "Mounting means is to be secured in the

10        channel means.   And the mounting means is to have

11        a raised spine positioned between and in the same

12        plane as said inwardly turned opposed flanges and

13        said channel means whereby rotational motion of

14        said mounting means is inhibited."

15   Q.   Okay.   And does that mean that the inhibition is

16        caused by the spine touching the flange?

17                   MR. SINGER:   Objection.

18   A.   The spine is positioned between the same plane

19        and said channel means.   It's in the same plane.

20   Q.   Are you familiar with how to do an infringement

21        analysis?

22   A.   As explained by the lawyers, I'm familiar with

23        that.

24   Q.   Did you do an infringement analysis in reaching
```

1      your opinion?

2  A.  Yes.

3  Q.  Okay.

4           (US Patent 5,365,638 marked Exhibit No.

5      4.)

6  Q.  Mr. Shina, I place before you Exhibit 4.

7  A.  Mm-hmm.

8  Q.  Do you recognize that document?

9  A.  Yes, I do.

10  Q.  What is that document?

11  A.  That is the patent -- and I'll make absolutely

12      sure.  That's a patent 5,365,638 that I looked

13      at, that I examined.

14  Q.  Would you look at the claim section of that

15      patent?

16  A.  Correct.

17  Q.  Okay.  And when doing an infringement analysis,

18      what are the steps that you go through to reach

19      your conclusion of infringement?

20  A.  I examine a device or examined a device of -- in

21      this particular case Caldwell and I looked at

22      features of the device that matches the claims of

23      this invention.

24  Q.  Is it fair to say you read through the claims and

```
 1        you look at the words of the claims and you

 2        compare them to the device --

 3   A.   Correct.

 4   Q.   -- to do your analysis?

 5   A.   That is correct.

 6   Q.   Okay.  What happens when you reach a term in the

 7        claim that you can't find in the device?  Is

 8        there infringement in that case?

 9   A.   I usually do it this way:  I look at the device,

10        look at a feature and see if the feature matches

11        the claim.

12   Q.   If we find a feature of the claim and we can't

13        find it in the device, what does that lead you to

14        conclude?

15   A.   That the device is not infringing.

16   Q.   Not infringing?

17   A.   Not infringing on the patent.

18   Q.   Okay.  All right.  And did you do that analysis?

19   A.   Yes, I did.

20   Q.   So you compared claims one and eight of Shina

21        Exhibit 4 to the Caldwell balance that you had

22        here at the office of Goodwin Procter and you did

23        your infringement analysis, correct?

24   A.   Correct.
```

```
 1    Q.   You must have found each element of the claim was

 2         present in the Caldwell Quick-Tilt device in

 3         order to conclude there is an infringement,

 4         correct?

 5    A.   Correct.

 6    Q.   Okay.  Now, one of those elements is the -- found

 7         at the very end of claim one, which says,

 8         "Whereby rotational motion of said mounting means

 9         is inhibited," correct?

10    A.   May I -- give me the --

11    Q.   Sure.

12    A.   -- column number.

13    Q.   Column number six, line number 14 or so.

14    A.   Yeah.  Okay.  Yes.

15    Q.   If you examine the claim and then you examine the

16         Caldwell Quick-Tilt and you find that the flanges

17         and the spine do not touch, do you conclude --

18         sorry.  Strike that.

19              If you examine the claim and you

20         compare it to the Caldwell device and if you find

21         that the spine is not capable of touching the

22         flanges, would you conclude that that product

23         does not infringe claim one of the '638 patent?

24              MR. SINGER:  Objection.
```

1   A.  How do you define "not capable"?

2   Q.  If the device is constructed in a way that it is

3       not possible for the spine to touch the flange,

4       must you then conclude that that Caldwell product

5       cannot infringe the claim?

6              MR. SINGER:  Objection.

7   A.  Again, there is a definition here.  It could be

8       because I did not examine forces and calculate

9       forces and all of that.  I considered repeated

10      use, as I said in my report.  I considered the

11      thickness of materials.  So with the proviso,

12      that would do that.  The device -- the device

13      that I examined in the office I would say is

14      based on my report.  The hypothetical situation

15      that you are giving me, I would conclude -- I

16      would agree with your suggestion.

17   Q.  So if I handed you a series of balances and you

18      examined them and you concluded that from

19      examining the balances each one of them had a

20      spine and flange separation which rendered it

21      incapable of the spine and flange contacting one

22      another, you would have to conclude that all

23      elements of the claim were not satisfied and

24      there's no infringement?

```
 1                    MR. SINGER:  Objection.  Neal, I've got

 2          a question.  I'm confused and hopefully you can

 3          clarify.  You're talking about spines and

 4          flanges.

 5                    MR. SLIFKIN:  Yes.

 6                    MR. SINGER:  Are you talking about a

 7          jamb channel with flanges of a consistent gap or

 8          are you talking about any jamb channel with any

 9          size gap flanges?

10                    MR. SLIFKIN:  First of all, I mean, I

11          object to you making a speaking objection.  I'll

12          take it as -- that you're acting in good faith

13          here.

14                    MR. SINGER:  I'm simply trying to

15          understand your question.

16                    MR. SLIFKIN:  I'm asking -- it's not

17          for you to understand the question or not

18          understand the question.  It's for Mr. Shina to

19          do that.

20                    THE WITNESS:  Yes.

21     Q.   But I am asking in general if I handed you a

22          Caldwell balance installed in a channel --

23     A.   Mm-hmm.

24     Q.   -- and you looked at it and you said it's not
```

1       possible for the spine to touch the flange in

2       that configuration, would you conclude that there

3       is no infringement of that device in that

4       particular channel?

5  A.   Okay.  So let's set the scene so to speak.  It's

6       a theoretical situation.  It is a theoretical

7       channel of a particular width.  We don't know

8       where that came from.  It's a theoretical spine

9       of a particular width spine.  And the material

10      surrounding the device is of sufficient thickness

11      and the spine is far away -- the diameter of the

12      spine is much less than the diameter of the

13      flange -- of the opening in the flanges.

14           In that particular case, I would say --

15      I would agree with your statement.

16  Q.   Would you agree with all of the conditions you

17      just placed that statement is true for both

18      claims one and claims eight of the patent?

19  A.   Correct.

20  Q.   Okay.  All right.  Well, let's move from the

21      theoretical to the actual.  And I will hand you

22      again Braid Exhibit 9, which is a Caldwell

23      balance installed in a jamb and ask you to

24      examine that.

1    A.  Okay.

2    Q.  First let me ask you about a force we have not

3        discussed.  Are you able to see the separation

4        between what you call the wings and the interior

5        walls of the channel?

6    A.  No.

7    Q.  Do you know whether that separation is greater or

8        less than the spacing between the spine and the

9        flanges?

10                  MR. SINGER:  Objection.

11   A.  I do not know.  I cannot see that.

12   Q.  Okay.

13   A.  Let me take this opportunity to get some water.

14   Q.  Sure.  That's fine.

15                  MR. SLIFKIN:  All right.  I would like

16       to mark that, please.

17                  (Frame jamb marked Exhibit No. 5.)

18                  (Off the record.)

19   Q.  Mr. Shina, I'm going to hand you what's been

20       marked as Shina Exhibit 5.  I apologize.  I only

21       have one and we're all going to have to refer to

22       it.  Do you see that?

23   A.  Yeah.

24   Q.  Do you recognize what that is?

```
1    A.   Jamb channel.

2    Q.   Just so we can identify it properly, do you see

3         something written on it in magic marker?

4    A.   Number two.

5    Q.   Okay.  And it has the exhibit sticker "Shina 5"

6         on it.  Do you see that?

7    A.   Yes.

8    Q.   Okay.  I'm going to hand you a -- I better mark

9         it separately.  Another exhibit.

10              (Constant Force balance marked Exhibit

11        No. 6.)

12   Q.   Mr. Shina, I'm going to give you Shina Exhibit 6

13        and ask you to look at that in connection with

14        Shina Exhibit 5.  And ask you, do you see the

15        wings on Shina Exhibit 6 we talked about earlier?

16   A.   Mm-hmm.

17   Q.   Okay.  Can you slide that --

18   A.   May I ask you before, what is Exhibit 5 exactly?

19        I'm looking at it for the first time.

20   Q.   Exhibit 6.

21   A.   Exhibit 6.  I'm sorry.

22   Q.   Exhibit 6 is a Constant Force balance that's at

23        issue in this case.

24   A.   Okay.
```

```
1    Q.   And ask you to slide it in but if you can the

2         other way, turn the orientation around.  Slide it

3         in dust cover first and see if you can determine

4         the spacing between the wings and the channel.

5    A.   Okay.

6    Q.   Do you have an idea of what that spacing is?

7    A.   It's -- it's some separation.

8    Q.   What amount of separation?

9    A.   I cannot determine.

10   Q.   Is it greater or less than the separation between

11        the flanges and the spine in that jamb channel?

12             MR. SINGER:  Objection.

13   A.   Between the flange -- could you -- I'm sorry.

14        Could you point to what separation you mean?

15   Q.   You know --

16   A.   I know this separation, yes.

17   Q.   You know where the spine is, right?

18   A.   That's the spine, yes.

19   Q.   You know where the flanges are, right?

20   A.   Yes.

21   Q.   Is there separation between the flanges and the

22        spine?

23   A.   That's correct.

24   Q.   Is that separation, can you measure that
```

```
 1          separation or give me an estimate of it?

 2   A.     Well, we talked about it before.

 3   Q.     What --

 4   A.     Somewhere eighth to a quarter inch.

 5   Q.     Okay.  The separation now between the wings as

 6          you call them and the inside of the channel, what

 7          is that separation?

 8   A.     That seems to me from looking at it is smaller

 9          than the separation between the spine and the

10          flanges.

11   Q.     Okay.  So can you tell me -- we analyzed the

12          forces earlier.  We tried to.  And you gave a

13          number of forces that would oppose -- I'd ask you

14          to be careful with that.

15   A.     Yeah.  Sorry.

16   Q.     We talked about a number of forces that would

17          oppose rotation, correct?

18   A.     Mm-hmm.  Mm-hmm.

19   Q.     One of the ones that you -- I don't think you

20          mentioned was the wings touching the channel.

21          Did you talk about that before?

22   A.     I think we discussed that, yes.

23   Q.     All right.  In that jamb liner that you have in

24          front of you and with that balance that you have,
```

```
 1        would the wings come in contact with the sides of

 2        the channel if that part began to rotate?

 3   A.   Well, it's hard to tell.  May I take it out?

 4   Q.   Yes.  Sure.

 5   A.   Okay.  Because there is -- the dust cover that we

 6        talked about.  And the dust cover -- and I can't

 7        tell what -- looking at it where the dust cover

 8        would come in contact first and then the wings.

 9        You have another thing to worry about, which is

10        the dust cover.

11   Q.   If the dust cover over time I think you testified

12        might deform in a way --

13   A.   Correct.

14   Q.   If it did so, would then next the wings come in

15        contact with the sides of the channel?

16   A.   If it deformed to the limit, after repeated use,

17        then the wings would come into contact, yes.

18   Q.   If the wings contacted the sides of the channel,

19        would the spine be touching or not touching the

20        flanges in that configuration there?

21   A.   Once the wings contacted and assuming they have

22        not degraded or flexed due to use, then they

23        would come in contact before the spine.  Contact

24        with jamb channels.
```

1    Q.   Before the spine would?

2    A.   Before the spine would.

3    Q.   In that setup that you have in front of you,

4         Exhibit 5 and Exhibit 6 placed together --

5    A.   Mm-hmm.

6    Q.   -- assuming the wings had not degraded, to use

7         your word, would the spine touch the flanges?

8    A.   Assuming -- let's make the -- make sure we

9         understand the assumption.  The assumption is the

10        cover has degraded and no longer making contact,

11        making sufficient contact.  The wings have not

12        degraded and the spine is of that geometry.  That

13        specific geometry that I'm looking at today.

14              Then -- I'm sorry.  I lost my train of

15        thought.  Yes.  Then the wings would come in

16        contact before the spine would come in contact.

17        The wings would come in contact with the sides

18        before the spine comes in contact with the jamb.

19   Q.   Okay.  And keeping the same assumptions, that the

20        dust cover is degraded, the wings have not

21        degraded and the spine is the same size --

22   A.   Mm-hmm.

23   Q.   -- would the spine be incapable of touching the

24        flanges in that Exhibits 5 and 6?

```
 1    A.   Based on these assumptions and what I'm seeing

 2         today with Exhibits 5 and 6, that is correct.

 3    Q.   Okay.  So then based on those assumptions, you

 4         would have to conclude that that balance and

 5         channel configuration does not infringe claims

 6         one and eight of the '638 patent, correct?

 7    A.   Given the assumptions we talked about today,

 8         given the Exhibit 5 or 6 that I'm seeing for the

 9         first time today, that is correct.

10    Q.   Okay.  And have you ever seen the wings degrade

11         on a balance?

12    A.   No.

13    Q.   Do you know if the wings do degrade on a balance?

14    A.   I'm making an assumption.

15    Q.   Do you know if they do?  Do you know if the wings

16         degrade on a balance?

17    A.   I would say there would be a probability

18         depending on the thickness of the wings and the

19         use of the device in the window.

20    Q.   You're an engineer.  Tell me, look at the

21         thickness and tell me whether you believe on that

22         device you have the wings would degrade to such

23         an extent that they would then allow the spine to

24         contact the flanges.
```

```
 1    A.   I would -- I would have to make some calculations

 2         based on the physical properties of the materials

 3         and the repeated use so I could not give you a

 4         yes or no answer right now.

 5    Q.   Have you made those calculations?

 6    A.   In this specific instances?

 7    Q.   Yes.

 8    A.   No.

 9    Q.   Have you made those calculations in your report

10         anywhere?

11    A.   Not in my report.

12    Q.   I'm sorry.  I forgot one other thing about this

13         exhibit.  Is there a screw present in that that

14         holds the mounting means to the channel?

15    A.   Sorry about that.  You're having the same problem

16         I was.  No.

17    Q.   Okay.  I'm trying to recall the terms that we all

18         agreed upon.

19              Okay.  Now, the screw I think we agreed

20         would create an additional force resisting

21         rotation that's not present in this example which

22         is the combination of Exhibits 5 and 6, correct?

23    A.   We discussed that, correct.

24    Q.   And that's correct, that the screw would cause a
```

1    frictional force that in addition to the other

2    forces we've talked about caused by the dust

3    cover and the wings that would resist rotation?

4  A.  As I said earlier, not knowing the amount of

5    torque to be applied to the screw we could not --

6    I could not make a judgment as to how much force

7    that is.  There would be some force.  I have no

8    idea of the magnitude.

9  Q.  In order for in this setup, assuming that there

10    was a screw in place, for the flange and the

11    spine to come in contact, we would have to, one,

12    overcome the force caused by the dust cover

13    through its degradation, we would, two, have to

14    overcome the force caused by the wings through

15    its degradation, and we would, three, have to

16    find that the screw has loosened itself to the

17    extent that would allow rotation; is that

18    correct?

19  A.  Given what I see today, given the thicknesses

20    that I see today, and the only comment I would

21    make before I make my conclusion is we don't know

22    what the starting -- you said it would cause it

23    to degrade.  We don't know where the starting

24    point of the force due to the screw, to the

1       fixing screw --

2             I'm sorry.  What was the conclusion

3       that you tried to tell me?  I lost it.

4             MR. SLIFKIN:  You have to read the

5       question back.  It was a long one.  I'm sorry.

6             (Question read.)

7   A.  Well, my only concern here is the screw degrading

8       itself.  As I said, we don't know what the

9       starting point of the screw itself but given

10      these instances today that you described and

11      under these conditions, I would agree with your

12      conclusion.

13  Q.  Okay.  Have you ever seen the degradation of the

14      wings and the dust cover in an actual window

15      balance?

16  A.  No.

17           MR. SLIFKIN:  I would ask you to mark

18      that, please.

19           (Frame jamb marked Exhibit No. 7.)

20           (Off the record.)

21           MR. SLIFKIN:  Let's call it a frame

22      jamb.  Can we call that a frame jamb and No. 5 a

23      frame jamb?

24  Q.  Mr. Shina, I'm going to hand you what's been

1       marked as Shina 7, which is a frame jamb.

2                   MR. STILL:  Yes.

3    Q.  Ask you, have you seen that exhibit before?

4    A.  No.

5    Q.  Just for identification purposes, there's a

6        number written on it in marker.  Do you see that?

7    A.  Yes.

8    Q.  What is that number?

9    A.  Number one.

10   Q.  Okay.  And I'm going to again hand you Shina

11       Exhibit 6, which is a Caldwell single coil

12       Constant Force balance.  Ask you to examine the

13       wing separation on that in comparison to the

14       spacing of the frame jamb channel and give me

15       some indication of the distance between the wings

16       and the walls of the frame jamb channel.

17   A.  So this is similar to a question you asked me

18       before?

19   Q.  Exactly.

20   A.  And the question is the separation of the wings

21       to the sides is smaller than the separation of

22       the spine to the flanges.

23   Q.  That wasn't the question but that -- ultimately

24       that's what I was looking for.

1   A.  Okay.

2   Q.  So the spacing between the wings and the sides of

3       the channel is greater than -- I'm sorry.  Strike

4       that.  The spacing between the wings and the

5       sides of the channel is less than the spacing

6       between the flange, flanges and the spine,

7       correct?

8   A.  Correct.

9   Q.  And can you approximate the difference?

10  A.  It's smaller.  I have to measure it to tell you.

11  Q.  How much smaller?

12              MR. SINGER:  Objection.

13  A.  It's smaller.

14  Q.  Is the spacing between the wings and the sides of

15      the channel on the order of one millimeter?

16  A.  Spacing between the wings and the channel.  Could

17      you use English units, if I may?

18  Q.  Is the spacing between the -- I can give you a

19      precise conversion but I don't know if that will

20      help us.  Is the spacing between the wings and

21      the sides of the channel on the order of 1/16th

22      of an inch or less?

23              MR. SINGER:  Objection.

24  A.  That's not going to be helpful.  That's a very

1       small number.  16th of an inch or smaller?  I

2       would say it's in the vicinity.  I cannot be

3       sure.

4   Q.  And the spacing between the flange on each side

5       of the spine and the spine is -- compared to that

6       other spacing approximately what?

7   A.  It is greater.

8                   MR. SINGER:  Objection.

9   Q.  On the order of what?

10  A.  May I borrow --

11  Q.  Let me hand the witness a couple of rulers.

12  A.  Okay.  To the best of my ability, without my

13      glasses, it is 3/16th.

14  Q.  Is 3/16th bigger than 1/16?

15  A.  Yes.

16  Q.  Do you agree that the spacing between the wings

17      and the channel appears to be somewhere around a

18      16th of an inch or less?

19                  MR. SINGER:  Objection.

20  A.  I have to measure it but it's in that vicinity.

21      Could be 50 percent more or less.

22  Q.  In no case is the spacing between -- in this

23      particular exhibit, in no case is the spacing

24      between the wings and the sides of the channel

```
1            greater than the spacing between the flanges and

2            the spine, correct?

3     A.     In the -- in Exhibit 7 and 6 that I observed

4            today for the first time, that is correct.

5     Q.     Okay.  Now, in this combination of Shina 6 and

6            Shina 7, can the spine touch the flanges?

7     A.     In the present combination, it does not.  As I

8            see it today of this combination of Exhibit 6 and

9            Exhibit 7, as I mentioned earlier, there's a

10           possibility due to degradation over time that it

11           could.

12    Q.     Okay.  Let's talk about its present condition and

13           ask you, is it possible in its present condition

14           for the spine to touch the flanges?

15    A.     No.

16    Q.     So you would have to agree then in its present

17           condition that balance and channel combination

18           does not infringe claim one of the patent,

19           correct?

20                     MR. SINGER:  Objection.

21    A.     Which part of the claim?

22    Q.     Well, what does it take to infringe a claim?

23    A.     Any part of the claim, yeah.

24    Q.     So let me ask the question again.
```

1   A.   Mm-hmm.

2   Q.   Looking at Exhibits 6 and 7 --

3   A.   Right.   Sorry.

4   Q.   In its present condition, you would have to

5        conclude that the combination of the balance and

6        the channel do not infringe claim one of the '638

7        patent, correct?

8   A.   Correct.

9   Q.   And looking at it in its present condition, the

10       combination of Exhibit 6 and 7, you would have to

11       conclude that that combination does not infringe

12       claim eight of the '638 patent, correct?

13  A.   Correct.

14  Q.   Let me ask the same question because I'm not sure

15       that I did on the other combination and that is

16       Exhibit 6 and Exhibit 5.   I have now placed those

17       two together and ask you in its present

18       condition, does the combination of Exhibits 5 and

19       6 infringe claim one of the '638 patent?

20  A.   As I see today for the first time, Exhibit 5,

21       Shina Exhibit 5 and Shina Exhibit 6, and in its

22       present condition, which does not include

23       possible degradation over time of the dust cover

24       and of the wings, this particular combination of

1    Exhibit 6 and 5 does not infringe on claim one.

2 Q. Okay.  Does the combination of Exhibit 6 and 5 in

3    its present condition infringe claim eight of the

4    '638 patent?

5 A. I would repeat my same proviso, which is the

6    exhibits that I see today, presented to me today

7    for the first time, and not -- in its present

8    condition not counting on possible degradation of

9    the dust cover and the wings, that the exhibits

10    that I see before me do not infringe on claim

11    eight.

12 Q. I place before you what I showed you before.

13    Braid Exhibit 9.  And I'll ask you in its present

14    condition, does the combination of the balance in

15    channel -- strike that.  In its present

16    condition, does the combination of the frame jamb

17    and balance in Braid Exhibit 9 infringe claim one

18    of the '638 patent?

19 A. As we discussed before, I'm seeing before me

20    Exhibit Braid 9.  I cannot see the width of the

21    wings so I cannot comment as to the wings and in

22    its present condition, which does not include

23    degradation of the dust cover.  And since I

24    cannot move the balance since it's attached by a

1       screw to the jamb, that I would say it -- I

2       cannot determine the -- since I cannot rotate it

3       myself physically, that it possibly might not

4       infringe.

5  Q.  You cannot determine whether it does or does not

6       infringe.  Is that what you're saying?

7  A.  Because I would like to rotate it like I did with

8       the other two.

9  Q.  Go ahead.  Rotate it.

10  A.  I can't.  It's screwed in.

11  Q.  Well, that's the way you would see it in a window

12       installation, wouldn't you?  Screwed in.

13  A.  Yes, you would.  But again, then I would have to

14       add the proviso over time where it would -- the

15       screw might be -- might be loosened over time.  I

16       do not know what force was applied to the screw,

17       whether it was a typical installation or special

18       installation.  I do not have enough information.

19  Q.  I'm asking you in that particular exhibit, Braid

20       Exhibit 9, and the way it's currently installed,

21       without reference to degradation over time,

22       without reference to loosening of screws, does

23       that Braid Exhibit 9 infringe claim one of the

24       '638 patent?

```
 1   A.   I would just like to add before I make my

 2        statement that I'm not sure what torque was used

 3        to install the screw and whether it was to any

 4        standard or any instruction or where it was made

 5        since I have no collection or information as to

 6        that event.

 7             That given this combination and given

 8        the provisos we have talked about, it does not

 9        infringe.

10   Q.   Okay.  I wasn't asking you about various torques.

11        I'm asking you about a particular exhibit that

12        you have in your hand.  If you could pick that up

13        again --

14   A.   Right.

15   Q.   I would ask you as it's presently assembled, does

16        Braid Exhibit 9 infringe claim one of the '638

17        patent?

18             MR. SINGER:  Objection.

19   A.   As it's presently assembled, which I have no

20        information as to who did it and where it was

21        taken from and what conditions under which it was

22        assembled, I would say -- I would make a

23        statement that there is -- there is a probability

24        that it does not infringe mainly because I do not
```

```
 1            know where it came from, what condition it was

 2            made.

 3    Q.      Is it more probable than not that it doesn't

 4            infringe?

 5    A.      Yes.

 6    Q.      Okay.  It is more probable that it does not

 7            infringe claim one of the '638 patent?

 8    A.      Correct.

 9    Q.      With reference to claim eight of the '638 patent,

10            is it more probable than not that Braid Exhibit 9

11            does not infringe claim eight of the '638 patent?

12    A.      Again, I give the same provisos that I gave

13            before.  And that is I cannot tell the width of

14            the wings.  I cannot tell what force was used,

15            what torque was used to install the screw.

16            Whether it was special or under operating

17            conditions or under special conditions.  But

18            given what I see today for the first time, I

19            would say there is a probability it does not

20            infringe.

21    Q.      Which is greater than the probability that it

22            infringes?

23    A.      Correct.

24    Q.      Okay.  That statement is correct as to both
```

1           claims one and eight of the '638 patent?

2   A.  As regards to the combinations of Exhibit --

3         Braid Exhibit 9, is it?  I'm sorry.  Yeah.

4   Q.  When we were concluding -- strike that.  When we

5         were discussing noninfringement, you must find a

6         missing element, correct, an element that is in

7         the claim but not in the device, correct?

8   A.  Correct.

9   Q.  What element is in the claim but not in the

10        product that leads you to conclude at least a

11        probability of noninfringement?

12           MR. SINGER:  Specifically with respect

13        to Braid 9?

14           MR. SLIFKIN:  Yes.

15   A.  Okay.  It's the -- if I look at '638, Exhibit 4,

16        I look at Exhibit 4, column 6, around line 14,

17        and I will read.  "A raised spine positioned

18        between and in the same plane as said inwardly

19        turned opposed flanges of said channel means

20        whereby rotational motion of said mounting means

21        is inhibited."

22   Q.  And in a discussion we've had about probabilities

23        of noninfringement, it is that element that is

24        more probable than not missing in the Braid

```
 1         Exhibit 9, correct?

 2    A.   The element of "whereby rotational motion of said

 3         mounting means is inhibited."

 4    Q.   Okay.  And that was a discussion of claim one,

 5         correct?

 6    A.   I'm sorry.  Yes.  That was claim one.

 7    Q.   That's right.  Moving on to claim eight, which

 8         element do you find that it's more probable than

 9         not that's missing from the Braid Exhibit 9?

10    A.   Let me read the part, if I may.

11    Q.   Sure.

12    A.   "Mounting means having projection means

13         positioned between said inwardly turned opposite

14         flanges of the channel means which cooperate with

15         said flanges of the channel means within which

16         the mounting means is positioned whereby

17         rotational movement of the mounting means is

18         inhibited."

19    Q.   That portion it's your view is the element that

20         leads you to believe that it's more probable than

21         not that as currently constructed Braid Exhibit 9

22         does not infringe claim eight of the '638 patent,

23         correct?

24    A.   Correct.
```

```
1    Q.  One other thing.  Would you take a look at,

2        again, Braid 9?  Do you see because it is screwed

3        in, you can actually extend the bottom carrier --

4    A.  Correct.

5    Q.  Go ahead and extend that if you would.

6    A.  Mm-hmm.

7    Q.  Be careful when you pull it out.

8    A.  I'm extending it.

9    Q.  Do you see any movement of the mounting means

10       when you pull that spring out?

11   A.  Not that I can notice.  I do notice the dust

12       cover has deformed but I don't know if that's

13       because of handling or because of these

14       movements.

15   Q.  Do you know if the dust cover is larger or

16       smaller than the channel opening?

17   A.  It looks like a snug fit.

18   Q.  Do you know what the term "interference fit"

19       means?

20   A.  Yes.

21   Q.  What does it mean?

22   A.  That one dimension is larger than the other.

23   Q.  The two pieces still fit together in some way,

24       correct?
```

```
 1   A.   That's correct.

 2   Q.   Do you know whether the dust cover is designed to

 3        be an interference fit with the channel?

 4   A.   Which channel?

 5   Q.   The channel that it's installed in.

 6              MR. SINGER:  Objection.

 7   A.   I cannot tell from looking at it.

 8   Q.   Do you know what the variations in channel

 9        opening exist in frame jambs in windows currently

10        on the market in the United States?

11   A.   No, I do not.

12   Q.   Do you know whether in the fenestration industry

13        there is an agreed upon dimension of the width of

14        the channel in the frame jamb of a window sold in

15        the market today?

16   A.   Could you repeat that question because I have an

17        answer?  I just want to be specific on the

18        answer.

19   Q.   Okay.  I don't know if I can repeat it.

20              MR. SLIFKIN:  If you could read it

21        back.

22              (Question read.)

23   A.   Because it's a double negative question, let me

24        answer it in my --
```

```
 1   Q.  Go right ahead.

 2   A.  It's very confusing.  I believe there's no

 3       standard to the channel opening in the window

 4       fenestration industry.

 5   Q.  So the distance between the side walls of the

 6       channel in your opinion is not standard

 7       throughout the American window industry; is that

 8       correct?

 9   A.  Side walls or the flanges.

10   Q.  Side walls.

11   A.  I did not -- I retract my last question.  I

12       thought you asked about the flanges.  The side

13       walls I do not know.

14   Q.  You do not know whether that -- the industry has

15       reached some standard for the spacing between the

16       side walls of the channel and a frame jamb?

17   A.  I do not know that.

18   Q.  Okay.  Do you know whether the industry has

19       reached a standard for the spacing between the

20       flanges of a frame jamb?

21   A.  Let me make sure.  There is no -- to my knowledge

22       there's no standard.

23   Q.  Okay.  Can you tell whether the dust cover in

24       Braid Exhibit 9 is designed to have an
```

```
1           interference fit with the channel in which it's

2           installed?

3    A.     I cannot tell until I take it apart and measure

4           both sides.

5    Q.     Okay.  I'm going to place before you what's

6           already been marked as Still Exhibit 4A and ask

7           you to take a look at that part.

8    A.     Including the balance?

9    Q.     Yes, please.

10   A.     Okay.  What balance is this?  Can you give me

11          some information?

12   Q.     I'm just asking you to take a look at the balance

13          as you have it in your hand.

14   A.     Sure.  Okay.

15   Q.     Okay.  Have you done that?

16   A.     I'm looking at a channel and a balance inside the

17          channel.

18   Q.     Okay.  As presently combined, the balance and

19          channel -- strike that.  As you examine Exhibit

20          4A that's in your hand, can you tell whether the

21          spine in that exhibit as presently constructed is

22          capable of touching the flanges?

23   A.     May I take the --

24   Q.     Sure.
```

```
 1    A.   -- balance out?

 2              I'm sorry.  Could you repeat the

 3         question?

 4              (Question read.)

 5              THE WITNESS:  I'm having trouble.  Mr.

 6         Still, you want to put it back and do me a favor?

 7         I don't want to break it.

 8    Q.   Put it the other end first.

 9              MR. STILL:  The other end first.

10    A.   The other end first.  Okay.  I don't want to

11         break it.

12              MR. SINGER:  There you go.

13    A.   There you go.

14              In its present configuration, as I said

15         earlier, and that is cognizant of the fact that

16         after repeated use the wings and the dust cover

17         might deform, the spine is not in contact with

18         the flanges.

19    Q.   If they do not deform, is the spine incapable of

20         touching the flanges?

21              MR. SINGER:  Objection.

22    A.   In this particular situation where you are

23         assuming -- where I would be assuming that it

24         would not deform after repeated use and over the
```

```
 1            lifetime of the balance and they will stay as

 2            they are today, it's not in contact.

 3    Q.  It cannot come in contact?

 4    A.  Cannot come in contact.

 5    Q.  Is there any evidence you've seen when you put

 6            together your report that the wings deform on a

 7            balance in the field?

 8    A.  As I said in my report, and I can refer to it

 9            again, given repeated use it's customary for

10            materials to deform.  I did not make the

11            calculations to determine that.

12    Q.  In fact, your report doesn't discuss the wings at

13            all, does it?

14    A.  It discusses the dust cover.

15    Q.  Okay.  It does not discuss the wings?

16    A.  Does not discuss the wings.

17    Q.  So you in reaching your conclusion of

18            infringement did not consider the wings in

19            reaching your conclusion that the Caldwell

20            balance infringes claims one and eight of the

21            '638 patent, did you?

22    A.  I was basing my report on the device that I saw

23            physically with the -- that the Amesbury lawyers

24            had shown me.
```

1   Q.  I ask you again, in your report, did you discuss

2       the wings?

3   A.  Let me make absolutely sure so -- would you give

4       me one second?  I will look at my report.

5   Q.  Sure.

6           MR. SINGER:  Go off the record for just

7       a second.

8           (Off the record.)

9   A.  Do you want me to answer the last question?

10          MR. SLIFKIN:  Can you read back the

11      last question, please?  Thank you.

12          (Question read.)

13   A.  As I mentioned earlier, I did not discuss the

14      wings because the device that the Amesbury lawyer

15      showed me, that was not an issue.

16   Q.  Okay.  Is it an issue in the devices I've shown

17      you?

18   A.  It could be based on our discussions.

19   Q.  Is there any evidence in your report relating to

20      the degradation of the wings over time?

21   A.  Not to the degradation of the wings over time

22      because I did not discuss the wings.

23   Q.  Is there any evidence you have seen in everything

24      you reviewed that the wings degrade over time?

```
 1   A.   As I mentioned earlier, plastic parts over time

 2        would degrade with the constant use so I do not

 3        have calculations but I would consider that would

 4        be an issue.

 5   Q.   What would be the mechanism by which the plastic

 6        parts degraded?

 7   A.   If they are the ones preventing rotation, then

 8        they would degrade.

 9   Q.   What happens?

10   A.   Over time they might bend or twist and that would

11        -- that process would continue and would result

12        eventually in possible malfunction of the

13        balance.

14   Q.   So only in cases where the balance malfunctions

15        would the flange and spine come in contact with

16        another, correct?

17              MR. SINGER:  Specifically with respect

18        to Still 4A?

19              MR. SLIFKIN:  With respect to 4A.

20   A.   Wait a minute.  Still 4A is --

21   Q.   The one right in front of you.

22   A.   This one here?

23   Q.   Yes.

24   A.   Okay.  I just want to make sure.
```

```
 1                    No.  The malfunction would be a result

 2          of the natural workings of the -- of the device.

 3    Q.    Right.  What I asked was, only in cases of device

 4          malfunction would the device in your hand,

 5          Exhibit 4A, be capable of having its spine touch

 6          the flanges; is that correct?

 7    A.    Well, it's the definition of malfunction.  What

 8          I'm saying is over repeated use over time, the

 9          wings might degrade or twist or change shape such

10          that the spine would come in contact with the

11          flanges.

12    Q.    When you say they might, they also might not?

13    A.    That's correct.

14    Q.    Okay.  And have you ever seen a wing degrade to

15          the extent that it would allow a spine to touch

16          the flange in any Caldwell Constant Force window

17          balance assembly?

18    A.    No.

19    Q.    Have you seen any evidence in everything you

20          looked at to prepare your reports that the --

21    A.    Evidence -- I'm sorry.

22    Q.    That the wings have actually degraded to the

23          extent such that the spine could touch the

24          flanges?
```

```
 1    A.   I have only seen one evidence.  I have only seen
 2         one instance of a Caldwell balance inside a
 3         window jamb.
 4    Q.   That wasn't the question.
 5    A.   I'm sorry.  I have not seen evidence.  I based --
 6         I have not seen evidence.
 7    Q.   Okay.  You testified earlier that a repeated
 8         operation of the window could be anywhere from
 9         one time a day to one time a week or one time a
10         month.  Do you remember that testimony?
11    A.   Yes, I do.
12    Q.   If it's one time a month, 12 times a year,
13         correct?
14    A.   Correct.
15    Q.   Okay.  You can cycle that Braid Exhibit 9, can't
16         you, 12 times?
17    A.   I cannot -- use it in its intended operation.
18    Q.   We have already confirmed that the force of the
19         spring is the same regardless of how far you
20         extend the spring, correct?
21    A.   Correct.
22    Q.   Okay.  So that device is capable of movement and
23         you can place a finger in the cam mechanism and
24         cycle it, correct?
```

```
 1    A.   Correct.  I cannot cycle it in its operational --
 2    Q.   What's the difference between cycling it by hand
 3         and cycling it in operation?
 4    A.   Well, you're cycling it over the length of the
 5         sash which might be much longer than I want to do
 6         here because it will take it outside of the jamb.
 7    Q.   Okay.  You can take it out if you would like.
 8    A.   Sure.  I don't want to have injury to myself.
 9         That's all.
10    Q.   I understand.  Let me cycle it for you.
11    A.   Okay.
12    Q.   That's fine.  I'll demonstrate.  You look at it.
13         I'm going to pull this out.  Do you see any
14         movement of the --
15    A.   I'm have to look closely.  Not going to be --
16         it's not worth the risk of having this jump at
17         me.  I already had something happen to me like
18         that.
19    Q.   All right.
20    A.   To prove your point.
21    Q.   All right.  Does the distance over which the
22         spring is extended -- I'm sorry.  Strike that.
23         Is the distance over which the spring is extended
24         a factor in determining how quickly the balance
```

1        will malfunction, in your words?

2   A.   The distance of the operation of the balance?

3   Q.   Yes.

4   A.   Well, it will continue the rotational moment on

5        the mounting means for a longer time.

6   Q.   In a window that's opened once a year over a

7        period of ten years, in your view would that be

8        sufficient to degrade the parts of Braid Exhibit

9        9 such that its spine would then contact the

10       flanges?

11                  MR. SINGER:  Objection.

12  A.   So you're giving me a hypothetical situation

13       where you're saying ten times a window opening

14       and closing and you're asking me to see -- to

15       comment whether this would degrade the balance?

16  Q.   Yes.

17  A.   I cannot honestly answer that.  It depends on the

18       thicknesses and things like that.

19  Q.   Okay.  There is nothing in your report analyzing

20       the thicknesses to the extent that you can answer

21       that question, correct?

22  A.   No, there is not.

23  Q.   If the balance is operated 20 times over a

24       ten-year period, is there anything in your report

1    that would indicate whether there would be

2    sufficient force to degrade the dust cover and

3    the wings and the integrity of the screw mount

4    such that the spine could rotate?

5            MR. SINGER:  Objection.

6    A.  I would give the same answer to this hypothetical

7        situation of 20 versus ten and that is, I would

8        have to make some calculation.  I don't -- I

9        cannot really provide you an answer at this

10       instant.

11   Q.  Okay.  There is nothing in your report regarding

12       that?

13   A.  That's correct.

14   Q.  If the balance were operated at 100 times over a

15       ten-year period, is there anything in your report

16       to indicate that the dust cover and the wings

17       would degrade and the screw would loosen to the

18       extent that it would allow Braid Exhibit 9 to --

19       a balance constructed as Braid Exhibit 9 is -- to

20       allow the spine to touch the flanges?

21           MR. SINGER:  Objection.

22   A.  In order to make a determine -- I'll give you the

23       same answer.  The reason I'm giving you the same

24       answer is in repeated motions like this, there

```
 1        are certain laws and certain equations that you
 2        follow.  And certainly without that application
 3        of these equations, I could not give you that
 4        answer.
 5   Q.   Are those equations in your report?
 6   A.   No, they're not.
 7   Q.   Do you know what those equations are as we sit
 8        here today?
 9   A.   Yes.  They're reliability equations and life
10        testing equations.
11   Q.   Explain to me what those equations are.
12   A.   These equations have to do -- in most cases, you
13        do it one of two ways.  You would do it by
14        physically doing -- asking me what you're doing.
15        You take the physical combination and you do it
16        over the number of times that you are describing
17        and then you carefully examine before and after
18        what would that look like.  That would be a
19        physical implementation of what you're asking.
20   Q.   Those aren't equations, though.
21   A.   That's a physical test.
22   Q.   Right.
23   A.   So I would -- if you wanted me to make an
24        accurate answer to your question, I would have to
```

```
1              do both the theoretical analysis and the

2              practical or the physical analysis to conform it.

3      Q.      Have you done either of the theoretical analysis

4              or the practical analysis?

5      A.      Yes, I have.

6      Q.      For this particular --

7      A.      No.  Sorry.  Not for this one.

8      Q.      For window balances?

9      A.      Not for window balances.

10     Q.      Okay.  You have not done the practical analysis,

11             nor a theoretical analysis, of the degradation

12             over time of a window balance assembly which

13             includes a Caldwell Constant Force balance

14             installed in a jamb or frame jamb?

15     A.      I have not done that.

16     Q.      Okay.  What are the equations on the -- the

17             calculation side of that analysis that you would

18             use?

19     A.      Well, there would be issues such as plastic

20             deformation and inelastic.  And they would be

21             graphs that you apply where you extrapolate some

22             of these changes.  You start with some changes

23             and then you take some data and then you

24             extrapolate that to event -- you would do it on a
```

1          smaller number of cycles and then you extrapolate

2          that over longer cycles.

3                    That's how reliability studies are

4          done.

5     Q.   Are those graphs in your report?

6     A.   No.

7     Q.   Are there any equations in your report relating

8          to this reliability study?

9     A.   No, they're not.

10    Q.   Have you looked at any evidence in the case

11         relating to reliability studies of window

12         balances to determine what those equations would

13         be?

14    A.   No, I have not for this case.

15    Q.   Okay.  Have you ever looked at those equations

16         for window balances?

17    A.   No, I have not.

18    Q.   As we sit here today, can you tell me what those

19         equations are?

20    A.   These equations extrapolate from physical data

21         where you would have to have a failure according

22         to so many runs to extrapolate them to how many

23         devices will fail in a larger number of runs.

24    Q.   I guess maybe you're misunderstanding the

```
 1              question.  I'm asking you in terms of the

 2              variables --

 3    A.    Yes.

 4    Q.    An equation, the mathematical equation that would

 5              be applied to analyze the failure of this part in

 6              the field.

 7    A.    This particular part?

 8    Q.    Yes.

 9    A.    Yes.  As I said, the normal procedure for any

10              repetitive failure would be the one I described.

11    Q.    We're still not understanding one another.  I'm

12              asking you for a mathematical equation with

13              variables and constants and equal sign.  Is there

14              an equation that one would apply to do the

15              calculation?

16    A.    There is.  There is many ways of performing that

17              equation.  Some of it is being performed by

18              creating a solid model of the device and then

19              applying boundary conditions and repetitions to

20              the solid model.  That would be the way I would

21              prefer to do it.

22                   I would not work from a straight

23              equation.  I would work from a solid model of the

24              device where the physical properties of the
```

```
 1          plastic is included in the three-dimensional

 2          model.

 3    Q.    Okay.  For the benefit of people who are not

 4          engineers, when you say "solid model," we're not

 5          talking about a physical part like I have in my

 6          hand, Braid Exhibit 9, are we?

 7    A.    No.

 8    Q.    We're talking about a computer model?

 9    A.    Computer model.

10    Q.    When you say "solid model," you mean a computer

11          modeling of the real device?

12    A.    Correct.  With its current geometry and its

13          current physical properties.

14    Q.    Have you done any computer modeling of the

15          Caldwell Constant Force balances?

16    A.    No.

17    Q.    Okay.  Have you seen any evidence in the case of

18          the computer modeling of the Caldwell Constant

19          Force balances?

20    A.    No.

21    Q.    Without that computer modeling, you cannot

22          conclude, can you, that the balance and frame

23          jamb in any of the exhibits we looked at today

24          would in fact degrade to the point where the
```

1     spine touches the flanges, can you?

2              MR. SINGER:  Objection.

3  A.  As I mentioned earlier, there is a probability

4     that it might.

5  Q.  You cannot conclude that it will, can you?

6  A.  I cannot conclude with 100 percent certainty.

7  Q.  In terms of probability, is it more probable or

8     less probable than not that it would -- the

9     balance would degrade in any of the arrangements

10    we have here today on the table, including Braid

11    9, Shina 7, Still 4B, Shina 5?

12             In any of those, can you conclude

13    whether it would be more probable or less

14    probable that the device would fail such that the

15    spine touches the flanges?

16             MR. SINGER:  Objection.

17 A.  There's just too many variables here in your

18    general question.  You have to ask me about

19    lifetime.  I would have to get numbers of typical

20    uses.  I cannot make that conclusion.

21 Q.  So you cannot conclude as we sit here today that

22    any of the devices that we have discussed today

23    that include a jamb frame and a balance would

24    more probably than not fail such that their

1   spines touch the flanges?

2      MR. SINGER:  Objection.

3 A. Again, I repeat my initial concerns.  And that

4   is, in order to reach such a conclusion I need to

5   know typical uses, typical lifetime, typical

6   geometry, typical material properties, typical

7   clearances, for each one of those, which they

8   might be the same or they might be different so I

9   cannot make that conclusion.

10 Q. Have you done any of that?

11 A. For window balances?

12 Q. Yes.

13 A. No.

14 Q. Okay.  So that given the information that you

15   have today, including the exhibits that are

16   sitting here on the table that are balances and

17   frame jambs, you cannot conclude either way

18   whether it's more probable or not that they will

19   fail such that the spine touches the flange?

20      MR. SINGER:  Objection.

21 A. I cannot conclude.

22      MR. SLIFKIN:  All right.  I think we

23   can take a break for lunch.

24      MR. SINGER:  Okay.

1                    (Lunch recess.)

2

3                    Afternoon Session

4            MR. SLIFKIN:  Before we get into the

5      deposition questions again, I'm directing my

6      comments to Mr. Singer.  Will you confirm Mr.

7      Shina was served with a subpoena on April 29th?

8      We have the affidavit of service back.  In

9      addition, you received a subpoena at least two

10     weeks before that time requesting the billing and

11     time records.  I don't have the subpoena in front

12     of me but I believe it's item nine in the

13     subpoena.

14            I'm going to ask you formally on the

15     record, are you going to produce Mr. Shina's

16     expense records for this case?

17            MR. SINGER:  Mr. Slifkin, our position

18     is Mr. Shina was never served formally with a

19     subpoena.  I don't know the date -- I believe

20     April 29th was actually a Saturday.  I'm

21     certainly unaware of any formal service of that.

22            As we explained to you previously, a

23     subpoena or a document purporting to be a

24     subpoena was slipped under Mr. Shina's office

1     door.  He was never personally served.  And that

2     document requested production of documents on

3     April 24, several days before the document was

4     served, quote, unquote.

5          That said, I have gone back and looked

6     in my E-mail and I see you did informally request

7     on April 27th a copy of Mr. Shina's time sheets

8     and expense reports.  And so in a show of good

9     faith, we are happy to produce to you the one

10    document we have that does fit the description.

11         MR. SLIFKIN:  Okay.  Thank you.

12         We'll get to that later.

13         THE WITNESS:  Sure.

14 Q.  Mr. Shina, welcome back.

15 A.  Thank you.

16 Q.  I would like to continue along the same line of

17    questioning on the Caldwell Quick-Tilt product.

18    We spent a good bit of time today talking about

19    the Caldwell balances that have been marked as

20    exhibits and some of which are single coil

21    balances and some of which are double coil

22    balances.  I would like to now turn your

23    attention to a triple coil balance.

24         MR. SLIFKIN:  I'm going to mark that as

1       an exhibit.

2                   (Triple coil balance marked Exhibit No.

3       8.)

4                   MR. SLIFKIN:  Can we go off the record

5       for a second?

6                   (Off the record.)

7   Q.  Mr. Shina, I'm going to put in front of you

8       what's been previously marked as Exhibit Still 4B

9       and ask you to take a look at that, please.

10  A.  Could you identify what I'm looking at?

11  Q.  For now, just look it over and we'll get to that.

12  A.  Okay.  Fine.  Okay.

13  Q.  Okay.  If you slide that balance that's part of

14      4B out --

15  A.  Sorry.  Yes.  Completely out.

16  Q.  You can observe that it's three coils; is that

17      correct?

18  A.  Correct.

19  Q.  Okay.  Are you able to now determine the spacing

20      between the wings as you call them on the balance

21      that's part of Exhibit 4B and the inside edges of

22      the frame jamb channel?

23  A.  May I put it back in?

24  Q.  Please.

1   A.  Thank you.

2           Yes.  I can observe the space.

3   Q.  Is the spacing between that product in Exhibit

4       Still 4B and the spacing found in the other

5       exhibits you have examined today, including Shina

6       5, Shina 7, Still 4A, is the spacing about the

7       same?

8           MR. SINGER:  Objection.

9   A.  Without proper tools, I can't make a definite

10      conclusion but about the same would be a correct

11      description.

12  Q.  Is the spacing between the wings and the side

13      walls of the channel greater or less than the

14      spacing between the flange and its corresponding

15      edge of the spine?

16          MR. SINGER:  Objection.

17  A.  It seems to be different than what I've seen

18      before.  It's not as prominent a difference.  I

19      would say without accurately measuring it, I

20      would say the spacing, the difference is much

21      smaller than I've seen in the previous exhibits.

22  Q.  May I see that?

23          All right.  I have now inserted the

24      balance entirely within Still Exhibit 4B.  And

```
 1        ask you if you can move the spine so that it

 2        touches the flanges.

 3   A.   I cannot move the spine so it touches the

 4        flanges.

 5   Q.   And if the spine cannot touch the flanges, as

 6        that exhibit is currently constructed, would that

 7        balance and jamb assembly infringe claim one of

 8        the '638 patent?

 9             MR. SINGER:  Objection.

10   A.   Can I just read the patent just to make sure?

11   Q.   Sure.

12   A.   Again, given the proviso that I gave this morning

13        of the twisting or the aging of the components

14        that we talked about, the cover, the wings, I

15        notice there's no screw here, that in its present

16        conditions, it does not touch.

17   Q.   Cannot touch?

18   A.   Cannot touch.

19   Q.   I'm asking you about its present condition, not

20        some future condition.  Do you understand that?

21   A.   That's correct.  In its present condition.

22   Q.   The provisos you've placed deal with what might

23        happen over time, correct?

24   A.   That's correct.
```

1   Q.   Okay.  So as it stands today in front of you, if

2        it were installed in a window assembly, would the

3        spine be capable of touching the flanges?

4             MR. SINGER:  Objection.

5   A.   Not knowing the operation, not seeing the

6        operation, as I see it, I cannot move it so it

7        can touch, myself.  I cannot -- I don't want to

8        extend it because I was injured in this office so

9        I'm -- for my own personal safety, I don't want

10       to do it.

11  Q.   I understand.

12  A.   So as I notice it in its position, it does not

13       touch.

14  Q.   Okay.  Are you able to determine without

15       extending the spring beyond the boundaries of the

16       channel whether it would rotate enough so that

17       the spine touches the flanges?

18  A.   I cannot even push it since it's triple spring so

19       the force is much greater.

20  Q.   Okay.  Now, in the triple spring, what are the

21       forces tending to cause that housing to rotate?

22  A.   As we discussed this morning when we discussed

23       single and double springs, these would be the

24       same forces that we discussed only this time

```
1              they're triple spring as opposed to double

2              spring.

3      Q.  Now, do you know whether as Caldwell makes and

4              sells it which direction the springs come out of

5              the housing?

6      A.  Come out of which housing?

7      Q.  The housing of the balance.  The springs project

8              either to the left or the right, correct?

9      A.  Correct.  There is -- if I may use the brochure

10             --

11     Q.  Sure.

12     A.  -- that I mentioned earlier, that's the only

13             information I have as to the position.

14     Q.  All right.  Starting with the bottom and looking

15             at page C 000532, on the triple spring design,

16             can you tell which direction the spring exits the

17             housing on the bottom?

18     A.  Not in this.  Maybe there's -- not in this.  If

19             there is a colored one that you have.

20     Q.  I don't.

21     A.  It might be --

22     Q.  Let's take the balance out of the channel then --

23     A.  Okay.

24     Q.  -- that you have there.  Still Exhibit 4B.
```

```
 1                    Okay.  Looking at the spring side of

 2            the balance, there's a bottom spring.  And which

 3            direction does the spring exit from the coil?

 4     A.     To the left.

 5     Q.     Okay.  And the middle spring, which direction

 6            does that exit?

 7     A.     To the right.

 8     Q.     Okay.  And the top spring, which direction does

 9            it exit?

10     A.     To the right as well.

11     Q.     So we have two exiting to the right and one

12            exiting to the left, correct?

13     A.     Correct.

14     Q.     Do those forces oppose each other in terms of

15            causing or resisting rotation?

16     A.     I believe --

17                    MR. SINGER:  Objection.

18     A.     -- I mentioned something like that in my report.

19            May I read it to you?

20     Q.     Sure.

21     A.     Okay.

22                    This is page 14.  Item C.  "For triple

23            nest covers, there is a fixing screw to attach

24            the upper triple spacer as shown in Quick-Tilt
```

1        brochure page two that could work in conjunction

2        with the coil nest screw to inhibit rotation."

3  Q.  The question I asked was the -- not relating to

4        the screws but relating to the springs

5        themselves.  Do the forces of the springs oppose

6        each other in any way limiting the rotational

7        moment of the device?

8  A.  There is two of them to the right with different

9        lengths from the pivot of rotation.  There's one

10      exiting to the left with a different moment to

11      the pivot of the rotation.  So it would, correct,

12      it would somewhat limit the rotational force.

13  Q.  So the one that's to the right would to some

14      extent counteract the forces that are caused by

15      the springs going to the left or vice versa?

16  A.  Correct.  It would reduce or limit similar

17      forces.

18  Q.  Stated another way, if all the springs exited off

19      the same side of the coil, there would be a

20      greater rotational moment in the housing as a

21      whole compared to if the -- at least one of the

22      springs went the opposite direction; is that

23      correct?

24  A.  That is a correct statement.

```
1    Q.  Okay.  Did you measure the offset moment caused
2        by the different moment arms in the triple coil
3        Quick-Tilt design?
4    A.  No, I did not.
5    Q.  Okay.  Do you know what the value of that offset
6        moment is?
7    A.  No.
8    Q.  Is there anything in your report referring to the
9        numerical value of the offset moment of the
10        triple coil spring design in the Caldwell
11        Quick-Tilt product?
12   A.  No.
13   Q.  If you could flip that exhibit over, please.
14   A.  (Witness complies.)
15   Q.  Again, that's the balance that goes with Exhibit
16        4B of Still.  You see there are -- appear to be
17        two holes in the cover.  Do you see that?
18   A.  Correct.
19   Q.  What are those two holes for?
20   A.  For a fixing screw.
21   Q.  For a single fixing screw or two fixing screws?
22   A.  There's two fixing screws.
23   Q.  One goes through each hole, correct?
24   A.  That's correct.
```

```
 1   Q.   Okay.  Would those fixing screws tend to resist

 2        rotation of the housing when it's installed in a

 3        -- properly installed in a frame jamb channel?

 4   A.   They would assist in preventing rotation.

 5   Q.   Would they assist in preventing rotation or

 6        prevent rotation?

 7             MR. SINGER:  Objection.

 8   A.   The reason I said the word "assist," I did not

 9        see this device previously working in a channel

10        before today.  The device that I saw in

11        Amesbury's lawyer where I saw a balance in a

12        jamb, the spine was preventing rotation.

13   Q.   And this device --

14   A.   In this device since you cannot tell me what the

15        jamb spacing is as opposed to the spine width,

16        that's the reason I used the word "assist."

17   Q.   Okay.  You can see for yourself the jamb spacing

18        and the spine width if you insert it back into

19        the channel, couldn't you?

20   A.   Let's take a look.

21   Q.   Better to put it in the other end.

22   A.   Yeah.  Yeah.  Okay.

23             Oh, what do I do here?

24             Okay.  I would say they would be --
```

```
 1                    MR. STILL:  Push it in further.

 2    A.   Push it in further.  Sure.  No problem.

 3                    Okay.  I would say given what I see,

 4         they would be the primary resistance to --

 5    Q.   What would be the primary resistance?

 6    A.   Inserting two screws.

 7    Q.   In fact, they would prevent any rotation

 8         whatsoever, wouldn't they?

 9    A.   If I made -- under some conditions where the

10         channel width would match the spine width, then

11         they would be assisting.  In this particular

12         condition, let me see the width of the window.

13         The wings.

14                    In this particular condition, they

15         would be a primary cause for preventing rotation.

16    Q.   In that particular exhibit you have, Still

17         Exhibit 4B, when you say it would be primary, in

18         fact, it would prevent any movement whatsoever

19         regardless of the -- strike that.

20                    In Exhibit Still 4B, there are when

21         properly installed two screws through holes,

22         correct?

23    A.   Mm-hmm.

24    Q.   And the screws, whether they were loose or tight,
```

```
1         would act as pins holding the balance in the

2         particular orientation which it is currently

3         found in that exhibit, correct?

4              MR. SINGER:  Objection.

5    A.   The only reason for my proviso is, again, as I

6         mentioned earlier this morning, if there's

7         repeated use and there is no standard for the

8         torque to be applied to those screws, repeated

9         use of the balance in the window jamb might force

10        the loosening or eventually the falling out of a

11        screw and that will be the condition by which it

12        would not be the primary in that case.

13   Q.   Let's put aside the falling out for now and talk

14        about the loosening.

15   A.   Okay.

16   Q.   If a screw is loose in a hole such that it has

17        backed out somewhat from its tight position --

18   A.   Right.

19   Q.   -- does it still bang into the sides of the hole

20        if it's -- if the one part is moved with respect

21        to the other part?

22              MR. SINGER:  Objection.

23   A.   If a screw is loosened, it would still act like

24        the pin example that you used and would prevent
```

```
 1        rotation.  Other than the screw side, which I do

 2        not see the clearance between the screw body and

 3        the hole.  That would be the loosening -- that

 4        would be some rotational movement but in that

 5        fashion it would prevent rotation.

 6   Q.   In fact, it could only move to the extent that

 7        there is a gap between the screw and the screw

 8        hole, correct?

 9   A.   That's correct.

10   Q.   Did you measure the gap between the screw and the

11        screw hole in a properly installed Caldwell

12        balance?

13   A.   No.

14   Q.   Okay.  So in your report, which is Exhibit 1 of

15        this deposition, you talk about on page 14, item

16        C, "triple nest covering."  And in it you say,

17        "Repeated sash operations during the useful

18        lifetime of the windows might reduce the

19        integrity of the Caldwell fastening method due to

20        the constant pressure applied by the rotation of

21        the coil nest," et cetera.

22              Do you see that?

23   A.   Yes.

24   Q.   Okay.  If the screw were loose but not out of the
```

```
 1          hole, would it still pin the housing in place

 2          such that it was incapable of rotating?

 3                  MR. SINGER:  Objection.

 4    A.    So the assumption in this situation is that there

 5          are two screws.  They are loose or have backed

 6          out due to repeated operation and would they

 7          prevent rotation even if they backed out

 8          partially but not fully disconnected from the

 9          jamb.

10    Q.    Yes.

11    A.    Yes.  That would prevent rotation as long as they

12          are still attached to the jamb.

13    Q.    Okay.  And in that situation we've just

14          described, given the spacing that you see in

15          front of you between the spine and the flanges,

16          would the spine be capable of touching the

17          flanges even if the screws had backed out

18          partially?

19    A.    Okay.  Again, let me repeat that situation so I

20          have the correct answer to your theoretical

21          question.

22                  In this particular situation as I see

23          this jamb and this balance and these dimension of

24          jamb openings and spine width and the two fixing
```

```
1              screws and the condition that you just described

2              is a screw has backed up but not completely

3              detached, then this condition of the screws being

4              partially backed up but not fully detached would

5              prevent rotation as to the extent of the

6              clearance between the screw and the hole.

7      Q.   And not the spine?

8      A.   And not the spine until such time that the screw

9              would fall out.

10     Q.   So only until the screw falls out of that

11             configuration you see in front of you in Still

12             Exhibit 5, only when that occurs would there be

13             infringement in your opinion; is that correct?

14                    MR. SINGER:  Objection.

15     A.   You're talking about both screws or one screw or

16             --

17     Q.   Both -- let's -- yes.  Both screws.

18     A.   Both screws.  Sorry.  I lost it.

19     Q.   Do you want --

20     A.   Yeah.  I'm sorry.

21                    MR. SLIFKIN:  Can you read that

22             question back?

23                    (Question read.)

24                    MR. SINGER:  Same objection.
```

1    Q.  I think it's Still Exhibit --

2    A.  Exhibit 4B.  Okay.  If both screws fall out, then

3        I do not know what the outcome is.  If one screw

4        falls out, then it would pivot on the other

5        screw.  And again, not having all the dimensions

6        and all that, depending whether it's this screw

7        or that screw that falls out, which screw falls

8        out and where it will pivot on the rotation based

9        on which screw remains in the hole and which

10       screw has fallen out, that would be in

11       consideration of my answer.

12   Q.  So based on the information in your report and

13       the information you have today, can you conclude

14       one way or the other whether that exhibit would

15       be infringing if the screws were not present in

16       the holes?

17   A.  Both screws?

18   Q.  Yes.

19   A.  When both screws are out, then we go back to the

20       situation we discussed earlier today and

21       depending on the life use of the balance in the

22       channel and how the plastic parts would flex.

23   Q.  So we still have the situation where there are

24       other factors resisting rotation such as the dust

```
 1         cover, the wings, primarily?

 2    A.   Yes.  That's right.  We fall back to that

 3         situation.

 4    Q.   And that situation is still a situation in which

 5         you do not have enough information today to

 6         determine whether it does or does not infringe,

 7         correct?

 8    A.   That's correct.

 9    Q.   Okay.  We've looked at a number of sample

10         channels and balances, including Shina 5, Shina

11         7, Still 4A, Still 4B, Braid 9.  And we talked

12         about whether under certain conditions there is

13         or is not an infringement.  Would your opinion

14         change had these cutoff sections of channel

15         actually been full length and installed in an

16         operating window?

17    A.   Under these conditions and under these width and

18         these dimensions --

19    Q.   Yes.

20    A.   Sitting here, seeing these for the first time, I

21         cannot make a ready decision on that.  I have to

22         study it and think about it before I would do

23         that.

24    Q.   You have never actually seen a full length frame
```

1         jamb channel, have you?

2    A.   That's correct.

3    Q.   Okay.  And you have never seen a Caldwell balance

4         installed in a full length frame jamb channel,

5         have you?

6    A.   That's correct.

7    Q.   And there's nothing in your report about review

8         or analysis of full length frame jamb channels

9         with Caldwell balances in them, correct?

10   A.   Correct.

11   Q.   Okay.  So your opinion that you reached in your

12        report was based on a section of frame jamb

13        channel similar in length to the parts that we

14        have here on the table today, correct?

15   A.   That's correct.  I can't recall the exact length

16        but it's not a full length.

17   Q.   But the conclusion you reached in your report was

18        really not -- was not based on a materially

19        different length of channel that you see in Still

20        4A, for example?

21   A.   I don't -- I don't believe -- I don't think the

22        length of the channel is that different.  I can't

23        recall exactly what the length of the channel I

24        saw that the Amesbury lawyers presented me.  The

1        length, not the width.

2   Q.  I'm asking you whether your conclusions you're

3        reaching today would differ if I showed you a

4        much longer channel, for example, instead of a

5        short channel on the table.

6   A.  No.  Except these are different lengths.

7   Q.  They're different lengths, yes.

8              All right.  Mr. Shina, I'm going to put

9        in front of you another US patent.

10            MR. SLIFKIN:  Mark that, please.

11            THE WITNESS:  If I may just take a

12        moment and clean up the table.  It's just too

13        much stuff here.  Way too distracting.  Are you

14        going to use these samples again?  If you don't

15        mind, if you can put them aside.

16            MR. SLIFKIN:  Put them aside.

17            MR. SINGER:  Why don't you put the

18        exhibits aside?

19            (US Patent 5,157,808 marked Exhibit No.

20        9.)

21   Q.  Mr. Shina, I've placed in front of you Exhibit

22        No. 9.  Shina 9.

23   A.  Mm-hmm.

24   Q.  Ask you if you've looked at that before.

1    A.   Yes, I have.

2    Q.   What is that?

3    A.   That is a patent which I will refer to as number

4         '808 in my reports.

5    Q.   Is that a patent issued to Mr. Maurice Sterner,

6         Jr.?

7    A.   Apparently.

8    Q.   Okay.  And are you familiar with that patent?

9    A.   Yes.  I've studied that patent for one of my

10        reports.

11   Q.   I'm going to ask you to look at figure 2 and

12        compare it to figure 3.  Take a moment and do

13        that.

14   A.   Figure 2 and compare it to figure 3.  Okay.

15   Q.   Figure 2, what type of view is that in terms of

16        drafting drawing conventions, do you know?

17   A.   Well, because the -- this was a contention when I

18        was reading it because it was confusing.  You are

19        looking at a front view but it might be a side

20        view in the -- as you look forward to the window.

21        If I may, can I refer to where the patent refers

22        to figure 2?

23   Q.   Sure.

24   A.   Let's see.

```
 1                    "Figure 2 is an enlarged foreshortened

 2          side elevation view of the improved coil spring

 3          counterbalance hardware assemblies taken along

 4          the lines 2-2 of figure 1."

 5    Q.    So the draftsman who drew these has indicated in

 6          figure 1 the way we should think about figure 2;

 7          is that correct?

 8    A.    That's correct.

 9    Q.    Okay.  So can you now tell me in figure 2 with

10          reference to, say, an actual window what we're

11          looking at here to figure 2?

12    A.    We're looking at the side of the window.

13    Q.    So if I open the window and I put my head between

14          the window opening and I look at -- in the

15          direction of the wall, is that what we're looking

16          at?

17    A.    Yes.

18    Q.    Something has been cut away such that it's a

19          cross-section, correct?

20    A.    That's correct.

21    Q.    Okay.  Now, figure 3 is a different view.  Can

22          you tell me what that view is?

23    A.    If I may, again, this is confusing because if I

24          may refer to the patent description of figure 3,
```

```
 1          I think we'll be all on the same level of

 2          understanding.

 3                    "Figure 3 is a front elevation view of

 4          the coil spring subassembly component of the

 5          instant invention as seen along lines 3-3 of

 6          figure 2."

 7    Q.    So again, the draftsman has indicated in figure 2

 8          how we should consider figure 3 in some way,

 9          correct?

10    A.    That's correct.

11    Q.    Okay.  And by the convention here is that there's

12          a line on figure 2 with some arrows and some

13          numbers, and those give you some indication of

14          the viewpoint that you're looking at in figure 3;

15          is that correct?

16    A.    That's correct.

17    Q.    You are familiar with engineering drawings,

18          correct?

19    A.    That's correct.

20    Q.    Okay.  In fact, you worked with CAD systems in

21          one of your previous employers?

22    A.    That's correct.

23    Q.    So you have some understanding of what these

24          drawings are showing, correct?
```

```
 1   A.  Correct.

 2   Q.  The drawings may or may not be well done but you

 3       can at least gather some information from these

 4       drawings, correct?

 5   A.  Correct.

 6   Q.  Okay.  Referring to figure 3, on the left-most

 7       edge, there is a double line.  Do you see what

 8       I'm referring to?

 9   A.  Yes.

10   Q.  Okay.

11   A.  There's no arrow pointing to that.

12   Q.  No.  Do you see what I'm -- why don't we just

13       take a pen and draw a line to that?

14   A.  To that double line right here?

15   Q.  Yes.

16   A.  Is that what you want?

17   Q.  Yes.  And put a letter K this time.

18   A.  Okay.

19   Q.  Can you tell from figures 2 or 3 what that double

20       line is?

21   A.  From figure -- I'm sorry.  From figures 2 or 3?

22   Q.  Yes.

23   A.  What that double line is?

24   Q.  Yes.
```

```
1    A.   Well, that line appears to be the flanges or what
2         we refer to as the flange line of the channel.
3    Q.   We have looked at a number of channels and frame
4         jambs and I'm going to just put one in front of
5         you.  Shina 7.  And ask you what your -- in
6         reference to Shina 7, what you're referring to as
7         what the K is pointing to in your -- in the
8         drawing you just drew on.
9    A.   Referring to this line here.
10   Q.   Is it also possible that the item K in the
11        Sterner patent is referring to a different part
12        of that frame jamb?
13   A.   Not that I could tell right now.
14   Q.   In figure 2, can you tell whether this is a
15        single hung or double hung window?
16   A.   It's a double hung because I see two sets of --
17        balances.
18   Q.   In a double hung window, are the channels in the
19        same plane with one another or are they in
20        different planes from one another?
21   A.   I cannot make a general statement on that.
22   Q.   You can't tell?
23   A.   No.
24   Q.   Okay.  In the Exhibit 7 that's in front of you,
```

```
1            are the channels in the same plane with one

2            another or different planes?

3    A.     They're different planes.

4    Q.     Okay.  Now, if I can orient Shina 7 in a

5            direction similar to the direction you're looking

6            at figure 3 in the Shina 9 exhibit --

7    A.     Okay.

8    Q.     -- can you see that there are items that are

9            projecting both to the right and to the left of

10           the flanges in the actual Shina Exhibit 7?

11   A.     Can you point to them?

12   Q.     Sure.  For example --

13   A.     Use a pencil.

14   Q.     I'll use this.  Is further out to your right than

15           the flange?

16   A.     Correct.

17   Q.     And similarly, there's an item here which is

18           further out to the left of the flange?

19   A.     Correct.

20   Q.     Okay.  Is it possible that the double line K in

21           Shina 9 is representing some other item other

22           than the flanges that may be projecting further

23           to the right or further to the left of the

24           flanges?
```

```
 1    A.   Sitting here today, trying to answer your

 2         question, I cannot determine that.

 3    Q.   Are you able to tell the depth at which the line

 4         3-3 in figure 2 is drawn in terms of whether it

 5         is in front of or behind or in the middle of the

 6         flange through which it passes?

 7    A.   That's a long question.  I'm sorry.  If I could

 8         hear it again.

 9              (Question read.)

10              MR. SINGER:  Objection.

11    A.   I cannot tell at this point.

12    Q.   So you do not know whether item K, and you've

13         drawn on Shina 9, is the flange or some other

14         part of the flange that projects to one side of

15         the flange or the other?

16              MR. SINGER:  Objection.

17    A.   When I looked at it initially, I assumed it was

18         the flange.  If you want me to answer in 100

19         percent certainty, I would have to go back since

20         you raised that doubt in my head.  I have to go

21         back and study it further.  It's difficult for me

22         to make a decision right now under these

23         circumstances.

24    Q.   In your report you reached a conclusion that the
```

1        -- that item K that you've labeled there is in

2        fact the flange, did you not?

3   A.   That's correct.  I based that, if I may --

4   Q.   Sure.

5   A.   Based on the figure that I saw, which became

6        figure 12, which shows the -- device being

7        attached to the jamb wall.

8   Q.   Okay.

9   A.   And my assumption at the time I wrote the report,

10       my assumption but not with extreme certainty is

11       that is the jamb wall.  That's the jamb flanges.

12  Q.   Are you now questioning that assumption?

13  A.   No, I'm not.  I just need further time to make

14       sure now that you've raised that question in my

15       mind.  I'm accustomed to drawings with dimensions

16       on them and that would have settled that

17       immediately.

18  Q.   There are no dimensions on this drawing, correct?

19  A.   There are no dimensions on this drawing.

20  Q.   If I ask you today, can you tell me with 100

21       percent certainty that item K that you have drawn

22       in Exhibit 9 is the flange, you cannot answer

23       that with certainty, can you?

24  A.   The only thing I would have to do -- one of the

```
 1          things I would have to do is to read the patent
 2          one more time as I read it and I cannot recall
 3          and I would look at the verbiage in that patent
 4          to see if it's -- if it described the jamb in
 5          that manner.
 6     Q.   Okay.  Is it possible that item K that you have
 7          drawn in Exhibit 9 is in fact this part here
 8          that's extending beyond to your right of the
 9          channel as I have oriented Shina Exhibit 7?
10     A.   There's no mention of such feature in the -- in
11          the patent description.
12     Q.   Mr. Shina, I have now placed in front of you
13          Still Exhibit 4B, Braid Exhibit 9, Shina Exhibit
14          5, Shina Exhibit 7 and Still Exhibit 4A and ask
15          you whether in each of these jambs there is a
16          part that extends either to the right or to the
17          left of the flanges when those jambs are viewed.
18     A.   Could I orient in the same way so we can make a
19          one-to-one comparison?
20     Q.   Yes.  Please do.
21               MR. SINGER:  I'll object to the
22          question before you answer.
23     Q.   Can you answer the question now?
24     A.   I notice in Still Exhibit 4B that that feature
```

```
 1           that you refer to and you pointed to does not
 2           exist in Exhibit -- sorry.  In Exhibit Still 4B.
 3      Q.   And all of the other ones, is there a part that
 4           projects either to the right or the left of the
 5           flange as you have those oriented on the table in
 6           front of you?
 7      A.   There is a part that projects outward from the
 8           flange surface and the dimensions and the
 9           geometry of the associated parts with it differ
10           in every situation.
11      Q.   Right.  But in every situation, is there a part
12           that projects to the -- to your right of the
13           flange in Exhibits Braid 9, Shina 5, Shina 7 and
14           Still 4A?
15      A.   For the record, if I may, I'm noticing four out
16           of the five that were presented to me and the
17           four do have a projection to the right of the --
18           I'm sorry.  To the right of -- what you said.
19      Q.   To the right of the flanges?
20      A.   Of the flanges.  Okay.  Just want to make sure.
21      Q.   That is correct then?
22      A.   Yeah.
23      Q.   Okay.  Are those exhibits as they're sitting on
24           the table in front of you oriented the same way
```

1      figure 3 is in Exhibit 9, which is the Sterner

2      patent?

3   A. Okay.  Figure 9?  I'm sorry.

4   Q. Figure 3 of Exhibit 9.

5   A. Oh, okay.  Sorry.  Let's see.

6           It shows the -- figure 3 shows the

7      screw being screwed into the jamb wall and that

8      is to the right.  And in this particular case, if

9      I put a screw in the exhibits that you mentioned,

10     they would be going to the left.

11  Q. All right.  So let me flip them all over so

12     they're oriented now the same way as figure 3 in

13     Shina Exhibit 9.  Now in all of the four, putting

14     aside Still 4B, in Braid 9, Shina 5, Shina 7 and

15     Still 4A, is there a part that's projecting

16     beyond the flange to the left which is visible in

17     each of those frame jamb channels or frame jambs?

18  A. Yes.  There is a part.

19  Q. Is it possible that that part that's projecting

20     to the part in each of those four exhibits is the

21     same part you labeled K in figure 3?

22  A. Part of my answer would be in -- there's no

23     standard drawing procedures to draw an edge.  I

24     notice in figure 3 the line that I marked K is a

double line. There is no standard drawing procedures to the meaning of a double line. Usually if it's a feature that is a single feature, which ends in a single edge, that is usually drawn as a single line.

In a feature that has in it such as the feature where the double flanges come in where they have two parts terminating at the same point, there is no standardized procedures but it's common in engineering drawings to have a double line when you are trying to convey to the reader the fact that there are two features which end at the same point.

Q. You don't know whether the draftsman of these patent drawings followed that convention or not, do you?

A. I do not know that.

Q. So you cannot conclude with certainty that the item K you have drawn in Exhibit 9 is the flange or is some feature other than the flange?

MR. SINGER: Objection.

A. Conventional wisdom would say that the double line would indicate it's the flange. However, since the absence of a standard I cannot say with

```
1         extreme certainty, with 100 percent certainty

2         whether this is -- conventional wisdom would tell

3         me that that's a flange.

4               Since you raised that point, I have to

5         do further study to determine whether it's the

6         flange or the feature that I see right in front

7         of me to the left of the flange.

8    Q.   I'm going to place in front of you what's been

9         previously marked as Still Exhibit 5.  And other

10        than the plane in which this horizontal surface

11        is found, can you determine whether the device in

12        Still Exhibit 5 is the device drawn in Shina

13        Exhibit 9?

14   A.   Okay.  May I take the device out?

15   Q.   Yes.

16   A.   Thank you.

17             Whoops.  Okay.

18             MR. SINGER:  I'll object to the

19        question.

20   A.   Having seen it for the first time, I would say

21        that it bears a good resemblance to -- that the

22        device I'm looking at in my hand bears a good

23        resemblance to the device shown in Shina Exhibit

24        9.
```

```
 1    Q.  You have quite a bit of experience throughout

 2        your employment history in dealing with

 3        mechanical drawings, do you not?

 4    A.  That's correct.

 5    Q.  So when you see a prospective view such as figure

 6        12 in Shina Exhibit 9, you have a fairly good

 7        understanding of what is being drawn there, do

 8        you not?

 9    A.  That's correct.

10    Q.  Okay.  Is there anything in figure 12 of Shina 9

11        that you don't believe you understand?

12    A.  Well, there's conceptually the two devices -- the

13        device that -- is there a name for this?

14    Q.  You're getting ahead of the questions.

15    A.  Sure.

16    Q.  I'm asking you now specifically with reference to

17        figure 12.

18    A.  Yes.

19    Q.  And which is in Shina 9 and asking you if you

20        understand the drawing.

21    A.  I understand the drawing.

22    Q.  You can in your mind imagine how the parts fit

23        together when fully assembled, correct?

24    A.  That's correct.
```

1  Q.  Figure 12 is what we might call an exploded view

2      of the device; is that right?

3  A.  That's correct.

4  Q.  Okay.  Meaning the parts are separated but in

5      construction it would be put together; is that

6      right?

7  A.  That's correct.

8  Q.  In fact, the drawing shows you with the dotted

9      lines how they're to be assembled; isn't that

10     correct?

11 A.  Drawing figure --

12 Q.  12.

13 A.  -- 12?  I'm sorry.  I was looking at figure 9.  I

14     apologize.  Okay.

15         There is no dotted line on figure 12.

16 Q.  The line, for example, that is near the screw --

17 A.  Oh.

18 Q.  -- is a diagonal line projecting from the end of

19     the screw back through the coil and then into a

20     socket, shall we say, for the screw.  Do you see

21     that line?

22 A.  There's only one dotted line that I can see.

23 Q.  Okay.  And you understand that to mean that when

24     assembled those parts fit together in a certain

1      way, right?

2   A.  That's correct.

3   Q.  And the drawing is prospective so that it's

4      fairly easy to see all the components; is that

5      correct?

6   A.  Correct.

7   Q.  Are there any components in figure 12 you don't

8      understand?

9   A.  Well, the attachment of the spring to the -- I

10     guess what we would call -- let me make sure

11     here.

12         The carrier is -- in the device that

13     I'm holding in my hand is with a screw.  And in

14     figure 12, the attachment of the spring to the

15     carrier is through a notch and a slot in the --

16     in the figure 12.

17   Q.  Other than that, are there any material

18     differences between the item in your hand, which

19     is part of Still 5, and the drawing in figure 12

20     in Shina 9?  Are there any other material

21     differences?

22   A.  There's a couple but I don't see a screw 36 on 12

23     here.

24   Q.  Can you see where the screw would go in the item

```
 1          in your hand, which is the actual balance?

 2    A.    Yes, I would.

 3    Q.    Would it go in the same place that's depicted in

 4          figure 12 in Shina Exhibit 9?

 5    A.    Correct.

 6    Q.    Other than the screw and the way the spring is

 7          attached to the carrier, are there any material

 8          differences between what's shown in the drawing

 9          and --

10    A.    I see two others.

11    Q.    Yeah.

12    A.    One is a pivot pin with screws, which I do not --

13          which attaches itself to the device, which is not

14          in the device I hold.

15    Q.    Is the pin -- is there a place in the device that

16          you hold that would accept that pin?

17    A.    Yes.

18    Q.    Does it appear that a pin of configuration

19          similar to what's shown in figure 12 would fit

20          into the receptacle for a pin in the actual

21          device in your hand?

22    A.    Yes.

23    Q.    Okay.  So the pin may be missing but it looks to

24          be that the device you have in your hand would
```

```
 1        accept a pin similar to what's shown in the

 2        drawing, correct?

 3   A.   Correct.

 4   Q.   Any other differences you see?

 5   A.   Well, figure 12 shows an exploded view of two

 6        plastic parts that go around the coil.  And here

 7        it looks like it's an assembly.  I would rather

 8        not take it apart if you don't want me to.

 9   Q.   I rather you not take it apart.

10   A.   Okay.

11   Q.   All right.

12   A.   But I'm assuming that this is an assembly of the

13        two parts --

14   Q.   Okay.

15   A.   -- in figure 12.

16   Q.   Can you now slide that assembly back into the

17        channel which you took it out of?

18   A.   Okay.  Any particular -- no.

19             Okay.

20   Q.   Now you have it assembled, balance and channel,

21        the way I originally handed it to you as Exhibit

22        Still 5, right?

23   A.   Okay.  Correct.

24   Q.   Is it possible that what you have in front of you
```

1       as Still Exhibit 5 is the device that's shown in

2       the Sterner patent, which is Shina Exhibit 9?

3              MR. SINGER:  Objection.

4   A.  Except for the -- discussed items of differences

5       between what I see as Still 5 and my figure 12, I

6       would agree.

7   Q.  Now I would ask you to examine the front face of

8       the balance that is between the flanges.  Do you

9       see that?

10            Do you see what I'm talking about?

11  A.  The one that says "down"?  Is that correct?

12  Q.  Yes.  The one with the word "down" on it.  Do you

13      see that?

14  A.  Yes, I do see that.

15  Q.  Okay.  Is that front face with the word "down" on

16      it between and in the same plane as the flanges

17      of that frame jamb?

18  A.  Between and in the same plane, yes.

19  Q.  Is it possible that now that you go back and look

20      at figure 3 of the Sterner patent that what's

21      depicted in Sterner patent figure 3 is in fact

22      Still Exhibit 5 in all material respects?

23             MR. SINGER:  Objection.

24  A.  Okay.  May I put it in here since the contentious

1          line we're talking about is this feature so let

2          me put it where we would think it would be?

3    Q.   Go ahead.  Go right ahead.

4    A.   Okay.

5              Okay.  Now we can repeat the question.

6              (Question read.)

7              MR. SINGER:  Objection.

8    A.   Again, I go back to my comment earlier about the

9          double line, and the double line usually refers

10         to a two feature that coincides as opposed to a

11         single feature.

12   Q.   Is there somewhere where that double line

13         convention is documented in your report?

14   A.   No.

15   Q.   Is there some reference that you would look to to

16         see if that double line convention is truly a

17         convention in the mechanical drawing field?

18   A.   I would have to do some research on that.

19         Looking at drawing books and such but that's a

20         common convention in the industry.

21   Q.   Have you looked at drawing books in connection

22         with the preparation of your reports?

23   A.   No.

24   Q.   The surface that we refer to in the physical

1     exhibits you have there, Still 5, is it between

2     and in the same plane as the flanges?

3  A.  This is the surface that you called "down."

4  Q.  Yes.

5  A.  Yes.  It is in the same plane.  That surface is

6     in the same plane as the flanges.

7  Q.  Is that surface raised from the remainder of the

8     housing that's holding the coil?  In fact, is it

9     above the -- a portion of the housing that's

10    holding the coil?

11          MR. SINGER:  Objection.

12  A.  That surface -- "above" is a term.  An

13     operational term in this case.  I'm going back to

14     figure 12.  So that surface in the operational

15     sense, the way the device sits in there, the

16     surface marked "down" is above the flat surface,

17     which is at the bottom operationally of the

18     device.

19  Q.  So operationally it's a raised surface from

20     another section of the housing, correct?

21          MR. SINGER:  Objection.

22  A.  "Raised" is a relative term.  So it's a surface

23     that dimensionally sits above the other surface,

24     that's correct.

```
 1   Q.  All right.  Is it longer than it is wide?

 2   A.  Yes, it is.

 3   Q.  Okay.  Is it rectangular in shape generally?

 4   A.  Generally.

 5   Q.  With a curved top, curved bottom?

 6   A.  Correct.

 7   Q.  Okay.  Other than its length, does it have the

 8       same general configuration as the spine that is

 9       in Shina Exhibit 8?

10   A.  Okay.  Just so I can be perfectly precise so we

11       don't have a misunderstanding, the spine in

12       figure -- I'm sorry.  The spine in --

13   Q.  8?

14   A.  In Exhibit 8 is a feature of a surface which has

15       wings and a spine.  The balance that we have the

16       surface called "down" does not have wings.

17   Q.  But looking only at the surface that has the word

18       "down" on it and looking only at the surface --

19       only at the surface we call the spine, do they

20       have the same general shape?

21   A.  If I talk about geometry, they both are generally

22       rectangular.

23   Q.  Elongated rectangular shape?

24   A.  That's looking at one direction only, yes.  One
```

```
1        plane only.

2    Q.  In fact, their width is fairly close to one

3        another, correct?

4    A.  I have to examine that, if I may.

5                    No.  I believe one is wider than the

6        other.

7    Q.  Which one is wider?

8    A.  Figure 12.  The "down" surface.

9    Q.  The surface on the Shina Exhibit -- I'm sorry.

10       The surface on Still Exhibit 5 --

11   A.  Yeah.

12   Q.  -- is wider?

13   A.  Wider.

14   Q.  In other words, when placed in a frame jamb

15       between the flanges, it would be closer to the

16       flanges than Shina Exhibit 8 would be when placed

17       in the same frame jamb, correct?

18   A.  Depends on the width of the frame jamb.

19   Q.  I'm saying putting them both in the same frame

20       jamb.

21   A.  In the same frame jamb, which at least is wider

22       than --

23   Q.  Yes.

24   A.  The wider one of them.
```

1    Q.   Yes.

2    A.   What's the question?

3    Q.   Would the sides of the surface that have the word

4         "down" written on them be closer to the flanges

5         than with the sides of the spine in the Caldwell

6         balance?

7    A.   When placed in the same --

8    Q.   Yes.

9    A.   Theoretically, yes.  That would be true.

10   Q.   Okay.  I would like you to place that back inside

11        --

12   A.   You can do that.

13   Q.   Okay.  I'll do that.  Still Exhibit 5.  And ask

14        you if the flat surface that's between and in the

15        same plane as the flanges would inhibit the

16        rotation of that surface.

17   A.   Again, I would like to say the proviso that we're

18        describing the surface "down" and not the word

19        "spine" or "projection."  As I see this surface

20        "down," marked "down," it would seem to prohibit

21        rotation of the device.

22   Q.   Because it fits snugly within the -- between the

23        flanges, correct?

24   A.   That's correct.

```
 1                    (Off the record.)

 2                    (Recess.)

 3    Q.   Mr. Shina, back on the record.  Turn your

 4         attention to another Caldwell brochure.

 5                    (Caldwell Series 86xt brochure marked

 6         Exhibit No. 10.)

 7    Q.   10.  I place in front of you what's Shina Exhibit

 8         10.  I ask you if you've seen a document similar

 9         to that in preparation for your expert reports.

10    A.   Yes.

11    Q.   Okay.  Is there a balance depicted in that

12         exhibit?

13    A.   Yes.

14    Q.   Can you tell me what balance is depicted in that

15         exhibit?

16    A.   Series 86xt Block & Tackle system.

17    Q.   I would like to again try to agree on some

18         terminology so I'll ask you to draw some lines to

19         and letters designating various parts.

20    A.   Sure.  I might ask you to refer to my -- if

21         you're going to ask me the names, I want to be

22         consistent with my report so whatever you want to

23         do.

24    Q.   Is there an item on page two of that brochure
```

```
 1          that you would call a top guide?

 2    A.    Yes.

 3    Q.    Can you draw a line to the top guide and put a

 4          letter L next to it?

 5    A.    Okay.

 6    Q.    Is there a channel in that drawing?

 7    A.    Yes.

 8    Q.    Can you draw a line to the channel and put M?

 9    A.    U-shaped channel.

10    Q.    Okay.  Is there an item that you would call a

11          bottom guide?

12    A.    Yes.

13    Q.    Can you draw a line to that and put an N next to

14          it?

15    A.    Yes.

16    Q.    Is there an item that you would call a bottom

17          guide roller shown in those drawings on the

18          second page of Exhibit 10?

19    A.    It's not very clear.  But that would be where --

20          did you ask me to --

21    Q.    Yes, please.

22    A.    -- to put a number on it?

23    Q.    Put the letter O.

24    A.    Oh, okay.
```

```
1    Q.   And you're indicating between the two brown parts

2         in the drawing there, the edge of that roller; is

3         that correct?

4    A.   That's correct.

5    Q.   What's the purpose of putting that roller in the

6         bottom guide?  Do you know?

7              MR. SINGER:  Objection.

8    A.   I'll have to refer to my notes just to make sure

9         that I'm consistent with what I said before.  I

10        think the best one of my notes is my second

11        report, which we have not put into an exhibit

12        yet.

13   Q.   I believe that's marked --

14             MR. SINGER:  Yeah.  Shina 2.

15   A.   Did you?  No.  I -- this is my copy.

16   Q.   Shina 2.

17   A.   Shina 2.  I'm sorry.  I apologize.

18             I refer to the function of the bottom

19        guide roller in it so just give me one second to

20        look at it.

21             If it takes me too long, I'll have to

22        say it without looking but give me one second.

23             I was looking in the wrong place.

24             I'm having trouble finding it.
```

```
 1    Q.   Do you know without reference to your report?

 2    A.   Well, just give me one more second.  If I give

 3         up, I'll tell you.

 4              I can't find it but I said in my report

 5         words to the effect that it reverses direction

 6         for the cord to allow the hook to be hooked to

 7         the jamb side.

 8    Q.   If you wanted to simply reverse the direction,

 9         couldn't you just wind the cord the opposite

10         direction through the other pulleys?

11    A.   It's being used to hook against the jamb so the

12         cord has to be pointed up so it has to go around

13         some mechanism that goes from up and down in the

14         Block & Tackle towards -- going up towards the

15         jamb.

16    Q.   If the cord exited from the pulley assembly

17         immediately above that bottom roller and exited

18         in the same direction that the cord was facing in

19         the second page of Exhibit 10, would it not be

20         projecting in the correct direction?

21    A.   If the cord exited from one of the bottom

22         pulleys, one of the two bottom pulleys already

23         you threaded, then it might -- you might not get

24         the full -- the full Block & Tackle action that
```

1          you would look for.

2    Q.    What do you mean by that?

3    A.    The arrangement of the Block & Tackle converts

4          the motion of the hook end to motion against the

5          spring and any changes in that might change the

6          characteristics or the properties of the spring

7          or of the Block & Tackle device.

8    Q.    Can you point to the -- what I would call the

9          lower pulleys?  Do you see those that are

10         immediately adjacent, the pulley (O) that you

11         have already labeled?  Do you see there's two of

12         them?

13   A.    Yes.

14   Q.    Label them P, please.

15   A.    Okay.

16   Q.    In the assembled Caldwell series xt balance, do

17         those pulleys (P) move or are they fixed with

18         respect to the bottom guide (N)?

19   A.    They are -- well, it would be easy if I see the

20         device but they are fixed and the top pulley

21         moves with the spring.

22   Q.    Okay.  So they rotate but they don't move further

23         away or closer to the bottom guide (N) when this

24         balance is operating, right?

```
 1    A.   That's correct.

 2    Q.   Okay.  So if the cord were to wrap around the --

 3         one of the two pulleys (P) and exit in the same

 4         direction as it was exiting the drawing, would

 5         that be an operational or a not operational

 6         balance?

 7    A.   I think for my clarity I would like to see a

 8         sample of that so we could discuss what we're

 9         talking about other than a hypothetical --

10    Q.   Well --

11    A.   -- situation.

12    Q.   Is there something about that drawing that you

13         don't understand?

14    A.   No.  But it's easier to point to things around.

15    Q.   Let's for now look at the drawing.  We'll get to

16         --

17    A.   I would like to do it and if you feel that that

18         would not help, that's fine.

19    Q.   We'll get to the samples in a minute.

20    A.   So what's the question?

21    Q.   If the cord instead of wrapping around the bottom

22         pulley (O) instead ended at the pulley (P) and

23         exited in the same direction as is shown in

24         figure or the drawings on page two of Exhibit 10,
```

1       would it be an operational balance?

2             MR. SINGER:  Objection.

3  A.  Both pulleys (P) have a cord already in them.

4  Q.  Right.  If you instead of winding the cord the

5       way it's wound in the drawing, if you wound it in

6       a way such that the cord terminated at its free

7       end at pulley (P) and then projected out from the

8       balance and the same orientation as shown in the

9       second page of Exhibit 10, would it be an

10      operational balance?

11  A.  I would really like to see the unit so I can give

12      you a better answer.

13  Q.  You can't answer the question as posed?

14  A.  I would be in a much better position to answer

15      that question correctly if I see a physical unit.

16  Q.  Are you unable to answer the question as I posed

17      it?

18  A.  No.  I'm able to but I want to be absolutely

19      correct.

20  Q.  Why don't you answer it now and then you can get

21      to the unit and see if your answer changes?

22  A.  All right.

23  Q.  So the question --

24  A.  Repeat the question then.

```
1    Q.  If you wound the cord in such a way that its free

2        end was wrapped around one of the two bottom

3        pulleys (P) and exited in the direction that is

4        shown in the second page of Exhibit 10, would it

5        be an operational balance?

6    A.  Well, then you have to describe to me how you

7        would wind it differently since both pulleys have

8        cords on them already.

9    Q.  Could you simply wrap the cord in the opposite

10       direction?

11   A.  Wrap the cord in the opposite direction?  There's

12       two pulleys (P) with cords already in them.

13       Where would you put those cords?

14   Q.  If you took it off and rewound it such that it

15       met the conditions that I described, would it

16       work?

17   A.  The conditions that there would be two cords on

18       the same pulley?

19   Q.  No.  If you take the cord off entirely and

20       restrung it.

21   A.  Restrung it so that --

22   Q.  So that it ends at pulley (P) and then exits in

23       the direction that is shown already in the

24       drawing.  In other words, it wraps around the
```

```
 1          back of pulley (P) and projects on the front side

 2          and upwards as is shown, would it be an

 3          operational balance?

 4    A.    So there would be one less loop in the Block &

 5          Tackle as you've threaded it.

 6    Q.    If you think that's the way it would work.

 7    A.    That's the way it would work.

 8    Q.    So would it be an operational balance?

 9    A.    There is a table on the third page here that

10          talks about the -- the channel length that's

11          supported.  You might have to not be able to meet

12          that table.  You might not -- the design as you

13          describe it might not meet this specification

14          that they advertised here.

15    Q.    What if you anchored the other end of the cord?

16          Instead of anchoring it to the top pulley block,

17          you anchor it to the bottom pulley block and

18          begin your winding that way?  Would it then be an

19          operational balance?

20    A.    I cannot answer that since there is

21          specifications that are given here.  And I cannot

22          tell operationally the way you described it

23          whether it will meet the specifications or not

24          without some study on my part.
```

```
 1    Q.   If the bottom roller is placed higher up in the
 2         channel than it appears in the second page of
 3         Exhibit 10, how would that affect the operation
 4         of the balance?
 5              MR. SINGER:  Objection.
 6    A.   If I look on the third page, and there is the
 7         balance travel where the hook comes in, that
 8         would affect that dimension.
 9    Q.   So in terms of placement of the bottom roller,
10         its placement affects the travel of the balance?
11         Is that what you're saying?
12    A.   That's -- that's one of the issues that I
13         mentioned, yes.
14    Q.   Okay.  The higher up the channel that the bottom
15         roller is placed, is that a shorter or longer
16         length of travel of the balance?
17    A.   The balance -- the higher up the bottom roller,
18         the shorter the balance travel will be.
19    Q.   Why would someone want to have a longer travel,
20         do you know?
21    A.   From the material that I read, it has to do with
22         egress and there are specifications where you
23         would require egress to be longer.  That's one of
24         the -- one of the situations or one of the desire
```

```
 1           -- design -- design functions that I looked at.

 2    Q.   Can you explain what that means?  "For egress

 3           purposes."

 4    A.   Well, there is standards that apply, from what I

 5           have seen, standards that apply to egress.  And

 6           also standards that apply in this particular case

 7           where there is expanded egress that you could

 8           reduce your inventory as I saw.

 9    Q.   So with the same inventory of balances, you can

10           get a longer travel.  Is that the point you're

11           making?

12    A.   You could get longer travel and you could stock

13           -- with that balance, you could stock a smaller

14           number of inventory.

15    Q.   Why is egress a concern?

16    A.   According to what I saw, that's a desired

17           situation of design.

18    Q.   What's the concept referring to?  Egress.

19    A.   Egress is the amount of allowable space inside a

20           window.

21    Q.   The opening size?

22    A.   Opening size.

23    Q.   Is there some advantage to a bigger opening?

24    A.   It has to do with fire codes as I recollect.
```

```
1    Q.   Can you explain what it has to do with fire

2         codes?

3    A.   I was not concerned about that.  My own expertise

4         is in design.  How design meets requirements.

5    Q.   Okay.  So you don't really have an interest in

6         determining whether a balance meets or doesn't

7         meet fire code when installed in a window?

8              MR. SINGER:  Objection.

9    A.   My interest is in seeing how -- two situations.

10        One, a patent is given and infringement is shown.

11        Other situation, whether the window is used in a

12        ship or a building or a basement, that's not my

13        concern.

14   Q.   If you were a window balance designer for a

15        window balance company, would you be concerned

16        about egress?

17             MR. SINGER:  Objection.

18   A.   You asked me questions specific to fenestration

19        design.  My expertise is in patent infringement

20        and design consideration.  The way -- that's it.

21   Q.   Is egress a design consideration?

22   A.   From reading the -- from reading the evidence in

23        the case or the documents in the case, it seems

24        to be one of the design considerations.
```

```
1    Q.   Okay.  Would the need for egress requirements

2         motivate somebody to make changes to a balance in

3         the industry?

4    A.   It seems that this would be a design requirement

5         -- not a design requirement but a design -- what

6         I would call high want.  Meaning you can have --

7         when you're designing something, you can have

8         musts.  You must meet certain criteria.  And

9         there's wants.  You want to meet other criteria

10        to the best of your ability as a designer.

11   Q.   Okay.  So the balance designers would have a high

12        want, in your terms, of increasing the opening

13        size of a window?

14   A.   Correct.

15   Q.   So there's a need to increase the opening size;

16        is that correct?

17   A.   Correct.

18   Q.   And in terms of the window industry, do you know

19        how that need would get expressed to the window

20        balance designer?

21             MR. SINGER:  Objection.

22   A.   In my examining of the depositions of the

23        principals from the Caldwell company, it seems to

24        me the management of the engineering department
```

```
 1          and the functions that the engineers take and

 2          activities is very similar to any mechanical

 3          engineering designs.  That is, requirements are

 4          transmitted to the engineers and then the

 5          engineers design.

 6     Q.   Do you know if customers for window balances at

 7          one time in the history of window balances design

 8          felt a need to increase egress from what you've

 9          examined in your materials?

10     A.   From what I examined in the materials, the

11          situation in the window balance industry is

12          similar to any other mechanical engineering

13          industry that I worked with.  And that is some of

14          the requirements are internal and some of the

15          requirements are driven by customers.

16     Q.   Is the egress, increased egress requirement

17          driven by internally or driven by the customer?

18               MR. SINGER:  Objection.

19     A.   To the best of my recollection, there was some

20          discussions that were driven by customers.

21     Q.   So to put it in less scientific terms, customers

22          needed more egress from their balances; is that

23          correct?  At some point in the history of the

24          balances.
```

```
 1   A.   I don't know if I would agree with the word

 2        "needed."  They might have expressed a desire to

 3        high want in the design to have more egress.

 4   Q.   Okay.  And what is the solution to the problem of

 5        wanting more egress from a given balance?

 6             MR. SINGER:  Objection.

 7   A.   Depends on the engineers and what they decide to

 8        do.

 9   Q.   Is there one solution that you learned about in

10        this case that solved the egress or satisfied the

11        egress want?

12   A.   It's not a satisfying for want.  It's do the best

13        you can with the want historically.  The patent

14        description of '264 -- and I can read you from

15        here -- alludes to this.

16   Q.   Okay.  So there was a high wants in the industry

17        to increase travel for a given balance size.  The

18        solution or one solution was to put the bottom

19        roller in the bottom guide; is that correct?

20             MR. SINGER:  Objection.

21   A.   I am not privy other than the material I read as

22        to the history of the development if that's what

23        you refer to, to patent '264.  I can only comment

24        on what patent '264 contains.
```

```
 1    Q.   Other than reference to materials in the case,

 2         are you aware of any solution to the problem of

 3         increasing egress for a given balance channel

 4         length?

 5    A.   I have only reviewed the cases that I described

 6         to you in my report.

 7    Q.   Okay.  So if you're aware of a need to increase

 8         egress and a solution for that, it came from the

 9         documents you reviewed in preparation for your

10         report; correct?

11    A.   Correct.

12    Q.   Okay.  And what did you learn from your review of

13         those documents as one solution to the egress

14         issue?

15    A.   If I may read to you patent '264 and what it

16         described as its principal -- objective.  If I

17         may in my report.

18    Q.   Yes, please.

19    A.   So I'll go to my Exhibit 1.

20              Let's see.  I do have that summary of

21         each patent somewhere.  Or I could ask you to --

22         if I could get the patent from my package.

23         Whichever is easier for you.

24              Excellent.
```

1    Q.  Let me mark the patent for your benefit.

2              (US Patent 6,598,264 B2 marked Exhibit

3        No. 11.)

4              MR. SLIFKIN:  We're going to go off the

5        record.

6              (Off the record.)

7    Q.  I place before the witness Exhibit 11, I believe.

8    A.  Mm-hmm.

9    Q.  Which is a Newman patent, 6,598,264.  Have you

10       seen that document before?

11   A.  Yes, I have.

12   Q.  We've been discussing the need or want in the

13       industry for increased balance travel.  And it's

14       your belief that the solution to that problem is

15       described in the '264 patent; is that right?

16   A.  That's correct.

17   Q.  Can you find that for me, please?

18   A.  Mm-hmm.

19             MR. SINGER:  Do you have a copy of the

20       exhibit, Counsel?

21             MR. SLIFKIN:  I'm sorry.

22             MR. SINGER:  Thanks.

23   A.  If I may refer to column one, line 27.

24             "A disadvantage of this type of device

```
 1              is that travel distance of the window sash is

 2              limited by some of the pulleys located within the

 3              rigid channel interfering with jamb mounting hook

 4              that attaches the window balance to a window

 5              jamb."

 6                        That's in the background information.

 7     Q.   Okay.  To extend the travel to overcome the

 8          disadvantage, is one solution to put the pulley

 9          outside of the channel and into a piece that's

10          below the channel?

11     A.   Without getting very specific, if a design

12          engineer is given a job to increase the egress,

13          there might be many different ways of doing it.

14          Patent '264 happens to be one way of doing it,

15          which was patented.

16     Q.   Yes.  And that one way is to put the pulley out

17          of the channel and into the -- a part that's

18          below the channel; is that correct?

19                        MR. SINGER:  Objection.

20     A.   We will have to read the claim to give you the

21          correct answer.  Claim one.

22     Q.   Before we do that, go to figure 4A of the '264

23          patent, please.

24     A.   Figure 4A?
```

1   Q.  Yes.

2   A.  Okay.

3   Q.  Do you see the bottom roller?

4   A.  That's correct.

5   Q.  Okay.  Is the bottom roller in the channel or in

6       the bottom guide beneath the channel?

7   A.  Looks like it's in the bottom guide beneath the

8       channel.

9   Q.  If the bottom roller were in the channel in this

10      design, all other parts being of equal length,

11      would that balance have less or more travel than

12      the one shown in figure 4A?

13              MR. SINGER:  Objection.

14  A.  Again, I would have to -- I cannot make a general

15      statement without seeing a specific design and

16      then I can tell you what the design would look

17      like.

18  Q.  You can't tell me that if I move that bottom

19      roller up an inch, can you tell me whether the

20      balance would have the same travel as the one

21      shown in 4A or a different travel?

22  A.  If you move it up an inch without referencing

23      whether it's going to be in the channel or the

24      bottom guide, if you just said to me, I'll move

```
 1        it up an inch, would that be less, and I would

 2        agree, yes.

 3   Q.   You would agree?

 4   A.   Yes.  But not -- not -- with a -- without any

 5        prior knowledge to how the roller is attached.

 6        Just moving it up one inch.

 7   Q.   It would have an inch less travel?

 8   A.   It would have an inch less travel, that's

 9        correct.

10   Q.   If your roller is in the channel and you want to

11        get more travel out of the balance, doesn't it

12        necessarily follow that if you drop the roller

13        down an inch below the channel you get an inch

14        longer travel?

15             MR. SINGER:  Objection.

16   A.   Again, we have several assemblies here and I

17        don't want to be not precise in answering your

18        question.  I could answer the question by saying

19        if the bottom roller moved down, there will be

20        more travel.

21   Q.   Okay.

22   A.   Without any reference to any physical features.

23   Q.   I'm asking you to look at this figure 4A and

24        compare it to a balance which would have a
```

```
 1            similar construction but would have the roller in

 2            the channel approximately an inch above its

 3            present location.

 4    A.      Well, again, I cannot say inch -- roller in the

 5            channel with all the other pieces around so I

 6            don't want to be less precise than you want me to

 7            be.  All I would say is no matter what the

 8            attachment is, if that roller moved up, then

 9            there would be less travel.

10    Q.      And if it moved down, more travel?

11    A.      That's correct.  That's the only thing I could

12            say.

13    Q.      So if you're trying to solve the egress issue,

14            all things being equal, a lower roller is better

15            than a higher roller, correct?

16    A.      A lower is a relative term.  A lower position

17            roller would be better, yes.

18    Q.      Would be better.  All right.  So if a customer

19            comes to a window balance designer and says, I

20            got a problem.  I've got to get more opening out

21            of my window.  Can you help me?  One solution is

22            to move the roller lower; is that correct?

23    A.      Position-wise if we assume the roller is

24            positioned in air, then that would be the
```

```
1         solution.

2    Q.   Positioned in?

3    A.   In air.  Meaning I'm not saying where the roller

4         is positioned.  Whether it's positioned in the

5         guide or the channel.  I don't want to get into

6         that.

7    Q.   Okay.  Okay.

8    A.   Just positioned in air, meaning there's no

9         reference point.

10   Q.   Okay.  But if you can get the roller lower in the

11        balance -- when I say "lower," I'm talking about

12        a balance oriented as one in figure 4A.  If you

13        can get the roller lower, you can get more travel

14        out of the balance, right?

15   A.   Correct.

16   Q.   Okay.  And what's the purpose of the bottom guide

17        that's shown in figure 4A?  It's designated by

18        the number 315.  Do you know?

19   A.   I'll have to read the -- to be exact, I have to

20        read the writing and look for it.

21             Okay.  I refer to the patents '264.

22        Column one.  Line 50.  Line 49.  Sorry.  "The

23        cord is threaded around both the translatable and

24        fixed pulley block unit and extends around the
```

```
 1          bottom guide roller located within the bottom

 2          guide."

 3    Q.    Okay.  What's the purpose of the bottom guide?

 4    A.    That's one of the purposes.

 5    Q.    What is that purpose?

 6    A.    To provide for -- to provide for -- for a

 7          geometry for the bottom -- around the bottom

 8          guide roller.

 9    Q.    Are there any other purposes of the bottom guide

10          that you know of?

11    A.    There might be.  I just want to make absolutely

12          sure so I'll read from the patent.

13    Q.    Okay.

14    A.    If I look at column one, page 61 --

15    Q.    Line 60, 61?

16    A.    Column one, line 61.  "In still yet another

17          embodiment, the bottom guide of the device

18          further includes to -- a channel to receive a

19          portion of a window sash."

20    Q.    Okay.  So there is a place to receive the window

21          sash in the bottom guide.  Is that accurate?

22    A.    Yes.  In another embodiment.

23    Q.    Any other purposes of the bottom guide you're

24          aware of?
```

```
 1    A.   Let's see.

 2              In column one, line 54.  I'm sorry.

 3         Strike that.

 4              Okay.  Line 54.  The bottom portion --

 5         no.  That's not it.  Sorry.

 6              I can't see any, given the time that I

 7         have -- I would gladly give you more information

 8         if I had more time.

 9    Q.   Is there anything that you have read in

10         preparation for rendering your reports that you

11         can recall as a purpose for the bottom guide

12         other than the two purposes you've just

13         described?

14    A.   The two that I described that it envelopes the

15         bottom guide roller and the other one where it

16         -- the bottom guide includes the channel to

17         receive a portion of the window sash.  I cannot

18         offhand recall another one that I can see here in

19         this summary of the invention in this short time.

20              If I do, I will certainly think there

21         would be more.  But right now, from my brief look

22         at it, that's what I see.

23    Q.   Okay.  Referring to the function which the bottom

24         guide envelopes, as you say, the bottom guide
```

```
 1        roller, does the bottom guide allow for a

 2        rotation in some way of that bottom guide roller?

 3   A.   The -- let me refer to one of the figures that

 4        maybe we can see.  I guess that's the only thing

 5        we have is figure 4A.  Did you say -- 4A?

 6   Q.   4A.

 7   A.   Okay.  The bottom guide roller is located within

 8        the bottom guide and rotates.

 9   Q.   About something?

10   A.   About some pin or axis.

11   Q.   Could that be what's shown and dotted as 352 in

12        item 4A?

13   A.   I would have to read the patent to make sure that

14        that is the correct one.  I don't want to take

15        any --

16   Q.   Is that generally in the location you would

17        expect to find an axle?

18   A.   Yes.  Yes, it is.  To be exact I have to look at

19        the -- I've read them all.  I remember seeing

20        that but I want to be absolutely sure.

21   Q.   That's fine.

22   A.   Do you want me to read it?

23   Q.   No, no.

24   A.   Okay.
```

```
 1    Q.  I'm going to show you what's been previously

 2        marked as Still Exhibit 15 and ask you if you

 3        recognize that device.

 4    A.  I have not seen this particular device.

 5    Q.  Ask you to turn it so you can see the roller

 6        assembly.  Do you see that?  The bottom.

 7    A.  Yes.  I see the bottom.

 8    Q.  Are there rollers that are within the bounds of

 9        the metal channel at the bottom of that device?

10    A.  I have not -- excuse me.  Let me go back.  Just

11        want to make sure we're on the same angle.  I

12        have not seen this physical device but I believe

13        it looks like one of the patents that I looked

14        at.

15    Q.  Okay.  I am not asking you whether you have seen

16        it before.  I'm asking you to take a look at it.

17        You have it in your hand there.

18    A.  Okay.

19    Q.  Are there rollers that are towards the bottom of

20        the channel that are within the bounds of the

21        channel?

22    A.  Within the bounds of the channel?

23    Q.  Yes.  The metal channel?

24    A.  The metal channel.  Well, this is not a
```

```
 1              straightforward question.  I see a plastic piece

 2              which is attached to the U-shaped channel.  And

 3              there are rollers within the plastic piece.

 4     Q.       When this is oriented the way it would be in a

 5              window, in a vertical orientation --

 6     A.       Sure.

 7     Q.       Can you tell if the two rollers near the bottom

 8              terminate below or above the metal U-shaped

 9              channel?

10                      MR. SINGER:  Objection.

11     A.       The two rollers -- there's three rollers here

12              that I see, right.

13     Q.       I'm asking about the two that are paired

14              together.

15     A.       The two that are paired together.  The question

16              was?

17     Q.       Do they terminate above or below the bottom end

18              of the metal channel?

19     A.       Physically, geometrically, geometrically, not in

20              attachment, they are -- they terminate -- they're

21              located above the end of the U-shaped channel.

22     Q.       Okay.  Is there a third roller in that general

23              area towards the bottom of the balance that you

24              are looking at?
```

```
 1   A.   There is a third area in that -- third roller in

 2        the area I'm looking at.

 3   Q.   Is that third roller above or below the bottom

 4        edge of the metal U-shaped channel?

 5   A.   It's difficult to ascertain but portions of it

 6        are above the very low edge of the U-shaped

 7        channel.

 8   Q.   And portions are below the --

 9   A.   And portions are below the U-shaped channel.

10   Q.   Knowing what you know about window balances, what

11        you have learned from this case, if you were to

12        move that bottom-most roller upward an inch,

13        would that increase or decrease the length of

14        travel of that balance if you maintain the same

15        length for the metal portion of that balance?

16   A.   Well, physically I cannot move it since it's

17        going to be inside the U-shaped channel and that

18        the cord will start hitting the end of the -- I

19        don't see how we can move it since it extends

20        outside as I see the U-shaped channel.

21   Q.   If you were to make it smaller and then move it

22        upwards, would that increase or decrease the

23        length of travel of the balance?

24             MR. SINGER:  Objection.
```

```
 1    A.   Make the roller smaller and move it upwards

 2         towards the spring side of the balance?

 3    Q.   Yes.

 4    A.   There are certain issues I would have to ask you

 5         before I answer this.  If I move it an inch, the

 6         cord will start hitting the metal and will scrape

 7         on the metal.  That would not be a desirable

 8         situation.

 9    Q.   Let's say we moved it less than an inch.  We

10         moved it so that the bottom of the roller still

11         projected out of the metal channel but it was

12         moved up some distance towards the spring end.

13         Would that increase or decrease the length of

14         travel of the balance?

15    A.   So you would -- you would move it slightly.

16    Q.   Yes.

17    A.   But not more than the bottom edge of the channel.

18    Q.   Yes.

19    A.   The question is, would it decrease or increase

20         the length of the travel?

21    Q.   Yes.

22    A.   It would tend to change it certainly.

23    Q.   In which direction?

24    A.   It would decrease it.
```

```
1    Q.   Decrease it?

2    A.   Yeah.

3    Q.   Okay.  So if the bottom roller were in a position

4         as we've just discussed so that it's higher up in

5         the channel and a customer expressed a need for

6         more travel, would you get more travel by

7         dropping the roller down to its position as shown

8         in that Exhibit Still 15?

9              MR. SINGER:  Objection.

10   A.   I'm sorry.  There's too many if's on this.  Could

11        you repeat it?

12   Q.   Maybe she can read it back for me.

13              (Question read.)

14              MR. SINGER:  Objection.

15   A.   You would, yes.

16   Q.   Okay.  I'm going to ask you about the device

17        shown in figure 3 of the Newman '264 patent and

18        also figure 2B.  Do you understand how that

19        balance operates?

20              MR. SINGER:  Objection.  Which figure

21        are you --

22              MR. SLIFKIN:  2B and -- let's just

23        stick with 2B.

24   A.   I read the description of the embodiment that's
```

1           in the patent.

2    Q.    Do you have an understanding of how the balance

3          operates?

4    A.    I have an understanding of what the different

5          parts of the -- what the functions of the

6          different parts of the balance are.

7    Q.    Where is the bottom-most roller in figure 2B?

8    A.    Because I just want to review my notes so that I

9          would not give you any wrong number.  You're

10         looking for a particular number?

11   Q.    No, no, no.  I'm asking you in reference to other

12         parts in the figure 2B, can you tell me where

13         approximately the bottom-most roller is?

14   A.    Oh, where it is?  I was going to name it.

15   Q.    No, no.  I'm asking you to tell me where it is in

16         relation to other parts.

17   A.    It's in the bottom part that I pointed to right

18         here.

19   Q.    Does the bottom part have a number?

20   A.    That's why I want to check my thing.  I'm not

21         going to do it without checking my number.

22   Q.    Is there a number that is adjacent to the bottom

23         part?

24   A.    Yes, there is.  There is many numbers.  I want to

```
 1          give you the right number.

 2    Q.    Go ahead.

 3    A.    Okay?

 4                Okay.  Just a second.  So we're looking

 5          for the bottom guide roller.  What number would

 6          that be on the part.

 7    Q.    Actually, that's not actually what I'm looking

 8          for.

 9    A.    Okay.

10    Q.    You see a bottom-most roller, don't you?

11    A.    Yes.

12    Q.    Okay.  There's at the bottom, there is a roller

13          there that it's lower than other rollers on the

14          drawing, correct?

15    A.    Correct.

16    Q.    And that roller has a terminal end at its bottom

17          somewhere in that drawing, correct?

18    A.    Terminal.  What do you mean by "terminal"?

19    Q.    It ends somewhere at the bottom.  It doesn't go

20          on for infinity, does it?

21    A.    Right.

22    Q.    It has an end point?

23    A.    Yes.

24    Q.    It has a bottom-most end point?
```

```
 1    A.   Right.

 2    Q.   I'm asking you where that bottom-most end point

 3         of that roller is in relation to anything else

 4         you can identify in the drawing.  Just trying to

 5         fix its relative location as far as you

 6         understand it.

 7    A.   It's not very clear to me from looking at it.

 8    Q.   Okay.  That's fair.

 9              Is it in the metal U-shaped channel or

10         is it outside the metal U-shaped channel?

11    A.   I can't tell from looking at it since this is a

12         cutaway of the U-shaped channel.

13    Q.   Turn back to figure 2A.

14    A.   Okay.

15    Q.   Can you answer that question now?

16    A.   Without reading my notes, again, I see the

17         assembly of the bottom guide and the U-shaped

18         channel.  And it's in that vicinity.  I can't

19         tell you which one it is unless I read my notes.

20    Q.   Is this a complex mechanical drawing?

21    A.   No, it's not.  I just want to be very precise for

22         you.

23    Q.   I understand.

24    A.   I don't want to make any -- I don't want to
```

```
 1         answer you with anything that's imprecise.

 2    Q.   I understand.  I'm asking you fairly simple,

 3         basic questions about a simple mechanical drawing

 4         and I'm asking you where the bottom of the

 5         bottom-most pulley is in relation to other parts

 6         in the drawing.  You must be able to form some

 7         opinion about where that is without reference to

 8         the documents.

 9    A.   Well, I want to be absolutely sure.  I've written

10         that document a month ago.

11    Q.   Can you tell me generally?

12    A.   It's in the bottom.  That's all I can tell you.

13         And if you want me to be absolutely correct, I'll

14         have to read you in my report.

15    Q.   All right.  Is it possible that that bottom-most

16         pulley could be lowered in this figure 2A?

17                   MR. SINGER:  Objection.

18    A.   Sure.

19    Q.   Would the balance still operate if it were

20         lowered?

21                   MR. SINGER:  Objection.

22    A.   It depends on the design.  I can't -- I can't --

23         that's a hypothetical.

24    Q.   If I simply move the axle down a quarter of an
```

```
 1        inch, is it your belief that that would operate

 2        or not operate?

 3                  MR. SINGER:  Objection.

 4    A.  That's a general question.  You have to be more

 5        specific.

 6    Q.  Okay.  Is there a bottom guide shown in figure

 7        2A?

 8    A.  I believe so.

 9    Q.  What do you believe that bottom guide to be?

10    A.  215.

11    Q.  Okay.  Is there a roller in that bottom guide?

12    A.  Again, from looking at it on the picture, I have

13        to refer to the wording.  If you want me to

14        answer that precisely to refer to the wording --

15    Q.  Yes.

16    A.  -- I can either refer to the wording in my report

17        or refer to the wording in the patent.

18    Q.  Either one.

19    A.  Okay.  If I look at claim one, it says, "A bottom

20        guide roller rotatably mounted in the bottom

21        guide."  That's on claim one.

22    Q.  Okay.  And what does that have to do with figure

23        2A?

24    A.  Figure 2A is an embodiment of the claim.
```

```
 1    Q.   Okay.  So in your view, the bottom guide roller

 2         in figure 2A is rotatably mounted in the bottom

 3         guide?

 4    A.   Yes.  There's other ways of mounting this one in

 5         different claims.  Do you want me to tell you?

 6    Q.   Is one of those ways shown in figure 4A?

 7    A.   Claim two.  "The device in claim one wherein the

 8         bottom guide roller is located external to the

 9         channel."

10    Q.   Okay.  In Exhibit Still 15 is the bottom guide

11         roller rotatably mounted in the bottom guide?

12              MR. SINGER:  Objection.

13    A.   I made a report which I believe is the patent

14         that describes -- that this device refers to.

15    Q.   You've got the device there in front of you.  I'm

16         asking you if the bottom guide roller is

17         rotatably mounted in the bottom guide.

18              MR. SINGER:  Objection.

19    A.   In my report, there is issues and I addressed

20         that question.  And there's different

21         nomenclature.  I would like to read that to you

22         to make sure that you are aware of that.

23    Q.   I am aware of it.  I'm asking you to take a look

24         at Still Exhibit 15 and tell me where the bottom
```

1       guide roller is located in that Exhibit 15.

2               MR. SINGER:  Objection.  I don't

3       believe there has been any testimony.  You

4       haven't asked him whether there is a bottom guide

5       roller --

6   Q.  Is there a bottom guide roller?

7               MR. SINGER:  -- in that question.

8   A.  Well, I refer to it in my report.

9   Q.  I understand that.

10  A.  That's called a housing extension.

11  Q.  Okay.

12  A.  So --

13  Q.  Is there a bottom guide roller in the housing

14      extension?

15              MR. SINGER:  Objection.

16  A.  The way to give you the correct answer is to read

17      from my report.

18  Q.  Okay.  You have a physical device in front of

19      you.  Are you not able to answer the question by

20      looking at it?

21  A.  There's nomenclature differences in the patents.

22      Okay.

23  Q.  Did you write your report?

24  A.  Absolutely.

```
 1   Q.  Okay.  Are you familiar with the terms that you

 2       used in your report?

 3   A.  Yes, I am.

 4   Q.  Okay.  And I'm putting in front of you a sample

 5       window balance and asking simple questions about

 6       it.  Is there a bottom roller that you can find

 7       in that balance?

 8   A.  There is a roller that reverses direction of the

 9       cord.

10   Q.  All right.  Is that roller at least partially

11       beneath the metal U-shaped channel?

12   A.  It's located partially beneath the U-shaped

13       channel.

14   Q.  Is it housed in a plastic housing?

15   A.  It is housed in a plastic housing.

16   Q.  Is the axle for that roller mounted to the

17       channel or mounted to the plastic housing?

18   A.  It's mounted in the plastic housing.

19   Q.  Is it mounted in the plastic housing below the

20       bottom end of the metal U-shaped channel?

21   A.  It's mounted in the plastic housing below the

22       bottom of the U-shaped channel.

23   Q.  Do you know what the function of this pin is

24       here?  It's at the very bottom of the plastic
```

```
 1            housing.

 2    A.   If I go back to my report I can tell you exactly

 3         what I describe as the function of that pin.

 4    Q.   Can you tell me what it is without going back to

 5         your report?

 6    A.   I will do the best I can.  You can reference my

 7         report to the exact location.  That pin allows

 8         for tilt operation of the device since it slides

 9         up and down in the jamb channel.

10    Q.   Does it guide the movement of the balance as it

11         slides up and down the jamb channel?

12              MR. SINGER:  Objection.

13    A.   The pin is described as a guide pin so it would

14         guide.

15    Q.   So when installed, it has some controlling

16         function in terms of controlling movement; is

17         that correct?

18              MR. SINGER:  Objection.

19    A.   Controlling movement in which direction?

20    Q.   Let's start with from inside to outside of a

21         building.

22    A.   A building?

23    Q.   Well, this is used in a window, correct?

24    A.   Correct.
```

```
 1    Q.   Okay.  And the building -- the window is

 2         installed in a building generally?

 3    A.   Correct.

 4    Q.   And a building has an inside and an outside,

 5         correct?

 6    A.   Okay.

 7    Q.   Usually.

 8    A.   I didn't see your train of thinking.  That's

 9         fine.

10    Q.   Okay.  So you'll agree that the building has an

11         inside and outside.  I'm just trying to define

12         direction here in a way that everybody can

13         understand.

14    A.   Okay.

15    Q.   Does the pin prevent movement in the direction

16         either from outside to inside or inside to

17         outside?

18    A.   Depends on the jamb that it's into.

19    Q.   Okay.  Does it guide movement in the up and down

20         direction?

21              MR. SINGER:  Objection.

22    A.   Again, depends on the jamb it's into.

23    Q.   Have you seen it installed in a jamb?

24    A.   No.
```

Q. So you don't know the answer to the question then, if it does guide movement or not?
A. All I know is I believe this device that you are showing me is according to a patent that was mentioned in Mr. Still's report.
Q. And looking at the device, you can't tell me whether this pin guides movement or not, can you?
A. Just looking at it just as I see it and with no other reference that you allow me to make, it's a pin.
Q. Okay.
A. I can't give you any conclusion.
Q. The purpose of the pin to the best of your knowledge is what?
A. To allow the movement of the sash and to allow for tilt operations.
Q. So somehow it turns and allows the sash to move as it turns; is that right?
MR. SINGER: Objection.
A. You are describing an operation. That is a possibility.
Q. Possibility. Okay. Do you know why it's shaped the way it's shaped with a rectangular head that's wider than it is high?

```
 1    A.   I would have to refer to the patent.  If you

 2         allow me to, I will.

 3    Q.   Sure.  Go ahead.

 4    A.   Okay.  I'll have to get the patent --

 5    Q.   Let me mark it for you.

 6    A.   -- that goes to that one.

 7              (US Patent 6,840,011 B2 marked Exhibit

 8         No. 12.)

 9    A.   Okay.

10    Q.   Do you need this?

11    A.   No.  I don't need that because I haven't seen it

12         before.

13              Okay.  Let me refer to my report.

14         Let's find the corresponding one to the guide.

15              Okay.  If I may.

16    Q.   Yes.

17    A.   May I read from my report?

18    Q.   Is there a question pending?

19    A.   Yes.  You said what's the shape of the pin.

20    Q.   Sorry.

21    A.   I remember that one.

22              MR. SINGER:  Before you answer, I will

23         object to the extent that there has been no

24         evidence introduced that the balance marked as
```

```
 1          Still 15 is directly the same as the balance

 2          shown in what is now Shina 12.

 3   A.   Okay.  Page 16.  Top of the page.  Trying to find

 4          out the --

 5                "I note a pin 206 on the back of the

 6          housing extension as follows:  A first pivot pin

 7          206 and a second pivot pin (not shown) provide

 8          the tilting mechanism.  The pivot pin preferably

 9          slides in a groove in a jamb liner.  Patent '011,

10          column five, line 13 and 15 and figure 2."

11   Q.   Does that answer the question of why the pin head

12          is shaped the way it's shaped?

13   A.   It tells me to the purpose of the pin.  The

14          purpose of the geometry of the pin I have to find

15          -- I can spend more time finding it.  I'm sure

16          there is a reason for it.  Why it is shaped so.

17   Q.   As you sit here today, you're not able to tell me

18          whether the pin has a guiding function?  In other

19          words, controls the movement of the balance in

20          one direction or another.

21                MR. SINGER:  Objection.

22   A.   Could you rephrase that?  It's a very --

23   Q.   Let me rephrase.  As you sit here today, are you

24          able to tell me whether the pin that we've just
```

```
 1        been talking about guides the motion of the

 2        balance such that its movement is restricted in

 3        some way?

 4                  MR. SINGER:  Objection.

 5   A.   The pin movement is --

 6   Q.   No.  The balance.

 7   A.   The balance movement is restricted.  I cannot

 8        answer that without some due time to understand

 9        your question and reviewing my -- reviewing the

10        patent.  If you -- I am sure there is language in

11        the patent that I recall reading that would

12        explain the shape of the patent.

13   Q.   Why don't you take a moment to look for it?

14   A.   Sure.

15                  (Off the record.)

16   A.   Okay.  This answers a lot of your questions.  As

17        I said, if you give me time I could.  Column 7,

18        line 24.

19   Q.   Of which exhibit?

20   A.   I'm sorry.  Exhibit 12, which is the '011 patent.

21                  MR. SINGER:  Before you read, let me

22        again renew my objection that to the extent the

23        patent in Shina 12 has not been shown to be the

24        same as the balance in Still 15, I object to
```

1        testimony conflating the two.

2   Q.  Go ahead.

3   A.  Okay.  "The pin 206 is made of plastic and is an

4        integral part of housing extension 423 and second

5        pulley member 422.  During normal vertical up and

6        down movement of the sash in the frame, the pin

7        206 slides up and down with the sash in the

8        groove 436 of the jamb liner 432.  The large head

9        438 on the pin 206 prevents the pin from being

10       removed from the groove."

11  Q.  Okay.  Without reference to Still Exhibit 15 but

12       with reference to the Thompson '011 patent, are

13       you now able to answer the question of whether

14       the pin serves a guiding function as described in

15       that patent?

16  A.  It allows for sliding up and down with the sash

17       in the groove of the jamb.

18  Q.  And is there more to that sentence?

19  A.  Yes.  "When the sash is tilted out of the plane"

20       -- may I?

21  Q.  Yes.

22  A.  It's column 7, line 30.  Line 29.  "When the sash

23       is tilted out of the plane of the frame, the tilt

24       axis is along the line between the pin 206 and

1       its counterpart pin (not shown) located on the

2       opposite sash -- on the opposite side of the sash

3       near the bottom rail."

4  Q.  The sentence that you read earlier that -- in

5       column 7, line -- approximately 27, it reads,

6       "The large head 438 on the pin 206 prevents the

7       pin from being removed from the groove."  Do you

8       see that?

9  A.  Yes.  That's correct.

10  Q.  Is that guiding the pin in the groove?  Is that

11      pin guiding the balance in the groove, would be a

12      better question?

13  A.  It allows it to stay in -- that large dimension

14      allows it to stay in the groove.

15  Q.  So is it fair to say the pin guides the movement

16      of the balance?

17            MR. SINGER:  Objection.

18  A.  "Guides" is a verb.  That's a nonscientific verb

19      to me.  But if it allows it to stay, you could

20      perhaps say it guides it in the groove.

21  Q.  If I guide somebody through a path in the woods,

22      am I directing them to stay on the path?

23  A.  That's correct.

24  Q.  Is that the sense in which the word "guide" is

1       being used in this sentence to your knowledge?

2   A.  That's I think what you imply by the word

3       "guide."

4   Q.  Is that consistent with your reading of the

5       sentence, that the pin is guiding the motion so

6       that it doesn't fall out of the groove?

7   A.  Right.  Correct.

8   Q.  Okay.  So can we now agree that the pin guides

9       the movement of the balance?

10             MR. SINGER:  Objection.

11   A.  In the conditions that we described.  Slides up

12       and down with the sash in the groove.

13   Q.  You would describe that as a guiding function?

14   A.  That's a sort of a guiding function.

15   Q.  Okay.  So this plastic piece as a whole that's

16       shown in figure 4 of the Thompson '011 patent

17       has, as you say, somewhat of a guiding function;

18       is that correct?

19   A.  Correct.

20   Q.  And it has a roller in it, correct?

21   A.  The plastic piece --

22   Q.  Yes.

23   A.  -- has a roller in it.

24   Q.  Okay.  And that roller is beneath the U-shaped

```
 1        channel, correct?

 2    A.  Can I look at it just to make sure?

 3    Q.  Look at the drawing?

 4    A.  Look at the drawing now, not the physical?

 5    Q.  Please.

 6    A.  Let me just refer to my notes because it's just

 7        too many things here and I don't want to make any

 8        mistakes.

 9    Q.  Go right ahead.

10    A.  Okay.  I'm sorry.  Repeat your question now that

11        I looked at it.

12    Q.  I have forgotten already.

13              MR. SLIFKIN:  Would you read it?

14              (Question read.)

15    A.  Correct.

16              MR. SLIFKIN:  Anybody need a break?

17              MR. SINGER:  I would like a break.

18              MR. SLIFKIN:  That's fine.

19              (Recess.)

20              (Caldwell Series 97ez brochure marked

21        Exhibit No. 13.)

22    Q.  No. 13?

23              MR. SINGER:  13.

24    Q.  Mr. Shina, I place before you Shina Exhibit 13.
```

1          Ask you if you recognize that document.

2     A.   I do.

3     Q.   What is that showing?

4     A.   Series 97ez Block & Tackle system.

5     Q.   Have you seen that document before?

6     A.   Yes.

7     Q.   Do you recognize the balance that's shown in the

8          drawings in that document?

9     A.   Yes, I do.

10               MR. SINGER:  Can I have a copy of the

11         exhibit, please?

12               MR. SLIFKIN:  Oh, yes.

13               I note just for the record it's a color

14         copy and there are various black and white copies

15         that have been used as well.

16    Q.   In the third page of that document, on the bottom

17         of the left-hand side, do you see two small

18         plastic items depicted there?

19    A.   Yes, I do.

20    Q.   Okay.  Can we call those pivot shoes?

21    A.   Sure.

22    Q.   Or shoes?

23    A.   Whatever.

24    Q.   That's a fair description of the part?

1    A.   Mm-hmm.

2    Q.   Did you conduct an infringement analysis of the

3         part shown on page three of that exhibit,

4         comparing that to the claims of an Amesbury

5         patent in this case?

6    A.   Yes, I did.

7    Q.   And was that patent patent number 6,820,368?

8    A.   '368, yes, it was.  May I look in my notes?

9    Q.   Yes.

10   A.   Just to make sure.

11              (US Patent 6,820,368 B2 marked Exhibit

12        No. 14.)

13   Q.   Also place before you, Mr. Shina, as Exhibit 14.

14        Do you recognize that document?

15   A.   Yes, I do.

16   Q.   What is that document?

17   A.   That's the patent '368.

18   Q.   Okay.  Mr. Shina, I'm going to give you another

19        exhibit.  This is previously marked as Still

20        Exhibit 20.  Ask you to take a look at that.

21   A.   Okay.  Yes.

22   Q.   Have you ever seen a balance of that

23        configuration before?

24   A.   I've seen a photo of that.

1    Q.  You have not actually seen the balance?

2    A.  I have not seen the physical balance.

3    Q.  Did you examine any Caldwell Block & Tackle

4        balances physically?

5    A.  I examined one in the Amesbury lawyer's office.

6        That was more on the 97ez.

7    Q.  Okay.  So this Still Exhibit 20 is not an 97ez,

8        is it?

9    A.  That's correct.

10   Q.  Do you know which product is shown there in Still

11       or is Still Exhibit 20?

12   A.  I'll have to look at my notes.  But it's either

13       the 97i or the 97ih.

14   Q.  Okay.  Go ahead and look at your notes.  When you

15       say your "notes," you mean your report?

16   A.  Well, I don't think it's going to be in my

17       report.  It's going to be more in the -- I have

18       in my background information that I examined a

19       brochure of the 97i and a drawing of a 97ih.

20   Q.  Okay.  Do you have any handwritten notes you

21       prepared in this case?

22   A.  I do not.

23   Q.  Okay.  So when you say "notes," you mean

24       documentation?

```
1    A.   Documentation.

2    Q.   Okay.

3    A.   Exactly.

4    Q.   Could you find the brochures for the 97i and

5         97ih --

6    A.   Yeah.

7    Q.   -- please?

8    A.   That's the one right here.  Oops.  It's only one

9         page.  We used some of it in my report.  So it

10        might be that there is no -- complete set.  I

11        just see here the front page so let me see if

12        there is any -- if not, then go back to my -- to

13        my notes.

14             No.  I will have to go to my notes

15        because I think there was only one brochure of

16        the i and that was used in -- backup for my

17        notes.  Exhibit 1.

18             Right here.  These are the remaining

19        pages.

20   Q.   What is that -- in the location of your report,

21        where is that found?

22   A.   Figure 12 at the very end.

23   Q.   Last figure in your report.  And which -- is that

24        the 97i or 97ih?
```

```
1    A.  97i looks like.

2    Q.  Okay.  Let's start with the page.  Figure 12 from

3        your report.  That's the 97i; is that correct?

4    A.  That's correct.

5    Q.  Okay.  And the Still Exhibit 20 that I place in

6        front of you, is that the 97i as well?

7    A.  I cannot make a determination whether it's the i

8        or the ih from looking at it.

9    Q.  Do you know what the difference is between the i

10       and the ih?

11   A.  I know that the -- best of my recollection from

12       reading the depositions of the case, that the

13       shoe design is very similar.

14   Q.  Okay.  I would like to go through Still -- sorry.

15       Shina Exhibit 14.

16   A.  Yeah.

17   Q.  And compare it to Still Exhibit 20.

18   A.  Okay.

19   Q.  Specifically looking at the claims --

20   A.  Okay.

21   Q.  -- of Shina Exhibit 14.

22   A.  Okay.

23   Q.  Just take claim two.

24   A.  Okay.  May I make a comment at this point?
```

1   Q.  Yes.

2   A.  I have addressed all these in my report.  May I

3       look at my report as we discuss claim two?

4   Q.  That's fine.

5   A.  And do you want me to look at the i or the ih?

6   Q.  I want you -- primarily I would like you to refer

7       to the Still Exhibit 20 so whatever you need to

8       answer questions about that is fine.

9   A.  Okay.  All right.

10            All right.  Yes.  Claim two.  Two, yes.

11   Q.  Okay.  Let's go through the elements of claim two

12       and compare it to Still Exhibit 20.  And you can

13       reference whatever materials you need to --

14   A.  Right.

15   Q.  -- to answer the questions.  Does Still Exhibit

16       20 have a U-shaped channel comprising of a

17       plurality of openings?

18   A.  Yes.  Just hold on one second.

19            Okay.  Yes.  I made this document,

20       which is very similar to this document for your

21       perusal.  I can read it to you as well.

22   Q.  I just asked you if --

23   A.  Yes.

24   Q.  -- Still Exhibit 20 has a U-shaped --

```
1    A.  Yes, it does.

2    Q.  Okay.  Is there a spring in Still Exhibit 20

3        that's connected to a system of pulleys?

4    A.  Yes.

5    Q.  Is there a cord in Still Exhibit 20 which is

6        threaded through the system of pulleys?

7    A.  Yes.  In that claim there is a special way of

8        threading.

9    Q.  Yes.  I'm asking you just --

10   A.  Threaded.

11   Q.  -- if there's threading.

12               Is there a balance shoe in Still

13       Exhibit 20?

14   A.  Yes.

15   Q.  Can you just point to the balance shoe?

16   A.  (Witness indicates.)

17   Q.  Indicating the plastic part of the -- one end of

18       the Still Exhibit 20, correct?

19   A.  Correct.

20   Q.  Does the balance shoe have a frame?

21   A.  Yes.

22   Q.  With an enlarged first end?

23   A.  Yes.

24   Q.  And a second end?
```

```
 1   A.  Yes.  Second end is adapted to be received by the

 2       U-shaped channel.

 3   Q.  Yes.  I was going to get to that.

 4   A.  Okay.

 5   Q.  Is at least a portion of that second end disposed

 6       within the U-shaped channel?

 7   A.  At least a portion of the second end disposed.

 8       Can you tell me what "disposed" means?

 9   Q.  Does it have a meaning to you?

10   A.  I would like to be more precise.  I don't know

11       the meaning of "disposed."

12   Q.  You conducted an infringement analysis of this

13       claim, didn't you?

14   A.  Was "disposed" in the analysis?  That's your

15       word.

16   Q.  It appears claim -- let's see.

17             MR. SINGER:  I think you're looking at

18       claim one.

19   Q.  I'm sorry.

20   A.  I never saw that word before.

21   Q.  Did you conduct an infringement analysis of claim

22       one?

23   A.  No.

24   Q.  Okay.  Is the portion of the frame adapted to be
```

```
 1              received by the U-shaped channel?

 2    A.    Portion of the frame of the balance shoe, just to

 3          make sure?

 4    Q.    Yes.

 5    A.    Yes.

 6    Q.    Is that the second end that's adapted to be

 7          received by the U-shaped channel?

 8    A.    Correct.

 9    Q.    Is there a pocket positioned in the second end of

10          the frame adapted to mate with a rivet?

11    A.    Just want to make sure.

12                Oh, I must have it -- oh, I was looking

13          at the wrong place.  Figure 11.  If I may just --

14          just make sure that I'm following.

15                Yes.

16    Q.    Okay.  In the Still Exhibit 20, can you indicate

17          to me where the pocket is in this Still 20?

18    A.    Right.  As I mentioned -- and this looks very

19          similar to this.  I'll put them together.  And

20          the two G's, as I mentioned, it is this pocket

21          right here.

22    Q.    Can you describe what it looks like on the actual

23          device?

24    A.    I have to look without my glasses.  There's like
```

1        a shape, a shape which is -- the bottom surface

2        of this end is not smooth and there's a shape

3        which envelopes or runs around the rivet.

4    Q.  Okay.  So the pocket is an opening that's

5        surrounding that rivet?

6                    MR. SINGER:  Objection.

7    A.  Well, the correct term that I want to use is --

8        whenever we use the word "pocket" in this patent

9        '368, I refer to -- to the US District Court

10       claim construction of the word "pocket."

11   Q.  What is that construction?

12   A.  Reading from my report on page 44, if I may, The

13       disputed term "pocket," to be constructed as

14       quote, notch with an opening shaped to mate, i.e.

15       to join or fit together, with a rivet, thereby

16       aiding to secure the balance shoe within the

17       U-shaped channel of the inverted window balance.

18   Q.  Do you find that, what you have just read, as the

19       definition of pocket in Still Exhibit 20

20       somewhere?

21   A.  That's correct.  That's the one I pointed to here

22       and I point to as -- in my own -- in my own

23       report as figure 11.2G.

24   Q.  Okay.  Is there a rivet in Still Exhibit 20 that

1          is mating with the pocket?

2     A.   Yes.

3     Q.   In Exhibit 20, can you point that out to me?

4          Still Exhibit 20.

5     A.   Right.  Just want to make sure it's consistent --

6               MR. SINGER:  I'll object to the

7          question.

8     A.   I want to make sure.  I have it here as 2G.  I'm

9          trying to read what is 2G here.

10              Okay.  Okay.  Okay.  As I refer to 2J,

11         J, is the notch -- is the rivet where the notch

12         was adapted to mate with --

13    Q.   And in the Still Exhibit 20, can you point to me

14         where that rivet is?

15    A.   Right here.

16    Q.   Okay.  You're indicating the lower-most rivet in

17         that balance; is that correct?

18    A.   That's correct.

19    Q.   The rivet that is near the end of the channel,

20         not the rivet that's closer to the center of the

21         channel; is that correct?

22    A.   That's correct.

23    Q.   Okay.  All right.  And in your view, that rivet

24         is mated with the pocket; is that correct?

```
1                   MR. SINGER:  Objection.

2     A.   Adapted to mate to the rivet.

3     Q.   The pocket is adapted --

4     A.   To mate with the rivet, yes.

5     Q.   Are they mated or not mated?

6     A.   Depends on your definition of "mate."

7     Q.   What is your definition of "mate"?

8     A.   That the notch -- notch is adapted to mate with a

9          river.  With a rivet.  Sorry.  Okay.  As recorded

10         in the language of claim two.  Actually, I'm

11         sorry.  I apologize.  In the language of the

12         court construction.

13    Q.   So I guess I'm trying to get from you your

14         definition of the term "mate."  Do you have one?

15    A.   "Mate" to me is that there is a shape that joins

16         together, a shape with another shape.  And that

17         would be the word "mate."

18    Q.   Referring to the rivet and the pocket in Still

19         Exhibit 20, are those two parts mated with one

20         another?

21    A.   Yes.  To the definition of the word "mate" as I

22         gave earlier.

23    Q.   To your definition of the word "mate," they are

24         in fact mated?
```

```
1    A.   My opinion, yes.  That's correct.

2    Q.   Okay.  Is there a locking member proximal to the

3         enlarged first end?

4    A.   Yes.

5    Q.   Where is that in Still Exhibit 20?

6    A.   Locking member is -- as I said in my notes, I

7         refer to it in my own notes as 12.2H.

8    Q.   And where is that on this Still Exhibit 20?

9    A.   This member here.

10   Q.   Referring to the lighter color plastic member,

11        which is oriented transverse to the long axis of

12        the balance; is that correct?

13   A.   Correct.

14   Q.   Is there a cam that's in communication with that

15        locking member?

16   A.   That's correct.

17   Q.   Where is that cam?

18   A.   In my exhibit, I refer to the cam communication

19        with the locking member figure 11.2I.  Right

20        here.  And that would be over here.

21   Q.   That is the metal insert that's inside the

22        plastic shoe; is that accurate?

23   A.   Correct.

24   Q.   Is there a connecting device for attaching the
```

```
 1            balance shoe within the U-shaped channel of the

 2            window balance?

 3    A.   Yes, yes.

 4    Q.   And referring to Still Exhibit 20, where is that?

 5    A.   To be absolutely correct, I am precise, I am

 6            referring to my notes.  Connecting -- my notes on

 7            page 44.  "Connecting device for attaching the

 8            balance shoe within the U-shaped channel of the

 9            window balance.  See figure 11.2J."

10    Q.   And on the Still Exhibit 20, where is that?

11    A.   Right here.

12    Q.   What is that that you're pointing to?

13    A.   That's that rivet.

14    Q.   Okay.  Is that the same rivet that you discussed

15            as the rivet that's mating with the pocket?

16    A.   Correct.

17    Q.   So in your view, the term "rivet" in column 8,

18            line 63, approximately, do you see that?

19    A.   Yes.  I see the word "rivet."

20    Q.   And the connecting device that appears in the

21            second to last line of column 8 are one in the

22            same item?

23    A.   Correct.

24    Q.   Okay.  Is there a separate connecting device in
```

```
1           Still Exhibit 20 that is different from the

2           rivet?

3    A.    A separate connecting device.  No.

4    Q.    Okay.  So there are two items then that are

5           listed in claim two of the '368 patent that refer

6           back to a single item in the Still Exhibit 20

7           balance; is that correct?

8                    MR. SINGER:  Objection.

9    A.    That is my -- that's what I said in my report.

10   Q.    Okay.  And in other words, in order to find

11          infringement of the Still Exhibit 20, you must

12          find that the single rivet that's nearest the end

13          of the channel matches both the rivet in claim

14          two and the connecting device in claim two; is

15          that correct?

16                   MR. SINGER:  Objection.  Misstates

17          testimony.

18   A.    I find the description in the claim matched by

19          design features of Exhibit Still 20.

20   Q.    Are there two separate items in claim two, one

21          being a rivet and the other being a connecting

22          device, which correspond to a single item in the

23          Still Exhibit 20 in your view?

24                   MR. SINGER:  Objection.
```

```
 1    A.   In my view, the item that I refer to as item in

 2         my report as item figure 11.2J matches both

 3         elements that you are talking about.

 4    Q.   Those two elements are what?

 5    A.   "The shoe further forms a pocket at the second

 6         end of the frame adapted to mate with a rivet.

 7         And a connecting device for attaching the balance

 8         shoe within the U-shaped balance -- U-shaped

 9         channel."

10    Q.   We much earlier in your testimony we talked about

11         the infringement analysis and it involves reading

12         through the claim, finding elements of the claim

13         and matching them to elements in the accused

14         product.  Do you recall that?

15    A.   I recall that, yes.  I recall my answer as well.

16    Q.   Is that how you conducted your infringement

17         analysis of claim two?

18    A.   If you remember, my answer to your question at

19         that time was I would read the claim, then find

20         elements in the infringing device that matches

21         that claim.

22    Q.   Okay.

23    A.   So that's the way I do it.

24    Q.   That's what you did for claim two of the '368
```

1       patent?

2   A.   That's correct.  I read the claim, then found

3       parts or features that matched that claim.

4   Q.   Okay.  So when you came to the term "rivet," in

5       reading through the claim, and you looked at

6       either drawings or physical Caldwell 97i, you

7       found a corresponding element in the device that

8       you would call a rivet, correct?

9             MR. SINGER:  Objection.

10  A.   I looked at the patent claim and I looked at the

11      court construction and then I looked at the

12      physical device to find features or parts in the

13      physical device that would match the claim.

14  Q.   Okay.  One of the features in the claim is a

15      rivet, correct?

16  A.   Correct.

17            MR. SINGER:  Objection.

18  Q.   And when you read the word "rivet," did you go

19      looking in the Caldwell product for the rivet

20      that matched the words of the claim?

21            MR. SINGER:  Objection.

22  A.   I looked in the claim for the complete sentence.

23      And the complete sentence, "Balance shoe further

24      forms a pocket positioned in the second end of

```
 1        the frame adapted to mate with a rivet."

 2   Q.   Are you familiar with the principles of patent

 3        claim construction?

 4   A.   From what the lawyers told me, that's all I can

 5        tell you that I know.

 6   Q.   Are you familiar with the use of the -- the

 7        difference in the use between the indefinite

 8        article "a" and the definite article "the" when

 9        drafting a claim?

10   A.   I'm sorry.  Could you read the two terms?

11   Q.   Sure.  The word "a," which is a single letter

12        A --

13   A.   Right.

14   Q.   -- is used in the claim, correct?

15   A.   A.  That's correct.  Yes.

16   Q.   Do you know when a patent attorney writes a claim

17        if he intends something different by introducing

18        an element with the word "a" before it compared

19        to stating the element with the word "the" before

20        it?

21   A.   Oh, okay.

22   Q.   Do you understand that principle of patent claim

23        drafting?

24   A.   I just took what the lawyers explained to me in
```

```
 1        the claim definitions.  I cannot -- if I venture

 2        giving you a distinction, I probably would be

 3        wrong so I would rather not.

 4    Q.  So you don't know as you sit here today why a

 5        patent attorney in drafting a claim would use the

 6        term "a" before an element compared to why he or

 7        she would use the word "the" before an element,

 8        do you?

 9    A.  I cannot say that with certainty.

10    Q.  Okay.

11    A.  Absolute certainty.

12    Q.  Does the term "a connecting device" that's found

13        in the second to last line of claim two refer

14        back to anything in the claim?

15    A.  If I read it, it just says "a connecting device

16        for attaching the balance shoe within the

17        U-shaped channel of the window balance."

18    Q.  Is that connecting device discussed anywhere else

19        in claim two?

20    A.  No.

21    Q.  Is it your understanding that the connecting

22        device referred to in claim two is something

23        different than the rivet discussed earlier in

24        claim two?
```

```
 1    A.   Are you referring to claim two, just the language

 2         of claim two?

 3    Q.   Yes.

 4    A.   Well, in one case there's a notch to mate with a

 5         rivet.  In the other case, there's a connecting

 6         device.

 7    Q.   The use of the term "rivet" is in that claim.  Do

 8         you see it?

 9    A.   Yes, I do.

10    Q.   And it's a rivet?

11    A.   A rivet.  That's correct.

12    Q.   Is it your belief that the connecting device is

13         what is mating with the pocket or is it some

14         other device that's mating with the pocket?

15              MR. SINGER:  Objection.

16    A.   They appear in two different locations.  And

17         therefore, they're two distinct thoughts to me.

18    Q.   Okay.

19    A.   Two distinct ideas.

20    Q.   And when you look for those two distinct ideas in

21         Still Exhibit 20, do you find the two distinct

22         ideas?

23    A.   Yes, I do.

24    Q.   Can you explain where those two distinct ideas
```

1       you say are found in Still Exhibit 20?

2   A.  One distinct idea is "pocket positioned in the

3       second end of the frame adapted to mate with a

4       rivet."  That's one idea.  The other idea,

5       there's a connection device for attaching the

6       balance shoe within the U-shaped channel.  These

7       are the two distinct ideas.  Or members.

8       Elements.  Sorry.  Elements.

9   Q.  In the claim itself, in reading the language of

10      the claim, is the rivet a distinct element from

11      the connecting device?

12  A.  There is no specification what the connecting

13      device is in the claim.  So there's a rivet,

14      which is physically mentioned in that element of

15      the claim, the element that has to do with the

16      pocket, and there's a connecting device.

17      Connecting device is not specified in that part

18      of the claim.

19  Q.  Let's turn to Still Exhibit 21 and you can refer

20      to whatever materials you need to refresh your

21      recollection about your infringement analysis --

22  A.  Okay.

23  Q.  -- relating to that part.  Do you recognize what

24      part you have in your hand as Still Exhibit 21?

```
 1   A.   I believe what I see here is Caldwell 97ez.

 2   Q.   Does the part, Still Exhibit 21, appear to be in

 3        all material respects the same part that's shown

 4        in the brochure for the 97ez that you also have

 5        in front of you?

 6   A.   I could make a judgment that it does look like

 7        the 97ez.

 8   Q.   Okay.

 9   A.   The brochure does not give detailed drawings.

10        One of the problems that I have is the brochure

11        does not contain detailed engineering features.

12   Q.   I would like to walk through claim two of the

13        '368 patent and compare it to Still Exhibit 21.

14   A.   Okay.

15   Q.   And ask you to find the parts that I'm reading

16        from the claim.

17   A.   If I may again refer to my notes --

18   Q.   Sure.

19   A.   -- which I've done already in my notes and we

20        would want -- I would want to be giving you the

21        best answer that I can.  This is 97ez.  So it

22        would be here.

23             Okay.  Give me a second.  Just give me

24        one second.  It's a little bit long here so just
```

1        want to make sure I have both pages so once we

2        get started I'll know where everything is.

3                  That's the shoe.  Okay.  Okay.  That

4        would be figure 9.  Just want to make sure I

5        locate them all because I think I know what your

6        line of questioning is going to be.

7                  MR. SINGER:  No reason to predict his

8        line of questioning.

9                  THE WITNESS:  Sorry.  Sorry.

10                  MR. SINGER:  No reason to say anything

11        until a question is pending.

12                  THE WITNESS:  I apologize.

13   A.   I'm ready.

14   Q.   Okay.  Is there a U-shaped channel comprising a

15        plurality of openings in Still Exhibit 21?

16   A.   Yes.  There is.

17   Q.   Can you point to that in the Still Exhibit 21,

18        please?

19   A.   I will reference it to my drawing so we're

20        consistent.  In my drawing, the U-shaped channel

21        is 8.2A and it's this one.

22   Q.   You're pointing to the metallic channel that runs

23        the majority of the length of Still Exhibit 21;

24        is that correct?

```
 1    A.  Correct.

 2    Q.  Is there a spring in that that's connected to a

 3        system of pulleys?

 4    A.  Yes.  In my report, Exhibit 1, page 32, item

 5        8.2B.  Just make sure I've got it right.  I might

 6        have gotten confused.  I think you said pulleys.

 7        You threw me off.

 8    Q.  Sorry.  Spring.

 9    A.  Spring.  That's what I thought.

10    Q.  That's connected to pulleys.

11    A.  Okay.  Threw me off.  It's getting late.  That is

12        a spring.  It's 8.2B.

13    Q.  Is there a system of pulleys also in that --

14    A.  Yes.

15    Q.  -- Still Exhibit 21?

16    A.  Yeah.

17    Q.  There's two separate pulley blocks; is that

18        correct?

19    A.  That's correct.

20    Q.  Separated by a space and connected by a cord?

21    A.  Correct.

22    Q.  So there's a cord that is threaded through the

23        system of pulleys; is that correct?

24    A.  Correct.  I refer to my report, Exhibit 1, page
```

```
 1          32, figure 8.2C, and I refer to them here.

 2     Q.   Is there a balance shoe in Still Exhibit 21?

 3     A.   Yes.  I refer to it on page 32, my Exhibit 1.

 4          8.2D.  And I refer to it over here.

 5     Q.   And you're pointing to the large plastic element

 6          that's attached to one end of the channel; is

 7          that correct?

 8     A.   Correct.

 9     Q.   Does the balance shoe have a frame?

10     A.   Yes.

11     Q.   Does it have an enlarged first end?

12     A.   Yes.  I referred to it in my report, page 32,

13          figure -- 9.2E.  And I refer to it on the Exhibit

14          21.  Still 21.

15     Q.   You're referring to the lighter plastic end of

16          the shoe, correct?

17     A.   Correct.

18     Q.   And is there a second end adapted to be received

19          by the U-shaped channel?

20     A.   Just want to make absolutely sure.  In my notes

21          it says "adapted to mate."  Is it "to be

22          received" or "to mate"?  I would like to -- maybe

23          that was a typo.

24     Q.   Adapted to be received.
```

```
 1   A.   Adapted to be received.  I'm sorry.  Yes.  I was

 2        looking at the wrong place.  I apologize.

 3   Q.   Where is that in Still Exhibit 21?

 4   A.   Second end is -- my report, page 21, figure 9.2F.

 5        Right here.

 6   Q.   And on the Exhibit 21?

 7   A.   Over here.

 8   Q.   And you're pointing to the end that is partially

 9        inserted into the metal channel, correct?

10   A.   That's correct.

11   Q.   Okay.  Is there a pocket positioned in the second

12        end?

13   A.   A pocket positioned in the second end of frame

14        adapted to mate with a rivet.  In my report, page

15        32, figure 9.2G, that's the pocket.  And I refer

16        to that pocket.

17   Q.   Just so the record is clear, you're pointing to

18        the very end of the plastic carrier, correct?

19   A.   That's correct.  As its geometrical shape.

20   Q.   There is two rivets in this balance.  One rivet

21        is at the end.  One rivet is closer to the center

22        of the balance.  Which rivet is closest to the

23        pocket that you just pointed out?

24   A.   Which rivet is closest to the pocket?  That's the
```

```
1          rivet that's closest to the pocket.
2     Q.   You're pointing to the rivet that is nearer the
3          center of the balance than the other rivet,
4          correct?
5     A.   That's correct.
6     Q.   So the pocket appears to be on the side of that
7          rivet and then underneath that rivet; is that
8          correct?
9     A.   That's correct.
10    Q.   Okay.  And in defining -- I'm sorry.  In doing
11         the infringement analysis, what was the
12         definition you used for the term "pocket"?
13    A.   I used the order of US District Court of
14         Massachusetts dated January 20, 2006 where the
15         term "pocket" was clarified.
16    Q.   And was there a particular word that the judge
17         used to describe that pocket?
18    A.   Correct.
19    Q.   What was that word?
20    A.   "Notch with an opening shaped to mate (i.e., to
21         join or fit together) with a rivet, thereby
22         aiding to secure the balance shoe within the
23         U-shaped channel of the inverted window balance."
24    Q.   And is the part that you pointed to as the pocket
```

```
 1          adapted to mate with a rivet?
 2    A.    Yes.
 3    Q.    And how has it been adapted to mate with a rivet?
 4    A.    It's been given a shape in the design to mate
 5          with a rivet.
 6    Q.    And how are those parts mated?
 7                MR. SINGER:  Objection.
 8    A.    Again, I would use my same definition of "mate,"
 9          which is features that would work together to
10          form the pocket.  And -- to form the pocket,
11          yeah.
12    Q.    When one object sits on top of another object,
13          are those two objects mated?
14                MR. SINGER:  Objection.
15    A.    Are you referring to a completely flat object
16          against a completely flat another object?
17    Q.    Well, let's start with that.  Yes.
18    A.    That's not mating.
19    Q.    If a round object is placed on a flat object, are
20          those two parts mated?
21                MR. SINGER:  Objection.
22    A.    A round object on a flat object.  No.  They're
23          not mated.
24    Q.    So my pen sitting on the table, is the pen mated
```

1        with the table?

2    A.  No.

3    Q.  So you need something more than a horizontal

4        surface and a round surface touching one another

5        to constitute mating; is that correct?

6            MR. SINGER:  Objection.

7    A.  That's correct, yes.

8    Q.  What do you need beyond the round surface and a

9        horizontal surface touching one another to

10       constitute mating in your opinion?

11           MR. SINGER:  Objection.

12   A.  What we need is some shape to give us the result

13       as was clar -- I want to say the correct word.

14           Claim construction.  To clarify the

15       claim construction of the US District Court.

16   Q.  What have you found in that exhibit that leads

17       you to conclude that there's mating going on

18       between the pocket and the rivet?

19           MR. SINGER:  Objection.

20   A.  The pocket is shaped as an L shape, which would

21       work against two sides of the pin.

22   Q.  Okay.  So a part that touches a round part on two

23       sides in your view constitutes mating?

24           MR. SINGER:  Objection.

1   A.   In this particular instance, yes.

2   Q.   Okay.  Under the judge's --

3   A.   Claim construction.

4   Q.   Okay.  I'm going to skip a couple of elements and

5        then go down to the last element of that claim

6        two.  "A connecting device for attaching the

7        balance shoe within the U-shaped channel."  Can

8        you indicate to me where the connecting device is

9        in Still Exhibit 21?

10  A.   That would be figure 9.2J, which would be this

11       connecting device.

12  Q.   And that's the other rivet, the one that is at

13       the edge of the channel, not the one that is

14       towards the center of the channel; is that

15       correct?

16  A.   That's the end of the channel, yes.

17  Q.   So in this case for this product, you found that

18       the connecting device and the rivet referred to

19       in the claim are two distinct elements in the

20       accused product; is that correct?

21            MR. SINGER:  Objection.

22  A.   Could you slow down?  Just sit down.  We're going

23       too fast and I'm losing it so just give me a

24       moment.

1   Q.   Sure.

2   A.   Because they're coming fast and I'm losing my

3        concentration.

4             Okay.  Yes.  Just for the record, if I

5        may, because I want to make sure I nail it to the

6        report on page 34 of my Exhibit 1 report,

7        somewhere along the bottom third of the page, the

8        last of the paragraph, "The Caldwell 97ez product

9        contains a rivet that connects the balance shoe

10       to the U-shaped channel of the inverted window

11       balance.  See figure 9.2J."

12            I just wanted to refer to that.

13            MR. SLIFKIN:  Okay.  So can you read

14       back my question that -- the last question?

15            THE WITNESS:  It was about the two

16       rivets.

17            MR. SINGER:  Wait for the question.

18            (Question read.)

19            MR. SINGER:  Objection.

20  A.   That is correct.

21  Q.   So comparing Still Exhibit 20 to Still Exhibit

22       21, in one case, Still Exhibit 20, you found that

23       a rivet in a connecting device are satisfied by a

24       single item in Still Exhibit 20; is that correct?

1              MR. SINGER:  Objection.

2    A.   I'm sorry.  There's too many rivets here.  Could

3         you rephrase that?

4    Q.   Sure.  In Still Exhibit 20, you found when you

5         did your infringement analysis that the rivet of

6         claim two and the connecting device of claim two

7         are satisfied by a single rivet in Still Exhibit

8         20; is that correct?

9              MR. SINGER:  Objection.

10   A.   Satisfied by single rivet, that's correct.

11   Q.   Okay.  In other words, the other rivet in Still

12        Exhibit 20 is not the connecting device nor the

13        rivet that's referred to in claim two of the '368

14        patent; is that correct?

15             MR. SINGER:  Objection.

16   A.   Correct.

17   Q.   I'm sorry.  I didn't hear.

18   A.   Correct.

19   Q.   Okay.  In Still Exhibit 21, you found that the

20        rivet mentioned in the claim and the connecting

21        device mentioned in the claim are actually two

22        distinct parts of Still Exhibit 21; is that

23        correct?

24             MR. SINGER:  Objection.

```
1    A.   Just to make sure, one rivet forms -- there is a

2         pocket positioned in the second end of the frame

3         adapted to mate with a rivet.  That's the one we

4         talked about in my report as figure 9.2G.  And

5         then there's a connecting device, which I

6         referred to my figure 9.2J.

7    Q.   So the answer to my question is yes or no?

8              MR. SINGER:  Objection.

9    A.   I'm sorry.  There is a rivet that mates with a

10        pocket and there's a connecting device that is a

11        rivet, which is different than the other rivet.

12   Q.   It's not the rivet you referred to --

13   A.   Not the same --

14   Q.   -- as mating with the pocket?

15             MR. SINGER:  Objection.

16   A.   Correct.

17             MR. SLIFKIN:  Mark that, please.

18             (Time sheet marked Exhibit No. 15.)

19   Q.   Mr. Shina, I'm going to hand you Shina Exhibit

20        15.  I apologize.  I was only given one copy of

21        this by your counsel so we have to share it.

22   A.   Share it.  Sure.

23   Q.   Should be the last exhibit of the deposition.

24   A.   Okay.  Do you want to put it so we can both read
```

```
 1        it together?  That's fine.

 2   Q.   Do you recognize that document?

 3   A.   Yes, I do.

 4   Q.   What is that document?

 5   A.   That is a list of the hours I have worked on this

 6        project.

 7   Q.   Is it a list of all the hours that you put in on

 8        the project?

 9   A.   Up to that date, which is the last date entered.

10        4/8 -- 4/18/2006.

11   Q.   Okay.  And what is your hourly rate that you're

12        charging the attorneys for Amesbury?

13   A.   It's in my report.

14   Q.   Do you know what it is offhand?

15   A.   Yes.  $300 an hour.

16   Q.   Okay.  And you up to this stage, you have worked

17        a total of 113 hours; is that correct?

18   A.   That is correct.

19   Q.   Okay.  Is that the rate you customarily charge

20        for consulting work?

21   A.   Depends.  For legal work, yes.  For consulting

22        work, I have different rates.

23   Q.   Okay.  In this Shina Exhibit 15, there's a

24        discussion of "comments report."  What does it
```

1       mean?

2    A.  The way I named my two reports, I think I called

3       this report my comments report because it --

4       sorry.  Exhibit 2, because Exhibit 2 says "Dr.

5       Shina's comments" so I called that the comments

6       report.

7    Q.  Okay.  You're referring to what I think I would

8       call the rebuttal report.  Is that --

9    A.  That's correct.  I prefer to call it comments

10      report.

11   Q.  Your second report?

12   A.  Yes.

13   Q.  Okay.  Now, there's a note here, "E-mail, fourth

14      patent, '797."  What is that referring to?

15   A.  Okay.  When I was delivered Mr. Still's report --

16      and you can see the date.  I can't see it from

17      here.  There were four patents mentioned by Mr.

18      Still in his report.  And I received a package

19      that contains only three patents.  So that was

20      the fourth patent.

21   Q.  On April 4th, you had a telephone call with

22      lawyers.  Do you recall what that was about?

23   A.  Yes, I do.

24   Q.  What was that about?

```
 1   A.   Just want to make sure.  That was -- just want to

 2        make sure.

 3                  Yeah.  That was at the beginning of my

 4        writing my comments report.  And there were legal

 5        terms that I needed help with.  And these legal

 6        terms included things like anticipation and

 7        obviousness.  I'm sorry.  I can't say it.

 8        Obviousness.  Is that correct?  And I needed --

 9        the phone call involved explaining of these

10        terms.

11   Q.   Did the attorneys for Amesbury explain to you the

12        meanings of those terms?

13   A.   Yes.

14   Q.   Okay.  Do you have an understanding of the

15        meaning of those terms now?

16   A.   Yes, I do.

17   Q.   What's your understanding of the term

18        "obviousness"?

19   A.   I'll have to -- to be exact, I'll have to report

20        -- to look at my report, if I may.

21   Q.   Go ahead.

22   A.   I'll read you from my report.

23                  I guess it doesn't matter because I

24        have it in both ends.  Okay.  Just one second.
```

1            May I read you -- this would be page

2       35, towards the bottom third of the page.  "My

3       understanding of the concept of 'obviousness' is

4       based on the AIPLA Model Jury Instructions

5       (Revised 2005).  Quote:  For obviousness, a

6       person of ordinary skill in the art may combine

7       two or more items of prior art before...before

8       determining... obviousness" -- I'm sorry.  I

9       guess -- that would be a new topic.  "Before

10      determining...obviousness...you must determine...

11      1. The scope of content of prior art relied upon

12      by the defendant; 2. The difference or

13      differences, if any, between each claim of the

14      patent...and the prior art...when doing so, each

15      claim must be considered in its entirety" --

16   Q.  Entirety.

17   A.  -- "and separately from other claims...Although

18      you should consider any differences between the

19      claimed invention and the prior art, you must

20      still determine the obviousness or nonobviousness

21      of the entirety of the invention, not merely some

22      portion of it."

23   Q.  Was that definition given to you in written form

24      or orally?

1   A.   It was given to me in written form.

2   Q.   Was that definition in the materials that you

3        have collected here for your deposition?

4   A.   Yes.  It's in the box here, I believe.

5   Q.   On Saturday, March 18, you have an entry that

6        says "finish first draft report."

7   A.   Right.

8   Q.   Was there a draft report?

9   A.   What I meant -- what I meant is -- first cut is

10       what I said.  No.  There was no draft.  As I

11       mentioned to you earlier, there's only a final

12       report.

13  Q.   You finished your first cut.  Sometime

14       thereafter, I assume you had a discussion with

15       your lawyers about that first cut; is that right?

16  A.   That's correct.

17  Q.   There's an entry for "write report boilerplate."

18       What is that?

19  A.   Before I started the report, there were certain

20       things -- this is my third report similar to

21       this.  So I would use things in this report, what

22       materials did I examine, what is my

23       qualifications, what's my hourly rates.  These

24       are things I consider as boilerplate before

```
1              getting into the meat of the report.

2      Q.      Okay.  I understand.  Did you receive any

3              information which forms -- strike that.  Did you

4              receive any information on which you relied in

5              rendering your reports from any source other than

6              Goodwin Procter?

7      A.      No.

8      Q.      Did you do any independent research to form the

9              basis for your report?

10     A.      The only thing I mentioned earlier is I happened

11             to be in Home Depot.  That was the only instance

12             where I independently did something that was not

13             supplied by the Amesbury lawyers.

14     Q.      Did you have any discussions with any employees

15             of Amesbury directly at any time prior to

16             rendering your reports?

17     A.      No.

18     Q.      Have you ever had any discussions with any

19             employees of Amesbury?

20     A.      No.

21     Q.      That's all I have.

22     A.      Okay.

23

24
```

```
1          EXAMINATION BY MR. SINGER:

2     Q.   I have just very short, few follow-up questions.

3          If you don't mind, Professor Shina.

4     A.   To me?

5     Q.   Yes.  To you.

6               If you will turn back to Exhibit 14,

7          which is the '368 patent that you were discussing

8          with Mr. Slifkin a few minutes ago.

9     A.   Okay.  '368.  Yes.

10    Q.   When you wrote your report on infringement, which

11         is Exhibit 1, with respect to the '368 patent,

12         did you conduct your infringement analysis by

13         looking at -- I believe you testified that you

14         conducted your infringement analysis by looking

15         at each element of the claims and then

16         determining whether they were in each of the

17         products that related?

18    A.   That's correct.

19              MR. SLIFKIN:  Objection.

20    Q.   Did you in conducting your analysis consider any

21         elements that were not within the claims?

22              MR. SLIFKIN:  Objection.

23    A.   Any elements that were not in the claims.  I'm

24         sorry.  Can you --
```

1   Q.  Let me ask a better question.

2           When you were comparing the products to

3       the claims in the '368 patent, did you look just

4       at the elements that were actually in the claims

5       or did you look beyond that for anything else?

6   A.  No.  I just looked at the elements --

7           MR. SLIFKIN:  Objection.

8   A.  -- in the claim.

9   Q.  If you look at Exhibit Shina 14, claim two.

10  A.  Okay.

11  Q.  If you look at column 8, line 60 or so.  I

12      believe you testified earlier that one of the

13      elements that you considered and found in the

14      Caldwell 97ez and the Caldwell 97i and ih is "a

15      balance shoe further forms a pocket positioned in

16      the second end of the frame adapted to mate with

17      a rivet."  Is that right?

18  A.  That's correct.

19  Q.  Okay.  Is there any language in claim two that

20      requires a rivet adapted to mate with a pocket?

21  A.  I'm sorry.  I'm not understanding the question.

22      Say again.  Is there any language --

23  Q.  Is there any language that you see in claim two

24      that requires a rivet adapted to mate with a

```
1        pocket?

2   A.   No.  What I see is "the balance shoe further

3        forms a pocket positioned in the second end of

4        the frame adapted to mate with a rivet."

5   Q.   Is there any requirement or claim element in

6        claim two that actually requires that the pocket

7        mate with the rivet that you see?

8             MR. SLIFKIN:  Objection.

9   A.   Hold on a second.

10            "Adapted to mate" is the operable word

11       here.

12  Q.   How do you understand "adapted to mate"?

13  A.   Shaped and -- it would be if you design it and

14       you form a physical design that the physical

15       design has a shape such that the shape would work

16       with a rivet.

17  Q.   Do you see language in claim two requiring that

18       the pocket actually mate with a rivet?

19            MR. SLIFKIN:  Objection.

20  A.   Again, I answered that question before to the

21       gentleman across from me.  And the mating has to

22       do with -- the mating -- the definition of mating

23       is a physical shape that would allow the shape or

24       what's called a pocket to work with a rivet.
```

```
 1    Q.  My question is, we see that there's a term, claim

 2        element, "pocket positioned in the second end of

 3        the frame adapted to mate with a rivet," correct?

 4    A.  Correct.

 5    Q.  Is there similar inverse language, rivet

 6        positioned adapted to mate with a pocket?

 7                  MR. SLIFKIN:  Objection.

 8    A.  I don't see that.

 9    Q.  Professor Shina, I believe earlier this morning

10        Mr. Slifkin showed you Exhibit Braid 9.  Is that

11        correct?

12    A.  Correct.

13    Q.  And he asked you to examine that exhibit?

14    A.  Correct.

15    Q.  Had you ever seen this exhibit before Mr. Slifkin

16        showed it to you this morning?

17    A.  No.

18    Q.  And at one point he asked you for your opinion on

19        whether Braid 9 sitting here today as it stood

20        infringed claim one of the '638 patent.  Do you

21        recall that question?

22    A.  Infringe in terms of preventing rotation I

23        believe, yeah.  Yes, I do recall.

24    Q.  And you recall your answer?
```

```
 1    A.   I gave a qualified answer given the fact that I

 2         cannot see the -- the wings and how far they

 3         extend.  Qualified answer in terms of the shape

 4         of the -- I forgot what we called it.  Hat or

 5         whatever it was called.  The portion here.  And a

 6         qualified answer as far as the torque applied to

 7         the fixing screw.

 8              That given -- in its present situation

 9         before determining the -- determining the process

10         by which these -- the top shape and the screw

11         that might change over -- lifetime of the

12         product, that -- in its present situation, that

13         the spine would not prevent rotation.

14    Q.   Is it fair to say that your analysis of Braid 9

15         was limited to Braid 9 as presently configured in

16         front of you?

17              MR. SLIFKIN:  Objection.

18    A.   That's -- I did mention that given the channel

19         width and the width of the spine that I see

20         present today.

21    Q.   You were also asked to do a similar analysis on

22         the Exhibit Still 4B.  Do you recall that?

23    A.   Yes, I do.

24    Q.   Okay.  Was your analysis with respect to Still 4B
```

1      similarly limited to the Still 4B exhibit

2      directly in front of you?

3                    MR. SLIFKIN:   Objection.

4   A.  That analysis and that answer that I gave is

5      limited to the geometries that I see in front of

6      me of the spine and of the flanges.

7   Q.  Was your analysis of Still 4A with respect to the

8      same question similarly limited to the Still 4A

9      exhibit presented to you this morning?

10                    MR. SLIFKIN:   Objection.

11  A.  My understanding is limited to the geometries

12      that I see here before me of the width of the

13      spine and the width of the channel.

14  Q.  Do you --

15  A.  Of the flanges.

16  Q.  Do you recall you were also asked to perform an

17      analysis of the combination of Exhibit Shina 5

18      and Exhibit 6?

19  A.  My analysis is limited to the shapes that I see

20      today, geometries and shapes that I see today

21      regarding the width of the channel and the width

22      of the spine that I see today.

23  Q.  And you're also asked to perform a similar

24      analysis with respect to Exhibit Shina 6 and

```
 1          Shina 7.  Do you recall that?

 2     A.   I'll have to take it out to help me in recalling

 3          that.

 4     Q.   Sure.

 5     A.   Yes.  That response is given to the earlier

 6          constraints that I said in terms of the width of

 7          the wing and the thickness of the cover and also

 8          to the geometries of the spine, the width of the

 9          spine and the width between the flanges.

10     Q.   And your analysis was similarly limited to the

11          combination of Exhibit 6 and Exhibit 7 presented

12          to you today?

13                    MR. SLIFKIN:  Objection.

14     A.   That's correct.

15                    MR. SINGER:  I have nothing further.

16                    MR. SLIFKIN:  All right.

17                    MR. SINGER:  That's a wrap.

18                    THE WITNESS:  Okay.  That's a wrap.

19                    (Whereupon, the deposition was

20          concluded at 4:59 p.m.)

21

22

23

24
```

1        Excerpt from Rule 30(e):
        Submission to Witness; Changes; Signing.

2

          When the testimony is fully transcribed,

3        the deposition shall be submitted to the witness
        for examination and shall be read to or by

4        him/her, unless such examination and reading are
        waived by the witness and by the parties.  Any

5        changes in form or substance which the witness
        desires to make shall be entered upon the

6        deposition by the officer with a statement of the
        reasons given by the witness for making them.

7

              ***********************************

8

9         I, Sammy G. Shina, Ph.D., PE, have examined
        the above transcript of my testimony and it is

10       true and correct to the best of my knowledge,
        information and belief.  Any corrections are

11       noted on the errata sheet.

12

13        Signed under the pains and penalties of
        perjury this     day of                , 2006.

14

15

16                 ----------------------------
                 Deponent's Signature

17

        On this     day of               , 2006, before

18       me, the undersigned notary public, personally
        appeared                 , proved to me through

19       satisfactory evidence of identification, which
        were           , to be the person whose name is

20       signed on the preceding or attached document, and
        who swore or affirmed to me that the contents of

21       the document are truthful and accurate to the
        best of his/her knowledge and belief.

22

23

                 ----------------------------

24                 Notary Public
        My commission expires:

1     COMMONWEALTH OF MASSACHUSETTS

      ESSEX, SS.

2

3         I, Susan L. Prokopik, Registered Merit

4     Reporter and Notary Public duly commissioned and

5     qualified in and for the Commonwealth of

6     Massachusetts do hereby certify that there came

7     before me on the 3rd day of May, 2006 the person

8     hereinbefore named, who was satisfactorily

9     identified by me and duly sworn to testify to the

10    truth of his knowledge concerning the matters in

11    controversy in this cause; that he was thereupon

12    carefully examined upon his oath and his

13    examination reduced to typewriting under my

14    direction; and that the deposition is a true and

15    accurate record of the testimony given by the

16    witness.

17        I further certify that I am not

18    interested in the cause of this action.

19

20

              SUSAN L. PROKOPIK, RMR, CRR

21               (CSR #124893)

22

     My commission expires:

23      March 23, 2012

24