UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

AMESBURY GROUP, INC. and
AMESBURY SPRINGS, LTD.,

                  Plaintiffs,

                                   Civil Action No. 05-CV-10020

    vs-

THE CALDWELL MANUFACTURING CO.,

                  Defendant.

_____

DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 3

    Summary Judgment Standard ......................................................................................... 3

    POINT I   CALDWELL'S QUICK-TILT*nc DOES NOT INFRINGE ANY
             CLAIM OF AMESBURY'S '638 PATENT ......................................................... 4

          A.    Amesbury's '638 Patent ................................................................................ 4

          B.    The Caldwell Quick-Tilt*nc Balance Does Not Infringe Claims 1,
                2, 3 and 8 of the '638 Patent ....................................................................... 5

               1.    *The Caldwell Quick-Tilt*nc does not infringeiIndependent
                      claims 1 and 8* ................................................................................ 6

               2.    *Caldwell does not make, use, sell, or offer to sell any
                      products which include a channel means for use in
                      connection with its Quick Tilt*nc balance* .................................... 14

          C.    Any infringement claim relating to dependent claims 2 and 3 fail
                as a matter of law ...................................................................................... 15

          D.    The website purportedly maintained by Tri-State Wholesale
                Building Supplies, Inc. is inadmissible hearsay ........................................ 15

          E.    Amesbury's '638 Patent is Invalid .......................................................... 18

    POINT II  CALDWELL'S 86xt DOES NOT INFRINGE AMESBURY'S '264
             PATENT .......................................................................................... 22

          A.    Amesbury's '264 Patent ............................................................................. 22

          B.    The 86xt balance does not infringe independent claim 1 and
                dependant claims 2, 4 and 5 of '264 ......................................................... 23

          C.    The 86xt does not infringe claim 1 of the '264 Patent under the
                doctrine of equivalents ............................................................................... 25

D.      Amesbury's '264 Patent is Invalid.............................................................. 26

POINT III CALDWELL    DOES    NOT    INFRINGE    ANY    CLAIMS    IN
           AMESBURY'S 368 PATENT ........................................................ 29

A.      Amesbury's '368 Patent............................................................................ 29

B.      Caldwell's  Series  97ez  balance  does  not  infringe  independent
        claim 2 of the '368 Patent ....................................................................... 30

C.      The 97ez does not  infringe under the doctrine of equivalents ................. 33

D.      The  97ez  does  not    infringe  dependent  claims  3,  6  and  7  of
        Amesbury's '368 Patent............................................................................ 34

E.      Caldwell's Series 97i balance does not infringe Independent Claim
        2 of '368 ................................................................................................... 34

F.      Caldwell's Series 97ih balance does not infringe Claims 2, 3, 6 and
        7 of the '368 ............................................................................................. 35

CONCLUSION............................................................................................................. 35

# TABLE OF AUTHORITIES

Page

**Cases**

A.B. Chance Co. v. RTE Corp., 854 F.2d 1307 (Fed. Cir. 1988)................................................... 3

Blair Foods Inc. v. Ranchers Cotton Oil, 610 F.2d 665 (9th Cir. 1980)........................................ 17

Brand Management Inc., and Pro Plans Co., Inc. d/b/a/ Pro Shop Company v. Menard,
   135 F.3d 776 (Fed. Cir. 1998)................................................................................................ 24

Carroll Touch, Inc. v. Electro Mechanical Sys., 15 F.3d 1573 (Fed. Cir. 1993)........................... 4

Continental Can Co. v. Monsanto Co., 948 F.2d 1264 (Fed. Cir. 1991) ...................................... 22

Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293 (Fed. Cir. 2005)..... 27

Cummings v. Pearson Educ., Inc., 2006 WL 151880 (D. Mass. January 18, 2006) ................... 16

D.L. Auld Co. v. Chroma Graphics Corp., 714 F.2d 1144 (Fed. Cir. 1983) ................................. 3

El Dorado Foundry, Machine & Supply Co. v. Fluid Packed Pump Co et al.,
   81 F.2d 782 (8th Cir. 1936) cert. den. 299 U.S. 560 (1936)................................................... 14

Garside v. Osco Drug, Inc., 895 F.2d 46 (1st Cir. 1990).............................................................. 15

General Mills Inc. v. Hunt-Wesson Inc., 103 F.3d 978 (Fed. Cir. 1997) ......................... 13, 24, 33

Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 86 S. Ct. 684 (1966) ............................ 26

Great Northern Ins. Co. v. Paino Associates., 364 F.Supp.2d 7 (D. Mass. 2005) ....................... 25

Hewlett-Packard Co. v. Mustek Systems, Inc., 340 F.3d 1314 (Fed. Cir. 2003)......................... 13

In re Rouffet, 149 F.3d 1350 (Fed Cir. 1998)............................................................................... 27

Jeneric/Pentron, Inc. v. Dillon Co., 205 F.3d 1377 (Fed. Cir. 2000)........................................... 15

Johnson v. IVAC Corp., 885 F.2d 1574 (Fed. Cir. 1989)............................................................ 26

Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533 (Fed. Cir. 1991) .................................................... 3

Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353 (Fed. Cir. 2002) ................... 14

Lemelson v. United States, 752 F.2d 1538 (Fed. Cir. 1985) ......................................................... 35

Lewmar Marine, Inc. v. Barient, Inc., 827 F.2d 744 (Fed. Cir. 1987) .......................................... 18

Manchak v. Chemical Waste Mgmt., Inc., 1999 U.S. App. LEXIS 32001 (Fed. Cir.1999) ........ 15

Miller v. Solem, 728 F.2d 1020 (8th Cir. 1984) ........................................................................... 16

Moos v. Hampshire College, 1999 WL 377259 (D. Mass. 1999) ................................................. 15

Pan-Islamic Trade Corp. v. Exxon Corp., 632 F.2d 539 (5th Circ. 1980).................................... 17

Princeton Biochemicals, Inc. v. Beckman Coulter, Inc., 411 F.3d 1332 (Fed. Cir. 2005) ........... 27

Read Corp. v. Portec, Inc., 970 F.2d 816 (Fed. Cir. 1992) .......................................................... 24

Ruiz v. A.B. Chance Co., 357 F.3d 1270 (Fed Cir. 2004)............................................................. 27

Schering Corp. v. Geneva Pharms., Inc., 339 F.3d 1373  (Fed. Cir. 2003) ........................... 18, 22

SIBIA Neurosciences, Inc.. v. Cadus Pharm. Corp., 225 F.3d 1349 (Fed Cir. 2000) ................. 27

State Mut. Life Insurance Co. of Am. v. Deer Creek Park, 612 F.2d 259 (6th Cir. 1979) ........... 17

Texas Instruments, Inc. v. United States ITC, 805 F.2d 1558 (Fed. Cir. 1986) ............................ 4

Wahpeton Canvas Co. v. Frontier, Inc., 870 F.2d 1546 (Fed. Cir. 1989).............................. passim

**Statutes**

35 U.S.C. §102.............................................................................................................................. 26

35 U.S.C. §103.............................................................................................................................. 27

35 U.S.C. §103(a) ................................................................................................................... 26, 27

35 U.S.C. § 271(a) ........................................................................................................................ 14

**Rules**

Federal Rule 56(c)..................................................................................................... 3

Federal Rule 56(e)............................................................................................. 16, 25

Local Rule 56.1 ................................................................................................. 16, 25

## PRELIMINARY STATEMENT

Plaintiffs, (collectively "Amesbury") assert that five of the defendant's ("Caldwell") products infringe three Amesbury patents – U.S. Patent 6,598,264 ("264 Patent"), U.S. Patent 6,820,368 ("368 Patent") and U.S. Patent 5,365,638 ("638 Patent"). Amesbury moves for summary judgment on all counts in its complaint. That motion should be denied in all respects.

Preliminarily, the support for Amesbury's motion in large part, is grounded in the purported expert opinions of Sammy G. Shina, Ph.D. Shina's Reports,[1] however, lack the foundation and authentication required by Local Rule 56.1 and Federal Rule 56(e). They should be disregarded and stricken from the record.

In any event, Caldwell's products do not infringe any claims of the Amesbury patents. Amesbury claims that Caldwell's Quick-Tilt*nc literally infringes the '638 Patent. This is simply not true. To prove literal infringement, Amesbury must show that the Quick-Tilt*nc includes a raised spine that contacts the flange inhibiting the rotational motion of the mounting means. There is no evidence in the record, however, demonstrating that any such contact occurs. Nor is there evidence of any rotational motion in the first place. Indeed, the record reveals that Amesbury has never examined a *properly installed* Quick-Tilt*nc product. Moreover, Caldwell does not make, use, sell or offer to sell the "opposed flanges" and "channel means", necessary to prove a direct infringement claim. Finally, prior art, U.S. Patent 5,157,808 (the, "Sterner Patent"), anticipates the '638 Patent; therefore, the '638 Patent is invalid as a matter of law.

---

[1] Amesbury's Statement of Material Facts cites to two such reports, dated March 23, 2006 and April 18, 2006.

Amesbury also claims that the Caldwell 86xt balance infringes the '264 Patent, both literally and by application of the doctrine of equivalents. Amesbury's arguments are again misplaced. To show literal infringement, Amesbury must prove, by a preponderance of the evidence, that the 86xt balance includes "a bottom guide roller rotatably mounted in the bottom guide." The 86xt does not, however, include a bottom guide "roller" – it includes a fixed pulley block connected to the channel, which contains three pulleys. Further, Caldwell's expert, Charles E. Still, states that this "pulley" does not meet the "function, way, result" criteria of the doctrine of equivalents. In other words, it does not perform the same function as the "roller", in the same way, to achieve the same result. This doctrine of equivalents, thus, has no application to the 86xt balance.

The '264 Patent, too, is invalid. The admitted prior art in Figure 2A of the '264 Patent, as well as U.S. Patent 6,840,011 (the "Thompson" Patent), disclose all of the elements of the '264 Patent. At the time of the invention described in the '264 Patent, there was a well known need in the window balance industry to extend the travel of window balances to better comply with building egress codes. The obvious solution was to combine the admitted prior art in Figure 2A of the '264 Patent and the bottom guide roller from the Thompson device, extending the travel of the window balance to better comply with egress code requirements. The combination of these two references invalidates the '264 Patent.

Amesbury claims that the Caldwell Series 97ez infringes the '368 Patent – again both literally and by application of the doctrine of equivalents. Caldwell's 97ez does not literally infringe Amesbury's '368 Patent because two elements are absent: i) a "pocket … adapted to mate with a rivet"; and ii) a connecting device for attaching the balance shoe with the U-shaped channel. Neither does the doctrine of equivalents apply. Here, Amesbury claims that the 97ez

discloses a "connecting device" (i.e., a rivet) that performs the same function of attaching the balance shoe to the channel. However, Caldwell's expert directly disputes this contention creating, minimally, a question of fact for trial.

Finally, Amesbury contends that the Caldwell Series 97i and 97ih products literally infringe the '368 Patent. As with the 97ez, the Series 97i and 97ih do not disclose a "pocket" and/or a "connecting device," as those terms have been construed by this Court. For these reasons, among others set forth below, Amesbury's motion for summary judgment should be denied in all respects.

## ARGUMENT

### Summary Judgment Standard

Federal Rule 56(c) provides that summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Id. Thus, summary judgment is not proper when material issues of fact requiring trial are present. D.L. Auld Co. v. Chroma Graphics Corp., 714 F.2d 1144 (Fed. Cir. 1983). The moving party bears the burden of showing the absence of a material fact issue. A.B. Chance Co. v. RTE Corp., 854 F.2d 1307 (Fed. Cir. 1988). Any doubt will be resolved against the moving party and all evidence and inferences must be viewed in the light most favorable to the non-moving party. Id.

In a case of alleged patent infringement, the plaintiff bears the burden proving infringement by a preponderance of the evidence. Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533 (Fed. Cir. 1991). Determining whether a patent is infringed requires a two-step analysis. First, the claim must be properly construed to determine its scope and meaning. Second, the

claim as thus construed must be compared to the accused device or process.  Carroll Touch, Inc. v. Electro Mechanical Sys., 15 F.3d 1573 (Fed. Cir. 1993).  This analytical framework applies irrespective of whether the patentee asserts claims of literal infringement, or infringement by application of the doctrine of equivalents.  See Texas Instruments, Inc. v. United States ITC, 805 F.2d 1558 (Fed. Cir. 1986).

## POINT I

### CALDWELL'S QUICK-TILT*nc DOES NOT INFRINGE ANY CLAIM OF AMESBURY'S '638 PATENT

**A.    Amesbury's '638 Patent.**

Amesbury's '638 Patent involves a "constant force coil balance." It is designed for a "tilt in" window. (Still Report [March 13, 2006 at 5]).  A constant force balance is described as follows:

> It features a coil spring mounted[2] in a housing that supports the bottom curvature of the coil spring[3] and is fastened[4] to the frame jambs of the window inside a channel that is partially open on the exposed side.  The other end of the coil spring is attached to a sash frame support, generally termed as a balance pivot shoe.[5]  The pivot shoe travels inside the frame jamb channel allowing the coil spring to retract towards its original position and thus assisting the vertical sash lift.  Multiple coils can be added to the window for heavier sash loads. The pivot shoe includes a keyway or socket for the pivot bar connected to the sash, which can be rotated inward when the sash is ready to be removed from the window frame. When the pivot shoe is rotated, it automatically locks the pivot shoe inside the jamb channel to prevent sash travel while removing the sash. (Still Report [March 13, 2006 at 5, 6]).

---

[2] See Patent Number 5,365,638, Figure 1 at 22.

[3] See Patent Number 5,365,638, Figure 1 at 20.

[4] A "fixing screw" **14 (Fig. 1)** fastens the bottom curvature of the coil spring to the frame jambs

[5] See Patent Number 5,365,638, Figure 1 at 28.

The '638 Patent also discloses that the spring mounting element is secured in the jamb track channel. The mounting element includes a raised spine which is designed to contact the jamb track, "whereby rotational motion of the said mounting means is inhibited."[6]

**B.     The Caldwell Quick-Tilt\*nc Balance Does Not Infringe Claims 1, 2, 3 and 8 of the '638 Patent.**

Amesbury has not proved, and cannot prove, by a preponderance of the evidence that the Caldwell Quick-Tilt\*nc balance infringes Claims 1, 2, 3 and 8 of the '638 Patent.[7] First, the

---

[6] The Description of the Preferred Embodiments (Patent Number 5,365,638) describes this the "raised spine" as follows:

> The mounting element **100** is devoid of the lateral ears **86** but instead is provided with a raised spine formation **102** whose width **W** is arranged such that it is a snug fit between open lip portions **104** of a channel section sash frame member **5** (shown in broken line in FIG 10) within which the mounting element is to be operatively received. Thus, rotational, pivoting or twisting motion of the element **100** within the sash frame member **5** is inhibited.

<u>See</u> <u>also</u> Independent Claims 1 and 8 ("whereby rotational movement of the mounting means is inhibited").

[7] Independent Claim Number 1 provides:

    1. A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having a first end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means *whereby rotational motion of said mounting means is inhibited* (Emphasis Added).

Dependant Claim Number 2 provides:

    2. The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means.

Dependant Claim Number 3 provides:

    3. The mounting assembly of claim 2 wherein said mounting means has a body portion having an aperture therein, a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, a surface of said body portion being concavely curved, said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion.

Independent Claim 8 provides:

    8. A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, said mounting means being secured in said channel means and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, *whereby rotational movement of the mounting means is inhibited (Emphasis Added).*

Quick-Tilt*nc does not contain a raised spine which inhibits the "rotational motion of the mounting means." Second, Caldwell does not make, use or sell any products which include a channel means having a rear wall, side walls and extremities of said sidewalls, including inwardly turned opposed flanges. This fact is significant because such "opposed flanges" and "channel means" are necessary to Amesbury's theory of infringement on independent claims 1 and 8.

Because there is no literal infringement of independent claims 1 and 8, there can be no infringement of dependent claims 2 and 3 as a matter of law. Wahpeton Canvas Co. v. Frontier, Inc., 870 F.2d 1546 (Fed. Cir. 1989).

1.    **_The Caldwell Quick-Tilt*nc does not infringeiIndependent claims 1 and 8_**

Here, the primary issue is whether the Quick-Tilt*nc contains a raised spine which inhibits the rotational motion of the mounting means. In its January 20, 2006 Memorandum and Order, this Court held that, "it is the addition of the 'raised spine' in this Patent that inhibits any rotation of the mounting element under any normal condition." (Memorandum and Order at 39). This Court thus construed this claim term, in both claims 1 and 8, to mean:

> The mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means *whereby rotational motion of said mounting means is inhibited* (Emphasis Added).

To inhibit the rotation of the mounting means, the raised spine of the Quick-Tilt*nc must actually contact the flange of the channel. Indeed, the inventor named in the '638 Patent, Simon Braid, confirms that it is the contact between the raised spine and opposed flanges that prevents rotation.[8] Even Mr. Shina concedes this point.[9] However, as noted below, other than speculation

---

[8] Simon Braid testified as follows (Ex. 15, Dep. Trans. [Braid at 87]):

and conjecture, Amesbury offers no evidence to show that the raised spine on Quick-Tilt*nc contacts the flanges of the jamb.  For this reason alone, the Caldwell Quick-Tilt*nc does not infringe independent claims 1 and 8 (and by extension dependent claims 2 and 3).  <u>Wahpeton Canvas Co. v. Frontier, Inc.</u>, 870 F.2d 1546 (Fed. Cir. 1989).

Furthermore, it is a "fixing screw" that fastens the Quick- Tilt*nc to the frame jambs of a window and prevents rotational motion of the mounting means.  Amesbury offers no evidence that, *when properly mounted* – when a fixing screw is used – the Quick-Tilt*nc spine contacts the flange of the channel.  This is because, as even Amesbury's expert concedes, the fixing screw creates frictional forces between the mounting means and the channel means which, in turn, resist rotation (Es. 10, Dep. Trans [Shina at 74-75]):

> Question:  Does the screw that's shown in Shina Exhibit 3[10] force the mounting means against the back of the channel?
>
> Shina:  Yes.

---

Braid:  So, your question was; what stops it rotating?

Question:  Yes.  In this sentence.  What is it in this sentence [referring to "whereby rotational motion of said mounting means is inhibited"] that we have just read, Claim 1, that prevents rotation?

Braid:  If refers to "Inwardly" – the raised spine position between the same plane will hit the opposed flanges of said channel to stop rotation.

Question:  Right.  So the spine serves that function; right?

Braid:  In that particular instance.

[9] Specifically, Shina's deposition testimony was:  (Ex. Dep. Trans. [Shina at 93; 98]):

Question:  So in order to infringe the claim, we must conclude that the spine touches the flange?

Shina:  The spine has to be in touch with the flange.
…
Question:  If the spine does not contact the flange, the spine does not inhibit rotation?

Shina:  Correct.

[10] Shina Exhibit 3 refers to Shina deposition Exhibit 3, which is a page from a Caldwell brochure describing the Quick-Tilt*nc.

Question:  Is there frictional force caused by the touching of those two parts?

Shina:  There might be.

Question:  Is the frictional force dependant on how tight that screw is?

Shina:  Could be.

Question:  Could be or is?

Shina:  Is.

Question:  The tighter the screw, the greater the Friction Force, correct?

Shina:  Correct.

Question:  So we've now identified at least two secondary, to use your terminology, forces that act to oppose rotation of that part, those being the dust cover[11] hitting the sides and the frictional force from the screw, correct?

Shina:  Mm-hmm. Yes.

Question:  Okay.  There may be others but you can't tell from this drawing?

Shina:  Correct.

---

[11]   As the question suggests, Shina previously testified that the "dust cover" also resists rotation.  Specifically, Shina's testimony on this point was:  (Ex. 10, Dep. Trans. [Shina at 73-74]):

Question:  Okay.  There's nothing else in that drawing that you would see that would cause the balance to resist rotation?

Shina:  There might be a possibility that there is a portion E [referring to Shina deposition Exhibit 3] that sits inside the channel.  Could exert a force, a secondary force.

Question:  "E" I think is what we called the dust cover earlier, correct?

Shina:  That's correct.

Question:  How would that resist rotation?

Shina:  I can't tell you how it fits into the channel but it would resist the rotation by the fact that if it rotates one way or the other way, it could have some slight effect.

Question:  And how would that effect be manifested?

Shina:  By the – by the fact that E would hit against one of the sides and will prevent further rotation.

Shina also conceded that, if the forces resisting rotation of the mounting means of the Quick-Tilt*nc balance are greater than the forces causing the mounting means to rotate, *the mounting means will not rotate.* (Dep. Trans. [Shina at 78-79]). Put differently, if the mounting means does not rotate, then the raised spine cannot contact the flange of the channel.[12]

Remarkably, Amesbury elected not to measure the forces causing the rotation and compare them to those resisting rotation. (Ex. 10, Dep. Trans. [Shina at 77]). Moreover, the Quick-Tilt*nc balance examined by Shina was not properly secured by a fixing screw. (Ex. 10, Dep. Trans. [Shina at 44-45; 78-79]).[13] Not only has Amesbury failed to show contact between the raised spine and flange of the channel regarding the Quick-Tilt*nc, it entirely ignores an element of the Quick-Tilt*nc that is designed to prevent rotational movement of the mounting means – the fixing screw. Shina's speculation that the spine may possibly, in some limited instances, inhibit rotation of the mounting means is based upon just that – speculation and not empirical data.[14] (See Exhibit 9 [Shina Report dated March 23 at 12]).

---

[12] Shina speculated that the raised spine may contact the flange of the channel *if* the "dust cover" and "wings" degrade over time. See e.g., Ex. 10, Dep. Trans. [Shina at 80, 105, 115-116]. Shina did not offer any insight as to how long this process might take. In any event, Still confirmed during his deposition that the life of a Quick-Tilt*nc is about thirty (30) years. (Ex. 9, Dep. Trans. [Sill at 75]). This fact is significant because the '638 Patent expires on January 21, 2013, well before the 30 year useful life of the Quick-Tilt*nc.

[13] On this point, Mr. Shina testified as follows (Ex. 10 [Shina A+ 44])::

> Question: That balance that you examined here at the other of Goodwin Proctor had no Fixing Screw, correct?
>
> Shina: Correct.

[14] It goes without saying, then, that Shina never actually observed rotation inside the jamb channel. (Dep. Trans. [Shina at 60]):

> Question: So you have never actually seen rotation of a Caldwell Quick-Tilt*nc balance inside a jamb channel have you?
>
> Shina: No, I have not.

Amesbury claims that "Caldwell's own expert testified that when the Quick-Tilt*nc balance is *installed in the window jamb* channel inspected by Amesbury's expert, and marked in this case as Still Exhibit 10, the spine inhibits rotation." (Amesbury Brief at 35) (Emphasis Added). In support of this argument, Amesbury relies upon the following exchange between its counsel and Mr. Still (Amesbury Brief at 35):

> Question: …Independent of whether additional features of the Caldwell balance inhibit rotation, in this assembly, this spine also inhibits rotation of the balance, correct?

> Still: It can.

This statement is taken out of context, and disingenuous in the extreme. The proper inquiry is not whether the Quick-Tilt*nc balance is merely "installed in the window jamb channel"; rather, it is whether it is "*properly* installed in the window jamb channel." This is so because, as Mr. Still's deposition testimony, in its entirety, reveals, the Quick-Tilt*nc balance examined by Amesbury's expert was <u>not</u> secured in the window jamb channel by a fixing screw as it should have been. In other words, Still Exhibit 10 discloses a balance that is improperly installed in the channel because it is not *fastened and/or secured* by a fixing screw. During his examination, Mr. Still was asked a series of questions about Exhibit 10. When he was asked these questions, not only was the Quick-Tilt*nc balance unfastened/unsecured, it was only "partially" inserted into the jamb. (Ex. 9, Dep. Trans. [Still at 70]). What Amesbury fails to disclose to the Court is the following testimony:

> Question:  Okay.  I would like to show you, Mr. Still, I have taken Still Exhibit 10 and I have inserted the Quick-Tilt*nc balance *partially* into the channel, correct?

> Still:  Yes.

> Question:  And when I apply a slight moment of force to wiggle the device side to side, the spine hits the flanges correct?

> Still:  It does, also the bottom of the mounting element also hits the sides of the channel.

The testimony continues (Ex. 9, Dep. Trans. [Still at 71-73]):

> Question:  So at least in this instance, that spine is preventing me from further rotating the mounting member; isn't that correct?

> Still:  That's right, but the Caldwell balance does not depend upon that.

> Question:  I understand it may not depend on that but the spine in this instance does contribute to the inhibition of rotation, correct?

> Still:  All due to the design of that channel, yes.

> Question: …Independent of whether additional features of the Caldwell balance inhibit rotation, in this assembly, this spine also inhibits rotation of the balance, correct?

> Still:  It can.

> Question: … So it's your opinion that in certain installations, the spine on Caldwell's Quick-Tilt*nc does not inhibit rotation because it's narrower than the gap defined by the flanges, correct?

> Question:  And in other installations having narrower gaps, the spine can inhibit rotation, correct?

> Still:  It does not. Let me show you.[15]  When you had this pulled out, you are disregarding the top cover which is a tighter tolerance than the body of the element.  If you put the unit all the way in, the top of the mounting element acts as an anti-rotation as well.

> Question:  In addition to the spine, correct?

> Still:  In addition, no.  In addition to the body of the element itself.  In other words, it has a tighter tolerance because it is designed to be tight, tighter than the actual mounting element.  So the spine does not have any relationship to the rotation at all.

---

[15]  At this point, Mr. Still slides the Quick-Tilt*nc all the way into the jamb (although it is not properly fastened/secured by a fixing screw).

In context, then, Mr. Still testified that it is possible for the spine to inhibit rotation *only if partially inserted in the window jamb channel and not properly fastened by a fixing screw.* Mr. Still reiterated this point before the deposition concluded (Dep. Trans. [Ex. 9, Still 151-152]):

> Question: … when the balance is installed, what is necessary to complete the installation process if anything that you don't see there?
>
> Kline:  Objection, foundation.
>
> Still:  There is a screw that attaches the mounting element to the frame jamb and it's missing.
>
> Question:  Did Mr. Kline show you a sample with a screw or without a screw?
>
> Still:  Without a screw.
>
> Question:  Does the screw affect the ability of the shoe to rotate in the channel?
>
> Kline:  Object to the form of the question.
>
> Still:  Yes.
>
> Question:  And how does the screw affect the ability of the shoe to rotate?
>
> Still:  Well, it secures it down tight and minimizes any rotation of the coil.
>
> Question:  So when Mr. Kline demonstrated the movement of the housing and discussed the flanges, would it function differently had the screw been properly in place?
>
> Kline:  Object to the form of the question; leading, foundation, mischaracterizes the earlier questions.
>
> Still:  Yes.

Shina's testimony on the subject of the fixing screw, and its effect on the shoe's ability to rotate in the channel is equally compelling.  Shina was shown a Quick-Tilt*nc properly fastened to the jamb (identified as Braid Exhibit 9).  He testified (Ex. 10, Dep. Trans. [Shina at 117]):

> Question:  You cannot determine whether it does or does not infringe.  Is that what your saying?

Shina:  Because I would like to rotate it like I did with the other two.

Question:  Go ahead.  Rotate it.

Shina:  I can't.  It's screwed in.

The named inventor on the '638 Patent, Simon Braid, was also asked to examine Braid

Exhibit 9 (a Quick-Tilt*nc properly fastened to the jamb).  He too, confirmed that when properly

installed the spine does not touch the flanges (Ex. 15, Dep. Trans. [Braid at 100]):

Question:  And does the spine touch – well, let me ask you another question first.
Do you see the flanges as part of the jamb?

Braid:  I do see flanges.

Question:  Does the spine touch the flanges?

Braid:  In this particular instance it doesn't.

There is, thus no evidence tending to show that, when properly installed (i.e., secured

with a fixing screw), the raised spine on the Quick-Tilt*nc actually contacts the flange, inhibiting

the rotational motion of the mounting means.   Indeed, all of the evidence is to the contrary.

Amesbury relies, improperly, on product features that do not accurately reflect the features of

Caldwell's Quick-Tilt*nc – specifically, a Quick-Tilt*nc that is not fastened in a window jamb

channel by a fixing screw and by mischaracterizing the testimony of Caldwell's expert.  Having

failed to demonstrate that the Quick-Tile*nc meets this limitation of independent claims 1 and 8,

Amesbury's motion must be denied.  See General Mills Inc. v. Hunt-Wesson Inc., 103 F.3d 978

(Fed. Cir. 1997) (literal infringement requires that every limitation of the patent claim be found

in the accused infringing device); Hewlett-Packard Co. v. Mustek Systems, Inc., 340 F.3d 1314

(Fed. Cir. 2003) (conclusion that claim in optical scanner patent, requiring user's selection of

scan speed, was literally infringed by accused device which allowed user to select scan

resolution, was not supported by substantial evidence; resolution selection did not have one-to-one correspondence with scan speed).

2.    ***Caldwell does not make, use, sell, or offer to sell any products which include a channel means for use in connection with its Quick Tilt\*nc balance***.

To establish a direct infringement claim, 35 U.S.C. § 271(a) requires the unlawful making, using, offering to sell or selling of a patented invention.  That section states:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes on the patent.

Here, the "opposed flanges" and "channel means" are necessary elements of Amesbury's direct infringement claims.  However:  (i) Caldwell does not make, use, sell, or offer to sell any products which include a channel means for use in connection with its Quick Tilt\*nc balance (Zinter Dec. ¶¶8-11); (ii) Caldwell does not make, use, sell, or offer to sell any products which include a channel means having a rear wall, side walls and inwardly turned opposed flanges. (Zinter Dec. ¶¶8-11); and (iii) Caldwell sells window balances which are mounted by Caldwell's customers in the channels of jambs manufactured and sold by companies other than Caldwell. (Zinter Dec. ¶¶8-11).

Because Caldwell does not make, use sell, or offer to sell the necessary "opposed flanges" and "channel means", Amesbury has no direct infringement claim as a matter of law. El Dorado Foundry, Machine & Supply Co. v. Fluid Packed Pump Co et al., 81 F.2d 782 (8th Cir. 1936) *cert. den*. 299 U.S. 560 (1936) (holding that, since appellant never made or sold entire product pump, it was not liable for direct infringement); accord, Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353 (Fed. Cir. 2002) (to prove literal infringement**,** the patentee must show that the accused device contains every limitation in the asserted claims).

14

**C.**    **Any infringement claim relating to dependent claims 2 and 3 fail as a matter of law.**

While one may infringe an independent claim but not a dependent claim, the reverse is not true. One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim. Wahpeton Canvas Co. v. Frontier, Inc., supra.; see also Manchak v. Chemical Waste Mgmt., Inc., 1999 U.S. App. LEXIS 32001 (Fed. Cir.1999) (it is axiomatic that dependent patent claims cannot be infringed unless the claims from which they depend have been infringed); Jeneric/Pentron, Inc. v. Dillon Co., 205 F.3d 1377 (Fed. Cir. 2000). Because Caldwell has not infringed independent claims 1 and 8, it cannot infringe dependant claims 2 and 3 as a matter of law.

**D.**    **The website purportedly maintained by Tri-State Wholesale Building Supplies, Inc. is inadmissible hearsay**.

Amesbury claims that "customers of the Quick-Tilt*nc balance, including Tri-State Wholesale Building Supplies, Inc. of Cincinnati Ohio ("Tri-State"), use the Caldwell Quick-Tilt*nc balance in window jambs of the same geometry and configuration as the window jamb marked as Still deposition Exhibit 10." In support of this argument Amesbury offers an exhibit that purports to be material and information maintained by Tri-State on its website. Amesbury contends that the website states that Tri-State "currently uses and is offering for sale the Caldwell constant force balance system in its Earthwise brand of double hung windows." (See Amesbury Brief at 36 citing SOF at ¶¶ 104, 105).

Summary judgment motions, however, can be decided only on admissible evidence. See generally Moos v. Hampshire College, 1999 WL 377259 (D. Mass. 1999) citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990), and unauthenticated website material from an alleged Caldwell customer is not admissible evidence. For all anyone knows, the material offered by Amesbury is little more than clip art. Amesbury had the opportunity to conduct discovery on

this issue, but didn't.  Had it done so, it might have overcome at least this evidentiary impediment.

Local Rule 56.1 provides, in pertinent part, as follows:

> Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation.

Further, Federal Rule 56(e) requires supporting affidavits to be made "upon personal knowledge" and "shall set forth such facts as would be admissible in evidence."

Taken together, Local Rule 56.1 and Federal Rule 56(e) mean that this Court is restricted to certain forms of pleadings and evidence when considering a motion for summary judgment. In particular, the evidence adduced must be "shown admissible."  See Cummings v. Pearson Educ., Inc., 2006 WL 151880 (D. Mass. January 18, 2006) (Woodlock, J., holding that Local Rule 56.1 and Federal Rule 56(e) require that evidence in a summary judgment motion must be "shown admissible").

Here, Amesbury's motion papers do not include an Affidavit by a Tri-State representative authenticating the website material or otherwise validating Amesbury's speculative conclusions about what the website purports to show.  Amesbury's Statement of Material Facts merely cites to a "printout" of the Tri-State Website.  (See ¶¶ 104 and 105 of Statement of Material Facts). As this "printout" is offered for the truth of the matters asserted therein (i.e. that Tri-State uses the Quick-Tilt*nc balance in window jambs of the same geometry and configuration as the window jamb marked as Still deposition Exhibit 10), in the absence of proper authentication this evidence is inadmissible hearsay.

Affidavits consisting of hearsay evidence do not satisfy Rule 56(e) and must be disregarded.  See Miller v. Solem, 728 F.2d 1020, 1026 (8th Cir. 1984)(affidavits containing

hearsay statements failed to comply with Rule 56(e) requirement "that the facts set forth in affidavits be admissible in evidence"); <u>Pan-Islamic Trade Corp. v. Exxon Corp.</u>, 632 F.2d 539 (5th Circ. 1980)("hearsay evidence in [Rule 56] affidavits is entitled to no weight"); <u>Blair Foods Inc. v. Ranchers Cotton Oil</u>, 610 F.2d 665, 667 (9th Cir. 1980)(hearsay evidence "is inadmissible and may not be considered by this court on review of a summary judgment"); <u>State Mut. Life Insurance Co. of Am. v. Deer Creek Park</u>, 612 F.2d 259 (6th Cir. 1979)("[a]ffidavits composed of hearsay and opinion evidence do not satisfy Rule 56(e) and must be disregarded").   Here, however:

- There is no admissible evidence that Still Exhibit 10 includes a window jamb manufactured by or for Tri-State Wholesale Building Supplies, Inc., of Cincinnati, Ohio;

- There is no admissible evidence that the channel geometry of Still Exhibit 10 is the same as is found in the Tri-State window product shown on Tri-State's website;

- The channel geometry on the window jamb shown in Amesbury's statement of facts Ex. 38 cannot be determined from Tri-State's website;

- There is no admissible evidence that the window jamb shown in Ex. 38 is the same relevant configuration as that of Still deposition Exhibit 10.

Just as Amesbury would be precluded at trial from offering into evidence such an inherently unreliable document without an appropriate foundational, so too is it precluded from having this evidence considered in connection with this summary judgment motion.

Candidly, an objective observer can't determine a thing about the geometry of the jamb configuration from looking at Exhibit 38.   Indeed, Shina Exhibits 5 and 7 (with the Quick-Tilt*nc balance of Shina Exhibit 6), and Braid Exhibit 9 reveal the inherent unreliability of

Exhibit 38 because Shina concedes that these latter three exhibits — which appear similar to Exhibit 38 — do not infringe Claims 1 and 8 of the '638 Patent.[16]

## E.    Amesbury's '638 Patent is Invalid

The Sterner patent (U.S. Patent 5,157,808) was filed February 18, 1992.  Mr. Still examined the Sterner reference and concluded that it anticipates the invention disclosed in claims 1, 2, 3 and 8 of the '638 Patent.  A patent is invalid if a single prior art reference discloses each limitation of the claimed invention.  Schering Corp. v. Geneva Pharms., Inc., 339 F.3d 1373  (Fed. Cir. 2003); citing Lewmar Marine, Inc. v. Barient, Inc., 827 F.2d 744, 747 (Fed. Cir. 1987).  Specifically, Mr. Still concluded (Still March 13, 2006 Report at 6):

---

[16] On this point, Shina testified (Ex. 10, Dep. Trans [Shina at 115-117]):

Question:  …I have now placed those two together [Shina Exhibits 5 and 6] and ask you in its present condition, does the combination of Exhibits 5 and 6 infringe Claim one of the '638 Patent?

Shina:  As I see today for the first time, Exhibit 5, Shina Exhibit 5 and Shina Exhibit 6, and in its present condition, which does not include possible degradation over time of the dust cover and of the wings, this particular combination of Exhibit 6 and 5 does not infringe on Claim one.

Question:  Okay.  Does the combination of Exhibit 6 and 5 in its present condition infringe Claim eight of the '638 Patent?

Shina:  I would repeat my same proviso, which is the Exhibits that I see today, presented to me for the first time, and not – in its present condition not counting on possible degradation of the dust cover and the wings, that the Exhibits that I see before me do not infringe on Claim eight.

Question:  I place before you what I showed you before.  Braid Exhibit 9.  And I'll ask you in its present condition, does the combination of the balance in channel – strike that. In its present condition, does the combination of the frame jamb and balance in Braid Exhibit 9 infringe Claim one of the '638 Patent?

Shina:  As we discussed before, I'm seeing before me Exhibit Braid 9.  I cannot see the width of the wings so I cannot comment as to the wings and in its present condition, which does not include degradation of the dust cover. And since I cannot move the balance since its attached by a screw to the jamb, that I would say it – I cannot determine the – since I cannot rotate it myself physically, that it possibly might not infringe.

Question:  You cannot determine whether it does or does not infringe. Is that what you're saying?

Shina:  Because I would like to rotate it like I did with the other two.

Question:  Go ahead.  Rotate it.

Shina:  I can't.  It's screwed in.

Braid, U.S. Patent 5,365,638, based upon my findings, is not novel and/or is obvious and therefore, not valid.

Prior art proves that all components of [the] '638 Patent existed before [the] '638 Patent was filed. U.S. Patent 5, 157,808 (Sterner) contains all of the elements disclosed in claims 1, 2, 3 & 8 of the '638 Patent, thereby anticipating those claims.

Amesbury — relying on Shina's evaluation — argues that "Sterner does not disclose the element that recites, 'whereby rotational motion of said mounting means is inhibited.'" (Amesbury Brief at 37); specifically, that Sterner does not "disclose that any portion of the mounting means is 'positioned between and in the same plane as said inwardly turned opposed flanges of said channel means,' a required element of both Claims 1 and 8." (Amesbury Brief at 39). But Shina's testimony does not support this contention. During his deposition Shina identified the location of the flanges on the Sterner reference (Exhibit 9) by marking them with the letter "K." Yet, later in the deposition it became clear that Shina was, uncertain about the location of the flanges (Ex. 10, Dep. Trans. [Shina at 171-174]):

Question -- Okay. Are those exhibits as they're sitting on the table in front of you oriented the same way figure 3 is in Exhibit 9, which is the Sterner Patent?

Shina: - Okay. Figure 9? I'm sorry.

Question -- Figure 3 of Exhibit 9.

Shina -- Oh, okay. Sorry. Let's see. It shows the -- figure 3 shows the screw being screwed into the jamb wall and that is to the right. And in this particular case, if I put a screw in the exhibits that you mentioned, they would be going to the left.

Question -- All right. So let me flip them all over so they're oriented now the same way as figure 3 in Shina Exhibit 9. Now in all of the four, putting aside Still 4B, in Braid 9, Shina 5, Shina 7 and Still 4A, is there a part that's projecting beyond the flange to the left which is visible in each of those frame jamb channels or frame jambs?

Shina -- Yes. There is a part.

Question -- Is it possible that [the] part that's projecting to the part in each of those four exhibits is the same part you labeled K in figure 3?

Shina -- Part of my answer would be in -- there's no standard drawing procedures to draw an edge. I notice in figure 3 the line that I marked K is a double line. There is no standard drawing procedures to the meaning of a double line. Usually if it's a feature that is a single feature, which ends in a single edge, that is usually drawn as a single line. In a feature that has in it such as the feature where the double flanges come in where they have two parts terminating at the same point, there is no standardized procedures but it's common in engineering drawings to have a double line when you are trying to convey to the reader the fact that there are two features which end at the same point.

Question -- You don't know whether the draftsman of these patent drawings followed that convention or not, do you?

Shina -- I do not know that.

Question -- So you cannot conclude with certainty that the item K you have drawn in Exhibit 9 is the flange or is some feature other than the flange?

MR. SINGER: Objection.

Shina -- Conventional wisdom would say that the double line would indicate it's the flange. *However, since the absence of a standard I cannot say with extreme certainty, with 100 percent certainty whether this is -- conventional wisdom would tell me that that's a flange. Since you raised that point, I have to do further study to determine whether it's the flange or the feature that I see right in front of me to the left of the flange* (Emphasis Added).

Thus, Amesbury's claim that the raised spine on the Sterner reference is not "positioned between and in the same plane" as the inwardly turned opposed flanges lacks merit.

Moreover, during his deposition, Shina was asked to examine Still Exhibit 5. Still Exhibit 5 is a window balance and jamb assembly which is made by the owner of the Sterner reference. (Zinter Dec. ¶17). Significantly, upon examining Still Exhibit 5, Shina conceded:

- The Sterner product includes a raised spine (Ex. 10, Dep. Trans. [Shina at 182-183]);[17]

- The raised spine is positioned between the same plane as inwardly opposed flanges of a channel means (Ex. 10, Dep. Trans. [Shina at 179-180]); [18]and

- The raised spine inhibits the rotational movement of the mounting means (Ex. 10, Dep. Tran. [Shina at 185]).[19]

Thus, the characteristic Amesbury asserts is missing from Sterner ("whereby rotational motion of said mounting means is inhibited") is necessarily present or inherent in the reference. A prior art reference may anticipate without disclosing a feature of the claimed invention if that

---

[17] Shina's testimony was:

Question:  So operationally it's a raised surface from one another section of the housing, correct?

Shina:  "Raised" is a relative term.  So it's a surface that dimensionally sits above the other surface, that's correct.

[18] Shina's testimony was:

Question:  Now you have it assembled, balance and channel, the way I originally handed it to you as Exhibit 5, right?

Shina: Okay.  Correct.
…
Question:  Now I would ask you to examine the front face of the balance that is between the flanges. Do you see that? Do you see what I'm talking about?

Shina:  The one that says "down"? Is that correct?

Question:  Yes.  The one with the word "down" on it.  Do you see that?

Shina:  Yes I do see that.

Question:  Okay.  Is that front face with the word "down" on it between and in the same plane as the flanges of that frame jamb?

Shina:  Between the same plane, yes.

[19] Mr. Shina's testimony was:

Question:  [referring to Still Exhibit 5]…And ask you if the flat surface that's between and in the same plane as the flanges would inhibit the rotation of that surface.

Shina:  Again, I would like to say the proviso that we're describing the surface 'down' and not the word "spine" or "projection."  As I see this surface 'down', marked 'down', it would seem to prohibit rotation of the device.

missing characteristic is necessarily present, or inherent, in the single anticipating reference. Schering, supra citing Continental Can Co. v. Monsanto Co., 948 F.2d 1264, 1268 (Fed. Cir. 1991).

Likewise without merit is Amesbury's claim that Sterner fails to disclose "a mounting means having a raised spine" and/or a spine "positioned between and in the same plane as said inwardly turned opposed flanges of said channel means." Here too, the concessions made by Shina during his deposition reveal that Sterner disclosed these elements. (Ex. 10, See Dep. Trans. [Shina at 180-183]).

## POINT II

### CALDWELL'S 86xt DOES NOT INFRINGE AMESBURY'S '264 PATENT

**A.    Amesbury's '264 Patent**

Amesbury's '264 Patent involves a "block and tackle" window balance. It can be described as follows:[20]

> The window balance **300** includes the rigid U-shaped channel **305**, a top guide **310**, a bottom guide **315**, a spring **320**, a translatable pulley unit **330**, a fixed pulley unit **335**, a bottom guide roller **350**, and a cord **340**. The top guide **310** and the bottom guide **315** are fixed to the rigid U-shaped channel **305** by fasteners **312**, **316**. The top guide **310** is used to help connect the block and tackle window balance **300** to the window sash **104**, **106** and to help guide the movement of the block and tackle window balance **300** within the jamb pocket **108**.

According to Amesbury, the '264 Patent is unique because it mounts the lower roller (the "guide roller") within the bottom guide at the bottom of the balance. This configuration allows the sash to travel a greater distance. Other balances locate the lower roller above the bottom guide (a considerable distance from the bottom of the balance).

---

[20] See Patent Number 6,598,264 at FIGS 4A and 4B.

**B.**    **The 86xt balance does not infringe independent claim 1[21] and dependant claims 2, 4 and 5 of '264.**

Amesbury claims that to meet its burden on this motion it must show that the 86xt balance includes "a bottom guide roller[22] rotatably mounted in the bottom guide."[23]   However, the 86xt does not include a bottom guide "roller" – it includes a fixed pulley block connected to the channel which contains three pulleys.

Amesbury asserts that the difference between a "roller" and "pulley" is semantic. Not so. Even Gary Roger Newman, the named inventor on the '264 Patent concedes this point (Ex. 11, Dep. Trans. [Newman at 23]):

---

[21] Claim 1 of '264 provides:

    1. A block and tackle window balance device comprising:

    a channel comprising a first end and a second end;

    a top guide connected to the first end of the channel;

    a bottom guide connected to the second end of the channel;

    a bottom guide roller rotatably mounted in the bottom guide;

    a fixed pulley block unit connected to the channel;

    a translatable pulley block unit moveable within the channel;

    a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and

    a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

[22] Construction order which provides, "the ordinary meaning of the roller being mounted in the bottom guide could encompass the idea that the roller is *"in"* the bottom guide, yet not necessarily mounted directly to the bottom guide."

[23] According to the construction order, this means, "a roller mounted in the bottom guide in a way that permits its rotation."

Question:  Is a roller different than a pulley?

Newman:  In my world it is.[24]

Mr. Still agrees (Ex. 9, Dep. Tran. [Still at 99]):

Question:  Based upon your knowledge and expertise, is there a difference between the term "roller" and "pulley"?

Still:  In my opinion, yes.

Question:  What are the differences?

Still:  If you compare a steam roller to a car tire, a roller is real wide, it's cylindrical and goes through the center point but its normally wider than a tire or pulley.

Question:  with respect to a window balance design, is there a difference between the term 'roller" and "pulley" based upon your knowledge and experience?

Still:  There can be, yes.

Question:  What differences do you have in mind?

Still:  A roller may have certain design intent.  It may or may not have a groove in the center where a pulley does.

On this record, therefore, Amesbury is not entitled to summary judgment on the claims it makes under the '264 patent.  See General Mills Inc. v. Hunt-Wesson, Inc. 103 F.3d 978 (Fed. Cir. 1997) (Literal infringement requires that every limitation of the patent claim be found in the accused infringing device; Read Corp. v. Portec, Inc., 970 F.2d 816, 821 (Fed. Cir. 1992); Brand Management Inc., and Pro Plans Co., Inc. d/b/a/ Pro Shop Company v. Menard, 135 F.3d 776 (Fed. Cir. 1998) (comparing properly construed claim with the accused product is a question of fact).

---

[24] Mr. Newman's world is that of the inventor, a career window balance designer and a self-proclaimed "expert" in window balances.  In other words, Mr. Newman is a person of expert skill in the relevant art.  In contrast, Shina's world is that of one, not of expert – or even ordinary skill in the art, but one who only once examined a fully assembled window for a few seconds at a Home Depot department store.

Because Amesbury cannot demonstrate that Caldwell has infringed independent claim 1, it also cannot demonstrate infringement of dependent claims 2, 4 and 5.  <u>Wahpeton Canvas Co. v. Frontier, Inc</u>., 870 F.2d 1546 (Fed. Cir.1989) ([o]ne who does not infringe an independent claim cannot infringe a claim dependent on it).

**C.    <u>The 86xt does not  infringe claim 1 of the '264 Patent under the doctrine of equivalents.</u>**

Amesbury argues that, even if the 86xt does not literally incorporate the bottom claimed roller, "Caldwells' bottom pulley performs the same function of the claimed bottom guide roller, *in the same way to achieve the same result,* and is therefore equivalent to the claimed bottom roller."  (Amesbury Brief at 12).  Not so.

First, in making this argument, Amesbury relies entirely upon the reports of Mr. Shina, which are not properly authenticated and must be disregarded on this summary judgment motion. As noted in Point IV, <u>infra</u>, the record contains no affidavit by Shina confirming that the annexed reports are, in fact:  (1) true and accurate copies of his final reports; (2) that the matters asserted therein are true to best of his knowledge; and (3) that his conclusions therein were made to a reasonable degree of professional certainty.  <u>See</u> Local Rule 56.1; Federal Rule 56(e); <u>see</u> <u>also</u> <u>Great Northern Ins. Co. v. Paino Associates.</u>, 364 F.Supp.2d 7 (D. Mass. 2005) (holding that an expert report, submitted without an authenticating affidavit, would ordinarily be stricken). Absent Shina's inadmissible opinions, there is no evidence that a pulley performs substantially the same function in substantially the same way, to achieve substantially the same result as a "roller."  Indeed, the evidence is to the contrary.

First, two experts, Gary Roger Newman, and Charles E. Still, agree that a "pulley" is different than a "roller."  Of course, Mr. Still was not asked to elaborate in his deposition.  He does so, however, in his Declaration in support of this motion.  There, Still clearly states that a

"pulley" functions differently than a "roller" because a roller is designed to roll along a bearing surface, where a pulley is not. (Still Dec. at ¶¶10-12). This evidence, creates minimally, a question of fact on the issue sufficient to deny Amesbury's motion. Johnson v. IVAC Corp., 885 F.2d 1574 (Fed. Cir. 1989).

D. **Amesbury's '264 Patent is Invalid**

35 U.S.C. §103(a) states:[25]

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title (35 U.S.C. §102), if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

A legal conclusion that a claim is obvious within the meaning of §103(a) depends upon four underlying factual issues: (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art; and, (4) evaluation of any relevant secondary considerations. See Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17, 86 S. Ct. 684 (1966).

The analysis begins with an examination of the scope of the admitted prior art disclosed in Figure 2A of the '264 Patent. The admitted prior art includes a spring **220**, a translatable pulley **230**, a fixed pulley **235**, a roller **239** and a cord **240** housed within the U-shaped channel **206 207 208**. The admitted art also includes an angled top guide **210** and bottom guide **215**. The bottom guide **215** includes a channel **214** sized to receive a portion of a window sash.

Thus, with the exception of the "bottom guide roller" and "bottom guide", Figure 2A discloses all elements of the '264 Patent. These latter two elements (the bottom guide roller and

---

[25] Amesbury claims that "Caldwell's Obviousness analysis is legally defective" because Mr. Still never considered the "level of ordinary skill in the art and any relevant secondary considerations of nonobviousness." (Amesbury Memorandum of Law at 17). This is simply not true. In fact, Mr. Still states just the opposite at page 52 of his deposition transcript.

bottom guide), however, are disclosed in the Thompson reference (U.S. Patent Number 6,840,011). (Ex. 11, Dep. Trans. [Newman at 18:17– 20:4]); see also Still Report dated March 8, 2006 at page 7).[26]

When assessing the differences between the prior art and the claimed subject matter under §103(a), the claimed invention "as a whole" must be considered. See Ruiz v. A.B. Chance Co., 357 F.3d 1270, 1275 (Fed Cir. 2004); Princeton Biochemicals, Inc. v. Beckman Coulter, Inc., 411 F.3d 1332 (Fed. Cir. 2005). Such an assessment requires a showing that one of ordinary skill in the art at the time of invention, confronted by the same problems as the inventor and with no knowledge of the claimed invention, would have selected the various elements from the prior art and combined them in the claimed manner. Id. In other words, §103 requires some suggestion or motivation, before the invention itself, for the new combination. Id. citing In re Rouffet, 149 F.3d 1350, 1355-56 (Fed Cir. 1998). Thus, this test asks not merely what the references disclose, but whether a person of ordinary skill in the art, with the understandings and knowledge reflected in the prior art, and motivated by the general problem facing the inventor, would have been led to make the combination recited in the claims. See also Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293 (Fed. Cir. 2005).

Motivation to modify prior art teachings may appear in the content of the public prior art, in the nature of the problem addressed by the invention, or even in the knowledge of one of ordinary skill in the art. Princeton Biochemicals, Inc. v. Beckman Coulter, Inc., supra citing SIBIA Neurosciences, Inc.. v. Cadus Pharm. Corp., 225 F.3d 1349 (Fed Cir. 2000). Here, at the time of the invention, there was a well known need in the window balance industry to extend the

---

[26] The invention disclosed in the Thompson reference was made and sold by Amesbury more than a year before the filing date of the '264 Patent (Ex. 11, Dep. Trans. [Newman at 5-6]).

travel of window balances to better comply with building egress codes. (Ex. 17, Dep. Trans. [Zinter at 21-24]). Douglas Zinter described the need as follows:

> Well, this – the idea really started to gain momentum in I guess it was about June of 2000 and really that began with discussions I had with Carl Shelton who was an engineer for Solar Industries. And Solar Industries was in the process of developing a new window design and in the process of working out the sash balance application from design drawings, I pointed out to Carl Shelton that we had difficulty in meeting an egress opening on their emergency escape window size which was typically in the industry, it is a window size of about 36 inches wide by 60 inches tall. So it was at that point in time that we began having discussions concerning the sash balance application. (Ex. 17, Dep. Trans [Zinter at 24-25]).

Mr. Shina agrees:

> Question: Why would someone want to have a longer travel, if you know?
>
> Shina: From the material that I read, it has to do with egress and there are specifications where you would require egress to be longer. That's one of the – one of the situations or one of the desire -- design – design functions that I looked at. (Ex. 10, Dep. Trans [Shina at 195-196]).[27]

The obvious solution, to one of ordinary skill in the art, was to combine the admitted prior art in figure 2A of the '264 patent with the bottom guide roller in the Thompson reference, extending the travel of the window to better comply with building code requirements regarding egress. (Ex. 10, Dep. Trans [Shina at 195-198]). Indeed, the named inventor on the '264 Patent, Gary Newman, confirmed that the combination would solve the problem associated with building egress. (Ex. 11, Dep. Trans. [Newman at 39-40]):

---

[27] Later in his testimony, Shina went on to say (Ex. 10, Dep. Trans.[Shina at 198]):

> Question: Okay. So the balance designers would have a high want, in your terms, of increasing the opening of a window size?
>
> Shina: Correct.
>
> Question: So there's a need to increase the opening size; is that correct?
>
> Shina: Correct.

Question:  …If I were to take the device shown in Figure 2A of the Exhibit 6 and put the pulleys in that as are shown on the first page of Exhibit 18 [Balance, Block and Tackle], the two fixed pulleys and the third pulley beneath that, would the travel then be extended of the balance shown in Figure 2a as modified?

Newman:  The travel would be increased relative to the channel length.

## POINT III

### CALDWELL DOES NOT INFRINGE ANY CLAIMS IN AMESBURY'S 368 PATENT

**A.    Amesbury's '368 Patent.**

This Patent relates to a tiltable block and tackle window.  More particularly, it relates to a balance shoe of a window balance system used in conjunction with a pivot bar mounted on a window sash for rotating the window sash relative to a window frame.  The '368 Patent can be described as follows:

Figures 3A and 3B of Patent '368 are perspective views of a snap lock balance shoe **210**, which is at issue in this case.  The snap lock balance shoe **210** has a frame **211** in which is housed a connecting device **212**, a locking device **214**, and a cam **218**.  The connecting device **212** can be integral with the frame **211** and attaches the snap lock balance shoe **210** directly with the inverted window balance **622** shown in FIG 3C.  The inverted window balance **622** in combination with the snap lock balance shoe **210** forms a snap lock inverted window balance system **600**.

Regarding the snap lock balance shoe, Claim 2 provides, in pertinent part,

a balance shoe, wherein the balance shoe comprises:

a frame comprising an enlarged fist end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms ***a pocket*** positioned in the second end of the frame ***adapted to mate with a rivet*** (Emphasis added);

a locking member proximal to the enlarged first end;

29

> a cam in communication with the locking member, and

> a *connecting device* for attaching the balance shoe within the U-shaped channel of the window balance (Emphasis added).[28]

This Court has construed "pocket" to mean:

> A notch with an opening shaped to mate (i.e. 'to join or fit together') with a rivet, thereby aiding to secure the balance shoe within the U-shaped channel of the inverted window balance.

A "connecting device" was construed to mean:

> A device such as a rivet, screw, or resilient tabs, that connects the balance shoe to the U-shaped channel of the inverted window balance.

**B.**    **Caldwell's Series 97ez balance does not infringe independent claim 2 of the '368 Patent.**

Caldwell's series 97ez balance does not infringe independent claim 2 of Amesbury's '368 Patent because two elements are absent: (i) a "pocket … adapted to mate with a rivet"; and, (ii) a connecting device for attaching the balance shoe with the U-shaped channel."

The 97ez has two rivets in the channel. Mr. Still describes this design as follows (Still Report [April 17, 2006 at 8]):

---

[28] In totality, Independent Claim 2 provides:

2. A window balance system comprising:

a U-shaped channel comprising a plurality of openings;

a spring connected to a system of pulleys located within the U-shaped channel;

a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and

a balance shoe, wherein the balance shoe comprises:

a frame comprising an enlarged fist end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms *a pocket* positioned in the second end of the frame *adapted to mate with a rivet*;

a locking member proximal to the enlarged first end;

a cam in communication with the locking member, and
a *connecting device for attaching the balance shoe within the U-shaped channel of the window balance* (Emphasis Added).

> During factory assembly, a connecting rivet is threaded through an aperture molded into the frame of the carrier.  A second rivet through the end of the channel holds the end of the spring as well as supports two legs of the carrier to prevent outward rotation.  The carrier is designed to be non-removable and does not have a snap-in capability.

Mr. Still concluded that the 97ez does not infringe Amesbury's '368 Patent (Still Report [April 17, 2006 at 8]) because it does not have a "pocket" and the rivet at issue does "not connect the carrier to the channel" (Still Report [April 17, 2006 at 8]):

> Caldwell's series 97ez with Long Carrier does not infringe the '368 Patent because Caldwell's 97ez with Long Carrier *does not have a pocket in its balance carrier (shoe) frame.*  It has an aperture for a rivet and, at the extreme end of the carrier, it has two legs supported by a second rivet (that holds the end of the spring) to prevent outward rotation.  Further, *the second rivet does not connect the carrier to the channel* and does not mate with the carrier legs (Emphasis added).

During his deposition, Mr. Still emphasized this point (Ex. 9, Dep. Trans. [Still at 141-142]):

> Question:  Now there seems to be some interplay between a portion of the shoe and a second rivet passing through the channel; can we agree on that?
>
> Still: Yes.
>
> Question:  What is the purpose of that relationship?
>
> Still:  The purpose of that is to keep the rotation out and 90 degrees[29] to the channel.  There is two legs that have to be formed on the back end of the molded carrier goes underneath a rivet that supports the end of the spring and that minimizes rotation.
>
> Question:  Would it be fair to say that the end of the shoe and those legs are designed to mate with that second rivet?
>
> Still:  No.
>
> Question:  Why not?
>
> Still:  It's a separate part of the housing, all its purpose is to keep the rotation out.

---

[29]  The deposition transcript states as follows, "the purpose of that is to keep the rotation out and *9 degrees*. **...** This is still a misquote.  Mr. Still actually stated 90 degrees, not 9 degrees.  This mistake was corrected in the errata sheet.  Nevertheless, substantially, this minor point does not change the analysis above.

Question:  How does it do that?

Still:  When you put those two legs underneath the rivet, it keeps – inhibits it from rotating.  It does have nothing to do with the connection to the channel.

In his deposition testimony, Wilbur J. Kellum, confirmed that the Caldwell 97ez does not include a pocket that mates and/or touches a rivet (Ex. 14, Dep. Trans. [Kellum at 144]):

Question:  Mr. Kellum, when the 97ez balance is installed in a window, does the carrier rotate?

Kellum:  No.

Question:  And when installed in a window, does the carrier of the 97ez balance touch the rivet that is the attachment point for the spring in any way?

Kellum:  That is the – what we had previously referred to today as the second rivet?

Question:  correct.

Kellum:  No, it does not touch it.

This testimony, which establishes that the 97ez does not contain a "pocket … adapted to mate with a rivet,"  is sufficient to defeat Amesbury's claim of literal infringement of the '368 Patent.  However, the 97ez also does not contain a "connecting device for attaching the balance shoe with the U-shaped channel."  The deposition testimony of Gary Newman makes this point. Gary Newman is the inventor on the '264 Patent who claims to be an expert in the construction of window balances and skilled in reviewing engineering drawings.  (Dep. Trans. [Newman 91: 121- 122).  Significantly, Mr. Newman was unable to locate a "connecting device" in engineering drawings of Caldwell's 97ez balance. (Ex. 11, Dep. Trans. [Newman 121- 122]).  He testified:

Question:  Do you see a snapping element [referring to Patent '368]?

Newman:  I have not picked it out, no.

Question:  Is it possible that there is no snapping element?

Newman:  That is possible.

Mr. Ishmael: Objection.

Question:  If there were no snapping element, would that mean there's no connecting device as claimed in claim two of Exhibit 15?

Mr. Ishmael: Objection.  Calls for a legal conclusion.

Newman:  As in that claim, yes.

Question:  yes what?

Newman:  If there was no connecting device, then its not the same as the one depicted in claim 15.[30]

Absent a "pocket … adapted to mate with a rivet" and a "connecting device", the 97ez cannot literally infringe the 368 Patent.  See General Mills Inc. v. Hunt- Wesson, Inc., supra.

**C.    The 97ez does not  infringe under the doctrine of equivalents.**

Amesbury claims that, in any event, the "pocket" in the 97ez is equivalent to the "pocket" claimed in the '368 Patent.  Again, the argument fails, both legally and factually.

To reiterate, Shina's Report, upon which this argument rests, has not be properly authenticated and, therefore, cannot be considered.  Moreover, Mr. Shina does not have the requisite skill and background to render an opinion on either infringement or patent validity (see Caldwell's Motion to Disqualify Amesbury's Expert).

In any event, Shina's contention – that "the connecting device (i.e., the rivet) of claim 2 performs the same performs the same function of attaching the balance shoe to the channel, by using a method connecting the shoe to the channel."  (Shina Report [March 23 at 40]) – is directly disputed by Caldwell's expert creating, at a minimum, a question of fact on the issue.  As noted, Mr. Still states the rivet has "nothing to do with the connection to the channel" (Dep. Trans. [Still

---

[30] It appears that Newman meant to say Claim 2 of Exhibit 15, as there is no Claim 15 in the '368 Patent.

at 140-142]), and Mr. Kellum confirmed that, when installed in a window, the carrier of the 97ez balance does not touch the rivet. (Ex. 14, Dep. Trans. [Kellum at 144]).

**D.    The 97ez does not  infringe dependent claims 3, 6 and 7 of Amesbury's '368 Patent.**

Dependent Claims 3, 6 and 7 cannot be infringed unless the claims from which they depend (i.e., independent claim 2) has been infringed.  Wahpeton Canvas Co. v. Frontier, Inc., supra.   As this is not the case, Amesbury's claim that dependant claims 3, 6, and 7 of Amesbury's '368 Patent have been infringed has no merit.

**E.    Caldwell's Series 97i balance does not infringe Independent Claim 2 of '368.**

Like the 97ez, the Series 97i balance does not infringe independent claim 2 of Amesbury's '368 Patent because two elements are absent:  (i) a "pocket … adapted to mate with a rivet"; and, (ii) a connecting device for attaching the balance shoe with the U-shaped channel.

In his April 17, 2006 Report, Mr. Still describes the Series 97i as follows:

> Caldwell's Series 97i with Short Carrier (Shoe) is "T" shaped and is directly connected to the end of the balance channel with one rivet.  It does not have snap tabs and does not rotate around a rivet.  During factory assembly, a connecting rivet is threaded through a clearance through both outer walls of the carrier.  It is designed to be non-removable and does not have a snap-in capacity.

Mr. Still concludes that the 97i "does not have 'pocket' in its balance carrier (shoe) frame.  It has a clearance on both walls of the carrier (shoe) for a connecting rivet."  (Still Report [April 17, 2006]).  His opinion alone creates an issue of fact sufficient to deny summary judgment.

Amesbury asserts that the 97i has a "'pocket' or notch that is shaped to fit together with a rivet, *that also serves as a connecting device, to secure the balance shoe with the U-shaped channel."*  In other words, Amesbury seeks to satisfy two separate limitations in the claim (i.e., the "pocket" and "connecting device") with the same element in the device.  This violates the well established "all limitations rule."  A device cannot infringe a claim, either literally or by the

doctrine of equivalents, unless the accused structure incorporates each limitation.  See Lemelson v. United States, 752 F.2d 1538 (Fed. Cir. 1985).  As a result, Amesbury's infringement claim with regard to the 97i fails as a matter of law.

**F.     Caldwell's Series 97ih balance does not infringe Claims 2, 3, 6 and 7 of the '368.**

The analysis is exactly the same with respect to the 97i and the 97ih.  There is essentially no difference in the balance shoes of the 97i and 97ih products of Caldwell.  (Dep. Trans. [Batten 74]).  As such, this Court should deny Amesbury's motion for summary judgment for the same reasons presented above regarding the Series 97i balance.

## CONCLUSION

For the reasons stated herein, Caldwell respectfully requests that this Court deny Amesbury's motion for summary judgment in all respects, and that it have such other and further relief as may be just and proper.

Dated:  June 9, 2006                    Respectfully submitted,

                                        THE CALDWELL MANUFACTURING COMPANY

                                        By its attorneys,

                                        /s/Neal L. Slifkin_____
                                        Paul J. Yesawich, III
                                        Neal L. Slifkin
                                        David J. Edwards
                                        Laura W. Smalley
                                        *Attorneys for Defendant*
                                        99 Garnsey Road
                                        Pittsford, New York 14534
                                        Telephone: 585-419-8800

                                            -and-

                                        David E. Lurie, BBO# 542030
                                        Thomas E. Lent, BBO# 644970
                                        Lurie & Krupp, LLP
                                        One McKinley Square
                                        Boston, MA 02109
                                        Telephone: 617-367-1970


                            **CERTIFICATE OF SERVICE**

        I hereby certify this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 9, 2006.


                                        /s/ Thomas E. Lent_____
                                        Thomas E. Lent

210199 70118.2
6/9/2006 3:31 PM