UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

          Plaintiffs,

                                          Civil Action
    v.                                     No. 05-CV-10020

THE CALDWELL MANUFACTURING CO.,

          Defendant.

_____

**DECLARATION OF NEAL L. SLIFKIN IN OPPOSITION TO
AMESBURY'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT
AND THAT THE ASSERTED CLAIMS ARE INVALID**

     I, NEAL L. SLIFKIN, hereby declare as follows:

     I am a member of the law firm of Harris Beach PLLC and counsel of record for

The Caldwell Manufacturing Company ("Caldwell"). I make this declaration in

opposition to Amesbury's Motion for Summary Judgment of Infringement and that the

Asserted Claims are Invalid

     1.     Attached hereto as Exhibit 1 is a true and correct copy of U.S. Patent No.

6,840,011.

     2.     Attached hereto as Exhibit 2 is a true and correct copy of U.S. Patent No.

5,157,808.

     3.     Attached hereto as Exhibit 3 is a true and correct copy of U.S. Patent No.

3,091,797.

4.      Attached hereto as Exhibit 4 is a true and correct copy of the Expert Witness Report of Charles E. Still dated April 17, 2006.

5.      Attached hereto as Exhibit 5 is a true and accurate copy of the Expert Witness Report of Charles E. Still dated March 8, 2006.

6.      Attached hereto as Exhibit 6 is a true and correct copy of the Expert Witness Report of Charles E. Still dated March 13, 2006.

7.      Attached hereto as Exhibit 7 is a true and accurate copy of this Court's Memorandum and Order dated January 20, 2006.

8.      Attached hereto as Exhibit 8 is a true and correct copy of Defendant's Second Supplemented Answer to Plaintiffs' First Set of Interrogatories.

9.      Attached hereto as Exhibit 9 is a true and correct copy of excerpts from the official transcript of the May 2, 2006 deposition of expert witness Charles E. Still.

10.      Attached hereto as Exhibit 10 is a true and correct copy of the excerpts from the official transcript of the May 3, 2006 deposition of Dr. Sammy Shina.

11.      Attached hereto as Exhibit 11 is a true and correct copy of the excerpts from the official transcript of the October 18 and 19, 2005 deposition of Roger Gary Newman.

12.      Attached hereto as Exhibit 12 is a true and correct copy of the excerpts from the official transcript of the October 20, 2005 deposition of Douglas Zinter.

13.      Attached hereto as Exhibit 13 is a true and correct copy of the excerpts from the official transcript of the November 8, 2005 deposition of Thomas Batten.

14.      Attached hereto as Exhibit 14 is a true and correct copy of the excerpts from the official transcript of the October 28, 2005 deposition of Wilbur James Kellum.

15.    Attached hereto as Exhibit 15 is a true and correct copy of the excerpts from the official transcript of the November 30, 2005 deposition of Simon Braid.

16.    Attached hereto as Exhibit 16 is a true and correct copy of the excerpts from the official transcript of the October 18, 2005 Rule 30(b)(6) Deposition of Gary Newman.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 8, 2006.

 /s/ Neal L. Slifkin
        Neal L. Slifkin

210199 70318.1
6/8/2006

Exhibit 1

US006840011B2

(12) **United States Patent**       (10) **Patent No.:**    **US 6,840,011 B2**

Thompson et al.                     (45) **Date of Patent:**    **Jan. 11, 2005**

(54) **WINDOW PANEL BALANCE APPARATUS AND METHOD**

(75) Inventors: **Roy A. Thompson**, Dorchester, MA (US); **Douglas W. Kroncke**, Boston, MA (US); **John C. Costello**, Wellesley, MA (US); **David P. Chastain**, Acton, MA (US); **Jack D. Gundlach**, Acton, MA (US); **Timothy J. Kelley**, Stillwater, MN (US); **Larry Versteeg**, Sioux Falls, SD (US); **Thomas Hansel**, Rockford, IL (US); **Arthur R. King, IV**, River Falls, WI (US); **James R. Harger**, Rockford, IL (US); **Michael L. Doll**, Osceola, WI (US); **James L. Peterson**, New Richmond, WI (US); **Dennis A. Galowitz**, Stillwater, MN (US); **Richard M. Fischer**, Stillwater, MN (US)

(73) Assignee: **Andersen Corporation**, Bayport, MN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/149,181**

(22) PCT Filed: **Dec. 13, 2000**

(86) PCT No.: **PCT/US00/33789**

§ 371 (c)(1),
(2), (4) Date: **Oct. 24, 2002**

(87) PCT Pub. No.: **WO01/42605**

PCT Pub. Date: **Jun. 14, 2001**

(65) **Prior Publication Data**

US 2003/0226317 A1 Dec. 11, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/170,307, filed on Dec. 13, 1999.

(51) Int. Cl.⁷ ............................................... E05D 15/22

(52) U.S. Cl. .......................................... 49/181; 49/445

(58) Field of Search .......................... 49/176, 181, 445, 49/446, 447; 16/196, 197, 198, 199

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 2,262,990 A | 11/1941 | Cross et al. |
| 2,952,884 A | 9/1960 | Dinmore |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| GB | 2 276 655 | 10/1994 |

OTHER PUBLICATIONS

The 'Invisible' Balance for Custom Wood Windows, *SHELTER Magazine*, describing Strybuc Industries' concealed balance as being on the market since before Dec. 13, 1998, p. 37 (Jul. 2000).

(List continued on next page.)

*Primary Examiner*—Jerry Redman
(74) *Attorney, Agent, or Firm*—Womble Carlyle Sandridge & Rice, PLLC

(57) **ABSTRACT**

A window having a window panel that slides in a frame and at least one balancer that is secured to the window panel is disclosed. The window is of the tiltable hung type having a vertical operating position in which the balancer slides with the window panel in the frame and a tilted position in which the balancer remains secured to the window panel. The balancer includes an extensible member having a first end operatively coupled to the balancer and a second end operatively coupled to a frame so that the balancer can exert a force on the window panel to assist against the force of gravity when the window panel is in the vertical operating position. A method of constructing a tiltable hung window with a balancer secured to the window panel is also disclosed.

**18 Claims, 7 Drawing Sheets**



**US 6,840,011 B2**
Page 2

---

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,054,152 | A | | 9/1962 | Trammell, Jr. |
| 3,055,044 | A | | 9/1962 | Dinsmore |
| 3,091,797 | A | | 6/1963 | Prosser |
| 3,114,178 | A | | 12/1963 | Wood |
| 3,147,517 | A | | 9/1964 | Dinsmore |
| 3,358,403 | A | | 12/1967 | Dinsmore |
| 3,676,956 | A | | 7/1972 | Taylor et al. |
| 4,078,336 | A | | 3/1978 | Prosser |
| 4,089,085 | A | | 5/1978 | Fitzgibbon |
| 4,190,930 | A | | 3/1980 | Prosser |
| 4,332,054 | A | * | 6/1982 | Paist et al. .................... 16/197 |
| 4,642,845 | A | * | 2/1987 | Marshik ...................... 16/194 |
| 4,654,928 | A | | 4/1987 | Flight |
| 4,675,948 | A | | 6/1987 | Bengtsson |
| 4,704,821 | A | | 11/1987 | Berndt |
| 4,718,194 | A | | 1/1988 | FitzGibbon et al. |
| 4,724,577 | A | | 2/1988 | Langley |
| 4,763,447 | A | | 8/1988 | Haltof et al. |
| 4,949,425 | A | | 8/1990 | Dodson et al. |
| 5,542,212 | A | | 8/1996 | Erickson et al. |
| 5,544,450 | A | | 8/1996 | Schmidt et al. |
| 5,615,452 | A | | 4/1997 | Habbersett |
| 5,737,877 | A | | 4/1998 | Meunier et al. |
| 5,784,840 | A | | 7/1998 | Dodson |
| 5,873,199 | A | | 2/1999 | Meunier et al. |
| 6,467,128 | B1 | * | 10/2002 | Damani ........................ 16/197 |
| 6,622,342 | B1 | * | 9/2003 | Annes et al. ................. 16/197 |

## OTHER PUBLICATIONS

Take Out System for Single/Double Hung Windows 100 Series brochure (color copy submitted, 6 pages) This balancer product is believed to have been sold since before Dec. 13, 1998.

Take Out System for Single/Double Hung Windows 400 Series brochure (color copy submitted, 6 pages) This balancer product is believed to have been sold since before Dec. 13, 1998.

Take Out System for Single/Double Hung Windows 650 Series brochure (color copy submitted, 6 pages) This balancer product is believed to have been sold since before Dec. 13, 1998.

* cited by examiner



*Fig. 1*



*Fig. 6*          *Fig. 5*



**Fig. 2**

**Fig. 3**

**Fig. 4**



**Fig. 7**



**Fig. 8**



**Fig. 9**



**Fig. 10**



**Fig. 11**



**Fig. 12**



**Fig. 13**          **Fig. 14**



**Fig. 15**



**Fig. 16**



**Fig. 17**



**Fig. 18**



**Fig. 19**

**Fig. 20**



Fig. 23

Fig. 22

Fig. 21

US 6,840,011 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

WINDOW PANEL BALANCE APPARATUS
AND METHOD

This application is being filed as a PCT International Patent Application in the name of Andersen Corporation, a U.S. national corporation and resident, (Applicant for all countries except US), Roy A. Thompson, a U.S. citizen (Applicant for US only), Douglas W. Kroncke a U.S. citizen (Applicant for US only), John C. Costello, a U.S. citizen (Applicant for US only), David P. Chastain, a U.S. citizen (Applicant for US only), Jack D. Gundlach, a U.S. citizen (Applicant for US only), Timothy J. Kelley, a U.S. citizen (Applicant for US only), Larry Versteeg, a U.S. citizen (Applicant for US only), Thomas Hansel, a U.S. citizen (Applicant for US only), Arthur R. King IV, a U.S. citizen (Applicant for US only), James R. Hager, a U.S. citizen (Applicant for US only), Michael L. Doll, a U.S. citizen (Applicant for US only), James L. Peterson, a U.S. citizen (Applicant for US only), Dennis A. Galowitz, a U.S. citizen (Applicant for US only), and Richard M. Fischer, a U.S. citizen (Applicant for US only) on 13, Dec. 2000, designating all countries.

## FIELD OF THE INVENTION

This invention relates generally to tilting hung windows. More specifically, this invention relates to a tilting hung window having a balancer secured to the window panel.

## BACKGROUND OF THE INVENTION

This invention relates generally to double and single hung windows. Specifically, this invention relates to balancers secured to the window panel.

Hung windows such as double and single hung windows typically include a balancer secured to the frame such that the balancer assists the sash against gravity. The balancer typically includes a spring which provides the lifting force. Many balancers also include a block and tackle assembly which provides a combination of the necessary internal friction and mechanical advantage such that a relatively limited change in the compression of the spring provides a much larger range of movement of the sash itself.

In the prior art, the balancer is located and secured in the jamb or jamb liner. Balancers in jamb liners cause jamb liners to be thick and complex in shape. Furthermore, the complex shape makes it difficult to appropriately color the jamb liner. The jamb/jamb liner combination must be disassembled to gain access to the balancer for service or replacement. When a window is replaced, it is sometimes necessary to install an additional jamb liner so that the balancer can be placed in the jamb liner. This added jamb liner takes space away from the clear glass area.

Many hung windows include a sash that can be tilted inward for ease of cleaning. Typically, the lower rail of the sash remains in the plane of the window while the top rail tilts inward. The sash typically pivots about a pivot mechanism that is a separate component from the balancer. This separate component requires additional assembly time when constructing the window.

On the tilting type hung windows, it is important to prevent the lower rail from vertical movement during cleaning or replacement. Different mechanisms have been used to "lock" the vertical position of the sash when in its tilted position. However, these prior art mechanisms are bulky and costly and are separate components that must be assembled to the window separately from the balancer. This separate assembly results in time consuming construction of the window.

## SUMMARY OF THE DISCLOSURE

In accordance with this invention the above and other problems have been solved by a hung window having a frame, a window panel and a balancer secured to one of the sides of the window panel. The frame includes two oppositely disposed side members. The window panel includes two oppositely disposed sides such that the window panel is slidably mounted in the frame. The window panel has a vertical operating position and a tilted position. The balancer includes a housing, extensible member and latching mechanism. The housing is secured to the first side member of the window panel. The housing includes a pivot end about which the housing pivots when the window moves from its vertical position to its tilted position. The first end of the extensible member is operatively coupled to the balancer and the second end of the extensible member is operatively coupled to the first side member of the frame wherein the balancer exerts a force on the window panel through the extensible member in the direction substantially opposite the force of gravity when the window panel is in the vertical operating position. The latching mechanism communicates with the balancer to prevent the pivot end of the housing from moving vertically in the direction of gravity when the window panel is in the tilted position.

In accordance with another aspect of the invention, a spring loaded block and tackle balance assembly is provided. The spring loaded block and tackle assembly includes a housing having a first and second end and defining an elongated chamber. A pulley wheel is operatively coupled to the second end of the housing wherein the pulley wheel includes a first and second circumferential edge portions defining a groove there between. The block and tackle balance assembly includes a biasing member positioned in the elongated chamber. A block and tackle are located in the housing and are operatively coupled to each other and to the housing. The block and tackle include an extensible member that has two positions relative to the pulley wheel. The first position of the extensible member is in the groove of the pulley wheel. The extensible member is extensible when in the first position. The second position of the extensible member is between one of the first and second circumferential edge portions and a pinching member that is operatively coupled to the housing. The extensible member is not extensible when in the second position. The first position of the extensible member occurs when the window panel is in its vertical position within the frame. When the window panel is tilted from the vertical position to the tilted position the extensible member moves from the first position to the second position.

In accordance with another aspect of the invention, a balancer including a housing, an extensible member, a pulley wheel having a circumferential portion, a brake and a rotatable cam member is disclosed. The extensible member passes partially around the circumferential portion of the pulley wheel. The brake includes a braking surface adjacent the extensible member and an oppositely disposed force receiving surface. The brake has a locked position and an unlocked position. In the unlocked position the braking surface is not in forceful contact with the extensible member. In the locked position the brake is in contact with the extensible member such as to compress the extensible member between the circumferential portion of the pulley wheel and the braking surface. The rotatable cam includes a camming surface that when rotated contacts the force receiving surface of the brake forcing the brake into the locked position.

US 6,840,011 B2

3

In accordance with another aspect of the invention, a balancer for a hung window is provided. The balancer includes a housing, extensible member, rotatable block and pulley wheel. The housing includes a first pinching surface defining an opening. The extensible member includes a first end connected to the housing. The rotatable block is rotationally coupled to the housing and includes a second pinching surface substantially parallel to the first pinching surface. The rotatable block is configured to communicate with a frame side member such that tilting of the housing relative to the frame side member results in rotation of the rotatable block relative to the housing along an axis perpendicular to the first and second pinching surfaces. The pulley wheel is rotatably coupled to the rotatable block. The extensible member passes through the opening in the first pinching surface and partially around the circumferential surface of the pulley wheel. When the balancer is in a vertical upright position, the opening in the first pinching surface and the circumferential portion of the pulley wheel are aligned to allow the movement of the extensible member there through. When the balancer is in a tilted non-vertical position relative to an associated window frame, the rotatable block rotates to place the opening and the pulley wheel out of alignment such that longitudinal movement of the extensible member is prevented.

In accordance with another aspect of the invention a balancer having a housing, extensible member, pivot pin, pulley wheel and rotatable pinching member is provided.

In accordance with another aspect of the invention, a balance, pin and latch mechanism for attachment to a window panel is provided. The mechanism includes balance means for applying force to the window panel. The mechanism also includes a pivot pin connected to balance means such that the window panel can be pivoted about the pivot pin. A latch means is also provided for preventing vertical motion of the window panel when in its tilted position. The latch means is also connected to balance means.

In accordance with another aspect of the invention, a method of constructing a hung window is provided. The method includes building a frame, obtaining a window panel and securing a pair of balancers to respective sides of the window panel. The balancers include an extensible member. The method also includes the step of coupling the extensible member to the frame wherein the pair of balancers bias the window panel in a direction substantially opposite the force of gravity when the window panel is in the vertical untilted position.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is front view of a hung window in accordance with the principles of the invention.

FIG. 2 is a perspective view of a portion of a hung window of a first embodiment in accordance with the principles of the invention.

FIG. 3 is a side sectional view of a bottom rail of a sash and its interaction with the frame bottom member.

FIG. 4 is a perspective view of a balancer and a portion of a jamb liner and frame of a first embodiment in accordance with the principles of the invention.

FIG. 5 is a side sectional view of a latching mechanism of a balancer of a first embodiment in accordance with the principles of the invention.

FIG. 6 is a side sectional view of a latching mechanism of a first embodiment in accordance with the principles of the invention.

4

FIG. 7 is a front sectional view of a latching mechanism of a balancer of a second embodiment in accordance with the principles of the invention.

FIG. 8 is a front sectional view of a latching mechanism of a balancer of a second embodiment in accordance with the principles of the invention.

FIG. 9 is a side sectional view of latching mechanism of a balancer of a second embodiment in accordance with the principles of the invention.

FIG. 10 is a top sectional view of a brake of a second embodiment in accordance with the principles of the invention.

FIG. 11 is a front sectional view of a latching mechanism of a balancer of a third embodiment in accordance with the principles of the invention.

FIG. 12 is a front sectional view of a latching mechanism of a balancer of a third embodiment in accordance with the principles of the invention.

FIG. 13 is a top sectional view of a brake of a third embodiment in accordance with the principles of the invention.

FIG. 14 is a side sectional view of a housing of a third embodiment in accordance with the principles of the invention.

FIG. 15 is a side sectional view of a latching mechanism of a balancer of a fourth embodiment in accordance with the principles of the invention.

FIG. 16 is a side sectional view of a latching mechanism of a balancer of a fourth embodiment in accordance with the principles of the invention.

FIG. 17 is a front sectional view of a latching mechanism of a balancer of a fourth embodiment in accordance with the principles of the invention.

FIG. 18 is a side sectional view of a rotatable block of a balancer of a fourth embodiment in accordance with the principles of the invention.

FIG. 19 is a perspective view of a rotatable pinching member of a balancer of a fifth embodiment in accordance with the principles of the invention.

FIG. 20 is a perspective view of an end of a housing of a fifth embodiment in accordance with the principles of the invention.

FIG. 21 is a perspective view of a latching mechanism of a balancer of a fifth embodiment in accordance with the principles of the invention.

FIG. 22 is a perspective view of a latching mechanism of a balancer of a fifth embodiment in accordance with the principles of the invention.

FIG. 23 is a perspective view of a latching mechanism of a balancer of a fifth embodiment in accordance with the principles of the invention.

## DETAILED DESCRIPTION

In the following description of preferred embodiments, reference is made to the accompanying drawings which form a part hereof, and in which is shown by way of illustration specific embodiments in which the invention may be practiced. It is to be understood that other embodiments may be utilized and structural changes may be made without departing from the scope of the preferred embodiments of the present invention.

FIG. 1 is a front view of a hung window 100 of this invention. The window 100 includes a frame 102 having oppositely disposed side members 104 and 106. The frame

US 6,840,011 B2

5

102 also has a top member 108 and a bottom member 110. A sash 112 supports a window panel 114. The sash 112 has two oppositely disposed sides 116 and 118 parallel to the frame side members 104 and 106. The sash also includes a top rail 120 and a bottom rail 122.

FIG. 2 illustrates a preferred embodiment of the invention in which a sash 200 that supports a window panel 201 is shown in a tilted position with respect to the frame 202. A balancer 208 is secured to the sash side 212 by a screw 213. The balancer 208 is preferably positioned within a groove 210 in the sash side 212. The sash 200 is tilted along an axis substantially along the bottom rail 204. A first pivot pin 206 and a second pivot pin (not shown) provide the tilting mechanism. The pivot pin preferably slides in a groove in a jamb liner (not shown in FIG. 2) but it could also slide directly in the frame. The second pivot pin is positioned opposite the first pivot pin 206 on the side 207. The first pivot pin is operatively coupled to the balancer 208. The balancer 208 is further secured to the sash side 212 by a screw or other fastener through hole 215 in the pivot pin 206. Alternatively, the balancer 208 may be secured to the sash side 212 by a snap mechanism.

A balancer includes a pivot end. A pivot end is an end of a balancer around which the remainder of the balancer pivots when the balancer and its associated window panel rotate from a vertical operating position to a tilted position. One embodiment of a pivot end is pivot end 299 shown in FIGS. 2 and 4.

A second pivot pin (not shown) is coupled to a second balancer (not shown). The second balancer (not shown) is secured to the sash side 207 symmetrically to the way first balancer 208 is secured to sash side 212. Since the structure and operation of the second balancer is symmetric to the first balancer 208, this discussion is limited to the first balancer 208.

An extensible member such as a cord 214 or a chain, cable or other member that is extensible extends from the first balancer 208 at a location near the bottom rail 204. The portion of the cord 214 outside the balancer 208 extends substantially parallel to the frame side member 216 and is secured to the frame side member 216 by an anchor 218. The anchor 218 is preferably located in the same groove of the jamb liner or frame side member as the pivot pin 206 slides in. The anchor 218 may be a block that is attached to the side member 216 with a screw or other fastener. The cord 214 is held in the anchor 218 by being knotted on the opposite side of a hole in the anchor 218.

The balancer 208, secured to the sash 200, in conjunction with the cord 214 and its anchor 218 applies a biasing force to the sash 200 in an upward direction against the direction of gravitational acceleration. This biasing force augments the force applied by a user of the window in lifting the sash 200 upward in the frame 202 when the window panel is in the vertical untilted position.

In a preferred embodiment of the invention the sash may be tilted from a vertical position to a tilted position. When it is desired to tilt the sash 200, the top rail 220 is disengaged from the frame 202 or jamb liner (not shown) by operation of the lever 222 and its symmetrical counterpart (not shown) located on the opposite end of the top rail 220. When the sash 200 is in its vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from the plane of the frame 202. By lifting the lever handle 223 up and away from the top rail 220, the lever end 224 is rotated downward such that

6

the lever end 224 becomes positioned within the groove 210. When the lever end 224 is so positioned in the groove 210, the top of the sash 200 including the top rail 220 can be tilted from its vertical position to its tilted position as shown in FIG. 2. Note that as positioned in FIG. 2 the lever handle 223 is substantially down near the surface of the top rail 220 and hence the lever end 224 is not located in the groove 210. This position of the lever is the position that would be associated with the untilted or vertical position of the sash 200.

FIG. 3 illustrates a cross section of one embodiment of the bottom rail 204 and its interaction with the bottom member 203 of the frame when the sash 200 is in its vertical position. As shown in FIG. 3 the bottom rail 204 of the sash 200 defines a groove 300 that is substantially an upside down U shape. The bottom member 203 of the frame 202 has a U shaped extension 302 that mates with the groove 300. When the sash 200 is at its lowest vertical position in the frame 202, the extension 302 is mated with the groove 300 for insulation and other purposes. It is important that the person operating the window not be allowed to tilt the sash 200 when the extension 302 is mated into the groove 300 because tilting in this position would result in the extension 302 or part of the bottom rail 204 being broken. To avoid this problem, a preferred embodiment of the present invention requires placement of the anchor 218 in a specific vertical location on the frame side member 216. The general idea is to place the anchor 218 in such a position that when the extension 302 is mated even partially with the groove 300, the lever end 224 cannot be rotated into the groove 210 because the lever end 224 physically contacts the anchor 218. The user must lift the sash 200 vertically upward until the lever end 224 can be rotated into groove 210 without interference by the anchor 218. The anchor is vertically positioned such that the distance the sash 200 must be lifted corresponds with the vertical distance required to remove the extension 302 from the groove 300 sufficiently such that the sash can be tilted without interference between the extension 302 and the sash bottom rail 204.

FIG. 4 is a perspective view of a preferred embodiment of a balancer 208 of this invention. A balancer is defined as being any mechanism that provides a biasing force to a window sash. The balancer could be a spring biased block and tackle mechanism or it could be some other mechanism such as a weight and pulley system. While the preferred embodiments of this invention relate to a spring biased block and tackle mechanism, this invention is not so limited.

A housing is any structural member that supports the elements of a balancer. A housing may be made of steel or other materials including plastic. A housing may have multiple components or it may be one integral piece. A housing may include a housing extension which may be a separate member secured to the main part of the housing.

In a preferred embodiment, the balancer 208 includes a housing 402 that includes an elongated U-shaped housing 403 and a housing extension 423 attached to one end of the elongated U-shaped housing 403. The elongated U-shaped housing 403 is made of steel having a pair of parallel, laterally spaced sidewalls 404 and 406 and an outer wall 408 interconnecting the side walls 404 and 406 together. The elongated U-shaped housing 403 defines an elongated chamber 410. The housing 402 is secured to a side of sash such as sash 200 by means of screw 213 which is held in place by fastening block 412 which in turn is fastened to the housing 402 by a press fit. The housing extension 423 can be made of any structural material including steel and plastic.

A coil spring 414 has an anchored end connected to a pin 416 by a hook that hooks around the pin 416. The pin 416

7

is riveted or otherwise fastened to the side walls 404 and 406 of the housing 402. The opposite end of the spring 414 is connected to a block and tackle 418. The block and tackle 418 includes a first pulley member 420 and a second pulley member 422 that are conventionally interconnected by a cord 214 that passes back and forth between the two pulley members. The cord has a first end that is connected to the block and tackle 418. The cord 420 exits the block and tackle 418 by extending around the circumference of a pulley wheel 426 that is adjacent second pulley member 422. In a preferred embodiment of the invention, the pulley wheel 426 is slightly elliptical in shape. Preferably, pulley wheel 426 is supported at its axis by a pin 428 that is supported by housing extension 423 that is integral with second pulley member 422. The pulley wheel 426 changes the direction of the cord 214 by approximately 180 degrees. After this 180 degree turn, the cord extends parallel to the balancer 208 and a second end 219 of the cord 214 is anchored to the frame side member 216. The cord 214 is anchored to the frame side member 216 by attaching the cord 214 to anchor 218 as described above and then screwing the anchor 218 through the jamb liner 432 and into the frame side member 216 with screw 434.

The pin 206 is made of plastic and is an integral part of the housing extension 423 and second pulley member 422. During normal vertical up and down movement of the sash in the frame, the pin 206 slides up and down with the sash in the groove 436 of the jamb liner 432. The large head 438 on the pin 206 prevents the pin from being removed from the groove 436. When the sash is tilted out of the plane of the frame, the tilt axis is along the line between the pin 206 and its counterpart pin (not shown) located on the opposite side of the sash near the bottom rail. The housing extension 423 which is integral with the pin 206 is attached to the housing 402 by rivet pins 440 and 442 that extend through the second pulley member 422.

A latching mechanism is a component of a balancer, which operates to prevent a pivot end of a balancer from moving in a vertical downward direction when the window panel to which the balancer is attached is in a tilted position relative to the frame side members. Various embodiments of latching mechanisms are provided below. However, the scope of this invention is not limited to the specific embodiments provided. Other latching mechanisms including commercially available mechanisms may be used.

One embodiment of a latching mechanism is shown in FIGS. 5 and 6 taken along the line 5—5 of FIG. 4. FIG. 5 illustrates the unlocked position of the cord 214 with respect to pulley wheel 426 and housing extension 423 that occurs when the sash 200 is in a vertical untilted position. Note that housing extension 423 is part of the housing 402. FIG. 6 illustrates a locked position of the cord 214 with respect to the pulley wheel 426 and the housing extension 423 that occurs when the sash 200 is in its tilted position.

As can be seen in both FIGS. 5 and 6, the pulley wheel has a first and second circumferential edge portions 502 and 504 and a groove 506 between them. These circumferential edge portions have a larger radius than the groove 506. As shown in FIG. 5, when the sash is in its vertical position the cord 214 rides in the groove 506 and because of the circumferential edge portions 502 and 504 cannot be displaced out of the groove 506. When the sash is in its vertical position, the cord 214 is extensible such that it may freely be drawn and withdrawn during rotation of pulley wheel 426 as the window panel is moved vertically.

In FIG. 6 the cord 214 is pinched or caught between the circumferential edge portion 502 and the housing extension

8

423. Tilting the sash 200 relative to the frame causes this position of the cord 214 shown in FIG. 6. The second end 219 of the cord 214 is anchored to the frame and so the tilting action pulls the cord 214 out of the groove 506 and into a position in which it is between the pulley wheel and the housing extension 423. In the position shown in FIG. 6, the cord may not be extended in or out of the pulley wheel because the cord 214 is frictionally engaged between the pulley wheel 426 and the pinch point 510. The housing extension 423 is preferably shaped as shown in FIGS. 5 and 6. The housing extension 423 includes a right-angled pinch point 510 and a recess 512. The recess 512 is located closer to the axis of the pulley wheel 426 than is the pinch point 510. When the sash is tilted, the cord 214 is pulled into the recess 512 and necessarily between the circumferential edge portion 502 of the pulley wheel 426 and the pinch point 510.

A preferred embodiment of the circumferential edge portions discussed throughout the various embodiments of the invention is chamfered or rounded so that damage to the extensible member is minimized when the extensible member is pinched against a circumferential edge portion. Such a chamfered or rounded edge is shown in the drawing figures.

The latching mechanisms shown in FIGS. 7-23 may be utilized within the same window construction as discussed above with respect to FIGS. 1-4. The latching mechanisms shown in FIGS. 7-23 are possible replacements for the latching mechanism identified in FIGS. 5-6. The remaining portion of the balancers not shown in FIGS. 7-23 is the same as those balancer portions as described above with regard to both general concepts and specific embodiments.

One embodiment of a latching mechanism of a balancer is shown in FIGS. 7-9. Specifically a portion of balancer 600 is provided. As described above, the portions of balancer 600 not shown in FIGS. 7-9 would be the same as described above and shown in FIGS. 1-4. FIGS. 7 and 8 are side views with a portion of the housing extension cut away so that the underlying brake can be seen. FIG. 9 is a rear sectional view taken along lines 9—9 of FIG. 8.

The balancer 600 shown in FIGS. 7-9 includes a housing 602 that includes an elongated U-shaped housing (not shown but the same as described above and shown in FIGS. 1-4) and a housing extension 604. Balancer 600 includes a pulley wheel 606 that is rotatably coupled to housing extension 604 by axis 608. Pulley wheel 606 includes a first circumferential edge portion 610 and a second circumferential edge portion 612. The portion of the outer circumference of the pulley wheel 606 between the circumferential edge portions 610 and 612 is referred to as the circumferential portion 614. It should be noted that a circumferential portion might in general be any shape that will accommodate passage of an extensible member around the circumferential portion. Circumferential portion 614 is but one embodiment of a circumferential portion.

Extensible member 616 is centered on the circumferential portion 614 between the first and second circumferential edge portions 610 and 612 as it wraps around the pulley wheel 606. End 618 of the extensible member is configured to be secured to a frame side member as described above with respect to earlier embodiments. End 617 of the extensible member 616 continues to be utilized by the block and tackle also as described above with respect to earlier embodiments.

A brake is any member having a braking surface wherein the braking surface is configured so that when forceful contact is made between the braking surface and the exten-

US 6,840,011 B2

9

sible member supported by a pulley wheel, longitudinal movement of the extensible member is prevented. A brake may be stationary such that the extensible member and pulley wheel move toward and away from the stationary brake. Alternatively, the brake may move.

FIGS. 7 and 8 illustrate one embodiment of a brake, namely brake 620. Brake 620 includes an anchored end 622 and an oppositely disposed braking end 624. Anchored end 622 is nonrotatably secured to housing extension 604. Braking end 624 includes a braking surface 626 and a force-receiving surface 628. A braking surface is any surface which when forcefully made to contact an extensible member is configured to prevent longitudinal movement of the extensible member because of frictional contact and/or pinching of the extensible member between the braking surface and another member. The braking surface 626 is rounded to a radius that approximates the radius of the circumferential portion 614 of the pulley wheel 606. This shaping of the braking surface to match the shape of the pulley wheel increases the surface area of contact between the braking surface and the extensible member.

Balancer 600 includes a pivot pin 630 that is the same as pivot pin 206 except that pivot pin 630 is made of steel. Pivot pin 630 performs the same function as pivot pin 206.

A camming surface is any surface that rotates about an axis and which has at least one point of varying distance from the axis. A rotatable cam member is a rotatable member that includes a camming surface configured to contact a brake upon rotation of the rotatable cam member.

Rotatable cam member 634 shown in FIG. 9 is one embodiment of a rotatable cam member. Pivot pin 630 provides an axis 632 about which rotatable cam member 634 rotates. Rotatable cam member 634 includes a circular section 636 that travels less than the full circumference of the cam member 634. The radius from circular section 636 to the axis 632 is constant. Rotatable cam member 634 also includes a notch defined by a recessed edge 638. A recessed edge is an edge comprising points that are a shorter distance to the axis of rotation than the circular section. The transition from the recessed edge 638 to the circular edge 636 is a smooth transition to provide camming surface 640.

Note that many alternative designs for a rotatable cam member and its associated camming surface are possible. For example, a rotatable cam member could be a generally circular member with a bulge or bump along which the radius or distance from the outer edge of the rotatable cam member to the axis of rotation is greater than along the generally circular portion. Many other shapes for the camming surface are possible.

Rotatable cam member 634 includes transferring end 642, which is designed to be slidably received by a jamb liner channel. If a window panel secured to this embodiment of a balancer is moved from its vertical operating position to a tilted position, the sides of the jamb liner channel will prevent the transferring end 642, and hence the rotatable cam member 634, from tilting with the window panel thereby causing rotation of the rotatable cam member relative to and about the pivot pin 630.

FIG. 8 shows the positioning of the brake 620 and other elements of the balancer 600 when the associated window panel is in its vertical operating position. As shown in FIG. 8, the notch formed by the recessed edge 638 is aligned with the brake 620. In this vertical operating position, there is a gap between the braking surface 626 and the extensible member 616. As the window panel is moved from its vertical operating position to the tilted position, the camming surface

10

640 comes into forceful contact with the force-receiving surface 628 of the brake 620. The force applied by the rotatable cam member 634 onto the brake 620 causes the brake to flex in the direction of the extensible member 616 and the pulley wheel 606. Continued tilting of the window panel eventually results in the braking surface of the brake 620 forcefully pressing the extensible member against the circumferential portion 614 of the pulley wheel 606. Such pressure on the extensible member prevents longitudinal movement of the extensible member 616 and hence prevents the window panel from dropping downward by the force of gravity or by the force of any washing action on the window panel. FIG. 7 illustrates brake 620 in forceful contact with extensible member 616 as would be seen when the window panel is in its tilted position.

FIG. 10 is a sectional view of brake 620 taken along lines 10—10 in FIG. 8. Brake 620 is generally T-shaped having ends 621 and 623. The ends 621 and 623 are designed to be inserted into receiving slots 625 and 627 in the housing extension 604 shown in FIG. 9.

Turning now to FIGS. 11 and 12, another embodiment of a latching mechanism for a balancer is provided. Balancer 650 is the same as balancer 600 except that the brake utilized in balancer 650 has a rotational end instead of an anchored end. A rotational end is an end of a brake designed and positioned so that it can pivot about an axis. Brake 652 includes a rotational end 654 and a braking end 656. Braking end 656 is the same as braking end 624 of the embodiment shown in FIGS. 7-9. Rotational end 654 is not anchored, as was anchored end 622 in FIGS. 7-9. Rotational end 654 is designed to rotate about axis 658.

Operation of brake 652 is similar to brake 620 except that brake 652 rotates around axis 658 instead of flexing along the length of the brake when the rotatable cam member presses on the brake.

FIG. 13 is a sectional view of brake 652 taken along lines 13—13 in FIG. 12. As can be seen in FIG. 13, brake 652 in this view is T-shaped.

FIG. 14 is a portion of the balancer 650 taken along lines 14—14 in FIG. 12. Rotational end 654 of brake 652 can be seen positioned in a slot formed by slot edge 659 in housing extension 660.

FIGS. 15-18 illustrate another embodiment of a balancer. FIGS. 15-18 do not show the entire balancer but rather components of the balancer. Components of the balancer not shown in FIGS. 15-18 are the same as shown in the earlier discussed embodiments.

FIGS. 15 and 16 are sectional views as would be viewed from an adjacent frame side member when the balancer is secured to a window panel. Balancer 700 includes housing extension 702 configured with an opening 704 for receipt of a rivet for attaching housing extension 702 to an elongated U-shaped housing (not shown).

A pivot pin 706 is integrally connected to housing extension 702. Pivot pin 706 is configured for sliding interaction with a channel in a frame jamb liner that would be adjacent to the balancer.

A rotatable block is a rotatable member configured to rotate about a pivot pin when a window panel to which the associated balancer is attached is moved from a vertical operating position to a tilted position or vice versa. Rotatable block 708 is one embodiment of a rotatable block. Rotatable block 708 rotates about pivot pin 706. In its normal operating position, rotatable block 708 is situated in a groove of a jamb liner such as groove 436 in FIG. 4. Therefore, as the window panel is moved from its vertical operating position

US 6,840,011 B2

11

to its tilted position, rotatable block 708 rotates about pivot pin 706 relative to housing extension 702. FIG. 15 shows rotatable block 708 in the position associated with the vertical operating position of the window panel and balancer. FIG. 16 illustrates the position of the rotatable block 708 when the window panel and balancer are in a tilted position.

A pinching surface is any surface capable of compressing or pinching an extensible member between itself and another member. Housing extension 702 includes one embodiment of a pinching surface, specifically first pinching surface 710. First pinching surface 710 is a planar surface.

Housing extension 702 is shown with a cutaway view in FIG. 16 to show the positioning of pulley wheel 714. Housing extension 702 defines an opening 712 for passage of the extensible member 720 there through. Pulley wheel 714 receives the extensible member from the block and tackle (not shown). Extensible member passes partially around pulley wheel 714 and through the opening 712 and around pulley wheel 716 that is rotationally mounted to the rotatable block 708. As can be seen in FIG. 15, the opening 712 in extension housing 702 is aligned with pulley wheel 716 when the rotatable block is aligned with the housing extension 702. In FIG. 16, the rotation of rotatable block 708 causes the circumferential portion 718 of the pulley wheel 716 to move out of alignment with the opening 712.

Rotatable block 708 includes a second pinching surface 722 as shown in FIG. 17. As rotatable block 708 moves into a position in which it is not aligned with the housing extension as shown in FIG. 16, extensible member 720 is pressed or pinched between the first pinching surface 710 and the second pinching surface 722. The pinching of extensible member 720 between the first and second pinching surfaces 710 and 722 when the balancer 700 is in the tilted position prevents the extensible member 720 from longitudinal movement which prevents the pivot pin 706 and the connected window panel from moving downward in the direction of gravity during tilting of the window panel and balancer.

Rotatable block 708 includes hinge clasp 724. Hinge clasp 724 allows for removable attachment of the rotatable block 708 to the pivot pin 706. Hinged clasp 724 includes hinge portion 726 and attachment end 728. Hinge clasp 724 hingably rotates about the hinged portion 726. Attachment end 728 is removably attached to lip 730 of rotatable block 708.

Rotatable block 708 is preferably made of plastic. Housing extension 702 is preferably made of steel. However other materials and combinations of materials may be used.

Housing extension 702 includes jag 732. Jag 732 is a protrusion in the housing extension. Rotatable block 708 includes jag 734, which is a protrusion in the rotatable block 708. The purpose of jags 732 and 734 is twofold. First, the jags 732 and 734 provide the desired spacing between the first pinching surface and the second pinching surface 722. The desired distance between the first and second pinching surfaces which is set by the height of the jags 732 and 734 varies depending on the type and size extensible member used and should be engineered to prevent slippage of the extensible member when the window panel is in the tilted position without causing unnecessary damage to the extensible member. A distance between first pinching surface and second pinching surface of between 0.1 and 1.0 mm is preferred. More preferably, a distance between 0.2 and 0.4 mm is used. But of course these dimensions can vary outside these ranges, as they are heavily dependant on the type of extensible member used.

12

Jags 732 and 734 also perform the function of preventing the rotatable block 708 from being moved more than a small distance away from the pivot pin 706. If the rotatable block 708 begins to move away from the pivot pin 706 the jags 732 and 734 will contact each other to prevent further movement of the rotatable block 708.

Housing extension 702 includes hemispherically shaped bumps 736 and 738 on the first pinching surface 710. The hemispherical bumps 736 and 738 are approximately the same height as the jags 732 and 734. The bumps 736 and 738 provide a more discrete movement of the rotatable block 708 from an aligned position as shown in FIG. 15 to a nonaligned or tilted position as shown in FIG. 16 and vice versa. Because of the frictional fit between the hemispherical bumps 736 and 738 and the surface 740 of the rotatable block 708, the rotatable block 708 is prevented from too easily sliding from an aligned position to a nonaligned or tilted position. The bumps 736 and 738 help prevent pre-installation accidents wherein the rotatable block 708 may accidentally be moved from a nonaligned position to an aligned position causing release of a loaded spring.

Pulleys 742 and 744 form the pulleys for a block in the block and tackle (tackle not shown and extensible member not shown in relation to pulleys 742 and 744) the same as in block and tackle 418 disclosed earlier.

FIG. 18 is a view of a rotatable block 708 taken along the lines 18—18 in FIG. 17. Rotatable block 708 defines an opening 748 for placement of pulley wheel 716. Rotatable block 708 also defines an opening 746 for passage of the extensible member 720 there through where the extensible member 720 would then pass through the opening 712 in the housing extension 702. Second pinching surface 722 can be seen adjacent to the opening 746. Jag 734 extends across the rotatable member 708 with a curvature.

Hinge clasp 728 can be seen in its open position wherein the rotatable member 708 is ready to be placed on the pivot pin 706.

Turning now to FIGS. 19-23, another embodiment of a latching mechanism for a balancer is disclosed. FIGS. 19-23 do not show the entire balancer but rather illustrate a portion of the housing extension and the latching mechanism that would be utilized by replacing the latching mechanism shown in FIGS. 5 and 6.

FIGS. 19 and 20 illustrate two components of a balancer shown separately. Specifically FIG. 19 illustrates one embodiment of a rotatable pinching member 806 and FIG. 20 illustrates one embodiment of a housing extension 802 and related parts. The components in FIGS. 19 and 20 are combined, as they would be in normal operation in FIGS. 21-23.

Turning first to FIG. 20, a portion of housing extension 802 is provided. Housing extension 802 is configured to be secured to an elongated U-shaped housing as disclosed above with respect to embodiments shown in FIGS. 1-5. Housing extension 802 defines an opening along surface 804. The opening defined by surface 804 is generally cylindrical and is shaped for receipt of a rotatable pinching member 806 shown in FIG. 19. A pivot pin 808 is integrally secured to the housing extension 802 and passes through the opening defined by surface 804. Pivot pin 808 serves the same function with respect to sliding interaction with a jamb liner as described above with respect to the embodiments disclosed with respect to FIGS. 1-5. Pulley wheel 810 is rotatably secured to housing extension 802 along axis 812 by axle 813. Pulley wheel 810 includes a first circumferential edge portion 814 and a second circumferential edge

US 6,840,011 B2

13

portion 816. The circumferential edge portions 814 and 816 extend into the opening past the surface 804 so as to provide an appropriate pinching surface with the rotatable pinching member as will be described below.

Turning now to FIG. 19, rotatable pinching member 806 includes a pivot pin-engaging end 818 and a locking end 820 opposite the pivot pin engaging end 818.

A pivot pin-engaging end of a rotatable pinching member may be any shape or design capable of rotatably interacting with the pivot pin so that the rotatable pinching member can rotate about the pivot pin.

Pivot pin engaging end 818 is one embodiment of a pivot pin-engaging end. Pivot pin engaging end 818 defines a generally circular opening 822 that is approximately the same diameter as the post portion 824 of the pivot pin 808. Rotatable pinching member 806 is attached to the pivot pin 808 with the opening 822 surrounding the post portion 824 of the pivot pin 808. Locking end 820 is positioned in the opening of the housing extension 802 formed by surface 804.

A locking end of a rotatable pinching member is any surface shaped such that rotation of the locking end within a housing extension causes pinching of an extensible member against its associated pulley wheel. Locking end 820 is generally a truncated cone-shape with a first edge 826 and a second edge 828 forming a channel 830 there between.

FIG. 21 illustrates the positioning of the rotatable pinching member 806 with the housing extension 802 when the balancer 800 is in a vertical operating position. As can be seen, pivot-engaging end 818 receives pivot pin 808 around post portion 824. In the position shown in FIG. 21, channel 830 is aligned with the pulley wheel 810. The alignment of channel 830 with the pulley wheel 810 allows the extensible member 832 to pass around the pulley wheel 810 without interference from the rotatable pinching member 806.

Pivot pin engaging end 818 of the rotatable pinching member 806 is slidably received by a groove in a jamb liner such as groove 436 as described above with respect to FIG. 4. Therefore, as the balancer 800 is tilted with respect to its associated frame side member, the rotatable pinching member 806 rotates relative to the housing extension 802 and the pulley wheel 810. Since end 834 of extensible member 832 is attached to the frame side member, the extensible member 832 is pulled out of alignment with the pulley wheel 810 when the balancer is moved to a tilted position.

FIG. 22 illustrates the positioning of the various components of the balancer 800 when the balancer 800 is moving from a vertical operating position to a tilted position. FIG. 23 illustrates the components of balancer 800 and their positions when the balancer 800 is in a tilted position. As can be seen in FIG. 23, rotation of the rotatable pinching member 806 relative to the housing extension 802 and the pulley wheel 810 results in the extensible member 832 becoming pinched or compressed between edge 828 and first circumferential edge portion 814 of pulley wheel 810. This pinching or compression of the extensible member 832 prevents longitudinal movement of the extensible member 832 when in the tilted position.

As with all of the embodiments of this invention, as the balancer 800 is moved back from a tilted position to a vertical operating position, the extensible member moves back from a pinched or compressed state to its normal operating state in which longitudinal movement is allowed.

It should be noted that if the rotatable pinching member 806 is designed with two edges such as edges 826 and 828, the balancer could be used for either side of a window panel.

14

It should also be noted that in a preferred embodiment, edges 826 and 828 are chamfered as shown in FIG. 19. The chamfered edge allows for pinching of the extensible member without unnecessary abrasion or damage to the extensible member.

It should be noted that in one preferred embodiment of this invention, the balancer is operatively coupled to the window panel. The window panel may be a pane of glass or it may be an insulated glass assembly. The balancer may also be operatively coupled to the window panel through connection to a sash as has been illustrated above.

The foregoing description of preferred embodiments of the invention has been presented for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. It is intended that the scope of the invention be limited not by this detailed description, but rather by the claims appended hereto.

What is claimed is:

1. A hung window comprising:

  (a) frame having a first vertical side member and an oppositely disposed second vertical side member wherein the first and second side members define a plane;

  (b) a sash housing a window panel, the sash having a first side member and an oppositely disposed second side member, the sash having a first substantially vertical operating position in which the sash is slidably mounted in the frame with the first and second side members substantially parallel to the first and second frame side members, and the sash having a tilted position wherein the sash is positioned at an angle with respect to the plane of the frame; and

  (c) balancer comprising:

    (i) housing secured to the first side of the sash wherein the housing comprises a pivot end about which the housing pivots when the sash rotates from the vertical operating position to the tilted position;

    (ii) extensible member having a first end operatively coupled to the balancer and a second end operatively coupled to the first side member of the frame, wherein the balancer exerts a force on the sash through the extensible member in the direction substantially opposite the force of gravity when the sash is in the vertical operating position; and

    (iii) latching mechanism communicating with the balancer wherein the latching mechanism prevents the pivot end of the housing from moving vertically in the direction of gravity when the sash is in the tilted position.

2. The window of claim 1 wherein the housing comprises an elongated housing defining an elongated chamber, the housing comprising a second end opposite the pivot end, and wherein the balancer further comprises:

  (a) biasing member for providing a biasing force, the biasing member having an anchored end and an opposite movable end, wherein the anchored end is connected to the second end of the housing and located in the elongated chamber;

  (b) block and tackle located in the elongated chamber, the block secured to the housing near the pivot end, the tackle operatively coupled to the movable end of the biasing member, wherein the extensible member operatively connects the block to the tackle; and

  (c) pulley wheel operatively coupled to the housing substantially near the pivot end of the housing, the

15

pulley wheel comprising a circumferential portion wherein the extensible member passes partially around the circumferential portion of the pulley wheel wherein the pulley wheel causes a change in direction of the extensible member of about 180 degrees.

3. The window of claim 1 wherein the biasing member is a spring.

4. The window of claim 1 comprising a second balancer secured to the side of the sash opposite the first balancer.

5. The window of claim 4 wherein a first sash groove is defined in the first sash side member and a second sash groove is defined in the second sash side member wherein the first balancer is mounted in the first sash groove and the second balancer is mounted in the second sash groove.

6. The window of claim 1 wherein the housing comprises an elongated housing defining an elongated chamber, the elongated housing having a second end wherein the balancer further comprises:

(a) pulley wheel operatively coupled to the housing substantially near the pivot end of the housing, the pulley wheel including a first and second circumferential edge portion defining a groove there between;

(b) biasing member located in the elongated chamber for providing a biasing force, the biasing member having an anchored end and an oppositely disposed movable end, wherein the anchored end of the biasing member is connected to the second end of the housing;

(c) block and tackle located in the elongated chamber, wherein the tackle is operatively coupled to the movable end of the biasing member and the block is operatively coupled to the pivot end of the housing, wherein the extensible member operatively connects the block to the tackle, wherein the extensible member has a first end, second end and central portion, wherein the first end of the extensible member is operatively coupled to the block and tackle, the central portion connects the block to the tackle and the central portion is operatively coupled to the pulley wheel wherein the central portion has a first position relative to the pulley wheel in which the central portion of the extensible member is in the groove of the pulley wheel, the extensible member being in the first position when the sash is in the vertical position, wherein the second end of the extensible member is anchored to the first frame side member, wherein the extensible member is extensible in the first position;

(d) pinching member adjacent one of the first and second edge portions of the pulley wheel wherein the extensible member has a second position relative to the pulley wheel in which the extensible member has a second position relative to the pulley wheel in which the extensible member is positioned between the pinching member and one of the first and second edge portions wherein the extensible member is not extensible when in the second position, and the extensible member is in the second position when the sash is in the tilted position.

7. The window of claim 6 further comprising a jamb liner substantially parallel to and operatively coupled to the first frame side member, the jamb liner having a front face, and the front face having an elongate channel, and wherein a pivot pin that slides in the elongate channel is operatively coupled to the balancer wherein the sash can be pivoted at the pivot pin from the vertical position to the tilted position, and wherein the extensible member moves from the first position to the second position when the sash is moved from the vertical position to the tilted position.

16

8. The hung window of claim 1 wherein the latching mechanism comprises:

(a) pulley wheel rotatably connected to the pivot end of the housing, the pulley wheel comprising a circumferential portion wherein the extensible member passes partially around the circumferential portion of the pulley wheel;

(b) brake comprising a braking surface adjacent the extensible member and the circumferential portion of the pulley wheel wherein the pulley wheel and brake have a first relative position wherein a space is provided between the braking surface and the extensible member, and wherein the pulley wheel and brake have a second relative position wherein the extensible member is pinched between the circumferential portion and the braking surface; and

(c) rotatable cam member comprising a camming surface, wherein the rotatable cam member operatively interacts with the first frame side member such that movement of the sash from the vertical operating position to the tilted position causes rotation of the cam member wherein movement of the sash from the vertical operating position to the tilted position results in the camming surface contacting one of the pulley wheel and brake wherein the pulley wheel and brake are moved from the first relative position to the second relative position.

9. The hung window of claim 1 wherein the latching mechanism comprises:

(a) pulley wheel rotatably connected to the pivot end of the housing, the pulley wheel comprising a circumferential portion wherein the extensible member passes partially around the circumferential portion of the pulley wheel;

(b) brake having an unlocked position and a locked position relative to the extensible member, the brake comprising:

(i) braking surface wherein the braking surface is adjacent but not in forceful contact with the extensible member when the brake is in the unlocked position, and the braking surface is in contact with the extensible member such as to compress the extensible member between the circumferential portion of the pulley wheel and the braking surface to prevent longitudinal movement of the extensible member when the brake is in the locked position; and

(ii) force receiving surface opposite the braking surface; and

(c) rotatable cam member comprising a camming surface, wherein the rotatable cam member operatively interacts with the first frame side member such that movement of the sash from the vertical operating position to the tilted position causes rotation of the cam member wherein movement of the sash from the vertical operating position to the tilted position results in the camming surface contacting the force receiving surface of the brake forcing the brake into the locked position.

10. The hung window of claim 9 wherein the brake comprises a rotational end and an oppositely disposed braking end, wherein the braking surface and the force receiving surface are on the braking end, and the rotational end is in pivotal engagement with the housing such that the brake rotates around the rotational end when the camming surface of the cam member contacts the force receiving surface of the brake.

11. The hung window of claim 9 wherein the brake comprises an anchored end and an oppositely disposed

US 6,840,011 B2

**17**

braking end, wherein the braking surface and the force receiving surface are on the braking end, and the anchored end is nonpivotally anchored to the housing such that the brake bends in the direction of the pulley wheel when the camming surface of the cam member contacts the force receiving surface of the brake.

12. The hung window of claim 9 wherein the cam member comprises:

(a) center axis wherein the cam member rotates around the center axis;

(b) circular section comprising a circular outer edge wherein the distance from the center axis to the circular outer edge is constant along the circular outer edge; and

(c) recessed edge forming a notch wherein the distance from the center axis to the recessed edge is less than the distance from the center axis to the circular outer edge and is wherein the camming surface comprises the recessed edge.

13. The hung window of claim 1 wherein the housing further comprises a first pinching surface at the pivot point end, wherein the pinching surface defines an opening and wherein the latching mechanism further comprises:

(a) rotatable block rotatably coupled to the pivot end of the housing wherein the rotatable block comprises a second pinching surface substantially parallel to the first frame side member such that movement of the sash from the vertical operating position to the tilted position causes rotation of the rotatable block relative to the housing along an axis perpendicular to the first and second pinching surfaces; and

(b) pulley wheel rotatably coupled to the rotatable block, wherein the pulley wheel comprises a circumferential portion, wherein the extensible member passes through the opening in the housing and partially around the circumferential portion of the pulley wheel, wherein the opening in the housing and the circumferential portion of the pulley wheel are aligned when the sash is in its vertical operating position, and the opening in the housing and the circumferential portion of the pulley wheel are out of alignment when the sash is moved into the tilted position wherein the extensible member is pinched between the first pinching surface and the second pinching surface wherein longitudinal movement of the extensible member is prevented when the sash is moved to the tilted position.

14. The hung window according to claim 13 wherein the rotatable block comprises plastic.

15. The hung window according to claim 13 wherein the balancer further comprises a pivot pin connected to the pivot end of the housing wherein the pivot pin is configured for sliding interaction with the frame side member adjacent the

**18**

balancer and wherein the rotatable block is rotatably coupled to the pivot pin to provide rotation of the rotatable block relative to the housing.

16. The hung window according to claim 1 wherein the housing is configured to further define an opening, wherein the balancer further comprises a pivot pin connected to the pivot end of the housing wherein the pivot pin is configured for sliding interaction with the first frame side member, and wherein the latching mechanism further comprises:

(a) pulley wheel rotatably coupled to the pivot end of the housing, wherein the pulley wheel comprises a circumferential edge portion extending into the opening defined by the housing; and

(b) rotatable pinching member rotatably coupled to the pivot pin, the rotatable pinching member operatively interacting with the first frame side member such that movement of the sash from the vertical operating position to the tilted position causes rotation of the rotatable pinching member relative to the housing along an axis parallel to the pivot pin, wherein the rotatable pinching member comprises:

(i) pivot pin engaging end defining a pivot pin receiving opening for receiving the pivot pin wherein the rotatable pinching member operatively interacts with the frame side member adjacent to pivot around the pivot pin when the sash is moved from the vertical operating position to the tilted position;

(ii) locking end opposite the pivot pin engaging end wherein the locking end is positioned in the housing opening, wherein the locking end includes a first edge and a second edge wherein the first and second edges define a channel therebetween, wherein when the sash is in the vertical operating position the channel is aligned with the pulley wheel to allow longitudinal movement of the extensible member through the channel, and when the sash is in the tilted position the channel is not aligned with the pulley wheel wherein the extensible member is pinched between the circumferential edge portion of the pulley wheel and one of the first and second edges of the locking end of the rotatable pinching member wherein longitudinal movement of the extensible member is prevented.

17. The hung window according to claim 16 wherein one of the first and second edges of the rotatable pinching member is chamfered.

18. The hung window of claim 1 wherein the latching mechanism prevents longitudinal movement of the extensible member when the sash is tilted.

* * * * *

Exhibit 2



US005157808A

# United States Patent [19]

## Sterner, Jr.

[11] Patent Number: 5,157,808

[45] Date of Patent: Oct. 27, 1992

[54] **COIL SPRING COUNTERBALANCE HARDWARE ASSEMBLY AND CONNECTION METHOD THEREFOR**

[75] Inventor: Maurice E. Sterner, Jr., Spring Grove, Pa.

[73] Assignee: Product Design & Development, Inc., York, Pa.

[21] Appl. No.: 836,565

[22] Filed: Feb. 18, 1992

[51] Int. Cl.⁵ .............................................. E05D 13/00
[52] U.S. Cl. ......................................... 16/197; 267/156; 49/445
[58] Field of Search .................. 16/197, 77, DIG. 16, 16/DIG. 36; 267/156; 49/445, 446

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,732,594 | 1/1956 | Adams et al. | 16/197 |
| 2,817,872 | 12/1957 | Foster | 16/197 |
| 3,150,420 | 9/1964 | Brenner. | |
| 3,452,480 | 7/1969 | Foster. | |
| 3,475,865 | 11/1969 | Arnes | 16/197 |
| 4,227,345 | 10/1980 | Durham, Jr. | |

4,935,987  6/1990  Sterner, Jr. .

*Primary Examiner*—John Sipos
*Assistant Examiner*—Carmine Cudo
*Attorney, Agent, or Firm*—Samuel M. Learned, Jr.

[57] **ABSTRACT**

An improved coil spring counterbalance assembly embodying a coil spring support structure that provides a cooperatively radiused restraining shoe against which the uninterrupted smooth external circumferential surface of the coil spring ribbon rotationally operates in extension and retraction thereof during counterbalanced sash movement, thereby eliminating both the clicking sound and spring rotational cyclic vibrational shocks otherwise caused by the spring interior ribbon core tail ending riding over the top of a spring core support hub, in addition to a multiple coil spring connection method for improved successive affixment of extended coil spring ribbons one to the other and in turn to the sash attached balance shoe connector therefor when more than on coil spring is required in order to effect proper sash counterbalancing.

**3 Claims, 5 Drawing Sheets**





FIG. 1



FIG. 2

FIG. 3

FIG. 4



FIG. 5

FIG. 6



**U.S. Patent**     Oct. 27, 1992     Sheet 5 of 5     5,157,808



FIG. 11

FIG. 10

FIG. 12

5,157,808

1

## COIL SPRING COUNTERBALANCE HARDWARE ASSEMBLY AND CONNECTION METHOD THEREFOR

### BACKGROUND OF THE INVENTION

The present invention relates to an improved coil spring counterbalance assembly for use on vertically sliding window sashes wherein the improved assembly hereof incorporates structural embodiments which substantially enhance the smoothness of counterbalance sash operation as well as the ease and facility with which one may install and connect multiple spring components one to the other and to the sash attached balance shoe connector when more than one spring component is required in order to adequately counterbalance a particular sash.

As shown in Applicant's previous teaching, in U.S. Pat. No. 4,935,987 dated Jun. 26, 1990, to Sterner, and in particular as illustrated in FIGS. 2, 3 and 4 thereof, the respective counterbalance springs are each supported by a hub insertably installed through the core openings thereof, upon which hub a coil spring rotates in feeding out and retracting the coil ribbon thereof during vertical movement of a sash in opening and closing operations. Each of the coil spring ribbons has a ribbon core tail ending that in consequence cyclically snaps over the support hub in radius adjustment as the coil spring radius decreases or increases upon sash movement whereby the coil spring radius snapping adjustment effect in turn causes both a distinct and audibly distracting sound in addition to any annoying sash vibration, which sound and vibration effects become more pronounced with the use of multiple coil springs to balance a sash. The counterbalance coil spring sub-assembly as taught in U.S. Pat. No. 4,227,345 to Durham, Jr., dated Oct. 14, 1980, and best illustrated in FIG. 5 thereof, shows a structure in some respects similar to that herein taught but is distinguished in that the coil spring of Durham, Jr., is attached to and supported by the mounting bracket hub thereof.

Other coil spring sash balance hardware apparatus provide for coil support about the external circumferential surface of the spring, such as those respectively taught in U.S. Pat. No. 3,150,420 to Brenner, dated Sept. 29, 1964, and U.S. Pat. No. 3,452,480 to Foster, dated Jul. 1, 1969.

Prior art coil spring counterbalance devices of the external circumferential support category do avoid the snapping sound and sash vibration effects, but do not adapt well to use in applications requiring multiple springs for the counterbalancing of heavier sashes.

The applicant's improved coil spring counterbalance assembly, however, mechanically provides a structural capability to both enhance the ease and smoothness of a sash operation as well as at the same time providing a connection method for joining successive coil spring ribbons in sash counterbalancing applications requiring a use of multiple coil springs, all in a manner as hereinafter more fully detailed and described.

### SUMMARY OF THE INVENTION

It is the principal object of the present invention to provide an improved coil spring counterbalance hardware assembly which operates by means of a coil spring ribbon that extends and retracts about the uninterrupted external coil circumferential surface thereof compressively against a cooperatively radiused restraining shoe

2

to thereby enhance the smoothness of sash raising and lowering by eliminating both the clicking sound and spring rotational cyclic vibrational shocks otherwise caused by the spring component interior ribbon core tail ending riding over the top of a spring core support hub as is characteristically common of prior art coil spring counterbalance assemblies.

It is another object of the present invention to provide an improved spring ribbon connection method for affixing an extended coil spring ribbon to the sash attached balance shoe connector therefor, or in the event of multiple coil spring assembly employment, an improved method for affixing the extended coil spring ribbons one to the other successively to the lead coil spring ribbon which is in turn affixed to the sash attached balance shoe connector therefor.

A further object of the present invention is to provide an improved counterbalance hardware assembly which is adapted to cooperatively accommodate the addition of individual coil spring elements as may be necessary to achieve the proper counterbalance effect for the weight of a particular sash to be supported.

It is also an object of the present invention to provide an improved coil spring counterbalance hardware assembly spring ribbon connection slot structure which facilitates the ease and convenience of affixing multiple coil springs to connect one with the other and to the sash attached balance shoe connector.

It is a further object of the present invention to provide an improved coil spring counterbalance hardware assembly spring ribbon connection method which optimizes the effective range of multiple coil spring utility and efficiency in providing a substantially constantaly uniform counterbalance force effect throughout the raising and lowering limits of any particular sash to which said assembly is affixed in achieving the counterbalance thereof.

Still another object of the present invention is to provide an improved coil spring counterbalance hardware assembly adapted to be installably utilized within both the conventional modern and traditional older sash and jamb structures as either a retrofit or replacement sash counterbalance means, without the costly need or necessity to re-design or reconstruct either the sash or supporting jamb and frame structures therefor.

Yet another object of the present invention is to provide an improved coil spring counterbalance hardware assembly which when operationally installed is hidden from view, and is yet easily accessible for maintenance, repair, or removal as may from time to time be necessary.

It is an additional object of the present invention to provide an improved coil spring counterbalance hardware assembly which is efficient in design, economical in cost, and easy to install and maintain.

The foregoing, and other objects hereof, will be readily evident upon a study of the following specification and accompanying drawings comprising a part thereof.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a front elevation view of a typical double hung window embodying upper and lower vertically sliding sash members, therein showing an exemplary installation of improved coil spring counterbalance hardware assemblies comprising the instant invention.

5,157,808

| 3 | 4 |

FIG. 2 is an enlarged foreshortened side elevation view of the improved coil spring counterbalance hardware assemblies as taken along the line 2—2 of FIG. 1.

FIG. 3 is a front elevation view of the coil spring sub-assembly component of the instant invention as seen along the line 3—3 of FIG. 2.

FIG. 4 is a front elevation view of the balance shoe sash connector sub-assembly component of the instant invention as seen along the line 4—4 of FIG. 2.

FIG. 5 is a partial side elevation view of a typical heavy duty window frame and sash assembly showing an exemplary installation therein of an improved coil spring counter balance hardware assembly embodying the employment of successively connected multiple coil spring sub-assembly components to thereby accommodate counterbalancing of a heavier sash.

FIG. 6 is an front elevation view of the typical heavy duty window frame and sash assembly and exemplary hardware installation as shown in FIG. 5.

FIG. 7 is a partial side elevation view of a typical window frame and sash assembly showing installation therein of exemplary prior art multiple and single coil spring counterbalance hardware assemblies.

FIG. 8 is an enlarged side elevation view of an exemplary prior art coil spring counterbalance component therein showing the spring interior ribbon core tail ending to spring core support hub relationship.

FIG. 9 is an exploded perspective view of an exemplary prior art coil spring counterbalance hardware assembly.

FIG. 10 is a partial side elevation view of a typical window frame and sash assembly showing installation therein of the improved coil spring counterbalance hardware assembly of instant invention.

FIG. 11 is an enlarged side elevation view of the coil spring counterbalance component of instant invention therein showing the external coil ribbon diameter relationship to the cooperative radiused restraining shoe as well as the spring interior ribbon core tail ending clearance of the core support hub.

FIG. 12 is an exploded perspective view of the improved coil spring counterbalance hardware assembly of instant invention.

### DETAILED DESCRIPTION OF THE INVENTION

Referring to FIG. 1, a front elevation view of a typical double hung window 10 embodying an exemplary set of upper and lower vertically sliding sash members, comprised of an upper sash 12 and a lower sash 14 both of which sashes are cooperatively installed within and supported by a typical window frame encasement structure 16, said sashes 12 and 14 being respectively shown counterbalance by a spaced set of the improved coil spring counterbalance hardware assemblies 18 of instant invention which are illustrated and installed in a manner typical of that for either an original equippage or retro-fit application. It should be noted, however, as would be determined by the size and weight of a sash to be counterbalanced in each particular use circumstance, as well as the counterbalance coil spring force rating of an individual coil spring sub-assembly 20, there may be a requirement to employ multiple numbers of the individual coil spring sub-assemblies 20 of said hardware assembly 18 joined by the respective coil spring ribbons 22 thereof in successive coil spring connection one to the other and to the sash attached balance shoe connector 24 therefor by the method as hereinafter taught by

illustration and description. Thus, each improved coil spring counterbalance hardware assembly 18 is comprised of at least one individual coil spring sub-assembly 20 connected by means of the coil spring ribbon 22 thereof to a sash attached balance shoe connector sub-assembly 24.

Referring again to FIG. 1 to discuss general considerations of the method for installing the improved coil spring counterbalance hardware assemblies 18, wherein it will be noted for purposes of obtaining optimum sash 12 and 14 operational balance within the frame encasement structure 16 an installation of said hardware assemblies 18 is preferably comprised of a spaced set thereof for each sash 12 and 14 to thereby minimize any tendency for a sash to cant or cock and thereby bind within the encasement structure sash guide tracks during sash raising or lowering operations. Installation of said hardware assemblies 18 is simply and efficiently accomplished by first affixing a balance shoe connector sub-assembly 24 to either lateral lower side of the upper and lower sash 12 and 14 respective lower sash frame members 26 and 28 by means of a set of connector bracket screws 30 inserted installed through openings therefor in the balance shoe connector bracket 32 and threadably secured into the opposingly located outer lateral underside surfaces of said lower sash frame members 26 and 28, wherein it should be noted, regardless of the number of individual coil spring sub-assemblies 20 to be employed in achieving proper sash 12 and 14 counterbalancing, whether it be either single or successive such coil spring sub-assemblies 20, only one sash attached balance shoe connector sub-assembly 24 is required.

Next, at a vertical position above each of the respective lower sash frame members 26 and 28 when the corresponding upper and lower sashes 12 and 14 therefor are in the closed position, either a single or successively stacked individual coil spring sub-assemblies 20 are securably installed to the corresponding window jamb 34 by means of insertable threadable connection of a spring bracket screw 36 through an opening in the spring bracket cap spacing post 38 and to said corresponding window jamb 34.

As also shown in FIG. 1, the respective sashes 12 and 14 are adapted to be pivotally opened inward and are therefore each provided with a set of spring loaded jamb latches 40 assembled to the upper sash frame member 42 and the lower sash upper frame member 44, which jamb latches 40 function to retain the respective sashes 12 and 14 within the encasement structure sash guide tracks respectively by means of engagement of the jamb latch lugs 46 of said latches 40 within said guide tracks for normal vertically slidable displacement of said sashes 12 and 14 within said encasement structure guide tracks. Upon manual retraction of a set of the jamb latch lugs 46 for either sash 12 or 14, by means of simultaneous sash inward displacement of the jamb latch push pads 48, said lugs 46 are thereby retracted from the subject guide tracks and the sash 12 or 14 as the case may be is then pivotally rotated inwardly about the rotation hub 50 of the sash attached balance shoe sub-assembly for purposes of window pane 52 cleaning or the like. Afterwards the pivotally opened sash may be returned and secured in a normally vertical position within the window frame encasement structure 16 simply by means of reverse rotation thereof about the rotation hub 50 and re-engagement of the latch lugs 46 within the encasement structure guide tracks. Addition-

5,157,808

5                                                           6

ally, the window 10 is provided with a locking means typically consisting of a cam latch assembly 54 which is installed upon the upper mid-point surface of the lower sash upper frame member 44, which cam latch assembly 54 is cooperatively operable pivotally to lockably and releasably engage a cam latch retainer 56 which is assembled to the upper mid-point of the upper sash lower frame member 26.

At this point it should be noted that although the sash attached balance shoe connector sub-assembly 24 is shown and illustrated in a typical tilt window hardware component profile, this is exemplary only and the sash attached balance shoe connector sub-assembly 24 could just as well be provided in a standard non-tilt window hardware component profile with equally beneficial and satisfactory results.

Considering now FIG. 2, which shows greater structural detail of the improved coil spring counterbalance hardware assembly 18 and the coil spring 20 and balance shoe connector 24 sub-assembly components thereof. Particularly shown in connection of the coil spring ribbon 22 by means of the ribbon tail slot 58 in cooperative engagement within the balance shoe connector coil spring ribbon receiving slot 60, which is also illustrated in corresponding FIG. 4. Additionally shown in FIG. 2 as well as in corresponding FIG. 3 is the coil spring 62 interior ribbon core 64 circumferential clearance "X" with respect to the outer circumference of the spring bracket cap spacing post 38, and the uninterrupted external coil spring circumferential surface 66 support by the cooperatively radiused coil spring restraining shoe 68 whereby low noise level and non-vibrational coil spring 62 extension and retraction is achieved upon sash 12 or 14 vertical displacement. It will be noted, as best shown in FIG. 3, the cooperatively radiused coil spring restraining shoe 68 is a sectional piece so as to facilitate coil spring 62 assembly within the coil spring sub-assembly 20 as will hereinafter be more fully explained, wherein one sectioned piece of said radiused coil spring restraining shoe 68 is a shoe base 74 which is registerably interconnected to a shoe base cover 76 by means of register connecting pins 78 whereby a smooth cooperative radiused coil spring support surface 80 is provided against which the uninterrupted external coil spring circumferential surface 66 smoothly operates in extension and retraction of the coil spring 62 upon vertical displacement of a sash 12 or 14.

Referring now to FIG. 4, wherein is shown greater sectional detail of assembly of the sash attached balance shoe connector sub-assembly 24 to the lower sash lower frame member 28 by means of threadable connection therewith of connector bracket screws 30 through openings in the balance shoe connector bracket 32. Also shown as previously described is interconnected assembly of the coil spring ribbon 22 by means of the coil spring ribbon tail slot 58 insertably within the balance shoe connector coil spring ribbon receiving slot 60 whereby the coil spring sub-assembly 20 of the hardware assembly 18 is made operationally functional with the balance shoe connector sub-assembly 24 thereof in providing low noise level vibration free counterbalancing of a sash 12 or 14 on vertical displacement thereof within the window frame encasement structure 16. Additionally shown in FIG. 4 is the coil spring ribbon interconnecting slot 82 which is employed for assembling coil spring ribbons 22 to each other and to the balance shoe connector sub-assembly 24 when it is necessary to employ an in-series plurality of individual coil

spring sub-assemblies 20 in achieving proper sash 12 or 14 operational counterbalance within the window frame encasement structure 16.

Turning now to a consideration of FIGS. 5 and 6 to explain in greater detail the assembly method for interconnecting an in-series plurality of individual coil spring sub-assemblies 20 in achieving heavy or large size sash 12 or 14 operational counterbalance, wherein it is to be understood that the specific number of individual coil spring sub-assemblies 20 that may be required is determined by the coil spring 62 force ratings in relation to the sash 12 or 14 weight to be counterbalanced, and the illustration in FIGS. 5 and 6 of four such coil springs 62 is to be regarded as exemplary only for purposes of explaining the connection method.

Referring to FIGS. 5 and 6, an improved coil spring counterbalance hardware assembly 18 embodying a plurality of coil spring sub-assemblies 20 is shown, which sub-assemblies 20 are installed respectively by means of spring bracket screw 36 threadable connection to the window jamb 34 as was previously described for installation of a single such sub-assembly 20, in series, so that the respective coil spring ribbons 22 thereof may be drawn down and cumulatively assembled one to the other by successive coil spring ribbon tail slot 58 interconnection to coil spring ribbon interconnecting slot 82. The assembly sequence as aforesaid being first an interconnection of the coil spring ribbon tail slot 58 of the lowermost coil spring 62 with the balance shoe connector coil spring ribbon receiving slot 60, followed by interconnection of the coil spring ribbon tail slot 58 of the next most lowest coil spring 62 of said plurality with the coil spring ribbon interconnecting slot 82 of the lowermost coil spring 62 thereof, and thereafter progressively upward in a similar such successive coil spring 62 tail slot 58 to interconnecting slot 82 assemblage pattern. Such a method of successive in-series coil spring 62 interconnection maximizes operational efficiency of the cumulative coil spring counterbalancing effect as well as easing the manual aspects of effecting coil spring interconnection since the amount of coil spring ribbon 22 that must be withdrawn to effect interconnection is minimal as compared to interconnecting each such separate coil spring ribbon 22 separately to the balance shoe connector sub-assembly 24 as is typically done in prior art hardware assemblies of the type herein dealt with and as more particularly shown in FIGS. 7 through 9 next to be considered.

The exemplary prior art coil spring counterbalance hardware assembly 84 as illustrated in FIG. 7 shows upper sash counterbalancing with two coil spring assemblies 86, which are interconnected to the balance shoe connector component 88 in a manner typical of such prior art hardware assemblies 84 which is by individual spring ribbon 90 affixment thereto. With respect to the prior art lowermost coil spring assembly 86 spring ribbon 90 extension for connection to the balance shoe connector component 88 there is no appreciable difference between that and that of the present invention 18, whether a single or a plurality of coil spring assemblies 86 are involved. However, in the case of a plurality of coil spring assemblies 86 in series successive interconnection to the balance shoe connector component 88, each subsequent spring ribbon 90 as shown must be correspondingly increased in extension to effect balance shoe 88 connection which incrementally decreases the overall counterbalance efficiency of a multiple springed hardware assembly 84 by successively increasing the respective spring ribbon

5,157,808

7

90 extensions and consequent pre-loads on the corresponding coil spring assemblies 86. Secondly, installation of such a prior art multiple springed hardware assembly 84 is more difficult since the spring ribbon 90 of each successively removed coil spring assembly 86 must in turn be successively increased in extension by a corresponding amount in order to effect balance shoe 88 interconnection. Thus is the difference and distinction of methodology for coil spring to balance shoe interconnection between that of a typical prior art coil spring counterbalance hardware assembly 84 embodying the use of a successive plurality of coil springs in series and that of a corresponding improved coil spring counterbalance hardware assembly 18 as previously illustrated and explained on the earlier consideration of FIGS. 5 and 6.

The enlarged side elevation view illustration of FIG. 8 shows the manner of support provided for a prior art coil spring 92, which is the source for noise and vibration effects as previously mentioned and evidenced upon vertical displacement of a sash counterbalanced by a prior art coil spring hardware assembly 84. As shown, the coil spring 92 interior coil spring circumferential surface 94 is supported by and rotates upon the coil spring mounting bracket bushing 96 as the spring ribbon 90 is extended or retracted upon vertical displacement of a sash to which said coil spring 92 is interconnectedly assembled. As the coil spring 92 rotates upon the bushing 96, the interior circumferential coil spring tail ending 98 in rotationally riding over the bushing mid-point support surface arc 100 snaps thereagainst on each rotational cycle when the coil spring 92 radius automatically compensates for a change thereof upon spring ribbon 90 extension or retraction during attached sash vertical displacement. It is this coil spring 92 cyclical radius compensating snap effect which causes the annoying noise and sash vibration during vertical displacement thereof. Since in the instant invention, as previously explained, the uninterrupted external coil spring circumferential surface 66 is supported by and rotates upon the smooth cooperative radiused coil spring support surface 80 of the cooperatively radiused coil spring restraining shoe 68 during coil spring ribbon 22 extension or retraction upon sash attached vertical displacement, there is no cyclical radius compensating snap effect as otherwise described for the typical prior art coil spring counterbalance hardware assembly 84 and therefore no annoying clicking sound or sash vibrational effects are produced.

Directing attention now to FIG. 9, which is an exploded perspective view of the exemplary prior art coil spring counterbalance hardware assembly 84, therein showing the physical assembly relationships of the various component elements thereof, and particularly the coil spring 92 core opening insertion upon the mounting bracket bushing 96 for coil spring 92 supportable retention between the mounting bracket bushing collar 102 and the bushing cap collar 104 when the two are insertably joined and retained by the bracket screw 106 and installed in affixment to a window jamb 34 as previously shown in FIG. 7. Also shown is the manner of connectably assembling the spring ribbon 90 to the balance shoe component 88, which is by means of individual coil spring 92 spring ribbon 90 retainable insertion within one of the plurality of balance shoe spring ribbon connection slots 108 and stoppable retention therewithin by means of the spring ribbon loop 110. Mounting of the balance shoe component 88 to a lower sash frame mem-

8

ber is as was before, with insertion of connector bracket screws 30 through openings in the balance shoe connector bracket 32 and then threadable assembly to the lower sash frame member.

Considering lastly the series of improved coil spring counterbalance hardware assembly 18 views shown in FIGS. 10 through 12, wherein FIG. 10 depicts an exemplary hardware assembly 18 installation within a typical window frame encasement structure 16. The enlarged side elevation coil spring sub-assembly 20 view shown in FIG. 11 illustrates clearly the interior ribbon core cumferential clearance "X" between the coil spring interior ribbon core 64 and the spring bracket cap spacing post 38 so there is no operational contact of any hardware assembly 18 structure with the interior coil spring circumferential tail ending 112 whereby neither cyclical noise or vibrational effects are brought into play during vertical displacement movement of a sash. The exploded perspective hardware 18 assembly view shown in FIG. 12 illustrates how the various component parts thereof fit together, and the structural relationship of the uninterrupted external coil spring circumferential surface 66 to the supportable retention thereof by the smooth cooperative radiused coil spring support surface 80 whereby noise and vibration free operation is achieved.

Although the invention has been herein shown and described in what is conceived to be the most practical and preferred embodiment and method, it is recognized that departures may be respectively made therefrom within the scopes hereof, which are not to be limited to the specific details disclosed herein but are to be accorded the full scope of the claims so as to embrace any and all equivalent improved coil spring counterbalance hardware assemblies and the connection methods therefor.

I claim:

1. An improved coil spring counterbalance hardware assembly adapted for counterbalancing a vertically displaceable sash within a window frame encasement structure, said assembly comprising in combination at least one coil spring sub-assembly having a coil spring supportably retained about the uninterrupted external coil spring circumferential surface thereof within said coil spring sub-assembly by means of a cooperatively radiused coil spring restraining shoe said coil spring sub-assembly being adapted for installation connection to a window jamb of said window frame encasement structure, a sash attached balance shoe connector subassembly adapted for installation connection to the lower frame member of said sash the same side thereof as the installation connection of said coil spring subassembly to said window jamb, and a coil spring ribbon of said coil spring of said coil spring sub-assembly extendable therefrom and connectable to a balance shoe slot within said balance shoe connector sub-assembly by means of a first cooperatively complementary slot means on one side edge of said coil spring ribbon and inward from the end thereof, wherein said coil spring is further provided with a second cooperatively complementary slot means on the opposite side edge of said coil spring ribbon as said first cooperatively complementary slot means and at a greater inward distance from the end than said first slot means.

2. The improved coil spring counterbalance hardware assembly according to claim 1 having a plurality of coil spring sub-assemblies connected to said window jamb in a successively removed cooperative in-series

5,157,808

**9**

relation. with respect to said sash attached balance shoe connector sub-assembly.

3. The improved coil spring counterbalance hardware assembly according to claim 2 wherein the respective coil spring ribbons of the respective coil springs of said plurality of coil spring sub-assemblies are connectably assembled one to the other in series and to said sash

**10**

attached balance shoe connector sub-assembly by means of successive coil ribbon interconnection of the first cooperatively complementary slot means respectively therein with the second cooperatively complementary slot means respectively therein.

\*  \*  \*  \*  \*

10

15

20

25

30

35

40

45

50

55

60

65

Exhibit 3

June 4, 1963

Filed April 26, 1961

D. M. PROSSER

WINDOW STRUCTURE

3,091,797

2 Sheets—Sheet 1



Fig.1.

Fig.2.

Fig.3.

INVENTOR.
DWIGHT M. PROSSER
BY Bosworth, Sessions,
Herron & Knowles
ATTORNEYS.

**June 4, 1963**

D. M. PROSSER

3,091,797

WINDOW STRUCTURE

Filed April 26, 1961

2 Sheets—Sheet 2



INVENTOR.

DWIGHT M. PROSSER

BY Bosworth, Sessions,
Nerustrom + Knowles
ATTORNEYS.

# United States Patent Office

3,091,797

Patented June 4, 1963

1

3,091,797
WINDOW STRUCTURE
Dwight M. Prosser, Mansfield, Ohio, assignor to Shiloh
Tool & Die Manufacturing Company
Filed Apr. 26, 1961, Ser. No. 105,594
3 Claims. (Cl. 16—197)

This invention relates to a window component, more particularly a jamb facing that has detachably secured thereto one or more housings incorporating spring-and-sheave assemblies.

A principal object of the invention is to provide an inexpensive jamb facing usable, inter alia, for weather stripping purposes in which jamb facing are incorporated the parting stop, the sash-receiving ways, and replaceable housings containing spring-and-sheave assemblies. The construction is such that when replacement of one or both of the housings becomes necessary, due, for example, to mechanical failure, the facing may be separated from the jamb by removing the screws by which it is held in place, after which, the facing being then in a more convenient position, the housing or housings may be manually detached. To this end, the invention provides tongue-and-slot connections for the housings, making it a simple matter to attach and detach them. Within the housings themselves, the invention further provides tongue-and-slot connections by which certain of the elements of the spring-and-sheave assembly are held in place.

Other objects, advantages and features of the invention will be apparent from the description which follows and from the accompanying drawings, in which:

FIGURE 1 is a perspective of a portion of a window structure in which the invention is incorporated, such figure showing the window frame, the jamb, the facing carried by the jamb, and the upper and lower sash elements.

FIGURE 2 is an elevation of the jamb facing showing the housings for the spring-and-sheave assemblies.

FIGURE 3 is a similar elevation of the jamb facing without the housings for the spring-and-sheave assemblies, the scale being twice that of FIGURE 2.

FIGURE 4 is a top plan on a still larger scale of the jamb facing and housings.

FIGURES 5 and 6 are, respectively, rear and side elevations of the housings, the scale being the same as that of FIGURE 4.

FIGURE 7 is an enlarged section on line 7—7 of FIGURE 2.

FIGURE 8 is an enlarged detail of the upper end of the jamb facing.

FIGURE 9 is an exploded view showing details of the lower end of one of the housings.

In the drawings, the window structure as a whole is designated 1. Along with conventional components that are not important for present purposes, it includes a jamb 2 of wood which in FIGURE 1 is largely concealed by a metal jamb facing 3. The latter is coextensive as regards length with the jamb itself, extending from end to end lengthwise of the jamb. It also extends laterally across the jamb as indicated at a, FIGURE 1, its width being somewhat less than that of the jamb. It is adapted to serve as a weatherstrip, if desired. Although it may be made of other materials, facing 3 may conveniently be made of a non-rusting sheet metal such as stainless steel, aluminum or the like. If of aluminum, it can be formed as an extrusion; preferably, however, it is made of rolled stock.

Facing 3 incorporates a channel-shaped parting stop 4, the opening in which faces toward the jamb; i.e., away from the sash elements. Flanking parting stop 4 are two similar sash-receiving ways 5 and 6 the bottoms of which

2

(5a and 6a) are depressed to provide laterally spaced tracks (5b and 6b) for the sash elements. Parting stop 4 and end flanges 7 and 8 determine the effective widths of sash-receiving ways 5 and 6. Where feasible, as, for example, in a rolled facing, parting stop 4, sash-receiving ways 5 and 6, and end flanges 7 and 8 will normally be formed in one piece: see FIGURES 4 and 8.

Facing 3 is held to jamb 2 by means of screws 9, which, if desired, may pass through holes 10 in parting stop 4 (FIGURES 2 and 3); however, they may be located elsewhere, if preferred.

As shown in FIGURE 1, the usual lower and upper sash elements, respectively designated 11 and 12, are in their open positions. They should be understood to have been moved to these positions from closed positions which, respectively, are at the bottom and top of the window structure. The arrows in FIGURE 1 indicate the direction of movement bringing the two sash elements into their closed positions, at which time check rail 11a on sash element 11 will engage check rail 12a on sash element 12. For reasons that will be apparent, sash elements 11 and 12 are cut away as indicated at 11b and 12b (FIGURE 4).

Fixed to jamb facing 3 in the path of travel of sash elements 11 and 12 are channel-shaped housings 13 and 14 for the spring-and-sheave assemblies. At the lower ends of housings 13 and 14, respectively, are stepped bottom plates 15 and 16, constructed as shown in FIGURE 9, each of which forms part of one of the spring-and-sheave assemblies. Bottom plates 15 and 16 are connected to the remainder of the spring-and-sheave assemblies by cables 17, one of which appears in FIGURE 1. They engage the lowermost portions of sash elements 11 and 12 and move up or down, as the case may be, in conformity with the movements of the sash elements which they respectively engage.

Housings 13 and 14 are held detachably in place in sash-receiving ways 5 and 6 by means of tongue-and-slot connections. To this end, there are slots in the upper portions and other slots near the middle portions of each of sash-receiving ways 5 and 6. In the case of sash-receiving way 5, the slots are formed by off-setting rectangular tabs from the general plane of depressed area 5a; similarly, in the case of sash-receiving way 6, the slots are formed by off-setting rectangular tabs 19 from the general plane of depressed area 6a. As best seen in FIGURE 8, the result of so offsetting tabs 18 and 19, respectively, is to form L-shaped slots 20 and 21. Appropriately located tongues on housings 13 and 14 can enter into and will be retained in place in these slots.

In order to provide suitably located tongues, housings 13 and 14 are formed with laterally extending flanges 22: see FIGURES 5 and 6, which show housing 13 as seen from the rear and one side. Those parts which appear in FIGURES 5 and 6 occur also in housing 14, which is identical with housing 13. It will be noted from FIGURE 4 that flanges 22 on housings 13 and 14 are so proportioned as to fit snugly within depressed areas 5a and 6a of sash-receiving ways 5 and 6, respectively.

Flanges 22 are interrupted near their upper and lower ends by relatively long cut-away portions 23 and by relatively short cut-away portions 24: see FIGURE 5. By introducing cut-away portions 23 and 24, four tongues 25 and four stops 26 are formed in flanges 22. Tongues 25, of which there is a first pair at the upper end and a second pair at the lower end of each of housings 13 and 14, are adapted to enter into L-shaped slots 20 and 21 and, when they do enter into them, interlock with rectangular tabs 18 and 19. The manner in which this is accomplished will be apparent from FIGURE 7.

Referring again to FIGURES 5 and 6, it will be noted

3,091,797

**3**

that there is a transversely extending spring anchor 27 at the upper end of housing 13 at substantially the level of cut-away portions 24. Spring anchor 27 takes the form of a pin the ends of which are headed over against the side walls of housing 13. The upper end of a stout coil spring 28 is hooked over spring anchor 27, such spring comprising one of the principal components of the spring-and-sheave assembly. It is attached at its lower end to a movable sheave holder 29 made up of two spaced plates 30, a first connecting pin 31 over which the end of the spring is hooked, a second connecting pin 32, and two nylon sheaves 33.

Cable 17, to which reference has already been made, passes a number of times between movable sheave holder 29 and a stationary sheave holder 34 at the lower end of housing 13. Sheave holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38. One end of cable 17 is made fast to pin 36; the other end extends through bottom plate 15, being knotted against its lower face. When bottom plate 15 moves with sash element 11 on movement of the latter toward closed position, the spring-and-sheaves assembly releases the needed length of cable. It is taken up by the spring-and-sheave assembly on movement of the sash element 11 in the opposite direction.

As will be apparent from FIGURES 5, 6 and 9, stationary sheave holder 34 is intended to coact with bottom plate 15 when the bottom plate is in its retracted position. To this end, bottom plate 15 is provided with a hole for cable 17 (one of two holes 40) and an elongated slot 41 for receiving two end tangs 42 that depend from the lower ends of plates 35. Plates 35 are further provided with holes 43 and 44 for pins 36 and 37, respectively. At their outer ends, pins 36 and 37 are headed over against the exposed outer faces of plates 35, thus forming a rigid assembly.

Each of the two plates 35 is provided with an outwardly projecting tongue 45 in the space between holes 43 and 44. These tongues, which are offset from the planes of the stock of which plates 35 are formed, are adapted to enter into slots 46 in the side walls of housing 13. As appears from FIGURE 9, these slots are produced by slitting plates 35 and pressing inwardly tab-like portions 47. The manner in which tongues 45 and tabs 47 cooperate is shown in FIGURE 5. Inasmuch as cable 17 exerts a constant upward pull on pin 36, there is little likelihood of displacement of sheave housing 34.

Thus the invention provides a sash balancing system

**4**

in and by which one or more spring-and-sheave assemblies are held in place in suitable housings by means of tongue-and-slot connections. Each such housing is itself held in place in one of the sash receiving ways by means of tongue-and-slot connections at the upper and lower ends of the housing. These tongue-and-slot connections permit of easy replacement of worn or defective parts in the spring-and-sheave assembly and, if desired, of replacement of the housing itself. Once the necessary replacement has been accomplished, the housing may be returned to its position on jamb facing 3 and the latter restored to its intended position in the window structure.

It is evident that changes in and departures from what has been described may readily be made by those skilled in the art. For example, it is not necessary that the facing be formed in one piece, as shown. Being made of sheet metal, it may be built up of a plurality of pieces attached to each other in suitable fashion. At the sides of the facing, the end flanges may, if desired, project toward rather than away from the jamb. Numerous other changes of like nature can be expected from those versed in the art to which the invention relates.

It is intended that the patent shall cover, by summarization in appended claims, all features of patentable novelty residing in the invention.

What is claimed is:

1. A window component comprising a metal housing of channel-shaped cross-section; a spring-and-sheave assembly in the housing, said spring-and-sheave assembly extending lengthwise from one end of the housing to the other; an anchor for one end of the spring-and-sheave assembly at one end of the housing; and, at the opposite end of the housing, tongue-and-slot connections for holding in place the opposite end of the spring-and-sheave assembly, the slots being in the housing and the tongues forming part of a sheave holder that itself forms part of the spring-and-sheave assembly.

2. A window component according to claim 1 in which the sheave holder takes the form of spaced side pieces held together by pins.

3. A window component according to claim 2 in which the side pieces are provided with end tanks that project out of the housing into a movable end plate.

References Cited in the file of this patent

UNITED STATES PATENTS

| 2,715,747 | Prosser et al. | Aug. 23, 1955 |
| 2,722,723 | Mears | Nov. 8, 1955 |
| 2,912,726 | Goellner | Nov. 17, 1959 |

Exhibit 7

Part 1

Exhibit 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMESBURY GROUP, INC., and       )
AMESBURY SPRINGS LTD.,          )
       Plaintiffs,              )
                   )     CIVIL ACTION NO.
       v.                       )     05-10020-DPW
                   )
THE CALDWELL MANUFACTURING      )
COMPANY,                        )
       Defendant.               ).

MEMORANDUM AND ORDER
January 20, 2006

Amesbury Group, Inc. and Amesbury Springs Ltd.
(collectively, "Amesbury") commenced this action against The
Caldwell Manufacturing Company ("Caldwell") for allegedly
infringing three of Amesbury's patents related to window
balances.  These are: United States Patents numbered 5,365,638
(the "'638 patent") for "Spring Mounting for Sash Frame
Tensioning Arrangements"; 6,598,264 (the "'264 patent") for
"Block and Tackle Window Balance with Bottom Guide Roller"; and
6,820,368 (the "'368 patent") for "Snap Lock Balance Shoe and
System for a Pivotable Window".  In response, Caldwell has filed
counterclaims seeking a declaration that it has not infringed any
of the patents at issue and that Amesbury's patents are invalid
in any event.

In order to frame the issues in this litigation, I resolve

in this Memorandum the threshold dispute between the parties
regarding the construction of various claim terms in this
Memorandum and Order. See Watts v. XL Systems, Inc., 232 F.3d
877, 880 (Fed. Cir. 2000)("The determination of infringement is a
two-step process. First, this court construes the claims and,
second, we compare the properly construed claims to the accused
device.")

## I.  CLAIM CONSTRUCTION

"It is a 'bedrock principle' of patent law that 'the claims
of a patent define the invention to which the patentee is
entitled the right to exclude.'"  Phillips v. AWH Corporation,
415 F.3d 1303, 1312 (Fed. Cir. 2005) quoting Innova/Pure Water,
Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111,
1115 (Fed. Cir. 2004)).  The Federal Circuit in Phillips recently
set out a comprehensive framework for construing claims.

Claim construction, notwithstanding its evidentiary
underpinnings, is a question of law to be determined by a judge.
Markman v. Westview Instruments, Inc., 517 U.S. 370, 384, 390
(1996).  Courts are to give claim terms "their ordinary and
customary meaning."  Phillips, 415 F.3d at 1312 quoting Vitronics
Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (1996).  However,
the ordinary and customary meaning of a claim is not necessarily
the meaning understood by a layperson, but "the meaning that the
term would have to a person of ordinary skill in the art in

-2-

question at the time of the invention."[1]  <u>Id.</u> at 1313.  This

understanding provides "an objective baseline from which to begin

claim interpretation."  <u>Id.</u>

     "In some cases, the ordinary meaning of claim language as

understood by a person of skill in the art may be readily

apparent even to lay judges, and claim construction in such cases

involves little more than the application of the widely accepted

meaning of commonly understood words."  <u>Id.</u> at 1314.  "In such

circumstances, general purpose dictionaries may be helpful."  <u>Id.</u>

However, where the ordinary meaning of claim language as

understood by a person of skill in the art is not readily

apparent, <u>Phillips</u> directs district courts to a hierarchy of

sources to aid in claim construction.  The intrinsic record,

including the claim terms themselves, the remainder of the

specification, and the prosecution history, provides the best

guidance as to the meaning of the claims.  <u>Id.</u> at 1313-14.

Extrinsic evidence, such as dictionaries, expert testimony, and

learned treatises, may also play a valuable role in claim

construction.  However, in a departure from the line of cases led

by <u>Texas Digital Systems, Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193

(Fed Cir. 2002), <u>Phillips</u> urges caution in their use.  <u>Id.</u> at

1319-1324.

     Among the sources of intrinsic evidence, <u>Phillips</u> places

---

    [1] For purposes of claim construction, the "time of the
invention" is the effective filing date of the patent
application.  <u>Phillips v. AWH Corporation</u>, 415 F.3d 1303, 1313
(Fed. Cir. 2005).

primary importance on the claims themselves and the specification.  The context in which a term is used in the asserted claim and the use of the term in other claims can be "highly instructive."  _Id._ at 1314.  The claims, "of course, do not stand alone."  _Id._ at 1315.  They "must be read in view of the specification, of which they are a part."  _Id._ _quoting_ _Markman_, 52 F.3d at 978.  Thus, _Phillips_ reaffirmed the long-standing principle that the specification "is the single best guide to the meaning of a disputed term."  _Id._ at 1303.  In addition to its statutory role as a "full" and "exact" description of the claimed invention, the specification may reveal a patentee's distinctive definition of a term or a disavowal of claim scope.  _Id._ at 1316.  The specification is such a valuable tool that it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims."  _Id._ at 1317.  Nevertheless, _Phillips_ warned of "the danger of reading limitations from the specification into the claim."  _Id._ at 1323.  The purpose of the specification is to enable one skilled in the art to make and use the invention.  _Id._ Specific embodiments of the invention described for teaching purposes should not be imported into the claim as a limitation. _Id._  The distinction between proper claim construction and improper limitation turns on "whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature."  _Id._ at

1323.

A court may also consult the prosecution history, which "consists of the complete record of the proceedings before the PTO [the Patent and Trademark Office] and includes the prior art cited during the examination of the patent", when construing a claim. Id. at 1317. Like the specification, the prosecution history "can inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. See Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'"), quoting ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1580 (Fed. Cir. 1988). However, the prosecution history is not a final product; it "represents an ongoing negotiation between the PTO and the applicant." Phillips, 415 F.3d at 1317. As such, it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.

Although the Phillips court attached greater value to intrinsic evidence, it approved the use of extrinsic evidence in a limited fashion. Specifically, technical dictionaries are helpful to the extent that they assist a court to "'better understand the underlying technology' and the way in which one of skill in the art might use the claim terms." Id. at 1318 quoting

-5-

<u>Vitronics</u>, 90 F.3d at 1344.  Expert testimony is also valuable for providing background on the technology at issue, explaining how an invention works, or describing a distinctive use of a term in a particular field.  However, neither dictionaries nor expert testimony, are entirely reliable sources for claim interpretation for a variety of reasons.  The <u>Phillips</u> court's greatest concern with extrinsic evidence, particularly dictionaries, is that it may lead judges to construe terms in an overbroad manner:

> The problem is that if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.

<u>Id</u>. at 1321.  Because dictionaries provide a broad array of definitions, "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract."  <u>Id</u>.  The <u>Texas Digital</u> line of cases adopted this "dictionary down" approach, thereby reducing the role of the specification to a mere "check on the dictionary meaning of a claim term."  <u>Id.</u> at 1320.  In contrast, <u>Phillips</u> articulated a "claims up" approach, instructing courts to focus "at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down."  <u>Id.</u> at 1321.

Ultimately, there is no "magic formula" for conducting claim construction when the ordinary meaning of the disputed terms as

understood by a person of skill in the art is not readily

apparent.  Id. at 1324.  The key lies in giving appropriate

weight to each "source in light of the statutes and policies that

inform patent law."  Id.  Accordingly, the claims and the

specification are most significant, followed by prosecution

history, and finally by extrinsic sources.  Id.

Having set out the general principles, I now turn to explain

the particular interpretative approach that is required for

"means-plus-function" claims that invoke 35 U.S.C. § 112, ¶ 6.

Such claim[s] shall be construed to cover the corresponding

structure, material, or acts described in the specification and

equivalents thereof."  35 U.S.C. § 112, ¶ 6.  This mandatory

interpretative approach "restrict[s] a functional claim element's

'broad literal language ... to those means that are 'equivalent'

to the actual means shown in the patent specification.'"  Al-Site

Corp. v. VSI Int'l, 174 F.3d 1308, 1320 (Fed. Cir. 1999) quoting

Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 28

(1997).

The Federal Circuit "has established a framework for

determining whether the elements of a claim invoke

means-plus-function treatment."  Micro Chemical, Inc. v. Great

Plains Chemical Co., Inc., 194 F.3d 1250, 1257 (Fed. Cir. 1999).

> If the word "means" appears in a claim element in
> association with a function, this court presumes that
> § 112, ¶ 6 applies.  This presumption collapses,
> however, if the claim itself recites sufficient
> structure, material, or acts to perform the claimed

```
function.  Without the term "means," a claim element is
presumed to fall outside means-plus-function
strictures.  Once again, however, that presumption can
collapse when an element lacking the term "means"
nonetheless relies on functional terms rather than
structure or material to describe performance of the
claimed function.
```

Id. (internal citations omitted).

If a claim invokes means-plus-function treatment, the first
step in construing it is to identify the function.  ACTV, Inc. v.
Walt Disney Co., 346 F.3d 1082, 1087 (Fed. Cir. 2003).  "The
court must construe the function of a means-plus-function
limitation to include the limitations contained in the claim
language, and only those limitations.  It is improper to narrow
the scope of the function beyond the claim language.  It is
equally improper to broaden the scope of the claimed function by
ignoring clear limitations in the claim language.  Ordinary
principles of claim construction govern interpretation of the
claim language used to describe the function."  Cardiac
Pacemakers, Inc. v. St. Jude Medical, Inc., 296 F.3d 1106, 1113
(Fed. Cir. 2002).

The second step is to "examine the written description to
determine the structure that corresponds to and performs that
function."  ACTV, 346 F.3d at 1087.  "In order to qualify as
corresponding, the structure must not only perform the claimed
function, but the specification must clearly associate the
structure with performance of the function."  Cardiac, 296 F.3d

at 1113.

With these principles in mind, I may proceed to consideration of the disputed claim terms in the '638, '264, and '368 patents respectively.

## II.    DISPUTED TERMS

### A.    '638 patent

1. **Background** - The '638 patent entitled "Spring Mounting for Sash Frame Tensioning Arrangements" was created to improve on a basic "coiled spring" window balance by eliminating the noise created by such springs when they are in use.    [Amesbury's Brief, p. 2; '638 Patent Background, col. 1, l. 46-47.]

Window balances are secured by an anchor in the hollow channels within the window jambs (the vertical sides of the window frame that contain tracks on their interior for the windows to slide up and down).  A basic coiled spring window balance is sized to counter the weight of the window "sash" (the movable portion of the hung window that holds the panes of glass), allowing the sash to move up and down the window jamb and remain in any desired open position. ['638 Patent Abstract.]  The outer end of the coiled spring balance is attached to the "shoe" or "sash frame support element", which is connected to the sash. This outer end of the spring uncoils and recoils as the sash slides up and down during use.

In the older spring balances the inner end of the spring was

-9-

not secured to anything.  ['638 Patent Background, col. 1, ll. 24-26, 34.] Instead the spring was mounted on a drum in the open space within the coil around which the spring rotated as the outer free end uncoiled and recoiled.  The upper part of the inside of the coil rested on the drum with the lower part of the coil slung below the drum and not supported by it.  ['638 Patent Background, col. 1, ll. 30-32.] The drum was either arranged to be stationary or to rotate with the spring as a guide, ['638 Patent Background, col. 1, ll. 22-23], but in either case the drum provided only a "reaction member" that "retain[ed] the body of the spring loosely in a position in the channel" of the window jamb as the outer end uncoils. ['638 Patent Background, col. 1, ll. 37-39.] Securing the coiled spring in place in this way created the disadvantage "that the spring [was] not silent in use, possibly due to relative movement between the inner, free end of the spring and the spring support drum." ['638 Patent Background, col. 1, ll. 41-45.]

The '638 Patent alters how the coiled spring balance is held in place to eliminate the noise.  Instead of being supported from within the coil, the patent allows the spring to rest on a mounting element, ['638 Patent Summary, col. 2, ll. 20-24], which appears to support the spring "from below" (when the springs are "used in vertical sash frames as is usual") by means of a "surface" or "arm" underneath the spring "being concavely curved

-10-

to support the curved outer undersurface of the spring." ['638 Patent, col. 2, ll. 4-6, 17-18, 48-50, col. 4, ll. 20-21, 22-23.] The patent also envisions the possibility of having a "tube-like hub which, in use, loosely impales" the center of "the coiled ribbon spring", but the hub would not provide any support to the spring (except that it might provide minor support if the spring was fully extended, but that is not the function of the hub). ['638 Patent, col. 4, ll. 17-19; col. 2, ll. 55-58.]

The patent describes that the mounting element would preferably be secured to the frame by a fixing screw through "an aperture" in the mounting element. ['638 Patent, col. 2, ll. 14-16; See also Claim 2, col. 6, ll. 23-25.] If the mounting element had the tube-like hub, an "aperture" could run through the hub portion and thus through the middle of the coil "to receive ... a fixing screw by which the mounting element may be secured to the frame". ['638 Patent, col. 2, ll. 43-45.]

The patent describes how the mounting element is to include "formations" that cooperate with the "inwardly turned opposed flanges"[2] of the window jamb channel to inhibit the rotation or twisting of the mounting element relative to the sash frame so

---

[2] The inwardly turned opposed (or opposite) flanges of the channel correspond to inwardly-turned protruding edges that run along both sides of the window jamb track (or channel). The mounting element for the coiled spring balance appears to fit inside the window jamb track or channel with the flanges partially closing off the side opposite the back of the track or channel.

-11-

that the mounting element remains "substantially stationary when the spring is in operation." ['638 Patent Summary, col. 2, ll. 59-67; Claim 1, cl. 6, 11-15; Claim 8, col. 6, ll. 56-63.]  The patent also allows for stacking or "inter-engagement" of mounting assembly units where more than one coiled spring is required.

Based on the parties' proposed claim constructions, there are only four disputed terms, all of which are part of the two independent claims at issue - Claims 1 and 8 set out below with the disputed terms in bold face italics.

<u>Claim 1</u>

A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having a first end engaged with said sash frame support means, and *a means for mounting said coiled ribbon spring*, the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a *raised spine* positioned between and in the same plane as said inwardly turned opposed flanges of said channel means **whereby rotational motion of said mounting means is inhibited.**

<u>Claim 8</u>

A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having an outer end engaged with said sash frame support means, and **a means for mounting said coiled ribbon spring**, the coiled body portion of said

-12-

coiled ribbon spring with the other end of said coiled
ribbon spring positioned in said mounting means, said
mounting means being secured in said channel means and
the mounting means having *projection means* positioned
between said inwardly turned opposite flanges of the
channel means within which the mounting means is
positioned, **whereby rotational movement of the mounting
means in inhibited.**

2. **"<u>a means for mounting said coiled ribbon spring</u>"** - Both

parties agree that this term is a means-plus-function term.

Nonetheless, Amesbury suggests that the term means "a body with a

surface for supporting the coiled ribbon spring," whereas

Caldwell argues that the correct construction of the term is a

structure for mounting the coiled ribbon spring to the channel

that has "a body with an opening to receive a fixing screw [or

its equivalent] and an upper surface concavely curved to support

the curved outer undersurface of the spring."  I note that the

patent refers to the disputed term as "mounting means" in

subsequent parts of Claims 1 and 8.

The first step in construing a means-plus-function term is

to identify the function.  <u>ACTV</u>, 346 F.3d at 1087.  Amesbury and

Caldwell seem to agree that the recited function is simply

"mounting the coiled ribbon spring" to the channel as stated in

the claim.  However, the parties dispute the degree to which the

idea of "being secured" in the channel and the fixing screw

itself must be incorporated into the meaning of the term.

To "construe the meaning of the words used to describe the

claimed function" I must use "ordinary principles of claim construction."  Lockheed Martin Corp. v. Space Systems/Loral, Inc., 324 F.3d 1308, 1319 (Fed. Cir. 2003).  Thus, I must give the term 'mounting' "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312.  In this case, I am satisfied that the ordinary meaning of "mounting" as understood by a person of skill in the art is readily apparent.  This is not the case where the term has a "particular meaning in [the relevant] field of art", nor does it appear that the term is being used "idiosyncratically".  Id. at 1315.  Consequently, I will construe the term according to the "widely accepted meaning" of these "commonly understood words".  Phillips, 415 F.3d at 1314.  "In such circumstances, general purpose dictionaries may be helpful." Id.

Caldwell cites the definition of "mount" in the American Heritage Dictionary (3d ed 1992) at p. 1180 - "to fix securely to a support" - which I find to be the ordinary meaning of the verb as understood by a person of skill in the art.  However, in this claim, the "mounting means" is secured, in the passive voice sense, to the channel according to a later phrase in Claims 1 and 8.  As a result, I conclude that it is readily apparent that the disputed term describes a means for enabling the coiled ribbon spring to be fixed to the window frame channel.

This function is consistent with the section of the

-14-

specification cited by both parties.  That section uses two verbs
to describe the dual purposes of the 'mounting element' - "to
receive, in use, a fixing screw by which the mounting element may
be secured [to the window] frame" and "to support the curved
outer undersurface of the spring".  ['638 Patent, col. 2, ll. 13-
19.] Together these enable the "mounting element" to 'mount' the
coil spring.  In drawing this conclusion, I note that the
"mounting element" or "mounting means" alone does not "secure"
the mounting element to the channel as suggested by Caldwell
[Caldwell Brief, p. 5], nor is the fixing screw or its equivalent
part of the element called a "mounting means".  Rather, the
"mounting means" "receive[s] a fixing screw by which the mounting
element may be secured [to the window] frame or abutment".  ['638
Patent, col. 2, ll. 13-20] Thus, according to this patent, the
fixing screw or its equivalent is the element that actually
secures the "mounting element" to the wall and it is distinct
from the "mounting element".  This interpretation of the patent
does not ignore the presence of the screw or its equivalent, but
recognizes the relationship between the "mounting means" and the
idea of securing the "mounting means" implicit in Claims 1 and 8.

The second step in the means-plus-function analysis is to
identify "what structures disclosed in the written description
correspond to the 'means' for performing that function,"
Lockhead Martin, 324 F.3d at 1319, and the "equivalents" of those

-15-

structures.  <u>Altiris, Inc. v.</u>

<u>Syman</u>

<u>tec Corp.</u>, 318 F.3d 1363, 1377 (Fed.

Cir.

2003).  Here, both parties agree

that

the corresponding structure is the

"moun

ting element" described in the

follo

wing paragraph of the patent

speci

fication:

> **Preferably,** the <u>**mounting**</u>
>
> <u>**element**</u> comprises a **body** portion having an **aperture** therein to receive, in use, a fixing screw by which the mounting element may be secured to said frame or abutment, an **upper surface of the body** portion being **concavely curved** to support the curved outer undersurface of the spring, thus providing said support surface.

['648 Patent, col. 2, ll. 13-19 (emphasis added).]

This generic description fits all of the preferred

embodiments.  See for

 example Fig. 2 and 7 shown below, both of which have a

body, an aperture or a bore to receive a fixing screw

or something similar (noted as **12** in Fig. 2 and **88** in Fig. 7),
and a concavely curved surface to support the spring coil (noted
as **20** in Fig. 2 and **20'** in Fig. 7).



FIG.7.



FIG.2.

Another description of the "mounting element" builds on the
more generic description referenced above.

> **Alternatively**, the <u>mounting element</u> may be configured
> such that there is a **hub portion** having an **aperture**
> therein to receive, in use, a fixing screw by which the
> mounting element may be secured to the frame or
> abutment; the hub portion being disposed such that in
> use the spring encircles such hub portion, the mounting
> element having an **arm** portion slung below said hub
> portion and disposed so as to support said outer
> undersurface of said spring.

['648 Patent, col. 2, ll. 42-50 (emphasis added).] This
alternative is depicted in the preferred embodiments in Figures
3-5 with Fig. 4 shown below.  Again there is a body and an
aperture to receive a fixing screw and the "arm portion slung
below said hub portion" (noted as **62**) in these figures is
described as the "curved support surface" which is "the
counterpart of the support surface in the first [and other]
embodiments" (noted as **20** in Figs. 2 and 7). ['638 Patent, col.
4, ll. 22-24.]

-19-



FIG.4.

Formations that cooperate with the inwardly turned opposed flanges of the window jamb channel and inter-engagement formations are also envisioned as possible characteristics of the "mounting element."

Since an aperture (or bore) allowing a fixing screw to pass through the "mounting element" to secure it to the window frame is common to the simplest description and all of the preferred embodiments and drawings, Caldwell seeks to include "an aperture for a screw" as part of the construction of the term "mounting means". Amesbury does not adopt the addition of this phrase.

I agree with Amesbury; the term "mounting element", and therefore the disputed term, does not necessarily require an aperture for a fixing screw because the second last paragraph of the patent specification explains that "other methods of securing the mountings to a frame or abutment may be used." ['638 Patent, col. 5, ll. 51-52.] Thus, the body of the "mounting element" can be designed to receive a fixing screw, "two or more screw[s] [sic] or other fixings", or "[a]lternatively, pegs, spigots or catches could be used." ['638 Patent, col. 5, ll. 53-56.] As a

-20-

result, Claims 1 and 8 encompass mounting elements similar to the ones depicted in the drawings that correspond to the 'means' for performing the 'mounting' function, but which use catches, for instance, to attach the back of the mounting element to the window jamb channel wall instead of a screw.  Consequently, I disagree with Caldwell that the "only structures disclosed in the specification corresponding to the 'mounting means' are depicted in Figures 1 through 12." [Caldwell Brief, p. 6.]

This conclusion is supported by the doctrine of claim differentiation, which "'create[s] a presumption that each claim in a patent has a different scope.'"  Free Motion Fitness, Inc. v. Cybex Intern., Inc., 423 F.3d 1343, 1351 (Fed. Cir. 2005) quoting Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998).  "The difference in meaning and scope between claims is presumed to be significant '[t]o the extent that the absence of such difference in meaning and scope would make a claim superfluous.'"  Free Motion Fitness, 423 F.3d at 1351 quoting Tandon Corp. v. United States Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987).  The presumption applies in interpreting means-plus-function terms, even though "the stringencies of a means-plus-function limitation are not to be avoided by the mere addition of a dependent claim that recites the corresponding structure disclosed in the specification."  Wenger Manufacturing, Inc. v. Coating Machinery Systems, Inc.,

239 F.3d 1225, 1234 (Fed. Cir. 2001).

Here, Claim 3 describes a "mounting assembly" where the "mounting means has a body portion having an aperture therein, a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means[.]"  This claim describes the "aperture" element that Caldwell seeks to include in the general term "mounting means" in Claim 1.  I find that the dependent claim limiting Claim 3 to a body with an aperture to receive a fixing screw confirms that the independent claims may encompass other methods of fixing.  See Free Motion Fitness, 423 F.3d at 1351 (holding that the "dependent claims limiting the claim to a single cable confirm that the independent claims may encompass more than one cable").

Both parties seek to include the idea of a surface for supporting the coiled ribbon spring in the definition, but Caldwell argues that the definition should be more specific, suggesting that the phrase "upper surface concavely curved to support the curved outer undersurface of the spring" is more appropriate.  In the hearing, Amesbury did not press the curvature issue except to say that the curvature of the surface is not required, important, and does not need to conform exactly to the curvature of the spring.  I understand and adopt Amesbury's argument that the corresponding curvatures of the support surface and the spring do not need to conform exactly.

-22-

[638 Patent, col. 4, ll. 8-10.]  Since Claim 3 also specifies

that the support surface of the mounting element is to be

"concavely curved", the doctrine of claim differentiation also

suggests that I should not limit the surface of the structure

referenced by "mounting means" to those with surfaces that are

"concavely curved".  However, claim differentiation "is a 'guide,

not a rigid rule'".  <u>Nomos Corp. v. Brainlab USA, Inc.</u>, 357 F.3d

1364, 1368 (Fed. Cir. 2004) <u>quoting</u> <u>Autogiro Co. of Am. v. United</u>

<u>States</u>, 181 Ct.Cl. 55, 384 F.2d 391, 404 (1967).  It "does not

override the requirements of § 112, ¶ 6 when the 'claim will bear

only one interpretation." <u>Id.</u> <u>quoting</u> <u>Autogiro</u>, 384 F.2d at 404.

Here there is no comparable disclaimer anywhere in the

specification that the mounting element can incorporate a surface

to hold a coiled ribbon spring that is anything other than

concavely curved.  The only disclaimer is that the corresponding

curvatures of the support surface and the spring do not need to

conform exactly. ['638 Patent, col. 4, ll. 8-10.] Thus, I find

that the claim will only bear one interpretation - the mounting

element must include a concavely curved surface to support the

spring, but the corresponding curvatures do not need to conform

exactly.

<u>Construction</u>: The term "mounting means" or "a means for mounting
said coiled ribbon spring" in Claims 1 and 8 describes a
structure for mounting a coiled ribbon spring to the window jamb
channel.  The structure has a body with a surface concavely
curved to support the curved outer undersurface of the spring,
but the corresponding curvatures of the two surfaces do not need

to conform exactly.  The design of the body also includes some
method of fixing, such as aperture to receive a fixing screw, to
secure the structure to a window jamb channel.

   3. "<u>raised spine</u>" - Amesbury argues that "the term 'raised

spine' should be construed in accordance with its plain and

ordinary meaning; that is, a raised projection or protrusion."

Caldwell argues for a more precise construction - "a raised,

elongated, rectangular shape that fits snugly between the flanges

of the channel means" - which it argues better corresponds with

the ordinary and customary meaning for the term "spine".

   Here again, I feel confident that the ordinary meaning of

"raised spine" as understood by a person of skill in the art is

readily apparent.  This is not the case where the term has a

"particular meaning in [the relevant] field of art", nor does it

appear that the term is being used "idiosyncratically".

<u>Phillips</u>, 415 F.3d at 1315.  Thus, I will construe the term

according to the "widely accepted meaning" of this metaphor.  <u>Id.</u>

at 1314.

   It is unclear how Amesbury determined that "a raised

projection or protrusion" is the plain and ordinary meaning of

"raised spine".  Caldwell, on the other hand, points me again to

the American Heritage Dictionary (3d ed 1992), which includes the

following definition for 'spine' - "Something that resembles or

suggests a backbone, as: a. The hinged back of a book.  b. The

crest of a ridge."  I find that this definition more accurately

describes the ordinary meaning of this term as used in the
context of Claim 1 and I agree with Caldwell that the words
"raised projection or protrusion" do not sufficiently capture the
concept of "raised spine" intended by the patentee's choice of
that term in both Claim 1 and the specification.  Rather, the
ordinary meaning of the term "spine" is more specific than the
broader terms "projection" or "protrusion", which may encompass
simple knobs, bumps, or even a "poorly-hammered nail".  The
Federal Circuit gave some guidance in <u>International Rectifier</u>
<u>Corp. v. IXYS Corp.</u>, a pre-<u>Phillips</u> case, where it disapproved of
the district court's adoption of a synonym of the claim term as
the definition because it "disregard[ed] entirely the distinction
between the two terms set forth in the usage note."  The court
observed that "[h]ad the inventor meant [the synonym], he could
have used that word.  However, we must consider the word that the
inventor actually chose and use the definitions of that term that
are consistent with the written description."  <u>International</u>
<u>Rectifier Corp. v. IXYS Corp.</u>, 361 F.3d 1363, 1374 (Fed. Cir.
2004).

    Having recognized the importance of fully capturing the
proposed usage, I must disagree with Caldwell that the disputed
term is necessarily limited to the elongated and rectangular
shapes depicted in the patent drawings.  To do so "would be to
impermissibly read a limitation into the claims from the written

description", <u>Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.</u>, 340 F.3d 1298, 1308 (Fed. Cir. 2003) <u>citing Comark</u>, 156 F.3d at 1186, and "the patent drawings depict[ing] a particular embodiment". <u>Id.</u> at 1306-07. <u>See also Phillips</u>, 414 F.3d at 1323.[3]

Here Caldwell argues for the inclusion of the adjectives elongated and rectangular because in Claim 1 the "raised spine" is supposed to be "positioned between and in the same plane as the inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited." ['638 Patent, col. 6, ll. 12-15.] Similarly, an embodiment corresponding to this description is depicted in Figures 9, 10 and 11 and described as having a width "arranged such that it is a snug fit between open lip portions ... of a channel section sash frame member ... within which the mounting element is to be operatively received." ['638 Patent, col. 5, ll. 8-11.] Neither the Claim nor the description in the specification require the raised formation to be 'elongated' as it is depicted in Figures 9, 10 and 11 except to the degree that the term 'spine' imports such a characteristic.  Furthermore, the raised formation in

---

[3] Amesbury points to the Federal Circuit's reversal on the meaning of "protrusion" in <u>Anchor Wall</u> for the proposition that shape-based limitations should not be included in the definition unless expressly set forth in the patent.  However, I find the general principle re-affirmed in <u>Phillips</u> that claims should not be confined to the specific embodiments in the specification more compelling for purposes of construing the patent before me.

-26-

Figures 9, 10 and 11 is not even a true rectangle because of the
inter-engagement projections sculpted into it.  The Claim
encompasses variously shaped raised formations that could be
designed to have at least some of the edges positioned between
and in the same plane as the inwardly turned opposed flanges with
the requisite width thereby inhibiting rotation.  A rectangular
shape is not necessarily required, and I note that the crest of a
ridge is not normally rectangular.  Furthermore, a rectangular
shape would only fit snugly in the channel if the inwardly turned
opposed flanges had straight edges.  If for some reason a window
jamb channel were designed with jagged flanges, for instance, a
rectangular shape would not fit.  Rather, the raised spine of the
mounting element would have to have a shape that corresponds and
cooperates with the jagged flanges, which is at bottom the
defining characteristic of this component.



FIG.10.

In conclusion, in an attempt to deconstruct the metaphor of "raised spine" I will not limit its meaning with descriptors not included in either the Claims or the specification.  However, simply analogizing "raised spine" with "raised projection or protrusion" loses the ordinary meaning implicit in this common usage of spine.  To the extent that Caldwell is suggesting that the meaning of the term "raised spine" ought to embody the qualifier that it be "positioned between and in the same plane as [the] inwardly turned opposed flanges of [the] channel . . . whereby rotational motion of [the] mounting means is inhibited", I decline the invitation.  To do so would make the remainder of the Claim just quoted redundant and unnecessary.

**Construction** - A raised portion of the mounting element that resembles or suggests the spine of the mounting element, shaped to cooperate with the window jamb flanges to inhibit the rotational motion of the mounting means.

4. **"projection means"** - Amesbury contends that the term "projection means" in Claim 8 is not a means-plus-function term. Rather, the term ought to be interpreted as though it just said "projection".  In that respect, Amesbury argues that the term connotes "at least one projection or protrusion", with the word "projection" meaning "a part that juts out".  By contrast, Caldwell argues that the term is a mean-plus-function claim and that the term should be construed more narrowly as "a means that projects from the mounting means and cooperates with the flanges

-28-

of the channel, which is limited to the rectangular or elongated structure of a spine or rib.  Furthermore, the spine or rib must fit snugly between the flanges."[4]

The Federal Circuit has observed that "[i]f the word 'means' appears in a claim element in association with a function, this court presumes that § 112, ¶ 6 applies.  This presumption collapses, however, if the claim itself recites sufficient structure, material, or acts to perform the claimed function." Micro Chemical, 194 F.3d at 1257; accord Allen Engineering Corp. v. Bartel Industries, Inc., 299 F.3d 1336, 1347 (Fed. Cir. 2002); but see Cole v. Kimberly-Clark Corp., 102 F.3d 524, 531 (Fed. Cir. 1997)("Patent drafters conventionally [invoked the means-plus-function statute] by using only the words 'means for' followed by a recitation of the function performed.  Merely because a named element of a patent claim is followed by the word 'means,' however, does not automatically make that element a 'means-plus-function' element under 35 U.S.C. § 112, ¶ 6.").

In submissions following the *Markman* hearing, both parties cited to several more decisions of the Federal Circuit regarding the issue of whether a particular claimed term invokes the means-

---

[4] At the hearing, Caldwell proposed the following definition on page 18 of its handout:
> Function:  projecting between the inwardly turned opposed flanges and cooperating with the flanges of the channel means (jamb).  The corresponding structure is a spine or rib.

Exhibit 7

Part 2

plus-function statute, and more particularly, whether a term that
includes the word "means" recites sufficient structure or
material for performing the claimed function to rebut the
presumption.  See e.g. Altiris, 318 F.3d at 1375-76 (finding that
"*means of booting*"[5] is a means-plus-function even though
"commands" represent structure and the claim states a location);
Cole, 102 F.3d at 531 (finding that "*perforation means*"[6] is not a
means-plus-function because the claim "describes the structure
supporting the tearing function (ie. perforations) ... [and] also
its location (extending from the leg band to the waist band) and
extent (extending through the outer impermeable layer)"); Wenger,
239 F.3d at 1237 (finding that "*means defining a plurality of
separate product coating zones*"[7] is not a means-plus-function
because, even assuming sufficient function, the "claim
specifically recites structure including spray nozzles that are
directed toward the sidewall of the reel, which" accomplish the

———————————

[5] The relevant claim stated: "*means of booting* including a
first set of commands ... resident on said storage device of said
digital computer ..., and a second set of commands resident on a
storage device external to said digital computer..." Altiris, 318
F.3d at 1368.

[6] The relevant claim stated: "*perforation means* extending
from the leg band means to the waist band means through the outer
impermeable layer means..." Cole, 102 F.3d at 526.

[7] The relevant claim stated: "*means defining a plurality of
separate product coating zones* ..., each of said zones including
at least one spray nozzle directed toward said sidewall..."
Wenger, 239 F.3d at 1229.

function); <u>Envirco Corp. v. Clestra Cleanroom, Inc.</u>, 209 F.3d
1360, 1365 (Fed. Cir. 2000)(finding that *"second baffle means"*[8]
is not a means-plus-function because the term 'baffle' itself
imparts structure and further, the "claims describe the
particular structure of this particular baffle ('having inner
surfaces for directing airflow ... radially outward ... and
thereafter ... between said first baffle means and said air
filter means')" and the claims describe "details about the
location and formational details"); <u>TI Group Automotive Systems
(North America) v. VDO North America, L.L.C.</u>, 375 F.3d 1126, 1135
(Fed. Cir. 2004)(finding that *"pumping means"*[9] is not a means-
plus-function because the claim recites "its structure
('including a nozzle and a venturi tube in alignment with the
nozzle'), location ('being located within the reservoir in the

---

[8] The relevant claim stated: "*second baffle means* disposed
radially outwardly of said centrifugal fan means ... [and] having
inner surfaces for directing the airflow from said centrifugal
fan means inwardly of said primary housing and between said first
baffle means and said filter means whereby air being introduced
into said housing by said centrifugal fan means will be directed
radially outwardly of said centrifugal fan means and guided by
said first baffle means towards said second baffle means and
thereafter by said second baffle means between said first baffle
means and said air filter means." <u>Envirco Corp.</u>, 209 F.3d at
1363.

[9] The relevant claim stated: "*pumping means* for pumping fuel
into the reservoir, said means being located within the reservoir
in the region of the opening and including a nozzle and a venturi
tube in alignment with the nozzle, the passage of fuel out of the
nozzle and through the venturi tube causing fuel to be entrained
through the opening into the interior of the reservoir;" <u>TI
Group</u>, 375 F.3d at 1131.

region of the opening'), and operation ('the passage of fuel out

of the nozzle and through the venturi tube causing fuel to be

entrained through the opening into the interior of the

reservoir')").

Turning to the patent at issue, I find that this is not a

case where the drafter of the patent was as "clearly enamored of

the word 'means'" as in Allen Engineering, 299 F.3d at 1348,

where the Court ignored the word 'means', which appeared 32 times

in the relevant claim, in all but one of the twelve 'means'

limitations, or in Cole, 102 F.3d at 531, where the Court

declined to construe any of the six elements that included the

word 'means', which occurred in the claim 14 times, as means-

plus-function terms.  The '368 Patent used the word "means" 13

times, but only with respect to four limitations: channel means,

sash frame support means, mounting means/means for mounting, and

projection means.  And as discussed above, at least "mounting

means" or "means for mounting" is a means-plus-function.  The

question, therefore, is whether Claim 8 recites sufficient

structure or material associated with 'projection means' to rebut

the means-plus-function presumption.

Amesbury argues that the presumption is overcome in Claim 8

because the claim describes the structure carrying out the

function of inhibiting the rotational movement of the mounting

means (ie. a 'projection' or a 'thing or part that extends

-32-

outward beyond a prevailing line or surface'), its location
("positioned between said inwardly turned opposite flanges of the
channel"), and its extent (sufficient to cooperate with the
channel flanges).  See Cole, 102 F.3d at 531; Amesbury's Post
*Markman* Hearing Brief, p. 2.

Claim 8 does not articulate the 'extent' of the "projection
means", although the 'extent' suggested by Amesbury could be
inferred.  It is clear, however, that Claim 8 describes the
location or position of the "projection means", namely
"positioned between said inwardly turned opposite flanges of the
channel."  Location is a relevant factor and part of the
structure according to the Federal Circuit.  See Cole, 102 F.3d
at 531; TI Group, 375 F.3d at 1135; and Envirco, 209 F.3d at 1365
(holding that "the claims recite sufficient structure, including
details about the location and formational details").  However,
as suggested by Caldwell, one could interpret Altiris, 318 F.3d
at 1376, as implying that a location alone will not necessarily
provide sufficient structure.  Consequently, I find that the
crucial question is whether the term "projection" imports
sufficient structure like the term "perforation" in Cole, or
whether the term is, as Caldwell argues, "functional and
inherently meaningless" as "any three-dimensional object will
project from the surface to which it is attached." [Caldwell's
Supplemental Submission, p. 1.] As to this issue, I agree with

-33-

Amesbury; "projection" imports sufficient structure to overcome

the presumption.

The ordinary meaning of "projection" as understood by a

person of skill in the art is readily apparent.  In Amesbury's

initial submissions, they suggested the definition of "a part

that juts out", and in the supplemental submission, Amesbury

suggested the definition of a "thing or part that extends outward

beyond a prevailing line or surface."  I do not believe that it

is necessary to adopt one or the other definition, because the

debate seems to be whether or not "projection means" should be

limited to the structures in the specification that correspond to

and perform the function, namely the "raised spine" and the

"locating rib", not over the definition of "projection".[10]

Construction - Projection(s).

5. "whereby rotational movement of the mounting means is

inhibited" - This term appears in both Claims 1 and 8.  The

parties agree that the "whereby" clause only modifies the

preceding clause describing the "projection means" in Clause 8,

but the parties disagree about what the clause modifies in Claim

1.

---

[10] In construing "raised spine", Caldwell argued that
"'spine' is not broad enough to encompass any 'projection' or
'protrusion' such as a knob or a bump." [Caldwell's Brief, p. 7.]
Thus, it appears that Caldwell shares Amesbury's understanding of
the term.

-34-

Claim 1: "... and a means for mounting said coiled ribbon spring, ... and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means **whereby rotational motion of said mounting means in inhibited.**"

Claim 8: "... and a means for mounting said coiled ribbon spring, ..., said mounting means being secured in said channel means and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means within which the mounting means is positioned, **whereby rotational movement of the mounting means in inhibited.**"

I find that as a matter of syntax, the "whereby" clause only modifies the preceding clause describing the raised spine. Amesbury's citation to Idexx Laboratories, Inc. v. Abaxis, Inc., 222 F.Supp.2d 66, 73-74 (D. Me. 2002) is unavailing. There is no rule that a "whereby" clause must modify the entire claim limitation. In fact, the Court in Idexx concluded that the "syntax of the sentence alone does not answer [the] debate" of whether the "whereby" clause at issue in that case modified only the three steps explicitly recounted or the entire description of the claimed method. Id.

"What controls here is no legal 'test' derived from some different fact situation **but common sense interpretation of language according to the rules of grammar in the context in which it occurs.**" Application of Dean, 48 C.C.P.A. 1072, 291 F.2d 947, 952-53 (1961) (emphasis added). It seems clear that the

"whereby" clause only modifies the description of the "raised spine", not that description and the preceding clause which is set off by a comma.  There is certainly no basis in the syntax of Claim 1 to conclude, as Amesbury argues, that the rotation of the mounting means is inhibited "**either** by the structure of the mounting means alone **or** in conjunction with the way it is installed in the mounting assembly."  It would actually make more sense if the "whereby" clause in Claim 8 modified both the of requirement of being secured in the channel and having projection means positioned in a certain way.  However, the parties agree that even in Claim 8, the "whereby" clause only modifies the "projection means".

   To the degree that there is any confusion or ambiguity in the syntax of Claim 1, I find that on balance the prosecution history supports my conclusion that the "whereby" clause only applies to the "raised spine" described in Claim 1.  I look to the prosecution history as urged by Caldwell, because the specification could be interpreted to add to the confusion and ambiguity Amesbury is attempting to exploit.

   Some sections of the specification clearly link the prevention of rotation with the positioning of the "raised spine".  For example, the description of the mounting element in Figures 7 and 8 explains that the width of the raised spine formation is arranged such that it is a snug fit between the open

lip portions of a channel to inhibit a rotational, pivoting or twisting motion. ['638 Patent, col. 5, ll. 7-13.] The specification makes this point even more clearly with respect to the "lateral ears" formation, which has the same purpose as the "raised spine", since the "lateral ears... are intended to prevent rotation of the mounting element **about a fixing screw** ... received, in use, in recessed bore." ['638 Patent, col. 4, ll. 44-47.]

In contrast, other parts can be read to mean that the fixing screw is also supposed to prevent rotation. According to the specification, "[t]he mounting element **may** be provided with formations conformed so as to cooperate with a portion of the sash frame within which the element is to be received, such that contact of said formations with said sash frame inhibits in a rotational, pivoting, or twisting sense of the element relative to the sash frame." ['638 Patent, Summary, col. 2, ll. 59-64 (emphasis added).] The use of the word "may" in this description is confusing and misleading because both of the independent claims require respectively a "raised spine" or "projection means" that inhibits rotation. The Summary of the Invention then sets out in a separate paragraph that "[i]t will be apparent that the mounting element does not rotate or otherwise move with the spring but is substantially stationary when the spring is in operation." ['638 Patent, Summary, col. 2, ll. 65-67.] The fact

that the two sentences are separate paragraphs could be read to mean that even without the formation described in the first paragraph, the mounting element does not rotate. And the only explanation for non-rotation is that the mounting element is be secured to the window frame by a fixing screw.

Despite the ambiguity in the specification, the prosecution history "inform[s] the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Phillips, 415 F.3d at 1317. Originally Claim 1 made no mention of the "raised spine ... whereby rotational motion of said mounting means is inhibited." The patent examiner denied the patent, rejecting Claims 1-5 and 8-9 because they were clearly anticipated by Sterner's "Coil spring counterbalance hardware assembly and connection method therefor", U.S. Patent No. 5,157,808 and Foster's "Spring sash counterbalance", U.S. Patent No. 3,992,751. It is only when the patentee sought to amend the claims in light of the rejection that he added "said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited." In explaining the change, the patentee emphasized that "[n]one of the cited art show anti-rotational means which interact with flanged channels to prevent rotation of the

-38-

mounting means." Consequently, I find that the "whereby" clause only modifies the description of the "raised spine", not that description and the preceding clause which is set off by a comma.

Having reached this conclusion, however, I do not mean that the fixing screw or other fixing method that secures the mounting element to the window jamb channel cannot contribute to the substantially stationary position of the mounting element when the spring is in operation. There is nothing in the Claims or the specification that would prohibit attributing any anti-rotational effect to the method of fixing or securing the mounting element to the window jamb channel. The Claims recognize, for instance, that if a mounting element without a raised spine was fixed to the channel, it might not rotate or pivot under minimal stress. But when the window sash was opened with a certain amount of force or opened a certain distance, the force might overcome the anti-rotational inertia effect of simply being secured by a fixing screw. Therefore, it is the addition of the "raised spine" in this patent that inhibits any rotation of the mounting element under any normal condition.

**Construction** - The mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited.

B.    '264 patent

-39-

1. **Background** - The '264 Patent entitled "Block and tackle window balance with bottom guide roller" improves on the basic block and tackle window balance, and is an alternative to the coiled spring balance.  Block and tackle balances use a combination of a spring and pulleys located within a U-shaped channel[11] to balance the weight of the window sash at any position within the jamb pockets. ['264 Patent, col. 1, ll. 19-22.]  In a basic block and tackle window balance, the channel holds a spring, two pulleys (one that moves pulling the spring and a fixed one) and a roller.  A cord, which connects the pulleys together, is attached to a hook that connects to an opening in a window jamb pocket to secure the balance to the window jamb. ['264 Patent, col. 1, ll. 25-27.]  The assembled channel is attached to the window sash by a "top guide" and a "bottom guide", which help guide the vertical motion of the window balance within the jamb. ['264 Patent, col. 3, ll. 23-27.] The components within the channel work in combination to allow the spring to provide the force to counterbalance the weight of the attached sash at any vertical position within the window frame. ['264 Patent, col. 3, ll. 48-51.]

---

[11] This patent uses the word "channel" in a different way than the '638 patent.  With respect to the coiled spring balance patent, "channel" referred to the window jamb track.  Here, "channel" refers to an actual piece of the block and tackle balance that contains the springs and pulleys.  A window jamb "pocket" in this patent seems to correspond with the window jamb "channel".

The travel distance of the window sash is limited by the length of the window balance. The '264 Patent increases the distance a window sash can travel by reconfiguring the placement of the bottom guide roller "in" or "within" the bottom guide, instead of "within" the channel as in prior art balances. This allows the sash to travel a greater distance before the bottom guide roller hits the jamb mounting hook.

Based on the parties' proposed claim constructions, it appears that there is only one disputed term and it is part of the independent Claim 1.[12] That claim is identified by bold face in the claim language set out below.

<u>Claim 1</u>

A block and tackle window balance device comprising:

a channel comprising a first end and a second end;

a top guide connected to the first end of the channel;

a bottom guide connected to the second end of the channel;

**a bottom guide roller rotatably mounted in the bottom guide;**

a fixed pulley block unit connected to the channel;

a translatable pulley block unit moveable within

---

[12] Caldwell initially argued that the term "bottom guide axle mounted within the bottom guide", which is part of Claim 23 is disputed. However, Amesbury is only asserting Claims 1-7 and 9-21 of the '264 patent against Caldwell and does not make any arguments regarding the proper construction of this term.

-41-

> the channel;
>
> a spring comprising a first end and a second end,
> wherein the first end is fixed relative to the
> channel and the second end is connected to the
> translatable pulley block unit; and
>
> a cord comprising a first cord end and a second
> cord end, wherein the cord is threaded through the
> translatable pulley block unit and the fixed
> pulley block unit and extends around the bottom
> guide roller, the first cord end being attached to
> the translatable pulley block unit and the second
> cord end being attachable to a jamb.

2. "bottom guide roller rotatably mounted in the bottom

guide" - Amesbury argues that this phrase should be construed as

meaning "a roller, mounted so as to permit rotation, in the

portion of the bottom guide that is sized or configured to be

received in and to slide in the jamb pocket, when installed."

Caldwell has construed the phrase as requiring "the bottom guide

roller to be mounted to the bottom guide and be located entirely

within the bottom guide" and "external to the channel".  This

definition is both more limiting and more general than Amesbury's

construction.

The parties do not appear to dispute the meaning of the term

"bottom guide roller", rather they argue over the placement

requirements implicitly included in Claim 1.  In this case, the

ordinary meaning of the claim language as understood by a person

of skill in the art is not readily apparent.  Consequently, I

consider the Claim terms, the specification, and the prosecution

history as to each of the disputed proposed elements of the

-42-

definition.

a) **<u>"Mounted in" or "Mounted to"</u>**: Claim 1 specifically uses the preposition "in" and Caldwell has not pointed to anything in the specification that requires the bottom guide roller to be mounted to the bottom guide. The focus of the specification is on where the roller is to be mounted, not on what. For instance, in the Summary of the Invention the patentee describes how the bottom roller "mounted proximate to the second end of the channel." ['264 Patent, col. 2, ll. 5-6, 14-15.] But, the use of "proximate" in the Summary does not impose the limitation suggested by Caldwell that the roller must be mounted to the bottom guide. It is possible that the bottom roller could be "in", even entirely within, the bottom guide, yet be mounted to the channel via some link rather than being mounted to the bottom guide itself.

In addition, Claim 1 was initially rejected as being anticipated by *Fitzgibbon's* "Sash balances and components thereof", U.S. Patent No. 4,089,085, which disclosed a block and tackle window balance device comprising "a bottom guide roller rotatably mounted to the bottom guide". To read "mounted in" as "mounted to" would not distinguish '264 Patent from *Fitzgibbon's* patent and would ignore the distinguishing feature of the invention, namely the location of the roller as discussed more thoroughly in the next sub-section.

b) **"in the Bottom Guide" or "entirely within the bottom
guide and external to the channel"**: The ordinary meaning of
being mounted "in" an area could encompass the idea that the
object may be both partially inside and outside the area.  For
example, a trash bag is "in" a trashcan even though a portion of
it is hanging outside of the trashcan.[13]  Thus, the ordinary
meaning of the roller being mounted in the bottom guide could
encompass the idea that the roller is "in" the bottom guide, yet
not necessarily mounted directly to the bottom guide, with part
of the roller sticking out of the bottom guide and/or part of it
within the overlapping section of the channel.  This
interpretation makes sense when one compares Claims 1 and 23,
which describes a window balance device comprising a bottom guide
including "a bottom guide axle mounted **within** the bottom guide,
the bottom guide axle located **outside** the window balance channel;
and a bottom guide roller rotatably mounted **on** the bottom guide
axle." ['264 Patent, col. 8, ll. 40-44.]  Nonetheless, Caldwell
argues that "in the bottom guide" should be construed more

_____

[13] In Amesbury's Post *Markman* Hearing Brief filed on January
6, 2006, counsel for Amesbury brought the unreported and non-
precedential opinion of Cannon Rubber Ltd. v. The First Years,
Inc., No. 05-1063, 2005 WL 3542910 (Fed. Cir. December 28, 2005)
to this Court's attention.  Under Fed. Cir. R. 47.6, this order
is not citable as precedent.  Consequently, I do not consider
this case as precedent.  Nonetheless, I incorporate the trashcan
example and acknowledge that I have thought about the arguments
considered in the case.

narrowly as "entirely within the bottom guide and external to the channel" based on the specification and alleged disclaimers in the prosecution history.

With respect to the prosecution history, Caldwell argues that the patentee disclaimed the idea of being mounted partially in and partially out of the bottom guide, and partially in the channel.    I disagree.

Prosecution history "can inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Phillips*, 415 F.3d at 1317.  Here, as mentioned above, it appears that Claim 1 was initially rejected as being anticipated by *Fitzgibbon's* "Sash balances and components thereof", U.S. Patent No. 4,089,085, which disclosed a block and tackle window balance device comprising "a bottom guide roller rotatably mounted to the bottom guide", by which the Patent Examiner meant that "the bottom guide roller 239 is rotatably mounted to bottom guide 215 in that roller 239 is rotatably mounted within fixed pulley unit 235, which is fixed to channel 205, which is fixed to bottom guide 215; thus, bottom guide roller 239 is 'rotatably mounted to' bottom guide 215." <u>See</u> Figures 2A and 2B of the Prior Art below.  [Smalley Declaration, Exhibit J, at 000630, 000639.]



FIG. 2A
PRIOR ART

FIG. 2B
PRIOR ART

As Caldwell discusses in its Brief, dependent Claim 2 of the
Patent, which claims "the device of claim 1 wherein the bottom
guide roller is *located external to the channel*", was also
initially rejected because the *Fitzibbon's* patent showed that the
"bottom guide roller 239 is located 'external' to channel 205 in
that a portion of roller 239, *the portion that strikes mounting
hook* 245 *when lower sash* 104 *is raised*, is located outside of
channel 205, see Figures 2A and 7A." [Smalley Declaration,
Exhibit J, at 000631, 000640.] However, the Examiner accepted
Claim 2 after the patentee amended Claim 1.  As an aside, this
comment also shows that the Examiner and the patentee had in
their minds during the prosecution that at least the phrase
"located external to the channel" includes the manifestation
where only a portion of the object is external to the channel.

-46-

During a telephone interview, the Examiner also called
attention to Fig. 4 in *Biro*, U.S. Patent No. 3,449,862 as
anticipating the present invention.  The patentee distinguished
his invention from *Biro*, claiming that:

> Biro is silent with respect to the location and
> mounting details of the 'bottom guide roller'
> (unnumbered) relative to the support slide; however as
> shown in FIG. 4, the roller appears to be mounted to
> the counterbalance housing above the lower support
> slide, not in the lower support slide.  The lower
> support slide is held in place by rivets and appears to
> terminate below the axis of the roller.  See also, for
> example, FIGS. 2A and 2B of Applicant's specification.
> Accordingly, Biro fails to disclose or suggest 'a
> bottom guide roller rotatably mounted in the bottom
> guide.'[14] [Smalley Declaration, Exhibit J, at 000656]

The patentee then amended "Claims 1, 12, 14, and 19 ... to more
clearly define the subject matter of Applicant's invention.
Specifically, the claims are amended to clarify that the bottom
guide roller is rotatably mounted *in* the bottom guide." [Smalley
Declaration, Exhibit J, at 000656]

Given this prosecution history, it appears that the Examiner
approved Claim 1 of the patent after the patentee explained that
the subject matter of his invention was the relocation of the
roller into the bottom guide, rather than mounting it in the
channel above the bottom guide as in the prior art.  From this
response, it is not possible to conclude that the patentee

---

[14]  In the *Biro* Patent, the "support slide" is equivalent to
the "bottom guide" in the '264 Patent, and the "counterbalance"
is equivalent to the "U-shaped channel".

explicitly disclaimed the ordinary meaning of "in" or limited his invention to configurations where the roller is entirely within the bottom roller and completely below the channel.  Thus, this is not the case where the claim was narrowed in the way suggested by Caldwell in order for the patentee to obtain issuance over the prior art.  Elekta Instrument S.A. v. O.U.R. Scientific Intern., Inc., 214 F.3d 1302, 1308 (Fed. Cir. 2000).  Nonetheless, I turn to the specification to determine whether the written description shows an "express intent to impart a novel meaning" to the commonly understood word "in", and whether the written description "clearly redefine[s] [the] claim term 'so as to put a reasonable competitor or one reasonably skilled in the art on notice that the patentee intended to so redefine that claim term.'" Id. at 1307 quoting Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1357 (Fed. Cir. 1999).

As I understand Caldwell's argument, Claim 1 should be construed in the narrow sense suggested because of the repeated references in the patent supporting the idea that the invention allows the sash to travel a greater distance "because the bottom guide roller is located in the bottom guide, instead of within the rigid U-shaped channel as in prior art balances." ['264 Patent, col. 5, ll. 64-66.] In particular, Caldwell points to the repeated references in the specification to the instruction that the bottom guide roller is to be located "within the bottom

guide." ['264 Patent, Abstract, col. 1, l. 51, col. 2, l. 52,
col. 5, l. 42, col. 6, l. 18].  The use of "within" is
significant, according to Caldwell, because of the Federal
Circuit's reasoning in TI Group, 375 F.3d at 1136, with respect
the claim term "[the pumping] means being *located within* the
reservoir".  In that pre-Phillips case, the Federal Circuit
affirmed the district court's construction of the term "within"
as meaning "inside", because "[c]ertainly, in ordinary and
customary usage, what is not outside is on the inside."  Id.  The
Federal Circuit drew this conclusion because the dictionary
definition proposed by the alleged infringer ("on the inside")
and the one adopted by the district court ("inside") "are not so
different as the definition" proposed by the patentee ("within
the limits of, not outside or beyond.")

    Here, it is true that the patent specifically describes the
roller as mounted within the bottom guide four times. [The '264
Patent, Abstract, col. 1, l. 51, col. 2, l. 52, col. 5, l. 42,
col. 6, l. 18.] However, I do not think it is appropriate to
simply adopt the conclusion in TI Group, where both parties were
essentially proposing the same limitation and where the claim
itself used the words "located within".  Looking further, then, I
note that the '264 Patent also states that the bottom guide
serves as "a frame for housing the bottom guide roller", ['264
Patent, col. 4, ll. 44-45], that it "is located in the bottom

-49-

guide, instead of within the rigid U-shaped channel as in prior art balances" ['264 Patent, col. 5, ll. 64-66], and that it "is located outside of the rigid U-shaped channel." ['264 Patent, col. 4, ll. 46-48.] Thus, in my opinion, the issue is whether or not these expressions in the specification show that the patentee intended to assign a more narrow definition to the phrase "mounted *in* the bottom guide".

As explained above in Section I, <u>Phillips</u> warned of "the danger of reading limitations from the specification into the claim." <u>Id.</u> at 1323. Specific embodiments of the invention described for teaching purposes should not be imported into the claim as a limitation. <u>Id.</u> The distinction between proper claim construction and improper limitation turns on "whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature." <u>Id.</u> at 1323.



FIG. 4A          FIG. 4B

Given these principles, I will not import the limitation of "external to the channel", despite the parts of the written description cited above. Although the roller in Figures 4A and 4B shown above is certainly not "within" the channel in the way the rollers in Figures 2A and 2B are, it would be perfectly consistent with the patent for the roller to be within the section of the bottom guide that is itself fastened to the overlapping section of the channel also shown in Figures 4A and 4B. In such a configuration, the roller would not be "external" to the channel. In addition, Claim 2 specifically provides that "the bottom guide roller is located external to the channel." ['264 Patent, col. 6, ll. 57-58; see also Claims 14 and 19.] Given the possibility that a portion of the roller might actually be located inside the part of the bottom guide that overlaps with the channel, I will apply the doctrine of claim differentiation,

-51-

which "is at its strongest 'where the limitation sought to be

'read into' an independent claim already appears in a dependent

claim,'" <u>Seachange Int'l, Inc. v. C-Cor, Inc.</u>, 413 F.3d 1361,

1368-69 (Fed. Cir. 2005) <u>quoting</u> <u>Liebel-Flarsheim Co. v. Medrad,</u>

<u>Inc.</u>, 358 F.3d 898, 910 (Fed. Cir. 2004), with respect to this

aspect of Claims 1 and 2. Thus, I exclude the proposed addition

of "external to the channel" from the definition.

    With respect to the idea of limiting "in" in Claim 1 to

"entirely within", I also disagree with Caldwell. The focus of

this patent is the relocation of the roller from the channel

above the bottom guide, as in the prior art, to the bottom guide.

This relocation "provides an increased range of travel within a

window frame", ['264 Patent, col. 1, ll. 9-10], because it is the

roller hitting the jamb mounting hook that limits the travel

distance in these kinds of window balance assemblies. ['264

Patent, col. 6, ll. 11-12.] Thus, by moving the roller down into

the bottom guide instead of above it, the "sash can travel a

greater distance before the bottom guide roller 239/350 hits the

jamb mounting hook 245/345, resulting in a greater travel

distance." ['264 Patent, col. 6, ll. 20-22.] Compare Figures 7B

and 8B below.

Exhibit 7

Part 3



FIG. 7B
PRIOR ART

FIG. 8B

    Relocating the roller "in" the bottom guide with either the

portion that strikes the jamb mounting hook when the sash is

raised extending partially outside the bottom guide, or even with

a portion of the roller extending slightly above or below the

bottom guide, would still allow one skilled in the art to make

use of the invention and take advantage of the greater travel

distance.  In these configurations, one could not say that the

roller would be "entirely within" the bottom guide.

Consequently, while the specification describes or depicts an

embodiment where the roller is "within" or framed by the bottom

guide and while there is nothing in the specification describing

or depicting the roller as partially outside the bottom guide, I

am not convinced that "a person of skill in the art would

-53-

understand the embodiments to define the outer limits of the claim term" rather than merely being "exemplary in nature." <u>Phillips</u>, 415 F.3d at 1323.  Thus, I adopt the common meaning of the term "mounted in", namely that mounting the roller in the bottom guide does not exclude the possibility that the roller may not be entirely within the piece of the apparatus called a bottom guide.

   c) "**so as to permit rotation**": Caldwell does not contest the addition of this phrase in the definition.

   d) "**in the portion of the bottom guide that is sized or configured to be received in and to slide in the jamb pocket when installed**": There is nothing in the Claims, the specification, or the prosecution history that limits the location of the roller within the bottom guide.  Claims 13 and 18 do describe a window balance device comprising "a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and a bottom guide roller rotatably mounted in the bottom guide." ['264 Patent, col. 7, ll. 43-45; col. 8, ll. 1-2, 19-23; <u>See also</u> Claim 23, col. 8, ll. 36-38.] However, the specific references in these Claims, undermine Amesbury's attempt to include this additional limitation in Claim 1.

<u>Construction</u> - A roller mounted in the bottom guide in a way that permits its rotation.

C.    '368 patent

1. <u>Background</u> - The '368 Patent entitled "Snap Lock Balance Shoe and System for a Pivotable Window" improves the balance shoe element and details a method of assembling and installing the components of the inverted window balance system for tilt-in windows.

Tiltable or pivotable windows use a combination of balances and pivot bars to allow the window sashes to slide up and down in the window jamb and to rotate or tilt in to facilitate the cleaning of the outside surface of the sash glass.

Similar to the block and tackle balance, this model uses an inverted window balance that includes an extension spring connected to a system of pulleys housed within a rigid U-shaped channel, and a cord for connecting the system of pulleys to a jamb mounting attachment (ie. hook). A pivot bar connects with a balance shoe that is connected to the inverted window balance to allow the window sash to tilt in.

Balance shoes are used to guide the rotational movement of the window sashes with respect to the window frame when the sash is tilted in. The balance shoe includes a frame, a locking device that engages with the jamb track of the window frame when the pivot bar rotates, thereby locking the balance shoe in that location, a cam in communication with the locking device that has a keyhole opening for receiving a pivot bar attached to a window

-55-

sash, and a "connecting device" for attaching the balance shoe
within a window balance.  The frame may also include a frame
"pocket" sized to receive a fastener, which can further secure
the balance shoe to the rigid U-shaped channel of the window
balance.

Based on the parties' proposed claim constructions, it
appears that there are only two disputed terms, both of which are
part of the independent claim at issue - Claim 2.  Based upon
this independent Claim, Amesbury is asserting Claims 2-3, 6-8,
and 11 against Caldwell.


<u>Claim 2</u>

A window balance system comprising:
    a U-shaped channel comprising a plurality of
openings;
    a spring connected to a system of pulleys
located within the U-shaped channel;
    a cord with a first cord end and a second
cord end, the first cord end connected and
threaded through the system of pulleys, the
second cord end connected to a jamb mounting
attachment; and
    a balance shoe, wherein the balance shoe
comprises:
        a frame comprising an enlarged fist end
and a second end, wherein the second end
is adapted to be received by the
U-shaped channel, and wherein the second
end of the frame of the balance shoe
further forms a **pocket** positioned in the
second end of the frame adapted to mate
with a rivet;
    a locking member proximal to the enlarged
first end;
    a cam in communication with the locking
member, and

-56-

a **connecting device** for attaching the balance
shoe within the U-shaped channel of the
window balance.

    2. **"pocket"** - Amesbury argues that this phrase should be
construed as meaning "a contour formed to mate with a rivet or
fixed structure", whereas Caldwell has construed the phrase as "a
U or C-shaped channel bounded on three sides with an opening
designed to mate with a rivet."

    The parties agree that, however described structurally, the
"pocket" must be shaped to "mate" with something, which the
parties agree means "to join or fit together" with that
something.  As to the 'something', Amesbury argues that the
"pocket" must be "formed to mate *with a rivet or fixed
structure*".  However, Claim 2 specifically says that the "pocket"
is "adapted to mate with a rivet".  Thus, even though, the
specification describes a "fastener, such as a rivet", ['368
Patent, col. 6, l. 41], I find that the Claim is clear - the
"pocket" must be shaped to mate (ie. "to join or fit together")
with a rivet.

    The crux of the debate revolves around what shape dimensions
and descriptors should be included in the reference to "pocket"
in Claim 2.  I will consider the Claim terms, the specification,
and the prosecution history to determine the structural
description implicit in yet another metaphor.

    Claim 2 states that the "second end of the frame of the

-57-

balance shoe further forms a pocket positioned in the second end
of the frame *adapted to mate with a rivet*." ['368 Patent, col. 8,
ll. 60-63.] In the Summary of the Invention, the patent describes
a "frame pocket *sized to receive a fastener*", ['368 Patent, col.
2, ll. 3-4], and how "[t]he balance shoe can be further secured
to the rigid U-shaped channel with a fastener that *interfaces
with a frame pocket* in the balance shoe." ['368 Patent, col. 2,
ll. 38-41.]  The specification mentions the "pocket" four times.
In the detailed description of the invention, the patent
describes how "[t]o *accommodate the fastener*, the snap lock
balance shoe can form a connection pocket *sized to receive or
mate with the fastener*", ['368 patent, col. 5, ll. 37-40], and
how during installation one of the steps "is to slide the snap
lock balance shoe into the rigid U-shaped channel such that the
*fastener is received* in the connection pocket of the snap lock
balance shoe." ['368 patent, col. 6, ll. 42-46.]

    Amesbury argues that nothing in the specification requires
the "pocket" to have a specific shape, other than a shape capable
of mating with a rivet.  Thus, while conceding it may not be the
best choice of words, Amesbury proposes the term "contour".  On
the other hand, Caldwell argues that describing the "pocket" as a
"contour" shaped to mate with a rivet insufficiently describes
what the patentee meant by "pocket".  Instead "pocket" should be
construed as "a U or C-shaped channel bounded on three sides with

-58-

an opening" shaped to mate with a rivet.

Caldwell's reference to the file history and the deposition of the inventor, Gary Newman, to elucidate the patentee's understanding of the term "pocket" is unavailing. While some of the patentee's initial claims were rejected as being anticipated by *Schmidt*'s "Locking Slide Balance", U.S. Patent No. 5,301,467,[15] that patent did not have a "pocket" to fasten the balance shoe *inside* the U-shaped channel of the window balance with a horizontal rivet as is described in the '368 Patent. Rather, the *Schmidt* '467 Patent described a new design for the "locking slide block", the component referred to as the "balance shoe" in the '368 Patent. The figures and the specification in the '467 Patent do not demonstrate how the "counter-balance spring", which is not shown, is attached to the metal plate at the top of the "locking slide block". It is clear from the

_____

[15] The Examiner wrote that "Schmidt discloses a balance shoe assembly 20 ["locking slide block" in the patent] for a sash comprised of a frame 24 ["housing" in the patent], ..., a connecting device 28 ["metal plate" in the patent], which connects the shoe to a counter-balance spring **and has a pocket therein**, and is received within the frame 24, ... , and a **frame pocket**, which can receive a fastener." [Smalley Declaration, Exhibit L, at C000793] The "frame pocket" does not refer to the same component or element as the "pocket" in the '368 Patent; it refers to a "channel" at the 'bottom' of the block/shoe that receives the locking cam. The Examiner's other use of "pocket" seems to refer to the "pocket" in the "metal plate" at the 'top' of the "locking slide block" that attaches to the counter-balance spring. The *Schmidt* '467 Patent itself never uses the term "pocket". The patentee seems to have understood this distinction when responded to the rejection.

patentee's response to the initial rejection, that what
distinguishes the '368 Patent from the '467 Patent is that the
'top' or "second end" of the balance shoe is "adapted to be
received by a U-shaped channel of a window balance."  The mating
of the "pocket" and a rivet through the U-shaped channel
referenced in Claim 2 is part of the design for securing the
balance shoe within the U-shaped channel of the window balance.[16]
Consequently, neither party has identified anything in the file
history that aids in the interpretation of the term "pocket".  As
to Mr. Newman's deposition, I will not treat a non-lawyer's
response as an admission as to the proper construction, even
though "[testimony agaist a patentee's own interest . . . is
perhaps the most persuasive extrinsic evidence."  Bristol-Myers
Squibb Co. v. Tera Pharmaceutical USA, Inc, 288 F.Supp.2d 562,
585 (S.D.N.Y. 2005).  I have only been provided with a snippet of
Mr. Newman's deposition testimony and I credit Amesbury's
suggestion at the hearing that Mr. Newman may have been
describing the "pocket" in the patent's figures rather than
explaining what he as the inventor meant by choosing to use the
term "pocket" in Claim 2.

   Returning back to the specification, I find that the
function of the "pocket" is clear - to receive a rivet, thereby

---

   [16] The other way that the shoe is attached within the window
balance is by the "connecting device", also referred to in Claim
2.

-60-

aiding to secure the balance shoe within the U-shaped channel of the inverted window balance. This function defines the shape. Consequently, I find that the shape of the "rivet" in effect defines the shape of the interfacing pocket.

Neither of the parties has presented any argument on how the term "rivet" should be construed. However, I find that the ordinary meaning of "rivet" as understood by a person of skill in the art is readily apparent. Thus, I will construe the term according to the "widely accepted meaning" of these "commonly understood words". <u>Phillips</u>, 415 F.3d at 1314. The term "rivet" encompasses a variety of fasteners consisting of a shaft with heads on either end. Typically the shaft is a smooth cylinder, as depicted as **635** in Figure 6A shown below, for instance.



As a result, the "pocket" would typically have to be shaped to
receive a smooth cylinder through the shoe.  However, the patent
does not require that the "pocket" and rivet match perfectly.  As
a result, the "pocket" could have a cylindrical contour with a
diameter long enough to fit the rivet or the "pocket" could be a
"U-shaped channel bounded on three sides", as depicted as **213** in
Figure 3B shown above, with a height and depth long enough to fit
the rivet.  The problem with Caldwell's suggestion is that it
requires the pocket to have sides, which denies the possibility
that the indent might actually be a cylindrical match to the
rivet without sides per se.  Consequently, to the extent any
ambiguity remains about the shape of the "pocket", I will adopt
as a definition a notch shaped to mate with a rivet, thereby
aiding to secure the balance shoe within the U-shaped channel of
the inverted window balance.

Nevertheless, I will adopt Caldwell's suggestion that the
definition of "pocket" must incorporate the idea that the rivet
slides into the "pocket" through an opening.  The installation
discussion in the specification explains that "the snap lock
balance shoe ["is to slide"] into the rigid U-shaped channel such
that the fastener is received in the connection pocket of the
snap lock balance shoe".  ['368 patent, col. 6, ll. 42-46.] In
order for the balance shoe to be installed in this way, the
"pocket" must have an opening into which the rivet can slide.

Without incorporating the idea of an opening, one could erroneously interpret the term "pocket" to include a fully enclosed channel through the balance shoe, in which the rivet would have to be thread through rather than snapping in. However, it is clear from the specification that this is not what the patentee understood the term to connote.

**Construction** - A notch with an opening shaped to mate (ie. "to join or fit together") with a rivet, thereby aiding to secure the balance shoe within the U-shaped channel of the inverted window balance.

    3. "**connecting device**" - The parties are in disagreement about what kinds of "things" can be considered a "connecting device" as understood in Claim 2 and about whether the "connecting device" must be construed as a separate element from the rivet that mates with the pocket.

    As to the first issue, I agree with Amesbury that the term "connecting device" should not be limited to "retractable tabs", also referred to as "resilient tabs," as suggested by Caldwell in its written submissions.[17] Claim 2 describes a window balance comprising a "connecting device for attaching the balance shoe within the U-shaped channel of the window balance" without including any specifics about the "connecting device".  This

_____

    [17] At the hearing, Caldwell proposed the following definition on page 33 of its handout:
        A pair of retractable tabs or a screw used for attaching the balance shoe in the channel, separate from the pocket that mates with a rivet.

-63-

wording contrasts with the specific description set out in Claim
1 (which is not at issue here) that defines a "connecting device"
as one "comprising one or more resilient tabs for attaching the
balance shoe within the U-shaped channel of the window balance,
wherein the one or more resilient tabs extend at least partially
through a corresponding number of the plurality of openings in
the U-shaped channel."  In addition, there are three claims that
are dependant on Claim 2 that limit the scope of the "connecting
device" in those claims.  Claim 3 refers to "[t]he window balance
system of claim 2 wherein the connecting device comprises a
rivet"; Claim 4 refers to "[t]he window balance system of claim 2
wherein the connecting device comprises a screw"; and Claim 5
refers to "[t]he window balance system of claim 2 wherein the
connecting device comprises a resilient tab".  Given this
important overlap, I turn again to the doctrine of claim
differentiation.

    As discussed above, "[t]he doctrine of claim differentiation
'create[s] a presumption that each claim in a patent has a
different scope.'"  Free Motion Fitness, 423 F.3d at 1351 quoting
Comark, 156 F.3d at 1187.  "The difference in meaning and scope
between claims is presumed to be significant '[t]o the extent
that the absence of such difference in meaning and scope would
make a claim superfluous.'"  Id. quoting Tandon Corp., 831 F.2d at
1023.  Caldwell misunderstands the law in stating that "[s]ince

-64-

the dependent claim specifically limits the 'connecting device' to a screw, the independent claim 2 presumptively does not encompass that structure." See id. (holding that the "dependent claims limiting the claim to a single cable confirm that the independent claims *may encompass more than one cable*")

Here, Claims 3-5 incorporate Claim 2 and limit "connecting device" to three different types of fastening devices - rivet (Claim 3), screw (Claim 4), and resilient tabs (Claim 5). Consequently, these specific references support Amesbury's construction that "connecting device" in Claim 2 ought to be given the broader meaning described in the specification.  The specification explains that the "connecting device" "can include one or more retractable tabs for engaging the right U-shaped channel" ['368 Patent, col. 2, ll. 35-36] or "other connecting devices such as a screw." ['368 Patent, col. 5, ll. 31-32.]

In addition, since Claim 1 specifically defines the connecting device as one comprising "one or more resilient tabs ... , [which] extend at least partially through a corresponding number of the plurality of openings in the U-shaped channel" and Claim 2 does not specify any limits, the term in Claim 2 should be given the broad meaning suggested by the specification.

Caldwell also incorrectly argues that "connecting device" should be limited to resilient tabs because dependent claims 3 and 4 are invalid for lack of enablement.  As a basis for this

-65-

argument, Caldwell cites to <u>Pandrol USA, LP v. Airboss Ry.</u>
<u>Products, Inc.</u>, 320 F.3d 1354 (Fed. Cir. 2003) and <u>The Toro</u>
<u>Company v. White Consolidated Industried</u>, 199 F.3d at 1295 (Fed.
Cir. 1999) without pin cites for the proposition that because
"[t]he patent drawings do not contain a picture of those claimed
structures as required by 37 CFR § 1.83(a)[18], ... those claims
are not enabled."  In doing so, Caldwell misinterprets <u>Pandrol</u>
and <u>Toro</u>, the later of which actually stands for the proposition
that a claim may be limited to the embodiment depicted if that is
the only embodiment and "no other structure is illustrated **or**
**described.**"  <u>Toro</u>, 199 F.3d at 1301.  "It is well established
that the preferred embodiment does not limit broader claims that
are supported **by the written description.**" <u>Id.</u>

The enablement requirement in 35 U.S.C. § 112, ¶ 1,
"provides in pertinent part that the specification shall describe
'the manner and process of making and using [the invention], in
such clear and concise, and exact terms as to enable any person
skilled in the art to which it pertains, or with which it is most

---

[18] 37 C.F.R. § 1.83 Content of drawing. (a) The drawing in a
nonprovisional application must show every feature of the
invention specified in the claims. However, conventional features
disclosed in the description and claims, where their detailed
illustration is not essential for a proper understanding of the
invention, should be illustrated in the drawing in the form of a
graphical drawing symbol or a labeled representation (e.g., a
labeled rectangular box). In addition, tables and sequence
listings that are included in the specification are, except for
applications filed under 35 U.S.C. 371, not permitted to be
included in the drawings.

nearly connected, to make and use [the invention].'"  <u>AK Steel</u>

<u>Corp. v. Sollac and Ugine</u>, 344 F.3d 1234, 1243-44 (Fed. Cir.

2003) <u>quoting</u> 35 U.S.C. § 112, ¶ 1.  "The enablement requirement

is satisfied when one skilled in the art, after **reading** the

specification, could practice the ["full scope of the"] claimed

invention without undue experimentation."  <u>Id.</u> at 1244 <u>quoting</u> <u>In</u>

<u>re Wands</u>, 858 F.2d 731, 736-37 (Fed. Cir. 1988).

The requirement for drawings, on the other hand, is set out

in 35 U.S.C. § 113, which provides that:

> The applicant shall furnish a drawing where necessary
> for the understanding of the subject matter sought to
> be patented. When the nature of such subject matter
> admits of illustration by a drawing and the applicant
> has not furnished such a drawing, the Director may
> require its submission within a time period of not less
> than two months from the sending of a notice thereof.
> Drawings submitted after the filing date of the
> application may not be used (i) to overcome any
> insufficiency of the specification due to lack of an
> enabling disclosure or otherwise inadequate disclosure
> therein, or (ii) to supplement the original disclosure
> thereof for the purpose of interpretation of the scope
> of any claim.

35 U.S.C. § 113.  Consequently, it appears to me, that drawings

in a patent may help overcome any insufficiency of the

specification due to lack of an enabling disclosure, but they are

not to be scrutinized for proper "enablement" or depiction of

every "claimed structure" under 35 U.S.C. § 112, ¶ 1 as suggested

by Caldwell.  Although 37 CFR § 1.83(a) of the PTO rules require

that applications include drawings that "show every feature of

the invention specified in the claims", I will not limit my

construction of "connecting device" to retractable or resilient
tabs because Claims 3 and 4 are not "enabled". "[T]he fact that
the drawings are limited to a particular embodiment does not
similarly limit the scope of the claims. Rather, [the patentee]
is entitled to the full breadth of claim scope supported by the
**words of the claims** and the **written description.**" TI Group, 375
F.3d at 1138 citing Anchor, 340 F.3d at 1306-07 ("[T]he mere fact
that the patent drawings depict a particular embodiment of the
patent does not operate to limit the claims to that specific
configuration.") Here, it is clear that the written description
supports a broader meaning of the claimed term "connecting
device" than the depicted embodiment, which uses retractable or
resilient tabs. Thus, Caldwell has failed to convince me that 37
C.F.R. § 1.83(a) requires me to find that the other embodiments
are not sufficiently "enabled."

As to the second issue, I am inclined to disagree with
Caldwell that the "connecting device" must be a separate and
distinct component of the window balance assembly from the
fastener (rivet) that mates with the frame "pocket".

Claim 2 describes a window balance comprising a "connecting
device for attaching the balance shoe within the U-shaped channel
of the window balance" in addition to a balance shoe comprising a
frame "wherein the second end of the frame of the balance shoe
further forms a pocket positioned in the second end of the frame

adapted to mate with a rivet." ['368 Patent, col. 8, ll. 59-62.]
This compares with Claim 1 where the frame of the balance does
not have a pocket and the connecting device is specifically
described as "one or more resilient tabs [that] extend at least
partially through a corresponding number of the plurality of
openings in the U-shaped channel." ['368 Patent, col. 8, ll. 44-
46.]  It is clear that in "one embodiment of a method for
securing the snap lock balance shoe within a rigid U-shaped
channel with multiple openings" depicted in Figures 6A-6D shown
below, ['368 Patent, col. 6, 34-36], the fastener (the rivet) and
the connecting device (resilient tabs) are different structures.
The specification explains that under this method:

> The first step, shown in FIG. 6A, is to place a
> fastener **635**, such as a **rivet**, in one of the pairs of
> openings in the rigid U-shaped channel. The next step,
> as depicted in FIG. 6B, is to slide the snap lock
> balance shoe into the rigid U-shaped channel such that
> the fastener is received in the connection pocket of
> the snap lock balance shoe. As shown in FIG. 6C, the
> snap lock balance shoe is then rotated down so that the
> front frame surface is aligned with a bottom wall of
> the rigid U-shaped channel. FIG. 6D shows the last step
> of attaching the snap lock balance shoe within the
> rigid U-shaped channel. In this step, the **connecting
> device 212** of the snap lock balance shoe **snaps** into one
> of the pairs of openings located on the rigid U-shaped
> channel.  ['368 Patent, col. 6, 40-53.]



Furthermore, in Figures 3A and 3B shown below, the patent depicts the connecting device **212** as "a pair of retractable tabs that snaps into the rigid U-shaped channel", ['368 Patent, col. 5, ll. 29-31], and a connection pocket **213** that is sized to receive a "fastener located in the inverted window balance [that] can be used to **further secure** the connection between the snap lock balance shoe and the inverted window balance." ['368 Patent, col. 5, ll. 34-36.]  This suggests that the rivet (**635** in Figs. 6A-6D) is only supposed to *help* the separate and distinct component called the connecting device secure the balance shoe.

-70-



FIG. 3A



FIG. 3B

However, Figs. 3A and 3B only depict one embodiment of the
snap lock balance shoe and Figs. 6A-6D only depict "one
embodiment of a method for securing the snap lock balance shoe
within the rigid U-shaped channel with multiple openings." ['638
Patent, col. 6, ll. 34-36.] The patent also explains that in
"some [other] embodiments, the snap lock balance shoe is attached
to the rigid U-shaped channel **with the fastener 635**.  In other
embodiments, the snap lock balance shoe is attached to the rigid
U-shaped channel **without** the **fastener 635**." ['368 Patent, col. 6,
54-61.] The latter alternative embodiment appears to be captured
by Claim 1 since that claim omits the "pocket" from the
description of the balance shoe's frame.  The former alternative
embodiment appears to describe a balance shoe consisting of a

-71-

pocket "adapted to mate with a rivet", wherein the rivet (the fastener) acts as the "connecting device for attaching the balance shoe within the U-shaped channel of the window balance." ['368 Patent, col. 8, ll. 62, 66-67.]

Since the function of the "connecting device" is to "attach[] the snap lock balance shoe directly within an inverted window balance", ['368 Patent, col. 5, ll. 19-21], Claim 2 ought to be construed to include the possibility that the rivet could serve as the "connecting device" when it locks into the frame "pocket" shaped to mate with it.  Furthermore, the specification explains that the "connecting device can be integral with the frame", suggesting that as just described, the connecting device may not be integral to the frame and may be a "screw", ['368 Patent, col. 5, l. 32], or the rivet in addition to or instead of resilient tabs.  As a result, I will not construe "connecting device" in Claim 2 as a structure necessarily distinct from the rivet that mates with the pocket.

**Construction** - A device, such as a rivet, screw, or resilient tabs, that connects the balance shoe to the U-shaped channel of the inverted window balance.

/s/ Douglas P. Woodlock

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

APPENDIX: Summary of Claim Construction

I. The '638 Patent

| Disputed Term | Court's Construction |
|---|---|
| "means for mounting said coiled ribbon spring" (Claims 1 & 8) | The term "mounting means" or """"a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvatures of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to a window jamb channel. |
| "raised spine" (Claims 1 & 8) | A raised protrusion that resembles or suggests a spine of the mounting element, shaped to cooperate with the window jamb flanges to inhibit the rotational motion of the mounting means. |
| "projection means" (Claim 8) | Projection(s) |
| "whereby rotational motion of said mounting means is inhibited" (Claims 1 & 8) | The mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited. |

II. The '264 Patent

| Disputed Term | Court's Construction |
|---|---|
| "bottom guide roller rotatably mounted in the bottom guide" (Claim 1) | A roller mounted in the bottom guide in a way that permits its rotation. |

-73-

**III. The '368 Patent**

| Disputed Term | Court's Construction |
|---|---|
| "pocket" (Claim 2) | A notch with an opening shaped to mate (ie. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U-shaped channel of the inverted window balance. |
| "connecting device" (Claim 2) | A device, such as a rivet, screw, or resilient tabs, that connects the balance shoe to the U-shaped channel of the inverted window balance. |

Exhibit 8

Part 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMESBURY GROUP, INC., and AMESBURY SPRINGS LTD, | **DEFENDANT'S SECOND SUPPLEMENTED ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| Plaintiffs, | |
| vs. | |
| THE CALDWELL MANUFACTURING COMPANY, | Civil Action No. 05-10020-DPW |
| Defendant. | |

Defendant the Caldwell Manufacturing Company ("Caldwell"), by its attorneys Harris Beach PLLC, submits the following supplemental answers to plaintiffs' First Set of Interrogatories, which are intended to supplement, not replace, its previous answers:

**INTERROGATORY NO. 6:**

State the full factual and legal basis for Caldwell's assertion that each of the patents-in-suit is invalid for failure to meet the requirements of the patent laws of the United States as set forth in, *inter alia*, 35 U.S.C. §§102, 103 and 112.

**ANSWER**: Caldwell objects to this interrogatory in that it calls for legal conclusions and requires expert testimony to answer fully. Caldwell reserves the right to supplement its answers after it obtains expert analysis on invalidity. Caldwell also incorporates by reference its prior answers to this interrogatory. Subject to and without waiving these objections, Caldwell provides the following additional information:

(1)    U.S. Patent No. 6,598,264: The file history indicates that the only potentially novel element of this patent is the location of the bottom guide roller within the bottom guide. This element is disclosed, or is obvious in light of, the prior art references

previously disclosed, either singly or in combination.  Attached as Exhibit "A" is a further analysis of which elements are present in certain previously-cited art references.  Caldwell further specifically states that the '264 Patent is anticipated and/or obvious in light of Thompson, U.S. Patent No. 6,840,011 (and the Anderson 200 Series balance previously disclosed) and/or Fitzgibbon, U.S. Patent No. 4,089,085, either singly or in combination.

(2)    U.S. Patent No. 6,820,368:    The file history indicates that the only potentially novel element of this patent is enlarged end of the balance shoe.  This element is disclosed, or is obvious in light of, the prior art references previously disclosed, either singly or in combination.  Attached as Exhibit "A" is a further analysis of which elements are present in certain previously-cited art references.

(3)    U.S. Patent No. 5,365,638:    The file history indicates that the only potentially novel element of this patent is the raised spine that inhibits rotation of the mounting means.  This element is disclosed, or is obvious in light of, the prior art references previously disclosed, either singly or in combination.  Attached as Exhibit "A" is a further analysis of which elements are present in certain previously-cited art references.

## Analysis of '264 Patent

| Claim Element | Designation |
|---|---|
| 1. A block and tackle window balance device comprising: | A |
| a channel comprising a first end and a second end; | channel (B) with first end (C) and second end (D) |
| a top guide connected to the first end of the channel; | E |
| a bottom guide connected to the second end of the channel; | F1 |
| a bottom guide roller rotatably mounted in the bottom guide; | bottom guide roller (G1) |
| a fixed pulley block unit connected to the channel; | H |
| a translatable pulley block unit moveable within the channel; | I |
| a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and | spring (J), with a first end (K) and a second end (L) |
| a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. | cord (M) with a first end (N) and a second end (O) |
| 2. The device of claim 1 wherein the bottom guide roller is located external to the channel. | G2 |
| 4. The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | F3 |
| 12. A window assembly comprising:<br><br>a window frame with two jambs with jamb pockets;<br><br>at least one of an upper window sash and a lower window sash slideably receivable in the jamb pockets; and<br><br>at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | A window assembly (P) and a block and tackle window balance (A) |
| a channel comprising a first end and a second end; | channel (B) with first end (C) and second end (D) |
| a top guide connected to the first end of the channel; | E |
| a bottom guide connected to the second end of the channel; | F1 |
| a bottom guide roller rotatably mounted in the bottom guide; | bottom guide roller (G1) |
| a fixed pulley block unit connected to the channel; | H |
| a translatable pulley block unit moveable within the channel; | I |
| a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and | spring (J), with a first end (K) and a second end (L) |

| Claim Element | Designation |
|---|---|
| a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. | cord (M) with a first end (N) and a second end (O) |
| 13. A window balance device comprising: | A |
| a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | F2 |
| a bottom guide roller rotatably mounted in the bottom guide. | bottom guide roller (G1) |
| 14. The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | bottom guide roller (G2) |
| 15. The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | F3 |
| 18. A window balance device comprising: | A |
| a channel comprising a first end and a second end; | channel (B) with first end (C) and second end (D) |
| a top guide connected to the first end of the channel; | E |
| a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and | F2 |
| a bottom guide roller rotatably mounted in the bottom guide. | bottom guide roller (G) |
| 19. The device of claim 18 wherein the bottom guide roller is located external to the channel. | G2 |
| 20. The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | F3 |
| 22. The device of claim 18 wherein the bottom guide further comprises a bottom guide axle for mounting the roller. | Q1 |
| 23. A window balance device comprising: | A |
| a bottom guide connected to an end of a window balance channel, the bottom guide slidable in a jamb pocket when installed in a window frame, the bottom guide including: a bottom guide axle mounted within the bottom guide, the bottom guide axle located outside the window balance channel; and | a bottom guide (F1), window balance channel (B) and axle (Q2) |
| a bottom guide roller rotatably mounted on the bottom guide axle. | bottom guide roller (G5) and axle (Q2) |

Comparison of '264 Patent to Prosser, U.S. Patent No. 3,091,797

Element P
not shown in
these drawings
but is present in
both systems



FIG. 4A

Fig. 5.

Comparison of '264 Patent to Wood, U.S. Patent No. 3,114,178

Element P is not shown
in these drawings
(F is the frame), but
is present in both
systems.

See Prosser
analysis for
analysis of
FIG. 4A



FIG. 4A

Fig. 1

\* Bottom guide roller positioned in
the channel.

Exhibit 8

Part 2

Comparison of '264 Patent to Biro, U.S. Patent No. 3,449,862



See prosser
analysis
for discussion
of FIG. 4A.

The spring has
a second end (L)
not shown in
drawing.

FIG. 4A

FIG. 3.

Element P is not shown in
these drawings, but is
present in both systems

* If Amesbury contends that the patent
covers a roller partially external to the
guide, these elements are present in
Biro.

Comparison of '264 Patent to Berndt, U.S. Patent No. 4, 704,821

Element P is not shown in
these drawings, but is
present in both systems



See Prosser
Analysis for
discussion of
FIG. 4A

**FIG. 4A**



FIG.6

Spring (J) and Cord (M)
are present in the
Berndt patent, but are
not pictured in this
drawing.

Comparison of '264 Patent to Fitzgibbon, U.S. Patent No. 4,089,085.

Element P is not pictured in these drawings, but is present in both systems



See Prosser analysis for analysis of FIG. 4A

FIG. 4A



Comparison of '264 Patent to Thompson, U.S. Patent No. 6,840,041 (also applies to Anderson 200 series balance).

Element P is not shown in these drawings, but is present in both systems.

See Prosser analysis for analysis of FIG. 4A



FIG. 4A

Fig. 4

Comparison of '264 Patent to Japanese Utility Model JITUSKAI S62-19485  (Figure 3)



This reference shows a mounting structure consisting of a slider (13) attached to the lower end of a twisting plate (9). The rotating adjuster (17) is mounted in a similar fashion to the bottom guide roller of the patent.

Exhibit 8

Part 3

| Claim Element | Designation |
|---|---|
| 1. A window balance system comprising: | A |
| a U-shaped channel comprising a plurality of openings; | B |
| a spring connected to a system of pulleys located within the U-shaped channel; | spring (C) and system of pulleys (D) |
| a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and | a cord (E) with a first end (F) and a second end (G) connected to a jamb mounting attachment (H) |
| a balance shoe, wherein the balance shoe comprises: | I |
| a frame comprising an enlarged first end and a second end, wherein at least a portion of the second end of the frame is disposed within the U-shaped channel; | a frame (J) with an enlarged first end (K) and a second end (L) |
| a locking member proximal to the enlarged first end; | M |
| a cam in communication with the locking member; and | N |
| a connecting device comprising one or more resilient tabs for attaching the balance shoe within the U-shaped channel of the window balance, wherein the one or more resilient tabs extend at least partially through a corresponding number of the plurality of openings in the U-shaped channel. | O |
| 2. A window balance system comprising: | A |
| a U-shaped channel comprising a plurality of openings; | B |
| a spring connected to a system of pulleys located within the U-shaped channel; | spring (C) and system of pulleys (D) |
| a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and | a cord (E) with a first end (F) and a second end (G) connected to a jamb mounting attachment (H) |
| a balance shoe, wherein the balance shoe comprises: | I |

| Claim Element | Designation |
|---|---|
| a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | a frame (J) with an enlarged first end (K) and a second end (L) forming a pocket positioned in the second end of the frame (P) |
| a locking member proximal to the enlarged first end; | M |
| a cam in communication with the locking member, and | N |
| a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | O |
| 3. The window balance system of claim 2 wherein the connecting device comprises a rivet. | The use of a rivet to connect two parts is not novel. |
| 4. The window balance system of claim 2 wherein the connecting device comprises a screw. | The use of a screw to connect two parts is not novel. |
| 5. The window balance system of claim 2 wherein the connecting device comprises a resilient tab. | The use of a tab to connect two parts is not novel. |

Comparison of '368 Patent to DeNormand, U.S. Patent No. 6,041,546



\* This is Fig. 1 of the DeNormand Patent and Fig. 2A of the '368 Patent

Comparison of '368 Patent With Berndt, U.S. Patent No. 4,704,821



See DeNormand
Analysis for
analysis of
FIG. 3C →

Element C is
pictured in Fig. 7 of
the Berndt patent,
as are elements
E (45), F, G and H (31)

Comparison of '368 Patent with Schmidt, U.S. Patent No. 5,301,467



* locking member attaching balance to sash

The elements A, B and C are referred to by Schmit (Col. 3, ll. 4-17) but are not depicted here.

FIG. 2

* connecting device engaging the cam

FIG. 3A

| Claim Element | Depiction |
|---|---|
| 1 A mounting assembly comprising | A |
| a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, | a channel (B) with: (1) a rear wall (C); (2) side walls (D); and (3) inwardly turned opposed flanges (E) |
| a sash frame support means slidable in said channel means, | F |
| a coiled ribbon spring having a first end engaged with said sash frame support means, | a coiled ribbon spring (G) and first end (H) |
| and a means for mounting said coiled ribbon spring, | I |
| the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, | the coiled body portion of the coiled ribbon spring (J) has a second end (K) |
| said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, | K |
| said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited. | a raised spine (L) |
| 8. A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, | A mounting assembly (A) and a channel (B) with: (1) a rear wall (C); (2) side walls (D); and (3) inwardly turned opposed flanges (E) |
| a sash frame support means slidable in said channel means, | F |
| a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, | a coiled ribbon spring (G) having an outer end (M) and having a means for mounting the coiled ribbon spring (I). |

| Claim Element | Depiction |
|---|---|
| the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | the coiled body portion of the coiled ribbon spring (J) has a second end (K) |
| said mounting means being secured in said channel means and | I |
| the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited. | Projection means (L) |

Exhibit 8

Part 4

Comparison of claims of '638 Patent with Makarowski, U.S. Patent No. 5,069,001



FIG. 2

FIG. 3

Comparison of '638 Patent with Japanese Utility Model No. JIKKOHE18-9334



The sliding means (c) has a spine or projection means (L) that is positioned between flanges of the channel and inhibits rotation

Comparison of '638 Patent with Japanese Utility Model No. JIKKAIHEI4-119083



【図5】                    【図6】



Comparison of '638 Patent with Japanese Utility Model No. JIKKOHEI14-112279



This drawing shows
a spine or projection
that interacts with
flanges of a channel
to prevent
rotation.

Comparison of '638 Patent with Sterner, U.S Patent No. 5,157,808

FIG. 2



Exhibit 9

# ORIGINAL

1

1

2          UNITED STATES DISTRICT COURT
3        FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - - - -x
4    AMESBURY GROUP, INC., and
     AMESBURY SPRINGS LTD.,
5              Plaintiffs,

6          v.     Civil Action No. 05-10020-DPW

7    THE CALDWELL MANUFACTURING
     COMPANY,
8              Defendant.
- - - - - - - - - - - - - - - - - - - -x
9            C O N F I D E N T I A L

10   Deposition Upon Oral Examination Of:
                 Charles E. Still

11

12   Location:    Harris Beach PLLC
                  99 Garnsey Road
13                Pittsford, New York   14534

14   Date:        May 2, 2006

15

16   Time:        9:11 a.m.

17

18

19   Reported By:  Joanne N. Pero

20                 Alliance Shorthand, Inc.

21                 Suite 1500 - The Penthouse

22                 Alliance Building

23                 183 Main Street East

24                 Rochester, New York   14604

25

60

CHARLES STILL - BY MR. KLINE

1

2      Q.    The raised spine is positioned between

3      and in the same plane as the inwardly-turned

4      opposed flanges of the channel means, correct?

5      A.    Yes.

6      Q.    And then you wrote the raised spine of

7      Caldwell's Quick-Tilt does not inhibit rotation; is

8      that correct?

9      A.    Yes.

10     Q.    How did you determine that the raised

11     spine of Caldwell's Quick-Tilt does not inhibit

12     rotation?

13     A.    By examining the samples and trying the

14     samples out in the different window jambs and also

15     studying the dimensions of the entire assembly.

16     Q.    When you say "different window jambs,"

17     did you inspect the sample in window jambs in

18     addition to those we have marked as Exhibit 4-A,

19     4-B?

20     A.    Yes.

21     Q.    How many?

22     A.    There is one that was shown to me by this

23     office and it is here.

24     Q.    Could I see that, please?

25     A.    Yes.

61

CHARLES STILL - BY MR. KLINE

1

2    Q.  And that has already been marked as Braid

3  Exhibit 9; is that correct?

4    A.  Yes.

5    Q.  I am not going to mark it again.  Other

6  than Still Exhibit 4-A and 4-B and Braid Exhibit 9,

7  did you inspect any other jamb assemblies including

8  Caldwell Quick-Tilt products in connection with

9  determining your opinion concerning infringement?

10    A.  No.

11    Q.  Now, in each of these jamb assemblies,

12  Still Exhibit 4-A, Still Exhibit 4-B and Braid

13  Exhibit 9, flanges define a gap, correct?

14    A.  Yes, sir.

15    Q.  And the Caldwell constant force balance

16  includes a raised spine, correct?

17    A.  Yes.

18    Q.  And the raised spine is in the same plane

19  as the flanges that define the gaps, correct?

20    A.  Yes.

21    Q.  But the gap in each of these samples is

22  wider than the raised spine, correct?

23    A.  Yes.

24    Q.  And does that fact compel you to conclude

25  that the raised spine does not inhibit rotation in

70

1              CHARLES STILL - BY MR. KLINE

2      element"?

3           A.    This back side here, that is the base of

4      the element right there.  It slides in the channel

5      and that inhibits rotation in the design.

6           Q.    Okay.  I would like to show you, Mr.

7      Still, I have taken Still Exhibit 10 and I have

8      inserted the Quick-Tilt balance partially into the

9      channel, correct?

10          A.    Yes.

11          Q.    And when I apply a slight moment force to

12     wiggle the device side to side, the spine hits the

13     flanges, correct?

14          A.    It does, also the bottom of the mounting

15     element also hits the sides of the channel.

16          Q.    Well -- I have a question for you.  When

17     you say "the bottom of the mounting element hits

18     the channel as well," if you look at it from there,

19     though, it doesn't, does it (indicating)?

20          A.    On this side it does, yes.  Put it in

21     there a little further.

22          Q.    I don't want to put it in there a little

23     further.  I will put it in there a little further.

24     What I would like you to do -- I want to do it.  I

25     have put it in a little further as you asked and

71

1              CHARLES STILL - BY MR. KLINE
2      when I wiggle it back and forth, the spine hits the
3      flange before the side of the base of the mounting
4      element hits the wall inside the channel, doesn't
5      it?
6           A.   It does.
7           Q.   When I put it in even a little further,
8      the spine of the mounting element hits the flange
9      before the side walls of the base of the mounting
10     element hits the internal portion of the channel,
11     doesn't it?
12          A.   It does.
13          Q.   When I put it in there even further, I
14     can wiggle it and still cause the spine to hit the
15     wall of the flanges, correct?
16          A.   That is correct.
17          Q.   So at least in this instance, that spine
18     is preventing me from further rotating the mounting
19     member; isn't that correct?
20          A.   That's right but the Caldwell balance
21     does not depend on that.
22          Q.   I understand it may not depend on that
23     but the spine in this instance does contribute to
24     the inhibition of rotation, correct?
25          A.   All due to the design of that channel,

72

1                    CHARLES STILL - BY MR. KLINE
2        yes.
3            Q.   So whether -- strike that.
4                 Independent of whether additional
5        features of the Caldwell balance inhibit rotation,
6        in this assembly, this spine also inhibits rotation
7        of the balance, correct?
8            A.   It can.
9            Q.   Do you know whether Caldwell sold
10       Quick-Tilt balances to any customer installing
11       those balances in jambs configured like those we
12       have marked as Still Exhibit 10?
13           A.   I do not.
14           Q.   So can we agree that in some applications
15       it's your opinion that -- strike that.
16                So it's your opinion that in certain
17       installations, the spine on Caldwell's Quick-Tilt
18       does not inhibit rotation because it's narrower
19       than the gap defined by the flanges, correct?
20                MR. SLIFKIN:   Objection.
21           Q.   And in other installations having
22       narrower gaps, the spine can inhibit rotation,
23       correct?
24                MR. SLIFKIN:   Objection.
25           A.   It does not.  Let me show you.  When you

73

1                  CHARLES STILL - BY MR. KLINE
2       had this pulled out, you are disregarding the top
3       cover which is a tighter tolerance than the body of
4       the element.  If you put the unit all the way in,
5       the top of the mounting element acts as an
6       anti-rotation as well.
7            Q.   In addition to the spine, correct?
8            A.   In addition, no.  In addition to the body
9       of the element itself.  In other words, it has a
10      tighter tolerance because it is designed to be
11      tight, tighter than the actual mounting element.
12      So the spine does not have any relationship to the
13      rotation at all.
14           Q.   How --
15           A.   Put that in backwards and then try to
16      rotate it.  Right there.  It's larger than the
17      mounting element.
18           Q.   This is called a dust cover, right?
19           A.   Yes.
20           Q.   The dust cover is wider than the mounting
21      element; isn't that correct?
22           A.   Yes.
23           Q.   The walls of the back of the mounting
24      element are narrower than the width of the dust
25      cover, correct?

74

1                    CHARLES STILL - BY MR. KLINE

2          A.   Yes.

3          Q.   So therefore, since the dust cover fits

4     in the channel, the walls of the back of the

5     mounting element are narrower than the width of the

6     back of the channel, correct?

7          A.   No, you didn't say that correctly.

8          Q.   Okay.

9          A.   The dust cover is wider than the width of

10    the mounting element.

11         Q.   Right and the dust cover fits in the

12    channel, correct?

13         A.   Yes.  So it is going to minimize rotation

14    faster or quicker than the base of the mounting

15    element.

16         Q.   It is going to minimize rotation --

17         A.   At the very tip end.

18         Q.   At the very tip end, correct?

19         A.   Yes.  Also we are looking at a sample

20    with no screw and you have to screw the mounting

21    element down to the jamb.

22         Q.   Why is that?

23         A.   Well, you are pulling on it.  It is going

24    to stay with the sash here if you operate the sash.

25         Q.   How many times in typical installations

75

1                    CHARLES STILL - BY MR. KLINE
2      do these window balances go up and down?
3              A.    Depends.
4              Q.    And based on your knowledge and
5      expertise, how many times do they go up and down?
6              A.    Like in Phoenix or Albuquerque, they
7      operate their windows every day because it gets
8      cool in the evenings, they raise their windows.    In
9      Texas, you wouldn't find anyone operating their
10     windows other than spring and fall.
11             Q.    How many years does it typically last?
12             A.    30 years.
13             Q.    So they go up and down thousands of
14     times; is that fair to say?
15             MR. SLIFKIN:    Objection.
16             A.    Yes, they can.
17             Q.    Do you know whether the stiffness of this
18     dust cover stays the same over the life of the
19     balance?
20             A.    I have no idea.
21             Q.    Do you know whether over the life of the
22     balance the dust cover becomes more flexible than
23     it was when it was new?
24             A.    Well, it is on the interior, it is not
25     exposed to ultraviolet, it is pretty well

97

1        CHARLES STILL - BY MR. KLINE

2        Q.   And there is a description of the first

3   cord end being attached to the translatable pulley

4   block unit; do you see that?

5        A.   Yes.

6        Q.   Now, Prosser does not have a first cord

7   end attached to a translatable pulley block unit,

8   correct?

9        A.   That is true.

10        Q.   And the next claim 1 of the '264 patent

11   describes that the second cord end being attachable

12   to a jamb; do you see that?

13        A.   Yes.

14        Q.   Prosser does not include a second cord

15   end attachable to the frame jamb, right?

16        A.   It says "the jamb."  Attach it to a sash

17   jamb.

18        Q.   Well, let me ask you this, did you read

19   the '264 patent?

20        A.   I did.

21        Q.   When the '264 patent uses the term

22   "jamb," what is it referring to?

23        A.   The mainframe, frame jamb.

24        Q.   The frame jamb?

25        A.   Yes.

99

1                    CHARLES STILL - BY MR. KLINE
2      the cord.
3            Q.   As you read these patents -- strike that.
4                 Based on your knowledge and expertise, is
5      there a difference between the term "roller" and
6      "pulley"?
7            A.   In my opinion, yes.
8            Q.   What are the differences?
9            A.   If you compare a steam roller to a car
10     tire, a roller is real wide, it's cylindrical and
11     goes through a center point but it's normally wider
12     than a wheel or a pulley.
13           Q.   With respect to window balance design, is
14     there a difference between the term "roller" and
15     "pulley" based on your knowledge and experience?
16           A.   There can be, yes.
17           Q.   What differences do you have in mind?
18           A.   A roller may have a certain design
19     intent.  It may or may not have a groove in the
20     center where a pulley does.
21           Q.   So when you concluded that the Prosser
22     patent shows a top guide, you were considering the
23     tongues 25 and 26; is that correct?
24           A.   That is correct.
25           Q.   And when you concluded that the Prosser

ALLIANCE SHORTHAND INC.
(585) 546-4920          (800) 724-0836

100

1                  CHARLES STILL - BY MR. KLINE

2    patent shows a bottom guide, you had in mind the

3    bottom tongues 25 and 26, correct?

4         A.   Yes.

5         Q.   Is there any other feature of the Prosser

6    patent that you understand to constitute a top

7    guide as the term is used in the Newman '264

8    patent?

9         A.   No.

10        Q.   Is there any other feature shown in the

11   Prosser patent that you understand to constitute a

12   bottom guide as the term is used in the Newman '264

13   patent?

14        A.   No.

15        Q.   The top guide in the Newman patent rides

16   with the sash, correct?

17        A.   Yes, it does.

18        Q.   The top tongues in the Prosser patent are

19   fixed to the jamb, correct?

20        A.   Yes.

21        Q.   The bottom guide in the Newman patent

22   rides with the sash, correct?

23        A.   Yes.

24        Q.   And the bottom tongues in the Prosser

25   patent are fixed to the jamb, correct?

140

1                    CHARLES STILL - BY MR. KLINE
2    balance that we designated as Still Deposition
3    Exhibit 21, correct?
4         A.   Yes.   In addition to the fact it does not
5    rotate and it is not replaceable in the field.   The
6    97ez is not replaceable in the field, you have to
7    replace the entire balance.
8         Q.   Now, in the 97ez includes a channel,
9    correct?
10        A.   Yes.
11        Q.   And it includes a shoe, correct?
12        A.   Yes.
13        Q.   And the shoe is connected to the channel,
14   correct?
15        A.   Yes.
16        Q.   And it's connected with a rivet?
17        A.   Yes.
18        Q.   And we have confirmed that a rivet can be
19   a device, have we not?
20        A.   Yes.
21        Q.   If you could further describe for me
22   generally how the shoe of the 97ez is connected to
23   the channel of the 97ez?
24        A.   There is one rivet that goes through both
25   walls of the steel channel that passes through an

141

CHARLES STILL - BY MR. KLINE

1
2   aperture that is mounted into the sash carrier, it
3   comes out the other wall and of course it is
4   riveted in place.  That is the only connecting
5   member to this device.
6           Q.   Now, there seems to be some interplay
7   between a portion of the channel -- strike that.
8                There seems to be some interplay between
9   a portion of the shoe and a second rivet passing
10  through the channel; can we agree to that?
11          A.   Yes.
12          Q.   What is the purpose of that relationship?
13          A.   The purpose of that is to keep the
14  rotation out and 9 degrees to the channel.  There
15  is two legs that have been formed on the back end
16  of the molded carrier goes underneath a rivet that
17  supports the end of the spring and that minimizes
18  rotation.
19          Q.   Would it be fair to say that the end of
20  the shoe and those legs are designed to mate with
21  that second rivet?
22          A.   No.
23          Q.   Why not?
24          A.   It's a separate part of the housing, all
25  its purpose is to keep the rotation out.

ALLIANCE SHORTHAND INC.
(585) 546-4920          (800) 724-0836

142

CHARLES STILL - BY MR. KLINE

1

2      Q.   How does it do that?

3      A.   When you put those two legs underneath

4   the rivet, it keeps -- inhibits it from rotating.

5   It does have nothing to do with the connection to

6   the channel.

7      Q.   I understand that.  I am just asking,

8   it's the interaction between the end of the shoe,

9   the legs and the rivet that prevent the rotation,

10  correct?

11     A.   Yes.  Once the balance is in place, it

12  serves no purpose.

13     Q.   Well, prevents the rotation, right?

14     A.   It won't rotate in a window.

15     Q.   I am sorry.  I didn't get the end of

16  that.

17     A.   I am sorry, it won't rotate in a window.

18  Once a balance is in place inside the jamb channel,

19  it cannot rotate.

20     Q.   Why is it necessary, then?

21     A.   Just to keep the part from swinging out

22  during shipment or during assembly, just to keep it

23  straight.

24     Q.   So when you concluded that Caldwell's

25  97ez balance omits any pocket, did you have in mind

ALLIANCE SHORTHAND INC.
(585) 546-4920                (800) 724-0836

148

1          CHARLES STILL - BY MR. SLIFKIN

2      A.   Yes.

3           MR. KLINE:   I don't have any further

4   questions at this time.

5    EXAMINATION BY MR. SLIFKIN:

6      Q.   I have a few questions.  I want to ask

7   you to take a look -- I refer you to Exhibit 10

8   which is a jamb liner with two balances installed;

9   do you recall looking at that exhibit during your

10  earlier testimony?

11     A.   I do.

12     Q.   And Mr. Kline asked you a number of

13  questions about the function of the spine and its

14  role if any in inhibiting rotation; do you recall

15  that testimony?

16     A.   Yes, I do.

17     Q.   When he did that, he held the shoe

18  partially in and partially out of the channel; do

19  you recall that?

20     A.   Yes.

21     Q.   When a window balance is installed in a

22  window and the window it is fully assembled in a

23  building, does the shoe ever hang partially out of

24  the channel?

25     A.   It does not.

149

1                    CHARLES STILL - BY MR. SLIFKIN

2              MR. KLINE:  Objection; leading.

3              I have a right to object, so if you could

4     give me a moment to interpose an objection, thank

5     you.

6         Q.   Now, Mr. Kline also showed you referring

7     to the tabs at the bottom of the shoe; do you

8     recall that?

9         A.   Yes.

10        Q.   Can you tell me if the cam that controls

11    those tabs was in approximately that orientation

12    when the device was shown to you; do you recall?

13        A.   They were outwards, the brake shoes were

14    out.

15        Q.   There is a cam that controls those shoes?

16        A.   That is correct.

17        Q.   Do you see the position that is in

18    currently?

19        A.   Yes, it's in the closed position.

20        Q.   In that position, does the shoe if it

21    were fully inside the channel, would the shoe move

22    or not move?

23        A.   It would move.

24        Q.   It would move?

25        A.   Yes.

150

```
 1            CHARLES STILL - BY MR. SLIFKIN
 2       Q.   Is -- excuse me, one second.  I am going
 3   to ask you to rotate that cam to the
 4   fully-retracted position?
 5       A.   Okay.
 6       Q.   Is it in the fully-retracted position?
 7       A.   It is.
 8       Q.   Are those tabs or brakes flush with the
 9   side of the housing now?
10       A.   Yes.
11            MR. KLINE:  Object to the form of the
12   question.
13       Q.   Were they flush with the side of the
14   housing when Mr. Kline showed them to you?
15            MR. KLINE:  Object to form.
16       A.   No, they were in a locked position,
17   extended out.
18       Q.   In the orientation in which those tabs or
19   brakes are flush, is that the orientation in which
20   the shoe is free to move or not free to move?
21            MR. KLINE:  Object to form.
22       A.   It's free to move.
23       Q.   May I have that back?
24            MR. KLINE:  Can I see it, please?
25       Q.   Just so the record is clear, when Mr.
```

151

```
 1              CHARLES STILL - BY MR. SLIFKIN
 2    Kline showed you the shoe, he had the brakes in an
 3    at least partially-extended position; is that
 4    correct?
 5              MR. KLINE:  Object to the form of the
 6    question; leading.
 7         A.   In an extended position, yes.
 8         Q.   Extended?
 9         A.   Yes.
10         Q.   When the balance is installed in a window
11    jamb properly, is there anything that is missing
12    from this assembly?
13              MR. KLINE:  Object to the form of the
14    question.
15         A.   Over the entire assembly?
16         Q.   Anything that -- let me rephrase the
17    question.
18              When the balance is installed, what is
19    necessary to complete the installation process if
20    anything that you don't see there?
21              MR. KLINE:  Objection; foundation.
22         A.   There is a screw that attaches the
23    mounting element to the frame jamb and it's
24    missing.
25         Q.   Did Mr. Kline show you a sample with a
```

152

CHARLES STILL - BY MR. SLIFKIN

1    screw or without a screw?

2         A.    Without a screw.

3         Q.    Does the screw affect the ability of the

4    shoe to rotate in the channel?

5              MR. KLINE:   Object to the form of the

6    question.

7         A.    Yes.

8         Q.    And how does the screw affect the ability

9    of the shoe to rotate?

10        A.    Well, it secures it down tight and

11   minimizes any rotation from the coil.

12        Q.    So when Mr. Kline demonstrated the

13   movement of the housing and discussed the flanges,

14   would it function differently had the screw been

15   properly in place?

16             MR. KLINE:   Object to the form of the

17   question; leading, foundation, mischaracterizes the

18   earlier questions.

19        A.    Yes.

20        Q.    Moving to a separate subject, Mr. Still,

21   you can put that down.

22        Did you review Judge Woodlock's decision,

23   claim interpretation decision in this case before

24   you rendered your opinions?

Exhibit 10

Part 1

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 05-CV-10020 (DPW)

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
AMESBURY GROUP, INC., and AMESBURY    *
SPRINGS LTD.,                         *
                                      *
        Plaintiffs,                   *
                                      *
v.                                    *
                                      *
THE CALDWELL MANUFACTURING COMPANY,   *
        Defendant.                    *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

        DEPOSITION OF SAMMY G. SHINA, Ph.D., PE,
taken pursuant to the applicable provisions of
the Federal Rules of Civil Procedure, before
Susan L. Prokopik, Registered Merit Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on
Wednesday, May 3, 2006, at 9:07 a.m.

                KACZYNSKI REPORTING
            72 CHANDLER STREET, SUITE 3
            BOSTON, MASSACHUSETTS 02116
                  (617) 426-6060

44

```
 1   A.   I examined that without being attached -- as a
 2        free device.
 3   Q.   If both parts of the Caldwell Quick-Tilt window
 4        balance were able to move freely up and down in
 5        the channel, would the balance operate properly?
 6   A.   If both parts are not secured, no, it would not
 7        operate correctly.
 8   Q.   So one part at a minimum must be fixed in some
 9        way to the channel; is that correct?
10   A.   Correct.
11   Q.   And why is that?
12   A.   To allow for the function of the invention or of
13        the device, which is to give counterbalance.
14   Q.   If both parts moved, there would be nothing
15        counteracting the weight of the window sash; is
16        that correct?
17   A.   If both parts moved freely you mean?
18   Q.   Yes.
19   A.   Yes.   That's correct.
20   Q.   Okay.  Now, the balance that you examined here at
21        the office of Goodwin Procter had no fixing
22        screw; correct?
23   A.   Correct.
24   Q.   It was not fixed to the channel in which you
```

1     examined it, correct?

2  A.   Correct.

3  Q.   So you have never examined a Quick-Tilt balance

4     of Caldwell as it is properly installed in a

5     channel; is that correct?

6  A.   Correct.

7            MR. SLIFKIN:  Mark that, please.

8            (Quick-Tilt*nc document marked Exhibit

9     No. 3.)

10  Q.   Mr. Shina, I'll place before you what's been

11     marked as Shina Exhibit 3.  Ask you if you

12     recognize that document.

13  A.   Yes.

14  Q.   Is that document the same as the page that is

15     attached to your Exhibit 1 listed as figure 3

16     towards the back?

17  A.   Yes.

18  Q.   It's a color copy of the black and white figure 3

19     you have in your report; is that correct?

20  A.   Mm-hmm.  Mm-hmm.

21  Q.   I would like to see if we can agree on some

22     terminology.  What I would like to do is have you

23     take a pen.  Do you have one?

24  A.   No.

60

1      sample that you examined, correct?

2  A.  I extended it but not to a -- it required a lot

3      of strength.  I did not extend it to a great

4      extent.

5  Q.  When you extended it, to the extent you could,

6      did you see the -- did you observe rotation?

7  A.  I was holding it very rigid.

8  Q.  Did you observe rotation of the mounting means

9      inside the channel?

10 A.  The force that I was using was so great I could

11     not feel if there was a rotation or not.

12 Q.  So you have never actually seen rotation of a

13     Caldwell Quick-Tilt balance inside a jamb

14     channel, have you?

15 A.  No, I have not.

16 Q.  But you theorize that it happens, correct?

17 A.  Correct.

18 Q.  What forces in a properly installed Caldwell

19     Quick-Tilt balance resist rotation?

20 A.  I've only seen one.  I can only comment on that

21     one.

22 Q.  Tell me in the one you saw, what forces resist

23     rotation.

24 A.  There was a spine on the back of the one that I

1    appears to me that there's somewhere on the order

2    of an eighth of an inch spacing on either side of

3    the spine between the spine and its corresponding

4    flange.  Is that a fair characterization of the

5    scale?

6                MR. SINGER:  Objection.

7  A.  I can't tell.  I don't know if it's to life or

8    whatever.

9  Q.  Okay.  We'll look at some balances later.

10 A.  Sure.

11 Q.  Other than the spine, what other forces can you

12    see that would resist the rotational force caused

13    by the spring in your opinion?

14 A.  I think the spine is the primary force.

15 Q.  I understand that.  I'm looking for the secondary

16    forces.

17 A.  Well, we discussed that the two coils as I see

18    could act differently on different sides of the

19    mounting means.

20 Q.  What else?

21 A.  That's it.

22 Q.  Okay.  There's nothing else in that drawing that

23    you would see that would cause the balance to

24    resist rotation?

74

1   A.   There might be a possibility that there is a

2        portion E that sits inside the channel.  Could

3        exert a force, a secondary force.

4   Q.   "E" I think is what we called the dust cover

5        earlier, correct?

6   A.   That's correct.

7   Q.   How would that resist rotation?

8   A.   I can't tell how it fits into the channel but it

9        would resist the rotation by the fact that if it

10       rotates one way or the other way, it could have

11       some slight effect.

12  Q.   And how would that effect be manifested?

13  A.   By the -- by the fact that E would hit against

14       one of the sides and will prevent further

15       rotation.

16  Q.   Okay.  Anything else in the drawing in Shina

17       Exhibit 3 that would hit against the sides to

18       prevent rotation that you can see?

19  A.   I can't see from what I can see here.

20  Q.   Okay.  Are there any other things that are shown

21       in Shina Exhibit 3 that would act to resist

22       rotation of that part?

23  A.   Not that I can see.

24  Q.   Does the screw that's shown in Shina Exhibit 3

1      force the mounting means against the back of the

2      channel?

3   A.   Yes.

4   Q.   Is there frictional force caused by the touching

5      of those two parts?

6   A.   There might be.

7   Q.   Is the frictional force dependent on how tight

8      that screw is?

9   A.   Could be.

10   Q.   Could be or is?

11   A.   Is.

12   Q.   The tighter the screw, the greater the friction

13      force, correct?

14   A.   Correct.

15   Q.   So we've now identified at least two secondary,

16      to use your terminology, forces that act to

17      oppose rotation of that part, those being the

18      dust cover hitting the sides and the frictional

19      force from the screw, correct?

20   A.   Mm-hmm.  Yes.

21   Q.   Okay.  There may be others but you can't tell

22      from this drawing?

23   A.   Correct.

24   Q.   In rendering your opinion, did you compare the

76

1        sum of the forces in the Caldwell balance tending

2        to make the part rotate compared to the sum of

3        the forces in the Caldwell balance tending to

4        resist rotation?

5    A.  In my report, I have made mention of that.

6    Q.  Can you show me where that is, please?

7    A.  Sure.  I would direct you to page 13 of my report

8        and to the bottom of the page 13.

9    Q.  Okay.

10   A.  May I read it to you?

11   Q.  Sure.

12   A.  Okay.  "The top portion of the Quick-Tilt*nc

13       cover is too thin to adequately inhibit the

14       rotation of the coil nest, with a thickness

15       ranging from .025 to .011 inches.  There are two

16       diagonal thin cutouts at the top of the covers to

17       allow for twisting of the cover.

18               "Two, the alternating coil design

19       mentioned in the top of page two of the

20       Quick-Tilt brochure (C 000531) will only apply to

21       tandem coiled ribbon spring.  I note the

22       following:

23               "For single nest cover, this does not

24       apply at all."

KACZYNSKI REPORTING

1   Q.   I see there is more.

2   A.   Sure.

3   Q.   Thank you for that.

4              Did you measure the forces that allowed

5         you to reach this conclusion?

6   A.   No.

7   Q.   So how do you know that the forces causing

8         rotation are greater than the forces resisting

9         rotation on an actual Caldwell balance as

10        properly installed in a channel?

11  A.   I tried physically to pull the balance and the

12        force looked very, very -- looked large.  And the

13        top portion of the cover looked very thin to me.

14  Q.   That balance you examined did not have a screw,

15        correct?

16  A.   Did not have a screw, that's correct.

17  Q.   And you don't know what the value of the

18        frictional force resisting rotation is in a

19        properly installed Caldwell balance, do you?

20  A.   No, I do not.  But my experience tells me -- I

21        inspected the brochure by Caldwell on the

22        Quick-Tilt and I did not see any specification as

23        to the force of the screw to be applied so

24        therefore, I am not sure what the force would be

1      since no specification is given in the brochures.

2  Q.  So you simply don't know the value of the

3      frictional force caused by the screw in a

4      properly installed balance, do you?

5  A.  I could not determine it based on the lack of

6      specification in the Caldwell brochure.

7  Q.  And so you don't know whether it's larger or

8      smaller than the force tending to cause rotation,

9      do you?

10  A.  I do not know since I have no idea what it is.

11  Q.  And if the frictional force plus the force caused

12      by the dust cover are greater than the force

13      tending to make the part rotate, the part would

14      not rotate, correct?

15  A.  Given that statement only, the way you stated it,

16      that is correct.  As -- sorry.

17  Q.  You're a professor of engineering, correct?

18  A.  Correct.

19  Q.  This is a setup that you could give to a student

20      of engineering and have him calculate the forces

21      acting on a part, couldn't you?

22  A.  Correct.

23  Q.  And there would be a series of equations?

24  A.  Correct.

1  Q.  And you would have on one side force tending to

2      cause rotation and on the other side you could

3      have a series of equations that added up the

4      force resisting rotation, correct?

5  A.  Correct.

6  Q.  And if you knew all those values, you could tell

7      whether the part would rotate or not, correct?

8  A.  The only -- I do not know the value --

9  Q.  I'm asking --

10 A.  Sure.

11 Q.  -- theoretically --

12 A.  Yeah.

13 Q.  -- if you knew the values of the forces, if the

14     student knew the value of the forces, the student

15     could calculate whether that part would rotate or

16     not, right?

17 A.  If all the values are present and all the

18     measurements are made and available to the

19     student, the student could do that.  That's

20     correct.

21 Q.  Were all those measurements made by you?

22 A.  I did not make those measurements.

23 Q.  Did you know the values of those forces?

24 A.  I did not calculate the values of those forces.

80

1   Q.  You simply do not know whether the forces in this

2       Caldwell balance are sufficient to cause rotation

3       of the part, do you?

4   A.  I used my opinion in page 13.  And that is the

5       cover is too thin and I add to that that the

6       force or the torsion to apply to the screw is not

7       available.

8   Q.  So there is not enough information in your report

9       then to reach a conclusion as to whether or not

10      the mounting means would rotate, is there?

11                  MR. SINGER:  Objection.

12  A.  I'm also considering one other factor that I

13      would not -- that I would not use in the example

14      to the student.  And that is over time with many

15      repeated operations of this device, whether the

16      screw will tend to unravel because if a force is

17      -- the force is on it and also whether the cover

18      will tend to twist with time so that the

19      operation would degrade with time.

20  Q.  How much time would that take?

21  A.  I would have to make calculations on this but

22      this would be in the normal lifetime of a

23      balance.

24  Q.  Have you made those calculations anywhere?

1    run, as I describe, in kind of a snug fit.  And

2    it would definitely would inhibit rotation

3    because it's long and it would give you a good

4    moment to inhibit rotation.

5  Q.  When you say "a moment," is there some physical

6    interaction of parts that causes the inhibition

7    of rotation?

8  A.  When the spine goes up and down and it is -- I

9    use the word "snug."  It is -- fits nicely

10    between the two flanges.  The device cannot

11    rotate because the spine is there.

12  Q.  What is happening that's preventing the rotation?

13  A.  The spine interacts or conflicts, whichever word

14    you want to use, with the flanges and inhibits

15    rotation.

16  Q.  Is another word "touch" perhaps?

17  A.  Touch is a possibility, yes.

18  Q.  So the spine touches the flange and prevents

19    rotation, correct?

20  A.  Correct.

21  Q.  Can the spine prevent rotation without touching

22    the flange?

23  A.  Depends on the amount of -- the snugness of the

24    fit so to speak.  Certainly if the spine is far

92

1      away from the flanges, then it would not act in

2      that manner.

3   Q.  I'm asking you in terms of inhibiting rotation,

4      to conclude that the spine has inhibited

5      rotation, must we conclude that the spine has

6      touched the flange?

7   A.  Correct.

8   Q.  It doesn't inhibit rotation by its presence alone

9      between flanges but must touch the flange in

10     order to stop rotation, correct?

11  A.  Correct.

12  Q.  There is a force between the spine and the flange

13     when the spine touches the flange that acts

14     opposite the force causing rotation, correct?

15  A.  Correct.

16  Q.  So in order to infringe the claim, must we

17     conclude that the spine touches the flange?

18              MR. SINGER:  Objection.

19  A.  The spine has to be in contact with the flange.

20  Q.  If the spine doesn't touch the flange, the spine

21     doesn't inhibit rotation, correct?

22  A.  Only to the effect that let's say if rotation

23     does begin and the spine would rotate, then it

24     would touch it and it would then inhibit

1    rotation.

2  Q.  The spine must touch the flange in order for the

3      spine to inhibit rotation, correct?

4  A.  The spine must be in contact with the flange to

5      inhibit rotation.

6  Q.  If the spine does not contact the flange, the

7      spine does not inhibit rotation, correct?

8  A.  Correct.

9  Q.  If the spine does not inhibit rotation, there is

10     no infringement of Amesbury's '638 patent, is

11     there?

12             MR. SINGER:  Objection.

13 A.  In the wording of the -- let me read the wording

14     so we can be absolutely sure.

15 Q.  Mm-hmm.

16 A.  Okay?

17             I refer to my report, page 11, item H.

18     This is the outcome of the spine "whereby

19     rotational motion of said mounting means is

20     inhibited."

21             That's the outcome of the spine.  And

22     now I'm going to look at the -- and then the

23     previous claim is the definition of the spine

24     itself.

```
 1  A.  How do you define "not capable"?

 2  Q.  If the device is constructed in a way that it is

 3      not possible for the spine to touch the flange,

 4      must you then conclude that that Caldwell product

 5      cannot infringe the claim?

 6               MR. SINGER:  Objection.

 7  A.  Again, there is a definition here.  It could be

 8      because I did not examine forces and calculate

 9      forces and all of that.  I considered repeated

10      use, as I said in my report.  I considered the

11      thickness of materials.  So with the proviso,

12      that would do that.  The device -- the device

13      that I examined in the office I would say is

14      based on my report.  The hypothetical situation

15      that you are giving me, I would conclude -- I

16      would agree with your suggestion.

17  Q.  So if I handed you a series of balances and you

18      examined them and you concluded that from

19      examining the balances each one of them had a

20      spine and flange separation which rendered it

21      incapable of the spine and flange contacting one

22      another, you would have to conclude that all

23      elements of the claim were not satisfied and

24      there's no infringement?
```

105

1      would the wings come in contact with the sides of

2      the channel if that part began to rotate?

3  A.  Well, it's hard to tell.  May I take it out?

4  Q.  Yes.  Sure.

5  A.  Okay.  Because there is -- the dust cover that we

6      talked about.  And the dust cover -- and I can't

7      tell what -- looking at it where the dust cover

8      would come in contact first and then the wings.

9      You have another thing to worry about, which is

10     the dust cover.

11  Q.  If the dust cover over time I think you testified

12     might deform in a way --

13  A.  Correct.

14  Q.  If it did so, would then next the wings come in

15     contact with the sides of the channel?

16  A.  If it deformed to the limit, after repeated use,

17     then the wings would come into contact, yes.

18  Q.  If the wings contacted the sides of the channel,

19     would the spine be touching or not touching the

20     flanges in that configuration there?

21  A.  Once the wings contacted and assuming they have

22     not degraded or flexed due to use, then they

23     would come in contact before the spine.  Contact

24     with jamb channels.

1   A.   Mm-hmm.

2   Q.   Looking at Exhibits 6 and 7 --

3   A.   Right.  Sorry.

4   Q.   In its present condition, you would have to

5        conclude that the combination of the balance and

6        the channel do not infringe claim one of the '638

7        patent, correct?

8   A.   Correct.

9   Q.   And looking at it in its present condition, the

10       combination of Exhibit 6 and 7, you would have to

11       conclude that that combination does not infringe

12       claim eight of the '638 patent, correct?

13  A.   Correct.

14  Q.   Let me ask the same question because I'm not sure

15       that I did on the other combination and that is

16       Exhibit 6 and Exhibit 5.  I have now placed those

17       two together and ask you in its present

18       condition, does the combination of Exhibits 5 and

19       6 infringe claim one of the '638 patent?

20  A.   As I see today for the first time, Exhibit 5,

21       Shina Exhibit 5 and Shina Exhibit 6, and in its

22       present condition, which does not include

23       possible degradation over time of the dust cover

24       and of the wings, this particular combination of

1      Exhibit 6 and 5 does not infringe on claim one.

2  Q.  Okay.  Does the combination of Exhibit 6 and 5 in

3      its present condition infringe claim eight of the

4      '638 patent?

5  A.  I would repeat my same proviso, which is the

6      exhibits that I see today, presented to me today

7      for the first time, and not -- in its present

8      condition not counting on possible degradation of

9      the dust cover and the wings, that the exhibits

10     that I see before me do not infringe on claim

11     eight.

12 Q.  I place before you what I showed you before.

13     Braid Exhibit 9.  And I'll ask you in its present

14     condition, does the combination of the balance in

15     channel -- strike that.  In its present

16     condition, does the combination of the frame jamb

17     and balance in Braid Exhibit 9 infringe claim one

18     of the '638 patent?

19 A.  As we discussed before, I'm seeing before me

20     Exhibit Braid 9.  I cannot see the width of the

21     wings so I cannot comment as to the wings and in

22     its present condition, which does not include

23     degradation of the dust cover.  And since I

24     cannot move the balance since it's attached by a

117

1    screw to the jamb, that I would say it -- I

2    cannot determine the -- since I cannot rotate it

3    myself physically, that it possibly might not

4    infringe.

5  Q.  You cannot determine whether it does or does not

6    infringe.  Is that what you're saying?

7  A.  Because I would like to rotate it like I did with

8    the other two.

9  Q.  Go ahead.  Rotate it.

10  A.  I can't.  It's screwed in.

11  Q.  Well, that's the way you would see it in a window

12    installation, wouldn't you?  Screwed in.

13  A.  Yes, you would.  But again, then I would have to

14    add the proviso over time where it would -- the

15    screw might be -- might be loosened over time.  I

16    do not know what force was applied to the screw,

17    whether it was a typical installation or special

18    installation.  I do not have enough information.

19  Q.  I'm asking you in that particular exhibit, Braid

20    Exhibit 9, and the way it's currently installed,

21    without reference to degradation over time,

22    without reference to loosening of screws, does

23    that Braid Exhibit 9 infringe claim one of the

24    '638 patent?

Exhibit 10

Part 2

118

1  A.  I would just like to add before I make my

2      statement that I'm not sure what torque was used

3      to install the screw and whether it was to any

4      standard or any instruction or where it was made

5      since I have no collection or information as to

6      that event.

7              That given this combination and given

8      the provisos we have talked about, it does not

9      infringe.

10 Q.  Okay.  I wasn't asking you about various torques.

11     I'm asking you about a particular exhibit that

12     you have in your hand.  If you could pick that up

13     again --

14 A.  Right.

15 Q.  I would ask you as it's presently assembled, does

16     Braid Exhibit 9 infringe claim one of the '638

17     patent?

18              MR. SINGER:  Objection.

19 A.  As it's presently assembled, which I have no

20     information as to who did it and where it was

21     taken from and what conditions under which it was

22     assembled, I would say -- I would make a

23     statement that there is -- there is a probability

24     that it does not infringe mainly because I do not

119

1    know where it came from, what condition it was

2    made.

3  Q.  Is it more probable than not that it doesn't

4    infringe?

5  A.  Yes.

6  Q.  Okay.  It is more probable that it does not

7    infringe claim one of the '638 patent?

8  A.  Correct.

9  Q.  With reference to claim eight of the '638 patent,

10    is it more probable than not that Braid Exhibit 9

11    does not infringe claim eight of the '638 patent?

12  A.  Again, I give the same provisos that I gave

13    before.  And that is I cannot tell the width of

14    the wings.  I cannot tell what force was used,

15    what torque was used to install the screw.

16    Whether it was special or under operating

17    conditions or under special conditions.  But

18    given what I see today for the first time, I

19    would say there is a probability it does not

20    infringe.

21  Q.  Which is greater than the probability that it

22    infringes?

23  A.  Correct.

24  Q.  Okay.  That statement is correct as to both

120

1       claims one and eight of the '638 patent?

2  A.  As regards to the combinations of Exhibit --

3       Braid Exhibit 9, is it?  I'm sorry.  Yeah.

4  Q.  When we were concluding -- strike that.  When we

5       were discussing noninfringement, you must find a

6       missing element, correct, an element that is in

7       the claim but not in the device, correct?

8  A.  Correct.

9  Q.  What element is in the claim but not in the

10      product that leads you to conclude at least a

11      probability of noninfringement?

12           MR. SINGER:  Specifically with respect

13      to Braid 9?

14           MR. SLIFKIN:  Yes.

15  A.  Okay.  It's the -- if I look at '638, Exhibit 4,

16      I look at Exhibit 4, column 6, around line 14,

17      and I will read.  "A raised spine positioned

18      between and in the same plane as said inwardly

19      turned opposed flanges of said channel means

20      whereby rotational motion of said mounting means

21      is inhibited."

22  Q.  And in a discussion we've had about probabilities

23      of noninfringement, it is that element that is

24      more probable than not missing in the Braid

171

1    that you refer to and you pointed to does not

2    exist in Exhibit -- sorry.  In Exhibit Still 4B.

3  Q.  And all of the other ones, is there a part that

4    projects either to the right or the left of the

5    flange as you have those oriented on the table in

6    front of you?

7  A.  There is a part that projects outward from the

8    flange surface and the dimensions and the

9    geometry of the associated parts with it differ

10    in every situation.

11  Q.  Right.  But in every situation, is there a part

12    that projects to the -- to your right of the

13    flange in Exhibits Braid 9, Shina 5, Shina 7 and

14    Still 4A?

15  A.  For the record, if I may, I'm noticing four out

16    of the five that were presented to me and the

17    four do have a projection to the right of the --

18    I'm sorry.  To the right of -- what you said.

19  Q.  To the right of the flanges?

20  A.  Of the flanges.  Okay.  Just want to make sure.

21  Q.  That is correct then?

22  A.  Yeah.

23  Q.  Okay.  Are those exhibits as they're sitting on

24    the table in front of you oriented the same way

1      figure 3 is in Exhibit 9, which is the Sterner

2      patent?

3  A.  Okay.  Figure 9?  I'm sorry.

4  Q.  Figure 3 of Exhibit 9.

5  A.  Oh, okay.  Sorry.  Let's see.

6          It shows the -- figure 3 shows the

7      screw being screwed into the jamb wall and that

8      is to the right.  And in this particular case, if

9      I put a screw in the exhibits that you mentioned,

10     they would be going to the left.

11  Q.  All right.  So let me flip them all over so

12     they're oriented now the same way as figure 3 in

13     Shina Exhibit 9.  Now in all of the four, putting

14     aside Still 4B, in Braid 9, Shina 5, Shina 7 and

15     Still 4A, is there a part that's projecting

16     beyond the flange to the left which is visible in

17     each of those frame jamb channels or frame jambs?

18  A.  Yes.  There is a part.

19  Q.  Is it possible that that part that's projecting

20     to the part in each of those four exhibits is the

21     same part you labeled K in figure 3?

22  A.  Part of my answer would be in -- there's no

23     standard drawing procedures to draw an edge.  I

24     notice in figure 3 the line that I marked K is a

173

1    double line.  There is no standard drawing

2    procedures to the meaning of a double line.

3    Usually if it's a feature that is a single

4    feature, which ends in a single edge, that is

5    usually drawn as a single line.

6          In a feature that has in it such as the

7    feature where the double flanges come in where

8    they have two parts terminating at the same

9    point, there is no standardized procedures but

10    it's common in engineering drawings to have a

11    double line when you are trying to convey to the

12    reader the fact that there are two features which

13    end at the same point.

14  Q.  You don't know whether the draftsman of these

15    patent drawings followed that convention or not,

16    do you?

17  A.  I do not know that.

18  Q.  So you cannot conclude with certainty that the

19    item K you have drawn in Exhibit 9 is the flange

20    or is some feature other than the flange?

21          MR. SINGER:  Objection.

22  A.  Conventional wisdom would say that the double

23    line would indicate it's the flange.  However,

24    since the absence of a standard I cannot say with

174

```
 1      extreme certainty, with 100 percent certainty

 2      whether this is -- conventional wisdom would tell

 3      me that that's a flange.

 4               Since you raised that point, I have to

 5      do further study to determine whether it's the

 6      flange or the feature that I see right in front

 7      of me to the left of the flange.

 8  Q.  I'm going to place in front of you what's been

 9      previously marked as Still Exhibit 5.  And other

10      than the plane in which this horizontal surface

11      is found, can you determine whether the device in

12      Still Exhibit 5 is the device drawn in Shina

13      Exhibit 9?

14  A.  Okay.  May I take the device out?

15  Q.  Yes.

16  A.  Thank you.

17               Whoops.  Okay.

18               MR. SINGER:  I'll object to the

19      question.

20  A.  Having seen it for the first time, I would say

21      that it bears a good resemblance to -- that the

22      device I'm looking at in my hand bears a good

23      resemblance to the device shown in Shina Exhibit

24      9.
```

179

1       accept a pin similar to what's shown in the

2       drawing, correct?

3    A. Correct.

4    Q. Any other differences you see?

5    A. Well, figure 12 shows an exploded view of two

6       plastic parts that go around the coil.  And here

7       it looks like it's an assembly.  I would rather

8       not take it apart if you don't want me to.

9    Q. I rather you not take it apart.

10   A. Okay.

11   Q. All right.

12   A. But I'm assuming that this is an assembly of the

13      two parts --

14   Q. Okay.

15   A. -- in figure 12.

16   Q. Can you now slide that assembly back into the

17      channel which you took it out of?

18   A. Okay.  Any particular -- no.

19              Okay.

20   Q. Now you have it assembled, balance and channel,

21      the way I originally handed it to you as Exhibit

22      Still 5, right?

23   A. Okay.  Correct.

24   Q. Is it possible that what you have in front of you

1       as Still Exhibit 5 is the device that's shown in

2       the Sterner patent, which is Shina Exhibit 9?

3                MR. SINGER:  Objection.

4  A.  Except for the -- discussed items of differences

5       between what I see as Still 5 and my figure 12, I

6       would agree.

7  Q.  Now I would ask you to examine the front face of

8       the balance that is between the flanges.  Do you

9       see that?

10        Do you see what I'm talking about?

11  A.  The one that says "down"?  Is that correct?

12  Q.  Yes.  The one with the word "down" on it.  Do you

13       see that?

14  A.  Yes, I do see that.

15  Q.  Okay.  Is that front face with the word "down" on

16       it between and in the same plane as the flanges

17       of that frame jamb?

18  A.  Between and in the same plane, yes.

19  Q.  Is it possible that now that you go back and look

20       at figure 3 of the Sterner patent that what's

21       depicted in Sterner patent figure 3 is in fact

22       Still Exhibit 5 in all material respects?

23                MR. SINGER:  Objection.

24  A.  Okay.  May I put it in here since the contentious

1      line we're talking about is this feature so let

2      me put it where we would think it would be?

3   Q.  Go ahead.  Go right ahead.

4   A.  Okay.

5           Okay.  Now we can repeat the question.

6           (Question read.)

7           MR. SINGER:  Objection.

8   A.  Again, I go back to my comment earlier about the

9      double line, and the double line usually refers

10     to a two feature that coincides as opposed to a

11     single feature.

12  Q.  Is there somewhere where that double line

13     convention is documented in your report?

14  A.  No.

15  Q.  Is there some reference that you would look to to

16     see if that double line convention is truly a

17     convention in the mechanical drawing field?

18  A.  I would have to do some research on that.

19     Looking at drawing books and such but that's a

20     common convention in the industry.

21  Q.  Have you looked at drawing books in connection

22     with the preparation of your reports?

23  A.  No.

24  Q.  The surface that we refer to in the physical

```
 1        exhibits you have there, Still 5, is it between

 2        and in the same plane as the flanges?

 3   A.   This is the surface that you called "down."

 4   Q.   Yes.

 5   A.   Yes.  It is in the same plane.  That surface is

 6        in the same plane as the flanges.

 7   Q.   Is that surface raised from the remainder of the

 8        housing that's holding the coil?  In fact, is it

 9        above the -- a portion of the housing that's

10        holding the coil?

11                  MR. SINGER:  Objection.

12   A.   That surface -- "above" is a term.  An

13        operational term in this case.  I'm going back to

14        figure 12.  So that surface in the operational

15        sense, the way the device sits in there, the

16        surface marked "down" is above the flat surface,

17        which is at the bottom operationally of the

18        device.

19   Q.   So operationally it's a raised surface from

20        another section of the housing, correct?

21                  MR. SINGER:  Objection.

22   A.   "Raised" is a relative term.  So it's a surface

23        that dimensionally sits above the other surface,

24        that's correct.
```

183

```
 1   Q.  All right.  Is it longer than it is wide?

 2   A.  Yes, it is.

 3   Q.  Okay.  Is it rectangular in shape generally?

 4   A.  Generally.

 5   Q.  With a curved top, curved bottom?

 6   A.  Correct.

 7   Q.  Okay.  Other than its length, does it have the

 8       same general configuration as the spine that is

 9       in Shina Exhibit 8?

10   A.  Okay.  Just so I can be perfectly precise so we

11       don't have a misunderstanding, the spine in

12       figure -- I'm sorry.  The spine in --

13   Q.  8?

14   A.  In Exhibit 8 is a feature of a surface which has

15       wings and a spine.  The balance that we have the

16       surface called "down" does not have wings.

17   Q.  But looking only at the surface that has the word

18       "down" on it and looking only at the surface --

19       only at the surface we call the spine, do they

20       have the same general shape?

21   A.  If I talk about geometry, they both are generally

22       rectangular.

23   Q.  Elongated rectangular shape?

24   A.  That's looking at one direction only, yes.  One
```

1    plane only.

2  Q.  In fact, their width is fairly close to one

3    another, correct?

4  A.  I have to examine that, if I may.

5          No.  I believe one is wider than the

6    other.

7  Q.  Which one is wider?

8  A.  Figure 12.  The "down" surface.

9  Q.  The surface on the Shina Exhibit -- I'm sorry.

10    The surface on Still Exhibit 5 --

11  A.  Yeah.

12  Q.  -- is wider?

13  A.  Wider.

14  Q.  In other words, when placed in a frame jamb

15    between the flanges, it would be closer to the

16    flanges than Shina Exhibit 8 would be when placed

17    in the same frame jamb, correct?

18  A.  Depends on the width of the frame jamb.

19  Q.  I'm saying putting them both in the same frame

20    jamb.

21  A.  In the same frame jamb, which at least is wider

22    than --

23  Q.  Yes.

24  A.  The wider one of them.

185

```
 1   Q.   Yes.

 2   A.   What's the question?

 3   Q.   Would the sides of the surface that have the word

 4        "down" written on them be closer to the flanges

 5        than with the sides of the spine in the Caldwell

 6        balance?

 7   A.   When placed in the same --

 8   Q.   Yes.

 9   A.   Theoretically, yes.  That would be true.

10   Q.   Okay.  I would like you to place that back inside

11        --

12   A.   You can do that.

13   Q.   Okay.  I'll do that.  Still Exhibit 5.  And ask

14        you if the flat surface that's between and in the

15        same plane as the flanges would inhibit the

16        rotation of that surface.

17   A.   Again, I would like to say the proviso that we're

18        describing the surface "down" and not the word

19        "spine" or "projection."  As I see this surface

20        "down," marked "down," it would seem to prohibit

21        rotation of the device.

22   Q.   Because it fits snugly within the -- between the

23        flanges, correct?

24   A.   That's correct.
```

1   Q.   If the bottom roller is placed higher up in the

2        channel than it appears in the second page of

3        Exhibit 10, how would that affect the operation

4        of the balance?

5                    MR. SINGER:   Objection.

6   A.   If I look on the third page, and there is the

7        balance travel where the hook comes in, that

8        would affect that dimension.

9   Q.   So in terms of placement of the bottom roller,

10       its placement affects the travel of the balance?

11       Is that what you're saying?

12  A.   That's -- that's one of the issues that I

13       mentioned, yes.

14  Q.   Okay.  The higher up the channel that the bottom

15       roller is placed, is that a shorter or longer

16       length of travel of the balance?

17  A.   The balance -- the higher up the bottom roller,

18       the shorter the balance travel will be.

19  Q.   Why would someone want to have a longer travel,

20       do you know?

21  A.   From the material that I read, it has to do with

22       egress and there are specifications where you

23       would require egress to be longer.  That's one of

24       the -- one of the situations or one of the desire

1      -- design -- design functions that I looked at.

2  Q.  Can you explain what that means?  "For egress

3      purposes."

4  A.  Well, there is standards that apply, from what I

5      have seen, standards that apply to egress.  And

6      also standards that apply in this particular case

7      where there is expanded egress that you could

8      reduce your inventory as I saw.

9  Q.  So with the same inventory of balances, you can

10     get a longer travel.  Is that the point you're

11     making?

12 A.  You could get longer travel and you could stock

13     -- with that balance, you could stock a smaller

14     number of inventory.

15 Q.  Why is egress a concern?

16 A.  According to what I saw, that's a desired

17     situation of design.

18 Q.  What's the concept referring to?  Egress.

19 A.  Egress is the amount of allowable space inside a

20     window.

21 Q.  The opening size?

22 A.  Opening size.

23 Q.  Is there some advantage to a bigger opening?

24 A.  It has to do with fire codes as I recollect.

1   Q.   Can you explain what it has to do with fire

2        codes?

3   A.   I was not concerned about that.  My own expertise

4        is in design.  How design meets requirements.

5   Q.   Okay.  So you don't really have an interest in

6        determining whether a balance meets or doesn't

7        meet fire code when installed in a window?

8              MR. SINGER:  Objection.

9   A.   My interest is in seeing how -- two situations.

10       One, a patent is given and infringement is shown.

11       Other situation, whether the window is used in a

12       ship or a building or a basement, that's not my

13       concern.

14  Q.   If you were a window balance designer for a

15       window balance company, would you be concerned

16       about egress?

17             MR. SINGER:  Objection.

18  A.   You asked me questions specific to fenestration

19       design.  My expertise is in patent infringement

20       and design consideration.  The way -- that's it.

21  Q.   Is egress a design consideration?

22  A.   From reading the -- from reading the evidence in

23       the case or the documents in the case, it seems

24       to be one of the design considerations.

198

```
 1  Q.  Okay.  Would the need for egress requirements
 2      motivate somebody to make changes to a balance in
 3      the industry?
 4  A.  It seems that this would be a design requirement
 5      -- not a design requirement but a design -- what
 6      I would call high want.  Meaning you can have --
 7      when you're designing something, you can have
 8      musts.  You must meet certain criteria.  And
 9      there's wants.  You want to meet other criteria
10      to the best of your ability as a designer.
11  Q.  Okay.  So the balance designers would have a high
12      want, in your terms, of increasing the opening
13      size of a window?
14  A.  Correct.
15  Q.  So there's a need to increase the opening size;
16      is that correct?
17  A.  Correct.
18  Q.  And in terms of the window industry, do you know
19      how that need would get expressed to the window
20      balance designer?
21              MR. SINGER:  Objection.
22  A.  In my examining of the depositions of the
23      principals from the Caldwell company, it seems to
24      me the management of the engineering department
```

**EXHIBIT 11**


**FILED UNDER SEAL**

Exhibit 12

C O N F I D E N T I A L

1

1

2                    UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
3      - - - - - - - - - - - - - - - - - - - -x
       AMESBURY GROUP, INC., and
4      AMESBURY SPRINGS LTD.,
                    Plaintiffs,
5
                   v.      Civil Action No. 05-10020-DPW
6
       THE CALDWELL MANUFACTURING
7      COMPANY,
                    Defendant.
8      - - - - - - - - - - - - - - - - - - - -x
                   C O N F I D E N T I A L
9
       <u>Videotaped Deposition Upon Oral Examination Of</u>:
10                    Douglas Zinter

11

12     <u>Location</u>:      Harris Beach PLLC
                          99 Garnsey Road
13                        Pittsford, New York   14534

14     <u>Date</u>:          October 20, 2005

15

16     <u>Time</u>:          9:40 a.m.

17

18

19     <u>Reported By</u>:   Joanne N. Pero

20                        Alliance Shorthand, Inc.

21                        Suite 1500 - The Penthouse

22                        Alliance Building

23                        183 Main Street East

24                        Rochester, New York   14604

25

CONFIDENTIAL

21

DOUGLAS ZINTER - BY MR. SINGER

1

2    of the balance would be beneficial in a PVC window

3    application.

4        Q.   How did you come to that conclusion?

5        A.   Simply by coming up against situations

6    where we were having difficulty passing a building

7    code for egress opening.

8        Q.   Are there particular situations that you

9    can recall that led you to that conclusion?

10       A.   I don't recall the specific situation,

11   no.  I would say it was more of a general

12   realization.

13       Q.   And you say this was in the mid 1990s?

14       A.   Approximately.

15       Q.   Did you record this idea in any paper

16   form when you first thought of it?

17       A.   Not to my knowledge.

18       Q.   Did you discuss the idea with anyone in

19   the mid 1990s?

20       A.   Yes, I recall discussing it with two

21   members of the Engineering Department.

22       Q.   Who were those two members?

23       A.   Jim Martini and Richard deNormand.

24       Q.   Is Jim Martini still with Caldwell?

25       A.   He is not.

C O N F I D E N T I A L

22

1              DOUGLAS ZINTER - BY MR. SINGER

2       Q.    Do you know where he is now?

3       A.    I don't.

4       Q.    What was his position at Caldwell at the

5    time?

6       A.    He was a design engineer.

7       Q.    And Mr. deNormand is with Caldwell still,

8    correct?

9       A.    Yes, he is.

10      Q.    What do you recall telling Jim Martini

11   about your idea for the elongated side of the

12   bottom guide and repositioning the lower pulley?

13      A.    We talked about the ways that it would be

14   beneficial in a window application and in a

15   functional sense, we talked about how that would

16   provide extra travel in the balance and improve the

17   overall fit of the balance in a PVC sash.

18      Q.    Did you have a discussion with Mr.

19   Martini and Mr. deNormand at the same time or did

20   you have separate discussions with them?

21      A.    I don't recall.

22      Q.    What was the reaction of Mr. Martini to

23   your idea?

24      A.    I think we all agreed that the idea had

25   some merit, that we saw the advantages of it.

C O N F I D E N T I A L

23

1          DOUGLAS ZINTER - BY MR. SINGER

2      Q.   Mr. deNormand had the same reaction?

3      A.   I believe so, yes.

4      Q.   Did you pursue that idea in any way in

5  the mid 1990s?

6      A.   Not in a major way.

7      Q.   Why not?

8      A.   We weren't able to create an economic

9  justification in the market to support the

10  development costs for a product of that sort.

11     Q.   You say you didn't pursue it in a major

12  way.  What do you mean by that?

13     A.   Well, I think the idea was perhaps

14  generally discussed with managers higher up in the

15  company and there was really no encouragement given

16  to pursue the idea further.

17     Q.   And you say your idea included both the

18  elongated side of the bottom guide and a

19  repositioning of the lower pulley?

20     A.   Yes.

21     Q.   Did you discuss this idea with anyone

22  else besides Mr. Martini and Mr. deNormand?

23     A.   Those are the people that I recall

24  specifically.

25     Q.   So is it fair to say after your

C O N F I D E N T I A L

24

1            DOUGLAS ZINTER - BY MR. SINGER
2     discussions in the mid 1990s, you came to the
3     conclusion that there really wasn't an economic
4     justification for pursuing that particular
5     development at that time?
6          A.   The company was not -- was not really
7     willing to fund any development.
8          Q.   Caldwell, of course, did eventually
9     develop the 86xt balance, correct?
10         A.   Yes, we did.
11         Q.   When was the idea raised again for
12    developing that product?
13         A.   Well, this -- the idea really started to
14    gain momentum in I guess it was about June of 2000
15    and really that began with discussions I had with
16    Carl Shelton who was an engineer for Solar
17    Industries.  And Solar Industries was in the
18    process of developing a new window design and in
19    the process of working out the sash balance
20    application from design drawings, I pointed out to
21    Carl Shelton that we had difficulty in meeting an
22    egress opening on their emergency escape window
23    size which is typically in the industry, it's a
24    window size of about 36 inches wide by 60 inches
25    tall.  So it was at that point in time that we

CONFIDENTIAL

25

1              DOUGLAS ZINTER - BY MR. SINGER
2      began having discussions concerning the sash
3      balance application.
4              Q.   Did Caldwell have a relationship with
5      Solar Industries at that time?
6              A.   Yes, we were their sash balance supplier.
7              Q.   Do you know when Caldwell's relationship
8      with Solar Industries started?
9              A.   I am afraid I couldn't give you an exact
10     date.  There was a company which preceded Solar
11     Industries called Joe Keith Industries, they were a
12     customer of Caldwell's.
13             Q.   You said Joe Keith?
14             A.   Joe Keith Industries.  But they had been
15     a customer for some time.
16             Q.   Is Solar Industries still a customer of
17     Caldwell?
18             A.   If they are, it's only in a very small
19     way.
20             Q.   Why has that relationship become smaller?
21             A.   They began purchasing the major sash
22     balance needs from our competitor.
23             Q.   What competitor was that?
24             A.   Balance Systems.
25             Q.   When did Solar Industries start

Exhibit 13

1

1

2               UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
3       - - - - - - - - - - - - - - - - - - -x
     AMESBURY GROUP, INC., and
4    AMESBURY SPRINGS LTD.,
                    Plaintiffs,
5
            v.      Civil Action No. 05-10020-DPW
6
     THE CALDWELL MANUFACTURING
7    COMPANY,
                    Defendant.
8       - - - - - - - - - - - - - - - - - - -x
                C O N F I D E N T I A L
9
     Videotaped Deposition Upon Oral Examination Of:
10                 Thomas F. Batten

11
     Location:    Harris Beach PLLC
12                99 Garnsey Road
                  Pittsford, New York   14534
13

14   Date:        November 8, 2005

15

16   Time:        9:37 a.m.

17

18

19   Reported By:    Joanne N. Pero

20                   Alliance Shorthand, Inc.

21                   Suite 1500 - The Penthouse

22                   Alliance Building

23                   183 Main Street East

24                   Rochester, New York   14604

25

131

THOMAS F. BATTEN - BY MR. SINGER

Q.   Where in the channel is that rivet
located?

A.   It's at that -- near that same end of the
balance as the carrier.

Q.   Does it touch the carrier in any way?

A.   No.

Q.   When you say "near that end of the
balance," could you -- is there something on
Exhibit 9 -- is there an area on Exhibit 9 where
you could --

A.   It's not shown in the Exhibit 9 images.

Q.   Even if it's not shown in Exhibit 9,
could you give an approximation as to where that
rivet is located?

MR. SLIFKIN:   Objection.

A.   Approximately, I would say, one half to
three quarters of an inch to the right of the joint
between the channel and the carrier body.

Q.   Can you draw an arrow on Exhibit 9
pointing to the approximate location that you just
identified, mark that with an F?

A.   (The witness complied.)

Q.   Now, on Exhibit 9, you have marked the F
on the carrier -- strike that.

Exhibit 14

1

1

2                    UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
3      - - - - - - - - - - - - - - - - - - - - -x
       AMESBURY GROUP, INC., and
4      AMESBURY SPRINGS LTD.,
                     Plaintiffs,
5
               v.       Civil Action No. 05-10020-DPW
6
       THE CALDWELL MANUFACTURING
7      COMPANY,
                     Defendant.
8      - - - - - - - - - - - - - - - - - - - - -x
              C O N F I D E N T I A L
9
       Deposition Upon Oral Examination Of:
10                     Wilbur J. Kellum

11

12     Location:    Harris Beach PLLC
                    99 Garnsey Road
13                  Pittsford, New York  14534

14     Date:        October 28, 2005

15

16     Time:        9:36 a.m.

17

18

19     Reported By:  Joanne N. Pero

20                   Alliance Shorthand, Inc.

21                   Suite 1500 - The Penthouse

22                   Alliance Building

23                   183 Main Street East

24                   Rochester, New York  14604

25

144

1                WILBUR J. KELLUM - BY MR. EDWARDS
2          EXAMINATION BY MR. EDWARDS:
3               Q.   Mr. Kellum, when the 97ez balance is
4          installed in a window, does the carrier rotate?
5               A.   No.
6               Q.   And when installed in a window, does the
7          carrier of the 97ez balance touch the rivet that is
8          the attachment point for the spring in any way?
9               A.   That is the -- what we had previously
10         referred to today as the second rivet?
11              Q.   Correct.
12              A.   No, it does not touch it.
13              MR. EDWARDS:   Thank you.   That's all I
14         have.
15              MS. ISHMAEL:   No redirect.
16                   (TIME:  3:14 p.m.)
17
18
19
20
21
22
23
24
25

Exhibit 15

IN THE HIGH COURT OF JUSTICE 
QUEENS BENCH DIVISION

IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER
JURISDICTIONS) ACT 1975

and

AND IN THE MATTER OF AN APPLICATION PURSUANT TO CPR PART 34

IN THE MATTER OF A PROCEEDING NOW PENDING IN THE UNITED
STATES DISTRICT COURT OF THE DISRICT OF MASSACHUSETTS

AMESBURY GROUP INC.,    Civil Action No. 05-10020(DPW)
and
AMESBURY SPRINGS LTD.   [Assigned to Hon Douglas P. Woodlock]
        Plaintiff,

                    -v-

THE CALDWELL MANUFACTURING COMPANY
        Defendants

  Deposition, in the presence of an Examiner, of:

        SIMON CHRISTOPHER BRAID

            taken at:
        The offices of:
         Wragge & Co LLP
       3 Waterhouse Square
          142 Holborn
            London
         UNITED KINGDOM

              on
        30th November 2005

1    Q    Is that right?

2    A    Correct.

3    Q    "... of said channel means whereby

4    rotational motion of said mounting means is

5    inhibited".

6                Okay.  My question is; what is it

7    that prevents rotation?

8    A    Anything that comes into contact with the

9    channel 104, yes, anything that comes into contact

10   with channel 5, be it raised plane or the side

11   pieces, because we -- yes.

12   Q    Where does it say, "The side pieces"?

13   A    So, your question was; what stops it

14   rotating?

15   Q    Yes.  In this sentence.  What is it in

16   this sentence that we have just read, claim 1, that

17   prevents rotation?

18   A    It refers to, "Inwardly" -- the raised

19   spine position between the same plane will hit the

20   opposed flanges of the said channel to stop

21   rotation.

22   Q    Right.  So the spine serves that function;

23   right?

24   A    In that particular instance.

25   Q    Now, I would like to go down to the bottom

```
 1            MR. EDWARDS:  Yes.  With your pen, mark
 2       that with an A, and how about today's date?  It
 3       is the 30th, and similarly, for the record, you
 4       have placed a white sticker, with a letter A
 5       and today's date on what you have just
 6       described as the spine; correct?
 7       A    Correct.
 8       Q    And does the spine touch -- well, let me
 9  ask you another question first.  Do you see flanges
10  as part of the jamb?
11       A    I do see flanges.
12       Q    Does the spine touch the flanges?
13       A    In this particular instance it doesn't.
14            THE EXAMINER:  Should the flanges be
15       marked if they can be marked?
16            MR. EDWARDS:  They are even narrower than
17       the spine, but I think that --
18            THE EXAMINER:  If Mr. Singer is happy that
19       they are not marked?
20            MR. EDWARDS:  Mr. Singer, do we all agree
21       what the flanges are?
22       A    Yes, they don't touch in this instance.
23            MR. SINGER:  We will stipulate to what the
24       flanges are on this exhibit.
25            MR. EDWARDS:  All right.  And with that,
```

**EXHIBIT 16**

**FILED UNDER SEAL**