IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMESBURY GROUP, INC., and AMESBURY SPRINGS LTD., | |
| Plaintiffs, | |
| v. | Civil Action No.  05-10020-DPW |
| THE CALDWELL MANUFACTURING COMPANY, | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

**AMESBURY'S OPPOSITION TO CALDWELL'S MOTION TO EXCLUDE EXPERT TESTIMONY AND TO STRIKE EXPERT REPORTS AND HEARSAY STATEMENTS FROM AMESBURY'S MOTION FOR SUMMARY JUDGMENT**

The Court should deny Caldwell's motion to exclude the testimony of Dr. Sammy Shina. Dr. Shina is a highly qualified university professor whose opinions in this case rest on a reliable foundation and concern subject matter squarely within his area of expertise – mechanical engineering.  Dr. Shina has offered his opinions that Caldwell's mechanical balance products infringe three Amesbury patents and that the alleged prior art references that Caldwell relies upon do not invalidate the claims of these patents.  In reaching his opinions, Dr. Shina, who is a licensed professional engineer, drew upon his extensive formal education as a mechanical engineer, his years of teaching as a professor of mechanical engineering, and his many years of practical experience as a mechanical engineer in the private sector.  In addition, Dr. Shina scrutinized Caldwell's detailed engineering drawings of the accused products, examined a number of the accused balances, reviewed deposition testimony of Caldwell's witnesses, and evaluated Caldwell's alleged prior art references.  Dr. Shina's opinions thus are both relevant and reliable.

Caldwell's principal complaint is that Dr. Shina lacks experience in the specific field of window design. Caldwell, however, ignores the fact that Dr. Shina's opinions address mechanical, force transmission components, such as pulleys, springs, and cords, as to which he indisputably is an expert based on his years of education, training and experience. These basic components are familiar to those in the mechanical engineering field and are not at all unique to the window business. Caldwell also attempts to impugn Dr. Shina's qualifications by citing deposition testimony in which Caldwell quizzed him on the details of a spring equation. Dr. Shina's ability to recall specific formulas at his deposition is irrelevant. More importantly, neither Dr. Shina nor Caldwell's own expert relied on this spring equation in their opinions in this case. Indeed, Caldwell's expert relied on *the same* geometric method of analysis as Dr. Shina.

In a further effort to evade Dr. Shina's opinions, rather than confront them substantively, Caldwell asks the Court to strike the expert reports that Amesbury included as exhibits to its motion for summary judgment. Dr. Shina's expert reports, however, were authenticated by an attorney's declaration that Amesbury submitted with its summary judgment papers. Moreover, Dr. Shina's reports memorialize the opinions that Dr. Shina will present at trial, and Caldwell used these expert reports to question Dr. Shina about his opinions during his deposition. Nevertheless, Amesbury submits herewith a declaration by Dr. Shina identifying his reports and attesting to the veracity of the opinions contained in those reports.

Last, Caldwell's attempt to strike Exhibit 38 to Amesbury's summary judgment motion is without merit because the exhibit was authenticated by an attorney's affidavit, and the exhibit will be an admissible business record at trial.

**I.     DR. SHINA IS WELL-QUALIFIED TO OPINE
ON THE MECHANICAL BALANCE PRODUCTS AT ISSUE,
<u>AND HIS EXPERT REPORTS REST ON A RELIABLE FOUNDATION.</u>**

In screening expert witnesses under Fed. R. Evid. 702 and the controlling <u>Daubert</u> standard, courts in the First Circuit perform a three-pronged analysis.  <u>See</u> <u>Ed Peters Jewelry Co.</u> <u>v. C & J Jewelry Co.</u>, 124 F.3d 252, 259 (1st Cir. 1997); <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993).  First, the court determines whether the expert is qualified to offer an opinion based on either knowledge, skill, experience, training, or education.  <u>Id.</u>  Second, the court evaluates whether the proposed expert's testimony rests on a reliable foundation and is relevant to the case.  <u>Id.</u>  Third, the court must determine whether the expert's testimony concerns scientific, technical, or other specialized knowledge.  <u>Id.</u>  Caldwell challenges Dr. Shina's expert opinions under the first two prongs and offers no argument on the third. Caldwell's challenge is meritless because Dr. Shina has years of experience as a mechanical engineer, is a registered professional engineer, has a Ph.D. in, and is a professor of mechanical engineering, and is therefore qualified as an expert on the mechanical balance products at issue in this case.  Furthermore, Dr. Shina rigorously examined numerous, detailed engineering drawings of the products at issue, samples of several of the products themselves, and the alleged prior art references at issue, thus establishing a reliable foundation for his opinions.

**A.  Dr. Shina's Education, Training, And Experience
<u>Qualify Him To Opine On The Mechanical Structures At Issue.</u>**

**1.     Dr. Shina Has Impeccable Credentials
<u>In The Field Of Mechanical Engineering.</u>**

Dr. Shina is a tenured Professor of Mechanical Engineering at the University of Massachusetts (Lowell), has a Ph.D. in Mechanical Engineering from Tufts University, and holds Bachelor's and Master's degrees from MIT and WPI , respectively.  (<u>See</u> Dr. Sammy

Shina's Curriculum Vitae ("Shina CV") (attached to Ex. 1, Declaration of Sammy Shina, Ph.D.,

at Exhibit 3), at 1.)  Dr. Shina is also a registered Professional Engineer in Massachusetts, and

has published numerous scholarly papers and text books in the field. (Shina CV, at 3, 9 - 17.)

Dr. Shina has also taught courses in mechanical engineering to both undergraduate and graduate

students.  (Shina CV, at 22 – 34.)

Caldwell's claim that Dr. Shina is not a "nuts and bolts" mechanical engineer is wrong.

For instance, Dr. Shina testified that he took mechanical engineering courses in the process of

obtaining his Ph.D.:

> Q.  Was there course work involved in obtaining the Ph.D. in addition to that?
>
> A.  Yes.
>
> Q.  Did you have courses in mechanical engineering?
>
> A.  Yes.

(Ex. 2, Shina Dep., 05/03/2006, 8:22 – 9:2.)

Furthermore, Dr. Shina has extensive industry experience as a mechanical engineer,

including seventeen years of experience in mechanical engineering at Hewlett Packard's

Waltham, Massachusetts division:

> Q.  . . . Did your work at Hewlett-Packard involve mechanical engineering?
>
> A.  Yes.
>
> Q.  What percentage of the time you spent working at Hewlett-Packard was devoted to mechanical engineering?
>
> A.  I was there for 17 years so obviously it varied. It varied from 100 percent to 25 percent.

(Ex. 2, Shina Dep., 12:18 – 13:1.)

**2.      The Claimed Mechanical Balances Are Not Windows,
And Experience In The Window Business Is Irrelevant.**

The patent claims on which Dr. Shina opines relate to balances that consist of, among other things, springs, pulleys, cords, connecting devices, and balance shoes.  (See generally, Shina March 23 Report (attached to Ex. 1, Declaration of Sammy Shina, Ph.D., at Exhibit 1); Shina April 18 Report (attached to Ex. 1, Declaration of Sammy Shina, Ph.D., at Exhibit 2.).) With one exception, the claimed inventions are simple stand-alone mechanical devices and are not window assemblies.  Thus, Caldwell's criticism that Dr. Shina lacks experience in the window field is a red herring.

For example, an exemplary claim that Dr. Shina discusses in his opinions is independent claim 2 of Amesbury's '368 patent that claims a stand-alone mechanical device including, among other things, a U-shaped channel, a cord, a system of pulleys, and a balance shoe with an enlarged end.  (Shina March 23 Report, at 32-35.)  Claim 2, and indeed all of the '368 patent claims, are directed to stand-alone balance products, and do not encompass a window, or the installation of the balance product in a window. (See Ex. 3, '368 Patent, cls. 1 – 11.)  The accused Caldwell Series 97ez product that Dr. Shina opines infringes claim 2 and other claims of the '368 patent, is shown below.  As is clear from the picture, the product is a mechanical device, not a window or window assembly:



With respect to the '264 patent, Dr. Shina discusses several claims, including claim 1, which is directed to a stand-alone mechanical device including, among other things, a channel,

top and bottom guides, a fixed pulley block unit, a spring, and a cord. (Shina March 23 Report, at 22-23.) Like the claims of the '368 patent, claim 1 of the '264 patent claims neither a window nor the installation or operation of the product in a window. (See Ex. 4, '264 Patent, cl. 1.) All of the other '264 patent claims that Dr. Shina addresses are similarly directed to stand-alone balance products, with the sole exception of claim 12.[1] The Caldwell Series 86xt balance product that Dr. Shina opines infringes claims of the '264 patent is shown below:



With respect to the third asserted patent, Amesbury's '638 patent, an exemplary claim that Dr. Shina discusses in his opinions is independent claim 1, which claims a jamb pocket ("channel means"), a support ("support means"), a coiled ribbon spring, and a mounting element ("mounting means"). (See Shina March 23 Report, at 23-31.) Claim 1 does not claim a window assembly and neither do any of the other claims of the '638 patent. (See Ex. 5, '638 Patent, cls. 1 – 8.) While the claims of the '638 patent encompass a balance product installed in a jamb pocket, the claims do



---

[1] Claim 12 of the '264 patent is directed to a window assembly comprising a similar balance product that is attached to a window sash. (See Ex. 4, '264 patent, cl. 12 (claiming that the balance product is "attached to the at least one of the upper window sash and the lower window sash . . .").)

not encompass a window sash or window assembly.  Id.  A picture of the Quick-Tilt*nc balance

product (Caldwell Doc. Prod. No. C 00532), installed in a jamb pocket, which Dr. Shina opines

infringes claims of the '638 patent, is shown above.

Contrary to Caldwell's assertion, to offer an opinion on a mechanical product, an expert

need not have specific prior experience with that particular field of products; general mechanical

engineering background is sufficient.  See Chapman v. Bernard's Inc., 167 F. Supp.2d 406, 421

(D. Mass. 2001) (holding that a general mechanical engineering background was sufficient

qualification for an expert to opine on the design of beds where the expert had no prior

experience with bed manufacture or design).  Here, Mr. Shina's extensive experience in the field

of mechanical engineering qualifies him to offer his opinions regarding the mechanical structures

at issue and the prior art.  Indeed, Caldwell has failed completely to explain why window

industry experience is required to opine on the validity and infringement of the patent claims in

this case.  For example, Caldwell has failed to show why Dr. Shina is not qualified to identify the

presence or absence, in products or in prior art references, of, "a pocket . . . adapted to mate with

a rivet," and a "connecting device,"  --  the only disputed elements of the claims in the '368

patent.  (See Ex. 6, Still Dep. 139:14 – 140:4.)  Caldwell has also failed to show why Dr. Shina,

is not qualified to identify the presence or absence of "a bottom guide roller rotatably mounted in

the bottom guide," -- the only disputed element of the claims of the '264 patent.  (See Ex. 6, Still

Dep. 127:6 – 25.)  Caldwell similarly has failed to show why window industry experience is

necessary for an expert to opine on the disputed "whereby rotational movement of said [the]

mounting means is inhibited" element of the claims of the '638 patent. (See Ex. 6, Still Dep. 78:8

– 18.)

An opinion on infringement of a patent claim requires a showing that the accused product includes each element of the claim, or its substantial equivalent.  See, e.g., Zygo Corp. v. Wyko Corp., 79 F.3d. 1563, 1568 (Fed. Cir. 1996).  Conversely, a determination of validity of a patent claim requires a showing that a prior art reference, or a combination of prior art references, lack at least one element of the patent claim.  See, e.g., Apple Computer, Inc. v. Articulate Sys., Inc., 234 F.3d 14, 20 (Fed. Cir. 2000) (anticipation of a claim requires a showing that a single prior art reference discloses each and every limitation of a claimed invention); 35 U.S.C. § 103 (a patent claim can be invalid as obvious if it claims an invention that would be obvious in view of the combined teachings of the prior art).  Given his mechanical engineering expertise, Dr. Shina is fully qualified to provide an expert opinion on the presence of the claimed mechanical components in the accused devices and the absence of those mechanical components in alleged prior art references.[2]

In Chapman v. Bernard's Inc., 167 F.Supp. 406 (D. Mass. 2001), the court denied a motion to disqualify an expert in a products liability case concerning the design of a bed.  The expert was a mechanical engineer who had no prior experience or expertise with beds, but the court nevertheless refused to disqualify the expert.  Id. at 421.  According to the court, "general engineering experience [was] sufficient because the design defect at issue turn[ed] on the interaction of metal tubes, bolts, springs, and various stresses thereon" and was "the subject of basic engineering expertise."  Id.  In the present case, Dr. Shina requires no prior expertise in the

---

[2] Window experience is also unnecessary for an expert to opine on claim 12 of the '264 patent, although claim 12, unlike all of the other claims Dr. Shina opines upon, claims a balance product installed in a window assembly.  The claimed window assembly is a mechanical structure, and a mechanical engineering expert is more than qualified to opine on not only the mechanical components of the balance product itself, but also on its attachment to a sash. Indeed, specialized knowledge of a particular product is not needed to qualify a witness as an expert.  See Fed. R. Evid. 702 (requiring only that the expert testimony must be able to "assist the trier of fact to understand the evidence or to determine a fact in issue").  Given his considerable expertise in mechanical engineering, Dr. Shina qualifies as an expert witness with respect to the all the claims at issue, including claim 12 of the '264 patent.

window business because his opinions are based on the presence or absence of mechanical components and their physical connections with each other in mechanical devices. Like the expert in <u>Chapman</u>, Dr. Shina's general mechanical engineering expertise qualifies him as an expert witness in this case.

In several other cases, courts have rejected the suggestion that a lack of experience in designing or manufacturing a particular mechanical product is sufficient to disqualify an expert with general mechanical engineering expertise. For example, in <u>Da Silva v. American Brands, Inc.</u>, 845 F.2d 356 (1st Cir. 1988), the court upheld a ruling that a mechanical engineer was qualified as an expert on the safety of an industrial mixing machine's design although he had no experience in the design of the machine in question. <u>Da Silva</u>, 845 F.2d at 361; <u>see</u> <u>also</u> <u>Alfred v. Caterpillar, Inc.</u> 262 F.3d 1083 (10th Cir. 2001) (mechanical engineer who had no experience with road pavers is qualified to provide expert testimony relating to variable speed control mechanism standards in pavers); <u>Scordill v. Louisville Ladder Group, LLC.</u>, 2003 U.S. Dist. LEXIS 19052, 1-5 (D. La. 2003) (mechanical engineer is qualified to provide expert testimony relating to the failure of a ladder even though he had never designed or manufactured a ladder).

In <u>Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.</u>, 315 F. Supp. 2d 589, 601-602 (D. Del. 2004), a patent case, the court ruled that a Ph.D. in mechanical engineering, who was also a licensed professional engineer, was qualified as an expert on the design of a razor even though he had no expertise in razor design. The court noted that, given the expert's academic training and work experience, the expert "certainly possess[ed] skill or knowledge greater than the average layman, the minimum requirement to qualify as an expert under Rule 702." <u>Id.</u> at 602. And in <u>Eaton Corp. v. Parker-Hannifin Corp.</u>, 292 F. Supp. 2d 555, 567 (D. Del. 2003), the court rejected an argument that an expert was not qualified to testify on quick-connect hydraulic

couplings.  The court pointed to the expert's bachelor of science degree in mechanical engineering and noted that the expert's specialized technical education and extensive practical experience suggested that his understanding of hydraulic couplings would far exceed the knowledge of an ordinary juror.  Id.

Moreover, the cases Caldwell cites for the proposition that Dr. Shina should be disqualified do not support Caldwell's position.  For example, Whiting involves the causal relationship between a radiation dose and the induction of acute lymphocytic leukemia.  The first expert excluded in Whiting was an *epidemiologist* who relied on dosimetry to attempt to reconstruct the amount of radiation that may have caused the plaintiff's cancer.  Whiting v. Boston Edison Co., 891 F.Supp. 12,17 (D. Mass. 1995).  The expert acknowledged, however, that dosimetry (the science of determining the radiation dose received by persons who work with radioactive materials) is a methodology used by health physicists and not epidemiologists.  Thus the court struck the expert's testimony because he was not qualified in the area of health physics and radiation epidemiology.  Id. at 17, 25.  The second expert in Whiting also had no expertise or background in health physics and radiation epidemiology.  Id. at 25.  The court in Whiting disqualified these proffered experts not because they lacked specific expertise in lymphocytic leukemia, but because they were not experts in the relevant fields of health physics and radiation epidemiology.  Consistent with Whiting, in this case an expert need not have experience in the narrow area of window construction.  Rather, what is important is that the expert have expertise in the relevant field of mechanical engineering.

Caldwell also cites Tokio Marine, but in that case the proposed crane expert had only a civil engineering degree and no mechanical engineering degree.  See Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co., 958 F.2d 1169, 1173 – 74 (1st Cir. 1992).  Indeed, the district court in

<u>Tokio Marine</u> noted that a suitable expert would either have vast experience in the design and manufacture of cranes or would be a *mechanical engineer*. <u>See</u> <u>Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.</u>, 762 F.Supp. 1012, 1018 (D.P.R. 1991).

Additionally, the court in <u>Jesionowsky</u>, upon which Caldwell relies, held that a qualified polygraph examiner could not testify about the underlying theory behind polygraph examinations. <u>Jesionowsky v. Beck</u>, 955 F.Supp. 149, 150 (D. Mass. 1997). According to the court, evaluating the theoretical basis underpinning polygraph tests required expertise in physiology and psychology, which the proffered expert did not have. <u>Id.</u> In contrast, in the present case, mechanical engineering furnishes the theoretical basis for window design, and Dr. Shina is an expert on that subject.

<u>Smith</u>, <u>Bogosian</u>, <u>Hochen</u>, and <u>Polaino</u> also do not support Caldwell's motion. In <u>Smith</u>, the court held that while a former auto industry worker with a certificate in fire management was qualified to render an expert opinion on the possible causes of a fire, he could not testify regarding the design of the truck's fuel or electrical systems due to his lack of engineering experience. <u>Smith v. Ford Motor Co.</u>, 882 F. Supp. 770, 772 (N.D. Ind. 1995). Similarly, in <u>Bogosian</u>, the court affirmed the exclusion of expert testimony on an automobile transmission design partially because the proffered expert did not possess an engineering degree. <u>See</u> <u>Bogosian v. Mercedes-Benz of North America, Inc.</u>, 104 F.3d 473, 477 (1st Cir. 1997). In <u>Hochen</u>, the court upheld a lower court's decision that an expert in electronic controls did not qualify to testify about the cause of a fire because he had no knowledge regarding the fields of fires and explosions. <u>Hochen v. Bobst Group</u>, 290 F.3d 446 (1st Cir. 2002). Similarly, in <u>Polaino</u> the court upheld a ruling that a chemist was not qualified to render an expert opinion on a mixing machine because the chemist had no education in mechanical engineering and had

never designed a mechanical device.  Polaino v. Bayer Corp., 122 F. Supp. 2d 63, 68-69 (1st Cir. 2002).[3]  Here, by contrast, Dr. Shina possesses a mechanical engineering degree, mechanical engineering experience, and extensive knowledge regarding the mechanical structures and forces at issue.

> ### 3.    Caldwell's Own Balance Product Engineers Had No Prior Window Industry Experience And <u>Only General Mechanical Engineering Expertise.</u>

Caldwell's assertion that experience in the window business is required to understand the balances at issue is disproven by the resumes of several Caldwell employees.  Caldwell's balance product design engineers testified that they began designing balance products shortly after entering the field from other nonrelated mechanical engineering fields.  For example, Tom Batten, a professional engineer with a B.S. in Mechanical Engineering, testified that he became Caldwell's Vice President of Engineering, a position relating to the design and development of Caldwell balance products, (Ex. 7, Batten Dep., 11/08/2005, 7:17 – 8:19, 9:13-19), after leaving his position in the division of a company that manufactured and designed medical instrumentation  (Ex. 7, Batten Dep., 5:15-21).

In fact, Batten testified that before becoming Caldwell's Vice President of Engineering, he had no prior experience in the window balance industry:

> Q.   Have you ever worked for any other employer that makes
> window balances prior to moving to Caldwell in 1995?
>
> A.   No.

(Ex. 7, Batten Dep., 7:9 – 12.)

Furthermore, Jeffrey Robertson who has a B.S. in Mechanical Engineering and is one of the designers of the accused Quick-Tilt*nc and Series 97ez balance products, testified that he

---

[3] Perkins is also irrelevant here because it holds only that the decision below was "not manifestly erroneous" under

began designing Caldwell constant force balances[4] as a Caldwell product engineer after leaving his position as an engineer at Eastman Kodak. (Ex. 8, Robertson Dep., 11/29/2005, 7:13 – 9:23.) Like Batten, Robertson had no experience in the window industry prior to designing balance products at Caldwell. (See Ex. 8, Robertson Dep., 6:17 – 9:8.)

### 4.    Caldwell's Argument About "F=kx" Is Irrelevant.

Caldwell's petty argument that Dr. Shina's knowledge is deficient because he was not certain how a general spring equation, "F=kx" applied to one of the products in the case is unfounded. Neither Dr. Shina nor Caldwell's expert, Charles Still, relied on the equation "F=kx" in their expert reports. Caldwell has not shown, and indeed cannot show, why this equation is at all relevant to Dr. Shina's analysis or opinions. Moreover, Dr. Shina made clear that to resolve any uncertainties about this formula he could easily refer to his reference materials. (Ex. 2, Shina Dep., 70:15 – 19, 71:7 – 13.)

### B.  DR. SHINA'S EXPERT REPORTS HAVE A RELIABLE FOUNDATION.

Dr. Shina extensively reviewed numerous Caldwell engineering drawings related to the accused products and, in most cases, examined actual samples of the accused products before forming his opinion as to whether these products contained the mechanical components recited in the asserted claims. (See Ex. 2, Shina Dep., 22:11 – 24; Shina March 23 Report, at 1 - 5.) Similarly, Dr. Shina examined the alleged prior art references in this suit and compared them to the claims on which he opined. (See Shina April 18 Report, at 1, 10.) Thus, Dr. Shina's opinions rest on facts that provide a solid, reliable foundation.

---

the Fifth Circuit's standard of review. Perkins v. Volkswagen of America, Inc., 596 F.2d 681, 682 (5th Cir. 1979).

[4] The accused Caldwell Quick-Tilt*nc is a type of constant force balance.

Caldwell's argument on the foundation prong of the <u>Daubert</u> analysis is limited to Dr. Shina's infringement opinion regarding claims 1 and 8 of the '638 patent as applied to the Caldwell Quick-Tilt balance. These claims recite "whereby rotational motion of said [the] mounting means is inhibited," and Dr. Shina discusses this element at pages 11 – 14 and 18 – 21 of his March 23 Report (attached to Ex. 1, Declaration of Sammy Shina, Ph.D., at Exhibit 1). Caldwell complains only that Dr. Shina did not examine a Caldwell Quick-Tilt balance mounted in a jamb with a mounting screw. Caldwell disregards that Dr. Shina examined the Caldwell Quick-Tilt balance mounted in a jamb, albeit without a mounting screw, and that he examined Caldwell drawings showing the product installed with the mounting screw. (<u>See, e.g.</u>, Shina April 18 Report, at 18 (stating that in Caldwell document production No. C000532, "a fixing screw is clearly shown to be used to fasten the Caldwell [Quick-Tilt] products to the window jamb").) Moreover, Dr. Shina plainly took the mounting screw into account in his opinion and concluded from his mechanical engineering training, education, and experience, that even though the screw could play a part in inhibiting rotation, the "constant pressure applied by the rotation of the coiled nest" of the spring would reduce the integrity of the screw as a fastening method and therefore the spine or projection of the product would still play a role in inhibiting rotational motion of the mounting means. (<u>See</u> Shina March 23 Report, at 14, 21.) Indeed, Dr. Shina's opinion with respect to this claim element is based on a geometric analysis of the dimensions of an actual Caldwell Quick-Tilt product and its spine as it was installed in a jamb pocket. In fact, Caldwell's own expert performed an identical analysis of the geometric dimensions of a Quick-Tilt product installed in a different jamb pocket to form his opinion on the very same claim element. (<u>See</u> Ex. 9, Still April 17 Report, at 6 (stating that certain window designs "allow a gap between either side of the raised spine and the ends of the inwardly turned flanges from 0.50" to

.109" " and using this geometric analysis to conclude that the spine does not inhibit rotation in

such a configuration); Ex. 9, Still April 17 Report, at Ex. G (showing the geometric

measurements in a graphic).)[5]

## II. DR. SHINA'S REPORTS SUBMITTED IN SUPPORT OF AMESBURY'S SUMMARY JUDGMENT MOTION ARE PROPERLY AUTHENTICATED AND CALDWELL HAD A FULL OPPORTUNITY TO QUESTION DR. SHINA ABOUT THEM AT HIS DEPOSITION.

The Court should deny Caldwell's motion to strike the Shina expert reports that

Amesbury submitted in support of its summary judgment motion because Dr. Shina's reports

were authenticated by an attorney's affidavit, and Caldwell had a full opportunity to question Dr.

Shina about these reports at his deposition.  Moreover, Dr. Shina's affidavit, submitted herewith,

renders Caldwell's argument for exclusion of the expert reports moot.  (See Ex. 1, Declaration of

Sammy Shina, Ph.D.)

### A. In Support Of Its Motion For Summary Judgment, Amesbury Submitted An Attorney Declaration That Authenticated Dr. Shina's Reports.

The Ishmael Declaration, a sworn statement by an attorney of record in this case that

Amesbury filed with its summary judgment papers on May 19, 2006, authenticates Dr. Shina's

expert reports.  (See Dkt. No. 79, Ishmael Declaration, ¶¶ 9, 11.)

Materials collected during discovery, such as the expert reports now at issue, may be

authenticated through an affidavit of counsel stating personal knowledge that the documents

were obtained during discovery.  See Commercial Data Servers, Inc. v. IBM, 262 F.Supp.2d 50,

58 (S.D.N.Y. 2003) (allowing an attorney affidavit to authenticate an attached expert report and

stating that a challenge to such practice was understandably not anticipated by the plaintiff

---

[5] In addition to performing a geometric analysis, Dr. Shina also evaluated and rejected Caldwell's justifications for the obvious similarities in the shape and geometry of Caldwell's Quick-Tilt spines and Amesbury's products that embody the claims of the '638 patent.  (See Shina March 23 Report, at 12 – 13.)

because "it is unprecedented to have reputable counsel (or any counsel, for that matter) challenge the authenticity of . . . discovery responses"). Additionally, courts have routinely held that attorney affidavits are an acceptable vehicle through which to offer documents in support of summary judgment when such supporting documents were created as part of the litigation. See Sitts v. United States, 811 F.2d 736 (2d Cir. 1987) (holding that attorney's affidavit was sufficient to support motion for summary judgment); United States v. Letscher, 83 F.Supp.2d 367 (S.D.N.Y. 1999) (noting that attorney's affidavit submitting documents was proper in summary judgment procedure). Therefore the Ishmael Declaration, a sworn statement averring that Exhibits 9 and 11 of the declaration are true and correct copies of Dr. Shina's expert reports, properly authenticates those reports. (See Dkt. No. 79, Ishmael Declaration, ¶¶ 9, 11.)

Caldwell cites Great Northern Ins. Co. v. Paino Associates, 364 F.Supp.2d 7 (D. Mass. 2005) for the proposition that expert reports, submitted without an authenticating affidavit, "would ordinarily be stricken." (Dkt. No. 81, Caldwell's Memo, at 17.) First, Caldwell ignores the fact that there *is* an authenticating affidavit in this case. Second, Caldwell ignores that the court denied the motion to strike in that case and pointedly observed that the motion was nothing more than "a procedural gimmick designed to gain some sort of tactical advantage over opposing counsel." See id. at 15.

      **B.**   **Dr. Shina's Reports Are Properly Submitted Materials**
             **Supporting Summary Judgment And Are Not Inadmissible Hearsay.**

Dr. Shina's expert reports properly support Amesbury's motion for summary judgment and are admissible at this stage. The proper focus at the summary judgment stage is on the admissibility of the disputed documents' content at trial. The requirement under Rule 56(e) that evidence supporting summary judgment should be "shown admissible" refers not to the summary judgment stage, but rather to the trial. See, e.g., Mohney v. USA Hockey, Inc., 77 F. Supp. 2d

859, 865 (N.D. Ohio 1999) (refusing to strike a letter that was not properly authenticated and holding that the letter was admissible at summary judgment because it was clear that the evidence subsequently could be put into admissible form at trial). Even the cases from this jurisdiction that Caldwell cites in arguing that the expert reports are inadmissible hearsay acknowledge that the appropriate focus is admissibility at trial. Moos v. Hampshire College, No. Civ. 97-30262, 1999 WL 377259 (D. Mass. June 8, 1999) citing Garside v. Osco Drug. Inc., 895 F.2d 46, 50 (1st Cir. 1990) ("[h]earsay evidence *inadmissible at trial* cannot be considered on a motion for summary judgment") (emphasis added). At trial in this case, Amesbury will offer Dr. Shina's testimony regarding the expert opinions set forth in his reports. Such expert testimony indisputably is admissible at trial, and Caldwell already has deposed Dr. Shina regarding his expert opinions. Therefore, the Court may consider Dr. Shina's expert reports at the summary judgment stage in lieu of his testimony. See Trepanier v. Davidson, No. Civ. 03-6687, 2006 WL 1302404, at *4 (N.D. Ill. May 5, 2006) ("Presumably Plaintiff expects to present any expert testimony live at trial. Thus, the hearsay defects that otherwise would appear to exist concerning the unsworn submission . . . would be mooted, as the testimony . . . would be offered as evidence.").

### C.    Dr. Shina's Declaration, Submitted Herewith, Moots Caldwell's Argument.

The Federal Rules of Civil Procedure expressly allow affidavits in support of a motion for summary judgment "to be supplemented or opposed by depositions, answers to interrogatories, or *further affidavits*." Fed. R. Civ. P. 56(e) (emphasis added). Pursuant to Rule 56(e), Amesbury submits a declaration by Dr. Shina (attached as Ex. 1) averring that the reports are his true opinions and that he is competent to testify as to them. See Great Northern Ins. Co. v. Paino Associates, 364 F.Supp.2d 7, 25 (D. Mass. 2005) (denying a motion to strike and stating

that the court "will not allow such a procedural gimmick to prevent an adjudication on the merits, but in the ordinary course will allow a party a reasonable opportunity to fix procedural mistakes"). The submission of this declaration does not cause Caldwell any unfair surprise or prejudice. Amesbury served Caldwell with Dr. Shina's reports in accordance with the Court's expert discovery schedule. In addition, Caldwell has deposed Dr. Shina and has cited his reports in its summary judgment opposition memorandum (Dkt. No. 84). See Gache v. Town of Harrison, 813 F.Supp. 1037, 1052 (S.D.N.Y. 1993) ("No prejudice results to defendants since the sworn declarations have been submitted by plaintiff well in advance of trial and defendants were already fully cognizant of the opinions of plaintiff's experts."). Thus, Caldwell has no basis for arguing that the submission of this declaration further authenticating the expert reports would be prejudicial.

## III.    EXHIBIT 38 SHOULD NOT BE STRUCK.

Caldwell moves to strike Exhibit 38 to the Ishmael Declaration, a printout of a website maintained by Tri-State Wholesale Building Supplies of Cincinnati, Ohio, on the grounds that it is not authenticated and is inadmissible hearsay. However, the Ishmael Declaration itself attests that Exhibit 38 is a true and correct copy of a printout of a page from the Tri-Sate website. (See Dkt. No. 79, Ishmael Declaration, ¶ 38.)

Additionally, the contents of the website is not inadmissible hearsay as it falls under the business records exception to the hearsay rule. See Fed. R. Evid. 803(6). If necessary, at trial, Amesbury intends to call a Tri-State Wholesale witness to testify that the website is a Tri-State Wholesale business record. Therefore, the Court should consider the contents of Exhibit 38 at summary judgment because Amesbury will offer Exhibit 38 in an admissible form at trial. See Border Collie Rescue, Inc. v. Ryan, 418 F.Supp.2d 1330, 1350 n. 16 (M.D. Fl. 2006)

(considering the contents of a website at summary judgment as the evidence is the type that can

be reduced to admissible form at trial); <u>Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware

Co., Inc.</u>, 998 F.2d 1224, 1235 n.9 (3rd Cir. 1993) (holding that a hearsay statement may be

considered at summary judgment because it is capable of being admissible at trial).  Caldwell's

motion to strike Exhibit 38 from consideration at summary judgment should therefore be denied.


## CONCLUSION

For the reasons set forth above, plaintiffs Amesbury Group, Inc. and Amesbury Springs

Ltd. respectfully request that this Court deny Caldwell's Motion To Exclude Expert Testimony

And Strike Expert Reports And Hearsay Statements From Amesbury's Motion For Summary

Judgment.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(D), Amesbury Group, Inc. and Amesbury Springs Ltd.

respectfully request an oral argument in this matter.


Respectfully submitted,

 /s/ Douglas J. Kline
Douglas J. Kline (BBO# 556680)
Terese Dillingham (BBO# 644520)
Safraz W. Ishmael (BBO# 657881)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
Phone:  (617) 570-1000
Fax:  (617) 523-1231

Attorneys for Plaintiffs

**AMESBURY GROUP, INC.**
**AMESBURY SPRINGS LTD.**

Dated: June 21, 2006

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 21, 2006.

/s/ Safraz W. Ishmael

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT MASSACHUSETTS

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

Plaintiffs,

v.

THE CALDWELL MANUFACTURING
COMPANY,

Defendant.

Civil Action No.  05-10020-DPW

## DECLARATION OF SAMMY SHINA, Ph.D.

I, SAMMY SHINA, hereby declare as follows:

1. I have personal knowledge of the facts and opinions stated herein, unless otherwise noted, and I am competent to testify to the same.

2. I previously submitted two expert reports, dated March 23, 2006 and April 18, 2006, respectively, and have been deposed in this case.

3. Attached as Exhibit 1 is a true and correct copy of my expert report, dated March 23, 2006, that I submitted in this matter. I hereby incorporate this report into this declaration. This report provides my opinions and the bases for my opinions regarding Caldwell's infringement of the '638, '264, and '368 patents in this case.

4. I have examined the Declaration of Safraz W. Ishmael ("Ishmael Declaration"), filed in this case on May 19, 2006, and have determined that Exhibit 9 of the Ishmael Declaration is a true and correct copy of my March 23, 2006 expert report, attached as Exhibit 1 to this declaration.

5.    Attached as Exhibit 2 is a true and correct copy of my expert report, dated April 18, 2006, that I submitted in this matter. I hereby incorporate this report into this declaration. This report provides my opinions and the bases for my opinions regarding the validity of the '638, '264, and '368 patents in this case.

6.    I have examined the Ishmael Declaration and have determined that Exhibit 11 of the Ishmael Declaration is a true and correct copy of the my April 18, 2006 report, attached as Exhibit 2 to this declaration.

7.    My qualifications, including education, publications, and experience, are detailed in the *curriculum vitae*, incorporated herein, and attached as Tab A to my March 23, 2006 report. A true and correct copy of my *curriculum vitae* is also attached as Exhibit 3 to this declaration. The statement of facts in my attached *curriculum vitae* are to the best of my knowledge true.

8.    The statement of facts in each of my expert reports, attached as Exhibits 1 and 2 to this declaration, are to the best of my knowledge true.

9.    The statements of opinion in each of my expert reports, attached as Exhibits 1 and 2 to this declaration, are true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is signed in a manner that, if falsely made, would subject me to criminal penalty under the laws of the United States.

Executed on June 20, 2006.

_____
Sammy Shina, Ph.D.

2

Declaration of Sammy Shina, Ph.D.

EXHIBIT 1

**Shina Consulting**

March 23, 2006

Jordan Singer
Attorney at Law
Goodwin|Procter LLP
Exchange Place
Boston, MA 02109

Re: Expert Report of Dr. Sammy Shina Submitted on Behalf of Plaintiffs in Civil Action No. 05-10020-DPW

I have been retained on behalf of the plaintiffs: Amesbury Group Inc., and Amesbury Springs Ltd. as an expert to review patents, patent applications, file histories, product brochures, depositions and oral examinations, design drawings, and the US District Court claim construction and comment on them, including analyzing whether products made by the defendant, the Caldwell Manufacturing Company, infringe on three of the plaintiffs' patents.

Chronological listing of the information reviewed by Sammy G Shina:

The following Patents and legal documents:
- US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994
- File history, US Patent 5,365,638
- US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003
- File history, US Patent 6,598,264 B2
- US Patent 6,820,368, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004
- File history, US patent 6,820,368 B2
- US District Court, Massachusetts District, Civil Action 05-10020-DPW; Memorandum and Order, dated January 20th, 2006.

The following Caldwell Physical Products:
- Physical Caldwell product for spring mounting "constant force system", moving coil preassembled option.
- Physical Caldwell product for block and tackle with bottom guide roller mounted outside the U shaped channel.
- Physical Caldwell product block and tackle inverted balance for windows with balance shoe for tilt operation, labeled as the 97ez on the back on the channel.

The following Caldwell Brochures:
- Caldwell brochure package entitled "Quick-Tilt Constant Force System, Smooth silent operation for tilt applications; containing 6 pages of front or title page(C000530), 2[nd] page describing the constant force system (C000531); 3[rd] page of technical specifications, accessories and installation(C000532), 4[th] page of options, warranty and contact information(C000533); 5[th] page entitled "Egress–Friendly Quick-Tilt for new construction

1

windows" for Quick-Tilt*eg balances(C000534); and 6th page entitled "New construction friendly Quick-Tilt" for "Caldwell preassembled Quick-Tilt constant force balance just got better with its evolution into Quick-Tilt*nc (C000535)."

- Caldwell brochure package series 86xt Block and Tackle System, Extended travel for sideload applications containing 4 pages of front or title\ page (C000498), 2nd page of component parts layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000498).
- Caldwell brochure package series 97ez Block and Tackle System Easy installation for tilt applications; containing 4 pages of front or title page (C000514), 2nd page of component part layout and description (C000515), 3rd page of technical specifications, accessories and installation (C000516); and 4th page of warranty and contact information (C000517).
- Caldwell brochure package series 97i Block and Tackle System Inverted Operation for tilt application; containing 4 pages of front or title page (C000490), 2nd page of component part layout and description (C000491), 3rd page of technical specifications, accessories and installation (C000492); and 4th page of warranty and contact information (C000493).

The following depositions and oral examinations:
- Deposition of Douglas Zinter, Dated October 20, 2005
- Deposition of Richard deNormand, Dated October 21, 2005
- Deposition of Wilbur Kellum, dated October 28, 2005
- Deposition of Thomas Batten, dated November 8, 2005
- Deposition of Jeffery Robertson, Dated November 29, 2005

The following Caldwell drawings on paper:
- Egress End Carriage Assembly including, (CW0114):
  - Egress End Plate, EX5939, rev0,  drawn/approved on 6/10/02, (CW0115)
  - Egress End Plate, EX5939, rev0,  drawn 9/24/02, (CW0116)
  - Channel, EX5957, rev 0, drawn, 09/23/02, approved?, (CW0128)
  - Terminal-V stage 5956-Vstage, rev 0, drawn/approved 9/24/02, (CW0129)
  - Axel, EX5959, rev 0, drawn/approved 9/24/02, (CW0130)
  - Channel, EX5970, drawn/approved 10/17/02, (CW0117)
  - Carriage (4.0), EX5975, rev 0, drawn/approve 10/29/02, (CW0118)
  - Carriage (4.0), EX5975, rev 0, drawn/approve 10/29/02, (CW0119)
  - Channel (4.0), EX5979, rev 0, drawn/approved 10/29/02, (CW0120)
  - Channel (4.0), EX5979, rev 0, drawn/approved 10/29/02, (CW0121)
  - Carriage (4.1) , EX5984, rev 0, drawn/approved 11/06/02, (CW0122)
  - Carriage (4.1) , EX5984, rev 0, drawn/approved 11/06/02, (CW0123)
  - Axel (4.1), EX5985, rev 0, drawn 11/05/02, approved 11/6/02, (CW0124)
  - Axel (4.1), EX5985, rev 0, drawn 11/05/02, approved 11/6/02, (CW0125)
  - Channel (4.1), EX5983, rev 0, drawn 11/5/02/approved 11/06/02, (CW0126)
  - Channel (4.1), EX5983, rev 0, drawn 11/5/02/approved 11/06/02, (CW0127)
- R/T (Roller Tilt) assembly (CW0131); including:
  - .270 Locking Case Half (Roller Tilt), 24A01 drawn ?/16/93, approved 6/19/03, (CW0132)
  - .270 Locking Case Half (R/T), 24A41 rev 2, drawn 3/25/02, approved 9/16/02, (CW0142)
  - .270 Locking Case Half-Tie in (R/T), 24A42 rev 1, drawn 2/27/04, (CW0143)
  - Cam (C.F.B.), 24A02, 24A03, drawn 2/18/93, (CW0133)

2

- o Tandem Spg. (Roller Tilt), Case. 24A04, drawn 2/10/93, approved 8/17/01
- o Tandem Spg. Case (Roller Tilt), Case. 24A04, rev 8, drawn 3/25/02, approved 9/16/02, (CW0134)
- o Tandem Spg. Case (Roller Tilt), Case. 24A44, rev 1, drawn 3/25/02, approved 8/16/02, (CW0144)
- o Spring (Roller Tilt), 24A05, rev 17, drawn 3/17/93, approved 1/14/04, (CW0135)
- o .340 Locking Case Half (Roller Tilt), 24A08 rev 10, drawn 2/16/93, checked 12/13/01, (CW0136)
- o .130 Locking Collar (Roller Tilt), 24A30 rev 3, drawn on 5/9/02, approved 4/29/03, (CW0137)
- o .130 Locking Collar (Roller Tilt), 24A30 rev 5, drawn on 5/9/02, approved 4/29/03, (CW0138)
- o Carrier (Roller Tilt), 24A32-33 rev 3, drawn 10/17/01, (CW0139)
- o Carrie4r Body (Roller Tilt) 24A34, 24A64, 24A69, 24A84, rev 9, drawn 10/19/96, (CW0140)
- o Wiper (Roller-Tilt), 24A40 rev1, drawn 01/20/04, approved 1/27/04, (CW0141)
- o Cam Tie-In (Roller/Tilt), 24A45-46-47, drawn 3/8/04, approved 5/3/04, (CW0145)
- o .340 Locking Case Half (Roller Tilt), 24A48 rev 2, drawn 3/25/02, checked 9/16/02, (CW0146)
- o Mounting Bracket (Roller Tilt); 24A56 rev 2, drawn on 925/95, approved 7/31/97, (CW0156)
- o 625-090/110/130Locking Case Assembly, 24A53/54/55 rev 2, drawn on 3/25/02, approved 2/06/04, (CW0147)
- o 625-090/110/130Tie-in Case Assembly, 24A58/59/60 rev 0, drawn on 2/06/04, approved 4/07/04, (CW0149)
- o 625-090/110/130Tie-in Case Assembly, 24A78/79/80 rev 0, drawn on 2/06/04, approved 4/07/04, (CW0150)
- Quick-Tilt assembly, (CW0152), including:
  - o Locking Ramp 16Y07-10, rev 13, drawn ?/15/96, (CW0153)
  - o Carrier Body .548/610 (24B01/08, rev 4, drawn 10/14/99 approved 5/7/02, (CW0154)
  - o Spring Nest, (Quick Tilt), 24B02, rev 3, drawn 10/05/99 checked 4/16/02, (CW0155)
  - o Spring (Quick Tilt), 24B05, rev 12, drawn 11-30-99, checked 1/20/04, (CW0156)
  - o Tamperlock (Quick Tilt), 24B10, rev 10, drawn 7/23/01, approved 9/18/01, (CW0157)
  - o Tamperlock (Quick Tilt), 24B21, rev 1, drawn 3/8/04, approved 4/5/04, (CW0163)
  - o Single Nest Cover (Quick Tilt), 24B14, rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, (CW0158)
  - o Tandem Nest Cover, 24B15 (Quick Tilt), rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, (CW0159)
  - o Triple Nest Cover (Quick Tilt) 24B16, rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, with upper nest screw, (CW0160)
  - o Egress Nest Cover-Triple, (QT) 24B19, rev 1, drawn 03-29-04, approved 3/10/04, shown integrated, (CW0161)
  - o Spring-3/8 (Quick Tilt), rev 0, 24B20, drawn 02-17-04, checked 1/20/04, (CW0162)
  - o Carrier (QT), 24B22, rev 0, drawn 4-5-04, approved 4/?/05, (CW0164)
  - o Cam (Q/T), 24B24, rev 0, drawn 2/26/04, approved 3/9/04, (CW0165)
  - o Cam (Q/T), 24B25, rev 0, drawn 6/8/01, approved 8/6/01, (CW0166)

3

- o Carrier Lock (QT II), 24B26, drawn 4/6/04, approved 4/27/04, (CW0167)
- o N/C Balance Assembly .562 (Q/T), 24B42, 24B43, rev 0, drawn 4/13/04, approved 5/14/04, shown integrated, (CW0169)
- o N/C Balance Assembly (Quick-Tilt), 24B52, 24B53, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0172)
- o N/C Balance Assembly (Quick-Tilt), 24B54, 24B55, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0173)
- o N/C Balance Assembly (Q/T), 24B50, 24B51, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated, (CW0170)
- o Balance Assembly .562 (Q/T), 24B46, 24B47, rev 0, drawn 4/15/04, approved 5/4/04, no cover Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0171)
- o Balance Assembly (Quick-Tilt), 24B56, 24B57, rev 02, drawn 8/10/01, approved 10/24/02, spacer or cover for triple, no cover for single or tandem Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0174)
- o Balance Assembly (Quick-Tilt), 24B58, 24B59, rev 02, drawn 8/10/01, approved 10/24/02, spacer or cover for triple, no cover for single or tandem. Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0175)
- o Balance Assembly (Quick-Tilt), 24B60, 24B61, rev 1, drawn 4/25/02, approved 10/24/02, spacer or cover for triple, no cover for single or tandem Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0176)
- o Carrier Assembly (drop-in R/T), 24B65 rev 1, drawn 1/5/01, approved 8/10/01 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0177)
- o Carrier Assembly (drop-in R/T), 24B70, rev 0, drawn 4/25/01, approved 4/25/02 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0178)
- o Carrier Assembly (drop-in R/T), 24B85, rev 2, drawn 4/10/00, approved 8/10/01 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0179)
- o Constant Force Spring Tester (Roller-Tilt), QA-RTLT-011, rev 4, 7/24/97, approved 4/23/02
- o Friction Adjuster (QT II), 24B31, rev 0, drawn 04/05/04 approved 4/5/04, (CW0168)
- o Pivot bar, Winged, (Q/T and Spirex series), 99C48, rev 10, drawn 5/14/01, approved 6/21/03, (CW0181)
- o Pivot bar (Quick-Tilt), 99C48, rev 1, drawn 2/10/04, approved 3/19/04 (CW0182)
- Quick-Tilt Triple spacer, (CW0196)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 0, drawn 11/27/00, approved 1/18/01, (CW0197)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 1, drawn 11/27/00, approved 1/22/01, (CW0198)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 1, drawn 11/27/00, approved 1/22/01, (CW0199)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0200)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0201)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0202)
- Quick-Tilt Spring Nest (carrier), (CW0215)

4

- o Spring Nest Drop-in R/T, (proposed), no Part #, Drawn 10-05-99, (CW0214)
- Quick-Tilt Cover Design, (CW0210)
  - o Single Spring Cover (Quick-Tilt), rev 0, EX5803, drawn 10/26/00, (CW0211)
  - o Tandem Spring Cover (Quick-Tilt), EX5804, rev 0, drawn 10/26/00, (CW0212)
  - o Triple Spring Cover (Quick-Tilt), EX5805, rev 0, drawn 10/26/00, (CW0213)
- Quick-Tilt Bumper (CW0203)
  - o Unmarked drawing (CW0204)
  - o Bumper (Quick-Tilt), 24B07, (rev 2); drawn 02-01-00, approved 10/18/00, (CW0209)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0206)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0207)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0208)
  - o Bumper (Quick-Tilt), 24B07, (rev 4); drawn 02-01-00, approved 04/06/00, (CW0205)
- Inverted 1-2-3 Carrier, (CW0183)
  - o Lock 1.292 (series 97ez), 15N39 Rev 1, Drawn 7/9/03, approved 5/5/04, (CW0193)
  - o Lock 1.292 (series 97ez), 15N39 Rev 2, Drawn 7/9/03, approved x/x/04, (CW0184)
  - o Lock 1.0 (series 97), 15N30 Rev 3, Drawn 9/30/02, approved 1/20/03, (CW0186)
  - o Lock 1.25 (series 97), 15N29 Rev 2, Drawn 9/30/02, approved 1/15/04, (CW0187)
  - o EX 5937-K, (shoe, my notations), no additional info, (CW0188)
  - o EX 5937-I, (shoe, my notations), no additional info, (CW0190)
  - o IE7 Travel Characteristics, no part number, drawn 9/2/03, (CW0185)
  - o Hemless Square Channel(series(Series 97), rev 4, drawn 7/12/02, approved 8/9/02, (CW0189)
  - o Carrier Body (1.25" Inverted); (series 97), 15N27, rev 2, drawn 10-01-02, approved 1/16/03, (CW0191)
  - o Carrier Body (1.0" Inverted); (series 97), 15N28, rev 2, drawn 10-01-02, approved 1/16/03, (CW0192)
  - o Channel (series 97ez), 15N400, 401, Rev 3, drawn 10/24/04, approved 5/6/04, (CW0194)
  - o Sash Pin, x no part #, rev 2, drawn 6/3/04 approved 10/15//04, (CW0195)
- Math Model, Series 97ez (CW0001 - CW0015), [Travel Characteristics]
- Inverted Terminal (Block and Tackle), (CW0040 – CW0053)
- Hook Mounted – Inverted, Series 97i (CW0016 – CW 0039)
- .019 Channel, reduced SKU, (CW0056 – CW0063), [86 Side Takeout]
- .0335 Channel, reduced SKU, (CW0054 – CW0055), [series 86xt channel]
- Guide, reduced SKU, (CW0100 – CW0113), [series 86xt guides]
- Experimental Documentation, reduced SKU, (CW0092 – CW0099), [series 86xt]
- End Carriage Plate, series 86xt, (CW0070 – CW0083)
- Hook Terminal, series 86xt, (CW0064 – CW0069)
- Math Model, Series 86xt (CW0084 - CW0091), [Travel Characteristics]

Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories, dated 8/31/2005

Qualifications of the Witness
The following items are excerpts from my Curriculum Vitae which are relevant to this opinion.
My Curriculum Vitae in full is attached.

1. I am the professor of Mechanical Engineering at the University of Massachusetts Lowell (UML), and have been teaching there full time since 1988. I have college degrees in Electrical Engineering, Industrial Management, Computer Science and a PhD in Mechanical Engineering from MIT, WPI and Tufts Universities.

2. Throughout my engineering career, I have worked at several companies while part time teaching at UML. While employed in industry, I worked on the design and manufacture of mechanical and electro-mechanical parts and products. I designed, modified and improved several automatic machines for manufacturing and testing of parts and products.

3. In industry, I held several engineering and management positions, including production engineer; manufacturing process engineer, Computer Aided Design (CAD) Manager, Tool Engineering Manager and Manufacturing Technology Manager. I also introduced CAD to the Hewlett Packard (HP) Medical Group and trained their engineers in the use of Design for Manufacturing tools and techniques as well as Mechanical CAD design. I have also given seminars on behalf of HP and Motorola to their customers on the use of CAD and Concurrent Engineering in the design of their products.

4. After joining the University, I began teaching courses there in Design Theory and Constraints as well as Engineering Principles. I am also the coordinator for the Mechanical Engineering Capstone Program where senior engineering students work with industrial companies to design mechanical products and assemblies. In addition, I performed research and consulting on a variety of technical subjects including product design, quality and the supply chain (design and/or manufacturing contracting services). I held seminars on these topics and trained thousands of working engineers. I published my work in over 90 publications, including in 5 books.

5. I also consulted for companies on their product design and manufacturing, including those in mechanical, electromechanical and medical instruments, devices and products.

6. I was a founding member of an Innovative Products Research and Services Incorporated (IPRS), a non-profit educational, scientific and charitable 501(c) (3) organization incorporated in the Commonwealth of Massachusetts. IPRS is an inventor support service, which performs early stage market and manufacturing evaluations. IPRS was able to obtain two grants from the Department of Energy in 1991 and 1992 as part of DOE's States' Inventors Initiative.

7. A list of all publications I authored in the preceding ten years is included in the attached Curriculum Vitae.

Compensation Statement
As a technical expert in this case my fees are $300/hour for technical work, opinions, and sworn testimony. In addition my expenses for travel are reimbursed at cost. My compensation is not affected by the outcome of this case and is based solely on the time spent in the development of my opinion.

Prior Deposition and Trial Experience
My deposition experience in the last four years can be found in my full CV, attached to this report as exhibit A.

## Summary of Patents

I have been asked to review three patents. U.S. Patent No. 5,365,638 was granted on November 22, 1994 and is entitled "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS." The patent "relates to a mounting for a coiled ribbon spring and is particularly, though not exclusively, applicable to sash springs used in sash frame tensioning arrangements for windows." '638 patent, column 1, lines 6-9. The patent describes an arrangement in which "the spring merely rests on the mounting element which acts as a reaction member which the spring abuts as a free outer end, attached to the sash, is unwound." '638 patent, column 2, lines 21-24. The device described in the patent also has a spine, projection, or other "formations conformed so as to cooperate with a portion of the sash frame within which the [mounting] element is to be received, such that contact of said formations with said sash frame inhibits in a rotational, pivoting, or twisting sense of the element relative to the sash frame." '638 patent, column 2, lines 60-65.

U.S. Patent No. 6,598,264 B2 was granted on July 29, 2003 and is entitled, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER." The patent relates particularly "to a block and tackle window balance device that provides an increased range of travel within a window frame." '264 patent, column 1, lines 8-10. The device described in the patent locates a bottom guide roller within the bottom guide of the balance instead of in the within the rigid U-shaped channel of the balance. Because the bottom guide roller is located within the bottom guide, "the window sash can travel a greater distance before the bottom guide roller hits the jamb mounting hook, resulting in a greater travel distance." '264 patent, column 6, lines 20-22.

U.S. Patent No. 6,820,368 B2 was granted on November 23, 2004 and is entitled, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW." The patent particularly relates to "a balance shoe of a window balance system used in conjunction with a pivot bar mounted on a window sash for rotating the window sash relative to a window frame." '368 patent, column 1, lines 21-24. "The balance shoe includes a frame, a locking member at least partially disposed within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within a window balance." '368 patent, column 1, lines 63-67. The patent also describes a method of installing the inverted window balance system claimed.

## Summary of Opinions.

The opinions expressed in this report are based on my understanding of what constitute an infringement. Each patent has a claim section, which must be interpreted by the court (claim construction). In my analysis, I compare each accused product against the each claim as interpreted by the court. To be literally infringing, the accused product must meet every element in a claim. In addition, I understand that an accused product may also infringe a claim element under the doctrine of equivalents if the accused product performs substantially the same function in substantially the same way to achieve substantially the same result.

I. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994.

Upon reviewing all information listed in the top of the report; I conclude the following:

7

The defendant Caldwell Manufacturing Company's "Quick-Tilt constant force system" and Quick-Tilt*nc products are infringing on claims 1, 2, 3 and 8 in the plaintiffs' US Patent 5,365,638.

II. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.
   Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20 and 21 in the plaintiffs' US Patent 6,598,264 B2.

III. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.
   Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 97ez products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US Patent 6,820,368 B2.

IV. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.
   Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 97ih products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US patent 6,820,368 B2.

V. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.
   Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 97i products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US patent 6,820,368 B2.

Support for Opinions
**I. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994.**

Upon reviewing all information listed in the top of the report, I conclude the following:
The defendant's "Quick-Tilt constant force system" and Quick-Tilt*nc products are infringing on claims 1, 2, 3 and 8 in the plaintiffs' US Patent 5,365,638. My reasoning for the basis of my opinion is stated for each claim numbered below:

Claim 1. This claim states as follows ('638 patent, column 5, line 62 - column 6, line 16)

"A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having first end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled spring having the other end of said coiled ribbon spring within the coil being

8

positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited."

Upon examining the physical Caldwell spring balance product Quick-Tilt*nc, the deposition testimony referenced above, the Caldwell 6-page brochure entitled "Quick-Tilt Constant Force System" (C000530-C000535) and the Caldwell engineering drawings (CW0152 - CW0215); it is my opinion that the Caldwell Quick-Tilt system and Quick-Tilt*nc products are infringing on the Plaintiffs' US Patent 5,365,638 claim 1 by virtue of the following observations:

a. The first element of this claim describes the use environment where the patented device is to be mounted; quote, "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges", ('638 patent, column 5, line 62 - column 6, line 1), is identical to the use environment for the Caldwell products. *See* Fig. 1.1.A; Fig. 3.1.A. (all referenced figures are collected as exhibit B to this report).

b. The next element of this claim identifies the frame to support the device which is slidable in the sash channel; quote, "a sash frame support means slidable in said channel means", ('638 patent, column 6, lines 1-2). This sash frame support means is used in the Caldwell products and is referred to in their brochures (page 3, C000532) as the "carrier"; which is offered to Caldwell customers in 3 different product sizes to match recommended channel sizes. *See* Fig. 1.1.B; Fig. 3.1.B.

c. The next element of this claim which identifies the coiled ribbon spring and one of its ends; quote, "a coiled ribbon spring having first end engaged with said sash frame support means," ('638 patent, column 6, lines 3-4), is identical to the coiled ribbon spring and one of its ends used in the physical Caldwell product I examined. In the Caldwell brochures, the coiled ribbon spring end is engaged to the frame support means which Caldwell calls the carrier (page 3, C000532). *See* Fig. 1.1.C.; Fig. 3.1.C.

d. The next element of this claim which specifies a mounting means for the coiled ribbon spring; quote; "and a means for mounting said coiled ribbon spring," ('638 patent, column 6, lines 4-5), is also found in the Caldwell product. The Caldwell brochure describes this support means as the "coil nest" (page 5, C000535). In the memorandum and order of the US District Court for the District of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in the '638 patent. The court construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". I note the following according to the Court claim construction:

i. The court's definition references a structure for mounting a coiled ribbon spring to the window jamb channel. Based upon examination of the Caldwell

9

Quick-Tilt brochure (page 2, C000531), I find that the Caldwell "coil nest" satisfies this definition in the claim construction of the court.

ii. The court's definition references a structure that has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell coil nest geometry satisfies this definition in the claim construction of the court.

iii. The court's definition references that the design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the design of the Caldwell coil nest includes a countersink hole to allow the coil nest to be secured to the to a window jamb channel, through a fixing screw.

I find the Caldwell mounting means for the Quick-Tilt and Quick-Tilt*nc products, which Caldwell calls the "coil nest," conforms to the Court's claim construction of the term "mounting means". *See* Fig 1.1.D; Fig. 4.1.D.

e.  The next element of this claim specifies the other end of the coiled ribbon spring being within the spring, being free and unattached to the support means, quote, "the coiled body portion of said coiled spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means" ('638 patent, column 6, lines 5-10). The physical Caldwell product I examined and the Caldwell brochure (page 2, C000531), show the Caldwell product coiled ribbon spring to be of exactly the same construction, based on the following observations:

i.   The other end of the coiled ribbon spring being within the spring

ii.  The other end of the coiled ribbon spring being free and unattached to the support means, which is called the coil nest by Caldwell. *See* Fig 1.1.E; Fig. 4.1.E.

f.  The next element of this claim describes the need for securing the mounting means to the channel means; quote "and said mounting means being secured in said channel means," ('638 Patent, column 6, lines 10-11). Several alternatives are shown in the patent "DESCRIPTION OF THE PREFERRED EMBODIMENTS": in Figure 4; a "fixing screw" as shown by item 64 can secure the mounting means. In figures 7, 8 and 9; the mounting means is secured by a screw (not shown). The screw is attached through a recessed bore 88 in Figure 7 and a bore 108 in Figure 9. I also note in the court's claim construction for the '638 patent the use of the term "fixing screw" for securing the mounting means: "....method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to the window jamb channel." I find the above discussions in the preferred embodiment for the '638 patent matches all of the installation information of the Quick-Tilt and Quick-Tilt*nc products: in the Caldwell Quick-Tilt brochure (page 3, C000532), a fixing screw is clearly shown to be used to fasten the Caldwell products to the window jamb channel. *See* Fig. 2.1.F; Fig 3.1.F.

10

g. The next element in this claim specifies a raised spine of the mounting means, with a following qualification explaining the need for such a feature in the device, quote, "said mounting means having raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means," ('638 patent, column 6, lines 11-13). I also note in the claim construction by the US District Court of Massachusetts dated January 20th, 2006 and mentioned in item (d) above, a construction for the term "raised spine" as follows: "A raised protrusion that resembles or suggests a spine of the mounting means, shaped to cooperate with the window jamb flanges to inhibit the rotational motion of the mounting means." I note in the Caldwell physical product and in the Caldwell Quick-Tilt brochure (C000530-C00535), the following observations:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, in page 2 (C000531), the cover of the Quick-Tilt product, which is clearly shown with a spine feature integrated in the plastic body of the cover, is available for single, double or triple coiled spring configurations (page 3, accessories, C000532). This cover is supplied as optional to the Caldwell product in page 2, (C000531). The cover is secured to the mounting means, called by Caldwell as the "coil nest", by a fastening screw. Once secured by the screw, the cover fastened to the coil nest acts as an integrated assembly of a raised spine of the mounting means defined as the coil nest in the Caldwell brochure. *See* Fig 2.1.G.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing the Quick-Tilt *nc product, that the Caldwell mounting means, called the "coil nest" and the plastic cover are integrated, by molding both features in the same product, with a "spine" running lengthwise across the back side of the molded part. Fig. 3.1.G

h. The final element of claim 1 is the reason given for the raised spine in item g; quote: "whereby rotational motion of said mounting means is inhibited." ('638 patent, column 6, lines 14-15). In the claim construction by the US District Court of Massachusetts, dated January 20th 2006, this element of the claim 1 in the '638 patent is construed as the "mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges and said channel means whereby rotational motion of said mounting means is inhibited." I note the following:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, I note in page 2 (C000531) that the cover fastened to the coil nest acts as an integrated assembly of a raised spine of the mounting means defined as the coil nest in the Caldwell brochure. The geometry of this assembly consisting of a coil nest fastened together to a cover will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing Quick-Tilt *nc product, the Caldwell mounting means called the "coil nest" and the cover are integrated, by molding both features in the

11

same product, with a "spine" or "projection" running lengthwise across the back side of the molded part. The geometry of this Caldwell coil nest molded together with a cover assembly will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel. For example, I note that when the physical Caldwell device was installed in a sample window jamb channel, the spine fitted snugly between channel flanges thereby inhibiting rotation of the Caldwell balance while allowing the balance to ride smoothly inside the channel.

iii.   In order to explain the need for the spine or projection features; but not for preventing rotation, the Caldwell representatives that were deposed had differing opinions:

1.   According to the testimony of Jeffrey Robertson (beginning page 112, line 20), ….the raised portion labeled as "I", has two functions, one to provide enough material thickness so that the proper countersink for the screws, mounting screws can be provided without breaking through the inside of the cover. [np] The second function is to provide a flow passage for the plastic in the injection molding process to fill the tool, fill the mold cavity…."

2.   According to the testimony of Wilbur Kellum (beginning page 93, line 10), in a series of answers by Mr. Kellum about the function of the protrusion "or spine/projection": "It is to help in the plastic molding….", and then Mr. Kellum adds in his testimony (page 94 lines 4-5); "…it serves to maintain straightness of the part during shipping…." Mr. Kellum answers the questions (page 94 lines 6-8) Q. does it serve to maintain the straightness of the part when installed? A: "No."

It is my opinion that these explanations for the need of the spine other than to inhibit rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1)   There are many geometries that can serve to allow for a flow passage for the plastic injection molding process to fill the mold cavity for the Quick-Tilt covers. The spine, when specified by the Caldwell engineers at the time of design, could be made deeper, wider or shorter than the geometry selected by them. I note that in the physical Caldwell Quick-Tilt*nc product that I reviewed, the spine's geometry matches, within a tight tolerance, the front opening of the channel in the window jamb pocket, and hence prevents rotation of the coil nest. Of all the many possible geometries for the spine available to satisfy the plastic flow requirements, Caldwell chose the specific one that will inhibit rotation of the mounting means.

2)   There are many geometries to provide enough material thickness so that the proper countersink for the mounting screws can be provided without breaking through the inside of the cover. The thicker material could be made around the screw only and not to extend the full length of the cover. In addition, another alternative could be to make a recessed bore inside the coil nest to allow for more plastic material on the inside as opposed to the outside of the cover. Of all the many possible geometries for the spine available to satisfy the need for

12

more material for the countersink of the fixing screw, Caldwell chose the specific one that will inhibit rotation of the mounting means.

3) The purpose of the spine to maintain straightness of the part during shipping appears to be unusual, There are two instances of shipping possibilities:

1) Since the balances are shipped as part of assembled windows. It is customary in the business and engineering practices for the end product supplier to maintain the integrity of their product during shipping, and not rely on individual suppliers to provide the integrity of each individual part. For a product such as windows, which contains fragile glass, the end product supplier will certainly be very careful in providing for proper support and packaging of the window during shipping and transportation, and not rely on their part suppliers such as the balance manufacturer.

2) When a part in an assembly such as a balance is shipped from the (balance) supplier to the end product (window) manufacturer, the requirement for the integrity of the product during shipping is normally achieved through the design of the shipping container of the part, including the use of packing materials.

iv. In order to show that the Caldwell Quick-Tilt and Quick-Tilt*nc products will prevent rotation other than through the spine or projection mentioned in the '638 patent, a Caldwell representative that was deposed, as well as the Caldwell brochure for Quick-Tilt, provided the following:

1. According to the testimony of Jeffrey Robertson (beginning page 115, line 13), "….the top portion [of the Quick-Tilt*nc] is large in length and width dimension than the opening into which the balance is inserted, so it is …the top portion is held by the interference between the top and the vinyl lineal, the bottom portion is held in place by the screw Those two attachments, or the attachment at the bottom and the interference at the top prevent any rotation of the cover…"

2. In the Quick-Tilt brochure; page 2 (C000531), describing the constant force system, in the top of the page…"Its alternating coil design prevents the cantilevering or twisting of the carrier that can diminish locking performance…."

It is my opinion that these explanations for inhibiting rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1) The top portion of the Quick Tilt *nc cover is too thin to adequately inhibit the rotation of the coil nest, with a thickness ranging from 0.025" to 0.011" (see drawings CW0158, CW0159 and CW 0160). There are two diagonal thin cutouts at the top of the covers to allow for twisting of the cover.

2) The alternating coil design mentioned in the top of page 2 of the Quick-Tilt brochure (C000531) will only apply to tandem coiled ribbon springs. I note the following:

a. For single nest cover this does not apply at all.

13

b. For tandem covers, the length of each extended spring during window sash operations will vary since one spring is mounted on top of the other, resulting in the tandem springs not equal in length. Therefore, there will be an offset moment forcing some rotation of the coil nest for tandem coiled ribbon spring configurations.

c. For triple nest covers, there is a fixing screw to attach the upper triple spacer as shown in the Quick-Tilt brochure page 2 (C000531) that could work in conjunction with the coil nest screw to inhibit rotation. I note that there are no instructions for the recommended amount of torque to apply for each of these two screws. Repeated sash operations during the useful lifetime of the windows might reduce the integrity of the Caldwell fastening method due to the constant pressure applied by the rotation of the coil nest due to the triple coiled ribbon spring configuration.

As a conclusion to item (h), I find that the reasons for having the spine feature according to Caldwell are inadequate. The Caldwell explanations for their techniques for inhibiting rotation, might contribute partially to reduce rotation. The spine feature they adopted based on the '638 patent, will perform the primary function of inhibiting the rotation. Therefore, I find that the Quick-Tilt and Quick-Tilt*nc series of products that contain the spine or projection along the longitudal axis of the mounting means will prevent rotation of the mounting means.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's balance system option for constant force moving coil system, called Quick-Tilt products, and the New construction friendly Quick-Tilt*nc products, are infringing on claim 1 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements."

Claim 2. This claim states as follows: ('638 patent, column 6, lines 17-22) "The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of coiled ribbon spring as said sash support means moves in said channel means."

This claim on the mounting means is also affected by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in patent '638. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". The Caldwell brochure describes this support means as the "coil nest." I find the mounting

14

means for the Caldwell devices, which they call "coil nest," conforms to the court's claim construction of the term "mounting means" for claims 1 & 8.

I examined the 6 page Caldwell Quick-Tilt brochure (C000530-C000535) and I also examined the physical Caldwell product that matches this invention. I conclude that in the Caldwell Quick-Tilt series, the support surface of the mounting means (coil nest) is in contact with the outer surface of the coiled body portion of the coiled ribbon spring during the movement of coiled ribbon spring as sash support means moves in the channel means.

Based on the above observations and supporting materials, it is my opinion that the Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the new construction-friendly Quick-Tilt*nc products made by the defendant are infringing on claim 2 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements"

Claim 3. This claim states as follows: ('638 patent, column 6, lines 23-30) "The mounting assembly of claim 2 wherein said mounting means has a body portion having an aperture therein, a fixing screw position in said aperture by which the mounting means is secured relative to said channel means, a surface of said body portion being concavely curved, said coil body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion."

This claim on the mounting means is also affected by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in patent '638. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". The Caldwell brochure describes this support means as the "coil nest." I find the mounting means for the Caldwell devices, which they call "coil nest," conforms to the court's claim construction of the term "mounting means" for claims 1 & 8.

I examined the 6 page Caldwell Quick-Tilt brochure (C000530-C000535) and I also examined the physical Caldwell product that matches this invention. I observe the following:

1. That the coil nest has a body portion with an aperture.
2. Wherein a fixing screw is used to attach the coil nest to the window channel jamb.
3. The upper surface of the coil nest is concavely curved.
4. The coil body portion of the coiled ribbon spring is in contact with and supported by the upper surface of the coil nest.

15

Based on the above observations and supporting materials, it is my opinion that the Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the new construction-friendly Quick-Tilt*nc products made by the defendant are infringing on claim 3 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements"

Claim 8. This claim states as follows ('638 patent, column 6, lines 47-62):  "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring  having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, said mounting means being secured in said channel means and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited."

Upon examining the physical Caldwell spring balance product that matches the invention recorded in Patent 5,365,638, as well as the Caldwell 6-page brochure entitled "Quick-Tilt Constant Force System" (C000530-C000535), the Caldwell depositions listed in the top of the report and the Caldwell engineering drawings (CW0152 -CW0215), it is my opinion that the Caldwell Manufacturing Company Quick-Tilt system and Quick-Tilt*nc products are infringing on the Plaintiffs' US patent 5,365,638 claim 8 by virtue of the following observations:

a. The first element of this claim describes the use environment where the patented device is to be mounted, quote, ('638 patent, column 6, lines 47-49); "a mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges," is identical to the use environment for the Caldwell products. See Fig. 1.8.A; Fig. 3.8.A.

b. The next element of this claim identifies the frame to support the device which is slidable in the sash channel, quote, ('638 patent, column 6, lines 49-50); "a sash frame support means slidable in said channel means." This sash frame support means is used in the Caldwell products and is referred to in their brochures (page 3, C000532) as the "carrier"; which is offered to Caldwell customers in 3 different product sizes to match recommended channel sizes. See Fig. 1.8.B; Fig. 3.8.B.

c. The next element of this claim which identifies the coiled ribbon spring and one of its ends, quote, ('638 patent, column 6, lines 51-52); "a coiled ribbon spring having an outer end engaged with said sash frame support means" is identical to a coiled ribbon spring and one of its ends used in the Caldwell products. In the Caldwell brochure (page 2, C00531), the coiled ribbon spring end is engaged to the frame support means which they call the carrier. See Fig. 1.8.C; Fig. 3.8.C.

d. The next element of this claim which specifies a mounting means for the coiled ribbon spring;  quote, ('638 patent, column 6, lines 53-54) "and a means for mounting said coiled ribbon spring" is also found on the Caldwell products. The Caldwell brochure (page 6, C00535) describes this support means as the "coil nest." In the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 &8 in the '638 patent. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows; "'mounting

16

means' or 'a means for mounting said coiled ribbon spring' describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel".
I note the following according to the Court claim construction:

   i.   The court's definition references a structure for mounting a coiled ribbon spring to the window jamb channel. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell "coil nest" satisfies this definition in the court's claim construction.
   ii.  The court's definition references a structure that has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell coil nest geometry satisfies this definition in the court's claim construction.
   iii. The court's definition references that the design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the design of the Caldwell coil nest includes a countersink hole to allow the coil nest to be secured to the to a window jamb channel, through a fixing screw.

I find the Caldwell mounting means for the Quick-Tilt and Quick-Tilt*nc products, which Caldwell calls the "coil nest," conforms to the Court's claim construction of the term "mounting means". *See* Fig. 1.8.D; Fig. 4.8.D.

e.  The next element of this claim specifies the other end of the coiled ribbon spring as to being within the spring, being free and unattached to the support means; quote, ('638 patent, column 6, line 55), "the coiled body portion of said coiled spring with the other end of said coiled ribbon spring positioned in said mounting means." The physical Caldwell product I examined and the Caldwell brochure (page 2, C000531) show the Caldwell product coiled ribbon spring to be of exactly the same construction, based on the following observations:

   i.   The other end of the coiled ribbon spring being within the spring
   ii.  The other end of the coiled ribbon spring being free and unattached to the support means, which is called the coil nest by Caldwell. *See* Fig. 1.8.E; Fig. 4.8.E.

f.  The next element of this claim describes the need for securing the mounting means to the channel means, quote, ('638 patent, column 6, lines 56-57); "and said mounting means being secured in said channel means". Several alternatives are shown in the patent "DESCRIPTION OF THE PREFERRED EMBODIMENTS": in Figure 4; a "fixing screw" as shown by item 64 can secure the mounting means. In figures 7, 8 and 9; the mounting means is secured by a screw (not shown). The screw is attached through a recessed bore 88 in Figure 7 and bore 108 in Figure 9. I also note in the Court's claim construction of patent '638 stated in item d the use of term fixing screw for securing the mounting means: "….method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to the jamb channel." I find the above discussions in the preferred embodiment for the '638 patent matches all of the installation instructions of the Quick-Tilt and Quick-Tilt*nc

17

products: in the Caldwell Quick-Tilt brochure (page 3, C000532), a fixing screw is clearly shown to be used to fasten the Caldwell products to the window jamb channel. *See* Fig 2.8.F.

g. The next element in this claim specifies a projection means of the mounting means, with a following qualification explaining the need for such a feature in the device, quote, ('638 patent, column 6, lines 57-61) "and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with the channel means within which the mounting means is positioned." I also note in the court's construction by the US District Court of Massachusetts dated January 20th, 2006 and mentioned in item (d), a construction for the term "projection means" as "projection(s)." I note in the Caldwell physical product and in the Caldwell brochure (C000530-C000535) the following observations:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, in page 2 (C000531), the cover of the Quick-Tilt product, which is clearly shown with a spine or projection feature integrated in the plastic body of the cover, is available for single, double or triple coiled spring configurations (page 3, accessories, C000532). This cover is supplied as (optional) to the Caldwell product in page 2, (C000531). The cover is secured to the mounting means, called by Caldwell as the "coil nest", through a fastening screw. Once secured by the screw, the cover fastened to the coil nest acts as an integrated assembly of a raised spine or projection of the mounting means defined as the coil nest in the Caldwell brochure. *See* Fig 2.8.G.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing the Quick-Tilt *nc product, that the Caldwell mounting means, called the "coil nest" and the plastic cover are integrated, by molding both features in the same product, with a "spine" or projection running lengthwise across the back side of the molded part. *See* Fig. 3.8.G.

h. The final element of claim 8 is the reason given for the projection means in item (g); quote, ('638 patent, column 6, lines 61-62); "whereby rotational motion of said mounting means is inhibited." In the claim construction by the District Court of Massachusetts, dated January 20th 2006, this element of the claims 1 and 8 in patent '638 was construed to mean the "mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges and said channel means whereby rotational motion of said mounting means is inhibited." I note the following:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, I note in page 2 (C000531), that the cover fastened to the coil nest acts as an integrated assembly of a raised spine or projection of the mounting means defined as the coil nest in the Caldwell brochure. The geometry of this assembly consisting of a coil nest fastened together to a cover will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell

brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing Quick-Tilt *nc product, The Caldwell mounting means, called the "coil nest" and the cover are integrated, by molding both features in the same product, with a "spine" or "projection" running lengthwise across the back side of the molded part. The geometry of this Caldwell coil nest molded together with a cover assembly will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel. For example, I note that when the physical Caldwell device was installed in a sample window jamb channel, the spine or projection fitted snugly between channel flanges thereby inhibiting rotation of the Caldwell balance while allowing the balance to ride smoothly inside the channel.

iii.  In order to explain the need for the spine or projection features; but not for preventing rotation, the Caldwell representatives that were deposed had differing opinions:

1.  According to the testimony of Jeffrey Robertson (beginning page 112, line 20), ….the raised portion labeled as "I", has two functions, one to provide enough material thickness so that the proper countersink for the screws, mounting screws can be provided without breaking through the inside of the cover...The second function is to provide a flow passage for the plastic in the injection molding process to fill the tool, fill the mold cavity…."

2.  According to the testimony of Wilbur Kellum (beginning page 93, line 10), in a series of answers by Mr. Kellum about the function of the protrusion "or spine/projection": "It is to help in the plastic molding….", and then Mr. Kellum adds in his testimony (page 94 lines 4-5); "…it serves to maintain straightness of the part during shipping…." Mr. Kellum answers the questions (p94 lines 6-8) Q: does it serve to maintain the straightness of the part when installed? A: "No.".

It is my opinion that these explanations for the need of the spine or projection other than to inhibit rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1)  There are many geometries that can serve to allow for a flow passage for the plastic injection molding process to fill the mold cavity for the Quick-Tilt covers. The spine or projection, when specified by the Caldwell representatives, can be made deeper, wider or shorter than the geometry selected by them. I note that the physical Caldwell Quick-Tilt*nc products' spine geometry matches, within a tight tolerance, the front opening of the channel in the window jamb pocket, and hence prevents rotation of the coil nest. Of all the many possible geometries for the spine or projection available to satisfy the plastic flow requirements, Caldwell chose the specific one that will inhibit rotation of the mounting means.

2)  There are many geometries to provide enough material thickness so that the proper countersink for the mounting screws can be provided without breaking through the inside of the cover. The thicker material could be made around the screw only and not to extend the full length of the cover. In addition, another alternative could be to make a recessed bore inside the coil nest to allow for more plastic material

19

on the inside as opposed to the outside of the cover. Of all the many possible geometries for the spine or projection available to satisfy the need for more material for the countersink of the fixing screw, Caldwell chose the specific one that will inhibit rotation of the mounting means.

3) The purpose of the spine or projection to maintain straightness of the part during shipping appears to be unusual; since the balances are shipped as part of assembled windows. It is customary in the business and engineering practices for the end product supplier to maintain the integrity of their product during shipping, and not rely on individual suppliers to provide the integrity of each individual part. For a product such as windows, which contains fragile glass, the end product supplier will certainly be very careful in providing for proper support and packaging of the window during shipping and transportation, and not rely on the balance manufacturer.

iv. In order to show that the Caldwell Quick-Tilt and Quick-Tilt*nc products will prevent rotation other than through the spine or projection mentioned in the '638 patent, a Caldwell representative that was deposed, as well as the Caldwell brochure for Quick-Tilt, provided the following :

1. According to the testimony of Jeffrey Robertson (beginning page 115, line 13), "….the top portion [of the Quick-Tilt*nc] is large in length and width dimension than the opening into which the balance is inserted, so it is …the top portion is held by the interference between the top and the vinyl lineal, the bottom portion is held in place by the screw Those two attachments, or the attachment at the bottom and the interference at the top prevent any rotation of the cover…"

2. In the Quick-Tilt brochure; page 2 (C000531), describing the constant force system, in the top of the page…"Its alternating coil design prevents the cantilevering or twisting of the carrier that can diminish locking performance…."

It is my opinion that these explanations for inhibiting rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1. The top portion of the Quick Tilt *nc cover is too thin to adequately inhibit the rotation of the coil nest, with a thickness ranging from 0.025" to 0.011" (drawings CW0158, Cw0159 and CW 0160). There are two diagonal thin cutouts at the top of the covers to allow for twisting of the cover.

2. The alternating coil design mentioned in the top of page 2 of the Quick-Tilt brochure (C000531) will only apply to tandem coiled ribbon springs. I note the following:

   a. For single nest cover this does not apply at all.

   b. For tandem covers, the length of each extended spring during window sash operations will vary since one spring is mounted on top of the other, resulting in the tandem springs not equal in length. Therefore , there will a be an offset moment forcing some rotation of the coil nest for tandem spring configurations

    c. For triple nest covers, there is a fixing screw to attach the upper triple spacer as shown in the Quick-Tilt brochure page 2 (C000531) that could work in conjunction with the coil nest screw to inhibit rotation. I note that there are no instructions for the recommended amount of torque to apply for each of these two screws. Repeated sash operations during the useful lifetime of the windows might reduce the integrity of the Caldwell fastening method due to the constant pressure applied by the rotation of the coil nest due to the triple coiled ribbon spring configuration.

As a conclusion to item (h), I find that the reasons for having the spine or projection feature according to Caldwell are inadequate. The Caldwell explanations for their techniques for inhibiting rotation might contribute partially to reducing rotation. The spine or projection feature they adopted based on the '638 patent, will perform the primary function of inhibiting the rotation. Therefore, I find that the Quick-Tilt and Quick-Tilt*nc series of products that contain the spine or projection along the longitudal axis of the mounting means will prevent rotation of the mounting means.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the New construction friendly Quick-Tilt*nc products are infringing on claim 8 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements."

**II. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.**

Upon reviewing all information listed in the top of the report, I conclude the following: The defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20 and 21 of plaintiffs' U.S. Patent 6,598,264 B2. My reasoning for the basis of my opinion is stated for each claim numbered below:

Claim 1. This claim states as follows, quote, ('264 patent, column 6, lines 35-56):
A block and tackle window balance device comprising:
a channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel;
a bottom guide roller rotatably mounted in the bottom guide;
a fixed pulley block unit connected to the channel;
a translatable pulley block unit moveable within the channel;
a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and
a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

Upon examining the physical Caldwell block and tackle product that matches U.S. Patent 6,598,264 B2; the Caldwell brochure entitled "Series 86xt Block and Tackle System, Extended travel for sideload applications," containing 4 pages of front or title page (C000498), 2nd page of component part layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000501); the Caldwell depositions listed at the top of the report; and the Caldwell engineering drawings (CW0054 -CW099), it is my opinion that the defendant Caldwell Manufacturing Company's block and tackle system Series 86xt products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 1 by virtue of the following observations:

    a. The Caldwell product Series 86xt contains a channel comprising a first end and a second end;  *See* Fig. 5.1.A.
    b. The Caldwell product Series 86xt contains a top guide connected to the first end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (C000500) shows 2 part numbers of top guides.  *See* Fig. 5.1.B.
    c. The Caldwell product Series 86xt contains a bottom guide connected to the second end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (C000500) shows 2 part numbers of bottom guides.  *See* Fig 5.1.C.
    d. The Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide.  *See* Fig 6.1.D.  In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term "bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in

22

a way that permits its rotation." in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

e.  The Caldwell Series 86xt  product contains a fixed pulley block unit connected to the channel; *See* Fig 5.1.E
f.  The Caldwell product Series 86xt contains a translatable pulley block unit moveable within the channel; *See* Fig 5.1.F.
g.  The Caldwell product Series 86xt contains a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and;  *See* Fig. 5.1.G.
h.  The Caldwell product Series 86xt contains a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. *See* Fig 5.1.H.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company 86xt Block and Tackle System products are infringing on claim 1 of the Plaintiffs" US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 2. The device in claim 1 wherein the bottom guide roller is located external to the channel ('264 patent, column 6, lines 57-58).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called series 86xt, that it contains a bottom guide roller located in the bottom guide and visibly extends beyond the channel.

Based on the above observations, it is my opinion that the defendant's Caldwell Manufacturing Company series 86xt Block and Tackle System products are infringing on claim 2 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 3. The device according to claim 2 where in the top angled portion is sized to receive a member of the window sash ('264 patent, column 6, lines 59-60).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called series 86xt, that it contains a top angled portion is sized to receive a member of the window sash. The top angled portion is sized to cooperate with a window sash

23

cam, as shown in the Caldwell brochure cover page (C000498). This top angled portion is formed by the assembly of the top guide and the top end of the channel through a fastening means of a rivet.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 3 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 4. The device according to claim 1 wherein a portion of the bottom guide is external to the channel ('264 patent, column 6, lines 61-62).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that a portion of the bottom guide is external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 4 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 5. The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of the window sash ('264 patent, column 6, lines 63-64).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt that it contains a bottom guide that forms a channel to receive a portion of the window sash. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front or title page (C000498), the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 5 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 6. The device in claim 1 wherein the fixed pulley block unit comprises a frame, an axle, and at least one pulley rotatable around the axle ('264 patent, column 6, lines 65-67).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a fixed pulley block unit comprising a frame, an axle and 2 pulleys rotatable around the axle.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 6 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 7. The device according to claim 6 wherein the axle is located within the frame ('264 patent, column 7, lines 1-2).

24

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains an axle is located at least partially within the frame.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 7 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 9. The device in claim 1 wherein the translatable pulley block unit comprises a frame, an axle within the frame, and at least one pulley rotatable around the axle ('264 patent, column 7, lines 6-8).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a translatable pulley block unit comprising a frame, an axle at least partially within the frame and 2 pulleys rotatable around the axle.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 9 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 10. The device according to claim 1 wherein the top guide includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel ('264 patent, column 7, lines 9-12).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a top guide that includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel to form an integrated assembly.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 10 of the Plaintiffs'' US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 11. The device according to claim 1 wherein the fixed pulley block unit is integral within the bottom guide ('264 patent, column 7, lines 13-14).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a fixed pulley block that is integral within the bottom guide to form an assembly.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 11 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 12.</u> A window assembly comprising ('264 patent, column 7, lines 15-42):

A window frame with two jambs with jamb pockets;

at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets, and;

at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising:

channel comprising a first end and a second end;

a top guide connected to the first end of the channel;

a bottom guide connected to the second end of the channel;

a bottom guide roller rotatably mounted in the bottom guide;

a fixed pulley block unit connected to the channel;

a translatable pulley block unit moveable within the channel;

a spring comprising a first end and a second, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and

a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

Upon examining the physical Caldwell Block and tackle device that matches the U.S. Patent 6,598,264 B2; the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications containing 4 pages of front or title page (C000498), 2nd page of component part layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000501); the Caldwell engineering drawings (CW0054 -CW0099); and depositions of the Caldwell representatives, it is my opinion that the defendant Caldwell Manufacturing Company's Block and tackle Series 86xt products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 12 by virtue of the following observations:

    a. The Caldwell product Series 86xt is to be used in a window assembly with a window frame with 2 jambs and with jamb pockets; as shown in the Caldwell series 86xt Block and Tackle system brochure front page (C000498). *See* Fig. 7.12.A.

    b. The Caldwell product Series 86xt is to function with at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets, as shown in the Caldwell series 86xt Block and Tackle system brochure (C000498). *See* Fig. 7.12.B.

    c. The Caldwell product Series 86xt is a block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, as shown in the Caldwell series 86xt Block and Tackle system brochure (C000498). *See* Fig. 7.12.C.

    d. The Caldwell physical product Series 86xt contains a channel comprising a first end and a second end; *See* Fig. 5.12.D.

    e. The Caldwell physical product Series 86xt contains a top guide connected to the first end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories, C000500) shows 2 part numbers of top guides. *See* Fig. 5.12.E.

    f. The Caldwell physical product Series 86xt contains a bottom guide connected to the second end of the channel. In addition, the Caldwell brochure entitled Series

26

86xt Block and Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories,C000498) shows 2 part numbers of bottom guides. *See* Fig 5.12.F.

g.  The Caldwell physical product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide. *See* Fig 6.12.G. In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term ""bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 12 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

h.  The Caldwell physical product Series 86xt contains a fixed pulley block unit connected to the channel; *See* Fig 5.12.H.

i.  The Caldwell physical product Series 86xt contains a translatable pulley block unit moveable within the channel; *See* Fig 5.12.I.

j.  The Caldwell physical product Series 86xt contains a spring comprising a first end and a second, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and; *See* Fig 5.12.J.

k.  The Caldwell physical product Series 86xt contains a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the to the translatable pulley block unit and the second cord end being attachable to a jamb. *See* Fig. 5.12.K.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 12 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 13. A window balance system comprising: ('264 patent, column 7, line 46 – column 8, line 2)

a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and
a bottom guide roller rotatably mounted in the bottom guide.

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, the Caldwell engineering drawings (CW0054 - CW0099); and the corresponding Caldwell brochure (C000498-C000501) that it contains

27

a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame. *See* Fig. 5.13.A. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front or title page (C000498), the bottom guide is shown adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame.

I also observe that the Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide. *See* Fig. 6.13.B. In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term "bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 13 of the Plaintiffs" US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 14. The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto ('264 patent, column 8, lines 3-5).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-C000501), that it contains a bottom guide roller located at least partially external to the channel when the bottom guide is attached thereto.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 14 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 15. The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto ('264 patent, column 8, lines 6-8).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-

C000501), that it contains at least a portion of the bottom guide which is external to the channel when attached thereto.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 15 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 16. The device according to claim 13, wherein the bottom guide forms a channel to receive a portion of a window sash when installed ('264 patent, column 8, lines 3-11).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt and the corresponding Caldwell brochure (C000498-C000501), that it contains a bottom guide that forms a channel to receive a portion of the window sash when installed. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front (title) page, the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 16 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 18. A window balance device comprising: ('264 patent, column 8, lines 15-23):
a channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel; and adapted to slide in a jamb
     pocket when installed in a window frame; and
a bottom guide roller rotatably mounted in the bottom guide.

Upon examining the physical Caldwell Block and tackle device that matches the U.S. Patent 6,598,264 B2; the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications containing 4 pages of front or title page (C000498), 2nd page of component part layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000501); the depositions of the Caldwell representatives; and the Caldwell engineering drawings (CW0054 -CW0099), it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system Series 86xt products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 18 by virtue of the following observations:
   a. The Caldwell product Series 86xt contains a channel comprising a first end and a second end; *See* Fig. 5.18.A.
   b. The Caldwell product Series 86xt contains a top guide connected to the first end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories, C000500) shows 2 part numbers for top guides. See Fig.5.18.B.
   c. The Caldwell product Series 86xt contains a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame. In addition, the Caldwell brochure entitled Series 86xt Block and

Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories, C000500) shows 2 part numbers of bottom guides. See Fig.5.18.C.

d. The Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide. In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term ""bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation. See Fig.6.18.D.

I understand from examining Caldwell's Supplemental Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 18 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 19. The device of claim 18 wherein the bottom guide roller is located external to the channel ('264 patent, column 8, lines 25-26);

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-000501), that it contains a bottom guide roller located at least partially external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 19 of the Plaintiffs" US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 20. The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel ('264 patent, column 8, lines 27-28).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-C000501), that it contains at least a portion of the bottom guide which is external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 20 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 21.</u> The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of the window sash when installed ('264 patent, column 8, lines 29-30).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt and the corresponding Caldwell brochure, (C000498-C000501) that it contains a bottom guide that forms a channel to receive a portion of the window sash when installed. In the Caldwell brochure series 86xt Block and Tackle System, Extended travel for sideload applications front or title (C000498) page, the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant's Caldwell Manufacturing Company Series 86xt Block and Tackle System products are infringing on claim 21 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

**III. Infringement by Caldwell systems of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97ez products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' U.S. Patent No. 6,820,368 B2.

Claim 2. This claim states as follows: ('368 patent, column 8, lines 48-67):
A window balance system comprising:
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

Upon examining the physical Caldwell product, as well as the Caldwell 4-page brochure entitled "Series 97ez Block and Tackle System, Easy Installation for Tilt Applications" (C000514-C000517) and the Caldwell engineering drawings (CW0001 -CW0015 and CW0183-CW0195), it is my opinion that the defendant Caldwell Manufacturing Company's Series 97ez system products are infringing on the Plaintiffs' U.S. Patent 6,820,368 B2 claim 2 by virtue of the following observations:

    a. The Caldwell product Series 97ez contains a U shaped channel comprising a plurality of openings; *See* Fig 8.2.A.
    b. The Caldwell product Series 97ez contains a spring connected to a system of pulleys located within the U shaped channel; *See* Fig 8.2.B.
    c. The Caldwell product Series 97ez contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; *See* Fig 8.2.C.
    d. The Caldwell product Series 97ez contains a balance shoe (Fig 8.2.D), wherein the balance shoe comprises:
    a frame comprising an enlarged first end (Fig 9.2.E) and a second end (Fig. 9.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 9.2.G). The disputed term "pocket" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening

32

shaped to mate (i.e., to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell balance shoe is called in their 97ez brochure page 3 (C00516) as the "side locking pivot shoe". The Caldwell shoe forms a notch adapted to mate with a rivet in the U shaped channel. I observe that the notch located physically in the Caldwell device at the narrow end of the plastic carrier.

I observe that the Caldwell product 97ez has two rivets in the U shaped channel. The first rivet, located at the end of the channel, is enclosed completely by the shoe and the shoe can rotate freely around the first rivet. The second rivet, located near the first rivet but towards the center of the channel, prevents the free rotation of the shoe. This is confirmed by the testimony given during the deposition of Mr. Jeffrey Robertson, a Caldwell design engineer familiar with the design of the 97ez, where he confirms the connecting scheme as follows: In his testimony, as shown in Exhibit 6 to his deposition, the first rivet (near the channel end) is called E, and the second rivet (towards the center of the channel) is called D. The plastic feature that forms the pocket or "notch" in the shoe in the District Court of Massachusetts definition is called F in exhibit 6 of the Robertson deposition. The feature called F mates (i.e., joins together) with the rivet D.

In the Robertson deposition, beginning on page 53 line 25, Mr. Robertson answered the following question:

    Q. If I removed the plastic portion F and forcibly rotated the bottom of the carrier into the page, would the carrier rotate about the rivet E?
    A. Yes.

In the Robertson deposition beginning on page 73, line 14, Mr. Robertson answered the following question:

    Q. Now the rivet labeled "E" in exhibit 6, would allow the carrier to rotate about itself; is this correct?
    A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97ez shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance."

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ez product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: a possible function of the pocket in claim 2 is to prevent displacement or rotation of the balance shoe during shipping, handling and in use. When the shoe is under a force directed at the enlarged end, the pocket touches a fastener (i.e. rivet) in order to stop the displacement (rotation) of the shoe.

In Mr. Robertson's deposition, on page 49, Mr. Robertson answered the following question:

33

Q. Now in the 97ez, what is the purpose of the plastic part you labeled as "F"?
A. Prevent rotation in the carrier in the channel.
Q. Is this to prevent rotation of the carrier while in operation?
A. During handling of the balance or shipping of the balance.

Mr. Robertson also testified on page 51:
Q. Is there any circumstance in which F would touch the rivet D?
A. If the shoe is rotated forcibly in the direction opposite to that we were just discussing.
Q. And when would that happen?
A. Possibly in shipping and handling.

Given Mr. Robertson's testimony and my own examination of the Series 97ez, I conclude that the part of the Caldwell 97ez shoe that forms a notch shaped to mate with a rivet performs the same function of preventing unwanted rotation of the balance shoe as the invention. The 97ez will stop displacement (rotation) in the same manner as the invention by contacting a rivet, thus achieving the same result of securing the balance shoe in the channel during shipment, handling, and usage.

e.   The Caldwell product Series 97ez contains a locking member proximal to the enlarged first end. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to "**Rotate** cam to lock shoe in place…." *See* Fig. 8.2.H.

f.   The Caldwell product Series 97ez contains a cam in communications within the locking member. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to "**Rotate** cam to lock shoe in place…." *See* Fig. 9.2.I.

g.   The Caldwell product Series 97ez contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

The Caldwell 97ez product contains a rivet that connects the balance shoe to the U shaped channel of the inverted window balance. *See* Fig. 9.2.J.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ez product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel. In the Caldwell 97ez product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

34

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 3. The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock construed the term as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97ez has a rivet as the connecting device. I also refer to section (g) in my discussion of claim 2 of the '368 patent above as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on the plaintiffs' claim 3 of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 6. The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez that it contains a cam at least partially housed within the enlarged end of the frame, called the "carrier" in page 3 (C000516) of the Caldwell brochure for system 97ez, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:

> **Slide** the series 97ez Block and tackle balance into the frame pocket.
> **Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
> **Rotate** cam to lock shoe in place…

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 7. The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent, column 9, lines 12-14).

35

I observe from examining the physical Caldwell series 97ez that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 8. The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from examining the physical Caldwell product 97ez that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:
**Slide** the series 97ez Block and tackle balance into the frame pocket.
**Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
**Rotate** cam to lock shoe in place...

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 11. The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from examining the physical Caldwell Series 97ez that it contains a cam comprises of at least one camming surface (the observed Caldwell product has 2 camming surfaces) and a keyhole opening sized to receive a pivot bar. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:
**Slide** the series 97ez Block and tackle balance into the frame pocket.
**Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
**Rotate** cam to lock shoe in place....
**Install** the sash by dropping the bottom corner pivot bar into the shoe opening....

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for

36

tilt applications called Series 97ez products are infringing on claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

**IV. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97ih products are infringing on claims 2, 3, 6, 7, 8 and 11 of plaintiffs' U.S. Patent 6,820,368 B2.

Claim 2. This claim states as follows:
A window balance system comprising
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

('368 patent column 8, lines 48-67)

I examined photos of the device, including the one denoted in the Robertson deposition as Exhibit 3. I also examined three engineering drawings included as Exhibit 12 to the Batten deposition. They are:

1. 97i(H) Channel, Caldwell drawing ## 15A10/15A11, rev 2, drawn 05-20-04, approved 01-07-05
2. 97i(H) Balance assembly-screw mounted, Caldwell drawing ##15A50/15A51 rev 2, drawn 05-21-04, approved 01-10-05. The drawing is clearly marked with the location of the locking mechanism and the cam by Mr. Batten during his testimony in his deposition (page 146, line 21, and page 147 line 21).
3. 97i(H) Balance assembly-short/screw mounted, Caldwell drawing ##15A52, rev 1, drawn 08-13-04, approved 01-10-05.

According to the Batten Deposition, the Caldwell 97ih product preceded the 97ez product (Batten deposition, page 72, line 1). The 97i preceded the 97ih, and both products were very similar, with the same shoe. Quote from the Batten deposition page 74, lines 13- 24.
A. There was a predecessor product to the [97]ih called 97i. It was a predecessor to the I hybrid, otherwise known as ih.
Q. What is the difference between the [97]ih or i hybrid and the 97i?
A. The principal difference is the weight and range of the two products. The sash weight ranges that each carries is a little bit different.
Q. Is there any difference in the shoe between the 97i and the 97ih?
A. No.

38

Another quote from the Batten deposition compares the 97ih to the 97ez; quote (page 147, beginning line 22)

Q. Does the locking mechanism for the 97ih work in the same way as the 97ez's locking mechanism?

A. Yes.

Q. So if you rotate the cam, it forces the ends out and they engage in the jamb tracks?

A. That is correct.

Q. Did the 97i, the original 97i, prior to the introduction of the 97ih have the same carrier as what is depicted here in Exhibit 12?

A. I have to make sure we get our i's straight here

Q.I am talking with reference to the 97i that you testified earlier was a predecessor to the 97ih, that 97i, the one no longer on the market, was replaced sometime in 2004.

A. Yes.

Q. Did the carrier for that balance, was it the same carrier as what is shown here as the 97ih?

A. I believe it was, yes.

Based on the above discussion, it is my opinion that the defendant Caldwell Manufacturing Company's Series 97ih system products are infringing on claim 2 of U.S. Patent 6,820,368 B2 by virtue of the following observations:

a. The Caldwell product Series 97ih contains a U shaped channel comprising a plurality of openings; *See* Fig. 10.2.A.

b. The Caldwell product Series 97ih contains a spring connected to a system of pulleys located within the U shaped channel; *See* Fig. 10.2.B.

c. The Caldwell product Series 97ih contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; *See* Fig. 10.2.C.

d. The Caldwell product Series 97ih contains a balance shoe (Fig. 10.2.D), wherein the balance shoe comprises:
    a frame comprising and enlarged first end (Fig. 10.2.E) and a second end (Fig 10.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 11.2.G). The disputed term "pocket" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell shoe forms a notch adapted to mate with a rived in the U shaped channel. More of my observations on this issue are noted in element (h).

e. The Caldwell product Series 97ih contains a locking member proximal to the enlarged first end. *See* Fig. 10.2.H.

f. The Caldwell product Series 97ih contains a cam in communications within the locking member. *See* Fig. 11.2.I.

39

g. The Caldwell product Series 97ih contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. *See* Fig. 11.2.J. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) and engineering drawings of two shoe sizes (called the carrier) in the Batten deposition, exhibits 12 and 13 (C004553 and C004554), that the Caldwell 97ih has two rivets in the U shaped channel.

The first rivet, located towards the center of the channel, is used to anchor the spring. The second rivet is used to connect the carrier to the balance. This is collaborated for the first rivet by the Robertson deposition, page 26, lines 2-5, quote:

Q. As you are looking at it. What is the purpose of this rivet [to the right of the page?
A. It is to anchor the spring.

The second rivet function is also collaborated by the Robertson deposition, page 26, lines 15-19, quote:

Q. Is it also correct to say the leftmost rivet connects the carrier to the channel?
A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97ih shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The notch is indicated by the letter H in the Batten deposition Exhibit 13 (Batten deposition, page 142, line 24).

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ih product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel. In the Caldwell 97ih product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle Series 97ih products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 3.</u> The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97ih has a rivet as the connecting device. I also refer to section (g) in my discussion of claim 2 of the '368 patent above as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 3 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 6.</u> The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a cam at least partially housed within the enlarged end of the frame, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 7.</u> The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent, column 9, lines 12-14).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle 97ih products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 8.</u> The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of

the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97ih that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 11.</u> The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97ih that it contains a cam comprises of at least one camming surface (the observed Caldwell product has 2 camming surfaces) and a keyhole opening sized to receive a pivot bar.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

**V. Infringement by defendant, Caldwell Manufacturing Company, of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant's Caldwell Manufacturing Company Series 97i products are infringing on claims 2, 3, 6, 7, 8 and 11 of plaintiffs' U.S. Patent 6,820,368 B2.

Claim 2. This claim states as follows:
A window balance system comprising:
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

('368 patent, column 8, lines 48-67):

Upon examining Caldwell brochure package Series 97i Block and Tackle System Inverted Operation for tilt application, containing 4 pages of front or title page (C000490), 2nd page of component part layout and description (C000491), 3rd page of technical specifications, accessories and installation (C000492), and 4th page of warranty and contact information (C000493); and the Caldwell engineering drawings (CW0016 -CW0039), it is my opinion that the defendant Caldwell Manufacturing Company's Series 97i system products are infringing on the Plaintiffs' U.S. Patent 6,820,368 B2 claim 2 by virtue of the following observations:

    a. The Caldwell product Series 97i contains a U shaped channel comprising a plurality of openings; *See* Fig. 12.2.A.
    b. The Caldwell product Series 97i contains a spring connected to a system of pulleys located within the U shaped channel; *See* Fig 12.2.B.
    c. The Caldwell product Series 97i contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; *See* Fig 12.2.C.
    d. The Caldwell product Series 97i contains a balance shoe (Fig. 12.2.D), wherein the balance shoe comprises:
        a frame comprising and enlarged first end (Fig. 12.2.E) and a second end (Fig. 12.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 11.2.G). The disputed term "pocket" was clarified by the

memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell balance shoe is called in their 97i brochure page 3 (C00492) as the "locking pivot shoe". The Caldwell shoe forms a notch adapted to mate with a rived in the U shaped channel. More of my observations on this issue are noted in element (g).

e.  The Caldwell product Series 97i contains a locking member proximal to the enlarged first end. *See* Fig. 12.2.H.  In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to "**Rotate** cam to lock shoe in place…."

f.  The Caldwell product Series 97i contains a cam in communications within the locking member. *See* Fig. 11.2.I.  In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to "**Rotate** cam to lock shoe in place…."

g.  The Caldwell product Series 97i contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. *See* Fig. 11.2.J. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

I note from the Batten deposition page 74, lines 13- 24:

A. There was a predecessor product to the [97]ih called 97i. It was a predecessor to the I hybrid, otherwise known as ih.
Q. What is the difference between the [97]ih or i hybrid and the 97i?
A. The principal difference is the weight and range of the two products. The sash weight ranges that each carries is a little bit different.
Q. Is there any difference in the shoe between the 97i and the 97ih?
A. No.

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) and engineering drawings of two shoe sizes (called the carrier) in the Batten deposition, exhibits 12 and 13 (C004553 and C004554), that the Caldwell 97i has two rivets in the U shaped channel.

The first rivet, located towards the center of the channel, is used to anchor the spring. The second rivet is used to connect the carrier to the balance. This collaborated for the first rivet by the Robertson deposition, page 26, lines 2-5, quote:

Q. As you are looking at it. What is the purpose of this rivet [to the right of the page]?
A. It is to anchor the spring.

44

The second rivet function is also collaborated by the Robertson deposition, page 26, lines 15-19, quote:
Q. Is it also correct to say the leftmost rivet connects the carrier to the channel?
A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97i shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The notch is indicated by the letter H in the Batten deposition Exhibit 13 (Batten deposition, page 142, line 24).

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97i product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the   Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel.  In the Caldwell 97i product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 3. The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97i has a rivet as the connecting device. I also refer to section (g) in claim 2 of the '368 patent as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing on the plaintiffs' claim 3 of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 6. The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to

engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, exhibit 3), that it contains a cam at least partially housed within the enlarged end of the frame, called the "carrier" in page 3 (C000492) of the Caldwell brochure for system 97i, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to perform the following functions:

> **Slide** the series 97i Block and tackle balance into the frame jamb pocket.
> **Insert** a mounting screw through the terminal and fasten securely to the jamb.
> **Rotate** cam to lock shoe in place...

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 7.</u> The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent column 9, lines 12-14).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 8.</u> The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, exhibit 3) for the Caldwell product 97i that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to perform the following functions:

> **Slide** the series 97i Block and tackle balance into the frame jamb pocket.
> **Insert** a mounting screw through the terminal and fasten securely to the jamb.

**Rotate** cam to lock shoe in place...

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 11.</u> The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97i that it contains a cam comprises of at least one camming surface (the observed Caldwell product has two camming surfaces) and a keyhole opening sized to receive a pivot bar. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:

**Slide** the series 97i Block and tackle balance into the frame jamb pocket.
**Insert** a mounting screw through the terminal and fasten securely to the jamb.
**Rotate** cam to lock shoe in place...
**Install** the sash by guiding the bottom corner pivot bars into their respective carrier opening....

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Sincerely yours

Dr. Sammy G. Shina, P.E.
19 Swanson Road
Framingham, MA 01701
Sammy_shina@uml.edu
Home 508 877 6109, Work 978 934 2590;
cell 508 934 9176

TAB A

**Dr. Sammy G. Shina, Ph.D., PE**

*OFFICE:* College of Engineering
University of Massachusetts Lowell
1 University Avenue
Lowell, MA 01854
Phone:  (978) 934 2590
Fax:    (978) 934 3048
Cell    (508) 934 6777
Sammy_Shina@UML.edu
DOB       9/28/ 44

*HOME:*   19 Swanson Road
Framingham, 01701
Phone and fax
(508) 877-6109

# A. EDUCATION AND ACADEMIC QUALIFICATIONS

### 1. Education (Degrees, with fields, institutions and dates).

| | | |
|---|---|---|
| Ph.D. | MECHANICAL ENGINEERING | TUFTS, 1998 |
| M.S. | COMPUTER SCIENCE | WPI, 1972 |
| B.S. | INDUSTRIAL MANAGEMENT - | MIT, 1966 |
| B.S. | ELECTRICAL ENGINEERING- | MIT, 1966 |

Completed 6 courses in the Computer Engineering graduate program at Boston University.

### 2. Academic Experience

| | |
|---|---|
| 1999 - Current | University of Massachusetts Lowell, College of Engineering Full time Professor, Department of Mechanical Engineering |
| 2003 | Coordinator of the Graduate Certificate Program: Design and Manufacturing Engineering |
| 2000 | e-Engineering lectures, National Technological University, and PBS Business Network |
| 1992 - Current | University of Massachusetts Lowell, College of Engineering Full time Associate Professor, Department of Mechanical Engineering |
| 1989- 1995 | Adjunct Professor, University of California Irvine |
| 1993 - 1995 | Adjunct Professor, University of Pennsylvania EXMSE program for business executives |
| 1994 - 1995 | Lecturer, Six Sigma Institute on Quality and Concurrent |

1

|            | Engineering, Motorola University for Motorola and Texas Instrument Six Sigma Black Belt Engineers. |
|------------|---|
| 1988-1992  | University of Lowell, College of Engineering<br>Full time Associate Professor, Department of Industrial Technology |
| 1970-1990  | University of Lowell, Continuing Education<br>Adjunct Faculty, Industrial Technology Department |
| 1985-1988  | Technical Education Coordinator for Hewlett Packard Corporation, Waltham MA |

Set up the training courses for the different tools and systems such as Mechanical and Electrical CAD/CAM. Introduced Masters of Engineering Programs from the National Technological University and Boston University engineering schools for 400 engineers.

|            | |
|------------|---|
| 1967-1968  | The Technical Education Institute, Florence, SC<br>Taught Computer Programming, Mechanical and Electrical Engineering courses in the Institute. |

2

## B. PROFESSIONAL ACTIVITIES

### 1. Professional Association

Secretary and Past chairman for the Robotics Chapter of the SME (Society of Manufacturing Engineers), Chapter 293, Region 5. Chairman elect 1998.
***Member(current or past) of the following professional societies:***
Society of Quality Engineers (ASQC)  - Senior Member
Society of Manufacturing Engineers (SME) - Senior Member
American Society for Engineering Education (ASEE) - Senior Member
Institute of Electrical and Electronics Engineers (IEEE) - Senior Member
Member of the Board of Directors, Massachusetts Quality Award
Quality Examiner, Massachusetts Quality Award
Registered Professional Engineer (EE) in Massachusetts, No. 345922.
Senior Member of the Surface Mount Technology Association (SMTA) No 13849

### 2. Work Experience

Summer of 2000    CoCreate CAD Software, Fort Collins, Colorado
    I was engaged by CoCreate to develop the concepts and strategies of collaborative engineering by researching and interviewing companies engaged in the design of mechanical products using distributed design teams as well as distributed supply chains. The results of the research are to be documented in case studies and future publication in journals and a fifth book.

Summers of 1997/1998    Lecroy Corporation, Chestnut Ridge, NY
    I was engaged by the Lecroy Corporation Network Products Group to select an outside manufacturing contracting services for PCB, Instrument and system assembly and test. Evaluated several potential contractors and helped select the manufacturing plan and the contractor.

Summer of 1992    Phillips Kommunication Industrie AG, Nuremberg, Germany.
During the summer of 1992, I was engaged by the company to help transition the product creation process from a serial (throw it over the fence) to concurrent engineering. I worked with the management and engineering teams of the company to effect that transition, My work at the company formed the basis of the first chapter in my second book on concurrent engineering.

1971-1988    HEWLETT PACKARD WALTHAM DIVISION, Waltham, MA
    I worked for the company in many positions, both at the division and the corporate levels.  I filled many diverse assignments: manufacturing engineer and manager, in the process, production and tool engineering departments. I have successfully built and turned on a $10 million automated electronic manufacturing plant and associated wastewater treatment system in 1980. I have received an award from the MDC for the design of the plant, which was featured on the front cover of their annual report.
    As a production manager, I understood how to manage and ship more than $50 million of medical electronics instruments in 1985, and managed an

3

organization of 300 workers, including ten supervisors, manufacturing and process engineers. This position gave me a unique perspective on the congruence of design, manufacturing, operational and engineering issues.

A significant assignment was the Waltham division productivity manager in 1986, where I investigated the methodologies on how to increase engineers' productivity and quality. I was in charge of capital equipment and training for 400 engineers. I spend more than $7 million on CAD and associated equipment, especially automatic links to manufacturing and CAM. One of the visitors to Hewlett Packard described my efforts in the field of Design - Manufacturing connection in 1986 as the most complete he has seen outside of Detroit. This assignment led me to formulae my opinions about concurrent engineering, which I published in my first book 1991.

Engineering Assignments:

Surface Mount Technology (SMT) Coordinator
Computer Aided Design (CAD) Manager
Prototype-In-Production (PIP) Program Manager
Automatic Test of PC Boards Systems Designer/Manager
Automatic N/C generation for Punch Press equipment
Printed Circuit Board Fabrication System Designer
Automatic PC Solder and Wash System Designer
Automatic Insertion of Components Systems designer/Manager

Line Management Experience:

Auto Insertion Department Manager.
Medical Monitoring Instruments Assembly and Test Manager
Central Station Monitoring Assembly and Test Manager
Oximeter and Capnometer Assembly and Test Manager
Engineering Services Manager
Productivity Manager
Tool Engineering Manger
Manufacturing Technology Manager

1968-1971    RCA COMPUTER SYSTEMS DIVISION, Marlborough MA

Designed an automatic manufacturing / test systems for computer peripherals, including magnetic tape storage and high speed disc storage devices. I was slated to become the manufacturing engineering manager before RCA decided to quit the IBM mainframe compatible market in 1971, and closed the plant.

1966-1968    UNION CARBIDE COOPERATION LINDE DIVISION, Florence, SC

I introduced computer technology to the plant that was newly built in the south. I designed computer based inventory control and material handling systems, including working with one of the first IBM bill of materials processors.

4

## C. RESEARCH

### 1a. Awarded Grants and Contracts

__Funded__ (^$750,000)

| | |
|---|---|
| 001402-001 | Lead Free Solder Testing, EPA work order #4w-1362-NAEX, 9/2004, $25,000. |
| 05-8011 | Income Account for Lead Free Consortium Schneider Automation, MACOM; and Analog Devices 2000-2004= $8,500 |
| UML Turi | Support for Lead Free Consortium $6000; in 5/02 and 5/03 |
| UML Turi | Research Fellowships for Lead Free Soldering, $20,000 9/99; $6,000 9/00; $20,000 9/01 Total = $46,000 |
| Corporate Education | "Skills Training – Machine Controls and XY Movement) Lucent Technology , Summer 2000, $13,000 |
| 99-348 | Parlex Corporation Student Interneship, June 1999 $14,450 |
| 05- 08225 | Resin Technology, MFG. Evaluation, January 1999, $3,844 |
| Corporate Education | "Skills Training – Machine Controls and XY Movement) Lucent Technology , Fall 1999, $32,000 |
| 05- 08112 | Microtouch Corporation, MFG. Evaluation, July 1998, $13,908 |
| UML TURI | MFG Research Fellowship for Sunny Grover, in Additive PCB's Build Up Vias, September 1998, $25,000 |
| 05-08011 | Coop and Internship Income Account, March 1998, $2,100 |
| UML TURI | MFG Research Fellowship for Val Carvalho, May 1997, in Additive PCB Fabrication Technology, $25,000.00 |
| CITA | Conception, Product Development and Environmentally Appropriate Technology, with Maas, Fiddy, Geiser and McCarthy, May 1997, $4190 |
| UML TURI | MFG Research Fellowship for Dennis Gagne, 9/1996, Additive PCB Fabrication Technology, $15,345.00 |

5

| Continuing Education | "Manufacturing and Total Quality Management and Control", USCI Baird with Stephen Driscoll, June 1996, $50,000. |
| --- | --- |
| 05 -07433-F | "Undergraduate Faculty Development in New Product Realization", National Science Foundation, June 1996, $44,000 |
| 05- 07212 | EASNE Design for Quality, UML-UGC2-5, May 1996, $68,000; Co-PI with R. Giglio, UMA. |
| 05-07362 | "Practical Statistics for Engineers", USCI Baird, December 1995; with Professor McKelliget, $5,000 |
| UML TURI | MFG Research Fellowship for Doug Sommer, in NO Clean Paste for PCB Assembly, September 1995, $15,345.00 |
| UML TURI | MFG Research Fellowship for Paul Haley, in NO Clean SMT Paste for PCB Assembly, September 1994, $15,645.22 |
| 05 - 6450-F | "Undergraduate Faculty Development in Concurrent Engineering and Design for Manufacture", National Science Foundation.  June 1993, $77,810. |
| Continuing Education | "Concurrent Engineering, Quality Management and Control", Baush & Lomb Corporation, July 1992, $16,000. |
| 05 - 6222 | "Faculty and Course Development", GE Aircraft Engines Education Fund, February 1992, $10,000 |
| 05 - 5850 | "Faculty and Course Development", GE Aircraft Engines Education Fund, February 1991, $10,000 |
| 05 - 5807-F | "Undergraduate Faculty Development in DFM", National Science Foundation. January 1991, $54,924. |
| 05 - 5636 | "Concurrent Engineering and Design for Manufacturing", Genrad Corporation, June 1990, $1,500. |
| 05 - 5792 | "Faculty and Curriculum Development", Society of Manufacturing Engineering Education Foundation, May 1990, $ 9,500. |
| 16 - 5336 | "Technology Transfer Grant in Manufacturing Engineering", Costa Rica Educational Development Center, with John Colluccini. May 1989, $ 8,404. |

6

| 16 - 5257 | "Process Quality Improvements Using SPC and Taguchi Methods", Wang Labs Incorporated, April 1989, $48,334. |
| 16 - 5260 | "Factory Process and material handling optimization using simulation tool", Wang Labs Incorporated, April 1989, $ 58,939 |
| Continuing Education | More than $100,000 in seminars on quality an Concurrent Engineering, 1989-1993 |

**1b. Equipment and Software Grants ($178,000)**
GENRAD Tester, $140,000, 12/ 1998; Hewlett Packard, Optical Laser Measurement System, $15,000, 5/ 1996; Storm Software, Manufacturing Software, $2000, 5/1995.; AMTX Corporation, Screening Stencils, $1,000, March 1995; AT&T, Merrimack Valley Works, for 2 ADEPT Robots, book value: $15,000, 11/1993; UTZ Corporation, Screening Stencil, $1,000, 12/1993; CACI Products Company, SIMFACTORY Software training, $4,000, 12/ 1993.

**1c. Consultancy:**
<u>University and Technical Conference Based Seminars and Training</u>
University of Massachusetts, Lowell, University of California, Irvine, University of Pennsylvania, ExMSE Program, Motorola University Six Sigma Institute, Bellevue Community College, Washington, Brunel University, London, NEPCON Conferences and Expositions, NEPCON College of Manufacturing, SMT International Conference and Exposition, Hong Kong Productivity Council, Singapore Center for Management Technology, American Society for Quality Control (ASQC), Puerto Rico Chapter, Society of Manufacturing Engineering (SME), New England Region, Iteso, University, Guadalajaro, Mexico, Mexican Branch of the IEEE, Australian SMCBA Association, Technical University of Costa Rica, Technical University of Puerto Rico, Arab School of Science and Technology, Society of Manufacturing Engineers(SME), SMTI Chicago
<u>Consultancy, US</u>
Omnisonis, CoCreate, Lucent, BTU, Phoenix International; Teradyne, Bose, Lecroy, General Scanning, Lockheed Martin Sanders, General DataCom, MicroTouch Systems, Leybold Inficon, PictureTel, USCI Baird, Hewlett Packard, Motorola, Pensar Corporation, AT&T Corporation, AMETEK Corporation, M/ACom Corporation, GTE Sylvania, Atlanta Scientific, U.S. Navy, Port Hueneme and Pt. Mugu; Xerox Corporation, Polymer Technology, National Science Foundation, General Electric Aircraft Engines, Genrad Corporation, Tredgar Plastics, C&K electronics, Parker Brothers, Wang Incorporated


<u>Consultancy, International</u>
Havelsan Company, Ankara, Turkey, Hong Kong Productivity Council Fisher and Paykel, Switchtek Power Systems, Tait Electronics and Dynamic in New Zealand. Phillips Kommunication Industrie AG, (Nurenberg, Germany),

7

Australian Electronics Development Center, Victoria Australia, Surface Mount and Circuit Board Association, Hughesdale, Australia; NISTEC (Advanced Technologies in the Electronics Industry), Petah Tikva, Israel; R&D Network Devices, Efrat Technology and ECI Telecom, Petah Tikvah, Israel; NECPON Singapore, NPCON Europe, Puerto Rico ASQC, Mexicon, Mexico

**EXPERT WITNESS/** Litigation Support Experience

1. Xyratics Design v AB circuits v Eltek, 1999: The case involved quality issues in the electronics supply chain. The plaintiffs and defendants were value added manufacturers that worked on a product originated in a South Korean Company, which had hidden defects in the product. The Korean company went bankrupt, and the other companies in the supply chain sued each. I advised on the issues of proper testing and quality procedures in the electronics industry, especially when related to the supply chain. I wrote several expert reports on test and quality for the solicitors and barristers in the case. Case was settled out of court. *INCE and Company; Solicitors; 11 Byward Street; London EC3; England*

2. Vial, Inc., v. Triple S. Plastics, Inc., CV 97-499 (Dist. AZ); CV 98-102 (Dist. AZ): Patent infringement case involving molding of plastics injected parts, with two companies making plastic containers for the Dairy and consumer food industries. The patent included closing of plastic containers in the mold for the defendant, while the other company used similar techniques for closing the cap by a robotic arm. I help the plaintiff lawyers research the prior art to find instances of use of robotics in the plastics industry. *Morgan and Finnegan, L.L.P., Attorneys at Law, 345 Park Avenue, New York, NY 10154*

3. Fuji Machine Manufacturing Company, Ltd. V. Hoover-Davis Inc.; Civil Action No. 96-CV-5087I: Patent infringement case involving pick and place Feeder design. I worked with the lawyers of the plaintiff (FUJI) to explain the workings of the feeder, and how the design of the defendants (Hover-Davis) feeder design had similarity in function. *Oliff & Berridge, P.L.C, Attorneys at law; 700 South Washington Street, Alexandria, Virginia 22314*

4. US District Court Of Maine 05-32 –PC, RFT Technology Corporation V Applied Microwave Technology: Case including conversion, breach of contract and misappropriation of trade secrets. Case involved using the same design strategy and copying of CAD files versus reverse engineering claims by the defendants. I wrote an expert report, and was deposed in the discovery process. Case was settled out of court. *Hamilton, Brook, Smith & Reynolds, P.C. , 530 Virginia Road, P.O. Box 9133, Concord, Massachusetts 01742*

**2a. Academic & Professional Publications (94 publications)**

8

## Text and Reference Books (5 published)

1. S. Shina, "Six Sigma for Electronics Design and Manufacturing McGraw Hill, May 2002
2. Shina S. and Saigal A., "Manufacturing Costs for electronic Products", Volume 3 of the Encyclopedia of Materials, Elesevier Press, November 2001, pp 2727-2735.
3. S Shina , "Design Of Experiments", chapter 25 to "Environment Friendly Electronics: Lead-Free Technology" by J. Hwang, Electrochemical Publications Ltd, 2001.
4. S. Shina, editor and co-author, "Successful Implementation of Concurrent Engineering Products and Processes", published by Van Nostrand Reinhold N.Y., 1994, reprinted by Wiley Press.
5. S. Shina, "Concurrent Engineering and Design for Manufacture of Electronic Products", published by Van Nostrand Reinhold N.Y., 1991. Reprinted by Kluwer Academic Publishers.

## Papers published in refereed Journals and publications (10 papers published):

1. Shina S. and Saigal A., "Using Cpk as a Design Tool for New System Development", Journal of Quality Engineering, Volume XII, Number 4, 2000, pp. 333-349.
2. Shina S. and Saigal A., "A design Quality Based Cost Model for New Electronic Systems and Products," Journal Of Materials, April 1998, pp 29-33.
3. Shina S. and Saigal A., "Technology Cost Modeling for the Manufacture of Printed Circuit Boards in New Electronic Products," Journal of Manufacturing Science and Engineering, May, 1998, pp 368- 375.
4. Shina, S., Gagne D. and Quaglia, M., "Methods for paste Selection and Process Optimization for Fine Pitch SMT, Journal of the SMART (Surface Mount and Related Technologies) Group, No. 24, October 1996, pp. 8-11.
5. Shina, S., W. Eaton W., et all, "Using circuit simulation with Taguchi Design of Experiment Techniques to optimize the performance of a digital half-adder integrated circuit", Quality Progress, Journal of Quality Engineering, 1993, Vol. 5, Number 4, pp. 589-600.
6. Shina, S., "Taguchi Experiments for Improving Solder Quality", Journal of Surface Mount Technology, July 1992, pp. 4-13.
7. Shina, S., "Developing a course in Design for Manufacture", Journal of Industrial Technology, Volume 7, Number 2, 1991. pp. 7 - 11
8. Shina, S., "The successful use of the Taguchi Method to Increase Manufacturing process Capability", Journal of Quality Engineering, Volume III, Number 3, 1991, pp. 333-349.
9. Shina, S., "New Rules for World Class Companies", IEEE Spectrum, July 1991. pp. 23-26
10. Shina, S., "The use of the Taguchi Method to Optimize Manufacturing", Technologia en Marsha, published by the Instituto Technologico de Costa Rica, Volume 10, Number 2, 1990.  pp. 3-7.

9

**Papers published in refereed Conferences (50 papers published/accepted)**

1. Shina S., Morose G. et al; "Visual and Reliability Testing Results of Surface Mounted Lead Free Soldering Materials and Processes in a Simulated Production Environment"; paper to be presented at the IPC Printed Circuits Expo, APEX and the Designers Summit, Anaheim, CA, February 2006

2. Shina S. et al, "Summary of New England Lead Free Consortium Implementation Plan of High Volume Assembly of Printed Wiring Boards", paper to be presented as the keynote speech at the Pan Pacific Microelectronics Symposium", Kona, Hawaii, January 2006

3. Shina et al; Consortium authors. "Analysis of Testing Results of Surface Mounted Lead Free Solders and Materials in Production Environments", paper accepted for the SMTI International, Chicago, IL, September 2004

4. Shina et al; Consortium authors. "Lead Free Consortium Update for Process Conversion", accepted for IPC/JEDEC 8th International Conference on Lead Free Electronic Assemblies and Components San Jose, California, April 2005

5. Shina et al; Consortium authors. "Lead Free Conversion Analysis for Multiple PWB/Component Materials and Finishes using Quality and Reliability Testing", APEX conference, Anaheim, CA, February 2005

6. Shina et al; "Analysis of Testing Results of Surface Mounted Lead Free Soldering Materials and Processes", Pan Pacific Conference, Kauai, January 2005.

7. Shina et al; "Summary of Visual and Reliability Testing Results of Surface Mounted Lead Free Soldering Materials and Processes"; 7th International IPC/JEDEC conference, Frankfurt, Germany, October 2004

8. Shina et al; Consortium authors. "Lead Free Conversion Analysis for Multiple PWB/Component Materials and Finishes using Quality and Reliability Testing", APEX conference, Anaheim, CA, February 2004

9. Shina et al; Consortium authors. "A Comparative Analysis of Lead Free Materials and Processes Using Design of Experiments Techniques", SMTI International, Chicago, IL, September 2003

10. Shina et al; "Testing Results for Lead-Free PWB's by the Massachusetts Lead-Free Electronics Research Consortium"; 2003 IEEE International; Symposium on Electronics and the Environment (ISEE); Boston, MA, May 2003.

11. Shina et al; " Materials and Processes for Surface Mount Lead Free Soldering", proceedings of the APEX Conference, Anaheim, CA, March 2003, pp.s20-2-1/9

12. Shina S; "A Cpk-Based Toolkit for Tolerance Analysis and Design," Engineering Design Conference; London; July 2002.

13. Shina *et al*, "Process and Material Selection for zero defects and superior adhesion Lead Free SMT soldering", SMTA International Conference, Chicago, IL., September 2001, pp 651 -656

14. Previous paper translated into Chinese by the Hong Kong SMT society for their annual conference 2004.

15. Shina et al, Reliability Testing Techniques For Lead Free Soldering Of SMT Technology", ETRONIX Conference, Anaheim, CA, March 2001.

10

16. Above paper translated into Japanese Journal ANBE, SMT, Kanagawa, Japan, July 2001

17. Shina et al, "Selecting Material and Process Parameters for Lead Free SMT Soldering Using Design of Experiments Techniques", Apex Conference, January 2001, San Diego, CA

18. Shina et al, "Design Of Experiments For Lead Free Materials, Surface Finishes And Manufacturing Processes Of Printed Wiring Boards", SMTA International Conference; Chicago, IL., September 2000

19. Previous paper translated into Chinese by the Chinese Electronics Association Journal. June 2001.

20. Previous paper translated into Chinese by the Hong Kong SMT society for their annual conference 2004.

21. S. Shina and M. Grover, "Developing Vias For Additive Technologies In Printed Wiring Board Fabrication", NEPCON East , Boston, June 1999, pp.77-83

22. Shina, "When Global Manufacturing Does not Work" , International Mechanical Engineering Congress and Exposition (IMECE), November 1999, Nashville, Tennessee, MED VOL. 10, MFG Science and Engineering, pp 557-562.

23. Shina S. and Saigal A., "Using Cpk as Design Tool for New System Development," International Conference on Engineering Design (ICED), Vol. 1, pp. 357-360, Munich, August 1999.

24. Shina, Callahan, Sutera, McCrillis and Geogapoulos, "Methodology for Applying Specifications in Electronics Manufacturing Equipment", NEPCON East 1998, Boston, MA June 1998, pp. 3-10

25. Shina, S., and Carvalho, V., "Additive Technologies: An Examination of Polymer Film Technology in Comparison to Etched Copper Circuitry", NEPCON East 1998, Boston, MA, June 1998, pp. 11-17

26. Shina S., and A Saigal, "A Design Cost Model for New Products Development", ASME Winter Annual Conference, Dallas, TX, November 1997.

27. Shina S., and Saigal, A.,"A Design Cost Model for New Products Development", American Society of Metals Annual Conference, Indianapolis, Indiana, September 1997

28. Shina S., et al., "Paste Qualification for SMT process", NEPCON East 1997, Boston, MA June 1997, pp 23-35

29. Shina, S., "Paperless Tooling System for PCB Fabrication", NEPCON East 1997, Boston, MA June 1997, pp 35-48

30. Shina S., and Calvarho, V., "Evaluation of SMT Paste and Stencil Technologies", NEPCON WEST 97, Anaheim California, February, 1997

31. Shina S., and Saigal, A., Concurrent Engineering and the Virtual Factory: Developing Products with Contract Manufacturers, ASME Winter Annual Conference, Atlanta GA, November 1996.

32. Shina S., and Saigal, A., "An Algorithm for selecting the electronic design implementation in Printed Circuit Board Fabrication based on cost factors", ASME Winter Annual Conference, Atlanta GA, November 1996.

33. Shina, S., "Design For Manufacture of Electronic Products", Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996, pp. 79-100

34. Shina, S., "Product Realization Process in a Global Environment", Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996, pp. 79-100

35. Shina, S., Kissinger D. and Crocker, K., "Process Development for SMT Stencil Adhesive Application", NEPCON East 1996, Boston, MA June 1996.

36. Shina, S., "Laboratory Exercises to Support Manufacturing Engineering Curriculum", International Conference on Education in Manufacturing, San Diego, CA, March 1996.

37. Shina S., and Saigal, A., "Technology Based Cost Modeling for Manufacturing and Material Selection in New Product Development", ASME Winter Annual Meeting, Chicago, IL November 1994, pp 85-92

38. Shina, S., Gagne D. and Qualiglia, M., "Method for Paste Selection and Process Optimization for Fine Pitch SMT", NEPCON WEST 1996, Anaheim CA, February 1996, pp 61-70

39. Shina, S., "Achieving World Class Quality in PCB Manufacturing through Concurrent Engineering", Proceeding of the Technical Program, NEPCON WEST 1993, pp 1818- 1826

40. Shina S., and Kurpad, R., "Performance Improvements: Application to Aerospace Rivets Installation", paper presented at the Winter Annual Meeting of the ASME, Anaheim, California, November 1992.

41. Shina S., and Wils, J., "Tuning a Large Data base Using Robust Design Techniques", paper presented at the Winter Annual Meeting of the ASME, Anaheim, California, November 1992.

42. Shina, S., "Optimizing Surface Mount Technology Soldering", presented at Surface Mount International Conference, San Jose CA, August 1991.

43. Shina, S., "Using the Taguchi Method to optimize Solder Processing", IPC Conference, San Diego CA, October 1990.

44. Shina S., and Capulli, K., "Optimized Processing and Cleaning of Hybrid Integrated Circuits", NEPCON EAST Conference Proceedings, Boston Ma, June 1990. pp 931-940.

45. Shina, S., "Quality Improvement Methods for Printed Circuit Fabrication & Assembly", NEPCON SOUTHEAST Conference Professional Advancement, Orlando Florida, November 1989.

46. Shina, S. Wu J. and Lowell, C., "Optimizing the new HOLLIS wave solder machine", American Supplier Institute Seventh Symposium Proceedings, Phoenix, Arizona, October 1989. pp 101-115.

47. Shina, S., "Reducing Defects in a Printed Circuit Wave Soldering Process using the Taguchi Method". NEPCON EAST Conference Proceedings, Boston, MA, June, 1989. pp 205-224.

48. Shina, S., " An Algorithm for selecting soldering flux for cleaning and surface conductivity", NEPCON WEST Conference Proceedings, Los Angles, California, March, 1989. pp 1064-1070.

12

49. Shina, S., "Reducing Solder Wave defects in a Printed Circuit Board Wave Soldering Process", <u>American Supplier Institute's Sixth Symposium Proceedings</u>, Dearborn Michigan, October 1988. pp 123-144.
50. Shina, S., "Justification for Dry-Film Photoresist Process", <u>American Electroplater's Society Sixth Annual PC Conference</u>, March 1977.

**<u>Papers published in general conferences and magazines (29 papers published)</u>**

1. Shina S and Morose G., "Transitioning to Lead-Free Electronics: Now a Business Necessity", New England Environmental Journal, September 2005.
2. Shina S. and Morose, G., "Lead Free Conversion Analysis for multiple PWB materials and processes", SMT Journal, January 2005
3. Shina S. And MacFadden T., "lead Free Conversion issues in Component and PWB Surface Finishes", SMT Journal, May 2004, p73
4. Previous paper translated to Korean for Chomdan Publishing Company in Korea.
5. Shina, S., "Process Changes Face Industry", Mass High Tech, June 2-8, 1997
6. Shina, S., "UMASS Lowell Students team with Business", Mass High Tech, June 2-8, 1997
7. Shina S. and Christafides, S., "Putting Quality Tools to Good Use, A Practical Approach", Printed Circuit Fabrication, Vol. 15, No 10, October 1992, pp 36-39
8. Shina, S., "Benefits of Concurrent Product/Process Development", <u>HP Corporation Executive Conferences</u>, Palo Alto CA, June, September, December 1986.
9. Shina, S., "Mechanical Engineers go CAD", <u>HP Monitor Magazine</u>; March 1986
10. Shina, S., "Mechanical Design and Test", <u>HP engineering Symposium</u>, Lexington MA, December 1985.
11. Shina, S., "A PIP of a Process", <u>HP Engineer</u>, June 1985
12. Shina, S. and Peschier, R., "CAD/CAM, A revolutionary way of the future", <u>HP Monitor Magazine</u>, October 1984.
13. Shina, S., "The Technologist", paper presented at <u>Keeping Pace with Change, The Challenge for Engineers</u>, a joint conference of Northeastern University College of Engineering in Collaboration with the Massachusetts High Technology Council, September 1984. Proceedings pp 103-108
14. Shina, S., "Trendshot Release, A Bold Change for the 1980's", <u>HP Monitor Magazine</u>, September 1982
15. Shina, S., "Water Purification Project at MED", <u>HP Monitor Magazine</u>, 7/1977.
16. Shina, S., "Automatic Insertion of Components", <u>IEEE Manufacturing Technology Conference</u>, Waltham MA, February 1976.
17. Shina, S., "Optimized Soldering processes using the Taguchi Method", presented at the <u>British Electronics Conference</u>, Birmingham, England, 3/1991.

18. Shina, S., "Automatic Testing at HP Medical", <u>IEEE Manufacturing Technology Conference</u>, Waltham Ma, March 1975
19. Shina, S., "Cleaning PC Boards", <u>Circuits Manufacturing</u>, July 1974
20. Shina, "Manufacturing technology at MED", <u>HP Monitor Magazine</u>, February 1974.

Co authored the following Hewlett Packard Manufacturing Standards: (1977-81).
21. PC Design for Manufacurability Guideline
22. PC Design and layout Guidelines
23. PC Pin/Receptacle system Guidelines
24. PC Assembly Process Guidelines
25. PC Assembly Workmanship Guidelines
26. PC Automatic Component Insertion Guidelines
27. Shina, S.,Tufts Ph.D. Thesis. "Technology Based Cost Modeling of Printed Circuit Boards", Professor Anil Saigal, Advisor, June 1998
28. Shina, S., WPI Masters of Science Thesis, " Microprogramming, Design Considerations", Professor N. Sondak, Advisor, September 1972.
29. Shina, S., MIT Senior Thesis, "Simulation of the Massachusetts Transportation Authority (MTA) System", Professor E. Roberts, Advisor, August, 1967.

**2b. Papers/Talks presented at conferences as invited speaker (60 total).**
1. Keynote speaker, Pan Pacific conference sponsored by the SMTA, Kona, HI, January 2006
2. Speaker for the American Society of Quality, Manchester NH, February 2005
3. Speaker at he September meeting of the Toronto Chapter of the SMTA, Toronto, Canada, November 5th, 2004
4. Speaker for the ME department technical forums, October 2004
5. Speaker at he September meeting of the Boston Chapter of the SMTA, Boxborough, MA, September 16, 2003
6. Quoted in The Mass High Tech Journal editorial, Bay State takes the lead out", Nov 11, 2002 http://www.masshightech.com/displayarticledetail.asp?art_id=61052&sec_id=43
7. Quoted in the Lowell Sun article on "Lead Free Electronics", published November 7[th], 2002, http://www.lowellsun.com/Stories/0,1413,105%257E4744%257E976553,00.html?search=filter
8. Quoted in the Mass High Tech Journal about lead free electronics, published on November 11[th], 2003
9. Lead Free Research Summary, TURA Coordinators Conference, Best Western Royal Plaza and Trade Center, Marlborough, April 23[th] 2002.
10. Lead Free Electronics Workshop hosted by Schnieder Electric Wilmington, MA, April 10, 2002.

14

11. "Lead Free UMASS Consortium", conference sponsored by the Strategic Envirotechnology Partnership (STEP), Boston MA , November 2nd, 2001
12. "Lead Free at UMASS Lowell", Workshop on Modeling and Data Needs for Lead-Free Solders, sponsored NEMI, NIST, NSF, and TMS, Thursday, February, 2001, New Orleans, LA, lead free research summary by Dr. Shina
13. Speaker to the State of Massachusetts Legislative committee on education policy, UMASS President Bulger's Office, May 4th, 2000.
14. Seminar speaker on Lead Free Electronics, TURI Planner continuing education conference, Marlboro, MA. April 26th, 2000
15. Career and Skill Upgrade Seminar Leader on Design for Quality using Six Sigma and Cpk Methods, ASME April 18th, 2000 Meeting, Cambridge, MA
16. Panelist, Lead Free Electronics Symposium, Sponsored by TURI, at Lucent Corporation, Haverhill, MA, April 13, 2000.
17. Speaker to the Havestan Technical Facility, Turkish Airforce, Ankara, Turkey, August 1999.
18. Speaker to the Mechanical Engineering Department, Cape Tecknicon University, CapeTown, South Africa, March 1999.
19. Speaker to the Boston Chapter SMTA, "Applying SPC to the SMT Manufacturing Process", November 1998
20. Symposium Panelist, American Loudspeaker Manufacturers Conference, Las Vegas Nevada, January 1998.
21. Keynote Speaker, Electronics Industries Forum, IEEE, May 1997
22. Speaker to the Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996
23. Speaker to the Globatronics Conference, Singapore, October 1996.
24. Keynote Speaker, NAFEM Association, Cincinnati Ohio, January 1996
25. Speaker to the UMASS Lowell SME Student branch, on recruiting for the SME, February, 1994.
26. Speaker to the UMASS Lowell ASME Student branch, on future employment opportunities, November 1993.
27. Speaker, Mortorola Incorporated Six Sigma Institute Conference, Dallas Texas, October 1993.
28. Keynote Speaker, Australian Surface Mount and Printed Circuit Board Association SM93 Conference, Sydney, Australia, August 1993.
29. Panelist for the session on Concurrent Engineering: Innovation, Speed and Service, Western Regional Conference, sponsored by the American Society of Quality Control and the American Society of Naval Engineers, Oxnard California, February 1993.
30. Speaker for on Concurrent Engineering, Advanced Technologies in the Electronics Industry Conference, Tel Aviv, Israel, January 1993.
31. Guest speaker on Concurrent Engineering, ,Joint Meeting of the ASQC - APICS - SME societies of Danbury Connecticut, January 1993.
32. Plenary speaker at the MEXICON 92 conference in Guadalajara, Mexico on October 1992.
33. Colloquium speaker on Concurrent Engineering to the Engineering faculty of Iteso University Guadalajara, Mexico, October 1992.

15

34. Speaker to the IEEE Guadalajara chapter, October 1992.
35. Invited to be keynote speaker at the International Society for Hybrid Microelectronics (ISHIM) Southern California Chapter Conference, May 1992.
36. Speaker on Concurrent Engineering to the University of Pennsylvania MSME program, November 1991
37. Symposium Speaker on Concurrent Engineering, IEEE Advanced Semiconductor Manufacturing Conference, Boston MA, 10/91
38. Invited to speak to the Hong Kong Productivity Council and the Hong Kong Branch of SME on "Concurrent Engineering", 11/91.
39. Invited to speak on "Robust Design" at the Quality Conference sponsored by the Technical University in Medellin, Columbia on TQM, 8/91.
40. Speaker on "Concurrent Engineering", delivered to Itek Corporation, 7/91
41. Speaker on "Total Quality Management", MACOM Waltham on 4/91
42. Speaker on "Concurrent Engineering", delivered to the SME CASA/CIM professional societies in March 1991.
43. Speaker on "Concurrent Engineering and Design for Manufacture ", IEEE Boston Chapter, Minuteman Lexington High School, January 1991.
44. Speaker on "University of Lowell Engineering Students' activities," Leadership Conference, Society of Manufacturing Engineering, Ludlow MA, 12/ 1990
45. Invited to critique United Technologies, Hamilton Standard Division Program on Concurrent Engineering, Windsor Locks, Connecticut, December 1990.
46. Speaker to the student chapter of the Society of Manufacturing Engineers (SME) on Design for Manufacture, November 1990.
47. Invited to critique Parker Brothers "World Class Manufacturing Program", October 1990.
48. Speaker on "Printed Circuit Design for Manufacture", Valid Users Group Northeast Region Meeting, October 1990
49. Interviewed by Electronic Products and Packaging (EPP) Magazine on Design for Manufacture, September 1990 issue.
50. Invited to critique GENRAD Corporation Quality Program in September 1990.
51. Speaker on "Design for Manufacturing", Distinguished Speaker lecture Series Gordon Institute, June 1990.
52. Session leader on "Total Quality for the Manufacturing Enterprise", Company Wide Quality Conference sponsored by the University of Lowell, April 1990.
53. Speaker on Quality Methods for Engineers and their Managers, Company Wide Quality Conference, sponsored by the University of Lowell, 11/ 1989.
54. Speaker on Quality and Productivity, Digital Equipment Corporation Senior Executives, November 1989.
55. Lecture on Taguchi Methods in the University of Lowell Seminar series on the Assurance Sciences and Technologies, October 1989.
56. Speaker on "Design for Manufacturing, " Manufacturing Technology Conference sponsored by Bay State Skills Corporation and Associated Industries of Massachusetts, May 1989.
57. Speaker on Industry/Academic Corporation, joint meeting with Wang Incorporated, Presented to the Brookings Institute guests at the University of Lowell, May 1989.

58. Speaker on Taguchi Methods, Hollis Automation, Nashua NH, January 1990.
59. Speaker on Quality Methods, Wang Incorporated, Lowell MA, 12/1989
60. Speaker on Taguchi Methods, Boston University Manufacturing Engineering faculty, November 1988.

17

## SERVICE ACTIVITIES

**1. Professional Leadership and Achievements**

1. I established the **Umass Lowell Lead Free consortium**, consisting of several local and national companies to sponsor and assist in the research. The original companies included BTU International, North Billerica, MA, Sanmina (formerly Hadco) Corporation; Tech Center East, Ward Hill MA; Multicore Solders; Richardson, Texas; Raytheon Corporation;, Lexington, MA; Solectron Massachusetts Corporation, Westborough, MA and Texas Instruments, Attleboro, MA. Companies that joined the consortium this year include MACOM of Lowell, MA, a division of AMP, which has been acquired by Tyco Industries and Shneider Automation (formerly Modicon) of North Andover, MA. I was funded by various sources for this research including TURI for sponsoring graduate students and research activities, and from companies in the consortium. The total amount exceeds $50,000. I helped TURI with annual conferences to the local supplier base area on the conversion issues of Lead free electronics. These were offered free to local companies to assist then with lead free conversion process. New additions in phase III (2004/5) include Skyworks Solutions (Woburn, MA), Teradyne Inc. (North Reading, MA), Textron Systems (Wilmington, MA), DDI Inc. (Newburyport, MA), American Power Conversion (West Kingston, RI) and Benchmark Electronics (Hudson, NH)

2. Design Judge, USA First Robotics Comnpetition; Manchester NH, March 2003, 2004 and 2005

3. Symposium Chair, Manufacturing Enigneering Division, International Mechanical Engineering Congress and Exposition (IMECE), November 1999, Nashville, Tennessee.

4. Design Judge - Milton S. Kiver Awards Competition sponsored by the Electronic Packaging and Production Magazine, 1995, 1999

5. Professor of the Year, ME Department, 1997

6. Awarded a Certificate of Appreciation, for Dedication and Service during the 1995 School Year, from Lowell High School, May 1995.

7. Chaired a session in the Symposium on Production Engineering Division at the Winter Annual Meeting of the American Society of Mechanical Engineers (ASME), in Chicago, Illinois during the month of November 1992: Session PE 4A, Symposium of New Product introduction.

8. Chaired two sessions in the Symposium on Design, Management, and Computers at the Winter Annual Meeting of the American Society of Mechanical Engineers (ASME), in Anaheim, California during the month of November 1992: Session PE 11A: Product Process Interactions, and session PE 6A, Group Technology and Knowledge Management.

9. Invited as the plenary speaker at the MEXICON 92 conference in Guadalajara, Mexico on October 19 - 21, 1992. While in Guadalajara, lectured to the faculty of Iteso University and the IEEE chapter there.

18

10. Founding member and a member of the Board of Directors, Massachusetts Quality Award, 1991- 1993
11. Nominated to the Board of directors for the Society of manufacturing Engineering (SME) Electronics Manufacturing Committee, 1992, 1993.

*Journal Reviewer for the Following 7Journals:*
12. "Computer Magazine",
13. "Journal of Manufacturing Science and Engineering"
14. "TAPI magazine"
15. University of Road Island Transportation Center Peer Review
16. IEEE Publications
17. IEEE Spectrum Magazine
18. Machine Vision and Applications
*Book reviewer for the following 8 books and manuscripts*
19. "Design Process", by
20. "Evolvable Design of Experiments: Applications for Printed Circuit Boards", by Octavian Iordache, CRC Press
21. " A  Facilitator's Guide to Usability Testing," J. McWane, to be published by Prentice Hall,  Upper Saddle River, NJ
22. "Concurrent Project Management", by Q. Turtle, to be published by Van Nostrand Reinhold, New York.
23. "Introduction to Control Systems Technology" by R. Bateson, to be published by Merrill Publishing Company, Columbus Ohio.
24. "Concurrent Engineering" by J. Torino, published by Van Nostrand Reinhold, NY
25. Tool and Manufacturing Engineers Handbook (TMEH) Volume 6 Handbook, Design for Manufacturability, published by the SME (Society of Manufacturing Engineers), Dearborn Michigan.
26. "Handbook of Electronics Manufacturing Engineering", 2nd edition, by Richard Matisoff, to be published by Van Nostrand Reinhold, New York.
27. Founding member of an Innovative Products Research and Services Incorporated (IPRS), a non-profit educational, scientific and charitable 501(c) (3) organization incorporated in the Commonwealth of Massachusetts. IPRS is an inventor support service, which performs early stage market and manufacturing evaluations.  IPRS was able to obtain two grants from the Department of Energy in 1991 and 1992 as part of DOE's States' Inventors Initiative.
28. Appointed as a founding member of the student activities' team of the Society of Manufacturing Engineering (SME), New England Region.
29. Appointed in 1992 as an examiner for the Massachusetts Quality Award, having been a founding member of the Massachusetts Quality Award Council.
30. Chairman of the SME (Society of Manufacturing Engineers) Robotics Chapter 293, New England Region, 1991-1997

19

31. Chairman of the Quality Function Deployment for NEPCON (National Electronic Packaging Conference), annually attracting over 30,000 design, quality and manufacturing engineers from throughout the country.
32. Selected as the Speaker on Engineering Productivity for Hewlett Packard Corporation to Senior Management (CEO's and VP's) of Customer Corporations in 1986, 1987.
33. "Excellence in Design" Award for the HP Waltham Waste Water Treatment plant from the Metropolitan District Commission of Massachusetts in 1982.

## 2. Service to the University
### 2.1 Student advising
1. Advisor to the Industrial Technology Classes of 1988-1994.
2. Advisor to Mechanical Engineering Students, Freshman Classes 1996-Present

### 2.2 Committee Membership
1. In working with the curriculum committee, I developed a proposed program for a Manufacturing Engineering Curriculum. This was part of a proposal to convert the Industrial Technology Department to Manufacturing Engineering.
2. Manufacturing Engineering Course Development Committee
3. Member of the Mechanical Engineering Department Graduate Committee.
4. Developed three courses in the MMS graduate programs.
    A.    20.525 Computer Integrated Manufacturing (CIM)
    B.    20.572 Design for Manufacture (DFM)
    C.    20.575 Robust Design
D. Developed Two courses for the Mechanical Engineering Department
    A.    22.571 Concurrent Engineering /Quality; renamed Collaborative Engineering
    B.    22.575 Industrial Design of Experiments

### 2.3 Service to the Department
1. Developed the microelectronics manufacturing laboratory for manufacturing education, research and training for students, faculty and the local manufacturing companies. Selected, ordered and installed the equipment in a competitive bidding process.
2. Member of the Mechanical Engineering department graduate committee.
3. Chairman of the ME advisory Committee 4th and 5th annual Conferences.
4. Coordinated the Mechanical Engineering series of seminars offered to the Industrial Community, summer of 1993
5. Assisted in the ARPA grant development for Manufacturing Engineering Education.
6. Advisor to ME freshman students.
7. Capstone Course Coordinator
8. Active in developing and tabulating Graduating Students and Alumni Surveys

20

**2.4 Service to the College of Engineering**

1. Member of the College Rank and Tenure Committee; Spring 2003
2. Member of the College of Engineering Repositioning Task Force, Spring 2002
3. Graduate coordinator for the Manufacturing Systems Engineering Option for all the graduate students in the College of Engineering. All the graduate coordinators in the Engineering Departments approved this program. The programs are explained in several memos attached to this package and have been in operation in 1989-1994. This option was be replaced by the new manufacturing concentration in Mechanical Engineering under the direction of professor Parking.
4. Company Wide Quality Seminars, University of Lowell Continuing Education

Provided technical assistance, recruited faculty and coordinated activities in the Total Quality Management and The Productivity/Quality tools in Engineering and Manufacturing Seminars, which are short and intensive versions of the courses I teach. A list of the seminars provided is as follows:

1. *Taguchi Methods*, offered March 1989, March 1990 and June 1990.
2. *Design for Manufacturing*, offered March 1989, May 1989, January 1990, June 1990 and January 1991.
3. *Total Quality Management* offered January 1991.
4. *Soldering Methods* offered November 1989.

Other Activities

5. Member of the Graduate Faculty membership committee.
6. Member of the College of Engineering Computer Needs Committee.
7. College representative in the Watertown Arsenal Manufacturing Development Park Committee.

**2.4.1 College of Engineering COOP Coordinator**

1. Coordinated the revival of the College of Engineering COOP program 1997
2. Ran several meetings with the department managers to outline rules/procedures
3. Coordinated with the Dean and the Office of Career Services on issues of policy and administration of the COOP program
4. Worked with the department coordinators on issues of students activities and jobs
5. Worked with local companies on advertising and recruitment of students and jobs
6. Published the first coop manuals for students and companies
7. Ran the COOP and Internship Fair in April 98. More than 400 students and 30 companies participated.
8. The program achieved its initial goal of 10% of students in the engineering college during the first year of its implementation

**2.5 Service to the University**

1. Faculty Senate representative from the ME department Spring 2005

21

2. Coordinator of the Graduate Certificate Program: Design and Manufacturing Engineering
3. Member of the Committee for "Strategic Plan to Strengthen Lowell 1998-2005 Development Plan", Chaired By Professor Best.
4. Member of the Committee for Manufacturing option for the MBA degree for the College of Management
5. Member of the Chancellor's Federation for the Industrial Economy
6. Member of the ARPA Technology Reinvestment Program proposal Committee of Industrial Extension, Commonwealth of Mass.
7. Member of the ARPA Technology Reinvestment Program proposal Committee, Southern New England Academy
8. Member of the Work Environment Pilot effort on technology review of fatal accidents
9. Assisted in the College of Management Re accreditation process

# E. TEACHING
## 1. Principal Thesis / Project Advising:
### 1a. Completed, Mechanical Engineering Department (19 students)

1. Optimal Reliability Design Method for Remote Solar Systems", Nuchida Suwaparet, Doctor of Mechanical Engineering Thesis, September, 2005
2. "Bio Solar House", Ittipon Tungaray, Master's of Mechanical Engineering Thesis, September 2004; Committee Member
3. "Comparison Of The Performance Of U.S. And Japanese Aluminum Bats Using U.S. And Japanese Test Protocols", Shintaro Nabeshima, Master's of Mechanical Engineering Thesis, May 2004; Committee Member
4. "Experimental and Finite Element Study of the Design Parameters of Baseball Bas", Gayatri Vedula, Master's of Mechanical Engineering Thesis, May 2004; Committee Member
5. "Characterization of the effects of use and Moisture Content on Baseball Bats..."; Patrick Drane; Master's of Mechanical Engineering Thesis, March 2003; Committee Member
6. "Design for Reliability, Remote Communication system using solar power", Nuchida Suwapaet, ; Master's of Mechanical Engineering Thesis, November 2002; Committee Member
7. "Lead Free Soldering". Hemant Belbase, Master's of Mechanical Engineering Thesis, September 2000.
8. Terence Lee Master's of Mechanical Engineering Thesis, Committee Member; 1999
9. "Additive PCB Fabrication Technology", Dennis, Gagne, Master's of Mechanical Engineering Thesis, May 1998.
10. "NO Clean SMT Paste for PCB Assembly,", Doug Summer, Master's of Mechanical Engineering Thesis, May 1997.
11. "Failure Prediction Analysis in Machining Pin Fin Heat Sinks, Hoke Bullard, Master's of Mechanical Engineering Thesis, May 1997 (committee member)

22

12. "A study of high speed, high volume product assembly process with respect to scrap reduction issues", Lisa Silva, Master's of Mechanical Engineering Project, December 1996

13. "A paperless system for manufacturing assembly automation", Farzad Majzoubi , Master's of Mechanical Engineering Project, December 1996

14. "Optimization of a touchscreen sensor manufacturing process", Julie Kimble, Master's of Mechanical Engineering Project, December 1996

15. "Experimental design of an injected mold RF insulation Material ", Steve Paradis,  Master's of Mechanical Engineering Project, May 1996

16. "Development of a no clean soldering flux", Paul Hailey, Master's of Mechanical Engineering Thesis, completed May 1994.

17. "Developing a tolerance analysis methodology with case studies", Sreedhar Godula, Master's of Mechanical Engineering Project, completed 8/93.

18. "Design of an aircraft industry riveting system", Kurpad Ram, Master's of Mechanical Engineering Thesis, completed 6/92.

19. "Optimization of the performance of the weldlines in injection molded products using robust design methods", Srinath Narayan, Master's of Mechanical Engineering Thesis, completed 5/92.

1b. In Progress, Mechanical Engineering Department (1 student)

1. "Developing Vias Build Up Methodology for Additive Technologies in the Printed Circuit Wiring Board (PWB) Fabrication Industry", Manmeet Grover

## 1c. Completed, MMS in Manufacturing Engineering Program (17 students)

1. "Just-In-Time Manufacturing in a regulated industry", Nasser Heshmatpour, Master of Manufacturing Engineering Project, completed 5/92

2. " Concurrent Engineering for the Defense Industry", John Hart, Masters of Manufacturing Engineering Thesis, completed May 1992

3. "Implementation of ISO 9000 in American Manufacturing Companies", Mark Alpert, Masters of Manufacturing Engineering Project, completed December 1991

4. "Optimizing IC Welding", Bob Mullins, Masters of Manufacturing Engineering Project, completed December 1991

5. "Simulation of Assembly Systems using SAIMAN", Bill Guest, Masters of Manufacturing Engineering Thesis, completed December 1991

6. "Simulation Language Applications in Job Shop Scheduling", Nancy Barnes, Masters of Manufacturing Engineering Project, completed December 1991

7. "Design for Robotics Assembly", George Lloyd, Masters of Manufacturing Engineering Project, completed December 1991

8. "An Algorithm for conversion of Printed Circuit Board from Through Hole to Surface Mount Technology", Suzan Lanza, Masters of Manufacturing Engineering Project, completed December 1991.

9. "Eliminating CFC's from Electronic Manufacturing Processes", Betty Drake, Masters of Manufacturing Engineering Project, completed December 1991

10. "Technical training program for engineering computer tools", Norm Fisk, Masters of Manufacturing Engineering Project, completed May 1991

23

11. "Process Optimization in Distribution Systems", Ven Cen Chang, Masters of Manufacturing Engineering Project. completed May 1991. Mr Chang was nominated the outstanding graduate student in the Industrial Technology Department.
12. "Optimization of Stress Testing using Taguchi Method", Sana Wakim, Masters of Manufacturing Engineering Project, completed May 1991
13. "Expediting in a Job Shop", Jean Shine, Masters of Manufacturing Engineering Thesis, Completed 9/90.
14. "Evaluations and Implementation of Terpene as a Printed Circuit Cleaning Solvent" Greg Hamblet, Masters of Manufacturing Engineering Thesis, Completed 5/90.
15. "Optimized Processing and Cleaning of Hybrid Integrated Circuits", Keith Capulli, Masters of Manufacturing Engineering Project, Completed 4/90.
16. "Optimizing The Wave Soldering Process for Mixed Technology of Through Hole and SMT Components", James Wu, Masters of Manufacturing Engineering Project, Completed 12/89.
17. "Design of a Wheel Chair Carry-On", James Jollife, Masters of Manufacturing Engineering Project , Completed 4/89.

**1d. Thesis / Project Advising, other Engineering Departments**
1. "A study on the effect of process parameters on the spring constant of a manometer spring", Samir Seth, master of Plastics Engineering, Thesis Committee, April 2001

**2. Courses taught**
2.1 Graduate

| | | |
|---|---|---|
| 22. 571 | Concurrent Engineering | 7 years |
| 22.575 | Industrial Design of Experiments | 7 years |
| 20 525 | Computer Integrated Manufacturing (CIM) | 3 years |
| 20.572 | Design for Manufacture | 3 years |
| 20.575 | Robust Design | 1 year |
| 20.710 | Graduate Seminar | 1 year |

2.2 Undergraduate Courses

| | | |
|---|---|---|
| 22.424 | Capstone Projects | 2 years |
| 22.472 | Manufacturing Systems & Processes | 2 years |
| 22.473 | Design for Manufacture | 3 years |
| 22. 202 | Mechanical Design Laboratory II | 1 year |
| 20.202 | Industrial Computer Science. | 10 years |
| 20.303 | Manufacturing Systems | 5 years |
| 20.407 | Instrumentation and Process Control ( IPC )) | 5 years |
| 20.314 | Motion and Time Study | 5 years |
| 20.309 | Process control | 20 years |
| 20.408 | Microprocessors | 23 years |
| 20.315 | Plant Layout and Material handling | 7 years |
| | Inventory Control and Material Handling | (discontinued) |
| | Tool Engineering | (discontinued) |

24

## 2.3 Courses Upgraded/developed

Undergraduate Courses

25.108 Introduction to Engineering II. Completely revamped this course since taking it over in the spring semester 2004. Included modules for Microsoft word, excel and powerpoint as well as a module for matlab. Provided for several projects for the first ear students to practice computer programming and presentation tools in a fun and rewarding experience.

25.108 Freshman Manufacturing Module. This a 4week introduction to manufacturing for freshman engineering students

22.472 Manufacturing Systems: New undergraduates course that I developed for Mechanical Engineering Department, Manufacturing Option, spring 1993.

22.473 Design Theory and constraints: New undergraduate course developed for Mechanical Engineering Department, Manufacturing Option, taught in fall 1991.

20.202. Industrial Computer Science. I have changed this course from a FORTRAN Programming course to a one of solving engineering problems.

20.407 Instrumentation and process control (IPC): This course is divided into two sections: traditional control theory and microprocessor programming. I have completely revamped the microprogramming portion with plc.'s

**Graduate Courses**

22. 571. Collaborative Engineering and Quality: A new course that I developed for the Manufacturing Engineering Option for the Mechanical Engineering Masters Program, combining elements of the following graduate courses that I taught at the MMS program.

20. 525 Computer Integrated Manufacturing (CIM). This course was previously taught over two semesters by guest lectures. Using my notes, I have revamped and consolidated the course into one semester.

20.575. Robust Design. The course deals with the subject of Design of Experiments and the Taguchi Method.

## 2.4 Teaching Load

| Course | Course Title | Contct Hours | Credit Hours | Enrol ment | Total StudentH | Total Credit Hours |
|--------|-------------|--------------|--------------|------------|----------------|--------------------|
| 2004/2005 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 Design Constraints | 3 | 3 | 27 | 81 | 81 |
| IG | 22.571 CE/Quality | 3 | 3 | 7 | 21 | 21 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 2003/2004 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 Design Constraints | 3 | 3 | 31 | 93 | 93 |
| IG | 22.571 CE/Quality | 3 | 3 | 7 | 21 | 21 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 2nd semester | | | | | | |
| 1U | 25.108 Freshman Design | 2 | 2 | 65 | 130 | 130 |
| 4U | 22.423 Capstone | 3 | 3 | 16 | 48 | 48 |

25

| 1G | 22.575 Ind. Design Expts | 3 | 3 | 14 | 42 | 42 |
|---|---|---|---|---|---|---|

**2002/2003**
1st semester

| 4U | 22.473 Design Constraints | 3 | 3 | 36 | 108 | 108 |
|---|---|---|---|---|---|---|
| IG | 22.571 CE/Quality | 3 | 3 | 16 | 48 | 48 |
| 4U | 22.423 Capstone | 3 | 3 | 2 | 6 | 6 |

2nd semester

| 4U | 22.423 Capstone | 3 | 3 | 20 | 60 | 60 |
|---|---|---|---|---|---|---|
| 1G | 22.575 Ind. Design Expts | 3 | 3 | 26 | 78 | 78 |

**2001/2002**
1st semester
Sabbatical
2nd semester

| IG | 22.575 Ind. Design Expts. | 3 | 3 | 20 | 60 | 60 |
|---|---|---|---|---|---|---|
| 4U | 22.423 Capstone | 3 | 3 | 4 | 15 | 15 |
| 4U | 22.473 Design Constraints | 3 | 3 | 16 | 48 | 48 |

**2000/2001**
1st semester

| 4U | 22.473 Design Constraints | 3 | 3 | 20 | 60 | 60 |
|---|---|---|---|---|---|---|
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 30 | 90 | 90 |
| 4U | 22.423 Capstone | 3 | 3 | 5 | 15 | 15 |

2nd semester

| 1U | 25.108 Intro Eng DFQ (3w) | 3 | 2 | 50 | 100 | 100 |
|---|---|---|---|---|---|---|
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 1G | 22.571 CE/Quality | 3 | 3 | 18 | 54 | 54 |

**1999/2000**
1st semester

| 4U | 22.473 Design Constraints | 3 | 3 | 28 | 71 | 71 |
|---|---|---|---|---|---|---|
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 12 | 36 | 36 |
| 4U | 22.423 Capstone | 3 | 3 | 12 | 36 | 36 |

2nd semester

| 1U | 25.108 Intro Eng DFQ (3w) | 3 | 2 | 42 | 84 | 84 |
|---|---|---|---|---|---|---|
| 4U | 22.424 Capstone | 3 | 3 | 7 | 21 | 21 |
| 1G | 22.571 CE/Quality | 3 | 3 | 27 | 91 | 91 |

**1998/1999**
1st semester

| 4U | 22.473 Design Constraints | 3 | 3 | 20 | 60 | 60 |
|---|---|---|---|---|---|---|
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 15 | 45 | 45 |
| 4U | 22.423 Capstone | 3 | 3 | 5 | 15 | 15 |

2nd semester

| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
|---|---|---|---|---|---|---|
| 4U | 22.424 Capstone | 4 | 3 | 9 | 36 | 27 |
| 1G | 22.571 CE/Quality | 3 | 3 | 15 | 45 | 45 |

**1997/1998**
1st semester

| 4U | 22.473 DFM | 3 | 3 | 20 | 60 | 60 |
|---|---|---|---|---|---|---|

26

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.424 Capstone | 2 | 2 | 30 | 60 | 60 |
| 4U | 22.423 Capstone | 4 | 4 | 10 | 40 | 40 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 4 | 8 | 32 | 32 |
| 1G | 22.571 CE/Quality | 3 | 3 | 25 | 75 | 75 |

Summer semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.423 Capstone | 2 | 2 | 10 | 20 | 20 |

1996/1997
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 DFM | 3 | 3 | 23 | 69 | 69 |
| 4U | 22.423 Capstone | 2 | 2 | 13 | 26 | 26 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 4 | 7 | 28 | 28 |
| 1G | 22.575 DoE | 3 | 3 | 25 | 75 | 75 |

Summer

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.423 Capstone | 2 | 2 | 10 | 20 | 20 |

1995/1996
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFM (3w) | 3 | 2 | 170 | 72 | 48 |
| 4U | 22.473 DFM | 3 | 3 | 33 | 99 | 99 |
| 4U | 22.423 Capstone | 2 | 2 | 7 | 14 | 14 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 25 | 75 | 75 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (4w) | 3 | 2 | 170 | 145 | 97 |
| 4U | 22.423 Capstone | 4 | 4 | 7 | 28 | 28 |
| 4U | 22.473 DFM | 3 | 3 | 16 | 48 | 48 |
| 1G | 22.575 DoE | 3 | 3 | 25 | 75 | 75 |

1994/1995
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFM (3w) | 3 | 2 | 170 | 109 | 73 |
| 4U | 22.473 DFM | 4 | 3 | 17 | 68 | 51 |
| 4U | 22.423 Capstone | 2 | 2 | 4 | 26 | 26 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 19 | 57 | 57 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (4w) | 3 | 2 | 170 | 145 | 97 |
| 1U | 25.105 Fortran (6w, 2 cls) | 3 | 2 | 30 | 39 | 26 |
| 4U | 22.483 Capstone | 4 | 4 | 4 | 52 | 52 |
| 2U | 22.211 Statics | 3 | 3 | 22 | 66 | 66 |

1993/1994
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 DFM | 4 | 3 | 17 | 68 | 51 |
| 4U | 22.483 Capstone | 2 | 2 | 13 | 26 | 26 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 19 | 57 | 57 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.472 | Manuf Systems | 3 | 3 | 17 | 68 | 51 |
| 4U | 22.423 | Capstone | 4 | 4 | 13 | 52 | 52 |
| 2U | 22.202 | Mech. Design Lab. | 3 | 2 | 60 | 180 | 180 |

**1992/1993** 1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 20.407 | IPC | 3 | 3 | 37 | 111 | 111 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 37 | 37 | 37 |
| 4U | 22.473 | DFM | 3 | 3 | 17 | 51 | 51 |
| 4U | 22.483 | Capstone | 4 | 2 | 4 | 8 | 8 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.472 | Manuf Systems | 3 | 3 | 8 | 24 | 24 |
| 4U | 22.423 | Capstone | 4 | 2 | 4 | 8 | 8 |

1991/1992
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 28 | 84 | 84 |
| 4U | 20.407 | IPC | 3 | 3 | 55 | 165 | 165 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 55 | 110 | 55 |
| 4U | 22.473 | DFM | 3 | 3 | 12 | 36 | 36 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.573 | DFM | 3 | 3 | 45 | 135 | 135 |
| G | 20.575 | Robust | 3 | 3 | 42 | 126 | 126 |
| G | 20.710 | Seminar | 3 | 3 | 15 | 45 | 45 |

1990/1991
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 26 | 78 | 78 |
| 4U | 20.407 | IPC | 3 | 3 | 60 | 180 | 180 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 60 | 180 | 60 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.573 | DFM | 3 | 3 | 32 | 96 | 96 |
| G | 20.575 | Robust | 3 | 3 | 25 | 75 | 75 |

1989/1990
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 25 | 75 | 75 |
| 4U | 20.407 | IPC | 3 | 3 | 35 | 105 | 75 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 35 | 105 | 35 |

2nd Semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.572 | DFM. | 3 | 3 | 30 | 90 | 90 |
| 2U | 20.202 | Ind. Comp. | 3 | 3 | 16 | 48 | 48 |

1988/1989
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 19 | 57 | 57 |
| 4U | 20.407 | IPC | 3 | 3 | 45 | 135 | 135 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 45 | 135 | 45 |
| 2U | 20.202 | Ind. Comp.. | 3 | 3 | 55 | 165 | 165 |

2nd Semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.572 | DFM. | 3 | 3 | 27 | 81 | 81 |

| 4U | 20.407 | IPC* | 3 | 3 | 30 | 45 | 45 |
| 4U | 20.407 | IPC Lab* | 2 | 1 | 30 | 45 | 15 |
| 2U | 20.202 | Ind. Comp. | 3 | 3 | 18 | 54 | 54 |

29

**2.5 Specific programs in which faculty member participated to improve teaching and competence.**

<u>In the last 3 years</u>
Attended following Seminars and training courses:
1. Apex Conference; Anaheim, CA, February 2004-05
2. ASME Manufacturing Conference, Chicago; March 2003
3. Product Life Management (PLM) , Chicago, IL, November 2002
4. SMT International, Chicago IL, September 1999-2005
5. Engineering Design Conference; London; July 2002

<u>In prior years</u>
1. Technicon University, Cape town South Africa March 1999
2. ICED, Munich Germany, August 1999
3. ASME WAM, Nashville, November 1999
4. CEA, (Coop Education Association); Salt lake City, UT, June  2000
5. Workshop on Modeling and Data Needs for Lead-Free Solders, sponsored NEMI, NIST, NSF, and TMS, Thursday, February, 2001, New Orleans, LA,
6. Etronix Conference, Anaheim, CA , February 2001
7. CEA (Coop Education Association), Atlanta, GA, March 2001
8. MRS (Materials Research Society), Boston, MA, November 2001
9. SMT soldering, SUNY, Binghampton, New York, 5/88.
10. Witness Simulation Training, Lowell MA, 4/89
11. Computer Integrated Manufacturing, Hewlett Packard, 6/88
12. Axiomatic Theory of Design, MIT, 7/88
13. Taguchi Methods Conference, ASI, Detroit MI, 1989-1990
14. NEPCON West, Los Angles, California, 1989 - 1999
15. NEPCON Singapore, 1991, 1993
16. NEPCON Australia, 1998
17. NEPCON EAST, Boston, 1989-1999
18. NEPCON SOUTHEAST, Florida and Texas, 1989, 1998
19. IPC, San Diego CA, 1990
20. British Electronic Week, Birmingham, England, 1991
21. SMT International, San Jose CA, 1991-1995
22. IEEE Advanced Semiconductor Manufacturing Conference, 1991
23. SME International Conference on Education, San Diego, 1996
24. Puerto Rico Technical University SMT Conference, 1995-1997
25. ASME Winter Annual Conference, 1991-1999

**2.6 Teaching Effectiveness**
Rated in the highest rank by students and fellow faculty members from the University of Massachusetts Lowell and other engineering faculty from around the country. I submit he following facts in this session and in appendix C to substantiate this claim
1. Undergraduate and graduate student feedback is always rated at the top of all items.

30

2. All my undergraduate manufacturing option courses in the Mechanical Engineering Program are heavily oversubscribed.

### 2.6.1 Ratings by UML ME Students evaluations in the last 4 years:

My students always gave me excellent reviews of my courses, both at the Undergraduate and the graduate levels. I am enclosing the results of the my students evaluations for last two years to demonstrate. These are the summaries of student evaluations taken at the last day of the semester. The y were collected by fellow students and delivered to the department according to the rules.

As can be seen by the many positive comments, my students rate my efforts as well as my courses as being mostly exceptional and very effective. For the last three years I received the following evaluations:

**1997**
22.473 Design Theory and Constraints; Undergraduate (19 students):
Rating of instructor **14** excellent      **4** good      **1** average      **0** bad
22.423 capstone; Undergraduate (8 students):
Great experience, Thank you very much
**1998**
22.473 Design Theory and Constraints; Undergraduate (29 students):
Rating of instructor **19** excellent      **9** good      **1** average      **0** bad
Rating of course   **22** Effective   **7** relative Eff.   **0** Barely Eff.   **0** not worth it
22.423 capstone; Undergraduate (5 students) :
Great capstone, found it information and educational, applied studies to real world solutions. I enjoyed working with Professor Shina, This was a great experience.
22.575 Design of Experiments; Graduate (16 students)
Rating of instructor **9** excellent   **6** good   **2** average      **0** bad
Rating of course   **11** Effective   **5** relative Eff. **0** Barely Eff.      **0** not worth it
**1999**
22.473 Design Theory and Constraints; Undergraduate (27 students):
Rating of instructor **12** excellent   **6** good      **9** average      **0** bad
Rating of course   **13** Effective   **9** relative Eff.   **4** Barely Eff.   **0** not worth it
22.423 capstone; Undergraduate (11 students) :
Great experience, Shina was helpful; structured meetings, thanks for being open; I found out that this is not the type of manufacturing career I want
22.575 Design of Experiments; Graduate (11 students)
Rating of instructor **4** excellent   **7** good      **0** average      **0** bad
Rating of course   **6** Effective   **5** relative Eff. **0** Barely Eff.      **0** not worth
**2000**
22.423 capstone; Undergraduate (5 students):
Great Capstone, found it informational and educational, applied studies to real world solutions, I enjoyed working with professor Shina, This is a great industrial experience

31

## 2.7. Mentoring of students

The best proof of appreciation by the students is their letters of support obtained during a long teaching career. **Some comments and quotes written by former students:**

-You did an excellent job of keeping us up to date on recent trends in the areas of PCB

-I was impressed with the hands on project work you encouraged them to do

-Shina is far more than a great professor. His ambition, loyalty and dedication to his students reaches beyond that which my education at Lowell has lead me

-I can honestly say that without personal support, encouragement, advice and coaching I received from Dr. Shina during and after my college career, I would never have made so far in business so quickly

-You are one of the most talented instructors at UML. It is very rare to see instructors care for their students as you have

-Shina enabled me to gain the experience and knowledge I needed to seek employment. He is sincerely concerned about his students, and goes out of his way to help them in any way he can, either in the classroom, or a professional work environment. (he) is an excellent professor, advisor and friend to many students.

- His teaching style created and maintained interest by the students. He welcomed comments and dissenting opinion which were always grounds for further class discussions....(He) is an advocate for the students and a credit to the profession and the University.

-I benefited from his vast knowledge of the latest manufacturing trends....He also extended himself to reach students beyond the classroom and help them in their professional career.

-Shina is a credit to the academic excellence of the faculty....Thank you for the time and for the education you have provided me with...

-My successes are a direct result of Shina understanding of how real world industry works and what types of skills employers desire. He is able to skillfully guide a hard working student along a path that allows them to piece the experience and academics together necessary to become an immediate contributor to world class manufacturers.

-Professor Shina works to ensure that his students take the initiative in their professional growth before they leave the university and uses his industry contacts

to assist in placing students in (jobs).

-he has not only been an excellent professor, but also a supportive friend

-I feel that he had taught me many different tools that I still use today in everyday work... (he) also found me an internship as an ME through his many contacts...

-My success in the semi-conductor industry is in many ways attributable to Shina's instruction at UML...His (courses) gave me insight into ...techniques that I have put to practical use countless times. My boss...cited my experience ...gained during capstone project as one of the actor that convinced him to hire me

32

-He helped me with my resume, helped to build to build my personality, and directed me in a career path that I travel to this day….(his) characteristics are…intelligence, patience, integrity, knowledge, dependability and ability to teach…

-Shina is concerned with the welfare of his students, and he has taken time to counsel them and support them in their career research. He provided advice to many of my classmates individually on improving their resumes, and he was an invaluable resource because f his industry knowledge and networking contacts at many different local companies. He has assisted many of his students with finding successful careers.

-My association with Shina has continued throughout my professional career. He has been involved at work projects at two of my post graduate companies…his knowledge of state of the art PC assembly and design techniques has made him a valuable resource to myself and many of my colleagues over the years.

-his class was very instructional and well taught, and I have used many of these principles and methods he emphasized in my work as a design engineer.

-I have seen Shina help so many of his students obtain jobs. He makes the whole process so much easier for he students, He has helped in so many ways and I am sure he will continue to help me in the future. Students in the ME department are very fortunate to have a professor like him.

-My employment opportunity was due to a large part to the courses I was fortunate enough to partake with professor Shina (courses)

-Only after completing my course of study at Lowell did it became aware to me just how important these (shina) courses are..

-Not only is he clear, up to date on current industrial concepts and trends, and very open to questions and discussions, but he also displays a genuine interest and concern for his students after they have moved on to pursue their careers

- Dr. Shina has a magical presence in the class.  Classes were very lively with interaction between everyone in the class.  As a student with "zero" industry experience I had a wonderful opportunity to meet and interact with dozens of students from industry.

## 2.8 Help with Industry Contacts to secure Manufacturing Jobs for UML ME Students

I have made it a personal goal of mine to make sure that UML ME graduates are gainfully employed in the local economy. Approximately 50 % of the ME undergraduate students become directly employed in manufacturing or manufacturing related industries. I am enclosing the job survey for the ME graduates for the last four years. My thesis or capstone students and those who went to manufacturing jobs are highlighted. The list shows that I have advised the largest number of students in the manufacturing area in the Master's program.

## 2.9 ME Personnel Committee Academic Review  (PMYR 2001)
Received an accepted rank as follows:

**Teaching:** He has a heavy load primarily at the graduate level. He is invaluable in teaching and coordinating our capstone design courses

**Service:** He is the College COOP coordinator. He also does a lot of unsung work connecting our students and graduates up with contacts in industry. He is active in the professional societies

**Research:** He has an extensive record of funded research and publications. He is the author or two books and completing a third.

34

TAB B



FIG. 1.



# Quick-Tilt®
# CONSTANT FORCE SYSTEM

Quick-Tilt® is quiet, corrosion-resistant and comes preassembled to easily install in residential, tilt-window applications. For quick assembly, it was designed for the pivot bar to easily drop-in and tie-in to the carrier. Its alternating coil design prevents cantilevering or twisting of the carrier that can diminish locking performance. Quick-Tilt® remains hidden during normal sash operation, requires no adjustment and, of course, performs reliably. It is rated Class 2 on the American Architectural Manufacturers Association (AAMA) Verified Components List.



**COVER (OPTIONAL)**
Encloses spring assembly. Minimizes contamination by debris.

A    B

With Triple Spacer    With Cover

**PREASSEMBLED STAINLESS STEEL SPRINGS**
Greaseless, corrosion-resistant springs uncoil against each other in opposite directions to minimize friction and maximize smooth, silent operation.

**BUMPER (OPTIONAL)**
Used in place of a stop. Prevents carrier from colliding with spring assembly.

**TAMPERLOK (RECOMMENDED)**
This safety feature, when snapped into the carrier, prevents the homeowner from accidentally detaching the sash.

**DIE CAST METAL CAM**
For strength and durability.

**TIE-IN PIVOT BAR**
When seated in the carrier, it secures the sash to the frame, preventing the sash from accidentally detaching or falling out.

FIG. 2.

# Quick-Tilt*nc
## CONSTANT FORCE BALANCE



CALDWELL
Build on it.

### *"New Construction" friendly Quick-Tilt®*

If new construction debris was holding you back from considering a Constant Force balance, you now have a dependable solution with Caldwell's **Quick-Tilt*nc** balance.



Caldwell's pre-assembled **Quick-Tilt** Constant Force balance just got better with its evolution to the **Quick-Tilt*nc** – or "new construction" friendly version.  Until now most Constant Force balances weren't ready for the abuse caused by construction site dust and debris.  With the launch of **Quick-Tilt*nc**, air-borne contaminants are kept from lodging inside the moving coil assembly.   The integrated coil nest and cover is specifically engineered to keep the coils dust-free and operating in the smooth, quiet manner for which **Quick-Tilt** balances are renowned.

**Call us at 585-352-3790.  Let's talk about your window.**

FIG. 3.

www.caldwellmfgco.com



Fig.4.



## Series 86xt
# BLOCK & TACKLE SYSTEM

The Caldwell Series 86xt is a result of our long tradition of continuous improvement in design, engineering and manufacturing. It is built for sideload applications in both residential and commercial windows and is rated Class 2 on the American Architectural Manufacturers Association (AAMA) Verified Component List. The Series 86xt is designed to allow for quick and easy removal of the sash. Because it rides with the sash, the balance is hidden from view during operation. In addition, the Series 86xt is engineered to allow for an additional 1" of sash opening (egress). Often this can reduce inventory by moving to all-even or all-odd channel lengths.



**GALVANIZED STEEL CHANNEL**
Provides maximum strength, corrosion resistance and durability.

**HEMMED EDGES**
For greater safety when handling.

**RE-ENGINEERED BOTTOM GUIDE**
Specially designed to allow for application advantages in PVC welded sash. The sash side contact area has been lengthened, creating an option to increase sash opening.

**SPRINGS BY CALDWELL**
We've made our own springs for over 100 years, continually improving our manufacturing process to deliver high quality and consistent performance.

**MUSIC WIRE**
This high-quality material is more fatigue-resistant and has a greater consistency of performance than the hard-drawn and oil-tempered steel commonly used by other balance manufacturers.

**STAMPED METAL**
Our parts are made of stamped metal for maximum durability.

**GUIDE BLOCK**
Designed to dampen sound during operation and prevent twisting of the tackle.

**INDEPENDENTLY ROTATING PULLEY WHEELS**
Selected specifically for their lubricity, low frictional characteristics and resistance to developing flat spots, allowing for remarkably smooth and consistent operation.

**SELF-ALIGNING STAINLESS STEEL HOOK**
The balance mounting hook is positively parked in a fixed position when retracted. Installation into the window is easier than ever. Pull-off strength of the corrosion-resistant crimped terminal exceeds maximum load by more than 2 times. The low profile of the hook minimizes clearance issues, and only requires a single jamb punch.

Fig.5.

C000499



1.D

12.G

13.B

18.D

FIG. 6.



**CALDWELL**

Series 86xt
BLOCK & TACKLE SYSTEM

Extended travel
for sideload applications

C000498



FIG. 8.



Fig. 9



FIG. 10.

NOTES:

1 – RIVET CLINCH REQUIREMENTS:
--NO MORE THAN THREE (3) CRACKS PER 360° OR
--NO MORE THAN TWO (2) CRACKS PER 180°.
--CRACKS CANNOT MIGRATE UP AND OVER CLINCH AND INTO UNCLINCHED HOLE.

2 – REFER TO 99A55 ASSEMBLY SCHEDULE FOR INDIVIDUAL BALANCE SPECIFICATIONS.

3 – CORD MUST BE WRAPPED AS SHOWN

4 – COUNTERSINK IN CHANNEL IS ACCEPTABLE, BUT NOT REQUIRED.
SEE DRAWING 15A10 / 15A11 FOR DETAILS.

5 – REFER TO 15A10 / 15A11 CHANNEL DRAWING FOR BALANCE IDENTIFICATION DETAILS.

Confidential -- Attorneys' Eyes Only

CL017418



Fig 11.

# Series 97i
# BLOCK & TACKLE SYSTEM

The Caldwell Series 97i is a result of our long tradition of continuous improvement in design, engineering and manufacturing. It is built for tilt applications in both residential and commercial windows and is rated Class 2 by the American Architectural Manufacturers Association (AAMA). Caldwell invented the Inverted Balance design, which brings significant benefits to the Block & Tackle user. Designed to ride with the sash, the balance is hidden from view during operation. So, no jambliner is required. The attached carrier provides for faster installation, thereby reducing labor costs. And, the design maximizes the all-important egress opening.



**ATTACHED CARRIER DESIGN**
No assembly required. Design allows for faster installation and easier field change-out.

**GALVANIZED STEEL CHANNEL**
Provides maximum strength, corrosion resistance, and durability.

**ROUNDED CORNERS**
For handling safety, our steel channel has gently rounded corners.

**SPRINGS BY CALDWELL**
We've made our own springs for over 100 years, continually improving our manufacturing process to deliver high quality and consistent performance.

**GUIDE BLOCK**
Designed to dampen sound during operation and prevent twisting of the tackle.

**MUSIC WIRE**
This high-quality material is more fatigue-resistant and has a greater consistency of performance than the hard-drawn and oil-tempered steel commonly used by other spring manufacturers.

**STAMPED METAL**
Our parts are made of stamped metal for maximum durability.

**INDEPENDENTLY ROTATING PULLEY WHEELS**
Selected specifically for their lubricity, low frictional characteristics and resistance to developing flat spots, allowing for remarkably smooth and consistent operation.

**SELF-ALIGNING STAINLESS STEEL TERMINAL**
The terminal automatically aligns itself for quick installation. This corrosion-resistant material is crimped onto the cord ends. Pull-off strength exceeds maximum load by more than 2 times.

Fig 12

C000491

Declaration of Sammy Shina, Ph.D.

EXHIBIT 2

**Shina Consulting**

April 18, 2006

Jordan Singer
Attorney at Law
Goodwin|Procter LLP
Exchange Place
Boston, MA 02109

Re: Dr. Sammy Shina's comments regarding the two expert witness reports of Charles E. Still in civil action no. 05-10020-DPW

I have been retained on behalf of the plaintiffs: Amesbury Group INC., and Amesbury Springs LTD. as an expert to review and comment on two expert witness reports of Mr. Charles Still dated March 8 and March 13 2006. I had previously rendered my own expert Report Submitted on Behalf of Plaintiffs in civil action no. 05-10020-DPW dated March 23, 2006.

**I. My comments regarding Mr. Still's opinion of the invalidity of Amesbury Patent No 5,365,638.**

In forming my opinion, I examined Mr. Still's expert witness report on behalf of the defendants, dated March 13, 2006 including the Patent mentioned in his report: Sterner, U. S. Patent 5,157,808. I understand that Mr. Still's report also addressed Leitzel, US Patent 4,961,247 and mentioned Cripps, 'S Patent 5,219,976, and that Caldwell has notified Amesbury that it will not rely on the Leitzel and/or Cripps Patents in their invalidity arguments. Accordingly, I will not address these Patents in my comments.

I examined Mr. Still's expert witness report on behalf of the defendant, dated March 13, 2006, where he states that the "**Sterner, U. S. Patent 5,157,808**-filed February 18, 1992 (see Exhibits A&B) clearly shows a constant spring force coil spring balance with a spring mounting that incorporates a raised spine and in the same plane as the inwardly opposed flanges of the frame jamb channel. It also clearly shows a concave support surface in the spring mounting to support the coil spring. It also clearly shows an aperture with a screw to attach the spring mounting to the frame jamb of the window. These components perform the same function as in the **'638 Patent.**" I disagree.

**Exhibits A & B for the case involving Amesbury Patent No 5,365,638**
Based on my knowledge of the case that I summarized in my own expert witness report entitled "On Behalf of Plaintiffs in Civil Action No. 05-10020-DPW", dated March 23, 2006, I disagree with many of Mr. Still's assumptions in Exhibit A in his report, where he attempts to point out that the elements (components) mentioned in the Sterner U. S. Patent 5,157,808 exist and/or perform the same function as in the plaintiffs '638 Patent.

In Exhibit A, Mr. Still lists some claim elements of Amesbury's '638 Patent, then attempts to show corresponding elements (components) in the '808 Patent that might satisfy these claim elements. These elements (components) are labeled (sometimes) with a particular letter (A-H) in Exhibit B. Since some of the '638 Patent claim elements are not matched with corresponding ,beled" elements (components) in Exhibit B, I am therefore forced to make assumptions as to Mr. Still's intentions. I note at least the following discrepancies in Mr. Still's report Exhibit A, where he

1

does not present a proper reason for a claim element in the '638 Patent to have a corresponding element (component) in the '808 Patent. In addition, there is a lack of proper referencing of the '808 elements (components) that match the '638 claim elements. In my analysis below, I record Mr. Still's comments on each '638 Patent claim element and the alleged corresponding component in the '808 Patent as they appear in his Exhibit A, then I note my own opinion to these comments directly underneath Mr. Still's statements, as to their lack of applicability, irrelevance or incorrectness.

1.  Page #    '638 Claim Element and description
    Ex A, p2  638/1 said mounting means having a
              raised spine

Corresponding '808 component
See Exhibit B, item F said mounting
means having a raised spine.

In examining Exhibit B item F, I find that the mounting means are defined by the memorandum and order of the US District Court for the District of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in the '638 Patent. The court construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel." I also note in the claim construction by the US District Court of Massachusetts dated January 20th, 2006, a construction for the term "raised spine" as follows: "A raised protrusion that resembles or suggests a spine of the mounting means, shaped to cooperate with the window jamb flanges to inhibit the rotational motion of the mounting means."

Item (component) F as shown in Exhibit B as shown in the '808 Patent, and referred to by the number 68 on the '808 Patent does not have a raised spine. In fact the whole back side of F in the 08 Patent is smooth and does not appear to have any raised features such as a protrusion or spine. Please refer to Figure 12 in the '808 Patent shown here. In addition, I found no language in the '808 Patent referring to a protrusion or raised spine.



2

2. Page #     '638 Claim Element and description          Corresponding '808 component
   Ex A, p2   638/1 positioned between and in the same     positioned between and in the same
              plane as said inwardly turned opposed        plane as said inwardly turned opposed
              flanges of channel means                     flanges of channel means.

In examining Sterner, U. S. Patent 5,157,808, it shows the front elevation view of the coil spring sub-assembly 20 installed in a window frame (Figure 3) and another front elevation view of a typical heavy duty window frame with multiple coil spring sub-assemblies 20 installed (Figure 6). It is clear to me that the component 68 (item F) alleged to be the mounting means does not come into the same plane as the inwardly turned opposed flanges of the channel means. As can be seen from Figure 3 and Figure 6 in the '808 Patent, it is clear that the mounting means does not extend to the inwardly turned opposed flanges of the channel means, but rather is located behind the flanges.





3

| 3. | Page # | '638 Claim Element and description | Corresponding '808 component |
|---|---|---|---|

3. Page #    '638 Claim Element and description
   Ex A, p2  638/1 whereby rotational motion of said
            mounting means is inhibited

Corresponding '808 component
whereby rotational motion of said
mounting means is inhibited, because
the spine shown in the '808 Patent is
sized such that it would have a close
tolerance with the flanges.

In examining Sterner, U. S. Patent 5,157,808, showing all the side elevation views of the balance (figures 2, 5, 7 and 10), it is not clear to me that there is a close tolerance between the component 68 (item F) and the flanges. I found no mention in the '808 Patent that indicates any tolerance between the component 68 and the flanges or even use the word "tolerance". Even if the tolerance was close, the component 68 does not extend into the plane of the flanges in order to inhibit the rotation of the component 68. Please note the discussion related to Figures 3 and 6 above.



FIG. 2



FIG. 10

4



FIG. 5



FIG. 7

4. I also note that Mr. Still alleges that dependant claims 2 and 3 are also invalid based on the '808 Patent. I have shown that claim 1 of the '638 Patent is not invalid, therefore claims 2 and 3 are not invalid as well. This is because the missing elements in claim 1 are also necessarily missing in claims 2 and 3.

5. | Page # | '638 Claim Element and description | Corresponding '808 component |
|---|---|---|
| Ex A, p5 | 638/8 and the mounting means having projection means | and the mounting means having projection means. |

In examining Exhibit B item F, I find that the mounting means are defined by the memorandum and order of the US District Court for the District of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in the '638 Patent. The court construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure

5

for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body Iso includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel." I also note in the court's construction by the US District Court of Massachusetts dated January 20th, 2006 for a construction for the term "projection means" as "projection(s)."

Mr. Still did not identify which element in Exhibit B corresponds to the claimed projection means. For the purposes of my report, I am assuming he is referring to Item (component) F as shown in Exhibit B, and referred to by the number 68 on the '808 Patent. Component 68 does not have a projection means. In fact the whole back side of item F is smooth and does not appear to have any features such as a protrusion or projection. Please refer to Figure 12 in the 808 Patent. In addition, I found no language in the '808 Patent referring to a protrusion or projection.



6.  Page #    '638 Claim Element and description
    Ex A, p5   638/8 positioned between said inwardly
                turned opposite flanges of the channel means
                which cooperate with said flanges of the
                channel means within which the mounting
                means is positioned

Corresponding '808 component
positioned between said inwardly
turned opposed flanges of the channel
means which cooperate with said
flanges of the channel means within
which the mounting means is
positioned.

In examining Sterner, U. S. Patent 5,157,808, it shows the front elevation view of the coil spring sub-assembly 20 installed in a window frame (Figure 3) and another front elevation view of a typical heavy duty window frame with multiple coil spring sub-assemblies 20 installed (Figure 6). It is clear to me that the component 68 (item F) alleged to be the mounting means does not contact the inwardly turned opposed flanges of the channel means. As can be seen from Figure 3 and Figure 6 in the '808 Patent, it is clear that the mounting means does not extend to the

6

inwardly turned opposed flanges of the channel means, but rather is located behind the flanges. Therefore, as shown in the '808 Patent, component 68 will not cooperate with the flanges of the channel means within which the component 68 is positioned.

| Page # | '638 Claim Element and description | Corresponding '808 component |
|---|---|---|
| Ex A, p5 | 638/8 whereby rotational movement of the mounting means is inhibited | whereby rotational movement of the mounting means is inhibited. |

In examining Sterner, U. S. Patent 5,157,808, showing all the side elevation views of the balance (figures 2, 5, 7 and 10), it is clear to me that there is no possibility of contact between component 68 and the flanges. Therefore since there is no cooperation of the component 68 with the flanges, rotational movement of the component 68 is not inhibited by the flanges.

In summary, I note that the analysis by Mr. Still regarding the alleged existence of the components of the '808 Patent that perform the same function as in the '638 Patent is incorrect. I note the following claim elements in the '638 Patent are not present in the '808 Patent, as I indicated above:

1. 638/1 said mounting means having a raised spine
2. 638/1 positioned between and in the same plane as said inwardly turned opposed flanges of said channel means
3. 638/1 whereby rotational motion of said mounting means is inhibited
4. 638/2 and 638/3 (dependent claims of 638/1 for the same reasons as 638/1)
5. 638/8 the mounting means having projection means
6. 638/8 positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned
7. 638/8 whereby rotational movement of the mounting means is inhibited.

**My comments regarding Mr. Still's opinions of Braid U.S. 5,365,638 Patent infringement by the defendant.**

Mr. Still states in his opinions regarding the '638 Patent that:
"based on my findings, [the '638 Patent] is not novel and/or is obvious and therefore, not valid.
Prior art proves that all components of '638 Patent existed before '638 Patent was filed. US Patent 5,157,808 contains all of the elements disclosed in claims 1, 2, 3, & 8 of the '638 Patent, thereby anticipating those claims. All of the claims would have been obvious to one of ordinary skill in the art to which this invention pertains based on (1) Sterner, U. S. Patent 5,157,808 …. Therefore the claims are invalid. Detailed comparisons of the claims of the Patent to the prior art are attached as Exhibits A, B, C & D."

I disagree with Mr. Still opinions for the following reasons:
1. The Patent office has reviewed the filing for the '638 Patent in light of prior art including Sterner, U. S. Patent 5,157,808 and concluded that the Patent is worthy of being granted. In the prosecution history of Patent '638, the communication between Patent office and the Patent applicant initially rejected '638 claims based on the '808 Patent. Then in the Amendment under Rule 1.11 dated October 15, 1993, the Patent applicant amended the claims and distinguished the '808 Patent based on
   a. '808 Patent did not have a means of preventing rotation
   b. '808 Patent did not have an element such as a spine that prevent rotation

After the claims were amended, the Patent Office granted the '638 Patent.

2. The statement "US Patent 5,157,808 contains all of the elements disclosed in claims 1, 2, 3, & 8 of the '638 Patent, thereby anticipating all of those claims," is incorrect; as I indicated in my analysis of Exhibits A, B, C & D above, since many claims of the '638 Patent do not have a corresponding element (component) in the '808 Patent, they are:

    1) 638/1 said mounting means having a raised spine
    2) 638/1 positioned between and in the same plane as said inwardly turned opposed flanges of channel means
    3) 638/1 whereby rotational motion of said mounting means is inhibited
    4) 638/2 and 638/3 (dependent claims of 638/1 for the same reasons as 638/1)
    5) 638/8 the mounting means having projection means
    6) 638/8 positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned
    7) 638/8 whereby rotational movement of the mounting means is inhibited.

Therefore the claims of '638 Patent cannot be anticipated from the components of the '808 Patent. My understanding of the concept of "anticipation" is based on AIPLA Model Jury Instructions (revised 2005). Quote: "to prove anticipation the defendant must present clear and convincing evidence showing that the claimed invention is not new… To anticipate a claim, each and every one of the elements in the claim must be present in a single item of prior art. You may not combine two or more items of prior art to prove anticipation." I have noted in my report many instances where the claimed invention (Patent '638) contains elements that are not present in the prior art mentioned by Mr. Still. ('808 Patent)

The statement that: "All of the claims would have been obvious to one of ordinary skill in the art to which this invention pertains based on (1) Sterner, U. S. Patent 5,157,808 …." is incorrect, because of the following:

a. The ordinary skill in the art required to design new balances at the time the '638 Patent invention was made is not specific to fenestration design, but is part of the general engineering skills acquired by graduates of any accredited engineering college or university or the equivalent industrial experience in the field. In fact, most of the defendant "Caldwell" principals that were deposed came from other industries: Mr. Douglas Zinter (marketing) came from fertilizer products, and Mr. Thomas Batten (engineering) and Mr. Wilbur Kellum came from the medical industry, and Mr. Jeffery Robertson (engineering) came from the consumer photography business, while Mr. deNormand worked directly for Caldwell after graduating as an engineer. Most of the Caldwell principals shared the fact that they were mechanical engineering graduates.

b. The '638 Patent and the '808 Patent describe different objectives:
    i. The '638 Patent seeks to overcome the "….disadvantage of this known type of mounting that the spring is not silent in use, possibly due to relative movement between the inner, free end of the spring and the spring supporting drum." ('638 Patent column 1 lines 41-44)
    ii. The '808 Patent background specifies that the "present invention relates to an improved …counterbalance assembly…which substantially enhance the smoothness of counterbalance sash operation as well as the ease of and facility which one may install and connect multiple spring components…when more than one spring is required…" ('808 Patent column 1 lines 5-18)

8

c. I observe that many claims of the '638 Patent do not have a corresponding element (component) in the '808 Patent, they are:

1. 638/1 said mounting means having a raised spine
2. 638/1 positioned between and in the same plane as said inwardly turned opposed flanges of channel means
3. 638/1 whereby rotational motion of said mounting means is inhibited
4. 638/2 and 638/3 (dependent claims of 638/1 for the same reasons as 638/1)
5. 638/8 the mounting means having projection means
6. 638/8 positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned
7. 638/8 whereby rotational movement of the mounting means is inhibited.

Mr. Still provides no basis or reasoning why a person of ordinary skill in the art would modify the prior art to pick and choose some elements and not others, and combine them to arrive at the invention claimed in the '638 Patent.

d. I note that one of ordinary skill in the art cannot simply pick and choose elements (components) at will from the '808 Patent and invent the claimed invention of the '638 Patent, while at the same time ignoring other components of the '808 Patent that are not found in the '638 Patent claims. Further as described above, many of the claim elements are not found in the '808 Patent.

My understanding of the concept of "Obviousness" is based on the AIPLA Model Jury Instructions (revised 2005). Quote: "for obviousness, a person of ordinary skill in the art may combine two or more items of prior art...before determining...obviousness...you must determine .... 1. The scope and content of prior art relied upon by the defendant; 2. The difference or differences, if any between each claim of the Patent... and the prior art...when doing so, each claim must be considered in its entirety and separately from other claims...Although you should consider any differences between the claimed invention and the prior art, you must still determine the obviousness or non obviousness of the entirety of the invention, not merely some portion of it."

In conclusion, Mr. Still is incorrect in his Obviousness declaration since there are many differences between many of the claims of the '638 Patent and the '808 Patent, in fit, function as well as in form or geometric features. In addition the total invention in the '638 Patent performs a particular function that is distinctly different from the '808 Patent. The total invention of the '638 Patent uses a methodology to inhibit rotation by a raised spine or projection that is entirely absent in the '808 Patent.  In addition, it is wrong to use hindsight for obviousness, to attempt to combine the structural elements of the '808 Patent to achieve the results of the '638 Patent claims.

In addition, there are other indicators of non-obviousness of the '638 Patent invention: my understanding of the commercial success of the Amesbury products based on this invention, and the copying of this invention by Caldwell. If this invention is so obvious, then competitors of Amesbury such as Caldwell would have made products based on this invention before it was patented by Amesbury, and not afterwards.

**II. My comments regarding Mr. Still's opinion of the invalidity of Amesbury Patent No 6,598,264.**

In forming my opinion, I examined Mr. Still's expert witness report of behalf of the defendants, dated March 8, 2006 as well as the two Patents mentioned in his report: Thompson U. S. Patent 6,840,011 and Prosser, U.S. Patent 3,091,797.

I examined Mr. Still's expert witness report of behalf of the defendant, dated on March 8, 2006, where he states that the

"**Thompson U. S. Patent 6,840,011-**filed December 13, 2000 (see Exhibits A&B) clearly shows a block and tackle balance with a bottom guide roller within the bottom guide. During the **'264 Patent** search, the Primary Examiner Anthony Knight, and Assistant Examiner, William D. Hutton Jr. was not made aware of the existence of '011 Patent being filed prior to **'264 Patent** filing. The remaining major components in '011 Patent are commonplace and can be found in Prior Art illustrated in '264 Patent, Fig. 2A and Fig. 2B. These components perform the same function as in the '264 Patent."

I will make my remarks on Mr. Still's comments on the '011 Patent after I have noted my own observations on Exhibits A, B, C & D of his March 8, 2006 report.

**Exhibits A & B for the case involving Amesbury Patent No 6,598,264**

Based on my knowledge of the case that I summarized in my own expert witness report entitled "On Behalf of Plaintiffs in Civil Action No. 05-10020-DPW", dated March 23, 2006, I disagree with many of Mr. Still's assumptions in Exhibit A in his report, where he attempts to point out that the elements (components) mentioned in the Thompson U. S. Patent 6,840,011 exist and/or perform the same function as in the Amesbury '264 Patent.

In Exhibit A, Mr. Still lists some claim elements of the Amesbury '264 Patent, then attempts to show corresponding elements (components) in the '011 Patent that might satisfy these claims. These elements (components) are labeled (sometimes) with a particular letter (A…R) in Exhibit B. Since some of the '264 Patent claim elements are not matched with a corresponding "labeled" component in Exhibit B, I am therefore forced to make assumptions as to Mr. Still's intentions. I note at least the following discrepancies in Mr. Still's report Exhibit A, where he does not present a proper reason for a claim element in the '264 Patent to have a corresponding element (component) in the '011 Patent. In addition, there is a lack of proper referencing of the '011 elements (components) that match the '264 claim elements. In my analysis below, I record Mr. Still's comments on each '264 Patent claim element and the alleged corresponding component in the '011 Patent as they appear in his Exhibit A, then I note my own opinion to these comments directly underneath Mr. Still's statements, as to their lack of applicability, irrelevance or incorrectness.

| 1. Page # | '264 Claim Element and description | Corresponding '011 component |
|---|---|---|
| Ex A, p1 | 264/1 a top guide, connected to the first end of the channel; | '011 Pat. has no top guide connected to the first end of the channel; Prior art is established in '264 Pat. Figure 2A, 2B and Fig. 3 which shows the top guide. |

Mr. Still is referring to another Patent since he cannot find a corresponding component to a top guide in Patent '011. The two Patents perform different functions: Patent '011 describes a balancer used for tilted window operation, where "A balancer 208 is secured to the sash side 212 by a screw 213" (Column 5, Line 8-9). The top of the sash is secured in the jamb channel by a set of levers, such as: "When the sash 200 is in its vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from the plane of the frame 202." (Patent '808 column 5 lines 61-66 and Figure 2). Therefore no balancer top guide is required for the '011 Patent, and there is no motivation to combine a top guide from any other reference to the '011 Patent balancer. Patent '264 describes the function of the top guide as follows (column 4, lines 38-41); "The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to guide the movement of the block and tackle window balance 300 within the jamb pocket 108." Accordingly, the claimed invention is not obvious. Please note my further comments down below regarding Mr. Still's opinions.



**Fig. 2**

2.  Page #    '264 Claim Element and description                Corresponding '011 component
    Ex A, p1    264/1 a bottom guide, connected to the          See Exhibit B item G, a bottom guide
                second end of the channel;                       connected to the second end of the
                                                                 channel;

In Exhibit B, Mr. Still points to item G as the bottom guide; referred to as the housing extension 423 in the '011 Patent, as in column 6 lines 55-56 "a housing extension 423 attached to one end of the elongated U-shaped housing 403". In the '011 Patent Figure 4, I note a pin 206 on the back of the housing extension, as follows; "A first pivot pin 206 and a second pivot pin (not shown) provide the titling mechanism. The pivot pin preferably slides in a groove in a jamb liner..." (Patent '011 column 5 lines 13-15 and figure 2). In the '264 Patent, "the bottom guide 315 is also used for connections and guidance purposes."(Column 4 lines 43-44). The function of the corresponding elements is different for the two inventions: the '011 Patent describes a tilt window and the housing extension includes a pin to provide the tilting mechanism, while the '264 Patent describes a non-tilt window and the bottom guide is used for sash connection and guidance. Therefore the housing extension 423 should not be considered as the claimed bottom guide. Accordingly, the claimed invention is not obvious.



Fig. 4

12

3.  Page #     '264 Claim Element and description
    Ex A, p1   264/1  a bottom guide roller rotatably
               mounted in the bottom guide

Corresponding '011 component
See Exhibit B, item R, a bottom guide
roller rotatably mounted in the bottom
guide.

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide and therefore, the '011 Patent roller is not mounted in a claimed bottom guide.

4.  Page #     '264 Claim Element and description
    Ex A, p3   264/2 The device in claim 1 wherein the
               bottom guide roller is located external to
               the channel

Corresponding '011 component
The device of the '011 Patent has a
bottom guide roller located
external to the channel

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide and therefore, the '011 Patent roller is not located external to the channel in a bottom guide.

5.  Page #     '264 Claim Element and description
    Ex A, p3   264/3 The device according to claim 2
               wherein the top angled portion is sized
               to receive a member of a window sash

Corresponding '011 component
'011 Pat. has no top angled portion
Prior art is established in '264 Pat.
Figure 2A, 2B and Fig. 3 which shows
the top angled portion.

Mr. Still is referring to another Patent since he cannot find a corresponding component to a top guide in Patent '011, and therefore no top guide with an angled portion. The inventions in the two Patents perform different functions: Patent '011 describes a balancer used for tilted window operation, where "A balancer 208 is secured to the sash side 212 by screw 213" (Column 5, Line 8-9). The top of the sash is secured in the jamb channel by a set of levers, such as: "When the sash 200 is in its vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from the plane of the frame 202." (Patent '808 column 5 lines 61-66 and Figure 2). Therefore no balancer top guide is required for the '011 Patent, and there is no motivation to combine a top guide from any other reference to the '011 Patent balancer. Patent '264 describes the function of the top guide as follows (column 4, lines 38-42): "The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to guide the movement of the block and tackle window balance 300 within the jamb pocket 108.The top guide 315 may include a top angled portion 302 …." Please note my further comments down below regarding Mr. Still's opinions.

6.  Page #     '264 Claim Element and description
    Ex A, p3   264/4 The device according to claim 1
               Wherein a portion of the bottom guide is
               external to the channel

Corresponding '011 component
The device of the '011 Patent has a
portion of the bottom guide external
to the channel

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide. Therefore, the housing extension 423 is not a bottom guide with a portion external to the channel.

13

7.  Page #   '264 Claim Element and description
    Ex A, p3   264/5 The device according to claim 1
    wherein the bottom guide forms a channel
    to receive a portion of a window sash

Corresponding '011 component
The device according to claim 1
wherein the bottom guide forms a
channel to receive a portion of a
window sash.

In Exhibit B, Mr. Still points to item G as the bottom guide; referred to as the housing extension 423 in the '011 Patent column 6 lines 55-56: "a housing extension 423 attached to one end of the elongated U-shaped housing 403". In the '011 Patent figure 4, I note a pin 206 on the back of the housing extension. The housing extension does not form a channel to receive a window sash. In fact the entire balancer 208 is received in a groove 210 in the sash side 212. (Patent '011 column 5 lines 6-10 and figure 2).

8.  Page #   '264 Claim Element and description
    Ex A, p4   264/10 The device according to claim 1
    wherein the top guide includes a top
    angled portion

Corresponding '011 component
'011 Pat. has no top guide
Prior art is established in '264 Pat.
Figure 2A, 2B and Fig. 3 which has a
top guide.

Mr. Still is referring to another Patent since he cannot find a corresponding component to a top guide in Patent '011, and therefore no top guide with an angled portion. The two Patents perform different functions: Patent '011 describes a balancer used for tilted window operation, where "A balancer 208 is secured to the sash side 212 by screw 213 (Column 5, Line 8-9). The top of the sash is secured in the jamb channel by a set of levers, such as: "When the sash 200 is in its vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from the plane of the frame 202." (Patent '808 column 5 lines 61-66 and Figure 2). Therefore no balancer top guide is required for the '011 Patent, and there is no motivation to combine a top guide from any other reference to the '011 Patent balancer. Patent '264 describes the function of the top guide as follows (column 4, lines 38-42); "The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to guide the movement of the block and tackle window balance 300 within the jamb pocket 108. The top guide 315 may include a top angled portion 302 ...." Please note my further comments down below regarding Mr. Still's opinions.

9.  Page #   '264 Claim Element and description
    Ex A, p5   264/10 and a bottom portion, the bottom
    portion being connected to the first end
    of the channel

Corresponding '011 component
'011 Patent has a bottom portion,
the bottom portion being connected
to the first end of the channel.

I believe Mr. Still is confused. This claim item refers to the bottom portion of the top guide, not the bottom guide. Patent '011 has no top guide. Please note my previous comments about the top guide and my further comments down below regarding Mr. Still's opinions.

10. Page #   '264 Claim Element and description
    Ex A, p4   264/11 The device according to claim 1
    wherein the fixed pulley block unit
    is integral with the bottom guide

Corresponding '011 component
The device of the '011 Pat. has a fixed
fixed pulley block unit integral with
the bottom guide.

The fixed pulley block mentioned in the '264 Patent may be equivalent to the second pulley member 422 (item H in Exhibit B) in the '011 Patent, since both are fixed and do not move with the spring. In Figure 4 of Patent '011, it appears that second pulley member 422 is inside the U

14

shaped channel, and is not necessarily part of the housing extension 423 in Patent '011. I note in '011 Patent column 7 lines 33-36: "the housing extension 423 which is integral with the pin 206 is attached to the housing 402 by rivet pins 440 and 442 that extend through the second pulley member 422."

11. I also note that in addition to dependant claims 2, 3, 4, 5 10 and 11 that I addressed above, Mr. Still alleges that dependant claims 6, 7, and 9 are also invalid based on the '011 Patent and the alleged admitted prior art. I have shown that claim 1 of the '264 Patent is not invalid, therefore all dependant claims 2, 3, 4, 5, 6, 7, 9, 10 and 11 are not invalid as well. This is because the missing elements in claim 1 are also necessarily missing in these claims.

| 12. Page # Ex A, p5 | '264 Claim Element and description 264/12 At least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | Corresponding '011 component In use, the device of the '011 Patent has at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: |

The attachment method for the balance is different in the two Patents. In the '264 Patent, I note the following (column 5, lines 56-61): "The window balance 300 is then connected to a window sash by inserting a portion of the window sash into the channel 314 of the bottom guide 315 and connecting a cam 405 mounted on the top of the window sash 400 to the top angled portion 302 of the top guide 310 as shown in Figure 6." In the '011 Patent, the attachment is quite the opposite (column 5, lines 8-11): "A balancer 208 is secured to the sash 212 by a screw 213. The balancer 208 is preferably positioned within a groove 210 in the side sash 212." Accordingly, the claimed invention is not obvious. Please note my further comments down below regarding Mr. Still's opinions.

| 13. Page # Ex A, p6 | '264 Claim Element and description 264/12 a top guide, connected to the first end of the channel; | Corresponding '011 component '011 Pat. has no top guide. Prior art is established in '264 Pat. Figure 2A, 2B and Fig. 3. |

Mr. Still is referring to another Patent since he cannot find a corresponding component to a top guide in Patent '011. The two Patents perform different functions: Patent '011 describes a balancer used for tilt window operation, where "A balancer 208 is secured to the sash side 212 by screw 213 (Column 5, Line 8-9). The top of the sash is secured in the jamb channel by a set of levers, such as "When the sash 200 is in its vertical position, the lever end 224 is positioned in the same groove of the jamb liner or frame side member as is located the anchor 218. In this position the top rail 220 cannot be pulled away from the plane of the frame 202." (Patent '808 column 5 lines 61-66 and Figure 2). Therefore no balancer top guide is required for the '011 Patent, and there is no motivation to combine a top guide from any other reference to the '011 Patent balancer. Patent '264 describes the function of the top guide as follows(column 4, lines 38-41); "The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to guide the movement of the block and tackle window balance 300 within the jamb pocket 108." Accordingly, the claimed invention is not obvious. Please note my further comments down below regarding Mr. Still's opinions.

15

14.  Page #    '264 Claim Element and description
     Ex A, p6    264/12 a bottom guide, connected to the
                 second end of the channel;

Corresponding '011 component
a bottom guide connected to the
connected to the second end of the
channel;

In Exhibit B, Mr. Still points to item G as the bottom guide; referred to as the housing extension 423 in the '011 Patent, as in column 6 lines 55-56 "a housing extension 423 attached to one end of the elongated U-shaped housing 403". In the '011 Patent Figure 4, I note a pin 206 on the back of the housing extension, as follows; "A first pivot pin 206 and a second pivot pin (not shown) provide the titling mechanism. The pivot pin preferably slides in a groove in a jamb liner…" (Patent '011 column 5 lines 13-15 and figure 2). In the '264 Patent, "the bottom guide 315 is also used for connections and guidance purposes."(Column 4 lines 43-44). The function of the corresponding elements is different for the two inventions: the '011 Patent describes a tilt window and the housing extension includes a pin to provide the titling mechanism, while the '264 Patent describes a non-tilt window and the bottom guide is used for sash connection and guidance. Therefore the housing extension 423 should not be considered as the claimed bottom guide. Accordingly, the claimed invention is not obvious.

15.  Page #    '264 Claim Element and description
     Ex A, p6    264/12 a bottom guide roller rotatably
                 mounted in the bottom guide

Corresponding '011 component
a bottom guide roller rotatably
mounted in the bottom guide.

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide, and therefore the '011 Patent roller is not rotatably mounted in a claimed bottom guide.

5.  Page #    '264 Claim Element and description
    Ex A, p7    264/13 a bottom guide adapted to be
                connected to an end of a window balance
                channel and adapted to slide in a jamb
                pocket when installed in a window frame;
                and

Corresponding '797 component
a bottom guide adapted to be connected
to an end of a window balance
channel and adapted to slide in a jamb
pocket when installed in a window
frame; and

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide.
     Even if the housing extension was the bottom guide as Mr. Still claims, I note the following: In the '011 Patent figure 4, I note a pin 206 on the back of the housing extension, which is not adapted to slide in a jamb pocket when installed in a window frame. In fact the entire balancer 208 is received in a groove 210 in the sash side 212. (Patent '011 column 5 lines 6-10 and figure 2).

17.  Page #    '264 Claim Element and description
     Ex A, p7    264/13 a bottom guide roller rotatably
                 mounted in the bottom guide

Corresponding '011 component
a bottom guide roller rotatably
mounted in the bottom guide.

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide, and therefore, the '011 Patent roller is not is not mounted rotatably in a claimed bottom guide.

18. Page #    '264 Claim Element and description         Corresponding '011 component
    Ex A, p7  264/14 The device in claim 13 wherein the    The device of the '011 Patent has a
              bottom guide roller is located external to     bottom guide located
              the channel when the bottom guide            external to the channel when the
              is attached thereto                          bottom guide is attached.

    Mr. Still is confused, the claim has a bottom guide **roller** which is not mentioned in the
corresponding '011 component. Instead, Mr. Still refers just to the bottom guide.

19. Page #    '264 Claim Element and description         Corresponding '011 component
    Ex A, p8  264/15 The device in claim 13 wherein       The device of the '011 Patent has a
              at least a portion of the bottom guide is     has a bottom guide at least a portion of
              external to the channel when attached thereto  of which is external to the channel when
                                                          attached thereto

    As I discussed in claim 1, the housing extension 423 should not be considered as the claimed
bottom guide. Therefore, Mr. Still in incorrect in stating that at least a portion of housing extension
423 is external to the channel when attached thereto.

20. Page #    '264 Claim Element and description         Corresponding '011 component
    Ex A, p8  264/16 The device according to claim 13     The device of the '011 Patent has a
              wherein the bottom guide forms a channel     bottom guide that forms a
              to receive a portion of a window sash        channel to receive a portion of a
              when installed                               window sash when installed.

    As I discussed in claim 1, the housing extension 423 should not be considered as the claimed
bottom guide.
    Even if the housing extension was the bottom guide as Mr. Still claims, I note the following: In
the '011 Patent figure 4, I note a pin 206 on the back of the housing extension, which does not
form a channel to receive a window sash. In fact the entire balancer 208 is received in a groove
210 in the sash side 212. (Patent '011 column 5 lines 6-10 and figure 2).

21. I have shown that claim 13 of the '264 Patent is not invalid, based on the '011 Patent and the
alleged admitted prior art, therefore all asserted dependant claims 14, 15, and 16 are not invalid
as well. This is because the missing elements in claim 13 are also necessarily missing in these
claims.

22. Page #    '264 Claim Element and description         Corresponding '011 component
    Ex A, p8  264/18 a top guide, connected to the        '011 Pat. has no top guide connected to
              first end of the channel;                    the first end of the channel; Prior art is
                                                          established in '264 Pat. Figure 2A, 2B
                                                          and Fig. 3 which shows the top guide.

    Mr. Still is referring to another Patent since he cannot find a corresponding component to a top
guide in Patent '011. The two Patents perform different functions: Patent '011 describes a
balancer used for tilt window operation, where "A balancer 208 is secured to the sash side 212 by
screw 213 (Column 5, Line 8-9). The top of the sash is secured in the jamb channel by a set of
levers such as: "When the sash 200 is in its vertical position, the lever end 224 is positioned in the
same groove of the jamb liner or frame side member as is located the anchor 218. In this position
the top rail 220 cannot be pulled away from the plane of the frame 202." (Patent '808 column 5
lines 61-66 and Figure 2). Therefore no balancer top guide is required for the '011 Patent, and

there is no motivation to combine a top guide from any other reference to the '011 Patent balancer.  Patent '264 describes the function of the top guide as follows(column 4, lines 38-41); "The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to guide the movement of the block and tackle window balance 300 within the jamb pocket 108." Accordingly, the claimed invention is not obvious. Please note my further comments down below regarding Mr. Still's opinions.

| | | |
|---|---|---|
| 23. Page #<br>Ex A, p8 | '264 Claim Element and description<br>264/18 a bottom guide connected<br>to the second end of the channel and<br>adapted to slide in a jamb pocket<br>when installed in a window frame; and | Corresponding '011 component<br>a bottom guide connected to<br>the second end of the channel and<br>adapted to slide in a jamb pocket |

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide.

Even if the housing extension was the bottom guide as Mr. Still claims, I note the following: In the '011 Patent figure 4, I note a pin 206 on the back of the housing extension, which is not adapted to slide in a jamb pocket when installed in a window frame. In fact the entire balancer 208 is received in a groove 210 in the sash side 212. (Patent '011 column 5 lines 6-10 and figure 2). Accordingly, the claimed invention is not obvious.

| | | |
|---|---|---|
| 24. Page #<br>Ex A, p9 | '264 Claim Element and description<br>264/18 bottom guide roller rotatably<br>mounted in the bottom guide | Corresponding '011 component<br>a bottom guide roller rotatably<br>mounted in the bottom guide. |

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide and therefore, the '011 Patent roller is not mounted rotatably in a claimed bottom guide.

| | | |
|---|---|---|
| 25. Page #<br>Ex A, p9 | '264 Claim Element and description<br>264/19 The device in claim 18 wherein the<br>bottom guide roller is located external to<br>the channel | Corresponding '011 component<br>The device of the '011 Patent has a<br>bottom guide roller located<br>external to the channel |

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide and therefore, the '011 Patent roller is not located external to the channel in a claimed bottom guide.

| | | |
|---|---|---|
| 26. Page #<br>Ex A, p9 | '264 Claim Element and description<br>264/20 The device in claim 18 wherein<br>at least a portion of the bottom guide is<br>external to the channel | Corresponding '011 component<br>The device of the '011 Patent has a<br>has a bottom guide at least a portion of<br>of which is external to the channel |

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide, and therefore housing Patent '011 does not have a portion of the bottom guide external to the channel.

| | | |
|---|---|---|
| 27. Page #<br>Ex A, p9 | '264 Claim Element and description<br>264/21 The device according to claim 18<br>wherein the bottom guide forms a channel<br>to receive a portion of a window sash<br>when installed | Corresponding '011 component<br>The device of the '011 Patent has a<br>bottom guide forms a channel to receive<br>channel to receive a portion of a<br>window sash when installed. |

18

As I discussed in claim 1, the housing extension 423 should not be considered as the claimed bottom guide.

Even if the housing extension was the bottom guide as Mr. Still claims, I note the following: In the '011 Patent figure 4, I note a pin 206 on the back of the housing extension, which does not form a channel to receive a window sash. In fact the entire balancer 208 is received in a groove 210 in the sash side 212. (Patent '011 column 5 lines 6-10 and figure 2).

28. I have shown that claim 18 of the '264 Patent is not invalid, based on the '011 Patent and the alleged admitted prior art, therefore all asserted dependant claims 19, 20, and 21 are not invalid as well. This is because the missing elements in claim 18 are also necessarily missing in these claims.

In summary, I note that the analysis by Mr. Still regarding the components of Patent '011 that perform the same function as in the '264 Patent is incorrect. I note the following elements (components) in the '264 Patent are not present in the '011 Patent, as I indicated above:

1. 264/1 a top guide, connected to the first end of the channel;
2. 264/1 a bottom guide, connected to the second end of the channel;
3. 264/1 a bottom guide roller rotatably mounted in the bottom guide
4. 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel
5. 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash
6. 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel
7. 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash
8. 264/10 The device according to claim 1 wherein the top guide includes a top angled portion
9. 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel
10. 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide
11. Dependant claims 6, 7 and 9 (dependent claims of 264/1 for the same reasons as 264/1)
12. 264/12 At least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising:
13. 264/12 a top guide, connected to the first end of the channel;
14. 264/12 a bottom guide, connected to the second end of the channel;
15. 264/12 a bottom guide roller rotatably mounted in the bottom guide
16. 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and
17. 264/13 a bottom guide roller rotatably mounted in the bottom guide.
18. 264/14 The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto
19. 264/15 The device according to claim 13 wherein at least a portion of the bottom bottom guide is external to the channel when attached thereto
20. 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed
21. Dependant claims 14, 15, and 16 (dependent claims of 264/13 for the same reasons as 264/13)
22. 264/18 a top guide, connected to the first end of the channel
23. 264/18 a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and
24. 264/18 a bottom guide roller rotatably mounted in the bottom guide

19

25. 264/19 The device in claim 18 wherein the bottom guide roller is located external to the channel
26. 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel
27. 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed
28. Dependant claims 19, 20, and 21 (dependent claims of 264/18 for the same reasons as 264/18)


**Exhibits C & D for the case involving Amesbury Patent No 6,598,264**

Based on my knowledge of the case that I summarized in my own expert witness report entitled "On Behalf of Plaintiffs in Civil Action No. 05-10020-DPW", dated March 23, 2006, I disagree with many of Mr. Still's assumptions in Exhibit C in his report, where he attempts to point out that the elements (components) mentioned in the Prosser U.S. Patent 3,091,797 perform the same function as in the plaintiffs '264 Patent.


In Exhibit C, Mr. Still lists some claim elements of the plaintiff's '264 Patent, then attempts to show corresponding elements (components) in the '797 Patent that might satisfy these claims. Theses elements (components) are labeled (sometimes) with a particular letter (A...R) in Exhibit D. Since some of the '264 claims are not matched with a corresponding "labeled" element (component) in Exhibit D, I am therefore forced to make assumptions as to Mr. Still's intentions. I note the following discrepancies in Mr. Still's report Exhibit C, where he does not present a proper reason for a claim by the '264 Patent to have a corresponding element (component) in the '797 Patent. In addition, there is a lack of proper referencing of the '797 components that match the '264 claims. In my analysis below, I record Mr. Still comments on each '264 Patent claim element and the alleged corresponding component in the '797 Patent as they appear in his Exhibit C, then I note my own opinion to these comments directly underneath Mr. Still statements, as to their lack of applicability, irrelevance or incorrectness:


| | | |
|---|---|---|
| 1. Page #<br>Ex C, p1 | '264 Claim Element and description<br>264/1 a top guide connected to the<br>first end of the channel; | Corresponding '797 component<br>See Exhibit D, Item E, a top guide<br>connected to the first end of the<br>channel; |

I note that Mr. Still argues that Exhibit D item E is the claimed top guide. I disagree since item E refers to tongue and stop attachment features formed integrally with one end of the housing and does not constitute a top guide connected to the first end of the channel. Exhibit D item E are features in the flanges of the U-shaped channel used to interlock the balancer to the jamb facing in the following manner in Patent '797: [the balance] "housings 13 and 14 are formed with laterally extending flanges 22 (column 2, line 51-52)... Flanges 22 are interrupted near their upper and lower ends by relatively long cut-away portions 23, and by relatively short cut-away portion 24, see FIGURE 5. By introducing cut-away portions 23 and 24; four tongues 25 and four stops 26 are formed in flanges 22. Tongues 25, of which there is a first pair at the upper end and a second pair at the lower end of the housings 13 and 14 are adapted to enter into L-shaped slots 20 and 21, and when they do enter into them, interlock with rectangular tabs 18 and 19." Patent '797 Colum 2 lines 60-70.

The top guide in Patent '264 is attached to the U shaped channel, and is used in this manner: "the top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to help guide the movement of the block and tackle window balance 300 within the jamb pocket 108." Column 4, lines 37-41.

The component mentioned by Mr. Still as Exhibit D item E is a feature of the laterally extending flanges 22 that is stationary in the jamb facing that is totally different from the '264 claim of a top guide which is a distinct part connected to the U-shaped channel and rides up and down with the sash, such that "Attached to the two ends of the rigid U-shaped channel 205 with fasteners 212, 216 are a top guide 210 and a bottom guide 215 that are used to connect the window balance 200 to either the upper or lower window sashs 104, 106 and to help guide the vertical motion of the window balance 200 within the jamb pockets 108" (Patent '264 column 3 lines 22-27).

Therefore the tongue and stop features (Exhibit D item E) do not constitute the claimed top guide, since they are structurally and functionally different. Therefore no window balance top guide is required for the '797 Patent, and there is no motivation to combine a top guide from any other reference to the '797 Patent window balance. Accordingly, the claimed invention is not anticipated and/or obvious.



Filed April ;

Fig. 5.

2. Page #    '264 Claim Element and description            Corresponding '797 component
   Ex C, p1   264/1 a bottom guide connected to the          See Exhibit D, Item G, a bottom guide
              second end of the channel;                     connected to the second end of the
                                                             channel;

I note that Mr. Still argues that Exhibit D item G is the claimed bottom guide. I disagree since item G refers to tongue and stop attachment, features formed integrally with one end of the housing, and does not constitute a bottom guide connected to the second end of the channel. Exhibit D item G are features in the flanges of the U-shaped channel used to interlock the balancer to the jamb facing in the following manner in Patent '797: [the balance] "housings 13 and 14 are formed with laterally extending flanges 22" (column 2, line 51-52) … "Flanges 22 are interrupted near their upper and lower ends by relatively long cut-away portions 23, and by relatively short cut-away portion 24, see FIGURE 5. By introducing cut-away portions 23 and 24; four tongues 25 and four stops 26 are formed in flanges 22. Tongues 25, of which there is a first pair at the upper end and a second pair at the lower end of the housings 13 and 14 are adapted to enter into L-shaped slots 20 and 21, and when they do enter into them, interlock with rectangular tabs 18 and 19." Patent '797 Colum 2 lines 60-70.

The bottom guide in Patent '264 is attached to the U shaped channel, and is used in this manner: "the bottom guide 315 is also used for connection and guidance purposes, but the bottom guide 315 further serves as a frame for housing the bottom guide roller 350." Column 4, lines 43-46. The component mentioned by Mr. Still as Exhibit D item G is a feature being stationary in the jamb facing that is totally different from the '264 claim of a bottom guide which is a distinct part connected to the U-shaped channel and rides up and down with the sash, such that "Attached to the two ends of the rigid U-shaped channel 205 with fasteners 212, 216 are a top guide 210 and a bottom guide 215 that are used to connect the window balance 200 to either the upper or lower window sashs 104, 106 and to help guide the vertical motion of the window balance 200 within the jamb pockets 108 (Patent '797 column 2 lines 22-27). Therefore the tongue and stop features (Exhibit D item G) do not constitute the claimed bottom guide, since they are structurally and functionally different. Therefore no window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance. Accordingly, the claimed invention is not anticipated and/or obvious.

3. Page #    '264 Claim Element and description            Corresponding '797 component
   Ex C, p1   264/1 a bottom guide roller rotatably           See Exhibit D, Item R, a bottom guide
              mounted in the bottom guide;                    roller rotatably mounted in the bottom
                                                             guide;

As I noted earlier, there is no bottom guide in the '797 Patent and the bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable pulley, it should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): "…..a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38." Please refer to the next item.

4. Page #    '264 Claim Element and description            Corresponding '797 component
   Ex C, p1   264/1 a fixed pulley block unit connected       See Exhibit D, Item H, a fixed pulley
              to the channel                                  block unit connected to the channel.

I believe Mr. Still is incorrect in labeling item H as the fixed pulley lock unit and R as the bottom guide roller rotatably mounted in the bottom guide. I note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 36, which is defined in the '797 Patent as a pin. I also note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 38, which is defined in the '797 Patent as a nylon sheave and part of the fixed (stationary) holder 34. This is a result from the fact that Patent '797 has two sheaves (pulley blocks) in its embodiment: the stationary and moveable sheaves. While the '264 Patent has two pulley blocks in it: fixed, translatable and a separate rotatable pulley mounted on a separate axle in the bottom guide. The '797 Patent describes it this way (column 3 lines 14-18): "…..a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38." There are no other sheaves (pulleys) in the '797 embodiment i.e. it has no bottom guide roller.

5.  Page #      '264 Claim Element and description         Corresponding '797 component
    Ex C, p2    264/1 and extends around the bottom        and extends around the bottom
                guide roller,                              guide roller,

As I noted earlier, there is no bottom guide in the '797 Patent. The bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable (bottom guide roller) pulley, it should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): "…..a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38."

.   Page #      '264 Claim Element and description         Corresponding '797 component
    Ex C, p3    264/1 and the second cord end being        and the second cord end being
                attachable to a jamb                       attachable to a jamb.

The second cord end in the '797 Patent is attached to the bottom of the sash, based on the '797 Patent column 3, lines 18-22: "one end of cable 17 is made fast to pin 36, the other end extends through bottom plate 15, being knotted against its lower face. When bottom plate 15 moves with sash element 11, on movement of the latter towards closed position…." It is clear that the second cord end is not attached to a jamb.

7.  Page #      '264 Claim Element and description         Corresponding '797 component
    Ex C, p3    264/2 The device of claim 1 wherein the    The device of the '797 Patent has a
                bottom guide roller is located external    bottom guide roller located internal
                to the channel                             to the channel

I note that Mr. Still states that the claim element does not have a corresponding component in the '797 Patent, by the use of the terms "external" in the '264 Patent and "internal" in the 797 Patent. I also noted that there is no bottom guide in the '797 Patent. I also note that that the bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jam as in the '264 Patent. I believe Mr. Still is incorrect in labeling item H as the fixed pulley lock unit and R as the bottom guide roller rotatably mounted in the bottom guide. I note in xhibit D, a line originating from the letter H and pointing to the vicinity of item 36, which is defined in the '797 Patent as a pin. I also note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 38, which is defined in the '797 Patent as a nylon sheave and part of the fixed

(stationary) holder 34. This is a result from the fact that Patent '797 has two sheaves (pulley blocks) in its embodiment: the stationary and moveable sheaves. While the '264 Patent has two pulley blocks in it: fixed, translatable and a separate rotatable pulley mounted on a separate axle in the bottom guide. The '797 Patent describes it this way (column 3 lines 14-18): "...a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38." There are no other sheaves (pulleys) in the '797 embodiment i.e. it has no bottom guide roller.

| 8. Page #<br>Ex C, p3 | '264 Claim Element and description<br>264/3 The device according to claim 2<br>wherein the top angled portion is sized<br>to receive a member of a window sash | Corresponding '797 component<br>'797 Pat. has no top angled portion<br>Prior art is established in '264 Pat.<br>Figure 2A, 2B & Fig. 3, which has a<br>top angled portion. |
|---|---|---|

Mr. Still is referring to another Patent since he cannot find a corresponding component to the claim of a top angled portion which is sized to receive a member of a window sash in Patent '797. As I noted earlier, there is no top guide in the '797 Patent, and therefore there is no top angled portion sized to receive a member of a window sash. Therefore no window balance top guide with a top angled portion is required for the '797 Patent, and there is no motivation to combine a top guide from any other reference to the '797 Patent window balance

| 9. Page #<br>Ex C, p3 | '264 Claim Element and description<br>264/4 The device according to claim 1<br>wherein a portion of the bottom guide<br>is external to the channel | Corresponding '797 component<br>The device of the '797 Patent<br>has a portion of the bottom guide<br>external to the channel. |
|---|---|---|

As I noted earlier, the tongue and stop features (Exhibit D item G) do not constitute the claimed bottom guide, since they are structurally and functionally different. No window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance.

| 10. Page #<br>Ex C, p3 | '264 Claim Element and description<br>264/5 The device according to claim 1<br>wherein the bottom guide forms a channel<br>to receive a portion of a window sash | Corresponding '797 component<br>The device of the '797 Patent has no<br>channel to receive a portion of a<br>window sash in the bottom guide.<br>Prior art is established in Pat. '264<br>Fig. 2A, 2B and Fig. 3 which shows<br>the bottom guide to receive a portion<br>of a window sash when installed. |
|---|---|---|

As I noted earlier, the tongue and stop features (Exhibit D item G) do not constitute the claimed bottom guide, since they are structurally and functionally different. Even if item G was the bottom guide as Mr. Still claims, it does not have a channel to receive a portion of a window sash. No window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance.

| 11. Page #<br>Ex C, p4 | '264 Claim Element and description<br>264/10 The device according to claim 1<br>wherein the top guide includes a top angled<br>portion | Corresponding '797 component<br>'797 Pat. has no angled portion on the<br>top guide. Prior art is established in Pat.<br>'264 Fig. 2A, 2B & Fig. 3. |
|---|---|---|

24

Mr. Still is referring to another Patent since he cannot find a corresponding component to an angled portion of the top guide in Patent '797. As I noted above, there is no top guide in the '797 Patent, and therefore there is no top angled portion. Therefore no window balance top guide with a top angled portion is required for the '797 Patent, and there is no motivation to combine a top guide from any other reference to the '797 Patent window balance

| 12. Page # Ex C, p5 | '264 Claim Element and description 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel | Corresponding '797 component The device of '797 Patent has a bottom portion, the bottom portion being connected to the first end of the channel. |
|---|---|---|

This claim item refers to the bottom portion of the top guide. As I noted earlier, Patent '797 has no top guide, and so there is no bottom portion of a top guide.

| 13. Page # Ex C, p4 | '264 Claim Element and description 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide | Corresponding '797 component The device of the '797 Pat. has a fixed fixed pulley block unit integral with the bottom guide. |
|---|---|---|

As I noted earlier, there is no bottom guide in the '797 Patent. Therefore, there is no fixed pulley block integral with a bottom guide.

14. I also note that in addition to dependant claims 2, 3, 4, 5 10 and 11 that I addressed above, Mr. Still alleges that dependant claims 6, 7, and 9 are also invalid based on the '797 Patent and the alleged admitted prior art. I have shown that claim 1 of the '264 Patent is not invalid, therefore all dependant claims 2, 3, 4, 5, 6, 7, 9, 10 and 11 are not invalid as well. This is because the missing elements in claim 1 are also necessarily missing in these claims.

| 15. Page # Ex C, p5 | '264 Claim Element and description 264/12 At least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | Corresponding '797 component In use, the device of the '797 Patent is a block and tackle window balance attached to the at least one of the upper window sash and the lower window sash, the device comprising: |
|---|---|---|

The attachment method for the balance is different in the two Patents. In the '264 Patent, I note the following (column 5, lines 56-61): "The window balance 300 is then connected to a window sash by inserting a portion of the window sash into the channel 314 of the bottom guide 315 and connecting a cam 405 mounted on the top of the window sash 400 to the top angled portion 302 of the top guide 310 as shown in Figure 6." In the '797 Patent, the attachment is rigid and therefore quite the opposite (column 2, lines 37-39): "housing 13 and 14 are held detachably in place in sash receiving ways 5 and 6 by means of a tongue and slot connections" Accordingly, the claimed invention is not obvious. Please note my further comments down below regarding Mr. Still's opinions.

| 16. Page # Ex C, p6 | '264 Claim Element and description 264/12 a top guide connected to the first end of the channel; | Corresponding '797 component a top guide connected to the first end of the channel. |
|---|---|---|

As I noted earlier, there is no top guide in the '797 Patent. Therefore no window balance top guide is required for the '797 Patent, and there is no motivation to combine a top guide from any other reference to the '797 Patent window balance.

| | | |
|---|---|---|
| 7. Page #<br>Ex C, p6 | '264 Claim Element and description<br>264/12 a bottom guide connected to the<br>second end of the channel; | Corresponding '797 component<br>a bottom guide connected to the<br>second end of the channel. |

As I noted earlier, there is no bottom guide in the '797 Patent. Therefore no window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance.

| | | |
|---|---|---|
| 18. Page #<br>Ex C, p6 | '264 Claim Element and description<br>264/12 a bottom guide roller rotatably<br>mounted in the bottom guide | Corresponding '797 component<br>a bottom guide roller rotatably<br>mounted in the bottom guide. |

As I noted earlier, there is no bottom guide in the '797 Patent and the bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable pulley, it should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): ".....a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38."

| | | |
|---|---|---|
| 19. Page #<br>Ex C, p7 | '264 Claim Element and description<br>264/12 and extends around the bottom<br>guide roller | Corresponding '797 component<br>and extends around the bottom<br>guide roller. |

As I noted earlier, there is no bottom guide in the '797 Patent. The bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable (bottom guide roller) pulley, it should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): ".....a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38."

| | | |
|---|---|---|
| 20. Page #<br>Ex C, p7 | '264 Claim Element and description<br>264/12 and the second cord end being<br>attachable to a jamb | Corresponding '797 component<br>and the second cord end being<br>attachable to a jamb. |

The second cord end in the '797 Patent is attached to the bottom of the sash, based on the '797 Patent column 3, lines 18-22: "one end of cable 17 is made fast to pin 36, the other end extends through bottom plate 15, being knotted against its lower face. When bottom plate 15 moves with sash element 11, on movement of the latter towards closed position..." It is clear that the second cord end is not attached or attachable to a jamb. If the second cord end was attached to the jamb, the balance would not function.

21. Page #
Ex C, p7

| '264 Claim Element and description | Corresponding '797 component |
|---|---|
| 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and |

As I noted earlier, there is no bottom guide in the '797 Patent. The tongue and stop feature referred to by Mr. Still in Exhibit D item G does not slide in the window jamb, but in fact are held stationary in through the tongue and stop connections: in Column 4 lines 4-6 as "Each such housing is itself held in place by one of sash receiving ways by means of a tongue and slot connection at the upper and lower end of the housing."

22. Page #
Ex C, p7

| '264 Claim Element and description | Corresponding '797 component |
|---|---|
| 264/13 a bottom guide roller rotatably mounted in the bottom guide | a bottom guide roller rotatably mounted in the bottom guide. |

As I noted earlier, there is not bottom guide in the '797 Patent. Even if there is, the bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable pulley, it should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): ".....a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38."

3. Page #
Ex C, p8

| '264 Claim Element and description | Corresponding '797 component |
|---|---|
| 264/14 The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | The device of the '797 Patent has a bottom guide located external to the to the channel. |

Mr. Still is confused. The claim has a bottom guide **roller** which is not mentioned in the corresponding '011 component. Instead, Mr. Still refers just to the bottom guide. In addition, as I mentioned earlier, there is no bottom guide and no bottom guide roller in the '797 Patent.

24. Page #
Ex C, p8

| '264 Claim Element and description | Corresponding '797 component |
|---|---|
| 264/15 The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto | The device of the '797 Patent has a bottom guide external and internal to the channel. |

As I noted earlier, there is no bottom guide in the '797 Patent. The tongue and stop feature that Mr. Still refers to as Exhibit D item G is integral in the channel in the '797 Patent, therefore it cannot be at the same time external and internal to the channel, since it is a part of the channel.

25. Page #
Ex C, p8

| '264 Claim Element and description | Corresponding '797 component |
|---|---|
| 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of window sash when installed | The device of the '797 Patent has no channel to receive a portion of a window sash in the bottom guide. Prior art is established in '264 Pat. |

Fig. 2A, 2B & Fig. 3 which shows
the bottom guide channel to receive a
portion of a window sash when installed.

Mr. Still is referring to another Patent since he cannot find a corresponding component to a bottom guide channel in Patent '797. As I noted earlier, there is no bottom guide in the '797 Patent. Even if Exhibit D item G is the bottom guide as Mr. Still claims, it does not form a channel to receive a portion of the window sash when installed. Therefore no window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance.

26. I have shown that claim 13 of the '264 Patent is not invalid, based on the '797 Patent and the alleged admitted prior art, therefore all asserted dependant claims 14, 15, and 16 are not invalid as well. This is because the missing elements in claim 13 are also necessarily missing in these claims.

| 27. Page #<br>Ex C, p8 | '264 Claim Element and description<br>264/18 a top guide connected to the<br>first end of the channel; | Corresponding '797 component<br>a top guide connected to the<br>first end of the channel; |
|---|---|---|

As I noted earlier, there is no top guide in the '797 Patent. Therefore no window balance top guide is required for the '797 Patent, and there is no motivation to combine a top guide from any other reference to the '797 Patent window balance.

| 28. Page #<br>Ex C, p8 | '264 Claim Element and description<br>264/18 a bottom guide connected to the<br>second end of the channel; | Corresponding '797 component<br>a bottom guide connected to the<br>second end of the channel; |
|---|---|---|

As I noted earlier, there is no bottom guide in the '797 Patent. Therefore no window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance.

| 29. Page #<br>Ex C, p9 | '264 Claim Element and description<br>264/18 a bottom guide roller rotatably<br>mounted in the bottom guide | Corresponding '797 component<br>a bottom guide roller rotatably<br>mounted in the bottom guide. |
|---|---|---|

The bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jamb as in the '011 and '264 Patents. I believe Mr. Still is incorrect in labeling item R as the rotatable pulley. It should be labeled as the fixed pulley, since the '797 Patent describes it this way (column 3 lines 14-18): "…..a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38."

| 30. Page #<br>Ex C, p9 | '264 Claim Element and description<br>264/19 The device of claim 18 wherein<br>the bottom guide roller is located external<br>to the channel | Corresponding '797 component<br>The device of the '797 Patent has a<br>bottom guide roller located internal<br>to the channel |
|---|---|---|

I note that Mr. Still states that the claim element does not have a corresponding component in the '797 Patent, by the use of the term "external" in the '264 Patent and "internal" in the 797 Patent.

28

The bottom guide roller rotatably mounted in the bottom guide in the '264 Patent does not exist in the '797 Patent, since the cord is directly tied to the bottom of the sash and does not have to be reversed in direction to tie into the window jam as in the '264 Patent. I believe Mr. Still is incorrect in labeling item H as the fixed pulley block unit and R as the bottom guide roller rotatably mounted in the bottom guide. I note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 36, which is defined in the '797 Patent as a pin. I also note in Exhibit D, a line originating from the letter H and pointing to the vicinity of item 38, which is defined in the '797 Patent as a nylon sheave and part of the fixed (stationary) holder 34. This is a result from the fact that Patent '797 has two sheaves (pulley blocks) in its embodiment: the stationary and moveable sheaves. While the '264 Patent has two pulley blocks in it: fixed, translatable and a separate rotatable pulley mounted on a separate axle in the bottom guide. The '797 Patent describes it this way (column 3 lines 14-18): ".....a moveable sheave [pulley] holder 29 and a stationary sheave [pulley] holder 34. Sheave [pulley] holder 34 is made up of two spaced plates 35, a first connecting pin 36, a second connecting pin 37, and a single nylon sheave 38." There are no other sheaves (pulleys) in the '797 embodiment i.e. it has no bottom guide roller.

31. Page #
    Ex C, p9

| '264 Claim Element and description | Corresponding '797 component |
|---|---|
| 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel | The device of the '797 Patent has a bottom guide at least a portion of which is external to the channel. |

As I noted earlier, there is no bottom guide in the '797 Patent. The tongue and stop feature that Mr. Still refers to as Exhibit D item G is integral in the channel in the '797 Patent and therefore no portion is external to the channel. This feature is a cutaway portion of the balance flanges 22. I note in the '797 Patent "Flanges 22 are interrupted near their upper and lower ends by relatively long cut-away portions 23 and by relatively short cut-away portions 24: see FIGURE 5. By introducing cut-away portions 23 and 24, four tongues 25 and four stops 26 are formed in flanges 22." (column 2, lines 60-64).

32. Page #
    Ex C, p9

| '264 Claim Element and description | Corresponding '797 component |
|---|---|
| 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed | The device of the '797 Patent has no channel to receive a portion of a window sash in the bottom guide. Prior art is established in '264 Patent Fig. 2A, 2B & Fig. 3 which shows the bottom guide channel to receive a portion of a window sash |

Mr. Still is referring to another Patent since he cannot find a corresponding component to a bottom guide channel in Patent '797. As I noted earlier, there is no bottom guide in the '797 Patent. Even if Exhibit D item G is the bottom guide as Mr. Still claims, it does not form a channel to receive a portion of the window sash when installed. Therefore no window balance bottom guide is required for the '797 Patent, and there is no motivation to combine a bottom guide from any other reference to the '797 Patent window balance. Accordingly, the claimed invention is not anticipated and/or obvious.

33. I have shown that claim 18 of the '264 Patent is not invalid, based on the '797 Patent and the alleged admitted prior art, therefore all asserted dependant claims 19, 20, and 21 are not invalid as well. This is because the missing elements in claim 18 are also necessarily missing in these claims.

29

In summary, I note that the analysis by Mr. Still regarding the components of Patent '797 that perform the same function as in the '264 Patent is incorrect. I note the following elements (components) in the '264 Patent are not present in the '797 Patent, as I indicated above:

1. 264/1 a top guide, connected to the first end of the channel;
2. 264/1 a bottom guide, connected to the second end of the channel;
3. 264/1 a bottom guide roller rotatably mounted in the bottom guide
4. 264/1 a fixed pulley block unit connected to the channel
5. 264/1 and extends around the bottom guide roller
6. 264/1 and the second cord end being attached to a jamb
7. 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel
8. 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash
9. 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel
10. 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash
11. 264/10 The device according to claim 1 wherein the top guide includes a top angled portion
12. 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel
13. 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide
14. Dependant claims 6, 7 and 9 (dependent claims of 264/1 for the same reasons as 264/1)
15. 264/12 At least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising:
16. 264/12 a top guide, connected to the first end of the channel;
17. 264/12 a bottom guide, connected to the second end of the channel;
8. 264/12 a bottom guide roller rotatably mounted in the bottom guide
19. 264/12 and extends around the bottom guide roller
20. 264/12 and the second cord end being attached to a jamb
21. 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and
22. 264/13 a bottom guide roller rotatably mounted in the bottom guide.
23. 264/14 The device of claim 13 wherein the bottom guide roller is located external    to the channel when the bottom guide is attached thereto
24. 264/15 The device according to claim 13 wherein at least a portion of the bottom    bottom guide is external to the channel when attached thereto
25. 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed
26. Dependant claims 14, 15, and 16 (dependent claims of 264/13 for the same reasons as 264/13)
27. 264/18 a top guide, connected to the first end of the channel
28. 264/18 a bottom guide, connected to the second end of the channel;
29. 264/18 a bottom guide roller rotatably mounted in the bottom guide
30. 264/19 The device in claim 18 wherein the bottom guide roller is located external    to the channel
31. 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel
32. 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed
3. Dependant claims 19, 20, and 21 (dependent claims of 264/18 for the same reasons as 264/18)

**My comments regarding Mr. Still's opinions of Newman U.S. 6,598,264 Patent infringement by the defendant.**

Mr. Still states in his opinions regarding '264 Patent as:

"based on my findings, [the '264 Patent] is not novel and/or is obvious and therefore, not valid.
Prior art proves that all components of '264 Patent existed before '264 was filed. US Patent 3,091,797 contains all of the elements disclosed in claims 1, 4, 6, 7, 9, 11, 12, 13, 14, 15, 18 & 20 of the '264 Patent, thereby anticipating all of those claims. All of the claims would have been obvious to one of ordinary skill in the art to which this invention pertains based on (1) the admitted prior art and Thompson, U. S. Patent 6,840,011 and/or (2) the admitted prior art and Prosser, U.S. Patent 3,091,797. Therefore the claims are invalid. Detailed comparisons of the claims of the Patent to the prior art are attached as Exhibits A, B, C & D."

I disagree with Mr. Still opinions for the following reasons:

1. The Patent office has reviewed the filing for the '264 Patent in light of prior art, and concluded that the '264 Patent is worthy of being granted.

2. The statement "US Patent 3,091,797 contains all of the elements disclosed in claims 1, 4, 6, 7, 9, 11, 12, 13, 14, 15, 18 & 20 of the '264 Patent, thereby anticipating all of those claims." is incorrect; as I indicated in my analysis of Exhibits A, B, C & D above, since many claims of the '264 Patent do not have a corresponding element (component) in the '797 Patent, they are :

1. 264/1 a top guide, connected to the first end of the channel;
2. 264/1 a bottom guide, connected to the second end of the channel;
3. 264/1 a bottom guide roller rotatably mounted in the bottom guide
4. 264/1 a fixed pulley block unit connected to the channel
5. 264/1 and extends around the bottom guide roller
6. 264/1 and the second cord end being attached to a jamb
7. 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel
8. 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash
9. 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel
10. 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash
11. 264/10 The device according to claim 1 wherein the top guide includes a top angled portion
12. 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel
13. 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide
14. Dependant claims 6, 7 and 9 (dependent claims of 264/1 for the same reasons as 264/1)
15. 264/12 At least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising:
16. 264/12 a top guide, connected to the first end of the channel;
17. 264/12 a bottom guide, connected to the second end of the channel;
18. 264/12 a bottom guide roller rotatably mounted in the bottom guide
19. 264/12 and extends around the bottom guide roller
20. 264/12 and the second cord end being attached to a jamb

21. 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and
22. 264/13 a bottom guide roller rotatably mounted in the bottom guide.
23. 264/14 The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto
24. 264/15 The device according to claim 13 wherein at least a portion of the bottom bottom guide is external to the channel when attached thereto
25. 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed
26. Dependant claims 14, 15, and 16 (dependent claims of 264/13 for the same reasons as 264/13)
27. 264/18 a top guide, connected to the first end of the channel
28. 264/18 a bottom guide, connected to the second end of the channel;
29. 264/18 a bottom guide roller rotatably mounted in the bottom guide
30. 264/19 The device in claim 18 wherein the bottom guide roller is located external to the channel
31. 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel
32. 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed
33. Dependant claims 19, 20, and 21 (dependent claims of 264/18 for the same reasons as 264/18)

Therefore the claims of '264 Patent cannot be anticipated from the components of the '797 Patent. My understanding of concept of "anticipation" is based on AIPLA Model Jury Instructions (revised 2005). Quote: "to prove anticipation the defendant must present clear and convincing evidence showing that the claimed invention is not new... To anticipate a claim, each and every one of the elements in the claim must be present in a single item of prior art. You may not combine two or more items of prior art to prove anticipation." I have noted in my report many instances where the claimed invention ('264 Patent) contains elements (components) that are not present in the prior art ('797 Patent) mentioned by Mr. Still.

3. The statement "All of the claims would have been obvious to one of ordinary skill in the art to which this invention pertains based on (1) the admitted prior art and Thompson, U. S. Patent 6,840,011 and/or (2) the admitted prior art and Prosser, U.S. Patent 3,091,797" is incorrect because of the following:

   a. The ordinary skill in the art required to design new balances at the time the '638 Patent invention was made is not specific to fenestration design, but is part of the general engineering skills acquired by graduates of any accredited engineering college or university or the equivalent industrial experience in the field. In fact, most of the defendant "Caldwell" principals that were deposed came from other industries: Mr. Douglas Zinter (marketing) came from fertilizer products, and Mr. Thomas Batten (engineering) and Mr. Wilbur Kellum came from the medical industry, and Mr. Jeffery Robertson (engineering) came from the consumer photography business, while Mr. deNormand worked directly for Caldwell after graduating as an engineer. Most of the Caldwell principals shared the fact that they were mechanical engineering graduates.

   b. That each prior art Patent cited was made for a specific purpose: the '011 Patent background and disclosure specified that the '011 Patent has solved many problems with balance such as the balancer not located and/or secured in the jamb or jamb liner. Patent '011 claims that it solves this problems by "A balancer 208 is secured to the sash side 212

32

by a screw 213" (column 5 lines 8-9), allowing the window to tilt, with an extensive tilt system allowing the window sash to be locked in place while it is tilted. The '797 Patent claims that " A principal object of the invention is to provide an inexpensive jamb facing usable, inter alia, for weather stripping purposes in which jam facing are incorporated the parting stop, the sash receiving ways, and replaceable housing containing spring and sheave assemblies (column 1, lines 11-16). Each of the Patents cited by Mr. Still operate quite differently than the plaintiffs' Patent '264:

    I.  The '264 Patent allows for an expanded egress window through the use of a bottom guide roller for non tilt windows, which addressed limitations of prior art balances of this type. In addition, it allows for side load through top and bottom guides but is not tilt-able.

    II.  Patent '011 is tilt-able, but cannot be tilted until the "user must lift the sash 200 until the lever end 224 can be rotated into groove 21 without the interference of anchor 218 (column 6 lines 31-33).

    III.  Patent '797 allows for the balancer housing to be manually detached (column 1 lines 25-28): "within the housing housings themselves, the invention further provides a tongue and slot connections by which certain elements of the spring-and-sheave [pulley] assembly are held in place." It is not tilt-able and differs from the other two Patents by being attached in place in the upper jamb pocket, and therefore can be visible to the user when the sash is down.

    IV.  None of the two Patents '011 or '797 address expanded egress capability provided by the '264 Patent or suggest that egress is an issue with the balances of the '011 or '797 Patents.

c.  I noted that many of the components of prior art Patents '011 and '797 do not reflect the claims of Patent '264 as indicated by Mr. Still. They are :

The following elements (components) in the '264 Patent are not present in the '011 Patent, as I indicated above:

1) 264/1 a top guide, connected to the first end of the channel;
2) 264/1 a bottom guide, connected to the second end of the channel;
3) 264/1 a bottom guide roller rotatably mounted in the bottom guide
4) 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel
5) 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash
6) 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel
7) 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash
8) 264/10 The device according to claim 1 wherein the top guide includes a top angled portion
9) 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel
10) 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide
11) Dependant claims 6, 7 and 9 (dependent claims of 264/1 for the same reasons as 264/1)
12) 264/12 At least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising:
13) 264/12 a top guide, connected to the first end of the channel;

14) 264/12 a bottom guide, connected to the second end of the channel;

15) 264/12 a bottom guide roller rotatably mounted in the bottom guide

16) 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and

17) 264/13 a bottom guide roller rotatably mounted in the bottom guide.

18) 264/14 The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto

19) 264/15 The device according to claim 13 wherein at least a portion of the bottom bottom guide is external to the channel when attached thereto

20) 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash        when installed

21) Dependant claims 14, 15, and 16 (dependent claims of 264/13 for the same reasons as 264/13)

22) 264/18 a top guide, connected to the first end of the channel

23) 264/18 a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and

24) 264/18 a bottom guide roller rotatably mounted in the bottom guide

25) 264/19 The device in claim 18 wherein the bottom guide roller is located external to the channel

26) 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel

27) 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed

28) Dependant claims 19, 20, and 21 (dependent claims of 264/18 for the same reasons as 264/18)

I also noted the following elements (components) in the '264 Patent are not present in the '797 Patent, as I indicated above:

1) 264/1 a top guide, connected to the first end of the channel;

2) 264/1 a bottom guide, connected to the second end of the channel;

3) 264/1 a bottom guide roller rotatably mounted in the bottom guide

4) 264/1 a fixed pulley block unit connected to the channel

5) 264/1 and extends around the bottom guide roller

6) 264/1 and the second cord end being attached to a jamb

7) 264/2 The device of claim 1 wherein the bottom guide roller is located external to the channel

8) 264/3 The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash

9) 264/4 The device according to claim 1 wherein a portion of the bottom guide is external to the channel

10) 264/5 The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash

11) 264/10 The device according to claim 1 wherein the top guide includes a top angled portion

12) 264/10 and a bottom portion, the bottom portion being connected to the first end of the channel

13) 264/11 The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide

14) Dependant claims 6, 7 and 9 (dependent claims of 264/1 for the same reasons as 264/1)

34

15) 264/12 At least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising:

16) 264/12 a top guide, connected to the first end of the channel;

17) 264/12 a bottom guide, connected to the second end of the channel;

18) 264/12 a bottom guide roller rotatably mounted in the bottom guide

19) 264/12 and extends around the bottom guide roller

20) 264/12 and the second cord end being attached to a jamb

21) 264/13 a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and

22) 264/13 a bottom guide roller rotatably mounted in the bottom guide.

23) 264/14 The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto

24) 264/15 The device according to claim 13 wherein at least a portion of the bottom bottom guide is external to the channel when attached thereto

25) 264/16 The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed

26) Dependant claims 14, 15, and 16 (dependent claims of 264/13 for the same reasons as 264/13)

27) 264/18 a top guide, connected to the first end of the channel

28) 264/18 a bottom guide, connected to the second end of the channel;

29) 264/18 a bottom guide roller rotatably mounted in the bottom guide

30) 264/19 The device in claim 18 wherein the bottom guide roller is located external to the channel

31) 264/20 The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel

32) 264/21 The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of window sash when installed

33) Dependant claims 19, 20, and 21 (dependent claims of 264/18 for the same reasons as 264/18)

Even when Mr. Still admits differences, he provides no basis or reasoning why a person of ordinary skill in the art would modify the prior art to pick and choose some elements and not others, and combine them to arrive at the invention claims of Patent '264

d. I note that one of ordinary skill in the art cannot simply pick and choose elements (components) at will from the '011 and '797 Patents and invent the claimed invention of the '264 Patent, while at the same time ignoring other components of the '011 and '797 Patents that are not found in the '264 Patent claims. Further as described above, many of the claim elements are not found in the '011 and '797 Patents.

My understanding of the concept of "Obviousness" is based on the AIPLA Model Jury Instructions (revised 2005). Quote: "for obviousness, a person of ordinary skill in the art may combine two or more items of prior art...before determining...obviousness...you must determine .... 1. The scope and content of prior art relied upon by the defendant; 2. The difference or differences, if any between each claim of the Patent... and the prior art...when doing so, each claim must be considered in its entirety and separately from other claims...Although you should consider any differences between the claimed invention and the prior art, you must still determine the obviousness or non obviousness of the entirety of the invention, not merely some portion of it."

In conclusion, Mr. Still is incorrect in his Obviousness declaration since there are many differences between many of the claims of the '264 Patent and the prior art, in fit, function as well as

in form or geometric features. In addition the total invention (Patent '264) performs a particular function that is distinctly different from the prior art (Patents '011 and '797) claimed by Mr. Still. The total invention of Patent '264 uses a methodology to increase egress that is entirely absent in the prior art, while the prior art is using different methodologies, one for tilt windows ('011 Patent) and the other ('797 patent) is an older (by 20 years) design for a fixed balancer mounted in the jamb and not hidden from the user. In addition, it is wrong to use hindsight for obviousness, to attempt to combine the structural elements of the '011 and '797 Patents to achieve the results of the '264 Patent claims.

In addition, there are other indicators of non-obviousness of the '264 Patent invention: my understanding of the commercial success of the Amesbury product based on this invention, and the copying of this invention by Caldwell. If this invention is so obvious, then competitors of Amesbury such as Caldwell would have made products based on this invention before it was patented by Amesbury, and not afterwards.

I reserve the right to add additional opinion in investigations and/or upon review of additional discovery materials.

Sincerely yours

Dr. Sammy G. Shina, P.E.
19 Swanson Road
Framingham, MA 01701
Sammy_shina@uml.edu
Home 508 877 6109, Work 978 934 2590;
cell 508 934 9176

36

Declaration of Sammy Shina, Ph.D.

EXHIBIT 3

**Dr. Sammy G. Shina, Ph.D., PE**

*OFFICE:* College of Engineering
University of Massachusetts Lowell
1 University Avenue
Lowell, MA 01854
Phone:    (978) 934 2590
Fax:      (978) 934 3048
Cell      (508) 934 6777
Sammy_Shina@UML.edu
DOB       9/28/ 44

*HOME:*    19 Swanson Road
Framingham, 01701
Phone and fax
(508) 877-6109

## A. EDUCATION AND ACADEMIC QUALIFICATIONS

### 1. Education (Degrees, with fields, institutions and dates).

Ph.D.  MECHANICAL ENGINEERING        TUFTS, 1998
M.S.   COMPUTER SCIENCE              WPI, 1972
B.S.   INDUSTRIAL MANAGEMENT -       MIT, 1966
B.S.   ELECTRICAL ENGINEERING-       MIT, 1966

Completed 6 courses in the Computer Engineering graduate program at Boston University.

### 2. Academic Experience

| | |
|---|---|
| 1999 - Current | University of Massachusetts Lowell, College of Engineering Full time Professor, Department of Mechanical Engineering |
| 2003 | Coordinator of the Graduate Certificate Program: Design and Manufacturing Engineering |
| 2000 | e-Engineering lectures, National Technological University, and PBS Business Network |
| 1992 - Current | University of Massachusetts Lowell, College of Engineering Full time Associate Professor, Department of Mechanical Engineering |
| 1989- 1995 | Adjunct Professor, University of California Irvine |
| 1993 - 1995 | Adjunct Professor, University of Pennsylvania EXMSE program for business executives |
| 1994 - 1995 | Lecturer, Six Sigma Institute on Quality and Concurrent |

1

Engineering, Motorola University for Motorola and Texas Instrument Six Sigma Black Belt Engineers.

1988-1992    University of Lowell, College of Engineering
Full time Associate Professor, Department of Industrial Technology

1970-1990    University of Lowell, Continuing Education
Adjunct Faculty, Industrial Technology Department

1985-1988    Technical Education Coordinator for Hewlett Packard Corporation, Waltham MA

Set up the training courses for the different tools and systems such as Mechanical and Electrical CAD/CAM. Introduced Masters of Engineering Programs from the National Technological University and Boston University engineering schools for 400 engineers.

1967-1968    The Technical Education Institute, Florence, SC
Taught Computer Programming, Mechanical and Electrical Engineering courses in the Institute.

2

## B. PROFESSIONAL ACTIVITIES

### 1. Professional Association

Secretary and Past chairman for the Robotics Chapter of the SME (Society of Manufacturing Engineers), Chapter 293, Region 5. Chairman elect 1998.

**Member(current or past) of the following professional societies:**

Society of Quality Engineers (ASQC) - Senior Member
Society of Manufacturing Engineers (SME) - Senior Member
American Society for Engineering Education (ASEE) - Senior Member
Institute of Electrical and Electronics Engineers (IEEE) - Senior Member
Member of the Board of Directors, Massachusetts Quality Award
Quality Examiner, Massachusetts Quality Award
Registered Professional Engineer (EE) in Massachusetts, No. 345922.
Senior Member of the Surface Mount Technology Association (SMTA) No 13849

### 2. Work Experience

Summer of 2000    CoCreate CAD Software, Fort Collins, Colorado
I was engaged by CoCreate to develop the concepts and strategies of collaborative engineering by researching and interviewing companies engaged in the design of mechanical products using distributed design teams as well as distributed supply chains. The results of the research are to be documented in case studies and future publication in journals and a fifth book.

Summers of 1997/1998    Lecroy Corporation, Chestnut Ridge, NY
I was engaged by the Lecroy Corporation Network Products Group to select an outside manufacturing contracting services for PCB, Instrument and system assembly and test. Evaluated several potential contractors and helped select the manufacturing plan and the contractor.

Summer of 1992    Phillips Kommunication Industrie AG, Nuremberg, Germany.
During the summer of 1992, I was engaged by the company to help transition the product creation process from a serial (throw it over the fence) to concurrent engineering. I worked with the management and engineering teams of the company to effect that transition, My work at the company formed the basis of the first chapter in my second book on concurrent engineering.

1971-1988   HEWLETT PACKARD WALTHAM DIVISION, Waltham, MA
I worked for the company in many positions, both at the division and the corporate levels.  I filled many diverse assignments: manufacturing engineer and manager, in the process, production and tool engineering departments. I have successfully built and turned on a $10 million automated electronic manufacturing plant and associated wastewater treatment system in 1980. I have received an award from the MDC for the design of the plant, which was featured on the front cover of their annual report.

As a production manager, I understood how to manage and ship more than $50 million of medical electronics instruments in 1985, and managed an

3

organization of 300 workers, including ten supervisors, manufacturing and process engineers. This position gave me a unique perspective on the congruence of design, manufacturing, operational and engineering issues.

A significant assignment was the Waltham division productivity manager in 1986, where I investigated the methodologies on how to increase engineers' productivity and quality. I was in charge of capital equipment and training for 400 engineers. I spend more than $7 million on CAD and associated equipment, especially automatic links to manufacturing and CAM. One of the visitors to Hewlett Packard described my efforts in the field of Design - Manufacturing connection in 1986 as the most complete he has seen outside of Detroit. This assignment led me to formulae my opinions about concurrent engineering, which I published in my first book 1991.

Engineering Assignments:
Surface Mount Technology (SMT) Coordinator
Computer Aided Design (CAD) Manager
Prototype-In-Production (PIP) Program Manager
Automatic Test of PC Boards Systems Designer/Manager
Automatic N/C generation for Punch Press equipment
Printed Circuit Board Fabrication System Designer
Automatic PC Solder and Wash System Designer
Automatic Insertion of Components Systems designer/Manager

Line Management Experience:
Auto Insertion Department Manager.
Medical Monitoring Instruments Assembly and Test Manager
Central Station Monitoring Assembly and Test Manager
Oximeter and Capnometer Assembly and Test Manager
Engineering Services Manager
Productivity Manager
Tool Engineering Manger
Manufacturing Technology Manager

1968-1971    RCA COMPUTER SYSTEMS DIVISION, Marlborough MA
Designed an automatic manufacturing / test systems for computer peripherals, including magnetic tape storage and high speed disc storage devices. I was slated to become the manufacturing engineering manager before RCA decided to quit the IBM mainframe compatible market in 1971, and closed the plant.

1966-1968    UNION CARBIDE COOPERATION LINDE DIVISION, Florence, SC
I introduced computer technology to the plant that was newly built in the south. I designed computer based inventory control and material handling systems, including working with one of the first IBM bill of materials processors.

4

## C. RESEARCH

### 1a. Awarded Grants and Contracts

**Funded** (^$750,000)

| | |
|---|---|
| 001402-001 | Lead Free Solder Testing, EPA work order #4w-1362-NAEX, 9/2004, $25,000. |
| 05-8011 | Income Account for Lead Free Consortium Schneider Automation, MACOM; and Analog Devices 2000-2004= $8,500 |
| UML Turi | Support for Lead Free Consortium $6000; in 5/02 and 5/03 |
| UML Turi | Research Fellowships for Lead Free Soldering, $20,000 9/99; $6,000 9/00; $20,000 9/01 Total = $46,000 |
| Corporate Education | "Skills Training – Machine Controls and XY Movement) Lucent Technology , Summer 2000, $13,000 |
| 99-348 | Parlex Corporation Student Interneship, June 1999 $14,450 |
| 05- 08225 | Resin Technology, MFG. Evaluation, January 1999, $3,844 |
| Corporate Education | "Skills Training – Machine Controls and XY Movement) Lucent Technology , Fall  1999, $32,000 |
| 05- 08112 | Microtouch Corporation, MFG. Evaluation, July 1998, $13,908 |
| UML TURI | MFG Research Fellowship for Sunny Grover, in Additive PCB's  Build Up Vias, September 1998, $25,000 |
| 05-08011 | Coop and Internship Income Account, March 1998, $2,100 |
| UML TURI | MFG Research Fellowship for Val Carvalho, May 1997, in Additive PCB Fabrication Technology, $25,000.00 |
| CITA | Conception, Product Development and Environmentally Appropriate Technology, with Maas, Fiddy, Geiser and McCarthy, May 1997, $4190 |
| UML TURI | MFG Research Fellowship for Dennis Gagne, 9/1996, Additive PCB Fabrication Technology, $15,345.00 |

5

| | |
|---|---|
| Continuing Education | "Manufacturing and Total Quality Management and Control", USCI Baird with Stephen Driscoll, June 1996, $50,000. |
| 05 -07433-F | "Undergraduate Faculty Development in New Product Realization", National Science Foundation, June 1996, $44,000 |
| 05- 07212 | EASNE Design for Quality, UML-UGC2-5, May 1996, $68,000; Co-PI with R. Giglio, UMA. |
| 05-07362 | "Practical Statistics for Engineers", USCI Baird, December 1995; with Professor McKelliget, $5,000 |
| UML TURI | MFG Research Fellowship for Doug Sommer, in NO Clean Paste for PCB Assembly, September 1995, $15,345.00 |
| UML TURI | MFG Research Fellowship for Paul Haley, in NO Clean SMT Paste for PCB Assembly, September 1994, $15,645.22 |
| 05 - 6450-F | "Undergraduate Faculty Development in Concurrent Engineering and Design for Manufacture", National Science Foundation.  June 1993, $77,810. |
| Continuing Education | "Concurrent Engineering, Quality Management and Control", Baush & Lomb Corporation, July 1992, $16,000. |
| 05 - 6222 | "Faculty and Course Development", GE Aircraft Engines Education Fund, February 1992, $10,000 |
| 05 - 5850 | "Faculty and Course Development", GE Aircraft Engines Education Fund, February 1991, $10,000 |
| 05 - 5807-F | "Undergraduate Faculty Development in DFM", National Science Foundation. January 1991, $54,924. |
| 05 - 5636 | "Concurrent Engineering and Design for Manufacturing", Genrad Corporation, June 1990, $1,500. |
| 05 - 5792 | "Faculty and Curriculum Development", Society of Manufacturing Engineering Education Foundation, May 1990, $ 9,500. |
| 16 - 5336 | "Technology Transfer Grant in Manufacturing Engineering", Costa Rica Educational Development Center, with John Colluccini. May 1989, $ 8,404. |

6

| 16 - 5257 | "Process Quality Improvements Using SPC and Taguchi Methods", Wang Labs Incorporated, April 1989, $48,334. |
| 16 - 5260 | "Factory Process and material handling optimization using simulation tool", Wang Labs Incorporated, April 1989, $ 58,939 |
| Continuing Education | More than $100,000 in seminars on quality an Concurrent Engineering, 1989-1993 |

**1b. Equipment and Software Grants ($178,000)**
GENRAD Tester, $140,000, 12/ 1998; Hewlett Packard, Optical Laser Measurement System, $15,000, 5/ 1996; Storm Software, Manufacturing Software, $2000, 5/1995.; AMTX Corporation, Screening Stencils, $1,000, March 1995; AT&T, Merrimack Valley Works, for 2 ADEPT Robots, book value: $15,000, 11/1993; UTZ Corporation, Screening Stencil, $1,000, 12/1993; CACI Products Company, SIMFACTORY Software training, $4,000, 12/ 1993.

**1c. Consultancy:**
**University and Technical Conference Based Seminars and Training**
University of Massachusetts, Lowell, University of California, Irvine, University of Pennsylvania, ExMSE Program, Motorola University Six Sigma Institute, Bellevue Community College, Washington, Brunel University, London, NEPCON Conferences and Expositions, NEPCON College of Manufacturing, SMT International Conference and Exposition, Hong Kong Productivity Council, Singapore Center for Management Technology, American Society for Quality Control (ASQC), Puerto Rico Chapter, Society of Manufacturing Engineering (SME), New England Region, Iteso, University, Guadalajaro, Mexico, Mexican Branch of the IEEE, Australian SMCBA Association, Technical University of Costa Rica, Technical University of Puerto Rico, Arab School of Science and Technology, Society of Manufacturing Engineers(SME), SMTI Chicago
**Consultancy, US**
Omnisonis, CoCreate, Lucent, BTU, Phoenix International; Teradyne, Bose, Lecroy, General Scanning, Lockheed Martin Sanders, General DataCom, MicroTouch Systems, Leybold Inficon, PictureTel, USCI Baird, Hewlett Packard, Motorola, Pensar Corporation, AT&T Corporation, AMETEK Corporation, M/ACom Corporation, GTE Sylvania, Atlanta Scientific, U.S. Navy, Port Hueneme and Pt. Mugu; Xerox Corporation, Polymer Technology, National Science Foundation, General Electric Aircraft Engines, Genrad Corporation, Tredgar Plastics, C&K electronics, Parker Brothers, Wang Incorporated


**Consultancy, International**
Havelsan Company, Ankara, Turkey, Hong Kong Productivity Council Fisher and Paykel, Switchtek Power Systems, Tait Electronics and Dynamic in New Zealand. Phillips Kommunication Industrie AG, (Nurenberg, Germany),

7

Australian Electronics Development Center, Victoria Australia, Surface Mount and Circuit Board Association, Hughesdale, Australia; NISTEC (Advanced Technologies in the Electronics Industry), Petah Tikva, Israel; R&D Network Devices, Efrat Technology and ECI Telecom, Petah Tikvah, Israel; NECPON Singapore, NPCON Europe, Puerto Rico ASQC, Mexicon, Mexico

**EXPERT WITNESS/ Litigation Support Experience**

1. Xyratics Design v AB circuits v Eltek, 1999: The case involved quality issues in the electronics supply chain. The plaintiffs and defendants were value added manufacturers that worked on a product originated in a South Korean Company, which had hidden defects in the product. The Korean company went bankrupt, and the other companies in the supply chain sued each. I advised on the issues of proper testing and quality procedures in the electronics industry, especially when related to the supply chain. I wrote several expert reports on test and quality for the solicitors and barristers in the case. Case was settled out of court. *INCE and Company; Solicitors; 11 Byward Street; London EC3; England*

2. Vial, Inc., v. Triple S. Plastics, Inc., CV 97-499 (Dist. AZ); CV 98-102 (Dist. AZ): Patent infringement case involving molding of plastics injected parts, with two companies making plastic containers for the Dairy and consumer food industries. The patent included closing of plastic containers in the mold for the defendant, while the other company used similar techniques for closing the cap by a robotic arm. I help the plaintiff lawyers research the prior art to find instances of use of robotics in the plastics industry. *Morgan and Finnegan, L.L.P., Attorneys at Law, 345 Park Avenue, New York, NY 10154*

3. Fuji Machine Manufacturing Company, Ltd. V. Hoover-Davis Inc.; Civil Action No. 96-CV-5087I: Patent infringement case involving pick and place Feeder design. I worked with the lawyers of the plaintiff (FUJI) to explain the workings of the feeder, and how the design of the defendants (Hover-Davis) feeder design had similarity in function. *Oliff & Berridge, P.L.C, Attorneys at law; 700 South Washington Street, Alexandria, Virginia 22314*

4. US District Court Of Maine 05-32 –PC, RFT Technology Corporation V Applied Microwave Technology: Case including conversion, breach of contract and misappropriation of trade secrets. Case involved using the same design strategy and copying of CAD files versus reverse engineering claims by the defendants. I wrote an expert report, and was deposed in the discovery process. Case was settled out of court. *Hamilton, Brook, Smith & Reynolds, P.C. , 530 Virginia Road, P.O. Box 9133, Concord, Massachusetts  01742*

**2a. Academic & Professional Publications (94 publications)**

8

**Text and Reference Books (5 published)**
1. S. Shina, "Six Sigma for Electronics Design and Manufacturing McGraw Hill, May 2002
2. Shina S. and Saigal A., "Manufacturing Costs for electronic Products", Volume 3 of the Encyclopedia of Materials, Elesevier Press, November 2001, pp 2727-2735.
3. S Shina , "Design Of Experiments", chapter 25 to "Environment Friendly Electronics: Lead-Free Technology" by J. Hwang, Electrochemical Publications Ltd, 2001.
4. S. Shina, editor and co-author, "Successful Implementation of Concurrent Engineering Products and Processes", published by Van Nostrand Reinhold N.Y., 1994, reprinted by Wiley Press.
5. S. Shina, "Concurrent Engineering and Design for Manufacture of Electronic Products", published by Van Nostrand Reinhold N.Y., 1991. Reprinted by Kluwer Academic Publishers.

**Papers published in refereed Journals and publications (10 papers published):**
1. Shina S. and Saigal A., "Using Cpk as a Design Tool for New System Development", Journal of Quality Engineering, Volume XII, Number 4, 2000, pp. 333-349.
2. Shina S. and Saigal A., "A design Quality Based Cost Model for New Electronic Systems and Products," Journal Of Materials, April 1998, pp 29-33.
3. Shina S. and Saigal A., "Technology Cost Modeling for the Manufacture of Printed Circuit Boards in New Electronic Products," Journal of Manufacturing Science and Engineering, May, 1998, pp 368- 375.
4. Shina, S., Gagne D. and Quaglia, M., "Methods for paste Selection and Process Optimization for Fine Pitch SMT, Journal of the SMART (Surface Mount and Related Technologies) Group, No. 24, October 1996, pp. 8-11.
5. Shina, S., W. Eaton W., et all, "Using circuit simulation with Taguchi Design of Experiment Techniques to optimize the performance of a digital half-adder integrated circuit", Quality Progress, Journal of Quality Engineering, 1993, Vol. 5, Number 4, pp. 589-600.
6. Shina, S., "Taguchi Experiments for Improving Solder Quality", Journal of Surface Mount Technology, July 1992, pp. 4-13.
7. Shina, S., "Developing a course in Design for Manufacture", Journal of Industrial Technology, Volume 7, Number 2, 1991. pp. 7 - 11
8. Shina, S., "The successful use of the Taguchi Method to Increase Manufacturing process Capability", Journal of Quality Engineering, Volume III, Number 3, 1991, pp. 333-349.
9. Shina, S., "New Rules for World Class Companies", IEEE Spectrum, July 1991. pp. 23-26
10. Shina, S., "The use of the Taguchi Method to Optimize Manufacturing", Technologia en Marsha, published by the Instituto Technologico de Costa Rica, Volume 10, Number 2, 1990.  pp. 3-7.

9

**Papers published in refereed Conferences (50 papers published/accepted)**

1. Shina S., Morose G. et al; "Visual and Reliability Testing Results of Surface Mounted Lead Free Soldering Materials and Processes in a Simulated Production Environment"; paper to be presented at the IPC Printed Circuits Expo, APEX and the Designers Summit, Anaheim, CA, February 2006

2. Shina S. et al, "Summary of New England Lead Free Consortium Implementation Plan of High Volume Assembly of Printed Wiring Boards", paper to be presented as the keynote speech at the Pan Pacific Microelectronics Symposium", Kona, Hawaii, January 2006

3. Shina et al; Consortium authors. "Analysis of Testing Results of Surface Mounted Lead Free Solders and Materials in Production Environments", paper accepted for the SMTI International, Chicago, IL, September 2004

4. Shina et al; Consortium authors. "Lead Free Consortium Update for Process Conversion", accepted for IPC/JEDEC 8th International Conference on Lead Free Electronic Assemblies and Components San Jose, California, April 2005

5. Shina et al; Consortium authors. "Lead Free Conversion Analysis for Multiple PWB/Component Materials and Finishes using Quality and Reliability Testing", APEX conference, Anaheim, CA, February 2005

6. Shina et al; "Analysis of Testing Results of Surface Mounted Lead Free Soldering Materials and Processes", Pan Pacific Conference, Kauai, January 2005.

7. Shina et al; "Summary of Visual and Reliability Testing Results of Surface Mounted Lead Free Soldering Materials and Processes"; 7th International IPC/JEDEC conference, Frankfurt, Germany, October 2004

8. Shina et al; Consortium authors. "Lead Free Conversion Analysis for Multiple PWB/Component Materials and Finishes using Quality and Reliability Testing", APEX conference, Anaheim, CA, February 2004

9. Shina et al; Consortium authors. "A Comparative Analysis of Lead Free Materials and Processes Using Design of Experiments Techniques", SMTI International, Chicago, IL, September 2003

10. Shina et al; "Testing Results for Lead-Free PWB's by the Massachusetts Lead-Free Electronics Research Consortium"; 2003 IEEE International; Symposium on Electronics and the Environment (ISEE); Boston, MA, May 2003.

11. Shina et al; " Materials and Processes for Surface Mount Lead Free Soldering", proceedings of the APEX Conference, Anaheim, CA, March 2003, pp.s20-2-1/9

12. Shina S; "A Cpk-Based Toolkit for Tolerance Analysis and Design," Engineering Design Conference; London; July 2002.

13. Shina et al, "Process and Material Selection for zero defects and superior adhesion Lead Free SMT soldering", SMTA International Conference, Chicago, IL., September 2001, pp 651 -656

14. Previous paper translated into Chinese by the Hong Kong SMT society for their annual conference 2004.

15. Shina et al, Reliability Testing Techniques For Lead Free Soldering Of SMT Technology", ETRONIX Conference, Anaheim, CA, March 2001.

10

16. Above paper translated into Japanese Journal ANBE, SMT, Kanagawa, Japan, July 2001
17. Shina et al, "Selecting Material and Process Parameters for Lead Free SMT Soldering Using Design of Experiments Techniques", Apex Conference, January 2001, San Diego, CA
18. Shina et al, "Design Of Experiments For Lead Free Materials, Surface Finishes And Manufacturing Processes Of Printed Wiring Boards", SMTA International Conference; Chicago, IL., September 2000
19. Previous paper translated into Chinese by the Chinese Electronics Association Journal. June 2001.
20. Previous paper translated into Chinese by the Hong Kong SMT society for their annual conference 2004.
21. S. Shina and M. Grover, "Developing Vias For Additive Technologies In Printed Wiring Board Fabrication", NEPCON East , Boston, June 1999, pp.77-83
22. Shina, "When Global Manufacturing Does not Work" , International Mechanical Engineering Congress and Exposition (IMECE), November 1999, Nashville, Tennessee, MED VOL. 10, MFG Science and Engineering, pp 557-562.
23. Shina S. and Saigal A., "Using Cpk as Design Tool for New System Development," International Conference on Engineering Design (ICED), Vol. 1, pp. 357-360, Munich, August 1999.
24. Shina, Callahan, Sutera, McCrillis and Geogapoulos, "Methodology for Applying Specifications in Electronics Manufacturing Equipment", NEPCON East 1998, Boston, MA June 1998, pp. 3-10
25. Shina, S., and Carvalho, V., "Additive Technologies: An Examination of Polymer Film Technology in Comparison to Etched Copper Circuitry", NEPCON East 1998, Boston, MA, June 1998, pp. 11-17
26. Shina S., and A Saigal, "A Design Cost Model for New Products Development", ASME Winter Annual Conference, Dallas, TX, November 1997.
27. Shina S., and Saigal, A.,"A Design Cost Model for New Products Development", American Society of Metals Annual Conference, Indianapolis, Indiana, September 1997
28. Shina S., et al., "Paste Qualification for SMT process", NEPCON East 1997, Boston, MA June 1997, pp 23-35
29. Shina, S., "Paperless Tooling System for PCB Fabrication", NEPCON East 1997, Boston, MA June 1997, pp 35-48
30. Shina S., and Calvarho, V., "Evaluation of SMT Paste and Stencil Technologies", NEPCON WEST 97, Anaheim California, February, 1997
31. Shina S., and Saigal, A., Concurrent Engineering and the Virtual Factory: Developing Products with Contract Manufacturers, ASME Winter Annual Conference, Atlanta GA, November 1996.
32. Shina S., and Saigal, A., "An Algorithm for selecting the electronic design implementation in Printed Circuit Board Fabrication based on cost factors", ASME Winter Annual Conference, Atlanta GA, November 1996.

33. Shina, S., "Design For Manufacture of Electronic Products", Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996, pp. 79-100

34. Shina, S., "Product Realization Process in a Global Environment", Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996, pp. 79-100

35. Shina, S., Kissinger D. and Crocker, K., "Process Development for SMT Stencil Adhesive Application", NEPCON East 1996, Boston, MA June 1996.

36. Shina, S., "Laboratory Exercises to Support Manufacturing Engineering Curriculum", International Conference on Education in Manufacturing, San Diego, CA, March 1996.

37. Shina S., and Saigal, A., "Technology Based Cost Modeling for Manufacturing and Material Selection in New Product Development", ASME Winter Annual Meeting, Chicago, IL November 1994, pp 85-92

38. Shina, S., Gagne D. and Qualiglia, M., "Method for Paste Selection and Process Optimization for Fine Pitch SMT", NEPCON WEST 1996, Anaheim CA, February 1996, pp 61-70

39. Shina, S., "Achieving World Class Quality in PCB Manufacturing through Concurrent Engineering", Proceeding of the Technical Program, NEPCON WEST 1993, pp 1818- 1826

40. Shina S., and Kurpad, R., "Performance Improvements: Application to Aerospace Rivets Installation", paper presented at the Winter Annual Meeting of the ASME, Anaheim, California, November 1992.

41. Shina S., and Wils, J., "Tuning a Large Data base Using Robust Design Techniques", paper presented at the Winter Annual Meeting of the ASME, Anaheim, California, November 1992.

42. Shina, S., "Optimizing Surface Mount Technology Soldering", presented at Surface Mount International Conference, San Jose CA, August 1991.

43. Shina, S., "Using the Taguchi Method to optimize Solder Processing", IPC Conference, San Diego CA, October 1990.

44. Shina S., and Capulli, K., "Optimized Processing and Cleaning of Hybrid Integrated Circuits", NEPCON EAST Conference Proceedings, Boston Ma, June 1990. pp 931-940.

45. Shina, S., "Quality Improvement Methods for Printed Circuit Fabrication & Assembly", NEPCON SOUTHEAST Conference Professional Advancement, Orlando Florida, November 1989.

46. Shina, S. Wu J. and Lowell, C., "Optimizing the new HOLLIS wave solder machine", American Supplier Institute Seventh Symposium Proceedings, Phoenix, Arizona, October 1989.  pp 101-115.

47. Shina, S., "Reducing Defects in a Printed Circuit Wave Soldering Process using the Taguchi Method". NEPCON EAST Conference Proceedings, Boston, MA, June, 1989.  pp 205-224.

48. Shina, S., " An Algorithm for selecting soldering flux for cleaning and surface conductivity", NEPCON WEST Conference Proceedings, Los Angles, California, March, 1989. pp 1064-1070.

12

49. Shina, S., "Reducing Solder Wave defects in a Printed Circuit Board Wave Soldering Process", American Supplier Institute's Sixth Symposium Proceedings, Dearborn Michigan, October 1988. pp 123-144.
50. Shina, S., "Justification for Dry-Film Photoresist Process", American Electroplater's Society Sixth Annual PC Conference, March 1977.

**Papers published in general conferences and magazines (29 papers published)**
1. Shina S and Morose G., "Transitioning to Lead-Free Electronics: Now a Business Necessity", New England Environmental Journal, September 2005.
2. Shina S. and Morose, G., "Lead Free Conversion Analysis for multiple PWB materials and processes", SMT Journal, January 2005
3. Shina S. And MacFadden T., "lead Free Conversion issues in Component and PWB Surface Finishes", SMT Journal, May 2004, p73
4. Previous paper translated to Korean for Chomdan Publishing Company in Korea.
5. Shina, S., "Process Changes Face Industry", Mass High Tech, June 2-8, 1997
6. Shina, S., "UMASS Lowell Students team with Business", Mass High Tech, June 2-8, 1997
7. Shina S. and Christafides, S., "Putting Quality Tools to Good Use, A Practical Approach", Printed Circuit Fabrication, Vol. 15, No 10, October 1992, pp 36-39
8. Shina, S., "Benefits of Concurrent Product/Process Development", HP Corporation Executive Conferences, Palo Alto CA, June, September, December 1986.
9. Shina, S., "Mechanical Engineers go CAD", HP Monitor Magazine; March 1986
10. Shina, S., "Mechanical Design and Test", HP engineering Symposium, Lexington MA, December 1985.
11. Shina, S., "A PIP of a Process", HP Engineer, June 1985
12. Shina, S. and Peschier, R., "CAD/CAM, A revolutionary way of the future", HP Monitor Magazine, October 1984.
13. Shina, S., "The Technologist", paper presented at Keeping Pace with Change, The Challenge for Engineers, a joint conference of Northeastern University College of Engineering in Collaboration with the Massachusetts High Technology Council, September 1984. Proceedings pp 103-108
14. Shina, S., "Trendshot Release, A Bold Change for the 1980's", HP Monitor Magazine, September 1982
15. Shina, S., "Water Purification Project at MED", HP Monitor Magazine, 7/1977.
16. Shina, S., "Automatic Insertion of Components", IEEE Manufacturing Technology Conference, Waltham MA, February 1976.
17. Shina, S., "Optimized Soldering processes using the Taguchi Method", presented at the British Electronics Conference, Birmingham, England, 3/1991.

13

18. Shina, S., "Automatic Testing at HP Medical", <u>IEEE Manufacturing Technology Conference</u>, Waltham Ma, March 1975
19. Shina, S., "Cleaning PC Boards", <u>Circuits Manufacturing</u>, July 1974
20. Shina, "Manufacturing technology at MED", <u>HP Monitor Magazine</u>, February 1974.

Co authored the following Hewlett Packard Manufacturing Standards: (1977-81).
21. PC Design for Manufacurability Guideline
22. PC Design and layout Guidelines
23. PC Pin/Receptacle system Guidelines
24. PC Assembly Process Guidelines
25. PC Assembly Workmanship Guidelines
26. PC Automatic Component Insertion Guidelines
27. Shina, S.,Tufts Ph.D. Thesis. "Technology Based Cost Modeling of Printed Circuit Boards", Professor Anil Saigal, Advisor, June 1998
28. Shina, S., WPI Masters of Science Thesis, " Microprogramming, Design Considerations", Professor N. Sondak, Advisor, September 1972.
29. Shina, S., MIT Senior Thesis, "Simulation of the Massachusetts Transportation Authority (MTA) System", Professor E. Roberts, Advisor, August, 1967.

**2b. Papers/Talks presented at conferences as invited speaker (60 total).**
1. Keynote speaker, Pan Pacific conference sponsored by the SMTA, Kona, HI, January 2006
2. Speaker for the American Society of Quality, Manchester NH, February 2005
3. Speaker at he September meeting of the Toronto Chapter of the SMTA, Toronto, Canada, November 5th, 2004
4. Speaker for the ME department technical forums, October 2004
5. Speaker at he September meeting of the Boston Chapter of the SMTA, Boxborough, MA, September 16, 2003
6. Quoted in The Mass High Tech Journal editorial, Bay State takes the lead out", Nov 11, 2002
   http://www.masshightech.com/displayarticledetail.asp?art_id=61052&sec_id=43
7. Quoted in the Lowell Sun article on "Lead Free Electronics", published November 7[th], 2002,
   http://www.lowellsun.com/Stories/0,1413,105%257E4744%257E976553,00.html?search=filter
8. Quoted in the Mass High Tech Journal about lead free electronics, published on November 11[th], 2003
9. Lead Free Research Summary, TURA Coordinators Conference, Best Western Royal Plaza and Trade Center, Marlborough, April 23[th] 2002.
10. Lead Free Electronics Workshop hosted by Schnieder Electric Wilmington, MA, April 10, 2002.

14

11. "Lead Free UMASS Consortium", conference sponsored by the Strategic Envirotechnology Partnership (STEP), Boston MA , November 2nd, 2001
12. "Lead Free at UMASS Lowell", Workshop on Modeling and Data Needs for Lead-Free Solders, sponsored NEMI, NIST, NSF, and TMS, Thursday, February, 2001, New Orleans, LA, lead free research summary  by Dr. Shina
13. Speaker to the State of Massachusetts Legislative committee on education policy, UMASS President Bulger's Office, May 4th, 2000.
14. Seminar speaker on Lead Free Electronics, TURI Planner continuing education conference, Marlboro, MA. April 26th, 2000
15. Career and Skill Upgrade Seminar Leader on Design for Quality using Six Sigma and Cpk Methods, ASME April 18th, 2000 Meeting, Cambridge, MA
16. Panelist, Lead Free Electronics Symposium, Sponsored by TURI, at Lucent Corporation, Haverhill, MA, April 13, 2000.
17. Speaker to the Havestan Technical Facility, Turkish Airforce, Ankara, Turkey, August 1999.
18. Speaker to the Mechanical Engineering Department, Cape Tecknicon University, CapeTown, South Africa, March 1999.
19. Speaker to the Boston Chapter SMTA, "Applying SPC to the SMT Manufacturing Process", November 1998
20. Symposium Panelist, American Loudspeaker Manufacturers Conference, Las Vegas Nevada, January 1998.
21. Keynote Speaker, Electronics Industries Forum, IEEE, May 1997
22. Speaker to the Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996
23. Speaker to the Globatronics Conference, Singapore, October 1996.
24. Keynote Speaker, NAFEM Association, Cincinnati Ohio, January 1996
25. Speaker to the UMASS Lowell SME Student branch, on recruiting for the SME, February, 1994.
26. Speaker to the UMASS Lowell ASME Student branch, on future employment opportunities, November 1993.
27. Speaker, Mortorola Incorporated Six Sigma Institute Conference, Dallas Texas, October 1993.
28. Keynote Speaker, Australian Surface Mount and Printed Circuit Board Association SM93 Conference, Sydney, Australia, August 1993.
29. Panelist for the session on Concurrent Engineering: Innovation, Speed and Service, Western Regional Conference, sponsored by the American Society of Quality Control and the American Society of Naval Engineers, Oxnard California, February 1993.
30. Speaker for on Concurrent Engineering, Advanced Technologies in the Electronics Industry Conference, Tel Aviv, Israel, January 1993.
31. Guest speaker on Concurrent Engineering, ,Joint Meeting of the ASQC - APICS - SME societies of  Danbury Connecticut, January 1993.
32. Plenary speaker at the MEXICON 92 conference in Guadalajara, Mexico on October 1992.
33. Colloquium speaker on Concurrent Engineering to the Engineering faculty of Iteso University Guadalajara, Mexico, October 1992.

15

34. Speaker to the IEEE Guadalajara chapter, October 1992.
35. Invited to be keynote speaker at the International Society for Hybrid Microelectronics (ISHIM) Southern California Chapter Conference, May 1992.
36. Speaker on Concurrent Engineering to the University of Pennsylvania MSME program, November 1991
37. Symposium Speaker on Concurrent Engineering, IEEE Advanced Semiconductor Manufacturing Conference, Boston MA, 10/91
38. Invited to speak to the Hong Kong Productivity Council and the Hong Kong Branch of SME on "Concurrent Engineering", 11/91.
39. Invited to speak on "Robust Design" at the Quality Conference sponsored by the Technical University in Medellin, Columbia on TQM, 8/91.
40. Speaker on "Concurrent Engineering", delivered to Itek Corporation, 7/91
41. Speaker on "Total Quality Management", MACOM Waltham on 4/91
42. Speaker on "Concurrent Engineering", delivered to the SME CASA/CIM professional societies in March 1991.
43. Speaker on "Concurrent Engineering and Design for Manufacture ", IEEE Boston Chapter, Minuteman Lexington High School, January 1991.
44. Speaker on "University of Lowell Engineering Students' activities," Leadership Conference, Society of Manufacturing Engineering, Ludlow MA, 12/ 1990
45. Invited to critique United Technologies, Hamilton Standard Division Program on Concurrent Engineering, Windsor Locks, Connecticut, December 1990.
46. Speaker to the student chapter of the Society of Manufacturing Engineers (SME) on Design for Manufacture, November 1990.
47. Invited to critique Parker Brothers "World Class Manufacturing Program", October 1990.
48. Speaker on "Printed Circuit Design for Manufacture", Valid Users Group Northeast Region Meeting, October 1990
49. Interviewed by Electronic Products and Packaging (EPP) Magazine on Design for Manufacture, September 1990 issue.
50. Invited to critique GENRAD Corporation Quality Program in September 1990.
51. Speaker on "Design for Manufacturing", Distinguished Speaker lecture Series Gordon Institute, June 1990.
52. Session leader on "Total Quality for the Manufacturing Enterprise", Company Wide Quality Conference sponsored by the University of Lowell, April 1990.
53. Speaker on Quality Methods for Engineers and their Managers, Company Wide Quality Conference, sponsored by the University of Lowell, 11/ 1989.
54. Speaker on Quality and Productivity, Digital Equipment Corporation Senior Executives, November 1989.
55. Lecture on Taguchi Methods in the University of Lowell Seminar series on the Assurance Sciences and Technologies, October 1989.
56. Speaker on  "Design for Manufacturing, " Manufacturing Technology Conference sponsored by Bay State Skills Corporation and Associated Industries of Massachusetts, May 1989.
57. Speaker on Industry/Academic Corporation, joint meeting with Wang Incorporated, Presented to the Brookings Institute guests at the University of Lowell, May 1989.

16

58. Speaker on Taguchi Methods, Hollis Automation, Nashua NH, January 1990.
59. Speaker on Quality Methods, Wang Incorporated, Lowell MA, 12/1989
60. Speaker on Taguchi Methods, Boston University Manufacturing Engineering faculty, November 1988.

17

## SERVICE ACTIVITIES

**1. Professional Leadership and Achievements**

1. I established the **Umass Lowell Lead Free consortium**, consisting of several local and national companies to sponsor and assist in the research. The original companies included BTU International, North Billerica, MA, Sanmina (formerly Hadco) Corporation; Tech Center East, Ward Hill MA; Multicore Solders; Richardson, Texas; Raytheon Corporation;, Lexington, MA; Solectron Massachusetts Corporation, Westborough, MA and Texas Instruments, Attleboro, MA. Companies that joined the consortium this year include MACOM of Lowell, MA, a division of AMP, which has been acquired by Tyco Industries and Shneider Automation (formerly Modicon) of North Andover, MA. I was funded by various sources for this research including TURI for sponsoring graduate students and research activities, and from companies in the consortium. The total amount exceeds $50,000. I helped TURI with annual conferences to the local supplier base area on the conversion issues of Lead free electronics. These were offered free to local companies to assist then with lead free conversion process. New additions in phase III (2004/5) include Skyworks Solutions (Woburn, MA), Teradyne Inc. (North Reading, MA), Textron Systems (Wilmington, MA), DDI Inc. (Newburyport, MA), American Power Conversion (West Kingston, RI) and Benchmark Electronics (Hudson, NH)

2. Design Judge, USA First Robotics Comnpetition; Manchester NH, March 2003, 2004 and 2005

3. Symposium Chair, Manufacturing Enigneering Division, International Mechanical Engineering Congress and Exposition (IMECE), November 1999, Nashville, Tennessee.

4. Design Judge - Milton S. Kiver Awards Competition sponsored by the Electronic Packaging and Production Magazine, 1995, 1999

5. Professor of the Year, ME Department, 1997

6. Awarded a Certificate of Appreciation, for Dedication and Service during the 1995 School Year, from Lowell High School, May 1995.

7. Chaired a session in the Symposium on Production Engineering Division at the Winter Annual Meeting of the American Society of Mechanical Engineers (ASME), in Chicago, Illinois during the month of November 1992: Session PE 4A, Symposium of New Product introduction.

8. Chaired two sessions in the Symposium on Design, Management, and Computers at the Winter Annual Meeting of the American Society of Mechanical Engineers (ASME), in Anaheim, California during the month of November 1992: Session PE 11A: Product Process Interactions, and session PE 6A, Group Technology and Knowledge Management.

9. Invited as the plenary speaker at the MEXICON 92 conference in Guadalajara, Mexico on October 19 - 21, 1992. While in Guadalajara, lectured to the faculty of Iteso University and the IEEE chapter there.

18

10. Founding member and a member of the Board of Directors, Massachusetts Quality Award, 1991- 1993
11. Nominated to the Board of directors for the Society of manufacturing Engineering (SME) Electronics Manufacturing Committee, 1992, 1993.

*Journal Reviewer for the Following 7 Journals:*
12. "Computer Magazine",
13. "Journal of Manufacturing Science and Engineering"
14. "TAPI magazine"
15. University of Road Island Transportation Center Peer Review
16. IEEE Publications
17. IEEE Spectrum Magazine
18. Machine Vision and Applications
*Book reviewer for the following 8 books and manuscripts*
19. "Design Process", by
20. "Evolvable Design of Experiments: Applications for Printed Circuit Boards", by Octavian Iordache, CRC Press
21. " A  Facilitator's Guide to Usability Testing," J. McWane, to be published by Prentice Hall,  Upper Saddle River, NJ
22. "Concurrent Project Management", by Q. Turtle, to be published by Van Nostrand Reinhold, New York.
23. "Introduction to Control Systems Technology" by R. Bateson, to be published by Merrill Publishing Company, Columbus Ohio.
24. "Concurrent Engineering" by J. Torino, published by Van Nostrand Reinhold, NY
25. Tool and Manufacturing Engineers Handbook (TMEH) Volume 6 Handbook, Design for Manufacturability, published by the SME (Society of Manufacturing Engineers), Dearborn Michigan.
26. "Handbook of Electronics Manufacturing Engineering", 2nd edition, by Richard Matisoff, to be published by Van Nostrand Reinhold, New York.
27. Founding member of an Innovative Products Research and Services Incorporated (IPRS), a non-profit educational, scientific and charitable 501(c) (3) organization incorporated in the Commonwealth of Massachusetts. IPRS is an inventor support service, which performs early stage market and manufacturing evaluations.  IPRS was able to obtain two grants from the Department of Energy in 1991 and 1992 as part of DOE's States' Inventors Initiative.
28. Appointed as a founding member of the student activities' team of the Society of Manufacturing Engineering (SME), New England Region.
29. Appointed in 1992 as an examiner for the Massachusetts Quality Award, having been a founding member of the Massachusetts Quality Award Council.
30. Chairman of the SME (Society of Manufacturing Engineers) Robotics Chapter 293, New England Region, 1991-1997

19

31. Chairman of the Quality Function Deployment for NEPCON (National Electronic Packaging Conference), annually attracting over 30,000 design, quality and manufacturing engineers from throughout the country.
32. Selected as the Speaker on Engineering Productivity for Hewlett Packard Corporation to Senior Management  (CEO's and VP's) of Customer Corporations in 1986, 1987.
33. "Excellence in Design" Award for the HP Waltham Waste Water Treatment plant from the Metropolitan District Commission of Massachusetts in 1982.

## 2. Service to the University
### 2.1 Student advising
1. Advisor to the Industrial Technology Classes of 1988-1994.
2. Advisor to Mechanical Engineering Students, Freshman Classes 1996-Present

### 2.2 Committee Membership
1. In working with the curriculum committee, I developed a proposed program for a Manufacturing Engineering Curriculum. This was part of a proposal to convert the Industrial Technology Department to Manufacturing Engineering.
2. Manufacturing Engineering Course Development Committee
3. Member of the Mechanical Engineering Department Graduate Committee.
4. Developed three courses in the MMS graduate programs.
   - A.    20.525 Computer Integrated Manufacturing (CIM)
   - B.    20.572 Design for Manufacture (DFM)
   - C.    20.575 Robust Design
D. Developed Two courses for the Mechanical Engineering Department
   - A.    22.571 Concurrent Engineering /Quality; renamed Collaborative Engineering
   - B.    22.575 Industrial Design of Experiments

### 2.3 Service to the Department
1. Developed the microelectronics manufacturing laboratory for manufacturing education, research and training for students, faculty and the local manufacturing companies. Selected, ordered and installed the equipment in a competitive bidding process.
2. Member of the Mechanical Engineering department graduate committee.
3. Chairman of the ME advisory Committee 4th and 5th annual Conferences.
4. Coordinated the Mechanical Engineering series of seminars offered to the Industrial Community, summer of 1993
5. Assisted in the ARPA grant development for Manufacturing Engineering Education.
6. Advisor to ME freshman students.
7. Capstone Course Coordinator
8. Active in developing and tabulating Graduating Students and Alumni Surveys

20

**2.4 Service to the College of Engineering**
1. Member of the College Rank and Tenure Committee; Spring 2003
2. Member of the College of Engineering Repositioning Task Force, Spring 2002
3. Graduate coordinator for the Manufacturing Systems Engineering Option for all the graduate students in the College of Engineering. All the graduate coordinators in the Engineering Departments approved this program. The programs are explained in several memos attached to this package and have been in operation in 1989-1994. This option was be replaced by the new manufacturing concentration in Mechanical Engineering under the direction of professor Parking.
4. Company Wide Quality Seminars, University of Lowell Continuing Education

Provided technical assistance, recruited faculty and coordinated activities in the Total Quality Management and The Productivity/Quality tools in Engineering and Manufacturing Seminars, which are short and intensive versions of the courses I teach. A list of the seminars provided is as follows:
1. *Taguchi Methods*, offered March 1989, March 1990 and June 1990.
2. *Design for Manufacturing*, offered March 1989, May 1989, January 1990, June 1990 and January 1991.
3. *Total Quality Management* offered January 1991.
4. *Soldering Methods* offered November 1989.

Other Activities
5. Member of the Graduate Faculty membership committee.
6. Member of the College of Engineering Computer Needs Committee.
7. College representative in the Watertown Arsenal Manufacturing Development Park Committee.

**2.4.1 College of Engineering COOP Coordinator**
1. Coordinated the revival of the College of Engineering COOP program 1997
2. Ran several meetings with the department managers to outline rules/procedures
3. Coordinated with the Dean and the Office of Career Services on issues of policy and administration of the COOP program
4. Worked with the department coordinators on issues of students activities and jobs
5. Worked with local companies on advertising and recruitment of students and jobs
6. Published the first coop manuals for students and companies
7. Ran the COOP and Internship Fair in April 98. More than 400 students and 30 companies participated.
8. The program achieved its initial goal of 10% of students in the engineering college during the first year of its implementation

**2.5 Service to the University**
1. Faculty Senate representative from the ME department Spring 2005

21

2. Coordinator of the Graduate Certificate Program: Design and Manufacturing Engineering
3. Member of the Committee for "Strategic Plan to Strengthen Lowell 1998-2005 Development Plan", Chaired By Professor Best.
4. Member of the Committee for Manufacturing option for the MBA degree for the College of Management
5. Member of the Chancellor's Federation for the Industrial Economy
6. Member of the ARPA Technology Reinvestment Program proposal Committee of Industrial Extension, Commonwealth of Mass.
7. Member of the ARPA Technology Reinvestment Program proposal Committee, Southern New England Academy
8. Member of the Work Environment Pilot effort on technology review of fatal accidents
9. Assisted in the College of Management Re accreditation process

# E. TEACHING
## 1. Principal Thesis / Project Advising:
### 1a. Completed, Mechanical Engineering Department (19 students)

1. Optimal Reliability Design Method for Remote Solar Systems", Nuchida Suwaparet, Doctor of Mechanical Engineering Thesis, September, 2005
2. "Bio Solar House", Ittipon Tungaray, Master's of Mechanical Engineering Thesis, September 2004; Committee Member
3. "Comparison Of The Performance Of U.S. And Japanese Aluminum Bats Using U.S. And Japanese Test Protocols", Shintaro Nabeshima, Master's of Mechanical Engineering Thesis, May 2004; Committee Member
4. "Experimental and Finite Element Study of the Design Parameters of Baseball Bas", Gayatri Vedula, Master's of Mechanical Engineering Thesis, May 2004; Committee Member
5. "Characterization of the effects of use and Moisture Content on Baseball Bats..."; Patrick Drane; Master's of Mechanical Engineering Thesis, March 2003; Committee Member
6. "Design for Reliability, Remote Communication system using solar power", Nuchida Suwapaet, ; Master's of Mechanical Engineering Thesis, November 2002; Committee Member
7. "Lead Free Soldering". Hemant Belbase, Master's of Mechanical Engineering Thesis, September 2000.
8. Terence Lee Master's of Mechanical Engineering Thesis, Committee Member; 1999
9. "Additive PCB Fabrication Technology", Dennis, Gagne, Master's of Mechanical Engineering Thesis, May 1998.
10. "NO Clean SMT Paste for PCB Assembly,", Doug Summer, Master's of Mechanical Engineering Thesis, May 1997.
11. "Failure Prediction Analysis in Machining Pin Fin Heat Sinks, Hoke Bullard, Master's of Mechanical Engineering Thesis, May 1997 (committee member)

22

12. "A study of high speed, high volume product assembly process with respect to scrap reduction issues", Lisa Silva, Master's of Mechanical Engineering <u>Project</u>, December 1996
13. "A paperless system for manufacturing assembly automation", Farzad Majzoubi , Master's of Mechanical Engineering <u>Project</u>, December 1996
14. "Optimization of a touchscreen sensor manufacturing process", Julie Kimble, Master's of Mechanical Engineering <u>Project</u>, December 1996
15. "Experimental design of an injected mold RF insulation Material ", Steve Paradis,  Master's of Mechanical Engineering <u>Project</u>, May 1996
16. "Development of a no clean soldering flux", Paul Hailey, Master's of Mechanical Engineering <u>Thesis,</u> completed May 1994.
17. "Developing a tolerance analysis methodology with case studies", Sreedhar Godula, Master's of Mechanical Engineering <u>Project</u>, completed 8/93.
18. "Design of an aircraft industry riveting system", Kurpad Ram, Master's of Mechanical Engineering <u>Thesis</u>, completed 6/92.
19. "Optimization of the performance of the weldlines in injection molded products using robust design methods", Srinath Narayan, Master's of Mechanical Engineering <u>Thesis</u>, completed 5/92.

<u>1b. In Progress, Mechanical Engineering Department (1 student)</u>
1. "Developing Vias Build Up Methodology for Additive Technologies in the Printed Circuit Wiring Board (PWB) Fabrication Industry", Manmeet Grover

<u>1c. Completed, MMS in Manufacturing Engineering Program (17 students)</u>
1. "Just-In-Time Manufacturing in a regulated industry", Nasser Heshmatpour, Master of Manufacturing Engineering <u>Project</u>, completed 5/92
2. " Concurrent Engineering for the Defense Industry", John Hart, Masters of Manufacturing Engineering <u>Thesis</u>, completed May 1992
3. "Implementation of ISO 9000 in American Manufacturing Companies", Mark Alpert, Masters of Manufacturing Engineering <u>Project</u>, completed December 1991
4. "Optimizing IC Welding", Bob Mullins, Masters of Manufacturing Engineering <u>Project</u>, completed December 1991
5. "Simulation of Assembly Systems using SAIMAN", Bill Guest, Masters of Manufacturing Engineering <u>Thesis</u>, completed December 1991
6. "Simulation Language Applications in Job Shop Scheduling", Nancy Barnes, Masters of Manufacturing Engineering <u>Project</u>, completed December 1991
7. "Design for Robotics Assembly", George Lloyd, Masters of Manufacturing Engineering <u>Project</u>, completed December 1991
8. "An Algorithm for conversion of Printed Circuit Board from Through Hole to Surface Mount Technology", Suzan Lanza, Masters of Manufacturing Engineering <u>Project</u>, completed December 1991.
9. "Eliminating CFC's from Electronic Manufacturing Processes", Betty Drake, Masters of Manufacturing Engineering <u>Project</u>, completed December 1991
10. "Technical training program for engineering computer tools", Norm Fisk, Masters of Manufacturing Engineering <u>Project</u>, completed May 1991

23

11. "Process Optimization in Distribution Systems", Ven Cen Chang, Masters of Manufacturing Engineering <u>Project</u>. completed May 1991. Mr Chang was nominated the outstanding graduate student in the Industrial Technology Department.

12. "Optimization of Stress Testing using Taguchi Method", Sana Wakim, Masters of Manufacturing Engineering <u>Project</u>, completed May 1991

13. "Expediting in a Job Shop", Jean Shine, Masters of Manufacturing Engineering <u>Thesis</u>, Completed 9/90.

14. "Evaluations and Implementation of Terpene as a Printed Circuit Cleaning Solvent" Greg Hamblet, Masters of Manufacturing Engineering <u>Thesis</u>, Completed 5/90.

15. "Optimized Processing and Cleaning of Hybrid Integrated Circuits", Keith Capulli, Masters of Manufacturing Engineering <u>Project</u>, Completed 4/90.

16. "Optimizing The Wave Soldering Process for Mixed Technology of Through Hole and SMT Components", James Wu, Masters of Manufacturing Engineering <u>Project</u>, Completed 12/89.

17. "Design of a Wheel Chair Carry-On", James Jollife, Masters of Manufacturing Engineering <u>Project</u> , Completed 4/89.

**1d. Thesis / Project Advising, other Engineering Departments**

1. "A study on the effect of process parameters on the spring constant of a manometer spring", Samir Seth, master of Plastics Engineering, Thesis Committee, April 2001

**2. Courses taught**

**2.1 Graduate**

| | | |
|---|---|---|
| 22. 571 | Concurrent Engineering | 7 years |
| 22.575 | Industrial Design of Experiments | 7 years |
| 20 525 | Computer Integrated Manufacturing (CIM) | 3 years |
| 20.572 | Design for Manufacture | 3 years |
| 20.575 | Robust Design | 1 year |
| 20.710 | Graduate Seminar | 1 year |

**2.2 Undergraduate Courses**

| | | |
|---|---|---|
| 22.424 | Capstone Projects | 2 years |
| 22.472 | Manufacturing Systems & Processes | 2 years |
| 22.473 | Design for Manufacture | 3 years |
| 22. 202 | Mechanical Design Laboratory II | 1 year |
| 20.202 | Industrial Computer Science. | 10 years |
| 20.303 | Manufacturing Systems | 5 years |
| 20.407 | Instrumentation and Process Control ( IPC )) | 5 years |
| 20.314 | Motion and Time Study | 5 years |
| 20.309 | Process control | 20 years |
| 20.408 | Microprocessors | 23 years |
| 20.315 | Plant Layout and Material handling | 7 years |
| | Inventory Control and Material Handling | (discontinued) |
| | Tool Engineering | (discontinued) |

24

## 2.3 Courses Upgraded/developed

Undergraduate Courses

25.108 Introduction to Engineering II. Completely revamped this course since taking it over in the spring semester 2004. Included modules for Microsoft word, excel and powerpoint as well as a module for matlab. Provided for several projects for the first ear students to practice computer programming and presentation tools in a fun and rewarding experience.

25.108 Freshman Manufacturing Module. This a 4week introduction to manufacturing for freshman engineering students

22.472 Manufacturing Systems: New undergraduates course that I developed for Mechanical Engineering Department, Manufacturing Option, spring 1993.

22.473 Design Theory and constraints: New undergraduate course developed for Mechanical Engineering Department, Manufacturing Option, taught in fall 1991.

20.202. Industrial Computer Science. I have changed this course from a FORTRAN Programming course to a one of solving engineering problems.

20.407 Instrumentation and process control (IPC): This course is divided into two sections: traditional control theory and microprocessor programming. I have completely revamped the microprogramming portion with plc.'s

**Graduate Courses**

22. 571. Collaborative Engineering and Quality: A new course that I developed for the Manufacturing Engineering Option for the Mechanical Engineering Masters Program, combining elements of the following graduate courses that I taught at the MMS program.

20. 525 Computer Integrated Manufacturing (CIM). This course was previously taught over two semesters by guest lectures. Using my notes, I have revamped and consolidated the course into one semester.

20.575. Robust Design. The course deals with the subject of Design of Experiments and the Taguchi Method.

## 2.4 Teaching Load

| Course | Course Title | Contct Hours | Credit Hours | Enrol ment | Total StudentH | Total Credit Hours |
|---|---|---|---|---|---|---|
| 2004/2005 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 Design Constraints | 3 | 3 | 27 | 81 | 81 |
| IG | 22.571 CE/Quality | 3 | 3 | 7 | 21 | 21 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 2003/2004 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 Design Constraints | 3 | 3 | 31 | 93 | 93 |
| IG | 22.571 CE/Quality | 3 | 3 | 7 | 21 | 21 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 2nd semester | | | | | | |
| 1U | 25.108 Freshman Design | 2 | 2 | 65 | 130 | 130 |
| 4U | 22.423 Capstone | 3 | 3 | 16 | 48 | 48 |

25

| 1G | 22.575 Ind. Design Expts | 3 | 3 | 14 | 42 | 42 |

**2002/2003**
1st semester

| 4U | 22.473 Design Constraints | 3 | 3 | 36 | 108 | 108 |
| IG | 22.571 CE/Quality | 3 | 3 | 16 | 48 | 48 |
| 4U | 22.423 Capstone | 3 | 3 | 2 | 6 | 6 |

2nd semester

| 4U | 22.423 Capstone | 3 | 3 | 20 | 60 | 60 |
| 1G | 22.575 Ind. Design Expts | 3 | 3 | 26 | 78 | 78 |

**2001/2002**
1st semester
Sabbatical

2nd semester

| IG | 22.575 Ind. Design Expts. | 3 | 3 | 20 | 60 | 60 |
| 4U | 22.423 Capstone | 3 | 3 | 4 | 15 | 15 |
| 4U | 22.473 Design Constraints | 3 | 3 | 16 | 48 | 48 |

**2000/2001**
1st semester

| 4U | 22.473 Design Constraints | 3 | 3 | 20 | 60 | 60 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 30 | 90 | 90 |
| 4U | 22.423 Capstone | 3 | 3 | 5 | 15 | 15 |

2nd semester

| 1U | 25.108 Intro Eng DFQ (3w) | 3 | 2 | 50 | 100 | 100 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 1G | 22.571 CE/Quality | 3 | 3 | 18 | 54 | 54 |

**1999/2000**
1st semester

| 4U | 22.473 Design Constraints | 3 | 3 | 28 | 71 | 71 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 12 | 36 | 36 |
| 4U | 22.423 Capstone | 3 | 3 | 12 | 36 | 36 |

2nd semester

| 1U | 25.108 Intro Eng DFQ (3w) | 3 | 2 | 42 | 84 | 84 |
| 4U | 22.424 Capstone | 3 | 3 | 7 | 21 | 21 |
| 1G | 22.571 CE/Quality | 3 | 3 | 27 | 91 | 91 |

**1998/1999**
1st semester

| 4U | 22.473 Design Constraints | 3 | 3 | 20 | 60 | 60 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 15 | 45 | 45 |
| 4U | 22.423 Capstone | 3 | 3 | 5 | 15 | 15 |

2nd semester

| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 3 | 9 | 36 | 27 |
| 1G | 22.571 CE/Quality | 3 | 3 | 15 | 45 | 45 |

**1997/1998**
1st semester

| 4U | 22.473 DFM | 3 | 3 | 20 | 60 | 60 |

26

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.424 Capstone | 2 | 2 | 30 | 60 | 60 |
| 4U | 22.423 Capstone | 4 | 4 | 10 | 40 | 40 |

<u>2nd semester</u>

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 4 | 8 | 32 | 32 |
| 1G | 22.571 CE/Quality | 3 | 3 | 25 | 75 | 75 |

<u>Summer semester</u>

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.423 Capstone | 2 | 2 | 10 | 20 | 20 |

<u>1996/1997</u>
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 DFM | 3 | 3 | 23 | 69 | 69 |
| 4U | 22.423 Capstone | 2 | 2 | 13 | 26 | 26 |

<u>2nd semester</u>

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 4 | 7 | 28 | 28 |
| 1G | 22.575 DoE | 3 | 3 | 25 | 75 | 75 |

<u>Summer</u>

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.423 Capstone | 2 | 2 | 10 | 20 | 20 |

<u>1995/1996</u>
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFM (3w) | 3 | 2 | 170 | 72 | 48 |
| 4U | 22.473 DFM | 3 | 3 | 33 | 99 | 99 |
| 4U | 22.423 Capstone | 2 | 2 | 7 | 14 | 14 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 25 | 75 | 75 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (4w) | 3 | 2 | 170 | 145 | 97 |
| 4U | 22.423 Capstone | 4 | 4 | 7 | 28 | 28 |
| 4U | 22.473 DFM | 3 | 3 | 16 | 48 | 48 |
| 1G | 22.575 DoE | 3 | 3 | 25 | 75 | 75 |

<u>1994/1995</u>
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFM (3w) | 3 | 2 | 170 | 109 | 73 |
| 4U | 22.473 DFM | 4 | 3 | 17 | 68 | 51 |
| 4U | 22.423 Capstone | 2 | 2 | 4 | 26 | 26 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 19 | 57 | 57 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (4w) | 3 | 2 | 170 | 145 | 97 |
| 1U | 25.105 Fortran (6w, 2 cls) | 3 | 2 | 30 | 39 | 26 |
| 4U | 22.483 Capstone | 4 | 4 | 4 | 52 | 52 |
| 2U | 22.211 Statics | 3 | 3 | 22 | 66 | 66 |

<u>1993/1994</u>
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 DFM | 4 | 3 | 17 | 68 | 51 |
| 4U | 22.483 Capstone | 2 | 2 | 13 | 26 | 26 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 19 | 57 | 57 |

2nd semester

27

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4U | 22.472 | Manuf Systems | 3 | 3 | 17 | 68 | 51 |
| 4U | 22.423 | Capstone | 4 | 4 | 13 | 52 | 52 |
| 2U | 22.202 | Mech. Design Lab. | 3 | 2 | 60 | 180 | 180 |

1992/1993 1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4U | 20.407 | IPC | 3 | 3 | 37 | 111 | 111 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 37 | 37 | 37 |
| 4U | 22.473 | DFM | 3 | 3 | 17 | 51 | 51 |
| 4U | 22.483 | Capstone | 4 | 2 | 4 | 8 | 8 |

2nd semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4U | 22.472 | Manuf Systems | 3 | 3 | 8 | 24 | 24 |
| 4U | 22.423 | Capstone | 4 | 2 | 4 | 8 | 8 |

1991/1992
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 28 | 84 | 84 |
| 4U | 20.407 | IPC | 3 | 3 | 55 | 165 | 165 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 55 | 110 | 55 |
| 4U | 22.473 | DFM | 3 | 3 | 12 | 36 | 36 |

2nd semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.573 | DFM | 3 | 3 | 45 | 135 | 135 |
| G | 20.575 | Robust | 3 | 3 | 42 | 126 | 126 |
| G | 20.710 | Seminar | 3 | 3 | 15 | 45 | 45 |

1990/1991
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 26 | 78 | 78 |
| 4U | 20.407 | IPC | 3 | 3 | 60 | 180 | 180 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 60 | 180 | 60 |

2nd semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.573 | DFM | 3 | 3 | 32 | 96 | 96 |
| G | 20.575 | Robust | 3 | 3 | 25 | 75 | 75 |

1989/1990
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 25 | 75 | 75 |
| 4U | 20.407 | IPC | 3 | 3 | 35 | 105 | 75 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 35 | 105 | 35 |

2nd Semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.572 | DFM. | 3 | 3 | 30 | 90 | 90 |
| 2U | 20.202 | Ind. Comp. | 3 | 3 | 16 | 48 | 48 |

1988/1989
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 19 | 57 | 57 |
| 4U | 20.407 | IPC | 3 | 3 | 45 | 135 | 135 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 45 | 135 | 45 |
| 2U | 20.202 | Ind. Comp.. | 3 | 3 | 55 | 165 | 165 |

2nd Semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.572 | DFM. | 3 | 3 | 27 | 81 | 81 |

28

| 4U | 20.407 | IPC* | 3 | 3 | 30 | 45 | 45 |
| 4U | 20.407 | IPC Lab* | 2 | 1 | 30 | 45 | 15 |
| 2U | 20.202 | Ind. Comp. | 3 | 3 | 18 | 54 | 54 |

**2.5 Specific programs in which faculty member participated to improve teaching and competence.**

**In the last 3 years**

Attended following Seminars and training courses:

1. Apex Conference; Anaheim, CA, February 2004-05
2. ASME Manufacturing Conference, Chicago; March 2003
3. Product Life Management (PLM) , Chicago, IL, November 2002
4. SMT International, Chicago IL, September 1999-2005
5. Engineering Design Conference; London; July 2002

**In prior years**

1. Technicon University, Cape town South Africa March 1999
2. ICED, Munich Germany, August 1999
3. ASME WAM, Nashville, November 1999
4. CEA, (Coop Education Association); Salt lake City, UT, June 2000
5. Workshop on Modeling and Data Needs for Lead-Free Solders, sponsored NEMI, NIST, NSF, and TMS, Thursday, February, 2001, New Orleans, LA,
6. Etronix Conference, Anaheim, CA , February 2001
7. CEA (Coop Education Association), Atlanta, GA, March 2001
8. MRS (Materials Research Society), Boston, MA, November 2001
9. SMT soldering, SUNY, Binghampton, New York, 5/88.
10. Witness Simulation Training, Lowell MA, 4/89
11. Computer Integrated Manufacturing, Hewlett Packard, 6/88
12. Axiomatic Theory of Design, MIT, 7/88
13. Taguchi Methods Conference, ASI, Detroit MI, 1989-1990
14. NEPCON West, Los Angles, California, 1989 - 1999
15. NEPCON Singapore, 1991, 1993
16. NEPCON Australia, 1998
17. NEPCON EAST, Boston, 1989-1999
18. NEPCON SOUTHEAST, Florida and Texas, 1989, 1998
19. IPC, San Diego CA, 1990
20. British Electronic Week, Birmingham, England, 1991
21. SMT International, San Jose CA, 1991-1995
22. IEEE Advanced Semiconductor Manufacturing Conference, 1991
23. SME International Conference on Education, San Diego, 1996
24. Puerto Rico Technical University SMT Conference, 1995-1997
25. ASME Winter Annual Conference, 1991-1999

**2.6 Teaching Effectiveness**

Rated in the highest rank by students and fellow faculty members from the University of Massachusetts Lowell and other engineering faculty from around the country. I submit he following facts in this session and in appendix C to substantiate this claim

1. Undergraduate and graduate student feedback is always rated at the top of all items.

30

2. All my undergraduate manufacturing option courses in the Mechanical Engineering Program are heavily oversubscribed.

### 2.6.1 Ratings by UML ME Students evaluations in the last 4 years:

My students always gave me excellent reviews of my courses, both at the Undergraduate and the graduate levels. I am enclosing the results of the my students evaluations for last two years to demonstrate. These are the summaries of student evaluations taken at the last day of the semester. The y were collected by fellow students and delivered to the department according to the rules.

As can be seen by the many positive comments, my students rate my efforts as well as my courses as being mostly exceptional and very effective. For the last three years I received the following evaluations:

**1997**
22.473 Design Theory and Constraints; Undergraduate (19 students):
Rating of instructor **14** excellent      **4** good      **1** average      **0** bad
22.423 capstone; Undergraduate (8 students):
Great experience, Thank you very much
**1998**
22.473 Design Theory and Constraints; Undergraduate (29 students):
Rating of instructor **19** excellent      **9** good      **1** average      **0** bad
Rating of course   **22** Effective   **7** relative Eff.   **0** Barely Eff.   **0** not worth it
22.423 capstone; Undergraduate (5 students) :
Great capstone, found it information and educational, applied studies to real world solutions. I enjoyed working with Professor Shina, This was a great experience.
22.575 Design of Experiments; Graduate (16 students)
Rating of instructor **9** excellent   **6** good   **2** average   **0** bad
Rating of course   **11** Effective   **5** relative Eff. **0** Barely Eff.   **0** not worth it
**1999**
22.473 Design Theory and Constraints; Undergraduate (27 students):
Rating of instructor **12** excellent   **6** good   **9** average   **0** bad
Rating of course   **13** Effective   **9** relative Eff.   **4** Barely Eff.   **0** not worth it
22.423 capstone; Undergraduate (11 students) :
Great experience, Shina was helpful; structured meetings, thanks for being open; I found out that this is not the type of manufacturing career I want
22.575 Design of Experiments; Graduate (11 students)
Rating of instructor **4** excellent   **7** good   **0** average   **0** bad
Rating of course   **6** Effective   **5** relative Eff. **0** Barely Eff.   **0** not worth
**2000**
22.423 capstone; Undergraduate (5 students):
Great Capstone, found it informational and educational, applied studies to real world solutions, I enjoyed working with professor Shina, This is a great industrial experience

31

## 2.7. Mentoring of students

The best proof of appreciation by the students is their letters of support obtained during a long teaching career. **Some comments and quotes written by former students:**

-You did an excellent job of keeping us up to date on recent trends in the areas of PCB

-I was impressed with the hands on project work you encouraged them to do

-Shina is far more than a great professor. His ambition, loyalty and dedication to his students reaches beyond that which my education at Lowell has lead me

-I can honestly say that without personal support, encouragement, advice and coaching I received from Dr. Shina during and after my college career, I would never have made so far in business so quickly

-You are one of the most talented instructors at UML. It is very rare to see instructors care for their students as you have

-Shina enabled me to gain the experience and knowledge I needed to seek employment. He is sincerely concerned about his students, and goes out of his way to help them in any way he can, either in the classroom, or a professional work environment. (he) is an excellent professor, advisor and friend to many students.

- His teaching style created and maintained interest by the students. He welcomed comments and dissenting opinion which were always grounds for further class discussions....(He) is an advocate for the students and a credit to the profession and the University.

-I benefited from his vast knowledge of the latest manufacturing trends....He also extended himself to reach students beyond the classroom and help them in their professional career.

-Shina is a credit to the academic excellence of the faculty....Thank you for the time and for the education you have provided me with...

-My successes are a direct result of Shina understanding of how real world industry works and what types of skills employers desire. He is able to skillfully guide a hard working student along a path that allows them to piece the experience and academics together necessary to become an immediate contributor to world class manufacturers.

-Professor Shina works to ensure that his students take the initiative in their professional growth before they leave the university and uses his industry contacts

to assist in placing students in (jobs).

-he has not only been an excellent professor, but also a supportive friend

-I feel that he had taught me many different tools that I still use today in everyday work... (he) also found me an internship as an ME through his many contacts...

-My success in the semi-conductor industry is in many ways attributable to Shina's instruction at UML...His (courses) gave me insight into ...techniques that I have put to practical use countless times. My boss...cited my experience ...gained during capstone project as one of the actor that convinced him to hire me

32

-He helped me with my resume, helped to build to build my personality, and directed me in a career path that I travel to this day....(his) characteristics are...intelligence, patience, integrity, knowledge, dependability and ability to teach...

-Shina is concerned with the welfare of his students, and he has taken time to counsel them and support them in their career research. He provided advice to many of my classmates individually on improving their resumes, and he was an invaluable resource because f his industry knowledge and networking contacts at many different local companies. He has assisted many of his students with finding successful careers.

-My association with Shina has continued throughout my professional career. He has been involved at work projects at two of my post graduate companies...his knowledge of state of the art PC assembly and design techniques has made him a valuable resource to myself and many of my colleagues over the years.

-his class was very instructional and well taught, and I have used many of these principles and methods he emphasized in my work as a design engineer.

-I have seen Shina help so many of his students obtain jobs. He makes the whole process so much easier for he students, He has helped in so many ways and I am sure he will continue to help me in the future. Students in the ME department are very fortunate to have a professor like him.

-My employment opportunity was due to a large part to the courses I was fortunate enough to partake with professor Shina (courses)

-Only after completing my course of study at Lowell did it became aware to me just how important these (shina) courses are..

-Not only is he clear, up to date on current industrial concepts and trends, and very open to questions and discussions, but he also displays a genuine interest and concern for his students after they have moved on to pursue their careers

- Dr. Shina has a magical presence in the class.  Classes were very lively with interaction between everyone in the class.  As a student with "zero" industry experience I had a wonderful opportunity to meet and interact with dozens of students from industry.

## 2.8 Help with Industry Contacts to secure Manufacturing Jobs for UML ME Students

I have made it a personal goal of mine to make sure that UML ME graduates are gainfully employed in the local economy. Approximately 50 % of the ME undergraduate students become directly employed in manufacturing or manufacturing related industries. I am enclosing the job survey for the ME graduates for the last four years. My thesis or capstone students and those who went to manufacturing jobs are highlighted. The list shows that I have advised the largest number of students in the manufacturing area in the Master's program.

## 2.9 ME Personnel Committee Academic Review  (PMYR 2001)

Received an accepted rank as follows:

33

**Teaching:** He has a heavy load primarily at the graduate level. He is invaluable in teaching and coordinating our capstone design courses

**Service:** He is the College COOP coordinator. He also does a lot of unsung work connecting our students and graduates up with contacts in industry. He is active in the professional societies

**Research:** He has an extensive record of funded research and publications. He is the author or two books and completing a third.

34

# EXHIBIT 2

00001
1           UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3               NO. 05-CV-10020 (DPW)

4     ****************************************

5     AMESBURY GROUP, INC., and AMESBURY    *

6     SPRINGS LTD.,                   *

7                         *

8           Plaintiffs,         *

9                         *

10    v.                    *

11                        *

12    THE CALDWELL MANUFACTURING COMPANY,   *

13          Defendant.          *

14    ****************************************

15          DEPOSITION OF SAMMY G. SHINA, Ph.D., PE,

16    taken pursuant to the applicable provisions of

17    the Federal Rules of Civil Procedure, before

18    Susan L. Prokopik, Registered Merit Reporter and

19    Notary Public in and for the Commonwealth of

20    Massachusetts, at the offices of Goodwin Procter

21    LLP, Exchange Place, Boston, Massachusetts, on

22    Wednesday, May 3, 2006, at 9:07 a.m.

23

24

00008

1    a business-type degree or an engineering-type

2    degree?

3  A.  It's a combination of business and engineering.

4  Q.  Okay.  For either of those two degrees, were you

5    required to take mechanical engineering classes?

6  A.  Yes.

7  Q.  Do you know approximately how many?

8  A.  One or two.  I can't remember.

9  Q.  Did you take any architectural courses?

10  A.  No.

11  Q.  Computer science degree you have from WPI, did

12    you take any mechanical engineering courses for

13    that?

14  A.  No.

15  Q.  Did you take any architectural courses for that?

16  A.  No.

17  Q.  You then have a Ph.D. from Tufts in mechanical

18    engineering.  Did you write a thesis for that?

19  A.  Yes, I did.

20  Q.  What was the topic of the thesis?

21  A.  A modeling of -- a cost model for products.

22  Q.  Was there course work involved in obtaining the

23    Ph.D. in addition to that?

24  A.  Yes.

00009

1  Q. Did you have courses in mechanical engineering?

2  A. Yes.

3  Q. Did you have courses in architecture?

4  A. No.

5  Q. I would like to move on to your work history.

6  A. Sure.

7  Q. Did there come a time when you were employed

8     full-time as an engineer in the workplace?

9  A. Yes.

10 Q. What was the first position you had working as an

11    engineer?

12 A. In page four of my resume, Union Carbide

13    Corporation, Linde Division, Florence, South

14    Carolina.

15 Q. And did that position involve mechanical

16    engineering?

17 A. Partially.

18 Q. What types of mechanical engineering did you do

19    in that position?

20 A. The company products were welding equipment. And

21    I was a manufacturing engineer in that company

22    involved in aspects of manufacturing for the

23    equipment.

24 Q. Okay. Did you do any engineering design as part

00012

1 A.  As you can see from my CV, in 1971 to 1988, I

2    worked as an engineer at Hewlett-Packard, Waltham

3    division.

4 Q.  Was that a full-time position?

5 A.  Yes, it is.

6 Q.  What were your job responsibilities at

7    Hewlett-Packard?

8 A.  I'll read from my resume.

9        "I worked for the company in many

10    positions, both at the division and the corporate

11    levels.  I filled many diverse assignments:

12    manufacturing engineer and manager, in the

13    process, production and tool engineering

14    departments.  I have successfully built and

15    turned on a $10 million automatic electronic

16    manufacturing plant and associated wastewater

17    treatment system in 1980."

18 Q.  That's fine.  Did your work at Hewlett-Packard

19    involve mechanical engineering?

20 A.  Yes.

21 Q.  What percentage of the time you spent working at

22    Hewlett-Packard was devoted to mechanical

23    engineering?

24 A.  I was there for 17 years so obviously it varied.

00013

1    It varied from 100 percent to 25 percent.

2  Q.  Okay.  Did you design any window balances at

3    Hewlett-Packard?

4  A.  No.

5  Q.  Did you work on the manufacturing processes

6    related to window balances at Hewlett-Packard?

7  A.  No.

8  Q.  Following your position at Hewlett-Packard, it

9    looks like you had three different summer

10    positions; is that correct?

11  A.  Correct.

12  Q.  Were you in school at the same time that you were

13    taking those summer -- in the years in which you

14    had the summer positions?

15  A.  Correct.

16  Q.  In those three positions listed on page three

17    under "work experience" that are summer

18    positions, did any of them involve mechanical

19    engineering?

20  A.  I'll go through them.

21  Q.  Okay.

22  A.  In 1992, I worked for Phillips Kommunication in

23    Germany.  And I was assisting the company in

24    designing of products.

00021

1    session in the Symposium on Production

2    Engineering Division at the winter annual meeting

3    of the American Society of Mechanical

4    Engineering, ASME.  Item three, Symposium Chair,

5    Manufacturing Engineering Division, International

6    Mechanical Engineering Congress and Exposition.

7    IMECE.  Gives you an idea of my --

8  Q.  Are you a member of the ASME?

9  A.  Yes.

10  Q.  Do you receive publications from ASME?

11  A.  Yes.

12  Q.  Do you recall any of those publications having

13    anything in them related to fenestration?

14  A.  No.

15  Q.  Prior to your engagement as an expert in this

16    case, have you ever read any publication in the

17    field of fenestration?

18  A.  No.

19  Q.  Prior to your engagement in this case, have you

20    ever read any publication on the subject matter

21    of window balances?

22  A.  No.

23  Q.  Mr. Shina, did you bring with you today all of

24    the documents and things that you examined and

00022

1    relied upon in preparing your expert reports in

2    this case?

3 A.  I believe the documents are in a box right there.

4 Q.  Does that box contain everything that you

5    reviewed in connection with rendering your expert

6    reports in this case?

7 A.  Correct.

8 Q.  Did you, other than documents, did you review any

9    physical objects in preparing your expert reports

10    in this case?

11 A.  While I was in this building, I did review some

12    products that the plaintiff lawyers have shown

13    me.

14 Q.  Can you tell me from your recollection what those

15    products were?

16 A.  They were examples of Caldwell's products.  I

17    think one was a Quick-Tilt.  One was an 86xt.

18    And one was a 97ez.

19 Q.  Did you see only one of each of those items or

20    did you see more than one of each?

21 A.  I might have seen more than one Quick-Tilt.

22 Q.  Do you know how many Quick-Tilt products you

23    examined?

24 A.  I believe it was two.  One of them I had seen

00023

1    very, very quickly.

2  Q.  Do you remember how the two Quick-Tilt balances

3    differed that you examined?

4  A.  One was a single coil and one was a multiple

5    coil.

6  Q.  Did the multiple coil have two coils or three

7    coils?

8  A.  Two coils.

9  Q.  Were either of those Quick-Tilt products placed

10    inside a window jamb?

11  A.  Yes, they were.

12  Q.  Were both of them placed inside a window jamb?

13  A.  My recollection is only one.

14  Q.  How many window jambs did you examine while you

15    -- I'm sorry.  Let me rephrase it.

16        How many window jambs did you examine

17    prior to rendering your reports in this case?

18  A.  One.

19  Q.  Was the 86xt that you examined installed in any

20    window jamb?

21  A.  No.

22  Q.  Was the 97ez that you examined installed in a

23    window jamb?

24  A.  No.

00069

1  Q.  In preparing your expert report, did you measure

2     the spring constant?

3  A.  No.

4  Q.  When you examined the actual Caldwell balance,

5     did you measure the spring constant?

6  A.  No.

7  Q.  Did you measure the diameter of the spring in the

8     actual Caldwell Constant Force balance that you

9     examined?

10 A.  No.

11        MR. SINGER:  Neal, when you get a

12    chance, we have been going about an hour and a

13    half.

14        MR. SLIFKIN:  Let me just --

15        MR. SINGER:  I would like to take a

16    break when it's convenient.

17        MR. SLIFKIN:  Maybe ten, 15 minutes if

18    you can go?

19        MR. SINGER:  Fine.

20 Q.  When you say "spring constant," what does that

21    mean?

22 A.  The resistance that the spring gives to an

23    outside force.  It tries to change its position.

24 Q.  Is that used in some equation?

00070

1 A. Yes, it is.

2 Q. What's that equation?

3 A. F = KX. K being the spring constant.

4 Q. Didn't we earlier conclude that equation does not

5    apply to coil springs?

6 A. We had a discussion about that. I cannot --

7 Q. Well, the equation indicates that the bigger X

8    is, the bigger the force is --

9 A. Correct.

10 Q. Because K is constant, correct?

11 A. Correct.

12 Q. But you told me earlier in a coil spring the

13    force does not increase as X increases, correct?

14 A. Correct.

15 Q. So then to do your calculation that you discussed

16    a minute ago in terms of the difference in

17    forces, you wouldn't need the spring constant,

18    would you?

19 A. I would have to consult my books on that.

20 Q. Have you consulted your books in preparing your

21    expert report?

22 A. No.

23 Q. Have you done any research into the forces that

24    are present with a coil spring?

**Shina, Sammy, 5/3/06**                    **Page 70**

00071

1  A.  No.

2  Q.  So when you reached your conclusion in your

3      report, you really didn't know what formula to

4      apply in calculating forces, did you?

5  A.  I did not use any formulas to calculate anything

6      in the report.

7  Q.  As you sit here today, you don't know the proper

8      formula to use, do you, to calculate the forces?

9  A.  On what?

10  Q.  On the coil spring.

11  A.  I would have to consult my books to look it up.

12  Q.  The answer is you do not know without consulting

13      your books; is that correct?

14  A.  That's correct.

15  Q.  As you sit here today, you don't know whether F =

16      KX for a coil spring, do you?

17  A.  Correct.

18  Q.  And you reached your conclusions in your report

19      without knowing the answer to that question;

20      isn't that correct?

21  A.  I did not feel I needed that information to write

22      my report.

23  Q.  Okay.  We can take a break.

24          MR. SINGER:  Okay.

# EXHIBIT 3



US006820368B2

(12) **United States Patent**
Uken et al.

(10) Patent No.: **US 6,820,368 B2**
(45) Date of Patent: **Nov. 23, 2004**

(54) **SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW**

(75) Inventors: **Stuart J. Uken**, Sioux Falls, SD (US); **Gary R. Newman**, Valley Springs, SD (US); **Lawrence J. VerSteeg**, Sioux Falls, SD (US)

(73) Assignee: **Amesbury Group, Inc.**, Amesbury, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/446,279**

(22) Filed: **May 23, 2003**

(65) **Prior Publication Data**

US 2003/0192257 A1 Oct. 16, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 10/044,005, filed on Jan. 11, 2002, now Pat. No. 6,679,000.
(60) Provisional application No. 60/261,501, filed on Jan. 12, 2001.

(51) **Int. Cl.⁷** .............................. **E05D 15/22; E05F 1/00**
(52) **U.S. Cl.** .............................. **49/181; 49/176; 49/446; 16/197**
(58) **Field of Search** .......................... 49/181, 183, 184, 49/185, 186, 445, 446, 449, 455, 453, 454, 176, 177, 161; 292/174, 175, DIG. 63, DIG. 47, DIG. 37; 16/197

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,007,212 A | 10/1911 | Lasersohn |
| 1,312,665 A | 8/1919 | Almquist |
| 2,178,533 A | 10/1939 | Viehweger |
| 2,952,884 A | 9/1960 | Dinsmore |
| 3,007,194 A | 11/1961 | Griswold |
| 3,105,576 A | 10/1963 | Jones et al. |
| 3,461,608 A | 8/1969 | Johnson |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

CA          2382933          4/2002

OTHER PUBLICATIONS

BSI's Hidden Advantage: It's as Easy as 1–2–3, Balance Systems—BSI, Amesbury Group, Inc., 2001. (3 pgs.), no month available.

(List continued on next page.)

*Primary Examiner*—Hugh B. Thompson, II
(74) *Attorney, Agent, or Firm*—Testa, Hurwitz & Thibeault, LLP

(57) **ABSTRACT**

The invention relates to a snap lock balance shoe and balance systems to be incorporated in pivotable double hung windows and installation methods of such systems. In one embodiment, the snap lock balance shoe includes a pair of retractable tabs that partially extend through openings within an inverted window balance. In one embodiment of the method, an elongated end of the balance shoe is inserted into a window jamb and then rotated into position.

**11 Claims, 13 Drawing Sheets**



## US 6,820,368 B2
### Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,497,999 A | 3/1970 | Hendra | |
| 3,529,381 A | 9/1970 | Grossman | |
| 3,676,956 A | 7/1972 | Taylor et al. | |
| 3,732,594 A | 5/1973 | Mills | |
| 3,869,754 A | 3/1975 | Foster | |
| 4,028,849 A | 6/1977 | Anderson | |
| 4,068,406 A | 1/1978 | Wood | 49/181 |
| 4,079,549 A | 3/1978 | Wood | 49/181 |
| 4,089,085 A | 5/1978 | Fitzgibbon | |
| 4,190,930 A | 3/1980 | Prosser | |
| 4,300,316 A | 11/1981 | Ficurilli | |
| 4,332,054 A | 6/1982 | Paist et al. | 16/197 |
| 4,506,478 A | 3/1985 | Anderson | 49/181 |
| 4,510,713 A | 4/1985 | Anderson | 49/175 |
| 4,610,108 A | 9/1986 | Marshik | 49/181 |
| 4,697,304 A | 10/1987 | Overgard | |
| 4,930,254 A | 6/1990 | Valentin | 49/181 |
| 4,941,285 A | 7/1990 | Westfall | 49/176 |
| 4,949,425 A | 8/1990 | Dodson et al. | |
| 4,958,462 A | 9/1990 | Cross | 49/181 |
| 5,069,001 A | 12/1991 | Makarowski | 49/176 |
| 5,127,192 A | 7/1992 | Cross | 49/181 |
| 5,140,769 A | 8/1992 | Hickson et al. | |
| 5,189,838 A | 3/1993 | Westfall | 49/181 |
| 5,251,401 A | 10/1993 | Prete et al. | 49/181 |
| 5,301,467 A | 4/1994 | Schmidt et al. | 49/181 |
| 5,353,548 A | 10/1994 | Westfall | |
| 5,371,971 A | 12/1994 | Prete | |
| 5,377,384 A | 1/1995 | Riegelman | 16/193 |
| D355,262 S | 2/1995 | Chancy et al. | |
| 5,445,364 A | 8/1995 | Tibbals, Jr. | |
| 5,448,858 A | 9/1995 | Briggs et al. | |
| 5,452,495 A | 9/1995 | Briggs | |
| 5,463,793 A | 11/1995 | Westfall | |
| 5,530,991 A | 7/1996 | deNormand et al. | |
| 5,553,903 A | 9/1996 | Prete et al. | 292/163 |
| 5,566,507 A | 10/1996 | Schmidt et al. | |
| 5,572,828 A | 11/1996 | Westfall | 49/181 |
| 5,615,452 A | 4/1997 | Habbersett | 16/194 |
| 5,632,117 A | 5/1997 | Prete et al. | 49/181 |
| 5,632,118 A | 5/1997 | Stark | 49/181 |
| 5,661,927 A | 9/1997 | Polowinczak et al. | 49/447 |
| 5,669,180 A | 9/1997 | Maier | |
| 5,697,188 A | 12/1997 | Fullick et al. | 49/181 |
| 5,704,165 A | 1/1998 | Slocomb et al. | 49/181 |
| 5,737,877 A | 4/1998 | Meunier et al. | 49/445 |
| 5,802,767 A | 9/1998 | Slocomb et al. | 49/181 |
| 5,806,243 A | 9/1998 | Prete et al. | 49/181 |
| 5,806,900 A | 9/1998 | Bratcher et al. | 292/137 |
| 5,829,196 A | 11/1998 | Maier | 49/181 |
| 5,855,092 A | 1/1999 | Raap et al. | |
| 5,873,199 A | 2/1999 | Meunier et al. | 49/181 |
| 5,924,243 A | 7/1999 | Polowinczak et al. | 49/181 |
| 5,927,013 A | 7/1999 | Slocomb et al. | 49/181 |
| 5,943,822 A | 8/1999 | Slocomb et al. | 49/181 |
| 6,032,417 A | 3/2000 | Jakus et al. | 49/181 |
| 6,041,475 A | 3/2000 | Nidelkoff | 16/193 |
| 6,041,476 A | 3/2000 | deNormand | 16/197 |
| 6,041,550 A | 3/2000 | Tix | 49/404 |
| 6,058,653 A | 5/2000 | Slocomb et al. | 49/181 |
| 6,119,398 A | 9/2000 | Yates, Jr. | |
| D434,637 S | 12/2000 | Habeck et al. | |
| 6,155,615 A | 12/2000 | Schultz | 292/163 |
| 6,161,335 A | 12/2000 | Beard et al. | |
| 6,178,696 B1 | 1/2001 | Liang | 49/185 |
| 6,226,923 B1 | 5/2001 | Hicks et al. | |
| 6,467,128 B1 | 10/2002 | Damani | |
| 6,470,530 B1 | 10/2002 | Trunkle | |
| D467,490 S | 12/2002 | Uken et al. | |
| 6,622,342 B1 | 9/2003 | Annes et al. | |
| 6,679,000 B2 | 1/2004 | Uken et al. | |
| 2002/0092241 A1 | 7/2002 | Uken et al. | |
| 2002/0129463 A1 | 9/2002 | Newman | |

### OTHER PUBLICATIONS

BSI Tilt Balance Systems, Balance Systems—BSI, Amesbury Group, Inc., 1996–2001. (4 pgs.), no month available.

Crossbow Balance! Another New Balance in BSI's Quiver, Balance Systems—BSI, Amesbury Group, Inc., Jun. 7, 1999. (3 pgs.).

**U.S. Patent**    Nov. 23, 2004    Sheet 1 of 13    US 6,820,368 B2



**FIG. 1**

Case 1:05-cv-10020-DPW    Document 93-7    Filed 06/21/2006    Page 17 of 83



PRIOR ART

FIG. 2A



FIG. 2B



**FIG. 3A**



**FIG. 3B**



FIG. 3C

210



230

**FIG. 3D**

210



240

250        250

**FIG. 3E**

210



250

**FIG. 3F**



**FIG. 4**



FIG. 5A

FIG. 5B





FIG. 6C

FIG. 6D



FIG. 7A

FIG. 7B

FIG. 8A

FIG. 8B



FIG. 9



FIG. 10A

FIG. 10B

FIG. 11A

FIG. 11B

FIG. 12A

FIG. 12B

FIG. 13A

FIG. 13B

US 6,820,368 B2

1

## SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW

### RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 10/044,005 entitled Snap Lock Balance Shoe and System for a Pivotable Window filed on Jan. 11, 2002, now U.S. Pat. No. 6,679,000, which application incorporates by reference in its entirety and claims priority to U.S. Provisional Patent Application Ser. No. 60/261,501 entitled Snap Lock Balance Shoe and System for a Pivotable Window filed on Jan. 12, 2001.

### FIELD OF THE INVENTION

This invention relates to a window balance system for use in a pivotable window assembly.

### BACKGROUND OF THE INVENTION

This invention relates to the field of tilt-in windows. More particularly this invention relates to a balance shoe of a window balance system used in conjunction with a pivot bar mounted on a window sash for rotating the window sash relative to a window frame.

Typical pivotable double hung windows include two window sashes disposed in tracks located in a window frame to allow vertical sliding movement of the sashes. Pivot bars are provided to allow rotational movement of a pivotable window sash about the pivot bars to facilitate cleaning of glazing. To control vertical movement, window balances are used so that the window sashes remain in a position in which they are placed. Balance shoes are used to guide the rotational movement of the window sashes with respect to the window frame. Typically, the balance shoes are coupled to window balances with a connecting member. See, for example, U.S. Pat. No. 6,119,398, entitled "Tilt Window Balance Shoe Assembly with Three Directional Locking" issued to H. Dale Yates, Jr., the disclosure of which is herein incorporated by reference in its entirety.

One of the problems with balance shoes and window balances for pivotable double hung windows is that they are difficult to install. In order to install a pivotable double hung window with balance shoes and window balances, the following installation steps typically must be followed. First, before the window frame is assembled, the balance shoes are inserted into jamb tracks. Next, connecting members are used to attach the balance shoes to the window balances. The balance shoes generally have an opening to accept the pivot bars that are mounted on window sashes. Finally, the sashes are made operable by inserting the pivot bars into the balance shoes and rotating the window sash up to a vertical position in the jamb tracks. The installation process is rather complex and difficult. Repair costs for replacing balance shoes are also significant. In order to change a malfunctioning or failed balance shoe, the jamb tracks either need to be deformed or replaced to gain access to the problematic balance shoe for removal and replacement.

### SUMMARY OF THE INVENTION

In general, in one aspect, the invention relates to a balance shoe. The balance shoe includes a frame, a locking member at least partially disposed within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within a window balance. Embodiments of the invention can include the following features. The connecting device can include one or more retractable tabs that engage the window balance directly. The frame can further include a frame pocket sized to receive a fastener. The cam can include at least one camming surface and a keyhole opening for receiving a pivot bar attached to a window sash. The cam is at least partially housed within the frame and is disposed within a space enclosed by the locking member. Upon rotating the cam with the pivot bar, the locking member engages the window jamb. In one embodiment, the locking member includes two opposing ends integrally connected by a spring member. The cam is located within a space between the opposing ends of the locking member, and upon rotating the cam with the pivot bar, the opposing ends engage the window jamb. In another embodiment, the locking member includes a plate, which is parallel to a back surface of the frame. The cam is located within a space between the plate and the frame such that rotating the cam with the pivot bar forces the plate to engage the window jamb.

In another aspect, the invention relates to an inverted window balance system for use within a pivotable double hung window assembly. The inverted window balance system includes a rigid U-shaped channel with a plurality of openings in the channel walls for securing the contents in the channel, which include an extension spring, a system of pulleys, a cord to connect the extension spring via the system of pulleys with the window sash, and a balance shoe. The balance shoe includes a frame, a locking member at least partially disposed within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within the rigid U-shaped channel. Embodiments of this aspect of the invention can include the following features. At least a portion of the balance shoe is disposed within the rigid U-shaped channel. The connecting device can include one or more retractable tabs for engaging the rigid U-shaped channel. The retractable tabs can partially extend through at least one of the plurality of openings in the rigid U-shaped channel. The balance shoe can be further secured to the rigid U-shaped channel with a fastener that interfaces with a frame pocket in the balance shoe. The cam can include at least one camming surface and a keyhole opening for receiving a pivot bar attached to a window sash. The cam is at least partially housed within the frame and is disposed within a space enclosed by the locking member. Upon rotating the cam with the pivot bar, the locking member engages the window jamb. In one embodiment, the locking member includes two opposing ends integrally connected by a spring member. The cam is located within a space between the opposing ends of the locking member, and upon rotating the cam with the pivot bar, the opposing ends engage the window jamb. In another embodiment, the locking member includes a plate, which is parallel to a back surface of the frame. The cam is located within a space between the plate and the frame such that rotating the cam with the pivot bar forces the plate to engage the window jamb.

In still another aspect, the invention relates to a method of installing an inverted window balance system within a window jamb in a window frame. The method includes four basic steps. The first step is to provide an inverted window balance system that includes a rigid U-shaped channel with a plurality of openings in the channel walls for securing the contents in the channel, an extension spring and a system of pulleys disposed within the rigid U-shaped channel, a cord to connect the extension spring via the system of pulleys with the window sash, and a balance shoe. The balance shoe includes a frame, a locking member located at least partially

US 6,820,368 B2

3

within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within the rigid U-shaped channel. The frame of the balance shoe has a frame bottom surface, a frame front surface, and two frame edge surfaces. The second step is to insert the inverted window balance system into a jamb track of the window jamb, such that an axis extending along a longitudinal direction of the rigid U-shaped channel is perpendicular to a back wall of the jamb track and an axis that is perpendicular to the two frame edge surfaces is parallel to the back wall while the frame front surface faces a side wall of the jamb track. The third step is to rotate the window balance system within the jamb track 90 degrees about the axis extending along the longitudinal direction of the rigid U-shaped channel, such that the frame front surface faces in a downward direction. The final step is to rotate the window balance system 90 degrees about the axis that is perpendicular to the two frame edge surfaces, such that the frame bottom surface faces in the downward direction.

These and other features of the invention will be made apparent from the following description taken in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention.

FIG. 1 is a perspective view of a pivotable double hung window assembly;

FIG. 2A is a rear view of inverted window balance system for use with a prior art balance shoe;

FIG. 2B is a rear view of a window balance;

FIG. 3A is one perspective view of an embodiment of a snap lock balance shoe of the present invention;

FIG. 3B is another perspective view of the embodiment of the snap lock balance shoe of FIG. 3A;

FIG. 3C is a rear view of one embodiment of a snap lock inverted balance system;

FIG. 3D is a bottom view of one embodiment of a snap lock balance shoe;

FIG. 3E is a front view of one embodiment of a snap lock balance shoe;

FIG. 3F is a side view of one embodiment of a snap lock balance shoe;

FIG. 4 is a perspective view of an embodiment of a snap lock balance shoe of the present invention;

FIG. 5A is one perspective view of another embodiment of a snap lock balance shoe of the present invention;

FIG. 5B is another perspective view of the embodiment of the snap lock balance shoe of FIG. 5A;

FIG. 6A is a perspective view of one embodiment of a balance shoe of the invention and a rigid U-shaped channel;

FIG. 6B is a perspective view showing the first step of connecting one embodiment of the balance shoe of the invention to the rigid U-shaped channel;

FIG. 6C is a perspective view showing the second step of connecting one embodiment of the balance shoe of the invention to the rigid U-shaped channel;

FIG. 6D is a perspective view showing one embodiment of the balance shoe of the invention connected to the rigid U-shaped channel;

FIG. 7A is a front view of a prior art balance shoe attached to a rigid U-shaped channel;

4

FIG. 7B is a side view of the prior art balance shoe attached to the rigid U-shaped channel;

FIG. 8A is a front view of one embodiment of a snap lock balance shoe of the present invention attached to a rigid U-shaped channel;

FIG. 8B is a side view of one embodiment of the snap lock balance shoe of the present invention attached to the rigid U-shaped channel;

FIG. 9 is a front view of a window assembly including one snap lock inverted window balance system of the present invention and one prior art inverted window balance system installed in a window frame;

FIG. 10A is a side view illustrating the first step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 10B is a front view illustrating the first step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 11A is a side view illustrating the second step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 11B is a front view illustrating the second step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 12A is a side view illustrating the third step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 12B is a front view illustrating the third step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 13A is a side view illustrating the last step of installing the snap lock inverted window balance system of the invention into the jamb track; and

FIG. 13B is a front view illustrating the last step of installing the snap lock inverted window balance system of the invention into the jamb track.

DETAILED DESCRIPTION OF THE INVENTION

Referring to FIG. 1, shown is a pivotable double hung window assembly 100 in which a snap lock balance shoe constructed in accordance with the teachings of the present invention can be used. The pivotable double hung window assembly 100 includes a window frame 102, a pivotable lower window sash 104, a pivotable upper window sash 106, and a window jamb 107. The pivotable lower window sash 104 and the pivotable upper window sash 106 slide vertically in jamb track 108 within the window jamb 107, while also being able to pivot about a pivot bar 114, as shown in FIG. 9.

FIG. 2A shows a rear view of an inverted window balance system 120 for use in the pivotable double hung window assembly 100. The inverted window balance system 120 includes an inverted window balance 122 used for balancing the weight of either the pivotable lower window sash 104 or the pivotable upper window sash 106 at any vertical position within the window frame 102, and a prior art balance shoe 110 for guiding the rotation of the pivotable lower window sash 104 about the pivot bar 114. A hanging connector 112 connects the prior art balance shoe 110 to the inverted window balance 122. The inverted window balance 122 includes an extension spring 126 connected to a system of pulleys 128 housed within a rigid U-shaped channel 130, and a cord 132 for connecting the system of pulleys 128 to a jamb mounting attachment 134. The jamb mounting

US 6,820,368 B2

5                                                                      6

attachment 134 is used for connecting the inverted window balance system 120 to the window jamb 107. One difference between the inverted window balance 122 and a window balance 140, shown in FIG. 2B, includes the placement of the extension spring 146 above a system of pulleys 148 within the rigid U-shaped channel 150. A cord 152 connects the system of pulleys 148 to a jamb mounting attachment 154. Another difference is that while inverted window balances 122 travel with either the pivotable lower window sash 104 or pivotable upper window sash 106, the window balance 140 remains in a fixed position in the window jamb 107 due to an attachment to the window jamb 107 through an attachment opening 155.

FIGS. 3A and 3B are perspective views of a snap lock balance shoe 210 of one embodiment of the present invention. The snap lock balance shoe 210 has a frame 211 in which is housed a connecting device 212, a locking device 214, and a cam 218. The connecting device 212 can be integral with the frame 211 and attaches the snap lock balance shoe 210 directly within an inverted window balance 622, shown in FIG. 3C. The inverted window balance 622 in combination with the snap lock balance shoe 210 forms a snap lock inverted window balance system 600. The inverted window balance 622 includes an extension spring 626 connected to a system of pulleys 628 housed within a rigid U-shaped channel 630, and a cord 632 for connecting the system of pulleys 628 to a jamb mounting attachment 634, such as a cord terminal or hook.

In the depicted embodiment, the connecting device 212 is a pair of retractable tabs that snap into the rigid U-shaped channel 630. In other embodiments, other connecting devices such as a screw, may be used to secure the frame 211 to the rigid U-shaped channel 630. A fastener 635 located in the inverted window balance 622 can be used to further secure the connection between the snap lock balance shoe 210 and the inverted window balance 622. To accommodate the fastener 635, the snap lock balance shoe 210 can form a connection pocket 213 sized to receive or mate with the fastener 635.

Another element of the snap lock balance shoe 210 visible in FIG. 3A is a keyhole opening 219 located within the cam 218. The keyhole opening 219 is sized to accept the pivot bar 114 extending from either the pivotable lower window sash 104 or the pivotable upper window sash 106, and serves as a connection point between the pivotable lower or upper window sash 104, 106 and the snap lock balance shoe 210. FIG. 3B shows a perspective view of the snap lock balance shoe 210 showing another face of the cam 218.

In the embodiment shown in FIG. 3B, the locking device 214 surrounds the cam 218 and includes of a pair of opposing ends 215 connected by a spring member 216. When the pivotable lower window sash 104 is tilted open, the pivot bar 114 rotates, which in turn rotates the cam 218 forcing the opposing ends 215 outward to engage the jamb track 108 of the window frame 102, thereby locking the balance shoe 210 in that location.

FIGS. 3D–3F show different views of one of the embodiments of the snap lock balance shoe 210 of the invention. FIG. 3D is a bottom view of the snap lock balance shoe 210 that shows a frame bottom surface 230. FIG. 3E is a front view of the same embodiment of the snap lock balance shoe 210 that illustrates a frame front surface 240, and FIG. 3F is an side view that shows one of the two frame edge surfaces 250 of the snap lock balance shoe 210.

FIG. 4 shows another embodiment of a snap lock balance shoe 310. The snap lock balance shoe 310 has an elongated

frame 311 in which is housed a connecting device 312, a locking device 314, and a cam 318. Within the cam is a keyhole opening 319 sized to receive the pivot bar 114. The elongated frame 311 has a length L 325 that is greater than about 1.25 inches. When attached to the rigid U-shaped channel 630, the balance shoe 310 extends further outward from the rigid U-shaped channel 630 than the balance shoe 210 attached to a similar sized rigid U-shaped channel 630. The balance shoe 310 allows a fixed-sized rigid U-shaped channel 630 to be used in a larger window having a greater travel distance by extending the length of the entire window balance system by having a longer balance shoe 310. One of the advantages of the present invention is that an installer can create a custom window balance system for a particular window by fitting a fixed-length rigid U-shaped channel 630 with an appropriately sized snap lock balance shoe.

Referring to FIGS. 5A–5B, shown is another embodiment of the present invention of a snap lock balance shoe 410. The snap lock balance shoe 410 has a locking member 422 which engages a back wall of the jamb track 108 locking the balance shoe 410 in that location. The locking member 422 is partially disposed in the frame 411 and includes a plate 423 that engages the back wall of the jamb track 108. The balance shoe 410 also includes a frame 411, a connecting device 412, and a cam 418. The cam 418 is partially disposed within the frame 411 in a space enclosed by the locking member 422. The cam 418 includes a keyhole opening 419 sized to receive the pivot bar 114. Upon rotation of the cam 418 with the pivot bar 114, the locking member 422 is forced away from the frame 411 towards the back wall of the jamb track 108, thereby anchoring the balance shoe 410 in that location within the window frame 102.

FIGS. 6A–6D show one embodiment of a method for securing the snap lock balance shoe 210 within a rigid U-shaped channel 630 with multiple openings 638. It should be noted that each opening 638 on one side of the rigid U-shaped channel 630 has a corresponding opening 638 on the other side of the rigid U-shaped channel 630 to form a pair of openings. The first step, shown in FIG. 6A, is to place a fastener 635, such as a rivet, in one of the pairs of openings 638 in the rigid U-shaped channel 630. The next step, as depicted in FIG. 6B, is to slide the snap lock balance shoe 210 into the rigid U-shaped channel 630 such that the fastener 635 is received in the connection pocket 213 of the snap lock balance shoe 210. As shown in FIG. 6C, the snap lock balance shoe 210 is then rotated down so that the front frame surface 240 is aligned with a bottom wall 636 of the rigid U-shaped channel 630. FIG. 6D shows the last step of attaching the snap lock balance shoe 210 within the rigid U-shaped channel 630. In this step, the connecting device 212 of the snap lock balance shoe 210 snaps into one of the pairs of openings 638 located on the rigid U-shaped channel 630. In alternative embodiments the connection device 212 of the snap lock balance shoe 210 can extend through off-set openings in the rigid U-shaped channel 630. In some embodiments, the snap lock balance shoe 210 is attached to the rigid U-shaped channel 630 with the fastener 635. In other embodiments, the snap lock balance shoe 210 is attached to the rigid U-shaped channel 630 without the fastener 635. It should also be noted that in some embodiments, the snap lock balance shoe 210 can be aligned and secured to the rigid U-shaped channel 630 such that the front frame surface 240 faces upwards instead of downwards as depicted in FIG. 6D.

FIG. 7A is a front view of the prior art balance shoe 110 attached to the rigid U-shaped channel 130. The rigid

US 6,820,368 B2

7

U-shaped channel 130 is connected to the prior art balance shoe 110 by the hanging connector 112. No part of the prior art balance shoe 110 lies within the rigid U-shaped channel 130. FIG. 7B is a side view of the prior art balance shoe 110 attached to the rigid U-shaped channel 130 illustrating channel openings 137. Fasteners (not shown) are installed through the channel openings 137 to secure the hanging connector 112 to the rigid U-shaped channel 130.

Referring to FIGS. 8A and 8B, shown is an embodiment of the snap lock balance shoe 210 of the present invention attached to the rigid U-shaped channel 630. The snap lock balance shoe 210 is directly attached within the rigid U-shaped channel 630 by a connecting device 212 located on the frame 211 of the snap lock balance shoe 210. The connecting device 212 extends through a pair of openings 638 located on the rigid U-shaped channel 630.

FIG. 9 is a front view of a pivotable double hung window assembly 800 in which an inverted window balance 122 is attached to a prior art balance shoe 110 by using the hanging connector 112, and the inverted window balance 622 is attached to the snap lock balance shoe 210 of an embodiment of the present invention. Pivot bars 114, as shown in FIG. 9, are secured to the pivotable lower window sash 104. The pivot bars 114 are slidably receivable by both the prior art balance shoe 110 and the snap lock balance shoe 210 and serve as connections between the pivotable lower window sash 104 and respective inverted window balances 122, 622.

An advantage of the type of balance shoe presently disclosed is that the snap lock balance shoe 210 is attached within the rigid U-shaped channel 630 resulting in a longer rigid U-shaped channel 630 than in the inverted balance systems 120 for a given window sash. The longer rigid U-shaped channel 630 of the inverted window balance 622 allows for the use of longer extension springs that provide greater control of the vertical positioning of the window sash than a shorter rigid U-shaped channel 130 with a shorter extension spring. Another advantage of the present invention is that the snap lock balance shoe 210 contains a smaller number of parts than prior art balance shoes 110.

One installation method used to place a snap lock inverted window balance system 600 within the jamb tracks 108 is schematically illustrated in the remaining figures. The snap lock inverted window balance system 600 includes one inverted window balance 622 and one snap lock window balance 210. FIGS. 10A, 11A, 12A, and 13A show the installation method from a side view, while FIGS. 10B, 11B, 12B, and 13B show the method from a front view. The installation method involves an orientation step, a first rotation step, and a second rotation step FIGS. 10A and 10B show the orientation step in the installation method. In the orientation step, the snap lock inverted window balance system 600 is inserted the jamb tracks 108 such that an axis CC 510 in FIG. 10A is perpendicular to a back wall 530 of the jamb tracks 108, while an axis DD 520 in FIG. 10A is parallel to the back wall 530 and the frame front surface 240 is adjacent to a side wall 532 of the jamb tracks 108. FIGS. 11A and 11B show the snap lock inverted window balance system 600 inserted in the jamb tracks 108 as well as an arrow 550 indicating the direction of rotation of the snap lock inverted window balance system 600 required to complete the first rotation step. The first rotation step involves rotating the snap lock inverted window balance system 600 90-degrees about the axis CC 510 such that the frame front surface 240 faces downward. FIGS. 12A and 12B show the snap lock inverted window balance system 600 after the

8

90-degree rotation around the axis CC 510 has been completed. The second rotation step involves a 90-degree rotation about the axis DD 520. An arrow 560 showing the direction of the second rotation step is shown in FIGS. 12A and 12B. FIGS. 13A and 13B show in two different views the snap lock inverted window balance system 600 after the installation method has been completed. The cord terminal or any other jamb mounting attachment 634 (see FIG. 9) can then be screwed or hooked into place to anchor the snap lock inverted window balance system 600.

The installation method just described can be carried out in reverse to remove the snap lock inverted window balance system 600 from the jamb track 108 of the window frame 102 to allow for easy replacement of the snap lock balance shoe 210 or the snap lock inverted window balance system 600 itself. In order to replace inverted window balance systems 120 with prior art balance shoes 110, either the jamb tracks 108 need to be warped or completely removed in order to replace the prior art balance shoe 110 of the inverted window balance system 120.

While there have been described several embodiments of the invention, other variants and alternatives will be obvious to those skilled in the art. Accordingly, the scope of the invention is not limited to the specific embodiments shown.

What is claimed is:

1. A window balance system comprising:

a U-shaped channel comprising a plurality of openings;

a spring connected to a system of pulleys located within the U-shaped channel;

a cord with a first cord end and a second cord end, the fist cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and

a balance shoe, wherein the balance shoe comprises:
a frame comprising an enlarged first end and a second end, wherein at least a portion of the second end of the frame is disposed within the U-shaped channel;
a locking member proximal to the enlarged first end;
a cam in communication with the locking member; and
a connecting device comprising one or more resilient tabs for attaching the balance shoe within the U-shaped channel of the window balance, wherein the one or more resilient tabs extend at least partially through a corresponding number of the plurality of openings in the U-shaped channel.

2. A window balance system comprising:

a U-shaped channel comprising a plurality of openings;

a spring connected to a system of pulleys located within the U-shaped channel;

a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and

a balance shoe, wherein the balance shoe comprises:
a frame comprising an enlarged fist end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;

a locking member proximal to the enlarged first end;

a cam in communication with the locking member, and

a connecting device for attaching the balance shoe within the U-shaped channel of the window balance.

US 6,820,368 B2

9

3. The window balance system of claim 2 wherein the connecting device comprises a rivet.

4. The window balance system of claim 2 wherein the connecting device comprises a screw.

5. The window balance system of claim 2 wherein the connecting device comprises a resilient tab.

6. The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

7. The window balance system of claim 2 wherein the locking member comprises two opposing ends integrally connected by a spring member.

8. The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of

10

the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

9. The window balance system of claim 2 wherein the locking member comprises a plate, wherein the plate is parallel to a back surface of the enlarged first end of the frame.

10. The window balance system of claim 9 wherein the cam is at least partially housed within the enlarged first end of the frame wherein rotating the cam forces the plate of the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

11. The window balance system of claim 2 wherein the cam comprises at least one camming surface and a keyhole opening sized to receive a pivot bar.

* * * * *

# EXHIBIT 4



US006598264B2

(12) **United States Patent**
Newman

(10) Patent No.: **US 6,598,264 B2**
(45) Date of Patent: **Jul. 29, 2003**

(54) **BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER**

(75) Inventor: **Gary Roger Newman**, Valley Springs, SD (US)

(73) Assignee: **Amesbury Group, Inc.**, Amesbury, MA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 6 days.

(21) Appl. No.: **09/810,868**

(22) Filed: **Mar. 16, 2001**

(65) **Prior Publication Data**

US 2002/0129463 A1 Sep. 19, 2002

(51) Int. Cl.[7] ................................................. E05D 13/00
(52) U.S. Cl. ............................. 16/197; 16/215; 16/401; 16/DIG. 16
(58) Field of Search .......................... 16/197, 193, 400, 16/401, DIG. 16, 210, 215; 49/445, 446, 447

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,114,178 A | * 12/1963 | Wood | 49/446 |
| 3,358,403 A | 12/1967 | Dinsmore | |
| 3,440,683 A | 4/1969 | Wood | 16/197 |
| 3,449,862 A | * 6/1969 | Biro | 49/406 |

| | | | |
|---|---|---|---|
| 4,089,085 A | 5/1978 | Fitzgibbon | 16/197 |
| 4,134,234 A | 1/1979 | Wood | 49/429 |
| 4,190,930 A | 3/1980 | Prosser | 16/197 |
| 4,238,907 A | 12/1980 | Swan | 49/446 |
| 4,300,316 A | 11/1981 | Ficurilli | 49/445 |
| 4,332,054 A | 6/1982 | Paist et al. | 16/197 |
| 4,373,295 A | 2/1983 | Starck | 49/435 |
| 4,413,445 A | 11/1983 | Trout | 49/445 |
| 4,503,641 A | 3/1985 | Swan | 49/445 |
| 4,586,291 A | 5/1986 | Swan | 49/501 |
| 4,654,928 A | 4/1987 | Flight | 16/199 |
| 4,672,713 A | 6/1987 | Newton et al. | 16/197 |
| 4,689,850 A | 9/1987 | Flight | 16/197 |
| 4,800,680 A | 1/1989 | Westfall et al. | 49/429 |
| 4,914,862 A | 4/1990 | Gregory | 49/322 |
| 4,949,425 A | 8/1990 | Dodson et al. | 16/198 |
| 5,174,064 A | 12/1992 | Stark | 49/445 |
| 5,530,991 A | 7/1996 | deNormand et al. | 16/198 |
| 5,737,877 A | 4/1998 | Meunier et al. | 49/445 |
| 6,041,476 A | 3/2000 | deNormand | 16/197 |

* cited by examiner

Primary Examiner—Anthony Knight
Assistant Examiner—William D Hutton, Jr.
(74) Attorney, Agent, or Firm—Testa, Hurwitz & Thibeault, LLP

(57) **ABSTRACT**

Disclosed are apparatus for a block and tackle window balance to be incorporated in single and double hung window assemblies. In one embodiment the block and tackle window balance includes a roller secured within a bottom guide to increase range of travel of a window sash.

**23 Claims, 10 Drawing Sheets**





**FIG. 1**

PRIOR ART



# FIG. 2A
## PRIOR ART



## FIG. 2B
### PRIOR ART

**U.S. Patent**      Jul. 29, 2003      **Sheet 4 of 10**      US 6,598,264 B2



200

210
202
203
212
205
206
207
208
213
214
216
215

# FIG. 3

## PRIOR ART



# FIG. 4A



FIG. 4B



**FIG. 5**



FIG. 6



FIG. 7B
PRIOR ART



FIG. 7A
PRIOR ART



FIG. 8B



FIG. 8A

US 6,598,264 B2

**1**

# BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER

## TECHNICAL FIELD

This invention relates to block and tackle window balance devices for single and double hung windows and, more particularly, to a block and tackle window balance device that provides an increased range of travel within a window frame.

## BACKGROUND INFORMATION

Hung window assemblies generally include a window frame, a lower window sash, an upper window sash, a pair of window jambs, two sets of jamb pockets, and at least one window balance device for offsetting the weight of a window sash throughout a range of travel within the window frame. Block and tackle window balance devices use a combination of a spring and pulleys located within a channel to balance the weight of the window sash at any position within the jamb pockets.

In some block and tackle window balance devices, the channel containing both the spring and pulleys is attached to the window sash, and a cord, which connects the pulleys together, is attached to a jamb mounting hook that is connected to a side jamb. A disadvantage of this type of device is that the travel distance of the window sash is limited by some of the pulleys located within the rigid channel interfering with the jamb mounting hook that attaches the window balance to the window jamb.

## SUMMARY OF THE INVENTION

In general, in one aspect, the invention relates to a block and tackle window balance device for use with single and double hung windows that affords increased window opening travel distance. In one embodiment, the block and tackle window balance device includes a channel, a spring with a first end and a second end, a translatable pulley block unit, a fixed pulley block unit, a cord, a top guide, and a bottom guide with a bottom guide roller. The top and bottom guides are connected to opposite ends of the channel. The spring, the translatable pulley block unit, and the fixed pulley block unit are all located within the channel. The first end of the spring and the fixed pulley block unit are fixed at opposite ends of the channel. The second end of the spring is connected to the translatable pulley block unit. The translatable and fixed pulley block units are connected by the cord. The cord is threaded around both the translatable and fixed pulley block units and extends around the bottom guide roller located within the bottom guide.

In another embodiment, the block and tackle window balance device includes a top guide including a top angled portion and a bottom portion. The bottom portion of the top guide is connected to one end of the channel. In still another embodiment, the top angled portion of the top guide is sized to receive a member from a window sash.

In yet another embodiment, the block and tackle window device includes a bottom guide that extends beyond the rigid channel. In still yet another embodiment, the bottom guide of the device further includes a channel to receive a portion of a window sash.

In general, in one aspect, the invention relates to a method of providing increased travel of a window sash slidably mounted in a window frame. The method includes three steps. A first step is to provide a window assembly that

**2**

includes a window frame with jambs with jamb pockets, an upper window sash, a lower window sash, and at least one block and tackle window balance device having a channel and a bottom roller for dispensing a cord. The channel has a first end and a second end. The bottom roller is mounted proximate to the second end of the channel with a first distance between the first end of the channel and the bottom roller. A second step is to remove the block and tackle window balance device from the window assembly. A final step is to provide and to install an increased travel window balance device. The increased window balance device has a channel with a first end and a second end and a bottom guide roller for dispensing a cord. The bottom guide roller is mounted proximate to the second end of the channel and a second distance is defined as the length between the first end of the channel and the bottom guide roller. The second distance of the increased window balance device is greater than the first distance of the removed block and tackle window balance device.

The foregoing and other objects, aspects, features, and advantages of the invention will become more apparent from the following description and from the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention.

FIG. 1 is a perspective view of a double hung window.

FIG. 2A is a perspective view of a prior art block and tackle window balance.

FIG. 2B is another perspective view of the prior art block and tackle window balance of FIG. 2A with one of two side walls of the U-shaped channel removed.

FIG. 3 is a perspective rear view of the prior art block and tackle window balance.

FIG. 4A is a perspective view of an embodiment of a block and tackle window balance of the invention.

FIG. 4B is perspective view of the block and tackle window balance of FIG. 4A with one of two side walls of the U-shaped channel removed.

FIG. 5 is a perspective view of an embodiment of a block and tackle window balance of the invention mounted within a window jamb.

FIG. 6 is an enlarged front view of a top guide of the block and tackle window balance of FIG. 4A attached to a cam.

FIG. 7A is a front view showing a closed position of a window assembly with prior art block and tackle window balances.

FIG. 7B is a front view showing an open position of the window assembly with prior art block and tackle window balances.

FIG. 8A is a front view showing a closed position of a window assembly with an embodiment of a block and tackle window balances of the invention.

FIG. 8B is a front view showing an open position of a window assembly with block and tackle window balances of the invention.

## DETAILED DESCRIPTION

Referring to FIG. 1, shown is a double hung window assembly 100 in which a block and tackle window balance constructed in accordance with the teachings of the present

US 6,598,264 B2

3

invention can be used. The double hung window assembly 100 includes a window frame 102, a lower window sash 104, an upper window sash 106, and a pair of window jambs 107. Within each window jamb 107, jamb pockets 108 are defined. The lower window sash 104 and upper window sash 106 slide vertically within the jamb pockets 108. Generally, window balances are attached to the lower and upper window sashes 104, 106 to balance the weight of the window sashes at any vertical position within the jamb pockets 108.

FIGS. 2A, 2B, and 3 show perspective views of a prior art block and tackle window balance 200. FIG. 2A shows the prior art block and tackle window balance 200 in full, whereas FIG. 2B shows the prior art block and tackle window balance 200 with one side wall of a rigid U-shaped channel 205 cut away so that components within the window balance 200 are more visible. FIG. 3 shows a rear view of the window balance 200.

The block and tackle window balance 200 includes a spring 220, a translatable pulley unit 230, a fixed pulley unit 235, a roller 239, and a cord 240 all housed with the rigid U-shaped channel 205. Attached to the two ends of the rigid U-shaped channel 205 with fasteners 212, 216 are a top guide 210 and a bottom guide 215 that are used to connect the window balance 200 to either the upper or lower window sashes 104, 106 and to help guide the vertical motion of the window balance 200 within the jamb pockets 108. The top guide 210 includes an upper portion 202 and a lower portion 203. The upper portion 202 of the top guide 210 is angled and is sized to be received by a member attached to a window sash, such as a cam. The bottom guide 215 includes a back portion 213, best seen in FIG. 3, that encases a portion of the rigid U-shaped channel 205. Within the back portion 213 of the bottom guide 215 is a channel 214 sized to receive a portion of a window sash.

The rigid U-shaped channel 205 has a back wall 206 and two side walls 207, 208 that in combination form the U-shape. The rigid U-shaped channel 205 serves as an external frame to which the components of the window balance 200 can be secured. The rigid U-shaped channel 205 also keeps components located within the rigid U-shaped channel 205 free of debris and particulate matter. The spring 220, the translatable pulley unit 230, the fixed pulley unit 235, and the roller 239 are located inside the rigid U-shaped channel 205. Both of the translatable pulley unit 230 and the fixed pulley unit 235 include one or more pulleys rotatable around respective axles.

Components within the rigid U-shaped channel 205 work in combination to create a force to counterbalance the weight of the attached sash at any vertical position within the window frame 102. These components are attached to each other such that a first end 219 of the spring 220 is connected to the translatable pulley unit 230, and the translatable pulley unit 230 is connected to the fixed pulley unit 235 and the roller 239 via the cord 240. A pulley in the fixed pulley unit 235 and the roller 239 may be contained in a frame 236. To secure the components within the rigid U-shaped channel 205, the second end 221 of the spring 220 and the frame 236 are fixed to opposite ends of the rigid U-shaped channel 205 via respective fasteners 218, 243. The frame 236 is also used to secure a pulley axle 237 and a roller axle 238, around which the pulley in the fixed pulley unit 235 and the roller 239 respectively rotate. A first distance "AA" 275 is defined by a length extending between the upper portion 202 of the top guide 210 and the roller axle 238. The spring 220 and the translatable pulley unit 230 are connected together by hooking the first end 219 of the spring 220 through an upper slot

4

opening 229 in a frame 225. The frame 225 houses the translatable pulley unit 230 and a pulley axle 232 around which a pulley in the translatable pulley unit 230 rotates. The cord 240, which can be a rope, string, or cable, has a first end 241 and a second end 242. The first end 241 of the cord 240 is secured to the frame 225 and the second end 242, which is a free cord end, is threaded through the translatable pulley unit 230, the fixed pulley unit 235, and the roller 239, thereby connecting all three components together. After the cord 240 connects the three components together, a jamb mounting attachment 245 is secured to the second end 242 of the cord 240. When the prior art window balance 200 is located in the jamb pocket 108, the jamb mounting attachment 245 engages an opening 430 (FIG. 5) within one of the jamb pockets 108, securing the window balance 200 to the window jamb 107.

The spring 220 provides the force required to balance the sashes. The spring 220 is extended when the second end 242 of the cord 240 with the jamb mounting attachment 245 is pulled, causing the frame 225 to move within the rigid U-shaped channel 205 towards the frame 236, which is fixed. As the frame 225 moves towards the frame 236, the spring 220 is extended.

FIGS. 4A and 4B show an embodiment of a block and tackle window balance 300 in accordance with the teachings of the present invention. The window balances 300 act to counterbalance the weight of the window sashes 104, 106 at any vertical position within the window frame 102. FIG. 4A show one perspective view of the window balance 300 and FIG. 4B shows another perspective view of the same balance, but with a side wall of the rigid U-shaped channel 305 removed. The window balance 300 includes the rigid U-shaped channel 305, a top guide 310, a bottom guide 315, a spring 320, a translatable pulley unit 330, a fixed pulley unit 335, a bottom guide roller 350, and a cord 340. The top guide 310 and the bottom guide 315 are fixed to the rigid U-shaped channel 305 by fasteners 312, 316. The top guide 310 is used to help connect the block and tackle window balance 300 to the window sash 104, 106 and to help guide the movement of the block and tackle window balance 300 within the jamb pocket 108. The top guide 310 may include a top angled portion 302 and a bottom portion 303 as shown in FIGS. 4A and 4B. The bottom guide 315 is also used for connection and guidance purposes, but the bottom guide 315 further serves as a frame for housing the bottom guide roller 350. The bottom guide 315 extends beyond the rigid U-shaped channel 305 and, therefore, the bottom guide roller 350 is located outside of the rigid U-shaped channel 305. A back portion 313 of the bottom guide 315 may include a channel 314 for receiving a portion of the window sash, as depicted in FIG. 5. Some windows have a groove running along a bottom rail of the sash. On conventional balances, the bottom guide can drop into this groove so a manufacturer needs to use a shorter balance to avoid dropping into the groove. This effectively reduces the amount of travel, because shorter balances have to be used. The bottom guide 315 of the present invention is configured so the contact point of the bottom guide 315 to the sash is higher on the balance 300 so the groove is avoided and a longer balance with a greater spring force can be used. This can afford increased force for balancing the sash at any vertical position, as well as increased amount of travel resulting from the longer balance.

The spring 320, the translatable pulley unit 330, and the fixed pulley unit 335 are located within the rigid U-shaped channel 305. In the embodiment shown in FIGS. 4A and 4B, the translatable pulley unit 330 includes two pulleys 326,

5

327 that are rotatable about a single pulley axle 328, however, in other embodiments, the translatable pulley unit 330 may contain one or more pulleys rotatable about the pulley axle 328. Similarly, the fixed pulley unit 335, as shown in FIGS. 4A and 4B, includes two pulleys 331, 332 that rotate about a single pulley axle 333; however, in other embodiments, the fixed pulley unit 335 may contain one or more pulleys that rotate about the pulley axle 333. A first end 319 of the spring 320 is fixed with respect to the rigid U-shaped channel 305 via a fastener 318. In the disclosed embodiment, the fastener is a rivet; however the fastener could also be a support member welded between the two side walls of the rigid U-shaped channel 305, a hook secured to or formed in the rigid U-shaped channel 305, or any other device which secures the first end 319 of the spring 320 to the rigid U-shaped channel 305. The second end 321 of the spring 320 is attached to a frame 325, which houses the translatable pulley unit 330. To connect the spring 320 to the frame 325, the second end 321 of the spring 320 hooks through an opening 329 in the frame 325. The cord 340 has a first end 341 and a second end 342. The first end 341 of the cord 340 is attached to the frame 325 through a frame opening 322. The second end 342 is attached to a jamb mounting hook 345. The cord 340 is threaded through the translatable pulley unit 330, the fixed pulley unit 335, and around the bottom guide roller 350, connecting the three components together. The cord 340 in the disclosed embodiment is a string, however it may also be a rope, or a cable. Both the fixed pulley unit 335 and the bottom guide roller 350 are fixed with respect to the rigid U-shaped channel 305. The fixed pulley unit 335 is housed within a frame 336 and rotates around the pulley axle 333. The frame 336 is secured within the rigid U-shaped channel 305 with a fastener 337. In an alternative embodiment, the frame 336 is not rotating, the fixed pulley unit 335 rotates around an axle supported between side walls of the rigid U-shaped channel 305. In yet another alternative embodiment, the fixed pulley unit 335 can be integral with the bottom guide 315 and as a result, fasteners 337 and 316 can be eliminated because tension of the spring 320 will keep the bottom guide 315 engaged with or connected to the rigid U-shaped channel 305. The bottom guide roller 350 is located within the bottom guide 315 and rotates around a bottom guide axle 352. A second distance "BB" 375 is defined as the length extending between the top angled portion 302 of the top guide 310 and the bottom guide axle 352. It should be noted that the second distance "BB" 375 is greater than the first distance "AA" 275 of the window balance 200.

To use the block and tackle window balance 300 within the window assembly, the balance is connected to both the window jamb 107 and to either the lower window sash 104 or the upper window sash 106. Referring to FIG. 5, the block and tackle window balance 300 is attached to the window jamb 107 via the jamb mounting hook 345. The jamb mounting hook 345 is secured within an opening 430 within the jamb pocket 108. The window balance 300 is then connected to a window sash by inserting a portion of the window sash into the channel 314 of the bottom guide 315 and connecting a cam 405 mounted on the top of the window sash 400 to the top angled portion 302 of the top guide 310, as shown in FIG. 6.

The spring 320 of the window balance 300 creates the force required to counterbalance the weight of the window sash. However, because the bottom guide roller 350 is located in the bottom guide 315, instead of within the rigid U-shaped channel 305 as in prior art balances, window sashes with the block and tackle window balances 300 as

6

disclosed in this application provide greater travel distance. FIG. 7A is an illustration of a window assembly 500 with two prior art window balances 200 attached to a lower window sash 504. In FIG. 7A, the lower window sash 504 is in a closed position. FIG. 7B shows the window assembly 500, but with the lower window sash 504 in a fully open position. The standard travel distance of a window sash attached to the prior art window balance 200 is labeled "CC" 520 in FIG. 7B. The window sash 504, as shown in FIGS. 7A and 7B, is prevented from achieving a greater travel distance by the roller 239, located within the rigid U-shaped channel 205, hitting the jamb mounting hook 245.

FIGS. 8A and 8B show a schematic of the window assembly 600 with block and tackle balances 300 of the present invention. FIG. 8A shows the window assembly 600 in the closed position, while FIG. 8B shows the window assembly 600 in the fully open position. Because the bottom guide roller 350 is mounted within the bottom guide 315 instead of within the rigid U-shaped channel 305, the window sash 604 can travel a greater distance before the bottom guide roller 350 hits the jamb mounting hook 345, resulting in a greater travel distance, labeled "DD" 530 in FIG. 8B. It should be noted that the distance "DD" 530 is greater than the distance "CC" 520. The greater travel distance is an important feature, because it allows for an increased window clearance that will help persons who are using the window assembly as an emergency

Variations, modifications, and other implementations of what is described herein will occur to those of ordinary skill in the art without departing from the spirit and the scope of the invention as claimed. Accordingly, the invention is to be defined not by the preceding illustrative description but instead by the spirit and scope of the following claims.

What is claimed is:

1. A block and tackle window balance device comprising:

a channel comprising a first end and a second end;

a top guide connected to the first end of the channel;

a bottom guide connected to the second end of the channel;

a bottom guide roller rotatably mounted in the bottom guide;

a fixed pulley block unit connected to the channel;

a translatable pulley block unit moveable within the channel;

a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and

a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

2. The device of claim 1 wherein the bottom guide roller is located external to the channel.

3. The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash.

4. The device according to claim 1 wherein a portion of the bottom guide is external to the channel.

5. The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash.

6. The device of claim 1 wherein the fixed pulley block unit comprises a frame, an axle, and at least one pulley rotatable around the axle.

US 6,598,264 B2

7

7. The device according to claim 6 wherein the axle is located within the frame.

8. The device according to claim 1 wherein the fixed pulley block unit is connected to the channel with a support member.

9. The device according to claim 1 wherein the translatable pulley block unit comprises a frame, an axle within the frame, and at least one pulley rotatable around the axle.

10. The device according to claim 1 wherein the top guide includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel.

11. The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide.

12. A window assembly comprising:

a window frame with two jambs with jamb pockets;

at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and

at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: channel comprising a first end and a second end;

a top guide connected to the first end of the channel;

a bottom guide connected to the second end of the channel;

a bottom guide roller rotatably mounted in the bottom guide;

a fixed pulley block unit connected to the channel;

a translatable pulley block unit moveable within the channel;

a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and

a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

13. A window balance device comprising:

a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and

8

a bottom guide roller rotatably mounted in the bottom guide.

14. The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto.

15. The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto.

16. The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed.

17. The device of claim 13 wherein the bottom guide further comprises a bottom guide axle for mounting the roller.

18. A window balance device comprising:

a channel comprising a first end and a second end;

a top guide connected to the first end of the channel;

a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and

a bottom guide roller rotatably mounted in the bottom guide.

19. The device of claim 18 wherein the bottom guide roller is located external to the channel.

20. The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel.

21. The device of claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed.

22. The device of claim 18 wherein the bottom guide further comprises a bottom guide axle for mounting the roller.

23. A window balance device comprising:

a bottom guide connected to an end of a window balance channel, the bottom guide slidable in a jamb pocket when installed in a window frame, the bottom guide including:

a bottom guide axle mounted within the bottom guide, the bottom guide axle located outside the window balance channel; and

a bottom guide roller rotatably mounted on the bottom guide axle.

*   *   *   *   *

# EXHIBIT 5



US005365638A

# United States Patent [19]

## Braid et al.

| [11] | Patent Number: | 5,365,638 |
|---|---|---|
| [45] | Date of Patent: | Nov. 22, 1994 |

[54] **SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS**

[76] Inventors: **Harold K. Braid,** The Sheilings, Braceborough, Lincolnshire, PE9 4NT; **Simon C. Braid,** 13, Crowson Way, Deeping, St. James, Lincolnshire, both of England

[21] Appl. No.: **7,628**

[22] Filed: **Jan. 21, 1993**

[30] **Foreign Application Priority Data**

Jan. 21, 1992 [GB] United Kingdom ............ 9201208.7
Feb. 25, 1992 [GB] United Kingdom ............ 9204006.2
Mar. 4, 1992 [GB] United Kingdom ............ 9204687.9

[51] Int. Cl.5 ................................................ E05D 13/00
[52] U.S. Cl. ........................................................ 16/197
[58] Field of Search ........................ 16/197, DIG. 16

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,732,594 | 1/1956 | Adams et al. | .......................... 16/197 |
| 2,873,472 | 2/1959 | Foster | .......................... 16/197 |
| 3,452,480 | 7/1969 | Foster | .......................... 16/197 |
| 3,992,751 | 11/1976 | Foster et al. | .......................... 16/197 |
| 4,227,345 | 10/1980 | Durham | . |
| 5,157,808 | 10/1992 | Sterner | .......................... 16/197 |

### FOREIGN PATENT DOCUMENTS

825513 12/1959 United Kingdom .
1505782 3/1978 United Kingdom .
2253874 9/1992 United Kingdom .

*Primary Examiner*—P. Austin Bradley
*Assistant Examiner*—Chuck Y. Mah
*Attorney, Agent, or Firm*—Steven H. Bazerman

[57] **ABSTRACT**

A mounting element and assembly for a sash frame tensioner used in a sash window frame to support the window in any desired open position, the assembly comprising a channel section member and a sash frame support element slidable in said channel section member. A coiled ribbon spring having a free outer end thereof engaged with said sash frame support member, and a mounting element, the mounting being disposed between the sash frame support member and a coiled body portion of said coiled ribbon spring with a free end of said coiled ribbon spring disposed alongside said mounting, said mounting being secured to said channel section member, directly or indirectly, and in use impinging upon an outer surface of said coiled body portion to retain said coiled body portion in position during uncoiling of said coiled ribbon spring as said sash support member is moved away from said coiled body portion.

**8 Claims, 4 Drawing Sheets**







FIG.1.

FIG.2.

FIG.3.



FIG.4.



FIG.5.



FIG.6.



FIG.7.



FIG.8.

95        95



110

102

FIG.9.

100

95        95

112    108



FIG.10.



FIG.11.



FIG.12.

5,365,638

1

## SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS

### BACKGROUND OF THE INVENTION

The invention relates to a mounting for a coiled ribbon spring and is particularly, though not exclusively, applicable to sash springs used in sash frame tensioning arrangements for windows.

Such coiled ribbon springs are in the form of a flat coil with one open area at their center and two free ends, an outer one on the outside of the coil and one on the inside; the springs being similar in construction to clock springs except that the inner free end is not (as in a clock spring) secured to a fixed point.

It is known in the art to mount such coiled ribbon springs on a drum within a hollow channel in a window frame by means of a screw or other fixing, about which the spring is able to uncoil as an outer free end of the spring attached to a window sash moves away from the coil as the sash is moved. The drum may be arranged to be stationary or to rotate with the spring, through the drum is provided only to guide the spring and is not operatively secured thereto (thus, if the spring were unwound too far, it would be unwound completely from the drum).

It is a feature of these known mountings that the spring is supported from the open space within the coil so that an upper part of the coil rests on the drum with a lower part of the coil slung below the drum and not supported thereby. It is, as stated above, a feature of such springs that the inner free end of the spring is not secured to any point (on the drum or elsewhere) such springs being referred to in some instances as "constant tension" springs.

The drum is merely to provide a reaction member and as a means of retaining the body of the spring loosely in position in the channel as its free outer end is uncoiled.

It has been a disadvantage of this known type of mounting that the spring is not silent in use, possibly due to relative movement between the inner, free end of the spring and the spring support drum.

The present invention seeks to overcome this disadvantage.

### SUMMARY OF THE INVENTION

The invention provides a mounting assembly comprising a channel section member, a sash frame support element slidable in said channel section member, a coiled ribbon spring having a free outer end thereof engaged with said sash frame support member, and a mounting element, the mounting being disposed between the sash frame support member and a coiled body portion of said coiled ribbon spring with a free end of said coiled ribbon spring disposed alongside said mounting, said mounting being secured to said channel section member, directly or indirectly, and in use impinging upon an outer surface of said coiled body portion to retain said coiled body portion in position during uncoiling of said coiled ribbon spring as said sash support member is moved away from said coiled body portion.

The present invention also provides a mounting element for use in the assembly set forth above, the mounting comprising a body portion having means for securing the mounting in a channel portion of a sash frame or

2

other abutment and having a support surface disposed so as to impinge upon an outer surface of the spring coil.

In normal circumstances the channel section member will in use be mounted substantially vertically and thus said mounting element will support an outer undersurface of said coiled body portion from below. Thus, normally the sash frame support member will be disposed in use beneath the mounting element which is itself disposed beneath the coiled body portion.

It will be understood that the mounting element is to be operatively disposed between the spring body portion and the sash frame support member.

Preferably, the mounting element comprises a body portion having an aperture therein to receive, in use, a fixing screw by which the mounting element may be secured to said frame or abutment, an upper surface of the body portion being concavely curved to support the curved outer undersurface of the spring, thus providing said support surface.

In this inventive arrangement the spring merely rests on the mounting element which acts as a reaction member which the spring abuts as a free outer end, attached to the sash, is unwound. (Ideally, there is a slight tension in the spring when at rest so there is no likelihood of the spring being displaced should the sash from be inverted for any reason).

The mounting element may be provided with inter-engagement formations by which a plurality of such elements may be stackingly inter-engaged, thus enabling a plurality of coiled ribbon springs to be used at a single location, only one fixing element or screw being required to secure the said stack against movement as the sash frame support member moves. The inter-engagement formations may be in the form of tooth-like projections cooperable with corresponding complementary detentes in another such mounting element. The inter-engagement formations may in addition or as an alternative be formed so as to provide an interference fit with formations of another mounting element or a "snap fit" therewith.

Alternatively, the mounting element may be configured such that there is a hub portion having an aperture therein to receive, in use, a fixing screw by which the mounting element may be secured to the frame or abutment; the hub portion being disposed such that in use the spring encircles such hub portion, the mounting element having an arm portion slung below said hub portion and disposed so as to support said outer undersurface of said spring.

In this arrangement, the hub portion loosely impales the spring body portion but in normal circumstances the hub portion does not support the spring, all the support is rendered by the arm portion slung below the hub portion. (In fact, in certain instances, i.e., when the spring is fully extended, the hub portion may also provide some minor support, though this is not its function).

The mounting element may be provided with formations conformed so as to cooperate with a portion of the sash frame within which the element is to be received, such that contact of said formations with said sash frame inhibits in a rotational, pivoting, or twisting sense of the element relative to the sash frame.

It will be apparent that the mounting element does not rotate or otherwise move with the spring but is substantially stationary when the spring is in operation.

5,365,638

| 3 | 4 |

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention will now be described by way of example only and with reference to the accompanying drawings in which:

FIG. 1 is a schematic side elevational view shown partly broken away of an assembly according to the invention showing a coiled ribbon spring supported by a mounting element according to the invention in a vertical channel section of a sash window;

FIG. 2 is a perspective view of the mounting element shown in FIG. 1;

FIG. 3 is a schematic side elevational view shown partly broken away of a mounting assembly for a coiled ribbon spring, showing a second mounting element according to the invention;

FIG. 4 is an exploded schematic view of the mounting assembly shown in FIG. 3;

FIG. 5 is a sectional view on line V—V of FIG. 3 with the coiled ribbon spring removed;

FIG. 6 is a schematic view on an enlarged scale of a portion of the mounting assembly shown in FIGS. 3, 4 and 5;

FIG. 7 is a schematic perspective view on an enlarged scale of a third mounting element according to the invention;

FIG. 8 is a schematic front view of a fourth mounting element similar to said third mounting element, according to the invention;

FIG. 9 is a partial schematic front view of a fifth mounting element similar to said third and fourth mounting elements according to the invention;

FIG. 10 is a schematic perspective view of the element of FIG. 9 shown on a larger scale and partially broken away so as to foreshorten the element;

FIG. 11 is a schematic perspective view of a fifth mounting element according to the invention being similar to that shown in FIG. 10 with certain differences; and

FIG. 12 is a partial front elevational view of a further mounting element similar to those shown in FIGS. 7 and 8 with certain differences.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The mounting assembly shown in FIG. 1 comprises a mounting element shown generally as M having a body portion 10 having a bore 12 therein to receive a fixing screw 14 by means of which the mounting element may be secured to a channel section 16 of a sash frame. The mounting element is dimensioned so as to be capable of insertion into the channel section from the side (i.e., without the necessity to slide the mounting element in from the end of the channel section).

The mounting is shown so fixed in FIG. 1. The body portion 10 has two upstanding walls 18 and disposed therebetween is a support surface 20 which is concavely curved to receive a coiled body portion 22 of a coiled ribbon spring shown generally as S, such that the coiled body portion 22 rests on said surface 20 between said walls. An outer free end 24 of the coiled ribbon spring S is provided with a hooked end 26 engageable with a sash frame support element 28 which forms part of a sliding sash. The sash frame support element 28 is slidable in the channel section 16 back and forth in the directions of arrows A, A', to move the sash.

It is to be noted that only a few coils of the coiled ribbon spring have been shown in the figures for sim-

plicity. In practice, many more coils wold be provided. Also, the thickness of the coiled ribbon spring has been exaggerated.

As the sash frame support element 28 (and so the sash) is moved downwardly in the direction of arrow A the coiled ribbon spring unwinds.

It may be the case during this unwinding that the curvature of the undersurface of the coiled body portion 22 does not conform exactly to the curvature of the surface 20. This is of no particular importance as the mounting only has a guiding and support function. It will e noted that the coiled ribbon spring is not supported from within the coil (shown generally as 30) as it is in the prior art. In the embodiment shown in FIGS. 3 to 6, the mounting element is in two parts 50, 52 which inter-engage to form a body portion 54 of reel-like structure but having a tube-like hub 56 which, in use, loosely impales a body portion of the coiled ribbon spring 58 but provides no support therefor.

A support portion 60 is provided slung below (when used in vertical sash frames as is usual) the tube 56 on part 52 and is provided with a curved support surface 62 the counterpart of the support surface 20 in the first embodiment. There is then provided on part 50 a bracing portion 64 inter-engageable with the under surface of the support portion 60 (see FIG. 5). As will be seen from FIG. 3 an outer undersurface of the coiled body portion of the coiled ribbon spring rests on the support surface 62, and is supported thereby. The hub 56 receives in use a fixing screw 64 by which the mounting may be fixed to a channel section member. FIG. 6 shows portions of coils 66, 68 and 70 of the spring, coil 70 being the outermost and having its outer undersurface supported by the support surface 62.

The mounting element shown in FIG. 7 is similar to that shown in FIGS. 1 and 2 except firstly that upstanding walls 78ᵃ and 78ᵇ are dissimilar and secondly that inter-engagement formations 80 are provided to enable a plurality of said elements to inter-engage in a stacked manner.

One of the upstanding walls 78ᵃ which is intended to lie against a back surface 82 (shown in broken line) of a channel section frame (shown as 84 in part hatched line) is provided with a pair of lateral ears 86 (only one of which is shown full line) which are intended to prevent rotation of the mounting element about a fixing screw (not shown) received, in use, in recessed bore 88. A concavely curved surface 20' is provided in similar manner to the embodiment of FIGS. 1 and 2. A second upstanding wall 78ᵇ has greater thickness than upstanding wall 78ᵃ and is provided with a plurality of tooth-like inter-engagement formations 80. There is provided a rebate 89 of a depth equal to the thickness of the upstanding wall 78ᵇ and provided with a plurality of detentes 90 corresponding to formations 80 such that the formations of one element as shown in FIG. 7 can engage in detentes 90 of another identical element lying above the first element. Thus, two or more coiled ribbon springs can be mounted one above the other with their mounting elements inter-engaged and only a lower one of said mounting elements need be secured with a screw as hereinbefore described.

FIG. 8 shows a fourth mounting element in accordance with the invention. This is closely similar to that shown in FIG. 7 except that at lower corner regions shown generally as 95, the element is rounded off for ease of insertion of the element into the sash frame.

5,365,638

| 5 | 6 |

The mounting element 100 shown in FIGS. 9 and 10 is similar to those of FIGS. 7 and 8 and some of those portions of the element similar to those provided in the elements shown in FIGS. 7 and 8 have been labelled with the same reference numerals. The mounting element 100 is devoid of the lateral ears 86 but instead is provided with a raised spine formation 102 whose width W is arranged such that it is a snug fit between open lip portions 104 of a channel section sash frame member 5 (shown in broken line in FIG. 10) within which the mounting element is to be operatively received. Thus, rotational, pivoting or twisting motion of the element 100 within the sash frame member 5 is inhibited. The element 100 is secured in the sash frame member 5 by a screw or other suitable fixing via a bore 108 in a similar manner to that of the element shown in FIG. 7. In the mounting element 100 a single inter-engagement projection formation 110 is provided, which is cooperable with a corresponding recess formation 112 of a second such element, so that elements can be "stacked" as in previous embodiments.

The mounting element 110 shown in FIG. 11 is similar to that shown in FIG. 10 except that the upstanding wall 78$^b$ is provided entirely by said raised spine formation 102. This is especially useful where space is limited, i.e., the depth of the coiled ribbon spring approaches the depth of the channel section sash frame member.

The mounting element shown in FIG. 12 is similar to those shown in FIGS. 7 and 8 and the same reference numerals have been used to indicate corresponding portions thereof. It has the rounded off regions 95 of the mounting element shown in FIG. 8 but differs in that it has a locating rib 102 like that shown in FIGS. 9 and 10 and the curved surface 20' (shown in broken line) is truncated at outer regions thereof by sloping shoulders 21 (shown in broken line). These enable a free end of a spring, supported by the mounting element in use, to be more easily fed between the mounting element and a wall 17 of a channel section 16, providing a funnel-like provision.

It will readily be apparent that the inter-engagement formations need not be as shown in the Figures but may be of any suitable shape, and number.

They may also be made to be interlocking, releasable or otherwise. It is to be understood that in the channel section partly shown in broken line in FIG. 7 the front retaining flanges shown in FIG. 1 at F have not been shown.

It will be noted that in none of the embodiments does the mounting element move with the spring.

It will be apparent that other methods of securing the mountings to a frame or abutment may be used. For example, two or more screw or other fixings would prevent any tendency for the mountings to move or rotate in use. Alternatively, pegs, spigots or catches could be used.

The previous descriptions of the preferred embodiments of the present invention are for purposes of illustration and are limited only by the provisions of the following claims.

What is claimed is:

1. A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having a first end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited.

2. The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means.

3. The mounting assembly of claim 2 wherein said mounting means has a body portion having an aperture therein, a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, a surface of said body portion being concavely curved, said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion.

4. The mounting assembly of claim 2 in which the mounting means has at least one inter-engagement means by which a plurality of such mounting means may be stacked in inter-engagement.

5. The mounting assembly of claim 4 in which the inter-engagement means comprises a tooth-like projection cooperable on said first mounting means with a corresponding complementary detente in a second mounting means.

6. The mounting assembly of claim 4 in which the inter-engagement means on said first mounting means is in an interference fit with an inter-engagement means on said second mounting means.

7. The mounting assembly of claim 4 in which the inter-engagement means is formed so as to provide a snap fit.

8. A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, said mounting means being secured in said channel means and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited.

* * * * *

65

# EXHIBIT 6

00001

1

2          UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - - - - - -x
      AMESBURY GROUP, INC., and

4    AMESBURY SPRINGS LTD.,
          Plaintiffs,

5
          v.    Civil Action No. 05-10020-DPW

6
      THE CALDWELL MANUFACTURING

7    COMPANY,
          Defendant.

8    - - - - - - - - - - - - - - - - - - -x
          C O N F I D E N T I A L

9
      Deposition Upon Oral Examination Of:

10          Charles E. Still

11
      Location:    Harris Beach PLLC

12              99 Garnsey Road
              Pittsford, New York  14534

13

14   Date:        May 2, 2006

15

16   Time:        9:11 a.m.

17

18

19   Reported By:   Joanne N. Pero

20              Alliance Shorthand, Inc.

21              Suite 1500 - The Penthouse

22              Alliance Building

23              183 Main Street East

24              Rochester, New York  14604

25

00077

1

2    A.  It is to help the molding of -- injection

3  molding and also to help support the counter-sunk

4  screw area.

5    Q.  How do you know that?

6    A.  Just being a designer.

7    Q.  Did you ask anybody at Caldwell about

8  that?

9    A.  No.

10    Q.  Did anyone at Caldwell explain to you why

11  they put the spine there?

12    A.  No.

13    Q.  If the dust cover became flexible enough

14  to permit some rotation of the mounting member, in

15  the sample I am showing you, the raised spine would

16  inhibit that rotation; isn't that correct?

17    A.  It would be meaningless but it possibly

18  could.  I can't say it couldn't.

19    Q.  So if we return to Exhibit A to your

20  report that we designated as Exhibit 9 -- we had

21  gone through all of claim 1 in your Exhibit A

22  before we began to look at that sample; do you

23  recall that?

24    A.  Yes.

25    Q.  And by your description in Exhibit A, the

00078

1

2  Caldwell Quick-Tilt balance includes all the

3  features of claim 1 other than the raised spine

4  that inhibits rotation; is that correct?

5      A.  That's right.

6      Q.  And in fact, throughout your claim charts

7  concerning infringement -- strike that.

8          Throughout your claim charts relating to

9  your opinion that Caldwell's Quick-Tilts do not

10  infringe Amesbury's '638 patent, the only feature

11  of any of those claims that you contend Caldwell's

12  Quick-Tilt products omit is a raised spine that

13  inhibits rotation, isn't that right?

14      A.  That's right.

15      Q.  You concede that the products include all

16  of the other limitations of the asserted claims,

17  correct?

18      A.  Yes.

19  (The following exhibit was marked for

20  identification:  Still 11.)

21      Q.  Mr. Still, I would like you to look at a

22  document we have marked Still Exhibit 11.  It bears

23  the title "Expert Witness Report of Charles E.

24  Still" and is dated March 8 of 2006.  Do you

25  recognize that?

00126

1

2  relative to the channel, correct?

3      A.  Yes.

4      Q.  The second end of the spring is connected

5  to the translatable pulley block unit, correct?

6      A.  Yes.

7      Q.  Caldwell's 86xt further includes a cord,

8  correct?

9      A.  Yes.

10     Q.  The cord includes first and second ends,

11  correct?

12     A.  Yes.

13     Q.  The cord is threaded through the

14  translatable pulley block unit, correct?

15     A.  Yes.

16     Q.  And the fixed pulley block unit, correct?

17     A.  Yes.

18     Q.  And the cord extends around the pulley

19  block bottom pulley, right?

20     A.  Yes.

21     Q.  And you contend that pulley is not a

22  roller, right?

23     A.  That is correct.

24     Q.  The first end of the cord is attached to

25  the translatable pulley block unit, correct?

00127

1

2   A.  Yes.

3   Q.  And the second end of the cord is

4 attached to the jamb, correct?

5   A.  Yes.

6   Q.  So the only element of Amesbury's '264

7 patent claim 1 that you contend is absent from

8 Caldwell's Series 86xt balance is the bottom roller

9 being mounted in the bottom guide, correct?

10   A.  That is correct.

11   Q.  You concede that all the other elements

12 of the claim are incorporated in Caldwell's 86xt

13 balance system; isn't that correct?

14   A.  Yes.

15   Q.  And if we were to go through all of these

16 claims in your Exhibit B, we would find that the

17 only element of Amesbury's '264 patent claims that

18 you contend is omitted from Caldwell's Series 86xt

19 balance is the bottom roller mounted in the bottom

20 guide, correct?

21   A.  Yes.

22   Q.  You concede that all other elements

23 appear in the Caldwell 86xt balance system,

24 correct?

25   A.  Yes.

00128

1

2     Q.  I would like to show you --

3     (The following exhibit was marked for

4     identification:  Still 19.)

5     Q.  We have marked as Still Deposition

6  Exhibit 19 a copy of U.S. patent 6,820,368; do you

7  have that before you?

8     A.  Yes.

9     Q.  Do you recognize that to be the third of

10  the three patents that Amesbury accuses Caldwell in

11  this litigation of infringing?

12     A.  Yes.

13     Q.  You did not submit any report concerning

14  any opinion you might have concerning the validity

15  of this patent, correct?

16     A.  I did not.

17     Q.  Did anyone at Caldwell or Harris Beach

18  ask you to consider the validity of this patent?

19     A.  No.

20     Q.  Did you investigate any prior art in

21  connection with considering the validity of this

22  patent?

23     A.  I did.

24     Q.  What prior art did you investigate?

25     A.  It was the inverted balance patent

00138

1

2   Q.  A locking member has two opposing ends;

3 isn't that right?

4   A.  Yes.

5   Q.  And the ends are integrally connected by

6 a spring member; is that right?

7   A.  Yes.

8   Q.  Referring to the row of your chart that

9 you prepared corresponding to claim 8, you agree,

10 do you not, that Caldwell's Series 97i balance

11 includes a cam that is partially housed within the

12 enlarged first end of the carrier frame?

13   A.  Yes.

14   Q.  The cam forces the opposing ends of the

15 locking member to engage a jamb track when the

16 balance carrier is installed in the window jamb;

17 isn't that correct?

18   A.  Yes.

19   Q.  And finally with the three rows of your

20 Exhibit C that you prepared corresponding to claim

21 11 of the '368 patent, you agree that Caldwell's

22 Series 97i balance includes a cam having at least

23 one camming surface, correct?

24   A.  Yes.

25   Q.  And a QA opening size to receive a pivot

00139

1

2  bar; isn't that right?

3     A.  Yes.

4     Q.  Now, Still Deposition Exhibit 21

5  corresponds to the Caldwell 97ez balance that you

6  inspected in connection with forming your opinion

7  concerning non-infringement; isn't that right?

8     A.  That is correct.

9     Q.  And you prepared the right-hand column of

10  Exhibit D in your expert report to describe your

11  understanding of the structure and operation of the

12  97ez that we have designated as Still Deposition

13  Exhibit 21, correct?

14     A.  Yes.

15     Q.  And again, the only elements of the

16  asserted patent claims that you contend are absent

17  from Caldwell's 97ez balance are first the pocket,

18  correct?

19     A.  Yes.

20     Q.  And second, the connecting device,

21  correct?

22     A.  Yes.

23     Q.  But you concede that all of the other

24  elements of the claims asserted by Amesbury in this

25  litigation are incorporated in the Caldwell 97ez

**Still, Charles E., 5/2/06**                    **Page 139**

00140
1

2   balance that we designated as Still Deposition

3   Exhibit 21, correct?

4       A.  Yes.  In addition to the fact it does not

5   rotate and it is not replaceable in the field.  The

6   97ez is not replaceable in the field, you have to

7   replace the entire balance.

8       Q.  Now, in the 97ez includes a channel,

9   correct?

10      A.  Yes.

11      Q.  And it includes a shoe, correct?

12      A.  Yes.

13      Q.  And the shoe is connected to the channel,

14  correct?

15      A.  Yes.

16      Q.  And it's connected with a rivet?

17      A.  Yes.

18      Q.  And we have confirmed that a rivet can be

19  a device, have we not?

20      A.  Yes.

21      Q.  If you could further describe for me

22  generally how the shoe of the 97ez is connected to

23  the channel of the 97ez?

24      A.  There is one rivet that goes through both

25  walls of the steel channel that passes through an

# EXHIBIT 7

00001
 1

 2          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 3     - - - - - - - - - - - - - - - - - - - -x
       AMESBURY GROUP, INC., and
 4     AMESBURY SPRINGS LTD.,
               Plaintiffs,

 5
               v.    Civil Action No. 05-10020-DPW

 6
       THE CALDWELL MANUFACTURING
 7     COMPANY,
               Defendant.
 8     - - - - - - - - - - - - - - - - - - - -x
              C O N F I D E N T I A L
 9
       Videotaped Deposition Upon Oral Examination Of:
10          Thomas F. Batten

11
       Location:    Harris Beach PLLC
12              99 Garnsey Road
               Pittsford, New York  14534
13

14     Date:        November 8, 2005

15

16     Time:        9:37 a.m.

17

18

19     Reported By:   Joanne N. Pero

20            Alliance Shorthand, Inc.

21            Suite 1500 - The Penthouse

22            Alliance Building

23            183 Main Street East

24            Rochester, New York  14604

25


                    **Batten, Thomas S., 11/08/05**                    **Page 1**

00005
1

2    Q.  Have you ever been deposed in any other

3  circumstance?

4    A.  No.

5    Q.  You are Caldwell's Vice President of

6  Engineering; is that correct?

7    A.  That is correct.

8    Q.  When did you become Vice President of

9  Engineering?

10    A.  1995.  August, 1995.

11    Q.  Did you hold any other positions at

12  Caldwell prior to becoming Vice President of

13  Engineering?

14    A.  No.

15    Q.  What did you do before you were hired at

16  Caldwell as Vice President of Engineering?

17    A.  I worked for the Milton Roy Company here

18  in Rochester as Director of Engineering.

19    Q.  What does Milton Roy Company do?

20    A.  The division that I worked for, designed

21  and manufactured medical instrumentation.

22    Q.  How long were you at Milton Roy Company?

23    A.  Approximately one and a half years.

24    Q.  What did you do prior to working at

25  Milton Roy Company?

00006

1

2    A.  Prior to Milton Roy, I was at Leica.

3    Q.  What was your position at Leica?

4    A.  Director of Research and Development.

5    Q.  Did you hold that position during your

6  entire time at Leica?

7    A.  No.

8    Q.  How long were you Director of Research

9  and Development at Leica?

10    A.  On the order of five to seven years.  I

11  have to check my records.

12    Q.  What was your position at Leica prior to

13  being Director of Research and Development?

14    A.  Prior to that, I was the Manager of

15  Manufacturing Engineering.

16    Q.  What did Leica, Inc. make or do; what was

17  their business?

18    A.  The company itself was a global

19  multi-divisional business.  The division I was

20  employed in manufactured optical and electronic

21  products.  Specifically microscopes and some other

22  lab and analytical equipment.

23    Q.  Prior to Leica, what was your employment?

24    A.  It is going back quite a while.  My

25  employment at Leica comprised about 13 years and

00007
1

2  before that, it would be Union Carbide Corporation.

3      Q.  What did you do at Union Carbide?

4      A.  I was a manufacturing engineer.

5      Q.  What sort of products did you work on at

6  Union Carbide?

7      A.  The division I was employed in made solid

8  tantalum capacitors, an electronic component.

9      Q.  Have you ever worked for any other

10  employer that makes window balances prior to moving

11  to Caldwell in 1995?

12      A.  No.

13      Q.  So that was quite a change?

14          MR. SLIFKIN:  Objection.

15      A.  Sure.  It was a different industry,

16  different product, yes.

17      Q.  I take it from your employment background

18  that you have some engineering education; is that

19  correct?

20      A.  That is correct.

21      Q.  What degrees do you hold in engineering?

22      A.  I hold a Bachelor's in mechanical

23  engineering.

24      Q.  Where did you receive that degree from?

25      A.  Georgia Tech.

**Batten, Thomas S., 11/08/05**                    **Page 7**

00008
 1
 2    Q.  When did you receive that degree?

 3    A.  1978.

 4    Q.  Do you have any other engineering

 5 degrees?

 6    A.  I do not.

 7    Q.  Do you have any other degrees of any

 8 sort?

 9    A.  Yes.

10    Q.  What are those?

11    A.  I have an MBA.

12    Q.  Where did you receive your MBA?

13    A.  University of Phoenix.

14    Q.  When did you receive your MBA?

15    A.  Approximately 1999.

16    Q.  Any other degrees?

17    A.  I am also licensed, which is

18 not literally a degree, but I am a licensed

19 professional engineer.

20    Q.  What exactly does that mean?

21    A.  A licensed engineer is required if you

22 are practicing engineering in the public domain,

23 similar to a CPA or any other profession that

24 practices in the public.

25    Q.  After receiving your degree from Georgia

00009
1

2 Tech, did you take any other classes, whether

3 continuing education or anything else of that sort,

4 in engineering?

5    A.  I did, yes.

6    Q.  What classes were those?

7    A.  Just a few classes in -- I don't remember

8 the specific disciplines but they were Master's

9 level mechanical engineering programs.

10    Q.  I take it you are comfortable reading an

11 engineering drawing?

12    A.  Yes, I am.

13    Q.  What are your job responsibilities as

14 Vice President of Engineering at Caldwell?

15    A.  Generally, there is two separate

16 divisions of my responsibilities.  One relates to

17 the design and development of products and the

18 other relates to the design and development of

19 manufacturing processes and equipment.

20    Q.  With respect to design and development of

21 products, can you break that down for me a little

22 more.  What sort of day-to-day responsibilities do

23 you have under that prong of your job?

24    A.  Well, it would be managing projects or

25 activities related to product redesigns or new

**Batten, Thomas S., 11/08/05**                    **Page 9**

00010
1

2 product designs and it would also have to do with

3 supporting current manufacturing activities as it

4 relates to products.

5    Q.  So part of your responsibility

6 specifically relates to developing new Caldwell

7 products?

8    A.  That is correct.

9    Q.  As part of that role, do you have a -- do

10 you have a role in deciding what new products

11 Caldwell will develop?

12    A.  I have some role in that, yes, partially.

13    Q.  What is your role in deciding what

14 products Caldwell will develop?

15    A.  The decisions typically are made by teams

16 of people at Caldwell comprising different

17 functions of the business, so the engineering

18 community has some say, the sales and marketing has

19 some say, the manufacturing has some say, so it's a

20 cross-functional activity, kind of a committee, if

21 you will.

22    Q.  Is there a typical process for developing

23 a new product; for example, does it usually get

24 initiated by engineering or the sales team?

25    A.  I would say it is not -- there is nothing

# EXHIBIT 8

00001

1

2　　　　　UNITED STATES DISTRICT COURT
　　　　FOR THE DISTRICT OF MASSACHUSETTS

3　- - - - - - - - - - - - - - - - - - - -x
　AMESBURY GROUP, INC., and

4　AMESBURY SPRINGS LTD.,
　　　　Plaintiffs,

5

　　　　v.　　Civil Action No. 05-10020-DPW

6

　THE CALDWELL MANUFACTURING

7　COMPANY,
　　　　Defendant.

8　- - - - - - - - - - - - - - - - - - - -x
　　　　　CONFIDENTIAL

9

　Videotaped Deposition Upon Oral Examination Of:

10　　　　Jeffrey Robertson

11

　Location:　　Alliance Shorthand, Inc.

12　　　　　183 East Main Street
　　　　Rochester, New York　14604

13

14　Date:　　　November 29, 2005

15

16　Time:　　　9:35 a.m.

17

18　　　　　　　　　　　　　.

19　Reported By:　Joanne N. Pero

20　　　　Alliance Shorthand, Inc.

21　　　　Suite 1500 - The Penthouse

22　　　　Alliance Building

23　　　　183 Main Street East

24　　　　Rochester, New York　14604

25

00006
1

2      A.  "You are commanded to produce and permit

3   inspection and copying of the following documents

4   or objects at the place, date and time specified

5   below."

6      Q.  And below that, it says "See Schedule A

7   attached hereto"; is that correct?

8      A.  Yes.

9      Q.  Did you review Schedule A?

10     A.  Yes.

11     Q.  Did you bring any documents with you

12  responsive --

13     A.  No, I have no documents.

14     Q.  Did you discuss this deposition with

15  anyone besides your attorney?

16     A.  No.

17     Q.  Mr. Robertson, I am going to ask now some

18  questions about your general education background.

19  Where did you go to college?

20     A.  University of Maine.

21     Q.  What did you study there?

22     A.  Mechanical engineering.

23     Q.  Did you receive a degree?

24     A.  Bachelor of Science in mechanical

25  engineering.

00007
1

2    Q.  Did you have further formal education?

3    A.  Yes.

4    Q.  Where?

5    A.  I took graduate courses at the University

6 of Maine.

7    Q.  Did you achieve a degree there?

8    A.  No.

9    Q.  How many graduate courses did you take?

10    A.  36 credits.

11    Q.  And in what field?

12    A.  Mechanical engineering subjects.

13    Q.  Now, after graduate school, did you

14 become employed?

15    A.  Yes.

16    Q.  And where?

17    A.  Eastman Kodak.

18    Q.  What was your position there?

19    A.  It was called a development engineer.

20    Q.  What years were you at Eastman Kodak?

21    A.  1969 through 1999.

22    Q.  Just to clear it up, did you graduate --

23 did you leave graduate school in 1969?

24    A.  Yes.

25    Q.  Did you say 1969 through 1999?

00008
1

2    A.  (Indicating).  Yes.

3    Q.  After leaving Eastman Kodak, where did

4 you go?

5    A.  I returned to Eastman Kodak as a

6 contractor for one year.

7        MR. REFERMAT:  Counsel, you mean for

8 employment, right?

9        MR. ISHMAEL:  For employment, yes.

10    Q.  Was this in 1999?

11    A.  Yes.  1999 into 2000.

12    Q.  When you say "returned to Eastman Kodak,"

13 what do you mean?

14    A.  I was a contractor, so my services were

15 contracted to Eastman Kodak.  I worked on the

16 premises.

17    Q.  Who was your employer as a contractor?

18    A.  Burns Employment Agency.

19    Q.  And when did you leave Burns Employment

20 Agency?

21    A.  Middle of the year, I finished my

22 contract at Kodak mid-year 2000.

23    Q.  Mid-year of 2000?

24    A.  Yes.

25    Q.  Where did you go?

**Robertson, Jeffrey, 11/29/05**                    **Page 8**

00009
1

2    A.  My next employment was in the spring of

3  2001 at Caldwell.

4    Q.  What did you do between mid 2000 and the

5  spring of 2001?

6    A.  Tried retirement again.

7    Q.  So in the spring of 2001, you joined

8  Caldwell?

9    A.  Yes.

10    Q.  What was your entry position?

11    A.  An engineer, product engineer.

12    Q.  Was there a particular title?

13    A.  I don't remember if there was.

14      MR. REFERMAT:  Just by "entry position,"

15  you mean when he joined Caldwell?

16      MR. ISHMAEL:  That's right, yes.

17    Q.  What were your responsibilities at

18  Caldwell?

19    A.  I was the product engineer for jamb liner

20  products and constant force balances.

21    Q.  And does that mean you played a part in

22  designing these products?

23    A.  Yes.

24      MR. REFERMAT:  Objection.

25    Q.  Who did you report to at Caldwell?

**Robertson, Jeffrey, 11/29/05**                    **Page 9**

00010

1

2    A.  Tom Batten.

3    Q.  Did you have any employees that reported

4 to you?

5    A.  No.

6    Q.  Were you a member of any project teams or

7 design teams at Caldwell?

8    A.  Yes.

9    Q.  Which ones?

10    A.  Various balance design teams.

11    Q.  Can you list them for me?

12    A.  We had a project on constant force

13 balances, so we had a team of people together to

14 execute that project.

15    Q.  Was it a general project in constant

16 force balances?

17      MR. REFERMAT:  Objection.

18    A.  There was a project on the Roller Tilt

19 product to provide snap features for assembly, for

20 instance.  There were other projects to design

21 carriers for balances.

22      MR. REFERMAT:  Did you understand the

23 question?

24      Is that answering your question?

25      MR. ISHMAEL:  Yes.

# EXHIBIT 9



**CHARLES E. STILL, CONSULTING SERVICES**

2914 PARTRIDGE CIRCLE
BRYAN, TEXAS 77802
PHONE: 979-731-1130
FAX: 979-731-1070
EMAIL: cestill@cox-internet.com

**Charles E. Still**
*Specialist in Fenestration*

April 17, 2006

### Expert Witness Report of Charles E. Still

I, Charles E. Still, have been retained by Harris Beach PLLC to render expert services in conjunction with a patent infringement lawsuit. I hereby provide the following report involving Amesbury's U.S Patent 5,365,638 "Spring Mounting For Sash Frame Tensioning Arrangements", U.S. Patent 6,598,264 B2 "Block And Tackle Window Balance With Bottom Guide Roller" and U.S. Patent 6,820,368 "Snap Lock Balance Shoe And System For A Pivotable Window" pursuant to Rule 26 of the Federal Rules of Civil procedure.

I received a Bachelor of Architecture Degree in 1962 from Texas A&M University in College Station, Texas. I am a graduate of Overton High School, Overton, Texas.

I am the owner of Charles E. Still, Consulting Services based in Bryan, Texas. I have held this position since the inception of the company in July 2001. CES, Consulting Services specializes in fenestration. Windows and Doors are included in the term "fenestration" as well as curtain walls, storefronts and skylights. During my career, I have designed in excess of 200 fenestration products including single hung and double hung windows in aluminum, vinyl and composite materials for Residential, Manufactured Housing and Commercial Window Companies in New Construction and Replacement Markets. I am an expert in all phases of window design. I am a member of AAMA, American Architectural Manufacturers Association. AAMA is a professional trade organization including window manufacturers and suppliers to the window and door industry.

**Prior work history:**

**July 2000-July 2001** *Product Engineering Manager*, Alenco Building Products, Inc. Responsibilities include all phases of Engineering, Design and Development, Tooling and Certification and Documentation for four Manufacturing Plants. Primary products developed



including windows, for new construction residential and commercial industry as well as residential replacement/remodeling market and manufactured housing industry. Primary window materials consists of extruded aluminum, extruded PVC vinyl and wood. Served on the AAMA Southeast Region and Western Boards of Directors. Active in Installation Task Group in AAMA Western Region. Active in AAMA "Installation Masters" certified installers program.

**March 1999-July 2000** *Director of Engineering Support*, Reliant Building Products, Inc. Responsibilities include all product liability case investigations and resolution, giving depositions and court testimony. Search for new product, including window technologies, in design, materials and equipment. Company voting representative to all member trade associations and building codes groups (AAMA, NFRC and IGMA). Responsible for Product Certification and Testing. Licensed Glazing Contractor in the State of California and Arizona.

**1982-1999** *Vice President of Engineering*, Reliant Building Products, Inc., formerly known as Redman Building Products, Inc. Responsibilities includes managing product design and development and installation, product liability and codes compliance to national and state building codes. Active member of AAMA (American architectural manufacturing Association) and served as chairman of numerous task groups and served three times on the National AAMA Board of Directors. Active member of NFRC (National Fenestration Rating Council) involving thermal performance of windows and doors and IGMA, Insulating Glass Manufacturers Association (formerly known as SIGMA, Sealed Insulating Glass Manufacturers Association).

**1979-1982** *Director of Product Design*, Redman Building Products, Inc.. Responsibilities include product design, including windows and development of new construction and replacement/remodeling windows, doors and skylights. Company owned and operated 5 manufacturing plants and 7 sales outlets.

**1974-1979** *Chief Engineer*, Alenco, A Division of Redman Building Products, Inc. Responsibilities include design and development, testing, quality control department, plant maintenance department, plant tooling department, shop drawings department and warranty service department.

**1968-1974** *Chief Design Engineer*, Alenco, a Division of Redman Building Products, Inc.. Responsibilities include all designs of aluminum windows and doors for Residential and Commercial construction as well as Manufactured Housing.

**1964-1968** *Design Engineer*, Alenco, Albritton Engineering Corporation. Responsibilities include design and development of new aluminum windows and doors. Responsible for Office and Plant Expansion Program in Bryan, Texas Facility. Prepared architectural working drawings for Office and Plant Facilities (3 expansions).

The following documents and Samples have been made available to me by the attorneys at Harris Beach.

- U.S. Patent   329,996. A Spring Sash Balance, February 25, 1929
- G.B. Patent 1,218,827. Sash Control Mechanism, July 17, 1967
- G.B. Patent 1,244,324. A Sliding Sash Window, August 11, 1968
- G.B. Patent 1,287,756. Improvements In Or Relating To Doors, August 25, 1969
- U.K. Patent 2,236,786. A. Guide Assembly, September 27, 1989
- U.S. Patent 2,262,990. Window Sash Counterbalance, September 2,1939
- U.S. Patent 2,279,600. Sash Balance, March 30, 1940
- U.K. Patent 2,280,697. Tiltable To Sash Windows, July 27, 1993
- U.K. Patent 2,292,168 A. Pivoting Sash Slide Locking Mechanism, July 31, 1995
- U.S. Patent 2,635,282. Spring Counterbalance, October 2, 1950
- U.S. Patent 2,826,090. Sash Balance Coupling Device, March 21, 1955
- U.S. Patent 3,055,044. Foot Attachment For Block And Tackle Type Spring Counterbalances, September 25, 1960
- U.S. Patent 3,449,862. Window Structure, August 21, 1967
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 3,091,797. Window Structure, April 26, 1961
- U.S. Patent 3,114,178. Sliding Window And Counterbalancer Combination, February 6, 1961
- U.S. Patent 3,358,403. Heavy Window Balance Assembly, January 28, 1966
- U.S. Patent 3,358,404. Readily Removable Double Hung Window, January 28, 1966
- U.S. Patent 3,440,683. Sash Control Mechanism, July 17, 1967
- U.S. Patent 3,449,862. Window Structures, August 11, 1967
- U.S. Patent 3,452,480. Spring Sash Counterbalance, September 14, 1967
- U.S. Patent 3,711,995. Building Structure, June 22, 1070
- U.S. Patent 3,869,754. Bracket For A Spring Sash Counterbalance, September 10, 1973
- U.S. Patent 4,079,549. Balance Spring Lock For Tilt Out Sash, August 26, 1976
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 4,227,345. Tilt-Lock Slide For Window Sash, January 26, 1979
- U.S. Patent 4,300,316. Sash Balance Foot Seal Mechanism, October 17, 1979
- U.S. Patent 4,610,108. Balance Spring Locking Slide Block For Tilt-Out Windows, December 20, 1984
- U.S. Patent 4,654,928. Adjustable Friction Block And Tackle Window Balance System, April 11, 1986
- U.S. Patent 4,704,821. Compression Seals In A Double Hung Style Window, July 3, 1986
- U.S. Patent 4,949,425. Spring Loaded Block And Tackle Window Sash Balance Assembly, October 19, 1988
- U.S. Patent 5,069,001. Pivotable Window Sash Assembly, November 21, 1990
  U.S. Patent 5,157,808. Coil Spring Counterbalance Hardware Assembly And Connection Method Therefore, February 18, 1992

3
1

- U.S. Patent 5,210,976. Window Balance Assembly, June 26, 1992
- U.S. Patent 5,243,783. Locking Slide Block, June 24, 1992
- U.S. Patent 5,301,467. Locking Slide Block, September 2, 1993
- U.S. Patent 5,353,548. Curl Spring Shoe Based Window Balance System, April 1, 1993
- U.S. Patent 5,365,638. Spring Mounting For Sash Frame Tensioning Arrangements, January 21, 1993
- U.S. Patent 5,371,971. Sash Balance Brake And Pivot Pin Assembly, May 4, 1993
- U.S. Patent 5,530,991. Block And Tackle Window Balance, January 21, 1994
- U.S. Patent 5,632,117. Sash Balance Brake Assembly, January 13, 1995
- U.S. Patent 5,661,927. Sliding Counterbalance Assembly For A Sash Window, March 6, 1996
- U.S. Patent 5,669,180. Window Balance Brake Shoe And Pivot Assembly, May 29, 1996
- U.S. Patent 5,737,877. Block And Tackle Balance With Integral, Non-Rotating Pulley System, July 26, 1996
- U.S. Patent 5,806,243. Sash Balance Brake Assembly, May 21, 1997
- U.S. Patent 5,829,196. Window Balance Brake Shoe And Pivot Assembly, May 30, 1997
- U.S. Patent 6,041,476. Inverted Block And Tackle Window Balance, November 21, 1997
- U.S. Patent 6,088,880. Adjustable Shoe For Awning Window Hinge, July 7, 1997
- U.S. Patent 6,151,832. Window Balance Cam Housing, February 19, 1999
- U.S. Patent 6,230,443 B1. Hardware Mounting, May 5, 1999
- U.S. Patent 6,467,128 B1. Block And Tackle Sash Counter Balance, September 11, 2000
- U.S. Patent 6,550,184 B1. Brake Shoe For Sash Window Or Door Assembly, February 9, 2001
- U.S. Patent 6,598,264 B2. Block And Tackle Window Balance With Bottom Guide Roller, March 16, 2001
- U.S. Patent 6,606,761 B2. Spring Mounting Arrangement For A Sash Window Counterbalance Arrangement, October 8, 2001
- U.S. Patent 6,622,342 B1. Block And Tackle Balance Assembly With Brake Shoe, June 6, 2001
- U.S. Patent 66,679,000 B2.
- U.S. Patent 6,820,368 B2. Snap Lock Balance Shoe And System For A Pivotable Window, May 23, 2003
- U.S. Patent 6,840,011 B2. Window Panel Balance Apparatus And Method, December 13, 2000
- U.S. Patent 6,990,710 B2. Counterbalance System For A Tilt-In Window Having An Improved Shoe Assembly And Anchor Mount, November 5, 2003
- Japanese Patent 62-194,895. Title and filing date unknown.
- Caldwell Fenestration Hardware Product Information, Bates C00477 thru C00542.
- Defendant's Second Supplemented Answers To Plaintiffs' First Set Of Interrogatories.

4
1

- Memorandum And Order, January 20, 2006.
- Amesbury's First Supplemental Response To Caldwell's Interrogatories (Nos.1-2)
- Amesbury's Second Supplemental Response To Caldwell's Interrogatories (Nos. 1-2,13-16).
- Defendant's Supplemented Answers To Plaintiffs' First Set Of Interrogatories
- Joint Motion to Set Schedule.
- Patent '264 File History, Bates C000543 thru C000690.
- Patent '638 File History, Bates C000921 thru C001116.
- Case Documents Bates AME 01931 through 01948
- CD files: Documents Produced in Response to Plaintiffs' First Request for documents and Things, dated September 28, 2005
- Expert Report of Dr. Sammy Shina Submitted on Behalf of Plaintiffs in Civil Action No. 05-10020-DPW
- Declaration of Prior Invention in the United States by Jason Annes To Overcome cited Publication Pursuant to 37 C.F.R.1.131
- Caldwell Sales Brochure
- Caldwell Physical Samples of Balance Hardware.

Other documents include:

- Voluntary Specifications for Aluminum, Vinyl (PVC) and Wood Windows and Glass Doors, AAMA/NWWDA 101/I.S.2-97.
- International Residential Code for One and Two Family Dwellings-2000.
- U.S Patent 4,961,247. Balancing Arrangements For Double Hung Windows. December 7, 1989

**U.S. Patent 5,365,638**

**Amesbury's Patent 5,365,638 – Spring Mounting For Sash Frame Tensioning Arrangements** involves a Constant Force Balance that is used in Single Hung and Double Hung Windows with a Tilting Sash. Constant force balances have been available for years and offer an economical solution to counter-balancing sash weight. Constant force balances include a stainless steel coiled spring, a coiled spring mounting in the frame jamb of the window with an attaching screw and a sash carrier (shoe). The window design must have certain design features in order to receive a constant force balance. It must have jamb tracks in the shape of a channel with one side of the channel open, creating flanges on each side. It must have at least one removable operating sash to be pivoted at the lower corner of the sash for tilting the sash inwards for sash removal or for cleaning the exterior sash glass surface from the interior. The mounting that cradles the coiled spring is fastened inside the frame jamb inside the open channel. One outer end of the coiled spring is attached to a sliding sash carrier that connects to the bottom corners of the operating sash. The inner end of the coiled spring is left free and unattached inside the coil. When the sash is lifted upwards towards an open position, the coiled spring retracts inside the mounting and counter-balances the weight of the sash and allows the sash to

5
1

remain open for ventilation. Coil springs can be added in dual or triple configuration to increase the lifting force for a heavier sash.

Prior art demonstrates that there is nothing unique or novel about the '638 Patent. Amesbury contends that Caldwell infringed on their '638 Patent in claim elements 1,2,3 & 8.

The '638 Patent Claims describe the window frame jamb channel, sash frame support (shoe), a coiled ribbon spring, a mounting for the coil and a raised spine as part of the spring mounting.

Claims 1 & 8 of the '638 Patent describe .. *"whereby rotational motion of said mounting means is inhibited"*, which Caldwell denies is contained in its products. Amesbury's '638 Patent design calls for a raised spine as part of the mounting means to inhibit rotational motion of the mounting inside the window frame jamb according to the claims. The mounting depends on the inwardly turned flanges of the open jamb channel to help support the mounting. Caldwell's Quick Tilt design does not depend on the inwardly turned flanges of the open jamb channel for the mounting support and does not infringe the '638 Patent. The molded nylon body of the Caldwell Quick-Tilt spring mounting fits snug <u>inside</u> the open jamb channel to prevent rotation of the mounting. Caldwell's Quick Tilt raised outer spine portion of the mounting is designed to help support the screw fastener, coil nest and aperture through the mounting and does nothing to inhibit rotation of the mounting under load. Standard window designs allow a gap between either side of the raised spine and the ends of the inwardly turned flanges from .050" to .109" (See Exhibits A, G & H).

Therefore, in Caldwell's Quick Tilt product, the spine cannot contact the flanges and cannot prevent rotation of the mounting element.

---

**U.S. Patent 6,598,264 B2**

**Amesbury's Patent 6,598,264 B2- Block And Tackle Window Balance With Bottom Guide Roller** involves a Block and Tackle Balance that is used in Single Hung and Double Hung Windows with a removable sash. Block and Tackle Balances have been used in windows for the past 67 years and have a good track record. The window industry calls this traditional type of balance a "side load" because the sash must be installed and removed by moving the sash to one side of the window to clear the jamb from the opposite side of the window. Block and Tackle balances are popular and are known for their sash weight carrying capacity, long reliable service and are user friendly.

The Block and Tackle Balance described in the '264 Patent has a "C" channel as the main body member, an angled top guide, a bottom guide with a roller, a spring, a fixed pulley block, a translatable pulley block and a cord. One end of the cord is attached to the translatable pulley block and the other end attaches to the frame jamb of the window

6
1

giving the operating sash a mechanical advantage of lifting the sash weight when the sash is being opened or closed.

Prior art demonstrates that there is nothing unique or novel about the '264 Patent. Amesbury contends that Caldwell infringed the '264 Patent, specifically patent claims 1,2,3,4,5,6,7,9,10,11,12,13,14,15,16,18,19,20 & 21.

Claims 1,2,12,13,18 & 19 of the '264 Patent describe... *"a bottom guide roller rotatably mounted in the bottom guide" and... " the bottom guide roller is located external to the channel"* which Caldwell denies is contained in its products. Caldwell's 86XT balance does not have a roller mounted in the bottom guide, and therefore, does not infringe the '264 Patent. Caldwell's 86XT balance has a bottom fixed pulley block with 3 pulleys, the third larger pulley being located immediately below the smaller pulleys and has a portion internal and external to the channel. (See Exhibit B, J & K). Therefore, Caldwell's 86XT balance does not have a roller in the bottom guide and does not infringe the '264 Patent claims.


## U.S. Patent 6,820,368 B2

**Amesbury's Patent 6,820,368 B2 –Snap Lock Balance Shoe And System For A Pivotable Window** involves a Block and Tackle Balance that is used in Single Hung and Double Hung Windows with a removable tilt-in sash. Tilt-in sash windows are popular because they allow the sash to be rotated inward to enable the exterior glass face of the sash to be cleaned from the interior. This type of balance is especially convenient on above grade floors, eliminating the use of ladders when double hung windows are installed.

The '368 Patent is designed with an "inverted" balance concept (see Exhibit E on Prior Art in U.S. Patent 6,041,476 and in '368 Patent Fig. 2A, 7A & 7B) wherein the fixed pulley block is located at the top end of the channel and the spring is located at the bottom end of the channel. The balance shoe is inverted ("T" shaped) and joined to the bottom end of the channel by way of two molded plastic tabs that snap into punched holes in the walls of the channel. The pivoting axis of the shoe is located 13/16" from the end of the channel where a rivet acts as an axle allowing the shoe to rotate. This allows the shoe to be removed for replacement after the window is constructed without modification to the window. The lower portion of the shoe has a cam with a recess for a pivot bar and brake pads.

Caldwell's Series 97I w/ Short Carrier (Shoe) is "T" shaped and is directly connected to the end of the balance channel with one rivet. It does not have snap tabs and does not rotate around a rivet. During factory assembly, a connecting rivet is threaded through a clearance through both outer walls of the carrier. It is designed to be non-removable and does not have a snap-in capability (See Exhibit C, E, F,L & N).
Amesbury contends that Caldwell infringed the '368 Patent, specifically Claims 2, 3,6,7,8, & 11.Claim 2 of the '368 Patent describes ... *"and wherein the second end of the*

*frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate the balance with a rivet;"* which Caldwell denies is contained in its products. Caldwell's Series 97I w/Short Carrier does not infringe the **'368 Patent** because Caldwell's 97I w/ Short Carrier does not have a pocket in its balance carrier (shoe) frame. It has a clearance on both walls of the carrier (shoe) for a connecting rivet.

Caldwell's Series 97EZ w/ Long Carrier (Shoe) is "T" shaped. During factory assembly, a connecting rivet is threaded through an aperture molded into the frame of the carrier. A second rivet through the end of the channel holds the end of the spring as well as supports two legs of the carrier to prevent outward rotation. The carrier is designed to be non-removable and does not have a snap-in capability (See Exhibits D, E, F,M & N). Claims 2 of the **'368 Patent** describes ...*"and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;"* which Caldwell denies is contained in its products. Caldwell's Series 97EZ w/Long Carrier does not infringe the **'368 Patent** because Caldwell's 97EZ w/ Long Carrier does not have a pocket in its balance carrier (shoe) frame. It has an aperture for a rivet and, at the extreme end of the carrier, it has two legs supported by a second rivet (that holds the end of the spring) to prevent outward rotation. Further, the second rivet does not connect the carrier to the channel and does not mate with the carrier legs.

**Opinions**

Based upon my research, past experience and knowledge, it is my opinion that Caldwell's Quick Tilt Products do not infringe Amesbury's Patent 5,365,638.

Based upon my research, past experience and knowledge, it is my opinion that Caldwell's 86XT Balance does not infringe Amesbury's Patent 6,598,264 B2.

Base upon my research, past experience and knowledge, it is my opinion that Caldwell's Series 97EZ Products do not infringe Amesbury's Patent 6,820,368.

I reserve the right to add additional opinions in my investigations and /or upon review of additional discovery materials. Opinions herein are within a reasonable degree of professional certainty.

Signed this17th day of April, 2006

*Chas. E. Still*

Charles E. Still, Consulting Services
2914 Partridge Circle
Bryan, Texas 77802

8
1

Attachments:
Exhibit A-Comparison Chart
Exhibit B-Comparison Chart
Exhibit C-Comparison Chart
Exhibit D-Comparison Chart
Exhibit E- Caldwell Patent 6,041,476
        Amesbury Patent 6,820,368 B2
Exhibit F- Caldwell Pulley Drawing
Exhibit G-  Photo
Exhibit H-  Photo
Exhibit  J-  Photo
Exhibit K- Photo
Exhibit L- Photo
Exhibit M- Photo
Exhibit N- Photo

**Charles E. Still**        **Testimony Given in Depositions and Trials**

| Type | Parties | Type of Claim | Location | Date |
|---|---|---|---|---|
| Deposition | VBP v. Royal Plastic | Patent Infringement | Oakland, New Jersey | |
| Trial | VBP v. Royal Pastics | Patent Infringement | Newark, New Jersey | |
| Deposition | Redman v. ? | Forced Entry/Injury | Albuquerque, New Mexico | |
| Deposition | Redman v. ? | Forced Entry/Injury | Houston, Texas | |
| Deposition | Thiokol v. ? | Glass Breakage | Denver, Colorado | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Trial | Redman v. ? | Personal Injury | Savannah, Georgia | |
| Trial | Redman v. ? | Water Infiltration | Little Rock, Arkansas | |
| Trial | Redman v. ? | Scratched Glass | Waco, Texas | |
| Arbitration | Redman v.? | Glass Breakage | Alexandria, Louisiana | |
| Trial | Redman v. ? | Water Infiltration | Baton Rouge, Louisiana | |
| Deposition | Inmont v. ? | Glass Breakage | Rockwall, Texas | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Deposition | Lamkin v. Gapco | Personal. Injury | Madison County, Illinois | |
| Deposition | Pace v. Gapco | Personal Injury | Madison County, Illinois | |
| Trial | Redman v. ? | Glass Breakage | Salt Lake City, Utah | |
| Deposition | Redman v. ? | Condensation | Baytown, Texas | |

| | | | |
|---|---|---|---|
| Deposition | Redman v. ? | Personal Injury | Detroit, Michigan | |
| Deposition | Redman v. ? | Personal Injury | South Padre Island, Texas | |
| Deposition | Gapco v. ? | Personal Injury | St. Louis, Missouri | |
| Trial | Unique v. Beard | Business Ethics | Roanoke, Virginia | |
| Deposition | Redman v. Somerset | Water Infiltration | Silver Springs, Maryland | |
| Deposition | Reman v. ? | Water Infiltration | San Francisco, California | |
| Deposition | Redman v. ? | Water Infiltration | Fresno, California | |
| Deposition | Bolander v. Champior | Water Infiltration | Houston, Texas | 8/29/2003 |
| Trial | Jason Lamkin v. Gapco | Personal Injury | Belleville, Illinois | 3/15/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, Texas | 4/2/2004 |
| Deposition | All Seasons v. Tradewinds Condo | Code Compliance | Orange Beach, AL | 5/19/2004 |
| Deposition | All Seasons v. Royal Palms Condo | Code Compliance | Gulf Shores, AL | 6/24/2004 |
| Deposition | W.S. Phillips v. Hope Lumber | Water Infiltration | College Station, TX | 10/27/2004 |
| Deposition | W.S. Phillips v. Alenco | Water Infiltration | College Station, TX | 11/30/2004 |
| Deposition | Sungate Development v. All Seasons | Water Infiltration | McAllen, TX | 12/7/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, TX | 2/23/2005 |

| Deposition | Cavalier Homes v. Larson Doors | Product Quality | Haleyville, AL | 5/26/2005 |
| Deposition | Grand Pointe HOA v. All Seasons | Product Liability | Orange Beach, AL | 6/29/2005 |
| Deposition | Donn v. Turner v. General Aluminum | Water Infiltration | Aubrey, TX | 9/9/2005 |
| Arbitration | Hilcom v. Moore | Water Infiltration | Houston, TX | 10/19/2005 |
| Trial | Sandhu v. Wellington | Personal Injury | Toronto, Canada | 11/18/2005 |
| Deposition | Planter's Place HOA v. All Seasons | Water Infiltration | Mt. Pleasant, S.C. | 12/20/2005 |

**EXHIBIT A**

NON-INFRINGEMENT OF
AMESBURY'S U.S. PATENT NO. 5,365,638
BY CALDWELL'S QUICK-TILT PRODUCTS

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/1 | A mounting assembly comprising | A mounting assembly comprising |
| 638/1 | a channel means | a channel means |
| 638/1 | having a rear wall, | having a rear wall, |
| 638/1 | side walls | side walls |
| 638/1 | and at extremities of said side walls, inwardly turned opposed flanges, | and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/1 | a sash frame support means slidable in said channel means, | a sash frame support means slidable in said channel means, |
| 638/1 | a coiled ribbon spring | a coiled ribbon spring |
| 638/1 | having a first end engaged with said sash frame support means, | having a first end engaged with said sash frame support means, |
| 638/1 | and a means for mounting said coiled ribbon spring, | and a means for mounting said coiled ribbon spring, |

1

| Claim Element | US Patent No. 6,675,638 | Caldwell's Quick Tilt Product |
|---|---|---|
| 638/1 | the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means | the coiled body of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means (See Prior Art in '638 Pat. Fig.1 & Fig.3) |
| 638/1 | and said mounting means being secured in said channel means, | And said mounting means being secured in said channel means, (See Prior Art in '638 Pat. Fig.1,Fig.3, Fig.4 and Fig.5) |
| 638/1 | said mounting means having a raised spine | Said mounting means having a raised spine |
| 638/1 | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means |
| 638/1 | whereby rotational motion of said mounting means is inhibited. | The raised spine of Caldwell's Quick Tilt does not inhibit rotation. |
| 638/2 | The mounting assembly of claim 1 wherein the mounting means has a | Caldwell's Quick Tilt has a mounting means that has a |

2

| Claim Element | U.S. Patent No. 5,566,741B | Caldwell's Quick Tilt Product |
|---|---|---|
| | support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. | support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. (See Prior Art in '638 Pat. Fig. 1, Fig. 2, Fig. 3, Fig.4, Fig.5 & Fig. 6) |
| | | |
| 638/3 | The mounting assembly of claim 2 | Caldwell's Quick Tilt has a mounting assembly (See Prior Art in '368 Pat. Fig.1, Fig.2, Fig.3, Fig.4 & Fig.5) |
| 638/3 | wherein said mounting means has a body portion | wherein said mounting means has a body portion |
| 638.3 | Having an aperture therein, | having an aperture therein, |
| 638/3 | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, |
| 638/3 | a surface of said body portion being concavely curved, | a surface of said body portion being concavely curved, |
| 638/3 | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion |

3

| Claim Element | U.S. Patent No. 5,365,638 | Andersen's Tilt-Pac Product |
|---|---|---|
| 638/8 | a mounting assembly comprising | a mounting assembly comprising |
| 638/8 | a channel means having | a channel means having |
| 638/8 | a rear wall, | a rear wall, |
| 638/8 | side walls | side walls |
| 638/8 | and at extremities of said side walls, inwardly turned opposed flanges, | and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/8 | a sash frame support means slidable in said channel means, | a sash frame support means slidable in said channel means, |
| 638/8 | a coiled ribbon spring | a coiled ribbon spring |
| 638/8 | having an outer end engaged with said sash frame support means, | having an outer end engaged with said sash frame support means, |
| 638/8 | and a means for mounting said coiled ribbon spring, | and a means for mounting said coiled ribbon spring, |
| 638/8 | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, |

4

| Claim Element | U.S. Patent No. 4,565,031 | Caldwell's Quick Tilt Products |
|---|---|---|
| 638/8 | Said mounting means being secured in said channel means | Said mounting means being secured in said channel means |
| 638/8 | and the mounting means having projection means | and the mounting means having projection means |
| 638/8 | positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, | positioned between said inwardly turned opposite flanges of the channel means. The projection means in Caldwell's Quick Tilt products is independent of said flanges of the channel means within which the mounting means is positioned, |
| 638/8 | whereby rotational movement of the mounting means is inhibited. | The raised spine of Caldwell's Quick Tilt does not inhibit rotation. |

5

**EXHIBIT B**

NON-INFRINGEMENT OF
AMESBURY'S U.S. PATENT NO. 6,598,264
BY CALDWELL'S SERIES 86XT PRODUCT

| Claim/Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86XT Balance System |
|---|---|---|
| 264/1 | A block and tackle window balance device comprising: | A block and tackle window balance device comprising: |
| 264/1 | a channel comprising | a channel comprising (See Prior Art in '264 Pat. Fig.2A,2B & Fig.3) |
| 264/1 | a first end | a first end  (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and a second end; | and a second end; (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel (See Prior Art in '264 Pat. Fig.2A, 2B & Fig.3 & 3); |
| 264/1 | a bottom guide connected to the second end of the channel; | a bottom guide connected to the second end of the channel (See Prior Art in '264 Pat. Fig. 2A, 2B & Fig.3); |
| 264/1 | a bottom guide roller rotatably mounted in the bottom guide; | Caldwell's Series 86XT bottom pulley is not a roller and is not mounted in the bottom guide; the bottom pulley is joined with 2 other pulleys in the fixed pulley block. |
| 264/1 | a fixed pulley block unit connected to the channel; | a fixed pulley block unit connected to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B); |
| 264/1 | a translatable pulley block unit | a translatable pulley block unit moveable within the channel |

1

| Claim Element | Amended Claim (Serial No. 06501362 | Caldwell's Series 269-DBP End System |
| --- | --- | --- |
| | moveable within the channel; | ( See Prior Art in '264 Pat. Fig.2A & 2B); |
| 264/1 | a spring comprising | a spring comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | a first end | a first end ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | and a second end, | and a second end, ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/1 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit (See Prior Art in '264 Pat. Fig. 2A & 2B); |
| 264/1 | and a cord comprising | and a cord comprising (See Prior Art in '264 Pat. Fig.2A & 2B); |
| 264/1 | a first cord end | a first cord end (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and a second cord end, | and a second cord end, (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and the fixed pulley block unit | and the fixed pulley block unit (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and extends around the bottom guide roller, | and extends around the pulley block bottom pulley, not a roller, |
| 264/1 | the first cord end being attached to | the first cord end being attached to |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86XT Balance System |
|---|---|---|
| | the translatable pulley block unit | the translatable pulley block unit ( See Prior Art in '264 Fig.2B) |
| 264/1 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. (See Prior Art in '264 Pat. Fig. 7A) |
| 264/2 | The device of claim 1 wherein the bottom guide roller is located external to the channel. | Caldwell's Series 86XT fixed pulley block bottom pulley is not a roller and is partially located internal and external to the channel. |
| 264/3 | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | Caldwell's Series 86XT top guide is angled to received a member of a window sash (See Prior Art in '264 Pat. Fig 2A, 2B, Fig. 3 & Fig. 7A). |
| 264/4 | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | Caldwell's Series 86XT bottom guide has a portion internal and external to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B). |
| 264/5 | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | Caldwell's Series 86XT bottom guide forms a channel to receive a portion of a window sash (See Prior Art in '264 Pat. Fig. 3). |
| 264/6 | The device of claim 1 wherein the | Caldwell's Series 86XT fixed pulley block unit comprises (See Prior Art in |

3

| Claim Element | Armstrong's (U.S. Patent No. 6,659,247) | Caldwell's Series 86XT Buildings System |
|---|---|---|
| | fixed pulley block unit comprises | '264 Pat. Fig.2A & 2B) |
| 264/6 | a frame, | a frame, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/6 | an axle, | an axle, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/6 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. |
| 264/7 | The device according to claim 6 wherein the axle is located within the frame. | Caldwell's Series 86XT has an axle located within the fixed pulley block unit frame. (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | The device according to claim 1 wherein the translatable pulley block unit comprises | Caldwell's Series 86XT has a translatable pulley block unit that comprises (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/9 | a frame, | a frame ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | an axle within the frame, | an axle within the frame (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/10 | The device according to claim 1 wherein the top guide includes a top | Caldwell's Series 86XT has a top guide including a top angled portion (See Prior Art in '264 Pat. Fig. 2A & 2B) |

4

| Claim Elements | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86XT Balance System |
|---|---|---|
| | angled portion | |
| 264/10 | and a bottom portion, the bottom portion being connected to the first end of the channel. | And a bottom portion, the bottom portion being connected to the first end of the channel. (See Prior Art in '264 Pat. Fig.2A, 2B, 3 & 7A) |
| 264/11 | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | Caldwell's 86XT has a fixed pulley block unit that is independent of the bottom guide. |
| 264/12 | A window assembly comprising: | A window assembly comprising: |
| 264/12 | a window frame with two jambs with jamb pockets; | a window frame with two jambs with jamb pockets; ( See Prior Art in '264 Pat. Fig.1) |
| 264/12 | At least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | At least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and (See Prior Art in '264 Pat. Fig.1 & 7A) |
| 264/12 | At least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | at least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising; (See Prior Art in '264 Pat. Fig.7A) |
| 264/12 | channel comprising a first end and a second end; | a channel comprising a first end and a second end;( See Prior Art in '264 Pat. Fig.2A, 2B, 3 & 7A) |

5

| Claim Element | Armstrong II Patent No. 6,598,264 | Caldwell's Series 80 Window Balance System |
|---|---|---|
| 264/12 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel; ( See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/12 | a bottom guide connected to the second end of the channel; | a bottom guide connected to the second end of the channel; (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/12 | a bottom guide roller rotatably mounted in the bottom guide; | Caldwell's 86XT has a bottom pulley that is not a roller and is mounted in the fixed pulley block unit. |
| 264/12 | a fixed pulley block unit connected to the channel; | a fixed pulley block unit connected to the channel; ( See Prior Art in Fig.2A, & 2B) |
| 264/12 | a translatable pulley block unit moveable within the channel; | a translatable pulley block unit moveable within the channel; (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a spring comprising | a spring comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a first end | a first end ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and a second end | and a second end (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit; (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and a cord comprising | and a cord comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a first cord end | a first cord end, (See Prior Art in '264 Pat. Fig.2A & 2B) |

6

| Claim Element | As embodied in U.S. Patent/No. 6,539,264 | Caldwell's Series BXXT Balance System |
|---|---|---|
| 264/12 | and a second cord end, | and a second cord end, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/12 | and the fixed pulley block unit | and the fixed pulley block unit (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and extends around the bottom guide roller, | and extends around the bottom fixed pulley block bottom pulley which is not a roller, |
| 264/12 | the first cord end being attached to the translatable pulley block unit | the first cord end being attached to the translatable pulley block unit (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. (See Prior Art in '264 Pat. Fig. 7A) |
| 264/13 | A window balance device comprising: | A window balance device comprising: (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/13 | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/13 | a bottom guide roller rotatably mounted in the bottom guide. | Caldwell's 86XT has a bottom pulley that is not a roller mounted in the fixed pulley block and that is independent of the bottom guide. |

7

| Claim Element | Amesbury U.S. Patent No. 6,598,264 | Caldwell's Series 86XT Balance System |
|---|---|---|
| 264/14 | The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | Caldwell's 86XT has a bottom pulley that is not a roller located internal and external to the channel. |
| 264/15 | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | Caldwell's 86XT has a portion of the bottom guide internal and external to the channel. |
| 264/16 | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of window sash when installed. | Caldwell's 86XT has a bottom guide that forms a channel to receive a portion of a window sash when installed (See Prior Art in '264 Pat. Fig. 3). |
| 264/18 | A window balance device comprising: | A window balance device comprising: |
| 264/18 | a channel comprising a first end and a second end; | a channel comprising a first end and a second end; (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/18 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel; (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/18 | a bottom guide connected to the second end of the channel and | a bottom guide connected to the second end of the channel and (See Prior Art in '264 Pat. Fig. 2A, 2B & 3) |

8

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86XT Balance System |
|---|---|---|
| | adapted to slide in a jamb pocket when installed in a window frame; and | adapted to slide in a jamb pocket when installed in a window frame; and (See Prior Art in '264 Pat. Fig.1) |
| 264/18 | a bottom guide roller rotatably mounted in the bottom guide. | Caldwell's 86XT has a bottom pulley that is not a roller in the fixed pulley block and is independent of the bottom guide. |
| 264/19 | The device of claim 18 wherein the bottom guide roller is located external to the channel. | Caldwell's 86XT has a bottom pulley located internal and external to the channel. |
| 264/20 | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | Caldwell's 86XT has a bottom guide that is internal and external to the channel. (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/21 | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | Caldwell's 86XT has a bottom guide that forms a channel to receive a portion of a window sash when installed (See Prior Art in '264 Pat. Fig.3). |

9

**EXHIBIT C**

**NON-INFRINGEMENT OF**
**AMESBURY'S U.S. PATENT NO. 6,820,368**
**BY CALDWELL'S SERIES 971 PRODUCT**

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 971 Product w/Short Carrier |
|---|---|---|
| 368/2 | A window balance system comprising: | A window balance system comprising: |
| 368/2 | a U-shaped channel comprising a plurality of openings; | a U-shaped channel comprising a plurality of openings (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B); |
| 368/2 | a spring connected to a system of pulleys located within the U-shaped channel; | a spring connected to a system of pulleys located within the U-shaped channel (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a cord with | a cord with (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a first cord end | a first cord end (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | and a second cord end, | and a second cord end, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the first cord end connected and threaded through the system of pulleys, | the first cord end connected and threaded through the system of pulleys, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the second cord end connected to a jamb mounting attachment; and | the second cord end connected to jamb mounting attachment; and (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a balance shoe, wherein the balance shoe comprises: | a balance carrier (shoe), wherein the balance carrier comprises (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B): |

| Claim Element | Amended U.S. Patent No. 5,820,178 | Caldwell's Series 971 Product / Shoe / Carrier |
|---|---|---|
| | | |
| 368/2 | a frame comprising an enlarged first end | a frame comprising an enlarged first end |
| 368/2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | and a second end, wherein the second end is adapted to be received by the U-shaped channel, |
| 368/2 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | Caldwell's Series 971 second end of the balance carrier further forms a clearance for a rivet that attaches the balance carrier to the U-shaped channel. A center support leg of the carrier rest against the rivet. The carrier is non-removable from the U-shaped channel; |
| 368/2 | a locking member proximal to the enlarged first end; | a locking member proximal to the enlarged first end; |
| 368/2 | a cam in communication with the locking member, and | a cam in communication with the locking member, and |
| 368/2 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Caldwell's Series 971 has no connecting device between the U-shaped channel and the balance carrier |
| | | |
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | Caldwell's Series 971 balance carrier has no connecting device. |
| | | |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to | Caldwell's Series 971 window balance system has a cam housed within the enlarged first end of the carrier; wherein rotating the cam forces the locking member to engage a jamb track when the balance carrier is |

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97I Product w/ Short Carrier |
|---|---|---|
| | engage a jamb track when the balance shoe is installed in a window jamb. | installed. (See Prior Art in '368 Pat. Fig. 2A, 7A. & 7B) |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | Caldwell's Series 97I balance system has a locking member comprising (See Prior Art '368 Pat. Fig. 2A, 7A & 7B) |
| 368/7 | two opposing ends | two opposing ends (See Prior Art '368 Pat. Fig. 2A, 7A & 7B) |
| 368/7 | integrally connected by a spring member | integrally connected by a spring member (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | Caldwell's Series 97I balance system has a cam that is partially housed within the enlarged first end of the carrier frame, wherein the cam forces the opposing ends of the locking member to engage a jamb track when the balance carrier is installed in a window jamb (See Prior Art in '368 Pat. Fig.2A, 7A & 7B). |
| 368/11 | The window balance system of claim 2 | Caldwell's Series 97I balance system |
| 368/11 | wherein the cam comprises at least one camming surface | has a cam comprising at least one camming surface (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/11 | and a keyhole opening sized to receive a pivot bar. | and a keyway opening sized to receive a pivot bar. (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |

EXHIBIT D

NON-INFRINGEMENT OF
AMESBURY'S U.S. PATENT NO. 6,820,368
BY CALDWELL'S SERIES 97EZ PRODUCT

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97EZ Product / Long Caprici |
|---|---|---|
| 368/2 | A window balance system comprising: | A window balance system comprising: |
| 368/2 | a U-shaped channel comprising a plurality of openings; | a U-shaped channel comprising a plurality of openings (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a spring connected to a system of pulleys located within the U-shaped channel; | a spring connected to a system of pulleys located within the U-shaped channel (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a cord with | a cord with (See Prior Art in '368 Fig.2A) |
| 368/2 | a first cord end | a first cord end (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | and a second cord end, | and a second cord end, (See Prior Art in '368 Fig.2A) |
| 368/2 | the first cord end connected and threaded through the system of pulleys, | the first cord end connected and threaded through the system of pulleys, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the second cord end connected to a jamb mounting attachment; and | the second cord end connected to jamb mounting attachment; and (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a balance shoe, wherein the balance shoe comprises: | a balance carrier (shoe), wherein the balance carrier comprises (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B): |

| Claim Element | Asserted from U.S. Patent No. 6,478,306 | Caldwell's Series 97EZ Product w/ Top Carrier |
|---|---|---|
| 368/2 | a frame comprising an enlarged first end | a frame comprising an enlarged first end |
| 368/2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | and a second end, wherein the second end is adapted to be received by the U-shaped channel, |
| 368/2 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | Caldwell's Series 97EZ second end of the frame of the balance carrier further forms two legs which are not a pocket for a supporting rivet, which does not mate with the legs. This product has an aperture for a second rivet that attaches the balance carrier to the U-shaped channel, The balance carrier is non-removable from the U-shaped channel. |
| 368/2 | a locking member proximal to the enlarged first end; | A locking member proximal to the enlarged first end; |
| 368/2 | a cam in communication with the locking member, and | a cam in communication with the locking member, and |
| 368/2 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Caldwell's Series 97EZ has a rivet between the U-shaped channel and the balance carrier. |
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | Caldwell's Series 97EZ balance is connected to the U-shaped channel with a rivet. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein | Caldwell's Series 97EZ window balance system has a cam housed within the enlarged first end of the carrier; wherein rotating the cam forces the locking member to |

| Claim Element | Amsbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97EZ Products w/Long Carrier |
|---|---|---|
| | rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | engage a jamb track when the balance carrier is installed in a window jamb. (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | Caldwell's Series 97EZ balance system has a locking member comprising (See Prior Art in '368 Pat. Fig. 2A 7A & 7B) |
| 368/7 | two opposing ends | two opposing ends (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/7 | integrally connected by a spring member | integrally connected by a spring member (See Prior Art in '368 Pat. 2A, 7A & 7B) |
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | Caldwell's Series 97EZ balance system has a cam that is partially housed within the enlarged first end of the carrier frame, wherein the cam forces the opposing ends of the locking member to engage a jamb track when the balance carrier is installed in a window jamb (See Prior Art in '368 Pat. Fig.2A, 7A & 7B). |
| 368/11 | The window balance system of claim 2 | Caldwell's Series 97EZ balance system |
| 368/11 | wherein the cam comprises at least one camming surface | has a cam comprising at least one camming surface (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B) |
| 368/11 | and a keyhole opening sized to receive a pivot bar. | and a keyway opening sized to receive a pivot bar. (See Prior Art in '368 Fig.2A, 7A & 7B) |



US006041476A

# United States Patent [19]

## deNormand

| | |
|---|---|
| [11] Patent Number: | **6,041,476** |
| [45] Date of Patent: | **Mar. 28, 2000** |

[54] **INVERTED BLOCK AND TACKLE WINDOW BALANCE**

[75] Inventor: **Richard S. deNormand**, Rochester, N.Y.

[73] Assignee: **Caldwell Manufacturing Company**, Rochester, N.Y.

[21] Appl. No.: **08/975,728**

[22] Filed: **Nov. 21, 1997**

[51] Int. Cl.⁷ ........................................... **B66D 3/08**

[52] U.S. Cl. ............................ **16/197; 16/196; 49/445; 254/393**

[58] Field of Search ..................... 16/193, 196, 197, 16/198, 401, 402; 49/445, 446; 492/30, 47; 254/393, 404, 416

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,584 | 7/1849 | Hoffman . | |
| 138,944 | 5/1873 | Shaw ............................... | 16/213 |
| 329,005 | 10/1885 | Blodgett ........................... | 16/213 |
| 464,795 | 12/1891 | Dodge . | |
| 527,306 | 10/1894 | Wern ............................... | 254/393 |
| 1,523,733 | 1/1925 | Trout ............................... | 254/404 |
| 1,668,497 | 5/1928 | Fishback . | |
| 1,713,586 | 5/1929 | Wright ............................. | 254/404 |
| 1,800,700 | 4/1931 | Pation . | |
| 2,196,948 | 4/1940 | Tremblay ........................... | 16/215 |
| 2,262,990 | 11/1941 | Cross et al. . | |
| 2,336,406 | 12/1943 | Kreuscher . | |
| 2,459,290 | 1/1949 | Rozner . | |

| | | | |
|---|---|---|---|
| 2,625,447 | 1/1953 | Derenter, III ..................... | 254/393 |
| 2,663,896 | 12/1953 | Trammell, Sr. et al. .............. | 49/445 |
| 3,055,044 | 9/1962 | Dinsmore . | |
| 3,150,420 | 9/1964 | Brenner . | |
| 4,078,336 | 3/1978 | Prosser . | |
| 4,190,930 | 3/1980 | Prosser . | |
| 4,240,614 | 12/1980 | Comer, Jr. ........................ | 254/393 |
| 4,332,054 | 6/1982 | Paist et al. ...................... | 16/197 |
| 4,503,641 | 3/1985 | Swan . | |
| 4,586,291 | 5/1986 | Swan . | |
| 4,654,928 | 4/1987 | Flight . | |
| 4,689,850 | 9/1987 | Flight ............................ | 16/197 |
| 4,914,862 | 4/1990 | Gregory ........................... | 49/445 |
| 4,949,425 | 8/1990 | Dodson et al. ..................... | 16/DIG. 20 |
| 5,530,991 | 7/1996 | deNormand et al. . | |

*Primary Examiner*—Chuck Y. Mah
*Assistant Examiner*—Donald M. Gurley
*Attorney, Agent, or Firm*—Eugene Stephens & Associates

[57] **ABSTRACT**

Pulleys of a block and tackle window balance include hub steps that interact with other components to reduce the introduction of dirt and dust particles into areas vulnerable to wear. The hub steps of some of the pulleys are recesses formed about the axial bores of the pulleys that mate with protrusions on an axle and a washer. The hub steps of other pulleys are protrusions that abut a support plate and heads of rivets that act as axles. The hub steps allow inverse mounting of the window balance so that the balance can be mounted in a shoe channel for movement with a sash of the window, attached to the sash shoe, and the cord can be attached to the jamb or frame, thus increasing sash travel.

23 Claims, 2 Drawing Sheets



**EXHIBIT E**



FIG. 1



FIG. 2



FIG. 3

C000458

**U.S. Patent**    Mar. 28, 2000    Sheet 2 of 2    **6,041,476**



FIG. 4



FIG. 5



FIG. 6

C000459

6,041,476

# 1

## INVERTED BLOCK AND TACKLE WINDOW BALANCE

### TECHNICAL FIELD

The invention relates to the field of block and tackle window balances for offsetting the weight of a window sash throughout a range of travel within a window frame.

### BACKGROUND OF THE INVENTION

Block and tackle window balances have become popular because of their compact size and ease of installation. They combine a system of pulleys with an extension spring to convert high spring tension applied over a short working distance to a lower spring tension applied over a longer working distance. The extension spring and pulley system are arranged within a rigid balance channel, with the extension spring anchored at one end of the balance channel and the pulley system anchored at the other end. In most block and tackle balances, the balance channel is mounted in the jamb of the window frame; and a cord, which is reeved through the pulley system, is attached to a sash shoe that slides in the jamb with the sash. The extension spring and pulley system are sized so that a desired lifting force is applied to the window sash throughout the entire range of sash travel within the window frame. A disadvantage of this type of balance is that the movement of the sash is limited by the presence of the balance in the jamb. In some cases, the travel is limited so much that the lower sash of the open window blocks egress through the window in escaping a fire.

To solve the problem of limited sash movement, the balance can be mounted upside down in the window sash with the balance channel attached to the sash shoe and the cord attached to the window jamb or frame. However, prior art window balances of this kind tend to be susceptible to contamination from dirt and dust, especially when mounted upside down. Particles work their way between the pulley bores and the pulley axles, increasing friction and wear. Thus, prior art block and tackle window balances are not as durable or reliable as is desired.

Some prior art block and tackle window balances that are less susceptible to contamination require the use of bushings and other parts. This is disadvantageous in that the use of additional parts increases the complexity of the machines and the likelihood of their failure. Also, the additional parts increase the cost of manufacture and assembly of the window balances.

### SUMMARY OF THE INVENTION

My inventive block and tackle window balance greatly reduces the invasion of the hub/axle interface by particulate contaminants. I form the pulleys with steps in their hubs so that they can engage mating steps on the rivets that serve as their axles. In addition, I mount the two pulleys at the open end of the balance so that they run against each other, effectively sealing the space between the pulley hubs. The steps in the pulley hubs can be recesses or protrusions, depending on their location and particular duty. My window balance provides better protection from dirt and dust contamination without the extra parts required by prior art window balances, keeping the balance relatively simple and less costly to manufacture and assemble. Additionally, because my window balance is less susceptible to contamination, it can be mounted to move with the sash of a window or to remain fixed relative to the frame of a window, depending on the requirements of a particular

# 2

installation, and can be mounted invertedly without significantly reducing its useful life.

### DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top schematic view of the invention.

FIG. 2 is a cross section taken along line II—II in FIG. 1 showing the first pair of pulleys.

FIG. 3 is a cross section taken along line III—III in FIG. 1 showing the second pair of pulleys.

FIG. 4 is a view taken along line IV—IV in FIG. 2 to illustrate the flats of a preferred pulley axle and the groove in which the axle is mounted.

FIG. 5 is a side view of a portion of the invention as shown in FIG. 1.

FIG. 6 is a schematic representation of the placement of my invention in a window.

### DESCRIPTION OF THE INVENTION

As seen in the accompanying Figures, my block and tackle window balance 1 includes a balance channel 2 preferably mounted in the shoe channel 55 of a window 51 and attached at one end to a sash shoe 50 that moves with the sash 53 in the shoe channel 55. I mount the shoe channel 55 on the jamb 54 of the window between the jamb 54 and the sash 53. The balance channel 2 supports a series of pulleys 11, 12, 31, 32 over which I reeve a cord 6. I attach an attachment end 8 of the cord 6 to the window jamb 54 or to the window frame 52. I attach a support plate end 7 of the cord 6 to a sliding support plate 35. The support plate 35 is biased against movement from a rest position by a spring 4 attached to the balance channel 2. Alternatively, a more conventional mounting arrangement can be used with the balance channel 2 fixed relative to the window jamb 54 and the attachment end 8 of the cord attached to the sash shoe 50.

As seen particularly in FIG. 2, an axle 15 mounted in grooves 24 in one end of the balance channel 2 supports a first pair 10 of pulleys 11, 12. The pulleys 11, 12 in the first pair 10 sit adjacent one another and include hub steps 13 in the form of recesses about the axial bores 14 of the pulleys 11, 12. The sides or rims 23 of the pulleys 11, 12 adjacent one another can slide or rub against each other and effectively seal the cavity 22 formed by their hub steps 13 against contamination from dirt and dust.

The axle 15 is preferably a rivet including flats 16 formed over portions of the circumferential surface of the axle 15 such that the flats 16 engage the grooves 24 in the balance channel 2, holding the axle 15 against rotation. The preferred rivet 15 also includes heads 17 that prevent axial movement of the axle 15. As shown in FIG. 4, I prefer to use a hexagonal arrangement of the flats 16 similar to that used in common nuts and bolt heads. The axle 15 can also include a flange 18 with a protruding flange step 19 that mates with a hub step 13 of one the pulleys of the first pair, such as the first pulley 11. I prefer to mount a washer 20 on the axle 15 between the other of the pulleys of the first pair 10 (the second pulley 12) and the wall 3 of the balance channel. The washer 20 can include a protruding washer step 21 that mates with a hub step 13 of the second pulley 12. The mating steps 13, 19, 21 effectively seal the washer/pulley, flange/pulley, and pulley/axle bearing surfaces from contamination by dirt and dust particles, reducing wear of these parts and increasing the effective life of the window balance.

A second pair 30 of pulleys 31, 32 is mounted on the support plate 35. The pulleys 31, 32 of the second pair 30 also include hub steps 33, but I prefer to form these hub steps

6,041,476

**3**

33 as protrusions about the axial bores 34 of the pulleys 31, 32. Axles 37, 38, preferably in the form of rivets, rotatably mount the pulleys 31, 32 on the support plate 35, the heads 39 of the rivets engaging or abutting respective hub steps 33 of the pulleys 31, 32. I prefer to form the hub steps 33 so that they have substantially the same diameter as the heads 39 of the rivets 37, 38. The hub steps 33 of the pulleys 31, 32 farthest from the rivet heads 39 abut the support plate 35. As with the first pair of pulleys 10, the mating hub steps 33 and rivet heads 39 effectively seal the pulley/axle bearing surfaces from contamination by dirt and dust particles, reducing wear of these parts and increasing the effective life of the window balance.

When installed, one end 8 of the cord 6 is preferably attached to the window frame 52 or the window jamb 54, the other being attached to the support plate 35. In this arrangement, I slidingly mount the balance channel 2 in the shoe channel 55 with one end connected to the sash shoe 50 so that the balance channel 2 can move with the sash 53 in the shoe channel 55. Alternatively, the end 8 of the cord 6 can be attached to the sash shoe 50 mounted in the conventional manner, the other end 7 of the cord being attached to the support plate 35. In the conventional arrangement, the balance channel 2 is fixed with respect to the frame 52. In either arrangement, the support plate 35 slides in the balance channel 2. I prefer to run the cord 6 from the support plate 35 to the first pulley 11, then to the fourth pulley 32, then to the second pulley 12, then to the third pulley 31, and then out the end of the balance channel 2 in which the first pair of pulleys 10 is mounted. The end 8 of the cord 6 not attached 30 to the support plate 35 includes a limit stop 9 to prevent the cord 6 from being pulled into the balance channel 2 when it is free.

The support plate 35 carries a guide 36 that keeps the support plate 35 properly aligned and oriented in the balance channel 2 while sliding and while resting. The support plate 35 also includes a spring attachment point 40, such as a hole, to which an end of a biasing spring 4 is attached. The other end of the biasing spring 4 is attached to the balance channel 2 via, for example, a support rivet 5. The spring 4 provides the force that balances the weight of the window sash 53. As the window sash 53 is moved, the cord 6 moves and rolls over the pulleys 11, 12, 31, 32, which rotate accordingly, and the support plate 35 slides. Travel of the support plate 35 is limited between its resting position and its extended position by the limit stop 9 on the cord 6 and the first pair of pulleys 10, respectively.

Parts List

1 Window balance
2 Balance channel
3 Walls of balance channel
4 Spring
5 Spring support/rivet
6 Cord
7 Support plate end of cord
8 Free end/attachment end of cord
9 Limit stop of cord
10 First pulley pair
11 First pulley
12 Second pulley
13 Hub steps/recesses of pulleys of first pair of pulleys
14 Axial bores of pulleys of first pair
15 Axle/rivet supporting first pair
16 Flats of axle
17 Heads of axle
18 Flange of axle

**4**

19 Flange step/protrusion
20 Washer
21 Washer step/protrusion
22 Cavity/space formed by hub steps of first pair
23 Rims of pulleys of first pair
24 Mounting groove of axle of first pair
30 Second pulley pair
31 Third pulley
32 Fourth pulley
33 Hub steps/protrusions of pulleys of second pair of pulleys
34 Axial bores of pulleys of second pair
35 Support plate
36 Guide for support plate
37 Support/rivet for third pulley
38 Support/rivet for fourth pulley
39 Heads of third and fourth pulleys
40 Attachment point for spring; hole in support plate
50 Pivot block or sash shoe
51 Window
52 Window frame
53 Window sash
54 Window jamb

I claim:

1. A block and tackle window balance comprising:
hub steps on each side of a pulley, the hub steps being formed coaxially with an axial bore of the pulley;
an axle on which the pulley is rotatably mounted so that the hub steps act to inhibit introduction of contaminants into the axial bore of the pulley;
a balance channel in which the axle is mounted, the balance channel being configured for mounting in one of a shoe channel, a sash, and a jamb of a window;
an end of the balance channel being attached to one of a sash shoe and a frame of a window;
a cord reeved over the pulley, a first end of the cord being attached to the other of the sash shoe and the frame of the window;
a spring having a first end attached to the balance channel and a second end connected to a second end of the cord; and
wherein the hub steps are recesses and the axle includes an axle step that protrudes toward and mates with a hub step of the pulley.

2. The window balance of claim 1 wherein the axle step is a protrusion extending from a flange formed in the axle.

3. The window balance of claim 1 wherein flats formed on a circumferential surface of the axle engage grooves formed in the balance channel to hold the axle against rotation.

4. The window balance of claim 1 wherein the mating axle step and hub step form two substantially right angles in a path to the axial bore of the pulley, substantially reducing introduction of dust into the axial bore of the pulley.

5. The window balance of claim 1 wherein the axle step is a protrusion formed on a washer mounted on the axle.

6. The window balance of claim 1 wherein the pulley is one of a substantially identical pair of pulleys mounted adjacent each other on the axle so that they can rotate relative to one another, a rim of one pulley substantially engaging a rim of the other pulley such that facing recesses form a cavity between the pulleys.

7. A block and tackle window balance comprising:
hub steps on each side of a pulley, the hub steps being formed coaxially with an axial bore of the pulley;
an axle on which the pulley is rotatably mounted so that the hub steps act to inhibit introduction of contaminants into the axial bore of the pulley;

6,041,476

**5**

a balance channel in which the axle is mounted, the balance channel being configured for mounting in one of a shoe channel, a sash, and a jamb of a window;

an end of the balance channel being attached to one of a sash shoe and a frame of a window;

a cord reeved over the pulley, a first end of the cord being attached to the other of the sash shoe and the frame of the window;

a spring having a first end attached to the balance channel and a second end connected to a second end of the cord; and

wherein the hub steps are protrusions and one of the hub steps engages a rivet head of an axle on which the pulley is rotatably supported, the axle being carried by a support plate that slides within the balance channel as the cord is played out of or drawn into the balance, the support plate being interposed between and attached to the second ends of the spring and the cord, the cord being biased by the spring against being played out of the balance.

8. The window balance of claim 7 wherein a pair of substantially identical axles carrying substantially identical pulleys is mounted on the support plate such that longitudinal axes of the axles are offset from one another.

9. The window balance of claim 7 wherein the support plate carries a guide that engages the balance channel to maintain the plate in proper alignment within the balance channel.

10. A block and tackle window balance comprising:

flats on a circumferential surface of an axle on which a pulley is rotatably mounted;

a balance channel in which the axle is mounted, the flats engaging a groove formed in the balance channel so that the axle is held against rotation, the balance channel being mounted for one of movement with a window sash and remaining fixed with respect to a window frame;

a cord reeved over the pulley, a first end of the cord being connected to the window frame when the balance channel is mounted for movement with the window sash, the first end of the cord being connected to the window sash when the balance channel is mounted for remaining fixed with respect to the window jamb;

a spring configured to provide a bias against withdrawal of the cord from the block and tackle window balance, a first end of the spring being connected to a second end of the cord, a second end of the spring being connected to the balance channel; and

one of an end of the balance channel and the first end of the cord being configured for attachment to a sash shoe mounted in a shoe channel on the window jamb, the sash shoe being configured to slide in the shoe channel with the window sash as the window sash is moved, the end of the balance channel being configured for attachment to the sash shoe when the balance channel is mounted for movement with the window sash, and the first end of the cord being configured for attachment to the sash shoe when the balance channel is mounted for remaining fixed with respect to the window frame.

11. The window balance of claim 10 wherein the axle is a rivet and further comprises a flange arranged between the flats and the pulley.

12. The window balance of claim 11 wherein the flange includes a flange step on a pulley side of the flange, the flange step engaging a mating hub step of the pulley.

13. The window balance of claim 10 wherein a washer is mounted between a side of the pulley and a wall of the balance channel, the washer including a washer step that engages a mating hub step of the pulley.

**6**

14. The window balance of claim 10 wherein first and second pulleys are mounted adjacent one another on the axle in the balance channel, each pulley including hub steps such that a hub step of the first pulley faces a hub step of the second pulley and a hub step of each pulley faces a respective wall of the balance channel.

15. The window balance of claim 14 wherein the axle includes a step mating with a hub step of one of the pulleys.

16. The window balance of claim 14 further comprising a washer with a washer step thereon mating with a hub step of one of the pulleys.

17. The window balance of claim 14 further comprising third and fourth pulleys rotatably mounted on respective rivets on a support plate slidably mounted in the balance channel, the support plate being interposed between the spring and the cord such that the first ends of the spring and the cord are attached thereto, the pulleys including hub steps each engaging one of a respective rivet head and the support plate.

18. The window balance of claim 17 wherein the balance channel is mounted for movement with the window sash, an end of the balance channel being attached to the sash shoe, the cord running over each of the first, second, third, and fourth pulleys so that the first end of the cord can be attached to the window frame.

19. A block and tackle window balance comprising:

first hub steps on each side of a first pulley;

second hub steps on each side of a second pulley;

a first axle on which the first and second pulleys are rotatably mounted, the first and second pulleys lying adjacent one another on the axle so that they rub together;

third hub steps on each side of a third pulley;

fourth hub steps on each side of a fourth pulley;

second and third axles carrying the third and fourth pulleys, respectively, and being mounted on a support plate;

a balance channel non-rotatably supporting the first axle and slidably supporting the support plate, the balance channel including first and second side walls and a bottom wall;

a cord reeved over the pulleys and having a first end attached to the support plate and a second end extending from a first end of the balance channel; and

a spring having a fixed end attached to the balance channel and a movable end attached to the support plate.

20. The window balance of claim 19 wherein the first axle is mounted in grooves in the side walls of the balance channel and includes flats formed on a circumferential surface of the first axle corresponding to a region in which the first axle engages one of the grooves, the flats engaging the one of the grooves so that the axle is held against rotation.

21. The window balance of claim 19 wherein the first hub steps are recesses and the first axle includes a flange with a flange step formed thereon, the flange step engaging and mating with one of the first hub steps of the first pulley.

22. The window balance of claim 19 wherein the second hub steps are recesses and the first axle carries a washer adjacent the second pulley, the washer including a washer step facing the second pulley and mating with an adjacent second hub step of the second pulley.

23. The window balance of claim 19 wherein the hub steps of one of the third and fourth pulleys are protrusions, the axle of the one of the third and fourth pulleys comprising a rivet with a head engaging one of the protrusions, the other protrusion running against the support plate.

* * * * *



PRIOR ART

FIG. 2A

U.S. Patent    Nov. 23, 2004    Sheet 11 of 13    US 6,820,368 B2



FIG. 7A

FIG. 7B

FIG. 8A

FIG. 8B



Ø .52

CAVITY IDENTIFICATION
RAISED .007" MAX

⑭

SUB-GATE LOCATION
(SEE NOTE 2)

⑬

SECTION A-A

CHAMFER .015 x 45°
TYP(2)

R.012

⑪

.150

⑨

⑩

Ø .33

Ø .420

⑥

⑦

◎ Ø .004 A Ⓐ Ⓔ CTF

R.010
TYP(2)

④

.130

⑤

R.040

②

10° REF.
TYP

①

NOTES:

1. MATERIAL: KOCETAL K300 ACETAL NATURAL OR CALDWELL ENGINEERING
   APPROVED EQUIVALENT. 25% MAXIMUM REGRIND ALLOWED.

Ⓐ⑯ CTP 2. MAXIMUM ALLOWABLE GATE VESTIGE TO BE .005" ABOVE ADJACENT PULLEY FACE.

Ⓐ⑰ CTP 3. MAXIMUM ALLOWABLE PROTRUSION OF FLASH TO BE .010".

④  4. DIMENSIONS SHOWN SYMMETRICAL ABOUT ₵ ARE TO BE CENTERED WITHIN .005"
⑱     UNLESS OTHERWISE SPECIFIED.

INSPECTION-PRINT

⓪ = INSPECTION NUMBER

Ⓔ CTF = CRITICAL TO FUNCTION

Ⓐ CTP = CRITICAL TO PROCESS

LAST NUMBER USED – 18

Ⓔ CTF  Ø .126± .002

– A –

Ⓔ CTF

Mass Properties - REFERENCE ONLY
PART # 15R503 REV 0

| DENSITY | 0.0507 | LBS./CU.IN. |
| MASS | 0.0011 | LBS. |
| VOLUME | 0.0221 | CU.IN. |

CALDWELL    MANUFACTURING
            COMPANY
2005 MANITOU ROAD    ROCHESTER, NEW YORK
                     SERIES 86 XT
TITLE
END PULLEY-LARGE
THIRD ANGLE PROJECTION   DRAWN K.A.C. DATE 2/11/03
                         CHECKED         DATE
                         DWG NO 15R503
A  EX. NO 5998           SIZE 4:1  SHEET 1 OF 1  REV
   SCALE  4:1                                     0

⊖ = DATUM IDENTIFICATION
○ = ROUNDNESS
∥ = PARALLELISM
⊥ = PERPENDICULARITY
∠ = ANGULARITY
⊕ = TRUE POSITION
◎ = CONCENTRICITY
⚪ = FLATNESS

NOTE: DO NOT SCALE DRAWING!
ALL TOLERANCES UNLESS
OTHERWISE SPECIFIED ARE
TWO DECIMAL PLACES    ± .010
THREE DECIMAL PLACES  ± .015
FOUR DECIMAL PLACES   ± .002
ANGULAR               ± 1°
FRACTIONS             ± 1/64

THIS IS THE PROPERTY OF
CALDWELL MANUFACTURING CO.
ANY USE OR REPRODUCTION
WITHOUT AUTHORIZATION BY
THIS COMANY IS PROHIBITED.

NEXT ASSY
15R504

MATERIAL
SEE NOTE 1

TREATMENT/FINISH

SIZE

REVISIONS
NUMBER DATE  REV    DESCRIPTION    DATE  BY

DEVIATIONS

⑮
⑫
⑧

EXHIBIT F

# EXHIBIT G



Caldwell's Quick Tilt
Constant Force Balances

Window Frame
Jamb (Vinyl)

Aperture for
Screw Fastener

.103

.543

Raised Spine of
Cover

.750

Aperture for
Screw Fastener

Sash Carrier (Shoe)



Dust Cover

Cover (Mounting Element)

Coil Nest

Aperture For
Screw Fastener

Coiled
Sspring

Coil Nest

Aperture For
Screw Fastener

Sash Balance
Carrier (Shoe)

Caldwell's Quick Tile
Constant Force Balances

EXHIBIT H



Cord

Channel

Pulleys (2)

Fixed Pulley Block

Fixed Pulley Block

Pulleys (3)

Roller in Bottom Guide

Bottom Guide w/ Roller

Bottom Guide

End of Cord

Amesbury's '264 Pat.
Bottom Giuide w/ Roller

Caldwell's Series 86X
Balance Fixed Pulley Block

EXHIBIT J



Channel

Fixed Pulley
Block

Pulleys (3)

Bottom Guide

Caldwell's Series 86XT
Balance Detail

EXHIBIT K



Spring

Channel

Rivet for Spring

Supporting Rivet

Rivet

"Snap—In Tabs"

Center Support Leg

Locking Member

Cam

Balance Carrier

Cam

Removable Balance Shoe

Amesbury's Snap Lock
Balance Shoe

Caldwell's Series 971
w/ Short Carrier

EXHIBIT L



Amesbury's Snap Lock
Balance Shoe

Caldwell's Series 97EZ
w/. Long Carrier

EXHIBIT M

Caldwell's Series 97I w/ Short Carrier

Cam
Channel
Spring
Rivet for Spring
Aperture
Rivet
Locking Member (Brake)

Caldwell's Series 97EZ w/ Long Carrier

Cam
Locking Member (Brake)

Amesbury's Snap-Lock Balance Shoe (Removable)

Spring
Rivet for Spring
Supporting Rivet (Center of Rotation)
Channel
Pocket
"Snap-In Tabs"
Cam
Locking Member (Brake)

EXHIBIT N