IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMESBURY GROUP, INC., and AMESBURY SPRINGS LTD., | |
| Plaintiffs, | |
| v. | Civil Action No. 05-10020-DPW |
| THE CALDWELL MANUFACTURING COMPANY, | |
| Defendant. | |

**SUPPLEMENTAL DECLARATION OF SAFRAZ W. ISHMAEL
IN SUPPORT OF AMESBURY'S MOTION FOR SUMMARY JUDGMENT
OF INFRINGEMENT AND THAT THE ASSERTED CLAIMS ARE NOT INVALID**

I, Safraz W. Ishmael, hereby declare as follows:

I am an associate in the law firm of Goodwin Procter LLP and counsel of record for plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd. (collectively "Amesbury"). I make this supplemental declaration in support of Amesbury's Motion for Summary Judgment Of Infringement And That The Asserted Claims Are Not Invalid.

1.      Attached as Exhibit 39 is a true and correct copy of excerpts from the official transcript of the deposition of Sammy Shina.

2.      Attached as Exhibit 40 is a true and correct copy of excerpts from the official transcript of the deposition of Charles Still.

3.      Attached as Exhibit 41 is a true and correct copy of excerpts from the official transcript of the deposition of Tom Batten.

4.      Attached as Exhibit 42 is a true and correction copy of excerpts from the official transcript of the deposition of Gary Newman.

5.      Attached as Exhibit 43 is a true and correct copy of excerpts from the official transcript of the deposition of Jeffrey Robertson.

6.      Attached as Exhibit 44 is a true and correct copy of excepts from the declaration of Douglas Zinter.

7.      Attached as Exhibit 45 is a true and correct copy of excerpts from the deposition of Wilbur Kellum.

8.      Attached as Exhibit 46 is a copy of the Federal Circuit's opinion in *Teleflex, Inc., v. KSR Int'l Co.*, 2005 U.S. App. Lexis 176 (Fed. Cir. Jan. 6, 2005), as obtained from the Lexis website.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 23, 2006.

/s/ Safraz W. Ishmael

Safraz W. Ishmael

# SUPPLEMENTAL DECLARATION
## OF SAFRAZ W. ISHMAEL

# EXHIBIT 39

00001

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                 NO. 05-CV-10020 (DPW)

4    ****************************************

5    AMESBURY GROUP, INC., and AMESBURY    *

6    SPRINGS LTD.,                    *

7                        *

8       Plaintiffs,           *

9                        *

10   v.                    *

11                        *

12   THE CALDWELL MANUFACTURING COMPANY,   *

13       Defendant.            *

14   ****************************************

15       DEPOSITION OF SAMMY G. SHINA, Ph.D., PE,

16   taken pursuant to the applicable provisions of

17   the Federal Rules of Civil Procedure, before

18   Susan L. Prokopik, Registered Merit Reporter and

19   Notary Public in and for the Commonwealth of

20   Massachusetts, at the offices of Goodwin Procter

21   LLP, Exchange Place, Boston, Massachusetts, on

22   Wednesday, May 3, 2006, at 9:07 a.m.

23

24

**Shina, Sammy, 5/3/06**                    **Page 1**

00044

1  A.  I examined that without being attached -- as a

2     free device.

3  Q.  If both parts of the Caldwell Quick-Tilt window

4     balance were able to move freely up and down in

5     the channel, would the balance operate properly?

6  A.  If both parts are not secured, no, it would not

7     operate correctly.

8  Q.  So one part at a minimum must be fixed in some

9     way to the channel; is that correct?

10  A.  Correct.

11  Q.  And why is that?

12  A.  To allow for the function of the invention or of

13     the device, which is to give counterbalance.

14  Q.  If both parts moved, there would be nothing

15     counteracting the weight of the window sash; is

16     that correct?

17  A.  If both parts moved freely you mean?

18  Q.  Yes.

19  A.  Yes.  That's correct.

20  Q.  Okay.  Now, the balance that you examined here at

21     the office of Goodwin Procter had no fixing

22     screw; correct?

23  A.  Correct.

24  Q.  It was not fixed to the channel in which you

**Shina, Sammy, 5/3/06**                                    **Page 44**

00045

1    examined it, correct?

2  A.  Correct.

3  Q.  So you have never examined a Quick-Tilt balance

4    of Caldwell as it is properly installed in a

5    channel; is that correct?

6  A.  Correct.

7        MR. SLIFKIN:  Mark that, please.

8        (Quick-Tilt*nc document marked Exhibit

9    No. 3.)

10  Q.  Mr. Shina, I'll place before you what's been

11    marked as Shina Exhibit 3.  Ask you if you

12    recognize that document.

13  A.  Yes.

14  Q.  Is that document the same as the page that is

15    attached to your Exhibit 1 listed as figure 3

16    towards the back?

17  A.  Yes.

18  Q.  It's a color copy of the black and white figure 3

19    you have in your report; is that correct?

20  A.  Mm-hmm.  Mm-hmm.

21  Q.  I would like to see if we can agree on some

22    terminology.  What I would like to do is have you

23    take a pen.  Do you have one?

24  A.  No.

00058

1 Q. Other than the single instance in which you saw

2 the Caldwell balance in that channel, you don't

3 know if a Caldwell balance has ever been put in a

4 jamb channel made by that company that made the

5 sample, do you?

6 A. I only saw the one instance, that's correct.

7 Q. Right. In other words, Caldwell sells balances

8 to a number of companies that make window

9 products, correct?

10 A. I assume.

11     MR. SINGER: Objection.

12 Q. You don't really know, do you?

13 A. I do not.

14 Q. And the jamb channels you've stated have varying

15 flange separations, correct?

16 A. Correct.

17 Q. So I'm asking you if you know whether a Caldwell

18 balance has ever been installed in a jamb channel

19 having the flange separation equal to or less

20 than the flange separation of the sample you

21 looked at.

22 A. I only looked at that one sample. I cannot make

23 a statement about others.

24 Q. Right. What are the forces that are tending to

00059
1    make the housing rotate in a proper installation

2    of the Caldwell balance inside of a jamb channel?

3  A.  The forces are rotational forces.

4  Q.  I'm sorry.  Go ahead.

5  A.  Caused by the extension of the spring.

6  Q.  Could you just describe mechanically how the part

7    in your opinion is caused to rotate by the

8    spring?

9  A.  There is more force on one side as there is on

10    the other.  And that would force the rotation.

11  Q.  What causes that force?

12  A.  The pulling of the spring.

13  Q.  Does the spring act on some part inside the

14    mounting means that causes the mounting means to

15    tend to rotate?

16  A.  The -- as was described in the patent -- and I

17    could refer to it --

18  Q.  I'm not asking about the patent.  I'm asking you

19    about the Caldwell product.

20  A.  The Caldwell product that I saw I was not able to

21    extend so I can only answer from the patent.

22  Q.  So you --

23  A.  Since it was not fixed.

24  Q.  You did not extend the spring in the Caldwell

**Shina, Sammy, 5/3/06**                          **Page 59**

00073

1    appears to me that there's somewhere on the order

2    of an eighth of an inch spacing on either side of

3    the spine between the spine and its corresponding

4    flange. Is that a fair characterization of the

5    scale?

6        MR. SINGER: Objection.

7 A. I can't tell. I don't know if it's to life or

8    whatever.

9 Q. Okay. We'll look at some balances later.

10 A. Sure.

11 Q. Other than the spine, what other forces can you

12    see that would resist the rotational force caused

13    by the spring in your opinion?

14 A. I think the spine is the primary force.

15 Q. I understand that. I'm looking for the secondary

16    forces.

17 A. Well, we discussed that the two coils as I see

18    could act differently on different sides of the

19    mounting means.

20 Q. What else?

21 A. That's it.

22 Q. Okay. There's nothing else in that drawing that

23    you would see that would cause the balance to

24    resist rotation?

00074

1 A.  There might be a possibility that there is a

2     portion E that sits inside the channel.  Could

3     exert a force, a secondary force.

4 Q.  "E" I think is what we called the dust cover

5     earlier, correct?

6 A.  That's correct.

7 Q.  How would that resist rotation?

8 A.  I can't tell how it fits into the channel but it

9     would resist the rotation by the fact that if it

10    rotates one way or the other way, it could have

11    some slight effect.

12 Q.  And how would that effect be manifested?

13 A.  By the -- by the fact that E would hit against

14    one of the sides and will prevent further

15    rotation.

16 Q.  Okay.  Anything else in the drawing in Shina

17    Exhibit 3 that would hit against the sides to

18    prevent rotation that you can see?

19 A.  I can't see from what I can see here.

20 Q.  Okay.  Are there any other things that are shown

21    in Shina Exhibit 3 that would act to resist

22    rotation of that part?

23 A.  Not that I can see.

24 Q.  Does the screw that's shown in Shina Exhibit 3

00075

1    force the mounting means against the back of the

2    channel?

3  A.  Yes.

4  Q.  Is there frictional force caused by the touching

5    of those two parts?

6  A.  There might be.

7  Q.  Is the frictional force dependent on how tight

8    that screw is?

9  A.  Could be.

10  Q.  Could be or is?

11  A.  Is.

12  Q.  The tighter the screw, the greater the friction

13    force, correct?

14  A.  Correct.

15  Q.  So we've now identified at least two secondary,

16    to use your terminology, forces that act to

17    oppose rotation of that part, those being the

18    dust cover hitting the sides and the frictional

19    force from the screw, correct?

20  A.  Mm-hmm.  Yes.

21  Q.  Okay.  There may be others but you can't tell

22    from this drawing?

23  A.  Correct.

24  Q.  In rendering your opinion, did you compare the

00077

1  Q.  I see there is more.

2  A.  Sure.

3  Q.  Thank you for that.

4          Did you measure the forces that allowed

5      you to reach this conclusion?

6  A.  No.

7  Q.  So how do you know that the forces causing

8      rotation are greater than the forces resisting

9      rotation on an actual Caldwell balance as

10     properly installed in a channel?

11 A.  I tried physically to pull the balance and the

12     force looked very, very -- looked large.  And the

13     top portion of the cover looked very thin to me.

14 Q.  That balance you examined did not have a screw,

15     correct?

16 A.  Did not have a screw, that's correct.

17 Q.  And you don't know what the value of the

18     frictional force resisting rotation is in a

19     properly installed Caldwell balance, do you?

20 A.  No, I do not.  But my experience tells me -- I

21     inspected the brochure by Caldwell on the

22     Quick-Tilt and I did not see any specification as

23     to the force of the screw to be applied so

24     therefore, I am not sure what the force would be

00078

1    since no specification is given in the brochures.

2  Q.  So you simply don't know the value of the

3      frictional force caused by the screw in a

4      properly installed balance, do you?

5  A.  I could not determine it based on the lack of

6      specification in the Caldwell brochure.

7  Q.  And so you don't know whether it's larger or

8      smaller than the force tending to cause rotation,

9      do you?

10  A.  I do not know since I have no idea what it is.

11  Q.  And if the frictional force plus the force caused

12      by the dust cover are greater than the force

13      tending to make the part rotate, the part would

14      not rotate, correct?

15  A.  Given that statement only, the way you stated it,

16      that is correct.  As -- sorry.

17  Q.  You're a professor of engineering, correct?

18  A.  Correct.

19  Q.  This is a setup that you could give to a student

20      of engineering and have him calculate the forces

21      acting on a part, couldn't you?

22  A.  Correct.

23  Q.  And there would be a series of equations?

24  A.  Correct.

00079

1 Q. And you would have on one side force tending to

2    cause rotation and on the other side you could

3    have a series of equations that added up the

4    force resisting rotation, correct?

5 A. Correct.

6 Q. And if you knew all those values, you could tell

7    whether the part would rotate or not, correct?

8 A. The only -- I do not know the value --

9 Q. I'm asking --

10 A. Sure.

11 Q. -- theoretically --

12 A. Yeah.

13 Q. -- if you knew the values of the forces, if the

14    student knew the value of the forces, the student

15    could calculate whether that part would rotate or

16    not, right?

17 A. If all the values are present and all the

18    measurements are made and available to the

19    student, the student could do that.  That's

20    correct.

21 Q. Were all those measurements made by you?

22 A. I did not make those measurements.

23 Q. Did you know the values of those forces?

24 A. I did not calculate the values of those forces.

00092

1    away from the flanges, then it would not act in

2    that manner.

3  Q.  I'm asking you in terms of inhibiting rotation,

4    to conclude that the spine has inhibited

5    rotation, must we conclude that the spine has

6    touched the flange?

7  A.  Correct.

8  Q.  It doesn't inhibit rotation by its presence alone

9    between flanges but must touch the flange in

10    order to stop rotation, correct?

11  A.  Correct.

12  Q.  There is a force between the spine and the flange

13    when the spine touches the flange that acts

14    opposite the force causing rotation, correct?

15  A.  Correct.

16  Q.  So in order to infringe the claim, must we

17    conclude that the spine touches the flange?

18       MR. SINGER:  Objection.

19  A.  The spine has to be in contact with the flange.

20  Q.  If the spine doesn't touch the flange, the spine

21    doesn't inhibit rotation, correct?

22  A.  Only to the effect that let's say if rotation

23    does begin and the spine would rotate, then it

24    would touch it and it would then inhibit

00093

1    rotation.

2  Q.  The spine must touch the flange in order for the

3    spine to inhibit rotation, correct?

4  A.  The spine must be in contact with the flange to

5    inhibit rotation.

6  Q.  If the spine does not contact the flange, the

7    spine does not inhibit rotation, correct?

8  A.  Correct.

9  Q.  If the spine does not inhibit rotation, there is

10    no infringement of Amesbury's '638 patent, is

11    there?

12          MR. SINGER:  Objection.

13  A.  In the wording of the -- let me read the wording

14    so we can be absolutely sure.

15  Q.  Mm-hmm.

16  A.  Okay?

17          I refer to my report, page 11, item H.

18    This is the outcome of the spine "whereby

19    rotational motion of said mounting means is

20    inhibited."

21          That's the outcome of the spine.  And

22    now I'm going to look at the -- and then the

23    previous claim is the definition of the spine

24    itself.

00115

1  A.  Mm-hmm.

2  Q.  Looking at Exhibits 6 and 7 --

3  A.  Right.  Sorry.

4  Q.  In its present condition, you would have to

5      conclude that the combination of the balance and

6      the channel do not infringe claim one of the '638

7      patent, correct?

8  A.  Correct.

9  Q.  And looking at it in its present condition, the

10     combination of Exhibit 6 and 7, you would have to

11     conclude that that combination does not infringe

12     claim eight of the '638 patent, correct?

13  A.  Correct.

14  Q.  Let me ask the same question because I'm not sure

15     that I did on the other combination and that is

16     Exhibit 6 and Exhibit 5.  I have now placed those

17     two together and ask you in its present

18     condition, does the combination of Exhibits 5 and

19     6 infringe claim one of the '638 patent?

20  A.  As I see today for the first time, Exhibit 5,

21     Shina Exhibit 5 and Shina Exhibit 6, and in its

22     present condition, which does not include

23     possible degradation over time of the dust cover

24     and of the wings, this particular combination of

**Shina, Sammy, 5/3/06**                    **Page 115**

00116
1    Exhibit 6 and 5 does not infringe on claim one.

2  Q.  Okay.  Does the combination of Exhibit 6 and 5 in

3    its present condition infringe claim eight of the

4    '638 patent?

5  A.  I would repeat my same proviso, which is the

6    exhibits that I see today, presented to me today

7    for the first time, and not -- in its present

8    condition not counting on possible degradation of

9    the dust cover and the wings, that the exhibits

10    that I see before me do not infringe on claim

11    eight.

12  Q.  I place before you what I showed you before.

13    Braid Exhibit 9.  And I'll ask you in its present

14    condition, does the combination of the balance in

15    channel -- strike that.  In its present

16    condition, does the combination of the frame jamb

17    and balance in Braid Exhibit 9 infringe claim one

18    of the '638 patent?

19  A.  As we discussed before, I'm seeing before me

20    Exhibit Braid 9.  I cannot see the width of the

21    wings so I cannot comment as to the wings and in

22    its present condition, which does not include

23    degradation of the dust cover.  And since I

24    cannot move the balance since it's attached by a

**Shina, Sammy, 5/3/06**                        **Page 116**

00117

1   screw to the jamb, that I would say it -- I

2   cannot determine the -- since I cannot rotate it

3   myself physically, that it possibly might not

4   infringe.

5 Q. You cannot determine whether it does or does not

6   infringe. Is that what you're saying?

7 A. Because I would like to rotate it like I did with

8   the other two.

9 Q. Go ahead. Rotate it.

10 A. I can't. It's screwed in.

11 Q. Well, that's the way you would see it in a window

12   installation, wouldn't you? Screwed in.

13 A. Yes, you would. But again, then I would have to

14   add the proviso over time where it would -- the

15   screw might be -- might be loosened over time. I

16   do not know what force was applied to the screw,

17   whether it was a typical installation or special

18   installation. I do not have enough information.

19 Q. I'm asking you in that particular exhibit, Braid

20   Exhibit 9, and the way it's currently installed,

21   without reference to degradation over time,

22   without reference to loosening of screws, does

23   that Braid Exhibit 9 infringe claim one of the

24   '638 patent?

**Shina, Sammy, 5/3/06**             **Page 117**

00118

1  A.  I would just like to add before I make my

2     statement that I'm not sure what torque was used

3     to install the screw and whether it was to any

4     standard or any instruction or where it was made

5     since I have no collection or information as to

6     that event.

7          That given this combination and given

8     the provisos we have talked about, it does not

9     infringe.

10  Q.  Okay.  I wasn't asking you about various torques.

11     I'm asking you about a particular exhibit that

12     you have in your hand.  If you could pick that up

13     again --

14  A.  Right.

15  Q.  I would ask you as it's presently assembled, does

16     Braid Exhibit 9 infringe claim one of the '638

17     patent?

18          MR. SINGER:  Objection.

19  A.  As it's presently assembled, which I have no

20     information as to who did it and where it was

21     taken from and what conditions under which it was

22     assembled, I would say -- I would make a

23     statement that there is -- there is a probability

24     that it does not infringe mainly because I do not

00119

1    know where it came from, what condition it was

2    made.

3  Q.  Is it more probable than not that it doesn't

4    infringe?

5  A.  Yes.

6  Q.  Okay.  It is more probable that it does not

7    infringe claim one of the '638 patent?

8  A.  Correct.

9  Q.  With reference to claim eight of the '638 patent,

10    is it more probable than not that Braid Exhibit 9

11    does not infringe claim eight of the '638 patent?

12  A.  Again, I give the same provisos that I gave

13    before.  And that is I cannot tell the width of

14    the wings.  I cannot tell what force was used,

15    what torque was used to install the screw.

16    Whether it was special or under operating

17    conditions or under special conditions.  But

18    given what I see today for the first time, I

19    would say there is a probability it does not

20    infringe.

21  Q.  Which is greater than the probability that it

22    infringes?

23  A.  Correct.

24  Q.  Okay.  That statement is correct as to both

00120

1    claims one and eight of the '638 patent?

2  A.  As regards to the combinations of Exhibit --

3    Braid Exhibit 9, is it?  I'm sorry.  Yeah.

4  Q.  When we were concluding -- strike that.  When we

5    were discussing noninfringement, you must find a

6    missing element, correct, an element that is in

7    the claim but not in the device, correct?

8  A.  Correct.

9  Q.  What element is in the claim but not in the

10    product that leads you to conclude at least a

11    probability of noninfringement?

12        MR. SINGER:  Specifically with respect

13    to Braid 9?

14        MR. SLIFKIN:  Yes.

15  A.  Okay.  It's the -- if I look at '638, Exhibit 4,

16    I look at Exhibit 4, column 6, around line 14,

17    and I will read.  "A raised spine positioned

18    between and in the same plane as said inwardly

19    turned opposed flanges of said channel means

20    whereby rotational motion of said mounting means

21    is inhibited."

22  Q.  And in a discussion we've had about probabilities

23    of noninfringement, it is that element that is

24    more probable than not missing in the Braid

**Shina, Sammy, 5/3/06**                    **Page 120**

00180

1 as Still Exhibit 5 is the device that's shown in

2 the Sterner patent, which is Shina Exhibit 9?

3   MR. SINGER: Objection.

4 A. Except for the -- discussed items of differences

5 between what I see as Still 5 and my figure 12, I

6 would agree.

7 Q. Now I would ask you to examine the front face of

8 the balance that is between the flanges. Do you

9 see that?

10   Do you see what I'm talking about?

11 A. The one that says "down"? Is that correct?

12 Q. Yes. The one with the word "down" on it. Do you

13 see that?

14 A. Yes, I do see that.

15 Q. Okay. Is that front face with the word "down" on

16 it between and in the same plane as the flanges

17 of that frame jamb?

18 A. Between and in the same plane, yes.

19 Q. Is it possible that now that you go back and look

20 at figure 3 of the Sterner patent that what's

21 depicted in Sterner patent figure 3 is in fact

22 Still Exhibit 5 in all material respects?

23   MR. SINGER: Objection.

24 A. Okay. May I put it in here since the contentious

00181

1    line we're talking about is this feature so let

2    me put it where we would think it would be?

3  Q.  Go ahead.  Go right ahead.

4  A.  Okay.

5      Okay.  Now we can repeat the question.

6      (Question read.)

7      MR. SINGER:  Objection.

8  A.  Again, I go back to my comment earlier about the

9    double line, and the double line usually refers

10    to a two feature that coincides as opposed to a

11    single feature.

12  Q.  Is there somewhere where that double line

13    convention is documented in your report?

14  A.  No.

15  Q.  Is there some reference that you would look to to

16    see if that double line convention is truly a

17    convention in the mechanical drawing field?

18  A.  I would have to do some research on that.

19    Looking at drawing books and such but that's a

20    common convention in the industry.

21  Q.  Have you looked at drawing books in connection

22    with the preparation of your reports?

23  A.  No.

24  Q.  The surface that we refer to in the physical

00182

1    exhibits you have there, Still 5, is it between

2    and in the same plane as the flanges?

3 A.  This is the surface that you called "down."

4 Q.  Yes.

5 A.  Yes.  It is in the same plane.  That surface is

6    in the same plane as the flanges.

7 Q.  Is that surface raised from the remainder of the

8    housing that's holding the coil?  In fact, is it

9    above the -- a portion of the housing that's

10    holding the coil?

11        MR. SINGER:  Objection.

12 A.  That surface -- "above" is a term.  An

13    operational term in this case.  I'm going back to

14    figure 12.  So that surface in the operational

15    sense, the way the device sits in there, the

16    surface marked "down" is above the flat surface,

17    which is at the bottom operationally of the

18    device.

19 Q.  So operationally it's a raised surface from

20    another section of the housing, correct?

21        MR. SINGER:  Objection.

22 A.  "Raised" is a relative term.  So it's a surface

23    that dimensionally sits above the other surface,

24    that's correct.

**Shina, Sammy, 5/3/06**                    **Page 182**

00183

1  Q.  All right.  Is it longer than it is wide?

2  A.  Yes, it is.

3  Q.  Okay.  Is it rectangular in shape generally?

4  A.  Generally.

5  Q.  With a curved top, curved bottom?

6  A.  Correct.

7  Q.  Okay.  Other than its length, does it have the

8      same general configuration as the spine that is

9      in Shina Exhibit 8?

10  A.  Okay.  Just so I can be perfectly precise so we

11      don't have a misunderstanding, the spine in

12      figure -- I'm sorry.  The spine in --

13  Q.  8?

14  A.  In Exhibit 8 is a feature of a surface which has

15      wings and a spine.  The balance that we have the

16      surface called "down" does not have wings.

17  Q.  But looking only at the surface that has the word

18      "down" on it and looking only at the surface --

19      only at the surface we call the spine, do they

20      have the same general shape?

21  A.  If I talk about geometry, they both are generally

22      rectangular.

23  Q.  Elongated rectangular shape?

24  A.  That's looking at one direction only, yes.  One

**Shina, Sammy, 5/3/06**                    **Page 183**

00184

1    plane only.

2  Q.  In fact, their width is fairly close to one

3    another, correct?

4  A.  I have to examine that, if I may.

5        No.  I believe one is wider than the

6    other.

7  Q.  Which one is wider?

8  A.  Figure 12.  The "down" surface.

9  Q.  The surface on the Shina Exhibit -- I'm sorry.

10    The surface on Still Exhibit 5 --

11  A.  Yeah.

12  Q.  -- is wider?

13  A.  Wider.

14  Q.  In other words, when placed in a frame jamb

15    between the flanges, it would be closer to the

16    flanges than Shina Exhibit 8 would be when placed

17    in the same frame jamb, correct?

18  A.  Depends on the width of the frame jamb.

19  Q.  I'm saying putting them both in the same frame

20    jamb.

21  A.  In the same frame jamb, which at least is wider

22    than --

23  Q.  Yes.

24  A.  The wider one of them.

00185

1  Q.  Yes.

2  A.  What's the question?

3  Q.  Would the sides of the surface that have the word

4      "down" written on them be closer to the flanges

5      than with the sides of the spine in the Caldwell

6      balance?

7  A.  When placed in the same --

8  Q.  Yes.

9  A.  Theoretically, yes.  That would be true.

10 Q.  Okay.  I would like you to place that back inside

11     --

12 A.  You can do that.

13 Q.  Okay.  I'll do that.  Still Exhibit 5.  And ask

14     you if the flat surface that's between and in the

15     same plane as the flanges would inhibit the

16     rotation of that surface.

17 A.  Again, I would like to say the proviso that we're

18     describing the surface "down" and not the word

19     "spine" or "projection."  As I see this surface

20     "down," marked "down," it would seem to prohibit

21     rotation of the device.

22 Q.  Because it fits snugly within the -- between the

23     flanges, correct?

24 A.  That's correct.

# SUPPLEMENTAL DECLARATION
## OF SAFRAZ W. ISHMAEL

# EXHIBIT 40

00001
1

2           UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS
3   - - - - - - - - - - - - - - - - - - -x
    AMESBURY GROUP, INC., and
4   AMESBURY SPRINGS LTD.,
         Plaintiffs,
5
         v.   Civil Action No. 05-10020-DPW
6
    THE CALDWELL MANUFACTURING
7   COMPANY,
         Defendant.
8   - - - - - - - - - - - - - - - - - - -x
         C O N F I D E N T I A L
9
    Deposition Upon Oral Examination Of:
10       Charles E. Still

11
    Location:   Harris Beach PLLC
12            99 Garnsey Road
            Pittsford, New York  14534
13

14  Date:      May 2, 2006

15

16  Time:      9:11 a.m.

17

18

19  Reported By:  Joanne N. Pero

20          Alliance Shorthand, Inc.

21          Suite 1500 - The Penthouse

22          Alliance Building

23          183 Main Street East

24          Rochester, New York  14604

25

**Still, Charles E., 5/2/06**                    **Page 1**

00039

1 associated with that part, would the device shown in

2 figure 2A as modified include a fixed pulley block?

3    A.  Yes.

4    Q.  Would it include a pulley beneath the fixed

5 pulley block?

6    A.  Yes.

7    Q.  Would it have a cord that wrapped around that

8 bottom pulley and projected towards, up towards the

9 jamb?

10    A.  Yes.

11    Q.  Would the travel of such a balance be longer

12 than the travel of the balance shown in figure 2A of

13 Exhibit 6?

14    A.  It would be totally nonfunctional.

15    Q.  And why is that?

16    A.  Because the rest of the surfaces that are

17 incorporated into the guide are not incorporated into

18 this other housing.

19    Q.  Which surfaces are those?

20    A.  The caming surface, the -- and none of the

21 functional parts of that type of balance is included in

22 this kind of a pulley system.

23    Q.  Okay.  If I were to take the device shown in

24 figure 2A of the Exhibit 6 and put the pulleys in that

00040

1  are shown on the first page of Exhibit 18, the two

2  fixed pulleys and the third pulley beneath that, would

3  the travel then be extended of the balance shown in

4  figure 2A as modified?

5     A.  Say it again, please.

6          MR. SLIFKIN:  Read that back, please.

7          (Reporter read the record as requested).

8     A.  Relative to what?

9     Q.  The one that's shown in the drawing, I'm

10  asking you to compare the modification to the one

11  that's shown in the drawing as unmodified.

12    A.  The travel would be increased relative to the

13  channel length.

14          MR. SLIFKIN:  I think this would be a

15  good time to end for the day.  I'd like to see those

16  documents if you don't mind.

17          (Deposition suspended at 5:02 p.m.).

18

19

20

21

22

23

24

00053

1

2  ordinary person skill of the art.

3      Q.  Now, if we look at the Braid patent, for

4  example, and your report that we have designated as

5  Exhibit 6.  At the end of page 6, there is a

6  paragraph in your report where you have written

7  "Braid U.S. patent 5,365,638 based upon my findings

8  is not novel and/or is obvious and therefore not

9  valid"; do you see that?

10     A.  Yes.

11     Q.  So I want to understand your opinion, is

12  it your opinion that the claims of the Braid patent

13  lack novelty over the prior art?

14     A.  Yes, it's just not novel.

15     Q.  And is it in addition your opinion that

16  the claims of the Braid patent are obvious in view

17  of the prior art?

18     A.  Yes.

19     Q.  And the prior art that we focused on is

20  the Sterner '808 patent; is that correct?

21     A.  Yes.

22     Q.  Let me ask you this:  Do you have an

23  understanding of what would be required of the

24  disclosure of the Sterner '808 patent for it to

25  anticipate any claim of the Braid patent?

00054

1

2    A.   Well, as I first looked at this, it had

3  all the elements of '638.

4    Q.   But it doesn't show the face of the

5  mounting element in the same plane as any flanges,

6  correct?

7    A.   In their drawings, they don't do a good

8  job of that.

9    Q.   I am sorry?

10    A.   As an ordinary skilled person, I would

11  look at this and know what it is and what it means.

12    Q.   But again, the drawings don't show that,

13  right?

14    A.   That is correct.

15    Q.   And the specification doesn't describe

16  it, correct?

17    A.   That's right.

18    Q.   So when you reach your opinion that

19  Sterner anticipates the Braid '638 patent, you are

20  adding to the disclosure of Sterner your knowledge

21  and expertise; is that fair to say?

22    A.   It is what it is.  It's a raised spine.

23    Q.   What is a raised spine, I am sorry, I

24  didn't understand that.

25    A.   Well, the projection or the raised spine

00059

1

2    A.  Yes.

3    Q.  And Caldwell's Quick-Tilt products -- at

4  the top of page 2 of your claim chart now, you

5  wrote "The coiled body portion of said coiled

6  ribbon spring having the other end of said coiled

7  ribbon spring within the coil being positioned in

8  said mounting means, said other end of said coiled

9  ribbon spring being free and unattached to said

10  mounting means"; is that your description of your

11  understanding of the feature of Caldwell's

12  Quick-Tilt products?

13    A.  Also in parentheses "see prior art in

14  '638 patent, figure 1 and figure 3."

15    Q.  I understand that but is it also a

16  description of your understanding of the feature of

17  the Caldwell's Quick-Tilt products?

18    A.  Yes.

19    Q.  You further describe the products as

20  including said mounting means being secured in said

21  channel means; is that correct?

22    A.  Yes.

23    Q.  You said further that, the mounting means

24  includes a raised spine; is that correct?

25    A.  Yes.

00060

1

2    Q.   The raised spine is positioned between

3    and in the same plane as the inwardly-turned

4    opposed flanges of the channel means, correct?

5    A.   Yes.

6    Q.   And then you wrote the raised spine of

7    Caldwell's Quick-Tilt does not inhibit rotation; is

8    that correct?

9    A.   Yes.

10    Q.   How did you determine that the raised

11    spine of Caldwell's Quick-Tilt does not inhibit

12    rotation?

13    A.   By examining the samples and trying the

14    samples out in the different window jambs and also

15    studying the dimensions of the entire assembly.

16    Q.   When you say "different window jambs,"

17    did you inspect the sample in window jambs in

18    addition to those we have marked as Exhibit 4-A,

19    4-B?

20    A.   Yes.

21    Q.   How many?

22    A.   There is one that was shown to me by this

23    office and it is here.

24    Q.   Could I see that, please?

25    A.   Yes.

**Still, Charles E., 5/2/06**                    **Page 60**

00072

1

2  yes.

3     Q.  So whether -- strike that.

4          Independent of whether additional

5  features of the Caldwell balance inhibit rotation,

6  in this assembly, this spine also inhibits rotation

7  of the balance, correct?

8     A.  It can.

9     Q.  Do you know whether Caldwell sold

10  Quick-Tilt balances to any customer installing

11  those balances in jambs configured like those we

12  have marked as Still Exhibit 10?

13    A.  I do not.

14    Q.  So can we agree that in some applications

15  it's your opinion that -- strike that.

16          So it's your opinion that in certain

17  installations, the spine on Caldwell's Quick-Tilt

18  does not inhibit rotation because it's narrower

19  than the gap defined by the flanges, correct?

20        MR. SLIFKIN:  Objection.

21    Q.  And in other installations having

22  narrower gaps, the spine can inhibit rotation,

23  correct?

24        MR. SLIFKIN:  Objection.

25    A.  It does not.  Let me show you.  When you

**Still, Charles E., 5/2/06**                    **Page 72**

00073
1

2 had this pulled out, you are disregarding the top

3 cover which is a tighter tolerance than the body of

4 the element. If you put the unit all the way in,

5 the top of the mounting element acts as an

6 anti-rotation as well.

7    Q.  In addition to the spine, correct?

8    A.  In addition, no.  In addition to the body

9 of the element itself.  In other words, it has a

10 tighter tolerance because it is designed to be

11 tight, tighter than the actual mounting element.

12 So the spine does not have any relationship to the

13 rotation at all.

14    Q.  How --

15    A.  Put that in backwards and then try to

16 rotate it.  Right there.  It's larger than the

17 mounting element.

18    Q.  This is called a dust cover, right?

19    A.  Yes.

20    Q.  The dust cover is wider than the mounting

21 element; isn't that correct?

22    A.  Yes.

23    Q.  The walls of the back of the mounting

24 element are narrower than the width of the dust

25 cover, correct?

**Still, Charles E., 5/2/06**                    **Page 73**

00078
1

2  Caldwell Quick-Tilt balance includes all the

3  features of claim 1 other than the raised spine

4  that inhibits rotation; is that correct?

5    A.  That's right.

6    Q.  And in fact, throughout your claim charts

7  concerning infringement -- strike that.

8        Throughout your claim charts relating to

9  your opinion that Caldwell's Quick-Tilts do not

10  infringe Amesbury's '638 patent, the only feature

11  of any of those claims that you contend Caldwell's

12  Quick-Tilt products omit is a raised spine that

13  inhibits rotation, isn't that right?

14    A.  That's right.

15    Q.  You concede that the products include all

16  of the other limitations of the asserted claims,

17  correct?

18    A.  Yes.

19  (The following exhibit was marked for

20  identification:  Still 11.)

21    Q.  Mr. Still, I would like you to look at a

22  document we have marked Still Exhibit 11.  It bears

23  the title "Expert Witness Report of Charles E.

24  Still" and is dated March 8 of 2006.  Do you

25  recognize that?

00099

1

2  the cord.

3     Q.  As you read these patents -- strike that.

4        Based on your knowledge and expertise, is

5  there a difference between the term "roller" and

6  "pulley"?

7     A.  In my opinion, yes.

8     Q.  What are the differences?

9     A.  If you compare a steam roller to a car

10  tire, a roller is real wide, it's cylindrical and

11  goes through a center point but it's normally wider

12  than a wheel or a pulley.

13     Q.  With respect to window balance design, is

14  there a difference between the term "roller" and

15  "pulley" based on your knowledge and experience?

16     A.  There can be, yes.

17     Q.  What differences do you have in mind?

18     A.  A roller may have a certain design

19  intent.  It may or may not have a groove in the

20  center where a pulley does.

21     Q.  So when you concluded that the Prosser

22  patent shows a top guide, you were considering the

23  tongues 25 and 26; is that correct?

24     A.  That is correct.

25     Q.  And when you concluded that the Prosser

**Still, Charles E., 5/2/06**                              **Page 99**

00110

1

2  the same thing?

3    A.  No.  A wheel and pulley is the same.

4  Roller is different.

5    Q.  So you understand that element of the

6  Thompson balance that you have just indicated to me

7  to be a roller, correct?

8    A.  It is termed as a roller when

9  described -- compared to '264 but in my opinion it

10  is a pulley wheel.

11    Q.  What if any differences are there in your

12  opinion between a pulley wheel and a roller as the

13  '264 patent uses the term?

14    A.  There is really not much difference.  The

15  patent calls for bottom roller and bottom guide.

16  If I were describing that, I would call it a

17  pulley.

18    Q.  Did you bring with you one of the

19  Caldwell 86xt balances?

20    A.  Yes.

21    Q.  Could I see that, please.

22    MR. KLINE:  If we could mark this as

23  Deposition Exhibit 16, please.

24  (The following exhibit was marked for

25  identification:  Still 16.)

**Still, Charles E., 5/2/06**                    **Page 110**

00121
1

2    A.  To extend the sash travel upwards for

3  egress.  To extend the upward sash travel for

4  egress.

5    Q.  Now, in Still Deposition Exhibit 16, can

6  we agree that part of the bottom guide is located

7  external to the channel?

8    A.  Yes.

9    Q.  And part of the bottom guide is located

10  internal to the channel?

11    A.  Yes, sir.

12    Q.  Can we agree that the bottom pulley in

13  Still Deposition Exhibit 16 is arranged within the

14  channel?

15    A.  Yes.

16    Q.  In fact, it's within the bottom guide,

17  isn't it?

18    A.  Yes.

19    Q.  Do you know whether -- strike this.

20      This Thompson balance that we have marked

21  Still Deposition 15, do you know who manufactured

22  this?

23    A.  I do.

24    Q.  Who?

25    A.  Amesbury.

00125
1

2          It is mounted to -- what did you call

3  that device?

4     A.  That is a fixed pulley block.

5     Q.  Caldwell's 86xt bottom pulley is mounted

6  to its fixed pulley block; is that right?

7     A.  Yes.

8     Q.  And that fixed pulley block is arranged

9  to place the bottom pulley within the bottom guide,

10  correct?

11     A.  Yes.

12     Q.  And in your Exhibit B to your report you

13  further describe Caldwell's Series 86xt balance as

14  including a fixed pulley block unit connected to

15  the channel; is that correct?

16     A.  Yes.

17     Q.  It includes a translatable pulley block

18  unit moveable within the channel, correct?

19     A.  Yes.

20     Q.  It includes a spring, correct?

21     A.  Yes.

22     Q.  The spring has first and second ends,

23  correct?

24     A.  Yes.

25     Q.  The first end of the spring is fixed

**Still, Charles E., 5/2/06**                    **Page 125**

00134

1

2 omitted from Caldwell's 97i balance, correct?

3    A.  Yes.

4    Q.  In your view, the 97i balance omits any

5 pocket in the shoe, right?

6    A.  Yes.

7    Q.  And it omits a connecting device for

8 attaching the balance shoe within the U-shaped

9 channel; is that correct?

10    A.  Yes.

11    Q.  Now, the balance shoe is connected within

12 the U-shaped channel, isn't it?

13    A.  It is.

14    Q.  What holds it there?

15    A.  A rivet.

16    Q.  So is it fair to call that rivet a

17 connecting device?

18    A.  I wouldn't.

19    Q.  Why not?

20    A.  That is a connecting rivet.

21    Q.  Any difference between a connecting rivet

22 and a connecting device in your view?

23    A.  A device could mean a number of things

24 but a rivet is a rivet.

25    Q.  Could a rivet be a device?

**Still, Charles E., 5/2/06**                    **Page 134**

00135
1

2    A.  You could probably put it in the

3  category, yes.

4    Q.  So a rivet connects the shoe to the

5  channel, correct?

6    A.  Yes.

7    Q.  And a rivet can be a device, right?

8    A.  It could be, yes.

9    Q.  You also say that the device -- strike

10  that.

11       Your report expresses the view that the

12  shoe in Caldwell's 97i balance omits any pocket; is

13  that correct?

14    A.  That is correct.

15    Q.  What definition of pocket did you have in

16  mind when you reached that conclusion?

17    A.  Well, something that is -- that is going

18  to hook around the balance like it does in the

19  Amesbury balance where it creates a pivot point for

20  the sash shoe to be rotated.

21    Q.  So when you concluded that Caldwell's 97i

22  balance omits any pocket, that is the definition of

23  pocket you had in mind; is that right?

24    A.  That is my explanation of a pocket, yes.

25    Q.  Describe for me in your words how the

**Still, Charles E., 5/2/06**                    **Page 135**

00141

1

2 aperture that is mounted into the sash carrier, it

3 comes out the other wall and of course it is

4 riveted in place. That is the only connecting

5 member to this device.

6    Q.  Now, there seems to be some interplay

7 between a portion of the channel -- strike that.

8        There seems to be some interplay between

9 a portion of the shoe and a second rivet passing

10 through the channel; can we agree to that?

11    A.  Yes.

12    Q.  What is the purpose of that relationship?

13    A.  The purpose of that is to keep the

14 rotation out and 9 degrees to the channel. There

15 is two legs that have been formed on the back end

16 of the molded carrier goes underneath a rivet that

17 supports the end of the spring and that minimizes

18 rotation.

19    Q.  Would it be fair to say that the end of

20 the shoe and those legs are designed to mate with

21 that second rivet?

22    A.  No.

23    Q.  Why not?

24    A.  It's a separate part of the housing, all

25 its purpose is to keep the rotation out.

**Still, Charles E., 5/2/06**                    **Page 141**

00142

1

2    Q.  How does it do that?

3    A.  When you put those two legs underneath

4  the rivet, it keeps -- inhibits it from rotating.

5  It does have nothing to do with the connection to

6  the channel.

7    Q.  I understand that.  I am just asking,

8  it's the interaction between the end of the shoe,

9  the legs and the rivet that prevent the rotation,

10  correct?

11    A.  Yes.  Once the balance is in place, it

12  serves no purpose.

13    Q.  Well, prevents the rotation, right?

14    A.  It won't rotate in a window.

15    Q.  I am sorry.  I didn't get the end of

16  that.

17    A.  I am sorry, it won't rotate in a window.

18  Once a balance is in place inside the jamb channel,

19  it cannot rotate.

20    Q.  Why is it necessary, then?

21    A.  Just to keep the part from swinging out

22  during shipment or during assembly, just to keep it

23  straight.

24    Q.  So when you concluded that Caldwell's

25  97ez balance omits any pocket, did you have in mind

**Still, Charles E., 5/2/06**                    **Page 142**

00143

1

2  the same definition of pocket that you described to

3  me earlier?

4    A.  Yes.

5    Q.  Have you ever considered any other

6  definition of pocket in connection with your

7  analysis in this matter?

8    A.  No.

9  (The proceeding recessed at 1:03 p.m.)

10  (The proceeding reconvened at 1:09 p.m.;

11  appearances as before noted.)

12  C H A R L E S   S T I L L, resumes:

13  EXAMINATION BY MR. KLINE CONTINUING:

14    Q.  Just a couple more questions.  Still

15  Deposition Exhibit 20, we looked at that clearance

16  in the shoe before through which the rivet passes?

17    A.  Yes.

18    Q.  Can we agree that that clearance helps to

19  secure the shoe in cooperation with the rivet to

20  the channel?

21    A.  No.

22    Q.  Why not?

23    A.  The wall of the rivet is actually

24  supported in the base of the part and also the

25  third leg that goes under the rivet to support it.

# SUPPLEMENTAL DECLARATION
# OF SAFRAZ W. ISHMAEL

# EXHIBIT 41

00001
1

2          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
3    - - - - - - - - - - - - - - - - - - - -x
     AMESBURY GROUP, INC., and
4    AMESBURY SPRINGS LTD.,
           Plaintiffs,
5
6          v.    Civil Action No. 05-10020-DPW

7    THE CALDWELL MANUFACTURING
     COMPANY,
           Defendant.
8    - - - - - - - - - - - - - - - - - - - -x
           C O N F I D E N T I A L
9
     Videotaped Deposition Upon Oral Examination Of:
10         Thomas F. Batten

11
     Location:    Harris Beach PLLC
12         99 Garnsey Road
           Pittsford, New York  14534
13

14   Date:       November 8, 2005

15

16   Time:       9:37 a.m.

17

18

19   Reported By:  Joanne N. Pero

20         Alliance Shorthand, Inc.

21         Suite 1500 - The Penthouse

22         Alliance Building

23         183 Main Street East

24         Rochester, New York  14604

25

00074
1

2    A.  In the last several days.

3    Q.  Did you put it together specifically for

4 this deposition?

5    A.  Yes.

6    Q.  We were talking previously about dates

7 for the 97ih, so let's stick with that for a

8 minute.  I see from looking at this document that

9 the design team for the 97ih was formed in

10 approximately October of 2002?

11    A.  Not entirely accurate, no.

12    Q.  What is inaccurate about that statement?

13    A.  There was a predecessor product to ih

14 called 97i.  It was a predecessor to the i hybrid,

15 otherwise known as ih.

16    Q.  What is the difference between the ih or

17 i hybrid and the 97i?

18       MR. SLIFKIN:  Objection.

19    A.  The principal difference is the weight

20 and ranges of the two products.  The sash weight

21 ranges that each carries is a little bit different.

22    Q.  Is there any difference in the shoe

23 between the 97i and the 97ih?

24    A.  No.

25    Q.  So the design team for the 97i was formed

**Batten, Thomas S., 11/08/05**                    **Page 74**

00128

1

2  difference.

3      Q.  And the second and the narrower end of

4  the carrier is designed to connect to the channel

5  of the inverted balance, correct?

6      A.  Connect to the channel?

7      Q.  Connect into the channel of the inverted

8  balance?

9      A.  Inserted into the channel, yes.

10     Q.  When the carrier is inserted into the

11  channel of the inverted balance, does it connect or

12  lock into place in that balance?

13         MR. SLIFKIN:  Objection.

14     A.  Not by itself, no.

15     Q.  How does it connect to the balance?

16         MR. SLIFKIN:  Form.

17     A.  It is connected with a rivet that passes

18  through the carrier body and through the side walls

19  of the channel.

20     Q.  Looking at Exhibit 10, can you taking the

21  pen, and I think that is next to you, can you draw

22  an arrow to the portion of the carrier through

23  which the rivet is placed on any of those drawings

24  where you feel it is a clear depiction of that?

25     A.  Sorry?

**Batten, Thomas S., 11/08/05**                    **Page 128**

SUPPLEMENTAL DECLARATION
OF SAFRAZ W. ISHMAEL

EXHIBIT 42

00001

```
 1          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
 2
                    05-CV-10020 (DPW)
 3                     VOLUME I

 4

 5  *****************************
    AMESBURY GROUP, INC., and    *
 6  AMESBURY SPRINGS LTD.,       *
        Plaintiff,       *
 7                       *
      v.                 *
 8                       *
    THE CALDWELL MANUFACTURING   *
 9  COMPANY,                *
        Defendant.          *
10  *****************************

11

12

13

14          VOLUME I OF THE DEPOSITION OF GARY
    ROGER NEWMAN, in his individual capacity, taken
15  pursuant to the applicable provisions of the Federal
    Rules of Civil Procedure, before Michelle Kaczynski, a
16  Registered Professional Reporter and Notary Public in
    and for the Commonwealth of Massachusetts, at the
17  offices of Goodwin Procter LLP, Exchange Place, Boston,
    Massachusetts, on Tuesday, October 18, 2005, at 4:06
18  p.m.

19

20

21

22
            KACZYNSKI REPORTING
23          72 CHANDLER STREET, SUITE 3
            BOSTON, MASSACHUSETTS  02116
24              (617) 426-6060
```

00023

1    Q.   -- in your handwritten changes?

2    A.   Yes.

3    Q.   So we've identified item two as the, as a

4  bottom pulley, and I'm trying to figure out what item

5  five is?

6    A.   Well, those are rollers within that same

7  housing.

8    Q.   I see.  Those are rollers.

9    A.   Yes.

10    Q.   Okay.  Are they fixed?

11    A.   In the housing, yes.

12    Q.   Is a roller different than a pulley?

13    A.   In my world it is.

14    Q.   It is.  What's the difference between a

15  roller and a pulley?

16    A.   Pulley typically means an assembly.

17    Q.   Are there -- there's two of them, right, two

18  rollers?

19    A.   Two.

20    Q.   Do two rollers make up an assembly?

21    A.   No, I mean, the -- in my terminology, the

22  whole housing assembled is the pulley.

23    Q.   The whole housing is a pulley?

24    A.   Well --

**Newman, Gary, 10/18/05**                    **Page 23**

00039

1   associated with that part, would the device shown in

2   figure 2A as modified include a fixed pulley block?

3      A.  Yes.

4      Q.  Would it include a pulley beneath the fixed

5   pulley block?

6      A.  Yes.

7      Q.  Would it have a cord that wrapped around that

8   bottom pulley and projected towards, up towards the

9   jamb?

10     A.  Yes.

11     Q.  Would the travel of such a balance be longer

12  than the travel of the balance shown in figure 2A of

13  Exhibit 6?

14     A.  It would be totally nonfunctional.

15     Q.  And why is that?

16     A.  Because the rest of the surfaces that are

17  incorporated into the guide are not incorporated into

18  this other housing.

19     Q.  Which surfaces are those?

20     A.  The caming surface, the -- and none of the

21  functional parts of that type of balance is included in

22  this kind of a pulley system.

23     Q.  Okay.  If I were to take the device shown in

24  figure 2A of the Exhibit 6 and put the pulleys in that

00040

1  are shown on the first page of Exhibit 18, the two

2  fixed pulleys and the third pulley beneath that, would

3  the travel then be extended of the balance shown in

4  figure 2A as modified?

5      A.  Say it again, please.

6          MR. SLIFKIN:  Read that back, please.

7          (Reporter read the record as requested).

8      A.  Relative to what?

9      Q.  The one that's shown in the drawing, I'm

10  asking you to compare the modification to the one

11  that's shown in the drawing as unmodified.

12      A.  The travel would be increased relative to the

13  channel length.

14          MR. SLIFKIN:  I think this would be a

15  good time to end for the day.  I'd like to see those

16  documents if you don't mind.

17          (Deposition suspended at 5:02 p.m.).

18

19

20

21

22

23

24

**Newman, Gary, 10/18/05**                    **Page 40**

00120

1  was a question.

2    A.  I am, yes.

3    Q.  So why don't you take some time and look at

4  the various views shown in Exhibit 30.  Also point out

5  that there's -- I'm sorry, the next page is a different

6  device, so if we could just concentrate on the first

7  page first.

8    A.  Do you have a better copy of this?

9    Q.  I do not.  Is there something that's unclear

10  to you from this copy?

11    A.  The print is very small, and the lines are

12  all the same color.  It's hard to make a, to define

13  what edges are which in the drawing.

14    Q.  Is this the first engineering drawing of a

15  part of a window balance that you are not able to

16  understand, because yesterday you testified that you

17  had seen a number of engineering drawings from

18  competitors and others that showed parts of window

19  balances and you understood them all?

20        MR. ISHMAEL:  Objection.

21    A.  This is not in a format that I'm normally

22  used to.

23    Q.  I thought we agreed this followed the

24  conventions of engineering drawings, is that not

**Newman, Gary, 10/19/05**                    **Page 120**

00121

1  correct?

2     A.  It does.  I am used to having different line

3  weights, different colors, different things that depict

4  surfaces, they're not included in this drawing.

5     Q.  The drawing that's at the top center is a

6  three-dimensional drawing that to me immediately

7  conveys construction of the device.  Do you not

8  understand the construction of the device from that

9  drawing?

10    A.  No, I don't.

11    Q.  What parts do you, are you confused about?

12    A.  I'm looking for a cross-section that shows

13  what plastic elements surround the rivet that is in the

14  channel.

15    Q.  Is that a different rivet than the one you

16  just mentioned adjacent to the letter A that you drew?

17    A.  I'm looking for a snapping element.

18    Q.  Do you see a snapping element?

19    A.  I have not picked it out, no.

20    Q.  Is it possible there is no snapping element?

21    A.  That's possible.

22        MR. ISHMAEL:  Objection.

23    Q.  If there were no snapping element, would that

24  mean there's no connecting device as claimed in claim

00122

1  two of Exhibit 15?

2          MR. ISHMAEL: Objection. Calls for a

3  legal conclusion.

4      A.  As in that claim, yes.

5      Q.  Yes what?

6      A.  If there is no connecting device, then it's

7  not the same as the one depicted in claim fifteen.

8      Q.  In claim -- the connecting device you

9  described as a snapping element, is that correct?

10     A.  It is a system for connecting the T-lock to

11  the channel, it's a snapping element.

12     Q.  And you don't see that in any of these

13  various views on the first page of Exhibit 30 --

14     A.  I'm not able to pick out the snapping element

15  in this drawing at this point, I'm sorry.

16     Q.  All right. It's possible there is none?

17     A.  It's possible there is none.

18          MR. ISHMAEL: Objection.

19     Q.  We have identified the rivet that's referred

20  to in line 63 approximately of claim two in Exhibit 15,

21  correct?

22     A.  Yes.

23     Q.  Or at least the location where the rivet

24  goes?

**Newman, Gary, 10/19/05**                           **Page 122**

# SUPPLEMENTAL DECLARATION
## OF SAFRAZ W. ISHMAEL

# EXHIBIT 43

00001
1

2          UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
3    - - - - - - - - - - - - - - - - - - -x
     AMESBURY GROUP, INC., and
4    AMESBURY SPRINGS LTD.,
          Plaintiffs,
5
          v.    Civil Action No. 05-10020-DPW
6
     THE CALDWELL MANUFACTURING
7    COMPANY,
          Defendant.
8    - - - - - - - - - - - - - - - - - - -x
               CONFIDENTIAL
9
     Videotaped Deposition Upon Oral Examination Of:
10          Jeffrey Robertson

11
     Location:    Alliance Shorthand, Inc.
12          183 East Main Street
          Rochester, New York  14604
13

14   Date:      November 29, 2005

15

16   Time:      9:35 a.m.

17

18

19   Reported By:  Joanne N. Pero

20          Alliance Shorthand, Inc.

21          Suite 1500 - The Penthouse

22          Alliance Building

23          183 Main Street East

24          Rochester, New York  14604

25

**Robertson, Jeffrey, 11/29/05**                              **Page 1**

00049
1

2    A.  Below.  In the picture?

3    Q.  Right.

4    A.  Okay.

5    Q.  Can you label that as "G"?

6    A.  (The witness complied.)

7    Q.  Can I take a look?

8    A.  (The witness complied.)

9    Q.  Now, in the 97ez, what is the purpose of

10  the plastic part you labeled as "F"?

11        MR. REFERMAT:  Objection.

12    A.  Prevent rotation in the carrier in the

13  channel.

14    Q.  Is this to prevent rotation of the

15  carrier while in operation?

16    A.  No.

17    Q.  When is it to prevent rotation?

18    A.  During handling of the balance or

19  shipping of the balance.

20        MR. REFERMAT:  Objection.

21    Q.  What is the purpose of the plastic part

22  labeled "G" in Exhibit 6?

23        MR. REFERMAT:  Objection.

24    A.  It bears the load that the sash puts on

25  the balance carrier against the rivet labeled "E."

00050

1

2    Q.  Now, does the parts F or G ever come into

3  contact with the rivet labeled "D"?

4        MR. REFERMAT:  Objection.

5    A.  Only if the carrier is bumped and there

6  is an impulse to rotate it.

7    Q.  But if you took the carrier and just

8  placed it on a table, does the rivet D touch any

9  part of the carrier?

10       MR. REFERMAT:  Objection.

11    A.  No.

12    Q.  Now, you said that the purpose of the

13  part labeled "F" is to prevent the rotation of the

14  carrier.  How does it prevent the rotation of the

15  carrier?

16    A.  It is -- it provides a point of contact

17  away from the axis of the rivet E about which the

18  carrier would want to rotate and at that point

19  contact prevents rotation around the rivet E.

20    Q.  What is the point of contact?

21       MR. REFERMAT:  Objection.

22    A.  The point of contact would be the surface

23  of part F against the channel.

24    Q.  Against what part of the channel?

25    A.  The back wall of the channel as we see it

00051
1

2  in the picture.

3     Q.   Is it possible that the carrier part F

4  would also rotate to touch the rivet D in such

5  circumstances?

6        MR. REFERMAT:  Objection.

7     A.   It would rotate away from the rivet D in

8  such circumstances.

9     Q.   Is there any circumstance in which F

10  would touch the rivet D?

11       MR. REFERMAT:  Objection.

12     A.   If the shoe is rotated forcibly in the

13  direction opposite to that we were just discussing.

14     Q.   And when would that happen?

15       MR. REFERMAT:  Objection.

16     A.   Possibly in shipping or in handling.

17     Q.   Is it fair to say part of the function of

18  the rivet D is also to prevent rotation in shipping

19  and handling of the carrier?

20       MR. REFERMAT:  Objection.

21     A.   It's not its intended purpose.  Its

22  intended purpose is the spring anchor.

23     Q.   Is it fair to say that an unintended

24  purpose or unintended function of the rivet D is to

25  prevent rotation of the carrier during shipping?

# SUPPLEMENTAL DECLARATION OF SAFRAZ W. ISHMAEL

# EXHIBIT 44

00001

1

2         UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS

3  - - - - - - - - - - - - - - - - - - -x
    AMESBURY GROUP, INC., and

4  AMESBURY SPRINGS LTD.,
        Plaintiffs,

5

        v.   Civil Action No. 05-10020-DPW

6

    THE CALDWELL MANUFACTURING

7  COMPANY,
        Defendant.

8  - - - - - - - - - - - - - - - - - - -x

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

00037

1

2 the unnumbered paragraph between numbered

3 paragraphs 2 and 3?

4    A.   Yes.

5    Q.   Could you read that paragraph, please,

6 aloud?

7    A.   "Usually the Series 86 balance is one of

8 our better products for creating an egress opening.

9 The use of cord overtravel and moving the hook

10 mounting position in the jamb allow extra

11 flexibility.  At present, management at Solar

12 (these people not defined) has rejected any

13 significant exposure of Series 86 cord and hook

14 (our normal overtravel method) to meet egress.

15 This issue may need to be further discussed within

16 Solar and probably beyond Carl because other

17 suggested options cost tooling dollars."

18    Q.   Was your conversation with Carl Shelton

19 on June 29, 2000 the first time you became aware of

20 the issue of the exposure of the hook that you

21 described earlier?

22       MR. EDWARDS:  That he described earlier

23 or which is referred to --

24    Q.   That he described earlier in this

25 deposition.  I believe you testified earlier that

**Zinter, Douglas, 10/20/05**                    **Page 37**

00038
1

2  you had spoken to Carl Shelton about the exposure

3  of the hook and that this was an option that Solar

4  did not want to pursue.  What I am asking is, is

5  this conversation with Carl Shelton on June 29,

6  2000 the first time that issue was raised?

7      MR. EDWARDS:  Object to the form.

8          You may answer if you understand.

9      A.  I believe that answer is probably "yes."

10  If this document indicates really our first

11  conversation on the issue, then I would have raised

12  it at that time.

13      Q.  Is there a reason why you have underlined

14  the portion of that paragraph that reads "At

15  present, management at Solar (these people are not

16  defined) has rejected any significant exposure of

17  Series 86 cord and hook (our normal overtravel

18  method) to meet egress"?

19      A.  Yes, my reason is that in my position

20  with Caldwell, I often function as a lobbyist for

21  customers trying to support and move their requests

22  up within the management chain of the company.  And

23  so some of the explanation that I am providing here

24  in this report is meant to be read by higher

25  management at Caldwell.

00043

1

2  the contact point became an elongated surface

3  rather than a single contact point.

4      Q.  It was Mr. Shelton who initially raised

5  that possibility, correct?

6      A.  Actually, I believe it was a suggestion

7  that I might have made but it has gotten kind of

8  lost in the midst.

9      Q.  So sitting here today, you can't recall

10  whether it was you or Mr. Shelton who initially

11  raised that idea?

12     A.  That is correct.  Because as I said

13  earlier, the concept of an elongated bottom guide

14  and a relocated pulley in the balance to increase

15  travel, those were both concepts and ideas that had

16  occurred to me many years prior.

17     Q.  Did you raise the idea of a lowered

18  pulley, I believe you said, with Mr. Shelton during

19  this conversation?

20     A.  I believe I specifically tried to avoid

21  that.

22     Q.  Why did you try to avoid it?

23     A.  Because I realized the high tooling

24  expense and cost to Caldwell Manufacturing to

25  completely rework a product.  And from a strategic

# SUPPLEMENTAL DECLARATION
# OF SAFRAZ W. ISHMAEL

# EXHIBIT 45

00001
1

2           UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS
3    - - - - - - - - - - - - - - - - - - -x
     AMESBURY GROUP, INC., and
4    AMESBURY SPRINGS LTD.,
            Plaintiffs,
5
            v.    Civil Action No. 05-10020-DPW
6
     THE CALDWELL MANUFACTURING
7    COMPANY,
            Defendant.
8    - - - - - - - - - - - - - - - - - - -x
              C O N F I D E N T I A L
9
     Deposition Upon Oral Examination Of:
10          Wilbur J. Kellum

11
     Location:    Harris Beach PLLC
12          99 Garnsey Road
            Pittsford, New York  14534
13

14   Date:      October 28, 2005

15

16   Time:      9:36 a.m.

17

18

19   Reported By:  Joanne N. Pero

20          Alliance Shorthand, Inc.

21          Suite 1500 - The Penthouse

22          Alliance Building

23          183 Main Street East

24          Rochester, New York  14604

25

**Kellum, Wilbur, 10/28/05**                    **Page 1**

00144

1          WILBUR J. KELLUM - BY MR. EDWARDS

2    EXAMINATION BY MR. EDWARDS:

3    Q.  Mr. Kellum, when the 97ez balance is

4  installed in a window, does the carrier rotate?

5    A.  No.

6    Q.  And when installed in a window, does the

7  carrier of the 97ez balance touch the rivet that is

8  the attachment point for the spring in any way?

9    A.  That is the -- what we had previously

10  referred to today as the second rivet?

11    Q.  Correct.

12    A.  No, it does not touch it.

13        MR. EDWARDS:  Thank you.  That's all I

14  have.

15        MS. ISHMAEL:  No redirect.

16          (TIME:  3:14 p.m.)

17

18

19

20

21

22

23

24

25

**Kellum, Wilbur, 10/28/05**                    **Page 144**

# SUPPLEMENTAL DECLARATION
# OF SAFRAZ W. ISHMAEL

# EXHIBIT 46

FOCUS - 6 of 38 DOCUMENTS

**TELEFLEX, INCORPORATED and TECHNOLOGY HOLDING COMPANY,
Plaintiffs-Appellants, v. KSR INTERNATIONAL CO., Defendant-Appellee.**

**04-1152**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*119 Fed. Appx. 282; 2005 U.S. App. LEXIS 176*

**January 6, 2005, Decided**

**NOTICE:  [**1]** THIS DECISION WAS ISSUED AS UNPUBLISHED OR NONPRECEDENTIAL AND MAY NOT BE CITED AS PRECEDENT. PLEASE REFER TO THE RULES OF THE FEDERAL CIRCUIT COURT OF APPEALS FOR RULES GOVERNING CITATION TO UNPUBLISHED OR NONPRECEDENTIAL OPINIONS OR ORDERS.

**SUBSEQUENT HISTORY:** Petition for certiorari filed at, 04/06/2005
Later proceeding at *KSR Int'l Co. v. Teleflex, Inc., 126 S. Ct. 327, 163 L. Ed. 2d 41, 2005 U.S. LEXIS 5490 (U.S., 2005)*

**PRIOR HISTORY:** *Teleflex Inc. v. KSR Int'l Co., 298 F. Supp. 2d 581, 2003 U.S. Dist. LEXIS 22606 ( E.D. Mich., 2003)*

**DISPOSITION:** Vacated and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee sought review of a decision of the United States District Court for the Eastern District of Michigan, which granted summary judgment in favor of defendant, accused infringer, after determining that the claim at issue was invalid by reason of obviousness.

**OVERVIEW:** The claim at issue in the patent related to an adjustable pedal assembly for use with automobiles having engines that are controlled electronically with a device known as an electronic throttle control (the electronic control). The claim specifically provided an assembly where the electronic control was mounted to the support bracket of the assembly. The district court granted summary judgment to the accused, finding that the claim was invalid due to obviousness. The court found that the district court did not apply the correct teaching-suggestion-motivation test, because the district court did not make findings as to the specific understanding or principle within the knowledge of a skilled artisan that would have motivated one with the knowledge to make the combination in the manner claimed. Applying the appropriate analysis, the court found that genuine issues of material fact existed, so that summary judgment of obviousness was not proper.

**OUTCOME:** The court vacated the district court's grant of summary judgment and remanded the matter to the district court for further proceedings.

**JUDGES:** Before MAYER, * SCHALL, and PROST, Circuit Judges.

    * Judge Haldane Robert Mayer vacated the position of Chief Judge on December 24, 2004.

**OPINIONBY:** SCHALL

**OPINION:  [*283]** SCHALL, Circuit Judge.

    DECISION

    Teleflex Incorporated and Technology Holding Company (collectively, "Teleflex") sued KSR International Co. ("KSR") in the United States District Court for the Eastern District of Michigan for infringement of *U.S. Patent No. 6,237,565* B1 ("the *'565 patent*"). On December 12, 2003, the district court granted summary judgment in favor of KSR, after determining that claim 4 of the *'565 patent*, the sole claim at issue, was invalid by reason of obviousness. *Teleflex Inc. v. KSR Int'l Co., 298 F. Supp. 2d 581 (E. D. Mich. 2003)*. Teleflex now appeals the district court's decision. For the reasons set forth below, we vacate the grant of summary judgment and remand the case to the district court for further proceedings.

DISCUSSION [**2]

I.

Claim 4 of the *'565 patent* relates to an adjustable pedal assembly n1 for use with automobiles having engines that are controlled electronically with a device known as an electronic throttle control. As such, **[*284]** the assembly of claim 4 incorporates an electronic pedal position sensor (referred to in claim 4, and throughout this opinion, as an "electronic control"). The electronic control is responsive to the pedal pivot and thereby generates an electrical signal corresponding to the relative position of the gas pedal between the rest and applied positions. Claim 4 specifically provides for an assembly wherein the electronic control is mounted to the support bracket of the assembly. This configuration avoids movement of the electronic control during adjustment of the pedal's position on the assembly. Claim 4 reads:

A vehicle control pedal apparatus (12) comprising:

a support (18) adapted to be mounted to a vehicle structure (20);

an adjustable pedal assembly (22) having a pedal arm (14) moveable in force [sic] and aft directions with respect to said support (18);

a pivot (24) for pivotally supporting said adjustable pedal assembly (22) with respect to said [**3] support (18) and defining a pivot axis (26); and

an electronic control (28) attached to said support (18) for controlling a vehicle system;

said apparatus (12) characterized by said electronic control (28) being responsive to said pivot (24) for providing a signal (32) that corresponds to pedal arm position as said pedal arm (14) pivots about said pivot axis (26) between rest and applied positions wherein the position of said pivot (24) remains constant while said pedal arm (14) moves in fore and aft directions with respect to said pivot (24).

The numbers in claim 4 correspond to the numbers in Figure 2 of the *'565 patent.*

n1 An adjustable pedal assembly (e.g., gas, break, or clutch) allows the location of the pedal to be adjusted to accommodate a particular driver's height.

The specification of the *'565 patent* indicates that prior-art pedal assemblies incorporating an electronic control suffered from being too bulky, complex, and expensive to manufacture. See *'565 patent*, col. 1, ll. [**4] 48-53. It was this problem that the *'565 patent* set out to address. See id. col. 2, ll. 2-5.

Teleflex sued KSR in the Eastern District of Michigan, alleging that KSR's adjustable pedal assembly infringed claim 4 of the *'565 patent*. KSR moved for summary judgment of invalidity of claim 4 based on obviousness under *35 U.S.C. § 103*. The district court granted KSR's motion after determining that claim 4 was obvious in view of a combination of prior art references. Teleflex timely appealed the district court's decision. We have jurisdiction pursuant to *28 U.S.C. § 1295(a)(1)*.

II.

This court reviews a district court's grant of summary judgment de novo. *TorPharm Inc. v. Ranbaxy Pharms., Inc., 324 F.3d 1322, 1326 (Fed. Cir. 2003)*. "In a patent case, as in any other, summary judgment may be granted when there are no disputed issues of material fact, ... or when the non-movant cannot prevail on the evidence submitted when viewed in a light most favorable to it." *Knoll Pharm. Co. v. Teva Pharms. USA, Inc., 367 F.3d 1381, 1383 (Fed. Cir. 2004)*. The movant carries the initial burden of proving that there [**5] are no genuine issues of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. If the movant shows a prima facie case for summary judgment, then the burden of production shifts to the nonmovant to present specific evidence indicating there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. "When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be **[*285]** drawn in the nonmovant's favor." *Caterpillar Inc. v. Deere & Co., 224 F.3d 1374, 1379 (Fed. Cir. 2000)*. "Where the evidence is conflicting or credibility determinations are required, the judgment should be vacated rather than reversed, and the case should be remanded for further proceedings." *Jones v. Hardy, 727 F.2d 1524, 1531 (Fed. Cir. 1984)*.

"The grant of summary judgment of invalidity for obviousness must be done on a claim by claim basis." *Knoll Pharm., 367 F.3d at 1383*. Because patents are

presumed valid, "the accused infringer must prove [**6] by clear and convincing evidence that each claim that is challenged cannot reasonably be held to be non-obvious." Id.; see also *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH, 139 F.3d 877, 881 (Fed. Cir. 1998).* Clear and convincing evidence exists when the movant "places in the mind of the ultimate fact finder an abiding conviction that the truth of its factual contentions are highly probable. " *Colorado v. New Mexico, 467 U.S. 310, 316, 104 S. Ct. 2433, 81 L. Ed. 2d 247 (1994).*

A patent claim is obvious, and thus invalid, when the differences between the claimed invention and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." *35 U.S.C. § 103; see also Graham v. John Deere Co., 383 U.S. 1, 14, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966); In re Dembiczak, 175 F.3d 994, 998 (Fed. Cir. 1999).* While obviousness is ultimately a legal determination, it is based on several underlying issues of fact, namely: (1) the scope and content of the prior art; (2) the level of skill of a person [**7] of ordinary skill in the art; (3) the differences between the claimed invention and the teachings of the prior art; and (4) the extent of any objective indicia of non-obviousness. See *Graham, 383 U.S. at 17-18.* When obviousness is based on the teachings of multiple prior art references, the movant must also establish some "suggestion, teaching, or motivation" that would have led a person of ordinary skill in the art to combine the relevant prior art teachings in the manner claimed. See *Tec Air, Inc. v. Denso Mfg. Mich. Inc., 192 F.3d 1353, 1359-60 (Fed. Cir. 1999); Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1572 (Fed. Cir. 1996).* The nonmovant may rebut a prima facie showing of obviousness with evidence refuting the movant's case or with other objective evidence of nonobviousness. See *WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1359 (Fed. Cir. 1999).*

"The reason, suggestion, or motivation to combine [prior art references] may be found explicitly or implicitly: 1) in the prior art references themselves; 2) in the knowledge of those of ordinary skill in the art that certain [**8] references, or disclosures in those references, are of special interest or importance in the field; or 3) from the nature of the problem to be solved, leading inventors to look to references relating to possible solutions to that problem. " *Ruiz v. A.B. Chance Co., 234 F.3d 654, 665 (Fed. Cir. 2000)* (quoting *Pro-Mold, 75 F.3d at 1572*). "Our case law makes clear that the best defense against the subtle but powerful attraction of a hindsight-based obviousness analysis is rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references." *Dembiczak, 175 F.3d at 999; see also Ruiz, 234 F.3d at 665* (explain-

ing that the temptation to engage in impermissible hindsight is especially strong with seemingly simple mechanical inventions). This is because "combining prior art references without evidence of such a suggestion, teaching, or motivation simply takes the inventor's disclosure as a blueprint for piecing together the prior art to defeat patentability--the essence of hindsight." [*286] *Dembiczak, 175 F.3d at 999.* Therefore, we have consistently held that a person [**9] of ordinary skill in the art must not only have had some motivation to combine the prior art teachings, but some motivation to combine the prior art teachings in the particular manner claimed. See, e.g., *In re Kotzab, 217 F.3d 1365, 1371 (Fed. Cir. 2000)* ("Particular findings must be made as to the reason the skilled artisan, with no knowledge of the claimed invention, would have selected these components for combination in the manner claimed." (emphasis added)); *In re Rouffet, 149 F.3d 1350, 1357 (Fed. Cir. 1998)* ("In other words, the examiner must show reasons that the skilled artisan, confronted with the same problems as the inventor and with no knowledge of the claimed invention, would select the elements from the cited prior art references for combination in the manner claimed." (emphasis added)).

III.

On appeal, Teleflex argues that we should vacate the district court's grant of summary judgment and remand the case because the district court committed multiple errors in its obviousness determination. First, Teleflex urges that the district court erred as a matter of law by combining prior art references based on an incorrect teaching-suggestion-motivation [**10] test. Second, it contends that genuine issues of material fact still remain as to whether a person of ordinary skill in the art would have considered it obvious to combine prior art in the manner stated in claim 4. Finally, Teleflex argues that the district court erred by not properly considering the commercial success of Teleflex's patented assembly and by failing to give adequate deference to the patentability determination of the U.S. Patent and Trademark Office ("PTO").

KSR responds that the district court did apply the correct teaching-suggestion-motivation test, and that, under that test, the court correctly concluded that no genuine issues of material fact existed so as to prevent the grant of summary judgment. KSR contends that the district court properly discounted the declarations of Teleflex's experts because their opinions were based on mere legal conclusions. KSR also contends that the district court properly dismissed Teleflex's evidence of commercial success because Teleflex failed to establish a nexus between commercial success and the claimed invention. Finally, KSR argues that the district court gave proper deference to the PTO.

We agree with Teleflex that the district [**11] court did not apply the correct teaching-suggestion-motivation test. We also agree that, under that test, genuine issues of material fact exist, so as to render summary judgment of obviousness improper. For these reasons, we vacate the decision of the district court and remand for further proceedings consistent with this opinion.

IV.

After comparing the teachings of the prior art with claim 4 of the *565 patent*, the district court concluded that, at the time of the invention, all of the limitations of claim 4 existed in the prior art. The court explained that *U.S. Patent No. 5,010,782*, issued to Asano et al. ("the Asano patent"), disclosed all of the structural limitations of claim 4 with the exception of the electronic control. *Teleflex, 298 F. Supp. 2d at 592* ("Asano teaches an adjustable pedal assembly pivotally mounted on a support bracket with the pedal moving in a fore and aft directions with respect to the support and the pivot remaining in a constant position during movement of the pedal arm."). Electronic controls were [*287] well known in the prior art. Id. Consequently, after finding a person of ordinary skill in the art would have been motivated to combine [**12] Asano and electronic control references, the district court granted KSR's motion for summary judgment of invalidity by reason of obviousness.

The district court based its finding of a suggestion or motivation to combine largely on the nature of the problem to be solved by claim 4 of the *565 patent. Id. at 593-94*. The court determined from the patent's specification that the invention of the *565 patent* was intended to "solve the problem of designing a less expensive, less complex and more compact [assembly] design." *Id. at 593*. The court then explained that *U.S. Patent No. 5,819,593*, issued to Rixon et al. ("the Rixon *593 patent*"), n2 also "suffered from being too complex because the pedal position sensor is located in the pedal housing and its fore and aft movement with the adjustment of the pedal could cause problems with wire failure. Thus, the solution to the problem required an electronic control that does not move with the pedal arm while the pedal arm is being adjusted by the driver." *Id. at 594*. The court then concluded that "a person with ordinary skill in the art with full knowledge of Asano and the modular pedal [**13] position sensors would be motivated to combine the two references to avoid the problems with Rixon *593*." Id.

n2 As explained by the district court, the Rixon *593 patent* teaches the combination of an electronic control with an adjustable pedal assembly. The Rixon *593 patent* and claim 4 differ, however, in that the electronic control of Rixon is attached to the pedal housing instead of the support bracket. See *Teleflex, 298 F. Supp. 2d at 594*. The electronic control of the Rixon reference consequently moves during adjustment of the pedal assembly. Id. The electronic control of claim 4 does not move during adjustment of the pedal assembly.

The district court also found an express teaching to attach the electronic control to the support bracket of a pedal assembly based on the disclosure of *U.S. Patent No. 5,063,811*, issued to Smith et al. ("the Smith patent"). The court explained that Smith teaches the use of a "rotary potentiometer ... attached to a fixed support member and responsive [**14] to the pedal's pivot shaft." Id. Moreover, the court stated that Smith provided express teachings as to the desirability of attaching the electronic control to a fixed support member in order to avoid the wire failure problems disclosed in the Rixon *593 patent* and solved by the *565 patent*: "The wiring to the electrical components must be secure from the possibility of chafing which will eventually result in electrical failure. Thus, the pedal assemblies must not precipitate any motion in the connecting wires themselves ...." Id. (quoting the Smith patent, col. 1, ll. 33-38).

Finally, the district court explained that the prosecution history of the *565 patent* bolstered its finding of a suggestion or motivation to combine the Asano and electronic control references. The court explained that the patent examiner initially rejected the *565 patent* in view of the teachings of *U.S. Patent No. 5,460,061*, issued to Redding et al. ("the Redding patent"), and the Smith patent. The examiner stated that the Redding patent disclosed the assembly structure of claim 4 and that Smith disclosed the electronic control attached to the assembly support structure. The patentee overcame the [**15] rejection, the court explained, by adding the limitation requiring the position of the assembly's pedal pivot to remain constant during adjustment of the assembly. (The position of the pedal pivot of the Redding patent does not remain constant during adjustment of the assembly position.) [*288] However, the Asano patent discloses an assembly where the position of the pivot remains constant during adjustment of the pedal assembly. Therefore, the district court reasoned, had Asano been cited to the patent examiner, the examiner would have rejected claim 4 as obvious in view of the Asano and Smith patents. *Id. at 595*.

We agree with Teleflex that the district court's analysis applied an incomplete teaching-suggestion-motivation test in granting KSR summary judgment. This is because the district court invalidated claim 4 of the *565 patent* on obviousness grounds without making "findings as to the specific understanding or principle

within the knowledge of a skilled artisan that would have motivated one with no knowledge of [the] invention to make the combination in the manner claimed." *Kotzab, 217 F.3d at 1371.* Under our case law, whether based on the nature [**16] of the problem to be solved, the express teachings of the prior art, or the knowledge of one of ordinary skill in the art, the district court was required to make specific findings as to whether there was a suggestion or motivation to combine the teachings of Asano with an electronic control in the particular manner claimed by claim 4 of the *'565 patent.* See *Kotzab, 217 F.3d at 1371; Rouffet, 149 F.3d at 1357.* That is, the district court was required to make specific findings as to a suggestion or motivation to attach an electronic control to the support bracket of the Asano assembly.

The district court correctly noted that the nature of the problem to be solved may, under appropriate circumstances, provide a suggestion or motivation to combine prior art references. However, the test requires that the nature of the problem to be solved be such that it would have led a person of ordinary skill in the art to combine the prior art teachings in the particular manner claimed. See *Rouffet, 149 F.3d at 1357.* We have recognized this situation when two prior art references address the precise problem that the patentee was trying to solve. [**17] See *Ruiz v. A.B. Chance Co., 357 F.3d 1270 at 1276* ("This record shows that the district court did not use hindsight in its obviousness analysis, but properly found a motivation to combine because the two references address precisely the same problem of underpinning existing structural foundations."). In this case, the Asano patent does not address the same problem as the *'565 patent.* The objective of the *'565 patent* was to design a smaller, less complex, and less expensive electronic pedal assembly. The Asano patent, on the other hand, was directed at solving the "constant ratio problem." n3 The district court's reliance on the problems associated with the Rixon *'593 patent* similarly fails to provide a sufficient motivation to combine. This is because the Rixon *'593 patent* does not address the problem to be solved by the *'565 patent*; rather, it suffers from the problem. The court did not explain how suffering from the problem addressed by the *'565 patent* would have specifically motivated one skilled in the art to attach an electronic control to the support bracket of the Asano assembly.

n3 The constant ratio problem refers to the problem of creating an assembly where the force required to depress the pedal remains constant irrespective of the position of the pedal on the assembly. See Asano patent, col. 1, l. 48 - col. 2, l. 13.

[**18]

Neither do we agree with the district court's reliance on the express teachings of the Smith patent. This is because the statement in the Smith patent that "the pedal assemblies must not precipitate any motion in the connecting wires," does not necessarily go to the issue of motivation to attach the electronic control on the support bracket of the pedal assembly. In other words, solving the problem of wire [*289] chafing is a different task than reducing the complexity and size of pedal assemblies. What is more, the Smith patent does not relate to adjustable pedal assemblies; therefore, it does not address the problem of wire chafing in an adjustable pedal assembly.

Our view of the case is not altered by the *'565 patent's* prosecution history. That is because a court's task is not to speculate as to what an examiner might have done if confronted with a piece of prior art. Rather, a court must make an independent obviousness determination, taking into account the statutory presumption of patent validity. See *TorPharm, 336 F.3d at 1329-30* ("Where the factual bases of an examiner's decision to allow a claim have been undermined--as in other cases where prior art not before [**19] the examiner is brought to light during litigation--a court's responsibility is not to speculate what a particular examiner would or would not have done in light of the new information, but rather to assess independently the validity of the claim against the prior art under *section 102* or *section 103.* Such determination must take into account the statutory presumption of patent validity."). n4

n4 Noting Teleflex's argument that the district court did not give adequate deference to the PTO, we do not discern anything in the record indicating the district court failed to properly defer to the PTO. Nevertheless, we reiterate that, on remand, the district court must independently assess the evidence and determine whether KSR has provided clear and convincing evidence indicating invalidity of claim 4 by reason of obviousness.

We also agree with Teleflex that the presence of genuine issues of material fact rendered summary judgment inappropriate. KSR, in the first instance, failed to make out a prima facie case [**20] of obviousness. The only declaration offered by KSR--a declaration by its Vice President of Design Engineering, Larry Willemsen--did not go to the ultimate issue of motivation to combine prior art, i.e. whether one of ordinary skill in the art would have been motivated to attach an electronic control to the support bracket of the assembly disclosed by

Asano. Mr. Willemsen did state that an electronic control "could have been" mounted on the support bracket of a pedal assembly. (Willemsen Decl. at P33, 36, 39.) Such testimony is not sufficient to support a finding of obviousness, however. See, e.g., *In re Deuel, 51 F.3d 1552, 1559 (Fed. Cir. 1995)* ("'Obvious to try' has long been held not to constitute obviousness."). Mr. Willemsen also provided the following as a "specific motivation to combine" an electronic control with an adjustable pedal assembly:

> An increasing number of vehicles sold in the United States came equipped with electronic throttle control systems because such systems offered various operational advantages over cable-actuated throttle control systems ... In order to function in a vehicle whose engine incorporated an electronic throttle [**21] control, the adjustable pedal assembly ... would have had to be coupled to an electronic pedal position sensor.

(Willemsen Decl. at P34, 37, 39.) This statement may be factually correct. However, the issue is not whether a person of skill in the art had a motivation to combine the electronic control with an adjustable pedal assembly, but whether a person skilled in the art had a motivation to attach the electronic control to the support bracket of the pedal assembly.

In addition, Teleflex offered two declarants--Clark J. Radcliffe, Professor of Mechanical Engineering at Michigan State University; and Timothy L. Andresen, a former engineer at Ford Motor Company and McDonnel-Douglas Corporation [*290] --in rebuttal of the declaration of Mr. Willemsen. Mr. Radcliffe stated, inter alia, that "the location of the electronic control" (Radcliffe

Decl. at P15) in claim 4 "was a simple, elegant, and novel combination of features," (Radcliffe Decl. at P16) as opposed to the Rixon *'593 patent*'s attachment of the electronic control to the assembly housing, which was both electrically and mechanically complex (Radcliffe Decl. at P17). Mr. Andresen also stated that the non-obviousness of claim [**22] 4 was reflected in Rixon's choice to mount the electronic control to the assembly housing instead of the assembly's support bracket. (Andresen Decl. at P5.) At the summary judgment stage of a proceeding, it is improper for a district court to make credibility determinations. See, e.g., *Jones, 727 F.2d at 1531*. Therefore, by crediting KSR's expert declarant and discrediting the two declarants offered by Teleflex, the district court erred as a matter of law.

V.

In sum,

(1) We hold that, in granting summary judgment in favor of KSR, the district court erred as a matter of law by applying an incomplete teaching-suggestion-motivation test to its obviousness determination. The correct standard requires a court to make specific findings showing a teaching, suggestion, or motivation to combine prior art teachings in the particular manner claimed by the patent at issue.

(2) Under this standard, we hold that genuine issues of material fact exist as to whether a person of ordinary skill in the art would have been motivated, at the time the invention was made, to attach an electronic control to the support structure of the pedal assembly disclosed by the Asano patent. [**23]

(3) We consequently vacate the decision of the district court and remand the case for further proceedings on the issue of obviousness, and, if necessary, proceedings on the issues of infringement and damages.

Each party shall bear its own costs.