IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMESBURY GROUP, INC., and<br>AMESBURY SPRINGS LTD.,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE CALDWELL MANUFACTURING<br>COMPANY,<br><br>        Defendant. | Civil Action No.  05-10020-DPW<br><br>**ORAL ARGUMENT<br>REQUESTED** |

## AMESBURY'S OPPOSITION TO CALDWELL'S MOTION TO STRIKE PORTIONS OF PLAINTIFFS' REPLY PAPERS ON ITS MOTION FOR SUMMARY JUDGMENT

Through its discovery responses and the deposition testimony of its expert, Caldwell long ago conceded that its Quick-Tilt*nc product includes every element of the asserted claims of the '638 patent except one.  Specifically, Caldwell never has disputed that Caldwell offers its Quick-Tilt*nc product with a jamb that includes a jamb channel with rear walls, side walls, and inwardly turned opposed flanges.  Based on Caldwell's unequivocal admissions and on an inspection of the Quick-Tilt*nc product by Amesbury's expert, Amesbury moved for summary judgment that the Quick-Tilt*nc product infringes.

In opposition to Amesbury's motion, Caldwell now relies on the declaration of a Caldwell employee that flatly contradicts Caldwell's own admissions regarding the Quick-Tilt*nc product.  In disregard of its prior admissions, Caldwell asserts for the first time that it does not offer the Quick-Tilt*nc product with a window jamb that includes a jamb channel.

In response to Caldwell's repudiation of its previous admissions regarding the Quick-Tilt*nc product, Amesbury obtained an "Earthwise Window" with the Quick-Tilt*nc product

from Tri-State Wholesale Building Products.  Amesbury's expert, Dr. Sammy Shina, then examined this window and its jamb channels.  In support of Amesbury's summary judgment reply memorandum, Amesbury's expert provided a declaration in which he stated that the jambs and balances in the Earthwise Window are the same as those in Still Deposition Exhibit 10 upon which he previously based his infringement opinion.  ("Shina Declaration.")  Amesbury's expert concluded that the Earthwise Window confirmed his prior opinion.

Caldwell's repudiation of its admissions regarding the Quick-Tilt*nc product justifies the Shina Declaration.  At the summary judgment stage, Caldwell cannot legitimately disavow its previous admissions while also seeking to prevent Amesbury from responding to Caldwell's new assertion that Caldwell does not offer the Quick-Tilt*nc product with a jamb.  Far from setting forth a new opinion, the Shina Declaration simply confirms Dr. Shina's original opinion regarding the Quick-Tilt*nc product in light of the Earthwise Window that Amesbury obtained in response to Caldwell's new assertions.

Moreover, Caldwell's contention that the Shina Declaration will cause Caldwell unfair prejudice is groundless.  The Shina Declaration, which is a response to Caldwell's revised noninfringement arguments, does not raise new claims against Caldwell or alter Amesbury's theory of the case.  The Earthwise Window that Amesbury's expert examined is available for Caldwell to inspect, and Amesbury's expert is available for a deposition on the subject matter of his declaration.  Given that no trial date has been set in this case and that limited additional discovery would eliminate any prejudice Caldwell alleges it will suffer, striking the Shina Declaration is completely unwarranted.

## I.    **BACKGROUND**

On May 19, 2006, Amesbury moved for summary judgment that Caldwell's Quick-Tilt*nc product infringes several claims of Amesbury's '638 patent.  (Doc. No. 78, at 33 – 36.)  In its discovery responses and in deposition testimony, Caldwell unequivocally admitted that its Quick-Tilt*nc product contains every element of the asserted claims except the element: "whereby rotational motion of said [the] mounting means is inhibited."[1]  In particular, Caldwell admitted that the Quick-Tilt*nc product that Caldwell offers includes a jamb channel with rear walls, side walls, and inwardly turned opposed flanges.  (See Ex. 1, Def.'s Supp. Answers to Pls.' First Set of Interrogs., at Exhibit A.)  Additionally, Caldwell's expert conceded in his expert report that the Quick-Tilt*nc product contains the '638 patent's claimed "channel means" element, and he testified at his deposition:

> Q.   So in the first column, for example, the first entry says "a mounting assembly comprising," is that to express your view that Caldwell's Quick-Tilt products are a mounting assembly?
>
> A.   Yes.
>
> Q.   And they include a channel means; is that correct?
>
> A.   Yes.
>
> Q.   Having a rear wall, correct?
>
> A.   Yes.
>
> Q.   Side walls, correct?

---

[1] Independent claim 1 of the '638 patent (emphasis added) claims:

A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having a first end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means **whereby rotational motion of said mounting means is inhibited**.

A.   Yes.

Q.   And Caldwell Quick-Tilt products include at the extremities of the side walls inwardly turned opposed flanges; is that correct?

A.   Yes, sir.

(Ex. 2, Still Dep. Tr. 57:22 – 58:13; Ex. 3, Still April 17 Report, at Exhibit A.)

Based on Caldwell's concessions and Amesbury's expert's inspection of a Quick-Tilt*nc product in a window jamb (i.e. Still Dep. Ex. 10), Amesbury's expert concluded in his March 23 Report that the Quick-Tilt*nc product infringes.  Caldwell now seeks to oppose Amesbury's motion for summary judgment by relying on an affidavit from its Product Marketing Manager, Douglas Zinter, repudiating Caldwell's prior admissions and asserting for the first time that the Quick-Tilt*nc product does not meet the jamb channel limitation of the asserted patent claims. (See Ex. 4, Doc. No. 88, Declaration of Douglas Zinter ("Zinter Decl."), ¶¶ 8 – 10.)  In his declaration, Zinter also asserts that the Tri-State Earthwise Window shown in Exhibit 38 to Amesbury's motion for summary judgment does not contain the Quick-Tilt*nc product in an infringing jamb configuration.  (Zinter Decl. at ¶ 19)

In response to Caldwell's new assertion that Caldwell does not offer the Quick-Tilt*nc product installed in a window jamb and that the Earthwise Window that Amesbury addressed in its opening memorandum does not contain the Quick-Tilt*nc product in an infringing jamb configuration, Amesbury recently obtained an Earthwise Window with the Quick-Tilt*nc product from Tri-State.  Amesbury's expert, Dr. Sammy Shina, then examined the Earthwise Window and provided a declaration that Amesbury submitted with its summary judgment reply brief.  (See Ex. 5, Doc. No. 100, Second Declaration of Sammy Shina, Ph.D. ("Shina Declaration").)  The Shina Declaration notes that the Earthwise Window that Amesbury's expert inspected includes Quick-Tilt*nc balances installed in jamb channels (¶ 9) and that the geometry

4

of those jamb channels is identical to the geometry of the jamb channel in Still Exhibit 10 (¶ 8), which Amesbury's expert previously examined in connection with his March 23 Report.

Amesbury's expert also confirmed that the Quick-Tilt*nc products in the Earthwise Window inhibited rotational movement of the mounting means as the asserted claims require. Indeed, the Shina Declaration is entirely consistent with Shina's earlier March 23 opinion that the Quick-Tilt*nc installed with a mounting screw would inhibit rotational movement of the mounting means. (Ex. 6, Shina March 23 Report at 11 – 14, 18 - 21.)  In his declaration, Amesbury's expert further states that his inspection of the Earthwise Window "confirmed [his] findings and opinions, as outlined in [his] March 23, 2006 expert report, relating to infringement" and did not change his opinion at all.  (See Ex. 5, Shina Decl. at ¶ 17.)

Accompanying the Shina Declaration, Amesbury also filed the Declaration of Christopher Rogers (Ex. 7, Doc. No. 98) and the Declaration of Terese Dillingham, Esq. (Ex. 8, Doc. No. 99), in which Rogers, who is Amesbury's investigator, stated that he purchased the Earthwise Window from Tri-State.  Attorney Dillingham stated that she received the Earthwise Window from Rogers and provided it to Amesbury's expert for inspection.

## II.  ARGUMENT

### A.  The Shina Declaration Is A Proper Rule 26(e) Expert Report Supplementation.

Rule 26(e) allows, and indeed requires, an expert to supplement a Rule 26(a) expert report under certain circumstances.  See Fed. R. Civ. P. 26(e).  This duty to supplement "promotes the broader purpose of discovery, which is 'the narrowing of issues and the elimination of surprise.'" Sheek v. Asia Badger, Inc., 235 F.3d 687, 693-94 (1st Cir. 2000).  In the First Circuit, a party may submit a supplemental expert affidavit provided it does not express any new opinions.  Poulis-Minott v. Smith, 388 F.3d 354, 357 (1st Cir. 2004).  In Poulis-Minott

v. Smith, for example, the First Circuit addressed the district court's decision not to strike portions of an expert's "late-filed affidavits." Id. at 357. In holding that the district court was correct not to exclude the challenged affidavits, the First Circuit observed that "[t]he issue here is not that the experts' affidavits were entirely new and unannounced, but rather whether any new information was included in the expert affidavits that was not included in the 'complete statement of all opinions to be expressed' as required by Rule 26(a)." Id. at 358. Although the affidavit in Poulis-Minott contained new information, the court concluded that its contents "should come as no surprise in view of [the expert's] disclosure in his expert designation." Id. at 359. See also Harper v. Dismukes, No. 98-2160, 1999 U.S. App. LEXIS 32769, at *6 (7th Cir. Dec. 15, 1999) (amended expert report is permissible provided it does not include "new issues, claims, or theories not contained in the pretrial order.") (copy attached as Ex. 9).

This court has liberally construed Rule 26's supplementation provisions. For example, in Albert v. Warner-Lambert Co., the court allowed a damages expert to supplement his report more than a year after expert discovery closed, noting that "[s]upplementation of an expert's report in anticipation of trial may be more the rule than the exception." No. 99-11700, 2002 U.S. Dist. LEXIS 7242, at *2 (D. Mass. Apr. 24, 2002) (copy attached as Ex. 10). The court further observed that the admissibility of supplemental expert reports must be evaluated on a continuum whereby "supplementation of expert opinion that has already been disclosed" is nearly always allowed while "untimely disclosure of expert opinion that is totally unanticipated" is subject to greater scrutiny. Id. at *2-3.

Like the expert affidavits at issue in Poulis-Minott and Albert, the Shina Declaration expresses no new opinions and contains no surprises. Rather, it accounts for the Earthwise Window that Amesbury obtained as a result of Caldwell's new noninfringement argument.

Amesbury's expert explained that his inspection of the Earthwise Window confirmed the opinions that he had already expressed in his March 23 expert report, regarding the Quick-Tilt*nc product.  (Ex. 5, Shina Decl. at ¶ 17.)  Thus, the Shina Declaration is a proper supplement to his expert report and should not be excluded.

Caldwell cites <u>Akeva L.L.C. v. Mizuno Corp.</u> for the proposition that Rule 26(e) does not allow supplementation of an expert report where a party fails to perform necessary testing and analysis in the initial expert report.  <u>Akeva L.L.C. v. Mizuno Corp.</u>, 212 F.R.D. 306 (M.D. N.C. 2002).  In <u>Akeva</u>, the court excluded a supplemental expert report from a previously undisclosed expert because it presented a series of entirely new X-ray tests that the new expert undertook after the relevant cutoff date and that provided the only basis for that expert's opinion.  <u>Id.</u> at 310 <u>Akeva</u> is not on point because, in contrast to <u>Akeva</u>, Amesbury did not hide the identity of its expert, and Amesbury's expert Shina did not perform a fundamentally different test after the deadline for the exchange of expert reports.

In connection with his initial expert report on March 23, Amesbury's expert performed the necessary testing and analysis, and he formed his opinions based on that analysis. Specifically, Amesbury's expert extensively reviewed numerous Caldwell engineering drawings relating to the Quick-Tilt*nc product and examined samples of the product before forming his opinion that the Quick-Tilt*nc product contains the mechanical components recited in the asserted claims.[2]  (<u>See</u> Ex. 11, Shina Dep., 22:11 – 24; Ex. 6, Shina March 23 Report, at 1 - 5.) Amesbury's expert also examined the Caldwell Quick-Tilt*nc balance mounted in a jamb, albeit without a mounting screw (Still Exhibit 10).  He then examined Caldwell drawings showing the

---

[2] With respect to Caldwell's argument that Amesbury's expert failed to examine a "properly mounted" Quick-Tilt*nc product, such examination was unnecessary because the '638 patent does not claim a "properly mounted" balance.

accused product installed with the mounting screw. (See, e.g., Ex. 6, Shina March 23 Report, at 18 (stating that in Caldwell document production No. C000532, "a fixing screw is clearly shown to be used to fasten the Caldwell [Quick-Tilt] products to the window jamb").) Among other things, Amesbury's expert concluded that the "constant pressure applied by the rotation of the coiled nest" of the spring would reduce the integrity of the screw as a fastening method and therefore the spine or projection of the product would play a role in inhibiting rotational motion of the mounting means. (See Ex. 6, Shina March 23 Report, at 14, 21.) Moreover, Amesbury's expert based his opinion with respect to the "rotational movement" claim element on his geometric analysis of the dimensions of an actual Caldwell Quick-Tilt product as installed in a jamb pocket.[3]

The Shina Declaration, which Caldwell now seeks to exclude, does not present an analysis that differs from the analysis that Amesbury's expert undertook in connection with his March 23 Report. In the Shina Declaration, as in his March 23 Report, Amesbury's expert describes his evaluation of a Quick-Tilt*nc balance, and Amesbury's expert then confirms his prior opinion. The Shina Declaration simply addresses the Earthwise Window, which Amesbury obtained because Caldwell now attempts to disavow its earlier admission that Caldwell offers the Quick-Tilt*nc balance mounted in a jamb.

---

[3] In fact, Caldwell's own expert performed an identical analysis of the geometric dimensions of a Quick-Tilt product installed in a different jamb pocket to form his opinion on the very same claim element. (See Ex. 3, Still April 17 Report, at 6 (stating that certain window designs "allow a gap between either side of the raised spine and the ends of the inwardly turned flanges from 0.50" to .109" " and using this geometric analysis to conclude that the spine does not inhibit rotation in such a configuration); Still April 17 Report, at Ex. G (showing the geometric measurements in a graphic).) Thus, Caldwell cannot plausibly dispute that Dr. Shina's initial expert report contained all the necessary testing and analysis.

**B. Amesbury Was Justified In Submitting**
**The Shina Declaration And It Causes No Unfair Prejudice To Caldwell.**

Caldwell seeks to exclude the Shina Declaration, but Rule 37(c) makes clear that such a sanction is unwarranted if the alleged failure to provide information was substantially justified or harmless. Fed. R. Civ. P. 37; Lohnes v. Level 3 Commc'ns., 273 F.3d 49, 60 (1st Cir. 2001). Here, the Shina Declaration is a proper response to Caldwell's shifting noninfringement defense and will cause Caldwell no meaningful prejudice.

The Shina Declaration, which Amesbury filed on June 23, 2006, is appropriate given Caldwell's new contention that the Quick-Tilt*nc product does not include a jamb – a position that Caldwell took for the first time in the June 9, 2006 Zinter Declaration. See Mathers v. Northshore Mining Co., 217 F.R.D. 474, 482-83 (D. Minn. 2003) (declining to exclude a supplemental expert report because it responded to new information and arguments made by opposing counsel); Whatley v. Merit Distrib. Servs., 166 F. Supp. 2d 1350, 1356-57 (S.D. Ala. 2001) (permitting plaintiff to file supplemental expert affidavit twenty days after the close of expert discovery where the "report simply responded to a remark of defendants' own expert"). Caldwell fails to offer any explanation for its change in position, and this change justifies the Shina Declaration.

Exclusion of the Shina Declaration is also unwarranted because Caldwell cannot show that it would be unfairly harmed by the Shina Declaration. See White v. Meador, 215 F. Supp. 2d 215, 221-222 (D. Me. 2002) (allowing a late supplemental expert disclosure and noting that the party seeking to exclude the disclosure must "demonstrate any concrete harm from the insufficient designation and tardy provision of [the expert's] report"). Although Rule 37(c) allows for exclusion as a sanction, it stops "far from saying that the district court is obligated to exclude evidence based on such a failure when it occurs long before trial and is likely subject to

correction without much harm to the opposing party." Samos Imex Corp. v. Nextel Communs., Inc., 194 F.3d 301, 305 (1st Cir. 1999).

Here, Caldwell's claims of prejudice are unfounded and, moreover, any prejudice that Caldwell alleges it will suffer can be easily avoided through limited additional discovery. The Shina Declaration introduces no new opinions and simply rebuts Caldwell's recent arguments. Caldwell's primary complaint is that it does not have an opportunity to inspect the Earthwise Window, but more than a month after receiving the Shina Declaration, Caldwell has not even asked to see the Earthwise Window that Dr. Shina examined. In any event, the Earthwise Window is available for Caldwell's inspection.

Caldwell also claims prejudice because it purportedly cannot re-depose Amesbury's expert. Caldwell professes to need a further deposition to question Amesbury's expert regarding whether he accounted for additional elements of the Quick-Tilt*nc (other than the spine) that Caldwell contends prevent rotation. Such an inquiry is unnecessary because the Court has ruled that the asserted '638 patent claims do not require that the spine be the *only* mechanism for inhibiting rotational movement. (Ex. 12, Memorandum and Order, at 39.) Caldwell has not sought an additional deposition and plainly would prefer to exclude the Shina Declaration rather than confront it. In any event, if Caldwell wants to take it, Amesbury's expert is available for a deposition regarding his recent declaration.[4]

---

[4] Contrary to Caldwell's assertion it is not improper for a moving party to submit a declaration in support of a summary judgment reply brief. Douglas v. York County, 360 F.3d 286, 287 (1st Cir. 2004) (defendant included an expert affidavit in its motion for summary judgment and its reply brief where plaintiff included its own affidavit in opposition); Anderson v. Home Depot U.S.A., Inc., No. 02-11000, 2004 U.S. Dist. LEXIS 145, at *12 (D. Mass. Jan. 8, 2004) n.10 (defendant submitted affidavits with its summary judgment brief and in its reply brief where plaintiff opposed summary judgment with its own affidavits) (copy attached as Ex. 13). Moreover, the cases that Caldwell cites do not support its position. For example, Poulis-Minott v. Smith held that a late expert affidavit was *proper* because it did not include new opinions. 388 F.3d 354, 357 (1st Cir. 2004). Lohnes v. Level 3 Communs., Inc. involved a previously undisclosed expert witness, 272 F.3d 49,60 (1st Cir. 2001), and therefore is inapplicable here.

### C. **Amesbury Made No New Arguments In Its Reply Brief.**

Caldwell asserts that Amesbury improperly raised new arguments in its summary judgment reply brief, but Caldwell fails to cite even one such argument. As discussed above, Amesbury's reply brief properly responds to the arguments that Caldwell made in its summary judgment opposition brief. The Shina, Rogers, and Dillingham Declarations raise no new legal issues and do not request any new forms of relief. Rather, they confirm Dr. Shina's prior opinions.

VanHaaren, upon which Caldwell relies, is inapposite because in that case, the defendant made a "bevy of new legal arguments" for the first time in its reply brief. VanHaaren v. State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 7 n.8 (1st Cir. 1993). Fish Market is likewise irrelevant because it simply stands for the uncontroversial proposition that a party cannot request a new form of relief for the first time in its reply brief. Fish Mkt. Nominee Corp. v. Pelofsky, 72 F.3d 4, 6 (1st Cir. 1995).

Caldwell goes on to cite several cases holding that after the close of discovery a party cannot amend its complaint or counterclaims if doing so would cause prejudice to the opposing party. See Kennedy v. Josephthal, Inc., 814 F.2d 798, 806 (1st Cir. 1987) (plaintiff's motion for leave to file a second amended complaint denied); Quaker State Oil Refining Corp. v. Garrity, 884 F.2d 1510, 1517 (1st Cir. 1989) (defendant prohibited from filing a fifth counterclaim); Picker Int'l v. Leavitt, 865 F.Supp 951 (D. Mass. 1994) (defendant prevented from "in effect, amend[ing] its counterclaims" by asserting an additional "claim of illegal tying"). Again, these cases are irrelevant given that Amesbury is not seeking to amend or alter its claims.

Last, Caldwell inexplicably cites a slew of cases for the principle that a plaintiff is limited to the facts in its complaint when the plaintiff is faced with a motion to dismiss. See Miller v.

<u>Suffolk Cty. House of Correction</u>, No. 01-11331, 2002 WL 31194866, at *2 n.1 (D. Mass. Sept. 27, 2002) (court declined to address a "new allegation" raised by the plaintiff in response to defendants motion to dismiss that "he was coerced into pleading guilty") (copy attached as Ex. 14); <u>Scholastic, Inc. v. Stouffer</u>, 124 F. Supp 2d 836, 851 n.16 (S.D.N.Y. 2000) ("parties are not entitled to assert new facts in submissions on a motion to dismiss . . . consideration of the sufficiency of [a] claim [is limited] to the 'four corners of the pleading.'"); <u>Davis v. Cole</u>, 999 F. Supp. 809, 813 (E.D. Va. 1998) (courts must "consider the facts asserted in the complaint" and "may not consider additional allegations when ruling on a motion to dismiss"); <u>In re Colonial Ltd. P'ship Litig.</u>, 854 F. Supp. 64, 79 (D. Conn. 1994) ("allegations made outside of the complaint are not properly before the court on a motion to dismiss").  In the single summary judgment case Caldwell does cite, the court held that the "plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."  <u>Shanahan v. City of Chicago</u>, 82 F.3d 776, 781 (7th Cir. 1996).  Again, Amesbury is not seeking, by its reply brief, to amend its complaint.

**III.    <u>CONCLUSION</u>**

For the reasons set forth above, plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd. respectfully request that this Court deny Caldwell's Motion To Strike Portions of Plaintiffs' Reply Papers On Its Motion For Summary Judgment.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(D), Amesbury Group, Inc. and Amesbury Springs Ltd.

respectfully request an oral argument in this matter.

Respectfully submitted,

 /s/ Douglas J. Kline
Douglas J. Kline (BBO# 556680)
Terese Dillingham (BBO# 644520)
Safraz W. Ishmael (BBO# 657881)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
Phone:  (617) 570-1000
Fax:  (617) 523-1231

Attorneys for Plaintiffs

**AMESBURY GROUP, INC.**
**AMESBURY SPRINGS LTD.**

Dated: July 25, 2006

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 25, 2006.

 /s/ Douglas J. Kline

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMESBURY GROUP, INC., and AMESBURY SPRINGS LTD, | **DEFENDANT'S SUPPLEMENTED ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| Plaintiffs, | |
| vs. | |
| THE CALDWELL MANUFACTURING COMPANY, | Civil Action No. 05-10020-DPW |
| Defendant. | |

Defendant the Caldwell Manufacturing Company ("Caldwell"), by its attorneys Harris Beach PLLC, submits the following supplemental answers to plaintiffs' First Set of Interrogatories:

**INTERROGATORY NO. 4**:

For each Window Product identified in response to Interrogatory No. 1, separately state the full factual and legal basis for Caldwell's assertion that the Window Product does not infringe any claim of the patents-in-suit, identifying for each claim each element that Caldwell asserts is or is not present in the Window Product, either literally or under the doctrine of equivalents, and any claim construction relevant to Caldwell's assertion.

**ANSWER**:    Amesbury objects to this interrogatory in that is premature in that the court has not construed the claims at issue.  Additionally, Caldwell objects to this interrogatory for the reasons stated in response to Interrogatory No. 1 in that the definition of "Window Product" is vague and overly broad.    Caldwell's preliminary claim charts are attached as Exhibit "A".  Caldwell reserves the right to supplement or amend these responses based on further discovery, investigation or the Court's claim construction.

**INTERROGATORY NO. 6**:

State the full factual and legal basis for Caldwell's assertion that each of the patents-in-suit is invalid for failure to meet the requirements of the patent laws of the United States as set forth in, *inter alia*, 35 U.S.C. §§102, 103 and 112.

**ANSWER**:    Caldwell objects to this interrogatory in that it calls for legal conclusions.  Furthermore, Caldwell requires discovery from Amesbury to answer this interrogatory fully.  Subject to and without waiving these objections, Caldwell states as follows:

(1)    U.S. Patent No. 6,598,264: The file history indicates that the only potentially novel element of this patent is the location of the bottom guide roller within the bottom guide.  This element is disclosed, or is obvious in light of, the following prior art references, either singly or in combination:  (1) Prosser, U.S. Patent No. 3,091,797; (2) Thompson, U.S. Patent No. 6,840,011, (3) Wood, U.S. Patent No. 3,114,178, (4) Biro, U.S. Patent No. 3,449,862, (5) DeNormand, U.S. Patent No. 6,041,746, (6) Berndt, U.S. Patent No. 4,704,821, (7) Fitzgibbon, U.S. Patent No. 4,089,085, (8) a window balance product manufactured by or for Anderson Corporation that, upon information and belief, incorporated a part sold by Amesbury to Anderson as early as 1999, (9) Japanese Utility Model No. JITSUKAI S62-19485, (10) United Kingdom Patent No. GB1219927, (11) United Kingdom Patent No. GB1244324, and (12) additional prior art cited during the prosecution of the patent.  Additional prior art references may be found through additional prior art searches or in discovery, and Caldwell reserves the right to supplement this response.   Also, the patent is invalid to the extent that Amesbury seeks to construe the claims of this patent to cover rollers that are not attached directly to the bottom guide because, during prosecution of the patent, Amesbury distinguished certain prior art references, including *Biro*, supra, which disclosed a roller indirectly mounted to the bottom guide.

(2)     <u>U.S. Patent No. 6,820,368</u>: The file history indicates that the only potentially novel element of this patent is enlarged end of the balance shoe. The patent also discloses a "pocket" element. These elements are disclosed, or are obvious in light of, the following prior art references, either singly or in combination: (1) DeNormand, U.S. Pat. No. 6,041,746, (2) Berndt, U.S. Patent No. 4,704,821, (3) Schmidt, U.S. Patent No. 5, 301, 467, (4) additional prior art cited during the prosecution of the patent, (5) United Kingdom Patent Application No. 2280697A, (6) United Kingdom Patent Application No. 2236786A, (7) United Kingdom Patent Application No. 2292168A, (8) United Kingdom Patent No. 740223, (9) Japanese Utility Model JITSUKAI S56-171982, and (10) Japanese Utility Model JITSUKAI S63-3785.   Additional references may be discovered, and Caldwell reserves the right to supplement this response.   In addition, this patent is invalid to the extent that Amesbury argues that Caldwell's 97ez product infringes this patent because this argument requires a construction of the patent that would require two claim elements to correspond to a single part of Caldwell's product.  Caldwell's products do not have both a "pocket ... adapted to mate with a rivet" **and** a "connecting device" as claimed, even assuming that the Caldwell device has any of those elements as those terms are defined by the patent claims and specification. To argue otherwise would render the patent ambiguous and invalid.

(3)     <u>U.S. Patent No. 5,365,638</u>: The file history indicates that the only potentially novel element of this patent is the raised spine that inhibits rotation of the mounting means. This element is disclosed, or is obvious in light of, the following prior art references, either singly or in combination: (1) Makarowksi, U.S. Patent No. 5,069,001, (2) Patterson, U.S Patent No. 2,088,866, (3) Osten, U.S. Patent No. 2,774,119, (4) Arlauskas, U.S. Patent No. 3,069,152, (5) Jones, U.S. Patent No. 3,105,576, (6) Anderson, U.S. Patent No. 3,711,995, (7) Anderson, U.S. Patent No. 3,795,076, (8) Anderson, 4,028,849, (9) Japanese Utility Model No. JIKKOHEI8-9334,

(9) Japanese Utility Model No. JIKKAIHEI4-119083, (10) Japanese Utility Model No. JIKKAIHEI41-112279, (11) additional prior art cited during the prosecution of the patent, (12) United Kingdom Patent No. 1287756, and (13) United Kingdom Patent No. 329996. Additional references may be discovered, and Caldwell reserves the right to supplement this response. Furthermore, to the extent that Amesbury claims a spine that does not inhibit rotation is covered by the claims, the patent is anticipated and/or obvious in light of Sterner, U.S. Patent No. 5,157,808, and is invalid for lack of enablement in that the specification only discloses a spine that inhibits rotational movement.

**INTERROGATORY NO. 10**:

State the full factual and legal basis for Caldwell's denial that its infringement of the patents-in-suit is willful, including, but not by way of limitation, identifying any legal advice or legal opinion relied upon by Caldwell in deciding to use, make, offer for sale, sell in, or import into, the United States, or in deciding to continue to use, make, offer for sale, sell in, or import into, the United States, any of the Window Products identified in response to Interrogatory No. 1.

      **ANSWER**:    Caldwell objects to this interrogatory in that it is overly broad, calls for legal conclusions, and seeks material covered by the attorney-client privilege. Caldwell will not rely upon the opinion of counsel at trial. Caldwell declines to produce opinions of counsel regarding the validity and/or infringement of the patents-in-suit. Subject to and without waiving these objections, Caldwell states that it has a good faith basis for arguing that the patents-at-issue are invalid and/or not infringed, as outlined in its responses to Interrogatories Nos. 5 and 6 above, and as is evident from a comparison of Caldwell's products with the claims of the patents-in-suit. In addition, after Amesbury accused Caldwell of infringement, Caldwell withdrew its 97ez and 86xt products from the market, although Caldwell denies that those products infringed any of the patents-in-suit. Testimony

of Caldwell employees, including those disclosed in Caldwell's Rule 26 disclosures and Thomas E.

Batten, also are evidence of non-willfulness.

Dated: August _3/_, 2005

HARRIS BEACH PLLC

By: _____

Paul J. Yesawich, III
Neal L. Slifkin
David J. Edwards
Laura W. Smalley
*Attorneys for Defendant*
99 Garnsey Road
Pittsford, New York 14534
Telephone: 585-419-8800

-and-

BROWN & MICHAELS, P.C.
Christopher A. Michaels
Eugene S. Stephens
400 M&T Bank Building
118 North Tioga Street
Ithaca, New York 14850
Telephone: 607-256-2000

*Attorneys for Defendant*

TO:     GOODWIN PROCTER LLP
        Douglas J. Kline, Esq.
        Safraz W. Ishmael
        *Attorneys for Plaintiffs*
        Exchange Place
        Boston, MA 02109-2881
        Telephone: 617-570-1000

P:\CALDWELL\SuppIntResponses.doc
8/30/2005 2:57:26 PM

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK)
COUNTY OF MONROE ) SS.:

Karen J. Jenness, being duly sworn, deposes and says that I reside in the Town of Irondequoit, New York; I am over twenty-one years of age, and am a legal secretary for the office of Harris Beach LLP. That on the 31st day of August, 2005 before five-thirty o'clock p.m., at the City of Rochester, County of Monroe and State of New York, deponent served a copy of the annexed upon the following:

Safraz W. Ishmael, Esq.
Douglas J. Kline, Esq.
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109-2881

by causing a true copy thereof, properly and securely enclosed in a sealed wrapper for Federal Express marked for September 1, a.m. delivery.

Karen J. Jenness

Sworn to before me this
31st day of August 2005

Notary Public

HEATHER MCCURTY
Notary Public, State Of New York
Qualified In Monroe County
Commission Expires March 9, 2006

HARRIS BEACH
ATTORNEYS AT LAW

**EXHIBIT A**

| Patent Claims 6,820,368 | Caldwell Series 97EZ | Caldwell Series 97i(H) |
|---|---|---|
| 1. A window balance system comprising: | Yes | Yes |
| a U-shaped channel comprising a plurality of openings; | Yes | Yes |
| a spring connected to a system of pulleys located within the U-shaped channel; | Yes | Yes |
| a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and | Yes | Yes |
| a balance shoe, wherein the balance shoe comprises: | Yes | Yes |
| a frame comprising an enlarged first end and a second end, wherein at least a portion of the second end of the frame is disposed within the U-shaped channel; | Yes | Yes |
| a locking member proximal to the enlarged first end; | Yes | Yes |
| a cam in communication with the locking member; and | Yes | Yes |
| a connecting device comprising one or more resilient tabs for attaching the balance shoe within the U-shaped channel | No -- the Caldwell balance does not have resilient tabs | No -- the Caldwell balance does not have resilient tabs |

| | | |
|---|---|---|
| of the window balance, wherein the one or more resilient tabs extend at least partially through a corresponding number of the plurality of openings in the U-shaped channel. | | |
| 2. A window balance system comprising: | Yes | Yes |
| a U-shaped channel comprising a plurality of openings; | Yes | Yes |
| a spring connected to a system of pulleys located within the U-shaped channel; | Yes | Yes |
| a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and | Yes | Yes |
| a balance shoe, wherein the balance shoe comprises: | Yes | Yes |
| a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | No. The Caldwell balance does not have a pocket adapted to mate with a rivet. | Caldwell cannot state whether its 97i(h) product has this claim element until the court construes the term "pocket." |
| | Yes | Yes |

| | | |
|---|---|---|
| a locking member proximal to the enlarged first end;<br><br>a cam in communication with the locking member, and<br><br>a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Yes<br><br>No -- the Caldwell balance does not have a connecting device as that term is/will be defined by the claims and specification. To the extent Amesbury claims that this product infringes, Amesbury's construction violates the "all elements" rule in that Amesbury is claiming that two elements of the claim correspond to a single part of Caldwell's product. | Yes<br><br>No -- the Caldwell balance does not have a connecting device as that term is/will be defined by the claims and specification. To the extent Amesbury claims that this product infringes, Amesbury's construction violates the "all elements" rule in that Amesbury is claiming that two elements of the claim correspond to a single part of Caldwell's product. |
| 3. The window balance system of claim 2 wherein the connecting device comprises a rivet. | Noh | No |
| 4. The window balance system of claim 2 wherein the connecting device comprises a screw. | No | No |
| 5. The window balance system of claim 2 wherein the connecting device comprises a resilient tab. | No | No |
| 6. The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; | No<br><br>No | No<br><br>No |

| | | |
|---|---|---|
| wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | | |
| 7. The window balance system of claim 2 wherein the locking member comprises two opposing ends integrally connected by a spring member. | No | No |
| 8. The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame,<br><br>wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | No | No |
| 9. The window balance system of claim 2 wherein the locking member comprises a plate,<br><br>wherein the plate is parallel to a back surface of the enlarged first end of the frame. | No | No |

| | |
|---|---|
| 10.    The window balance system of claim 9 wherein the cam is at least partially housed within the enlarged first end of the frame | No |
| | No |
| wherein rotating the cam forces the plate of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | No |
| 11.    The window balance system of claim 2 wherein the cam comprises at least one camming surface and a keyhole opening sized to receive a pivot bar. | No |
| | No |

| Patent Claims 5,365,638 | Caldwell Quicktilt |
|---|---|
| 1.    A mounting assembly comprising | Yes |
| a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, | Yes |
| a sash frame support means slidable in said channel means, | Yes |
| a coiled ribbon spring having a first end engaged with said sash frame support means, | Yes |
| and a means for mounting said coiled ribbon spring, | Yes |
| the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, | Yes |
| said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, | Yes |
| said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited. | No.    The spine does not inhibit rotational motion.  Rotational motion is inhibited through an entirely different mechanism. |
| 2.    The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. | No |

| | |
|---|---|
| 3.    The mounting assembly of claim 2 wherein said mounting means has a body portion having an aperture therein,<br><br>a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means,<br><br>a surface of said body portion being concavely curved,<br><br>said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | No |
| 4.    The mounting assembly of claim 2 in which the mounting means has at least one inter-engagement means by which a plurality of such mounting means may be stacked in inter-engagement. | No |
| 5.    The mounting assembly of claim 4 in which the inter-engagement means comprises a tooth-like projection cooperable on said first mounting means with a corresponding complementary detente in a second mounting means. | No |
| 6.    The mounting assembly of claim 4 in which the inter-engagement means on said first mounting means is in an interference fit with an inter-engagement means on said second mounting means. | No |
| 7.    The mounting assembly of claim 4 in which the inter-engagement means is formed so as to provide a snap fit. | No |

| | |
|---|---|
| 8.    A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, | Yes |
| a sash frame support means slidable in said channel means, | Yes |
| a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, | Yes |
| the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | Yes |
| said mounting means being secured in said channel means and | Yes |
| the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited. | No.    The projection means does not inhibit rotational motion. Rotational motion is inhibited through an entirely different mechanism. |

| Patent Claims 6,598,264 | Caldwell 86xt Product |
|---|---|
| 1. | A block and tackle window balance device comprising: | Yes |
| | a channel comprising a first end and a second end; | Yes |
| | a top guide connected to the first end of the channel; | Yes |
| | a bottom guide connected to the second end of the channel; | Yes |
| | a bottom guide roller rotatably mounted in the bottom guide; | No - Bottom roller is attached to channel separately from bottom guide |
| | a fixed pulley block unit connected to the channel; | Yes |
| | a translatable pulley block unit moveable within the channel; | Yes |
| | a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and | Yes |
| | a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. | Yes |
| 2. | The device of claim 1 wherein the bottom guide roller is located external to the channel. | No |
| 3. | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | No |
| 4. | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | No |

| | | |
|---|---|---|
| 5. | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | No |
| 6. | The device of claim 1 wherein the fixed pulley block unit comprises a frame, an axle, and at least one pulley rotatable around the axle. | No |
| 7. | The device according to claim 6 wherein the axle is located within the frame. | No |
| 8. | The device according to claim 1 wherein the fixed pulley block unit is connected to the channel with a support member. | No |
| 9. | The device according to claim 1 wherein the translatable pulley block unit comprises a frame, an axle within the frame, and at least one pulley rotatable around the axle. | No |
| 10. | The device according to claim 1 wherein the top guide includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel. | No |
| 11. | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | No |
| 12. | A window assembly comprising: | |
| | a window frame with two jambs with jamb pockets; | |
| | at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | |

| | |
|---|---|
| at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | |
| channel comprising a first end and a second end; | Yes |
| a top guide connected to the first end of the channel; | Yes |
| a bottom guide connected to the second end of the channel; | Yes |
| a bottom guide roller rotatably mounted in the bottom guide; | **No - Bottom roller is attached to channel separately from bottom guide** |
| a fixed pulley block unit connected to the channel; | Yes |
| a translatable pulley block unit moveable within the channel; | Yes |
| a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and | Yes |
| a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. | Yes |
| **13.** A window balance device comprising: | Yes |
| a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | |
| a bottom guide roller rotatably mounted in the bottom guide. | **No - Bottom roller is attached to channel separately from bottom guide** |

| | | |
|---|---|---|
| 14. | The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | No |
| 15. | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | No |
| 16. | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | No |
| 17. | The device of claim 13 wherein the bottom guide further comprises a bottom guide axle for mounting the roller. | No |
| 18. | A window balance device comprising: | Yes |
| | a channel comprising a first end and a second end; | Yes |
| | a top guide connected to the first end of the channel; | Yes |
| | a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and | Yes |
| | a bottom guide roller rotatably mounted in the bottom guide. | **No - Bottom roller is attached to channel separately from bottom guide** |
| 19. | The device of claim 18 wherein the bottom guide roller is located external to the channel. | No |
| 20. | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | No |
| 21. | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | No |

4

| 22. | The device of claim 18 wherein the bottom guide further comprises a bottom guide axle for mounting the roller. | No |
|---|---|---|
| 23. | A window balance device comprising: | |
| | a bottom guide connected to an end of a window balance channel, the bottom guide slidable in a jamb pocket when installed in a window frame, the bottom guide including: | Yes |
| | a bottom guide axle mounted within the bottom guide; the bottom guide axle located outside the window balance channel; and | **No - Bottom roller is within channel** |
| | a bottom guide roller rotatably mounted on the bottom guide axle. | No |

# EXHIBIT 2

00001

1

2          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS

3  - - - - - - - - - - - - - - - - - - -x

   AMESBURY GROUP, INC., and

4   AMESBURY SPRINGS LTD.,
        Plaintiffs,

5

6          v.    Civil Action No. 05-10020-DPW

   THE CALDWELL MANUFACTURING

7   COMPANY,
        Defendant.

8  - - - - - - - - - - - - - - - - - - -x
          C O N F I D E N T I A L

9

   Deposition Upon Oral Examination Of:

10          Charles E. Still

11

   Location:    Harris Beach PLLC

12          99 Garnsey Road
          Pittsford, New York  14534

13

14   Date:      May 2, 2006

15

16   Time:      9:11 a.m.

17

18

19  Reported By:  Joanne N. Pero

20          Alliance Shorthand, Inc.

21          Suite 1500 - The Penthouse

22          Alliance Building

23          183 Main Street East

24          Rochester, New York  14604

25

**Still, Charles E., 5/2/06**                    **Page 1**

00057
1

2 Quick-Tilt products"; did I read that correctly?

3     A.  Yes, sir.

4     Q.  Do you recognize the '638 patent to be

5 the Braid patent that we have marked as Exhibit 8?

6     A.  Yes.

7     Q.  Again, did you prepare these, is it fair

8 to call these, claim charts?

9     A.  I prepared the right side of the claim

10 charts and the title.

11     Q.  So did you prepare these from blank claim

12 charts that you received from Harris Beach firm?

13     A.  Yes.

14     Q.  So all the information that is in the

15 right-most column of Exhibit A, is that information

16 that you placed into that column?

17     A.  It is.

18     Q.  And is it meant to describe your

19 understanding of various features of Caldwell's

20 Quick-Tilt products?

21     A.  Yes, sir.

22     Q.  So in the first column, for example, the

23 first entry says "a mounting assembly comprising,"

24 is that to express your view that Caldwell's

25 Quick-Tilt products are a mounting assembly?

00058
1

2     A.  Yes.

3     Q.  And they include a channel means; is that

4  correct?

5     A.  Yes.

6     Q.  Having a rear wall, correct?

7     A.  Yes.

8     Q.  Side walls, correct?

9     A.  Yes.

10     Q.  And Caldwell Quick-Tilt products include

11  at the extremities of the side walls inwardly

12  turned opposed flanges; is that correct?

13     A.  Yes, sir.

14     Q.  They include a sash frame support means

15  slideable in said channel means, correct?

16     A.  Yes.

17     Q.  And a coiled ribbon spring, correct?

18     A.  Yes.

19     Q.  The coiled ribbon spring includes a first

20  end engaged with the sash frame support means,

21  correct?

22     A.  Yes.

23     Q.  And Quick-Tilt products further include a

24  means for mounting the coiled ribbon spring; is

25  that correct?

# EXHIBIT 3



**CHARLES E. STILL, CONSULTING SERVICES**

2914 PARTRIDGE CIRCLE
BRYAN, TEXAS 77802
PHONE: 979-731-1130
FAX: 979-731-1070
EMAIL: cestill@cox-internet.com

Charles E. Still
*Specialist in Fenestration*

April 17, 2006

### Expert Witness Report of Charles E. Still

I, Charles E. Still, have been retained by Harris Beach PLLC to render expert services in conjunction with a patent infringement lawsuit. I hereby provide the following report involving Amesbury's U.S Patent 5,365,638 "Spring Mounting For Sash Frame Tensioning Arrangements", U.S. Patent 6,598,264 B2 "Block And Tackle Window Balance With Bottom Guide Roller" and U.S. Patent 6,820,368 "Snap Lock Balance Shoe And System For A Pivotable Window" pursuant to Rule 26 of the Federal Rules of Civil procedure.

I received a Bachelor of Architecture Degree in 1962 from Texas A&M University in College Station, Texas. I am a graduate of Overton High School, Overton, Texas.

I am the owner of Charles E. Still, Consulting Services based in Bryan, Texas. I have held this position since the inception of the company in July 2001. CES, Consulting Services specializes in fenestration. Windows and Doors are included in the term "fenestration" as well as curtain walls, storefronts and skylights. During my career, I have designed in excess of 200 fenestration products including single hung and double hung windows in aluminum, vinyl and composite materials for Residential, Manufactured Housing and Commercial Window Companies in New Construction and Replacement Markets. I am an expert in all phases of window design. I am a member of AAMA, American Architectural Manufacturers Association. AAMA is a professional trade organization including window manufacturers and suppliers to the window and door industry.

**Prior work history:**

**July 2000-July 2001**  *Product Engineering Manager*, Alenco Building Products, Inc. Responsibilities include all phases of Engineering, Design and Development, Tooling and Certification and Documentation for four Manufacturing Plants. Primary products developed



including windows, for new construction residential and commercial industry as well as residential replacement/remodeling market and manufactured housing industry. Primary window materials consists of extruded aluminum, extruded PVC vinyl and wood. Served on the AAMA Southeast Region and Western Boards of Directors. Active in Installation Task Group in AAMA Western Region. Active in AAMA "Installation Masters" certified installers program.

**March 1999-July 2000** *Director of Engineering Support*, Reliant Building Products, Inc. Responsibilities include all product liability case investigations and resolution, giving depositions and court testimony. Search for new product, including window technologies, in design, materials and equipment. Company voting representative to all member trade associations and building codes groups (AAMA, NFRC and IGMA). Responsible for Product Certification and Testing. Licensed Glazing Contractor in the State of California and Arizona.

**1982-1999** *Vice President of Engineering*, Reliant Building Products, Inc., formerly known as Redman Building Products, Inc. Responsibilities includes managing product design and development and installation, product liability and codes compliance to national and state building codes. Active member of AAMA (American architectural manufacturing Association) and served as chairman of numerous task groups and served three times on the National AAMA Board of Directors. Active member of NFRC (National Fenestration Rating Council) involving thermal performance of windows and doors and IGMA, Insulating Glass Manufacturers Association (formerly known as SIGMA, Sealed Insulating Glass Manufacturers Association).

**1979-1982** *Director of Product Design*, Redman Building Products, Inc.. Responsibilities include product design, including windows and development of new construction and replacement/remodeling windows, doors and skylights. Company owned and operated 5 manufacturing plants and 7 sales outlets.

**1974-1979** *Chief Engineer*, Alenco, A Division of Redman Building Products, Inc. Responsibilities include design and development, testing, quality control department, plant maintenance department, plant tooling department, shop drawings department and warranty service department.

**1968-1974** *Chief Design Engineer*, Alenco, a Division of Redman Building Products, Inc.. Responsibilities include all designs of aluminum windows and doors for Residential and Commercial construction as well as Manufactured Housing.

**1964-1968** *Design Engineer*, Alenco, Albritton Engineering Corporation. Responsibilities include design and development of new aluminum windows and doors. Responsible for Office and Plant Expansion Program in Bryan, Texas Facility. Prepared architectural working drawings for Office and Plant Facilities (3 expansions).

2
1

The following documents and Samples have been made available to me by the attorneys at
Harris Beach.

- U.S. Patent  329,996. A Spring Sash Balance, February 25, 1929
- G.B. Patent 1,218,827. Sash Control Mechanism, July 17, 1967
- G.B. Patent 1,244,324. A Sliding Sash Window, August 11, 1968
- G.B. Patent 1,287,756. Improvements In Or Relating To Doors, August 25, 1969
- U.K. Patent 2,236,786. A. Guide Assembly, September 27, 1989
- U.S. Patent 2,262,990. Window Sash Counterbalance, September 2,1939
- U.S. Patent 2,279,600. Sash Balance, March 30, 1940
- U.K. Patent 2,280,697. Tiltable To Sash Windows, July 27, 1993
- U.K. Patent 2,292,168 A. Pivoting Sash Slide Locking Mechanism, July 31, 1995
- U.S. Patent 2,635,282. Spring Counterbalance, October 2, 1950
- U.S. Patent 2,826,090. Sash Balance Coupling Device, March 21, 1955
- U.S. Patent 3,055,044. Foot Attachment For Block And Tackle Type Spring
  Counterbalances, September 25, 1960
- U.S. Patent 3,449,862. Window Structure, August 21, 1967
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 3,091,797. Window Structure, April 26, 1961
- U.S. Patent 3,114,178. Sliding Window And Counterbalancer Combination, February
  6, 1961
- U.S. Patent 3,358,403. Heavy Window Balance Assembly, January 28, 1966
- U.S. Patent 3,358,404. Readily Removable Double Hung Window, January 28, 1966
- U.S. Patent 3,440,683. Sash Control Mechanism, July 17, 1967
- U.S. Patent 3,449,862. Window Structures, August 11, 1967
- U.S. Patent 3,452,480. Spring Sash Counterbalance, September 14, 1967
- U.S. Patent 3,711,995. Building Structure, June 22, 1070
- U.S. Patent 3,869,754. Bracket For A Spring Sash Counterbalance, September 10,
  1973
- U.S. Patent 4,079,549. Balance Spring Lock For Tilt Out Sash, August 26, 1976
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 4,227,345. Tilt-Lock Slide For Window Sash, January 26, 1979
- U.S. Patent 4,300,316. Sash Balance Foot Seal Mechanism, October 17, 1979
- U.S. Patent 4,610,108. Balance Spring Locking Slide Block For Tilt-Out Windows,
  December 20, 1984
- U.S. Patent 4,654,928. Adjustable Friction Block And Tackle Window Balance
  System, April 11, 1986
- U.S. Patent 4,704,821. Compression Seals In A Double Hung Style Window, July 3,
  1986
- U.S. Patent 4,949,425. Spring Loaded Block And Tackle Window Sash Balance
  Assembly, October 19, 1988
- U.S. Patent 5,069,001. Pivotable Window Sash Assembly, November 21, 1990
  U.S. Patent 5,157,808. Coil Spring Counterbalance Hardware Assembly And
  Connection Method Therefore, February 18, 1992

3
1

- U.S. Patent 5,210,976. Window Balance Assembly, June 26, 1992
- U.S. Patent 5,243,783. Locking Slide Block, June 24, 1992
- U.S. Patent 5,301,467. Locking Slide Block, September 2, 1993
- U.S. Patent 5,353,548. Curl Spring Shoe Based Window Balance System, April 1, 1993
- U.S. Patent 5,365,638. Spring Mounting For Sash Frame Tensioning Arrangements, January 21, 1993
- U.S. Patent 5,371,971. Sash Balance Brake And Pivot Pin Assembly, May 4, 1993
- U.S. Patent 5,530,991. Block And Tackle Window Balance, January 21, 1994
- U.S. Patent 5,632,117. Sash Balance Brake Assembly, January 13, 1995
- U.S. Patent 5,661,927. Sliding Counterbalance Assembly For A Sash Window, March 6, 1996
- U.S. Patent 5,669,180. Window Balance Brake Shoe And Pivot Assembly, May 29, 1996
- U.S. Patent 5,737,877. Block And Tackle Balance With Integral, Non-Rotating Pulley System, July 26, 1996
- U.S. Patent 5,806,243. Sash Balance Brake Assembly, May 21, 1997
- U.S. Patent 5,829,196. Window Balance Brake Shoe And Pivot Assembly, May 30, 1997
- U.S. Patent 6,041,476. Inverted Block And Tackle Window Balance, November 21, 1997
- U.S. Patent 6,088,880. Adjustable Shoe For Awning Window Hinge, July 7, 1997
- U.S. Patent 6,151,832. Window Balance Cam Housing, February 19, 1999
- U.S. Patent 6,230,443 B1. Hardware Mounting, May 5, 1999
- U.S. Patent 6,467,128 B1. Block And Tackle Sash Counter Balance, September 11, 2000
- U.S. Patent 6,550,184 B1. Brake Shoe For Sash Window Or Door Assembly, February 9, 2001
- U.S. Patent 6,598,264 B2. Block And Tackle Window Balance With Bottom Guide Roller, March 16, 2001
- U.S. Patent 6,606,761 B2. Spring Mounting Arrangement For A Sash Window Counterbalance Arrangement, October 8, 2001
- U.S. Patent 6,622,342 B1. Block And Tackle Balance Assembly With Brake Shoe, June 6, 2001
- U.S. Patent 66,679,000 B2.
- U.S. Patent 6,820,368 B2. Snap Lock Balance Shoe And System For A Pivotable Window, May 23, 2003
- U.S. Patent 6,840,011 B2. Window Panel Balance Apparatus And Method, December 13, 2000
- U.S. Patent 6,990,710 B2. Counterbalance System For A Tilt-In Window Having An Improved Shoe Assembly And Anchor Mount, November 5, 2003
- Japanese Patent 62-194,895. Title and filing date unknown.
- Caldwell Fenestration Hardware Product Information, Bates C00477 thru C00542.
- Defendant's Second Supplemented Answers To Plaintiffs' First Set Of Interrogatories.

4
1

- Memorandum And Order, January 20, 2006.
- Amesbury's First Supplemental Response To Caldwell's Interrogatories (Nos.1-2)
- Amesbury's Second Supplemental Response To Caldwell's Interrogatories (Nos. 1-2,13-16).
- Defendant's Supplemented Answers To Plaintiffs' First Set Of Interrogatories
- Joint Motion to Set Schedule.
- Patent '264 File History, Bates C000543 thru C000690.
- Patent '638 File History, Bates C000921 thru C001116.
- Case Documents Bates AME 01931 through 01948
- CD files: Documents Produced in Response to Plaintiffs' First Request for documents and Things, dated September 28, 2005
- Expert Report of Dr. Sammy Shina Submitted on Behalf of Plaintiffs in Civil Action No. 05-10020-DPW
- Declaration of Prior Invention in the United States by Jason Annes To Overcome cited Publication Pursuant to 37 C.F.R.1.131
- Caldwell Sales Brochure
- Caldwell Physical Samples of Balance Hardware.

Other documents include:

- Voluntary Specifications for Aluminum, Vinyl (PVC) and Wood Windows and Glass Doors, AAMA/NWWDA 101/I.S.2-97.
- International Residential Code for One and Two Family Dwellings-2000.
- U.S Patent 4,961,247. Balancing Arrangements For Double Hung Windows. December 7, 1989

**U.S. Patent 5,365,638**

**Amesbury's Patent 5,365,638 – Spring Mounting For Sash Frame Tensioning Arrangements** involves a Constant Force Balance that is used in Single Hung and Double Hung Windows with a Tilting Sash. Constant force balances have been available for years and offer an economical solution to counter-balancing sash weight. Constant force balances include a stainless steel coiled spring, a coiled spring mounting in the frame jamb of the window with an attaching screw and a sash carrier (shoe). The window design must have certain design features in order to receive a constant force balance. It must have jamb tracks in the shape of a channel with one side of the channel open, creating flanges on each side. It must have at least one removable operating sash to be pivoted at the lower corner of the sash for tilting the sash inwards for sash removal or for cleaning the exterior sash glass surface from the interior. The mounting that cradles the coiled spring is fastened to the frame jamb inside the open channel. One outer end of the coiled spring is attached to a sliding sash carrier that connects to the bottom corners of the operating sash. The inner end of the coiled spring is left free and unattached inside the coil. When the sash is lifted upwards towards an open position, the coiled spring retracts inside the mounting and counter-balances the weight of the sash and allows the sash to

remain open for ventilation. Coil springs can be added in dual or triple configuration to increase the lifting force for a heavier sash.

Prior art demonstrates that there is nothing unique or novel about the '638 Patent. Amesbury contends that Caldwell infringed on their '638 Patent in claim elements 1,2,3 & 8.

The '638 Patent Claims describe the window frame jamb channel, sash frame support (shoe), a coiled ribbon spring, a mounting for the coil and a raised spine as part of the spring mounting.

Claims 1 & 8 of the '638 Patent describe .. *"whereby rotational motion of said mounting means is inhibited"*, which Caldwell denies is contained in its products. Amesbury's '638 Patent design calls for a raised spine as part of the mounting means to inhibit rotational motion of the mounting inside the window frame jamb according to the claims. The mounting depends on the inwardly turned flanges of the open jamb channel to help support the mounting. Caldwell's Quick Tilt design does not depend on the inwardly turned flanges of the open jamb channel for the mounting support and does nothing to infringe the '638 Patent. The molded nylon body of the Caldwell Quick-Tilt spring mounting fits snug <u>inside</u> the open jamb channel to prevent rotation of the mounting. Caldwell's Quick Tilt raised outer spine portion of the mounting is designed to help support the screw fastener, coil nest and aperture through the mounting and does nothing to inhibit rotation of the mounting under load. Standard window designs allow a gap between either side of the raised spine and the ends of the inwardly turned flanges from .050" to .109" (See Exhibits A, G & H).

Therefore, in Caldwell's Quick Tilt product, the spine cannot contact the flanges and cannot prevent rotation of the mounting element.

---

**U.S. Patent 6,598,264 B2**

**Amesbury's Patent 6,598,264 B2- Block And Tackle Window Balance With Bottom Guide Roller** involves a Block and Tackle Balance that is used in Single Hung and Double Hung Windows with a removable sash. Block and Tackle Balances have been used in windows for the past 67 years and have a good track record. The window industry calls this traditional type of balance a "side load" because the sash must be installed and removed by moving the sash to one side of the window to clear the jamb from the opposite side of the window. Block and Tackle balances are popular and are known for their sash weight carrying capacity, long reliable service and are user friendly.

The Block and Tackle Balance described in the '264 Patent has a "C" channel as the main body member, an angled top guide, a bottom guide with a roller, a spring, a fixed pulley block, a translatable pulley block and a cord. One end of the cord is attached to the translatable pulley block and the other end attaches to the frame jamb of the window

6
1

giving the operating sash a mechanical advantage of lifting the sash weight when the sash is being opened or closed.

Prior art demonstrates that there is nothing unique or novel about the '264 Patent. Amesbury contends that Caldwell infringed the '264 Patent, specifically patent claims 1,2,3,4,5,6,7,9,10,11,12,13,14,15,16,18,19,20 & 21.

Claims 1,2,12,13,18 & 19 of the '264 Patent describe... *"a bottom guide roller rotatably mounted in the bottom guide" and..." the bottom guide roller is located external to the channel"* which Caldwell denies is contained in its products. Caldwell's 86XT balance does not have a roller mounted in the bottom guide, and therefore, does not infringe the '264 Patent. Caldwell's 86XT balance has a bottom fixed pulley block with 3 pulleys, the third larger pulley being located immediately below the smaller pulleys and has a portion internal and external to the channel. (See Exhibit B, J & K). Therefore, Caldwell's 86XT balance does not have a roller in the bottom guide and does not infringe the '264 Patent claims.


### U.S. Patent 6,820,368 B2

**Amesbury's Patent 6,820,368 B2 –Snap Lock Balance Shoe And System For A Pivotable Window** involves a Block and Tackle Balance that is used in Single Hung and Double Hung Windows with a removable tilt-in sash. Tilt-in sash windows are popular because they allow the sash to be rotated inward to enable the exterior glass face of the sash to be cleaned from the interior. This type of balance is especially convenient on above grade floors, eliminating the use of ladders when double hung windows are installed.

The '368 Patent is designed with an "inverted" balance concept (see Exhibit E on Prior Art in U.S. Patent 6,041,476 and in '368 Patent Fig. 2A, 7A & 7B) wherein the fixed pulley block is located at the top end of the channel and the spring is located at the bottom end of the channel. The balance shoe is inverted ("T" shaped) and joined to the bottom end of the channel by way of two molded plastic tabs that snap into punched holes in the walls of the channel. The pivoting axis of the shoe is located 13/16" from the end of the channel where a rivet acts as an axle allowing the shoe to rotate. This allows the shoe to be removed for replacement after the window is constructed without modification to the window. The lower portion of the shoe has a cam with a recess for a pivot bar and brake pads.

Caldwell's Series 97I w/ Short Carrier (Shoe) is "T" shaped and is directly connected to the end of the balance channel with one rivet. It does not have snap tabs and does not rotate around a rivet. During factory assembly, a connecting rivet is threaded through a clearance through both outer walls of the carrier. It is designed to be non-removable and does not have a snap-in capability (See Exhibit C, E, F,L & N).
Amesbury contends that Caldwell infringed the '368 Patent, specifically Claims 2, 3,6,7,8, & 11.Claim 2 of the '368 Patent describes ... *"and wherein the second end of the*

7
1

*frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate the balance with a rivet;"* which Caldwell denies is contained in its products. Caldwell's Series 971 w/Short Carrier does not infringe the **'368 Patent** because Caldwell's 971 w/ Short Carrier does not have a pocket in its balance carrier (shoe) frame. It has a clearance on both walls of the carrier (shoe) for a connecting rivet.

Caldwell's Series 97EZ w/ Long Carrier (Shoe) is "T" shaped. During factory assembly, a connecting rivet is threaded through an aperture molded into the frame of the carrier. A second rivet through the end of the channel holds the end of the spring as well as supports two legs of the carrier to prevent outward rotation. The carrier is designed to be non-removable and does not have a snap-in capability (See Exhibits D, E, F,M & N). Claims 2 of the **'368 Patent** describes ... *"and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;"* which Caldwell denies is contained in its products. Caldwell's Series 97EZ w/Long Carrier does not infringe the **'368 Patent** because Caldwell's 97EZ w/ Long Carrier does not have a pocket in its balance carrier (shoe) frame. It has an aperture for a rivet and, at the extreme end of the carrier, it has two legs supported by a second rivet (that holds the end of the spring) to prevent outward rotation. Further, the second rivet does not connect the carrier to the channel and does not mate with the carrier legs.

**Opinions**

Based upon my research, past experience and knowledge, it is my opinion that Caldwell's Quick Tilt Products do not infringe Amesbury's Patent 5,365,638.

Based upon my research, past experience and knowledge, it is my opinion that Caldwell's 86XT Balance does not infringe Amesbury's Patent 6,598,264 B2.

Base upon my research, past experience and knowledge, it is my opinion that Caldwell's Series 97EZ Products do not infringe Amesbury's Patent 6,820,368.

I reserve the right to add additional opinions in my investigations and /or upon review of additional discovery materials. Opinions herein are within a reasonable degree of professional certainty.

Signed this17th day of April, 2006

*Chas. E. Still*

Charles E. Still, Consulting Services
2914 Partridge Circle
Bryan, Texas 77802

8
1

Attachments:
Exhibit A-Comparison Chart
Exhibit B-Comparison Chart
Exhibit C-Comparison Chart
Exhibit D-Comparison Chart
Exhibit E- Caldwell Patent 6,041,476
           Amesbury Patent 6,820,368 B2
Exhibit F- Caldwell Pulley Drawing
Exhibit G- Photo
Exhibit H- Photo
Exhibit J- Photo
Exhibit K- Photo
Exhibit L- Photo
Exhibit M- Photo
Exhibit N- Photo

**Charles E. Still**    **Testimony Given In Depositions and Trials**

| Type | Parties | Type of Claim | Location | Date |
|---|---|---|---|---|
| Deposition | VBP v. Royal Plastic | Patent Infringement | Oakland, New Jersey | |
| Trial | VBP v. Royal Pastics | Patent Infringement | Newark, New Jersey | |
| Deposition | Redman v. ? | Forced Entry/Injury | Albuquerque, New Mexico | |
| Deposition | Redman v. ? | Forced Entry/Injury | Houston, Texas | |
| Deposition | Thiokol v. ? | Glass Breakage | Denver, Colorado | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Trial | Redman v. ? | Personal Injury | Savannah, Georgia | |
| Trial | Redman v. ? | Water Infiltration | Little Rock, Arkansas | |
| Trial | Redman v. ? | Scratched Glass | Waco, Texas | |
| Arbitration | Redman v.? | Glass Breakage | Alexandria, Louisiana | |
| Trial | Redman v. ? | Water Infiltration | Baton Rouge, Louisiana | |
| Deposition | Inmont v. ? | Glass Breakage | Rockwall, Texas | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Deposition | Lamkin v. Gapco | Personal. Injury | Madison County, Illinois | |
| Deposition | Pace v. Gapco | Personal Injury | Madison County, Illinois | |
| Trial | Redman v. ? | Glass Breakage | Salt Lake City, Utah | |
| Deposition | Redman v. ? | Condensation | Baytown, Texas | |

| Type | Case | Subject | Location | Date |
|---|---|---|---|---|
| Deposition | Redman v. ? | Personal Injury | Detroit, Michigan | |
| Deposition | Redman v. ? | Personal Injury | South Padre Island, Texas | |
| Deposition | Gapco v. ? | Personal Injury | St. Louis, Missouri | |
| Trial | Unique v. Beard | Business Ethics | Roanoke, Virginia | |
| Deposition | Redman v. Somerset | Water Infiltration | Silver Springs, Maryland | |
| Deposition | Reman v. ? | Water Infiltration | San Francisco, California | |
| Deposition | Redman v. ? | Water Infiltration | Fresno, California | |
| Deposition | Bolander v. Champior | Water Infiltration | Houston, Texas | 8/29/2003 |
| Trial | Jason Lamkin v. Gapco | Personal Injury | Belleville, Illinois | 3/15/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, Texas | 4/2/2004 |
| Deposition | All Seasons v. Tradewinds Condo | Code Compliance | Orange Beach, AL | 5/19/2004 |
| Deposition | All Seasons v. Royal Palms Condo | Code Compliance | Gulf Shores, AL | 6/24/2004 |
| Deposition | W.S. Phillips v. Hope Lumber | Water Infiltration | College Station, TX | 10/27/2004 |
| Deposition | W.S. Phillips v. Alenco | Water Infiltration | College Station, TX | 11/30/2004 |
| Deposition | Sungate Development v. All Seasons | Water Infiltration | McAllen, TX | 12/7/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, TX | 2/23/2005 |

| | | | |
|---|---|---|---|
| Deposition | Cavalier Homes v. Larson Doors | Product Quality | Haleyville, AL | 5/28/2005 |
| Deposition | Grand Pointe HOA v. All Seasons | Product Liability | Orange Beach, AL | 6/29/2005 |
| Deposition | Donn v. Turner v. General Aluminum | Water Infiltration | Aubrey, TX | 9/9/2005 |
| Arbitration | Hillcom v. Moore | Water Infiltration | Houston, TX | 10/19/2005 |
| Trial | Sandhu v. Wellington | Personal Injury | Toronto, Canada | 11/18/2005 |
| Deposition | Planter's Place HOA v. All Seasons | Water Infiltration | Mt. Pleasant, S.C. | 12/20/2005 |

# EXHIBIT A

## NON-INFRINGEMENT OF
## AMESBURY'S U.S. PATENT NO. 5,365,638
## BY CALDWELL'S QUICK-TILT PRODUCTS

| | | |
|---|---|---|
| 638/1 | A mounting assembly comprising | A mounting assembly comprising |
| 638/1 | a channel means | a channel means |
| 638/1 | having a rear wall, | having a rear wall, |
| 638/1 | side walls | side walls |
| 638/1 | and at extremities of said side walls, inwardly turned opposed flanges, | and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/1 | a sash frame support means slidable in said channel means, | a sash frame support means slidable in said channel means, |
| 638/1 | a coiled ribbon spring | a coiled ribbon spring |
| 638/1 | having a first end engaged with said sash frame support means, | having a first end engaged with said sash frame support means, |
| 638/1 | and a means for mounting said coiled ribbon spring, | and a means for mounting said coiled ribbon spring, |

1

| | | |
|---|---|---|
| 638/1 | the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means | the coiled body of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means (See Prior Art in '638 Pat. Fig.1 & Fig.3) |
| 638/1 | and said mounting means being secured in said channel means, | And said mounting means being secured in said channel means, (See Prior Art in '638 Pat. Fig.1,Fig.3, Fig.4 and Fig.5) |
| 638/1 | said mounting means having a raised spine | Said mounting means having a raised spine |
| 638/1 | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means |
| 638/1 | whereby rotational motion of said mounting means is inhibited. | The raised spine of Caldwell's Quick Tilt does not inhibit rotation. |
| 638/2 | The mounting assembly of claim 1 wherein the mounting means has a | Caldwell's Quick Tilt has a mounting means that has a |

| | | |
|---|---|---|
| | support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. | support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. (See Prior Art in '638 Pat. Fig. 1, Fig. 2, Fig. 3, Fig.4, Fig.5 & Fig. 6) |
| 638/3 | The mounting assembly of claim 2 | Caldwell's Quick Tilt has a mounting assembly (See Prior Art in '368 Pat. Fig.1, Fig.2, Fig.3, Fig.4 & Fig.5) |
| 638/3 | wherein said mounting means has a body portion | wherein said mounting means has a body portion |
| 638/3 | Having an aperture therein, | having an aperture therein, |
| 638/3 | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, |
| 638/3 | a surface of said body portion being concavely curved, | a surface of said body portion being concavely curved, |
| 638/3 | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion |

3

| | | |
|---|---|---|
| 638/8 | a mounting assembly comprising | a mounting assembly comprising |
| 638/8 | a channel means having | a channel means having |
| 638/8 | a rear wall, | a rear wall, |
| 638/8 | side walls | side walls |
| 638/8 | and at extremities of said side walls, inwardly turned opposed flanges, | and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/8 | a sash frame support means slidable in said channel means, | a sash frame support means slidable in said channel means, |
| 638/8 | a coiled ribbon spring | a coiled ribbon spring |
| 638/8 | having an outer end engaged with said sash frame support means, | having an outer end engaged with said sash frame support means, |
| 638/8 | and a means for mounting said coiled ribbon spring, | and a means for mounting said coiled ribbon spring, |
| 638/8 | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, |

4

| | | |
|---|---|---|
| 638/8 | Said mounting means being secured in said channel means | Said mounting means being secured in said channel means |
| 638/8 | and the mounting means having projection means | and the mounting means having projection means |
| 638/8 | positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, | positioned between said inwardly turned opposite flanges of the channel means. The projection means in Caldwell's Quick Tilt products is independent of said flanges of the channel means within which the mounting means is positioned, |
| 638/8 | whereby rotational movement of the mounting means is inhibited. | The raised spine of Caldwell's Quick Tilt does not inhibit rotation. |

5

## EXHIBIT B

### NON-INFRINGEMENT OF
### AMESBURY'S U.S. PATENT NO. 6,598,264
### BY CALDWELL'S SERIES 86XT PRODUCT

| | | |
|---|---|---|
| 264/1 | A block and tackle window balance device comprising: | A block and tackle window balance device comprising: |
| 264/1 | a channel comprising | a channel comprising (See Prior Art in '264 Pat. Fig.2A,2B & Fig.3) |
| 264/1 | a first end | a first end  (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and a second end; | and a second end; (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel (See Prior Art in '264 Pat. Fig.2A, 2B & Fig.3 & 3); |
| 264/1 | a bottom guide connected to the second end of the channel; | a bottom guide connected to the second end of the channel (See Prior Art in '264 Pat. Fig. 2A, 2B & Fig.3); |
| 264/1 | a bottom guide roller rotatably mounted in the bottom guide; | Caldwell's Series 86XT bottom pulley is not a roller and is not mounted in the bottom guide; the bottom pulley is joined with 2 other pulleys in the fixed pulley block. |
| 264/1 | a fixed pulley block unit connected to the channel; | a fixed pulley block unit connected to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B); |
| 264/1 | a translatable pulley block unit | a translatable pulley block unit moveable within the channel |

1

| | | |
|---|---|---|
| | moveable within the channel; | ( See Prior Art in '264 Pat. Fig.2A & 2B); |
| 264/1 | a spring comprising | a spring comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | a first end | a first end ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | and a second end, | and a second end, ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/1 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit (See Prior Art in '264 Pat. Fig. 2A & 2B); |
| 264/1 | and a cord comprising | and a cord comprising (See Prior Art in '264 Pat. Fig.2A & 2B); |
| 264/1 | a first cord end | a first cord end (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and a second cord end, | and a second cord end, (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and the fixed pulley block unit | and the fixed pulley block unit (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and extends around the bottom guide roller, | and extends around the pulley block bottom pulley, not a roller, |
| 264/1 | the first cord end being attached to | the first cord end being attached to |

| | | |
|---|---|---|
| | the translatable pulley block unit | the translatable pulley block unit ( See Prior Art in '264 Fig.2B) |
| 264/1 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. (See Prior Art in '264 Pat. Fig. 7A) |
| 264/2 | The device of claim 1 wherein the bottom guide roller is located external to the channel. | Caldwell's Series 86XT fixed pulley block bottom pulley is not a roller and is partially located internal and external to the channel. |
| 264/3 | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | Caldwell's Series 86XT top guide is angled to received a member of a window sash (See Prior Art in '264 Pat. Fig 2A, 2B, Fig. 3 & Fig.7A). |
| 264/4 | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | Caldwell's Series 86XT bottom guide has a portion internal and external to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B). |
| 264/5 | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | Caldwell's Series 86XT bottom guide forms a channel to receive a portion of a window sash (See Prior Art in '264 Pat. Fig. 3). |
| 264/6 | The device of claim 1 wherein the | Caldwell's Series 86XT fixed pulley block unit comprises (See Prior Art in |

3

| | | |
|---|---|---|
| | fixed pulley block unit comprises | '264 Pat. Fig.2A & 2B) |
| 264/6 | a frame, | a frame, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/6 | an axle, | an axle, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/6 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. |
| 264/7 | The device according to claim 6 wherein the axle is located within the frame. | Caldwell's Series 86XT has an axle located within the fixed pulley block unit frame. (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | The device according to claim 1 wherein the translatable pulley block unit comprises | Caldwell's Series 86XT has a translatable pulley block unit that comprises (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/9 | a frame, | a frame (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | an axle within the frame, | an axle within the frame (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/10 | The device according to claim 1 wherein the top guide includes a top | Caldwell's 86XT has a top guide including a top angled portion (See Prior Art in '264 Pat. Fig. 2A & 2B) |

| | angled portion | |
|---|---|---|
| 264/10 | and a bottom portion, the bottom portion being connected to the first end of the channel. | And a bottom portion, the bottom portion being connected to the first end of the channel. (See Prior Art in '264 Pat. Fig.2A, 2B, 3 & 7A) |
| 264/11 | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | Caldwell's 86XT has a fixed pulley block unit that is independent of the bottom guide. |
| 264/12 | A window assembly comprising: | A window assembly comprising: |
| 264/12 | a window frame with two jambs with jamb pockets; | a window frame with two jambs with jamb pockets; ( See Prior Art in '264 Pat. Fig.1) |
| 264/12 | At least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | At least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and (See Prior Art in '264 Pat. Fig.1 & 7A) |
| 264/12 | At least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | at least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising; (See Prior Art in '264 Pat. Fig.7A) |
| 264/12 | channel comprising a first end and a second end; | a channel comprising a first end and a second end;( See Prior Art in '264 Pat. Fig.2A, 2B, 3 & 7A) |

| | | |
|---|---|---|
| 264/12 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel; ( See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/12 | a bottom guide connected to the second end of the channel; | a bottom guide connected to the second end of the channel; (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/12 | a bottom guide roller rotatably mounted in the bottom guide; | Caldwell's 86XT has a bottom pulley that is not a roller and is mounted in the fixed pulley block unit. |
| 264/12 | a fixed pulley block unit connected to the channel; | a fixed pulley block unit connected to the channel; ( See Prior Art in Fig.2A, & 2B) |
| 264/12 | a translatable pulley block unit moveable within the channel; | a translatable pulley block unit moveable within the channel; (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a spring comprising | a spring comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a first end | a first end ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and a second end | and a second end (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit; (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and a cord comprising | and a cord comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a first cord end | a first cord end, (See Prior Art in '264 Pat. Fig.2A & 2B) |

9

| | | |
|---|---|---|
| 264/12 | and a second cord end, | and a second cord end, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/12 | and the fixed pulley block unit | and the fixed pulley block unit (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and extends around the bottom guide roller, | and extends around the bottom fixed pulley block bottom pulley which is not a roller, |
| 264/12 | the first cord end being attached to the translatable pulley block unit | the first cord end being attached to the translatable pulley block unit (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. (See Prior Art in '264 Pat. Fig. 7A) |
| 264/13 | A window balance device comprising: | A window balance device comprising; (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/13 | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/13 | a bottom guide roller rotatably mounted in the bottom guide. | Caldwell's 86XT has a bottom pulley that is not a roller mounted in the fixed pulley block and that is independent of the bottom guide. |

7

| | | |
|---|---|---|
| 264/14 | The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | Caldwell's 86XT has a bottom pulley that is not a roller located internal and external to the channel. |
| 264/15 | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | Caldwell's 86XT has a portion of the bottom guide internal and external to the channel. |
| 264/16 | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of window sash when installed. | Caldwell's 86XT has a bottom guide that forms a channel to receive a portion of a window sash when installed (See Prior Art in '264 Pat. Fig. 3). |
| 264/18 | A window balance device comprising: | A window balance device comprising: |
| 264/18 | a channel comprising a first end and a second end; | a channel comprising a first end and a second end; (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/18 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel; (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/18 | a bottom guide connected to the second end of the channel and | a bottom guide connected to the second end of the channel and (See Prior Art in '264 Pat. Fig. 2A, 2B & 3) |

8

| | | |
|---|---|---|
| | adapted to slide in a jamb pocket when installed in a window frame; and | adapted to slide in a jamb pocket when installed in a window frame; and (See Prior Art in '264 Pat. Fig.1) |
| 264/18 | a bottom guide roller rotatably mounted in the bottom guide. | Caldwell's 86XT has a bottom pulley that is not a roller in the fixed pulley block and is independent of the bottom guide. |
| 264/19 | The device of claim 18 wherein the bottom guide roller is located external to the channel. | Caldwell's 86XT has a bottom pulley located internal and external to the channel. |
| 264/20 | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | Caldwell's 86XT has a bottom guide that is internal and external to the channel. (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/21 | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | Caldwell's 86XT has a bottom guide that forms a channel to receive a portion of a window sash when installed (See Prior Art in '264 Pat. Fig.3). |

9

EXHIBIT C

NON-INFRINGEMENT OF
AMESBURY'S U.S. PATENT NO. 6,820,368
BY CALDWELL'S SERIES 971 PRODUCT

| 368/2 | A window balance system comprising: | A window balance system comprising: |
|---|---|---|
| 368/2 | a U-shaped channel comprising a plurality of openings; | a U-shaped channel comprising a plurality of openings (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B); |
| 368/2 | a spring connected to a system of pulleys located within the U-shaped channel; | a spring connected to a system of pulleys located within the U-shaped channel (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a cord with | a cord with (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a first cord end | a first cord end (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | and a second cord end, | and a second cord end, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the first cord end connected and threaded through the system of pulleys, | the first cord end connected and threaded through the system of pulleys, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the second cord end connected to a jamb mounting attachment; and | the second cord end connected to jamb mounting attachment; and (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a balance shoe, wherein the balance shoe comprises: | a balance carrier (shoe), wherein the balance carrier comprises (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B): |

| | | |
|---|---|---|
| 368/2 | a frame comprising an enlarged first end | a frame comprising an enlarged first end |
| 368/2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | and a second end, wherein the second end is adapted to be received by the U-shaped channel, |
| 368/2 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | Caldwell's Series 97I second end of the balance carrier further forms a clearance for a rivet that attaches the balance carrier to the U-shaped channel. A center support leg of the carrier rest against the rivet. The carrier is non-removable from the U-shaped channel; |
| 368/2 | a locking member proximal to the enlarged first end; | a locking member proximal to the enlarged first end; |
| 368/2 | a cam in communication with the locking member, and | a cam in communication with the locking member, and |
| 368/2 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Caldwell's Series 97I has no connecting device between the U-shaped channel and the balance carrier |
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | Caldwell's Series 97I balance carrier has no connecting device. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to | Caldwell's Series 97I window balance system has a cam housed within the enlarged first end of the carrier; wherein rotating the cam forces the locking member to engage a jamb track when the balance carrier is |

| | | |
|---|---|---|
| | engage a jamb track when the balance shoe is installed in a window jamb. | installed. (See Prior Art in '368 Pat. Fig. 2A, 7A. & 7B) |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | Caldwell's Series 97I balance system has a locking member comprising (See Prior Art '368 Pat. Fig. 2A, 7A & 7B) |
| 368/7 | two opposing ends | two opposing ends (See Prior Art '368 Pat. Fig. 2A, 7A & 7B) |
| 368/7 | integrally connected by a spring member | integrally connected by a spring member (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | Caldwell's Series 97I balance system has a cam that is partially housed within the enlarged first end of the carrier frame, wherein the cam forces the opposing ends of the locking member to engage a jamb track when the balance carrier is installed in a window jamb (See Prior Art in '368 Pat. Fig.2A, 7A & 7B). |
| 368/11 | The window balance system of claim 2 | Caldwell's Series 97I balance system |
| 368/11 | wherein the cam comprises at least one camming surface | has a cam comprising at least one camming surface (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/11 | and a keyhole opening sized to receive a pivot bar. | and a keyway opening sized to receive a pivot bar. (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |

**EXHIBIT D**

**NON-INFRINGEMENT OF**
**AMESBURY'S U.S. PATENT NO. 6,820,368**
**BY CALDWELL'S SERIES 97EZ PRODUCT**

| | | |
|---|---|---|
| 368/2 | A window balance system comprising: | A window balance system comprising: |
| 368/2 | a U-shaped channel comprising a plurality of openings; | a U-shaped channel comprising a plurality of openings (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a spring connected to a system of pulleys located within the U-shaped channel; | a spring connected to a system of pulleys located within the U-shaped channel (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a cord with | a cord with (See Prior Art in '368 Fig.2A) |
| 368/2 | a first cord end | a first cord end (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | and a second cord end, | and a second cord end, (See Prior Art in '368 Fig.2A) |
| 368/2 | the first cord end connected and threaded through the system of pulleys, | the first cord end connected and threaded through the system of pulleys, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the second cord end connected to a jamb mounting attachment; and | the second cord end connected to jamb mounting attachment; and (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a balance shoe, wherein the balance shoe comprises: | a balance carrier (shoe), wherein the balance carrier comprises (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B); |

| | | |
|---|---|---|
| 368/2 | a frame comprising an enlarged first end | a frame comprising an enlarged first end |
| 368/2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | and a second end, wherein the second end is adapted to be received by the U-shaped channel, |
| 368/2 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | Caldwell's Series 97EZ second end of the frame of the balance carrier further forms two legs which are not a pocket for a supporting rivet, which does not mate with the legs. This product has an aperture for a second rivet that attaches the balance carrier to the U-shaped channel. The balance carrier is non-removable from the U-shaped channel. |
| 368/2 | a locking member proximal to the enlarged first end; | A locking member proximal to the enlarged first end; |
| 368/2 | a cam in communication with the locking member, and | a cam in communication with the locking member, and |
| 368/2 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Caldwell's Series 97EZ has a rivet between the U-shaped channel and the balance carrier. |
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | Caldwell's Series 97EZ balance is connected to the U-shaped channel with a rivet. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein | Caldwell's Series 97EZ window balance system has a cam housed within the enlarged first end of the carrier; wherein rotating the cam forces the locking member to |

| | | |
|---|---|---|
| | rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | engage a jamb track when the balance carrier is installed in a window jamb. (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | Caldwell's Series 97EZ balance system has a locking member comprising (See Prior Art in '368 Pat. Fig. 2A 7A & 7B) |
| 368/7 | two opposing ends | two opposing ends (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/7 | integrally connected by a spring member | integrally connected by a spring member (See Prior Art in '368 Pat. 2A, 7A & 7B) |
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | Caldwell's Series 97EZ balance system has a cam that is partially housed within the enlarged first end of the carrier frame, wherein the cam forces the opposing ends of the locking member to engage a jamb track when the balance carrier is installed in a window jamb (See Prior Art in '368 Pat. Fig.2A, 7A & 7B). |
| 368/11 | The window balance system of claim 2 | Caldwell's Series 97EZ balance system |
| 368/11 | wherein the cam comprises at least one camming surface | has a cam comprising at least one camming surface (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B) |
| 368/11 | and a keyhole opening sized to receive a pivot bar. | and a keyway opening sized to receive a pivot bar. (See Prior Art in '368 Fig.2A, 7A & 7B) |

US006041476A

# United States Patent [19]

## deNormand

[11] Patent Number: 6,041,476

[45] Date of Patent: Mar. 28, 2000

[54] **INVERTED BLOCK AND TACKLE WINDOW BALANCE**

[75] Inventor: **Richard S. deNormand**, Rochester, N.Y.

[73] Assignee: **Caldwell Manufacturing Company**, Rochester, N.Y.

[21] Appl. No.: **08/975,728**

[22] Filed: **Nov. 21, 1997**

[51] Int. Cl.⁷ .................................... B66D 3/08

[52] U.S. Cl. .................... 16/197; 16/196; 49/445; 254/393

[58] Field of Search ................... 16/193, 196, 197, 16/198, 401, 402; 49/445, 446; 492/30, 47; 254/393, 404, 416

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,584 | 7/1849 | Hoffman . |
| 138,944 | 5/1873 | Shaw .................... 16/213 |
| 329,005 | 10/1885 | Blodgett .................... 16/213 |
| 464,795 | 12/1891 | Dodge . |
| 527,306 | 10/1894 | Wern .................... 254/393 |
| 1,523,733 | 1/1925 | Trout .................... 254/404 |
| 1,668,497 | 5/1928 | Fishback . |
| 1,713,586 | 5/1929 | Wright .................... 254/404 |
| 1,800,700 | 4/1931 | Patton . |
| 2,196,948 | 4/1940 | Tremblay .................... 16/215 |
| 2,262,990 | 11/1941 | Cross et al. . |
| 2,336,406 | 12/1943 | Kreuscher . |
| 2,459,290 | 1/1949 | Rozner . |
| 2,625,447 | 1/1953 | Derenter, III .................... 254/393 |
| 2,663,806 | 12/1953 | Trammell, Sr. et al. .................... 49/445 |
| 3,055,044 | 9/1962 | Dinsmore . |
| 3,150,420 | 9/1964 | Brenner . |
| 4,078,336 | 3/1978 | Prosser . |
| 4,190,930 | 3/1980 | Prosser . |
| 4,240,614 | 12/1980 | Comer, Jr. .................... 254/393 |
| 4,332,054 | 6/1982 | Paist et al. .................... 16/197 |
| 4,503,641 | 3/1985 | Swan . |
| 4,586,291 | 5/1986 | Swan . |
| 4,654,928 | 4/1987 | Flight . |
| 4,689,850 | 9/1987 | Flight .................... 16/197 |
| 4,914,862 | 4/1990 | Gregory .................... 49/445 |
| 4,949,425 | 8/1990 | Dodson et al. .................... 16/DIG. 20 |
| 5,530,991 | 7/1996 | deNormand et al. . |

*Primary Examiner*—Chuck Y. Mah
*Assistant Examiner*—Donald M. Gurley
*Attorney, Agent, or Firm*—Eugene Stephens & Associates

[57] **ABSTRACT**

Pulleys of a block and tackle window balance include hub steps that interact with other components to reduce the introduction of dirt and dust particles into areas vulnerable to wear. The hub steps of some of the pulleys are recesses formed about the axial bores of the pulleys that mate with protrusions on an axle and a washer. The hub steps of other pulleys are protrusions that abut a support plate and heads of rivets that act as axles. The hub steps allow inverse mounting of the window balance so that the balance can be mounted in a shoe channel for movement with a sash of the window, attached to the sash shoe, and the cord can be attached to the jamb or frame, thus increasing sash travel.

**23 Claims, 2 Drawing Sheets**



**EXHIBIT E**

C000457



FIG. 1



FIG. 2



FIG. 3

**U.S. Patent**        Mar. 28, 2000        Sheet 2 of 2        **6,041,476**



**FIG. 4**



**FIG. 5**



**FIG. 6**

C000459

6,041,476

**1**

# INVERTED BLOCK AND TACKLE WINDOW BALANCE

## TECHNICAL FIELD

The invention relates to the field of block and tackle window balances for offsetting the weight of a window sash throughout a range of travel within a window frame.

## BACKGROUND OF THE INVENTION

Block and tackle window balances have become popular because of their compact size and ease of installation. They combine a system of pulleys with an extension spring to convert high spring tension applied over a short working distance to a lower spring tension applied over a longer working distance. The extension spring and pulley system are arranged within a rigid balance channel, with the extension spring anchored at one end of the balance channel and the pulley system anchored at the other end. In most block and tackle balances, the balance channel is mounted in the jamb of the window frame; and a cord, which is reeved through the pulley system, is attached to a sash shoe that slides in the jamb with the sash. The extension spring and pulley system are sized so that a desired lifting force is applied to the window sash throughout the entire range of sash travel within the window frame. A disadvantage of this type of balance is that the movement of the sash is limited by the presence of the balance in the jamb. In some cases, the travel is limited so much that the lower sash of the open window blocks egress through the window in escaping a fire.

To solve the problem of limited sash movement, the balance can be mounted upside down in the window sash with the balance channel attached to the sash shoe and the cord attached to the window jamb or frame. However, prior art window balances of this kind tend to be susceptible to contamination from dirt and dust, especially when mounted upside down. Particles work their way between the pulley bores and the pulley axles, increasing friction and wear. Thus, prior art block and tackle window balances are not as durable or reliable as is desired.

Some prior art block and tackle window balances that are less susceptible to contamination require the use of bushings and other parts. This is disadvantageous in that the use of additional parts increases the complexity of the machines and the likelihood of their failure. Also, the additional parts increase the cost of manufacture and assembly of the window balances.

## SUMMARY OF THE INVENTION

My inventive block and tackle window balance greatly reduces the invasion of the hub/axle interface by particulate contaminants. I form the pulleys with steps in their hubs so that they can engage mating steps on the rivets that serve as their axles. In addition, I mount the two pulleys at the open end of the balance so that there run against each other, effectively sealing the space between the pulley hubs. The steps in the pulley hubs can be recesses or protrusions, depending on their location and particular duty. My window balance provides better protection from dirt and dust contamination without the extra parts required by prior art window balances, keeping the balance relatively simple and less costly to manufacture and assemble. Additionally, because my window balance is less susceptible to contamination, it can be mounted to move with the sash of a window or to remain fixed relative to the frame of a window, depending on the requirements of a particular

**2**

installation, and can be mounted invertedly without significantly reducing its useful life.

## DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top schematic view of the invention.

FIG. 2 is a cross section taken along line II—II in FIG. 1 showing the first pair of pulleys.

FIG. 3 is a cross section taken along line III—III in FIG. 1 showing the second pair of pulleys.

FIG. 4 is a view taken along line IV—IV in FIG. 2 to illustrate the flats of a preferred pulley axle and the groove in which the axle is mounted.

FIG. 5 is a side view of a portion of the invention as shown in FIG. 1.

FIG. 6 is a schematic representation of the placement of my invention in a window.

## DESCRIPTION OF THE INVENTION

As seen in the accompanying Figures, my block and tackle window balance 1 includes a balance channel 2 preferably mounted in the shoe channel 55 of a window 51 and attached at one end to a sash shoe 50 that moves with the sash 53 in the shoe channel 55. I mount the shoe channel 55 on the jamb 54 of the window between the jamb 54 and the sash 53. The balance channel 2 supports a series of pulleys 11, 12, 31, 32 over which I reeve a cord 6. I attach an attachment end 8 of the cord 6 to the window jamb 54 or to the window frame 52. I attach a support plate end 7 of the cord 6 to a sliding support plate 35. The support plate 35 is biased against movement from a rest position by a spring 4 attached to the balance channel 2. Alternatively, a more conventional mounting arrangement can be used with the balance channel 2 fixed relative to the window jamb 54 and the attachment end 8 of the cord attached to the sash shoe 50.

As seen particularly in FIG. 2, an axle 15 mounted in grooves 24 on one end of the balance channel 2 supports a first pair 10 of pulleys 11, 12. The pulleys 11, 12 in the first pair 10 sit adjacent one another and include hub steps 13 in the form of recesses about the axial bores 14 of the pulleys 11, 12. The sides or rims 23 of the pulleys 11, 12 adjacent one another can slide or rub against each other and effectively seal the cavity 22 formed by their hub steps 13 against contamination from dirt and dust.

The axle 15 is preferably a rivet including flats 16 formed over portions of the circumferential surface of the axle 15 such that the flats 16 engage the grooves 24 in the balance channel 2, holding the axle 15 against rotation. The preferred rivet 15 also includes heads 17 that prevent axial movement of the axle 15. As shown in FIG. 4, I prefer to use a hexagonal arrangement of the flats 16 similar to that used in common nuts and bolt heads. The axle 15 can also include a flange 18 with a protruding flange step 19 that mates with a hub step 13 of one of the pulleys of the first pair, such as the first pulley 11. I prefer to mount a washer 20 on the axle 15 between the other of the pulleys of the first pair 10 (the second pulley 12) and the wall 3 of the balance channel. The washer 20 can include a protruding washer step 21 that mates with a hub step 13 of the second pulley 12. The mating steps 13, 19, 21 effectively seal the washer/pulley, flange/pulley, and pulley/axle bearing surfaces from contamination by dirt and dust particles, reducing wear of these parts and increasing the effective life of the window balance.

A second pair 30 of pulleys 31, 32 is mounted on the support plate 35. The pulleys 31, 32 of the second pair 30 also include hub steps 33, but I prefer to form these hub steps

C000460

6,041,476

**3**

33 as protrusions about the axial bores 34 of the pulleys 31, 32. Axles 37, 38, preferably in the form of rivets, rotatably mount the pulleys 31, 32 on the support plate 35, the heads 39 of the rivets engaging or abutting respective hub steps 33 of the pulleys 31, 32. I prefer to form the hub steps 33 so that they have substantially the same diameter as the heads 39 of the rivets 37, 38. The hub steps 33 of the pulleys 31, 32 farthest from the rivet heads 39 abut the support plate 35. As with the first pair of pulleys 10, the mating steps 33 and rivet heads 39 effectively seal the support plate/axle bearing surfaces from contamination by dirt and dust particles, reducing wear of these parts and increasing the effective life of the window balance.

When installed, one end 8 of the cord 6 is preferably attached to the window frame 52 or the window jamb 54, the other being attached to the support plate 35. In this arrangement, I slidingly mount the balance channel 2 in the shoe channel 55 with one end connected to the sash shoe 50 so that the balance channel 2 can move with the sash 53 in the shoe channel 55. Alternatively, the end 8 of the cord 6 can be attached to the sash shoe 50 mounted in the conventional manner, the other end 7 of the cord being attached to the support plate 35. In the conventional arrangement, the balance channel 2 is fixed with respect to the frame 52. In either arrangement, the support plate 35 slides in the balance channel 2. I prefer to run the cord 6 from the support plate 35 to the fourth pulley 32, then to the second pulley 12, then to the third pulley 31, and then out the end of the balance channel 2 in which the first pair of pulleys 10 is mounted. The end 8 of the cord 6 not attached to the support plate 35 includes a limit stop 9 to prevent the cord 6 from being pulled into the balance channel 2 when it is free.

The support plate 35 carries a guide 36 that keeps the support plate 35 properly aligned and oriented in the balance channel 2 while sliding and while resting. The support plate 35 also includes a spring attachment point 40, such as a hole, to which an end of a biasing spring 4 is attached. The other end of the biasing spring 4 is attached to the balance channel 2 via, for example, a support rivet 5. The spring 4 provides the force that balances the weight of the window sash 53. As the window sash 53 is moved, the cord 6 moves and rolls over the pulleys 11, 12, 31, 32, which rotate accordingly, and the support plate 35 slides. Travel of the support plate 35 is limited between its resting position and its extended position by the limit stop 9 on the cord 6 and the first pair of pulleys 10, respectively.

**Parts List**

1 Window balance
2 Balance channel
3 Walls of balance channel
4 Spring
5 Spring support/rivet
6 Cord
7 Support plate end of cord
8 Free end/attachment end of cord
9 Limit stop of cord
10 First pulley pair
11 First pulley
12 Second pulley
13 Hub steps/recesses of pulleys of first pair of pulleys
14 Axial bores of pulleys of first pair
15 Axle/rivet supporting first pair
16 Flats of axle
17 Heads of axle
18 Flange of axle

**4**

19 Flange step/protrusion
20 Washer
21 Washer step/protrusion
22 Cavity/space formed by hub steps of first pair
23 Rims of pulleys of first pair
24 Mounting groove of axle of first pair
30 Second pulley pair
31 Third pulley
32 Fourth pulley
33 Hub steps/protrusions of pulleys of second pair of pulleys
34 Axial bores of pulleys of second pair
35 Support plate
36 Guide for support plate
37 Support/rivet for third pulley
38 Support/rivet for fourth pulley
39 Heads of rivets for third and fourth pulleys
40 Attachment point for spring; hole in support plate
50 Pivot block or sash shoe
51 Window
52 Window frame
53 Window sash
54 Window jamb

I claim:

1. A block and tackle window balance comprising:
hub steps on each side of a pulley, the hub steps being formed coaxially with an axial bore of the pulley;
an axle on which the pulley is rotatably mounted so that the hub steps act to inhibit introduction of contaminants into the axial bore of the pulley;
a balance channel in which the axle is mounted, the balance channel being configured for mounting in one of a shoe channel, a sash, and a jamb of a window;
an end of the balance channel being attached to one of a sash shoe and a frame of a window;
a cord reeved over the pulley, a first end of the cord being attached to the other of the sash shoe and the frame of the window;
a spring having a first end attached to the balance channel and a second end connected to a second end of the cord; and
wherein the hub steps are recesses and the axle includes an axle step that protrudes toward and mates with a hub step of the pulley.

2. The window balance of claim 1 wherein the axle step is a protrusion extending from a flange formed in the axle.

3. The window balance of claim 1 wherein flats formed on a circumferential surface of the axle engage grooves formed in the balance channel to hold the axle against rotation.

4. The window balance of claim 1 wherein the mating axle step and hub step form two substantially right angles in a path to the axial bore of the pulley, substantially reducing introduction of dust into the axial bore of the pulley.

5. The window balance of claim 1 wherein the axle step is a protrusion formed on a washer mounted on the axle.

6. The window balance of claim 1 wherein the pulley is one of a substantially identical pair of pulleys mounted adjacent each other on the axle so that they can rotate relative to one another, a rim of one pulley substantially engaging a rim of the other pulley such that facing recesses form a cavity between the pulleys.

7. A block and tackle window balance comprising:
hub steps on each side of a pulley, the hub steps being formed coaxially with an axial bore of the pulley;
an axle on which the pulley is rotatably mounted so that the hub steps act to inhibit introduction of contaminants into the axial bore of the pulley;

6,041,476

**5**

a balance channel in which the axle is mounted, the balance channel being configured for mounting in one of a shoe channel, a sash, and a jamb of a window;

an end of the balance channel being attached to one of a sash shoe and a frame of a window;

a cord reeved over the pulley, a first end of the cord being attached to the other of the sash shoe and the frame of the window;

a spring having a first end attached to the balance channel and a second end connected to a second end of the cord; and

wherein the hub steps are protrusions and one of the hub steps engages a rivet head of an axle on which the pulley is rotatably supported, the axle being carried by a support plate that slides within the balance channel as the cord is played out of or drawn into the balance, the support plate being interposed between and attached to the second ends of the spring and the cord, the cord being biased by the spring against being played out of the balance.

8. The window balance of claim 7 wherein a pair of substantially identical axles carrying substantially identical pulleys is mounted on the support plate such that longitudinal axes of the axles are offset from one another.

9. The window balance of claim 7 wherein the support plate carries a guide that engages the balance channel to maintain the plate in proper alignment within the balance channel.

10. A block and tackle window balance comprising:

flats on a circumferential surface of an axle on which a pulley is rotatably mounted;

a balance channel in which the axle is mounted, the flats engaging a groove formed in the balance channel so that the axle is held against rotation, the balance channel being mounted for one of movement with a window sash and remaining fixed with respect to a window frame;

a cord reeved over the pulley, a first end of the cord being connected to the window frame when the balance channel is mounted for movement with the window sash, the first end of the cord being connected to the window sash when the balance channel is mounted for remaining fixed with respect to the window jamb;

a spring configured to provide a bias against withdrawal of the cord from the block and tackle window balance, a first end of the spring being connected to a second end of the cord, a second end of the spring being connected to the balance channel; and

one of an end of the balance channel and the first end of the cord being configured for attachment to a sash shoe mounted in a shoe channel on the window jamb, the sash shoe being configured to slide in the shoe channel with the window sash as the window sash is moved, the end of the balance channel being configured for attachment to the sash shoe when the balance channel is mounted for movement with the window sash, and the first end of the cord being configured for attachment to the sash shoe when the balance channel is mounted for remaining fixed with respect to the window frame.

11. The window balance of claim 10 wherein the axle is a rivet and further comprises a flange arranged between the flats and the pulley.

12. The window balance of claim 11 wherein the flange includes a flange step on a pulley side of the flange, the flange step engaging a mating hub step of the pulley.

13. The window balance of claim 10 wherein a washer is mounted between a side of the pulley and a wall of the balance channel, the washer including a washer step that engages a mating hub step of the pulley.

**6**

14. The window balance of claim 10 wherein first and second pulleys are mounted adjacent one another on the axle in the balance channel, each pulley including hub steps such that a hub step of the first pulley faces a hub step of the second pulley and a hub step of each pulley faces a respective wall of the balance channel.

15. The window balance of claim 14 wherein the axle includes a step mating with a hub step of one of the pulleys.

16. The window balance of claim 14 further comprising a washer with a washer step thereon mating with a hub step of one of the pulleys.

17. The window balance of claim 14 further comprising third and fourth pulleys rotatably mounted on respective rivets on a support plate slidably mounted in the balance channel, the support plate being interposed between the spring and the cord such that the first ends of the spring and the cord are attached thereto, the pulleys including hub steps each engaging one of a respective rivet head and the support plate.

18. The window balance of claim 17 wherein the balance channel is mounted for movement with the window sash, an end of the balance channel being attached to the sash shoe, the cord running over each of the first, second, third, and fourth pulleys so that the first end of the cord can be attached to the window frame.

19. A block and tackle window balance comprising:

first hub steps on each side of a first pulley;

second hub steps on each side of a second pulley;

a first axle on which the first and second pulleys are rotatably mounted, the first and second pulleys lying adjacent one another on the axle so that they rub together;

third hub steps on each side of a third pulley;

fourth hub steps on each side of a fourth pulley;

second and third axles carrying the third and fourth pulleys, respectively, and being mounted on a support plate;

a balance channel non-rotatably supporting the first axle and slidingly supporting the support plate, the balance channel including first and second side walls and a bottom wall;

a cord reeved over the pulleys and having a first end attached to the support plate and a second end extending from a first end of the balance channel; and

a spring having a fixed end attached to the balance channel and a movable end attached to the support plate.

20. The window balance of claim 19 wherein the first axle is mounted in grooves in the side walls of the balance channel and includes flats formed on a circumferential surface of the first axle corresponding to a region in which the first axle engages one of the grooves, the flats engaging the one of the grooves so that the axle is held against rotation.

21. The window balance of claim 19 wherein the first hub steps are recesses and the first axle includes a flange with a flange step formed thereon, the flange step engaging and mating with one of the first hub steps of the first pulley.

22. The window balance of claim 19 wherein the second hub steps are recesses and the first axle carries a washer adjacent the second pulley, the washer including a washer step facing the second pulley and mating with an adjacent second hub step of the second pulley.

23. The window balance of claim 19 wherein the hub steps of one of the third and fourth pulleys are protrusions, the axle of the one of the third and fourth pulleys comprising a rivet with a head engaging one of the protrusions, the other protrusion running against the support plate.

* * * * *



PRIOR ART

FIG. 2A



FIG. 7A

FIG. 7B

FIG. 8A

FIG. 8B



**EXHIBIT F**

NOTES:

1. MATERIAL: KOCETAL K300 ACETAL NATURAL OR CALDWELL ENGINEERING APPROVED EQUIVALENT. 25% MAXIMUM REGRIND ALLOWED.

2. MAXIMUM ALLOWABLE GATE VESTIGE TO BE .005" ABOVE ADJACENT PULLEY FACE.

3. MAXIMUM ALLOWABLE PROTRUSION OF FLASH TO BE .010".

4. DIMENSIONS SHOWN SYMMETRICAL ABOUT ℄ ARE TO BE CENTERED WITHIN .005" UNLESS OTHERWISE SPECIFIED.

INSPECTION-PRINT

⬡ = INSPECTION NUMBER

CTF = CRITICAL TO FUNCTION

⚠ CTP = CRITICAL TO PROCESS

LAST NUMBER USED – 18

SECTION A-A

CAVITY IDENTIFICATION RAISED .007" MAX

SUB-GATE LOCATION (SEE NOTE 2)

CHAMFER .015 x 45° TYP(2)

R.012

Ø .52

Ø 52

Ø .33

Ø .420

.150

.130

R.010 TYP(2)

R.040

Ø .126±.002

10° REF. TYP

Mass Properties – REFERENCE ONLY
PART # 15R503 REV 0

| DENSITY | 0.0507 | LBS./CU.IN. |
| MASS | 0.0011 | LBS. |
| VOLUME | 0.0221 | CU.IN. |

⊞ = DATUM IDENTIFICATION
○ = ROUNDNESS
// = PARALLELISM
⊥ = PERPENDICULARITY
∠ = ANGULARITY
⌖ = TRUE POSITION
◎ = CONCENTRICITY
⬭ = FLATNESS

NOTE: DO NOT SCALE DRAWING!
ALL TOLERANCES UNLESS
OTHERWISE SPECIFIED ARE
1/- DECIMAL PLACES    ±.010
TWO DECIMAL PLACES   ±.005
THREE DECIMAL PLACES ±.002
FOUR DECIMAL PLACES  ±.001
ANGULAR              ±1°
FRACTIONS            ±1/64

| MATERIAL | SEE NOTE 1 |
| TREATMENT/FINISH | |
| NEXT ASSY | 15R504 |

THIS IS THE PROPERTY OF
CALDWELL MANUFACTURING CO.
ANY USE OR REPRODUCTION
WITHOUT AUTHORIZATION BY
THIS COMPANY IS PROHIBITED.

**CALDWELL** MANUFACTURING COMPANY
2605 MANITOU ROAD    ROCHESTER, NEW YORK
SERIES 80 XT

TITLE
END PULLEY-LARGE

THIRD ANGLE PROJECTION    DRWN K.A.C. DATE 2/11/03
CHKD    DATE
APPVD    DATE

SIZE A    PL NO 5998    PART NO 15R503    REV 0

SCALE 4:1    SHEET 1 OF 1

REVISIONS
| NUMBER | DATE | DESCRIPTION | REV. | BY |

DEVIATIONS
| NUMBER | DATE | BY |



# EXHIBIT G

Caldwell's Quick Tilt
Constant Force Balances







Channel

Fixed Pulley Block

Pulleys (3)

Bottom Guide

Caldwell's Series 86XT
Balance Detail

EXHIBIT K



Amesbury's Snap Lock
Balance Shoe

Caldwell's Series 971
w/ Short Carrier

EXHIBIT L



Spring

Channel

Rivet for Spring

Supporting Rivet
(Center of Rotation)

Rivet

"Snap—In Tabs"

Locking Member

Cam

Removable Balance Shoe

Balance Carrier

Cam

Amesbury's Snap Lock
Balance Shoe

Caldwell's Series 97EZ
w/ Long Carrier

EXHIBIT M



# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

        Plaintiffs,

      v.

THE CALDWELL MANUFACTURING CO.,

        Defendant.

Civil Action
No. 05-CV-10020

---

DECLARATION OF DOUGLAS ZINTER

I, DOUGLAS ZINTER, hereby declare as follows:

1.    I am Product Marketing Manager of Caldwell Manufacturing Company ("Caldwell").

2.    I am responsible for marketing Caldwell's products.

3.    I am also involved in the phase of new product development and the maintenance of existing product lines and serve as the principal person through whom communications between Caldwell's customers and engineering department flow.

4.    I have been employed by Caldwell for 22 years and am familiar with all products that Caldwell sells.

5.    Caldwell's Quick-Tilt *nc is a window balance designed to fit inside the channel of a jamb.

6.      Jambs are sometimes referred to as window jambs, or frame jambs.  These terms all generally describe the part of a window which is opposite the sash when installed.

7.      Jambs have channels (sometimes referred to as pockets) designed to accommodate balances.

8.      Caldwell does not make, sell, or offer to sell jambs, either alone or in connection with our Quick-Tilt*nc.[1]

9.      We sell our Quick-Tilt *nc balances to customers who provide their own jambs.  Either the customers make the jambs themselves or purchase the jambs from a supplier other than Caldwell.

10.     These jambs manufactured by companies other than Caldwell include a channel with a rear wall, side walls and at extremities of the side walls, inwardly turned opposed flanges.

11.     The spacing between the flanges is not standardized in the industry and varies from manufacturer to manufacturer.

12.     I have examined Exhibit 5 from the deposition of Sammy Shina.  On the back of that Exhibit is the hand-written number 2.  I wrote that number 2 on that jamb prior to the deposition of Mr. Shina.  That jamb is used by Caldwell's second largest customer of Quick-Tilt *nc balances, Anlin Industries, Inc. ("Anlin").  Photographs containing fair and accurate representations of Anlin's window jamb with an uninstalled Quick-Tilt*nc (Shina Ex. 6) slid into the channel between the flanges (Shina Ex. 5) are attached as Exhibit A.

---

[1]  Although jambs are used in Caldwell's own windows, I am not aware of any instance in which we use our Quick-Tilt *nc balances in any of our buildings.

2

13.     I have examined deposition Exhibit 7 from the deposition of Mr. Shina.
Prior to his deposition, I wrote the number 1 on the back of that jamb.  The jamb is used
by Caldwell's largest customer for Quick-Tilt*nc, Accu-weld Replacement Window &
Door Co. ("Accu-weld").  Photographs fairly and accurately depicting Accu-weld's jamb
(Shina Exhibit 7) with an uninstalled Quick-Tilt*nc (Shina Exhibit 6) slid into the
channel between the flanges are attached as Exhibit B.

14.     Together, Caldwell currently sells over 70% of its Quick-Tilt*nc balances
to Anlin and Accu-weld.

15.     I have also examined the jamb which forms part of Exhibit 9 to the
deposition of Simon Braid.

16.     Braid Exhibit 9 is the only example of a Quick-Tilt*nc that has been
marked as an exhibit in this case which is properly installed in a jamb with a screw so
that the balance will operate.  Photographs fairly and accurately depicting Braid Exhibit 9
are attached as Exhibit C.

17.     Attached at Exhibit D are photographs fairly and accurately representing
Still Exhibit 5, which is a balance Caldwell has had in its possession for many years.
Caldwell obtained this balance from a customer of Product Design and Development,
Inc., the assignee of Maurice Sterner's Patent No. 5,157,808.  As noted in Charles Still's
Report of March 13, 2006, and as clearly shown in the attached photographs, this balance
is comprised of several elements, among them being a raised spine in the same plane and
snugly fitting between the inwardly turned, opposed flanges of the window jamb.

18.     I have examined Exhibit 38 of Amesbury's Statement of Material Facts
which appears to be a page from the website of Tri-State Wholesale Building Products,

3

Inc. From Exhibit 38, it is not possible to determine the flange separation. In fact, there is no cross-sectional view of the jamb in that Exhibit from which you could determine the flange separation.

19.    The jamb shown in Exhibit 38 appears to be similar to the types of jambs found in Shina Exhibit 5, Shina Exhibit 7 and Braid Exhibit 9.

20.    I have no knowledge of the specific flange separation in the jambs of Tri-State.

I declare, under penalty of perjury, that the foregoing is true and correct and that I signed this declaration on June 8, 2006.

_Douglas Zinter_
Douglas Zinter

210199 68618.1
6/8/2006

4

ZINTER EXHIBIT A

SHINA EXHIBIT 5

EXHIBIT

Shina 5
5/00 5/3/06





SHINA EXHIBIT 5

SHINA EXHIBIT 6









SHINA  EXHIBIT 6 IN
SHINA EXHIBIT 5

ZINTER EXHIBIT B



SHINA EXHIBIT 7

SHINA EXHIBIT 6 IN



SHINA EXHIBIT 6 IN
SHINA EXHIBIT 7



SHINA EXHIBIT 6 IN SHINA EXHIBIT 7



SHINA EXHIBIT 6 IN
SHINA EXHIBIT 7



SHINA EXHIBIT 6 IN
SHINA EXHIBIT 7



EXHIBIT
Shina 6  5/3/04

SHINA EXHIBIT 6 IN
SHINA EXHIBIT 7



SHINA EXHIBIT 6 IN
SHINA EXHIBIT 7

ZINTER EXHIBIT C

BRAID EXHIBIT 9

EXHIBIT
Bemis 9
11/30/05

BRAID EXHIBIT 9

BRAID EXHIBIT 9

BRAID EXHIBIT 9



BRAID EXHIBIT 9

ZINTER EXHIBIT D





STILL EXHIBIT 5



STILL EXHIBIT 5



STILL EXHIBIT 5



STILL EXHIBIT 5

STILL EXHIBIT 5

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

        Plaintiffs,

    v.

THE CALDWELL MANUFACTURING
COMPANY,

        Defendant.

Civil Action No. 05-10020-DPW

## SECOND DECLARATION OF SAMMY SHINA, Ph.D.

I, SAMMY SHINA, hereby declare as follows:

1.    I have personal knowledge of the facts and opinions stated herein, unless otherwise noted, and I am competent to testify to the same.

2.    I previously submitted two expert reports, dated March 23, 2006 and April 18, 2006, respectively, and have been deposed in this case. I also previously submitted a declaration dated June 20, 2006 in this case.

3.    I understand that Caldwell contends that it does not offer the Quick-Tilt*nc balance installed in window jambs.

4.    On June 22, 2006, I inspected a double hung window at the offices of Goodwin Procter LLP in Boston, MA. A picture of this window, hereinafter referred to as the "Earthwise Window," is attached as Exhibit A.

5.    The Earthwise Window I inspected bears a marking that reads, "Earthwise Vinyl Window Systems." A picture of this marking is attached as Exhibit B.

6.    The Earthwise Window bears labels indicating that it was sold under "Invoice Number 40184." A picture of one of these labels is attached as Exhibit C.

7.    I removed the inner and outer window sashes from the left and right window jambs of the Earthwise Window and noted that the Earthwise Window includes four window jamb channels. From my perspective looking at the Earthwise Window from the inside position, the four window jamb channels are an inner window left jamb channel, an inner window right jamb channel, an outer window left jamb channel, and an outer window right jamb channel.

8.    The geometry of the left and right window jambs appears to be identical to the geometry of the window jamb portion, marked in this case as Still Deposition Exhibit 10. In particular, the distance between the flanges of all four window jamb channels of the Earthwise Window appears to be identical to the distance between the flanges of Still Deposition Exhibit 10.

9.    Installed in each of the four window jamb channels was a Caldwell Quick-Tilt*nc balance: an inner left Quick-Tilt*nc balance installed with a fixing screw in the inner window left jamb channel, an inner right Quick-Tilt*nc balance installed with a fixing screw in the inner window right jamb channel, an outer left Quick-Tilt*nc balance installed with a fixing screw in the outer window left jamb, and an outer right Quick-Tilt*nc balance installed with a fixing screw in the outer window right jamb channel. Based on my inspection of observable features of these installed balances, they appear to

me to be identical to other Caldwell Quick-Tilt*nc balances and associated drawings I
have inspected, in all relevant aspects.

10. A picture of the inner left and outer left Quick-Tilt*nc balances is attached as Exhibit D.
The inner left balance is to the left in the picture in Exhibit D, while the outer left balance
is to the right in the picture in Exhibit D.

11. A picture of the inner right and outer right balances is attached as Exhibit E. The inner
right balance is to the right in the picture in Exhibit E, while the other right balance is to
the left in the picture in Exhibit E.

12. I note that with respect to outer right Quick-Tilt*nc balance, as installed and retained by
fixing screws, the spine is not centered within the flanges and one side of the spine is in
full contact with the flange of its window jamb channel.

13. I note with respect to the outer left Quick-Tilt*nc balance, as installed and retained by
fixing screws, the spine is not centered within the flanges and much closer to one flange
than the other.

14. I note that with respect to both the inner left and inner right Quick-Tilt*nc balances, as
installed and retained by fixing screws, their spines are generally centered within the
flanges and a small space exists between both edges of each of the spines and the
respective flanges.

15. I re-installed the inner and outer window sashes and moved each of them up and down
ten (10) times. I then removed the window sashes, and inspected the balances and

3

window jambs again. I note that the top plastic cover portions of all four balances were deformed.

16. I also note that the outer left Quick-Tilt*nc balance rotated so that the top portion of the spine was now in contact with the flange. I therefore conclude that the spine of the outer left Quick-Tilt*nc balance inhibited the rotational movement of the mounting means of the balance by contacting the flange.

17. My inspection of the Earthwise Window confirms my findings and opinions, as outlined in my March 23, 2006 expert report, relating to infringement of the '638 patent in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is signed in a manner that, if falsely made, would subject me to criminal penalty under the laws of the United States.

Executed on June 22, 2006.

Sammy Shina, Ph.D.

4



EXHIBIT A
To Second Declaration of Sammy Shina



<u>EXHIBIT B</u>
To Second Declaration of Sammy Shina



EXHIBIT C
To Second Declaration of Sammy Shina



<u>EXHIBIT D</u>
To Second Declaration of Sammy Shina



EXHIBIT E
To Second Declaration of Sammy Shina

# EXHIBIT 6

**Shina Consulting**

March 23, 2006

Jordan Singer
Attorney at Law
Goodwin|Procter LLP
Exchange Place
Boston, MA 02109

Re: Expert Report of Dr. Sammy Shina Submitted on Behalf of Plaintiffs in Civil Action No. 05-10020-DPW

I have been retained on behalf of the plaintiffs: Amesbury Group Inc., and Amesbury Springs Ltd. as an expert to review patents, patent applications, file histories, product brochures, depositions and oral examinations, design drawings, and the US District Court claim construction and comment on them, including analyzing whether products made by the defendant, the Caldwell Manufacturing Company, infringe on three of the plaintiffs' patents.

<u>Chronological listing of the information reviewed by Sammy G Shina:</u>

The following Patents and legal documents:
- US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994
- File history, US Patent 5,365,638
- US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003
- File history, US Patent 6,598,264 B2
- US Patent 6,820,368, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004
- File history, US patent 6,820,368 B2
- US District Court, Massachusetts District, Civil Action 05-10020-DPW; Memorandum and Order, dated January 20th, 2006.

The following Caldwell Physical Products:
- Physical Caldwell product for spring mounting "constant force system", moving coil preassembled option.
- Physical Caldwell product for block and tackle with bottom guide roller mounted outside the U shaped channel.
- Physical Caldwell product block and tackle inverted balance for windows with balance shoe for tilt operation, labeled as the 97ez on the back on the channel.

The following Caldwell Brochures:
- Caldwell brochure package entitled "Quick-Tilt Constant Force System, Smooth silent operation for tilt applications; containing 6 pages of front or title page(C000530), 2nd page describing the constant force system (C000531); 3rd page of technical specifications, accessories and installation(C000532), 4th page of options, warranty and contact information(C000533); 5th page entitled "Egress–Friendly Quick-Tilt for new construction

1

windows" for Quick-Tilt*eg balances(C000534); and 6[th] page entitled "New construction friendly Quick-Tilt" for "Caldwell preassembled Quick-Tilt constant force balance just got better with its evolution into Quick-Tilt*nc (C000535)."

- Caldwell brochure package series 86xt Block and Tackle System, Extended travel for sideload applications containing 4 pages of front or title\ page (C000498), 2nd page of component parts layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000498).

- Caldwell brochure package series 97ez Block and Tackle System Easy installation for tilt applications; containing 4 pages of front or title page (C000514), 2nd page of component part layout and description (C000515), 3rd page of technical specifications, accessories and installation  (C000516); and 4th page of warranty and contact information (C000517).

- Caldwell brochure package series 97i Block and Tackle System Inverted Operation for tilt application; containing 4 pages of front or title page (C000490), 2nd page of component part layout and description (C000491), 3rd page of technical specifications, accessories and installation  (C000492); and 4th page of warranty and contact information (C000493).

The following depositions and oral examinations:
- Deposition of Douglas Zinter, Dated October 20, 2005
- Deposition of Richard deNormand, Dated October 21, 2005
- Deposition of Wilbur Kellum, dated October 28, 2005
- Deposition of Thomas Batten, dated November 8, 2005
- Deposition of Jeffery Robertson, Dated November 29, 2005

The following Caldwell drawings on paper:
- Egress End Carriage Assembly including, (CW0114):
  - Egress End Plate, EX5939, rev0,  drawn/approved on 6/10/02, (CW0115)
  - Egress End Plate, EX5939, rev0,  drawn 9/24/02, (CW0116)
  - Channel, EX5957, rev 0, drawn, 09/23/02, approved?, (CW0128)
  - Terminal-V stage 5956-Vstage, rev 0, drawn/approved 9/24/02, (CW0129)
  - Axel, EX5959, rev 0, drawn/approved 9/24/02, (CW0130)
  - Channel, EX5970, drawn/approved 10/17/02, (CW0117)
  - Carriage (4.0), EX5975, rev 0, drawn/approve 10/29/02, (CW0118)
  - Carriage (4.0), EX5975, rev 0, drawn/approve 10/29/02, (CW0119)
  - Channel (4.0), EX5979, rev 0, drawn/approved 10/29/02, (CW0120)
  - Channel (4.0), EX5979, rev 0, drawn/approved 10/29/02, (CW0121)
  - Carriage (4.1) , EX5984, rev 0, drawn/approved 11/06/02, (CW0122)
  - Carriage (4.1) , EX5984, rev 0, drawn/approved 11/06/02, (CW0123)
  - Axel (4.1), EX5985, rev 0, drawn 11/05/02, approved 11/6/02, (CW0124)
  - Axel (4.1), EX5985, rev 0, drawn 11/05/02, approved 11/6/02, (CW0125)
  - Channel (4.1), EX5983, rev 0, drawn 11/5/02/approved 11/06/02, (CW0126)
  - Channel (4.1), EX5983, rev 0, drawn 11/5/02/approved 11/06/02, (CW0127)
- R/T (Roller Tilt) assembly (CW0131); including:
  - .270 Locking Case Half (Roller Tilt), 24A01 drawn ?/16/93, approved 6/19/03, (CW0132)
  - .270 Locking Case Half (R/T), 24A41 rev 2, drawn 3/25/02, approved 9/16/02, (CW0142)
  - .270 Locking Case Half-Tie in (R/T), 24A42 rev 1, drawn 2/27/04, (CW0143)
  - Cam (C.F.B.), 24A02, 24A03, drawn 2/18/93, (CW0133)

- o Tandem Spg. (Roller Tilt), Case. 24A04, drawn 2/10/93, approved 8/17/01
- o Tandem Spg. Case (Roller Tilt), Case. 24A04, rev 8, drawn 3/25/02, approved 9/16/02, (CW0134)
- o Tandem Spg. Case (Roller Tilt), Case. 24A44, rev 1, drawn 3/25/02, approved 8/16/02, (CW0144)
- o Spring (Roller Tilt), 24A05, rev 17, drawn 3/17/93, approved 1/14/04, (CW0135)
- o .340 Locking Case Half (Roller Tilt), 24A08 rev 10, drawn 2/16/93, checked 12/13/01, (CW0136)
- o .130 Locking Collar (Roller Tilt), 24A30 rev 3, drawn on 5/9/02, approved 4/29/03, (CW0137)
- o .130 Locking Collar (Roller Tilt), 24A30 rev 5, drawn on 5/9/02, approved 4/29/03, (CW0138)
- o Carrier (Roller Tilt), 24A32-33 rev 3, drawn 10/17/01, (CW0139)
- o Carrie4r Body (Roller Tilt) 24A34, 24A64, 24A69, 24A84, rev 9, drawn 10/19/96, (CW0140)
- o Wiper (Roller-Tilt), 24A40 rev1, drawn 01/20/04, approved 1/27/04, (CW0141)
- o Cam Tie-In (Roller/Tilt), 24A45-46-47, drawn 3/8/04, approved 5/3/04, (CW0145)
- o .340 Locking Case Half (Roller Tilt), 24A48 rev 2, drawn 3/25/02, checked 9/16/02, (CW0146)
- o Mounting Bracket (Roller Tilt); 24A56 rev 2, drawn on 925/95, approved 7/31/97, (CW0156)
- o 625-090/110/130Locking Case Assembly, 24A53/54/55 rev 2, drawn on 3/25/02, approved 2/06/04, (CW0147)
- o 625-090/110/130Tie-in Case Assembly, 24A58/59/60 rev 0, drawn on 2/06/04, approved 4/07/04, (CW0149)
- o 625-090/110/130Tie-in Case Assembly, 24A78/79/80 rev 0, drawn on 2/06/04, approved 4/07/04, (CW0150)
- Quick-Tilt assembly, (CW0152), including:
  - o Locking Ramp 16Y07-10, rev 13, drawn ?/15/96, (CW0153)
  - o Carrier Body .548/610 (24B01/08, rev 4, drawn 10/14/99 approved 5/7/02, (CW0154)
  - o Spring Nest, (Quick Tilt), 24B02, rev 3, drawn 10/05/99 checked 4/16/02, (CW0155)
  - o Spring (Quick Tilt), 24B05, rev 12, drawn 11-30-99, checked 1/20/04, (CW0156)
  - o Tamperlock (Quick Tilt), 24B10, rev 10, drawn 7/23/01, approved 9/18/01, (CW0157)
  - o Tamperlock (Quick Tilt), 24B21, rev 1, drawn 3/8/04, approved 4/5/04, (CW0163)
  - o Single Nest Cover (Quick Tilt), 24B14, rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, (CW0158)
  - o Tandem Nest Cover, 24B15 (Quick Tilt), rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, (CW0159)
  - o Triple Nest Cover (Quick Tilt), 24B16, rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, with upper nest screw, (CW0160)
  - o Egress Nest Cover-Triple, (QT) 24B19, rev 1, drawn 03-29-04, approved 3/10/04, shown integrated, (CW0161)
  - o Spring-3/8 (Quick Tilt), rev 0, 24B20, drawn 02-17-04, checked 1/20/04, (CW0162)
  - o Carrier (QT), 24B22, rev 0, drawn 4-5-04, approved 4/?/05, (CW0164)
  - o Cam (Q/T), 24B24, rev 0, drawn 2/26/04, approved 3/9/04, (CW0165)
  - o Cam (Q/T), 24B25, rev 0, drawn 6/8/01, approved 8/6/01, (CW0166)

3

- o Carrier Lock (QT II), 24B26, drawn 4/6/04, approved 4/27/04, (CW0167)
- o N/C Balance Assembly .562 (Q/T), 24B42, 24B43, rev 0, drawn 4/13/04, approved 5/14/04, shown integrated, (CW0169)
- o N/C Balance Assembly (Quick-Tilt), 24B52, 24B53, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0172)
- o N/C Balance Assembly (Quick-Tilt), 24B54, 24B55, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0173)
- o N/C Balance Assembly (Q/T), 24B50, 24B51, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated, (CW0170)
- o Balance Assembly .562 (Q/T), 24B46, 24B47, rev 0, drawn 4/15/04, approved 5/4/04, no cover Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0171)
- o Balance Assembly (Quick-Tilt), 24B56, 24B57, rev 02, drawn 8/10/01, approved 10/24/02, spacer or cover for triple, no cover for single or tandem Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0174)
- o Balance Assembly (Quick-Tilt), 24B58, 24B59, rev 02, drawn 8/10/01, approved 10/24/02, spacer or cover for triple, no cover for single or tandem. Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0175)
- o Balance Assembly (Quick-Tilt), 24B60, 24B61, rev 1, drawn 4/25/02, approved 10/24/02, spacer or cover for triple, no cover for single or tandem Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0176)
- o Carrier Assembly (drop-in R/T), 24B65 rev 1, drawn 1/5/01, approved 8/10/01 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0177)
- o Carrier Assembly (drop-in R/T), 24B70, rev 0, drawn 4/25/01, approved 4/25/02 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0178)
- o Carrier Assembly (drop-in R/T), 24B85, rev 2, drawn 4/10/00, approved 8/10/01 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0179)
- o Constant Force Spring Tester (Roller-Tilt), QA-RTLT-011, rev 4, 7/24/97, approved 4/23/02
- o Friction Adjuster (QT II), 24B31, rev 0, drawn 04/05/04 approved 4/5/04, (CW0168)
- o Pivot bar, Winged, (Q/T and Spirex series), 99C48, rev 10, drawn 5/14/01, approved 6/21/03, (CW0181)
- o Pivot bar (Quick-Tilt), 99C48, rev 1, drawn 2/10/04, approved 3/19/04, (CW0182)
- Quick-Tilt Triple spacer, (CW0196)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 0, drawn 11/27/00, approved 1/18/01, (CW0197)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 1, drawn 11/27/00, approved 1/22/01, (CW0198)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 1, drawn 11/27/00, approved 1/22/01, (CW0199)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0200)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0201)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0202)
- Quick-Tilt Spring Nest (carrier), (CW0215)

4

- o Spring Nest Drop-in R/T, (proposed), no Part #, Drawn 10-05-99, (CW0214)
- Quick-Tilt Cover Design, (CW0210)
  - o Single Spring Cover (Quick-Tilt), rev 0, EX5803, drawn 10/26/00, (CW0211)
  - o Tandem Spring Cover (Quick-Tilt), EX5804, rev 0, drawn 10/26/00, (CW0212)
  - o Triple Spring Cover (Quick-Tilt), EX5805, rev 0, drawn 10/26/00, (CW0213)
- Quick-Tilt Bumper (CW0203)
  - o Unmarked drawing (CW0204)
  - o Bumper (Quick-Tilt), 24B07, (rev 2); drawn 02-01-00, approved 10/18/00, (CW0209)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0206)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0207)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0208)
  - o Bumper (Quick-Tilt), 24B07, (rev 4); drawn 02-01-00, approved 04/06/00, (CW0205)
- Inverted 1-2-3 Carrier, (CW0183)
  - o Lock 1.292 (series 97ez), 15N39 Rev 1, Drawn 7/9/03, approved 5/5/04, (CW0193)
  - o Lock 1.292 (series 97ez), 15N39 Rev 2, Drawn 7/9/03, approved x/x/04, (CW0184)
  - o Lock 1.0 (series 97), 15N30 Rev 3, Drawn 9/30/02, approved 1/20/03, (CW0186)
  - o Lock 1.25 (series 97), 15N29 Rev 2, Drawn 9/30/02, approved 1/15/04, (CW0187)
  - o EX 5937-K, (shoe, my notations), no additional info, (CW0188)
  - o EX 5937-I, (shoe, my notations), no additional info, (CW0190)
  - o IE7 Travel Characteristics, no part number, drawn 9/2/03, (CW0185)
  - o Hemless Square Channel(series(Series 97), rev 4, drawn 7/12/02, approved 8/9/02, (CW0189)
  - o Carrier Body (1.25" Inverted); (series 97), 15N27, rev 2, drawn 10-01-02, approved 1/16/03, (CW0191)
  - o Carrier Body (1.0" Inverted); (series 97), 15N28, rev 2, drawn 10-01-02, approved 1/16/03, (CW0192)
  - o Channel (series 97ez), 15N400, 401, Rev 3, drawn 10/24/04, approved 5/6/04, (CW0194)
  - o Sash Pin, x no part #, rev 2, drawn 6/3/04 approved 10/15//04, (CW0195)
- Math Model, Series 97ez (CW0001 - CW0015), [Travel Characteristics]
- Inverted Terminal (Block and Tackle), (CW0040 – CW0053)
- Hook Mounted – Inverted, Series 97i (CW0016 – CW 0039)
- .019 Channel, reduced SKU, (CW0056 – CW0063), [86 Side Takeout]
- .0335 Channel, reduced SKU, (CW0054 – CW0055), [series 86xt channel]
- Guide, reduced SKU, (CW0100 – CW0113), [series 86xt guides]
- Experimental Documentation, reduced SKU, (CW0092 – CW0099), [series 86xt]
- End Carriage Plate, series 86xt, (CW0070 – CW0083)
- Hook Terminal, series 86xt, (CW0064 – CW0069)
- Math Model, Series 86xt (CW0084 - CW0091), [Travel Characteristics]

Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories, dated 8/31/2005

Qualifications of the Witness
The following items are excerpts from my Curriculum Vitae which are relevant to this opinion.
My Curriculum Vitae in full is attached.

1.  I am the professor of Mechanical Engineering at the University of Massachusetts Lowell
    (UML), and have been teaching there full time since 1988. I have college degrees in
    Electrical Engineering, Industrial Management, Computer Science and a PhD in
    Mechanical Engineering from MIT, WPI and Tufts Universities.

2.  Throughout my engineering career, I have worked at several companies while part time
    teaching at UML. While employed in industry, I worked on the design and manufacture of
    mechanical and electro-mechanical parts and products. I designed, modified and
    improved several automatic machines for manufacturing and testing of parts and
    products.

3.  In industry, I held several engineering and management positions, including production
    engineer; manufacturing process engineer, Computer Aided Design (CAD) Manager, Tool
    Engineering Manager and Manufacturing Technology Manager. I also introduced CAD to
    the Hewlett Packard (HP) Medical Group and trained their engineers in the use of Design
    for Manufacturing tools and techniques as well as Mechanical CAD design. I have also
    given seminars on behalf of HP and Motorola to their customers on the use of CAD and
    Concurrent Engineering in the design of their products.

4.  After joining the University, I began teaching courses there in Design Theory and
    Constraints as well as Engineering Principles. I am also the coordinator for the
    Mechanical Engineering Capstone Program where senior engineering students work with
    industrial companies to design mechanical products and assemblies. In addition, I
    performed research and consulting on a variety of technical subjects including product
    design, quality and the supply chain (design and/or manufacturing contracting services). I
    held seminars on these topics and trained thousands of working engineers. I published
    my work in over 90 publications, including in 5 books.

5.  I also consulted for companies on their product design and manufacturing, including those
    in mechanical, electromechanical and medical instruments, devices and products.

6.  I was a founding member of an Innovative Products Research and Services Incorporated
    (IPRS), a non-profit educational, scientific and charitable 501(c) (3) organization
    incorporated in the Commonwealth of Massachusetts. IPRS is an inventor support
    service, which performs early stage market and manufacturing evaluations. IPRS was
    able to obtain two grants from the Department of Energy in 1991 and 1992 as part of
    DOE's States' Inventors Initiative.

7.  A list of all publications I authored in the preceding ten years is included in the attached
    Curriculum Vitae.

Compensation Statement
As a technical expert in this case my fees are $300/hour for technical work, opinions, and sworn
testimony. In addition my expenses for travel are reimbursed at cost. My compensation is not
affected by the outcome of this case and is based solely on the time spent in the development of
my opinion.

Prior Deposition and Trial Experience
My deposition experience in the last four years can be found in my full CV, attached to this
report as exhibit A.

Summary of Patents

I have been asked to review three patents. U.S. Patent No. 5,365,638 was granted on November 22, 1994 and is entitled "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS." The patent "relates to a mounting for a coiled ribbon spring and is particularly, though not exclusively, applicable to sash springs used in sash frame tensioning arrangements for windows." '638 patent, column 1, lines 6-9. The patent describes an arrangement in which "the spring merely rests on the mounting element which acts as a reaction member which the spring abuts as a free outer end, attached to the sash, is unwound." '638 patent, column 2, lines 21-24. The device described in the patent also has a spine, projection, or other "formations conformed so as to cooperate with a portion of the sash frame within which the [mounting] element is to be received, such that contact of said formations with said sash frame inhibits in a rotational, pivoting, or twisting sense of the element relative to the sash frame." '638 patent, column 2, lines 60-65.

U.S. Patent No. 6,598,264 B2 was granted on July 29, 2003 and is entitled, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER." The patent relates particularly "to a block and tackle window balance device that provides an increased range of travel within a window frame." '264 patent, column 1, lines 8-10. The device described in the patent locates a bottom guide roller within the bottom guide of the balance instead of in the within the rigid U-shaped channel of the balance. Because the bottom guide roller is located within the bottom guide, "the window sash can travel a greater distance before the bottom guide roller hits the jamb mounting hook, resulting in a greater travel distance." '264 patent, column 6, lines 20-22.

U.S. Patent No. 6,820,368 B2 was granted on November 23, 2004 and is entitled, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW." The patent particularly relates to "a balance shoe of a window balance system used in conjunction with a pivot bar mounted on a window sash for rotating the window sash relative to a window frame." '368 patent, column 1, lines 21-24. "The balance shoe includes a frame, a locking member at least partially disposed within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within a window balance." '368 patent, column 1, lines 63-67. The patent also describes a method of installing the inverted window balance system claimed.

Summary of Opinions.

The opinions expressed in this report are based on my understanding of what constitute an infringement. Each patent has a claim section, which must be interpreted by the court (claim construction). In my analysis, I compare each accused product against the each claim as interpreted by the court. To be literally infringing, the accused product must meet every element in a claim. In addition, I understand that an accused product may also infringe a claim element under the doctrine of equivalents if the accused product performs substantially the same function in substantially the same way to achieve substantially the same result.

I. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994.

Upon reviewing all information listed in the top of the report; I conclude the following:

7

The defendant Caldwell Manufacturing Company's "Quick-Tilt constant force system" and Quick-Tilt*nc products are infringing on claims 1, 2, 3 and 8 in the plaintiffs' US Patent 5,365,638.

II. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.
        Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20 and 21 in the plaintiffs' US Patent 6,598,264 B2.

III. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.
        Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 97ez products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US Patent 6,820,368 B2.

IV. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.
        Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 97ih products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US patent 6,820,368 B2.

V. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.
        Upon reviewing all information listed in the top of the report; I conclude the following:
The defendant Caldwell Manufacturing Company's Series 97i products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US patent 6,820,368 B2.

Support for Opinions
I. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994.

        Upon reviewing all information listed in the top of the report, I conclude the following:
The defendant's "Quick-Tilt constant force system" and Quick-Tilt*nc products are infringing on claims 1, 2, 3 and 8 in the plaintiffs' US Patent 5,365,638. My reasoning for the basis of my opinion is stated for each claim numbered below:

Claim 1. This claim states as follows ('638 patent, column 5, line 62 - column 6, line 16)

        "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having first end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled spring having the other end of said coiled ribbon spring within the coil being

8

positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited."

Upon examining the physical Caldwell spring balance product Quick-Tilt*nc, the deposition testimony referenced above, the Caldwell 6-page brochure entitled "Quick-Tilt Constant Force System" (C000530-C000535) and the Caldwell engineering drawings (CW0152 - CW0215); it is my opinion that the Caldwell Quick-Tilt system and Quick-Tilt*nc products are infringing on the Plaintiffs' US Patent 5,365,638 claim 1 by virtue of the following observations:

    a.  The first element of this claim describes the use environment where the patented device is to be mounted; quote, "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges", ('638 patent, column 5, line 62 - column 6, line 1), is identical to the use environment for the Caldwell products. *See* Fig. 1.1.A; Fig. 3.1.A. (all referenced figures are collected as exhibit B to this report).

    b.  The next element of this claim identifies the frame to support the device which is slidable in the sash channel; quote, "a sash frame support means slidable in said channel means", ('638 patent, column 6, lines 1-2). This sash frame support means is used in the Caldwell products and is referred to in their brochures (page 3, C000532) as the "carrier"; which is offered to Caldwell customers in 3 different product sizes to match recommended channel sizes. *See* Fig. 1.1.B; Fig. 3.1.B.

    c.  The next element of this claim which identifies the coiled ribbon spring and one of its ends; quote, "a coiled ribbon spring having first end engaged with said sash frame support means," ('638 patent, column 6, lines 3-4), is identical to the coiled ribbon spring and one of its ends used in the physical Caldwell product I examined. In the Caldwell brochures, the coiled ribbon spring end is engaged to the frame support means which Caldwell calls the carrier (page 3, C000532). *See* Fig. 1.1.C.; Fig. 3.1.C.

    d.  The next element of this claim which specifies a mounting means for the coiled ribbon spring; quote; "and a means for mounting said coiled ribbon spring," ('638 patent, column 6, lines 4-5), is also found in the Caldwell product. The Caldwell brochure describes this support means as the "coil nest" (page 5, C000535). In the memorandum and order of the US District Court for the District of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in the '638 patent. The court construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". I note the following according to the Court claim construction:

        i.  The court's definition references a structure for mounting a coiled ribbon spring to the window jamb channel. Based upon examination of the Caldwell

9

Quick-Tilt brochure (page 2, C000531), I find that the Caldwell "coil nest" satisfies this definition in the claim construction of the court.

ii. The court's definition references a structure that has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell coil nest geometry satisfies this definition in the claim construction of the court.

iii. The court's definition references that the design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the design of the Caldwell coil nest includes a countersink hole to allow the coil nest to be secured to the to a window jamb channel, through a fixing screw.

I find the Caldwell mounting means for the Quick-Tilt and Quick-Tilt*nc products, which Caldwell calls the "coil nest," conforms to the Court's claim construction of the term "mounting means". *See* Fig 1.1.D; Fig. 4.1.D.

e. The next element of this claim specifies the other end of the coiled ribbon spring being within the spring, being free and unattached to the support means, quote, "the coiled body portion of said coiled spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means" ('638 patent, column 6, lines 5-10). The physical Caldwell product I examined and the Caldwell brochure (page 2, C000531), show the Caldwell product coiled ribbon spring to be of exactly the same construction, based on the following observations:

i. The other end of the coiled ribbon spring being within the spring

ii. The other end of the coiled ribbon spring being free and unattached to the support means, which is called the coil nest by Caldwell. *See* Fig 1.1.E; Fig. 4.1.E.

f. The next element of this claim describes the need for securing the mounting means to the channel means; quote "and said mounting means being secured in said channel means," ('638 Patent, column 6, lines 10-11). Several alternatives are shown in the patent "DESCRIPTION OF THE PREFERRED EMBODIMENTS": in Figure 4; a "fixing screw" as shown by item 64 can secure the mounting means. In figures 7, 8 and 9; the mounting means is secured by a screw (not shown). The screw is attached through a recessed bore 88 in Figure 7 and a bore 108 in Figure 9. I also note in the court's claim construction for the '638 patent the use of the term "fixing screw" for securing the mounting means: "....method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to the window jamb channel." I find the above discussions in the preferred embodiment for the '638 patent matches all of the installation information of the Quick-Tilt and Quick-Tilt*nc products: in the Caldwell Quick-Tilt brochure (page 3, C000532), a fixing screw is clearly shown to be used to fasten the Caldwell products to the window jamb channel. *See* Fig. 2.1.F; Fig 3.1.F.

10

g. The next element in this claim specifies a raised spine of the mounting means, with a following qualification explaining the need for such a feature in the device, quote, "said mounting means having raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means," ('638 patent, column 6, lines 11-13). I also note in the claim construction by the US District Court of Massachusetts dated January 20th, 2006 and mentioned in item (d) above, a construction for the term "raised spine" as follows: "A raised protrusion that resembles or suggests a spine of the mounting means, shaped to cooperate with the window jamb flanges to inhibit the rotational motion of the mounting means." I note in the Caldwell physical product and in the Caldwell Quick-Tilt brochure (C000530-C00535), the following observations:

    i.  In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, in page 2 (C000531), the cover of the Quick-Tilt product, which is clearly shown with a spine feature integrated in the plastic body of the cover, is available for single, double or triple coiled spring configurations (page 3, accessories, C000532). This cover is supplied as optional to the Caldwell product in page 2, (C000531). The cover is secured to the mounting means, called by Caldwell as the "coil nest", by a fastening screw. Once secured by the screw, the cover fastened to the coil nest acts as an integrated assembly of a raised spine of the mounting means defined as the coil nest in the Caldwell brochure. *See* Fig 2.1.G.

    ii.  I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing the Quick-Tilt *nc product, that the Caldwell mounting means, called the "coil nest" and the plastic cover are integrated, by molding both features in the same product, with a "spine" running lengthwise across the back side of the molded part. Fig. 3.1.G

h. The final element of claim 1 is the reason given for the raised spine in item g; quote: "whereby rotational motion of said mounting means is inhibited." ('638 patent, column 6, lines 14-15). In the claim construction by the US District Court of Massachusetts, dated January 20th 2006, this element of the claim 1 in the '638 patent is construed as the "mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges and said channel means whereby rotational motion of said mounting means is inhibited." I note the following:

    i.  In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, I note in page 2 (C000531) that the cover fastened to the coil nest acts as an integrated assembly of a raised spine of the mounting means defined as the coil nest in the Caldwell brochure. The geometry of this assembly consisting of a coil nest fastened together to a cover will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel.

    ii.  I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing Quick-Tilt *nc product, the Caldwell mounting means called the "coil nest" and the cover are integrated, by molding both features in the

same product, with a "spine" or "projection" running lengthwise across the back side of the molded part. The geometry of this Caldwell coil nest molded together with a cover assembly will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel. For example, I note that when the physical Caldwell device was installed in a sample window jamb channel, the spine fitted snugly between channel flanges thereby inhibiting rotation of the Caldwell balance while allowing the balance to ride smoothly inside the channel.

iii.  In order to explain the need for the spine or projection features; but not for preventing rotation, the Caldwell representatives that were deposed had differing opinions:

1.  According to the testimony of Jeffrey Robertson (beginning page 112, line 20), ....the raised portion labeled as "I", has two functions, one to provide enough material thickness so that the proper countersink for the screws, mounting screws can be provided without breaking through the inside of the cover. [np] The second function is to provide a flow passage for the plastic in the injection molding process to fill the tool, fill the mold cavity...."

2.  According to the testimony of Wilbur Kellum (beginning page 93, line 10), in a series of answers by Mr. Kellum about the function of the protrusion "or spine/projection": "It is to help in the plastic molding....", and then Mr. Kellum adds in his testimony (page 94 lines 4-5); "...it serves to maintain straightness of the part during shipping...." Mr. Kellum answers the questions (page 94 lines 6-8) Q. does it serve to maintain the straightness of the part when installed? A: "No."

It is my opinion that these explanations for the need of the spine other than to inhibit rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1)  There are many geometries that can serve to allow for a flow passage for the plastic injection molding process to fill the mold cavity for the Quick-Tilt covers. The spine, when specified by the Caldwell engineers at the time of design, could be made deeper, wider or shorter than the geometry selected by them. I note that in the physical Caldwell Quick-Tilt*nc product that I reviewed, the spine's geometry matches, within a tight tolerance, the front opening of the channel in the window jamb pocket, and hence prevents rotation of the coil nest. Of all the many possible geometries for the spine available to satisfy the plastic flow requirements, Caldwell chose the specific one that will inhibit rotation of the mounting means.

2)  There are many geometries to provide enough material thickness so that the proper countersink for the mounting screws can be provided without breaking through the inside of the cover. The thicker material could be made around the screw only and not to extend the full length of the cover. In addition, another alternative could be to make a recessed bore inside the coil nest to allow for more plastic material on the inside as opposed to the outside of the cover. Of all the many possible geometries for the spine available to satisfy the need for

12

more material for the countersink of the fixing screw, Caldwell chose the specific one that will inhibit rotation of the mounting means.

3) The purpose of the spine to maintain straightness of the part during shipping appears to be unusual, There are two instances of shipping possibilities:

1) Since the balances are shipped as part of assembled windows. It is customary in the business and engineering practices for the end product supplier to maintain the integrity of their product during shipping, and not rely on individual suppliers to provide the integrity of each individual part. For a product such as windows, which contains fragile glass, the end product supplier will certainly be very careful in providing for proper support and packaging of the window during shipping and transportation, and not rely on their part suppliers such as the balance manufacturer.

2) When a part in an assembly such as a balance is shipped from the (balance) supplier to the end product (window) manufacturer, the requirement for the integrity of the product during shipping is normally achieved through the design of the shipping container of the part, including the use of packing materials.

iv. In order to show that the Caldwell Quick-Tilt and Quick-Tilt*nc products will prevent rotation other than through the spine or projection mentioned in the '638 patent, a Caldwell representative that was deposed, as well as the Caldwell brochure for Quick-Tilt, provided the following:

1. According to the testimony of Jeffrey Robertson (beginning page 115, line 13), "….the top portion [of the Quick-Tilt*nc] is large in length and width dimension than the opening into which the balance is inserted, so it is …the top portion is held by the interference between the top and the vinyl lineal, the bottom portion is held in place by the screw Those two attachments, or the attachment at the bottom and the interference at the top prevent any rotation of the cover…"

2. In the Quick-Tilt brochure; page 2 (C000531), describing the constant force system, in the top of the page…"Its alternating coil design prevents the cantilevering or twisting of the carrier that can diminish locking performance…."

It is my opinion that these explanations for inhibiting rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1) The top portion of the Quick Tilt *nc cover is too thin to adequately inhibit the rotation of the coil nest, with a thickness ranging from 0.025" to 0.011" (see drawings CW0158, CW0159 and CW 0160). There are two diagonal thin cutouts at the top of the covers to allow for twisting of the cover.

2) The alternating coil design mentioned in the top of page 2 of the Quick-Tilt brochure (C000531) will only apply to tandem coiled ribbon springs. I note the following:

a. For single nest cover this does not apply at all.

13

b. For tandem covers, the length of each extended spring during window sash operations will vary since one spring is mounted on top of the other, resulting in the tandem springs not equal in length. Therefore, there will be an offset moment forcing some rotation of the coil nest for tandem coiled ribbon spring configurations.

c. For triple nest covers, there is a fixing screw to attach the upper triple spacer as shown in the Quick-Tilt brochure page 2 (C000531) that could work in conjunction with the coil nest screw to inhibit rotation. I note that there are no instructions for the recommended amount of torque to apply for each of these two screws. Repeated sash operations during the useful lifetime of the windows might reduce the integrity of the Caldwell fastening method due to the constant pressure applied by the rotation of the coil nest due to the triple coiled ribbon spring configuration.

As a conclusion to item (h), I find that the reasons for having the spine feature according to Caldwell are inadequate. The Caldwell explanations for their techniques for inhibiting rotation, might contribute partially to reduce rotation. The spine feature they adopted based on the '638 patent, will perform the primary function of inhibiting the rotation. Therefore, I find that the Quick-Tilt and Quick-Tilt*nc series of products that contain the spine or projection along the longitudinal axis of the mounting means will prevent rotation of the mounting means.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's balance system option for constant force moving coil system, called Quick-Tilt products, and the New construction friendly Quick-Tilt*nc products, are infringing on claim 1 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements."

Claim 2. This claim states as follows: ('638 patent, column 6, lines 17-22) "The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of coiled ribbon spring as said sash support means moves in said channel means."

This claim on the mounting means is also affected by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in patent '638. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". The Caldwell brochure describes this support means as the "coil nest." I find the mounting

14

means for the Caldwell devices, which they call "coil nest," conforms to the court's claim construction of the term "mounting means" for claims 1 & 8.

I examined the 6 page Caldwell Quick-Tilt brochure (C000530-C000535) and I also examined the physical Caldwell product that matches this invention. I conclude that in the Caldwell Quick-Tilt series, the support surface of the mounting means (coil nest) is in contact with the outer surface of the coiled body portion of the coiled ribbon spring during the movement of coiled ribbon spring as sash support means moves in the channel means.

Based on the above observations and supporting materials, it is my opinion that the Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the new construction-friendly Quick-Tilt*nc products made by the defendant are infringing on claim 2 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements"

Claim 3. This claim states as follows: ('638 patent, column 6, lines 23-30) "The mounting assembly of claim 2 wherein said mounting means has a body portion having an aperture therein, a fixing screw position in said aperture by which the mounting means is secured relative to said channel means, a surface of said body portion being concavely curved, said coil body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion."

This claim on the mounting means is also affected by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in patent '638. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". The Caldwell brochure describes this support means as the "coil nest." I find the mounting means for the Caldwell devices, which they call "coil nest," conforms to the court's claim construction of the term "mounting means" for claims 1 & 8.

I examined the 6 page Caldwell Quick-Tilt brochure (C000530-C000535) and I also examined the physical Caldwell product that matches this invention. I observe the following:

1. That the coil nest has a body portion with an aperture.
2. Wherein a fixing screw is used to attach the coil nest to the window channel jamb.
3. The upper surface of the coil nest is concavely curved.
4. The coil body portion of the coiled ribbon spring is in contact with and supported by the upper surface of the coil nest.

15

Based on the above observations and supporting materials, it is my opinion that the Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the new construction-friendly Quick-Tilt*nc products made by the defendant are infringing on claim 3 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements"

<u>Claim 8.</u> This claim states as follows ('638 patent, column 6, lines 47-62): "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, said mounting means being secured in said channel means and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited."

Upon examining the physical Caldwell spring balance product that matches the invention recorded in Patent 5,365,638, as well as the Caldwell 6-page brochure entitled "Quick-Tilt Constant Force System" (C000530-C000535), the Caldwell depositions listed in the top of the report and the Caldwell engineering drawings (CW0152 -CW0215), it is my opinion that the Caldwell Manufacturing Company Quick-Tilt system and Quick-Tilt*nc products are infringing on the Plaintiffs' US patent 5,365,638 claim 8 by virtue of the following observations:

a. The first element of this claim describes the use environment where the patented device is to be mounted, quote, ('638 patent, column 6, lines 47-49); "a mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges," is identical to the use environment for the Caldwell products. *See* Fig. 1.8.A; Fig. 3.8.A.

b. The next element of this claim identifies the frame to support the device which is slidable in the sash channel, quote, ('638 patent, column 6, lines 49-50); "a sash frame support means slidable in said channel means." This sash frame support means is used in the Caldwell products and is referred to in their brochures (page 3, C000532) as the "carrier"; which is offered to Caldwell customers in 3 different product sizes to match recommended channel sizes. *See* Fig. 1.8.B; Fig. 3.8.B.

c. The next element of this claim which identifies the coiled ribbon spring and one of its ends, quote, ('638 patent, column 6, lines 51-52); "a coiled ribbon spring having an outer end engaged with said sash frame support means" is identical to a coiled ribbon spring and one of its ends used in the Caldwell products. In the Caldwell brochure (page 2, C00531), the coiled ribbon spring end is engaged to the frame support means which they call the carrier. *See* Fig. 1.8.C; Fig. 3.8.C.

d. The next element of this claim which specifies a mounting means for the coiled ribbon spring; quote, ('638 patent, column 6, lines 53-54) "and a means for mounting said coiled ribbon spring" is also found on the Caldwell products. The Caldwell brochure (page 6, C00535) describes this support means as the "coil nest." In the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 &8 in the '638 patent. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows; "mounting

16

means' or 'a means for mounting said coiled ribbon spring' describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". I note the following according to the Court claim construction:

    i. The court's definition references a structure for mounting a coiled ribbon spring to the window jamb channel. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell "coil nest" satisfies this definition in the court's claim construction.

    ii. The court's definition references a structure that has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell coil nest geometry satisfies this definition in the court's claim construction.

    iii. The court's definition references that the design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the design of the Caldwell coil nest includes a countersink hole to allow the coil nest to be secured to the to a window jamb channel, through a fixing screw.

I find the Caldwell mounting means for the Quick-Tilt and Quick-Tilt*nc products, which Caldwell calls the "coil nest," conforms to the Court's claim construction of the term "mounting means". *See* Fig. 1.8.D; Fig. 4.8.D.

e. The next element of this claim specifies the other end of the coiled ribbon spring as to being within the spring, being free and unattached to the support means; quote, ('638 patent, column 6, line 55), "the coiled body portion of said coiled spring with the other end of said coiled ribbon spring positioned in said mounting means." The physical Caldwell product I examined and the Caldwell brochure (page 2, C000531) show the Caldwell product coiled ribbon spring to be of exactly the same construction, based on the following observations:

    i. The other end of the coiled ribbon spring being within the spring

    ii. The other end of the coiled ribbon spring being free and unattached to the support means, which is called the coil nest by Caldwell. *See* Fig. 1.8.E; Fig. 4.8.E.

f. The next element of this claim describes the need for securing the mounting means to the channel means, quote, ('638 patent, column 6, lines 56-57); "and said mounting means being secured in said channel means". Several alternatives are shown in the patent "DESCRIPTION OF THE PREFERRED EMBODIMENTS": in Figure 4; a "fixing screw" as shown by item 64 can secure the mounting means. In figures 7, 8 and 9; the mounting means is secured by a screw (not shown). The screw is attached through a recessed bore 88 in Figure 7 and bore 108 in Figure 9. I also note in the Court's claim construction of patent '638 stated in item d the use of term fixing screw for securing the mounting means: "….method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to the jamb channel." I find the above discussions in the preferred embodiment for the '638 patent matches all of the installation instructions of the Quick-Tilt and Quick-Tilt*nc

17

products: in the Caldwell Quick-Tilt brochure (page 3, C000532), a fixing screw is clearly shown to be used to fasten the Caldwell products to the window jamb channel. *See* Fig 2.8.F.

g. The next element in this claim specifies a projection means of the mounting means, with a following qualification explaining the need for such a feature in the device, quote, ('638 patent, column 6, lines 57-61) "and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with the channel means within which the mounting means is positioned." I also note in the court's construction by the US District Court of Massachusetts dated January 20th, 2006 and mentioned in item (d), a construction for the term "projection means" as "projection(s)." I note in the Caldwell physical product and in the Caldwell brochure (C000530-C000535) the following observations:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, in page 2 (C000531), the cover of the Quick-Tilt product, which is clearly shown with a spine or projection feature integrated in the plastic body of the cover, is available for single, double or triple coiled spring configurations (page 3, accessories, C000532). This cover is supplied as (optional) to the Caldwell product in page 2, (C000531). The cover is secured to the mounting means, called by Caldwell as the "coil nest", through a fastening screw. Once secured by the screw, the cover fastened to the coil nest acts as an integrated assembly of a raised spine or projection of the mounting means defined as the coil nest in the Caldwell brochure. *See* Fig 2.8.G.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing the Quick-Tilt *nc product, that the Caldwell mounting means, called the "coil nest" and the plastic cover are integrated, by molding both features in the same product, with a "spine" or projection running lengthwise across the back side of the molded part. *See* Fig. 3.8.G.

h. The final element of claim 8 is the reason given for the projection means in item (g); quote, ('638 patent, column 6, lines 61-62); "whereby rotational motion of said mounting means is inhibited." In the claim construction by the District Court of Massachusetts, dated January 20th 2006, this element of the claims 1 and 8 in patent '638 was construed to mean the "mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges and said channel means whereby rotational motion of said mounting means is inhibited." I note the following:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, I note in page 2 (C000531), that the cover fastened to the coil nest acts as an integrated assembly of a raised spine or projection of the mounting means defined as the coil nest in the Caldwell brochure. The geometry of this assembly consisting of a coil nest fastened together to a cover will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell

18

brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing Quick-Tilt "nc product, The Caldwell mounting means, called the "coil nest" and the cover are integrated, by molding both features in the same product, with a "spine" or "projection" running lengthwise across the back side of the molded part. The geometry of this Caldwell coil nest molded together with a cover assembly will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel. For example, I note that when the physical Caldwell device was installed in a sample window jamb channel, the spine or projection fitted snugly between channel flanges thereby inhibiting rotation of the Caldwell balance while allowing the balance to ride smoothly inside the channel.

iii.  In order to explain the need for the spine or projection features; but not for preventing rotation, the Caldwell representatives that were deposed had differing opinions:

1.  According to the testimony of Jeffrey Robertson (beginning page 112, line 20), ....the raised portion labeled as "I", has two functions, one to provide enough material thickness so that the proper countersink for the screws, mounting screws can be provided without breaking through the inside of the cover...The second function is to provide a flow passage for the plastic in the injection molding process to fill the tool, fill the mold cavity...."

2.  According to the testimony of Wilbur Kellum (beginning page 93, line 10), in a series of answers by Mr. Kellum about the function of the protrusion "or spine/projection": "It is to help in the plastic molding....", and then Mr. Kellum adds in his testimony (page 94 lines 4-5); "...it serves to maintain straightness of the part during shipping...." Mr. Kellum answers the questions (p94 lines 6-8) Q: does it serve to maintain the straightness of the part when installed? A: "No.".

It is my opinion that these explanations for the need of the spine or projection other than to inhibit rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1)  There are many geometries that can serve to allow for a flow passage for the plastic injection molding process to fill the mold cavity for the Quick-Tilt covers. The spine or projection, when specified by the Caldwell representatives, can be made deeper, wider or shorter than the geometry selected by them. I note that the physical Caldwell Quick-Tilt*nc products' spine geometry matches, within a tight tolerance, the front opening of the channel in the window jamb pocket, and hence prevents rotation of the coil nest. Of all the many possible geometries for the spine or projection available to satisfy the plastic flow requirements, Caldwell chose the specific one that will inhibit rotation of the mounting means.

2)  There are many geometries to provide enough material thickness so that the proper countersink for the mounting screws can be provided without breaking through the inside of the cover. The thicker material could be made around the screw only and not to extend the full length of the cover. In addition, another alternative could be to make a recessed bore inside the coil nest to allow for more plastic material

19

on the inside as opposed to the outside of the cover. Of all the many possible geometries for the spine or projection available to satisfy the need for more material for the countersink of the fixing screw, Caldwell chose the specific one that will inhibit rotation of the mounting means.

3) The purpose of the spine or projection to maintain straightness of the part during shipping appears to be unusual; since the balances are shipped as part of assembled windows. It is customary in the business and engineering practices for the end product supplier to maintain the integrity of their product during shipping, and not rely on individual suppliers to provide the integrity of each individual part. For a product such as windows, which contains fragile glass, the end product supplier will certainly be very careful in providing for proper support and packaging of the window during shipping and transportation, and not rely on the balance manufacturer.

iv.  In order to show that the Caldwell Quick-Tilt and Quick-Tilt*nc products will prevent rotation other than through the spine or projection mentioned in the '638 patent, a Caldwell representative that was deposed, as well as the Caldwell brochure for Quick-Tilt, provided the following :

1. According to the testimony of Jeffrey Robertson (beginning page 115, line 13), "....the top portion [of the Quick-Tilt*nc] is large in length and width dimension than the opening into which the balance is inserted, so it is ...the top portion is held by the interference between the top and the vinyl lineal, the bottom portion is held in place by the screw Those two attachments, or the attachment at the bottom and the interference at the top prevent any rotation of the cover..."

2. In the Quick-Tilt brochure; page 2 (C000531), describing the constant force system, in the top of the page..."Its alternating coil design prevents the cantilevering or twisting of the carrier that can diminish locking performance...."

It is my opinion that these explanations for inhibiting rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1. The top portion of the Quick Tilt *nc cover is too thin to adequately inhibit the rotation of the coil nest, with a thickness ranging from 0.025" to 0.011" (drawings CW0158, Cw0159 and CW 0160). There are two diagonal thin cutouts at the top of the covers to allow for twisting of the cover.

2. The alternating coil design mentioned in the top of page 2 of the Quick-Tilt brochure (C000531) will only apply to tandem coiled ribbon springs. I note the following:

   a. For single nest cover this does not apply at all.

   b. For tandem covers, the length of each extended spring during window sash operations will vary since one spring is mounted on top of the other, resulting in the tandem springs not equal in length. Therefore , there will a be an offset moment forcing some rotation of the coil nest for tandem spring configurations

20

    c. For triple nest covers, there is a fixing screw to attach the upper triple spacer as shown in the Quick-Tilt brochure page 2 (C000531) that could work in conjunction with the coil nest screw to inhibit rotation. I note that there are no instructions for the recommended amount of torque to apply for each of these two screws. Repeated sash operations during the useful lifetime of the windows might reduce the integrity of the Caldwell fastening method due to the constant pressure applied by the rotation of the coil nest due to the triple coiled ribbon spring configuration.

As a conclusion to item (h), I find that the reasons for having the spine or projection feature according to Caldwell are inadequate. The Caldwell explanations for their techniques for inhibiting rotation might contribute partially to reducing rotation. The spine or projection feature they adopted based on the '638 patent, will perform the primary function of inhibiting the rotation. Therefore, I find that the Quick-Tilt and Quick-Tilt*nc series of products that contain the spine or projection along the longitudal axis of the mounting means will prevent rotation of the mounting means.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the New construction friendly Quick-Tilt*nc products are infringing on claim 8 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements."

**II. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.**

Upon reviewing all information listed in the top of the report, I conclude the following: The defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20 and 21 of plaintiffs' U.S. Patent 6,598,264 B2. My reasoning for the basis of my opinion is stated for each claim numbered below:

Claim 1. This claim states as follows, quote, ('264 patent, column 6, lines 35-56):
A block and tackle window balance device comprising:
a channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel;
a bottom guide roller rotatably mounted in the bottom guide;
a fixed pulley block unit connected to the channel;
a translatable pulley block unit moveable within the channel;
a spring comprising a first end and a second end, wherein the first end is fixed relative to the
   channel and the second end is connected to the translatable pulley block unit; and
a cord comprising a first cord end and a second cord end, wherein the cord is threaded through
   the translatable pulley block unit and the fixed pulley block unit and extends around the
   bottom guide roller, the first cord end being attached to the translatable pulley block unit and
   the second cord end being attachable to a jamb.

Upon examining the physical Caldwell block and tackle product that matches U.S. Patent 6,598,264 B2; the Caldwell brochure entitled "Series 86xt Block and Tackle System, Extended travel for sideload applications," containing 4 pages of front  or title page (C000498), 2nd page of component part layout and description (C000499), 3rd page of technical specifications and accessories  (C000500) and 4th page of warranty and contact information (C000501); the Caldwell depositions listed at the top of the report; and the Caldwell engineering drawings (CW0054 -CW099), it is my opinion that the defendant Caldwell Manufacturing Company's block and tackle system Series 86xt products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 1 by virtue of the following observations:

   a. The Caldwell product Series 86xt contains a channel comprising a first end and a
      second end;  See Fig. 5.1.A.
   b. The Caldwell product Series 86xt contains a top guide connected to the first end of
      the channel. In addition, the Caldwell brochure entitled Series 86xt Block and
      Tackle system, Extended travel for sideload applications page 3 (C000500) shows
      2 part numbers of top guides.  See Fig. 5.1.B.
   c. The Caldwell product Series 86xt contains a bottom guide connected to the second
      end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block
      and Tackle system, Extended travel for sideload applications page 3 (C000500)
      shows 2 part numbers of bottom guides. See Fig 5.1.C.
   d. The Caldwell product Series 86xt contains a bottom guide roller rotatably mounted
      in the bottom guide.  See Fig 6.1.D.  In addition, in the memorandum and order of
      the US District Court of Massachusetts dated January 20th 2006, Judge Douglas
      Woodlock issued a claim construction on the disputed term "bottom guide roller
      rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in

22

a way that permits its rotation." in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

 I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

e. The Caldwell Series 86xt  product contains a fixed pulley block unit connected to the channel; *See* Fig 5.1.E

f. The Caldwell product Series 86xt contains a translatable pulley block unit moveable within the channel; *See* Fig 5.1.F.

g. The Caldwell product Series 86xt contains a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and;  *See* Fig. 5.1.G.

h. The Caldwell product Series 86xt contains a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. *See* Fig 5.1.H.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company 86xt Block and Tackle System products are infringing on claim 1 of the Plaintiffs" US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 2. The device in claim 1 wherein the bottom guide roller is located external to the channel ('264 patent, column 6, lines 57-58).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called series 86xt, that it contains a bottom guide roller located in the bottom guide and visibly extends beyond the channel.

Based on the above observations, it is my opinion that the defendant's Caldwell Manufacturing Company series 86xt Block and Tackle System products are infringing on claim 2 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 3. The device according to claim 2 where in the top angled portion is sized to receive a member of the window sash ('264 patent, column 6, lines 59-60).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called series 86xt, that it contains a top angled portion is sized to receive a member of the window sash. The top angled portion is sized to cooperate with a window sash

cam, as shown in the Caldwell brochure cover page (C000498). This top angled portion is formed by the assembly of the top guide and the top end of the channel through a fastening means of a rivet.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 3 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 4.</u> The device according to claim 1 wherein a portion of the bottom guide is external to the channel ('264 patent, column 6, lines 61-62).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that a portion of the bottom guide is external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 4 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 5.</u> The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of the window sash ('264 patent, column 6, lines 63-64).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt that it contains a bottom guide that forms a channel to receive a portion of the window sash. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front or title page (C000498), the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 5 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 6.</u> The device in claim 1 wherein the fixed pulley block unit comprises a frame, an axle, and at least one pulley rotatable around the axle ('264 patent, column 6, lines 65-67).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a fixed pulley block unit comprising a frame, an axle and 2 pulleys rotatable around the axle.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 6 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 7.</u> The device according to claim 6 wherein the axle is located within the frame ('264 patent, column 7, lines 1-2).

24

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains an axle is located at least partially within the frame.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 7 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 9. The device in claim 1 wherein the translatable pulley block unit comprises a frame, an axle within the frame, and at least one pulley rotatable around the axle ('264 patent, column 7, lines 6-8).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a translatable pulley block unit comprising a frame, an axle at least partially within the frame and 2 pulleys rotatable around the axle.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 9 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 10. The device according to claim 1 wherein the top guide includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel ('264 patent, column 7, lines 9-12).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a top guide that includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel to form an integrated assembly.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 10 of the Plaintiffs'' US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 11. The device according to claim 1 wherein the fixed pulley block unit is integral within the bottom guide ('264 patent, column 7, lines 13-14).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a fixed pulley block that is integral within the bottom guide to form an assembly.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 11 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

25

<u>Claim 12.</u> A window assembly comprising ('264 patent, column 7, lines 15-42):
A window frame with two jambs with jamb pockets;
at least one of an upper window sash and a lower window sash slidably receivable in the jamb
    pockets, and;
at least one block and tackle window balance device attached to the at least one of the upper
    window sash and the lower window sash, the device comprising:
channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel;
a bottom guide roller rotatably mounted in the bottom guide;
a fixed pulley block unit connected to the channel;
a translatable pulley block unit moveable within the channel;
a spring comprising a first end and a second, wherein the first end is fixed relative to the channel
    and the second end is connected to the translatable pulley block unit; and
a cord comprising a first cord end and a second cord end, wherein the cord is threaded through
    the translatable pulley block unit and the fixed pulley block unit and extends around the
    bottom guide roller, the first cord end being attached to the translatable pulley block unit and
    the second cord end being attachable to a jamb.

Upon examining the physical Caldwell Block and tackle device that matches the U.S. Patent
6,598,264 B2; the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for
sideload applications containing 4 pages of front or title page (C000498), 2nd page of component
part layout and description (C000499), 3rd page of technical specifications and accessories
(C000500) and 4th page of warranty and contact information (C000501); the Caldwell
engineering drawings (CW0054 -CW0099); and depositions of the Caldwell representatives, it is
my opinion that the defendant Caldwell Manufacturing Company's Block and tackle Series 86xt
products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 12 by virtue of the
following observations:

a. The Caldwell product Series 86xt is to be used in a window assembly with a
   window frame with 2 jambs and with jamb pockets; as shown in the Caldwell series
   86xt Block and Tackle system brochure front page (C000498).  *See* Fig. 7.12.A.
b. The Caldwell product Series 86xt is to function with at least one of an upper
   window sash and a lower window sash slidably receivable in the jamb pockets, as
   shown in the Caldwell series 86xt Block and Tackle system brochure (C000498).
   *See* Fig. 7.12.B.
c. The Caldwell product Series 86xt is a block and tackle window balance device
   attached to the at least one of the upper window sash and the lower window sash,
   as shown in the Caldwell series 86xt Block and Tackle system brochure
   (C000498).  *See* Fig. 7.12.C.
d. The Caldwell physical product Series 86xt contains a channel comprising a first
   end and a second end;  *See* Fig. 5.12.D.
e. The Caldwell physical product Series 86xt contains a top guide connected to the
   first end of the channel. In addition, the Caldwell brochure entitled Series 86xt
   Block and Tackle system, Extended travel for sideload applications page 3
   (technical specifications and accessories, C000500) shows 2 part numbers of top
   guides. *See* Fig. 5.12.E.
f. The Caldwell physical product Series 86xt contains a bottom guide connected to
   the second end of the channel. In addition, the Caldwell brochure entitled Series

86xt Block and Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories,C000498) shows 2 part numbers of bottom guides. *See* Fig 5.12.F.

g. The Caldwell physical product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide. *See* Fig 6.12.G. In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term ""bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 12 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

h. The Caldwell physical product Series 86xt contains a fixed pulley block unit connected to the channel; *See* Fig 5.12.H.

i. The Caldwell physical product Series 86xt contains a translatable pulley block unit moveable within the channel; *See* Fig 5.12.I.

j. The Caldwell physical product Series 86xt contains a spring comprising a first end and a second, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and; *See* Fig 5.12.J.

k. The Caldwell physical product Series 86xt contains a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the to the translatable pulley block unit and the second cord end being attachable to a jamb. *See* Fig. 5.12.K.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 12 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 13. A window balance system comprising: ('264 patent, column 7, line 46 – column 8, line 2)

a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and
a bottom guide roller rotatably mounted in the bottom guide.

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, the Caldwell engineering drawings (CW0054 - CW0099); and the corresponding Caldwell brochure (C000498-C000501) that it contains

27

a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame. *See* Fig. 5.13.A. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front or title page (C000498), the bottom guide is shown adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame.

I also observe that the Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide. *See* Fig. 6.13.B. In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term "bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 13 of the Plaintiffs" US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 14. The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto ('264 patent, column 8, lines 3-5).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-C000501), that it contains a bottom guide roller located at least partially external to the channel when the bottom guide is attached thereto.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 14 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 15. The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto ('264 patent, column 8, lines 6-8).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-

C000501), that it contains at least a portion of the bottom guide which is external to the channel when attached thereto.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 15 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 16.</u> The device according to claim 13, wherein the bottom guide forms a channel to receive a portion of a window sash when installed ('264 patent, column 8, lines 3-11).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt and the corresponding Caldwell brochure (C000498-C000501), that it contains a bottom guide that forms a channel to receive a portion of the window sash when installed. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front (title) page, the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 16 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 18.</u> A window balance device comprising: ('264 patent, column 8, lines 15-23):
a channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel; and adapted to slide in a jamb pocket when installed in a window frame; and
a bottom guide roller rotatably mounted in the bottom guide.

Upon examining the physical Caldwell Block and tackle device that matches the U.S. Patent 6,598,264 B2; the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications containing 4 pages of front or title page (C000498), 2nd page of component part layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000501); the depositions of the Caldwell representatives; and the Caldwell engineering drawings (CW0054 -CW0099), it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system Series 86xt products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 18 by virtue of the following observations:

    a. The Caldwell product Series 86xt contains a channel comprising a first end and a second end; *See* Fig. 5.18.A.
    b. The Caldwell product Series 86xt contains a top guide connected to the first end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories, C000500) shows 2 part numbers for top guides. See Fig.5.18.B.
    c. The Caldwell product Series 86xt contains a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame. In addition, the Caldwell brochure entitled Series 86xt Block and

Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories, C000500) shows 2 part numbers of bottom guides. See Fig.5.18.C.

d. The Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide. In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term ""bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation. See Fig.6.18.D.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 18 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 19. The device of claim 18 wherein the bottom guide roller is located external to the channel ('264 patent, column 8, lines 25-26);

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-000501), that it contains a bottom guide roller located at least partially external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 19 of the Plaintiffs'' US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 20. The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel ('264 patent, column 8, lines 27-28).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-C000501), that it contains at least a portion of the bottom guide which is external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 20 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 21.</u> The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of the window sash when installed ('264 patent, column 8, lines 29-30).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt and the corresponding Caldwell brochure, (C000498-C000501) that it contains a bottom guide that forms a channel to receive a portion of the window sash when installed. In the Caldwell brochure series 86xt Block and Tackle System, Extended travel for sideload applications front or title (C000498) page, the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant's Caldwell Manufacturing Company Series 86xt Block and Tackle System products are infringing on claim 21 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

31

**III. Infringement by Caldwell systems of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97ez products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' U.S. Patent No. 6,820,368 B2.

Claim 2. This claim states as follows: ('368 patent, column 8, lines 48-67):
A window balance system comprising:
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received  by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

Upon examining the physical Caldwell product, as well as the Caldwell 4-page brochure entitled "Series 97ez Block and Tackle System, Easy Installation for Tilt Applications" (C000514-C000517) and the Caldwell engineering drawings (CW0001 -CW0015 and CW0183-CW0195), it is my opinion that the defendant Caldwell Manufacturing Company's Series 97ez system products are infringing on the Plaintiffs' U.S. Patent 6,820,368 B2 claim 2 by virtue of the following observations:

    a.  The Caldwell product Series 97ez contains a U shaped channel comprising a plurality of openings;  See Fig 8.2.A.
    b.  The Caldwell product Series 97ez  contains a spring connected to a system of pulleys located within the U shaped channel;  See Fig 8.2.B.
    c.  The Caldwell product Series 97ez  contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; See Fig 8.2.C.
    d.  The Caldwell product Series 97ez  contains a balance shoe (Fig 8.2.D), wherein the balance shoe comprises:
        a frame comprising an enlarged first end (Fig 9.2.E) and a second end (Fig. 9.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 9.2.G). The disputed term "pocket" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening

32

shaped to mate (i.e., to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell balance shoe is called in their 97ez brochure page 3 (C00516) as the "side locking pivot shoe". The Caldwell shoe forms a notch adapted to mate with a rivet in the U shaped channel. I observe that the notch located physically in the Caldwell device at the narrow end of the plastic carrier.

I observe that the Caldwell product 97ez has two rivets in the U shaped channel. The first rivet, located at the end of the channel, is enclosed completely by the shoe and the shoe can rotate freely around the first rivet. The second rivet, located near the first rivet but towards the center of the channel, prevents the free rotation of the shoe. This is confirmed by the testimony given during the deposition of Mr. Jeffrey Robertson, a Caldwell design engineer familiar with the design of the 97ez, where he confirms the connecting scheme as follows: In his testimony, as shown in Exhibit 6 to his deposition, the first rivet (near the channel end) is called E, and the second rivet (towards the center of the channel) is called D. The plastic feature that forms the pocket or "notch" in the shoe in the District Court of Massachusetts definition is called F in exhibit 6 of the Robertson deposition. The feature called F mates (i.e., joins together) with the rivet D.

In the Robertson deposition, beginning on page 53 line 25, Mr. Robertson answered the following question:
> Q. If I removed the plastic portion F and forcibly rotated the bottom of the carrier into the page, would the carrier rotate about the rivet E?
> A. Yes.

In the Robertson deposition beginning on page 73, line 14, Mr. Robertson answered the following question:
> Q. Now the rivet labeled "E" in exhibit 6, would allow the carrier to rotate about itself; is this correct?
> A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97ez shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance."

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ez product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: a possible function of the pocket in claim 2 is to prevent displacement or rotation of the balance shoe during shipping, handling and in use. When the shoe is under a force directed at the enlarged end, the pocket touches a fastener (i.e. rivet) in order to stop the displacement (rotation) of the shoe.

In Mr. Robertson's deposition, on page 49, Mr. Robertson answered the following question:

33

Q. Now in the 97ez, what is the purpose of the plastic part you labeled as "F"?

A. Prevent rotation in the carrier in the channel.

Q. Is this to prevent rotation of the carrier while in operation?

A. During handling of the balance or shipping of the balance.

Mr. Robertson also testified on page 51:

Q. Is there any circumstance in which F would touch the rivet D?

A. If the shoe is rotated forcibly in the direction opposite to that we were just discussing.

Q. And when would that happen?

A. Possibly in shipping and handling.

Given Mr. Robertson's testimony and my own examination of the Series 97ez, I conclude that the part of the Caldwell 97ez shoe that forms a notch shaped to mate with a rivet performs the same function of preventing unwanted rotation of the balance shoe as the invention. The 97ez will stop displacement (rotation) in the same manner as the invention by contacting a rivet, thus achieving the same result of securing the balance shoe in the channel during shipment, handling, and usage.

e. The Caldwell product Series 97ez contains a locking member proximal to the enlarged first end. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to "**Rotate** cam to lock shoe in place…." *See* Fig. 8.2.H.

f. The Caldwell product Series 97ez contains a cam in communications within the locking member. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to "**Rotate** cam to lock shoe in place…." *See* Fig. 9.2.I.

g. The Caldwell product Series 97ez contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

The Caldwell 97ez product contains a rivet that connects the balance shoe to the U shaped channel of the inverted window balance. *See* Fig. 9.2.J.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ez product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel. In the Caldwell 97ez product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

34

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 3. The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock construed the term as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97ez has a rivet as the connecting device. I also refer to section (g) in my discussion of claim 2 of the '368 patent above as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on the plaintiffs' claim 3 of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 6. The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez that it contains a cam at least partially housed within the enlarged end of the frame, called the "carrier" in page 3 (C000516) of the Caldwell brochure for system 97ez, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:
> **Slide** the series 97ez Block and tackle balance into the frame pocket.
> **Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
> **Rotate** cam to lock shoe in place…

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 7. The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent, column 9, lines 12-14).

35

I observe from examining the physical Caldwell series 97ez that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 8. The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from examining the physical Caldwell product 97ez that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:
    **Slide** the series 97ez Block and tackle balance into the frame pocket.
    **Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
    **Rotate** cam to lock shoe in place...

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 11. The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from examining the physical Caldwell Series 97ez that it contains a cam comprises of at least one camming surface (the observed Caldwell product has 2 camming surfaces) and a keyhole opening sized to receive a pivot bar. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:
    **Slide** the series 97ez Block and tackle balance into the frame pocket.
    **Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
    **Rotate** cam to lock shoe in place....
    **Install** the sash by dropping the bottom corner pivot bar into the shoe opening....

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for

tilt applications called Series 97ez products are infringing on claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

**IV. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97ih products are infringing on claims 2, 3, 6, 7, 8 and 11 of plaintiffs' U.S. Patent 6,820,368 B2.

Claim 2. This claim states as follows:
A window balance system comprising
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
> a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;

a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

('368 patent column 8, lines 48-67)

I examined photos of the device, including the one denoted in the Robertson deposition as Exhibit 3. I also examined three engineering drawings included as Exhibit 12 to the Batten deposition. They are:
1. 97i(H) Channel, Caldwell drawing ## 15A10/15A11, rev 2, drawn 05-20-04, approved 01-07-05
2. 97i(H) Balance assembly-screw mounted, Caldwell drawing ##15A50/15A51 rev 2, drawn 05-21-04, approved 01-10-05. The drawing is clearly marked with the location of the locking mechanism and the cam by Mr. Batten during his testimony in his deposition (page 146, line 21, and page 147 line 21).
3. 97i(H) Balance assembly-short/screw mounted, Caldwell drawing ##15A52, rev 1, drawn 08-13-04, approved 01-10-05.

According to the Batten Deposition, the Caldwell 97ih product preceded the 97ez product (Batten deposition, page 72, line 1). The 97i preceded the 97ih, and both products were very similar, with the same shoe. Quote from the Batten deposition page 74, lines 13- 24.
A. There was a predecessor product to the [97]ih called 97i. It was a predecessor to the I hybrid, otherwise known as ih.
Q. What is the difference between the [97]ih or i hybrid and the 97i?
A. The principal difference is the weight and range of the two products. The sash weight ranges that each carries is a little bit different.
Q. Is there any difference in the shoe between the 97i and the 97ih?
A. No.

38

Another quote from the Batten deposition compares the 97ih to the 97ez; quote (page 147, beginning line 22)

Q. Does the locking mechanism for the 97ih work in the same way as the 97ez's locking mechanism?

A. Yes.

Q. So if you rotate the cam, it forces the ends out and they engage in the jamb tracks?

A. That is correct.

Q. Did the 97i, the original 97i, prior to the introduction of the 97ih have the same carrier as what is depicted here in Exhibit 12?

A. I have to make sure we get our i's straight here

Q. I am talking with reference to the 97i that you testified earlier was a predecessor to the 97ih, that 97i, the one no longer on the market, was replaced sometime in 2004.

A. Yes.

Q. Did the carrier for that balance, was it the same carrier as what is shown here as the 97ih?

A. I believe it was, yes.

Based on the above discussion, it is my opinion that the defendant Caldwell Manufacturing Company's Series 97ih system products are infringing on claim 2 of U.S. Patent 6,820,368 B2 by virtue of the following observations:

a. The Caldwell product Series 97ih contains a U shaped channel comprising a plurality of openings; See Fig. 10.2.A.

b. The Caldwell product Series 97ih  contains a spring connected to a system of pulleys located within the U shaped channel; See Fig. 10.2.B.

c. The Caldwell product Series 97ih  contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; See Fig. 10.2.C.

d. The Caldwell product Series 97ih  contains a balance shoe (Fig. 10.2.D), wherein the balance shoe comprises:

a frame comprising and enlarged first end (Fig. 10.2.E) and a second end (Fig 10.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 11.2.G). The disputed term "pocket" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell shoe forms a notch adapted to mate with a rived in the U shaped channel. More of my observations on this issue are noted in element (h).

e. The Caldwell product Series 97ih contains a locking member proximal to the enlarged first end. See Fig. 10.2.H.

f. The Caldwell product Series 97ih contains a cam in communications within the locking member. See Fig. 11.2.I.

g. The Caldwell product Series 97ih contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. *See* Fig. 11.2.J. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) and engineering drawings of two shoe sizes (called the carrier) in the Batten deposition, exhibits 12 and 13 (C004553 and C004554), that the Caldwell 97ih has two rivets in the U shaped channel.

The first rivet, located towards the center of the channel, is used to anchor the spring. The second rivet is used to connect the carrier to the balance. This is collaborated for the first rivet by the Robertson deposition, page 26, lines 2-5, quote:

Q. As you are looking at it. What is the purpose of this rivet [to the right of the page?

A. It is to anchor the spring.

The second rivet function is also collaborated by the Robertson deposition, page 26, lines 15-19, quote:

Q. Is it also correct to say the leftmost rivet connects the carrier to the channel?

A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97ih shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The notch is indicated by the letter H in the Batten deposition Exhibit 13 (Batten deposition, page 142, line 24).

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ih product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of claim, it also infringes based on the Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel. In the Caldwell 97ih product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle Series 97ih products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

40

<u>Claim 3.</u> The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97ih has a rivet as the connecting device. I also refer to section (g) in my discussion of claim 2 of the '368 patent above as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 3 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 6.</u> The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a cam at least partially housed within the enlarged end of the frame, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 7.</u> The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent, column 9, lines 12-14).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle 97ih products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 8.</u> The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of

the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97ih that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 11.</u> The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97ih that it contains a cam comprises of at least one camming surface (the observed Caldwell product has 2 camming surfaces) and a keyhole opening sized to receive a pivot bar.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

**V. Infringement by defendant, Caldwell Manufacturing Company, of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant's Caldwell Manufacturing Company Series 97i products are infringing on claims 2, 3, 6, 7, 8 and 11 of plaintiffs' U.S. Patent 6,820,368 B2.

<u>Claim 2.</u> This claim states as follows:
A window balance system comprising:
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is
        adapted to be received by the U shaped channel, and wherein the second end of the
        frame of the balance shoe further forms a pocket positioned in the second end of the
        frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

('368 patent, column 8, lines 48-67):

Upon examining Caldwell brochure package Series 97i Block and Tackle System Inverted Operation for tilt application, containing 4 pages of front or title page (C000490), 2nd page of component part layout and description (C000491), 3rd page of technical specifications, accessories and installation (C000492), and 4th page of warranty and contact information (C000493); and the Caldwell engineering drawings (CW0016 -CW0039), it is my opinion that the defendant Caldwell Manufacturing Company's Series 97i system products are infringing on the Plaintiffs' U.S. Patent 6,820,368 B2 claim 2 by virtue of the following observations:

    a. The Caldwell product Series 97i contains a U shaped channel comprising a plurality of openings;  *See* Fig. 12.2.A.
    b. The Caldwell product Series 97i contains a spring connected to a system of pulleys located within the U shaped channel;  *See* Fig 12.2.B.
    c. The Caldwell product Series 97i contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; *See* Fig 12.2.C.
    d. The Caldwell product Series 97i contains a balance shoe (Fig. 12.2.D), wherein the balance shoe comprises:
        a frame comprising and enlarged first end (Fig. 12.2.E) and a second end (Fig. 12.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 11.2.G). The disputed term "pocket" was clarified by the

43

memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell balance shoe is called in their 97i brochure page 3 (C00492) as the "locking pivot shoe". The Caldwell shoe forms a notch adapted to mate with a rivet in the U shaped channel. More of my observations on this issue are noted in element (g).

e.   The Caldwell product Series 97i contains a locking member proximal to the enlarged first end. *See* Fig. 12.2.H.   In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to "**Rotate** cam to lock shoe in place...."

f.   The Caldwell product Series 97i contains a cam in communications within the locking member. *See* Fig. 11.2.I.  In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to "**Rotate** cam to lock shoe in place...."

g.   The Caldwell product Series 97i contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. *See* Fig. 11.2.J. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

I note from the Batten deposition page 74, lines 13- 24:

A. There was a predecessor product to the [97]ih called 97i. It was a predecessor to the I hybrid, otherwise known as ih.
Q. What is the difference between the [97]ih or i hybrid and the 97i?
A. The principal difference is the weight and range of the two products. The sash weight ranges that each carries is a little bit different.
Q. Is there any difference in the shoe between the 97i and the 97ih?
A. No.

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) and engineering drawings of two shoe sizes (called the carrier) in the Batten deposition, exhibits 12 and 13 (C004553 and C004554), that the Caldwell 97i has two rivets in the U shaped channel.

The first rivet, located towards the center of the channel, is used to anchor the spring. The second rivet is used to connect the carrier to the balance. This collaborated for the first rivet by the Robertson deposition, page 26, lines 2-5, quote:

Q. As you are looking at it. What is the purpose of this rivet [to the right of the page]?
A. It is to anchor the spring.

44

The second rivet function is also collaborated by the Robertson deposition, page 26, lines 15-19, quote:
Q. Is it also correct to say the leftmost rivet connects the carrier to the channel?
A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97i shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The notch is indicated by the letter H in the Batten deposition Exhibit 13 (Batten deposition, page 142, line 24).

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97i product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the   Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel.  In the Caldwell 97i product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 3. The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97i has a rivet as the connecting device. I also refer to section (g) in claim 2 of the '368 patent as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing on the plaintiffs' claim 3 of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 6. The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to

45

engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, exhibit 3), that it contains a cam at least partially housed within the enlarged end of the frame, called the "carrier" in page 3 (C000492) of the Caldwell brochure for system 97i, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to perform the following functions:

> **Slide** the series 97i Block and tackle balance into the frame jamb pocket.
> **Insert** a mounting screw through the terminal and fasten securely to the jamb.
> **Rotate** cam to lock shoe in place…

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 7. The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent column 9, lines 12-14).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 8. The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, exhibit 3) for the Caldwell product 97i that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to perform the following functions:

> **Slide** the series 97i Block and tackle balance into the frame jamb pocket.
> **Insert** a mounting screw through the terminal and fasten securely to the jamb.

46

**Rotate** cam to lock shoe in place…

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 11.</u> The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97i that it contains a cam comprises of at least one camming surface (the observed Caldwell product has two camming surfaces) and a keyhole opening sized to receive a pivot bar. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:

**Slide** the series 97i Block and tackle balance into the frame jamb pocket.
**Insert** a mounting screw through the terminal and fasten securely to the jamb.
**Rotate** cam to lock shoe in place…
**Install** the sash by guiding the bottom corner pivot bars into their respective carrier opening….

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Sincerely yours

Dr. Sammy G. Shina, P.E.
19 Swanson Road
Framingham, MA 01701
Sammy_shina@uml.edu
Home 508 877 6109, Work 978 934 2590;
cell 508 934 9176

47

TAB A

**Dr. Sammy G. Shina, Ph.D., PE**

| | | |
|---|---|---|
| **OFFICE:** | College of Engineering | **HOME:** 19 Swanson Road |
| | University of Massachusetts Lowell | Framingham, 01701 |
| | 1 University Avenue | Phone and fax |
| | Lowell, MA 01854 | (508) 877-6109 |
| Phone: | (978) 934 2590 | |
| Fax: | (978) 934 3048 | |
| Cell | (508) 934 6777 | |
| Sammy_Shina@UML.edu | | |
| DOB | 9/28/ 44 | |

## A. EDUCATION AND ACADEMIC QUALIFICATIONS

### 1. Education (Degrees, with fields, institutions and dates).

| | | |
|---|---|---|
| Ph.D. | MECHANICAL ENGINEERING | TUFTS, 1998 |
| M.S. | COMPUTER SCIENCE | WPI, 1972 |
| B.S. | INDUSTRIAL MANAGEMENT - | MIT, 1966 |
| B.S. | ELECTRICAL ENGINEERING- | MIT, 1966 |

Completed 6 courses in the Computer Engineering graduate program at Boston University.

### 2. Academic Experience

| | |
|---|---|
| 1999 - Current | University of Massachusetts Lowell, College of Engineering Full time Professor, Department of Mechanical Engineering |
| 2003 | Coordinator of the Graduate Certificate Program: Design and Manufacturing Engineering |
| 2000 | e-Engineering lectures, National Technological University, and PBS Business Network |
| 1992 - Current | University of Massachusetts Lowell, College of Engineering Full time Associate Professor, Department of Mechanical Engineering |
| 1989- 1995 | Adjunct Professor, University of California Irvine |
| 1993 - 1995 | Adjunct Professor, University of Pennsylvania EXMSE program for business executives |
| 1994 - 1995 | Lecturer, Six Sigma Institute on Quality and Concurrent |

1

Engineering, Motorola University for Motorola and Texas
Instrument Six Sigma Black Belt Engineers.

1988-1992          University of Lowell, College of Engineering
                   Full time Associate Professor, Department of Industrial
                   Technology

1970-1990          University of Lowell, Continuing Education
                   Adjunct Faculty, Industrial Technology Department

1985-1988          Technical Education Coordinator for Hewlett Packard
                   Corporation, Waltham MA
Set up the training courses for the different tools and systems such as
Mechanical and Electrical CAD/CAM. Introduced Masters of Engineering
Programs from the National Technological University and Boston University
engineering schools for 400 engineers.

1967-1968          The Technical Education Institute, Florence, SC
                   Taught Computer Programming, Mechanical and Electrical
                   Engineering courses in the Institute.

2

## B. PROFESSIONAL ACTIVITIES

### 1. Professional Association

Secretary and Past chairman for the Robotics Chapter of the SME (Society of Manufacturing Engineers), Chapter 293, Region 5. Chairman elect 1998.
***Member(current or past) of the following professional societies:***
Society of Quality Engineers (ASQC)  - Senior Member
Society of Manufacturing Engineers (SME) - Senior Member
American Society for Engineering Education (ASEE) - Senior Member
Institute of Electrical and Electronics Engineers (IEEE) - Senior Member
Member of the Board of Directors, Massachusetts Quality Award
Quality Examiner, Massachusetts Quality Award
Registered Professional Engineer (EE) in Massachusetts, No. 345922.
Senior Member of the Surface Mount Technology Association (SMTA) No 13849

### 2. Work Experience

Summer of 2000    CoCreate CAD Software, Fort Collins, Colorado
        I was engaged by CoCreate to develop the concepts and strategies of collaborative engineering by researching and interviewing companies engaged in the design of mechanical products using distributed design teams as well as distributed supply chains. The results of the research are to be documented in case studies and future publication in journals and a fifth book.

Summers of 1997/1998    Lecroy Corporation, Chestnut Ridge, NY
        I was engaged by the Lecroy Corporation Network Products Group to select an outside manufacturing contracting services for PCB, Instrument and system assembly and test. Evaluated several potential contractors and helped select the manufacturing plan and the contractor.

Summer of 1992    Phillips Kommunication Industrie AG, Nuremberg, Germany.
During the summer of 1992, I was engaged by the company to help transition the product creation process from a serial (throw it over the fence) to concurrent engineering. I worked with the management and engineering teams of the company to effect that transition, My work at the company formed the basis of the first chapter in my second book on concurrent engineering.

1971-1988    HEWLETT PACKARD WALTHAM DIVISION, Waltham, MA
        I worked for the company in many positions, both at the division and the corporate levels.  I filled many diverse assignments: manufacturing engineer and manager, in the process, production and tool engineering departments. I have successfully built and turned on a $10 million automated electronic manufacturing plant and associated wastewater treatment system in 1980. I have received an award from the MDC for the design of the plant, which was featured on the front cover of their annual report.
        As a production manager, I understood how to manage and ship more than $50 million of medical electronics instruments in 1985, and managed an

3

organization of 300 workers, including ten supervisors, manufacturing and
process engineers. This position gave me a unique perspective on the
congruence of design, manufacturing, operational and engineering issues.

A significant assignment was the Waltham division productivity manager
in 1986, where I investigated the methodologies on how to increase engineers'
productivity and quality. I was in charge of capital equipment and training for 400
engineers. I spend more than $7 million on CAD and associated equipment,
especially automatic links to manufacturing and CAM. One of the visitors to
Hewlett Packard described my efforts in the field of Design - Manufacturing
connection in 1986 as the most complete he has seen outside of Detroit. This
assignment led me to formulae my opinions about concurrent engineering, which
I published in my first book 1991.

Engineering Assignments:

Surface Mount Technology (SMT) Coordinator
Computer Aided Design (CAD) Manager
Prototype-In-Production (PIP) Program Manager
Automatic Test of PC Boards Systems Designer/Manager
Automatic N/C generation for Punch Press equipment
Printed Circuit Board Fabrication System Designer
Automatic PC Solder and Wash System Designer
Automatic Insertion of Components Systems designer/Manager

Line Management Experience:

Auto Insertion Department Manager.
Medical Monitoring Instruments Assembly and Test Manager
Central Station Monitoring Assembly and Test Manager
Oximeter and Capnometer Assembly and Test Manager
Engineering Services Manager
Productivity Manager
Tool Engineering Manger
Manufacturing Technology Manager

1968-1971   RCA COMPUTER SYSTEMS DIVISION, Marlborough MA

Designed an automatic manufacturing / test systems for computer
peripherals, including magnetic tape storage and high speed disc storage
devices. I was slated to become the manufacturing engineering manager before
RCA decided to quit the IBM mainframe compatible market in 1971, and closed
the plant.

1966-1968   UNION CARBIDE COOPERATION LINDE DIVISION, Florence, SC

I introduced computer technology to the plant that was newly built in the
south. I designed computer based inventory control and material handling
systems, including working with one of the first IBM bill of materials processors.

4

## C. RESEARCH

### 1a. Awarded Grants and Contracts

<u>Funded</u> (^$750,000)

| | |
|---|---|
| 001402-001 | Lead Free Solder Testing, EPA work order #4w-1362-NAEX, 9/2004, $25,000. |
| 05-8011 | Income Account for Lead Free Consortium Schneider Automation, MACOM; and Analog Devices 2000-2004≈ $8,500 |
| UML Turi | Support for Lead Free Consortium $6000; in 5/02 and 5/03 |
| UML Turi | Research Fellowships for Lead Free Soldering, $20,000 9/99; $6,000 9/00; $20,000 9/01 Total = $46,000 |
| Corporate Education | *Skills Training – Machine Controls and XY Movement) Lucent Technology , Summer 2000, $13,000 |
| 99-348 | Parlex Corporation Student Internship, June 1999 $14,450 |
| 05- 08225 | Resin Technology, MFG. Evaluation, January 1999, $3,844 |
| Corporate Education | *Skills Training – Machine Controls and XY Movement) Lucent Technology , Fall  1999, $32,000 |
| 05- 08112 | Microtouch Corporation, MFG. Evaluation, July 1998, $13,908 |
| UML TURI | MFG Research Fellowship for Sunny Grover, in Additive PCB's  Build Up Vias, September 1998, $25,000 |
| 05-08011 | Coop and Internship Income Account, March 1998, $2,100 |
| UML TURI | MFG Research Fellowship for Val Carvalho, May 1997, in Additive PCB Fabrication Technology, $25,000.00 |
| CITA | Conception, Product Development and Environmentally Appropriate Technology, with Maas, Fiddy, Geiser and McCarthy, May 1997, $4190 |
| UML TURI | MFG Research Fellowship for Dennis Gagne, 9/1996, Additive PCB Fabrication Technology, $15,345.00 |

| | |
|---|---|
| Continuing Education | "Manufacturing and Total Quality Management and Control", USCI Baird with Stephen Driscoll, June 1996, $50,000. |
| 05 -07433-F | "Undergraduate Faculty Development in New Product Realization", National Science Foundation, June 1996, $44,000 |
| 05- 07212 | EASNE Design for Quality, UML-UGC2-5, May 1996, $68,000; Co-PI with R. Giglio, UMA. |
| 05-07362 | "Practical Statistics for Engineers", USCI Baird, December 1995; with Professor McKelliget, $5,000 |
| UML TURI | MFG Research Fellowship for Doug Sommer, in NO Clean Paste for PCB Assembly, September 1995, $15,345.00 |
| UML TURI | MFG Research Fellowship for Paul Haley, in NO Clean SMT Paste for PCB Assembly, September 1994, $15,645.22 |
| 05 - 6450-F | "Undergraduate Faculty Development in Concurrent Engineering and Design for Manufacture", National Science Foundation.  June 1993, $77,810. |
| Continuing Education | "Concurrent Engineering, Quality Management and Control", Baush & Lomb Corporation, July 1992, $16,000. |
| 05 - 6222 | "Faculty and Course Development", GE Aircraft Engines Education Fund, February 1992, $10,000 |
| 05 - 5850 | "Faculty and Course Development", GE Aircraft Engines Education Fund, February 1991, $10,000 |
| 05 - 5807-F | "Undergraduate Faculty Development in DFM", National Science Foundation. January 1991, $54,924. |
| 05 - 5636 | "Concurrent Engineering and Design for Manufacturing", Genrad Corporation, June 1990, $1,500. |
| 05 - 5792 | "Faculty and Curriculum Development", Society of Manufacturing Engineering Education Foundation, May 1990, $ 9,500. |
| 16 - 5336 | "Technology Transfer Grant in Manufacturing Engineering", Costa Rica Educational Development Center, with John Colluccini. May 1989, $ 8,404. |

6

16 - 5257     "Process Quality Improvements Using SPC and Taguchi Methods", Wang Labs Incorporated, April 1989, $48,334.

16 - 5260     "Factory Process and material handling optimization using simulation tool", Wang Labs Incorporated, April 1989, $ 58,939

Continuing     More than $100,000 in seminars on quality an Concurrent
Education      Engineering, 1989-1993

**1b. Equipment and Software Grants ($178,000)**
GENRAD Tester, $140,000, 12/ 1998; Hewlett Packard, Optical Laser Measurement System, $15,000, 5/ 1996; Storm Software, Manufacturing Software, $2000, 5/1995.; AMTX Corporation, Screening Stencils, $1,000, March 1995; AT&T, Merrimack Valley Works, for 2 ADEPT Robots, book value: $15,000, 11/1993; UTZ Corporation, Screening Stencil, $1,000, 12/1993; CACI Products Company, SIMFACTORY Software training, $4,000, 12/ 1993.

**1c. Consultancy:**
<u>University and Technical Conference Based Seminars and Training</u>
University of Massachusetts, Lowell, University of California, Irvine, University of Pennsylvania, ExMSE Program, Motorola University Six Sigma Institute, Bellevue Community College, Washington, Brunel University, London, NEPCON Conferences and Expositions, NEPCON College of Manufacturing, SMT International Conference and Exposition, Hong Kong Productivity Council, Singapore Center for Management Technology, American Society for Quality Control (ASQC), Puerto Rico Chapter, Society of Manufacturing Engineering (SME), New England Region, Iteso, University, Guadalajaro, Mexico, Mexican Branch of the IEEE, Australian SMCBA Association, Technical University of Costa Rica, Technical University of Puerto Rico, Arab School of Science and Technology, Society of Manufacturing Engineers(SME), SMTI Chicago
<u>Consultancy, US</u>
Omnisonis, CoCreate, Lucent, BTU, Phoenix International; Teradyne, Bose, Lecroy, General Scanning, Lockheed Martin Sanders, General DataCom, MicroTouch Systems, Leybold Inficon, PictureTel, USCI Baird, Hewlett Packard, Motorola, Pensar Corporation, AT&T Corporation, AMETEK Corporation, M/ACom Corporation, GTE Sylvania, Atlanta Scientific, U.S. Navy, Port Hueneme and Pt. Mugu; Xerox Corporation, Polymer Technology, National Science Foundation, General Electric Aircraft Engines, Genrad Corporation, Tredgar Plastics, C&K electronics, Parker Brothers, Wang Incorporated


<u>Consultancy, International</u>
Havelsan Company, Ankara, Turkey, Hong Kong Productivity Council
Fisher and Paykel, Switchtek Power Systems, Tait Electronics and Dynamic in New Zealand. Phillips Kommunication Industrie AG, (Nurenberg, Germany),

7

Australian Electronics Development Center, Victoria Australia, Surface Mount and Circuit Board Association, Hughesdale, Australia; NISTEC (Advanced Technologies in the Electronics Industry), Petah Tikva, Israel; R&D Network Devices, Efrat Technology and ECI Telecom, Petah Tikvah, Israel; NECPON Singapore, NPCON Europe, Puerto Rico ASQC, Mexicon, Mexico

**EXPERT WITNESS/** Litigation Support Experience
1. Xyratics Design v AB circuits v Eltek, 1999: The case involved quality issues in the electronics supply chain. The plaintiffs and defendants were value added manufacturers that worked on a product originated in a South Korean Company, which had hidden defects in the product. The Korean company went bankrupt, and the other companies in the supply chain sued each. I advised on the issues of proper testing and quality procedures in the electronics industry, especially when related to the supply chain. I wrote several expert reports on test and quality for the solicitors and barristers in the case. Case was settled out of court. *INCE and Company; Solicitors; 11 Byward Street; London EC3; England*

2. Vial, Inc., v. Triple S. Plastics, Inc., CV 97-499 (Dist. AZ); CV 98-102 (Dist. AZ): Patent infringement case involving molding of plastics injected parts, with two companies making plastic containers for the Dairy and consumer food industries. The patent included closing of plastic containers in the mold for the defendant, while the other company used similar techniques for closing the cap by a robotic arm. I help the plaintiff lawyers research the prior art to find instances of use of robotics in the plastics industry. *Morgan and Finnegan, L.L.P., Attorneys at Law, 345 Park Avenue, New York, NY 10154*

3. Fuji Machine Manufacturing Company, Ltd. V. Hoover-Davis Inc.; Civil Action No. 96-CV-5087I: Patent infringement case involving pick and place Feeder design. I worked with the lawyers of the plaintiff (FUJI) to explain the workings of the feeder, and how the design of the defendants (Hover-Davis) feeder design had similarity in function. *Oliff & Berridge, P.L.C, Attorneys at law; 700 South Washington Street, Alexandria, Virginia 22314*

4. US District Court Of Maine 05-32 –PC, RFT Technology Corporation V Applied Microwave Technology: Case including conversion, breach of contract and misappropriation of trade secrets. Case involved using the same design strategy and copying of CAD files versus reverse engineering claims by the defendants. I wrote an expert report, and was deposed in the discovery process. Case was settled out of court. *Hamilton, Brook, Smith & Reynolds, P.C. , 530 Virginia Road, P.O. Box 9133, Concord, Massachusetts 01742*

**2a. Academic & Professional Publications (94 publications)**

8

**Text and Reference Books (5 published)**

1. S. Shina, "Six Sigma for Electronics Design and Manufacturing McGraw Hill, May 2002
2. Shina S. and Saigal A., "Manufacturing Costs for electronic Products", Volume 3 of the Encyclopedia of Materials, Elesevier Press, November 2001, pp 2727-2735.
3. S Shina , "Design Of Experiments", chapter 25 to "Environment Friendly Electronics: Lead-Free Technology" by J. Hwang, Electrochemical Publications Ltd, 2001.
4. S. Shina, editor and co-author, "Successful Implementation of Concurrent Engineering Products and Processes", published by Van Nostrand Reinhold N.Y., 1994, reprinted by Wiley Press.
5. S. Shina, "Concurrent Engineering and Design for Manufacture of Electronic Products", published by Van Nostrand Reinhold N.Y., 1991. Reprinted by Kluwer Academic Publishers.

**Papers published in refereed Journals and publications (10 papers published):**

1. Shina S. and Saigal A., "Using Cpk as a Design Tool for New System Development", Journal of Quality Engineering, Volume XII, Number 4, 2000, pp. 333-349.
2. Shina S. and Saigal A., "A design Quality Based Cost Model for New Electronic Systems and Products," Journal Of Materials, April 1998, pp 29-33.
3. Shina S. and Saigal A., "Technology Cost Modeling for the Manufacture of Printed Circuit Boards in New Electronic Products," Journal of Manufacturing Science and Engineering, May, 1998, pp 368- 375.
4. Shina, S., Gagne D. and Quaglia, M., "Methods for paste Selection and Process Optimization for Fine Pitch SMT, Journal of the SMART (Surface Mount and Related Technologies) Group, No. 24, October 1996, pp. 8-11.
5. Shina, S., W. Eaton W., et all, "Using circuit simulation with Taguchi Design of Experiment Techniques to optimize the performance of a digital half-adder integrated circuit", Quality Progress, Journal of Quality Engineering, 1993, Vol. 5, Number 4, pp. 589-600.
6. Shina, S., "Taguchi Experiments for Improving Solder Quality", Journal of Surface Mount Technology, July 1992, pp. 4-13.
7. Shina, S., "Developing a course in Design for Manufacture", Journal of Industrial Technology, Volume 7, Number 2, 1991. pp. 7 - 11
8. Shina, S., "The successful use of the Taguchi Method to Increase Manufacturing process Capability", Journal of Quality Engineering, Volume III, Number 3, 1991, pp. 333-349.
9. Shina, S., "New Rules for World Class Companies", IEEE Spectrum, July 1991. pp. 23-26
10. Shina, S., "The use of the Taguchi Method to Optimize Manufacturing", Technologia en Marsha, published by the Instituto Technologico de Costa Rica, Volume 10, Number 2, 1990. pp. 3-7.

9

**Papers published in refereed Conferences (50 papers published/accepted)**

1. Shina S., Morose G. et al; "Visual and Reliability Testing Results of Surface Mounted Lead Free Soldering Materials and Processes in a Simulated Production Environment"; paper to be presented at the IPC Printed Circuits Expo, APEX and the Designers Summit, Anaheim, CA, February 2006
2. Shina S. et al, "Summary of New England Lead Free Consortium Implementation Plan of High Volume Assembly of Printed Wiring Boards", paper to be presented as the keynote speech at the Pan Pacific Microelectronics Symposium", Kona, Hawaii, January 2006
3. Shina et al; Consortium authors. "Analysis of Testing Results of Surface Mounted Lead Free Solders and Materials in Production Environments", paper accepted for the SMTI International, Chicago, IL, September 2004
4. Shina et al; Consortium authors. "Lead Free Consortium Update for Process Conversion", accepted for IPC/JEDEC 8th International Conference on Lead Free Electronic Assemblies and Components San Jose, California, April 2005
5. Shina et al; Consortium authors. "Lead Free Conversion Analysis for Multiple PWB/Component Materials and Finishes using Quality and Reliability Testing", APEX conference, Anaheim, CA, February 2005
6. Shina et al; "Analysis of Testing Results of Surface Mounted Lead Free Soldering Materials and Processes", Pan Pacific Conference, Kauai, January 2005.
7. Shina et al; "Summary of Visual and Reliability Testing Results of Surface Mounted Lead Free Soldering Materials and Processes"; 7th International IPC/JEDEC conference, Frankfurt, Germany, October 2004
8. Shina et al; Consortium authors. "Lead Free Conversion Analysis for Multiple PWB/Component Materials and Finishes using Quality and Reliability Testing", APEX conference, Anaheim, CA, February 2004
9. Shina et al; Consortium authors. "A Comparative Analysis of Lead Free Materials and Processes Using Design of Experiments Techniques", SMTI International, Chicago, IL, September 2003
10. Shina et al; "Testing Results for Lead-Free PWB's by the Massachusetts Lead-Free Electronics Research Consortium"; 2003 IEEE International; Symposium on Electronics and the Environment (ISEE); Boston, MA, May 2003.
11. Shina et al; " Materials and Processes for Surface Mount Lead Free Soldering", proceedings of the APEX Conference, Anaheim, CA, March 2003, pp.s20-2-1/9
12. Shina S; "A Cpk-Based Toolkit for Tolerance Analysis and Design," Engineering Design Conference; London; July 2002.
13. Shina *et al*, "Process and Material Selection for zero defects and superior adhesion Lead Free SMT soldering", SMTA International Conference, Chicago, IL., September 2001, pp 651 -656
14. Previous paper translated into Chinese by the Hong Kong SMT society for their annual conference 2004.
15. Shina et al, Reliability Testing Techniques For Lead Free Soldering Of SMT Technology", ETRONIX Conference, Anaheim, CA, March 2001.

10

16. Above paper translated into Japanese Journal ANBE, SMT, Kanagawa, Japan, July 2001

17. Shina et al, "Selecting Material and Process Parameters for Lead Free SMT Soldering Using Design of Experiments Techniques", Apex Conference, January 2001, San Diego, CA

18. Shina et al, "Design Of Experiments For Lead Free Materials, Surface Finishes And Manufacturing Processes Of Printed Wiring Boards", SMTA International Conference; Chicago, IL., September 2000

19. Previous paper translated into Chinese by the Chinese Electronics Association Journal. June 2001.

20. Previous paper translated into Chinese by the Hong Kong SMT society for their annual conference 2004.

21. S. Shina and M. Grover, "Developing Vias For Additive Technologies In Printed Wiring Board Fabrication", NEPCON East , Boston, June 1999, pp.77-83

22. Shina, "When Global Manufacturing Does not Work" , International Mechanical Engineering Congress and Exposition (IMECE), November 1999, Nashville, Tennessee, MED VOL. 10, MFG Science and Engineering, pp 557-562.

23. Shina S. and Saigal A., "Using Cpk as Design Tool for New System Development," International Conference on Engineering Design (ICED), Vol. 1, pp. 357-360, Munich, August 1999.

24. Shina, Callahan, Sutera, McCrillis and Geogapoulos, "Methodology for Applying Specifications in Electronics Manufacturing Equipment", NEPCON East 1998, Boston, MA June 1998, pp. 3-10

25. Shina, S., and Carvalho, V., "Additive Technologies: An Examination of Polymer Film Technology in Comparison to Etched Copper Circuitry", NEPCON East 1998, Boston, MA, June 1998, pp. 11-17

26. Shina S., and A Saigal, "A Design Cost Model for New Products Development", ASME Winter Annual Conference, Dallas, TX, November 1997.

27. Shina S., and Saigal, A.,"A Design Cost Model for New Products Development", American Society of Metals Annual Conference, Indianapolis, Indiana, September 1997

28. Shina S., et al., "Paste Qualification for SMT process", NEPCON East 1997, Boston, MA June 1997, pp 23-35

29. Shina, S., "Paperless Tooling System for PCB Fabrication", NEPCON East 1997, Boston, MA June 1997, pp 35-48

30. Shina S., and Calvarho, V., "Evaluation of SMT Paste and Stencil Technologies", NEPCON WEST 97, Anaheim California, February, 1997

31. Shina S., and Saigal, A., Concurrent Engineering and the Virtual Factory: Developing Products with Contract Manufacturers, ASME Winter Annual Conference, Atlanta GA, November 1996.

32. Shina S., and Saigal, A., "An Algorithm for selecting the electronic design implementation in Printed Circuit Board Fabrication based on cost factors", ASME Winter Annual Conference, Atlanta GA, November 1996.

33. Shina, S., "Design For Manufacture of Electronic Products", Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996, pp. 79-100

34. Shina, S., "Product Realization Process in a Global Environment", Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996, pp. 79-100

35. Shina, S., Kissinger D. and Crocker, K., "Process Development for SMT Stencil Adhesive Application", NEPCON East 1996, Boston, MA June 1996.

36. Shina, S., "Laboratory Exercises to Support Manufacturing Engineering Curriculum", International Conference on Education in Manufacturing, San Diego, CA, March 1996.

37. Shina S., and Saigal, A., "Technology Based Cost Modeling for Manufacturing and Material Selection in New Product Development", ASME Winter Annual Meeting, Chicago, IL November 1994, pp 85-92

38. Shina, S., Gagne D. and Qualiglia, M., "Method for Paste Selection and Process Optimization for Fine Pitch SMT", NEPCON WEST 1996, Anaheim CA, February 1996, pp 61-70

39. Shina, S., "Achieving World Class Quality in PCB Manufacturing through Concurrent Engineering", Proceeding of the Technical Program, NEPCON WEST 1993, pp 1818-1826

40. Shina S., and Kurpad, R., "Performance Improvements: Application to Aerospace Rivets Installation", paper presented at the Winter Annual Meeting of the ASME, Anaheim, California, November 1992.

41. Shina S., and Wils, J., "Tuning a Large Data base Using Robust Design Techniques", paper presented at the Winter Annual Meeting of the ASME, Anaheim, California, November 1992.

42. Shina, S., "Optimizing Surface Mount Technology Soldering", presented at Surface Mount International Conference, San Jose CA, August 1991.

43. Shina, S., "Using the Taguchi Method to optimize Solder Processing", IPC Conference, San Diego CA, October 1990.

44. Shina S., and Capulli, K., "Optimized Processing and Cleaning of Hybrid Integrated Circuits", NEPCON EAST Conference Proceedings, Boston Ma, June 1990. pp 931-940.

45. Shina, S., "Quality Improvement Methods for Printed Circuit Fabrication & Assembly", NEPCON SOUTHEAST Conference Professional Advancement, Orlando Florida, November 1989.

46. Shina, S. Wu J. and Lowell, C., "Optimizing the new HOLLIS wave solder machine", American Supplier Institute Seventh Symposium Proceedings, Phoenix, Arizona, October 1989. pp 101-115.

47. Shina, S., "Reducing Defects in a Printed Circuit Wave Soldering Process using the Taguchi Method". NEPCON EAST Conference Proceedings, Boston, MA, June, 1989. pp 205-224.

48. Shina, S., " An Algorithm for selecting soldering flux for cleaning and surface conductivity", NEPCON WEST Conference Proceedings, Los Angles, California, March, 1989. pp 1064-1070.

12

49. Shina, S., "Reducing Solder Wave defects in a Printed Circuit Board Wave Soldering Process", <u>American Supplier Institute's Sixth Symposium Proceedings</u>, Dearborn Michigan, October 1988. pp 123-144.
50. Shina, S., "Justification for Dry-Film Photoresist Process", <u>American Electroplater's Society Sixth Annual PC Conference</u>, March 1977.

**<u>Papers published in general conferences and magazines (29 papers published)</u>**

1. Shina S and Morose G., "Transitioning to Lead-Free Electronics: Now a Business Necessity", New England Environmental Journal, September 2005.
2. Shina S. and Morose, G., "Lead Free Conversion Analysis for multiple PWB materials and processes", SMT Journal, January 2005
3. Shina S. And MacFadden T., "lead Free Conversion issues in Component and PWB Surface Finishes", SMT Journal, May 2004, p73
4. Previous paper translated to Korean for Chomdan Publishing Company in Korea.
5. Shina, S., "Process Changes Face Industry", Mass High Tech, June 2-8, 1997
6. Shina, S., "UMASS Lowell Students team with Business", Mass High Tech, June 2-8, 1997
7. Shina S. and Christafides, S., "Putting Quality Tools to Good Use, A Practical Approach", Printed Circuit Fabrication, Vol. 15, No 10, October 1992, pp 36-39
8. Shina, S., "Benefits of Concurrent Product/Process Development", <u>HP Corporation Executive Conferences</u>, Palo Alto CA, June, September, December 1986.
9. Shina, S., "Mechanical Engineers go CAD", <u>HP Monitor Magazine</u>; March 1986
10. Shina, S., "Mechanical Design and Test", <u>HP engineering Symposium</u>, Lexington MA, December 1985.
11. Shina, S., "A PIP of a Process", <u>HP Engineer</u>, June 1985
12. Shina, S. and Peschler, R., "CAD/CAM, A revolutionary way of the future", <u>HP Monitor Magazine</u>, October 1984.
13. Shina, S., "The Technologist", paper presented at <u>Keeping Pace with Change, The Challenge for Engineers</u>, a joint conference of Northeastern University College of Engineering in Collaboration with the Massachusetts High Technology Council, September 1984. Proceedings pp 103-108
14. Shina, S., "Trendshot Release, A Bold Change for the 1980's", <u>HP Monitor Magazine</u>, September 1982
15. Shina, S., "Water Purification Project at MED", <u>HP Monitor Magazine</u>, 7/1977.
16. Shina, S., "Automatic Insertion of Components", <u>IEEE Manufacturing Technology Conference</u>, Waltham MA, February 1976.
17. Shina, S., "Optimized Soldering processes using the Taguchi Method", presented at the <u>British Electronics Conference</u>, Birmingham, England, 3/1991.

18. Shina, S., "Automatic Testing at HP Medical", <u>IEEE Manufacturing Technology Conference</u>, Waltham Ma, March 1975
19. Shina, S., "Cleaning PC Boards", <u>Circuits Manufacturing</u>, July 1974
20. Shina, "Manufacturing technology at MED", <u>HP Monitor Magazine</u>, February 1974.

Co authored the following Hewlett Packard Manufacturing Standards: (1977-81).

21. PC Design for Manufacurability Guideline
22. PC Design and layout Guidelines
23. PC Pin/Receptacle system Guidelines
24. PC Assembly Process Guidelines
25. PC Assembly Workmanship Guidelines
26. PC Automatic Component Insertion Guidelines
27. Shina, S.,Tufts Ph.D. Thesis. "Technology Based Cost Modeling of Printed Circuit Boards", Professor Anil Saigal, Advisor, June 1998
28. Shina, S., WPI Masters of Science Thesis, " Microprogramming, Design Considerations", Professor N. Sondak, Advisor, September 1972.
29. Shina, S., MIT Senior Thesis, "Simulation of the Massachusetts Transportation Authority (MTA) System", Professor E. Roberts, Advisor, August, 1967.

**2b. Papers/Talks presented at conferences as invited speaker (60 total).**
1. Keynote speaker, Pan Pacific conference sponsored by the SMTA, Kona, HI, January 2006
2. Speaker for the American Society of Quality, Manchester NH, February 2005
3. Speaker at he September meeting of the Toronto Chapter of the SMTA, Toronto, Canada, November 5th, 2004
4. Speaker for the ME department technical forums, October 2004
5. Speaker at he September meeting of the Boston Chapter of the SMTA, Boxborough, MA, September 16, 2003
6. Quoted in The Mass High Tech Journal editorial, Bay State takes the lead out", Nov 11, 2002
   http://www.masshightech.com/displayarticledetail.asp?art_id=61052&sec_id=43
7. Quoted in the Lowell Sun article on "Lead Free Electronics", published November 7[th], 2002,
   http://www.lowellsun.com/Stories/0,1413,105%257E4744%257E976553,00.html?search=filter
8. Quoted in the Mass High Tech Journal about lead free electronics, published on November 11[th], 2003
9. Lead Free Research Summary, TURA Coordinators Conference, Best Western Royal Plaza and Trade Center, Marlborough, April 23[th] 2002.
10. Lead Free Electronics Workshop hosted by Schnieder Electric Wilmington, MA, April 10, 2002.

14

11. "Lead Free UMASS Consortium", conference sponsored by the Strategic Envirotechnology Partnership (STEP), Boston MA , November 2nd, 2001
12. "Lead Free at UMASS Lowell", Workshop on Modeling and Data Needs for Lead-Free Solders, sponsored NEMI, NIST, NSF, and TMS, Thursday, February, 2001, New Orleans, LA, lead free research summary  by Dr. Shina
13. Speaker to the State of Massachusetts Legislative committee on education policy, UMASS President Bulger's Office, May 4th, 2000.
14. Seminar speaker on Lead Free Electronics, TURI Planner continuing education conference, Marlboro, MA. April 26th, 2000
15. Career and Skill Upgrade Seminar Leader on Design for Quality using Six Sigma and Cpk Methods, ASME April 18th, 2000 Meeting, Cambridge, MA
16. Panelist, Lead Free Electronics Symposium, Sponsored by TURI, at Lucent Corporation, Haverhill, MA, April 13, 2000.
17. Speaker to the Havestan Technical Facility, Turkish Airforce, Ankara, Turkey, August 1999.
18. Speaker to the Mechanical Engineering Department, Cape Tecknicon University, CapeTown, South Africa, March 1999.
19. Speaker to the Boston Chapter SMTA, "Applying SPC to the SMT Manufacturing Process", November 1998
20. Symposium Panelist, American Loudspeaker Manufacturers Conference, Las Vegas Nevada, January 1998.
21. Keynote Speaker, Electronics Industries Forum, IEEE, May 1997
22. Speaker to the Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996
23. Speaker to the Globatronics Conference, Singapore, October 1996.
24. Keynote Speaker, NAFEM Association, Cincinnati Ohio, January 1996
25. Speaker to the UMASS Lowell SME Student branch, on recruiting for the SME, February, 1994.
26. Speaker to the UMASS Lowell ASME Student branch, on future employment opportunities, November 1993.
27. Speaker, Mortorola Incorporated Six Sigma Institute Conference, Dallas Texas, October 1993.
28. Keynote Speaker, Australian Surface Mount and Printed Circuit Board Association SM93 Conference, Sydney, Australia, August 1993.
29. Panelist for the session on Concurrent Engineering: Innovation, Speed and Service, Western Regional Conference, sponsored by the American Society of Quality Control and the American Society of Naval Engineers, Oxnard California, February 1993.
30. Speaker for on Concurrent Engineering, Advanced Technologies in the Electronics Industry Conference, Tel Aviv, Israel, January 1993.
31. Guest speaker on Concurrent Engineering, ,Joint Meeting of the ASQC - APICS - SME societies of  Danbury Connecticut, January 1993.
32. Plenary speaker at the MEXICON 92 conference in Guadalajara, Mexico on October 1992.
33. Colloquium speaker on Concurrent Engineering to the Engineering faculty of Iteso University Guadalajara, Mexico, October 1992.

15

34. Speaker to the IEEE Guadalajara chapter, October 1992.
35. Invited to be keynote speaker at the International Society for Hybrid Microelectronics (ISHIM) Southern California Chapter Conference, May 1992.
36. Speaker on Concurrent Engineering to the University of Pennsylvania MSME program, November 1991
37. Symposium Speaker on Concurrent Engineering, IEEE Advanced Semiconductor Manufacturing Conference, Boston MA, 10/91
38. Invited to speak to the Hong Kong Productivity Council and the Hong Kong Branch of SME on "Concurrent Engineering", 11/91.
39. Invited to speak on "Robust Design" at the Quality Conference sponsored by the Technical University in Medellin, Columbia on TQM, 8/91.
40. Speaker on "Concurrent Engineering", delivered to Itek Corporation, 7/91
41. Speaker on "Total Quality Management", MACOM Waltham on 4/91
42. Speaker on "Concurrent Engineering", delivered to the SME CASA/CIM professional societies in March 1991.
43. Speaker on "Concurrent Engineering and Design for Manufacture ", IEEE Boston Chapter, Minuteman Lexington High School, January 1991.
44. Speaker on "University of Lowell Engineering Students' activities," Leadership Conference, Society of Manufacturing Engineering, Ludlow MA, 12/ 1990
45. Invited to critique United Technologies, Hamilton Standard Division Program on Concurrent Engineering, Windsor Locks, Connecticut, December 1990.
46. Speaker to the student chapter of the Society of Manufacturing Engineers (SME) on Design for Manufacture, November 1990.
47. Invited to critique Parker Brothers "World Class Manufacturing Program", October 1990.
48. Speaker on "Printed Circuit Design for Manufacture", Valid Users Group Northeast Region Meeting, October 1990
49. Interviewed by Electronic Products and Packaging (EPP) Magazine on Design for Manufacture, September 1990 issue.
50. Invited to critique GENRAD Corporation Quality Program in September 1990.
51. Speaker on "Design for Manufacturing", Distinguished Speaker lecture Series Gordon Institute, June 1990.
52. Session leader on "Total Quality for the Manufacturing Enterprise", Company Wide Quality Conference sponsored by the University of Lowell, April 1990.
53. Speaker on Quality Methods for Engineers and their Managers, Company Wide Quality Conference, sponsored by the University of Lowell, 11/ 1989.
54. Speaker on Quality and Productivity, Digital Equipment Corporation Senior Executives, November 1989.
55. Lecture on Taguchi Methods in the University of Lowell Seminar series on the Assurance Sciences and Technologies, October 1989.
56. Speaker on "Design for Manufacturing, " Manufacturing Technology Conference sponsored by Bay State Skills Corporation and Associated Industries of Massachusetts, May 1989.
57. Speaker on Industry/Academic Corporation, joint meeting with Wang Incorporated, Presented to the Brookings Institute guests at the University of Lowell, May 1989.

16

58. Speaker on Taguchi Methods, Hollis Automation, Nashua NH, January 1990.
59. Speaker on Quality Methods, Wang Incorporated, Lowell MA, 12/1989
60. Speaker on Taguchi Methods, Boston University Manufacturing Engineering
    faculty, November 1988.

17

### SERVICE ACTIVITIES

**1. Professional Leadership and Achievements**

1. I established the **Umass Lowell Lead Free consortium**, consisting of several local and national companies to sponsor and assist in the research. The original companies included BTU International, North Billerica, MA, Sanmina (formerly Hadco) Corporation; Tech Center East, Ward Hill MA; Multicore Solders; Richardson, Texas; Raytheon Corporation;, Lexington, MA; Solectron Massachusetts Corporation, Westborough, MA and Texas Instruments, Attleboro, MA. Companies that joined the consortium this year include MACOM of Lowell, MA, a division of AMP, which has been acquired by Tyco Industries and Shneider Automation (formerly Modicon) of North Andover, MA. I was funded by various sources for this research including TURI for sponsoring graduate students and research activities, and from companies in the consortium. The total amount exceeds $50,000. I helped TURI with annual conferences to the local supplier base area on the conversion issues of Lead free electronics. These were offered free to local companies to assist then with lead free conversion process. New additions in phase III (2004/5) include Skyworks Solutions (Woburn, MA), Teradyne Inc. (North Reading, MA), Textron Systems (Wilmington, MA), DDI Inc. (Newburyport, MA), American Power Conversion (West Kingston, RI) and Benchmark Electronics (Hudson, NH)

2. Design Judge, USA First Robotics Comnpetition; Manchester NH, March 2003, 2004 and 2005

3. Symposium Chair, Manufacturing Enigneering Division, International Mechanical Engineering Congress and Exposition (IMECE), November 1999, Nashville, Tennessee.

4. Design Judge - Milton S. Kiver Awards Competition sponsored by the Electronic Packaging and Production Magazine, 1995, 1999

5. Professor of the Year, ME Department, 1997

6. Awarded a Certificate of Appreciation, for Dedication and Service during the 1995 School Year, from Lowell High School, May 1995.

7. Chaired a session in the Symposium on Production Engineering Division at the Winter Annual Meeting of the American Society of Mechanical Engineers (ASME), in Chicago, Illinois during the month of November 1992: Session PE 4A, Symposium of New Product introduction.

8. Chaired two sessions in the Symposium on Design, Management, and Computers at the Winter Annual Meeting of the American Society of Mechanical Engineers (ASME), in Anaheim, California during the month of November 1992: Session PE 11A: Product Process Interactions, and session PE 6A, Group Technology and Knowledge Management.

9. Invited as the plenary speaker at the MEXICON 92 conference in Guadalajara, Mexico on October 19 - 21, 1992. While in Guadalajara, lectured to the faculty of Iteso University and the IEEE chapter there.

18

10. Founding member and a member of the Board of Directors, Massachusetts Quality Award, 1991- 1993
11. Nominated to the Board of directors for the Society of manufacturing Engineering (SME) Electronics Manufacturing Committee, 1992, 1993.

*Journal Reviewer for the Following 7Journals:*
12. "Computer Magazine",
13. "Journal of Manufacturing Science and Engineering"
14. "TAPI magazine"
15. University of Road Island Transportation Center Peer Review
16. IEEE Publications
17. IEEE Spectrum Magazine
18. Machine Vision and Applications
*Book reviewer for the following 8 books and manuscripts*
19. "Design Process", by
20. "Evolvable Design of Experiments: Applications for Printed Circuit Boards", by Octavian Iordache, CRC Press
21. " A Facilitator's Guide to Usability Testing," J. McWane, to be published by Prentice Hall, Upper Saddle River, NJ
22. "Concurrent Project Management", by Q. Turtle, to be published by Van Nostrand Reinhold, New York.
23. "Introduction to Control Systems Technology" by R. Bateson, to be published by Merrill Publishing Company, Columbus Ohio.
24. "Concurrent Engineering" by J. Torino, published by Van Nostrand Reinhold, NY
25. Tool and Manufacturing Engineers Handbook (TMEH) Volume 6 Handbook, Design for Manufacturability, published by the SME (Society of Manufacturing Engineers), Dearborn Michigan.
26. "Handbook of Electronics Manufacturing Engineering", 2nd edition, by Richard Matisoff, to be published by Van Nostrand Reinhold, New York.
27. Founding member of an Innovative Products Research and Services Incorporated (IPRS), a non-profit educational, scientific and charitable 501(c) (3) organization incorporated in the Commonwealth of Massachusetts. IPRS is an inventor support service, which performs early stage market and manufacturing evaluations. IPRS was able to obtain two grants from the Department of Energy in 1991 and 1992 as part of DOE's States' Inventors Initiative.
28. Appointed as a founding member of the student activities' team of the Society of Manufacturing Engineering (SME), New England Region.
29. Appointed in 1992 as an examiner for the Massachusetts Quality Award, having been a founding member of the Massachusetts Quality Award Council.
30. Chairman of the SME (Society of Manufacturing Engineers) Robotics Chapter 293, New England Region, 1991-1997

19

31. Chairman of the Quality Function Deployment for NEPCON (National Electronic Packaging Conference), annually attracting over 30,000 design, quality and manufacturing engineers from throughout the country.
32. Selected as the Speaker on Engineering Productivity for Hewlett Packard Corporation to Senior Management (CEO's and VP's) of Customer Corporations in 1986, 1987.
33. "Excellence in Design" Award for the HP Waltham Waste Water Treatment plant from the Metropolitan District Commission of Massachusetts in 1982.

## 2. Service to the University

### 2.1 Student advising

1. Advisor to the Industrial Technology Classes of 1988-1994.
2. Advisor to Mechanical Engineering Students, Freshman Classes 1996-Present

### 2.2 Committee Membership

1. In working with the curriculum committee, I developed a proposed program for a Manufacturing Engineering Curriculum. This was part of a proposal to convert the Industrial Technology Department to Manufacturing Engineering.
2. Manufacturing Engineering Course Development Committee
3. Member of the Mechanical Engineering Department Graduate Committee.
4. Developed three courses in the MMS graduate programs.
    A.    20.525 Computer Integrated Manufacturing (CIM)
    B.    20.572 Design for Manufacture (DFM)
    C.    20.575 Robust Design
D. Developed Two courses for the Mechanical Engineering Department
    A.    22.571 Concurrent Engineering /Quality; renamed Collaborative Engineering
    B.    22.575 Industrial Design of Experiments

### 2.3 Service to the Department

1. Developed the microelectronics manufacturing laboratory for manufacturing education, research and training for students, faculty and the local manufacturing companies. Selected, ordered and installed the equipment in a competitive bidding process.
2. Member of the Mechanical Engineering department graduate committee.
3. Chairman of the ME advisory Committee 4th and 5th annual Conferences.
4. Coordinated the Mechanical Engineering series of seminars offered to the Industrial Community, summer of 1993
5. Assisted in the ARPA grant development for Manufacturing Engineering Education.
6. Advisor to ME freshman students.
7. Capstone Course Coordinator
8. Active in developing and tabulating Graduating Students and Alumni Surveys

20

**2.4 Service to the College of Engineering**

1. Member of the College Rank and Tenure Committee; Spring 2003
2. Member of the College of Engineering Repositioning Task Force, Spring 2002
3. Graduate coordinator for the Manufacturing Systems Engineering Option for all the graduate students in the College of Engineering. All the graduate coordinators in the Engineering Departments approved this program. The programs are explained in several memos attached to this package and have been in operation in 1989-1994. This option was be replaced by the new manufacturing concentration in Mechanical Engineering under the direction of professor Parking.
4. Company Wide Quality Seminars, University of Lowell Continuing Education

Provided technical assistance, recruited faculty and coordinated activities in the Total Quality Management and The Productivity/Quality tools in Engineering and Manufacturing Seminars, which are short and intensive versions of the courses I teach. A list of the seminars provided is as follows:

1. *Taguchi Methods*, offered March 1989, March 1990 and June 1990.
2. *Design for Manufacturing*, offered March 1989, May 1989, January 1990, June 1990 and January 1991.
3. *Total Quality Management* offered January 1991.
4. *Soldering Methods* offered November 1989.

Other Activities

5. Member of the Graduate Faculty membership committee.
6. Member of the College of Engineering Computer Needs Committee.
7. College representative in the Watertown Arsenal Manufacturing Development Park Committee.

**2.4.1 College of Engineering COOP Coordinator**

1. Coordinated the revival of the College of Engineering COOP program 1997
2. Ran several meetings with the department managers to outline rules/procedures
3. Coordinated with the Dean and the Office of Career Services on issues of policy and administration of the COOP program
4. Worked with the department coordinators on issues of students activities and jobs
5. Worked with local companies on advertising and recruitment of students and jobs
6. Published the first coop manuals for students and companies
7. Ran the COOP and Internship Fair in April 98. More than 400 students and 30 companies participated.
8. The program achieved its initial goal of 10% of students in the engineering college during the first year of its implementation

**2.5 Service to the University**

1. Faculty Senate representative from the ME department Spring 2005

21

2. Coordinator of the Graduate Certificate Program: Design and Manufacturing Engineering
3. Member of the Committee for "Strategic Plan to Strengthen Lowell 1998-2005 Development Plan", Chaired By Professor Best.
4. Member of the Committee for Manufacturing option for the MBA degree for the College of Management
5. Member of the Chancellor's Federation for the Industrial Economy
6. Member of the ARPA Technology Reinvestment Program proposal Committee of Industrial Extension, Commonwealth of Mass.
7. Member of the ARPA Technology Reinvestment Program proposal Committee, Southern New England Academy
8. Member of the Work Environment Pilot effort on technology review of fatal accidents
9. Assisted in the College of Management Re accreditation process

## E. TEACHING
### 1. Principal Thesis / Project Advising:
### 1a. Completed, Mechanical Engineering Department (19 students)

1. Optimal Reliability Design Method for Remote Solar Systems", Nuchida Suwaparet, Doctor of Mechanical Engineering Thesis, September, 2005
2. "Bio Solar House", Ittipon Tungaray, Master's of Mechanical Engineering Thesis, September 2004; Committee Member
3. "Comparison Of The Performance Of U.S. And Japanese Aluminum Bats Using U.S. And Japanese Test Protocols", Shintaro Nabeshima, Master's of Mechanical Engineering Thesis, May 2004; Committee Member
4. "Experimental and Finite Element Study of the Design Parameters of Baseball Bas", Gayatri Vedula, Master's of Mechanical Engineering Thesis, May 2004; Committee Member
5. "Characterization of the effects of use and Moisture Content on Baseball Bats..."; Patrick Drane; Master's of Mechanical Engineering Thesis, March 2003; Committee Member
6. "Design for Reliability, Remote Communication system using solar power", Nuchida Suwapaet, ; Master's of Mechanical Engineering Thesis, November 2002; Committee Member
7. "Lead Free Soldering". Hemant Belbase, Master's of Mechanical Engineering Thesis, September 2000.
8. Terence Lee Master's of Mechanical Engineering Thesis, Committee Member; 1999
9. "Additive PCB Fabrication Technology", Dennis, Gagne, Master's of Mechanical Engineering Thesis, May 1998.
10. "NO Clean SMT Paste for PCB Assembly,", Doug Summer, Master's of Mechanical Engineering Thesis, May 1997.
11. "Failure Prediction Analysis in Machining Pin Fin Heat Sinks, Hoke Bullard, Master's of Mechanical Engineering Thesis, May 1997 (committee member)

12. "A study of high speed, high volume product assembly process with respect to scrap reduction issues", Lisa Silva, Master's of Mechanical Engineering Project, December 1996
13. "A paperless system for manufacturing assembly automation", Farzad Majzoubi , Master's of Mechanical Engineering Project, December 1996
14. "Optimization of a touchscreen sensor manufacturing process", Julie Kimble, Master's of Mechanical Engineering Project, December 1996
15. "Experimental design of an injected mold RF insulation Material ", Steve Paradis,  Master's of Mechanical Engineering Project, May 1996
16. "Development of a no clean soldering flux", Paul Hailey, Master's of Mechanical Engineering Thesis, completed May 1994,
17. "Developing a tolerance analysis methodology with case studies", Sreedhar Godula, Master's of Mechanical Engineering Project, completed 8/93.
18. "Design of an aircraft industry riveting system", Kurpad Ram, Master's of Mechanical Engineering Thesis, completed 6/92.
19. "Optimization of the performance of the weldlines in injection molded products using robust design methods", Srinath Narayan, Master's of Mechanical Engineering Thesis, completed 5/92.

1b. In Progress, Mechanical Engineering Department (1 student)
1. "Developing Vias Build Up Methodology for Additive Technologies in the Printed Circuit Wiring Board (PWB) Fabrication Industry", Manmeet Grover

1c. Completed, MMS In Manufacturing Engineering Program (17 students)
1. "Just-In-Time Manufacturing in a regulated industry", Nasser Heshmatpour, Master of Manufacturing Engineering Project, completed 5/92
2. " Concurrent Engineering for the Defense Industry", John Hart, Masters of Manufacturing Engineering Thesis, completed May 1992
3. "Implementation of ISO 9000 in American Manufacturing Companies", Mark Alpert, Masters of Manufacturing Engineering Project, completed December 1991
4. "Optimizing IC Welding", Bob Mullins, Masters of Manufacturing Engineering Project, completed December 1991
5. "Simulation of Assembly Systems using SAIMAN", Bill Guest, Masters of Manufacturing Engineering Thesis, completed December 1991
6. "Simulation Language Applications in Job Shop Scheduling", Nancy Barnes, Masters of Manufacturing Engineering Project, completed December 1991
7. "Design for Robotics Assembly", George Lloyd, Masters of Manufacturing Engineering Project, completed December 1991
8. "An Algorithm for conversion of Printed Circuit Board from Through Hole to Surface Mount Technology", Suzan Lanza, Masters of Manufacturing Engineering Project, completed December 1991.
9. "Eliminating CFC's from Electronic Manufacturing Processes", Betty Drake, Masters of Manufacturing Engineering Project, completed December 1991
10. "Technical training program for engineering computer tools", Norm Fisk, Masters of Manufacturing Engineering Project, completed May 1991

23

11. "Process Optimization in Distribution Systems", Ven Cen Chang, Masters of Manufacturing Engineering Project. completed May 1991. Mr Chang was nominated the outstanding graduate student in the Industrial Technology Department.
12. "Optimization of Stress Testing using Taguchi Method", Sana Wakim, Masters of Manufacturing Engineering Project, completed May 1991
13. "Expediting in a Job Shop", Jean Shine, Masters of Manufacturing Engineering Thesis, Completed 9/90.
14. "Evaluations and Implementation of Terpene as a Printed Circuit Cleaning Solvent" Greg Hamblet, Masters of Manufacturing Engineering Thesis, Completed 5/90.
15. "Optimized Processing and Cleaning of Hybrid Integrated Circuits", Keith Capulli, Masters of Manufacturing Engineering Project, Completed 4/90.
16. "Optimizing The Wave Soldering Process for Mixed Technology of Through Hole and SMT Components", James Wu, Masters of Manufacturing Engineering Project, Completed 12/89.
17. "Design of a Wheel Chair Carry-On", James Jollife, Masters of Manufacturing Engineering Project , Completed 4/89.

**1d. Thesis / Project Advising, other Engineering Departments**
1. "A study on the effect of process parameters on the spring constant of a manometer spring", Samir Seth, master of Plastics Engineering, Thesis Committee, April 2001

**2. Courses taught**
**2.1 Graduate**

| | | |
|---|---|---|
| 22. 571 | Concurrent Engineering | 7 years |
| 22.575 | Industrial Design of Experiments | 7 years |
| 20 525 | Computer Integrated Manufacturing (CIM) | 3 years |
| 20.572 | Design for Manufacture | 3 years |
| 20.575 | Robust Design | 1 year |
| 20.710 | Graduate Seminar | 1 year |

**2.2 Undergraduate Courses**

| | | |
|---|---|---|
| 22.424 | Capstone Projects | 2 years |
| 22.472 | Manufacturing Systems & Processes | 2 years |
| 22.473 | Design for Manufacture | 3 years |
| 22. 202 | Mechanical Design Laboratory II | 1 year |
| 20.202 | Industrial Computer Science. | 10 years |
| 20.303 | Manufacturing Systems | 5 years |
| 20.407 | Instrumentation and Process Control ( IPC )) | 5 years |
| 20.314 | Motion and Time Study | 5 years |
| 20.309 | Process control | 20 years |
| 20.408 | Microprocessors | 23 years |
| 20.315 | Plant Layout and Material handling | 7 years |
| | Inventory Control and Material Handling | (discontinued) |
| | Tool Engineering | (discontinued) |

24

## 2.3 Courses Upgraded/developed

Undergraduate Courses

25.108 Introduction to Engineering II. Completely revamped this course since taking it over in the spring semester 2004. Included modules for Microsoft word, excel and powerpoint as well as a module for matlab. Provided for several projects for the first ear students to practice computer programming and presentation tools in a fun and rewarding experience.

25.108 Freshman Manufacturing Module. This a 4week Introduction to manufacturing for freshman engineering students

22.472 Manufacturing Systems: New undergraduates course that I developed for Mechanical Engineering Department, Manufacturing Option, spring 1993.

22.473 Design Theory and constraints: New undergraduate course developed for Mechanical Engineering Department, Manufacturing Option, taught in fall 1991.

20.202. Industrial Computer Science. I have changed this course from a FORTRAN Programming course to a one of solving engineering problems.

20.407 Instrumentation and process control (IPC): This course is divided into two sections: traditional control theory and microprocessor programming. I have completely revamped the microprogramming portion with plc.'s

**Graduate Courses**

22. 571. Collaborative Engineering and Quality: A new course that I developed for the Manufacturing Engineering Option for the Mechanical Engineering Masters Program, combining elements of the following graduate courses that I taught at the MMS program.

20. 525 Computer Integrated Manufacturing (CIM). This course was previously taught over two semesters by guest lectures. Using my notes, I have revamped and consolidated the course into one semester.

20.575. Robust Design. The course deals with the subject of Design of Experiments and the Taguchi Method.

## 2.4 Teaching Load

| Course | Course Title | Contct Hours | Credit Hours | Enrol ment | Total StudentH | Total Credit Hours |
|--------|--------------|--------------|--------------|------------|----------------|---------------------|
| 2004/2005 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 Design Constraints | 3 | 3 | 27 | 81 | 81 |
| IG | 22.571 CE/Quality | 3 | 3 | 7 | 21 | 21 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 2003/2004 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 Design Constraints | 3 | 3 | 31 | 93 | 93 |
| IG | 22.571 CE/Quality | 3 | 3 | 7 | 21 | 21 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 2nd semester | | | | | | |
| 1U | 25.108 Freshman Design | 2 | 2 | 65 | 130 | 130 |
| 4U | 22.423 Capstone | 3 | 3 | 16 | 48 | 48 |

25

| | | | | | | |
|---|---|---|---|---|---|---|
| 1G | 22.575 Ind. Design Expts | 3 | 3 | 14 | 42 | 42 |

**2002/2003**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 36 | 108 | 108 |
| IG | 22.571 CE/Quality | 3 | 3 | 16 | 48 | 48 |
| 4U | 22.423 Capstone | 3 | 3 | 2 | 6 | 6 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.423 Capstone | 3 | 3 | 20 | 60 | 60 |
| 1G | 22.575 Ind. Design Expts | 3 | 3 | 26 | 78 | 78 |

**2001/2002**
1st semester
Sabbatical

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 20 | 60 | 60 |
| 4U | 22.423 Capstone | 3 | 3 | 4 | 15 | 15 |
| 4U | 22.473 Design Constraints | 3 | 3 | 16 | 48 | 48 |

**2000/2001**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 20 | 60 | 60 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 30 | 90 | 90 |
| 4U | 22.423 Capstone | 3 | 3 | 5 | 15 | 15 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.108 Intro Eng DFQ (3w) | 3 | 2 | 50 | 100 | 100 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 1G | 22.571 CE/Quality | 3 | 3 | 18 | 54 | 54 |

**1999/2000**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 28 | 71 | 71 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 12 | 36 | 36 |
| 4U | 22.423 Capstone | 3 | 3 | 12 | 36 | 36 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.108 Intro Eng DFQ (3w) | 3 | 2 | 42 | 84 | 84 |
| 4U | 22.424 Capstone | 3 | 3 | 7 | 21 | 21 |
| 1G | 22.571 CE/Quality | 3 | 3 | 27 | 91 | 91 |

**1998/1999**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 20 | 60 | 60 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 15 | 45 | 45 |
| 4U | 22.423 Capstone | 3 | 3 | 5 | 15 | 15 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 3 | 9 | 36 | 27 |
| 1G | 22.571 CE/Quality | 3 | 3 | 15 | 45 | 45 |

**1997/1998**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 DFM | 3 | 3 | 20 | 60 | 60 |

26

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.424 Capstone | 2 | 2 | 30 | 60 | 60 |
| 4U | 22.423 Capstone | 4 | 4 | 10 | 40 | 40 |
| 2nd semester | | | | | | |
| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 4 | 8 | 32 | 32 |
| 1G | 22.571 CE/Quality | 3 | 3 | 25 | 75 | 75 |
| Summer semester | | | | | | |
| 4U | 22.423 Capstone | 2 | 2 | 10 | 20 | 20 |
| 1996/1997 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 DFM | 3 | 3 | 23 | 69 | 69 |
| 4U | 22.423 Capstone | 2 | 2 | 13 | 26 | 26 |
| 2nd semester | | | | | | |
| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 4 | 7 | 28 | 28 |
| 1G | 22.575 DoE | 3 | 3 | 25 | 75 | 75 |
| Summer | | | | | | |
| 4U | 22.423 Capstone | 2 | 2 | 10 | 20 | 20 |
| 1995/1996 | | | | | | |
| 1st semester | | | | | | |
| 1U | 25.105 Intro Eng DFM (3w) | 3 | 2 | 170 | 72 | 48 |
| 4U | 22.473 DFM | 3 | 3 | 33 | 99 | 99 |
| 4U | 22.423 Capstone | 2 | 2 | 7 | 14 | 14 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 25 | 75 | 75 |
| 2nd semester | | | | | | |
| 1U | 25.105 Intro Eng DFQ (4w) | 3 | 2 | 170 | 145 | 97 |
| 4U | 22.423 Capstone | 4 | 4 | 7 | 28 | 28 |
| 4U | 22.473 DFM | 3 | 3 | 16 | 48 | 48 |
| 1G | 22.575 DoE | 3 | 3 | 25 | 75 | 75 |
| 1994/1995 | | | | | | |
| 1st semester | | | | | | |
| 1U | 25.105 Intro Eng DFM (3w) | 3 | 2 | 170 | 109 | 73 |
| 4U | 22.473 DFM | 4 | 3 | 17 | 68 | 51 |
| 4U | 22.423 Capstone | 2 | 2 | 4 | 26 | 26 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 19 | 57 | 57 |
| 2nd semester | | | | | | |
| 1U | 25.105 Intro Eng DFQ (4w) | 3 | 2 | 170 | 145 | 97 |
| 1U | 25.105 Fortran (6w, 2 cls) | 3 | 2 | 30 | 39 | 26 |
| 4U | 22.483 Capstone | 4 | 4 | 4 | 52 | 52 |
| 2U | 22.211 Statics | 3 | 3 | 22 | 66 | 66 |
| 1993/1994 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 DFM | 4 | 3 | 17 | 68 | 51 |
| 4U | 22.483 Capstone | 2 | 2 | 13 | 26 | 26 |
| 1G | 22.571 Concurrent Eng. | 3 | 3 | 19 | 57 | 57 |
| 2nd semester | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.472 | Manuf Systems | 3 | 3 | 17 | 68 | 51 |
| 4U | 22.423 | Capstone | 4 | 4 | 13 | 52 | 52 |
| 2U | 22.202 | Mech. Design Lab. | 3 | 2 | 60 | 180 | 180 |

1992/1993 1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 20.407 | IPC | 3 | 3 | 37 | 111 | 111 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 37 | 37 | 37 |
| 4U | 22.473 | DFM | 3 | 3 | 17 | 51 | 51 |
| 4U | 22.483 | Capstone | 4 | 2 | 4 | 8 | 8 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.472 | Manuf Systems | 3 | 3 | 8 | 24 | 24 |
| 4U | 22.423 | Capstone | 4 | 2 | 4 | 8 | 8 |

1991/1992
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 28 | 84 | 84 |
| 4U | 20.407 | IPC | 3 | 3 | 55 | 165 | 165 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 55 | 110 | 55 |
| 4U | 22.473 | DFM | 3 | 3 | 12 | 36 | 36 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.573 | DFM | 3 | 3 | 45 | 135 | 135 |
| G | 20.575 | Robust | 3 | 3 | 42 | 126 | 126 |
| G | 20.710 | Seminar | 3 | 3 | 15 | 45 | 45 |

1990/1991
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 26 | 78 | 78 |
| 4U | 20.407 | IPC | 3 | 3 | 60 | 180 | 180 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 60 | 180 | 60 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.573 | DFM | 3 | 3 | 32 | 96 | 96 |
| G | 20.575 | Robust | 3 | 3 | 25 | 75 | 75 |

1989/1990
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 25 | 75 | 75 |
| 4U | 20.407 | IPC | 3 | 3 | 35 | 105 | 75 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 35 | 105 | 35 |

2nd Semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.572 | DFM. | 3 | 3 | 30 | 90 | 90 |
| 2U | 20.202 | Ind. Comp. | 3 | 3 | 16 | 48 | 48 |

1988/1989
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.525 | CIM | 3 | 3 | 19 | 57 | 57 |
| 4U | 20.407 | IPC | 3 | 3 | 45 | 135 | 135 |
| 4U | 20.407 | IPC Lab | 2 | 1 | 45 | 135 | 45 |
| 2U | 20.202 | Ind. Comp.. | 3 | 3 | 55 | 165 | 165 |

2nd Semester

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 20.572 | DFM. | 3 | 3 | 27 | 81 | 81 |

28

| 4U | 20.407 | IPC* | 3 | 3 | 30 | 45 | 45 |
| 4U | 20.407 | IPC Lab* | 2 | 1 | 30 | 45 | 15 |
| 2U | 20.202 | Ind. Comp. | 3 | 3 | 18 | 54 | 54 |

29

**2.5 Specific programs in which faculty member participated to improve teaching and competence.**

**In the last 3 years**

Attended following Seminars and training courses:

1. Apex Conference; Anaheim, CA, February 2004-05
2. ASME Manufacturing Conference, Chicago; March 2003
3. Product Life Management (PLM), Chicago, IL, November 2002
4. SMT International, Chicago IL, September 1999-2005
5. Engineering Design Conference; London; July 2002

**In prior years**

1. Technicon University, Cape town South Africa March 1999
2. ICED, Munich Germany, August 1999
3. ASME WAM, Nashville, November 1999
4. CEA, (Coop Education Association); Salt lake City, UT, June 2000
5. Workshop on Modeling and Data Needs for Lead-Free Solders, sponsored NEMI, NIST, NSF, and TMS, Thursday, February, 2001, New Orleans, LA,
6. Etronix Conference, Anaheim, CA, February 2001
7. CEA (Coop Education Association), Atlanta, GA, March 2001
8. MRS (Materials Research Society), Boston, MA, November 2001
9. SMT soldering, SUNY, Binghampton, New York, 5/88.
10. Witness Simulation Training, Lowell MA, 4/89
11. Computer Integrated Manufacturing, Hewlett Packard, 6/88
12. Axiomatic Theory of Design, MIT, 7/88
13. Taguchi Methods Conference, ASI, Detroit MI, 1989-1990
14. NEPCON West, Los Angles, California, 1989 - 1999
15. NEPCON Singapore, 1991, 1993
16. NEPCON Australia, 1998
17. NEPCON EAST, Boston, 1989-1999
18. NEPCON SOUTHEAST, Florida and Texas, 1989, 1998
19. IPC, San Diego CA, 1990
20. British Electronic Week, Birmingham, England, 1991
21. SMT International, San Jose CA, 1991-1995
22. IEEE Advanced Semiconductor Manufacturing Conference, 1991
23. SME International Conference on Education, San Diego, 1996
24. Puerto Rico Technical University SMT Conference, 1995-1997
25. ASME Winter Annual Conference, 1991-1999

**2.6 Teaching Effectiveness**

Rated in the highest rank by students and fellow faculty members from the University of Massachusetts Lowell and other engineering faculty from around the country. I submit he following facts in this session and in appendix C to substantiate this claim

1. Undergraduate and graduate student feedback is always rated at the top of all items.

30

2. All my undergraduate manufacturing option courses in the Mechanical
Engineering Program are heavily oversubscribed.

**2.6.1 Ratings by UML ME Students evaluations in the last 4 years:**
My students always gave me excellent reviews of my courses, both at the Under-
graduate and the graduate levels. I am enclosing the results of the my students
evaluations for last two years to demonstrate. These are the summaries of
student evaluations taken at the last day of the semester. The y were collected
by fellow students and delivered to the department according to the rules.

As can be seen by the many positive comments, my students rate my
efforts as well as my courses as being mostly exceptional and very effective. For
the last three years I received the following evaluations:

**1997**
22.473 Design Theory and Constraints; Undergraduate (19 students):
Rating of instructor 14  excellent         4 good        1 average        0 bad
22.423 capstone; Undergraduate (8 students):
Great experience, Thank you very much
**1998**
22.473 Design Theory and Constraints; Undergraduate (29 students):
Rating of instructor 19 excellent       9 good       1 average       0 bad
Rating of course    22 Effective    7 relative Eff.    0 Barely Eff.    0 not
worth it
22.423 capstone; Undergraduate (5 students) :
Great capstone, found it information and educational, applied studies to real
world solutions. I enjoyed working with Professor Shina, This was a great
experience.
22.575 Design of Experiments; Graduate (16 students)
Rating of instructor 9 excellent    6 good        2 average        0 bad
Rating of course    11 Effective    5 relative Eff. 0 Barely Eff.    0 not worth it
**1999**
22.473 Design Theory and Constraints; Undergraduate (27 students):
Rating of instructor 12 excellent    6 good        9 average        0 bad
Rating of course    13 Effective    9 relative Eff.    4 Barely Eff.    0 not
worth it
22.423 capstone; Undergraduate (11 students) :
Great experience, Shina was helpful; structured meetings, thanks for being open;
I found out that this is not the type of manufacturing career I want
22.575 Design of Experiments; Graduate (11 students)
Rating of instructor 4 excellent    7 good        0 average        0 bad
Rating of course       6 Effective    5 relative Eff. 0 Barely Eff.    0 not worth
**2000**
22.423 capstone; Undergraduate (5 students):
Great Capstone, found it informational and educational, applied studies to real
world solutions, I enjoyed working with professor Shina, This is a great industrial
experience

31

## 2.7. Mentoring of students

The best proof of appreciation by the students is their letters of support obtained during a long teaching career. **Some comments and quotes written by former students:**

-You did an excellent job of keeping us up to date on recent trends in the areas of PCB

-I was impressed with the hands on project work you encouraged them to do

-Shina is far more than a great professor. His ambition, loyalty and dedication to his students reaches beyond that which my education at Lowell has lead me

-I can honestly say that without personal support, encouragement, advice and coaching I received from Dr. Shina during and after my college career, I would never have made so far in business so quickly

-You are one of the most talented instructors at UML. It is very rare to see instructors care for their students as you have

-Shina enabled me to gain the experience and knowledge I needed to seek employment. He is sincerely concerned about his students, and goes out of his way to help them in any way he can, either in the classroom, or a professional work environment. (he) is an excellent professor, advisor and friend to many students.

- His teaching style created and maintained interest by the students. He welcomed comments and dissenting opinion which were always grounds for further class discussions....(He) is an advocate for the students and a credit to the profession and the University.

-I benefited from his vast knowledge of the latest manufacturing trends....He also extended himself to reach students beyond the classroom and help them in their professional career.

-Shina is a credit to the academic excellence of the faculty....Thank you for the time and for the education you have provided me with...

-My successes are a direct result of Shina understanding of how real world industry works and what types of skills employers desire. He is able to skillfully guide a hard working student along a path that allows them to piece the experience and academics together necessary to become an immediate contributor to world class manufacturers.

-Professor Shina works to ensure that his students take the initiative in their professional growth before they leave the university and uses his industry contacts

to assist in placing students in (jobs).

-he has not only been an excellent professor, but also a supportive friend

-I feel that he had taught me many different tools that I still use today in everyday work... (he) also found me an internship as an ME through his many contacts...

-My success in the semi-conductor industry is in many ways attributable to Shina's instruction at UML...His (courses) gave me insight into ...techniques that I have put to practical use countless times. My boss...cited my experience ...gained during capstone project as one of the actor that convinced him to hire me

32

-He helped me with my resume, helped to build to build my personality, and directed me in a career path that I travel to this day….(his) characteristics are…intelligence, patience, integrity, knowledge, dependability and ability to teach…

-Shina is concerned with the welfare of his students, and he has taken time to counsel them and support them in their career research. He provided advice to many of my classmates individually on improving their resumes, and he was an invaluable resource because f his industry knowledge and networking contacts at many different local companies. He has assisted many of his students with finding successful careers.

-My association with Shina has continued throughout my professional career. He has been involved at work projects at two of my post graduate companies…his knowledge of state of the art PC assembly and design techniques has made him a valuable resource to myself and many of my colleagues over the years.

-his class was very instructional and well taught, and I have used many of these principles and methods he emphasized in my work as a design engineer.

-I have seen Shina help so many of his students obtain jobs. He makes the whole process so much easier for he students, He has helped in so many ways and I am sure he will continue to help me in the future. Students in the ME department are very fortunate to have a professor like him.

-My employment opportunity was due to a large part to the courses I was fortunate enough to partake with professor Shina (courses)

-Only after completing my course of study at Lowell did it became aware to me just how important these (shina) courses are..

-Not only is he clear, up to date on current industrial concepts and trends, and very open to questions and discussions, but he also displays a genuine interest and concern for his students after they have moved on to pursue their careers

- Dr. Shina has a magical presence in the class.  Classes were very lively with interaction between everyone in the class.  As a student with "zero" industry experience I had a wonderful opportunity to meet and interact with dozens of students from industry.

**2.8 Help with Industry Contacts to secure Manufacturing Jobs for UML ME Students**

I have made it a personal goal of mine to make sure that UML ME graduates are gainfully employed in the local economy. Approximately 50 % of the ME undergraduate students become directly employed in manufacturing or manufacturing related industries. I am enclosing the job survey for the ME graduates for the last four years. My thesis or capstone students and those who went to manufacturing jobs are highlighted. The list shows that I have advised the largest number of students in the manufacturing area in the Master's program.

**2.9 ME Personnel Committee Academic Review  (PMYR 2001)**

Received an accepted rank as follows:

33

**Teaching:** He has a heavy load primarily at the graduate level. He is invaluable in teaching and coordinating our capstone design courses

**Service:** He is the College COOP coordinator. He also does a lot of unsung work connecting our students and graduates up with contacts in industry. He is active in the professional societies

**Research:** He has an extensive record of funded research and publications. He is the author or two books and completing a third.

34

**TAB B**



FIG. 1.



# Quick-Tilt
# CONSTANT FORCE SYSTEM

Quick-Tilt® is quiet, corrosion-resistant and comes preassembled to easily install in residential, tilt-window applications. For quick assembly, it was designed for the pivot bar to easily drop-in and tie-in to the carrier. Its alternating coil design prevents cantilevering or twisting of the carrier that can diminish locking performance. Quick-Tilt® remains hidden during normal sash operation, requires no adjustment and, of course, performs reliably. It is rated Class 2 on the American Architectural Manufacturers Association (AAMA) Verified Components List.



**COVER (OPTIONAL)**
Encloses spring assembly.
Minimizes contamination
by debris.

**PREASSEMBLED STAINLESS STEEL SPRINGS**
Greaseless, corrosion-resistant springs uncoil against each other in opposite directions to minimize friction and maximize smooth, silent operation.

**BUMPER (OPTIONAL)**
Used in place of a stop.
Prevents carrier from
colliding with spring
assembly.

**DIE CAST METAL CAM**
For strength and durability.

**TAMPERLOK (RECOMMENDED)**
This safety feature, when snapped into the carrier, prevents the homeowner from accidentally detaching the sash.

**TIE-IN PIVOT BAR**
When seated in the carrier, it secures the sash to the frame, preventing the sash from accidentally detaching or falling out.

Fig. 2.

# Quick-Tilt*nc
### CONSTANT FORCE BALANCE



## *"New Construction" friendly Quick-Tilt®*

If new construction debris was holding you back from considering a Constant Force balance, you now have a dependable solution with Caldwell's **Quick-Tilt*nc** balance.



Caldwell's pre-assembled **Quick-Tilt** Constant Force balance just got better with its evolution to the **Quick-Tilt*nc** – or "new construction" friendly version. Until now most Constant Force balances weren't ready for the abuse caused by construction site dust and debris. With the launch of **Quick-Tilt*nc**, air-borne contaminants are kept from lodging inside the moving coil assembly. The integrated coil nest and cover is specifically engineered to keep the coils dust-free and operating in the smooth, quiet manner for which **Quick-Tilt** balances are renowned.

**Call us at 585-352-3790. Let's talk about <u>your</u> window.**

FIG. 3.



Fig.4.



**Series 86xt**
# BLOCK & TACKLE SYSTEM

The Caldwell Series 86xt is a result of our long tradition of continuous improvement in design, engineering and manufacturing. It is built for sideload applications in both residential and commercial windows and is rated Class 2 on the American Architectural Manufacturers Association (AAMA) Verified Component List. The Series 86xt is designed to allow for quick and easy removal of the sash. Because it rides with the sash, the balance is hidden from view during operation. In addition, the Series 86xt is engineered to allow for an additional 1" of sash opening (egress). Often this can reduce inventory by moving to all-even or all-odd channel lengths.

**GALVANIZED STEEL CHANNEL**
Provides maximum strength, corrosion resistance and durability.

**HEMMED EDGES**
For greater safety when handling.

**RE-ENGINEERED BOTTOM GUIDE**
Specially designed to allow for application advantages in PVC welded sash. The sash side contact area has been lengthened, creating an option to increase sash opening.

**SPRINGS BY CALDWELL**
We've made our own springs for over 100 years, continually improving our manufacturing process to deliver high quality and consistent performance.

**MUSIC WIRE**
This high-quality material is more fatigue-resistant and has a greater consistency of performance than the hard-drawn and oil-tempered steel commonly used by other balance manufacturers.

**STAMPED METAL**
Our parts are made of stamped metal for maximum durability.

**GUIDE BLOCK**
Designed to dampen sound during operation and prevent twisting of the tackle.

**INDEPENDENTLY ROTATING PULLEY WHEELS**
Selected specifically for their lubricity, low frictional characteristics and resistance to developing flat spots, allowing for remarkably smooth and consistent operation.

**SELF-ALIGNING STAINLESS STEEL HOOK**
The balance mounting hook is positively parked in a fixed position when retracted. Installation into the window is easier than ever. Pull-off strength of the corrosion-resistant crimped terminal exceeds maximum load by more than 2 times. The low profile of the hook minimizes clearance issues, and only requires a single jamb punch.

Fig. 5.

C000499

1. D
12. G
13. B
18. D

FIG. 6.



**CALDWELL**

**Series 86xt**
BLOCK & TACKLE SYSTEM

Extended travel
for sideload applications

C000498



FIG. 8.



Fig. 9



FIG. 10.

Confidential -- Attorneys' Eyes Only

CL017418



Fig 11.



# Series 97i
## BLOCK & TACKLE SYSTEM

The Caldwell Series 97i is a result of our long tradition of continuous improvement in design, engineering and manufacturing. It is built for fin applications in both residential and commercial windows and is rated Class 2 by the American Architectural Manufacturers Association (AAMA). Caldwell invented the Inverted Balance design which brings significant benefits to the Block & Tackle user. Designed to ride with the sash, the balance is hidden from view during operation. So, no jambliner is required. The attached carrier provides for faster installation thereby reducing labor costs. And, the design maximizes the all-important egress opening.



**ATTACHED CARRIER DESIGN**
No assembly required. Design allows for faster installation and easier field change-out.

**GALVANIZED STEEL CHANNEL**
Provides maximum strength, corrosion resistance, and durability.

**ROUNDED CORNERS**
For handling safety, our steel channel has gently rounded corners.

**SPRINGS BY CALDWELL**
We've made our own springs for over 100 years, continually improving our manufacturing process to deliver high quality and consistent performance.

**GUIDE BLOCK**
Designed to dampen sound during operation and prevent twisting of the tackle.

**MUSIC WIRE**
This high-quality material is more fatigue-resistant and has a greater consistency of performance than the hard-drawn and oil-tempered steel commonly used by other spring manufacturers.

**STAMPED METAL**
Our parts are made of stamped metal for maximum durability.

**INDEPENDENTLY ROTATING PULLEY WHEELS**
Selected specifically for their lubricity, low frictional characteristics and resistance to developing flat spots, allowing for remarkably smooth and consistent operation.

**SELF-ALIGNING STAINLESS STEEL TERMINAL**
The terminal automatically aligns itself for quick installation. This corrosion-resistant material is crimped onto the cord ends. Pull-off strength exceeds maximum load by more than 2 times.

Fig 12

C000491

EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT MASSACHUSETTS

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

      Plaintiffs,

      v.

THE CALDWELL MANUFACTURING
COMPANY,

      Defendant.

Civil Action No.  05-10020-DPW

## DECLARATION OF CHRISTOPHER ROGERS

I, Christopher Rogers, hereby declare as follows:

    1.    I am an employee of Elite Detective Services, Inc, a company that maintains its regular place of business at 495 Cabot Street, Suite 6, Beverly, Massachusetts.  Goodwin Procter LLP hired Elite Detective Services, Inc. to conduct certain investigative assignments.

    2.    On June 16, 2006, on behalf of Elite Detective Services, Inc., I ordered an Earthwise Window from Tri-State Whole Building Supplies, Inc. by telephone.  The purchase price for this window, including shipping, was $216.94.  The purchase order number was 40184.  This product was shipped via UPS on June 16, 2006.

    3.    Attached as Exhibit 1 is a true and correct copy of an invoice for this Earthwise Window that was purchased from Tri-State Whole Building Supplies, Inc.

    4.    Attached as Exhibit 2 is a true and correct copy of a shipping receipt from UPS indicating that the product was shipped from Tri-State Wholesale to me at my office address.

5.    I received the window on June 21, 2006 and sent it that same day via courier to Terese Dillingham, an attorney at Goodwin Procter LLP.  The window was sent to Ms. Dillingham in its original packing and was not opened.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 23, 2006.

Christopher Rogers

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

      Plaintiffs,

   v.

THE CALDWELL MANUFACTURING
COMPANY,

     Defendant.

Civil Action No. 05-10020-DPW

## DECLARATION OF CHRISTOPHER ROGERS

# EXHIBIT 1



**TRI-STATE**
WHOLESALE BUILDING SUPPLIES, INC.
1550 CENTRAL AVENUE
CINCINNATI, OHIO 45214

1550 Central Avenue
Fax:(513)381-9706
Cincinnati, OH 45214-2955
USA Phone: (513)-381-1231

**ORDER ACKNOWLEDGMENT**

**00040184**

Account#: 99 0001
Branch: TRISTATE
Phone#: ( )- .
Fax#: ( )- .

**BILL TO:**

CASH ACCOUNT

**SHIP TO:**

VIGLIOTTA, DOUGLAS
978-927-4449 CHRIS
978-927-4119 FAX

| | | | | | Page 1 of 1 |
|---|---|---|---|---|---|
| PO#: | | REF:1 DH NC WINDOW | | JOB#:VIGLIOTTA | |
| ORDER DATE: 06/16/06 | SALES | Inside Sales | TYPE: DELIVERY | SHIP VIA: UPS | FRT TERM: |
| EXP DELV DATE:06/16/06 | AGENTS | Kathy Caldon | ORDERED BY CHRIS: | | |

| QUANTITY | UOM | ITEM/DESCRIPTION | PRICE/ UOM | EXTENDED AMOUNT |
|---|---|---|---|---|
| 1 | EACH | EW | 155.00 /EACH | 155.00 |
| | | Earthwise Window | | |
| | | w.PrimeLok, d.Double Hung, W, 32, H, 46 | | |
| | | l.Install Screens, u.RUSH | | |
| | | | | |
| | | SUB-TOTAL | | 155.00 |
| | | | | |
| | | Delivery | | 44.00 |
| | | Surcharge | | 5.00 |
| | | Sales of Material in Ohio | | 12.94 |
| | | TOTAL | | 216.94 |
| | | Payment Tendered | | |
| | | AMEX | | 216.94 |

2% Serv Chrg/Month on Invts over 30 days (24% Annually)
15% Charged on all returned material before 30 days
50% Charged on all returned material after 30 days
NO RETURNS ON SPECIAL ORDERED MATERIAL

| TERMS: | | | |
|---|---|---|---|
| CASH | | Balance | $0.00 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| AMESBURY GROUP, INC., and AMESBURY SPRINGS LTD., <br><br>       Plaintiffs, <br><br>   v. <br><br> THE CALDWELL MANUFACTURING COMPANY, <br><br>       Defendant. |

Civil Action No. 05-10020-DPW

**<u>DECLARATION OF CHRISTOPHER ROGERS</u>**

# EXHIBIT 2

TRISTATE WHOLESALE
(513) 381-1231
THE UPS STORE #2734
2335 BUTTERMILK CROSSING
THE UPS STORE #2734
CRESCENT SPRING  KY 41017

39 LBS  1 OF 1
OS3
AH

SHIP (978) 927-4449
TO: CHRIS ROGERS
495 CABOT ST

BEVERLY  MA 01915-2515



MA 019 9-01

UPS GROUND

TRACKING #: 1Z E09 25Y 03 2692 8898



BILLING: P/P

REF #1: 06131984
REF #2: KMS 61906

ISH 3.30 E2844 54.0A 04/2006



International Shipping Notice - Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). Commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.
For shipping phone, call 1-800-782-7892.

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT MASSACHUSETTS

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

        Plaintiffs,

    v.

THE CALDWELL MANUFACTURING
COMPANY,

        Defendant.

Civil Action No.  05-10020-DPW

## DECLARATION OF TERESE DILLINGHAM

I, Terese Dillingham, hereby declare as follows:

1.      I am an associate in the law firm of Goodwin Procter LLP and counsel of record for plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd. (collectively "Amesbury").

2.      On June 21, 2006, Chris Rogers, an employee of Elite Detective Services, Inc., sent me an Earthwise Window via courier.  I received this window at the offices of Goodwin Procter, located at 53 State Street, Boston, Massachusetts.  The window's packaging was unopened.

3.      At all times since receipt, this window has been kept at the offices of Goodwin Procter LLP.  During this time, I made this window available to Dr. Sammy Shina, an expert witness hired by Amesbury in the present case.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 23, 2006.

                                 *Terese Dillingham*

                                   Terese Dillingham

# EXHIBIT 9

FOCUS - 6 of 218 DOCUMENTS

**CINDY HARPER, Plaintiff-Appellee, v. RICHARD DISMUKES, Defendant-Appellant.**

**No. 98-2160**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*1999 U.S. App. LEXIS 32769*

**October 5, 1999, Argued**
**December 15, 1999, Decided**

**NOTICE:** [*1] RULES OF THE SEVENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1999 U.S. App. LEXIS 37190.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of Indiana, Hammond Division. No. 96-CV-542. Theresa L. Springmann, Magistrate Judge.

**DISPOSITION:** Judgment of the district court AFFIRMED. Harper's motion to dismiss DENIED as moot. Court rejected the call for sanctions as not being appropriate in this case.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant appealed the judgment of the United States District Court for the Northern District of Indiana, awarding plaintiff damages in a negligence action for injuries she sustained in a vehicle accident.

**OVERVIEW:** Plaintiff motorist brought a negligence action against defendant motorist for injuries sustained in a vehicle accident. Plaintiff was awarded damages. The main issue on appeal was whether the district court abused its discretion in allowing plaintiff to introduce into evidence an amended medical report that was not listed as an exhibit in the pretrial order. The court applied the Smith v. Rowe test for determining the admissibility of exhibits not listed on the pretrial order and found the district court did not abuse its discretion in allowing the amended medical report into evidence. Defendant also

contended that the district court violated *Fed. R. Civ. P. 16* by modifying the pretrial order. The court found no violation of *Fed. R. Civ. P. 16* was committed because defendant knew that one of the issues was the severity of plaintiff's back injuries and defendant was not prejudiced by the admission of the exhibit.

**OUTCOME:** Judgment affirmed because the district court did not abuse its discretion in allowing the amended medical report into evidence. Plaintiff's motion to dismiss was denied as moot.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pretrial Matters > Conferences > Pretrial Orders*
*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN1] The appellate court reviews a district court's denial of a motion in limine for an abuse of discretion.

*Civil Procedure > Pretrial Matters > Conferences > Pretrial Orders*
*Civil Procedure > Pretrial Matters > Motions in Limine > General Overview*
[HN2] A trial court should consider four factors in determining whether to allow exhibits not listed on the pretrial order to be received into evidence: (1) the prejudice or surprise in fact of the party against whom the document is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which admission of unlisted documents would disrupt the orderly and efficient trial of the case or of other cases in the court; and (4) the bad

faith and willfulness exhibited in failing to comply with the court's orders regarding pretrial submissions.

*Civil Procedure > Pretrial Matters > Conferences > Pretrial Orders*
[HN3] The purpose of a pretrial order is to inform the litigants precisely what is in controversy. The pretrial order establishes the issues to be considered at trial. Claims and theories not raised in the pretrial order cannot be advanced during the trial.

**COUNSEL:** For CINDY HARPER, Plaintiff - Appellee: Donald P. Levinson, LEVINSON & LEVINSON, Merrillville, IN USA.

For RICHARD DISMUKES, Defendant - Appellant: Thomas E. Rosta, KOPKA, LANDAU & PINKUS, Crown Point, IN.

**JUDGES:** Before Hon. Richard A. Posner, Chief Judge, Hon. Jesse E. Eschbach, Circuit Judge, Hon. Terence T. Evans, Circuit Judge.

**OPINION:**

**ORDER**

Indiana resident Cindy Harper sued Illinois resident Richard Dismukes after his vehicle rear-ended her automobile. A jury awarded her $ 175,000 for injuries she sustained in the accident. The only issue in this appeal is whether the district court abused its discretion in allowing Harper to introduce into evidence an amended medical report that [*2] was not listed as an exhibit in the pretrial order. We affirm.

I.

In November 1996 Harper filed a complaint alleging that Dismukes' negligence resulted in her sustaining permanent and serious injuries and the loss of employment. n1 During discovery Dismukes obtained Harper's medical records. Based on those records, Dismukes' medical expert, Dr. Jonathan Javors, prepared a report in October 1997. He concluded that the collision with Dismukes did not cause or worsen Harper's preexisting back ailments. On March 24, 1998, a week before the trial commenced, the district court issued the pretrial order in which the parties stipulated into evidence all of Harper's medical records, including Dr. Byung Il Hyun's radiology report interpreting the June 1995 MRI. That same day, Dr. Hyun reexamined the MRI films and prepared an amended report. In the amended report Dr. Hyun added that Harper suffered another disc herniation in addition to the disc herniation he noted in his first report. Dismukes' counsel received a copy of the amended re-

port on March 25, 1998. Based on the amended report, Dr. Javors prepared a supplemental report on March 30, 1998. He disagreed with Dr. Hyun and concluded that [*3] Harper had not sustained an additional herniated disc in the accident.

n1 The parties consented to having all proceedings conducted by a magistrate judge pursuant to *28 U.S.C. § 636*(c).

On the first day of trial, March 31, Dismukes filed a motion in limine requesting that Dr. Hyun's amended report not be admitted as an exhibit because "such evidence not provided to defendant's counsel until the eve of trial is highly prejudicial and amounts to unfair surprise." The court denied the motion.

II.

On appeal, Dismukes first argues that the district court erred in denying the motion in limine because the amended medical report was not listed as an exhibit on the pretrial order, and thus its admission on the "eve of trial" was "highly prejudicial." [HN1] We review a district court's denial of a motion in limine for an abuse of discretion. See *Otto v. Variable Annuity Life Ins. Co., 134 F.3d 841, 852 (7th Cir. 1998)*. [HN2] We have stated that a trial court should consider four factors in [*4] determining whether to allow exhibits not listed on the pretrial order to be received into evidence: (1) the prejudice or surprise in fact of the party against whom the document is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which admission of unlisted documents would disrupt the orderly and efficient trial of the case or of other cases in the court; and (4) the bad faith and willfulness exhibited in failing to comply with the court's orders regarding pretrial submissions. *Smith v. Rowe, 761 F.2d 360, 365 (7th Cir. 1985)*; see also, *Ryan v. Illinois Dept. of Children and Family Serv., 185 F.3d 751, 763 (7th Cir. 1999)* (applying same test). Here, as to the first factor, the amended medical report did not significantly prejudice Dismukes because it did not create a new cause of action or raise a significant new disputed issue of fact. With respect to the second factor, Dismukes cured any prejudice he suffered by having his expert, Dr. Javors, prepare a supplemental report in response to the amended medical report. The third factor is not a concern because the amended medical report did not raise new theories, causes [*5] of action, or disputed issues of fact that could have potentially disrupted and lengthened the trial. Finally, there is no evidence in the record that Harper's late submission of the amended medical report was done willfully or in bad faith. Thus, under the Smith test the district court did not

1999 U.S. App. LEXIS 32769, *

abuse its discretion in allowing the amended medical report into evidence.

Next Dismukes contends that the district court, in effect, modified the pretrial order, violating *Federal Rule of Civil Procedure 16*, by admitting the amended report into evidence even though Harper did not make the requisite showing of "manifest injustice." [HN3] The purpose of the pretrial order is to inform the litigants precisely what is in controversy. *Marschand v. Norfolk and Western Rwy., 81 F.3d 714, 716 (7th Cir. 1996).* The pretrial order "establishes the issues to be considered at trial." Id. (quoting *Erff v. MarkHon Indus., Inc., 781 F.2d 613, 617 (7th Cir. 1986)).* Claims and theories not raised in the pretrial order cannot be advanced during the trial. *Marschand, 81 F.3d at 716.* Dismukes argues that because the district court allowed the amended medical [*6] report into evidence, he was prejudiced in violation of Rule 16. Thus, Dismukes' argument turns on whether the additional area of injury described in the amended medical report raises new issues, claims, or theories not contained in the pretrial order.

Our review of the pretrial order in this case makes it difficult for us to envision how Harper's or Dismukes' proposed issues of fact, claims, or legal theories would have been altered if the amended medical report had been available earlier. The pretrial order designates the factual issues, claims, and legal theories as: "negligence of the defendant which was a proximate cause of plaintiff's claimed injuries and damages" and "nature and extent of plaintiff's injuries and damages." Thus, Dismukes knew that one of the issues, in fact the only real issue in the case, was the severity of Harper's back injuries. Dismukes was not prejudiced by the admission of the exhibit at trial, and no violation of Rule 16 was committed. See *Riemer v. Illinois Dept. of Transp., 148 F.3d 800, 805 (7th Cir. 1998).*

For the foregoing reasons we AFFIRM the judgment of the district court. Harper's motion to dismiss is DENIED as moot. Finally, [*7] we reject the call for sanctions as not being appropriate in this case.

AFFIRMED.

# EXHIBIT 10

23 of 34 DOCUMENTS

**HARVEY ALBERT v. WARNER-LAMBERT COMPANY**

**CIVIL ACTION NUMBER 99-11700-RGS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS**

*2002 U.S. Dist. LEXIS 7242*

**April 24, 2002, Decided**

**DISPOSITION:** [*1] Defendant's motion to preclude
expert testimony denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant company
sought to preclude the testimony at trial of plaintiff indi-
vidual's damages expert.

**OVERVIEW:** The individual provided the company
with a final expert report more than a year after the dead-
line for completion of expert discovery. The court re-
jected the company's claim of surprise because the ex-
pert's initial report repeatedly indicated its interim nature.
The court held that because some of the material was
new opinion, the company was prejudiced in that the
expert's deposition had been completed. The court held
that exclusion of the report was too harsh a sanction,
even though the failure to comply with the expert disclo-
sure deadline was not justified or harmless. Accordingly,
the court allowed the expert to supplement his earlier
report contingent upon his being made available for addi-
tional direct deposition testimony at the individual's ex-
pense. The court further held that while the expert's
methodology could be subject to reproach, his survey of
35 nursing homes was statistically reasonable and his
assumptions regarding capture rates, market share, and
projected losses were not so unrealistic as to border on
the ipse dixit. The court noted that lost profits were noto-
riously difficult to estimate where a hypothetical product
was new to the market.

**OUTCOME:** The court denied the motion to preclude
the expert's testimony, but required the expert to be made
available for additional deposition testimony at the indi-
vidual's expense as a sanction.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Disclosures > Manda-
tory Disclosures*
*Civil Procedure > Discovery > Disclosures > Sanctions*
*Civil Procedure > Discovery > Methods > Expert Wit-
ness Discovery*
[HN1] Supplementation of an expert's report in anticipa-
tion of trial may be more the rule than the exception.
Experts, like lawyers themselves, may increase their ef-
forts as trial approaches, and there is no general bar to an
exhibit created in good faith for the expert after initial
discovery. There is, however, a line between supplemen-
tation of expert opinion that has been disclosed, and the
untimely disclosure of expert opinion that is totally unan-
ticipated. In the latter instance, the harsh sanction of pre-
clusion may be warranted, particularly where late disclo-
sure causes prejudice to the opposing party.

*Civil Procedure > Discovery > Methods > Expert Wit-
ness Discovery*
*Evidence > Testimony > Experts > Admissibility*
[HN2] Expert witness testimony may be excluded where
the gap between the underlying data and the expert's
opinion is simply too great. It remains the rule, however,
that trial courts, in evaluating the reliability of expert
opinion, must focus on the principles and methodology
employed by the expert, and not on the conclusions that
they generate.

*Evidence > Testimony > Experts > General Overview*
*Family Law > Marital Termination & Spousal Support
> General Overview*
[HN3] Where an expert's opinion is divorced from all
empirical reality, that in itself is strong evidence that his
underlying methodology is flawed.

*Evidence > Testimony > General Overview*
[HN4] Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

**COUNSEL:** For HARVEY ALBERT, Plaintiff: Albert P. Zabin, Schneider, Reilly, Zabin & Costello, Boston, MA.

For WARNER-LAMBERT CO., Defendant: David A. Barry, Christine M. Netski, Sugarman, Rogers, Barshak & Cohen, Boston, MA.

**JUDGES:** Richard G. Stearns, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Richard G. Stearns

**OPINION:**

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO PRECLUDE TESTIMONY OF PLAINTIFF'S EXPERT

April 24, 2002

STEARNS, D.J.

Defendant Warner-Lambert Company seeks to preclude the testimony at trial of plaintiff Albert's damages expert, Robert Brandwein. Warner-Lambert contends that Brandwein's January 2001 Market Analysis fails to meet the "reliability and assistance" criteria of *Fed.R.Evid. 702.* On March 19, 2002, Albert provided Warner-Lambert with a "final" report intended to flesh out the substance of Brandwein's earlier analysis. Warner-Lambert complains that Brandwein's "supplementation" of his initial report more than a year after the deadline for completion of expert discovery comes as a complete surprise.

Warner-Lambert's claim of surprise is somewhat difficult to digest. Brandwein's January 2001 report repeatedly [*2] flags its interim nature. "The questionnaire is in no way meant to substitute for a complete analysis to determine the market." Ex. E (Market Analysis), at 2. "The following figures are all subject to verification by additional surveys and are all very preliminary." Id., at 18, n.2. "A survey outlining the use of denture cups -- whether they be disposable or reusable is necessary in order to determine accurately the market. Making some reasonable assumptions, we can develop a preliminary estimate of the market." Id., at 19.

[HN1] Supplementation of an expert's report in anticipation of trial may be more the rule than the exception. "Experts, like lawyers themselves, may increase

their efforts as trial approaches, and we do not suggest any general bar to an exhibit created in good faith for the expert after initial discovery." *Fusco v. General Motors Corp., 11 F.3d 259, 266 (1st Cir. 1993).* There is, however, a line between supplementation of expert opinion that has been disclosed, and the untimely disclosure of expert opinion that is totally unanticipated. In the latter instance, the harsh sanction of preclusion may be warranted, particularly where late disclosure [*3] causes prejudice to the opposing party. See *Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 19-21 (1st Cir. 2001); Klonoski v. Mahlab, 156 F.3d 255, 268-273 (1st Cir. 1998).*

This case falls somewhere in between. Some of what Brandwein has now disclosed is new opinion, some of it is simply elaboration on opinions previously disclosed. Warner-Lambert justifiably argues prejudice because Brandwein's deposition has been completed and the deadline for further expert discovery has expired. Albert, for his part, does not seriously dispute the point, but notes that a trial date has yet to be set and that the exclusion of Brandwein's testimony would be tantamount to a death sentence to his case. In these circumstances, a lighter sanction than preclusion is counseled, as Rule 37(c)(1) permits, even in cases where a party cannot demonstrate that its failure to comply with an expert disclosure deadline was justified or harmless. See *Dura Automotive Systems of Indiana, Inc. v. CTS Corporation, 285 F.3d 609, 2002 WL 501027,* at *6 (7th Cir. April 4, 2002). Thus, in lieu of preclusion, the court will allow Brandwein to supplement [*4] his earlier report contingent upon his being made available for up to four hours of additional direct deposition testimony at Albert's expense. Warner-Lambert will also be permitted to supplement its rebuttal report without making its counter-expert available for a further deposition.

Finally, Warner-Lambert asserts that Brandwein's ultimate opinion as to Albert's lost profits is based on unsupported assumptions and a marketing survey too poorly designed and executed to produce statistically reliable results. [HN2] Expert witness testimony may be excluded where the gap between the underlying data and the expert's opinion "is simply too great." *General Electric Co. v. Joiner, 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997).* n1 It remains the rule, however, that trial courts, in evaluating the reliability of expert opinion, must focus on the "principles and methodology [employed by the expert, and] not on the conclusions that they generate." *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 595, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* While Brandwein's methodology may be subject to some reproach, his survey of thirty-five nursing homes [*5] appears statistically reasonable and his assumptions regarding capture rates, market share and

projected losses are not so unrealistic as to border on the ipse dixit. Some allowance may also be made for the fact that in cases where a hypothetical product is new to the market, as reputed lost profits are notoriously difficult to estimate with mathematical precision. See *Rombola v. Cosindas, 351 Mass. 382, 385, 220 N.E.2d 919 (1966).*

n1 Joiner stands for the self-evident proposition that [HN3] where an expert's opinion is divorced from all empirical reality, that in itself is strong evidence that his underlying methodology is flawed. See also *Ruiz-Troche v. Pepsi Cola of Puerto Rico, 161 F.3rd 77, 81* (1st cir. 1998).

To the extent that Brandwein's analysis and ultimate conclusions are open to debate, the rules of evidence provide a remedy. [HN4] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate [*6] means of attacking shaky but admissible evidence." *Daubert, 509 U.S. at 596.*

ORDER

For the foregoing reasons, the motion to preclude Brandwein's expert testimony is DENIED, subject to the sanctions imposed by this decision.

SO ORDERED.

Richard G. Stearns

UNITED STATES DISTRICT JUDGE

# EXHIBIT 11

00001
 1           UNITED STATES DISTRICT COURT

 2           DISTRICT OF MASSACHUSETTS

 3              NO. 05-CV-10020 (DPW)

 4     **************************************

 5     AMESBURY GROUP, INC., and AMESBURY    *

 6     SPRINGS LTD.,                    *

 7                      *

 8        Plaintiffs,          *

 9                      *

10     v.                  *

11                      *

12     THE CALDWELL MANUFACTURING COMPANY,   *

13        Defendant.           *

14     **************************************

15        DEPOSITION OF SAMMY G. SHINA, Ph.D., PE,

16     taken pursuant to the applicable provisions of

17     the Federal Rules of Civil Procedure, before

18     Susan L. Prokopik, Registered Merit Reporter and

19     Notary Public in and for the Commonwealth of

20     Massachusetts, at the offices of Goodwin Procter

21     LLP, Exchange Place, Boston, Massachusetts, on

22     Wednesday, May 3, 2006, at 9:07 a.m.

23

24

**Shina, Sammy, 5/3/06**                    **Page 1**

00021

1    session in the Symposium on Production

2    Engineering Division at the winter annual meeting

3    of the American Society of Mechanical

4    Engineering, ASME. Item three, Symposium Chair,

5    Manufacturing Engineering Division, International

6    Mechanical Engineering Congress and Exposition.

7    IMECE. Gives you an idea of my --

8  Q. Are you a member of the ASME?

9  A. Yes.

10  Q. Do you receive publications from ASME?

11  A. Yes.

12  Q. Do you recall any of those publications having

13    anything in them related to fenestration?

14  A. No.

15  Q. Prior to your engagement as an expert in this

16    case, have you ever read any publication in the

17    field of fenestration?

18  A. No.

19  Q. Prior to your engagement in this case, have you

20    ever read any publication on the subject matter

21    of window balances?

22  A. No.

23  Q. Mr. Shina, did you bring with you today all of

24    the documents and things that you examined and

00022

1    relied upon in preparing your expert reports in

2    this case?

3 A.  I believe the documents are in a box right there.

4 Q.  Does that box contain everything that you

5    reviewed in connection with rendering your expert

6    reports in this case?

7 A.  Correct.

8 Q.  Did you, other than documents, did you review any

9    physical objects in preparing your expert reports

10    in this case?

11 A.  While I was in this building, I did review some

12    products that the plaintiff lawyers have shown

13    me.

14 Q.  Can you tell me from your recollection what those

15    products were?

16 A.  They were examples of Caldwell's products.  I

17    think one was a Quick-Tilt.  One was an 86xt.

18    And one was a 97ez.

19 Q.  Did you see only one of each of those items or

20    did you see more than one of each?

21 A.  I might have seen more than one Quick-Tilt.

22 Q.  Do you know how many Quick-Tilt products you

23    examined?

24 A.  I believe it was two.  One of them I had seen

00023

1    very, very quickly.

2  Q.  Do you remember how the two Quick-Tilt balances

3    differed that you examined?

4  A.  One was a single coil and one was a multiple

5    coil.

6  Q.  Did the multiple coil have two coils or three

7    coils?

8  A.  Two coils.

9  Q.  Were either of those Quick-Tilt products placed

10    inside a window jamb?

11  A.  Yes, they were.

12  Q.  Were both of them placed inside a window jamb?

13  A.  My recollection is only one.

14  Q.  How many window jambs did you examine while you

15    -- I'm sorry.  Let me rephrase it.

16        How many window jambs did you examine

17    prior to rendering your reports in this case?

18  A.  One.

19  Q.  Was the 86xt that you examined installed in any

20    window jamb?

21  A.  No.

22  Q.  Was the 97ez that you examined installed in a

23    window jamb?

24  A.  No.

00024

1 Q. Did you examine a 97i or a 97ih product of

2   Caldwell?

3 A. No.  Physical products you mean?

4 Q. Yes, yes.

5 A. No.

6 Q. Were there any other physical things other than

7   paper documents that you examined in rendering

8   your expert reports?

9 A. No.

10 Q. Did you ever examine a fully assembled window

11   prior to rendering your expert reports?

12 A. Fully --

13 Q. Assembled window assembly.

14 A. The only time that I looked at it, I was in Home

15   Depot on another matter and I happened to pass by

16   the window section and I examined that.

17 Q. Could you tell me what you saw there at Home

18   Depot?

19 A. The window that I saw was a tilt window.

20 Q. Do you know what brand?

21 A. No.

22 Q. Do you know if it was single hung or double hung?

23 A. It was double hung.

24 Q. Did you examine the balance that was used in

**Shina, Sammy, 5/3/06**                    **Page 24**

00025

1    connection with that tilt window?

2  A.  Yes, I did.

3  Q.  Do you recall what style of balance or type of

4    balance it was?

5  A.  It was none of the ones that I looked at or the

6    patents that I looked at at that time.  It was in

7    the middle of the case so I've seen patents at

8    different times so it was none that I recognized

9    at that time.

10  Q.  Do you recall any details of the construction of

11    the balance of that window?

12  A.  No, no.  I just examined it a few seconds.

13  Q.  Are you familiar with the three main types of

14    window balances?

15        MR. SINGER:  Objection.

16  A.  I am familiar with only the physical models that

17    I saw in the patents.

18  Q.  Do you understand that in the window balance

19    industry there are different combinations of

20    mechanical parts that may be used to accomplish

21    the same result to balance a window?

22        MR. SINGER:  Objection.

23  A.  Could you repeat that question?  I'm not exactly

24    sure.

**Shina, Sammy, 5/3/06**                    **Page 25**

# EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMESBURY GROUP, INC., and )
AMESBURY SPRINGS LTD., )
      Plaintiffs, )
       )      CIVIL ACTION NO.
      v. )      05-10020-DPW
       )
THE CALDWELL MANUFACTURING )
COMPANY, )
      Defendant. )

MEMORANDUM AND ORDER
January 20, 2006

Amesbury Group, Inc. and Amesbury Springs Ltd.
(collectively, "Amesbury") commenced this action against The
Caldwell Manufacturing Company ("Caldwell") for allegedly
infringing three of Amesbury's patents related to window
balances. These are: United States Patents numbered 5,365,638
(the "'638 patent") for "Spring Mounting for Sash Frame
Tensioning Arrangements"; 6,598,264 (the "'264 patent") for
"Block and Tackle Window Balance with Bottom Guide Roller"; and
6,820,368 (the "'368 patent") for "Snap Lock Balance Shoe and
System for a Pivotable Window". In response, Caldwell has filed
counterclaims seeking a declaration that it has not infringed any
of the patents at issue and that Amesbury's patents are invalid
in any event.

    In order to frame the issues in this litigation, I resolve

that the two sentences are separate paragraphs could be read to mean that even without the formation described in the first paragraph, the mounting element does not rotate.  And the only explanation for non-rotation is that the mounting element is be secured to the window frame by a fixing screw.

Despite the ambiguity in the specification, the prosecution history "inform[s] the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  Phillips, 415 F.3d at 1317.  Originally Claim 1 made no mention of the "raised spine ... whereby rotational motion of said mounting means is inhibited."  The patent examiner denied the patent, rejecting Claims 1-5 and 8-9 because they were clearly anticipated by Sterner's "Coil spring counterbalance hardware assembly and connection method therefor", U.S. Patent No. 5,157,808 and Foster's "Spring sash counterbalance", U.S. Patent No. 3,992,751.  It is only when the patentee sought to amend the claims in light of the rejection that he added "said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited."  In explaining the change, the patentee emphasized that "[n]one of the cited art show anti-rotational means which interact with flanged channels to prevent rotation of the

-38-

mounting means."  Consequently, I find that the "whereby" clause

only modifies the description of the "raised spine", not that

description and the preceding clause which is set off by a comma.

Having reached this conclusion, however, I do not mean that

the fixing screw or other fixing method that secures the mounting

element to the window jamb channel cannot contribute to the

substantially stationary position of the mounting element when

the spring is in operation.  There is nothing in the Claims or

the specification that would prohibit attributing any anti-

rotational effect to the method of fixing or securing the

mounting element to the window jamb channel.  The Claims

recognize, for instance, that if a mounting element without a

raised spine was fixed to the channel, it might not rotate or

pivot under minimal stress.  But when the window sash was opened

with a certain amount of force or opened a certain distance, the

force might overcome the anti-rotational inertia effect of simply

being secured by a fixing screw.  Therefore, it is the addition

of the "raised spine" in this patent that inhibits any rotation

of the mounting element under any normal condition.


**Construction** - The mounting means is to be secured in the channel
means.  And the mounting means is to have a raised spine
positioned between and in the same plane as said inwardly turned
opposed flanges of said channel means whereby rotational motion
of said mounting means is inhibited.


**B.   '264 patent**

-39-

1. **Background** - The '264 Patent entitled "Block and tackle window balance with bottom guide roller" improves on the basic block and tackle window balance, and is an alternative to the coiled spring balance.  Block and tackle balances use a combination of a spring and pulleys located within a U-shaped channel[11] to balance the weight of the window sash at any position within the jamb pockets. ['264 Patent, col. 1, ll. 19-22.]  In a basic block and tackle window balance, the channel holds a spring, two pulleys (one that moves pulling the spring and a fixed one) and a roller.  A cord, which connects the pulleys together, is attached to a hook that connects to an opening in a window jamb pocket to secure the balance to the window jamb. ['264 Patent, col. 1, ll. 25-27.]  The assembled channel is attached to the window sash by a "top guide" and a "bottom guide", which help guide the vertical motion of the window balance within the jamb. ['264 Patent, col. 3, ll. 23-27.] The components within the channel work in combination to allow the spring to provide the force to counterbalance the weight of the attached sash at any vertical position within the window frame. ['264 Patent, col. 3, ll. 48-51.]

---

[11] This patent uses the word "channel" in a different way than the '638 patent.  With respect to the coiled spring balance patent, "channel" referred to the window jamb track.  Here, "channel" refers to an actual piece of the block and tackle balance that contains the springs and pulleys.  A window jamb "pocket" in this patent seems to correspond with the window jamb "channel".

# EXHIBIT 13

FOCUS - 13 of 25 DOCUMENTS

**WILLIAM ANDERSON, Plaintiff, v. HOME DEPOT U.S.A., INC., Defendant.**

**CIVIL ACTION NO. 02-11000-DPW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*2004 U.S. Dist. LEXIS 145*

**January 8, 2004, Decided**

**DISPOSITION:** [*1] Defendant's Motion for Summary Judgment was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, an at-will employee, was terminated from the job following his operation of a forklift without a spotter. He sued defendant employer, alleging it discriminated against him on the basis of age in violation of Mass. Gen. Laws. ch. 151B, and was estopped from firing him based on a written provision that a forklift violation would not result in termination. The employer moved for summary judgment on the claims.

**OVERVIEW:** The employee presented as evidence of discrimination against him the fact that when he was transferred, at his own request, and lost his status as a department head; however, he conceded his pay did not change. He also alleged stray discriminatory remarks, such as "you can't teach an old dog new tricks," but those comments were not sufficient to demonstrate an impermissible bias in the workplace, and the comments were not made by anyone with the authority to fire him. He was fired for failing to use a spotter while operating a forklift inside the store. Although there was a manual that contained a written warning that violating the forklift rule the first time would result in only minor discipline and not termination, the issue of whether the employer followed its own regulation was not relevant. The employee failed to show that the employer's motive in firing him was pretextual, or related in any way to his age. Also, the employee had no reasonable right to rely on the printed regulation as a promise that he would not be fired for violating the rule the first time.

**OUTCOME:** The motion for summary judgment was granted as to all claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it has the potential to affect the outcome of the suit under the applicable law, and a genuine issue is one that may reasonably be resolved in favor of either party.

*Labor & Employment Law > Discrimination > Age Discrimination > Federal & State Interrelationships*
[HN2] See Mass. Gen. Laws ch. 151B, § 4(1)(B).

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Mixed Motive*
[HN3] For cases arising under Mass. Gen. Laws ch. 151B, Massachusetts courts have adopted the analytical framework used in federal employment discrimination cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and the Age Discrimination in Employment Act, 29 U.S.C.S. § 621 et seq. Under the framework, a court can analyze a disparate treatment case in one of two ways: The first uses the

burden-shifting pretext framework set forth in McDonnell Douglas Corporation v. Green, and the second involves the so-called mixed-motive analysis.

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Evidence > Procedural Considerations > Burdens of Proof > Initial Burden of Persuasion*
*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*
[HN4] The McDonnell Douglas-Burdine framework involves a three-step analysis consisting of a shifting allocation of evidentiary burdens. In the first step, the plaintiff has the initial burden of establishing a prima facie case by showing: (1) he or she is a member of a class protected by Mass. Gen. Laws ch. 151B; (2) he or she performed his job at an acceptable level; (3) he or she was terminated; and (4) his or her employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's. Once the employee has established a prima facie case, a burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Finally, if the employer offers such a reason, the burden shifts back to the plaintiff who bears the ultimate burden of proof of showing that the employer's proffered reason is mere pretext for unlawful discrimination.

*Labor & Employment Law > Discrimination > Age Discrimination > Defenses & Exceptions > General Overview*
[HN5] The Age Discrimination in Employment Act does not stop a company from discharging an employee for any reason, fair or unfair, or for no reason, so long as the decision to fire does not stem from the person's age.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN6] To sustain the burden of persuasion on pretext, a discrimination plaintiff must demonstrate either that his or her dismissal was (1) more likely motivated by discrimination than by the explanation proffered by the defendant, or (2) the proffered explanation is unworthy of credence.

*Labor & Employment Law > Discrimination > Disability Discrimination > Proof > General Overview*
[HN7] Under the mixed-motive analysis of alleged employment discrimination, a plaintiff need not show that the reason given by the employer is pretextual but rather

need only show that an impermissible motive played a part in the employment decision.

*Labor & Employment Law > Discrimination > Disability Discrimination > Proof > General Overview*
[HN8] The mixed-motive analysis of alleged employment discrimination is limited to those infrequent cases in which a plaintiff can demonstrate with a high degree of assurance that the employment decision of which he or she complains was the product of a mixture of legitimate and illegitimate motives. Thus, to warrant a mixed-motive analysis, a plaintiff must offer strong evidence that proscribed criteria played a motivating part in the employment decision. In other words, a plaintiff must provide evidence that if believed, results in an inescapable, or at least highly probable, inference that a forbidden bias was present in the workplace.

*Labor & Employment Law > Discrimination > Age Discrimination > Proof > General Overview*
[HN9] Stray remarks in the workplace, statements by people without the power to make employment decisions, and statements made by decision makers unrelated to the decisional process itself do not suffice to satisfy the plaintiff's threshold burden that a forbidden bias was present in the workplace. Stray remarks suggestive of impermissible bias do not constitute the sort of evidence that places a case in the mixed motive category and requires the employer to prove that its decision was made only on the basis of legitimate criteria.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
*Labor & Employment Law > Discrimination > Age Discrimination > Proof > General Overview*
[HN10] Although discrimination claims often turn on issues which are ordinarily jury questions, like motive or intent, summary judgment is appropriate where the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
[HN11] The general rule is that an at-will employee may be terminated at any time for any reason or for no reason at all.

*Contracts Law > Consideration > Promissory Estoppel*
*Labor & Employment Law > Employment Relation-*
*ships > At-Will Employment > General Overview*
[HN12] To avoid the entry of summary judgment on an
estoppel claim, a plaintiff at-will employee must show
that he or she reasonably relied on an unambiguous
promise.

*Contracts Law > Consideration > Enforcement of*
*Promises > General Overview*
*Contracts Law > Consideration > Promissory Estoppel*
[HN13] A promise is a manifestation of an intention to
act or refrain from acting in a specified way, so as to
justify a promisee in understanding that a commitment
has been made.

**COUNSEL:** For William Anderson, Plaintiff: William
F. Green, LEAD ATTORNEY, Flynn & Clark, Cam-
bridge, MA.

For Home Depot U.S.A., Inc., Defendant: Robert P. Joy,
LEAD ATTORNEY, Morgan, Brown & Joy, Boston,
MA.

**JUDGES:** DOUGLAS P. WOODLOCK, UNITED
STATES DISTRICT JUDGE.

**OPINIONBY:** DOUGLAS P. WOODLOCK

**OPINION:**

MEMORANDUM AND ORDER

This suit arises out of plaintiff William Anderson's
termination of employment with defendant Home Depot
U.S.A., Inc. ("Home Depot"). Anderson's Complaint
alleges that in firing him, Home Depot discriminated on
the basis of both age and disability in violation of Mass.
Gen. Laws. ch. 151B ("Chapter 151B"); the Complaint
also alleged claims of breach of contract and promissory
estoppel. Home Depot has moved for summary judgment
on all counts, and Anderson opposes the motion only as
to the age discrimination and promissory estoppel
claims. n1 I will grant Home Depot's motion and accord-
ingly dismiss all counts.

> n1 In his opposition brief, Anderson states:
> "Mr. Anderson does not argue his contract, and
> disability/perceived disability counts." Plaintiff's
> Opposition to Defendant's Motion for Summary
> Judgment, at 16. At the hearing, Anderson's
> counsel acknowledged that he was not pursuing
> the contract or disability claims as his opposition
> suggests. I note Home Depot has moved to strike

as untimely Anderson's Opposition Memorandum
and his Statement of Material Facts in Dispute.
However, I choose to address Anderson's opposi-
tion on the merits and deny Home Depot's motion
to strike.

[*2]

**I. BACKGROUND**

Unless otherwise noted, the following facts are un-
disputed. Anderson began working 'at Home Depot in
November 1992 as a sales associate in Home Depot's
Somerville, Massachusetts store. Defendant's Statement
of Material Facts as to Which There is No Genuine Dis-
pute Ex. ("DE") 1, at 26. Anderson never had a written
employment contract with Home Depot, and he under-
stood that his employment was at-will and for an indefi-
nite period of time. n2 Id. at 38, 45-46. Anderson was
originally hired in the Building Department of the
Somerville store, but shortly after beginning work he was
transferred to the Garden Department, where he was
promoted to department head in 1997. Id. at 26-27.

> n2 The Home Depot 1992 Orientation
> Guide/Handbook ("Handbook"), which Anderson
> acknowledges set forth the guidelines for his em-
> ployment, DE 1, at 45, stated:
>
> > Employment with Home Depot is
> > by mutual agreement between
> > each employee and the Com-
> > pany. This employment may con-
> > tinue as long as both parties agree
> > and it may be terminated by either
> > party without notice to the other.
>
> DE 10.
>
> Anderson also signed an "Acknowledgment
> Form" on November 21, 1992, which provided,
> in part:
>
> > Neither the Handbook nor any
> > provisions of the Handbook is an
> > employment contract or any other
> > type of contract.
> >
> > ...
> >
> > I understand that my employment
> > will be for no definite term, such
> > that I will enjoy the right to termi-
> > nate my employment at any time,
> > at my convenience, with or with-
> > out cause or reason. I further un-

derstand that Home Depot will have the same right. This status can only be modified if such modification is in writing and signed by both me and the President of the Company.

DE 11.

Anderson disputes that he read and understood the terms outlined in the Handbook when he signed the form. Plaintiff's Statement of Material Fact in Dispute and Statement of Additional Material Facts that Preclude Summary Judgment, at 2-3. However, in his deposition, he acknowledged that he understood at the time of his employment with Home Depot that he was an at-will employee. DE 1, at 46.

[*3]

In April of 1998, Home Depot, at Anderson's own request, transferred Anderson from the Somerville store to the Tewksbury, Massachusetts store. Id. at 67-68. Anderson was classified as a sales associate, rather than as department head, in the Tewksbury store. n3 Id. at 68. Anderson believed that he had been transferred as a department head, and he inquired with Jason Carter, the Tewksbury store manager, why Carter did not acknowledge his department head position. Carter told Anderson that he would make Anderson department head as soon as Anderson registered for the position on the Home Depot job database in accordance with company procedure. Id. at 79-81. Anderson, however, refused to register because he believed he never had lost the position and therefore should not be required to reapply for it. Id. at 80.

n3 Anderson contends that this change in classification was a de facto demotion. Plaintiff's Statement of Material Fact in Dispute and Statement of Additional Material Facts that Preclude Summary Judgment, at 5. However, in his deposition, he conceded that his pay did not change as a result of the position change. DE 1, at 80-81.

[*4]

On March 21, 2001, Anderson and Doug Romaine, the head of the Garden Department, unloaded an 18-wheel truck in the parking lot using a forklift. DE 2, at 39. On that day, Debra Sheiner, then the Director of Safety for Home Depot's New England Division, happened to be in the Tewksbury store to discuss safety and loss prevention issues with Susan O'Farrell, then the

Controller for Home Depot's New England Division. n4 DE 3, at 36. At some point that day, Sheiner and O'Farrell were in or around the Garden section of the store, and they observed Anderson operating a forklift in the Garden department. Id. at 45. Under Home Depot policy, personnel using a forklift are required to have a "spotter" when inside the building. n5 O'Farrell did a thorough search of the surrounding area but did not find any associates who could have been acting as a spotter. DE 4, at 6.

n4 Sheiner and O'Farrell are currently a Regional Loss Prevention Manager and the Vice President of Finance for the Central Division, respectively.

n5 In February 2001, Home Depot set forth regulations stating that violation of the spotter policy would result in immediate termination. Anderson disputes that these new regulations ever were properly distributed to the New England stores, and he contends that the March 2000 regulations were still in effect in March 2001. DE 15. The March regulations contained a three-step process for spotter violations in which the first violation resulted in a written warning, the second resulted in a final written warning and loss of license for 30 days, and the third violation resulted in termination. DE 14. I discuss the specifics of the spotter policy and its discipline procedures as they relate to specific claims below.

[*5]

Sheiner and O'Farrell reported the incident to Carter who in turn questioned Anderson. Anderson claimed that Romaine and Katie Grenda, another employee, were at various times spotting him. DE 2, at 65-66. Later, Carter told Greg Morris, an assistant manager, to obtain Anderson's forklift license while the incident was investigated further. Id. 79, 81-82. Morris took Anderson's license and also prepared an "Associate Performance Notice" indicating that Anderson's license was suspended, that Anderson would attend forklift re-certification classes, and that any further violations would result in his termination from employment. n6 DE 17.

n6 Anderson claims Sheiner took him directly to Morris, not Carter. Affidavit of William Anderson, P 33. Additionally, the parties dispute whether Carter instructed Morris to prepare the form. Anderson apparently believes that the issuance of the notice, which in essence is a warning, undermines the legitimacy of Carter's subsequent

decision to terminate him for the same violation. Carter, however, testified that he did not know Morris had issued the notice when he decided to terminate Anderson, DE 2, at 82-83, and Morris testified that Carter did not instruct him to prepare the form and he did so out of "habit." DE 6, at 78-79. Anderson testified at his deposition that Morris told him that Carter had instructed Morris to prepare the form. That testimony, however, is hearsay, and I do not consider it for the purposes of this motion. This dispute, in any event, does not materially affect the summary judgment motion.

[*6]

Carter interviewed Grenda and Romaine, and according to Carter, both stated that they were not spotting Anderson at the time Sheiner and O'Farrell saw him operating the forklift. DE 2, at 116-18, 139-40. Both Grenda and Romaine prepared written statements to that effect. n7 DEs 18, 19. On March 27, 2001, Carter prepared a second "Associate Performance Notice" notifying Anderson that his employment had been terminated:

> On March 27, 2001 after investigation, it has been determined that Bill had no spotter while operating a forklift on 3/21/01 in the outside garden area. In violation of company policy, Bill is being terminated for safety violation. (Lift equipment safety standards.)

DE 20. At the time of his termination, Anderson was 54 years old. DE 1, at 9.

> n7 Romaine wrote that he had been unloading with Anderson and had been acting as a spotter but that he had left the area before Sheiner and O'Farrell walked by. DE 18. He stated that he had seen Grenda and thought she could or would spot Anderson during his absence. Id. Grenda, on the other hand, stated that although she had been in the area, she left the area to help a customer before Sheiner and O'Farrell came into the area, assuming that Romaine was spotting Anderson. DE 19.

[*7]

Anderson brought this action in April of 2002 in the Massachusetts Superior Court. Home Depot thereafter removed the case under diversity jurisdiction grounds.

## II. DISCUSSION

### A. Standard of Review

[HN1] Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000),* and a "genuine" issue is one that "may reasonably be resolved in favor of either party." *Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).*

### B. Age Discrimination

Chapter 151B states that [HN2] it shall be unlawful practice:

> For an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment [*8] such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

Mass. Gen. Laws ch. 151B § 4(1)(B).

[HN3] For cases arising under Chapter 151B, Massachusetts courts have adopted the well-established analytical framework used in federal employment discrimination cases arising under *Title VII* and the *Age Discrimination in Employment Act.* See *Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination, 431 Mass. 655, 729 N.E.2d 1068 (2000).* Under the framework, a court can analyze a disparate treatment case in one of two ways: The first uses the burden-shifting "pretext" framework set forth in *McDonnell Douglas Corporation v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973),* and in *Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).* See *Wheelock Coll. v. Mass. Comm'n Against Discrimination, 371 Mass. 130, 355 N.E.2d 309 (1976)* (adopting McDonnell Douglas-Burdine framework for Chapter 151B cases). The second involves the so-called "mixed-motive" analysis established [*9] in *Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989).* See *Wynn, 431 Mass. 655, 729 N.E.2d 1068* (using "mixed-motive" analysis).

Which analysis--"pretext" or "mixed-motive"--applies depends on the type of evidence the plaintiff offers to prove discriminatory intent. If the plaintiff can demonstrate some direct evidence of discriminatory intent, the latter applies, but if the plaintiff can muster only indirect, circumstantial evidence of discrimination the former applies. *Wynn, 431 Mass. at 665-66.* I find that under either analysis, Anderson has not adduced sufficient evidence to create a genuine issue of material fact as to his Chapter 151B age discrimination claim.

### (1) Pretext Model

[HN4] The McDonnell Douglas-Burdine framework involves a three-step analysis consisting of a shifting allocation of evidentiary burdens. *Wynn, 431 Mass. at 665.* In the first step, the plaintiff has the initial burden of establishing a prima facie case by showing: (1) he is a member of a class protected by Chapter 151B; (2) he performed his job at an acceptable level; (3) he was terminated; n8 and (4) his employer sought to fill the plaintiff's [*10] position by hiring another individual with qualifications similar to the plaintiff's. *Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441, 646 N.E.2d 111 (1995).* Once the employee has established a prima facie case, a burden of production shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for the adverse employment action. Id. Finally, if the employer offers such a reason, the burden shifts back to the plaintiff who bears the ultimate burden of proof of showing that the employer's proffered reason is mere "pretext" for unlawful discrimination. *Id. at 442.*

> n8 Anderson at various points refers to his alleged demotion from department head to sales associate upon his transfer to the Tewksbury store. Given that in his Complaint, Anderson alleged discrimination only with regard to his termination, he cannot rely on the alleged demotion as a basis for his age discrimination claim, I find the "demotion" adds no other weight to his Complaint.

Here, while [*11] he can demonstrate the first three elements of a prima facie case, n9 Anderson has not offered any evidence that Home Depot sought to fill his position. Anderson confusingly argues that this element is not relevant to his case because his de facto demotion from department head to sales associate did not involve a specific position but merely involved a change in title. Insofar as his claims concern his termination, rather than his alleged demotion, see supra note 8, Anderson's arguments are misplaced. Accordingly, his claims fail because he has not established the fourth element of a prima facie case.

> n9 Home Depot argues that Anderson has not established the second element--that he performed the job at an acceptable level--because he violated established safety policy. Home Depot, however, confuses its burden to produce a legitimate, nondiscriminatory reason for termination with the job qualification prong of Anderson's prima facie case. Anderson had been an employee at Home Depot for a number of years and had even become a department head at the Somerville store. Thus, I find that his performance was acceptable and that he satisfies the second element of his prima facie case.

[*12]

Even assuming that Anderson can establish a prima facie case, his claim fails in substance because he has not adduced sufficient evidence of Home Depot's discriminatory intent to survive the defendant's well-founded motion for summary judgment. Home Depot has offered a legitimate, nondiscriminatory reason for Anderson's termination: it contends that the reason for his termination was his failure to comply with the forklift safety procedures. Anderson has not produced any evidence that this reason was pretextual and that the real basis for his termination was Home Depot's age discriminatory animus.

Anderson contends that Home Depot's decision to terminate him was not justified for a number of reasons. First, he argues that he did not have proper notice of the new February 2001 safety regulations under which a single violation was grounds for immediate termination. n10 He additionally argues that he did in fact have spotters during the incident leading to his termination and, moreover, that the spotter policy did not even apply to the situation in the first place because its purpose was to protect customers and there were no customers in the area at the time.

> n10 The parties have submitted a barrage of papers related to this issue. Home Depot submitted with its summary judgment motion the affidavit of Aron King, a Home Depot trainer in the Tewksbury store. King stated in his affidavit that in February 2001, he conducted forklift license re-certification classes at the Tewksbury store in which employees were notified of the February 2001 standards and that he specifically recalled that Anderson attended two of those classes. In his opposition brief, Anderson disputed Home Depot's contention that the February 2001 standards were implemented as to him or any other employees in the Tewksbury store, and he has

moved pursuant to *Fed. R. Civ. P. 56(f)* to depose King. Home Depot submitted with its reply brief the affidavits of Kevin Flynn and Lee Anne Dunfey, employees of the Tewksbury store who stated that they attended the certification trainings held by King. Anderson has moved to depose Flynn and Dunfey and to file with his opposition motion the affidavit of Joseph Bucchio who rebutts King's statement.Home Depot in turn has moved to strike Bucchio's affidavit.

Each of these affidavits and motions concern the same issue: whether Anderson (and other Tewksbury store employees) were given adequate notice of the February 2001 standards. Drawing all inferences in favor of Anderson, I assume for the purposes of this motion that he did not have proper notice prior to the March 2001 incident leading to his termination. Even having made such an assumption, I find that summary judgment is appropriate and there is no need to resolve each of the individual motions pertaining to this issue.

[*13]

Even ignoring that such contentions lack evidentiary support, they entirely miss the mark. There is no evidentiary dispute that Sheiner and O'Farrell claimed to have observed Anderson using a forklift without a spotter, which constituted grounds for immediate termination under the safety standards dated February 2001. n11 It is also undisputed that Romaine and Grenda, who Anderson claimed were his spotters at the time made written statements that they were not spotting him at the time. Furthermore, Carter testified in his deposition that in firing Anderson he was aware of and acted pursuant to the February 2001 regulations, which authorized immediate termination for a firsttime spotter violation. Indeed the written performance notice informing Anderson of his termination explicitly stated that his termination resulted from his violation of the forklift safety policy.

> n11 Home Depot's "New England Division Safety Standards for Lift Equipment--Revised February 2001" states:
>
> A spotter must be utilized at all times when operating lift equipment inside store, outside garden and all loading/unloading customer traffic zones. Spotters' responsibilities include insuring the 10 ft zone of safety around all lift

> equipment. This is applicable to all hours the store is open.
>
> ...
>
> *** ANY VIOLATION OF THE ABOVE STANDARDS WILL RESULT IN IMMEDIATE TERMINATION***

[*14]

Whether Anderson had adequate notice of the safety regulations--or whether Home Depot properly applied the regulations to the incident at issue--does not go toward satisfying Anderson's burden of showing that the reason Home Depot has offered is pretext for discrimination. n12 Even if Home Depot's application of its forklift safety policy was not fair--and drawing all inferences in Anderson's favor I will assume it was not--Anderson has not offered any evidence to show the reason was pretextual; in other words, Anderson has not shown that the safety violation was not the real reason that Home Depot fired him and that his age was. See *Freeman v. Package Mach. Co., 865 F.2d 1331, 1341 (1st Cir. 1988)* [HN5] ("[ADEA] does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age.").

> n12 Such questions, however, will be taken up as to Anderson's promissory estoppel claim, as discussed below.

Anderson [*15] argues that Home Depot's discriminatory intent is evidenced both by his alleged demotion from department head to sales associate and by remarks several Home Depot managers made with regard to age. As to the demotion, it is unclear how the change in title--even if it was, as Anderson contends, wholly unjustified--is evidence of discriminatory animus. Anderson, of course, contends that the alleged demotion itself resulted from age discrimination but such conclusory allegations cannot be the evidentiary basis supporting his termination claim. As to the discriminatory remarks, Anderson has identified the following statements:

> (a) Eric Brenner, a co-manager of the Somerville store stated, "You can't teach an old dog new tricks." DE 1, at 89.

(b) Jim Farrell, a department head in the Somerville store and a "guy named John" stated, "All we hire is relics around here." Id. at 90-92.

(c) Chuck Lemphure, a district manager, stated before Anderson's transfer that he did not like department heads over the age of thirty. n13 Id. at 70.

(d) Romaine, in the Tewksbury store referred to Anderson as a "friggin' old fart." Id. at 85.

(e) Greg Morris, an assistant [*16] manager of the Garden Department in the Tewksbury store repeatedly called Anderson "grumpy." Id. at 87.

n13 Anderson alleges that Lemphure became the district manager over the Tewksbury store in 1998.

These remarks, however, do not support the conclusion that the safety violation reason was mere pretext for discrimination. [HN6] To sustain his burden of persuasion on pretext, Anderson must demonstrate either that his dismissal was (i) "more likely motivated" by discrimination than by the explanation proffered by Home Depot, or (ii) the proffered explanation is "unworthy of credence." *Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 35 (1st Cir. 2001)* (quoting *Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*. The remarks are sufficient to do neither.

The evidence in the record indicates that Carter was the sole decision maker with regard to Anderson's termination, and Anderson has not shown that any the remarks were in any way connected to [*17] Carter's decision. While they may be evidence of general discriminatory animus in the workplace, the remarks do not show that discriminatory intent played any role in Anderson's termination, and thus, they are insufficient to prove that Home Depot's proffered reason for Anderson's termination was pretextual. *Straughn, 250 F.3d at 36* (" Mere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance."); *McMillan v. Mass. Soc. for Prevention of Cruelty To Animals, 140 F.3d 288, 301 (1st Cir. 1998)*, cert. denied, *525 U.S. 1104, 142 L. Ed. 2d 772, 119 S. Ct. 870 (1999)* (Probativeness of remarks for pretext inquiry is "circum-

scribed if they were made in a situation temporally remote from the date of the employment decision, or if they were not related to the employment decision in question or were made by nondecisionmakers" (citations omitted)). I therefore find that Anderson's Chapter 151B claim does not survive summary judgment under a pretext model analysis.

### (2) Mixed-Motive Model [*18]

[HN7] Under the mixed-motive analysis, a plaintiff need not show that the reason given by the employer is pretextual but rather need only show that an impermissible motive played a part in the employment decision. *Wynn, 431 Mass. at 666*. Anderson argues that under such an analysis he has adduced sufficient evidence to survive summary judgment because the discriminatory remarks made by Anderson's fellow employees, noted above, show that there was discriminatory intent played a role in his termination.

[HN8] The mixed-motive analysis, however, is limited "to those infrequent cases in which a plaintiff can demonstrate with a high degree of assurance that the employment decision of which [he] complains 'was the product of a mixture of legitimate and illegitimate motives.'" Id. (quoting *Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999)*. Thus, to warrant a mixed-motive analysis, a plaintiff must offer strong evidence that proscribed criteria played a motivating part in the employment decision. *Wynn, 431 Mass. at 667*. In other words, a plaintiff must provide evidence that "if believed, results in an inescapable, or at [*19] least highly probable, inference that a forbidden bias was present in the workplace." Id. (quoting *Johansen v. NCR Comten, Inc., 30 Mass. App. Ct. 294, 300, 568 N.E.2d 611 (1991)*, cert. denied, *410 Mass. 1102, 573 N.E.2d 984 (1991)*.

Anderson has not provided such evidence. Just as the discriminatory remarks to which he points were not sufficiently tied to the decisional context to demonstrate animus for the purposes of pretext analysis, neither do they constitute direct evidence of discriminatory intent for the purposes of a mixed-motive analysis. *Wynn, 431 Mass. at 667* [HN9] ("Stray remarks in the workplace, statements by people without the power to make employment decisions, and statements made by decision makers unrelated to the decisional process itself do not suffice to satisfy the plaintiff's threshold burden in these cases."); *Johansen, 30 Mass. App. Ct. at 302* ("Stray remarks suggestive of impermissible bias do not constitute the sort of evidence that places a case in the mixed motive category and requires the employer to prove that its decision was made only on the basis of legitimate criteria.").

[HN10] Although discrimination claims often turn [*20] on issues which are ordinarily jury questions, like motive or intent, summary judgment is appropriate where "the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)*; *Vesprini v. Shaw Industries, Inc., 221 F. Supp. 2d 44, 53 (D. Mass. 2002)*, aff'd, *315 F.3d 37 (1st Cir. 2002)*; see also *Brunner v. Stone & Webster Eng'g Corp., 413 Mass. 698, 603 N.E.2d 206 (1992)* (summary judgment for defendant where plaintiff failed to offer evidence sufficient to carry burden of persuasion on employer's discriminatory motive); *McKenzie v. Brigham & Women's Hosp., 405 Mass. 432, 541 N.E.2d 325 (1989)* (same). I find that this is such a case, and accordingly, I grant Home Depot's motion for summary judgment as to Anderson's Chapter 151B age discrimination claim.

**C. Promissory Estoppel**

It is clear that Anderson was an at-will employee of Home Depot. Anderson signed an "Acknowledgment Form" on November 21, 1992, which provided, in part:

> I understand that my employment will be for no definite term, such that [*21] I will enjoy the right to terminate my employment at any time, at my convenience, with or without cause or reason. I further understand that Home Depot will have the same right. This status can only be modified if such modification is in writing and signed by both me and the President of the Company.

DE 11. Additionally, Anderson acknowledged at his deposition that he understood the at-will nature of his employment.

[HN11] The general rule is that an at-will employee may be terminated at any time for any reason or for no reason at all. *Upton v. JWP Businessland, 425 Mass. 756, 682 N.E.2d 1357 (1997)*; *Folmsbee v. Tech Tool Grinding & Supply, Inc., 417 Mass. 388, 394, 630 N.E.2d 586 (1994)*. [HN12] To avoid the entry of summary judgment against him on his estoppel claim, Anderson must show that he reasonably relied on an unambiguous promise. *Upton, 425 Mass. at 760*. I find that he can show neither that Home Depot made an unambiguous promise not to fired him for his first spotter violation nor that he reasonably relied on what he viewed as such a promise.

Anderson contends that the February 2001 safety standards, under which a first-time spotter violation would be grounds [*22] for immediate termination, did not apply to him in March 2001 because the standards had not been implemented in the Tewksbury store and he therefore did not have adequate notice of the new standards. It is clear, however, that given the at-will nature of Anderson's employment, Home Depot was not required to give him notice of the change in the grounds for termination, as it could have fired him for no cause at all. Anderson nevertheless contends that by implementing "Critical Operating Safety Standards" in March 2000, which set forth a three-step disciplinary procedure with termination as the third step, Home Depot made an unambiguous promise to him that it would follow that procedure. n14 This argument is entirely without merit.

> n14 Home Depot maintains that even under the March 2000 regulations it had the authority to terminate an employee for a single spotter violation. The standards, however, state that:

> violations of [spotter standard] *will result* in the following: (Up to and including immediate termination)

| * 1st Violation = | Written Warning |
| * 2nd Violation = | Final Written Warning & Loss Of License For 30 Days. |
| * 3rd Violation = | Termination |

DE 14 (emphasis added). Drawing all inferences in Anderson's favor, I find that the issue of whether the March 2000 standards warrant termination for a first-time spotter violation is, at the very least, disputed.

[*23]

Nothing in the March 2000 standards indicates a promise on the part of Home Depot. The March 2000 standards merely set forth several safety guidelines and disciplinary procedures. Nowhere do they state or imply that the standards will apply unless proper notice is given to employees of any changes. [HN13] A promise is a "manifestation of an intention to act or refrain from acting in a specified way, so as to justify a promisee in understanding that a commitment has been made." *Rhode Island Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 849-50, 647 N.E.2d 1174 (1995).* I find no evidence of such manifestation of intention in the March 2000 standards.

Even if an unambiguous promise can be read into the March 2000 standards, Anderson's reliance on such a promise would not have been reasonable. n15 Anderson knew that his employment was at-will. In seeking employment with Home Depot, Anderson submitted a signed application form which stated, in part:

> I hereby further acknowledge that I am expected to abide by all company rules and regulations, written or unwritten, promulgated by the Company, my Store Manager or my supervisor, but that such rules and regulations do not create a contract [*24] between me and the Company or otherwise restrict the right of either me or the company to terminate the employment relationship. I understand these rules and regulations may be subject to change at any time.

DE 9. Additionally, after Home Depot hired him, Anderson signed an "Acknowledgment Form," which stated, in part:

> I understand and agree that the Company may change and modify policies or procedures relating to employment matters without notice to me. I understand and agree these policies and procedures are to

be interpreted and applied by the Company in its sole discretion, whose decision in this regard will be final.

DE 11. Finally, in his deposition, Anderson acknowledged that he knew of a prior instance in which an employee had been terminated for a first violation of the spotter guideline. n16 DE 1, at 154.

> n15 I note here that from a public policy perspective, Anderson's argument is quite unattractive. In essence, he contends that in relying on the standards set forth by Home Depot he should have been able freely to violate the spotter policy with the assurance that he would get at least one more chance before termination.

[*25]

> n16 Home Depot also contends that as a result of a safety violation in 1997, Anderson had been informed in an "Associate Performance Notice" that subsequent safety violations would result in immediate termination. However, the notice states: "Any further instances will result in immediate termination!" DE 12. Because it is unclear whether "instances" refers to the particular type of violation that gave rise to the notice or to safety violations generally, I do not consider it probative for present purposes.

Given this background, Anderson's reliance on the March 2000 standards as an assurance that he would not be terminated for a first-time spotter violation was not reasonable. Thus, I find that Anderson's promissory estoppel claim fails as a matter of law.

### III. CONCLUSION

For the reasons set forth more fully above, Home Depot's Motion for Summary Judgment on all counts is GRANTED.

/s/ Douglas P. Woodlock

UNITED STATES DISTRICT JUDGE

# EXHIBIT 14

## Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31194866 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.
William H. MILLER, Plaintiff,
v.
SUFFOLK COUNTY HOUSE OF CORRECTION,
et al., Defendants.
**No. CIV.A.01-11331-DPW.**

Sept. 27, 2002.

MEMORANDUM AND ORDER
WOODLOCK, District J.
*1 *Pro se* plaintiff William H. Miller filed this
complaint pursuant to 42 U.S.C. § § 1983, 1985 and
*Bivens v. Six Unknown Named Agents of the Federal
Bureau of Narcotics,* 403 U.S. 388 (1971), seeking
monetary damages for alleged denial of certain
pretrial detention credits pursuant to Mass. Gen.
Laws ch. 127, § 129B (confinement while awaiting
trial; reduction of sentence). The Defendants move to
dismiss the complaint for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6).

### I. *Standard of Review*

When confronted with a Rule 12(b)(6) motion to
dismiss, a court must view the facts as presented in
the pleadings, and all reasonable inferences to be
drawn therefrom, in the light most favorable to the
non-moving party. *See Acadia Motors, Inc. v. Ford
Motor Co.,* 44 F.3d 1050, 1055 (1st Cir.1995). A
dismissal for failure to state a claim is appropriate
only if it appears, according to the facts alleged, that
the plaintiff cannot recover on any viable theory.
*Rumford Pharmacy, Inc. v. City of East Providence,*
970 F.2d 996, 998 (1st Cir.1992). The issue is not
whether a plaintiff will ultimately prevail, but
whether he is entitled to offer evidence to support his
claims. *See Vartanian v. Monsanto Co.,* 14 F.3d 697,
700 (1st Cir.1994); *Day v. Fallon Community Health
Plan, Inc.,* 917 F.Supp. 72, 75 (D.Mass.1996).

Ordinarily, if a court takes any documents into
consideration beyond the pleadings, a Rule 12(b)(6)
motion to dismiss must be converted into one for
summary judgment. *See* Fed.R.Civ.P. 12(b).
However, exceptions are made "for documents the
authenticity of which are not disputed by the parties;
for official public records; for documents central to
the plaintiffs' claim; or for documents sufficiently
referred to in the complaint." *Watterson v. Page,* 987
F.2d 1, 3 (1st Cir.1993). Here, both parties have
submitted documents, without opposition, that
appear to fall within the above exceptions.
Accordingly, as will be evident in the discussion, I
have considered certain of those documents without
converting the motion into one for summary
judgment.

### II. *Background*

The following background is taken directly from
plaintiff's complaint and, for purposes here, is
assumed to be true. *See Kiely v. Raytheon Co.,* 105
F.3d 734, 735 (1st Cir.1997). On June 6, 2001, Judge
Hanlon of the Dorchester District Court sentenced
plaintiff in case number 9907-CR-2390 to a term of
90 days at the Suffolk County House of Correction.
*See* Complaint ("Compl."), ¶ 4. This sentence
included six days credit for pretrial detention of
plaintiff from September 27, 2000, through October
2, 2000, in case number 9907-CR-2390. *Id.* Once at
the Suffolk County House of Correction, plaintiff
was granted three additional days credit for his
pretrial detention in case number 9907-CR-2390
from July 28, 2000, through July 31, 2000. *Id.*

Prior to his sentencing on June 6, 2001, plaintiff was
taken into custody and arraigned at the Boston
Municipal Court on January 5, 2001. *Id.* at ¶ 5. The
Judge in the Boston Municipal Court case entered a
bail amount of one thousand ($1,000) dollars cash
bail. The BMC Judge also entered a bail amount of
five hundred ($500) dollars on the Dorchester District
Court charge (9907-CR-2390) and entered a bail
amount of five hundred ($500) dollars on an
outstanding charge from Roxbury District Court. *Id.*

*2 On June 13, 2001, defendant Tina Donovan of
Inmate Legal Services wrote a memo to plaintiff
informing him that his sentence would not be
credited for the pre-trial detention that began on
January 5, 2001. *Id.* at ¶¶ 6-7; *see* Plaintiff's Exhibit
A, p. 1 (indicating that plaintiff would not be credited
for his pretrial detention from January to May
because plaintiff's Boston Municipal Court case was
pending).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 31194866 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

At an unspecified date, plaintiff was interviewed by Clara (a.k.a. Jane Doe) regarding his request for jail credits, and "she left and never returned." *Id.* at ¶ 10(a).

On June 28, 2002, plaintiff filed a legal request form with Suffolk County Inmate Legal Services, *see* Exhibit A, p. 2 (indicating that plaintiff sought to appeal decision not to credit plaintiff for his pretrial detention from January to May), and Joanne Lynds, an employee of the Suffolk County records department, failed to respond to plaintiff's appeal. *Id.* at ¶ 10(c).

On July 9, 2001, Deputy Superintendent Gerard Horgan wrote plaintiff a memorandum informing plaintiff that because his Boston Municipal Case was still open and pending, he could not receive jail credit for his pretrial detention from January through May 2001. *Id.* at ¶ 10(d); *see* Exhibit A, p. 4.

Plaintiff filed the instant action on July 23, 2001, seeking monetary damages and naming as defendants the Suffolk County House of Correction; Richard Rouse, Suffolk County Sheriff; Joanne Lynds; Tina Donovan; Larry Ransford, Suffolk County House of Correction Inmate Grievance Coordinator; Clara a.k.a. Jane Doe, Suffolk County House of Correction Inmate Legal Services employee; and John Doe, Suffolk County House of Correction Department of Releases employee.

### III. *Discussion*

Plaintiff contends (A) the decision to deny him jail credits deprived him of a liberty interest without due process of law; (B) the decision to deny him jail credits deprived him of equal protection of the law; and (C) that the defendants conspired to violate his civil rights.[FN1]

> FN1. In his opposition to the defendants' motion, plaintiff sets forth a new allegation: that "he was coerced into pleading guilty on September 27, 2001, and received a concurrent 8 month BMC sentence." *See* Pl. Mem., p. 3, § 2. I decline to consider that allegation for the purpose of this motion. *See Schneider v. California Dept of Corrections,* 151 F.3d 1194, 1197 n. 1 (9th Cir.1998) (court may not look to additional facts alleged in opposition to motion to dismiss when deciding 12(b)(6) motion); *Shanahan*

*v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996) (plaintiff may not present new allegations in response to dispositive motion); *Scholastic, Inc. v. Stouffer,* 124 F.Supp.2d 836, 851 n. 16 (S.D.N.Y.2000) (parties are not entitled to assert new facts in submissions on a motion to dismiss); *Davis v. Cole,* 999 F.Supp. 809, 813 (E.D.Va.1998) (court may not rely on additional allegations in response to motion to dismiss); *In re Colonial Ltd. P'ship Litig.,* 854 F.Supp. 64, 79 (D.Conn.1994) (plaintiff may not rely on new allegations introduced in response to motion to dismiss).

More fundamentally, this new claim appears to raise an issue that must be presented through a habeas corpus petition rather than a civil rights law suit. I note that to the extent plaintiff seeks to challenge through a damages action the failure to credit him with time spent in custody there is considerable question whether such a challenge is cognizable at this time in this proceeding. *See, e.g., Preiser v. Rodriguez,* 411 U.S. 475, 489-90 (1973) (prisoner challenging the very fact or duration of his physical imprisonment and seeking determination that he is entitled to immediate release or speedier release from such imprisonment must proceed under habeas corpus); *Heck v. Humphrey,* 512 U.S. 477, 486-487 (1994) (where prisoner sought damages, not speedier release, for allegedly unconstitutional conviction, prisoner had no cause of action under § 1983 in absence of independent invalidation of conviction because success of suit would effectively invalidate his underlying conviction and sentence); *Edwards v. Balisok,* 520 U.S. 641, 644-648 (1997) (prisoner's claims about alleged procedural defect at disciplinary hearing resulting in deprivation of good-time credits were not cognizable, in absence of independent invalidation of credit computation, under § 1983 because suit would necessarily imply the invalidity of the deprivation of good-time credits). Although plaintiff could presumably seek relief directly from the sentencing court, he cannot now challenge his confinement or its term through this civil action.

A. Plaintiff's Complaint Fails to Allege Deprivation of *a Liberty Interest Without Due Process of Law*

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 31194866 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. Liberty interests may arise from the constitution itself, statutes, judicial decrees or regulations. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiff complains that defendants violated his liberty interests under the Fourteenth Amendment by failing to credit him with time he spent in custody awaiting trial, before posting bail, for both the Dorchester District Court and subsequent Boston Municipal Court matters. Plaintiff seeks to challenge the practice of awarding sentence deductions, absent court order, only when all cases a prisoner was held on at that time are closed.

Two provisions of the Massachusetts General Laws govern the provision of such deductions to convicted prisoners for time spent in custody awaiting trial. *See* Mass. Gen. Laws ch. 127, § 129B; Mass. Gen. Laws ch. 279, § 33A. [FN2] Section 129B mandates the awarding of such deductions by the facility where the sentence is being served "unless the court, in imposing such sentence had already deducted therefrom the time during which such prisoner had been confined while awaiting trial." *See* Mass. Gen. Laws ch. 127, § 129B. Similarly, *Section 33A* directs the sentencing court to award deductions for "the number of days spent by the prisoner in confinement prior to such sentence awaiting and during trial." *See* Mass. Gen. Laws ch. 279, § 33A.

FN2. Mass. Gen. Laws ch. 127, § 129B, states:
The sentence of any prisoner in any correctional institution of the commonwealth or in any house of correction or jail, who was held in custody awaiting trial shall be reduced by the number of days spent by him in confinement prior to such sentence and while awaiting trial, unless the court in imposing such sentence had already deducted therefrom the time during which such prisoner had been confined while awaiting trial.
Mass. Gen. Laws ch. 279, § 33A, states:
The court on imposing a sentence of commitment to a correctional institution of the commonwealth, a house of correction, or a jail, shall order that the prisoner be deemed to have served a portion of said sentence, such portion to be the number of

days spent by the prisoner in confinement prior to such sentence awaiting and during trial.

*3 The plaintiff's claim that defendants violated his rights by failing to credit him with time he spent in custody awaiting trial for both the Dorchester District Court and subsequent Boston Municipal Court matters is plainly ambitious. [FN3] But I find it has no basis in this proceeding. The sentence on the Dorchester District Court matter by Judge Hanlon provided plaintiff six days credit for pretrial confinement. Under state law, because Judge Hanlon "had already deducted" time for pretrial confinement from plaintiff's sentence, the defendants were not obligated to reduce plaintiff's sentence further. *See* Mass. Gen. Laws ch. 127, § 129B; *see also Commonwealth v. Barriere,* 46 Mass.App.Ct. 286, 290-291, 705 N.E.2d 635 (1999) (noting that "determining whether a credit is due [in a large number of cases] involves an act of adjudication rather than a clerical correction").

FN3. Defendants appear to be correct in noting that plaintiff seeks jail credit that exceeds the sentence imposed and, if awarded, would require plaintiff's immediate release in spite of the sentence.

Although the sentencing statutes should be interpreted "against the backdrop of fair treatment for the prisoner," *Commonwealth v. McLaughlin,* 431 Mass. 506, 515-516, 729 N.E.2d 252 (2000) (citing *Commonwealth v. Grant,* 366 Mass. 272, 275, 317 N.E.2d 484 (1974)), time spent in custody awaiting trial for one crime generally may not be credited against a sentence for an unrelated crime. *Commonwealth v. Milton,* 427 Mass. 18, 23-24, 690 N.E.2d 1232, 1236-1237 (1998) (citing *Libby v. Commissioner of Correction,* 353 Mass. 472, 475, 233 N.E.2d 200 (1968); *Petition of Needel,* 344 Mass. 260, 262, 182 N.E.2d 125 (1962); *Commonwealth v. Carter,* 10 Mass.App.Ct. 618, 620 n. 4, 411 N.E .2d 184 (1980)).

Here, plaintiff was not in danger of serving "dead time" because he was informed that, once he was sentenced on the Boston Municipal Court matter, he would receive the credits in question. *See Commonwealth v. Milton,* 427 Mass. 18, 23-24, 690 N.E.2d 1232 (1998) (fairness governs award of jail credits, and in some circumstances, award of jail credits is permissible to avoid time in confinement for which no day-to-day credit is given against any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 4
Not Reported in F.Supp.2d, 2002 WL 31194866 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

sentence (i.e. "dead time")). Accordingly, plaintiff's rights were not violated by defendants' practice of not awarding a deduction unless all of the cases the prisoner was held on at that time were closed.

Even if, contrary to the facts in this case, plaintiff could establish that the defendants should have credited his Dorchester sentence with time served awaiting trial for both the Dorchester and BMC charges, he would still fail to identify the deprivation of a liberty interest without due process of law cognizable under the federal constitution. *See Bagley v. Rogerson,* 5 F.3d 325 (8th Cir.1993) (allegations concerning erroneous interpretation of state jail time crediting laws stated violation of state statutory or decisional law but did not state a claim for substantive due process violation).

To the extent plaintiff complains that defendants violated state law, "[m]ere violations of state law do not, of course, create constitutional claims." *Roy v. City of Augusta,* 712 F.2d 1517, 1522-1523 (1st Cir.1983). Moreover, "violations of state law-even where arbitrary, capricious, or undertaken in bad faith-do not, without more, give rise to a denial of substantive due process under the U.S. Constitution." *Barrington Cove, LP v. R.I. Hous. & Mortgage Fin. Corp.,* 246 F.3d 1, 6 (1st Cir.2001) (citing *Coyne v. City of Somerville,* 972 F.2d 440, 444 (1st Cir.1992). That is all that is alleged here and that is not enough to support plaintiff's due process claim.

### B. Plaintiff's Complaint Fails to State a Section *1983 Claim Based on the Equal Protection Clause*

\*4 "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U .S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citation omitted); *see also Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). The standard for a violation of equal protection is that (1) the plaintiff, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Rubinovitz v. Rogato,* 60 F.3d 906, 909-10 (1st Cir.1995).

Here, plaintiff has failed to allege any basis for an equal protection claim. He has failed to sufficiently allege any facts demonstrating that he was selectively treated-for impermissible reasons-compared with others similarly situated.

### C. Plaintiff's Complaint Fails to State a *Conspiracy Claim Pursuant to 42 U.S.C. § 1985*

Plaintiff's general assertion of a claim under 42 U.S.C. § 1985 is without basis. Subsection 1985(1) inapposite; it prohibits conspiracies to prevent others from accepting or holding public offices. And subsection 1985(2) is similarly inapposite; it prohibits conspiracies to tamper with jurors and witnesses. In order to bring a claim under subsection 1985(3), plaintiff must allege that the defendants have acted and conspired with "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268-69, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). Plaintiff alleges no facts showing that the acts complained of were the result of discriminatory animus.

### D. *Plaintiff's Complaint Fails to State a Bivens Claim*

Plaintiff's assertion of a claim pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971) is without merit. A *Bivens* action is unavailable against state officials. The Supreme Court in *Bivens* established a cause of action enabling plaintiffs to seek judicial relief against *federal* officers and employees for alleged violations of constitutional rights. Because plaintiff does not bring this action against any federal defendants, his *Bivens* claim is subject to dismissal.

### E. The Suffolk County House of *Correction is Not an Entity Subject to Suit*

Plaintiff's complaint includes the Suffolk County House of Correction as a defendant. Under Rule 17(b), the capacity of a non-individual defendant to be sued is determined by the law of the state in which the district court is located. Fed.R.Civ.P. 17(b). For purposes of litigation, the Suffolk County House of Correction is neither a governmental entity, a legal subdivision of Suffolk County, nor a public body politic. *See generally Kargman v. Boston Water and Sewer Comm'n,* 18 Mass.App.Ct. 51, 55, 463 N.E.2d 350 (1984) (setting out a two-part test for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2002 WL 31194866 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

determining whether an entity is an "independent body politic and corporate" within the meaning of Mass. Gen. Laws ch. 258); *see also Lafayette Place Assoc. v. Boston Redevelopment Auth., 427 Mass. 509, 649 N.E.2d 820 (1998)* (applying *Kargman* analysis). Therefore, plaintiff's claims against the Suffolk County House of Correction are subject to dismissal.

### F. The Individual Defendants are Entitled *to Qualified Immunity*

**\*5** Even assuming plaintiff's constitutional rights were violated, qualified immunity provides a basis for dismissing plaintiff's complaint as to the individual defendants. Qualified immunity shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); accord Gardner v. Vespia, 252 F.3d 500, 502 (1st Cir.2001)*. To the extent plaintiff alleges that the defendants violated the Massachusetts sentencing statutes, it is clear that "a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *Singer v. Maine, 49 F.3d 837, 844 (1st Cir.1995)* (citations and internal quotation marks omitted). All of the relevant state case law, *see* § III.A above, indicates that plaintiff was not entitled to the jail credit in question, and in any event, his entitlement was not clearly established. Therefore, the individual defendants are protected from suit by the doctrine of qualified immunity.

### CONCLUSION

Even after liberally construing plaintiff's complaint and response to defendants' motion to dismiss, *see Haines v. Kerner, 404 U.S. 519, 520-21 (1972)*, I find no cognizable legal claim. Accordingly, for the reasons stated for fully above, defendants' motion to dismiss (Docket No. 12) is GRANTED, and plaintiff's complaint is DISMISSED in its entirety as to all defendants.

D.Mass.,2002.
Miller v. Suffolk County House of Correction
Not Reported in F.Supp.2d, 2002 WL 31194866 (D.Mass.)

Briefs and Other Related Documents (Back to top)

• 1:01CV11331 (Docket) (Jul. 23, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.