UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


AMESBURY GROUP, INC., and    )
AMESBURY SPRINGS LTD.,       )
     Plaintiffs,          )
                      )    CIVIL ACTION NO.
     v.                   )    05-10020-DPW
                      )
THE CALDWELL MANUFACTURING     )
COMPANY,                     )
     Defendant.           )


MEMORANDUM AND ORDER
November 2, 2006


    Plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd.
(collectively, "Amesbury") commenced this action against The
Caldwell Manufacturing Company ("Caldwell") for allegedly
infringing three of Amesbury's patents related to window
balances.  These are: United States Patents numbered 5,365,638
("'638 Patent") for "Spring Mounting for Sash Frame
Tensioning Arrangements"; 6,598,264 ("'264 Patent") for
"Block and Tackle Window Balance with Bottom Guide Roller"; and
6,820,368 ("'368 Patent") for "Snap Lock Balance Shoe and
System for a Pivotable Window."  In response, Caldwell has filed
counterclaims seeking a declaration that it has not infringed any
of the patents at issue and that Amesbury's patents are invalid
in any event.

    Following a half-day Markman hearing, I issued a Memorandum
and Order on January 20, 2006 ("Markman Order") construing the

-1-

disputed claim terms in the three patents-in-suit.  Amesbury now moves for summary judgment on the infringement and validity issues as to each patent.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is as appropriate in a patent case as it is in any other matter.  *Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984).

Once the moving party shows that there is no genuine issue of material fact, the nonmovant must produce evidence to show that a trialworthy dispute exists.  *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 66 (1st Cir. 2004).  A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law."  *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000).  "A 'genuine' issue is one supported by such evidence that 'a reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party."  *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 427 (1st Cir. 1996)).  "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact.  *Velez-*

*Rivera v. Agosto-Alicea*, 437 F.3d 145, 154 (1st Cir. 2006)(internal citation omitted).

In ruling on a motion for summary judgment, a court must view "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Pacific Ins. Co., Ltd. v. Eaton Vance Management*, 369 F.3d 584, 588 (1st Cir. 2004) (internal citation omitted).

## II. BACKGROUND

Each of the patents-in-suit relates to window balances for use in hung windows.  Hung windows generally comprise at least one window sash that holds a pane of glass and moves up and down within a window frame.  The vertical sides of the window frame, called window jambs, include tracks or channels, which guide the window sashes as they slide up and down.  In some windows, the sashes may also be designed to tilt inward (*i.e.*, into the building) to facilitate cleaning.  Hung windows utilize window balances to offset sash weight, allowing even heavy sashes to be moved with ease.

There are several types of window balances.  At issue in this litigation are Amesbury's patents that purport to improve on three basic balances: (1) a "coiled spring" or "coiled ribbon spring" balance; (2) a "block and tackle" balance; and (3) a "tiltable block and tackle" balance.

## III. '638 PATENT

The '638 Patent purports to improve the mounting assembly for a basic coiled spring.  In the older balances, the coiled

spring was mounted on a drum around which it rotated as the outer free end uncoiled and recoiled when the sash moved up and down. This design produced a clicking sound as the interior coil spring tail end rotated about the drum.

In 1992, U.S. Patent 5,157,808 (the "Sterner Patent") disclosed "an improved coil spring counterbalance hardware assembly which operates by means of a coil spring ribbon that extends and retracts about the uninterrupted external coil circumferential surface." But unlike prior art, a space would remain between the interior core of the coiled spring and the protruding drum such that there would be no operational contact of any hardware assembly with the interior coil spring tail end. Instead, the spring would rest

> compressively against a cooperatively radiused restraining shoe to thereby enhance the smoothness of sash raising and lowering by eliminating both the clicking sound and spring rotational cyclic vibrational shocks otherwise caused by the spring component interior ribbon core tail ending riding over the top of a spring core support hub as is characteristically common of prior art coil spring counterbalance assemblies.

(Sterner '808 Patent, col. 1, ll. 64-68, col. 2, ll. 1-7, col. 8, ll. 11-19).

In 1994, Braid et al. patented the '638 Patent called "Spring Mounting For Sash Frame Tensioning Arrangements." Like the Sterner Patent, the '638 Patent discloses a mounting assembly where the spring rests on a concavely curved surface or arm that supports the curved outer undersurface of the spring. The

-4-

distinguishing element is the mounting element's "raised spine" or "projection means" that cooperate with the inwardly-turned opposed protruding edges or "flanges," which run along both sides of the window jamb track, to inhibit the rotation or twisting of the mounting element caused by rotational forces created as the sash moves up and down.

## A. INFRINGEMENT

Amesbury claims that Caldwell's Quick-Tilt*nc window balance infringes independent claims 1 and 8 and dependent claims 2 and 3 of the '638 Patent.

Claim 1 reads as follows:

> A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having a first end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means **whereby rotational motion of said mounting means is inhibited**.

Dependent Claims 2 and 3 add the following limitations:

> 2. The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash

support means moves in said channel means.

3. The mounting assembly of claim 2 wherein said
mounting means has a body portion having an
aperture therein, a fixing screw positioned in said
aperture by which the mounting means is secured
relative to said channel means, a surface of said
body portion being concavely curved, said coiled
body portion of said coiled ribbon spring being in
contact with and supported by said curved surface
of said body portion.

Independent Claim 8 is similar to Independent Claim 1 except that
it replaces the term "raised spine" with "projection means":

... said mounting means being secured in said
channel means and the mounting means having
projection means positioned between said inwardly
turned opposite flanges of the channel means within
which the mounting means is positioned, **whereby
rotational movement of the mounting means is
inhibited**.

Having construed in the Markman Order the disputed terms for
these claims -- "means for mounting said coiled ribbon spring,"
"raised spine," "projection means," and "whereby rotational
movement of the mounting means is inhibited," -- I turn now to
the second step in the infringement analysis: comparing the
accused product to the properly construed claims.  *See Freedman
Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1356-57 (Fed. Cir.
2005), *cert. denied*, 126 S. Ct. 1167 (2006).  This analysis
focuses only on the contested elements of independent claims 1
and 8 because infringement of a dependent claim cannot occur
without infringement of the underlying independent claim.  *See
Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552,
n. 9 (Fed. Cir. 1989).

In this case, up until the summary judgment stage, Caldwell's representatives and its expert appeared to have conceded that its Quick-Tilt*nc balance includes all of the elements of the '638 patent with the exception of the limitation "whereby rotational movement of [the] mounting means is inhibited." Before considering this argument, I consider a new argument raised by Caldwell for the first time in its Opposition Brief.

1. <u>Opposing Flanges or Channel Means</u>

In opposing summary judgment, Caldwell argued for the first time that the Quick-Tilt*nc balance also lacks "opposing flanges" or "channel means" because Caldwell does not make, use, sell, or offer to sell any products that include a channel means for use in connection with its Quick Tilt*nc balance. Instead, Caldwell's Product Marketing Manager, Douglas Zinter, represents that Caldwell only sells window balances which are mounted by Caldwell's customers in the channels of jambs manufactured and sold by companies other than Caldwell. (Zinter Decl. at ¶¶ 8-9).

In Caldwell's Claim Chart, *see* Def.'s Supp. Ans. to Pls.' First Set of Interrogs., Ex. A, Caldwell represented that it only disputed whether the spine and projection means inhibited rotation as disclosed in Claims 1 and 8. *See also* Charles Still April 17, 2006 Expert Report, Ex. A. Accordingly, Amesbury objects to this new ground, arguing that the new defense

contradicts Caldwell's prior representations.

I do not consider Caldwell's new theory as explicitly contradicting its prior representations in the sense that Caldwell did not, and still does not, deny that its balances are used in window jambs in a way that together comprises all the other uncontested elements of the patent.  I will not, however, permit Caldwell to secure an unfair tactical advantage by limiting Amesbury to its direct infringement theory.

Caldwell has suggested that summary judgment should be denied based on its new argument and assumes that Amesbury alleges only direct infringement and not contributory infringement.  But, Amesbury's Complaint broadly alleges that Caldwell "has infringed the '638 Patent throughout the United States by making, using, importing, selling, offering to sell, inducing the use and sale of, and/or **contributing to** the use and sale of, window hardware that falls within the scope of one or more claims of the '638 Patent."  (Complaint, ¶ 10).  I will therefore permit Amesbury to proceed on a theory of contributory infringement.  *See* 35 U.S.C. § 271(c)("Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition ... constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article

or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."). At the hearing in this matter, the parties conceded that some additional discovery is necessary to develop the contributory infringement theory more fully. For that reason, I will not grant summary judgment at this time. I will, however, proceed to consider the underlying dispute by comparing the accused product to the remaining disputed element of the claims.

2. <u>Anti-Rotational Aspect of the Raised Spine</u>

As I explained in the Markman Order, the '638 Patent does not negate the possibility that the fixing screw, which secures the mounting element to the window jamb channel, may contribute to the stationary position of the mounting element when the spring is in operation. However, it is the "raised spine" that is designed to inhibit the rotation of the mounting element. Accordingly, to move for summary judgment with respect to infringement of the '638 Patent successfully, Amesbury must establish that there is no genuine issue of fact that the spine of Caldwell's Quick-Tilt*nc balance inhibits rotation of the mounting element. Amesbury has not met this burden.

Amesbury presents the expert reports, affidavit, and deposition of Dr. Sammy Shina, Ph.D., P.E. as evidence that the geometry of the Caldwell Quick-Tilt*nc balance will inhibit the rotational movement of the mounting assembly when installed in a window jamb channel because the protruding spine fits snugly

between the channel flanges as disclosed by the '638 Patent.
Amesbury further presents Dr. Shina's evidence to support its
theory that even though the dust cover and the screw may play a
part in inhibiting rotation in Caldwell's Quick-Tilt*nc balance,
the spine configuration also plays an important role in
inhibiting rotation because the dust cover is too thin to inhibit
rotation adequately and because the constant pressure would
reduce the integrity of the screw such that the screw alone could
no longer prevent rotation.

I will not consider Dr. Shina's testimony as to these
theories for lack of proper foundation.  As discussed in the
accompanying motion to strike memorandum, Dr. Shina did not
develop these opinions by observing a Quick-Tilt*nc balance
properly mounted in a window jamb with a mounting screw.
Furthermore, he did not measure or calculate the anti-rotational
frictional forces involved in a properly mounted Caldwell Quick-
Tilt*nc balance, nor did he base his conclusion on reliable
values of the normal lifetime of a balance.[1]  I will also not
consider Dr. Shina's second declaration, which belatedly -- and

---

[1] I will also not consider the printout of a Tri-State
Wholesale Building Supplies, Inc. ("Tri-State") website.
(Exhibit 38 to Attorney Ishmael's May 19, 2006 Declaration).  The
printout lacks proper authentication and is hearsay not presented
in an admissible fashion.  In any event, it is impossible to
determine what is actually depicted on what I observe is a low-
resolution image.  Thus, even if I considered it, the website
cannot establish that the spine of Caldwell's Quick-Tilt*nc
balance fits snugly in between the channel flanges to inhibit
rotation.

still inadequately -- attempts to address the deficiencies in his method and conclusions with respect to the anti-rotational properties of the spine on the Quick-Tilt*nc products.

Even if I were to consider Dr. Shina's opinion on the anti-rotational aspects of the Quick-Tilt*nc balance, Caldwell has presented evidence, including Dr. Shina's own concessions in his deposition, that raise at least a genuine issue as to whether the spine on the Quick-Tilt*nc balance contributes at all to the prevention of rotation of the spring mounting unit.  In his third report, Caldwell's expert, Dr. Charles Still, identifies the molded nylon body of the spring as the anti-rotational element because it fits snugly inside the jamb channel to prevent rotation.  Dr. Still explains that the spine portion that sits in the plane of the channel flanges is designed to help support the screw fastener, coil nest, and aperture and does nothing to inhibit rotation of the mounting under load.  (Still April 17, 2006 Expert Report, at p. 6).  Furthermore, Dr. Still represents that standard window designs allow a gap between either side of the raised spine and the sides of the inwardly turned channel flanges from 0.50" to 0.109", as depicted in Exhibit G to his report and Still Deposition Exhibits 4A and 4B, such that the spine cannot contact the flanges and prevent rotation of the mounting element as disclosed in the '638 Patent.  To the degree Amesbury disputes this opinion and the photographs of the samples now in the record, that is a dispute of fact that cannot be

-11-

resolved on summary judgment.[2]  Accordingly, I will deny summary
judgment as to Caldwell's infringement of Claims 1, 2, 3, and 8
of the '638 Patent.

**B. INVALIDITY**

Amesbury claims that Caldwell cannot demonstrate that the
'638 Patent is invalid because it is anticipated by the Sterner
Patent.  Although Caldwell's expert also suggested that the '638
Patent is invalid for obviousness,[3] Caldwell did not respond in
its Opposition to Amesbury's discussion of why the asserted
claims of the '638 patent are not obvious.  Accordingly, I
consider only the issue of anticipation.

Patents are presumed to be valid, 35 U.S.C. § 282.
Consequently, should this case proceed to trial, the burden would
be on Caldwell to prove invalidity by clear and convincing
evidence.  But as the non-moving party on the Motion before me,
Caldwell need only establish the existence of a genuine issue of
material fact in order to preclude summary judgment for Amesbury

---

[2]  I do not consider Still Ex. 5, as it has not been
properly authenticated.

[3] Caldwell's Expert, Dr. Still, opined that the '638 Patent
"is not novel and/or is obvious and therefore, not valid.  Prior
Art proves that all components of '638 Patent existed before '638
Patent was filed. [Sterner Patent] contains all of the elements
disclosed in claims 1, 2, 3, & 8 of the '638 Patent, thereby
anticipating those claims.  All of the claims would have been
obvious to one of ordinary skill in the art to which this
invention pertains based on: (1) [Sterner Patent]; and/or (2)
Leitzel U.S. Patent 4,961,247."  (Still March 13, 2006 Expert
Report, at p. 6).

-12-

on the validity issue. *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1363 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1167 (2006). Caldwell does not need to establish, as Amesbury repeatedly, but wrongly, suggests, invalidity based on clear and convincing evidence since the process of weighing evidence is for the factfinder, not the judge evaluating summary judgment submissions.

The '638 Patent is invalid for anticipation "if a single prior art reference," here the Sterner Patent, "discloses each and every limitation of the claimed invention. Moreover, a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (internal citations and quotations omitted). The Sterner Patent's claims and specification do not need to identify each of the elements because inherent anticipation does not require recognition in the prior art. *Id.* Rather,

> [u]nder the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claims limitations, it anticipates. Moreover, inherency is not necessarily coterminous with knowledge of those of ordinary skill in the art. Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art.

*Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1376 (Fed. Cir. 2005)(internal citations and original alternations omitted).

Amesbury argues that it is entitled to summary judgment because the Sterner Patent does not disclose a spring mounting assembly that includes (1) a "mounting means having a raised spine"; (2) any such spine or projection "positioned between and in the same plane as said inwardly turned opposed flanges of said channel means"; or (3) a spine "whereby rotational movement of said mounting means is inhibited."

Both parties point to confusion and concessions by the other's expert to meet their respective burdens. (*See*, *e.g.*, Shina Depo. at pp. 168-70 questioning his conclusion in his April 18, 2006 Report at p. 3 that the mounting means in the Sterner Patent does not extend into the plane of the flanges as depicted in Exhibit 3; Still Depo. at pp. 53-54 acknowledging that the figures in the Sterner Patent do not do a good job of showing the face of the mounting element in the same plane as the flanges). However, the fact that the experts gave conflicting answers in their depositions supports the conclusion that there is a genuine issue of material fact as to whether the Sterner Patent inherently discloses all of the elements of the '638 Patent. Aside from the expert evidence, I find that it is unclear whether the flat back of the element identified as 68 in the Sterner Patent and F in Exhibit B of Still's March 13, 2006 Report inherently anticipates the '638 Patent's novel element -- the rotation-inhibiting spine -- since the element is arguably

depicted in the patent's cross-sectional figures (Figs. 2, 5, 6, 7, and 10) as resting in the same plane as the flanges with tight enough tolerance to inhibit rotation of the mounting element. Consequently, a genuine issue of fact exists as to whether Claims 1, 2, 3, and 8 are invalid for anticipation by the Sterner Patent and summary judgment will be denied on this issue.

### IV. '264 PATENT

The '264 Patent purports to improve the design of a block and tackle balance, which is a device that uses a combination of a spring and pulleys located within a channel to balance the weight of the window sash at any position within the jamb pockets. In older balances, the travel distance of the window sash was limited by some of the pulleys interfering with the jamb mounting hook. In 2003, Newman patented the "Block and Tackle Window Balance with Bottom Guide Roller," which disclosed a design that relocated the bottom guide roller within the bottom guide at the bottom of the balance to increase the distance that a window can open.

### A. INFRINGEMENT - Independent Claim 1

Amesbury claims that Caldwell's 86xt window balance literally infringes, or infringes under the doctrine of equivalents, independent Claim 1 and dependent Claims 2, 4, and 5 of the '638 Patent.

Claim 1 reads as follows:

-15-

A block and tackle window balance device comprising: a channel comprising a first end and a second end; a top guide connected to the first end of the channel; a bottom guide connected to the second end of the channel; **a bottom guide roller rotatably mounted in the bottom guide**; a fixed pulley block unit connected to the channel; a translatable pulley block unit moveable within the channel; a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

Caldwell concedes that its Series 86xt balance incorporates all of the elements of Claim 1 of the '264 Patent, except "a bottom guide roller rotatably mounted in the bottom guide." Instead, Caldwell argues that its balance includes a fixed pulley block connected to the channel.

Following the Markman hearing, I construed what was presented as the only disputed term -- "bottom guide roller rotatably mounted in the bottom guide" -- as a roller mounted in the bottom guide in a way that permits its rotation.  I also held that being mounted *in* the bottom guide does not require that the roller be mounted *to* the bottom guide, and that being mounted in the bottom guide, as claimed in Claim 1, does not require the roller to be entirely within the bottom guide or entirely external to the channel.  To resolve the summary judgment motion, it now appears that the term "roller" must also be defined.

Caldwell suggests in its opposition brief for the first time that a "roller" is not the same as a "pulley" because a roller is designed to roll along a bearing surface, whereas a pulley is not.  See Def's Supp. Resp. to Pls' 1st Interr. "No-bottom <u>roller</u> . . . "  Furthermore, a roller is normally cylindrical and wider than a tire or a pulley, and it may or may not have a groove in the center, whereas a pulley always does.  *See* Still Decl. at ¶ 11; Still Depo. at p. 99; Newman Depo. at p. 23.[4]  I will not adopt any such generic definition for "roller" detached from the context of the '264 Patent.  Instead, I consider the common meaning of the word "roller" in light of the specification and the prosecution history to discern how a person of ordinary skill in the art would understand the term "roller" as used in the '264 Patent.

---

[4] Amesbury argues that Caldwell cannot avoid summary judgment by submitting a declaration from its expert that contradicts his sworn deposition testimony.  I will consider the statement because Dr. Still did not really contradict himself. While he testified that there is not really any difference between a roller and a pulley, he also testified that there is a difference between roller and pulley with respect to window balance design in general. (Still Depo. at p. 99). Nevertheless, potential differences between the generic term roller and the generic terms pulley or pulley wheel do not resolve the question of whether the term roller as used in the '264 Patent describes or encompasses what Caldwell and Dr. Still now refer to as a pulley or pulley wheel.  And on that particular question, Caldwell is stuck with Dr. Still's answer to the question, "What if any differences are there in your opinion between a pulley wheel and a roller as the '264 patent uses the term?"  Namely, that "There is really not much difference.  The patent calls for a bottom roller and bottom guide. If I were describing that, I would call it a pulley."  (Still Depo. at p. 110).

It is clear from the '264 Patent specification and prosecution history, that the patentee intended the term roller to connote a cylindrical grooved wheel shape. The figures in the specification depict the roller as a cylindrical wheel with a groove around the center. The specification describes threading the cord that connects the three components of the window balance -- the translatable pulley unit, the fixed pulley unit, and the roller -- "through" the translatable and fixed pulley units and "around" the bottom guide roller. ('264 Patent, col. 4, ll. 7-9, col. 5, ll. 24-27). The function of the bottom guide roller is to provide a slidable curved surface, around the bottom of which the cord wraps before exiting the pulley system at the correct angle so that the jamb mounting hook attached to the exiting end of the cord can secure the balance to the window jamb.[5] What the parties appear to dispute are the dimensional requirements of the cylindrical grooved wheel shape that are implicit in the use of the term "roller" as opposed to "pulley."

The patentee chose to label what are numbered 326 & 327 and

---

[5] Fitzgibbon's "Sash Balances and Components Thereof," U.S. Patent No. 4,089,085 ("Fitzgibbon Patent"), which the '264 Patent recognized as prior art, described how the cord is to be trained over a similar pulley system: "In the embodiment shown, the cord extends downwardly over one of the uppermost pulleys 124 in the lower block 56, then up and over one of the pulleys 96 in the movable block 64, thence downwardly over the second upper pulley 124 in the lower block, again upwardly over the second pulley 98 in the upper block 64, then downwardly again and around the lower pulley 125 in the lower block 56, then upwardly and out of the frame and toward the supporting pin 46." (Fitzgibbon Patent, col. 9, ll. 13-21).

331 & 332 in Figs. 4A and 4B as the two "pulleys" that rotate
about a single "pulley axle 328" in the "translatable pulley unit
330" and the two "pulleys" that rotate about a single "pulley
axle 333" in the "fixed pulley unit 335," respectively.  ('264
Patent, col. 4, l. 67, col. 5, l. 1-6).  In contrast, the
patentee chose to label what is numbered 239 and 350 in Figs.
2A/2B and 4A/4B, respectively as the "bottom guide roller," which
rotates about a "roller axle 238."  ('264 Patent, col. 3, ll. 60-
63).  *See also* '264 Patent, col. 3, ll. 55-56 (With respect to
the prior art, the "pulley in the fixed pulley unit 235 and the
roller 239 may be contained in a frame.").  Based on this
nomenclature, one could argue that the patentee intended the term
"roller" to refer to a shape different than a "pulley."  The
figures in the specification also arguably support drawing such a
distinction because the roller is depicted as wider and greater
in diameter than the pulleys in the translatable and fixed pulley
units in Figs. 2A, 2B, 4A, and 4B.

Despite the patentee's separate use of both the term
"pulley" and the term "roller," neither the rollers depicted in
Figs. 2A, 2B, 4A, and 4B, nor the Amesbury roller photographed in
Dr. Still's April 17, 2006 Expert Report, Exs. J & K are long or
wide cylinders resembling the shape of a steam roller, as opposed
to a car tire.[6]  In fact, when asked "[w]hat if any differences

_____

[6] When asked if there is a difference between the term
"roller" and "pulley," Caldwell's expert Dr. Still answered: "If

are there in your opinion between a pulley wheel and a roller as the '264 patent uses the term," Caldwell's expert Dr. Still answered: "There is really not much difference. The patent calls for bottom roller and bottom guide. If I were describing that, I would call it a pulley." (Still Depo. at p. 110).  Furthermore, the prosecution history does not support reading a width and/or diameter limitation into the meaning of the term "roller" or creating a distinction between a "pulley" and a "roller." Rather, the prosecution history suggests that the terms "pulley" and "roller" may be used interchangeably to describe a grooved wheel used in a pulley system, regardless of the wheel's width and diameter.

The patent examiner equated the element identified as 125 in Fig. 5 of Fitzgibbon's "Sash Balances and Components Thereof," U.S. Patent No. 4,089,085 ("Fitzgibbon Patent"), with the '264 Patent's "bottom guide roller" component.  *See* Office Action November 20, 2002, '264 Prosecution History at C000639.  The Fitzgibbon Patent labeled element 125 first as a "single, larger diameter <u>pulley</u>," and later simply as the "lower <u>pulley</u> in the lower block." (Fitzgibbon Patent, col. 6, l. 26, col. 9, ll. 19-

---

you compare a steam roller to a car tire, a roller is real wide, it's cylindrical and goes through the center point but it's normally wider than a tire or pulley."  When asked whether "[w]ith respect to window balance design, is there a difference between the term 'roller' and 'pulley' based on your knowledge and experience?," Dr. Still answered: "There can be, yes." (Still Depo. at p. 99).

20).  Similarly, the patentee used the term "bottom guide roller"

to reference the lowermost wheel depicted in Fig. 4 of Biro's

"Window Structure" Patent, U.S. Patent No. 3,449,862 ("Biro

Patent").  *See* Amendment and Response to Office Action November

20, 2002, '264 Prosecution History at C000656.  That component of

the counterbalance depicted in Fig. 4 is not numbered in the Biro

Patent, although the specification does describe the

counterbalance 17 as having "an elongated housing 114 having a

tension spring assembly 115 comprising a coil spring 116

associated with a <u>pulley arrangement</u> 117 to provide a mechanical

advantage."  (Biro Patent, col. 12, ll. 59-61).[7]

Finally, I also note that in arguing invalidity, Caldwell's

expert equates the '264 Patent's "bottom guide roller" with the

"pulley wheel 426 that is adjacent [to the] second pulley member

422" in Thompson's "Window Panel Balance Apparatus and Method,"

U.S. Patent No. 6,840,011 ("Thompson Patent").  (Thompson Patent,

col. 7, ll. 9-10; Dr. Still March 8, 2006 Expert Report, Ex. B.)

---

[7] Furthermore, the Biro specification indicates that "[t]he
general structure of the counterbalance 17 is shown and described
in E. H. Wood Patent No. 3,114,178 (20-52.2) ["Wood Patent"] and
D. J. Dinsmore 3,358,404 (49-446) ["Dinsmore Patent"]."  (Biro
Patent, col. 12, ll. 54-57).  The Wood Patent labels all three
wheels numbered in its Fig. 2 (30, 31, 32) as "<u>pulleys</u>," (Wood
Patent, col. 3, ll. 28-30), even though the lowermost pulley (32)
is depicted with a greater diameter than the other two pulleys in
Fig. 2.  Likewise, the Dinsmore Patent describes all of the five
wheels depicted in its Fig. 6 as "grooved <u>rollers</u>" that are part
of a "compound <u>pulley</u> system," even though Fig. 6 clearly depicts
the uppermost wheel as wider and greater in diameter than the
other four wheels.  (Dinsmore Patent, col. 2, ll. 32-33).

Dr. Still also equates the '264 Patent "bottom guide roller" with the "single nylon sheave" depicted as 38 in Fig. 5 of Prosser's "Window Structure," U.S. Patent 3,091,797 ("Prosser Patent").  A sheave is another term used to describe a pulley or wheel with a grooved rim.

Considering the specification and prosecution history of the '264 Patent, I find that "the meaning that the term ["roller"] would have to a person of ordinary skill in the art in question at the time of the invention," *Phillips v. AWH*, 415 F.3d 1303, 1313 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006), is simply a cylindrical grooved wheel synonymous with sheave or pulley.  Applying this meaning, I find that a "bottom guide roller" is present in Caldwell's Series 86xt balance.  Furthermore, since the "bottom guide roller" is mounted in, although not to, the bottom guide, *see* Dr. Still April 17, 2006 Expert Report, Ex. J, I find that Amesbury has satisfied its burden as the moving party of establishing literal infringement as a matter of law.  Caldwell's assertion that the lowest wheel depicted in Dr. Still April 17, 2006 Expert Report, Ex. J is not a "roller," but a third pulley fixed to the fixed pulley block is insufficient to raise a genuine issue of material fact.  Accordingly, I will grant summary judgment to Amesbury regarding Independent Claim 1.

**B. INFRINGEMENT - Dependent Claims 2, 4, and 5**

Dependent Claims 2, 4, and 5 add the following additional limitations:

>    2. The device of claim 1 wherein the bottom guide roller is located **external** to the channel.
>
>    4. The device according to claim 1 wherein a portion of the bottom guide is external to the channel.
>
>    5. The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash.

Amesbury suggests that Caldwell has admitted that its Series 86xt balance features all of the limitations in dependent Claims 2, 4, and 5. Since Caldwell did not refute this assertion in its Opposition, I will also grant summary judgment to Amesbury as to dependent Claims 2, 4, and 5, but I do want to clarify an issue unaddressed by the parties in their summary judgment papers.

Caldwell's expert conceded in his non-infringement chart attached as Exhibit B to the April 17, 2006 Expert Report that the Caldwell Series 86xt balance features these claims except that he disputed the presence of Claim 2 stating that "Caldwell's Series 86XT fixed pulley block bottom pulley is not a roller and is partially located internal and external to the channel." (Dr. Still April 17, 2006 Expert Report, Ex. B at p. 3). In response to Amesbury's statement of facts at paragraphs 17 and 18, Caldwell did not dispute the suggestion that its lowermost pulley (the bottom guide roller) is located external to the channel or that at least a portion of the bottom guide is external to the

-23-

channel.  Looking at Dr. Still's April 17, 2006 Expert Report,
Exs. J & K, it is clear that the Series 86xt roller is located in
the bottom guide and partially located internal and external to
the channel.  This placement certainly satisfies Claim 1, which
claims a "bottom guide roller rotatably mounted in the bottom
guide."  *See* Markman Order at pp. 42-54 (rejecting Caldwell's
proposal that mounted "in the bottom guide" in Claim 1 be
construed as mounted "entirely within the bottom guide and
external to the channel").  The question, not directly addressed
in the Markman Order, is whether being partially located external
to the channel satisfies the additional limitation of being
"located external to the channel" in Claim 2.

In arguing over the correct interpretation of "mounted in
the bottom guide" in Claim 1, the parties made reference to the
limitation in Claim 2, but did not request that the term
"external" be construed.  Amesbury suggested, and I agreed, that
the principle of claim differentiation did not require the roller
to be external to the channel to meet the description in Claim 1.
Consequently, I held that a roller mounted in a bottom guide such
that it is also within the section of the channel that overlaps
the bottom guide would still be "mounted in the bottom guide" for
the purpose of Claim 1, but it would not be "external" to the
channel as claimed in Claim 2.  (Markman Order at pp. 51-52).
However, earlier in my Order, I recognized as an aside that "the

Examiner and the patentee had in their minds during the prosecution that at least the phrase 'located external to the channel' includes the manifestation where only a portion of the object is external to the channel."[8]  (Markman Order at p. 46). Upon reflection and now being focused on this issue, I find the Patent Examiner's remarks persuasive intrinsic evidence demonstrating that the patentee acquiesced in disclaiming the idea that "external" in Claim 2 means entirely external. Consequently, the roller on Caldwell's Series 87xt balance is sufficiently external to the channel to support literal infringement of Claim 2 of the '264 Patent.

## C. INVALIDITY

Caldwell has claimed that the obvious combination of the admitted prior art in Figure 2A of the '264 Patent with the Thompson Patent, filed December 13, 2000,[9] discloses all of the elements of the '264 Patent, rendering the patent invalid.[10]

---

[8] The Examiner initially rejected Claim 2 because both the admitted prior art and the Fitzgibbon Patent disclosed a bottom guide roller that is located external to the channel in that a portion of the roller is located outside of the channel. (November 20, 2006 Office Action, '264 Prosecution History at C000631, C000640).

[9] Amesbury does not dispute that the window balance disclosed in the Thompson Patent (the "Thompson device") was sold by Amesbury as its Series 728 balance more than a year prior to the filing date of the '264 Patent.

[10] Dr. Still opined that the '264 Patent is "not novel and/or is obvious.... [The Biro Patent] contains all of the elements disclosed in claims [1 and 4] ... of the '264 Patent, thereby anticipating those claims.  All of the claims would have

Amesbury argues that summary judgment is appropriate against this claim because Caldwell has not provided objective evidence of a motivation to combine the teachings of the prior art and the Thompson Patent.

Whether a patent is obvious "is a question of law based on underlying facts." *Group One Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005). The Federal Circuit recently outlined the obviousness analysis as follows:

> A claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. An invention may be a combination of old elements disclosed in multiple prior art references. In determining whether a combination of old elements is non-obvious, the court must assess whether, in fact, an artisan of ordinary skill in the art at the time of invention, with no knowledge of the claimed invention, would have some motivation to combine the teachings of one reference with the teachings of another reference. Motivation to combine references may come explicitly from statements in the prior art, the knowledge of one of ordinary skill in the art, or, in some cases the nature of the problem to be solved. The test for an implicit teaching is what the combined references, knowledge of one of ordinary skill in the art, and the nature of the problem to be solved as a whole would have suggested to those of ordinary skill in the art.

-----

been obvious to one of ordinary skill in the art to which this invention pertains based on a combination of: (1) the admitted prior art and Thompson U.S. Patent 6,840,011; and/or (2) the admitted prior art and Prosser U.S. 3,091,797." (Dr. Still March 8, 2006 Expert Report at p. 7). However, in Opposition, Caldwell only argues that there is a genuine issue of material fact regarding whether the combination of the admitted prior and the Thompson Patent rendered the '264 Patent invention obvious.

*Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1321-22 (Fed. Cir. 2005) *citing In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000), *In re Fulton*, 391 F.3d 1195, 1200-02 (Fed. Cir. 2004), and 35 U.S.C. § 103 (A patent claim is obvious, and thus invalid, when the differences between the claimed invention and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.").

The Background Information section of the '264 Patent discloses that:

> Hung window assemblies generally include a window frame, a lower window sash, an upper window sash, a pair of window jambs, two sets of jamb pockets, and at least one window balance device for offsetting the weight of a window sash throughout a range of travel within the window frame. Block and tackle window balance devices use a combination of a spring and pulleys located within a channel to balance the weight of the window sash at any position within the jamb pockets.
>
> In some block and tackle window balance devices, the channel containing both the spring and pulleys is attached to the window sash, and a cord, which connects the pulleys together, is attached to a jamb mounting hook that is connected to a side jamb. A disadvantage of this type of device is that the travel distance of the window sash is limited by some of the pulleys located within the rigid channel interfering with the jamb mounting hook that attaches the window balance to the window jamb.

('264 Patent, col. 1, ll. 14-31). The '264 Patent simply modifies the basic configuration of the prior art block and balance device to permit increased travel of the window sash by

relocating the "bottom guide roller" -- or the lowermost pulley about which the cord is last threaded -- into the bottom guide instead of above it.  Accordingly, the only difference between the prior admitted art as depicted in Figs. 2A and 2B is the relocation of the bottom guide roller into the bottom guide as depicted in Figs. 4A and 4B.

The Thompson Patent relates to improvements in the design of balances used in tilting or tiltable hung windows.  Prior art disclosed the use of balances attached to the jamb or jamb liners, which caused the jamb liners to be thick and complex in shape.  Thus, the Thompson Patent describes how to build a balance that can be secured to one of the sides of the window sash.  The preferred embodiment for the invention described the configuration of a spring biased block and tackle balance as follows:

> [T]he balancer 208 includes a housing 402 that includes an elongated U-shaped housing 403 and a housing extension 423 attached to one end of the elongated U-shaped housing 403. The elongated U-shaped housing 403 is made of steel having a pair of parallel, laterally spaced sidewalls 404 and 406 and an outer wall 408 interconnecting the side walls 404 and 406 together. The elongated U-shaped housing 403 defines an elongated chamber 410. The housing 402 is secured to a side of sash such as sash 200 by means of screw 213 which is held in place by fastening block 412 which in turn is fastened to the housing 402 by a press fit. The housing extension 423 can be made of any structural material including steel and plastic.
>
> A coil spring 414 has an anchored end connected to a pin 416 by a hook that hooks around the pin 416. The pin 416 is riveted or otherwise fastened to the

> side walls 404 and 406 of the housing 402. The
> opposite end of the spring 414 is connected to a
> block and tackle 418. The block and tackle 418
> includes a first pulley member 420 and a second
> pulley member 422 that are conventionally
> interconnected by a cord 214 that passes back and
> forth between the two pulley members. The cord has
> a first end that is connected to the block and
> tackle 418.  The cord 420 exits the block and
> tackle 418 by extending around the circumference of
> a pulley wheel 426 that is adjacent second pulley
> member 422. In a preferred embodiment of the
> invention, the pulley wheel 426 is slightly
> elliptical in shape. Preferably, pulley wheel 426
> is supported at its axis by a pin 428 that is
> supported by housing extension 423 that is integral
> with second pulley member 422.  The pulley wheel
> 426 changes the direction of the cord 214 by
> approximately 180 degrees.

(Thompson Patent, col. 6, ll 53-67, col. 7, ll. 1-16).  A pin
with a large head, which prevents it from being removed from the
groove of the jam liner as the sash slides up and down, is
further described as an integral part of the housing extension.
(Thompson Patent, col. 7, ll. 24-30).  Accordingly, I find that
the housing extension/pin/large-pin-head (423, 206, 438) unit as
depicted in Fig. 4 appears to perform a similar function to the
'264 Patent's bottom guide as the window sash moves up and down
in an untilted vertical position.  *See also* Dr. Still March 8,
2006 Expert Report, Ex. A at p. 1, Ex. B (equating the housing
extension with the bottom guide as "item G" and equating the
"pulley wheel 426 that is adjacent second pulley member" with the
bottom guide roller as "item R"); Newman Depo. at pp. 18-19
(stating that the post that sticks out from the housing -- i.e.,

the pin 206 -- performs a guiding function by restricting front to back motion).[11]

Amesbury argues that since the Thompson Patent does not include a top guide, Caldwell must provide evidence that one skilled in the art would have been motivated to combine a top guide from another reference with the balance of Thompson. But this obfuscates the issue. The real question is whether there is a genuine issue of fact regarding whether someone skilled in the art would have been motivated to combine the idea of locating the roller -- the pulley wheel below the fixed pulley unit -- in the bottom guide or housing extension instead of in the channel of a block and tackle balance designed for a non-tiltable hung window. The '264 Patent's inventor, Newman, suggested in his deposition that combining the configuration of the fixed pulleys and the single pulley beneath them with the prior art block and tackle balance shown in Fig. 2 of the '264 Patent would have allowed greater window sash travel.  (Newman Depo. at pp. 39-40). However, this testimony does not, as Amesbury points out, prove

---

[11] Amesbury disputes the suggestion that the Thompson Patent discloses a bottom guide.  In Amesbury's Response to Caldwell's Statement of Additional Facts, Amesbury points out that Newman's testimony suggests that the post performs the guiding function, whereas the lowermost pulley is located in the housing extension. It is certainly true that the Thompson block and tackle balance is assembled differently than the '264 Patent balance, as it must to allow tilting, but I nonetheless find that the housing extension/pin/large-pin-head (423, 206, 438) unit depicted in Fig. 4 performs both the guiding function and the housing of the lowermost pulley.

that someone skilled in the art would have been motivated to combine the admitted prior art and this particular pulley configuration in the Thompson Patent at the time of the invention.

Caldwell's evidence on the motivation issue is the testimony of Amesbury's expert, Dr. Shina, and Zinter, Caldwell's Product Marketing Manager. Dr. Shina testified that, based on his review of the material provided, at some point window balance customers had a "high want" for larger egress -- a window's opening size -- to meet fire building codes. The '264 Patent provided one way for design engineers to increase a window's egress without increasing the length of the balance. (Shina Depo. at pp. 195-203). Zinter testified that in the 1990s, after coming up against situations where Caldwell was having difficulty supplying balances that could pass a building code for egress opening, he came to a general realization that elongating the side of the bottom guide and repositioning the lower pulley would allow greater window egress. He remembers discussing this idea with two members of Caldwell's engineering department, but he testified that Caldwell did not pursue the idea in a major way in the 1990s because the company could not "create an economic justification in the market to support the development costs for a product" with the new design idea. (Zinter Depo. at pp. 21-23). Zinter further testified that "the idea really started to gain momentum" in June of 2000 after discussions between himself and

Carl Shelton, an engineer for one of the window companies that
Caldwell supplied window balances to.  (Zinter Depo. at p. 24).

From the testimony of Dr. Shina and Zinter, Caldwell states
that at the time of the invention, there was a well-known need in
the window balance industry to extend the travel of window
balances to better comply with building egress codes.  Caldwell
further contends that the obvious solution, to one of ordinary
skill in the art, was to combine the admitted prior art in figure
2A of the '264 patent with the positioning of the bottom guide
roller in the Thompson reference, a combination Newman testified
would achieve the goal of greater egress.  This is somewhat of an
overstatement of the testimony on the record and would certainly
not be enough for summary judgment to enter in favor of Caldwell,
but I conclude that a reasonable juror could find that "[t]he
problem [of insufficient egress] was within the general knowledge
of those of ordinary skill in the art, and thus provided
sufficient motivation to navigate the prior art in the [window
balance] field in search of a teaching on how one might modify"
the prior art to permit greater egress.  *Cross Med. Prod.*, 424
F.3d at 1322.  "Evidence that a person of ordinary skill in the
art [like Zinter] recognized the same problem to be solved as the
inventor and suggested a solution is, at the least, probative of
a person of ordinary skill in the art's willingness to search the
prior art in the same field for a suggestion on how to solve that

problem." *Id.* Accordingly, I will deny summary judgment on the invalidity issue.[12]

### V. '368 PATENT

As alluded to in the discussion of the Thompson Patent, a class of window balances have been developed for tiltable or pivotable windows. The tilt-in function facilitates the cleaning of the outside surface of the sash glass. Tiltable windows use a combination of balances and pivot bars to allow the window sashes to slide up and down in the window jamb and to rotate or tilt in.

Prior art disclosed using a "balance shoe," coupled to the window balance via a connecting member or connector, to guide the rotational movement of the window sashes with respect to the window frame. One of the problems with prior art balance shoes and window balances designed for pivotable double hung windows is that they were difficult to install. The '368 Patent purports to improve the balance shoe element by reconfiguring one end with a "T"-shaped design to fit within the balance channel itself, without losing the locking capability required during tilting.

---

[12] I recognize that the grant of certiorari in *Teleflex, Inc. v. KSR Int. Co.*, 119 Fed.Appx. 282 (Fed. Cir. 2005), *cert. granted*, 126 S. Ct. 2965 (2006) may put in question the continuing vitality of the Federal Circuit's jurisprudence regarding the concept of obviousness. Nevertheless, it appears that the obviousness contention pressed by Caldwell can only get stronger if the Supreme Court were to reverse *Teleflex*. In any event, for the time being, I have tried to analyze the obviousness claim in a manner faithful to current Federal Circuit jurisprudence, including that found in *Teleflex*.

## A. INFRINGEMENT

Amesbury claims that Caldwell's Series 97ez, Series 97i, and Series 97ih balances infringe independent Claim 2 and dependent Claims 3, 6, and 7 of the '368 Patent.

Claim 2 reads as follows:

> A window balance system comprising: a U-shaped channel comprising a plurality of openings; a spring connected to a system of pulleys located within the U-shaped channel; a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and a balance shoe, wherein the balance shoe comprises: a frame comprising an enlarged fist end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms a **pocket** positioned in the second end of the frame **adapted to mate with a rivet**; a locking member proximal to the enlarged fi[r]st end; a cam in communication with the locking member, and a **connecting device for attaching the balance shoe within the U-shaped channel of the window balance**.

Dependent Claims 3, 6, and 7 add the following limitations:

> 3. The window balance system of claim 2 wherein the connecting device comprises a rivet.
>
> 6. The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb.
>
> 7. The window balance system of claim 2 wherein the locking member comprises two opposing ends integrally connected by a spring member.

Following the Markman hearing, I construed the disputed term

-34-

"pocket" as a notch with an opening shaped to mate (*i.e.* to join
or fit together) with a rivet, thereby aiding to secure the
balance shoe within the U-shaped channel of the inverted window
balance, and "connecting device" as a device, such as a rivet,
screw, or resilient tabs, that connects the balance shoe to the
U-shaped channel of the inverted window balance.

Caldwell concedes that its 97ez, 97i, and 97ih balances
incorporate all of the elements of the asserted claims of the
'368 patent, with two exceptions: a "pocket . . . adapted to mate
with a rivet" and a "connecting device for attaching the balance
shoe with the U-shaped channel."

1. Caldwell's Series 97ez Balance

   *a. Pocket adapted to mate with a rivet*:  Amesbury contends
that the "pocket" in Caldwell's 97ez balance is formed at the top
of the frame of the "carrier," the term Dr. Still used to
describe the balance shoe on the 97ez balance.  Caldwell argues
that the shape of the top of the frame of the "carrier" does not
form a pocket because it does not mate with the rivet.  Rather,
that rivet, which holds the end of the spring, only prevents
outward rotation of the carrier by blocking outward movement of
the two "legs" at the top of the carrier ("carrier legs").

   As I found in my Markman Order, the function of the "pocket"
in the '368 Patent is clear -- to receive or mate with a rivet,
thereby aiding to secure the balance shoe within the U-shaped

channel of the inverted window balance.  Markman Order at pp. 60-61; '368 Patent, col. 5, ll. 33-39 ("A fastener 635 located in the inverted window balance 622 can be used to further secure the connection between the snap lock balance shoe 210 and the inverted window balance 622.  To accommodate the fastener 635, the snap lock balance shoe 210 can form a connection pocket 213 sized to receive or mate with the fastener 635.").  Since the shape of the rivet fastener therefore defines the shape of the interfacing pocket, I did not adopt Caldwell's suggestion that the pocket be construed "a U or C-shaped channel bounded on three sides with an opening designed to mate with a rivet" to permit some variability in the shape of the rivet and the corresponding pocket.  But in choosing to construe the term more broadly, I emphasized that the opening of the pocket must be "shaped to mate with a rivet, thereby aiding to secure the balance shoe within the U-shaped channel of the inverted window balance."  In fact, Claim 2 specifically claims a pocket "adapted to mate with a rivet."

The so-called "pocket" on the carrier element of the 97ez balance -- where the top of the carrier and the carrier legs form two "L"-like shapes -- is not shaped or adapted to mate with a rivet.  Contrary to Amesbury's assertion, the fact that the so-called pocket may contact the rivet if the carrier is forcibly rotated, as may occur during shipping and handling, *see* Robertson

Depo. at 51:9-16, does not mean that it is shaped or adapted to
**mate** with a rivet.  The common meaning of "mate" requires a more
correlative or complementary interfacing shape, such as the
pocket depicted in the figures in the '368 Patent and in the
photograph of Amesbury's Snap Lock Balance Shoe.  (Still April
17, 2006 Expert Report, Exs. L-N).  In addition, the parties
agreed at the Markman hearing that "mate" is to join or fit
together.  Accordingly, Amesbury has failed to show that it is
entitled to summary judgment for literal infringement.

Alternatively, Amesbury argues that the so-called "pocket"
on the 97ez balance is equivalent to the '368 Patent pocket.

The doctrine of equivalents, "by its very nature, extends
beyond the patent's literal claim scope, because otherwise a
finding of no literal infringement would be a foreordained
conclusion of no infringement at all." *LG Elec., Inc. v. Bizcom
Elec., Inc.*, 453 F.3d 1364, 1380 (Fed. Cir. 2006)(internal
citation omitted).  Equivalence must be "assessed on a
limitation-by-limitation basis, as opposed to from the
perspective of the invention as a whole." *Freedman Seating Co.
v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005), *cert.
denied*, 126 S. Ct. 1167 (2006), *citing Warner-Jenkinson Co. v.
Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).  "Whether an
element of the accused device is equivalent to a claim limitation
depends on 'whether the substitute element matches the function,

-37-

way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.'" *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998), *cert. denied*, 122 S. Ct. 580 (2001), *quoting Warner-Jenkinson*, 520 U.S. at 40.

Even when a difference might otherwise be considered plainly insubstantial, there can be no infringement under the doctrine of equivalents as a matter of law if the theory of equivalence would vitiate a claim limitation. *Tronzo*, 156 F.3d at 1160; *see also* Cases and Recent Development, 15 Fed. Circuit B.J. 321, 382-83 (2005).

> There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule. Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless.

*LG*, 453 F.3d at 1380 *quoting Freedman Seating*, 420 F.3d at 1359.

In carrying out the claim vitiation analysis, courts must be careful not to "swallow the doctrine of equivalents, reducing the application of the doctrine to nothing more than a repeated analysis of literal infringement." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1318 (Fed. Cir. 1998). On the other hand, the claim vitiation doctrine is intended to prevent the overextension of the doctrine of equivalents. *Freedman Seating*, 420 F.3d at 1362. "Members of the public [a]re

justified in relying on [the] specific language in assessing the bounds of [a] claim." *Id.* Consequently, in some circumstances it "would unjustly undermine the reasonable expectations of the public" to find infringement under the doctrine of equivalents. *Id.*

Since only Amesbury has moved for summary judgment, I consider whether on the facts presented, it has been established that no reasonable juror could find the differences between the allegedly infringing devices and the claimed inventions are substantial or different in kind. *Cf. Ethnicon*, 149 F.3d at 1318. If so, I also consider whether the difference can be characterized as an insubstantial change without rendering the pertinent limitation meaningless.

In this case, the claim limitation is a pocket adapted to mate with a rivet. Amesbury argues that the so-called 97ez balance pocket is equivalent to the '368 Patent pocket because they perform the same function -- stopping displacement or rotation of the balance shoe outward from the channel -- in the same way to achieve the same result as the claimed invention. Amesbury's only evidence that the function of the '368 Patent pocket is to stop rotation or outward displacement is Dr. Shina's opinion that "a <u>possible</u> function of the pocket in claim 2 is to prevent displacement or rotation of the balance shoe during shipping, handling and use." (Shina March 23, 2006 Expert Report

at p. 33).  Caldwell, however, has not produced evidence

suggesting that the pocket adapted to mate with a rivet performs

a different function.  Instead, Caldwell argues in opposition

that Amesbury's argument based on equivalence fails both legally

and factually.  But, other than criticizing Shina's

qualifications, Caldwell fails to elaborate convincingly why.[13]

Consequently, on this evidence I find that there is no genuine

issue of material fact as to the commonality of the functions of

the "pockets" in the '368 Patent and the 97ez balance.  I further

find that no reasonable juror could find that the 97ez carrier

legs are substantially different; rather, the difference between

the configuration of the '368 Patent's pocket adapted to mate

---

[13] Caldwell states that Dr. Shina's contention —- that "the
connecting device (i.e., the rivet) of claim 2 performs the same
function of attaching the balance shoe to the channel, by using a
method connecting the shoe to the channel" -- is directly
disputed by Caldwell's expert creating, at a minimum, a question
of fact on the issue.  For support, Caldwell cites to the
depositions of Dr. Still, who states that the rivet has "nothing
to do with the connection to the channel," (Still Depo. at pp.
140-42), and Kellum, who explained that when installed in a
window, the carrier of the 97ez balance does not touch the rivet.
(Kellum Depo. at p. 144).  This analysis is faulty for several
reasons.

First, it is the "connecting device" of claim 2 that
performs the function of attaching the balance shoe to the
channel.  The pocket adapted to mate with a rivet in claim 2 is
only designed to help secure the shoe to the channel by
preventing outward rotation.  (Shina March 23, 2006 Expert Report
at p. 34).  Second, Dr. Still's comment that the interaction
between the carrier legs and the rivet has nothing to do with the
connection to the channel, must be read in light of his testimony
that the configuration is designed to prevent rotation of the
carrier during shipment and assembly.

with a rivet and the top of the 97ez carrier with its two legs
that fit underneath the rivet is plainly insubstantial unless one
were to render the pertinent limitation ("adapted to mate with a
rivet") meaningless.  Both configurations prevent the rotation or
displacement outward of the balance shoe or carrier from the
channel.  And both configurations are shaped to allow the balance
shoe or carrier to "slide ... into the rigid U-shaped channel
such that the fastener [i.e. rivet] is received in the connection
pocket of the ... balance shoe."  ('368 Patent, col. 6, ll. 43-
46, Figs. 6A-6C).  Accordingly, Caldwell's 97ez balance includes
an element equivalent to the '368 Patent's pocket.

　　*b. Connecting device for attaching the balance shoe within
the U-shaped channel*: As indicated above, I construed the term
"connecting device" as a device, such as a rivet, screw, or
resilient tabs, that connects the balance shoe to the U-shaped
channel of the inverted window balance.  Although the name of the
patent is "snap lock balance shoe and system for a pivotable
window," which suggests connection via resilient or retractable
tabs that snap out to lock into place, I declined to limit
"connecting device" in Claim 2 to a pair of resilient tabs as
urged by Caldwell.  *See* Markman Order at p. 72.

　　Caldwell suggests that there is no literal infringement of
the '368 Patent because there is no "connecting device" in the
97ez balance.  For support, Caldwell cites only to one of the

inventors of the '368 Patent, Newman, who conceded in his
deposition that the engineering drawings for the 97ez balance did
not include a "snapping element" as he understood was required by
the claims of the '368 Patent.  (Newman Depo. at pp. 121-22).
But, as Amesbury points out in reply, Newman's testimony fails to
account for my broad construction of "connecting device" in light
of Claim 1, which refers to a "connecting device comprising one
or more resilient tabs ..., wherein the one or more resilient
tabs extend at least partially through a corresponding number of
the plurality of openings in the U-shaped channel," and dependent
Claims 2, 4, and 5, wherein the wherein the connecting device
comprises a rivet, screw, and resilient tabs, respectively.
Here, the carrier in Caldwell's 97ez balance is clearly connected
to the channel via the rivet that passes through an aperture in
the carrier.  *See* Still April 17, 2006 Expert Report at p. 8
("During factory assembly, a connecting rivet is threaded through
an aperture molded into the frame of the carrier.").
Accordingly, I find that a "connecting device" as claimed in
Claim 2 of the '368 Patent is present in the 97ez balance.

     Since there is no genuine issue of material fact about
whether a "connecting device" and the equivalent of a "pocket ...
adapted to mate with a rivet," as claimed in Claim 2 of the '368
Patent, are present in the 97ez balance, and since Caldwell does
not otherwise dispute infringement of dependent Claims 3, 6, and

7, I will grant summary judgment to Amesbury with respect to infringement of Claims 2, 3, 6, and 7 by the 97ez balance.

2. <u>Caldwell's Series 97i and 97ih Balances</u>

Caldwell argues that its 97i and 97ih balances, which have a shorter carrier without legs that extend below the second rivet that holds the spring, do not infringe independent Claim 2 of the '368 Patent because the "pocket ... adapted to mate with a rivet" and the "connecting device for attaching the balance shoe within the U-shaped channel" are missing. Amesbury suggests, however, that the notch in the carrier's frame into which the rivet slides is the "pocket" and that the rivet is the "connecting device."

*a. Connecting device for attaching the balance shoe within the U-shaped channel*: Caldwell argues that the rivet with which the purported "pocket" is supposed to adapt cannot also be the "connecting device." This is essentially a rehash of Caldwell's argument in its Markman Brief that the term "connecting device" must be construed as a separate element from the rivet that mates with the pocket. Since Caldwell has not provided any convincing reason to disturb my prior holding, I reaffirm my conclusion, for the reasons discussed in my Markman Order at pp. 68-72, that "connecting device" in Claim 2 should be construed to include the possibility that the rivet could serve as the "connecting device" when it locks into the frame's "pocket" shaped to mate with it. Consequently, since the 97i and 97ih balances' rivet attaches the

carrier within the U-shaped channel, it is clear that the rivet satisfies the "connecting device" element claimed in Claim 2 of the '368 Patent. (Robertson Depo. at p. 26, Still Depo. at p. 134, Shina March 23, 2006 Expert Report at pp. 40, 44).

b. *Pocket adapted to mate with a rivet*: Amesbury contends that the notch in the carrier's frame into which the rivet slides, which is visible in the engineering drawings of the 97i balance (Ishmael Decl., Ex. 36), is the "pocket." Caldwell objects to this characterization, arguing that the rivet simply passes through a clearance in the frame. I find that Amesbury has failed to establish that the so-called notch in Caldwell's 97i and 97ih balances literally incorporates the "pocket" claimed in the '368 Patent or its equivalent.

In construing the term "pocket," I adopted Caldwell's suggestion that the definition must incorporate the idea that the pocket have an opening into which the rivet slides, rather than an aperture in the frame through which a rivet is threaded. *See* Markman Order at pp. 62-63. I based this conclusion on the description of one of the methods for securing the snap lock balance shoe within the channel, depicted in Figs. 6A-6C. Based on this construction, I find that Caldwell's 97i and 97ih balances do not have a "pocket" or the equivalent of a "pocket"; they simply have apertures through which a rivet is threaded to secure the carrier to the channel. Accordingly, I will deny

-44-

summary judgment with respect to infringement of the '368 Patent by the 97i and 97ih balances.

**B. INVALIDITY**

Caldwell did not respond to Amesbury's argument that the '368 patent is not invalid.  Accordingly, I will grant summary judgment to Amesbury on the invalidity issue.

**VI. CONCLUSION**

For the reasons set forth more fully above, I DENY Amesbury's summary judgment motion with respect to:

(1)  infringement and the validity of the '638 Patent,

(2)  validity of the '264 Patent, and

(3)  infringement of Claims 2, 3, 6, and 7 of the '368 Patent by Caldwell's Series 97i and 97ih balances;  and

I GRANT Amesbury's summary judgment motion with respect to:

(1)  infringement of Claims 1, 2, 4, and 5 of the '264 Patent by Caldwell's Series 86xt balance,

(2)  infringement of Claims 2, 3, 6, and 7 of the '368 Patent by Caldwell's Series 97ez balances, and

(3)  validity of the '368 Patent.


/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE