IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT MASSACHUSETTS

| | |
|---|---|
| AMESBURY GROUP, INC., and AMESBURY SPRINGS LTD., <br><br> Plaintiffs, <br><br> v. <br><br> THE CALDWELL MANUFACTURING COMPANY, <br><br> Defendant. | Civil Action No.  05-10020-DPW |

## DECLARATION OF SAFRAZ W. ISHMAEL
## IN SUPPORT OF AMESBURY'S OPPOSITION TO
## CALDWELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Safraz W. Ishmael, hereby declare as follows:

I am an associate in the law firm of Goodwin Procter LLP and counsel of record for plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd. (collectively "Amesbury").  I make this declaration in support of Amesbury's Opposition to Caldwell's Motion for Partial Summary Judgment of Non-Infringement.

1.    Attached as Exhibit 1 is a true and correct copy of U.S. Patent No. 6,820,368.

2.    Attached as Exhibit 2 is a true and correct copy of excerpts of the official transcript of the November 22, 2005 deposition of Robert Lelio.

3.    Attached as Exhibit 3 is a true and correct copy of Defendant's Supplemented Answers to Plaintiffs' First Set of Interrogatories, dated August 31, 2005.

4.    Attached as Exhibit 4 is a true and correct copy of the Expert Witness Report of Charles E. Still, dated April 17, 2006.

1

5.    Attached as Exhibit 5 is a true and correct copy of excerpts from the official transcript of the May 2, 2006 deposition of Charles E. Still.

6.    Attached as Exhibit 6 is a true and correct copy of excerpts from the official transcript of the November 29, 2005 deposition of Jeffrey Robertson.

7.    Attached as Exhibit 7 is a true and correct copy of the Expert Report of Dr. Sammy Shina, dated March 23, 2006.

8.    Attached as Exhibit 8 is a true and correct copy of excerpts of the official transcript of the May 3, 2006 deposition of Dr. Sammy Shina.

9.    Attached as Exhibit 9 is a true and correct copy of a letter from Douglas J. Kline, Esq. to Neal L. Slifkin, Esq. dated December 18, 2006.

10.    Attached as Exhibit 10 is a true and correct copy of Amesbury's Second Supplemental Response to Caldwell's Interrogatories, dated January 12, 2006.

11.    Attached as Exhibit 11 is a true and correct copy of excerpts of the official transcript of the November 8, 2005 deposition of Thomas Batten.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on January 12, 2007.

/s/ Safraz W. Ishmael

Safraz W. Ishmael

LIBA/1756935.1

2

# EXHIBIT 1



US006820368B2

(12) **United States Patent**
Uken et al.

(10) **Patent No.:**  US 6,820,368 B2
(45) **Date of Patent:**  Nov. 23, 2004

(54) **SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW**

(75) Inventors: **Stuart J. Uken**, Sioux Falls, SD (US); **Gary R. Newman**, Valley Springs, SD (US); **Lawrence J. VerSteeg**, Sioux Falls, SD (US)

(73) Assignee: **Amesbury Group, Inc.**, Amesbury, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/446,279**

(22) Filed: **May 23, 2003**

(65) **Prior Publication Data**

US 2003/0192257 A1 Oct. 16, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 10/044,005, filed on Jan. 11, 2002, now Pat. No. 6,679,000.
(60) Provisional application No. 60/261,501, filed on Jan. 12, 2001.

(51) Int. Cl.⁷ .............................. E05D 15/22; E05F 1/00
(52) U.S. Cl. .............................. 49/181; 49/176; 49/446; 16/197
(58) Field of Search .......................... 49/181, 183, 184, 49/185, 186, 445, 446, 449, 455, 453, 454, 176, 177, 161; 292/174, 175, DIG. 63, DIG. 47, DIG. 37; 16/197

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,007,212 A | 10/1911 | Lasersohn | |
| 1,312,665 A | 8/1919 | Almquist | |
| 2,178,533 A | 10/1939 | Viehweger | |
| 2,952,884 A | 9/1960 | Dinsmore | |
| 3,007,194 A | 11/1961 | Griswold | |
| 3,105,576 A | 10/1963 | Jones et al. | |
| 3,461,608 A | 8/1969 | Johnson | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

CA          2382933          4/2002

OTHER PUBLICATIONS

BSI's Hidden Advantage: It's as Easy as 1–2–3, Balance Systems—BSI, Amesbury Group, Inc., 2001. (3 pgs.), no month available.

(List continued on next page.)

*Primary Examiner*—Hugh B. Thompson, II
(74) *Attorney, Agent, or Firm*—Testa, Hurwitz & Thibeault, LLP

(57) **ABSTRACT**

The invention relates to a snap lock balance shoe and balance systems to be incorporated in pivotable double hung windows and installation methods of such systems. In one embodiment, the snap lock balance shoe includes a pair of retractable tabs that partially extend through openings within an inverted window balance. In one embodiment of the method, an elongated end of the balance shoe is inserted into a window jamb and then rotated into position.

**11 Claims, 13 Drawing Sheets**



**US 6,820,368 B2**
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,497,999 A | 3/1970 | Hendra | |
| 3,520,381 A | 9/1970 | Grossman | |
| 3,676,956 A | 7/1972 | Taylor et al. | |
| 3,732,594 A | 5/1973 | Mills | |
| 3,869,754 A | 3/1975 | Foster | |
| 4,028,849 A | 6/1977 | Anderson | |
| 4,068,406 A | 1/1978 | Wood | 49/181 |
| 4,079,549 A | 3/1978 | Wood | 49/181 |
| 4,089,085 A | 5/1978 | Fitzgibbon | |
| 4,190,930 A | 3/1980 | Prosser | |
| 4,300,316 A | 11/1981 | Ficurilli | |
| 4,332,054 A | 6/1982 | Paist et al. | 16/197 |
| 4,506,478 A | 3/1985 | Anderson | 49/181 |
| 4,510,713 A | 4/1985 | Anderson | 49/175 |
| 4,610,108 A | 9/1986 | Marshik | 49/181 |
| 4,697,304 A | 10/1987 | Overgard | |
| 4,930,254 A | 6/1990 | Valentin | 49/181 |
| 4,941,285 A | 7/1990 | Westfall | 49/176 |
| 4,949,425 A | 8/1990 | Dodson et al. | |
| 4,958,462 A | 9/1990 | Cross | 49/181 |
| 5,069,001 A | 12/1991 | Makarowski | 49/176 |
| 5,127,192 A | 7/1992 | Cross | 49/181 |
| 5,140,769 A | 8/1992 | Hickson et al. | |
| 5,189,838 A | 3/1993 | Westfall | 49/181 |
| 5,251,401 A | 10/1993 | Prete et al. | 49/181 |
| 5,301,467 A | 4/1994 | Schmidt et al. | 49/181 |
| 5,353,548 A | 10/1994 | Westfall | |
| 5,371,971 A | 12/1994 | Prete | |
| 5,377,384 A | 1/1995 | Riegelman | 16/193 |
| D355,262 S | 2/1995 | Chaney et al. | |
| 5,445,364 A | 8/1995 | Tibbals, Jr. | |
| 5,448,858 A | 9/1995 | Briggs et al. | |
| 5,452,495 A | 9/1995 | Briggs | |
| 5,463,793 A | 11/1995 | Westfall | |
| 5,530,991 A | 7/1996 | deNormaad et al. | |
| 5,553,903 A | 9/1996 | Prete et al. | 292/163 |
| 5,566,507 A | 10/1996 | Schmidt et al. | |
| 5,572,828 A | 11/1996 | Westfall | 49/181 |
| 5,615,452 A | 4/1997 | Habbersett | 16/194 |
| 5,632,117 A | 5/1997 | Prete et al. | 49/181 |
| 5,632,118 A | 5/1997 | Stark | 49/181 |
| 5,661,927 A | 9/1997 | Polowinczak et al. | 49/447 |
| 5,669,180 A | 9/1997 | Maier | |
| 5,697,188 A | 12/1997 | Fullick et al. | 49/181 |
| 5,704,165 A | 1/1998 | Slocomb et al. | 49/181 |
| 5,737,877 A | 4/1998 | Meunier et al. | 49/445 |
| 5,802,767 A | 9/1998 | Slocomb et al. | 49/181 |
| 5,806,243 A | 9/1998 | Prete et al. | 49/181 |
| 5,806,900 A | 9/1998 | Braicher et al. | 292/137 |
| 5,829,196 A | 11/1998 | Maier | 49/181 |
| 5,855,092 A | 1/1999 | Raap et al. | |
| 5,873,199 A | 2/1999 | Meunier et al. | 49/181 |
| 5,924,243 A | 7/1999 | Polowinczak et al. | 49/181 |
| 5,927,013 A | 7/1999 | Slocomb et al. | 49/181 |
| 5,943,822 A | 8/1999 | Slocomb et al. | 49/181 |
| 6,032,417 A | 3/2000 | Jakus et al. | 49/181 |
| 6,041,475 A | 3/2000 | Nidelkoff | 16/193 |
| 6,041,476 A | 3/2000 | deNormaad | 16/197 |
| 6,041,550 A | 3/2000 | Tix | 49/404 |
| 6,058,653 A | 5/2000 | Slocomb et al. | 49/181 |
| 6,119,398 A | 9/2000 | Yates, Jr. | |
| D434,637 S | 12/2000 | Habeck et al. | |
| 6,155,615 A | 12/2000 | Schultz | 292/163 |
| 6,161,335 A | 12/2000 | Beard et al. | |
| 6,178,696 B1 | 1/2001 | Liang | 49/185 |
| 6,226,923 B1 | 5/2001 | Hicks et al. | |
| 6,467,128 B1 | 10/2002 | Damani | |
| 6,470,530 B1 | 10/2002 | Trunkle | |
| D467,490 S | 12/2002 | Uken et al. | |
| 6,622,342 B1 | 9/2003 | Annes et al. | |
| 6,679,000 B2 | 1/2004 | Uken et al. | |
| 2002/0092241 A1 | 7/2002 | Uken et al. | |
| 2002/0129463 A1 | 9/2002 | Newman | |

## OTHER PUBLICATIONS

BSI Tilt Balance Systems, Balance Systems—BSI, Amesbury Group, Inc., 1996–2001. (4 pgs.), no month available.

Crossbow Balance! Another New Balance in BSI's Quiver, Balance Systems—BSI, Amesbury Group, Inc., Jun. 7, 1999. (3 pgs.).

Case 1:05-cv-10020-DPW    Document 123-2    Filed 01/12/2007    Page 4 of 51



FIG. 1



PRIOR ART

FIG. 2A



FIG. 2B



FIG. 3A



FIG. 3B



FIG. 3C

210



230

**FIG. 3D**

210



240

250

250

**FIG. 3E**

210

250

**FIG. 3F**



**FIG. 4**



FIG. 5A



FIG. 5B



FIG. 6A

FIG. 6B



FIG. 6C

FIG. 6D



FIG. 7A

FIG. 7B

FIG. 8A

FIG. 8B

U.S. Patent     Nov. 23, 2004     Sheet 12 of 13     US 6,820,368 B2



FIG. 9



FIG. 10A

FIG. 10B

FIG. 11A

FIG. 11B

FIG. 12A

FIG. 12B

FIG. 13A

FIG. 13B

US 6,820,368 B2

1

# SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW

## RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 10/044,005 entitled Snap Lock Balance Shoe and System for a Pivotable Window filed on Jan. 11, 2002, now U.S. Pat. No. 6,679,000, which application incorporates by reference in its entirety and claims priority to U.S. Provisional Patent Application Ser. No. 60/261,501 entitled Snap Lock Balance Shoe and System for a Pivotable Window filed on Jan. 12, 2001.

## FIELD OF THE INVENTION

This invention relates to a window balance system for use in a pivotable window assembly.

## BACKGROUND OF THE INVENTION

This invention relates to the field of tilt-in windows. More particularly this invention relates to a balance shoe of a window balance system used in conjunction with a pivot bar mounted on a window sash for rotating the window sash relative to a window frame.

Typical pivotable double hung windows include two window sashes disposed in tracks located in a window frame to allow vertical sliding movement of the sashes. Pivot bars are provided to allow rotational movement of a pivotable window sash about the pivot bars to facilitate cleaning of glazing. To control vertical movement, window balances are used so that the window sashes remain in a position in which they are placed. Balance shoes are used to guide the rotational movement of the window sashes with respect to the window frame. Typically, the balance shoes are coupled to window balances with a connecting member. See, for example, U.S. Pat. No. 6,119,398, entitled "Tilt Window Balance Shoe Assembly with Three Directional Locking" issued to H. Dale Yates, Jr., the disclosure of which is herein incorporated by reference in its entirety.

One of the problems with balance shoes and window balances for pivotable double hung windows is that they are difficult to install. In order to install a pivotable double hung window with balance shoes and window balances, the following installation steps typically must be followed. First, before the window frame is assembled, the balance shoes are inserted into jamb tracks. Next, connecting members are used to attach the balance shoes to the window balances. The balance shoes generally have an opening to accept the pivot bars that are mounted on window sashes. Finally, the sashes are made operable by inserting the pivot bars into the balance shoes and rotating the window sash up to a vertical position in the jamb tracks. The installation process is rather complex and difficult. Repair costs for replacing balance shoes are also significant. In order to change a malfunctioning or failed balance shoe, the jamb tracks either need to be deformed or replaced to gain access to the problematic balance shoe for removal and replacement.

## SUMMARY OF THE INVENTION

In general, in one aspect, the invention relates to a balance shoe. The balance shoe includes a frame, a locking member at least partially disposed within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within a window balance. Embodiments of the invention can include the

2

following features. The connecting device can include one or more retractable tabs that engage the window balance directly. The frame can further include a frame pocket sized to receive a fastener. The cam can include at least one camming surface and a keyhole opening for receiving a pivot bar attached to a window sash. The cam is at least partially housed within the frame and is disposed within a space enclosed by the locking member. Upon rotating the cam with the pivot bar, the locking member engages the window jamb. In one embodiment, the locking member includes two opposing ends integrally connected by a spring member. The cam is located within a space between the opposing ends of the locking member, and upon rotating the cam with the pivot bar, the opposing ends engage the window jamb. In another embodiment, the locking member includes a plate, which is parallel to a back surface of the frame. The cam is located within a space between the plate and the frame such that rotating the cam with the pivot bar forces the plate to engage the window jamb.

In another aspect, the invention relates to an inverted window balance system for use within a pivotable double hung window assembly. The inverted window balance system includes a rigid U-shaped channel with a plurality of openings in the channel walls for securing the contents in the channel, which include an extension spring, a system of pulleys, a cord to connect the extension spring via the system of pulleys with the window sash, and a balance shoe. The balance shoe includes a frame, a locking member at least partially disposed within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within the rigid U-shaped channel. Embodiments of this aspect of the invention can include the following features. At least a portion of the balance shoe is disposed within the rigid U-shaped channel. The connecting device can include one or more retractable tabs for engaging the rigid U-shaped channel. The retractable tabs can partially extend through at least one of the plurality of openings in the rigid U-shaped channel. The balance shoe can be further secured to the rigid U-shaped channel with a fastener that interfaces with a frame pocket in the balance shoe. The cam can include at least one camming surface and a keyhole opening for receiving a pivot bar attached to a window sash. The cam is at least partially housed within the frame and is disposed within a space enclosed by the locking member. Upon rotating the cam with the pivot bar, the locking member engages the window jamb. In one embodiment, the locking member includes two opposing ends integrally connected by a spring member. The cam is located within a space between opposing ends of the locking member, and upon rotating the cam with the pivot bar, the opposing ends engage the window jamb. In another embodiment, the locking member includes a plate, which is parallel to a back surface of the frame. The cam is located within a space between the plate and the frame such that rotating the cam with the pivot bar forces the plate to engage the window jamb.

In still another aspect, the invention relates to a method of installing an inverted window balance system within a window jamb in a window frame. The method includes four basic steps. The first step is to provide an inverted window balance system that includes a rigid U-shaped channel with a plurality of openings in the channel walls for securing the contents in the channel, an extension spring and a system of pulleys disposed within the rigid U-shaped channel, a cord to connect the extension spring via the system of pulleys with the window sash, and a balance shoe. The balance shoe includes a frame, a locking member located at least partially

US 6,820,368 B2

3

within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within the rigid U-shaped channel. The frame of the balance shoe has a frame bottom surface, a frame front surface, and two frame edge surfaces. The second step is to insert the inverted window balance system into a jamb track of the window jamb, such that an axis extending along a longitudinal direction of the rigid U-shaped channel is perpendicular to a back wall of the jamb track and an axis that is perpendicular to the two frame edge surfaces is parallel to the back wall while the frame front surface faces a side wall of the jamb track. The third step is to rotate the window balance system within the jamb track 90 degrees about the axis extending along the longitudinal direction of the rigid U-shaped channel, such that the frame front surface faces in a downward direction. The final step is to rotate the window balance system 90 degrees about the axis that is perpendicular to the two frame edge surfaces, such that the frame bottom surface faces in the downward direction.

These and other features of the invention will be made apparent from the following description taken in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention.

FIG. 1 is a perspective view of a pivotable double hung window assembly;

FIG. 2A is a rear view of inverted window balance system for use with a prior art balance shoe;

FIG. 2B is a rear view of a window balance;

FIG. 3A is one perspective view of an embodiment of a snap lock balance shoe of the present invention;

FIG. 3B is another perspective view of the embodiment of the snap lock balance shoe of FIG. 3A;

FIG. 3C is a rear view of one embodiment of a snap lock inverted balance system;

FIG. 3D is a bottom view of one embodiment of a snap lock balance shoe;

FIG. 3E is a front view of one embodiment of a snap lock balance shoe;

FIG. 3F is a side view of one embodiment of a snap lock balance shoe;

FIG. 4 is a perspective view of an embodiment of a snap lock balance shoe of the present invention;

FIG. 5A is one perspective view of another embodiment of a snap lock balance shoe of the present invention;

FIG. 5B is another perspective view of the embodiment of the snap lock balance shoe of FIG. 5A;

FIG. 6A is a perspective view of one embodiment of a balance shoe of the invention and a rigid U-shaped channel;

FIG. 6B is a perspective view showing the first step of connecting one embodiment of the balance shoe of the invention to the rigid U-shaped channel;

FIG. 6C is a perspective view showing the second step of connecting one embodiment of the balance shoe of the invention to the rigid U-shaped channel;

FIG. 6D is a perspective view showing one embodiment of the balance shoe of the invention connected to the rigid U-shaped channel;

FIG. 7A is a front view of a prior art balance shoe attached to a rigid U-shaped channel;

4

FIG. 7B is a side view of the prior art balance shoe attached to the rigid U-shaped channel;

FIG. 8A is a front view of one embodiment of a snap lock balance shoe of the present invention attached to a rigid U-shaped channel;

FIG. 8B is a side view of one embodiment of the snap lock balance shoe of the present invention attached to the rigid U-shaped channel;

FIG. 9 is a front view of a window assembly including one snap lock inverted window balance system of the present invention and one prior art inverted window balance system installed in a window frame;

FIG. 10A is a side view illustrating the first step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 10B is a front view illustrating the first step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 11 A is a side view illustrating the second step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 11B is a front view illustrating the second step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 12A is a side view illustrating the third step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 12B is a front view illustrating the third step of installing the snap lock inverted window balance system of the invention into the jamb track;

FIG. 13A is a side view illustrating the last step of installing the snap lock inverted window balance system of the invention into the jamb track; and

FIG. 13B is a front view illustrating the last step of installing the snap lock inverted window balance system of the invention into the jamb track.

DETAILED DESCRIPTION OF THE INVENTION

Referring to FIG. 1, shown is a pivotable double hung window assembly 100 in which a snap lock balance shoe constructed in accordance with the teachings of the present invention can be used. The pivotable double hung window assembly 100 includes of a window frame 102, a pivotable lower window sash 104, a pivotable upper window sash 106, and a window jamb 107. The pivotable lower window sash 104 and the pivotable upper window sash 106 slide vertically in jamb track 108 within the window jamb 107, while also being able to pivot about a pivot bar 114, as shown in FIG. 9.

FIG. 2A shows a rear view of an inverted window balance system 120 for use in the pivotable double hung window assembly 100. The inverted window balance system 120 includes an inverted window balance 122 used for balancing the weight of either the pivotable lower window sash 104 or the pivotable upper window sash 106 at any vertical position within the window frame 102, and a prior art balance shoe 110 for guiding the rotation of the pivotable lower window sash 104 about the pivot bar 114. A hanging connector 112 connects the prior art balance shoe 110 to the inverted window balance 122. The inverted window balance 122 includes an extension spring 126 connected to a system of pulleys 128 housed within a rigid U-shaped channel 130, and a cord 132 for connecting the system of pulleys 128 to a jamb mounting attachment 134. The jamb mounting

US 6,820,368 B2

5

attachment 134 is used for connecting the inverted window balance system 120 to the window jamb 107. One difference between the inverted window balance 122 and a window balance 140, shown in FIG. 2B, includes the placement of the extension spring 146 above a set of pulleys 148 within the rigid U-shaped channel 150. A cord 152 connects the system of pulleys 148 to a jamb mounting attachment 154. Another difference is that while inverted window balances 122 travel with either the pivotable lower window sash 104 or pivotable upper window sash 106, the window balance 140 remains in a fixed position in the window jamb 107 due to an attachment to the window jamb 107 through an attachment opening 155.

FIGS. 3A and 3B are perspective views of a snap lock balance shoe 210 of one embodiment of the present invention. The snap lock balance shoe 210 has a frame 211 in which is housed a connecting device 212, a locking device 214, and a cam 218. The connecting device 212 can be integral with the frame 211 and attaches the snap lock balance shoe 210 directly within an inverted window balance 622, shown in FIG. 3C. The inverted window balance 622 in combination with the snap lock balance shoe 210 forms a snap lock inverted window balance system 600. The inverted window balance 622 includes an extension spring 626 connected to a system of pulleys 628 housed within a rigid U-shaped channel 630, and a cord 632 for connecting the system of pulleys 628 to a jamb mounting attachment 634, such as a cord terminal or hook.

In the depicted embodiment, the connecting device 212 is a pair of retractable tabs that snap into the rigid U-shaped channel 630. In other embodiments, other connecting devices such as a screw, may be used to secure the frame 211 to the rigid U-shaped channel 630. A fastener 635 located in the inverted window balance 622 can be used to further secure the connection between the snap lock balance shoe 210 and the inverted window balance 622. To accommodate the fastener 635, the snap lock balance shoe 210 can form a connection pocket 213 sized to receive or mate with the fastener 635.

Another element of the snap lock balance shoe 210 visible in FIG. 3A is a keyhole opening 219 located within the cam 218. The keyhole opening 219 is sized to accept the pivot bar 114 extending from either the pivotable lower window sash 104 or the pivotable upper window sash 106, and serves as a connection point between the pivotable lower or upper window sash 104, 106 and the snap lock balance shoe 210. FIG. 3B shows a perspective view of the snap lock balance shoe 210 showing another face of the cam 218.

In the embodiment shown in FIG. 3B, the locking device 214 surrounds the cam 218 and includes of a pair of opposing ends 215 connected by a spring member 216. When the pivotable lower window sash 104 is tilted open, the pivot bar 114 rotates, which in turn rotates the cam 218 forcing the opposing ends 215 outward to engage the jamb track 108 of the window frame 102, thereby locking the balance shoe 210 in that location.

FIGS. 3D–3F show different views of one of the embodiments of the snap lock balance shoe 210 of the invention. FIG. 3D is a bottom view of the snap lock balance shoe 210 that shows a frame bottom surface 230. FIG. 3E is a front view of the same embodiment of the snap lock balance shoe 210 that illustrates a frame front surface 240, and FIG. 3F is an side view that shows one of the two frame edge surfaces 250 of the snap lock balance shoe 210.

FIG. 4 shows another embodiment of a snap lock balance shoe 310. The snap lock balance shoe 310 has an elongated

6

frame 311 in which is housed a connecting device 312, a locking device 314, and a cam 318. Within the cam is a keyhole opening 319 sized to receive the pivot bar 114. The elongated frame 311 has a length L 325 that is greater than about 1.25 inches. When attached to the rigid U-shaped channel 630, the balance shoe 310 extends further outward from the rigid U-shaped channel 630 than the balance shoe 210 attached to a similar sized rigid U-shaped channel 630. The balance shoe 310 allows a fixed-sized rigid U-shaped channel 630 to be used in a larger window having a greater travel distance by extending the length of the entire window balance system by having a longer balance shoe 310. One of the advantages of the present invention is that an installer can create a custom window balance system for a particular window by fitting a fixed-length rigid U-shaped channel 630 with an appropriately sized snap lock balance shoe.

Referring to FIGS. 5A–5B, shown is another embodiment of the present invention of a snap lock balance shoe 410. The snap lock balance shoe 410 has a locking member 422 which engages a back wall of the jamb track 108 locking the balance shoe 410 in that location. The locking member 422 is partially disposed in the frame 411 and includes a plate 423 that engages the back wall of the jamb track 108. The balance shoe 410 also includes a frame 411, a connecting device 412, and a cam 418. The cam 418 includes a keyhole opening 419 sized to receive the pivot bar 114. The locking member 422 is partially disposed within the frame 411 in a space enclosed by the locking member 422. The cam 418 includes a keyhole opening 419 sized to receive the pivot bar 114. Upon rotation of the cam 418 with the pivot bar 114, the locking member 422 is forced away from the frame 411 towards the back wall of the jamb track 108, thereby anchoring the balance shoe 410 in that location within the window frame 102.

FIGS. 6A–6D show one embodiment of a method for securing the snap lock balance shoe 210 within a rigid U-shaped channel 630 with multiple openings 638. It should be noted that each opening 638 on one side of the rigid U-shaped channel 630 has a corresponding opening 638 on the other side of the rigid U-shaped channel 630 to form a pair of openings. The first step, shown in FIG. 6A, is to place a fastener 635, such as a rivet, in one of the pairs of openings 638 in the rigid U-shaped channel 630. The next step, as depicted in FIG. 6B, is to slide the snap lock balance shoe 210 into the rigid U-shaped channel 630 such that the fastener 635 is received in the connection pocket 213 of the snap lock balance shoe 210. As shown in FIG. 6C, the snap lock balance shoe 210 is then rotated down so that the front frame surface 240 is aligned with a bottom wall 636 of the rigid U-shaped channel 630. FIG. 6D shows the last step of attaching the snap lock balance shoe 210 within the rigid U-shaped channel 630. In this step, the connecting device 212 of the snap lock balance shoe 210 snaps into one of the pairs of openings 638 located on the rigid U-shaped channel 630. In alternative embodiments the connection device 212 of the snap lock balance shoe 210 can extend through off-set openings in the rigid U-shaped channel 630. In some embodiments, the snap lock balance shoe 210 is attached to the rigid U-shaped channel 630 with the fastener 635. In other embodiments, the snap lock balance shoe 210 is attached to the rigid U-shaped channel 630 without the fastener 635. It should also be noted that in some embodiments, the snap lock balance shoe 210 can be aligned and secured to the rigid U-shaped channel 630 such that the front frame surface 240 faces upwards instead of downwards as depicted in FIG. 6D.

FIG. 7A is a front view of the prior art balance shoe 110 attached to the rigid U-shaped channel 130. The rigid

US 6,820,368 B2

7

U-shaped channel 130 is connected to the prior art balance shoe 110 by the hanging connector 112. No part of the prior art balance shoe 110 lies within the rigid U-shaped channel 130. FIG. 7B is a side view of the prior art balance shoe 110 attached to the rigid U-shaped channel 130 illustrating channel openings 137. Fasteners (not shown) are installed through the channel openings 137 to secure the hanging connector 112 to the rigid U-shaped channel 130.

Referring to FIGS. 8A and 8B, shown is an embodiment of the snap lock balance shoe 210 of the present invention attached to the rigid U-shaped channel 630. The snap lock balance shoe 210 is directly attached within the rigid U-shaped channel 630 by a connecting device 212 located on the frame 211 of the snap lock balance shoe 210. The connecting device 212 extends through a pair of openings 638 located on the rigid U-shaped channel 630.

FIG. 9 is a front view of a pivotable double hung window assembly 800 in which an inverted window balance 122 is attached to a prior art balance shoe 110 by using the hanging connector 112, and the inverted window balance 622 is attached to the snap lock balance shoe 210 of an embodiment of the present invention. Pivot bars 114, as shown in FIG. 9, are secured to the pivotable lower window sash 104. The pivot bars 114 are slidably receivable by both the prior art balance shoe 110 and the snap lock balance shoe 210 and serve as connections between the pivotable lower window sash 104 and respective inverted window balances 122, 622.

An advantage of the type of balance shoe presently disclosed is that the snap lock balance shoe 210 is attached within the rigid U-shaped channel 630 resulting in a longer rigid U-shaped channel 630 than in the inverted balance systems 120 for a given window sash. The longer rigid U-shaped channel 630 of the inverted window balance 622 allows for the use of longer extension springs that provide greater control of the vertical positioning of the window sash than a shorter rigid U-shaped channel 130 with a shorter extension spring. Another advantage of the present invention is that the snap lock balance shoe 210 contains a smaller number of parts than prior art balance shoes 110.

One installation method used to place a snap lock inverted window balance system 600 within the jamb tracks 108 is schematically illustrated in the remaining figures. The snap lock inverted window balance system 600 includes one inverted window balance 622 and one snap lock window balance 210. FIGS. 10A, 11A, 12A, and 13A show the installation method from a side view, while FIGS. 10B, 11B, 12B, and 13B show the method from a front view. The installation method involves an orientation step, a first rotation step, and a second rotation step FIGS. 10A and 10B show the orientation step in the installation method. In the orientation step, the snap lock inverted window balance system 600 is inserted the jamb tracks 108 such that an axis CC 510 in FIG. 10A is perpendicular to a back wall 530 of the jamb tracks 108, while an axis DD 520 in FIG. 10A is parallel to the back wall 530 and the frame front surface 240 is adjacent to a side wall 532 of the jamb tracks 108. FIGS. 11A and 11B show the snap lock inverted window balance system 600 inserted in the jamb tracks 108 as well as an arrow 550 indicating the direction of rotation of the snap lock inverted window balance system 600 required to complete the first rotation step. The first rotation step involves rotating the snap lock inverted window balance system 600 90-degrees about the axis CC 510 such that the frame front surface 240 faces downward. FIGS. 12A and 12B show the snap lock inverted window balance system 600 after the

8

90-degree rotation around the axis CC 510 has been completed. The second rotation step involves a 90-degree rotation about the axis DD 520. An arrow 560 showing the direction of the second rotation step is shown in FIGS. 12A and 12B. FIGS. 13A and 13B show in two different views the snap lock inverted window balance system 600 after the installation method has been completed. The cord terminal or any other jamb mounting attachment 634 (see FIG. 9) can then be screwed or hooked into place to anchor the snap lock inverted window balance system 600.

The installation method just described can be carried out in reverse to remove the snap lock inverted window balance system 600 from the jamb track 108 of the window frame 102 to allow for easy replacement of the snap lock balance shoe 210 or the snap lock inverted window balance system 600 itself. In order to replace inverted window balance systems 120 with prior art balance shoes 110, either the jamb tracks 108 need to be warped or completely removed in order to replace the prior art balance shoe 110 of the inverted window balance system 120.

While there have been described several embodiments of the invention, other variants and alternatives will be obvious to those skilled in the art. Accordingly, the scope of the invention is not limited to the specific embodiments shown.

What is claimed is:

1. A window balance system comprising:

a U-shaped channel comprising a plurality of openings;

a spring connected to a system of pulleys located within the U-shaped channel;

a cord with a first cord end and a second cord end, the fist cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and

a balance shoe, wherein the balance shoe comprises:

a frame comprising an enlarged first end and a second end, wherein at least a portion of the second end of the frame is disposed within the U-shaped channel;

a locking member proximal to the enlarged first end;

a cam in communication with the locking member; and

a connecting device comprising one or more resilient tabs for attaching the balance shoe within the U-shaped channel of the window balance, wherein the one or more resilient tabs extend at least partially through a corresponding number of the plurality of openings in the U-shaped channel.

2. A window balance system comprising:

a U-shaped channel comprising a plurality of openings;

a spring connected to a system of pulleys located within the U-shaped channel;

a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and

a balance shoe, wherein the balance shoe comprises:

a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;

a locking member proximal to the enlarged first end;

a cam in communication with the locking member, and

a connecting device for attaching the balance shoe within the U-shaped channel of the window balance.

US 6,820,368 B2

9

10

3. The window balance system of claim 2 wherein the connecting device comprises a rivet.

4. The window balance system of claim 2 wherein the connecting device comprises a screw.

5. The window balance system of claim 2 wherein the connecting device comprises a resilient tab.

6. The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

7. The window balance system of claim 2 wherein the locking member comprises two opposing ends integrally connected by a spring member.

8. The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

9. The window balance system of claim 2 wherein the locking member comprises a plate, wherein the plate is parallel to a back surface of the enlarged first end of the frame.

10. The window balance system of claim 9 wherein the cam is at least partially housed within the enlarged first end of the frame wherein rotating the cam forces the plate of the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

11. The window balance system of claim 2 wherein the cam comprises at least one camming surface and a keyhole opening sized to receive a pivot bar.

* * * * *

# EXHIBIT 2

00001
1

2          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
3    - - - - - - - - - - - - - - - - - - -x
     AMESBURY GROUP, INC., and
4    AMESBURY SPRINGS LTD.,
            Plaintiffs,

5
           v.    Civil Action No. 05-10020-DPW

6
     THE CALDWELL MANUFACTURING
7    COMPANY,
            Defendant.
8    - - - - - - - - - - - - - - - - - - -x
            C O N F I D E N T I A L
9
     Videotaped Deposition Upon Oral Examination Of:
10          Robert J. Lelio

11
     Location:    Harris Beach PLLC
12               99 Garnsey Road
                 Pittsford, New York  14534
13

14   Date:       November 22, 2005

15

16   Time:       9:06 a.m.

17

18

19   Reported By:   Joanne N. Pero

20          Alliance Shorthand, Inc.

21          Suite 1500 - The Penthouse

22          Alliance Building

23          183 Main Street East

24          Rochester, New York  14604

25

**Lelio, Robert J., 11/22/05**                    **Page 1**

00002
1

2  Appearing on Behalf of Plaintiffs:

3    David J. Edwards, Esq.
       Harris Beach PLLC
4       99 Garnsey Road
        Pittsford, New York  14534
5

6  Appearing on Behalf of Defendant:

7    Safraz W. Ishmael, Esq.
       Goodwin Procter LLP
8       Exchange Place
        Boston, Massachusetts  02109
9

10  Videographer:

11    Mark DelMonte
        Electronic Field Productions, Inc.
12       3495 Winton Place, Building D, Suite 3
         Rochester, New York  14623
13

14                    *   *   *
15

16

17

18

19

20

21

22

23

24

25

**Lelio, Robert J., 11/22/05**                    **Page 2**

00081
1

2        MR. EDWARDS:  Object to the form "general

3  price history."

4     Q.   Sort of price increases versus decreases,

5  what generally happened?

6        MR. EDWARDS:  Object to the form.

7        You may answer.

8     A.   I don't believe there were any changes to

9  the pricing structure of the product during the

10  time it was sold.

11     Q.   Do you know what percentage of Caldwell's

12  net sales in 2003 was due to the Series 86xt?

13     A.   I could calculate it.

14     Q.   How would you go about calculating it?

15     A.   I would take the sales, the net sales

16  that are reported on Exhibit 5, and divide them by

17  the total net sales for Caldwell.

18     Q.   And the total net sales for that year,

19  2003, would be in the independent accountant's

20  report?

21     A.   Yes, it would.

22     Q.   Does the income analysis in Exhibit 5

23  accurately reflect the number of Series 86xt

24  products that were sold for the years 2003, 2004,

25  2005?

00082
1
2     A.   Yes, for 2005 up through February of

3 2005.

4     Q.   Are the rebates or discounts applied to

5 the Series 86xt reflected in any documents?

6     A.   Yes.

7     Q.   Which documents?

8     A.   They would be reflected in Exhibit 5.

9 They would be reflected in our total -- our

10 consolidated financial statements from the

11 independent accountants, they would be reflected in

12 the Exhibit 2 analysis that you have.

13     Q.   Let's move to the Series 97ih product.

14 When did Caldwell begin selling the Series 97ih?

15     A.   I believe it was 2004.

16     Q.   Do you remember the month?

17     A.   No, I don't.

18     Q.   Is Caldwell still selling this product?

19     A.   No, it is not.

20     Q.   When did it stop selling the Series 97ih?

21     A.   I am not certain of the date.

22     Q.   Do you know year?

23     A.   2005.

24     Q.   Not certain of the month?

25     A.   No, I am not.

00083
1

2    Q.   Who manufactured the 97ih?

3    A.   Caldwell Manufacturing Company.

4    Q.   And where was the 97ih manufactured?

5    A.   I believe it was manufactured in both

6 Williamsport, Maryland and in Jackson, Mississippi.

7    Q.   Where was it shipped from?

8    A.   It would have been shipped from either

9 one of those plants.

10    Q.   If I wanted to know what customers bought

11 the 97ih, would Exhibit 5 be a good place for me to

12 look?

13    A.   Yes, it would.

14    Q.   Would Exhibit 5 be a complete list of the

15 customers that bought the 97ih?

16    A.   Yes, it would up through the February,

17 2005 period that report summarizes.

18    Q.   Is the pricing of the product determined

19 in the same way as you explained that the pricing

20 of the Series 86 is determined?

21    A.   Yes.

22    Q.   So the Sales Department would handle that

23 in cooperation with the president and the vice

24 president?

25    A.   That is correct.

**Lelio, Robert J., 11/22/05**                    **Page 83**

00101

1

2  trying to -- I am familiar -- I know of the 97ih

3  and our standard 97. I don't believe we are

4  selling any other versions of the 97i.

5     Q.  There was a product called the 97i,

6  though, right?

7     A.  Yes, I guess.

8     Q.  So at some point, Caldwell stopped

9  selling the product?

10     A.  I don't know, I don't recall.

11     Q.  The 97ez, are you familiar with the part

12  of it known as the shoe?

13     A.  Yes.

14     Q.  Does Caldwell sell the shoe separately

15  from the balance itself?

16     A.  I believe that we sometimes would.

17     Q.  Are there documents reflecting those

18  sales?

19     A.  Any sales of that shoe would have been --

20  let me restate that because I believe that -- I

21  believe in our block and tackle products, the shoes

22  are attached to a balance, so I think I would have

23  to change it to say I don't think that the block

24  and tackles would have a shoe sold separately.

25     Q.  Back to the 97i product and not the 97ih

**Lelio, Robert J., 11/22/05**                    **Page 101**

00102
1

2 but the 97i itself, do you know where this product

3 was manufactured?

4    A.  It would have been manufactured -- would

5 definitely have been manufactured in Jackson,

6 Mississippi and was likely also manufactured in

7 Williamsport from 2004 on.

8    Q.  Was it shipped from those two locations?

9    A.  Yes.

10    Q.  Was it shipped from any other locations?

11    A.  No.

12    Q.  Is there an invoice spreadsheet

13 reflecting the 97i invoices?

14       MR. EDWARDS:  Object to the form.

15    A.  Those invoices would be included in the

16 CUSINVID2 file which is note number 1 on C 000141.

17    Q.  But those invoices are not reflected in

18 Exhibit 5; is that correct?

19       MR. EDWARDS:  Object to the form.

20    A.  That is correct.

21    Q.  Do you know where -- strike that.

22       Do you know what countries the 97i was

23 sold in?

24    A.  I know it would have been sold in the

25 U.S.  I don't know anything else.

**Lelio, Robert J., 11/22/05**                    **Page 102**

00103

1

2    Q.  What is your best estimate for the number

3  of 97i products that were sold?

4    A.  I don't know.

5    Q.  Do you know how to go about finding that

6  information?

7    A.  Yes.

8    Q.  How would you do so?

9    A.  I would look at the it's called an item

10  class report which summarizes the sales detail that

11  is -- was used to provide the Exhibit 5 information

12  and I would look at the item class for Series 97i.

13    Q.  With respect to the Series 97i, do you

14  know who Caldwell's competitors were?

15    A.  I know that BSI would have been one.  I

16  do not know of any others.

17    Q.  Do you know of any price increases or

18  decreases with respect to the 97i?

19    A.  I believe that it would have had -- since

20  our price increases for material price inflation

21  for Series 97 would apply to the product line as a

22  whole, it would have had the same price increases.

23    Q.  Are there documents detailing the

24  expenses and costs associated with the 97i?

25    A.  Yes.

**Lelio, Robert J., 11/22/05**          **Page 103**

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD,

                                    Plaintiffs,

            vs.

THE CALDWELL MANUFACTURING
COMPANY,

                                    Defendant.

DEFENDANT'S SUPPLEMENTED
ANSWERS TO PLAINTIFFS' FIRST
SET OF INTERROGATORIES

Civil Action No. 05-10020-DPW

---

Defendant the Caldwell Manufacturing Company ("Caldwell"), by its attorneys Harris Beach

PLLC, submits the following supplemental answers to plaintiffs' First Set of Interrogatories:

**INTERROGATORY NO. 4:**

For each Window Product identified in response to Interrogatory No. 1, separately state the

full factual and legal basis for Caldwell's assertion that the Window Product does not infringe any

claim of the patents-in-suit, identifying for each claim each element that Caldwell asserts is or is not

present in the Window Product, either literally or under the doctrine of equivalents, and any claim

construction relevant to Caldwell's assertion.

        **ANSWER:**    Amesbury objects to this interrogatory in that is premature in that the

court has not construed the claims at issue.   Additionally, Caldwell objects to this interrogatory for

the reasons stated in response to Interrogatory No. 1 in that the definition of "Window Product" is

vague and overly broad.     Caldwell's preliminary claim charts are attached as Exhibit "A".

Caldwell reserves the right to supplement or amend these responses based on further discovery,

investigation or the Court's claim construction.

**INTERROGATORY NO. 6**:

State the full factual and legal basis for Caldwell's assertion that each of the patents-in-suit is invalid for failure to meet the requirements of the patent laws of the United States as set forth in, *inter alia*, 35 U.S.C. §§102, 103 and 112.

**ANSWER**: Caldwell objects to this interrogatory in that it calls for legal conclusions. Furthermore, Caldwell requires discovery from Amesbury to answer this interrogatory fully. Subject to and without waiving these objections, Caldwell states as follows:

(1) U.S. Patent No. 6,598,264: The file history indicates that the only potentially novel element of this patent is the location of the bottom guide roller within the bottom guide. This element is disclosed, or is obvious in light of, the following prior art references, either singly or in combination: (1) Prosser, U.S. Patent No. 3,091,797; (2) Thompson, U.S. Patent No. 6,840,011, (3) Wood, U.S. Patent No. 3,114,178, (4) Biro, U.S. Patent No. 3,449,862, (5) DeNormand, U.S. Patent No. 6,041,746, (6) Berndt, U.S. Patent No. 4,704,821, (7) Fitzgibbon, U.S. Patent No. 4,089,085, (8) a window balance product manufactured by or for Anderson Corporation that, upon information and belief, incorporated a part sold by Amesbury to Anderson as early as 1999, (9) Japanese Utility Model No. JITSUKAI S62-19485, (10) United Kingdom Patent No. GB1219927, (11) United Kingdom Patent No. GB1244324, and (12) additional prior art cited during the prosecution of the patent. Additional prior art references may be found through additional prior art searches or in discovery, and Caldwell reserves the right to supplement this response. Also, the patent is invalid to the extent that Amesbury seeks to construe the claims of this patent to cover rollers that are not attached directly to the bottom guide because, during prosecution of the patent, Amesbury distinguished certain prior art references, including *Biro*, supra, which disclosed a roller indirectly mounted to the bottom guide.

(2)    U.S. Patent No. 6,820,368: The file history indicates that the only potentially novel element of this patent is enlarged end of the balance shoe. The patent also discloses a "pocket" element. These elements are disclosed, or are obvious in light of, the following prior art references, either singly or in combination: (1) DeNormand, U.S. Pat. No. 6,041,746, (2) Berndt, U.S. Patent No. 4,704,821, (3) Schmidt, U.S. Patent No. 5,301,467, (4) additional prior art cited during the prosecution of the patent, (5) United Kingdom Patent Application No. 2280697A, (6) United Kingdom Patent Application No. 2236786A, (7) United Kingdom Patent Application No. 2292168A, (8) United Kingdom Patent No. 740223, (9) Japanese Utility Model JITSUKAI S56-171982, and (10) Japanese Utility Model JITSUKAI S63-3785. Additional references may be discovered, and Caldwell reserves the right to supplement this response. In addition, this patent is invalid to the extent that Amesbury argues that Caldwell's 97ez product infringes this patent because this argument requires a construction of the patent that would require two claim elements to correspond to a single part of Caldwell's product. Caldwell's products do not have both a "pocket ... adapted to mate with a rivet" **and** a "connecting device" as claimed, even assuming that the Caldwell device has any of those elements as those terms are defined by the patent claims and specification. To argue otherwise would render the patent ambiguous and invalid.

(3)    U.S. Patent No. 5,365,638: The file history indicates that the only potentially novel element of this patent is the raised spine that inhibits rotation of the mounting means. This element is disclosed, or is obvious in light of, the following prior art references, either singly or in combination: (1) Makarowksi, U.S. Patent No. 5,069,001, (2) Patterson, U.S Patent No. 2,088,866, (3) Osten, U.S. Patent No. 2,774,119, (4) Arlauskas, U.S. Patent No. 3,069,152, (5) Jones, U.S. Patent No. 3,105,576, (6) Anderson, U.S. Patent No. 3,711,995, (7) Anderson, U.S. Patent No. 3,795,076, (8) Anderson, 4,028,849, (9) Japanese Utility Model No. JIKKOHEI8-9334,

(9) Japanese Utility Model No. JIKKAIHEI4-119083, (10) Japanese Utility Model No. JIKKAIHEI41-112279, (11) additional prior art cited during the prosecution of the patent, (12) United Kingdom Patent No. 1287756, and (13) United Kingdom Patent No. 329996. Additional references may be discovered, and Caldwell reserves the right to supplement this response. Furthermore, to the extent that Amesbury claims a spine that does not inhibit rotation is covered by the claims, the patent is anticipated and/or obvious in light of Sterner, U.S. Patent No. 5,157,808, and is invalid for lack of enablement in that the specification only discloses a spine that inhibits rotational movement.

**INTERROGATORY NO. 10**:

State the full factual and legal basis for Caldwell's denial that its infringement of the patents-in-suit is willful, including, but not by way of limitation, identifying any legal advice or legal opinion relied upon by Caldwell in deciding to use, make, offer for sale, sell in, or import into, the United States, or in deciding to continue to use, make, offer for sale, sell in, or import into, the United States, any of the Window Products identified in response to Interrogatory No. 1.

**ANSWER**:    Caldwell objects to this interrogatory in that it is overly broad, calls for legal conclusions, and seeks material covered by the attorney-client privilege. Caldwell will not rely upon the opinion of counsel at trial. Caldwell declines to produce opinions of counsel regarding the validity and/or infringement of the patents-in-suit. Subject to and without waiving these objections, Caldwell states that it has a good faith basis for arguing that the patents-at-issue are invalid and/or not infringed, as outlined in its responses to Interrogatories Nos. 5 and 6 above, and as is evident from a comparison of Caldwell's products with the claims of the patents-in-suit. In addition, after Amesbury accused Caldwell of infringement, Caldwell withdrew its 97ez and 86xt products from the market, although Caldwell denies that those products infringed any of the patents-in-suit. Testimony

of Caldwell employees, including those disclosed in Caldwell's Rule 26 disclosures and Thomas E.

Batten, also are evidence of non-willfulness.


Dated: August 3/, 2005                           HARRIS BEACH PLLC


                                    By: _____
                                          Paul J. Yesawich, III
                                          Neal L. Slifkin
                                          David J. Edwards
                                          Laura W. Smalley
                                          *Attorneys for Defendant*
                                          99 Garnsey Road
                                          Pittsford, New York 14534
                                          Telephone: 585-419-8800

                                                    -and-

                                          BROWN & MICHAELS, P.C.
                                          Christopher A. Michaels
                                          Eugene S. Stephens
                                          400 M&T Bank Building
                                          118 North Tioga Street
                                          Ithaca, New York 14850
                                          Telephone: 607-256-2000

                                          *Attorneys for Defendant*


TO:     GOODWIN PROCTER LLP
        Douglas J. Kline, Esq.
        Safraz W. Ishmael
        *Attorneys for Plaintiffs*
        Exchange Place
        Boston, MA 02109-2881
        Telephone: 617-570-1000
P:\CALDWELL\SuppIntResponses.doc
8/30/2005 2 57 26 PM

HARRIS BEACH 叫
ATTORNEYS AT LAW                          5

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK)
COUNTY OF MONROE ) SS.:


        Karen J. Jenness, being duly sworn, deposes and says that I reside in the Town of Irondequoit, New York; I am over twenty-one years of age, and am a legal secretary for the office of Harris Beach LLP.  That on the 31st day of August, 2005 before five-thirty o'clock p.m., at the City of Rochester, County of Monroe and State of New York, deponent served a copy of the annexed upon the following:

        Safraz W. Ishmael, Esq.
        Douglas J. Kline, Esq.
        GOODWIN PROCTER LLP
        Exchange Place
        Boston, MA  02109-2881


by causing a true copy thereof, properly and securely enclosed in a sealed wrapper for Federal Express marked for September 1, a.m. delivery.


                                        _____
                                        Karen J. Jenness


Sworn to before me this
31st day of August 2005


_____
        Notary Public

                                HEATHER MCCURTY
                            Notary Public, State Of New York
                              Qualified In Monroe County
                            Commission Expires March 9, 2006


HARRIS BEACH
ATTORNEYS AT LAW

**EXHIBIT A**

| Patent Claims 6,820,368 | Caldwell Series 97EZ | Caldwell Series 97i(H) |
|---|---|---|
| 1.  A  window  balance  system comprising: | Yes | Yes |
| a U-shaped channel comprising a plurality of openings; | Yes | Yes |
| a spring connected to a system of pulleys located within the U-shaped channel; | Yes | Yes |
| a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and | Yes | Yes |
| a balance shoe, wherein the balance shoe comprises: | Yes | Yes |
| a frame comprising an enlarged first end and a second end, wherein at least a portion of the second end of the frame is disposed within the U-shaped channel; | Yes | Yes |
| a locking member proximal to the enlarged first end; | Yes | Yes |
| a cam in communication with the locking member; and | Yes | Yes |
| a connecting device comprising one or more resilient tabs for attaching the balance shoe within the U-shaped channel | No -- the Caldwell balance does not have resilient tabs | No -- the Caldwell balance does not have resilient tabs |

| | | |
|---|---|---|
| of the window balance, wherein the one or more resilient tabs extend at least partially through a corresponding number of the plurality of openings in the U-shaped channel. | | |
| 2. A window balance system comprising: | Yes | Yes |
| a U-shaped channel comprising a plurality of openings; | Yes | Yes |
| a spring connected to a system of pulleys located within the U-shaped channel; | Yes | Yes |
| a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and | Yes | Yes |
| a balance shoe, wherein the balance shoe comprises: | Yes | Yes |
| a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U-shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | No. The Caldwell balance does not have a pocket adapted to mate with a rivet. | Caldwell cannot state whether its 971(h) product has this claim element until the court construes the term "pocket." |
| | Yes | Yes |

| | | |
|---|---|---|
| a locking member proximal to the enlarged first end; | Yes | Yes |
| a cam in communication with the locking member, and | | |
| a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | No -- the Caldwell balance does not have a connecting device as that term is/will be defined by the claims and specification. To the extent Amesbury claims that this product infringes, Amesbury's construction violates the "all elements" rule in that Amesbury is claiming that two elements of the claim correspond to a single part of Caldwell's product. | No -- the Caldwell balance does not have a connecting device as that term is/will be defined by the claims and specification. To the extent Amesbury claims that this product infringes, Amesbury's construction violates the "all elements" rule in that Amesbury is claiming that two elements of the claim correspond to a single part of Caldwell's product. |
| 3.    The window balance system of claim 2 wherein the connecting device comprises a rivet. | Noh | No |
| 4.    The window balance system of claim 2 wherein the connecting device comprises a screw. | No | No |
| 5.    The window balance system of claim 2 wherein the connecting device comprises a resilient tab. | No | No |
| 6.    The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; | No | No |

| | | |
|---|---|---|
| wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | | |
| 7.    The window balance system of claim 2 wherein the locking member comprises two opposing ends integrally connected by a spring member. | No | No |
| 8.    The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame,<br><br>wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | No | No |
| 9.    The window balance system of claim 2 wherein the locking member comprises a plate,<br><br>wherein the plate is parallel to a back surface of the enlarged first end of the frame. | No | No |

| | |
|---|---|
| 10. The window balance system of claim 9 wherein the cam is at least partially housed within the enlarged first end of the frame | No |
| wherein rotating the cam forces the plate of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | No |
| 11. The window balance system of claim 2 wherein the cam comprises at least one camming surface and a keyhole opening sized to receive a pivot bar. | No |

P:\CALDWELL\Claim Chart 6820368.doc
8/30/2005 2:59:18 PM

| Patent Claims 5,365,638 | Caldwell Quicktilt |
|---|---|
| 1.    A mounting assembly comprising | Yes |
| a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, | Yes |
| a sash frame support means slidable in said channel means, | Yes |
| a coiled ribbon spring having a first end engaged with said sash frame support means, | Yes |
| and a means for mounting said coiled ribbon spring, | Yes |
| the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, | Yes |
| said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, | Yes |
| said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited. | No.    The spine does not inhibit rotational motion. Rotational motion is inhibited through an entirely different mechanism. |
| 2.    The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. | No |

| | |
|---|---|
| 3. The mounting assembly of claim 2 wherein said mounting means has a body portion having an aperture therein, | |
| a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, | No |
| a surface of said body portion being concavely curved, | |
| said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | |
| 4. The mounting assembly of claim 2 in which the mounting means has at least one inter-engagement means by which a plurality of such mounting means may be stacked in inter-engagement. | No |
| 5. The mounting assembly of claim 4 in which the inter-engagement means comprises a tooth-like projection cooperable on said first mounting means with a corresponding complementary detente in a second mounting means. | No |
| 6. The mounting assembly of claim 4 in which the inter-engagement means on said first mounting means is in an interference fit with an inter-engagement means on said second mounting means. | No |
| 7. The mounting assembly of claim 4 in which the inter-engagement means is formed so as to provide a snap fit. | No |

| | |
|---|---|
| 8.    A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, | Yes |
| a sash frame support means slidable in said channel means, | Yes |
| a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, | Yes |
| the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | Yes |
| said mounting means being secured in said channel means and | Yes |
| the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited. | No.  The projection means does not inhibit rotational motion. Rotational motion is inhibited through an entirely different mechanism. |

P:\CALDWELL\Claim Chart 5365638.doc
8/30/2005 2 57 48 PM

| | Patent Claims 6,598,264 | Caldwell 86xt Product |
|---|---|---|
| 1. | A block and tackle window balance device comprising: | Yes |
| | a channel comprising a first end a second end; | Yes |
| | a top guide connected to the first end of the channel; | Yes |
| | a bottom guide connected to the second end of the channel; | Yes |
| | a bottom guide roller rotatably mounted in the bottom guide; | **No - Bottom roller is attached to channel separately from bottom guide** |
| | a fixed pulley block unit connected to the channel; | Yes |
| | a translatable pulley block unit moveable within the channel; | Yes |
| | a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and | Yes |
| | a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. | Yes |
| 2. | The device of claim 1 wherein the bottom guide roller is located external to the channel. | No |
| 3. | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | No |
| 4. | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | No |

1

| | | |
|---|---|---|
| 5. | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | No |
| 6. | The device of claim 1 wherein the fixed pulley block unit comprises a frame, an axle, and at least one pulley rotatable around the axle. | No |
| 7. | The device according to claim 6 wherein the axle is located within the frame. | No |
| 8. | The device according to claim 1 wherein the fixed pulley block unit is connected to the channel with a support member. | No |
| 9. | The device according to claim 1 wherein the translatable pulley block unit comprises a frame, an axle within the frame, and at least one pulley rotatable around the axle. | No |
| 10. | The device according to claim 1 wherein the top guide includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel. | No |
| 11. | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | No |
| 12. | A window assembly comprising: | |
| | a window frame with two jambs with jamb pockets; | |
| | at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | |

2

| | |
|---|---|
| at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | |
| channel comprising a first end and a second end; | Yes |
| a top guide connected to the first end of the channel; | Yes |
| a bottom guide connected to the second end of the channel; | Yes |
| a bottom guide roller rotatably mounted in the bottom guide; | No - Bottom roller is attached to channel separately from bottom guide |
| a fixed pulley block unit connected to the channel; | Yes |
| a translatable pulley block unit moveable within the channel; | Yes |
| a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and | Yes |
| a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. | Yes |
| | |
| 13. | A window balance device comprising: | |
| a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | Yes |
| a bottom guide roller rotatably mounted in the bottom guide. | No - Bottom roller is attached to channel separately from bottom guide |

3

| | | |
|---|---|---|
| 14. | The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | No |
| 15. | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | No |
| 16. | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | No |
| 17. | The device of claim 13 wherein the bottom guide further comprises a bottom guide axle for mounting the roller. | No |
| 18. | A window balance device comprising: | Yes |
| | a channel comprising a first end and a second end; | Yes |
| | a top guide connected to the first end of the channel; | Yes |
| | a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and | Yes |
| | a bottom guide roller rotatably mounted in the bottom guide. | **No - Bottom roller is attached to channel separately from bottom guide** |
| 19. | The device of claim 18 wherein the bottom guide roller is located external to the channel. | No |
| 20. | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | No |
| 21. | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | No |
| | | |

4

| 22. | The device of claim 18 wherein the bottom guide further comprises a bottom guide axle for mounting the roller. | No |
| 23. | A window balance device comprising: | |
| | a bottom guide connected to an end of a window balance channel, the bottom guide slidable in a jamb pocket when installed in a window frame, the bottom guide including: | Yes |
| | a bottom guide axle mounted within the bottom guide; the bottom guide axle located outside the window balance channel; and | No - Bottom roller is within channel |
| | a bottom guide roller rotatably mounted on the bottom guide axle. | No |

EXHIBIT 4



**CHARLES E. STILL, CONSULTING SERVICES**

Charles E. Still
*Specialist in Fenestration*

2914 PARTRIDGE CIRCLE
BRYAN, TEXAS 77802
PHONE: 979-731-1130
FAX: 979-731-1070
EMAIL: cestill@cox-internet.com

April 17, 2006

## Expert Witness Report of Charles E. Still

I, Charles E. Still, have been retained by Harris Beach PLLC to render expert services in conjunction with a patent infringement lawsuit. I hereby provide the following report involving Amesbury's U.S Patent 5,365,638 "Spring Mounting For Sash Frame Tensioning Arrangements", U.S. Patent 6,598,264 B2 "Block And Tackle Window Balance With Bottom Guide Roller" and U.S. Patent 6,820,368 "Snap Lock Balance Shoe And System For A Pivotable Window" pursuant to Rule 26 of the Federal Rules of Civil procedure.

I received a Bachelor of Architecture Degree in 1962 from Texas A&M University in College Station, Texas. I am a graduate of Overton High School, Overton, Texas.

I am the owner of Charles E. Still, Consulting Services based in Bryan, Texas. I have held this position since the inception of the company in July 2001. CES, Consulting Services specializes in fenestration. Windows and Doors are included in the term "fenestration" as well as curtain walls, storefronts and skylights. During my career, I have designed in excess of 200 fenestration products including single hung and double hung windows in aluminum, vinyl and composite materials for Residential, Manufactured Housing and Commercial Window Companies in New Construction and Replacement Markets. I am an expert in all phases of window design. I am a member of AAMA, American Architectural Manufacturers Association. AAMA is a professional trade organization including window manufacturers and suppliers to the window and door industry.

**Prior work history:**

**July 2000-July 2001** *Product Engineering Manager*, Alenco Building Products, Inc. Responsibilities include all phases of Engineering, Design and Development, Tooling and Certification and Documentation for four Manufacturing Plants. Primary products developed



including windows, for new construction residential and commercial industry as well as residential replacement/remodeling market and manufactured housing industry. Primary window materials consists of extruded aluminum, extruded PVC vinyl and wood. Served on the AAMA Southeast Region and Western Boards of Directors. Active in Installation Task Group in AAMA Western Region. Active in AAMA "Installation Masters" certified installers program.

**March 1999-July 2000** *Director of Engineering Support*, Reliant Building Products, Inc. Responsibilities include all product liability case investigations and resolution, giving depositions and court testimony. Search for new product, including window technologies, in design, materials and equipment. Company voting representative to all member trade associations and building codes groups (AAMA, NFRC and IGMA). Responsible for Product Certification and Testing. Licensed Glazing Contractor in the State of California and Arizona.

**1982-1999** *Vice President of Engineering*, Reliant Building Products, Inc., formerly known as Redman Building Products, Inc. Responsibilities includes managing product design and development and installation, product liability and codes compliance to national and state building codes. Active member of AAMA (American architectural manufacturing Association) and served as chairman of numerous task groups and served three times on the National AAMA Board of Directors. Active member of NFRC (National Fenestration Rating Council) involving thermal performance of windows and doors and IGMA, Insulating Glass Manufacturers Association (formerly known as SIGMA, Sealed Insulating Glass Manufacturers Association).

**1979-1982** *Director of Product Design*, Redman Building Products, Inc.. Responsibilities include product design, including windows and development of new construction and replacement/remodeling windows, doors and skylights. Company owned and operated 5 manufacturing plants and 7 sales outlets.

**1974-1979** *Chief Engineer*, Alenco, A Division of Redman Building Products, Inc. Responsibilities include design and development, testing, quality control department, plant maintenance department, plant tooling department, shop drawings department and warranty service department.

**1968-1974** *Chief Design Engineer*, Alenco, a Division of Redman Building Products, Inc.. Responsibilities include all designs of aluminum windows and doors for Residential and Commercial construction as well as Manufactured Housing.

**1964-1968** *Design Engineer*, Alenco, Albritton Engineering Corporation. Responsibilities include design and development of new aluminum windows and doors. Responsible for Office and Plant Expansion Program in Bryan, Texas Facility. Prepared architectural working drawings for Office and Plant Facilities (3 expansions).

2
1

The following documents and Samples have been made available to me by the attorneys at Harris Beach.

- U.S. Patent  329,996. A Spring Sash Balance, February 25, 1929
- G.B. Patent 1,218,827. Sash Control Mechanism, July 17, 1967
- G.B. Patent 1,244,324. A Sliding Sash Window, August 11, 1968
- G.B. Patent 1,287,756. Improvements In Or Relating To Doors, August 25, 1969
- U.K. Patent 2,236,786. A. Guide Assembly, September 27, 1989
- U.S. Patent 2,262,990. Window Sash Counterbalance, September 2,1939
- U.S. Patent 2,279,600. Sash Balance, March 30, 1940
- U.K. Patent 2,280,697. Tiltable To Sash Windows, July 27, 1993
- U.K. Patent 2,292,168 A. Pivoting Sash Slide Locking Mechanism, July 31, 1995
- U.S. Patent 2,635,282. Spring Counterbalance, October 2, 1950
- U.S. Patent 2,826,090. Sash Balance Coupling Device, March 21, 1955
- U.S. Patent 3,055,044. Foot Attachment For Block And Tackle Type Spring Counterbalances, September 25, 1960
- U.S. Patent 3,449,862. Window Structure, August 21, 1967
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 3,091,797. Window Structure, April 26, 1961
- U.S. Patent 3,114,178. Sliding Window And Counterbalancer Combination, February 6, 1961
- U.S. Patent 3,358,403. Heavy Window Balance Assembly, January 28, 1966
- U.S. Patent 3,358,404. Readily Removable Double Hung Window, January 28, 1966
- U.S. Patent 3,440,683. Sash Control Mechanism, July 17, 1967
- U.S. Patent 3,449,862. Window Structures, August 11, 1967
- U.S. Patent 3,452,480. Spring Sash Counterbalance, September 14, 1967
- U.S. Patent 3,711,995. Building Structure, June 22, 1070
- U.S. Patent 3,869,754. Bracket For A Spring Sash Counterbalance, September 10, 1973
- U.S. Patent 4,079,549. Balance Spring Lock For Tilt Out Sash, August 26, 1976
- U.S. Patent 4,089,085. Sash Balances And Components Thereof, March 28, 1977
- U.S. Patent 4,227,345. Tilt-Lock Slide For Window Sash, January 26, 1979
- U.S. Patent 4,300,316. Sash Balance Foot Seal Mechanism, October 17, 1979
- U.S. Patent 4,610,108. Balance Spring Locking Slide Block For Tilt-Out Windows, December 20, 1984
- U.S. Patent 4,654,928. Adjustable Friction Block And Tackle Window Balance System, April 11, 1986
- U.S. Patent 4,704,821. Compression Seals In A Double Hung Style Window, July 3, 1986
- U.S. Patent 4,949,425. Spring Loaded Block And Tackle Window Sash Balance Assembly, October 19, 1988
- U.S. Patent 5,069,001. Pivotable Window Sash Assembly, November 21, 1990
  U.S. Patent 5,157,808. Coil Spring Counterbalance Hardware Assembly And Connection Method Therefore, February 18, 1992

3
1

- U.S. Patent 5,210,976. Window Balance Assembly, June 26, 1992
- U.S. Patent 5,243,783. Locking Slide Block, June 24, 1992
- U.S. Patent 5,301,467. Locking Slide Block, September 2, 1993
- U.S. Patent 5,353,548. Curl Spring Shoe Based Window Balance System, April 1, 1993
- U.S. Patent 5,365,638. Spring Mounting For Sash Frame Tensioning Arrangements, January 21, 1993
- U.S. Patent 5,371,971. Sash Balance Brake And Pivot Pin Assembly, May 4, 1993
- U.S. Patent 5,530,991. Block And Tackle Window Balance, January 21, 1994
- U.S. Patent 5,632,117. Sash Balance Brake Assembly, January 13, 1995
- U.S. Patent 5,661,927. Sliding Counterbalance Assembly For A Sash Window, March 6, 1996
- U.S. Patent 5,669,180. Window Balance Brake Shoe And Pivot Assembly, May 29, 1996
- U.S. Patent 5,737,877. Block And Tackle Balance With Integral, Non-Rotating Pulley System, July 26, 1996
- U.S. Patent 5,806,243. Sash Balance Brake Assembly, May 21, 1997
- U.S. Patent 5,829,196. Window Balance Brake Shoe And Pivot Assembly, May 30, 1997
- U.S. Patent 6,041,476. Inverted Block And Tackle Window Balance, November 21, 1997
- U.S. Patent 6,088,880. Adjustable Shoe For Awning Window Hinge, July 7, 1997
- U.S. Patent 6,151,832. Window Balance Cam Housing, February 19, 1999
- U.S. Patent 6,230,443 B1. Hardware Mounting, May 5, 1999
- U.S. Patent 6,467,128 B1. Block And Tackle Sash Counter Balance, September 11, 2000
- U.S. Patent 6,550,184 B1. Brake Shoe For Sash Window Or Door Assembly, February 9, 2001
- U.S. Patent 6,598,264 B2. Block And Tackle Window Balance With Bottom Guide Roller, March 16, 2001
- U.S. Patent 6,606,761 B2. Spring Mounting Arrangement For A Sash Window Counterbalance Arrangement, October 8, 2001
- U.S. Patent 6,622,342 B1. Block And Tackle Balance Assembly With Brake Shoe, June 6, 2001
- U.S. Patent 66,679,000 B2.
- U.S. Patent 6,820,368 B2. Snap Lock Balance Shoe And System For A Pivotable Window, May 23, 2003
- U.S. Patent 6,840,011 B2. Window Panel Balance Apparatus And Method, December 13, 2000
- U.S. Patent 6,990,710 B2. Counterbalance System For A Tilt-In Window Having An Improved Shoe Assembly And Anchor Mount, November 5, 2003
- Japanese Patent 62-194,895. Title and filing date unknown.
- Caldwell Fenestration Hardware Product Information, Bates C00477 thru C00542.
- Defendant's Second Supplemented Answers To Plaintiffs' First Set Of Interrogatories.

4
1

- Memorandum And Order, January 20, 2006.
- Amesbury's First Supplemental Response To Caldwell's Interrogatories (Nos.1-2)
- Amesbury's Second Supplemental Response To Caldwell's Interrogatories (Nos. 1-2,13-16).
- Defendant's Supplemented Answers To Plaintiffs' First Set Of Interrogatories
- Joint Motion to Set Schedule.
- Patent '264 File History, Bates C000543 thru C000690.
- Patent '638 File History, Bates C000921 thru C001116.
- Case Documents Bates AME 01931 through 01948
- CD files: Documents Produced in Response to Plaintiffs' First Request for documents and Things, dated September 28, 2005
- Expert Report of Dr. Sammy Shina Submitted on Behalf of Plaintiffs in Civil Action No. 05-10020-DPW
- Declaration of Prior Invention in the United States by Jason Annes To Overcome cited Publication Pursuant to 37 C.F.R.1.131
- Caldwell Sales Brochure
- Caldwell Physical Samples of Balance Hardware.

Other documents include:

- Voluntary Specifications for Aluminum, Vinyl (PVC) and Wood Windows and Glass Doors, AAMA/NWWDA 101/I.S.2-97.
- International Residential Code for One and Two Family Dwellings-2000.
- U.S Patent 4,961,247. Balancing Arrangements For Double Hung Windows. December 7, 1989

**U.S. Patent 5,365,638**

**Amesbury's Patent 5,365,638 – Spring Mounting For Sash Frame Tensioning Arrangements** involves a Constant Force Balance that is used in Single Hung and Double Hung Windows with a Tilting Sash. Constant force balances have been available for years and offer an economical solution to counter-balancing sash weight. Constant force balances include a stainless steel coiled spring, a coiled spring mounting in the frame jamb of the window with an attaching screw and a sash carrier (shoe). The window design must have certain design features in order to receive a constant force balance. It must have jamb tracks in the shape of a channel with one side of the channel open, creating flanges on each side. It must have at least one removable operating sash to be pivoted at the lower corner of the sash for tilting the sash inwards for sash removal or for cleaning the exterior sash glass surface from the interior. The mounting that cradles the coiled spring is fastened to the frame jamb inside the open channel. One outer end of the coiled spring is attached to a sliding sash carrier that connects to the bottom corners of the operating sash. The inner end of the coiled spring is left free and unattached inside the coil. When the sash is lifted upwards towards an open position, the coiled spring retracts inside the mounting and counter-balances the weight of the sash and allows the sash to

remain open for ventilation. Coil springs can be added in dual or triple configuration to increase the lifting force for a heavier sash.

Prior art demonstrates that there is nothing unique or novel about the '638 Patent. Amesbury contends that Caldwell infringed on their '638 Patent in claim elements 1,2,3 & 8.

The '638 Patent Claims describe the window frame jamb channel, sash frame support (shoe), a coiled ribbon spring, a mounting for the coil and a raised spine as part of the spring mounting.
Claims 1 & 8 of the '638 Patent describe .. *"whereby rotational motion of said mounting means is inhibited"*, which Caldwell denies is contained in its products. Amesbury's '638 Patent design calls for a raised spine as part of the mounting means to inhibit rotational motion of the mounting inside the window frame jamb according to the claims. The mounting depends on the inwardly turned flanges of the open jamb channel to help support the mounting. Caldwell's Quick Tilt design does not depend on the inwardly turned flanges of the open jamb channel for the mounting support and does not infringe the '638 Patent. The molded nylon body of the Caldwell Quick-Tilt spring mounting fits snug inside the open jamb channel to prevent rotation of the mounting. Caldwell's Quick Tilt raised outer spine portion of the mounting is designed to help support the screw fastener, coil nest and aperture through the mounting and does nothing to inhibit rotation of the mounting under load. Standard window designs allow a gap between either side of the raised spine and the ends of the inwardly turned flanges from .050" to .109" (See Exhibits A, G & H).
Therefore, in Caldwell's Quick Tilt product, the spine cannot contact the flanges and cannot prevent rotation of the mounting element.

---

### U.S. Patent 6,598,264 B2

Amesbury's Patent 6,598,264 B2- Block And Tackle Window Balance With Bottom Guide Roller involves a Block and Tackle Balance that is used in Single Hung and Double Hung Windows with a removable sash. Block and Tackle Balances have been used in windows for the past 67 years and have a good track record. The window industry calls this traditional type of balance a "side load" because the sash must be installed and removed by moving the sash to one side of the window to clear the jamb from the opposite side of the window. Block and Tackle balances are popular and are known for their sash weight carrying capacity, long reliable service and are user friendly.

The Block and Tackle Balance described in the '264 Patent has a "C" channel as the main body member, an angled top guide, a bottom guide with a roller, a spring, a fixed pulley block, a translatable pulley block and a cord. One end of the cord is attached to the translatable pulley block and the other end attaches to the frame jamb of the window

6
1

giving the operating sash a mechanical advantage of lifting the sash weight when the sash is being opened or closed.

Prior art demonstrates that there is nothing unique or novel about the '264 Patent. Amesbury contends that Caldwell infringed the '264 Patent, specifically patent claims 1,2,3,4,5,6,7,9,10,11,12,13,14,15,16,18,19,20 & 21.

Claims 1,2,12,13,18 & 19 of the '264 Patent describe... *"a bottom guide roller rotatably mounted in the bottom guide" and... " the bottom guide roller is located external to the channel"* which Caldwell denies is contained in its products. Caldwell's 86XT balance does not have a roller mounted in the bottom guide, and therefore, does not infringe the '264 Patent. Caldwell's 86XT balance has a bottom fixed pulley block with 3 pulleys, the third larger pulley being located immediately below the smaller pulleys and has a portion internal and external to the channel. (See Exhibit B, J & K). Therefore, Caldwell's 86XT balance does not have a roller in the bottom guide and does not infringe the '264 Patent claims.

## U.S. Patent 6,820,368 B2

**Amesbury's Patent 6,820,368 B2 –Snap Lock Balance Shoe And System For A Pivotable Window** involves a Block and Tackle Balance that is used in Single Hung and Double Hung Windows with a removable tilt-in sash. Tilt-in sash windows are popular because they allow the sash to be rotated inward to enable the exterior glass face of the sash to be cleaned from the interior. This type of balance is especially convenient on above grade floors, eliminating the use of ladders when double hung windows are installed.

The '368 Patent is designed with an "inverted" balance concept (see Exhibit E on Prior Art in U.S. Patent 6,041,476 and in '368 Patent Fig. 2A, 7A & 7B) wherein the fixed pulley block is located at the top end of the channel and the spring is located at the bottom end of the channel. The balance shoe is inverted ("T" shaped) and joined to the bottom end of the channel by way of two molded plastic tabs that snap into punched holes in the walls of the channel. The pivoting axis of the shoe is located 13/16" from the end of the channel where a rivet acts as an axle allowing the shoe to rotate. This allows the shoe to be removed for replacement after the window is constructed without modification to the window. The lower portion of the shoe has a cam with a recess for a pivot bar and brake pads.

Caldwell's Series 97I w/ Short Carrier (Shoe) is "T" shaped and is directly connected to the end of the balance channel with one rivet. It does not have snap tabs and does not rotate around a rivet. During factory assembly, a connecting rivet is threaded through a clearance through both outer walls of the carrier. It is designed to be non-removable and does not have a snap-in capability (See Exhibit C, E, F,L & N).
Amesbury contends that Caldwell infringed the '368 Patent, specifically Claims 2, 3,6,7,8, & 11.Claim 2 of the '368 Patent describes ... *"and wherein the second end of the*

7
1

*frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate the balance with a rivet;"* which Caldwell denies is contained in its products. Caldwell's Series 97I w/Short Carrier does not infringe the **'368 Patent** because Caldwell's 97I w/ Short Carrier does not have a pocket in its balance carrier (shoe) frame. It has a clearance on both walls of the carrier (shoe) for a connecting rivet.

Caldwell's Series 97EZ w/ Long Carrier (Shoe) is "T" shaped. During factory assembly, a connecting rivet is threaded through an aperture molded into the frame of the carrier. A second rivet through the end of the channel holds the end of the spring as well as supports two legs of the carrier to prevent outward rotation. The carrier is designed to be non-removable and does not have a snap-in capability (See Exhibits D, E, F,M & N). Claims 2 of the **'368 Patent** describes ... *"and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;"* which Caldwell denies is contained in its products. Caldwell's Series 97EZ w/Long Carrier does not infringe the **'368 Patent** because Caldwell's 97EZ w/ Long Carrier does not have a pocket in its balance carrier (shoe) frame. It has an aperture for a rivet and, at the extreme end of the carrier, it has two legs supported by a second rivet (that holds the end of the spring) to prevent outward rotation. Further, the second rivet does not connect the carrier to the channel and does not mate with the carrier legs.

## Opinions

Based upon my research, past experience and knowledge, it is my opinion that Caldwell's Quick Tilt Products do not infringe Amesbury's Patent 5,365,638.

Based upon my research, past experience and knowledge, it is my opinion that Caldwell's 86XT Balance does not infringe Amesbury's Patent 6,598,264 B2.

Base upon my research, past experience and knowledge, it is my opinion that Caldwell's Series 97EZ Products do not infringe Amesbury's Patent 6,820,368.

I reserve the right to add additional opinions in my investigations and /or upon review of additional discovery materials. Opinions herein are within a reasonable degree of professional certainty.

Signed this 17th day of April, 2006

Charles E. Still, Consulting Services
2914 Partridge Circle
Bryan, Texas 77802

8
1

Attachments:
Exhibit A-Comparison Chart
Exhibit B-Comparison Chart
Exhibit C-Comparison Chart
Exhibit D-Comparison Chart
Exhibit E- Caldwell Patent 6,041,476
           Amesbury Patent 6,820,368 B2
Exhibit F- Caldwell Pulley Drawing
Exhibit G-  Photo
Exhibit H-  Photo
Exhibit J-  Photo
Exhibit K- Photo
Exhibit L- Photo
Exhibit M- Photo
Exhibit N- Photo

**Charles E. Still**    **Testimony Given in Depositions and Trials**

| Type | Parties | Type of Claim | Location | Date |
|---|---|---|---|---|
| Deposition | VBP v. Royal Plastic | Patent Infringement | Oakland, New Jersey | |
| Trial | VBP v. Royal Pastics | Patent Infringement | Newark, New Jersey | |
| Deposition | Redman v. ? | Forced Entry/Injury | Albuquerque, New Mexico | |
| Deposition | Redman v. ? | Forced Entry/Injury | Houston, Texas | |
| Deposition | Thiokol v. ? | Glass Breakage | Denver, Colorado | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Trial | Redman v. ? | Personal Injury | Savannah, Georgia | |
| Trial | Redman v. ? | Water Infiltration | Little Rock, Arkansas | |
| Trial | Redman v. ? | Scratched Glass | Waco, Texas | |
| Arbitration | Redman v.? | Glass Breakage | Alexandria, Louisiana | |
| Trial | Redman v. ? | Water Infiltration | Baton Rouge, Louisiana | |
| Deposition | Inmont v. ? | Glass Breakage | Rockwall, Texas | |
| Deposition | Redman v. ? | Water Infiltration | San Diego, California | |
| Deposition | Lamkin v. Gapco | Personal. Injury | Madison County, Illinois | |
| Deposition | Pace v. Gapco | Personal Injury | Madison County, Illinois | |
| Trial | Redman v. ? | Glass Breakage | Salt Lake City, Utah | |
| Deposition | Redman v. ? | Condensation | Baytown, Texas | |

| Type | Case | Matter | Location | Date |
|---|---|---|---|---|
| Deposition | Redman v. ? | Personal Injury | Detroit, Michigan | |
| Deposition | Redman v. ? | Personal Injury | South Padre Island, Texas | |
| Deposition | Gapco v. ? | Personal Injury | St. Louis, Missouri | |
| Trial | Unique v. Beard | Business Ethics | Roanoke, Virginia | |
| Deposition | Redman v. Somerset | Water Infiltration | Silver Springs, Maryland | |
| Deposition | Reman v. ? | Water Infiltration | San Francisco, California | |
| Deposition | Redman v. ? | Water Infiltration | Fresno, California | |
| Deposition | Bolander v. Champior | Water Infiltration | Houston, Texas | 8/29/2003 |
| Trial | Jason Lamkin v. Gapco | Personal Injury | Belleville, Illinois | 3/15/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, Texas | 4/2/2004 |
| Deposition | All Seasons v. Tradewinds Condo | Code Compliance | Orange Beach, AL | 5/19/2004 |
| Deposition | All Seasons v. Royal Palms Condo | Code Compliance | Gulf Shores, AL | 6/24/2004 |
| Deposition | W.S. Phillips v. Hope Lumber | Water Infiltration | College Station, TX | 10/27/2004 |
| Deposition | W.S. Phillips v. Alenco | Water Infiltration | College Station, TX | 11/30/2004 |
| Deposition | Sungate Development v. All Seasons | Water Infiltration | McAllen, TX | 12/7/2004 |
| Deposition | Hilcom v. Moore | Water Infiltration | Houston, TX | 2/23/2005 |

| | | | |
|---|---|---|---|
| Deposition | Cavalier Homes v. Larson Doors | Product Quality | Haleyville, AL | 5/26/2005 |
| Deposition | Grand Pointe HOA v. All Seasons | Product Liability | Orange Beach, AL | 6/29/2005 |
| Deposition | Donn v. Turner v. General Aluminum | Water Infiltration | Aubrey, TX | 9/9/2005 |
| Arbitration | Hilcom v. Moore | Water Infiltration | Houston, TX | 10/19/2005 |
| Trial | Sandhu v. Wellington | Personal Injury | Toronto, Canada | 11/18/2005 |
| Deposition | Planter's Place HOA v. All Seasons | Water Infiltration | Mt. Pleasant, S.C. | 12/20/2005 |

**EXHIBIT A**

**NON-INFRINGEMENT OF**
**AMESBURY'S U.S. PATENT NO. 5,365,638**
**BY CALDWELL'S QUICK-TILT PRODUCTS**

| | A mounting assembly comprising | A mounting assembly comprising |
|---|---|---|
| 638/1 | a channel means | a channel means |
| 638/1 | having a rear wall, | having a rear wall, |
| 638/1 | side walls | side walls |
| 638/1 | and at extremities of said side walls, inwardly turned opposed flanges, | and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/1 | a sash frame support means slidable in said channel means, | a sash frame support means slidable in said channel means, |
| 638/1 | a coiled ribbon spring | a coiled ribbon spring |
| 638/1 | having a first end engaged with said sash frame support means, | having a first end engaged with said sash frame support means, |
| 638/1 | and a means for mounting said coiled ribbon spring, | and a means for mounting said coiled ribbon spring, |

1

| | | |
|---|---|---|
| 638/1 | the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means | the coiled body of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means (See Prior Art in '638 Pat. Fig.1 & Fig.3) |
| 638/1 | and said mounting means being secured in said channel means, | And said mounting means being secured in said channel means, (See Prior Art in '638 Pat. Fig.1,Fig.3, Fig.4 and Fig.5) |
| 638/1 | said mounting means having a raised spine | Said mounting means having a raised spine |
| 638/1 | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means |
| 638/1 | whereby rotational motion of said mounting means is inhibited. | The raised spine of Caldwell's Quick Tilt does not inhibit rotation. |
| 638/2 | The mounting assembly of claim 1 wherein the mounting means has a | Caldwell's Quick Tilt has a mounting means that has a |

| | | |
|---|---|---|
| | support surface disposed in contact with the outer surface of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. | support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means.<br>(See Prior Art in '638 Pat. Fig. 1, Fig. 2, Fig. 3, Fig.4, Fig.5 & Fig. 6) |
| 638/3 | The mounting assembly of claim 2 | Caldwell's Quick Tilt has a mounting assembly<br>(See Prior Art in '368 Pat. Fig.1, Fig.2, Fig.3, Fig.4 & Fig.5) |
| 638/3 | wherein said mounting means has a body portion | wherein said mounting means has a body portion |
| 638.3 | Having an aperture therein, | having an aperture therein, |
| 638/3 | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, |
| 638/3 | a surface of said body portion being concavely curved, | a surface of said body portion being concavely curved, |
| 638/3 | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion |

3

| | | |
|---|---|---|
| 638/8 | a mounting assembly comprising | a mounting assembly comprising |
| 638/8 | a channel means having | a channel means having |
| 638/8 | a rear wall, | a rear wall, |
| 638/8 | side walls | side walls |
| 638/8 | and at extremities of said side walls, inwardly turned opposed flanges, | and at extremities of said side walls, inwardly turned opposed flanges, |
| 638/8 | a sash frame support means slidable in said channel means, | a sash frame support means slidable in said channel means, |
| 638/8 | a coiled ribbon spring | a coiled ribbon spring |
| 638/8 | having an outer end engaged with said sash frame support means, | having an outer end engaged with said sash frame support means, |
| 638/8 | and a means for mounting said coiled ribbon spring, | and a means for mounting said coiled ribbon spring, |
| 638/8 | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, |

4

| | | |
|---|---|---|
| 638/8 | Said mounting means being secured in said channel means | Said mounting means being secured in said channel means |
| 638/8 | and the mounting means having projection means | and the mounting means having projection means |
| 638/8 | positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, | positioned between said inwardly turned opposite flanges of the channel means. The projection means in Caldwell's Quick Tilt products is independent of said flanges of the channel means within which the mounting means is positioned, |
| 638/8 | whereby rotational movement of the mounting means is inhibited. | The raised spine of Caldwell's Quick Tilt does not inhibit rotation. |

5

## EXHIBIT B

## NON-INFRINGEMENT OF
## AMESBURY'S U.S. PATENT NO. 6,598,264
## BY CALDWELL'S SERIES 86XT PRODUCT

| | | |
|---|---|---|
| 264/1 | A block and tackle window balance device comprising: | A block and tackle window balance device comprising: |
| 264/1 | a channel comprising | a channel comprising (See Prior Art in '264 Pat. Fig.2A,2B & Fig.3) |
| 264/1 | a first end | a first end  (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and a second end; | and a second end; (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel (See Prior Art in '264 Pat. Fig.2A, 2B & Fig.3 & 3); |
| 264/1 | a bottom guide connected to the second end of the channel; | a bottom guide connected to the second end of the channel (See Prior Art in '264 Pat. Fig. 2A, 2B & Fig.3); |
| 264/1 | a bottom guide roller rotatably mounted in the bottom guide; | Caldwell's Series 86XT bottom pulley is not a roller and is not mounted in the bottom guide; the bottom pulley is joined with 2 other pulleys in the fixed pulley block. |
| 264/1 | a fixed pulley block unit connected to the channel; | a fixed pulley block unit connected to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B); |
| 264/1 | a translatable pulley block unit | a translatable pulley block unit moveable within the channel |

1

| | | |
|---|---|---|
| 264/1 | moveable within the channel; | ( See Prior Art in '264 Pat. Fig.2A & 2B); |
| 264/1 | a spring comprising | a spring comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | a first end | a first end ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | and a second end, | and a second end, ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/1 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/1 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit (See Prior Art in '264 Pat. Fig. 2A & 2B); |
| 264/1 | and a cord comprising | and a cord comprising (See Prior Art in '264 Pat. Fig.2A & 2B); |
| 264/1 | a first cord end | a first cord end (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and a second cord end, | and a second cord end, (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and the fixed pulley block unit | and the fixed pulley block unit (See Prior Art in '264 Pat. Fig.2B) |
| 264/1 | and extends around the bottom guide roller, | and extends around the pulley block bottom pulley, not a roller, |
| 264/1 | the first cord end being attached to | the first cord end being attached to |

2

| | | |
|---|---|---|
| | the translatable pulley block unit | the translatable pulley block unit ( See Prior Art in '264 Fig.2B) |
| 264/1 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. (See Prior Art in '264 Pat. Fig. 7A) |
| 264/2 | The device of claim 1 wherein the bottom guide roller is located external to the channel. | Caldwell's Series 86XT fixed pulley block bottom pulley is not a roller and is partially located internal and external to the channel. |
| 264/3 | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | Caldwell's Series 86XT top guide is angled to received a member of a window sash (See Prior Art in '264 Pat. Fig 2A, 2B, Fig. 3 & Fig.7A). |
| 264/4 | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | Caldwell's Series 86XT bottom guide has a portion internal and external to the channel (See Prior Art in '264 Pat. Fig. 2A & 2B). |
| 264/5 | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | Caldwell's Series 86XT bottom guide forms a channel to receive a portion of a window sash (See Prior Art in '264 Pat. Fig. 3). |
| 264/6 | The device of claim 1 wherein the | Caldwell's Series 86XT fixed pulley block unit comprises (See Prior Art in |

3

| | | '264 Pat. Fig.2A & 2B) |
|---|---|---|
| 264/6 | fixed pulley block unit comprises | |
| 264/6 | a frame, | a frame, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/6 | an axle, | an axle, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/6 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. |
| 264/7 | The device according to claim 6 wherein the axle is located within the frame. | Caldwell's Series 86XT has an axle located within the fixed pulley block unit frame. (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | The device according to claim 1 wherein the translatable pulley block unit comprises | Caldwell's Series 86XT has a translatable pulley block unit that comprises (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/9 | a frame, | a frame (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | an axle within the frame, | an axle within the frame (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/9 | and at least one pulley rotatable around the axle. | and at least one pulley rotatable around the axle. (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/10 | The device according to claim 1 wherein the top guide includes a top | Caldwell's 86XT has a top guide including a top angled portion (See Prior Art in '264 Pat. Fig. 2A & 2B) |

4

| | | |
|---|---|---|
| | angled portion | |
| 264/10 | and a bottom portion, the bottom portion being connected to the first end of the channel. | And a bottom portion, the bottom portion being connected to the first end of the channel. (See Prior Art in '264 Pat. Fig.2A, 2B, 3 & 7A) |
| 264/11 | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | Caldwell's 86XT has a fixed pulley block unit that is independent of the bottom guide. |
| 264/12 | A window assembly comprising: | A window assembly comprising: |
| 264/12 | a window frame with two jambs with jamb pockets; | a window frame with two jambs with jamb pockets; ( See Prior Art in '264 Pat. Fig.1) |
| 264/12 | At least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | At least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and (See Prior Art in '264 Pat. Fig.1 & 7A) |
| 264/12 | At least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising; | at least one block and tackle window balance device attached to at least one of the upper window sash and the lower window sash, the device comprising; (See Prior Art in '264 Pat. Fig.7A) |
| 264/12 | channel comprising a first end and a second end; | a channel comprising a first end and a second end;( See Prior Art in '264 Pat. Fig.2A, 2B, 3 & 7A) |

5

| 264/12 | | |
|---|---|---|
| 264/12 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel; ( See Prior Art in '264 Pat. Fig.2A ,2B & 3) |
| 264/12 | a bottom guide connected to the second end of the channel; | a bottom guide connected to the second end of the channel; (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/12 | a bottom guide roller rotatably mounted in the bottom guide; | Caldwell's 86XT has a bottom pulley that is not a roller and is mounted in the fixed pulley block unit. |
| 264/12 | a fixed pulley block unit connected to the channel; | a fixed pulley block unit connected to the channel; ( See Prior Art in Fig.2A, & 2B) |
| 264/12 | a translatable pulley block unit moveable within the channel; | a translatable pulley block unit moveable within the channel; (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a spring comprising | a spring comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a first end | a first end ( See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and a second end | and a second end (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | wherein the first end is fixed relative to the channel | wherein the first end is fixed relative to the channel (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and the second end is connected to the translatable pulley block unit; | and the second end is connected to the translatable pulley block unit; (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and a cord comprising | and a cord comprising (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | a first cord end | a first cord end, (See Prior Art in '264 Pat. Fig.2A & 2B) |

6

| | | |
|---|---|---|
| 264/12 | and a second cord end, | and a second cord end, (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | wherein the cord is threaded through the translatable pulley block unit | wherein the cord is threaded through the translatable pulley block unit (See Prior Art in '264 Pat. Fig. 2A & 2B) |
| 264/12 | and the fixed pulley block unit | and the fixed pulley block unit (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and extends around the bottom guide roller, | and extends around the bottom fixed pulley block bottom pulley which is not a roller, |
| 264/12 | the first cord end being attached to the translatable pulley block unit | the first cord end being attached to the translatable pulley block unit (See Prior Art in '264 Pat. Fig.2A & 2B) |
| 264/12 | and the second cord end being attachable to a jamb. | and the second cord end being attachable to a jamb. (See Prior Art in '264 Pat. Fig. 7A) |
| 264/13 | A window balance device comprising: | A window balance device comprising; (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/13 | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and (See Prior Art in '264 Pat. Fig.2A, 2B & 3) |
| 264/13 | a bottom guide roller rotatably mounted in the bottom guide. | Caldwell's 86XT has a bottom pulley that is not a roller mounted in the fixed pulley block and that is independent of the bottom guide. |

7

| | | |
|---|---|---|
| 264/14 | The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | Caldwell's 86XT has a bottom pulley that is not a roller located internal and external to the channel. |
| 264/15 | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | Caldwell's 86XT has a portion of the bottom guide internal and external to the channel. |
| 264/16 | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of window sash when installed. | Caldwell's 86XT has a bottom guide that forms a channel to receive a portion of a window sash when installed (See Prior Art in '264 Pat. Fig. 3). |
| 264/18 | A window balance device comprising: | A window balance device comprising: |
| 264/18 | a channel comprising a first end and a second end; | a channel comprising a first end and a second end; (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/18 | a top guide connected to the first end of the channel; | a top guide connected to the first end of the channel; (See Prior Art in '264 Pat. Fig.2A,2B & 3) |
| 264/18 | a bottom guide connected to the second end of the channel and | a bottom guide connected to the second end of the channel and (See Prior Art in '264 Pat. Fig. 2A, 2B & 3) |

8

| | | |
|---|---|---|
| | adapted to slide in a jamb pocket when installed in a window frame; and | adapted to slide in a jamb pocket when installed in a window frame; and (See Prior Art in '264 Pat. Fig.1) |
| 264/18 | a bottom guide roller rotatably mounted in the bottom guide. | Caldwell's 86XT has a bottom pulley that is not a roller in the fixed pulley block and is independent of the bottom guide. |
| 264/19 | The device of claim 18 wherein the bottom guide roller is located external to the channel. | Caldwell's 86XT has a bottom pulley located internal and external to the channel. |
| 264/20 | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | Caldwell's 86XT has a bottom guide that is internal and external to the channel. (See Prior Art in '264 Pat. Fig,2A,2B & 3) |
| 264/21 | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | Caldwell's 86XT has a bottom guide that forms a channel to receive a portion of a window sash when installed (See Prior Art in '264 Pat. Fig.3). |

9

**EXHIBIT C**

**NON-INFRINGEMENT OF**
**AMESBURY'S U.S. PATENT NO. 6,820,368**
**BY CALDWELL'S SERIES 971 PRODUCT**

| | | A window balance system comprising: |
|---|---|---|
| 368/2 | A window balance system comprising: | A window balance system comprising: |
| 368/2 | a U-shaped channel comprising a plurality of openings; | a U-shaped channel comprising a plurality of openings (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B); |
| 368/2 | a spring connected to a system of pulleys located within the U-shaped channel; | a spring connected to a system of pulleys located within the U-shaped channel (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a cord with | a cord with (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a first cord end | a first cord end (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | and a second cord end, | and a second cord end, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the first cord end connected and threaded through the system of pulleys, | the first cord end connected and threaded through the system of pulleys, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the second cord end connected to a jamb mounting attachment; and | the second cord end connected to jamb mounting attachment; and (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a balance shoe, wherein the balance shoe comprises: | a balance carrier (shoe), wherein the balance carrier comprises (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B): |

| | | |
|---|---|---|
| 368/2 | a frame comprising an enlarged first end | a frame comprising an enlarged first end |
| 368/2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel. | and a second end, wherein the second end is adapted to be received by the U-shaped channel, |
| 368/2 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | Caldwell's Series 97I second end of the balance carrier further forms a clearance for a rivet that attaches the balance carrier to the U-shaped channel. A center support leg of the carrier rest against the rivet. The carrier is non-removable from the U-shaped channel; |
| 368/2 | a locking member proximal to the enlarged first end; | a locking member proximal to the enlarged first end; |
| 368/2 | a cam in communication with the locking member, and | a cam in communication with the locking member, and |
| 368/2 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Caldwell's Series 97I has no connecting device between the U-shaped channel and the balance carrier |
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | Caldwell's Series 97I balance carrier has no connecting device. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to | Caldwell's Series 97I window balance system has a cam housed within the enlarged first end of the carrier; wherein rotating the cam forces the locking member to engage a jamb track when the balance carrier is |

| | | |
|---|---|---|
| | engage a jamb track when the balance shoe is installed in a window jamb. | installed. (See Prior Art in '368 Pat. Fig. 2A, 7A. & 7B) |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | Caldwell's Series 97I balance system has a locking member comprising (See Prior Art '368 Pat. Fig. 2A, 7A & 7B) |
| 368/7 | two opposing ends | two opposing ends (See Prior Art '368 Pat. Fig. 2A, 7A & 7B) |
| 368/7 | integrally connected by a spring member | integrally connected by a spring member (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | Caldwell's Series 97I balance system has a cam that is partially housed within the enlarged first end of the carrier frame, wherein the cam forces the opposing ends of the locking member to engage a jamb track when the balance carrier is installed in a window jamb (See Prior Art in '368 Pat. Fig.2A, 7A & 7B). |
| 368/11 | The window balance system of claim 2 | Caldwell's Series 97I balance system |
| 368/11 | wherein the cam comprises at least one camming surface | has a cam comprising at least one camming surface (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/11 | and a keyhole opening sized to receive a pivot bar. | and a keyway opening sized to receive a pivot bar. (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |

**EXHIBIT D**

**NON-INFRINGEMENT OF**
**AMESBURY'S U.S. PATENT NO. 6,820,368**
**BY CALDWELL'S SERIES 97EZ PRODUCT**

| | | |
|---|---|---|
| 368/2 | A window balance system comprising: | A window balance system comprising: |
| 368/2 | a U-shaped channel comprising a plurality of openings; | a U-shaped channel comprising a plurality of openings (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a spring connected to a system of pulleys located within the U-shaped channel; | a spring connected to a system of pulleys located within the U-shaped channel (See Prior Art in '368 Pat. Fig. 2A); |
| 368/2 | a cord with | a cord with (See Prior Art in '368 Fig.2A) |
| 368/2 | a first cord end | a first cord end (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | and a second cord end, | and a second cord end, (See Prior Art in '368 Fig.2A) |
| 368/2 | the first cord end connected and threaded through the system of pulleys, | the first cord end connected and threaded through the system of pulleys, (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | the second cord end connected to a jamb mounting attachment; and | the second cord end connected to jamb mounting attachment; and (See Prior Art in '368 Pat. Fig.2A) |
| 368/2 | a balance shoe, wherein the balance shoe comprises: | a balance carrier (shoe), wherein the balance carrier comprises (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B): |

| | | |
|---|---|---|
| 368/2 | a frame comprising an enlarged first end | a frame comprising an enlarged first end |
| 368/2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | and a second end, wherein the second end is adapted to be received by the U-shaped channel, |
| 368/2 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | Caldwell's Series 97EZ second end of the frame of the balance carrier further forms two legs which are not a pocket for a supporting rivet, which does not mate with the legs. This product has an aperture for a second rivet that attaches the balance carrier to the U-shaped channel. The balance carrier is non-removable from the U-shaped channel. |
| 368/2 | a locking member proximal to the enlarged first end; | A locking member proximal to the enlarged first end; |
| 368/2 | a cam in communication with the locking member, and | a cam in communication with the locking member, and |
| 368/2 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Caldwell's Series 97EZ has a rivet between the U-shaped channel and the balance carrier. |
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | Caldwell's Series 97EZ balance is connected to the U-shaped channel with a rivet. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein | Caldwell's Series 97EZ window balance system has a cam housed within the enlarged first end of the carrier; wherein rotating the cam forces the locking member to |

| | | |
|---|---|---|
| | rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | engage a jamb track when the balance carrier is installed in a window jamb. (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | Caldwell's Series 97EZ balance system has a locking member comprising (See Prior Art in '368 Pat. Fig. 2A 7A & 7B) |
| 368/7 | two opposing ends | two opposing ends (See Prior Art in '368 Pat. Fig.2A, 7A & 7B) |
| 368/7 | integrally connected by a spring member | integrally connected by a spring member (See Prior Art in '368 Pat. 2A, 7A & 7B) |
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | Caldwell's Series 97EZ balance system has a cam that is partially housed within the enlarged first end of the carrier frame, wherein the cam forces the opposing ends of the locking member to engage a jamb track when the balance carrier is installed in a window jamb (See Prior Art in '368 Pat. Fig.2A, 7A & 7B). |
| 368/11 | The window balance system of claim 2 | Caldwell's Series 97EZ balance system |
| 368/11 | wherein the cam comprises at least one camming surface | has a cam comprising at least one camming surface (See Prior Art in '368 Pat. Fig. 2A, 7A & 7B) |
| 368/11 | and a keyhole opening sized to receive a pivot bar. | and a keyway opening sized to receive a pivot bar. (See Prior Art in '368 Fig.2A, 7A & 7B) |

US006041476A

# United States Patent [19]
### deNormand

| | |
|---|---|
| [11] | **Patent Number:** 6,041,476 |
| [45] | **Date of Patent:** Mar. 28, 2000 |

[54] **INVERTED BLOCK AND TACKLE WINDOW BALANCE**

[75] Inventor: **Richard S. deNormand,** Rochester, N.Y.

[73] Assignee: **Caldwell Manufacturing Company,** Rochester, N.Y.

[21] Appl. No.: **08/975,728**

[22] Filed: **Nov. 21, 1997**

[51] Int. Cl.⁷ ..................................... B66D 3/08
[52] U.S. Cl. ......................... 16/197; 16/196; 49/445; 254/393
[58] Field of Search ................... 16/193, 196, 197, 16/198, 401, 402; 49/445, 446; 492/30, 47; 254/393, 404, 416

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 6,584 | 7/1849 | Hoffman . |
| 138,944 | 5/1873 | Shaw ............................ 16/213 |
| 329,005 | 10/1885 | Blodgett ...................... 16/213 |
| 464,795 | 12/1891 | Dodge . |
| 527,306 | 10/1894 | Wern .......................... 254/393 |
| 1,523,733 | 1/1925 | Trout .......................... 254/404 |
| 1,668,497 | 5/1928 | Fishback . |
| 1,713,586 | 5/1929 | Wright ......................... 254/404 |
| 1,800,700 | 4/1931 | Patton . |
| 2,196,948 | 4/1940 | Tremblay ...................... 16/215 |
| 2,262,990 | 11/1941 | Cross et al. . |
| 2,336,406 | 12/1943 | Kreuscher . |
| 2,459,290 | 1/1949 | Rozner . |
| 2,625,447 | 1/1953 | Derenter, III ................. 254/393 |
| 2,663,806 | 12/1953 | Trammell, Sr. et al. ......... 49/445 |
| 3,055,044 | 9/1962 | Dinsmore . |
| 3,150,420 | 9/1964 | Brenner . |
| 4,078,336 | 3/1978 | Prosser . |
| 4,190,930 | 3/1980 | Prosser . |
| 4,240,614 | 12/1980 | Comer, Jr. .................... 254/393 |
| 4,332,054 | 6/1982 | Paist et al. ................... 16/197 |
| 4,503,641 | 3/1985 | Swan . |
| 4,586,291 | 5/1986 | Swan . |
| 4,654,928 | 4/1987 | Flight . |
| 4,689,850 | 9/1987 | Flight ......................... 16/197 |
| 4,914,862 | 4/1990 | Gregory ....................... 49/445 |
| 4,949,425 | 8/1990 | Dodson et al. ............. 16/DIG. 20 |
| 5,530,991 | 7/1996 | deNormand et al. . |

Primary Examiner—Chuck Y. Mah
Assistant Examiner—Donald M. Gurley
Attorney, Agent, or Firm—Eugene Stephens & Associates

[57] **ABSTRACT**

Pulleys of a block and tackle window balance include hub steps that interact with other components to reduce the introduction of dirt and dust particles into areas vulnerable to wear. The hub steps of some of the pulleys are recesses formed about the axial bores of the pulleys that mate with protrusions on an axle and a washer. The hub steps of other pulleys are protrusions that abut a support plate and heads of rivets that act as axles. The hub steps allow inverse mounting of the window balance so that the balance can be mounted in a shoe channel for movement with a sash of the window, attached to the sash shoe, and the cord can be attached to the jamb or frame, thus increasing sash travel.

**23 Claims, 2 Drawing Sheets**



**EXHIBIT E**

**U.S. Patent**    Mar. 28, 2000    Sheet 1 of 2    **6,041,476**



FIG. 1



FIG. 2



FIG. 3

C000458



## FIG. 4



## FIG. 5



## FIG. 6

C000459

6,041,476

**1**

# INVERTED BLOCK AND TACKLE WINDOW BALANCE

## TECHNICAL FIELD

The invention relates to the field of block and tackle window balances for offsetting the weight of a window sash throughout a range of travel within a window frame.

## BACKGROUND OF THE INVENTION

Block and tackle window balances have become popular because of their compact size and ease of installation. They combine a system of pulleys with an extension spring to convert high spring tension applied over a short working distance to a lower spring tension applied over a longer working distance. The extension spring and pulley system are arranged within a rigid balance channel, with the extension spring anchored at one end of the balance channel and the pulley system anchored at the other end. In most block and tackle balances, the balance channel is mounted in the jamb of the window frame; and a cord, which is reeved through the pulley system, is attached to a sash shoe that slides in the jamb with the sash. The extension spring and pulley system are sized so that a desired lifting force is applied to the window sash throughout the entire range of sash travel within the window frame. A disadvantage of this type of balance is that the movement of the sash is limited by the presence of the balance in the jamb. In some cases, the travel is limited so much that the lower sash of the open window blocks egress through the window in escaping a fire.

To solve the problem of limited sash movement, the balance can be mounted upside down in the window sash with the balance channel attached to the sash shoe and the cord attached to the window jamb or frame. However, prior art window balances of this kind tend to be susceptible to contamination from dirt and dust, especially when mounted upside down. Particles work their way between the pulley bores and the pulley axles, increasing friction and wear. Thus, prior art block and tackle window balances are not as durable or reliable as is desired.

Some prior art block and tackle window balances that are less susceptible to contamination require the use of bushings and other parts. This is disadvantageous in that the use of additional parts increases the complexity of the machines and the likelihood of their failure. Also, the additional parts increase the cost of manufacture and assembly of the window balances.

## SUMMARY OF THE INVENTION

My inventive block and tackle window balance greatly reduces the invasion of the hub/axle interface by particulate contaminants. I form the pulleys with steps in their hubs so that they can engage mating steps on the rivets that serve as their axles. In addition, I mount the two pulleys at the open end of the balance so that they run against each other, effectively sealing the space between the pulley hubs. The steps in the pulley hubs can be recesses or protrusions, depending on their location and particular duty. My window balance provides better protection from dirt and dust contamination without the extra parts required by prior art window balances, keeping the balance relatively simple and less costly to manufacture and assemble. Additionally, because my window balance is less susceptible to contamination, it can be mounted to move with the sash of a window or to remain fixed relative to the frame of a window, depending on the requirements of a particular

**2**

installation, and can be mounted invertedly without significantly reducing its useful life.

## DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top schematic view of the invention.

FIG. 2 is a cross section taken along line II—II in FIG. 1 showing the first pair of pulleys.

FIG. 3 is a cross section taken along line III—III in FIG. 1 showing the second pair of pulleys.

FIG. 4 is a view taken along line IV—IV in FIG. 2 to illustrate the flats of a preferred pulley axle and the groove in which the axle is mounted.

FIG. 5 is a side view of a portion of the invention as shown in FIG. 1.

FIG. 6 is a schematic representation of the placement of my invention in a window.

## DESCRIPTION OF THE INVENTION

As seen in the accompanying Figures, my block and tackle window balance 1 includes a balance channel 2 preferably mounted in the shoe channel 55 of a window 51 and attached at one end to a sash shoe 50 that moves with the sash 53 in the shoe channel 55. I mount the shoe channel 55 on the jamb 54 of the window between the jamb 54 and the sash 53. The balance channel 2 supports a series of pulleys 11, 12, 31, 32 over which I reeve a cord 6. I attach an attachment end 8 of the cord 6 to the window jamb 54 or to the window frame 52. I attach a support plate end 7 of the cord 6 to a sliding support plate 35. The support plate 35 is biased against movement from a rest position by a spring 4 attached to the balance channel 2. Alternatively, a more conventional mounting arrangement can be used with the balance channel 2 fixed relative to the window jamb 54 and the attachment end 8 of the cord attached to the sash shoe 50.

As seen particularly in FIG. 2, an axle 15 mounted in grooves 24 in one end of the balance channel 2 supports a first pair 10 of pulleys 11, 12. The pulleys 11, 12 in the first pair 10 sit adjacent one another and include hub steps 13 in the form of recesses about the axial bores 14 of the pulleys 11, 12. The sides or rims 23 of the pulleys 11, 12 adjacent one another can slide or rub against each other and effectively seal the cavity 22 formed by their hub steps 13 against contamination from dirt and dust.

The axle 15 is preferably a rivet including flats 16 formed over portions of the circumferential surface of the axle 15 such that the flats 16 engage the grooves 24 in the balance channel 2, holding the axle 15 against rotation. The preferred rivet 15 also includes heads 17 that prevent axial movement of the axle 15. As shown in FIG. 4, I prefer to use a hexagonal arrangement of the flats 16 similar to that used in common nuts and bolt heads. The axle 15 can also include a flange 18 with a protruding flange step 19 that mates with a hub step 13 of one of the pulleys of the first pair, such as the first pulley 11. I prefer to mount a washer 20 on the axle 15 between the other of the pulleys of the first pair 10 (the second pulley 12) and the wall 3 of the balance channel. The washer 20 can include a protruding washer step 21 that mates with a hub step 13 of the second pulley 12. The mating steps 13, 19, 21 effectively seal the washer/pulley, flange/pulley, and pulley/axle bearing surfaces from contamination by dirt and dust particles, reducing wear of these parts and increasing the effective life of the window balance.

A second pair 30 of pulleys 31, 32 is mounted on the support plate 35. The pulleys 31, 32 of the second pair 30 also include hub steps 33, but I prefer to form these hub steps

C000460

6,041,476

**3**

33 as protrusions about the axial bores 34 of the pulleys 31, 32. Axles 37, 38, preferably in the form of rivets, rotatably mount the pulleys 31, 32 on the support plate 35, the heads 39 of the rivets engaging or abutting respective hub steps 33 of the pulleys 31, 32. I prefer to form the hub steps 33 so that they have substantially the same diameter as the heads 39 of the rivets 37, 38. The hub steps 33 of the pulleys 31, 32 farthest from the rivet heads 39 abut the support plate 35. As with the first pair of pulleys 10, the mating steps 33 and rivet heads 39 effectively seal the pulley/axle bearing surfaces from contamination by dirt and dust particles, reducing wear of these parts and increasing the effective life of the window balance.

When installed, one end 8 of the cord 6 is preferably attached to the window frame 52 or the window jamb 54, the other being attached to the support plate 35. In this arrangement, I slidingly mount the balance channel 2 in the shoe channel 55 with one end connected to the sash shoe 50 so that the balance channel 2 can move with the sash 53 in the shoe channel 55. Alternatively, the end 8 of the cord 6 can be attached to the sash shoe 50 mounted in the conventional manner, the other end 7 of the cord being attached to the support plate 35. In the conventional arrangement, the balance channel 2 is fixed with respect to the frame 52. In either arrangement, the support plate 35 slides in the balance channel 2. I prefer to run the cord 6 from the support plate 35 to the first pulley 11, then to the fourth pulley 32, then to the second pulley 12, then to the third pulley 31, and then out the end of the balance channel 2 in which the first pair of pulleys 10 is mounted. The end 8 of the cord 6 not attached to the support plate 35 includes a limit stop 9 to prevent the cord 6 from being pulled into the balance channel 2 when it is free.

The support plate 35 carries a guide 36 that keeps the support plate 35 properly aligned and oriented in the balance channel 2 while sliding and while resting. The support plate 35 also includes a spring attachment point 40, such as a hole, to which an end of a biasing spring 4 is attached. The other end of the biasing spring 4 is attached to the balance channel 2 via, for example, a support rivet 5. The spring 4 provides the force that balances the weight of the window sash 53. As the window sash 53 is moved, the cord 6 moves and rolls over the pulleys 11, 12, 31, 32, which rotate accordingly, and the support plate 35 slides. Travel of the support plate 35 is limited between its resting position and its extended position by the limit stop 9 on the cord 6 and the first pair of pulleys 10, respectively.

Parts List

1 Window balance
2 Balance channel
3 Walls of balance channel
4 Spring
5 Spring support/rivet
6 Cord
7 Support plate end of cord
8 Free end/attachment end of cord
9 Limit stop of cord
10 First pulley pair
11 First pulley
12 Second pulley
13 Hub steps/recesses of pulleys of first pair of pulleys
14 Axial bores of pulleys of first pair
15 Axle/rivet supporting first pair
16 Flats of axle
17 Heads of axle
18 Flange of axle

**4**

19 Flange step/protrusion
20 Washer
21 Washer step/protrusion
22 Cavity/space formed by hub steps of first pair
23 Rims of pulleys of first pair
24 Mounting groove of axle of first pair
30 Second pulley pair
31 Third pulley
32 Fourth pulley
33 Hub steps/protrusions of pulleys of second pair of pulleys
34 Axial bores of pulleys of second pair
35 Support plate
36 Guide for support plate
37 Support/rivet for third pulley
38 Support/rivet for fourth pulley
39 Heads of rivets for third and fourth pulleys
40 Attachment point for spring; hole in support plate
50 Pivot block or sash shoe
51 Window
52 Window frame
53 Window sash
54 Window jamb

I claim:

1. A block and tackle window balance comprising:
   hub steps on each side of a pulley, the hub steps being formed coaxially with an axial bore of the pulley;
   an axle on which the pulley is rotatably mounted so that the hub steps act to inhibit introduction of contaminants into the axial bore of the pulley;
   a balance channel in which the axle is mounted, the balance channel being configured for mounting in one of a shoe channel, a sash, and a jamb of a window;
   an end of the balance channel being attached to one of a sash shoe and a frame of a window;
   a cord reeved over the pulley, a first end of the cord being attached to the other of the sash shoe and the frame of the window;
   a spring having a first end attached to the balance channel and a second end connected to a second end of the cord; and
   wherein the hub steps are recesses and the axle includes an axle step that protrudes toward and mates with a hub step of the pulley.

2. The window balance of claim 1 wherein the axle step is a protrusion extending from a flange formed in the axle.

3. The window balance of claim 1 wherein flats formed on a circumferential surface of the axle engage grooves formed in the balance channel to hold the axle against rotation.

4. The window balance of claim 1 wherein the mating axle step and hub step form two substantially right angles in a path to the axial bore of the pulley, substantially reducing introduction of dust into the axial bore of the pulley.

5. The window balance of claim 1 wherein the axle step is a protrusion formed on a washer mounted on the axle.

6. The window balance of claim 1 wherein the pulley is one of a substantially identical pair of pulleys mounted adjacent each other on the axle so that they can rotate relative to one another, a rim of one pulley substantially engaging a rim of the other pulley such that facing recesses form a cavity between the pulleys.

7. A block and tackle window balance comprising:
   hub steps on each side of a pulley, the hub steps being formed coaxially with an axial bore of the pulley;
   an axle on which the pulley is rotatably mounted so that the hub steps act to inhibit introduction of contaminants into the axial bore of the pulley;

6,041,476

**5**

a balance channel in which the axle is mounted, the balance channel being configured for mounting in one of a shoe channel, a sash, and a jamb of a window;

an end of the balance channel being attached to one of a sash shoe and a frame of a window;

a cord reeved over the pulley, a first end of the cord being attached to the other of the sash shoe and the frame of the window;

a spring having a first end attached to the balance channel and a second end connected to a second end of the cord; and

wherein the hub steps are protrusions and one of the hub steps engages a rivet head of an axle on which the pulley is rotatably supported, the axle being carried by a support plate that slides within the balance channel as the cord is played out or drawn into the balance, the support plate being interposed between and attached to the second ends of the spring and the cord, the cord being biased by the spring against being played out of the balance.

8. The window balance of claim 7 wherein a pair of substantially identical axles carrying substantially identical pulleys is mounted on the support plate such that longitudinal axes of the axles are offset from one another.

9. The window balance of claim 7 wherein the support plate carries a guide that engages the balance channel to maintain the plate in proper alignment within the balance channel.

10. A block and tackle window balance comprising:

flats on a circumferential surface of an axle on which a pulley is rotatably mounted;

a balance channel in which the axle is mounted, the flats engaging a groove formed in the balance channel so that the axle is held against rotation, the balance channel being mounted for one of movement with a window sash and remaining fixed with respect to a window frame;

a cord reeved over the pulley, a first end of the cord being connected to the window frame when the balance channel is mounted for movement with the window sash, the first end of the cord being connected to the window sash when the balance channel is mounted for remaining fixed with respect to the window jamb;

a spring configured to provide a bias against withdrawal of the cord from the block and tackle window balance, a first end of the spring being connected to a second end of the cord, a second end of the spring being connected to the balance channel; and

one of an end of the balance channel and the first end of the cord being configured for attachment to a sash shoe mounted in a shoe channel on the window jamb, the sash shoe being configured to slide in the shoe channel with the window sash as the window sash is moved, the end of the balance channel being configured for attachment to the sash shoe when the balance channel is mounted for movement with the window sash, and the first end of the cord being configured for attachment to the sash shoe when the balance channel is mounted for remaining fixed with respect to the window frame.

11. The window balance of claim 10 wherein the axle is a rivet and further comprises a flange arranged between the flats and the pulley.

12. The window balance of claim 11 wherein the flange includes a flange step on a pulley side of the flange, the flange step engaging a mating hub step of the pulley.

13. The window balance of claim 10 wherein a washer is mounted between a side of the pulley and a wall of the balance channel, the washer including a washer step that engages a mating hub step of the pulley.

**6**

14. The window balance of claim 10 wherein first and second pulleys are mounted adjacent one another on the axle in the balance channel, each pulley including hub steps such that a hub step of the first pulley faces a hub step of the second pulley and a hub step of each pulley faces a respective wall of the balance channel.

15. The window balance of claim 14 wherein the axle includes a step mating with a hub step of one of the pulleys.

16. The window balance of claim 14 further comprising a washer with a washer step thereon mating with a hub step of one of the pulleys.

17. The window balance of claim 14 further comprising third and fourth pulleys rotatably mounted on respective rivets on a support plate slidably mounted in the balance channel, the support plate being interposed between the spring and the cord such that the first ends of the spring and the cord are attached thereto, the pulleys including hub steps each engaging one of a respective rivet head and the support plate.

18. The window balance of claim 17 wherein the balance channel is mounted for movement with the window sash, an end of the balance channel being attached to the sash shoe, the cord running over each of the first, second, third, and fourth pulleys so that the first end of the cord can be attached to the window frame.

19. A block and tackle window balance comprising:

first hub steps on each side of a first pulley;

second hub steps on each side of a second pulley;

a first axle on which the first and second pulleys are rotatably mounted, the first and second pulleys lying adjacent one another on the axle so that they rub together;

third hub steps on each side of a third pulley;

fourth hub steps on each side of a fourth pulley;

second and third axles carrying the third and fourth pulleys, respectively, and being mounted on a support plate;

a balance channel non-rotatably supporting the first axle and slidingly supporting the support plate, the balance channel including first and second side walls and a bottom wall;

a cord reeved over the pulleys and having a first end attached to the support plate and a second end extending from a first end of the balance channel; and

a spring having a fixed end attached to the balance channel and a movable end attached to the support plate.

20. The window balance of claim 19 wherein the first axle is mounted in the side walls of the balance channel and includes flats formed on a circumferential surface of the first axle corresponding to a region in which the first axle engages one of the grooves, the flats engaging the one of the grooves so that the axle is held against rotation.

21. The window balance of claim 19 wherein the first hub steps are recesses and the first axle includes a flange with a flange step formed thereon, the flange step engaging and mating with one of the first hub steps of the first pulley.

22. The window balance of claim 19 wherein the second hub steps are recesses and the first axle carries a washer adjacent the second pulley, the washer including a washer step facing the second pulley and mating with an adjacent second hub step of the second pulley.

23. The window balance of claim 19 wherein the hub steps of one of the third and fourth pulleys are protrusions, the axle of the one of the third and fourth pulleys comprising a rivet with a head engaging one of the protrusions, the other protrusion running against the support plate.

* * * * *

C000462

**U.S. Patent**     Nov. 23, 2004     Sheet 2 of 13     US 6,820,368 B2



PRIOR ART

FIG. 2A



FIG. 7A

FIG. 7B

FIG. 8A

FIG. 8B



EXHIBIT F



# EXHIBIT G

### Caldwell's Quick Tilt
### Constant Force Balances

Window Frame
Jamb (Vinyl)

Aperture for
Screw Fastener

.103

.543

.750

Raised Spine of
Cover

Aperture for
Screw Fastener

Sash Carrier (Shoe)



Caldwell's Quick Tile
Constant Force Balances

EXHIBIT H



Cord

Channel

Pulleys (2)

Fixed Pulley Block

Fixed Pulley Block

Pulleys (3)

Roller in Bottom Guide

Bottom Guide w/ Roller

Bottom Guide

End of Cord

Amesbury's '264 Pat.
Bottom Giuide w/ Roller

Caldwell's Series 86X
Balance Fixed Pulley Block

EXHIBIT J



Channel

Fixed Pulley Block

Pulleys (3)

Bottom Guide

Caldwell's Series 86XT
Balance Detail

EXHIBIT K



Spring

Channel

Rivet for Spring

Supporting Rivet

Rivet

"Snap-In Tabs"

Center Support Leg

Locking Member

Cam

Balance Carrier

Cam

Removable Balance Shoe

Amesbury's Snap Lock
Balance Shoe

Caldwell's Series 971
w/ Short Carrier

EXHIBIT L



Amesbury's Snap Lock
Balance Shoe

Caldwell's Series 97EZ
w/ Long Carrier

EXHIBIT M



# EXHIBIT 5

00001

1

2          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
3   - - - - - - - - - - - - - - - - - - -x
    AMESBURY GROUP, INC., and
4   AMESBURY SPRINGS LTD.,
           Plaintiffs,
5
           v.    Civil Action No. 05-10020-DPW
6
    THE CALDWELL MANUFACTURING
7   COMPANY,
           Defendant.
8   - - - - - - - - - - - - - - - - - - -x
           C O N F I D E N T I A L
9
    Deposition Upon Oral Examination Of:
10          Charles E. Still

11

    Location:    Harris Beach PLLC
12               99 Garnsey Road
                 Pittsford, New York  14534
13

14  Date:       May 2, 2006

15

16  Time:       9:11 a.m.

17

18

19  Reported By:  Joanne N. Pero

20          Alliance Shorthand, Inc.

21          Suite 1500 - The Penthouse

22          Alliance Building

23          183 Main Street East

24          Rochester, New York  14604

25

00002
1

2  Appearing on Behalf of Plaintiffs:

3    Neal L. Slifkin, Esq.
     Laura Smalley, Esq.
4      Harris Beach PLLC
       99 Garnsey Road
5      Pittsford, New York  14534

6
   Appearing on Behalf of Defendant:
7
     Douglas J. Kline, Esq.
8      Goodwin Procter LLP
       Exchange Place
9      Boston, Massachusetts  02109

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Still, Charles E., 5/2/06**                    **Page 2**

00131

1

2    A.   They are Caldwell's block and tackle

3  balance.  One of them is a 97i with a short carrier

4  and the 97ez with a long carrier.

5    Q.   Which one is 97i, which deposition

6  number?

7    A.   That is 20.  21 is the long shoe, long

8  carrier.

9    Q.   Is that designated 97ez?

10    A.   Yes, sir.

11    Q.   So if we look at Exhibit C to your April

12  17 report that we have designated Still Deposition

13  Exhibit 9; do you have that before you?

14    A.   Yes, I do.

15    Q.   Is that where you -- is that a claim

16  chart that you prepared a portion of concerning

17  your opinion of non-infringement of Amesbury's '368

18  patent by Caldwell Series 97i product?

19    A.   Yes, sir.

20    Q.   And can I safely assume you completed the

21  right-hand column of this chart?

22    A.   I did.

23    Q.   And the rest of the chart was prepared by

24  somebody at Harris Beach; is that correct?

25    A.   Either that or through Amesbury.

00132
1

2     Q.   You received the rest of the chart from

3  Harris Beach; is that correct?

4     A.   I did.

5     Q.   Does the right-hand column express your

6  understanding of the structure and function of

7  Caldwell Series 97i balance?

8     A.   Yes.

9     Q.   For example, you described it as a window

10  balance, correct?

11     A.   Yes, sir.

12     Q.   And you describe Caldwell's 97i as

13  including a U-shaped channel comprising a plurality

14  of openings; is that correct?

15     A.   Yes.

16     Q.   And it includes a spring connected to a

17  system of pulleys located within the U-shaped

18  channel, correct?

19     A.   Yes.

20     Q.   The 97i balance includes a cord having

21  first and second ends, correct?

22     A.   Yes.

23     Q.   The first cord end is connected and

24  threaded through a system of pulleys; is that

25  right?

**Still, Charles E., 5/2/06**                    **Page 132**

00133
1

2    A.  Yes.

3    Q.  And the second cord end is connected to a

4 jamb mounting attachment; is that right?

5    A.  Yes.

6    Q.  The 97i balance includes a balance

7 carrier which you describe as a shoe wherein the

8 balance carrier includes certain features; is that

9 right?

10    A.  Yes.

11    Q.  And the shoe includes a frame comprising

12 an enlarged first end, right?

13    A.  Yes.

14    Q.  And it further includes a second end

15 wherein the second end is adapted to be received by

16 the U-shaped channel, correct?

17    A.  Yes.

18    Q.  The 97i balance includes a locking member

19 proximal to the enlarged first end, correct?

20    A.  Yes.

21    Q.  It includes a cam in communication with

22 the locking member, right?

23    A.  Yes.

24    Q.  And now there are two elements of

25 Amesbury's '368 patent claim 2 that you contend are

00134

1

2   omitted from Caldwell's 97i balance, correct?

3       A.   Yes.

4       Q.   In your view, the 97i balance omits any

5   pocket in the shoe, right?

6       A.   Yes.

7       Q.   And it omits a connecting device for

8   attaching the balance shoe within the U-shaped

9   channel; is that correct?

10      A.   Yes.

11      Q.   Now, the balance shoe is connected within

12  the U-shaped channel, isn't it?

13      A.   It is.

14      Q.   What holds it there?

15      A.   A rivet.

16      Q.   So is it fair to call that rivet a

17  connecting device?

18      A.   I wouldn't.

19      Q.   Why not?

20      A.   That is a connecting rivet.

21      Q.   Any difference between a connecting rivet

22  and a connecting device in your view?

23      A.   A device could mean a number of things

24  but a rivet is a rivet.

25      Q.   Could a rivet be a device?

00135

1

2    A.   You could probably put it in the

3 category, yes.

4    Q.   So a rivet connects the shoe to the

5 channel, correct?

6    A.   Yes.

7    Q.   And a rivet can be a device, right?

8    A.   It could be, yes.

9    Q.   You also say that the device -- strike

10 that.

11        Your report expresses the view that the

12 shoe in Caldwell's 97i balance omits any pocket; is

13 that correct?

14    A.   That is correct.

15    Q.   What definition of pocket did you have in

16 mind when you reached that conclusion?

17    A.   Well, something that is -- that is going

18 to hook around the balance like it does in the

19 Amesbury balance where it creates a pivot point for

20 the sash shoe to be rotated.

21    Q.   So when you concluded that Caldwell's 97i

22 balance omits any pocket, that is the definition of

23 pocket you had in mind; is that right?

24    A.   That is my explanation of a pocket, yes.

25    Q.   Describe for me in your words how the

**Still, Charles E., 5/2/06**                    **Page 135**

00136

1

2   shoe connects to the channel in the Caldwell 97i

3   balance that we have designated Still Exhibit 20?

4       A.   There is only one connection and that is

5   the rivet.  It passes through a clearance in both

6   walls of the carrier which is the shoe and goes

7   through both walls of a steel channel and creates a

8   connection between the shoe and the channel.

9       Q.   So there is a clearance in the shoe walls

10  that mates with the rivet; is that fair to say?

11      A.   That is correct, yes.

12      Q.   If we look at your Exhibit C claim chart,

13  the row in your chart for '368 patent claim 3, the

14  window balance system of claim 2 wherein the

15  connecting device comprises a rivet; do you see

16  that?

17      A.   Excuse me a moment.  Exhibit C?

18      Q.   Right.

19      A.   What claim?

20      Q.   '368/3?

21      A.   Okay.

22      Q.   Do you see that?

23      A.   Yes.

24      Q.   The claim describes the window balance

25  system of claim 2 wherein the connecting device

**Still, Charles E., 5/2/06**                    **Page 136**

# EXHIBIT 6

00001

1

2       UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS

3  - - - - - - - - - - - - - - - - - - -x
  AMESBURY GROUP, INC., and

4  AMESBURY SPRINGS LTD.,
      Plaintiffs,

5

      v.   Civil Action No. 05-10020-DPW

6

  THE CALDWELL MANUFACTURING

7  COMPANY,
      Defendant.

8  - - - - - - - - - - - - - - - - - - -x
      CONFIDENTIAL

9

  Videotaped Deposition Upon Oral Examination Of:

10     Jeffrey Robertson

11

  Location:   Alliance Shorthand, Inc.

12       183 East Main Street
       Rochester, New York 14604

13

14  Date:     November 29, 2005

15

16  Time:     9:35 a.m.

17

18

19  Reported By:  Joanne N. Pero

20       Alliance Shorthand, Inc.

21       Suite 1500 - The Penthouse

22       Alliance Building

23       183 Main Street East

24       Rochester, New York 14604

25

**Robertson, Jeffrey, 11/29/05**          **Page 1**

00002

1

2  Appearing on Behalf of Plaintiffs:

3  John Refermat, Esq.
     Harris Beach PLLC
4   99 Garnsey Road
     Pittsford, New York  14534
5

6  Appearing on Behalf of Defendant:

7  Safraz W. Ishmael, Esq.
     Goodwin Procter LLP
8   Exchange Place
     Boston, Massachusetts  02109
9

10 Videographer:

11 Mark DelMonte
     Electronic Field Productions, Inc.
12  3495 Winton Place, Building D, Suite 3
     Rochester, New York  14623
13

14                  *    *    *

15

16

17

18

19

20

21

22

23

24

25

**Robertson, Jeffrey, 11/29/05**                    **Page 2**

00025

1

2  the channel -- sorry, the channel.  Do you see

3  there are two rivets pictured there?

4      A.  That is correct.

5      Q.  Do you recognize this design?

6      A.  Yes.

7      Q.  And would you agree that the balance

8  pictured here is the 97i?

9          MR. REFERMAT:  Objection.

10     A.  It is -- the brochure calls it a 97i.  I

11  believe that is what Caldwell named that particular

12  design, yes.

13     Q.  Okay.  So you recognize this balance but

14  you are just not sure what the name is?

15     A.  The proper nomenclature, yes.  I am not

16  sure of that.

17     Q.  Now, let me point you -- do you see --

18  strike that.

19         There are two rivets on this channel; is

20  that correct?

21     A.  That is correct.

22     Q.  Now, the rivet to the right of the page

23  or the right-most rivet --

24         MR. REFERMAT:  Right-most as you are

25  looking at it?

00026

1

2    Q.  As you are looking at it.  What is the

3  purpose of this rivet?

4       MR. REFERMAT:  Objection.

5    A.  It is to anchor the spring.

6    Q.  As you are looking at the picture, the

7  left-most rivet, what is the purpose of that rivet?

8       MR. REFERMAT:  Objection.

9    A.  To attach the carrier to the balance, to

10  the channel.

11    Q.  So the left-most rivet -- strike that.

12       You would agree that the left-most rivet

13  connects the carrier to the balance?

14    A.  Yes.

15    Q.  Is it also correct to say that the

16  left-most rivet connects the carrier to the

17  channel?

18       MR. REFERMAT:  Objection.

19    A.  Yes.

20    Q.  Now, do you see between the two rivets on

21  the surface of the carrier, there is a protrusion?

22    A.  Yes, it's evident in the picture.

23    Q.  Can you mark that protrusion with a pen

24  with the letter A?

25    A.  (The witness complied.)

**Robertson, Jeffrey, 11/29/05**                    **Page 26**

00027

1

2    Q.   What is the purpose of that protrusion

3  marked as letter A?

4        MR. REFERMAT:  Objection.

5    A.   To prevent rotation of the carrier on the

6  end of the balance.

7    Q.   And how does it prevent rotation?

8    A.   It contacts the channel at a distance

9  away from the center line of the rivet and prevents

10  rotation of the carrier about the rivet center.

11    Q.   So does the carrier tend to rotate when

12  installed?

13        MR. REFERMAT:  Objection.

14    A.   Define how it is installed.

15    Q.   In a typical installation into the window

16  jamb?

17    A.   In a typical installation in the window

18  jamb, lineals are laid on a table.  The balance

19  is --

20        MR. REFERMAT:  Objection.

21    A.   -- the lineals are placed on a work

22  table, the balances are inserted down the channels

23  in the lineals, the lineals are then placed in a

24  welder along with the window head and window sill

25  and the frame is welded.

# EXHIBIT 7

**Shina Consulting**

March 23, 2006

Jordan Singer
Attorney at Law
Goodwin|Procter LLP
Exchange Place
Boston, MA 02109

Re: Expert Report of Dr. Sammy Shina Submitted on Behalf of Plaintiffs in Civil Action No. 05-10020-DPW

I have been retained on behalf of the plaintiffs: Amesbury Group Inc., and Amesbury Springs Ltd. as an expert to review patents, patent applications, file histories, product brochures, depositions and oral examinations, design drawings, and the US District Court claim construction and comment on them, including analyzing whether products made by the defendant, the Caldwell Manufacturing Company, infringe on three of the plaintiffs' patents.

Chronological listing of the information reviewed by Sammy G Shina:

The following Patents and legal documents:
- US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994
- File history, US Patent 5,365,638
- US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003
- File history, US Patent 6,598,264 B2
- US Patent 6,820,368, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004
- File history, US patent 6,820,368 B2
- US District Court, Massachusetts District, Civil Action 05-10020-DPW; Memorandum and Order, dated January 20th, 2006.

The following Caldwell Physical Products:
- Physical Caldwell product for spring mounting "constant force system", moving coil preassembled option.
- Physical Caldwell product for block and tackle with bottom guide roller mounted outside the U shaped channel.
- Physical Caldwell product block and tackle inverted balance for windows with balance shoe for tilt operation, labeled as the 97ez on the back on the channel.

The following Caldwell Brochures:
- Caldwell brochure package entitled "Quick-Tilt Constant Force System, Smooth silent operation for tilt applications; containing 6 pages of front or title page(C000530), 2nd page describing the constant force system (C000531); 3rd page of technical specifications, accessories and installation(C000532), 4th page of options, warranty and contact information(C000533); 5th page entitled "Egress–Friendly Quick-Tilt for new construction

1

windows" for Quick-Tilt*eg balances(C000534); and 6[th] page entitled "New construction friendly Quick-Tilt" for "Caldwell preassembled Quick-Tilt constant force balance just got better with its evolution into Quick-Tilt*nc (C000535)."

- Caldwell brochure package series 86xt Block and Tackle System, Extended travel for sideload applications containing 4 pages of front or title\ page (C000498), 2nd page of component parts layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000498).
- Caldwell brochure package series 97ez Block and Tackle System Easy installation for tilt applications; containing 4 pages of front or title page (C000514), 2nd page of component part layout and description (C000515), 3rd page of technical specifications, accessories and installation (C000516); and 4th page of warranty and contact information (C000517).
- Caldwell brochure package series 97i Block and Tackle System Inverted Operation for tilt application; containing 4 pages of front or title page (C000490), 2nd page of component part layout and description (C000491), 3rd page of technical specifications, accessories and installation (C000492); and 4th page of warranty and contact information (C000493).

The following depositions and oral examinations:
- Deposition of Douglas Zinter, Dated October 20, 2005
- Deposition of Richard deNormand, Dated October 21, 2005
- Deposition of Wilbur Kellum, dated October 28, 2005
- Deposition of Thomas Batten, dated November 8, 2005
- Deposition of Jeffery Robertson, Dated November 29, 2005

The following Caldwell drawings on paper:
- Egress End Carriage Assembly including, (CW0114):
  - Egress End Plate, EX5939, rev0,  drawn/approved on 6/10/02, (CW0115)
  - Egress End Plate, EX5939, rev0,  drawn 9/24/02, (CW0116)
  - Channel, EX5957, rev 0, drawn, 09/23/02, approved?, (CW0128)
  - Terminal-V stage 5956-Vstage, rev 0, drawn/approved 9/24/02, (CW0129)
  - Axel, EX5959, rev 0, drawn/approved 9/24/02, (CW0130)
  - Channel, EX5970, drawn/approved 10/17/02, (CW0117)
  - Carriage (4.0), EX5975, rev 0, drawn/approve 10/29/02, (CW0118)
  - Carriage (4.0), EX5975, rev 0, drawn/approve 10/29/02, (CW0119)
  - Channel (4.0), EX5979, rev 0, drawn/approved 10/29/02, (CW0120)
  - Channel (4.0), EX5979, rev 0, drawn/approved 10/29/02, (CW0121)
  - Carriage (4.1) , EX5984, rev 0, drawn/approved 11/06/02, (CW0122)
  - Carriage (4.1) , EX5984, rev 0, drawn/approved 11/06/02, (CW0123)
  - Axel (4.1), EX5985, rev 0, drawn 11/05/02, approved 11/6/02, (CW0124)
  - Axel (4.1), EX5985, rev 0, drawn 11/05/02, approved 11/6/02, (CW0125)
  - Channel (4.1), EX5983, rev 0, drawn 11/5/02/approved 11/06/02, (CW0126)
  - Channel (4.1), EX5983, rev 0, drawn 11/5/02/approved 11/06/02, (CW0127)
- R/T (Roller Tilt) assembly (CW0131); including:
  - .270 Locking Case Half (Roller Tilt), 24A01 drawn ?/16/93, approved 6/19/03, (CW0132)
  - .270 Locking Case Half (R/T), 24A41 rev 2, drawn 3/25/02, approved 9/16/02, (CW0142)
  - .270 Locking Case Half-Tie in (R/T), 24A42 rev 1, drawn 2/27/04, (CW0143)
  - Cam (C.F.B.), 24A02, 24A03, drawn 2/18/93, (CW0133)

2

- o Tandem Spg. (Roller Tilt), Case. 24A04, drawn 2/10/93, approved 8/17/01
- o Tandem Spg. Case (Roller Tilt), Case. 24A04, rev 8, drawn 3/25/02, approved 9/16/02, (CW0134)
- o Tandem Spg. Case (Roller Tilt), Case. 24A44, rev 1, drawn 3/25/02, approved 8/16/02, (CW0144)
- o Spring (Roller Tilt), 24A05, rev 17, drawn 3/17/93, approved 1/14/04, (CW0135)
- o .340 Locking Case Half (Roller Tilt), 24A08 rev 10, drawn 2/16/93, checked 12/13/01, (CW0136)
- o .130 Locking Collar (Roller Tilt), 24A30 rev 3, drawn on 5/9/02, approved 4/29/03, (CW0137)
- o .130 Locking Collar (Roller Tilt), 24A30 rev 5, drawn on 5/9/02, approved 4/29/03, (CW0138)
- o Carrier (Roller Tilt), 24A32-33 rev 3, drawn 10/17/01, (CW0139)
- o Carrie4r Body (Roller Tilt) 24A34, 24A64, 24A69, 24A84, rev 9, drawn 10/19/96, (CW0140)
- o Wiper (Roller-Tilt), 24A40 rev1, drawn 01/20/04, approved 1/27/04, (CW0141)
- o Cam Tie-In (Roller/Tilt), 24A45-46-47, drawn 3/8/04, approved 5/3/04, (CW0145)
- o .340 Locking Case Half (Roller Tilt), 24A48 rev 2, drawn 3/25/02, checked 9/16/02, (CW0146)
- o Mounting Bracket (Roller Tilt); 24A56 rev 2, drawn on 925/95, approved 7/31/97, (CW0156)
- o 625-090/110/130Locking Case Assembly, 24A53/54/55 rev 2, drawn on 3/25/02, approved 2/06/04, (CW0147)
- o 625-090/110/130Tie-in Case Assembly, 24A58/59/60 rev 0, drawn on 2/06/04, approved 4/07/04, (CW0149)
- o 625-090/110/130Tie-in Case Assembly, 24A78/79/80 rev 0, drawn on 2/06/04, approved 4/07/04, (CW0150)
- Quick-Tilt assembly, (CW0152), including:
  - o Locking Ramp 16Y07-10, rev 13, drawn ?/15/96, (CW0153)
  - o Carrier Body .548/610 (24B01/08, rev 4, drawn 10/14/99 approved 5/7/02, (CW0154)
  - o Spring Nest, (Quick Tilt), 24B02, rev 3, drawn 10/05/99 checked 4/16/02, (CW0155)
  - o Spring (Quick Tilt), 24B05, rev 12, drawn 11-30-99, checked 1/20/04, (CW0156)
  - o Tamperlock (Quick Tilt), 24B10, rev 10, drawn 7/23/01, approved 9/18/01, (CW0157)
  - o Tamperlock (Quick Tilt), 24B21, rev 1, drawn 3/8/04, approved 4/5/04, (CW0163)
  - o Single Nest Cover (Quick Tilt), 24B14, rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, (CW0158)
  - o Tandem Nest Cover, 24B15 (Quick Tilt), rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, (CW0159)
  - o Triple Nest Cover (Quick Tilt), 24B16, rev 1, drawn 12-22-03, approved 1/29/04, shown integrated, with upper nest screw, (CW0160)
  - o Egress Nest Cover-Triple, (QT) 24B19, rev 1, drawn 03-29-04, approved 3/10/04, shown integrated, (CW0161)
  - o Spring-3/8 (Quick Tilt), rev 0, 24B20, drawn 02-17-04, checked 1/20/04, (CW0162)
  - o Carrier (QT), 24B22, rev 0, drawn 4-5-04, approved 4/?/05, (CW0164)
  - o Cam (Q/T), 24B24, rev 0, drawn 2/26/04, approved 3/9/04, (CW0165)
  - o Cam (Q/T), 24B25, rev 0, drawn 6/8/01, approved 8/6/01, (CW0166)

3

- o Carrier Lock (QT II), 24B26, drawn 4/6/04, approved 4/27/04, (CW0167)
- o N/C Balance Assembly .562 (Q/T), 24B42, 24B43, rev 0, drawn 4/13/04, approved 5/14/04, shown integrated, (CW0169)
- o N/C Balance Assembly (Quick-Tilt), 24B52, 24B53, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0172)
- o N/C Balance Assembly (Quick-Tilt), 24B54, 24B55, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0173)
- o N/C Balance Assembly (Q/T), 24B50, 24B51, rev 0, drawn 2/19/04, approved 5/5/04, shown integrated, (CW0170)
- o Balance Assembly .562 (Q/T), 24B46, 24B47, rev 0, drawn 4/15/04, approved 5/4/04, no cover Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0171)
- o Balance Assembly (Quick-Tilt), 24B56, 24B57, rev 02, drawn 8/10/01, approved 10/24/02, spacer or cover for triple, no cover for single or tandem Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0174)
- o Balance Assembly (Quick-Tilt), 24B58, 24B59, rev 02, drawn 8/10/01, approved 10/24/02, spacer or cover for triple, no cover for single or tandem. Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0175)
- o Balance Assembly (Quick-Tilt), 24B60, 24B61, rev 1, drawn 4/25/02, approved 10/24/02, spacer or cover for triple, no cover for single or tandem Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0176)
- o Carrier Assembly (drop-in R/T), 24B65 rev 1, drawn 1/5/01, approved 8/10/01 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0177)
- o Carrier Assembly (drop-in R/T), 24B70, rev 0, drawn 4/25/01, approved 4/25/02 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0178)
- o Carrier Assembly (drop-in R/T), 24B85, rev 2, drawn 4/10/00, approved 8/10/01 Cam (Q/T), 24B24, rev 0, drawn 2/26/04, rev 0, approved 3/9/04, (CW0179)
- o Constant Force Spring Tester (Roller-Tilt), QA-RTLT-011, rev 4, 7/24/97, approved 4/23/02
- o Friction Adjuster (QT II), 24B31, rev 0, drawn 04/05/04 approved 4/5/04, (CW0168)
- o Pivot bar, Winged, (Q/T and Spirex series), 99C48, rev 10, drawn 5/14/01, approved 6/21/03, (CW0181)
- o Pivot bar (Quick-Tilt), 99C48, rev 1, drawn 2/10/04, approved 3/19/04, (CW0182)
- Quick-Tilt Triple spacer, (CW0196)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 0, drawn 11/27/00, approved 1/18/01, (CW0197)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 1, drawn 11/27/00, approved 1/22/01, (CW0198)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 1, drawn 11/27/00, approved 1/22/01, (CW0199)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0200)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0201)
  - o Triple spacer (screw mount) Quick-Tilt, 24B09, Rev 2, drawn 11/27/00, approved 1/26/01, (CW0202)
- Quick-Tilt Spring Nest (carrier), (CW0215)

4

- o Spring Nest Drop-in R/T, (proposed), no Part #, Drawn 10-05-99, (CW0214)
- Quick-Tilt Cover Design, (CW0210)
  - o Single Spring Cover (Quick-Tilt), rev 0, EX5803, drawn 10/26/00, (CW0211)
  - o Tandem Spring Cover (Quick-Tilt), EX5804, rev 0, drawn 10/26/00, (CW0212)
  - o Triple Spring Cover (Quick-Tilt), EX5805, rev 0, drawn 10/26/00, (CW0213)
- Quick-Tilt Bumper (CW0203)
  - o Unmarked drawing (CW0204)
  - o Bumper (Quick-Tilt), 24B07, (rev 2); drawn 02-01-00, approved 10/18/00, (CW0209)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0206)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0207)
  - o Bumper (Quick-Tilt), 24B07, (rev 3); drawn 02-01-00, approved 02/09/01, (CW0208)
  - o Bumper (Quick-Tilt), 24B07, (rev 4); drawn 02-01-00, approved 04/06/00, (CW0205)
- Inverted 1-2-3 Carrier, (CW0183)
  - o Lock 1.292 (series 97ez), 15N39 Rev 1, Drawn 7/9/03, approved 5/5/04, (CW0193)
  - o Lock 1.292 (series 97ez), 15N39 Rev 2, Drawn 7/9/03, approved x/x/04, (CW0184)
  - o Lock 1.0 (series 97), 15N30 Rev 3, Drawn 9/30/02, approved 1/20/03, (CW0186)
  - o Lock 1.25 (series 97), 15N29 Rev 2, Drawn 9/30/02, approved 1/15/04, (CW0187)
  - o EX 5937-K, (shoe, my notations), no additional info, (CW0188)
  - o EX 5937-I, (shoe, my notations), no additional info, (CW0190)
  - o IE7 Travel Characteristics, no part number, drawn 9/2/03, (CW0185)
  - o Hemless Square Channel(series(Series 97), rev 4, drawn 7/12/02, approved 8/9/02, (CW0189)
  - o Carrier Body (1.25" Inverted); (series 97), 15N27, rev 2, drawn 10-01-02, approved 1/16/03, (CW0191)
  - o Carrier Body (1.0" Inverted); (series 97), 15N28, rev 2, drawn 10-01-02, approved 1/16/03, (CW0192)
  - o Channel (series 97ez), 15N400, 401, Rev 3, drawn 10/24/04, approved 5/6/04, (CW0194)
  - o Sash Pin, x no part #, rev 2, drawn 6/3/04 approved 10/15//04, (CW0195)
- Math Model, Series 97ez (CW0001 - CW0015), [Travel Characteristics]
- Inverted Terminal (Block and Tackle), (CW0040 – CW0053)
- Hook Mounted – Inverted, Series 97i (CW0016 – CW 0039)
- .019 Channel, reduced SKU, (CW0056 – CW0063), [86 Side Takeout]
- .0335 Channel, reduced SKU, (CW0054 – CW0055), [series 86xt channel]
- Guide, reduced SKU, (CW0100 – CW0113), [series 86xt guides]
- Experimental Documentation, reduced SKU, (CW0092 – CW0099), [series 86xt]
- End Carriage Plate, series 86xt, (CW0070 – CW0083)
- Hook Terminal, series 86xt, (CW0064 – CW0069)
- Math Model, Series 86xt (CW0084 - CW0091), [Travel Characteristics]

Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories, dated 8/31/2005

Qualifications of the Witness

The following items are excerpts from my Curriculum Vitae which are relevant to this opinion. My Curriculum Vitae in full is attached.

1. I am the professor of Mechanical Engineering at the University of Massachusetts Lowell (UML), and have been teaching there full time since 1988. I have college degrees in Electrical Engineering, Industrial Management, Computer Science and a PhD in Mechanical Engineering from MIT, WPI and Tufts Universities.

2. Throughout my engineering career, I have worked at several companies while part time teaching at UML. While employed in industry, I worked on the design and manufacture of mechanical and electro-mechanical parts and products. I designed, modified and improved several automatic machines for manufacturing and testing of parts and products.

3. In industry, I held several engineering and management positions, including production engineer; manufacturing process engineer, Computer Aided Design (CAD) Manager, Tool Engineering Manager and Manufacturing Technology Manager. I also introduced CAD to the Hewlett Packard (HP) Medical Group and trained their engineers in the use of Design for Manufacturing tools and techniques as well as Mechanical CAD design. I have also given seminars on behalf of HP and Motorola to their customers on the use of CAD and Concurrent Engineering in the design of their products.

4. After joining the University, I began teaching courses there in Design Theory and Constraints as well as Engineering Principles. I am also the coordinator for the Mechanical Engineering Capstone Program where senior engineering students work with industrial companies to design mechanical products and assemblies. In addition, I performed research and consulting on a variety of technical subjects including product design, quality and the supply chain (design and/or manufacturing contracting services). I held seminars on these topics and trained thousands of working engineers. I published my work in over 90 publications, including in 5 books.

5. I also consulted for companies on their product design and manufacturing, including those in mechanical, electromechanical and medical instruments, devices and products.

6. I was a founding member of an Innovative Products Research and Services Incorporated (IPRS), a non-profit educational, scientific and charitable 501(c) (3) organization incorporated in the Commonwealth of Massachusetts. IPRS is an inventor support service, which performs early stage market and manufacturing evaluations. IPRS was able to obtain two grants from the Department of Energy in 1991 and 1992 as part of DOE's States' Inventors Initiative.

7. A list of all publications I authored in the preceding ten years is included in the attached Curriculum Vitae.

Compensation Statement

As a technical expert in this case my fees are $300/hour for technical work, opinions, and sworn testimony. In addition my expenses for travel are reimbursed at cost. My compensation is not affected by the outcome of this case and is based solely on the time spent in the development of my opinion.

Prior Deposition and Trial Experience

My deposition experience in the last four years can be found in my full CV, attached to this report as exhibit A.

<u>Summary of Patents</u>

I have been asked to review three patents. U.S. Patent No. 5,365,638 was granted on November 22, 1994 and is entitled "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS." The patent "relates to a mounting for a coiled ribbon spring and is particularly, though not exclusively, applicable to sash springs used in sash frame tensioning arrangements for windows." '638 patent, column 1, lines 6-9. The patent describes an arrangement in which "the spring merely rests on the mounting element which acts as a reaction member which the spring abuts as a free outer end, attached to the sash, is unwound." '638 patent, column 2, lines 21-24. The device described in the patent also has a spine, projection, or other "formations conformed so as to cooperate with a portion of the sash frame within which the [mounting] element is to be received, such that contact of said formations with said sash frame inhibits in a rotational, pivoting, or twisting sense of the element relative to the sash frame." '638 patent, column 2, lines 60-65.

U.S. Patent No. 6,598,264 B2 was granted on July 29, 2003 and is entitled, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER." The patent relates particularly "to a block and tackle window balance device that provides an increased range of travel within a window frame." '264 patent, column 1, lines 8-10. The device described in the patent locates a bottom guide roller within the bottom guide of the balance instead of in the within the rigid U-shaped channel of the balance. Because the bottom guide roller is located within the bottom guide, "the window sash can travel a greater distance before the bottom guide roller hits the jamb mounting hook, resulting in a greater travel distance." '264 patent, column 6, lines 20-22.

U.S. Patent No. 6,820,368 B2 was granted on November 23, 2004 and is entitled, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW." The patent particularly relates to "a balance shoe of a window balance system used in conjunction with a pivot bar mounted on a window sash for rotating the window sash relative to a window frame." '368 patent, column 1, lines 21-24. "The balance shoe includes a frame, a locking member at least partially disposed within the frame, a cam in communication with the locking member, and a connecting device for attaching the balance shoe within a window balance." '368 patent, column 1, lines 63-67. The patent also describes a method of installing the inverted window balance system claimed.

<u>Summary of Opinions.</u>

The opinions expressed in this report are based on my understanding of what constitute an infringement. Each patent has a claim section, which must be interpreted by the court (claim construction). In my analysis, I compare each accused product against the each claim as interpreted by the court. To be literally infringing, the accused product must meet every element in a claim. In addition, I understand that an accused product may also infringe a claim element under the doctrine of equivalents if the accused product performs substantially the same function in substantially the same way to achieve substantially the same result.

I. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994.

  Upon reviewing all information listed in the top of the report; I conclude the following:

7

The defendant Caldwell Manufacturing Company's "Quick-Tilt constant force system" and Quick-Tilt*nc products are infringing on claims 1, 2, 3 and 8 in the plaintiffs' US Patent 5,365,638.

II. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

     Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20 and 21 in the plaintiffs' US Patent 6,598,264 B2.

III. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

     Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97ez products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US Patent 6,820,368 B2.

IV. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

     Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97ih products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US patent 6,820,368 B2.

V. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

     Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97i products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' US patent 6,820,368 B2.

Support for Opinions
I. Infringement by the defendant, Caldwell Manufacturing Company, of US Patent 5,365,638 "SPRING MOUNTING FOR SASH FRAME TENSIONING ARRANGEMENTS" granted on November 22, 1994.

     Upon reviewing all information listed in the top of the report, I conclude the following: The defendant's "Quick-Tilt constant force system" and Quick-Tilt*nc products are infringing on claims 1, 2, 3 and 8 in the plaintiffs' US Patent 5,365,638. My reasoning for the basis of my opinion is stated for each claim numbered below:

Claim 1. This claim states as follows ('638 patent, column 5, line 62 - column 6, line 16)

     "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having first end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled spring having the other end of said coiled ribbon spring within the coil being

8

positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means and said mounting means being secured in said channel means, said mounting means having a raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means whereby rotational motion of said mounting means is inhibited."

Upon examining the physical Caldwell spring balance product Quick-Tilt*nc, the deposition testimony referenced above, the Caldwell 6-page brochure entitled "Quick-Tilt Constant Force System" (C000530-C000535) and the Caldwell engineering drawings (CW0152 - CW0215); it is my opinion that the Caldwell Quick-Tilt system and Quick-Tilt*nc products are infringing on the Plaintiffs' US Patent 5,365,638 claim 1 by virtue of the following observations:

    a. The first element of this claim describes the use environment where the patented device is to be mounted; quote, "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges", ('638 patent, column 5, line 62 - column 6, line 1), is identical to the use environment for the Caldwell products. *See* Fig. 1.1.A; Fig. 3.1.A. (all referenced figures are collected as exhibit B to this report).

    b. The next element of this claim identifies the frame to support the device which is slidable in the sash channel; quote, "a sash frame support means slidable in said channel means", ('638 patent, column 6, lines 1-2). This sash frame support means is used in the Caldwell products and is referred to in their brochures (page 3, C000532) as the "carrier"; which is offered to Caldwell customers in 3 different product sizes to match recommended channel sizes. *See* Fig. 1.1.B; Fig. 3.1.B.

    c. The next element of this claim which identifies the coiled ribbon spring and one of its ends; quote, "a coiled ribbon spring having first end engaged with said sash frame support means," ('638 patent, column 6, lines 3-4), is identical to the coiled ribbon spring and one of its ends used in the physical Caldwell product I examined. In the Caldwell brochures, the coiled ribbon spring end is engaged to the frame support means which Caldwell calls the carrier (page 3, C000532). *See* Fig. 1.1.C.; Fig. 3.1.C.

    d. The next element of this claim which specifies a mounting means for the coiled ribbon spring; quote; "and a means for mounting said coiled ribbon spring," ('638 patent, column 6, lines 4-5), is also found in the Caldwell product. The Caldwell brochure describes this support means as the "coil nest" (page 5, C000535). In the memorandum and order of the US District Court for the District of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in the '638 patent. The court construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". I note the following according to the Court claim construction:

        i. The court's definition references a structure for mounting a coiled ribbon spring to the window jamb channel. Based upon examination of the Caldwell

9

Quick-Tilt brochure (page 2, C000531), I find that the Caldwell "coil nest" satisfies this definition in the claim construction of the court.

ii. The court's definition references a structure that has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell coil nest geometry satisfies this definition in the claim construction of the court.

iii. The court's definition references that the design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the design of the Caldwell coil nest includes a countersink hole to allow the coil nest to be secured to the to a window jamb channel, through a fixing screw.

I find the Caldwell mounting means for the Quick-Tilt and Quick-Tilt*nc products, which Caldwell calls the "coil nest," conforms to the Court's claim construction of the term "mounting means". *See* Fig 1.1.D; Fig. 4.1.D.

e.  The next element of this claim specifies the other end of the coiled ribbon spring being within the spring, being free and unattached to the support means, quote, "the coiled body portion of said coiled spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means" ('638 patent, column 6, lines 5-10). The physical Caldwell product I examined and the Caldwell brochure (page 2, C000531), show the Caldwell product coiled ribbon spring to be of exactly the same construction, based on the following observations:

i.  The other end of the coiled ribbon spring being within the spring

ii.  The other end of the coiled ribbon spring being free and unattached to the support means, which is called the coil nest by Caldwell. *See* Fig 1.1.E; Fig. 4.1.E.

f.  The next element of this claim describes the need for securing the mounting means to the channel means; quote "and said mounting means being secured in said channel means," ('638 Patent, column 6, lines 10-11). Several alternatives are shown in the patent "DESCRIPTION OF THE PREFERRED EMBODIMENTS": in Figure 4; a "fixing screw" as shown by item 64 can secure the mounting means. In figures 7, 8 and 9; the mounting means is secured by a screw (not shown). The screw is attached through a recessed bore 88 in Figure 7 and a bore 108 in Figure 9. I also note in the court's claim construction for the '638 patent the use of the term "fixing screw" for securing the mounting means: "....method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to the window jamb channel." I find the above discussions in the preferred embodiment for the '638 patent matches all of the installation information of the Quick-Tilt and Quick-Tilt*nc products: in the Caldwell Quick-Tilt brochure (page 3, C000532), a fixing screw is clearly shown to be used to fasten the Caldwell products to the window jamb channel. *See* Fig. 2.1.F; Fig 3.1.F.

10

g. The next element in this claim specifies a raised spine of the mounting means, with a following qualification explaining the need for such a feature in the device, quote, "said mounting means having raised spine positioned between and in the same plane as said inwardly turned opposed flanges of said channel means," ('638 patent, column 6, lines 11-13). I also note in the claim construction by the US District Court of Massachusetts dated January 20th, 2006 and mentioned in item (d) above, a construction for the term "raised spine" as follows: "A raised protrusion that resembles or suggests a spine of the mounting means, shaped to cooperate with the window jamb flanges to inhibit the rotational motion of the mounting means." I note in the Caldwell physical product and in the Caldwell Quick-Tilt brochure (C000530-C00535), the following observations:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, in page 2 (C000531), the cover of the Quick-Tilt product, which is clearly shown with a spine feature integrated in the plastic body of the cover, is available for single, double or triple coiled spring configurations (page 3, accessories, C000532). This cover is supplied as optional to the Caldwell product in page 2, (C000531). The cover is secured to the mounting means, called by Caldwell as the "coil nest", by a fastening screw. Once secured by the screw, the cover fastened to the coil nest acts as an integrated assembly of a raised spine of the mounting means defined as the coil nest in the Caldwell brochure. *See* Fig 2.1.G.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing the Quick-Tilt *nc product, that the Caldwell mounting means, called the "coil nest" and the plastic cover are integrated, by molding both features in the same product, with a "spine" running lengthwise across the back side of the molded part. Fig. 3.1.G

h. The final element of claim 1 is the reason given for the raised spine in item g; quote: "whereby rotational motion of said mounting means is inhibited." ('638 patent, column 6, lines 14-15). In the claim construction by the US Court of Massachusetts, dated January 20th 2006, this element of the claim 1 in the '638 patent is construed as the "mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges and said channel means whereby rotational motion of said mounting means is inhibited." I note the following:

   i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, I note in page 2 (C000531) that the cover fastened to the coil nest acts as an integrated assembly of a raised spine of the mounting means defined as the coil nest in the Caldwell brochure. The geometry of this assembly consisting of a coil nest fastened together to a cover will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel.

   ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing Quick-Tilt *nc product, the Caldwell mounting means called the "coil nest" and the cover are integrated, by molding both features in the

11

same product, with a "spine" or "projection" running lengthwise across the back side of the molded part. The geometry of this Caldwell coil nest molded together with a cover assembly will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel. For example, I note that when the physical Caldwell device was installed in a sample window jamb channel, the spine fitted snugly between channel flanges thereby inhibiting rotation of the Caldwell balance while allowing the balance to ride smoothly inside the channel.

iii.  In order to explain the need for the spine or projection features; but not for preventing rotation, the Caldwell representatives that were deposed had differing opinions:

1. According to the testimony of Jeffrey Robertson (beginning page 112, line 20), ....the raised portion labeled as "I", has two functions, one to provide enough material thickness so that the proper countersink for the screws, mounting screws can be provided without breaking through the inside of the cover. [np] The second function is to provide a flow passage for the plastic in the injection molding process to fill the tool, fill the mold cavity...."

2. According to the testimony of Wilbur Kellum (beginning page 93, line 10), in a series of answers by Mr. Kellum about the function of the protrusion "or spine/projection": "It is to help in the plastic molding....", and then Mr. Kellum adds in his testimony (page 94 lines 4-5); "...it serves to maintain straightness of the part during shipping...." Mr. Kellum answers the questions (page 94 lines 6-8) Q. does it serve to maintain the straightness of the part when installed? A: "No."

It is my opinion that these explanations for the need of the spine other than to inhibit rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1)  There are many geometries that can serve to allow for a flow passage for the plastic injection molding process to fill the mold cavity for the Quick-Tilt covers. The spine, when specified by the Caldwell engineers at the time of design, could be made deeper, wider or shorter than the geometry selected by them. I note that in the physical Caldwell Quick-Tilt*nc product that I reviewed, the spine's geometry matches, within a tight tolerance, the front opening of the channel in the window jamb pocket, and hence prevents rotation of the coil nest. Of all the many possible geometries for the spine available to satisfy the plastic flow requirements, Caldwell chose the specific one that will inhibit rotation of the mounting means.

2)  There are many geometries to provide enough material thickness so that the proper countersink for the mounting screws can be provided without breaking through the inside of the cover. The thicker material could be made around the screw only and not to extend the full length of the cover. In addition, another alternative could be to make a recessed bore inside the coil nest to allow for more plastic material on the inside as opposed to the outside of the cover. Of all the many possible geometries for the spine available to satisfy the need for

12

more material for the countersink of the fixing screw, Caldwell chose the specific one that will inhibit rotation of the mounting means.

3) The purpose of the spine to maintain straightness of the part during shipping appears to be unusual, There are two instances of shipping possibilities:

1) Since the balances are shipped as part of assembled windows. It is customary in the business and engineering practices for the end product supplier to maintain the integrity of their product during shipping, and not rely on individual suppliers to provide the integrity of each individual part. For a product such as windows, which contains fragile glass, the end product supplier will certainly be very careful in providing for proper support and packaging of the window during shipping and transportation, and not rely on their part suppliers such as the balance manufacturer.

2) When a part in an assembly such as a balance is shipped from the (balance) supplier to the end product (window) manufacturer, the requirement for the integrity of the product during shipping is normally achieved through the design of the shipping container of the part, including the use of packing materials.

iv. In order to show that the Caldwell Quick-Tilt and Quick-Tilt*nc products will prevent rotation other than through the spine or projection mentioned in the '638 patent, a Caldwell representative that was deposed, as well as the Caldwell brochure for Quick-Tilt, provided the following:

1. According to the testimony of Jeffrey Robertson (beginning page 115, line 13), "....the top portion [of the Quick-Tilt*nc] is large in length and width dimension than the opening into which the balance is inserted, so it is ...the top portion is held by the interference between the top and the vinyl lineal, the bottom portion is held in place by the screw Those two attachments, or the attachment at the bottom and the interference at the top prevent any rotation of the cover..."

2. In the Quick-Tilt brochure; page 2 (C000531), describing the constant force system, in the top of the page..."Its alternating coil design prevents the cantilevering or twisting of the carrier that can diminish locking performance...."

It is my opinion that these explanations for inhibiting rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1) The top portion of the Quick Tilt *nc cover is too thin to adequately inhibit the rotation of the coil nest, with a thickness ranging from 0.025" to 0.011" (see drawings CW0158, CW0159 and CW 0160). There are two diagonal thin cutouts at the top of the covers to allow for twisting of the cover.

2) The alternating coil design mentioned in the top of page 2 of the Quick-Tilt brochure (C000531) will only apply to tandem coiled ribbon springs. I note the following:

a. For single nest cover this does not apply at all.

13

b.  For tandem covers, the length of each extended spring during window sash operations will vary since one spring is mounted on top of the other, resulting in the tandem springs not equal in length. Therefore, there will be an offset moment forcing some rotation of the coil nest for tandem coiled ribbon spring configurations.

c.  For triple nest covers, there is a fixing screw to attach the upper triple spacer as shown in the Quick-Tilt brochure page 2 (C000531) that could work in conjunction with the coil nest screw to inhibit rotation. I note that there are no instructions for the recommended amount of torque to apply for each of these two screws. Repeated sash operations during the useful lifetime of the windows might reduce the integrity of the Caldwell fastening method due to the constant pressure applied by the rotation of the coil nest due to the triple coiled ribbon spring configuration.

As a conclusion to item (h), I find that the reasons for having the spine feature according to Caldwell are inadequate. The Caldwell explanations for their techniques for inhibiting rotation, might contribute partially to reduce rotation. The spine feature they adopted based on the '638 patent, will perform the primary function of inhibiting the rotation. Therefore, I find that the Quick-Tilt and Quick-Tilt*nc series of products that contain the spine or projection along the longitudal axis of the mounting means will prevent rotation of the mounting means.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's balance system option for constant force moving coil system, called Quick-Tilt products, and the New construction friendly Quick-Tilt*nc products, are infringing on claim 1 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements."

Claim 2. This claim states as follows: ('638 patent, column 6, lines 17-22) "The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of coiled ribbon spring as said sash support means moves in said channel means."

This claim on the mounting means is also affected by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in patent '638. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". The Caldwell brochure describes this support means as the "coil nest." I find the mounting

14

means for the Caldwell devices, which they call "coil nest," conforms to the court's claim construction of the term "mounting means" for claims 1 & 8.

I examined the 6 page Caldwell Quick-Tilt brochure (C000530-C000535) and I also examined the physical Caldwell product that matches this invention. I conclude that in the Caldwell Quick-Tilt series, the support surface of the mounting means (coil nest) is in contact with the outer surface of the coiled body portion of the coiled ribbon spring during the movement of coiled ribbon spring as sash support means moves in the channel means.

Based on the above observations and supporting materials, it is my opinion that the Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the new construction-friendly Quick-Tilt*nc products made by the defendant are infringing on claim 2 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements"

Claim 3. This claim states as follows: ('638 patent, column 6, lines 23-30) "The mounting assembly of claim 2 wherein said mounting means has a body portion having an aperture therein, a fixing screw position in said aperture by which the mounting means is secured relative to said channel means, a surface of said body portion being concavely curved, said coil body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion."

This claim on the mounting means is also affected by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 & 8 in patent '638. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows: "mounting means" or "a means for mounting said coiled ribbon spring" describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". The Caldwell brochure describes this support means as the "coil nest." I find the mounting means for the Caldwell devices, which they call "coil nest," conforms to the court's claim construction of the term "mounting means" for claims 1 & 8.

I examined the 6 page Caldwell Quick-Tilt brochure (C000530-C000535) and I also examined the physical Caldwell product that matches this invention. I observe the following:

1. That the coil nest has a body portion with an aperture.
2. Wherein a fixing screw is used to attach the coil nest to the window channel jamb.
3. The upper surface of the coil nest is concavely curved.
4. The coil body portion of the coiled ribbon spring is in contact with and supported by the upper surface of the coil nest.

15

Based on the above observations and supporting materials, it is my opinion that the Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the new construction-friendly Quick-Tilt*nc products made by the defendant are infringing on claim 3 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements"

<u>Claim 8.</u> This claim states as follows ('638 patent, column 6, lines 47-62): "A mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges, a sash frame support means slidable in said channel means, a coiled ribbon spring having an outer end engaged with said sash frame support means, and a means for mounting said coiled ribbon spring, the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, said mounting means being secured in said channel means and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, whereby rotational movement of the mounting means is inhibited."

Upon examining the physical Caldwell spring balance product that matches the invention recorded in Patent 5,365,638, as well as the Caldwell 6-page brochure entitled "Quick-Tilt Constant Force System" (C000530-C000535), the Caldwell depositions listed in the top of the report and the Caldwell engineering drawings (CW0152 -CW0215), it is my opinion that the Caldwell Manufacturing Company Quick-Tilt system and Quick-Tilt*nc products are infringing on the Plaintiffs' US patent 5,365,638 claim 8 by virtue of the following observations:

a. The first element of this claim describes the use environment where the patented device is to be mounted, quote, ('638 patent, column 6, lines 47-49); "a mounting assembly comprising a channel means having a rear wall, side walls and at extremities of said side walls, inwardly turned opposed flanges," is identical to the use environment for the Caldwell products. *See* Fig. 1.8.A; Fig. 3.8.A.

b. The next element of this claim identifies the frame to support the device which is slidable in the sash channel, quote, ('638 patent, column 6, lines 49-50); "a sash frame support means slidable in said channel means." This sash frame support means is used in the Caldwell products and is referred to in their brochures (page 3, C000532) as the "carrier"; which is offered to Caldwell customers in 3 different product sizes to match recommended channel sizes. *See* Fig. 1.8.B; Fig. 3.8.B.

c. The next element of this claim which identifies the coiled ribbon spring and one of its ends, quote, ('638 patent, column 6, lines 51-52); "a coiled ribbon spring having an outer end engaged with said sash frame support means" is identical to a coiled ribbon spring and one of its ends used in the Caldwell products. In the Caldwell brochure (page 2, C00531), the coiled ribbon spring end is engaged to the frame support means which they call the carrier. *See* Fig. 1.8.C; Fig. 3.8.C.

d. The next element of this claim which specifies a mounting means for the coiled ribbon spring; quote, ('638 patent, column 6, lines 53-54) "and a means for mounting said coiled ribbon spring" is also found on the Caldwell products. The Caldwell brochure (page 6, C00535) describes this support means as the "coil nest." In the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed terms of claims 1 &8 in the '638 patent. The court's construction of the term "means for mounting said coiled ribbon spring" is as follows; "'mounting

16

means' or 'a means for mounting said coiled ribbon spring' describes a structure for mounting a coiled ribbon spring to the window jamb channel. The structure has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. The design of the body also includes some method of fixing, such as aperture to receive a fixing screw, to secure the structure to the jamb channel". I note the following according to the Court claim construction:

    i.   The court's definition references a structure for mounting a coiled ribbon spring to the window jamb channel. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell "coil nest" satisfies this definition in the court's claim construction.

    ii.  The court's definition references a structure that has a body with a surface concavely curved to support the curved outer undersurface of the spring, but the corresponding curvature of the two surfaces do not need to conform exactly. Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the Caldwell coil nest geometry satisfies this definition in the court's claim construction.

    iii.  The court's definition references that the design of the body also includes some method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to a window jamb channel". Based upon examination of the Caldwell Quick-Tilt brochure (page 2, C000531), I find that the design of the Caldwell coil nest includes a countersink hole to allow the coil nest to be secured to the to a window jamb channel, through a fixing screw.

I find the Caldwell mounting means for the Quick-Tilt and Quick-Tilt*nc products, which Caldwell calls the "coil nest," conforms to the Court's claim construction of the term "mounting means". *See* Fig. 1.8.D; Fig. 4.8.D.

e.  The next element of this claim specifies the other end of the coiled ribbon spring as to being within the spring, being free and unattached to the support means; quote, ('638 patent, column 6, line 55), "the coiled body portion of said coiled spring with the other end of said coiled ribbon spring positioned in said mounting means." The physical Caldwell product I examined and the Caldwell brochure (page 2, C000531) show the Caldwell product coiled ribbon spring to be of exactly the same construction, based on the following observations:

    i.   The other end of the coiled ribbon spring being within the spring

    ii.  The other end of the coiled ribbon spring being free and unattached to the support means, which is called the coil nest by Caldwell. *See* Fig. 1.8.E; Fig. 4.8.E.

f.  The next element of this claim describes the need for securing the mounting means to the channel means, quote, ('638 patent, column 6, lines 56-57); "and said mounting means being secured in said channel means". Several alternatives are shown in the patent "DESCRIPTION OF THE PREFERRED EMBODIMENTS": in Figure 4; a "fixing screw" as shown by item 64 can secure the mounting means. In figures 7, 8 and 9; the mounting means is secured by a screw (not shown). The screw is attached through a recessed bore 88 in Figure 7 and bore 108 in Figure 9. I also note in the Court's claim construction of patent '638 stated in item d the use of term fixing screw for securing the mounting means: "….method of fixing, such as [an] aperture to receive a fixing screw, to secure the structure to the jamb channel." I find the above discussions in the preferred embodiment for the '638 patent matches all of the installation instructions of the Quick-Tilt and Quick-Tilt*nc

products: in the Caldwell Quick-Tilt brochure (page 3, C000532), a fixing screw is clearly shown to be used to fasten the Caldwell products to the window jamb channel. *See* Fig 2.8.F.

g. The next element in this claim specifies a projection means of the mounting means, with a following qualification explaining the need for such a feature in the device, quote, ('638 patent, column 6, lines 57-61) "and the mounting means having projection means positioned between said inwardly turned opposite flanges of the channel means which cooperate with the channel means within which the mounting means is positioned." I also note in the court's construction by the US District Court of Massachusetts dated January 20th, 2006 and mentioned in item (d), a construction for the term "projection means" as "projection(s)." I note in the Caldwell physical product and in the Caldwell brochure (C000530-C000535) the following observations:

  i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, in page 2 (C000531), the cover of the Quick-Tilt product, which is clearly shown with a spine or projection feature integrated in the plastic body of the cover, is available for single, double or triple coiled spring configurations (page 3, accessories, C000532). This cover is supplied as (optional) to the Caldwell product in page 2, (C000531). The cover is secured to the mounting means, called by Caldwell as the "coil nest", through a fastening screw. Once secured by the screw, the cover fastened to the coil nest acts as an integrated assembly of a raised spine or projection of the mounting means defined as the coil nest in the Caldwell brochure. *See* Fig 2.8.G.

  ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing the Quick-Tilt *nc product, that the Caldwell mounting means, called the "coil nest" and the plastic cover are integrated, by molding both features in the same product, with a "spine" or projection running lengthwise across the back side of the molded part. *See* Fig. 3.8.G.

h. The final element of claim 8 is the reason given for the projection means in item (g); quote, ('638 patent, column 6, lines 61-62); "whereby rotational motion of said mounting means is inhibited." In the claim construction by the District Court of Massachusetts, dated January 20th 2006, this element of the claims 1 and 8 in patent '638 was construed to mean the "mounting means is to be secured in the channel means. And the mounting means is to have a raised spine positioned between and in the same plane as said inwardly turned opposed flanges and said channel means whereby rotational motion of said mounting means is inhibited." I note the following:

  i. In the Caldwell brochure entitled "Quick-Tilt Constant Force System" which is a set of 6 pages, I note in page 2 (C000531), that the cover fastened to the coil nest acts as an integrated assembly of a raised spine or projection of the mounting means defined as the coil nest in the Caldwell brochure. The geometry of this assembly consisting of a coil nest fastened together to a cover will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel.

  ii. I note in both the physical Caldwell product for spring mounting "constant force system", moving coil preassembled option and in the Caldwell

18

brochure page 6 (C000535) entitled "New Construction Friendly Quick-Tilt", showing Quick-Tilt *nc product, The Caldwell mounting means, called the "coil nest" and the cover are integrated, by molding both features in the same product, with a "spine" or "projection" running lengthwise across the back side of the molded part. The geometry of this Caldwell coil nest molded together with a cover assembly will inhibit the rotational movement of the coil nest assembly, when installed in a window jamb channel. For example, I note that when the physical Caldwell device was installed in a sample window jamb channel, the spine or projection fitted snugly between channel flanges thereby inhibiting rotation of the Caldwell balance while allowing the balance to ride smoothly inside the channel.

iii.  In order to explain the need for the spine or projection features; but not for preventing rotation, the Caldwell representatives that were deposed had differing opinions:

1.  According to the testimony of Jeffrey Robertson (beginning page 112, line 20), ....the raised portion labeled as "I", has two functions, one to provide enough material thickness so that the proper countersink for the screws, mounting screws can be provided without breaking through the inside of the cover...The second function is to provide a flow passage for the plastic in the injection molding process to fill the tool, fill the mold cavity...."

2.  According to the testimony of Wilbur Kellum (beginning page 93, line 10), in a series of answers by Mr. Kellum about the function of the protrusion "or spine/projection": "It is to help in the plastic molding....", and then Mr. Kellum adds in his testimony (page 94 lines 4-5); "...it serves to maintain straightness of the part during shipping...." Mr. Kellum answers the questions (p94 lines 6-8) Q: does it serve to maintain the straightness of the part when installed? A: "No.".

It is my opinion that these explanations for the need of the spine or projection other than to inhibit rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1)  There are many geometries that can serve to allow for a flow passage for the plastic injection molding process to fill the mold cavity for the Quick-Tilt covers. The spine or projection, when specified by the Caldwell representatives, can be made deeper, wider or shorter than the geometry selected by them. I note that the physical Caldwell Quick-Tilt*nc products' spine geometry matches, within a tight tolerance, the front opening of the channel in the window jamb pocket, and hence prevents rotation of the coil nest. Of all the many possible geometries for the spine or projection available to satisfy the plastic flow requirements, Caldwell chose the specific one that will inhibit rotation of the mounting means.

2)  There are many geometries to provide enough material thickness so that the proper countersink for the mounting screws can be provided without breaking through the inside of the cover. The thicker material could be made around the screw only and not to extend the full length of the cover. In addition, another alternative could be to make a recessed bore inside the coil nest to allow for more plastic material

19

on the inside as opposed to the outside of the cover. Of all the many possible geometries for the spine or projection available to satisfy the need for more material for the countersink of the fixing screw, Caldwell chose the specific one that will inhibit rotation of the mounting means.

3) The purpose of the spine or projection to maintain straightness of the part during shipping appears to be unusual; since the balances are shipped as part of assembled windows. It is customary in the business and engineering practices for the end product supplier to maintain the integrity of their product during shipping, and not rely on individual suppliers to provide the integrity of each individual part. For a product such as windows, which contains fragile glass, the end product supplier will certainly be very careful in providing for proper support and packaging of the window during shipping and transportation, and not rely on the balance manufacturer.

iv.  In order to show that the Caldwell Quick-Tilt and Quick-Tilt*nc products will prevent rotation other than through the spine or projection mentioned in the '638 patent, a Caldwell representative that was deposed, as well as the Caldwell brochure for Quick-Tilt, provided the following :

1. According to the testimony of Jeffrey Robertson (beginning page 115, line 13), "….the top portion [of the Quick-Tilt*nc] is large in length and width dimension than the opening into which the balance is inserted, so it is …the top portion is held by the interference between the top and the vinyl lineal, the bottom portion is held in place by the screw Those two attachments, or the attachment at the bottom and the interference at the top prevent any rotation of the cover…"

2. In the Quick-Tilt brochure; page 2 (C000531), describing the constant force system, in the top of the page…"Its alternating coil design prevents the cantilevering or twisting of the carrier that can diminish locking performance…."

It is my opinion that these explanations for inhibiting rotation of the mounting means or the Caldwell "coil nest" are inadequate, based on my following observations:

1. The top portion of the Quick Tilt *nc cover is too thin to adequately inhibit the rotation of the coil nest, with a thickness ranging from 0.025" to 0.011" (drawings CW0158, Cw0159 and CW 0160). There are two diagonal thin cutouts at the top of the covers to allow for twisting of the cover.

2. The alternating coil design mentioned in the top of page 2 of the Quick-Tilt brochure (C000531) will only apply to tandem coiled ribbon springs. I note the following:

a. For single nest cover this does not apply at all.

b. For tandem covers, the length of each extended spring during window sash operations will vary since one spring is mounted on top of the other, resulting in the tandem springs not equal in length. Therefore , there will a be an offset moment forcing some rotation of the coil nest for tandem spring configurations

20

c. For triple nest covers, there is a fixing screw to attach the upper triple spacer as shown in the Quick-Tilt brochure page 2 (C000531) that could work in conjunction with the coil nest screw to inhibit rotation. I note that there are no instructions for the recommended amount of torque to apply for each of these two screws. Repeated sash operations during the useful lifetime of the windows might reduce the integrity of the Caldwell fastening method due to the constant pressure applied by the rotation of the coil nest due to the triple coiled ribbon spring configuration.

As a conclusion to item (h), I find that the reasons for having the spine or projection feature according to Caldwell are inadequate. The Caldwell explanations for their techniques for inhibiting rotation might contribute partially to reducing rotation. The spine or projection feature they adopted based on the '638 patent, will perform the primary function of inhibiting the rotation. Therefore, I find that the Quick-Tilt and Quick-Tilt*nc series of products that contain the spine or projection along the longitudal axis of the mounting means will prevent rotation of the mounting means.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company balance system for constant force moving coil system called Quick-Tilt and the New construction friendly Quick-Tilt*nc products are infringing on claim 8 of the Plaintiffs' U.S. Patent 5,365,638 entitled "Spring mounting for sash frame tensioning arrangements."

**II. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.**

Upon reviewing all information listed in the top of the report, I conclude the following: The defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20 and 21 of plaintiffs' U.S. Patent 6,598,264 B2. My reasoning for the basis of my opinion is stated for each claim numbered below:

Claim 1. This claim states as follows, quote, ('264 patent, column 6, lines 35-56):
A block and tackle window balance device comprising:
a channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel;
a bottom guide roller rotatably mounted in the bottom guide;
a fixed pulley block unit connected to the channel;
a translatable pulley block unit moveable within the channel;
a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and
a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb.

Upon examining the physical Caldwell block and tackle product that matches U.S. Patent 6,598,264 B2; the Caldwell brochure entitled "Series 86xt Block and Tackle System, Extended travel for sideload applications," containing 4 pages of front or title page (C000498), 2nd page of component part layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000501); the Caldwell depositions listed at the top of the report; and the Caldwell engineering drawings (CW0054 -CW099), it is my opinion that the defendant Caldwell Manufacturing Company's block and tackle system Series 86xt products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 1 by virtue of the following observations:

  a. The Caldwell product Series 86xt contains a channel comprising a first end and a second end;  See Fig. 5.1.A.
  b. The Caldwell product Series 86xt contains a top guide connected to the first end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (C000500) shows 2 part numbers of top guides.  See Fig. 5.1.B.
  c. The Caldwell product Series 86xt contains a bottom guide connected to the second end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (C000500) shows 2 part numbers of bottom guides. See Fig 5.1.C.
  d. The Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide.  See Fig 6.1.D.  In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term "bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in

22

a way that permits its rotation." in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

e.  The Caldwell Series 86xt  product contains a fixed pulley block unit connected to the channel; See Fig 5.1.E

f.  The Caldwell product Series 86xt contains a translatable pulley block unit moveable within the channel; See Fig 5.1.F.

g.  The Caldwell product Series 86xt contains a spring comprising a first end and a second end, wherein the first end is fixed relative to the channel and the second end is connected to the translatable pulley block unit; and; See Fig. 5.1.G.

h.  The Caldwell product Series 86xt contains a cord comprising a first cord end and a second cord end, wherein the cord is threaded through the translatable pulley block unit and the fixed pulley block unit and extends around the bottom guide roller, the first cord end being attached to the translatable pulley block unit and the second cord end being attachable to a jamb. See Fig 5.1.H.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company 86xt Block and Tackle System products are infringing on claim 1 of the Plaintiffs" US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 2. The device in claim 1 wherein the bottom guide roller is located external to the channel ('264 patent, column 6, lines 57-58).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called series 86xt, that it contains a bottom guide roller located in the bottom guide and visibly extends beyond the channel.

Based on the above observations, it is my opinion that the defendant's Caldwell Manufacturing Company series 86xt Block and Tackle System products are infringing on claim 2 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 3. The device according to claim 2 where in the top angled portion is sized to receive a member of the window sash ('264 patent, column 6, lines 59-60).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called series 86xt, that it contains a top angled portion is sized to receive a member of the window sash. The top angled portion is sized to cooperate with a window sash

23

cam, as shown in the Caldwell brochure cover page (C000498). This top angled portion is formed by the assembly of the top guide and the top end of the channel through a fastening means of a rivet.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 3 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 4.</u> The device according to claim 1 wherein a portion of the bottom guide is external to the channel ('264 patent, column 6, lines 61-62).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that a portion of the bottom guide is external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 4 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 5.</u> The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of the window sash ('264 patent, column 6, lines 63-64).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt that it contains a bottom guide that forms a channel to receive a portion of the window sash. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front or title page (C000498), the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 5 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 6.</u> The device in claim 1 wherein the fixed pulley block unit comprises a frame, an axle, and at least one pulley rotatable around the axle ('264 patent, column 6, lines 65-67).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a fixed pulley block unit comprising a frame, an axle and 2 pulleys rotatable around the axle.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 6 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 7.</u> The device according to claim 6 wherein the axle is located within the frame ('264 patent, column 7, lines 1-2).

24

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains an axle is located at least partially within the frame.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 7 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 9. The device in claim 1 wherein the translatable pulley block unit comprises a frame, an axle within the frame, and at least one pulley rotatable around the axle ('264 patent, column 7, lines 6-8).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a translatable pulley block unit comprising a frame, an axle at least partially within the frame and 2 pulleys rotatable around the axle.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 9 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 10. The device according to claim 1 wherein the top guide includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel ('264 patent, column 7, lines 9-12).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a top guide that includes a top angled portion and a bottom portion, the bottom portion being connected to the first end of the channel to form an integrated assembly.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 10 of the Plaintiffs'' US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 11. The device according to claim 1 wherein the fixed pulley block unit is integral within the bottom guide ('264 patent, column 7, lines 13-14).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, that it contains a fixed pulley block that is integral within the bottom guide to form an assembly.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 11 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

25

Claim 12. A window assembly comprising ('264 patent, column 7, lines 15-42):
A window frame with two jambs with jamb pockets;
at least one of an upper window sash and a lower window sash slidably receivable in the jamb
    pockets, and;
at least one block and tackle window balance device attached to the at least one of the upper
    window sash and the lower window sash, the device comprising:
channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel;
a bottom guide roller rotatably mounted in the bottom guide;
a fixed pulley block unit connected to the channel;
a translatable pulley block unit moveable within the channel;
a spring comprising a first end and a second, wherein the first end is fixed relative to the channel
    and the second end is connected to the translatable pulley block unit; and
a cord comprising a first cord end and a second cord end, wherein the cord is threaded through
    the translatable pulley block unit and the fixed pulley block unit and extends around the
    bottom guide roller, the first cord end being attached to the translatable pulley block unit and
    the second cord end being attachable to a jamb.

Upon examining the physical Caldwell Block and tackle device that matches the U.S. Patent
6,598,264 B2; the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for
sideload applications containing 4 pages of front or title page (C000498), 2nd page of component
part layout and description (C000499), 3rd page of technical specifications and accessories
(C000500) and 4th page of warranty and contact information (C000501); the Caldwell
engineering drawings (CW0054 -CW0099); and depositions of the Caldwell representatives, it is
my opinion that the defendant Caldwell Manufacturing Company's Block and tackle Series 86xt
products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 12 by virtue of the
following observations:

   a.  The Caldwell product Series 86xt is to be used in a window assembly with a
       window frame with 2 jambs and with jamb pockets; as shown in the Caldwell series
       86xt Block and Tackle system brochure front page (C000498).  See Fig. 7.12.A.
   b.  The Caldwell product Series 86xt is to function with at least one of an upper
       window sash and a lower window sash slidably receivable in the jamb pockets, as
       shown in the Caldwell series 86xt Block and Tackle system brochure (C000498).
       See Fig. 7.12.B.
   c.  The Caldwell product Series 86xt is a block and tackle window balance device
       attached to the at least one of the upper window sash and the lower window sash,
       as shown in the Caldwell series 86xt Block and Tackle system brochure
       (C000498).  See Fig. 7.12.C.
   d.  The Caldwell physical product Series 86xt contains a channel comprising a first
       end and a second end;  See Fig. 5.12.D.
   e.  The Caldwell physical product Series 86xt contains a top guide connected to the
       first end of the channel. In addition, the Caldwell brochure entitled Series 86xt
       Block and Tackle system, Extended travel for sideload applications page 3
       (technical specifications and accessories, C000500) shows 2 part numbers of top
       guides. See Fig. 5.12.E.
   f.  The Caldwell physical product Series 86xt contains a bottom guide connected to
       the second end of the channel. In addition, the Caldwell brochure entitled Series

26

86xt Block and Tackle system, Extended travel for sideload applications page 3
(technical specifications and accessories,C000498) shows 2 part numbers of
bottom guides. *See* Fig 5.12.F.

g.  The Caldwell physical product Series 86xt contains a bottom guide roller rotatably
mounted in the bottom guide. *See* Fig 6.12.G.  In addition, in the memorandum
and order of the US District Court of Massachusetts dated January 20th 2006,
Judge Douglas Woodlock issued a claim construction on the disputed term
""bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in
the bottom guide in a way that permits its rotation" in claim 12 of the '264 patent.
Based on my observation the roller is mounted in the bottom guide in a manner
that permits its rotation.

   I understand from examining Caldwell's Supplemented Answers to Plaintiff's
First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt
product meets this claim element. While I expressed my opinion above that the
86xt literally infringes on this element of the claim, it also infringes based on the
Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264
patent functions to allow *further* travel of the window sash, by way of its position
lower than a conventional roller; this will result in greater window egress.  The
Caldwell product Series 86xt bottom roller *performs* the same function of allowing
further travel of the window sash, by way of its position lower than a conventional
roller; this will result in greater window egress.

h.  The Caldwell physical product Series 86xt contains a fixed pulley block unit
connected to the channel; *See* Fig 5.12.H.

i.  The Caldwell physical product Series 86xt contains a translatable pulley block unit
moveable within the channel; *See* Fig 5.12.I.

j.  The Caldwell physical product Series 86xt contains a spring comprising a first end
and a second, wherein the first end is fixed relative to the channel and the second
end is connected to the translatable pulley block unit; and;  *See* Fig 5.12.J.

k.  The Caldwell physical product Series 86xt contains a cord comprising a first cord
end and a second cord end, wherein *the cord is threaded through the translatable
pulley block unit and the fixed pulley block unit and extends around the bottom
guide roller*, the first cord end being attached to the to the translatable pulley block
unit and the second cord end being attachable to a jamb. *See* Fig. 5.12.K.

   Based on the above observations, it is my opinion that the defendant Caldwell
Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim
12 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE
WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 13. A window balance system comprising: ('264 patent, column 7, line 46 – column 8, line
2)

a bottom guide adapted to be connected to an end of a window balance channel and adapted to
    slide in a jamb pocket when installed in a window frame; and
a bottom guide roller rotatably mounted in the bottom guide.

   I observe from examining the physical Caldwell product that matches the Caldwell Block
and Tackle system called Series 86xt, the Caldwell engineering drawings (CW0054 -
CW0099); and the corresponding Caldwell brochure (C000498-C000501) that it contains

27

a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame. *See* Fig. 5.13.A. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front or title page (C000498), the bottom guide is shown adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame.

I also observe that the Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide. *See* Fig. 6.13.B. In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term "bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 13 of the Plaintiffs" US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 14.</u> The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto ('264 patent, column 8, lines 3-5).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-C000501), that it contains a bottom guide roller located at least partially external to the channel when the bottom guide is attached thereto.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 14 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 15.</u> The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto ('264 patent, column 8, lines 6-8).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-

C000501), that it contains at least a portion of the bottom guide which is external to the channel when attached thereto.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 15 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 16.</u> The device according to claim 13, wherein the bottom guide forms a channel to receive a portion of a window sash when installed ('264 patent, column 8, lines 3-11).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt and the corresponding Caldwell brochure (C000498-C000501), that it contains a bottom guide that forms a channel to receive a portion of the window sash when installed. In the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications front (title) page, the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 16 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 18.</u> A window balance device comprising: ('264 patent, column 8, lines 15-23):
a channel comprising a first end and a second end;
a top guide connected to the first end of the channel;
a bottom guide connected to the second end of the channel; and adapted to slide in a jamb
    pocket when installed in a window frame; and
a bottom guide roller rotatably mounted in the bottom guide.

Upon examining the physical Caldwell Block and tackle device that matches the U.S. Patent 6,598,264 B2; the Caldwell brochure Series 86xt Block and Tackle System, Extended travel for sideload applications containing 4 pages of front or title page (C000498), 2nd page of component part layout and description (C000499), 3rd page of technical specifications and accessories (C000500) and 4th page of warranty and contact information (C000501); the depositions of the Caldwell representatives; and the Caldwell engineering drawings (CW0054 -CW0099), it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system Series 86xt products are infringing on the Plaintiffs' U.S. Patent 6,598,264 B2 claim 18 by virtue of the following observations:

a. The Caldwell product Series 86xt contains a channel comprising a first end and a second end; *See* Fig. 5.18.A.
b. The Caldwell product Series 86xt contains a top guide connected to the first end of the channel. In addition, the Caldwell brochure entitled Series 86xt Block and Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories, C000500) shows 2 part numbers for top guides. See Fig.5.18.B.
c. The Caldwell product Series 86xt contains a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame. In addition, the Caldwell brochure entitled Series 86xt Block and

29

Tackle system, Extended travel for sideload applications page 3 (technical specifications and accessories, C000500) shows 2 part numbers of bottom guides. See Fig.5.18.C.

d.  The Caldwell product Series 86xt contains a bottom guide roller rotatably mounted in the bottom guide. In addition, in the memorandum and order of the US District Court of Massachusetts dated January 20th 2006, Judge Douglas Woodlock issued a claim construction on the disputed term ""bottom guide roller rotatably mounted in the bottom guide" as "a roller mounted in the bottom guide in a way that permits its rotation" in claim 1 of the '264 patent. Based on my observation the roller is mounted in the bottom guide in a manner that permits its rotation. See Fig.6.18.D.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 86xt product meets this claim element. While I expressed my opinion above that the 86xt literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: The bottom guide roller claimed by claim 1 of the '264 patent functions to allow further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress. The Caldwell product Series 86xt bottom roller performs the same function of allowing further travel of the window sash, by way of its position lower than a conventional roller; this will result in greater window egress.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 18 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 19. The device of claim 18 wherein the bottom guide roller is located external to the channel ('264 patent, column 8, lines 25-26);

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-000501), that it contains a bottom guide roller located at least partially external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 19 of the Plaintiffs" US patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

Claim 20. The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel ('264 patent, column 8, lines 27-28).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt, and the corresponding Caldwell brochure (C000498-C000501), that it contains at least a portion of the bottom guide which is external to the channel.

Based on the above observations, it is my opinion that the defendant Caldwell Manufacturing Company's Series 86xt Block and Tackle System products are infringing on claim 20 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

<u>Claim 21.</u> The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of the window sash when installed ('264 patent, column 8, lines 29-30).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system called Series 86xt and the corresponding Caldwell brochure, (C000498-C000501) that it contains a bottom guide that forms a channel to receive a portion of the window sash when installed. In the Caldwell brochure series 86xt Block and Tackle System, Extended travel for sideload applications front or title (C000498) page, the bottom guide is shown in perspective view forming a channel to receive the bottom of the window sash.

Based on the above observations, it is my opinion that the defendant's Caldwell Manufacturing Company Series 86xt Block and Tackle System products are infringing on claim 21 of the Plaintiffs' U.S. Patent 6,598,264 B2, "BLOCK AND TACKLE WINDOW BALANCE WITH BOTTOM GUIDE ROLLER" granted on July 29, 2003.

31

**III. Infringement by Caldwell systems of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97ez products are infringing on claims 2, 3, 6, 7, 8 and 11 in the plaintiffs' U.S. Patent No. 6,820,368 B2.

Claim 2. This claim states as follows: ('368 patent, column 8, lines 48-67):
A window balance system comprising:
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received  by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

Upon examining the physical Caldwell product, as well as the Caldwell 4-page brochure entitled "Series 97ez Block and Tackle System, Easy Installation for Tilt Applications" (C000514-C000517) and the Caldwell engineering drawings (CW0001 -CW0015 and CW0183-CW0195), it is my opinion that the defendant Caldwell Manufacturing Company's Series 97ez system products are infringing on the Plaintiffs' U.S. Patent 6,820,368 B2 claim 2 by virtue of the following observations:

    a. The Caldwell product Series 97ez contains a U shaped channel comprising a plurality of openings;  See Fig 8.2.A.
    b. The Caldwell product Series 97ez  contains a spring connected to a system of pulleys located within the U shaped channel;  See Fig 8.2.B.
    c. The Caldwell product Series 97ez  contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; See Fig 8.2.C.
    d. The Caldwell product Series 97ez  contains a balance shoe (Fig 8.2.D), wherein the balance shoe comprises:
        a frame comprising an enlarged first end (Fig 9.2.E) and a second end (Fig. 9.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 9.2.G). The disputed term "pocket" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening

32

shaped to mate (i.e., to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell balance shoe is called in their 97ez brochure page 3 (C00516) as the "side locking pivot shoe". The Caldwell shoe forms a notch adapted to mate with a rivet in the U shaped channel. I observe that the notch located physically in the Caldwell device at the narrow end of the plastic carrier.

I observe that the Caldwell product 97ez has two rivets in the U shaped channel. The first rivet, located at the end of the channel, is enclosed completely by the shoe and the shoe can rotate freely around the first rivet. The second rivet, located near the first rivet but towards the center of the channel, prevents the free rotation of the shoe. This is confirmed by the testimony given during the deposition of Mr. Jeffrey Robertson, a Caldwell design engineer familiar with the design of the 97ez, where he confirms the connecting scheme as follows: In his testimony, as shown in Exhibit 6 to his deposition, the first rivet (near the channel end) is called E, and the second rivet (towards the center of the channel) is called D. The plastic feature that forms the pocket or "notch" in the shoe in the District Court of Massachusetts definition is called F in exhibit 6 of the Robertson deposition. The feature called F mates (i.e., joins together) with the rivet D.

In the Robertson deposition, beginning on page 53 line 25, Mr. Robertson answered the following question:

Q. If I removed the plastic portion F and forcibly rotated the bottom of the carrier into the page, would the carrier rotate about the rivet E?
A. Yes.

In the Robertson deposition beginning on page 73, line 14, Mr. Robertson answered the following question:

Q. Now the rivet labeled "E" in exhibit 6, would allow the carrier to rotate about itself; is this correct?
A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97ez shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance."

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ez product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: a possible function of the pocket in claim 2 is to prevent displacement or rotation of the balance shoe during shipping, handling and in use. When the shoe is under a force directed at the enlarged end, the pocket touches a fastener (i.e. rivet) in order to stop the displacement (rotation) of the shoe.

In Mr. Robertson's deposition, on page 49, Mr. Robertson answered the following question:

33

Q. Now in the 97ez, what is the purpose of the plastic part you labeled as "F"?

A. Prevent rotation in the carrier in the channel.

Q. Is this to prevent rotation of the carrier while in operation?

A. During handling of the balance or shipping of the balance.

Mr. Robertson also testified on page 51:

Q. Is there any circumstance in which F would touch the rivet D?

A. If the shoe is rotated forcibly in the direction opposite to that we were just discussing.

Q. And when would that happen?

A. Possibly in shipping and handling.

Given Mr. Robertson's testimony and my own examination of the Series 97ez, I conclude that the part of the Caldwell 97ez shoe that forms a notch shaped to mate with a rivet performs the same function of preventing unwanted rotation of the balance shoe as the invention. The 97ez will stop displacement (rotation) in the same manner as the invention by contacting a rivet, thus achieving the same result of securing the balance shoe in the channel during shipment, handling, and usage.

e. The Caldwell product Series 97ez contains a locking member proximal to the enlarged first end. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to "**Rotate** cam to lock shoe in place…." *See* Fig. 8.2.H.

f. The Caldwell product Series 97ez contains a cam in communications within the locking member. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to "**Rotate** cam to lock shoe in place…." *See* Fig. 9.2.I.

g. The Caldwell product Series 97ez contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

The Caldwell 97ez product contains a rivet that connects the balance shoe to the U shaped channel of the inverted window balance. *See* Fig. 9.2.J.

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ez product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe down the channel. The result is an integrated assembly of the shoe with the channel. In the Caldwell 97ez product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

34

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 3. The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock construed the term as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97ez has a rivet as the connecting device. I also refer to section (g) in my discussion of claim 2 of the '368 patent above as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on the plaintiffs' claim 3 of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 6. The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from examining the physical Caldwell product that matches the Caldwell Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez that it contains a cam at least partially housed within the enlarged end of the frame, called the "carrier" in page 3 (C000516) of the Caldwell brochure for system 97ez, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:
> **Slide** the series 97ez Block and tackle balance into the frame pocket.
> **Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
> **Rotate** cam to lock shoe in place…

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 7. The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent, column 9, lines 12-14).

35

I observe from examining the physical Caldwell series 97ez that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 8. The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from examining the physical Caldwell product 97ez that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:
> **Slide** the series 97ez Block and tackle balance into the frame pocket.
> **Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
> **Rotate** cam to lock shoe in place...

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97ez products are infringing on claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 11. The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from examining the physical Caldwell Series 97ez that it contains a cam comprises of at least one camming surface (the observed Caldwell product has 2 camming surfaces) and a keyhole opening sized to receive a pivot bar. In the Caldwell 97ez installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:
> **Slide** the series 97ez Block and tackle balance into the frame pocket.
> **Insert** a mounting screw through the terminal or a mounting hook into the jamb opening to fasten securely to the jamb.
> **Rotate** cam to lock shoe in place....
> **Install** the sash by dropping the bottom corner pivot bar into the shoe opening....

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for

36

tilt applications called Series 97ez products are infringing on claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

**IV. Infringement by defendant, Caldwell Manufacturing Company, of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant Caldwell Manufacturing Company's Series 97ih products are infringing on claims 2, 3, 6, 7, 8 and 11 of plaintiffs' U.S. Patent 6,820,368 B2.

Claim 2. This claim states as follows:
A window balance system comprising
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

('368 patent column 8, lines 48-67)

I examined photos of the device, including the one denoted in the Robertson deposition as Exhibit 3. I also examined three engineering drawings included as Exhibit 12 to the Batten deposition. They are:
1. 97i(H) Channel, Caldwell drawing ## 15A10/15A11, rev 2, drawn 05-20-04, approved 01-07-05
2. 97i(H) Balance assembly-screw mounted, Caldwell drawing ##15A50/15A51 rev 2, drawn 05-21-04, approved 01-10-05. The drawing is clearly marked with the location of the locking mechanism and the cam by Mr. Batten during his testimony in his deposition (page 146, line 21, and page 147 line 21).
3. 97i(H) Balance assembly-short/screw mounted, Caldwell drawing ##15A52, rev 1, drawn 08-13-04, approved 01-10-05.

According to the Batten Deposition, the Caldwell 97ih product preceded the 97ez product (Batten deposition, page 72, line 1). The 97i preceded the 97ih, and both products were very similar, with the same shoe. Quote from the Batten deposition page 74, lines 13- 24.
A. There was a predecessor product to the [97]ih called 97i. It was a predecessor to the I hybrid, otherwise known as ih.
Q. What is the difference between the [97]ih or i hybrid and the 97i?
A. The principal difference is the weight and range of the two products. The sash weight ranges that each carries is a little bit different.
Q. Is there any difference in the shoe between the 97i and the 97ih?
A. No.

Another quote from the Batten deposition compares the 97ih to the 97ez; quote (page 147, beginning line 22)

Q. Does the locking mechanism for the 97ih work in the same way as the 97ez's locking mechanism?

A. Yes.

Q. So if you rotate the cam, it forces the ends out and they engage in the jamb tracks?

A. That is correct.

Q. Did the 97i, the original 97i, prior to the introduction of the 97ih have the same carrier as what is depicted here in Exhibit 12?

A. I have to make sure we get our i's straight here

Q. I am talking with reference to the 97i that you testified earlier was a predecessor to the 97ih, that 97i, the one no longer on the market, was replaced sometime in 2004.

A. Yes.

Q. Did the carrier for that balance, was it the same carrier as what is shown here as the 97ih?

A. I believe it was, yes.

Based on the above discussion, it is my opinion that the defendant Caldwell Manufacturing Company's Series 97ih system products are infringing on claim 2 of U.S. Patent 6,820,368 B2 by virtue of the following observations:

a. The Caldwell product Series 97ih contains a U shaped channel comprising a plurality of openings;  *See* Fig. 10.2.A.

b. The Caldwell product Series 97ih  contains a spring connected to a system of pulleys located within the U shaped channel;  *See* Fig. 10.2.B.

c. The Caldwell product Series 97ih  contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; *See* Fig. 10.2.C.

d. The Caldwell product Series 97ih  contains a balance shoe (Fig. 10.2.D), wherein the balance shoe comprises:

a frame comprising and enlarged first end (Fig. 10.2.E) and a second end (Fig 10.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 11.2.G). The disputed term "pocket" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell shoe forms a notch adapted to mate with a rived in the U shaped channel. More of my observations on this issue are noted in element (h).

e. The Caldwell product Series 97ih contains a locking member proximal to the enlarged first end. *See* Fig. 10.2.H.

f. The Caldwell product Series 97ih contains a cam in communications within the locking member. *See* Fig. 11.2.I.

39

g.  The Caldwell product Series 97ih contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. *See* Fig. 11.2.J. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) and engineering drawings of two shoe sizes (called the carrier) in the Batten deposition, exhibits 12 and 13 (C004553 and C004554), that the Caldwell 97ih has two rivets in the U shaped channel.

The first rivet, located towards the center of the channel, is used to anchor the spring. The second rivet is used to connect the carrier to the balance. This is collaborated for the first rivet by the Robertson deposition, page 26, lines 2-5, quote:

Q. As you are looking at it. What is the purpose of this rivet [to the right of the page?
A. It is to anchor the spring.

The second rivet function is also collaborated by the Robertson deposition, page 26, lines 15-19, quote:

Q. Is it also correct to say the leftmost rivet connects the carrier to the channel?
A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97ih shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The notch is indicated by the letter H in the Batten deposition Exhibit 13 (Batten deposition, page 142, line 24).

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97ih product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of claim, it also infringes based on the Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel. In the Caldwell 97ih product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle Series 97ih products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

40

<u>Claim 3.</u> The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97ih has a rivet as the connecting device. I also refer to section (g) in my discussion of claim 2 of the '368 patent above as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 3 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 6.</u> The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a cam at least partially housed within the enlarged end of the frame, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 7.</u> The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent, column 9, lines 12-14).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle 97ih products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 8.</u> The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of

41

the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97ih that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 11.</u> The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from the photograph of the Caldwell 97ih connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97ih that it contains a cam comprises of at least one camming surface (the observed Caldwell product has 2 camming surfaces) and a keyhole opening sized to receive a pivot bar.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle 97ih products are infringing on claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

42

**V. Infringement by defendant, Caldwell Manufacturing Company, of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.**

Upon reviewing all information listed in the top of the report; I conclude the following: The defendant's Caldwell Manufacturing Company Series 97i products are infringing on claims 2, 3, 6, 7, 8 and 11 of plaintiffs' U.S. Patent 6,820,368 B2.

<u>Claim 2.</u> This claim states as follows:
A window balance system comprising:
a U shaped channel comprising a plurality of openings;
a spring connected to a system of pulleys located within the U shaped channel;
a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; and
a balance shoe, wherein the balance shoe comprises:
    a frame comprising an enlarged first end and a second end, wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet;
a locking member proximal to the enlarged first end;
a cam in communications within the locking member, and
a connecting device for attaching the balance shoe within the U shaped frame of the window balance.

('368 patent, column 8, lines 48-67):

Upon examining Caldwell brochure package Series 97i Block and Tackle System Inverted Operation for tilt application, containing 4 pages of front or title page (C000490), 2nd page of component part layout and description (C000491), 3rd page of technical specifications, accessories and installation (C000492), and 4th page of warranty and contact information (C000493); and the Caldwell engineering drawings (CW0016 -CW0039), it is my opinion that the defendant Caldwell Manufacturing Company's Series 97i system products are infringing on the Plaintiffs' U.S. Patent 6,820,368 B2 claim 2 by virtue of the following observations:

    a. The Caldwell product Series 97i contains a U shaped channel comprising a plurality of openings;  *See* Fig. 12.2.A.
    b. The Caldwell product Series 97i  contains a spring connected to a system of pulleys located within the U shaped channel;  *See* Fig 12.2.B.
    c. The Caldwell product Series 97i  contains a cord with a first cord end and a second cord end, the first cord end connected and threaded through the system of pulleys, the second cord end connected to a jamb mounting attachment; *See* Fig 12.2.C.
    d. The Caldwell product Series 97i  contains a balance shoe (Fig. 12.2.D), wherein the balance shoe comprises:
        a frame comprising and enlarged first end (Fig. 12.2.E) and a second end (Fig. 12.2.F), wherein the second end is adapted to be received by the U shaped channel, and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet (Fig. 11.2.G). The disputed term "pocket" was clarified by the

43

memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "pocket" in claim 2 of '368 patent, to be construed as a "notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The Caldwell balance shoe is called in their 97i brochure page 3 (C00492) as the "locking pivot shoe". The Caldwell shoe forms a notch adapted to mate with a rived in the U shaped channel. More of my observations on this issue are noted in element (g).

e. The Caldwell product Series 97i contains a locking member proximal to the enlarged first end. *See* Fig. 12.2.H. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to "**Rotate** cam to lock shoe in place...."

f. The Caldwell product Series 97i contains a cam in communications within the locking member. *See* Fig. 11.2.I. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to "**Rotate** cam to lock shoe in place...."

g. The Caldwell product Series 97i contains a connecting device for attaching the balance shoe within the U shaped channel of the window balance. *See* Fig. 11.2.J. The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance."

I note from the Batten deposition page 74, lines 13- 24:

A. There was a predecessor product to the [97]ih called 97i. It was a predecessor to the I hybrid, otherwise known as ih.
Q. What is the difference between the [97]ih or i hybrid and the 97i?
A. The principal difference is the weight and range of the two products. The sash weight ranges that each carries is a little bit different.
Q. Is there any difference in the shoe between the 97i and the 97ih?
A. No.

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) and engineering drawings of two shoe sizes (called the carrier) in the Batten deposition, exhibits 12 and 13 (C004553 and C004554), that the Caldwell 97i has two rivets in the U shaped channel.

The first rivet, located towards the center of the channel, is used to anchor the spring. The second rivet is used to connect the carrier to the balance. This collaborated for the first rivet by the Robertson deposition, page 26, lines 2-5, quote:

Q. As you are looking at it. What is the purpose of this rivet [to the right of the page]?
A. It is to anchor the spring.

44

The second rivet function is also collaborated by the Robertson deposition, page 26, lines 15-19, quote:
Q. Is it also correct to say the leftmost rivet connects the carrier to the channel?
A. Yes.

Consistent with the Robertson testimony and my own observations, I find that the Caldwell 97i shoe design meets the Court's claim construction because it has "A notch with an opening shaped to mate (i.e. to join or fit together) with a rivet, thereby aiding to secure the balance shoe within the U shaped channel of the inverted window balance." The notch is indicated by the letter H in the Batten deposition Exhibit 13 (Batten deposition, page 142, line 24).

I understand from examining Caldwell's Supplemented Answers to Plaintiff's First Set of Interrogatories", dated 8/31/2005, that Caldwell contests that their 97i product meets this claim element. While I expressed my opinion above that the 97ez literally infringes on this element of the claim, it also infringes based on the   Doctrine of Equivalents: the connecting device of claim 2 performs the function of attaching the balance shoe to the channel, by using a method connecting the shoe the channel. The result is an integrated assembly of the shoe with the channel.  In the Caldwell 97i product, the connecting device or rivet, located towards the end of the U shaped channel performs the same function of attaching the shoe to the channel, in the same way, and achieves the same result.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 2 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 3. The window balance system of claim 2, wherein the connecting device comprises a rivet ('368 patent, column 9, lines 1-2)

The disputed term "connecting device" was clarified by the memorandum and order of the US District Court of Massachusetts dated January 20th 2006. In it, Judge Douglas Woodlock issued a claim construction on the disputed term "Connecting device" in claim 2 of the '368 patent to be construed as a "device, such as a rivet, screw or resilient tabs, that connects the balance shoe to the U shaped channel of the inverted window balance." I observe that the Caldwell product 97i has a rivet as the connecting device. I also refer to section (g) in claim 2 of the '368 patent as a supporting argument.

Based on the above observations and supporting materials, it is my opinion that the defendant Caldwell Manufacturing Company's Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing on the plaintiffs' claim 3 of US Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 6. The window balance system of claim 2, wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to

45

engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 6-11).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, exhibit 3), that it contains a cam at least partially housed within the enlarged end of the frame, called the "carrier" in page 3 (C000492) of the Caldwell brochure for system 97i, wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to perform the following functions:

>**Slide** the series 97i Block and tackle balance into the frame jamb pocket.
>**Insert** a mounting screw through the terminal and fasten securely to the jamb.
>**Rotate** cam to lock shoe in place…

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 6 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 7. The window balance system of claim 2 where in the locking member comprises two opposing ends integrally connected by a spring member ('368 patent column 9, lines 12-14).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3), that it contains a locking member that comprises two opposing ends integrally connected by a spring member. All three features of the locking member of two ends and a spring connecting them are molded into one physical part that comprises the two opposing ends integrally connected by a spring member.

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called series 97i products are infringing on claim 7 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Claim 8. The window balance system of claim 7, wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb ('368 patent, column 9, lines 15-17).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, exhibit 3) for the Caldwell product 97i that it contains a cam at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000492), the customer is called to perform the following functions:

>**Slide** the series 97i Block and tackle balance into the frame jamb pocket.
>**Insert** a mounting screw through the terminal and fasten securely to the jamb.

46

**Rotate** cam to lock shoe in place...

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing claim 8 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

<u>Claim 11.</u> The window balance system of claim 2 wherein the cam comprises of at least one camming surface and a keyhole opening sized to receive a pivot bar ('368 patent, column 10, lines 13-15).

I observe from the photograph of the Caldwell 97i connecting system of the shoe connected to the U shaped channel (Robertson deposition, Exhibit 3) for the Caldwell product 97i that it contains a cam comprises of at least one camming surface (the observed Caldwell product has two camming surfaces) and a keyhole opening sized to receive a pivot bar. In the Caldwell 97i installation instructions (page 3 of the Caldwell brochure, C000516), the customer is called to perform the following functions:

  **Slide** the series 97i Block and tackle balance into the frame jamb pocket.
  **Insert** a mounting screw through the terminal and fasten securely to the jamb.
  **Rotate** cam to lock shoe in place...
  **Install** the sash by guiding the bottom corner pivot bars into their respective carrier opening....

Based on the above observations and supporting materials, it is my opinion that the defendant's Caldwell Manufacturing Company Block and Tackle system with a Balance Shoe for tilt applications called Series 97i products are infringing claim 11 of U.S. Patent 6,820,368 B2, "SNAP LOCK BALANCE SHOE AND SYSTEM FOR A PIVOTABLE WINDOW", granted on November 23, 2004.

Sincerely yours

Dr. Sammy G. Shina, P.E.
19 Swanson Road
Framingham, MA 01701
Sammy_shina@uml.edu
Home 508 877 6109, Work 978 934 2590;
cell 508 934 9176

47

TAB A

**Dr. Sammy G. Shina, Ph.D., PE**

| | | | |
|---|---|---|---|
| **OFFICE:** | College of Engineering | **HOME:** | 19 Swanson Road |
| | University of Massachusetts Lowell | | Framingham, 01701 |
| | 1 University Avenue | | Phone and fax |
| | Lowell, MA 01854 | | (508) 877-6109 |
| Phone: | (978) 934 2590 | | |
| Fax: | (978) 934 3048 | | |
| Cell | (508) 934 6777 | | |
| Sammy_Shina@UML.edu | | | |
| DOB | 9/28/ 44 | | |

## A. EDUCATION AND ACADEMIC QUALIFICATIONS

### 1. Education (Degrees, with fields, institutions and dates).

| | | |
|---|---|---|
| Ph.D. | MECHANICAL ENGINEERING | TUFTS, 1998 |
| M.S. | COMPUTER SCIENCE | WPI, 1972 |
| B.S. | INDUSTRIAL MANAGEMENT - | MIT, 1966 |
| B.S. | ELECTRICAL ENGINEERING- | MIT, 1966 |

Completed 6 courses in the Computer Engineering graduate program at Boston University.

### 2. Academic Experience

| | |
|---|---|
| 1999 - Current | University of Massachusetts Lowell, College of Engineering Full time Professor, Department of Mechanical Engineering |
| 2003 | Coordinator of the Graduate Certificate Program: Design and Manufacturing Engineering |
| 2000 | e-Engineering lectures, National Technological University, and PBS Business Network |
| 1992 - Current | University of Massachusetts Lowell, College of Engineering Full time Associate Professor, Department of Mechanical Engineering |
| 1989- 1995 | Adjunct Professor, University of California Irvine |
| 1993 - 1995 | Adjunct Professor, University of Pennsylvania EXMSE program for business executives |
| 1994 - 1995 | Lecturer, Six Sigma Institute on Quality and Concurrent |

Engineering, Motorola University for Motorola and Texas
Instrument Six Sigma Black Belt Engineers.

1988-1992          University of Lowell, College of Engineering
                   Full time Associate Professor, Department of Industrial
                   Technology

1970-1990          University of Lowell, Continuing Education
                   Adjunct Faculty, Industrial Technology Department

1985-1988          Technical Education Coordinator for Hewlett Packard
                   Corporation, Waltham MA
Set up the training courses for the different tools and systems such as
Mechanical and Electrical CAD/CAM. Introduced Masters of Engineering
Programs from the National Technological University and Boston University
engineering schools for 400 engineers.

1967-1968          The Technical Education Institute, Florence, SC
                   Taught Computer Programming, Mechanical and Electrical
                   Engineering courses in the Institute.

2

## B. PROFESSIONAL ACTIVITIES

### 1. Professional Association

Secretary and Past chairman for the Robotics Chapter of the SME (Society of Manufacturing Engineers), Chapter 293, Region 5. Chairman elect 1998.
*Member(current or past) of the following professional societies:*
Society of Quality Engineers (ASQC)  - Senior Member
Society of Manufacturing Engineers (SME) - Senior Member
American Society for Engineering Education (ASEE) - Senior Member
Institute of Electrical and Electronics Engineers (IEEE) - Senior Member
Member of the Board of Directors, Massachusetts Quality Award
Quality Examiner, Massachusetts Quality Award
Registered Professional Engineer (EE) in Massachusetts, No. 345922.
Senior Member of the Surface Mount Technology Association (SMTA) No 13849

### 2. Work Experience

Summer of 2000     CoCreate CAD Software, Fort Collins, Colorado
I was engaged by CoCreate to develop the concepts and strategies of collaborative engineering by researching and interviewing companies engaged in the design of mechanical products using distributed design teams as well as distributed supply chains. The results of the research are to be documented in case studies and future publication in journals and a fifth book.

Summers of 1997/1998     Lecroy Corporation, Chestnut Ridge, NY
I was engaged by the Lecroy Corporation Network Products Group to select an outside manufacturing contracting services for PCB, Instrument and system assembly and test. Evaluated several potential contractors and helped select the manufacturing plan and the contractor.

Summer of 1992     Phillips Kommunication Industrie AG, Nuremberg, Germany.
During the summer of 1992, I was engaged by the company to help transition the product creation process from a serial (throw it over the fence) to concurrent engineering. I worked with the management and engineering teams of the company to effect that transition, My work at the company formed the basis of the first chapter in my second book on concurrent engineering.

1971-1988    HEWLETT PACKARD WALTHAM DIVISION, Waltham, MA
I worked for the company in many positions, both at the division and the corporate levels.  I filled many diverse assignments: manufacturing engineer and manager, in the process, production and tool engineering departments. I have successfully built and turned on a $10 million automated electronic manufacturing plant and associated wastewater treatment system in 1980. I have received an award from the MDC for the design of the plant, which was featured on the front cover of their annual report.
As a production manager, I understood how to manage and ship more than $50 million of medical electronics instruments in 1985, and managed an

3

organization of 300 workers, including ten supervisors, manufacturing and process engineers. This position gave me a unique perspective on the congruence of design, manufacturing, operational and engineering issues.

A significant assignment was the Waltham division productivity manager in 1986, where I investigated the methodologies on how to increase engineers' productivity and quality. I was in charge of capital equipment and training for 400 engineers. I spend more than $7 million on CAD and associated equipment, especially automatic links to manufacturing and CAM. One of the visitors to Hewlett Packard described my efforts in the field of Design - Manufacturing connection in 1986 as the most complete he has seen outside of Detroit. This assignment led me to formulae my opinions about concurrent engineering, which I published in my first book 1991.

Engineering Assignments:
Surface Mount Technology (SMT) Coordinator
Computer Aided Design (CAD) Manager
Prototype-In-Production (PIP) Program Manager
Automatic Test of PC Boards Systems Designer/Manager
Automatic N/C generation for Punch Press equipment
Printed Circuit Board Fabrication System Designer
Automatic PC Solder and Wash System Designer
Automatic Insertion of Components Systems designer/Manager
Line Management Experience:
Auto Insertion Department Manager.
Medical Monitoring Instruments Assembly and Test Manager
Central Station Monitoring Assembly and Test Manager
Oximeter and Capnometer Assembly and Test Manager
Engineering Services Manager
Productivity Manager
Tool Engineering Manger
Manufacturing Technology Manager

1968-1971    RCA COMPUTER SYSTEMS DIVISION, Marlborough MA
Designed an automatic manufacturing / test systems for computer peripherals, including magnetic tape storage and high speed disc storage devices. I was slated to become the manufacturing engineering manager before RCA decided to quit the IBM mainframe compatible market in 1971, and closed the plant.
1966-1968    UNION CARBIDE COOPERATION LINDE DIVISION, Florence, SC
I introduced computer technology to the plant that was newly built in the south. I designed computer based inventory control and material handling systems, including working with one of the first IBM bill of materials processors.

4

## C. RESEARCH

### 1a. Awarded Grants and Contracts

<u>Funded</u> (^$750,000)

| | |
|---|---|
| 001402-001 | Lead Free Solder Testing, EPA work order #4w-1362-NAEX, 9/2004, $25,000. |
| 05-8011 | Income Account for Lead Free Consortium Schneider Automation, MACOM; and Analog Devices 2000-2004= $8,500 |
| UML Turi | Support for Lead Free Consortium $6000; in 5/02 and 5/03 |
| UML Turi | Research Fellowships for Lead Free Soldering, $20,000 9/99; $6,000 9/00; $20,000 9/01 Total = $46,000 |
| Corporate Education | *Skills Training – Machine Controls and XY Movement) Lucent Technology , Summer 2000, $13,000 |
| 99-348 | Parlex Corporation Student Internship, June 1999 $14,450 |
| 05- 08225 | Resin Technology, MFG. Evaluation, January 1999, $3,844 |
| Corporate Education | *Skills Training – Machine Controls and XY Movement) Lucent Technology , Fall  1999, $32,000 |
| 05- 08112 | Microtouch Corporation, MFG. Evaluation, July 1998, $13,908 |
| UML TURI | MFG Research Fellowship for Sunny Grover, in Additive PCB's  Build Up Vias, September 1998, $25,000 |
| 05-08011 | Coop and Internship Income Account, March 1998, $2,100 |
| UML TURI | MFG Research Fellowship for Val Carvalho, May 1997, in Additive PCB Fabrication Technology, $25,000.00 |
| CITA | Conception, Product Development and Environmentally Appropriate Technology, with Maas, Fiddy, Geiser and McCarthy, May 1997, $4190 |
| UML TURI | MFG Research Fellowship for Dennis Gagne, 9/1996, Additive PCB Fabrication Technology, $15,345.00 |

5

| | |
|---|---|
| Continuing Education | "Manufacturing and Total Quality Management and Control", USCI Baird with Stephen Driscoll, June 1996, $50,000. |
| 05 -07433-F | "Undergraduate Faculty Development in New Product Realization", National Science Foundation, June 1996, $44,000 |
| 05- 07212 | EASNE Design for Quality, UML-UGC2-5, May 1996, $68,000; Co-PI with R. Giglio, UMA. |
| 05-07362 | "Practical Statistics for Engineers", USCI Baird, December 1995; with Professor McKelliget, $5,000 |
| UML TURI | MFG Research Fellowship for Doug Sommer, in NO Clean Paste for PCB Assembly, September 1995, $15,345.00 |
| UML TURI | MFG Research Fellowship for Paul Haley, in NO Clean SMT Paste for PCB Assembly, September 1994, $15,645.22 |
| 05 - 6450-F | "Undergraduate Faculty Development in Concurrent Engineering and Design for Manufacture", National Science Foundation.  June 1993, $77,810. |
| Continuing Education | "Concurrent Engineering, Quality Management and Control", Baush & Lomb Corporation, July 1992, $16,000. |
| 05 - 6222 | "Faculty and Course Development", GE Aircraft Engines Education Fund, February 1992, $10,000 |
| 05 - 5850 | "Faculty and Course Development", GE Aircraft Engines Education Fund, February 1991, $10,000 |
| 05 - 5807-F | "Undergraduate Faculty Development in DFM", National Science Foundation. January 1991, $54,924. |
| 05 - 5636 | "Concurrent Engineering and Design for Manufacturing", Genrad Corporation, June 1990, $1,500. |
| 05 - 5792 | "Faculty and Curriculum Development", Society of Manufacturing Engineering Education Foundation, May 1990, $ 9,500. |
| 16 - 5336 | "Technology Transfer Grant in Manufacturing Engineering", Costa Rica Educational Development Center, with John Colluccini. May 1989, $ 8,404. |

6

16 - 5257          "Process Quality Improvements Using SPC and Taguchi
                   Methods", Wang Labs Incorporated, April 1989, $48,334.

16 - 5260          "Factory Process and material handling optimization using
                   simulation tool", Wang Labs Incorporated, April 1989, $
                   58,939

Continuing         More than $100,000 in seminars on quality an Concurrent
Education          Engineering, 1989-1993

**1b. Equipment and Software Grants ($178,000)**
GENRAD Tester, $140,000, 12/ 1998; Hewlett Packard, Optical Laser
Measurement System, $15,000, 5/ 1996; Storm Software, Manufacturing
Software, $2000, 5/1995.; AMTX Corporation, Screening Stencils, $1,000, March
1995; AT&T, Merrimack Valley Works, for 2 ADEPT Robots, book value:
$15,000, 11/1993; UTZ Corporation, Screening Stencil, $1,000, 12/1993; CACI
Products Company, SIMFACTORY Software training, $4,000, 12/ 1993.

**1c. Consultancy:**
<u>University and Technical Conference Based Seminars and Training</u>
University of Massachusetts, Lowell, University of California, Irvine, University of
Pennsylvania, ExMSE Program, Motorola University Six Sigma Institute,
Bellevue Community College, Washington, Brunel University, London, NEPCON
Conferences and Expositions, NEPCON College of Manufacturing, SMT
International Conference and Exposition, Hong Kong Productivity Council,
Singapore Center for Management Technology, American Society for Quality
Control (ASQC), Puerto Rico Chapter, Society of Manufacturing Engineering
(SME), New England Region, Iteso, University, Guadalajaro, Mexico, Mexican
Branch of the IEEE, Australian SMCBA Association, Technical University of
Costa Rica, Technical University of Puerto Rico, Arab School of Science and
Technology, Society of Manufacturing Engineers(SME), SMTI Chicago
<u>Consultancy, US</u>
Omnisonis, CoCreate, Lucent, BTU, Phoenix International; Teradyne, Bose,
Lecroy, General Scanning, Lockheed Martin Sanders, General DataCom,
MicroTouch Systems, Leybold Inficon, PictureTel, USCI Baird, Hewlett Packard,
Motorola, Pensar Corporation, AT&T Corporation, AMETEK Corporation,
M/ACom Corporation, GTE Sylvania, Atlanta Scientific, U.S. Navy, Port
Hueneme and Pt. Mugu; Xerox Corporation, Polymer Technology, National
Science Foundation, General Electric Aircraft Engines, Genrad Corporation,
Tredgar Plastics, C&K electronics, Parker Brothers, Wang Incorporated


<u>Consultancy, International</u>
Havelsan Company, Ankara, Turkey, Hong Kong Productivity Council
Fisher and Paykel, Switchtek Power Systems, Tait Electronics and Dynamic in
New Zealand. Phillips Kommunication Industrie AG, (Nurenberg, Germany),

7

Australian Electronics Development Center, Victoria Australia, Surface Mount and Circuit Board Association, Hughesdale, Australia; NISTEC (Advanced Technologies in the Electronics Industry), Petah Tikva, Israel; R&D Network Devices, Efrat Technology and ECI Telecom, Petah Tikvah, Israel; NECPON Singapore, NPCON Europe, Puerto Rico ASQC, Mexicon, Mexico

**EXPERT WITNESS/** Litigation Support Experience

1. Xyratics Design v AB circuits v Eltek, 1999: The case involved quality issues in the electronics supply chain. The plaintiffs and defendants were value added manufacturers that worked on a product originated in a South Korean Company, which had hidden defects in the product. The Korean company went bankrupt, and the other companies in the supply chain sued each. I advised on the issues of proper testing and quality procedures in the electronics industry, especially when related to the supply chain. I wrote several expert reports on test and quality for the solicitors and barristers in the case. *INCE and Company; Solicitors; 11 Byward Street; London EC3; England*

2. Vial, Inc., v. Triple S. Plastics, Inc., CV 97-499 (Dist. AZ); CV 98-102 (Dist. AZ): Patent infringement case involving molding of plastics injected parts, with two companies making plastic containers for the Dairy and consumer food industries. The patent included closing of plastic containers in the mold for the defendant, while the other company used similar techniques for closing the cap by a robotic arm. I help the plaintiff lawyers research the prior art to find instances of use of robotics in the plastics industry. *Morgan and Finnegan, L.L.P., Attorneys at Law, 345 Park Avenue, New York, NY 10154*

3. Fuji Machine Manufacturing Company, Ltd. V. Hoover-Davis Inc.; Civil Action No. 96-CV-5087I: Patent infringement case involving pick and place Feeder design. I worked with the lawyers of the plaintiff (FUJI) to explain the workings of the feeder, and how the design of the defendants (Hover-Davis) feeder design had similarity in function. *Oliff & Berridge, P.L.C, Attorneys at law; 700 South Washington Street, Alexandria, Virginia 22314*

4. US District Court Of Maine 05-32 –PC, RFT Technology Corporation V Applied Microwave Technology: Case including conversion, breach of contract and misappropriation of trade secrets. Case involved using the same design strategy and copying of CAD files versus reverse engineering claims by the defendants. I wrote an expert report, and was deposed in the discovery process. Case was settled out of court. *Hamilton, Brook, Smith & Reynolds, P.C. , 530 Virginia Road, P.O. Box 9133, Concord, Massachusetts 01742*

**2a. Academic & Professional Publications (94 publications)**

8

**Text and Reference Books (5 published)**

1. S. Shina, "Six Sigma for Electronics Design and Manufacturing McGraw Hill, May 2002
2. Shina S. and Saigal A., "Manufacturing Costs for electronic Products", Volume 3 of the Encyclopedia of Materials, Elesevier Press, November 2001, pp 2727-2735.
3. S Shina , "Design Of Experiments", chapter 25 to "Environment Friendly Electronics: Lead-Free Technology" by J. Hwang, Electrochemical Publications Ltd, 2001.
4. S. Shina, editor and co-author, "Successful Implementation of Concurrent Engineering Products and Processes", published by <u>Van Nostrand Reinhold</u> N.Y., 1994, reprinted by Wiley Press.
5. S. Shina, "Concurrent Engineering and Design for Manufacture of Electronic Products", published by <u>Van Nostrand Reinhold</u> N.Y., 1991. Reprinted by Kluwer Academic Publishers.

**Papers published in refereed Journals and publications (10 papers published):**

1. Shina S. and Saigal A., "Using Cpk as a Design Tool for New System Development", <u>Journal of Quality Engineering</u>, Volume XII, Number 4, 2000, pp. 333-349.
2. Shina S. and Saigal A., "A design Quality Based Cost Model for New Electronic Systems and Products," <u>Journal Of Materials</u>, April 1998, pp 29-33.
3. Shina S. and Saigal A., "Technology Cost Modeling for the Manufacture of Printed Circuit Boards in New Electronic Products," <u>Journal of Manufacturing Science and Engineering</u>, May, 1998, pp 368- 375.
4. Shina, S., Gagne D. and Quaglia, M., "Methods for paste Selection and Process Optimization for Fine Pitch SMT, <u>Journal of the SMART (Surface Mount and Related Technologies) Group</u>, No. 24, October 1996, pp. 8-11.
5. Shina, S., W. Eaton W., et all, "Using circuit simulation with Taguchi Design of Experiment Techniques to optimize the performance of a digital half-adder integrated circuit", Quality Progress, <u>Journal of Quality Engineering</u>, 1993, Vol. 5, Number 4, pp. 589-600.
6. Shina, S., "Taguchi Experiments for Improving Solder Quality", <u>Journal of Surface Mount Technology</u>, July 1992, pp. 4-13.
7. Shina, S., "Developing a course in Design for Manufacture", <u>Journal of Industrial Technology</u>, Volume 7, Number 2, 1991. pp. 7 - 11
8. Shina, S., "The successful use of the Taguchi Method to Increase Manufacturing process Capability", <u>Journal of Quality Engineering</u>, Volume III, Number 3, 1991, pp. 333-349.
9. Shina, S., "New Rules for World Class Companies", <u>IEEE Spectrum</u>, July 1991. pp. 23-26
10. Shina, S., "The use of the Taguchi Method to Optimize Manufacturing", <u>Technologia en Marsha</u>, published by the Instituto Technologico de Costa Rica, Volume 10, Number 2, 1990.  pp. 3-7.

9

**Papers published in refereed Conferences (50 papers published/accepted)**

1. Shina S., Morose G. et al; "Visual and Reliability Testing Results of Surface Mounted Lead Free Soldering Materials and Processes in a Simulated Production Environment"; paper to be presented at the IPC Printed Circuits Expo, APEX and the Designers Summit, Anaheim, CA, February 2006
2. Shina S. et al, "Summary of New England Lead Free Consortium Implementation Plan of High Volume Assembly of Printed Wiring Boards", paper to be presented as the keynote speech at the Pan Pacific Microelectronics Symposium", Kona, Hawaii, January 2006
3. Shina et al; Consortium authors. "Analysis of Testing Results of Surface Mounted Lead Free Solders and Materials in Production Environments", paper accepted for the SMTI International, Chicago, IL, September 2004
4. Shina et al; Consortium authors. "Lead Free Consortium Update for Process Conversion", accepted for IPC/JEDEC 8[th] International Conference on Lead Free Electronic Assemblies and Components San Jose, California, April 2005
5. Shina et al; Consortium authors. "Lead Free Conversion Analysis for Multiple PWB/Component Materials and Finishes using Quality and Reliability Testing", APEX conference, Anaheim, CA, February 2005
6. Shina et al; "Analysis of Testing Results of Surface Mounted Lead Free Soldering Materials and Processes", Pan Pacific Conference, Kauai, January 2005.
7. Shina et al; "Summary of Visual and Reliability Testing Results of Surface Mounted Lead Free Soldering Materials and Processes"; 7[th] International IPC/JEDEC conference, Frankfurt, Germany, October 2004
8. Shina et al; Consortium authors. "Lead Free Conversion Analysis for Multiple PWB/Component Materials and Finishes using Quality and Reliability Testing", APEX conference, Anaheim, CA, February 2004
9. Shina et al; Consortium authors. "A Comparative Analysis of Lead Free Materials and Processes Using Design of Experiments Techniques", SMTI International, Chicago, IL, September 2003
10. Shina et al; "Testing Results for Lead-Free PWB's by the Massachusetts Lead-Free Electronics Research Consortium"; 2003 IEEE International; Symposium on Electronics and the Environment (ISEE); Boston, MA, May 2003.
11. Shina et al; " Materials and Processes for Surface Mount Lead Free Soldering", proceedings of the APEX Conference, Anaheim, CA, March 2003, pp.s20-2-1/9
12. Shina S; "A Cpk-Based Toolkit for Tolerance Analysis and Design," Engineering Design Conference; London; July 2002.
13. Shina *et al*, "Process and Material Selection for zero defects and superior adhesion Lead Free SMT soldering", SMTA International Conference, Chicago, IL., September 2001, pp 651 -656
14. Previous paper translated into Chinese by the Hong Kong SMT society for their annual conference 2004.
15. Shina et al, Reliability Testing Techniques For Lead Free Soldering Of SMT Technology", ETRONIX Conference, Anaheim, CA, March 2001.

10

16. Above paper translated into Japanese Journal ANBE, SMT, Kanagawa, Japan, July 2001
17. Shina et al, "Selecting Material and Process Parameters for Lead Free SMT Soldering Using Design of Experiments Techniques", Apex Conference, January 2001, San Diego, CA
18. Shina et al, "Design Of Experiments For Lead Free Materials, Surface Finishes And Manufacturing Processes Of Printed Wiring Boards", SMTA International Conference; Chicago, IL., September 2000
19. Previous paper translated into Chinese by the Chinese Electronics Association Journal. June 2001.
20. Previous paper translated into Chinese by the Hong Kong SMT society for their annual conference 2004.
21. S. Shina and M. Grover, "Developing Vias For Additive Technologies In Printed Wiring Board Fabrication", NEPCON East , Boston, June 1999, pp.77-83
22. Shina, "When Global Manufacturing Does not Work" , International Mechanical Engineering Congress and Exposition (IMECE), November 1999, Nashville, Tennessee, MED VOL. 10, MFG Science and Engineering, pp 557-562.
23. Shina S. and Saigal A., "Using Cpk as Design Tool for New System Development," International Conference on Engineering Design (ICED), Vol. 1, pp. 357-360, Munich, August 1999.
24. Shina, Callahan, Sutera, McCrillis and Geogapoulos, "Methodology for Applying Specifications in Electronics Manufacturing Equipment", NEPCON East 1998, Boston, MA June 1998, pp. 3-10
25. Shina, S., and Carvalho, V., "Additive Technologies: An Examination of Polymer Film Technology in Comparison to Etched Copper Circuitry", NEPCON East 1998, Boston, MA, June 1998, pp. 11-17
26. Shina S., and A Saigal, "A Design Cost Model for New Products Development", ASME Winter Annual Conference, Dallas, TX, November 1997.
27. Shina S., and Saigal, A.,"A Design Cost Model for New Products Development", American Society of Metals Annual Conference, Indianapolis, Indiana, September 1997
28. Shina S., et al., "Paste Qualification for SMT process", NEPCON East 1997, Boston, MA June 1997, pp 23-35
29. Shina, S., "Paperless Tooling System for PCB Fabrication", NEPCON East 1997, Boston, MA June 1997, pp 35-48
30. Shina S., and Calvarho, V., "Evaluation of SMT Paste and Stencil Technologies", NEPCON WEST 97, Anaheim California, February, 1997
31. Shina S., and Saigal, A., Concurrent Engineering and the Virtual Factory: Developing Products with Contract Manufacturers, ASME Winter Annual Conference, Atlanta GA, November 1996.
32. Shina S., and Saigal, A., "An Algorithm for selecting the electronic design implementation in Printed Circuit Board Fabrication based on cost factors", ASME Winter Annual Conference, Atlanta GA, November 1996.

11

33. Shina, S., "Design For Manufacture of Electronic Products", Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996, pp. 79-100

34. Shina, S., "Product Realization Process in a Global Environment", Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996, pp. 79-100

35. Shina, S., Kissinger D. and Crocker, K., "Process Development for SMT Stencil Adhesive Application", NEPCON East 1996, Boston, MA June 1996.

36. Shina, S., "Laboratory Exercises to Support Manufacturing Engineering Curriculum", International Conference on Education in Manufacturing, San Diego, CA, March 1996.

37. Shina S., and Saigal, A., "Technology Based Cost Modeling for Manufacturing and Material Selection in New Product Development", ASME Winter Annual Meeting, Chicago, IL November 1994, pp 85-92

38. Shina, S., Gagne D. and Qualiglia, M., "Method for Paste Selection and Process Optimization for Fine Pitch SMT", NEPCON WEST 1996, Anaheim CA, February 1996, pp 61-70

39. Shina, S., "Achieving World Class Quality in PCB Manufacturing through Concurrent Engineering", Proceeding of the Technical Program, NEPCON WEST 1993, pp 1818- 1826

40. Shina S., and Kurpad, R., "Performance Improvements: Application to Aerospace Rivets Installation", paper presented at the Winter Annual Meeting of the ASME, Anaheim, California, November 1992.

41. Shina S., and Wils, J., "Tuning a Large Data base Using Robust Design Techniques", paper presented at the Winter Annual Meeting of the ASME, Anaheim, California, November 1992.

42. Shina, S., "Optimizing Surface Mount Technology Soldering", presented at Surface Mount International Conference, San Jose CA, August 1991.

43. Shina, S., "Using the Taguchi Method to optimize Solder Processing", IPC Conference, San Diego CA, October 1990.

44. Shina S., and Capulli, K., "Optimized Processing and Cleaning of Hybrid Integrated Circuits", NEPCON EAST Conference Proceedings, Boston Ma, June 1990. pp 931-940.

45. Shina, S., "Quality Improvement Methods for Printed Circuit Fabrication & Assembly", NEPCON SOUTHEAST Conference Professional Advancement, Orlando Florida, November 1989.

46. Shina, S. Wu J. and Lowell, C., "Optimizing the new HOLLIS wave solder machine", American Supplier Institute Seventh Symposium Proceedings, Phoenix, Arizona, October 1989. pp 101-115.

47. Shina, S., "Reducing Defects in a Printed Circuit Wave Soldering Process using the Taguchi Method". NEPCON EAST Conference Proceedings, Boston, MA, June, 1989. pp 205-224.

48. Shina, S., " An Algorithm for selecting soldering flux for cleaning and surface conductivity", NEPCON WEST Conference Proceedings, Los Angles, California, March, 1989. pp 1064-1070.

49. Shina, S., "Reducing Solder Wave defects in a Printed Circuit Board Wave Soldering Process", American Supplier Institute's Sixth Symposium Proceedings, Dearborn Michigan, October 1988. pp 123-144.
50. Shina, S., "Justification for Dry-Film Photoresist Process", American Electroplater's Society Sixth Annual PC Conference, March 1977.

**Papers published in general conferences and magazines (29 papers published)**

1. Shina S and Morose G., "Transitioning to Lead-Free Electronics: Now a Business Necessity", New England Environmental Journal, September 2005.
2. Shina S. and Morose, G., "Lead Free Conversion Analysis for multiple PWB materials and processes", SMT Journal, January 2005
3. Shina S. And MacFadden T., "lead Free Conversion issues in Component and PWB Surface Finishes", SMT Journal, May 2004, p73
4. Previous paper translated to Korean for Chomdan Publishing Company in Korea.
5. Shina, S., "Process Changes Face Industry", Mass High Tech, June 2-8, 1997
6. Shina, S., "UMASS Lowell Students team with Business", Mass High Tech, June 2-8, 1997
7. Shina S. and Christafides, S., "Putting Quality Tools to Good Use, A Practical Approach", Printed Circuit Fabrication, Vol. 15, No 10, October 1992, pp 36-39
8. Shina, S., "Benefits of Concurrent Product/Process Development", HP Corporation Executive Conferences, Palo Alto CA, June, September, December 1986.
9. Shina, S., "Mechanical Engineers go CAD", HP Monitor Magazine; March 1986
10. Shina, S., "Mechanical Design and Test", HP engineering Symposium, Lexington MA, December 1985.
11. Shina, S., "A PIP of a Process", HP Engineer, June 1985
12. Shina, S. and Peschier, R., "CAD/CAM, A revolutionary way of the future", HP Monitor Magazine, October 1984.
13. Shina, S., "The Technologist", paper presented at Keeping Pace with Change, The Challenge for Engineers, a joint conference of Northeastern University College of Engineering in Collaboration with the Massachusetts High Technology Council, September 1984. Proceedings pp 103-108
14. Shina, S., "Trendshot Release, A Bold Change for the 1980's", HP Monitor Magazine, September 1982
15. Shina, S., "Water Purification Project at MED", HP Monitor Magazine, 7/1977.
16. Shina, S., "Automatic Insertion of Components", IEEE Manufacturing Technology Conference, Waltham MA, February 1976.
17. Shina, S., "Optimized Soldering processes using the Taguchi Method", presented at the British Electronics Conference, Birmingham, England, 3/1991.

13

18. Shina, S., "Automatic Testing at HP Medical", IEEE Manufacturing Technology Conference, Waltham Ma, March 1975
19. Shina, S., "Cleaning PC Boards", Circuits Manufacturing, July 1974
20. Shina, "Manufacturing technology at MED", HP Monitor Magazine, February 1974.

Co authored the following Hewlett Packard Manufacturing Standards: (1977-81).

21. PC Design for Manufacurability Guideline
22. PC Design and layout Guidelines
23. PC Pin/Receptacle system Guidelines
24. PC Assembly Process Guidelines
25. PC Assembly Workmanship Guidelines
26. PC Automatic Component Insertion Guidelines
27. Shina, S.,Tufts Ph.D. Thesis. "Technology Based Cost Modeling of Printed Circuit Boards", Professor Anil Saigal, Advisor, June 1998
28. Shina, S., WPI Masters of Science Thesis, " Microprogramming, Design Considerations", Professor N. Sondak, Advisor, September 1972.
29. Shina, S., MIT Senior Thesis, "Simulation of the Massachusetts Transportation Authority (MTA) System", Professor E. Roberts, Advisor, August, 1967.

**2b. Papers/Talks presented at conferences as invited speaker (60 total).**
1. Keynote speaker, Pan Pacific conference sponsored by the SMTA, Kona, HI, January 2006
2. Speaker for the American Society of Quality, Manchester NH, February 2005
3. Speaker at he September meeting of the Toronto Chapter of the SMTA, Toronto, Canada, November 5th, 2004
4. Speaker for the ME department technical forums, October 2004
5. Speaker at he September meeting of the Boston Chapter of the SMTA, Boxborough, MA, September 16, 2003
6. Quoted in The Mass High Tech Journal editorial, Bay State takes the lead out", Nov 11, 2002
   http://www.masshightech.com/displayarticledetail.asp?art_id=61052&sec_id=43
7. Quoted in the Lowell Sun article on "Lead Free Electronics", published November 7[th], 2002,
   http://www.lowellsun.com/Stories/0,1413,105%257E4744%257E976553,00.html?search=filter
8. Quoted in the Mass High Tech Journal about lead free electronics, published on November 11[th], 2003
9. Lead Free Research Summary, TURA Coordinators Conference, Best Western Royal Plaza and Trade Center, Marlborough, April 23[th] 2002.
10. Lead Free Electronics Workshop hosted by Schnieder Electric Wilmington, MA, April 10, 2002.

14

11. "Lead Free UMASS Consortium", conference sponsored by the Strategic Envirotechnology Partnership (STEP), Boston MA , November 2nd, 2001
12. "Lead Free at UMASS Lowell", Workshop on Modeling and Data Needs for Lead-Free Solders, sponsored NEMI, NIST, NSF, and TMS, Thursday, February, 2001, New Orleans, LA, lead free research summary by Dr. Shina
13. Speaker to the State of Massachusetts Legislative committee on education policy, UMASS President Bulger's Office, May 4th, 2000.
14. Seminar speaker on Lead Free Electronics, TURI Planner continuing education conference, Marlboro, MA. April 26th, 2000
15. Career and Skill Upgrade Seminar Leader on Design for Quality using Six Sigma and Cpk Methods, ASME April 18th, 2000 Meeting, Cambridge, MA
16. Panelist, Lead Free Electronics Symposium, Sponsored by TURI, at Lucent Corporation, Haverhill, MA, April 13, 2000.
17. Speaker to the Havestan Technical Facility, Turkish Airforce, Ankara, Turkey, August 1999.
18. Speaker to the Mechanical Engineering Department, Cape Tecknicon University, CapeTown, South Africa, March 1999.
19. Speaker to the Boston Chapter SMTA, "Applying SPC to the SMT Manufacturing Process", November 1998
20. Symposium Panelist, American Loudspeaker Manufacturers Conference, Las Vegas Nevada, January 1998.
21. Keynote Speaker, Electronics Industries Forum, IEEE, May 1997
22. Speaker to the Arab School of Science and Technology Conference on Concurrent Product and Process Design and Development, October 1996
23. Speaker to the Globatronics Conference, Singapore, October 1996.
24. Keynote Speaker, NAFEM Association, Cincinnati Ohio, January 1996
25. Speaker to the UMASS Lowell SME Student branch, on recruiting for the SME, February, 1994.
26. Speaker to the UMASS Lowell ASME Student branch, on future employment opportunities, November 1993.
27. Speaker, Mortorola Incorporated Six Sigma Institute Conference, Dallas Texas, October 1993.
28. Keynote Speaker, Australian Surface Mount and Printed Circuit Board Association SM93 Conference, Sydney, Australia, August 1993.
29. Panelist for the session on Concurrent Engineering: Innovation, Speed and Service, Western Regional Conference, sponsored by the American Society of Quality Control and the American Society of Naval Engineers, Oxnard California, February 1993.
30. Speaker for on Concurrent Engineering, Advanced Technologies in the Electronics Industry Conference, Tel Aviv, Israel, January 1993.
31. Guest speaker on Concurrent Engineering, ,Joint Meeting of the ASQC - APICS - SME societies of Danbury Connecticut, January 1993.
32. Plenary speaker at the MEXICON 92 conference in Guadalajara, Mexico on October 1992.
33. Colloquium speaker on Concurrent Engineering to the Engineering faculty of Iteso University Guadalajara, Mexico, October 1992.

15

34. Speaker to the IEEE Guadalajara chapter, October 1992.
35. Invited to be keynote speaker at the International Society for Hybrid
    Microelectronics (ISHIM) Southern California Chapter Conference, May 1992.
36. Speaker on Concurrent Engineering to the University of Pennsylvania MSME
    program, November 1991
37. Symposium Speaker on Concurrent Engineering, IEEE Advanced
    Semiconductor Manufacturing Conference, Boston MA, 10/91
38. Invited to speak to the Hong Kong Productivity Council and the Hong Kong
    Branch of SME on "Concurrent Engineering", 11/91.
39. Invited to speak on "Robust Design" at the Quality Conference sponsored by
    the Technical University in Medellin, Columbia on TQM, 8/91.
40. Speaker on "Concurrent Engineering", delivered to Itek Corporation, 7/91
41. Speaker on "Total Quality Management", MACOM Waltham on 4/91
42. Speaker on "Concurrent Engineering", delivered to the SME CASA/CIM
    professional societies in March 1991.
43. Speaker on "Concurrent Engineering and Design for Manufacture ", IEEE
    Boston Chapter, Minuteman Lexington High School, January 1991.
44. Speaker on "University of Lowell Engineering Students' activities," Leadership
    Conference, Society of Manufacturing Engineering, Ludlow MA, 12/ 1990
45. Invited to critique United Technologies, Hamilton Standard Division Program
    on Concurrent Engineering, Windsor Locks, Connecticut, December 1990.
46. Speaker to the student chapter of the Society of Manufacturing Engineers
    (SME) on Design for Manufacture, November 1990.
47. Invited to critique Parker Brothers "World Class Manufacturing Program",
    October 1990.
48. Speaker on "Printed Circuit Design for Manufacture", Valid Users Group
    Northeast Region Meeting, October 1990
49. Interviewed by Electronic Products and Packaging (EPP) Magazine on
    Design for Manufacture, September 1990 issue.
50. Invited to critique GENRAD Corporation Quality Program in September 1990.
51. Speaker on "Design for Manufacturing", Distinguished Speaker lecture Series
    Gordon Institute, June 1990.
52. Session leader on "Total Quality for the Manufacturing Enterprise", Company
    Wide Quality Conference sponsored by the University of Lowell, April 1990.
53. Speaker on Quality Methods for Engineers and their Managers, Company
    Wide Quality Conference, sponsored by the University of Lowell, 11/ 1989.
54. Speaker on Quality and Productivity, Digital Equipment Corporation Senior
    Executives, November 1989.
55. Lecture on Taguchi Methods in the University of Lowell Seminar series on the
    Assurance Sciences and Technologies, October 1989.
56. Speaker on "Design for Manufacturing, " Manufacturing Technology
    Conference sponsored by Bay State Skills Corporation and Associated
    Industries of Massachusetts, May 1989.
57. Speaker on Industry/Academic Corporation, joint meeting with Wang
    Incorporated, Presented to the Brookings Institute guests at the University of
    Lowell, May 1989.

16

58. Speaker on Taguchi Methods, Hollis Automation, Nashua NH, January 1990.
59. Speaker on Quality Methods, Wang Incorporated, Lowell MA, 12/1989
60. Speaker on Taguchi Methods, Boston University Manufacturing Engineering faculty, November 1988.

17

## SERVICE ACTIVITIES

### 1. Professional Leadership and Achievements

1. I established the **Umass Lowell Lead Free consortium**, consisting of several local and national companies to sponsor and assist in the research. The original companies included BTU International, North Billerica, MA, Sanmina (formerly Hadco) Corporation; Tech Center East, Ward Hill MA; Multicore Solders; Richardson, Texas; Raytheon Corporation;, Lexington, MA; Solectron Massachusetts Corporation, Westborough, MA and Texas Instruments, Attleboro, MA. Companies that joined the consortium this year include MACOM of Lowell, MA, a division of AMP, which has been acquired by Tyco Industries and Shneider Automation (formerly Modicon) of North Andover, MA. I was funded by various sources for this research including TURI for sponsoring graduate students and research activities, and from companies in the consortium. The total amount exceeds $50,000. I helped TURI with annual conferences to the local supplier base area on the conversion issues of Lead free electronics. These were offered free to local companies to assist then with lead free conversion process. New additions in phase III (2004/5) include Skyworks Solutions (Woburn, MA), Teradyne Inc. (North Reading, MA), Textron Systems (Wilmington, MA), DDI Inc. (Newburyport, MA), American Power Conversion (West Kingston, RI) and Benchmark Electronics (Hudson, NH)
2. Design Judge, USA First Robotics Comnpetition; Manchester NH, March 2003, 2004 and 2005
3. Symposium Chair, Manufacturing Enigneering Division, International Mechanical Engineering Congress and Exposition (IMECE), November 1999, Nashville, Tennessee.
4. Design Judge - Milton S. Kiver Awards Competition sponsored by the Electronic Packaging and Production Magazine, 1995, 1999
5. Professor of the Year, ME Department, 1997
6. Awarded a Certificate of Appreciation, for Dedication and Service during the 1995 School Year, from Lowell High School, May 1995.
7. Chaired a session in the Symposium on Production Engineering Division at the Winter Annual Meeting of the American Society of Mechanical Engineers (ASME), in Chicago, Illinois during the month of November 1992: Session PE 4A, Symposium of New Product introduction.
8. Chaired two sessions in the Symposium on Design, Management, and Computers at the Winter Annual Meeting of the American Society of Mechanical Engineers (ASME), in Anaheim, California during the month of November 1992: Session PE 11A: Product Process Interactions, and session PE 6A, Group Technology and Knowledge Management.
9. Invited as the plenary speaker at the MEXICON 92 conference in Guadalajara, Mexico on October 19 - 21, 1992. While in Guadalajara, lectured to the faculty of Iteso University and the IEEE chapter there.

18

10. Founding member and a member of the Board of Directors,
    Massachusetts Quality Award, 1991- 1993
11. Nominated to the Board of directors for the Society of manufacturing
    Engineering (SME) Electronics Manufacturing Committee, 1992, 1993.

*Journal Reviewer for the Following 7Journals:*
12. "Computer Magazine",
13. "Journal of Manufacturing Science and Engineering"
14. "TAPI magazine"
15. University of Road Island Transportation Center Peer Review
16. IEEE Publications
17. IEEE Spectrum Magazine
18. Machine Vision and Applications
*Book reviewer for the following 8 books and manuscripts*
19. "Design Process", by
20. "Evolvable Design of Experiments: Applications for Printed Circuit
    Boards", by Octavian Iordache, CRC Press
21. " A  Facilitator's Guide to Usability Testing," J. McWane, to be published
    by Prentice Hall,  Upper Saddle River, NJ
22. "Concurrent Project Management", by Q. Turtle, to be published by Van
    Nostrand Reinhold, New York.
23. "Introduction to Control Systems Technology" by R. Bateson, to be
    published by Merrill Publishing Company, Columbus Ohio.
24. "Concurrent Engineering" by J. Torino, published by Van Nostrand
    Reinhold, NY
25. Tool and Manufacturing Engineers Handbook (TMEH) Volume 6
    Handbook, Design for Manufacturability, published by the SME (Society of
    Manufacturing Engineers), Dearborn Michigan.
26. "Handbook of Electronics Manufacturing Engineering", 2nd edition, by
    Richard Matisoff, to be published by Van Nostrand Reinhold, New York.
27. Founding member of an Innovative Products Research and Services
    Incorporated (IPRS), a non-profit educational, scientific and charitable
    501(c) (3) organization incorporated in the Commonwealth of
    Massachusetts. IPRS is an inventor support service, which performs early
    stage market and manufacturing evaluations.  IPRS was able to obtain
    two grants from the Department of Energy in 1991 and 1992 as part of
    DOE's States' Inventors Initiative.
28. Appointed as a founding member of the student activities' team of the
    Society of Manufacturing Engineering (SME), New England Region.
29. Appointed in 1992 as an examiner for the Massachusetts Quality Award,
    having been a founding member of the Massachusetts Quality Award
    Council.
30. Chairman of the SME (Society of Manufacturing Engineers) Robotics
    Chapter 293, New England Region, 1991-1997

19

31. Chairman of the Quality Function Deployment for NEPCON (National Electronic Packaging Conference), annually attracting over 30,000 design, quality and manufacturing engineers from throughout the country.
32. Selected as the Speaker on Engineering Productivity for Hewlett Packard Corporation to Senior Management (CEO's and VP's) of Customer Corporations in 1986, 1987.
33. "Excellence in Design" Award for the HP Waltham Waste Water Treatment plant from the Metropolitan District Commission of Massachusetts in 1982.

## 2. Service to the University
### 2.1 Student advising
1. Advisor to the Industrial Technology Classes of 1988-1994.
2. Advisor to Mechanical Engineering Students, Freshman Classes 1996-Present

### 2.2 Committee Membership
1. In working with the curriculum committee, I developed a proposed program for a Manufacturing Engineering Curriculum. This was part of a proposal to convert the Industrial Technology Department to Manufacturing Engineering.
2. Manufacturing Engineering Course Development Committee
3. Member of the Mechanical Engineering Department Graduate Committee.
4. Developed three courses in the MMS graduate programs.
   - A.  20.525 Computer Integrated Manufacturing (CIM)
   - B.  20.572 Design for Manufacture (DFM)
   - C.  20.575 Robust Design
D. Developed Two courses for the Mechanical Engineering Department
   - A.  22.571 Concurrent Engineering /Quality; renamed Collaborative Engineering
   - B.  22.575 Industrial Design of Experiments

### 2.3 Service to the Department
1. Developed the microelectronics manufacturing laboratory for manufacturing education, research and training for students, faculty and the local manufacturing companies. Selected, ordered and installed the equipment in a competitive bidding process.
2. Member of the Mechanical Engineering department graduate committee.
3. Chairman of the ME advisory Committee 4th and 5th annual Conferences.
4. Coordinated the Mechanical Engineering series of seminars offered to the Industrial Community, summer of 1993
5. Assisted in the ARPA grant development for Manufacturing Engineering Education.
6. Advisor to ME freshman students.
7. Capstone Course Coordinator
8. Active in developing and tabulating Graduating Students and Alumni Surveys

## 2.4 Service to the College of Engineering

1. Member of the College Rank and Tenure Committee; Spring 2003
2. Member of the College of Engineering Repositioning Task Force, Spring 2002
3. Graduate coordinator for the Manufacturing Systems Engineering Option for all the graduate students in the College of Engineering. All the graduate coordinators in the Engineering Departments approved this program. The programs are explained in several memos attached to this package and have been in operation in 1989-1994. This option was be replaced by the new manufacturing concentration in Mechanical Engineering under the direction of professor Parking.
4. Company Wide Quality Seminars, University of Lowell Continuing Education

Provided technical assistance, recruited faculty and coordinated activities in the Total Quality Management and The Productivity/Quality tools in Engineering and Manufacturing Seminars, which are short and intensive versions of the courses I teach. A list of the seminars provided is as follows:

1. *Taguchi Methods*, offered March 1989, March 1990 and June 1990.
2. *Design for Manufacturing*, offered March 1989, May 1989, January 1990, June 1990 and January 1991.
3. *Total Quality Management* offered January 1991.
4. *Soldering Methods* offered November 1989.

Other Activities

5. Member of the Graduate Faculty membership committee.
6. Member of the College of Engineering Computer Needs Committee.
7. College representative in the Watertown Arsenal Manufacturing Development Park Committee.

## 2.4.1 College of Engineering COOP Coordinator

1. Coordinated the revival of the College of Engineering COOP program 1997
2. Ran several meetings with the department managers to outline rules/procedures
3. Coordinated with the Dean and the Office of Career Services on issues of policy and administration of the COOP program
4. Worked with the department coordinators on issues of students activities and jobs
5. Worked with local companies on advertising and recruitment of students and jobs
6. Published the first coop manuals for students and companies
7. Ran the COOP and Internship Fair in April 98. More than 400 students and 30 companies participated.
8. The program achieved its initial goal of 10% of students in the engineering college during the first year of its implementation

## 2.5 Service to the University

1. Faculty Senate representative from the ME department Spring 2005

21

2. Coordinator of the Graduate Certificate Program: Design and Manufacturing Engineering
3. Member of the Committee for "Strategic Plan to Strengthen Lowell 1998-2005 Development Plan", Chaired By Professor Best.
4. Member of the Committee for Manufacturing option for the MBA degree for the College of Management
5. Member of the Chancellor's Federation for the Industrial Economy
6. Member of the ARPA Technology Reinvestment Program proposal Committee of Industrial Extension, Commonwealth of Mass.
7. Member of the ARPA Technology Reinvestment Program proposal Committee, Southern New England Academy
8. Member of the Work Environment Pilot effort on technology review of fatal accidents
9. Assisted in the College of Management Re accreditation process

# E. TEACHING
## 1. Principal Thesis / Project Advising:
## 1a. Completed, Mechanical Engineering Department (19 students)

1. Optimal Reliability Design Method for Remote Solar Systems", Nuchida Suwaparet, Doctor of Mechanical Engineering Thesis, September, 2005
2. "Bio Solar House", Ittipon Tungaray, Master's of Mechanical Engineering Thesis, September 2004; Committee Member
3. "Comparison Of The Performance Of U.S. And Japanese Aluminum Bats Using U.S. And Japanese Test Protocols", Shintaro Nabeshima, Master's of Mechanical Engineering Thesis, May 2004; Committee Member
4. "Experimental and Finite Element Study of the Design Parameters of Baseball Bas", Gayatri Vedula, Master's of Mechanical Engineering Thesis, May 2004; Committee Member
5. "Characterization of the effects of use and Moisture Content on Baseball Bats..."; Patrick Drane; Master's of Mechanical Engineering Thesis, March 2003; Committee Member
6. "Design for Reliability, Remote Communication system using solar power", Nuchida Suwapaet, ; Master's of Mechanical Engineering Thesis, November 2002; Committee Member
7. "Lead Free Soldering". Hemant Belbase, Master's of Mechanical Engineering Thesis, September 2000.
8. Terence Lee Master's of Mechanical Engineering Thesis, Committee Member; 1999
9. "Additive PCB Fabrication Technology", Dennis, Gagne, Master's of Mechanical Engineering Thesis, May 1998.
10. "NO Clean SMT Paste for PCB Assembly,", Doug Summer, Master's of Mechanical Engineering Thesis, May 1997.
11. "Failure Prediction Analysis in Machining Pin Fin Heat Sinks, Hoke Bullard, Master's of Mechanical Engineering Thesis, May 1997 (committee member)

22

12. "A study of high speed, high volume product assembly process with respect to scrap reduction issues", Lisa Silva, Master's of Mechanical Engineering Project, December 1996
13. "A paperless system for manufacturing assembly automation", Farzad Majzoubi , Master's of Mechanical Engineering Project, December 1996
14. "Optimization of a touchscreen sensor manufacturing process", Julie Kimble, Master's of Mechanical Engineering Project, December 1996
15. "Experimental design of an injected mold RF insulation Material ", Steve Paradis,  Master's of Mechanical Engineering Project, May 1996
16. "Development of a no clean soldering flux", Paul Hailey, Master's of Mechanical Engineering Thesis, completed May 1994,
17. "Developing a tolerance analysis methodology with case studies", Sreedhar Godula, Master's of Mechanical Engineering Project, completed 8/93.
18. "Design of an aircraft industry riveting system", Kurpad Ram, Master's of Mechanical Engineering Thesis, completed 6/92.
19. "Optimization of the performance of the weldlines in injection molded products using robust design methods", Srinath Narayan, Master's of Mechanical Engineering Thesis, completed 5/92.

1b. In Progress, Mechanical Engineering Department (1 student)
1. "Developing Vias Build Up Methodology for Additive Technologies in the Printed Circuit Wiring Board (PWB) Fabrication Industry", Manmeet Grover

1c. Completed, MMS In Manufacturing Engineering Program (17 students)
1. "Just-In-Time Manufacturing in a regulated industry", Nasser Heshmatpour, Master of Manufacturing Engineering Project, completed 5/92
2. " Concurrent Engineering for the Defense Industry", John Hart, Masters of Manufacturing Engineering Thesis, completed May 1992
3. "Implementation of ISO 9000 in American Manufacturing Companies", Mark Alpert, Masters of Manufacturing Engineering Project, completed December 1991
4. "Optimizing IC Welding", Bob Mullins, Masters of Manufacturing Engineering Project, completed December 1991
5. "Simulation of Assembly Systems using SAIMAN", Bill Guest, Masters of Manufacturing Engineering Thesis, completed December 1991
6. "Simulation Language Applications In Job Shop Scheduling", Nancy Barnes, Masters of Manufacturing Engineering Project, completed December 1991
7. "Design for Robotics Assembly", George Lloyd, Masters of Manufacturing Engineering Project, completed December 1991
8. "An Algorithm for conversion of Printed Circuit Board from Through Hole to Surface Mount Technology", Suzan Lanza, Masters of Manufacturing Engineering Project, completed December 1991.
9. "Eliminating CFC's from Electronic Manufacturing Processes", Betty Drake, Masters of Manufacturing Engineering Project, completed December 1991
10. "Technical training program for engineering computer tools", Norm Fisk, Masters of Manufacturing Engineering Project, completed May 1991

23

11. "Process Optimization in Distribution Systems", Ven Cen Chang, Masters of Manufacturing Engineering Project. completed May 1991. Mr Chang was nominated the outstanding graduate student in the Industrial Technology Department.
12. "Optimization of Stress Testing using Taguchi Method", Sana Wakim, Masters of Manufacturing Engineering Project, completed May 1991
13. "Expediting in a Job Shop", Jean Shine, Masters of Manufacturing Engineering Thesis, Completed 9/90.
14. "Evaluations and Implementation of Terpene as a Printed Circuit Cleaning Solvent" Greg Hamblet, Masters of Manufacturing Engineering Thesis, Completed 5/90.
15. "Optimized Processing and Cleaning of Hybrid Integrated Circuits", Keith Capulli, Masters of Manufacturing Engineering Project, Completed 4/90.
16. "Optimizing The Wave Soldering Process for Mixed Technology of Through Hole and SMT Components", James Wu, Masters of Manufacturing Engineering Project, Completed 12/89.
17. "Design of a Wheel Chair Carry-On", James Jollife, Masters of Manufacturing Engineering Project , Completed 4/89.

**1d. Thesis / Project Advising, other Engineering Departments**
1. "A study on the effect of process parameters on the spring constant of a manometer spring", Samir Seth, master of Plastics Engineering, Thesis Committee, April 2001

**2. Courses taught**
2.1 Graduate

| | | |
|---|---|---|
| 22. 571 | Concurrent Engineering | 7 years |
| 22.575 | Industrial Design of Experiments | 7 years |
| 20 525 | Computer Integrated Manufacturing (CIM) | 3 years |
| 20.572 | Design for Manufacture | 3 years |
| 20.575 | Robust Design | 1 year |
| 20.710 | Graduate Seminar | 1 year |

2.2 Undergraduate Courses

| | | |
|---|---|---|
| 22.424 | Capstone Projects | 2 years |
| 22.472 | Manufacturing Systems & Processes | 2 years |
| 22.473 | Design for Manufacture | 3 years |
| 22. 202 | Mechanical Design Laboratory II | 1 year |
| 20.202 | Industrial Computer Science. | 10 years |
| 20.303 | Manufacturing Systems | 5 years |
| 20.407 | Instrumentation and Process Control ( IPC )) | 5 years |
| 20.314 | Motion and Time Study | 5 years |
| 20.309 | Process control | 20 years |
| 20.408 | Microprocessors | 23 years |
| 20.315 | Plant Layout and Material handling | 7 years |
| | Inventory Control and Material Handling | (discontinued) |
| | Tool Engineering | (discontinued) |

24

## 2.3 Courses Upgraded/developed

Undergraduate Courses

25.108 Introduction to Engineering II. Completely revamped this course since taking it over in the spring semester 2004. Included modules for Microsoft word, excel and powerpoint as well as a module for matlab. Provided for several projects for the first ear students to practice computer programming and presentation tools in a fun and rewarding experience.

25.108 Freshman Manufacturing Module. This a 4week introduction to manufacturing for freshman engineering students

22.472 Manufacturing Systems: New undergraduates course that I developed for Mechanical Engineering Department, Manufacturing Option, spring 1993.

22.473 Design Theory and constraints: New undergraduate course developed for Mechanical Engineering Department, Manufacturing Option, taught in fall 1991.

20.202. Industrial Computer Science. I have changed this course from a FORTRAN Programming course to a one of solving engineering problems.

20.407 Instrumentation and process control (IPC): This course is divided into two sections: traditional control theory and microprocessor programming. I have completely revamped the microprogramming portion with plc.'s

**Graduate Courses**

22. 571. Collaborative Engineering and Quality: A new course that I developed for the Manufacturing Engineering Option for the Mechanical Engineering Masters Program, combining elements of the following graduate courses that I taught at the MMS program.

20. 525 Computer Integrated Manufacturing (CIM). This course was previously taught over two semesters by guest lectures. Using my notes, I have revamped and consolidated the course into one semester.

20.575. Robust Design. The course deals with the subject of Design of Experiments and the Taguchi Method.

## 2.4 Teaching Load

| Course | Course Title | Contct Hours | Credit Hours | Enrol ment | Total StudentH | Total Credit Hours |
|---|---|---|---|---|---|---|
| 2004/2005 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 Design Constraints | 3 | 3 | 27 | 81 | 81 |
| IG | 22.571 CE/Quality | 3 | 3 | 7 | 21 | 21 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 2003/2004 | | | | | | |
| 1st semester | | | | | | |
| 4U | 22.473 Design Constraints | 3 | 3 | 31 | 93 | 93 |
| IG | 22.571 CE/Quality | 3 | 3 | 7 | 21 | 21 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 2nd semester | | | | | | |
| 1U | 25.108 Freshman Design | 2 | 2 | 65 | 130 | 130 |
| 4U | 22.423 Capstone | 3 | 3 | 16 | 48 | 48 |

25

| | | | | | | |
|---|---|---|---|---|---|---|
| 1G | 22.575 Ind. Design Expts | 3 | 3 | 14 | 42 | 42 |

**2002/2003**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 36 | 108 | 108 |
| IG | 22.571 CE/Quality | 3 | 3 | 16 | 48 | 48 |
| 4U | 22.423 Capstone | 3 | 3 | 2 | 6 | 6 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.423 Capstone | 3 | 3 | 20 | 60 | 60 |
| 1G | 22.575 Ind. Design Expts | 3 | 3 | 26 | 78 | 78 |

**2001/2002**
1st semester
Sabbatical

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 20 | 60 | 60 |
| 4U | 22.423 Capstone | 3 | 3 | 4 | 15 | 15 |
| 4U | 22.473 Design Constraints | 3 | 3 | 16 | 48 | 48 |

**2000/2001**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 20 | 60 | 60 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 30 | 90 | 90 |
| 4U | 22.423 Capstone | 3 | 3 | 5 | 15 | 15 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.108 Intro Eng DFQ (3w) | 3 | 2 | 50 | 100 | 100 |
| 4U | 22.423 Capstone | 3 | 3 | 3 | 9 | 9 |
| 1G | 22.571 CE/Quality | 3 | 3 | 18 | 54 | 54 |

**1999/2000**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 28 | 71 | 71 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 12 | 36 | 36 |
| 4U | 22.423 Capstone | 3 | 3 | 12 | 36 | 36 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.108 Intro Eng DFQ (3w) | 3 | 2 | 42 | 84 | 84 |
| 4U | 22.424 Capstone | 3 | 3 | 7 | 21 | 21 |
| 1G | 22.571 CE/Quality | 3 | 3 | 27 | 91 | 91 |

**1998/1999**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 Design Constraints | 3 | 3 | 20 | 60 | 60 |
| IG | 22.575 Ind. Design Expts. | 3 | 3 | 15 | 45 | 45 |
| 4U | 22.423 Capstone | 3 | 3 | 5 | 15 | 15 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 Capstone | 4 | 3 | 9 | 36 | 27 |
| 1G | 22.571 CE/Quality | 3 | 3 | 15 | 45 | 45 |

**1997/1998**
1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 DFM | 3 | 3 | 20 | 60 | 60 |

26

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.424 | Capstone | 2 | 2 | 30 | 60 | 60 |
| 4U | 22.423 | Capstone | 4 | 4 | 10 | 40 | 40 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 | Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 | Capstone | 4 | 4 | 8 | 32 | 32 |
| 1G | 22.571 | CE/Quality | 3 | 3 | 25 | 75 | 75 |

Summer semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.423 | Capstone | 2 | 2 | 10 | 20 | 20 |

1996/1997

1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 | DFM | 3 | 3 | 23 | 69 | 69 |
| 4U | 22.423 | Capstone | 2 | 2 | 13 | 26 | 26 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 | Intro Eng DFQ (3w) | 3 | 2 | 40 | 80 | 80 |
| 4U | 22.424 | Capstone | 4 | 4 | 7 | 28 | 28 |
| 1G | 22.575 | DoE | 3 | 3 | 25 | 75 | 75 |

Summer

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.423 | Capstone | 2 | 2 | 10 | 20 | 20 |

1995/1996

1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 | Intro Eng DFM (3w) | 3 | 2 | 170 | 72 | 48 |
| 4U | 22.473 | DFM | 3 | 3 | 33 | 99 | 99 |
| 4U | 22.423 | Capstone | 2 | 2 | 7 | 14 | 14 |
| 1G | 22.571 | Concurrent Eng. | 3 | 3 | 25 | 75 | 75 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 | Intro Eng DFQ (4w) | 3 | 2 | 170 | 145 | 97 |
| 4U | 22.423 | Capstone | 4 | 4 | 7 | 28 | 28 |
| 4U | 22.473 | DFM | 3 | 3 | 16 | 48 | 48 |
| 1G | 22.575 | DoE | 3 | 3 | 25 | 75 | 75 |

1994/1995

1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 | Intro Eng DFM (3w) | 3 | 2 | 170 | 109 | 73 |
| 4U | 22.473 | DFM | 4 | 3 | 17 | 68 | 51 |
| 4U | 22.423 | Capstone | 2 | 2 | 4 | 26 | 26 |
| 1G | 22.571 | Concurrent Eng. | 3 | 3 | 19 | 57 | 57 |

2nd semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 1U | 25.105 | Intro Eng DFQ (4w) | 3 | 2 | 170 | 145 | 97 |
| 1U | 25.105 | Fortran (6w, 2 cls) | 3 | 2 | 30 | 39 | 26 |
| 4U | 22.483 | Capstone | 4 | 4 | 4 | 52 | 52 |
| 2U | 22.211 | Statics | 3 | 3 | 22 | 66 | 66 |

1993/1994

1st semester

| | | | | | | |
|---|---|---|---|---|---|---|
| 4U | 22.473 | DFM | 4 | 3 | 17 | 68 | 51 |
| 4U | 22.483 | Capstone | 2 | 2 | 13 | 26 | 26 |
| 1G | 22.571 | Concurrent Eng. | 3 | 3 | 19 | 57 | 57 |

2nd semester

27

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4U | 22.472 | Manuf Systems | | 3 | 3 | 17 | 68 | 51 |
| 4U | 22.423 | Capstone | | 4 | 4 | 13 | 52 | 52 |
| 2U | 22.202 | Mech. Design Lab. | 3 | 2 | 60 | 180 | 180 |

**1992/1993** 1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4U | 20.407 | IPC | | 3 | 3 | 37 | 111 | 111 |
| 4U | 20.407 | IPC Lab | | 2 | 1 | 37 | 37 | 37 |
| 4U | 22.473 | DFM | | 3 | 3 | 17 | 51 | 51 |
| 4U | 22.483 | Capstone | | 4 | 2 | 4 | 8 | 8 |

2nd semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4U | 22.472 | Manuf Systems | | 3 | 3 | 8 | 24 | 24 |
| 4U | 22.423 | Capstone | | 4 | 2 | 4 | 8 | 8 |

**1991/1992**
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | CIM | | 3 | 3 | 28 | 84 | 84 |
| 4U | 20.407 | IPC | | 3 | 3 | 55 | 165 | 165 |
| 4U | 20.407 | IPC Lab | | 2 | 1 | 55 | 110 | 55 |
| 4U | 22.473 | DFM | | 3 | 3 | 12 | 36 | 36 |

2nd semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.573 | | DFM | 3 | 3 | 45 | 135 | 135 |
| G | 20.575 | | Robust | 3 | 3 | 42 | 126 | 126 |
| G | 20.710 | | Seminar | 3 | 3 | 15 | 45 | 45 |

**1990/1991**
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | | CIM | 3 | 3 | 26 | 78 | 78 |
| 4U | 20.407 | | IPC | 3 | 3 | 60 | 180 | 180 |
| 4U | 20.407 | | IPC Lab | 2 | 1 | 60 | 180 | 60 |

2nd semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.573 | | DFM | 3 | 3 | 32 | 96 | 96 |
| G | 20.575 | | Robust | 3 | 3 | 25 | 75 | 75 |

**1989/1990**
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | | CIM | 3 | 3 | 25 | 75 | 75 |
| 4U | 20.407 | | IPC | 3 | 3 | 35 | 105 | 75 |
| 4U | 20.407 | | IPC Lab | 2 | 1 | 35 | 105 | 35 |

2nd Semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.572 | | DFM. | 3 | 3 | 30 | 90 | 90 |
| 2U | 20.202 | | Ind. Comp. | 3 | 3 | 16 | 48 | 48 |

**1988/1989**
1st semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.525 | | CIM | 3 | 3 | 19 | 57 | 57 |
| 4U | 20.407 | | IPC | 3 | 3 | 45 | 135 | 135 |
| 4U | 20.407 | | IPC Lab | 2 | 1 | 45 | 135 | 45 |
| 2U | 20.202 | | Ind. Comp.. | 3 | 3 | 55 | 165 | 165 |

2nd Semester

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G | 20.572 | | DFM. | 3 | 3 | 27 | 81 | 81 |

28

| 4U | 20.407 | IPC* | 3 | 3 | 30 | 45 | 45 |
| 4U | 20.407 | IPC Lab* | 2 | 1 | 30 | 45 | 15 |
| 2U | 20.202 | Ind. Comp. | 3 | 3 | 18 | 54 | 54 |

29

**2.5 Specific programs in which faculty member participated to improve teaching and competence.**

**In the last 3 years**

Attended following Seminars and training courses:

1. Apex Conference; Anaheim, CA, February 2004-05
2. ASME Manufacturing Conference, Chicago; March 2003
3. Product Life Management (PLM) , Chicago, IL, November 2002
4. SMT International, Chicago IL, September 1999-2005
5. Engineering Design Conference; London; July 2002

**In prior years**

1. Technicon University, Cape town South Africa March 1999
2. ICED, Munich Germany, August 1999
3. ASME WAM, Nashville, November 1999
4. CEA, (Coop Education Association); Salt lake City, UT, June 2000
5. Workshop on Modeling and Data Needs for Lead-Free Solders, sponsored NEMI, NIST, NSF, and TMS, Thursday, February, 2001, New Orleans, LA,
6. Etronix Conference, Anaheim, CA , February 2001
7. CEA (Coop Education Association), Atlanta, GA, March 2001
8. MRS (Materials Research Society), Boston, MA, November 2001
9. SMT soldering, SUNY, Binghampton, New York, 5/88.
10. Witness Simulation Training, Lowell MA, 4/89
11. Computer Integrated Manufacturing, Hewlett Packard, 6/88
12. Axiomatic Theory of Design, MIT, 7/88
13. Taguchi Methods Conference, ASI, Detroit MI, 1989-1990
14. NEPCON West, Los Angles, California, 1989 - 1999
15. NEPCON Singapore, 1991, 1993
16. NEPCON Australia, 1998
17. NEPCON EAST, Boston, 1989-1999
18. NEPCON SOUTHEAST, Florida and Texas, 1989, 1998
19. IPC, San Diego CA, 1990
20. British Electronic Week, Birmingham, England, 1991
21. SMT International, San Jose CA, 1991-1995
22. IEEE Advanced Semiconductor Manufacturing Conference, 1991
23. SME International Conference on Education, San Diego, 1996
24. Puerto Rico Technical University SMT Conference, 1995-1997
25. ASME Winter Annual Conference, 1991-1999

**2.6 Teaching Effectiveness**

Rated in the highest rank by students and fellow faculty members from the University of Massachusetts Lowell and other engineering faculty from around the country. I submit he following facts in this session and in appendix C to substantiate this claim

1. Undergraduate and graduate student feedback is always rated at the top of all items.

30

2. All my undergraduate manufacturing option courses in the Mechanical Engineering Program are heavily oversubscribed.

### 2.6.1 Ratings by UML ME Students evaluations in the last 4 years:

My students always gave me excellent reviews of my courses, both at the Undergraduate and the graduate levels. I am enclosing the results of the my students evaluations for last two years to demonstrate. These are the summaries of student evaluations taken at the last day of the semester. The y were collected by fellow students and delivered to the department according to the rules.

As can be seen by the many positive comments, my students rate my efforts as well as my courses as being mostly exceptional and very effective. For the last three years I received the following evaluations:

**1997**
22.473 Design Theory and Constraints; Undergraduate (19 students):
Rating of instructor 14  excellent        4 good        1 average        0 bad
22.423 capstone; Undergraduate (8 students):
Great experience, Thank you very much
**1998**
22.473 Design Theory and Constraints; Undergraduate (29 students):
Rating of instructor 19 excellent        9 good        1 average        0 bad
Rating of course    22 Effective    7 relative Eff.    0 Barely Eff.    0 not worth it
22.423 capstone; Undergraduate (5 students) :
Great capstone, found it information and educational, applied studies to real world solutions. I enjoyed working with Professor Shina, This was a great experience.
22.575 Design of Experiments; Graduate (16 students)
Rating of instructor 9 excellent    6 good        2 average        0 bad
Rating of course    11 Effective    5 relative Eff. 0 Barely Eff.    0 not worth it
**1999**
22.473 Design Theory and Constraints; Undergraduate (27 students):
Rating of instructor 12 excellent    6 good        9 average        0 bad
Rating of course    13 Effective    9 relative Eff.    4 Barely Eff.    0 not worth it
22.423 capstone; Undergraduate (11 students) :
Great experience, Shina was helpful; structured meetings, thanks for being open; I found out that this is not the type of manufacturing career I want
22.575 Design of Experiments; Graduate (11 students)
Rating of instructor 4 excellent    7 good        0 average        0 bad
Rating of course    6 Effective    5 relative Eff. 0 Barely Eff.    0 not worth
**2000**
22.423 capstone; Undergraduate (5 students):
Great Capstone, found it informational and educational, applied studies to real world solutions, I enjoyed working with professor Shina, This is a great industrial experience

31

## 2.7. Mentoring of students

The best proof of appreciation by the students is their letters of support obtained during a long teaching career. **Some comments and quotes written by former students:**

-You did an excellent job of keeping us up to date on recent trends in the areas of PCB

-I was impressed with the hands on project work you encouraged them to do

-Shina is far more than a great professor. His ambition, loyalty and dedication to his students reaches beyond that which my education at Lowell has lead me

-I can honestly say that without personal support, encouragement, advice and coaching I received from Dr. Shina during and after my college career, I would never have made so far in business so quickly

-You are one of the most talented instructors at UML. It is very rare to see instructors care for their students as you have

-Shina enabled me to gain the experience and knowledge I needed to seek employment. He is sincerely concerned about his students, and goes out of his way to help them in any way he can, either in the classroom, or a professional work environment. (he) is an excellent professor, advisor and friend to many students.

- His teaching style created and maintained interest by the students. He welcomed comments and dissenting opinion which were always grounds for further class discussions....(He) is an advocate for the students and a credit to the profession and the University.

-I benefited from his vast knowledge of the latest manufacturing trends....He also extended himself to reach students beyond the classroom and help them in their professional career.

-Shina is a credit to the academic excellence of the faculty....Thank you for the time and for the education you have provided me with...

-My successes are a direct result of Shina understanding of how real world industry works and what types of skills employers desire. He is able to skillfully guide a hard working student along a path that allows them to piece the experience and academics together necessary to become an immediate contributor to world class manufacturers.

-Professor Shina works to ensure that his students take the initiative in their professional growth before they leave the university and uses his industry contacts
to assist in placing students in (jobs).

-he has not only been an excellent professor, but also a supportive friend

-I feel that he had taught me many different tools that I still use today in everyday work... (he) also found me an internship as an ME through his many contacts...

-My success in the semi-conductor industry is in many ways attributable to Shina's instruction at UML...His (courses) gave me insight into ...techniques that I have put to practical use countless times. My boss...cited my experience ...gained during capstone project as one of the actor that convinced him to hire me

32

-He helped me with my resume, helped to build to build my personality, and directed me in a career path that I travel to this day....(his) characteristics are...intelligence, patience, integrity, knowledge, dependability and ability to teach...

-Shina is concerned with the welfare of his students, and he has taken time to counsel them and support them in their career research. He provided advice to many of my classmates individually on improving their resumes, and he was an invaluable resource because f his industry knowledge and networking contacts at many different local companies. He has assisted many of his students with finding successful careers.

-My association with Shina has continued throughout my professional career. He has been involved at work projects at two of my post graduate companies...his knowledge of state of the art PC assembly and design techniques has made him a valuable resource to myself and many of my colleagues over the years.

-his class was very instructional and well taught, and I have used many of these principles and methods he emphasized in my work as a design engineer.

-I have seen Shina help so many of his students obtain jobs. He makes the whole process so much easier for he students, He has helped in so many ways and I am sure he will continue to help me in the future. Students in the ME department are very fortunate to have a professor like him.

-My employment opportunity was due to a large part to the courses I was fortunate enough to partake with professor Shina (courses)

-Only after completing my course of study at Lowell did it became aware to me just how important these (shina) courses are..

-Not only is he clear, up to date on current industrial concepts and trends, and very open to questions and discussions, but he also displays a genuine interest and concern for his students after they have moved on to pursue their careers

- Dr. Shina has a magical presence in the class.  Classes were very lively with interaction between everyone in the class.  As a student with "zero" industry experience I had a wonderful opportunity to meet and interact with dozens of students from industry.

**2.8 Help with Industry Contacts to secure Manufacturing Jobs for UML ME Students**

I have made it a personal goal of mine to make sure that UML ME graduates are gainfully employed in the local economy. Approximately 50 % of the ME undergraduate students become directly employed in manufacturing or manufacturing related industries. I am enclosing the job survey for the ME graduates for the last four years. My thesis or capstone students and those who went to manufacturing jobs are highlighted. The list shows that I have advised the largest number of students in the manufacturing area in the Master's program.

**2.9 ME Personnel Committee Academic Review  (PMYR 2001)**
Received an accepted rank as follows:

33

**Teaching:** He has a heavy load primarily at the graduate level. He is invaluable in teaching and coordinating our capstone design courses

**Service:** He is the College COOP coordinator. He also does a lot of unsung work connecting our students and graduates up with contacts in industry. He is active in the professional societies

**Research:** He has an extensive record of funded research and publications. He is the author or two books and completing a third.

34

TAB B



FIG. 1.



## Quick-Tilt
# CONSTANT FORCE SYSTEM

Quick-Tilt® is quiet, corrosion-resistant and comes preassembled to easily install in residential, tilt-window applications. For quick assembly, it was designed for the pivot bar to easily drop-in and tie-in to the carrier. Its alternating coil design prevents cantilevering or twisting of the carrier that can diminish locking performance. Quick-Tilt® remains hidden during normal sash operation, requires no adjustment and, of course, performs reliably. It is rated Class 2 on the American Architectural Manufacturers Association (AAMA) Verified Components List.

**COVER (OPTIONAL)**
Encloses spring assembly.
Minimizes contamination
by debris.

**PREASSEMBLED STAINLESS STEEL SPRINGS**
Greaseless, corrosion-resistant springs uncoil against each other in opposite directions to minimize friction and maximize smooth, silent operation.

**BUMPER (OPTIONAL)**
Used in place of a stop.
Prevents carrier from
colliding with spring
assembly.

**DIE CAST METAL CAM**
For strength and durability.

**TAMPERLOK (RECOMMENDED)**
This safety feature, when snapped into
the carrier, prevents the homeowner
from accidentally detaching the sash.

**TIE-IN PIVOT BAR**
When seated in the carrier, it secures
the sash to the frame, preventing the
sash from accidentally detaching or
falling out.

Fig. 2.

# Quick-Tilt*nc
### CONSTANT FORCE BALANCE



**CALDWELL**
Build on it.

## *"New Construction" friendly Quick-Tilt®*

If new construction debris was holding you back from considering a Constant Force balance, you now have a dependable solution with Caldwell's **Quick-Tilt*nc** balance.



Caldwell's pre-assembled **Quick-Tilt** Constant Force balance just got better with its evolution to the **Quick-Tilt*nc** – or "new construction" friendly version. Until now most Constant Force balances weren't ready for the abuse caused by construction site dust and debris. With the launch of **Quick-Tilt*nc**, air-borne contaminants are kept from lodging inside the moving coil assembly. The integrated coil nest and cover is specifically engineered to keep the coils dust-free and operating in the smooth, quiet manner for which **Quick-Tilt** balances are renowned.

**Call us at 585-352-3790. Let's talk about <u>your</u> window.**

FIG. 3.



Fig.4.



Series 86xt
# BLOCK & TACKLE SYSTEM

The Caldwell Series 86xt is a result of our long tradition of continuous improvement in design, engineering and manufacturing. It is built for sideload applications in both residential and commercial windows and is rated Class 2 on the American Architectural Manufacturers Association (AAMA) Verified Component List. The Series 86xt is designed to allow for quick and easy removal of the sash. Because it rides with the sash, the balance is hidden from view during operation. In addition, the Series 86xt is engineered to allow for an additional 1" of sash opening (egress). Often this can reduce inventory by moving to all-even or all-odd channel lengths.



**GALVANIZED STEEL CHANNEL**
Provides maximum strength, corrosion resistance and durability.

**HEMMED EDGES**
For greater safety when handling.

**RE-ENGINEERED BOTTOM GUIDE**
Specially designed to allow for application advantages in PVC welded sash. The sash side contact area has been lengthened, creating an option to increase sash opening.

**SPRINGS BY CALDWELL**
We've made our own springs for over 100 years, continually improving our manufacturing process to deliver high quality and consistent performance.

**MUSIC WIRE**
This high-quality material is more fatigue-resistant and has a greater consistency of performance than the hard-drawn and oil-tempered steel commonly used by other balance manufacturers.

**STAMPED METAL**
Our parts are made of stamped metal for maximum durability.

**GUIDE BLOCK**
Designed to dampen sound during operation and prevent twisting of the tackle.

**INDEPENDENTLY ROTATING PULLEY WHEELS**
Selected specifically for their lubricity, low frictional characteristics and resistance to developing flat spots, allowing for remarkably smooth and consistent operation.

**SELF-ALIGNING STAINLESS STEEL HOOK**
The balance mounting hook is positively parked in a fixed position when retracted. Installation into the window is easier than ever. Pull-off strength of the corrosion-resistant crimped terminal exceeds maximum load by more than 2 times. The low profile of the hook minimizes clearance issues, and only requires a single jamb punch.

Fig. 5.

C000499

1. D
12. G
13. B
18. D

FIG. 6.



# CALDWELL

## Series 86xt
### BLOCK & TACKLE SYSTEM

Extended travel
for sideload applications

C000498



FIG. 8.



Fig 9



FIG. 10.

Confidential -- Attorneys' Eyes Only

CL017418



Fig 11.



# Series 97i
# BLOCK & TACKLE SYSTEM

The Caldwell Series 97i is a result of our long tradition of continuous improvement in design, engineering and manufacturing. It is built for tilt applications in both residential and commercial windows and is rated Class 2 by the American Architectural Manufacturers Association (AAMA). Caldwell invented the Inverted Balance design which brings significant benefits to the Block & Tackle user. Designed to ride with the sash, the balance is hidden from view during operation. So, no jambliner is required. The attached carrier provides for faster installation thereby reducing labor costs. And, the design maximizes the all-important egress opening.



**ATTACHED CARRIER DESIGN**
No assembly required. Design allows for faster installation and easier field change-out.

**GALVANIZED STEEL CHANNEL**
Provides maximum strength, corrosion resistance, and durability.

**ROUNDED CORNERS**
For handling safety, our steel channel has gently rounded corners.

**SPRINGS BY CALDWELL**
We've made our own springs for over 100 years, continually improving our manufacturing process to deliver high quality and consistent performance.

**GUIDE BLOCK**
Designed to dampen sound during operation and prevent twisting of the tackle.

**MUSIC WIRE**
This high-quality material is more fatigue-resistant and has a greater consistency of performance than the hard-drawn and oil-tempered steel commonly used by other spring manufacturers.

**STAMPED METAL**
Our parts are made of stamped metal for maximum durability.

**INDEPENDENTLY ROTATING PULLEY WHEELS**
Selected specifically for their lubricity, low frictional characteristics and resistance to developing flat spots, allowing for remarkably smooth and consistent operation.

**SELF-ALIGNING STAINLESS STEEL TERMINAL**
The terminal automatically aligns itself for quick installation. This corrosion-resistant material is crimped onto the cord ends. Pull-off strength exceeds maximum load by more than 2 times.

Fig 12

C000491

# EXHIBIT 8

00001
1           UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3               NO. 05-CV-10020 (DPW)

4    *****************************************

5    AMESBURY GROUP, INC., and AMESBURY    *

6    SPRINGS LTD.,                    *

7                        *

8        Plaintiffs,          *

9                        *

10   v.                    *

11                        *

12   THE CALDWELL MANUFACTURING COMPANY,   *

13       Defendant.          *

14   *****************************************

15       DEPOSITION OF SAMMY G. SHINA, Ph.D., PE,

16   taken pursuant to the applicable provisions of

17   the Federal Rules of Civil Procedure, before

18   Susan L. Prokopik, Registered Merit Reporter and

19   Notary Public in and for the Commonwealth of

20   Massachusetts, at the offices of Goodwin Procter

21   LLP, Exchange Place, Boston, Massachusetts, on

22   Wednesday, May 3, 2006, at 9:07 a.m.

23

24

00002
1    APPEARANCES:

2

     ON BEHALF OF THE PLAINTIFFS:
3
     JORDAN M. SINGER, ESQ.
4      Goodwin Procter LLP
       Exchange Place
5      Boston, MA  02109
       (617) 570-1000
6

7
     ON BEHALF OF THE DEFENDANT:
8
     NEAL L. SLIFKIN, ESQ.
9      Harris Beach PLLC
       99 Garnsey Road
10     Pittsford, NY  14534
       (585) 419-8800
11

12    ALSO PRESENT:

13     Charles E. Still

14

15

16

17

18

19

20

21

22

23

24

00242

1    received by the U-shaped channel?

2  A.  Portion of the frame of the balance shoe, just to

3      make sure?

4  Q.  Yes.

5  A.  Yes.

6  Q.  Is that the second end that's adapted to be

7      received by the U-shaped channel?

8  A.  Correct.

9  Q.  Is there a pocket positioned in the second end of

10     the frame adapted to mate with a rivet?

11  A.  Just want to make sure.

12         Oh, I must have it -- oh, I was looking

13     at the wrong place.  Figure 11.  If I may just --

14     just make sure that I'm following.

15         Yes.

16  Q.  Okay.  In the Still Exhibit 20, can you indicate

17     to me where the pocket is in this Still 20?

18  A.  Right.  As I mentioned -- and this looks very

19     similar to this.  I'll put them together.  And

20     the two G's, as I mentioned, it is this pocket

21     right here.

22  Q.  Can you describe what it looks like on the actual

23     device?

24  A.  I have to look without my glasses.  There's like

00243

1    a shape, a shape which is -- the bottom surface

2    of this end is not smooth and there's a shape

3    which envelopes or runs around the rivet.

4  Q. Okay. So the pocket is an opening that's

5    surrounding that rivet?

6        MR. SINGER: Objection.

7  A. Well, the correct term that I want to use is --

8    whenever we use the word "pocket" in this patent

9    '368, I refer to -- to the US District Court

10    claim construction of the word "pocket."

11  Q. What is that construction?

12  A. Reading from my report on page 44, if I may, The

13    disputed term "pocket," to be constructed as

14    quote, notch with an opening shaped to mate, i.e.

15    to join or fit together, with a rivet, thereby

16    aiding to secure the balance shoe within the

17    U-shaped channel of the inverted window balance.

18  Q. Do you find that, what you have just read, as the

19    definition of pocket in Still Exhibit 20

20    somewhere?

21  A. That's correct. That's the one I pointed to here

22    and I point to as -- in my own -- in my own

23    report as figure 11.2G.

24  Q. Okay. Is there a rivet in Still Exhibit 20 that

00244

1    is mating with the pocket?

2  A.  Yes.

3  Q.  In Exhibit 20, can you point that out to me?

4    Still Exhibit 20.

5  A.  Right.  Just want to make sure it's consistent --

6        MR. SINGER:  I'll object to the

7    question.

8  A.  I want to make sure.  I have it here as 2G.  I'm

9    trying to read what is 2G here.

10        Okay.  Okay.  Okay.  As I refer to 2J,

11    J, is the notch -- is the rivet where the notch

12    was adapted to mate with --

13  Q.  And in the Still Exhibit 20, can you point to me

14    where that rivet is?

15  A.  Right here.

16  Q.  Okay.  You're indicating the lower-most rivet in

17    that balance; is that correct?

18  A.  That's correct.

19  Q.  The rivet that is near the end of the channel,

20    not the rivet that's closer to the center of the

21    channel; is that correct?

22  A.  That's correct.

23  Q.  Okay.  All right.  And in your view, that rivet

24    is mated with the pocket; is that correct?

# EXHIBIT 9

GOODWIN | PROCTER

Douglas J. Klinel, Esq.
617.570.1209
dkline@goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

December 18, 2006

**By Facsimile (585-419-8801)**

Neal L. Slifkin, Esq.
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534

Re:    **Amesbury Group, Inc.,** *et al.* **v. The Caldwell Manufacturing Company**
       **C.A. No. 05-10020-DPW, District of Massachusetts**

Dear Neal:

        Following up on the telephone discussion we just had, let me ask again that you send us a sample of Caldwell's 97i(H) balance. As you know, Amesbury requested production of a sample balance during discovery in this case, but Caldwell agreed only to make one available for inspection. We have renewed our request that you send us a sample Caldwell 97i(H) balance several times since the Court's November 2, 2006, Memorandum and Order. In fact, during our discussion following the December 12, 2006, hearing we again asked for a sample 97i(H) balance and I understood that you were going to send us one. As you know, we have never received any sample of Caldwell's 97i(H) balance.

        Also as we just discussed, I understand that Caldwell has prepared a video that it claims depicts the assembly of a Caldwell 97i(H) balance, and that it plans to submit that video as an exhibit to a motion for summary judgment that the 97i(H) balance does not infringe Amesbury's '368 patent. As you know, you did not invite us to participate in the production of that video or to observe its being made.

        We had understood the Court to direct that the parties should jointly produce a video depicting the assembly of a Caldwell 97i(H) balance. Instead, Caldwell has proceeded unilaterally in this regard. To avoid prejudice to Amesbury, we request again that you send us not only an assembled 97i(H) balance, but that you also send us, unassembled, a sample of each component part of the balance.

                                    Very truly yours,

                                    Douglas J. Kline

1752658

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMESBURY GROUP, INC., and
AMESBURY SPRINGS LTD.,

        Plaintiffs,

    v.

THE CALDWELL MANUFACTURING
COMPANY,

        Defendant.

Civil Action No. 05-10020-DPW

## AMESBURY'S SECOND SUPPLEMENTAL RESPONSE TO
## CALDWELL'S INTERROGATORIES (NOS. 1 - 2, 13 - 16)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs Amesbury Group, Inc. and Amesbury Springs Ltd. (collectively, "Amesbury") hereby provide the following supplemental response to The Caldwell Manufacturing Company's ("Caldwell") Interrogatories.

## GENERAL RESPONSES AND OBJECTIONS

Amesbury hereby incorporates by reference each of the General Objections set forth in Amesbury's Objections and Responses to Caldwell's First Set of Interrogatories (Nos. 1 – 19). These General Objections are incorporated into each of the below Specific Responses and Objections as if set forth there in full, even if not repeated therein:

## SPECIFIC RESPONSES AND OBJECTIONS

## INTERROGATORY NO. 1:

Identify each individual Caldwell product, device, system, process, or service that Amesbury alleges infringes the Patents-In-Suit, and identify the specific claims of the Patents-In-Suit that are allegedly infringed by such product, the persons most knowledgeable and all documents concerning such allegations of infringement.

## RESPONSE:

Amesbury hereby incorporates by reference its previous responses and objections to Interrogatory No. 1. Subject to and without waiving the foregoing incorporated general and

specific objections, Amesbury preliminary states that, in addition to the products previously identified:

a) Caldwell's Quick-Tilt product and its accessory covers, Quick-Tilt*nc product, and all other similarly configured products, however designated, each infringe at least claims 1, 2, 3, and 8 of the '638 Patent;

b) Caldwell's Series 86xt product, and all other similarly configured products, however designated, each infringe at least claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, and 21 of the '264 Patent;

c) Caldwell's Series 97ez product, and all other similarly configured products, however designated, each infringe at least claims 2, 3, 6, 7, 8 and 11 of the '368 Patent; and

d) Caldwell's Series 97i product, Series 97ih product, and all other similarly configured products, however designated, each infringe at least claims 2, 3, 6, 7, 8 and 11 of the '368 Patent.

The Amesbury persons most knowledgeable of the above-listed infringement are Richard Koopmann, Howard Babbitt, and Gary Newman. Furthermore, the documents concerning such infringement are in Caldwell's possession, including the Patents-In-Suit, and documents illustrating and describing the accused Caldwell products.

Amesbury's investigations are ongoing and Amesbury reserves the right to supplement or amend this response.

## INTERROGATORY NO. 2:

Separately for each Accused Caldwell Product and for each claim of the Patents-In-Suit allegedly infringed by such product, using a claim chart format, indicate the element(s) component(s), or step(s) of such Accused Caldwell Product that allegedly meet or satisfy each individual limitation of such claim and specify whether each such limitation is met literally or under the doctrine of equivalents.

## RESPONSE:

Amesbury hereby incorporates by reference its previous responses and objections to Interrogatory No. 2. Subject to and without waiving the foregoing incorporated general and specific objections, Amesbury preliminarily states that the Caldwell products listed in the responses to Interrogatory No. 1 infringe the Patents-In-Suit literally. Should the court adopt a claim construction different from that on which Amesbury relies as establishing literal infringement, Amesbury asserts that those products infringe under the doctrine of equivalents as any such construction must encompass the embodiments disclosed by the patents, and the differences between those embodiments and the accused products are insubstantial.

Subject to and without waiving the foregoing general and specific objections, Amesbury

preliminarily demonstrates this infringement using the claim charts and annotated photographs in Appendices A, B, C, and D, all attached hereto.

## INTERROGATORY NO. 13:

Separately for each Accused Caldwell Product, state the total amount of damages allegedly sustained by Amesbury due to Caldwell's alleged infringement, Amesbury's theory of damages, and the method used to calculate damages including but not limited to whether the calculation is based on lost profits, reasonable royalty, or some other measure of damages, whether Amesbury alleges it is entitled to prejudgment interest on such damages and, if so, the interest rate and how that interest rate was determined and identify the persons most knowledgeable and all documents concerning such calculations.

## RESPONSE:

Amesbury hereby incorporates by reference the general and specific objections to this Interrogatory set forth in its original responses of July 5, 2005. Subject to those general and specific objections, Amesbury supplements its response as follows:

Amesbury has suffered damages from the infringement of its patents by the Caldwell products identified in Amesbury's responses to Interrogatory No. 1. The specific calculation of Amesbury's damages is properly the subject of expert analysis and is premature at this stage. Amesbury is also awaiting from Caldwell the production of additional documents necessary for accurate calculations of its damages. However, Amesbury restates that it is entitled to no less than a reasonable royalty for the use made by Caldwell of the inventions of the patents-in-suit, together with interest and costs, pursuant to 35 U.S.C. §§ 154 and 284. Amesbury is further entitled to a tripling of damages due to Caldwell's willful infringement of Amesbury's asserted patents. Amesbury reserves the right to modify these damages calculations and theories or seek damages under different theories as appropriate in view of the information discovered in this case or expert opinion.

## INTERROGATORY NO. 14:

Separately for each product of Amesbury as to which Amesbury alleges that it suffered damages due to lost sales, lost profits, or price erosion, state all facts concerning such damages, including but not limited to how the damages were calculated, identification of each Accused Caldwell Product alleged to have caused such damages, any alleged demand for the product of Amesbury in the market, the presence or absence of acceptable non-infringing substitute(s), and Amesbury's manufacturing and marketing capability to exploit the alleged demand, and identify the persons most knowledgeable and all documents concerning such facts.

## RESPONSE:

Amesbury hereby incorporates by reference the general and specific objections to this Interrogatory set forth in its original responses of July 5, 2005. Subject to those general and specific objections, Amesbury supplements its response as follows:

Amesbury has suffered lost profits due to the infringement of its patents by the Caldwell products identified in Amesbury's responses to Interrogatory No. 1. The specific calculation of Amesbury's damages, including the calculation of lost sales, lost profits, or price erosion, is properly the subject of expert analysis and is premature at this stage. Amesbury is also awaiting from Caldwell the production of additional documents necessary for accurate calculations of lost profits. However, Amesbury anticipates that the calculation of lost profits due to lost sales or price erosion will be based on prevailing legal and accounting standards, including without limitation the factors set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978). These factors include: (1) demand for the patented products; (2) absence of acceptable non-infringing substitutes; (3) Amesbury's manufacturing and marketing capacity to exploit the demand; and (4) the amount of profit Amesbury would have made.

Pursuant to Federal Rule of Civil Procedure 33(d), Amesbury identifies the following documents as containing information relevant to the *Panduit* factors set forth above: AME 1255 – AME 1273, AME 1501 – AME 1505, AME 1538 – AME 1656, AME 2137 – 2146, AME 2168 – 2169, and AME 2193 – AME 2202.

## INTERROGATORY NO. 15:

Separately for each product of Amesbury as to which Amesbury alleges that it has suffered damages due to lost sales, lost profits, or price erosion, state for each month during the alleged damages period, the number of each such product sold; the number of each such product made; the gross revenues and net revenues on sales on each such product; the gross profits on each such product; the net income or net profit/net income before taxes on each such product; the marginal profit on each such product; the cost of goods sold on each such product; and the fixed and variable costs of each such product; and identify the three (3) persons most knowledgeable and documents sufficient to evidence such facts.

## RESPONSE:

Amesbury hereby incorporates by reference the general and specific objections to this Interrogatory set forth in its original responses of July 5, 2005. Subject to those general and specific objections, Amesbury supplements its response as follows:

Pursuant to Federal Rule of Civil Procedure 33(d), Amesbury identifies the following documents from which information responsive to this interrogatory can be obtained: AME 1501 – AME 1505, AME 1538 – AME 1656, and AME 2193 – AME 2202.

## INTERROGATORY NO. 16:

Separately for each Accused Caldwell Product as to which Amesbury alleges that it is entitled to a reasonable royalty, state all facts concerning such reasonable royalty, including but not limited to how the royalty rate and royalty base were determined, and identify the persons most knowledgeable and all documents concerning such facts.

## RESPONSE:

Amesbury hereby incorporates by reference the general and specific objections to this Interrogatory set forth in its original responses of July 5, 2005. Subject to those general and specific objections, Amesbury supplements its response as follows:

Amesbury is entitled to no less than a reasonable royalty for the infringement of its patents by the Caldwell products identified in Amesbury's responses to Interrogatory No. 1. The specific calculation of Amesbury's damages, including the calculation of a reasonable royalty, is properly the subject of expert analysis and is premature at this stage. Amesbury is also awaiting from Caldwell the production of additional documents necessary for accurate calculations of lost sales, lost profits, and/or price erosion. However, Amesbury anticipates that the calculation of a reasonable royalty will be based on prevailing legal and accounting standards, including without limitation the factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). These factors include: (1) royalties received by Amesbury for the licensing of the patents-in-suit; (2) rates paid by Caldwell for the use of other patents comparable to the patents-in-suit; (3) the nature and scope of a hypothetical license, as exclusive or non-exclusive, or as restricted or non-restricted; (4) Amesbury's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or only granting licenses under special conditions designed to preserve that monopoly; (5) the commercial relationship between Amesbury and Caldwell; (6) the existing value of the invention to Amesbury as a generator of sales of its non-patented items; (7) the duration of the patents; (8) the established profitability of the products made under the patents, their commercial success, and their current popularity; (9) the utility and advantages of the patent property over the old modes and devices; (10) the nature of the patented inventions; (11) the extent to which Caldwell has made use of the invention; (12) the portion of the profit or selling price that is customary in the business; (13) the portion of the realizable profit that should be credited to the inventions as distinguished from non-patented elements; (14) expert opinion; and (15) the amount Amesbury and Caldwell would have agreed upon if both had been voluntarily trying to reach an agreement.

Pursuant to Federal Rule of Civil Procedure 33(d), Amesbury identifies the following documents as containing information relevant to the *Georgia-Pacific* factors set forth above: AME 1501 – AME 1505, AME 1538 – AME 1656, AME 2137 – 2146, AME 2168 – 2169, AME 2193 – AME 2202, C 00022 – C 00306, and the patents-in-suit attached as exhibits to the Complaint in this case.

Respectfully submitted,

Douglas J. Kline (BBO# 556680)
Jordan M. Singer (BBO# 651068)
Safraz W. Ishmael (BBO# 657881)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
Phone: (617) 570-1000
Fax: (617) 523-1231

Attorneys for Plaintiffs

**AMESBURY GROUP, INC.**
**AMESBURY SPRINGS LTD**.

Dated: January 12, 2006

## <u>CERTIFICATE OF SERVICE</u>

I, Safraz W. Ishmael, certify that I caused the foregoing AMESBURY'S SECOND
SUPPLEMENTAL RESPONSE TO CALDWELL'S INTERROGATORIES (NOS. 1 – 2, 13 –
16) to be served on January 12, 2006 on the following via Federal Express:

Neal L. Slifkin, Esq.
HARRIS BEACH LLP
99 Garnsey Road
Pittsford, NY 14534
Fax: (585)-419-8801

Attorneys for Defendant

THE CALDWELL MANUFACTURING
COMPANY

Date: January 12, 2005                                  _____
                                                              Safraz W. Ishmael

LIBA/1665374

**APPENDIX A**

**INFRINGEMENT OF
AMESBURY'S U.S. PATENT NO. 5,365,638
BY CALDWELL'S QUICK-TILT PRODUCTS**

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/1 | A mounting assembly comprising | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 638/1.A | a channel means | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. This element is also present when the Quick-Tilt product is installed into the window channel of a typical window frame, as such a window channel comprises a rear wall, side walls, and inwardly turned opposed flanges at the extremities of the side walls. This element is also annotated in Figure 1, a page from a Quick-Tilt product catalog. |
| 638/1.A.1 | having a rear wall, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. This element is annotated in Figure 1, a page from a Quick-Tilt product catalog. |
| 638/1.A.2 | side walls | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. This element is annotated in Figure 1, a page from a Quick-Tilt product catalog. |

1

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/1.A.3 | and at extremities of said side walls, inwardly turned opposed flanges, | Caldwell admits that this element is present in its Quick-Tilt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is annotated in Figure 1, a page from a Quick-Tilt product catalog. |
| 638/1.B | a sash frame support means slidable in said channel means, | Caldwell admits that this element is present in its Quick-Tilt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, and also in Figure 2, a picture of the Quick-Tilt product, attached hereto. |
| 638/1.C | a coiled ribbon spring | Caldwell admits that this element is present in its Quick-Tilt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto. |
| 638/1.D | having a first end engaged with said sash frame support means, | Caldwell admits that this element is present in its Quick-Tilt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Quick-Tilt product, attached hereto. |
| 638/1.E | and a means for mounting said coiled ribbon spring, | Caldwell admits that this element is present in its Quick-Tilt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto. The plastic molding that supports the coiled ribbon spring 1.C is a means for mounting the coiled ribbon spring. |

2

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/1.F | the coiled body portion of said coiled ribbon spring having the other end of said coiled ribbon spring within the coil being positioned in said mounting means, said other end of said coiled ribbon spring being free and unattached to said mounting means | Caldwell admits that this element is present in its Quick-Tilt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto. |
| 638/1.G | and said mounting means being secured in said channel means, | Caldwell admits that this element is present in its Quick-Tilt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a page from a Quick-Tilt product catalog.<br><br>This element is present when the mounting means is attached to a window frame, typically using a screw or other securing device. |
| 638/1.H | said mounting means having a raised spine | The Quick-Tilt product has a raised spine on its mounting means. This element is annotated in Figure 3, a picture of the Quick-Tilt product, attached hereto. |
| 638/1.I | positioned between and in the same plane as said inwardly turned opposed flanges of said channel means | When installed into a window channel of a typical window frame, the raised spine of the Quick-Tilt product is in the same plane as the inwardly turned opposed flanges of the window channel (the channel means).<br><br>This element is also annotated in Figure 1, a page from a Quick-Tilt product catalog. |

3

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/1.J | whereby rotational motion of said mounting means is inhibited. | When the Quick-Tilt product is installed into a window channel by securing the mounting means to the window channel, typically using a screw, this act of securing the device into the channel and also any contact between the spine and the window frame inhibits rotational motion of the mounting means.<br><br>Alternatively or additionally, the raised spine functions to stiffen the mounting means, thereby inhibiting the cupping rotation of the mounting means; without the raised spine, the mounting means tends to cup into itself and therefore rotates. |
| 638/2 | The mounting assembly of claim 1 wherein the mounting means has a support surface disposed in contact with the outer surface of said coiled body portion of said coiled ribbon spring during movement of said coiled ribbon spring as said sash support means moves in said channel means. | This support surface element of the mounting means is annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto.<br><br>The support surface is disposed in contact with the outer surface of the coiled body portion of the coiled ribbon spring during rotational winding and unwinding movement of the coiled ribbon spring, such movement taking place as the sash support means moves up and down in the window channel. |
| 638/3 | The mounting assembly of claim 2 | |
| 638/3.A | wherein said mounting means has a body portion | The body portion of the mounting means is annotated in Figure 2. |
| 638/3.B | having an aperture therein, | The body portion of the mounting means has an aperture and the aperture is annotated in Figures 2 and 3. |

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/3.C | a fixing screw positioned in said aperture by which the mounting means is secured relative to said channel means, | This element is present when the Quick-Tilt product is installed in a window frame. A fixing screw, or equivalent, is positioned in the aperture to secure the mounting means to the window channel.

This element is also annotated in Figure 1. |
| 638/3.D | a surface of said body portion being concavely curved, | The surface of the body portion is concavely curved, as annotated in Figure 2. |
| 638/3.E | said coiled body portion of said coiled ribbon spring being in contact with and supported by said curved surface of said body portion. | The coiled body portion of the coiled ribbon spring is in contact with the curved surface of, as shown annotated in Figure 2. |
| 638/8 | A mounting assembly comprising | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 638/8.A | a channel means having | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.

This element is also present when the Quick-Tilt product is installed into the window channel of a typical window frame, as such a window channel comprises a rear wall, side walls, and inwardly turned opposed flanges at the extremities of the side walls.

This element is also annotated in Figure 1. |

5

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/8.A.1 | a rear wall, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1. |
| 638/8.A.2 | side walls | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1. |
| 638/8.A.3 | and at extremities of said side walls, inwardly turned opposed flanges, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1. |
| 638/8.B | a sash frame support means slidable in said channel means, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 2. |
| 638/8.C | a coiled ribbon spring | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 2. |

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/8.D | having an outer end engaged with said sash frame support means, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Quick-Tilt product, attached hereto. |
| 638/8.E | and a means for mounting said coiled ribbon spring, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto. |
| 638/8.F | the coiled body portion of said coiled ribbon spring with the other end of said coiled ribbon spring positioned in said mounting means, | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Quick-Tilt product, attached hereto. |
| 638/8.G | said mounting means being secured in said channel means | Caldwell admits that this element is present in its Quick-Tilt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a page from a Quick-Tilt product catalog.<br><br>This element is present when the mounting means is attached to a window frame, typically using a screw or other securing device. |
| 638/8.H | and the mounting means having projection means | The Quick-Tilt product mounting means has a raised projection or protrusion. This element is annotated in Figure 3, a picture of the Quick-Tilt product, attached hereto. |

7

| Claim Element | U.S. Patent No. 5,365,638 | Caldwell's Quick-Tilt Products |
|---|---|---|
| 638/8.I | positioned between said inwardly turned opposite flanges of the channel means which cooperate with said flanges of the channel means within which the mounting means is positioned, | When installed into a window channel of a typical window frame, the projection or protrusion of the Quick-Tilt product is in the same plane as the inwardly turned opposed flanges of the window channel (the channel means).<br><br>This element is also annotated in Figure 1. |
| 638/8.J | whereby rotational movement of the mounting means is inhibited. | When the Quick-Tilt product is installed into a window channel, contact between the projection and the flanges of the window channel inhibits rotational motion of the mounting means.<br><br>Alternatively or additionally, the projection or protrusion functions to stiffen the mounting means, thereby inhibiting the cupping rotation of the mounting means; without the projection or protrusion, the mounting means tends to cup into itself and therefore rotates. |

8

Figure 1



# Quick-Tilt*nc
### CONSTANT FORCE BALANCE


**CALDWELL**
Build on it.

## *"New Construction" friendly Quick-Tilt*

If new construction debris was holding you back from considering a Constant Force balance, you now have a dependable solution with Caldwell's **Quick-Tilt*nc** balance.

Caldwell's pre-assembled **Quick-Tilt** Constant Force balance just got better with its evolution to the **Quick-Tilt*nc** – or "new construction" friendly version.   Until now most Constant Force balances weren't ready for the abuse caused by construction site dust and debris.  With the launch of **Quick-Tilt*nc**, air-borne contaminants are kept from lodging inside the moving coil assembly.   The integrated coil nest and cover is specifically engineered to keep the coils dust-free and operating in the smooth, quiet manner for which **Quick-Tilt** balances are renowned.

**Call us at 585-352-3790.  Let's talk about your window.**

C000535

**Quick-Tilt Product – Figure 2**



**Quick-Tilt Product – Figure 3**



APPENDIX B

INFRINGEMENT OF
AMESBURY'S U.S. PATENT NO. 6,598,264
BY CALDWELL'S SERIES 86XT PRODUCT

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1 | A block and tackle window balance device comprising: | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 264/1.A | a channel comprising | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.

This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |
| 264/1.A.1 | a first end | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.

This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |
| 264/1.A.2 | and a second end; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.

This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |

1

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1.B | a top guide connected to the first end of the channel; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 2, pictures of the Series 86xt product, attached hereto. |
| 264/1.C | a bottom guide connected to the second end of the channel; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 3, pictures of the Series 86xt product, attached hereto. |

2

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1.D | a bottom guide roller rotatably mounted in the bottom guide; | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 3, a picture of the Series 97ez product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is also present under the doctrine of equivalents, because the component of Caldwell's Series 86xt product annotated as 1.D in Figure 3 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result. See Dawn Equipment Co. v. Kentucky Farms Inc., 140 F.3d 1009, 1016 (Fed. Cir. 1998).<br><br>The roller of this claim element functions to allow further travel of the window sash, by being positioned lower in the balance than a conventional roller positioned above the bottom guide, to achieve the result of greater window egress.<br><br>Similarly, the element annotated as 1.D is a roller that functions to allow further travel of the window sash, by being positioned lower in the Series 86xt balance (relative to the position of the bottom roller in Caldwell's Series 86 balance), achieving the same result of greater window egress. |
| 264/1.E | a fixed pulley block unit connected to the channel; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |

3

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1.F | a translatable pulley block unit moveable within the channel; | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/1.G | a spring comprising | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 2 and 4, pictures of the Series 86xt product, attached hereto. |
| 264/1.G.1 | a first end | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 2, pictures of the Series 86xt product, attached hereto. |
| 264/1.G.2 | and a second end, | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 4, pictures of the Series 86xt product, attached hereto. |
| 264/1.G.3 | wherein the first end is fixed relative to the channel | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>As shown in annotated Figure 2, the first end of the spring 1.G.1 is connected to a fixed rivet and so is fixed relative to the channel. |

4

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1.G.4 | and the second end is connected to the translatable pulley block unit; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> As shown in annotated Figure 4, the second end of the spring 1.G.2 is connected to the translatable pulley block unit. |
| 264/1.H | and a cord comprising | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figure 3, 4, and 5, a pictures of the Series 86xt product, attached hereto. |
| 264/1.H.1 | a first cord end | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figures 1 and 4. |
| 264/1.H.2 | and a second cord end, | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figures 1 and 5. |
| 264/1.H.3 | wherein the cord is threaded through the translatable pulley block unit | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. <br><br> This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/1.H.4 | and the fixed pulley block unit | Caldwell admits that this element is present in its Series 86xt product. *See* Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/1.H.5 | and extends around the bottom guide roller, | Caldwell admits that this element is present in its Series 86xt product. *See* Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 5, a picture of the Series 86xt product, attached hereto. As shown the cord extends around the bottom guide roller and exits at a terminal point where it is attached to a hook. |
| 264/1.H.6 | the first cord end being attached to the translatable pulley block unit | Caldwell admits that this element is present in its Series 86xt product. *See* Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>As shown in Figure 4, the first cord end 1.H.1 is attached to the translatable pulley block unit. |
| 264/1.H.7 | and the second cord end being attachable to a jamb. | Caldwell admits that this element is present in its Series 86xt product. *See* Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>As shown in Figure 5, the second cord end 1.H.2 is attached to a terminal hook thereby making the second cord end attachable to a jamb. |
| 264/2 | The device of claim 1 wherein the bottom guide roller is located external to the channel. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. As shown, at least a part of the bottom guide roller is located outside the channel. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/3 | The device according to claim 2 wherein the top angled portion is sized to receive a member of a window sash. | This element is annotated in Figure 2, a picture of the Series 86xt product, attached hereto. As shown, the product has a top angled portion sized to received a member of a window sash. |
| 264/4 | The device according to claim 1 wherein a portion of the bottom guide is external to the channel. | This element is annotated in Figure 7, a picture of the Series 86xt product, attached hereto. As shown, at least part of the bottom guide is outside of the channel. |
| 264/5 | The device according to claim 1 wherein the bottom guide forms a channel to receive a portion of a window sash. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. |
| 264/6 | The device of claim 1 wherein the fixed pulley block unit comprises | This element is annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/6.A | a frame, | This element is annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/6.B | an axle, | This element is annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/6.C | and at least one pulley rotatable around the axle. | This element is annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |

7

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/7 | The device according to claim 6 wherein the axle is located within the frame. | The axle element 6.B in Figure 3, passes through the pulley 6.C and through the frame 6.A. The part of the axle 6.B that passes through the frame 6.A is located within the frame. |
| 264/9 | The device according to claim 1 wherein the translatable pulley block unit comprises | The translatable pulley block united is annotated in Figure 4. |
| 264/9.A | a frame, | This element is annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/9.B | an axle within the frame, | This element is annotated in Figure 4, a picture of the Series 86xt product, attached hereto. The axle passes through the frame and therefore is within the frame. |
| 264/9.C | and at least one pulley rotatable around the axle. | This element is annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/10.A | The device according to claim 1 wherein the top guide includes a top angled portion | This element is annotated in Figure 2, a picture of the Series 86xt product, attached hereto. |
| 264/10.B | and a bottom portion, the bottom portion being connected to the first end of the channel. | This element is annotated in Figure 2, a picture of the Series 86xt product, attached hereto. |

8

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/11 | The device according to claim 1 wherein the fixed pulley block unit is integral with the bottom guide. | This element is annotated in Figure 3. As shown, the fixed pulley block unit 1.E includes a frame that is connected directly to the bottom guide and is therefore integral with the bottom guide. |
| | | |
| 264/12 | A window assembly comprising: | |
| 264/12.A | a window frame with two jambs with jamb pockets; | When installed in a window frame, the Series 86xt product window assembly includes a window frame with two jambs with jamb pockets.<br><br>This element is also annotated in Figure 8, a page from a Series 86xt product catalog. |
| 264/12.B | at least one of an upper window sash and a lower window sash slidably receivable in the jamb pockets; and | When installed in a window frame, the Series 86xt product window assembly includes an upper window sash and a lower window sash slidably receivable in the jamb pockets.<br><br>This element is also annotated in Figure 8, a page from a Series 86xt product catalog. |
| 264/12.C | at least one block and tackle window balance device attached to the at least one of the upper window sash and the lower window sash, the device comprising: | When installed in a window frame, the Series 86xt block and tackle window balance device is attached an upper window sash and the lower window sash.<br><br>This element is also annotated in Figure 8, a page from a Series 86xt product catalog. |

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/12.D | channel comprising a first end and a second end; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |
| 264/12.E | a top guide connected to the first end of the channel; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 2, pictures of the Series 86xt product, attached hereto. |
| 264/12.F | a bottom guide connected to the second end of the channel; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 3, pictures of the Series 86xt product, attached hereto. |

10

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/12.G | a bottom guide roller rotatably mounted in the bottom guide; | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 3, a picture of the Series 97ez product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is also present under the doctrine of equivalents, because the component of Caldwell's Series 86xt product annotated as 12.G in Figure 3 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.<br><br>The roller of this claim element functions to allow further travel of the window sash, by being positioned lower in the balance than a conventional roller positioned above the bottom guide, to achieve the result of greater window egress.<br><br>Similarly, the element annotated as 12.G is a roller that functions to allow further travel of the window sash, by being positioned lower in the Series 86xt balance (relative to the position of the bottom roller in Caldwell's Series 86 balance), achieving the same result of greater window egress. |
| 264/12.H | a fixed pulley block unit connected to the channel; | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/12.I | a translatable pulley block unit moveable within the channel; | Caldwell admits that this element is present in its Series 86xt product.  See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |

11

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/12.J | a spring comprising | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 2 and 4, pictures of the Series 86xt product, attached hereto. |
| 264/12.J.1 | a first end | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Series 86xt product, attached hereto. |
| 264/12.J.2 | and a second end, | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/12.J.3 | wherein the first end is fixed relative to the channel | As shown in Figure 2, the first end 12.J.1 is connected to a fixed rivet and is therefore fixed relative to the channel. |
| 264/12.J.4 | and the second end is connected to the translatable pulley block unit; | As shown in Figure 4, the second end is connected to the translatable pulley block unit. |
| 264/12.K | and a cord comprising | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 3, 4 and 5, pictures of the Series 86xt product, attached hereto. |

12

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/12.K.1 | a first cord end | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/12.K.2 | and a second cord end, | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 5, a picture of the Series 86xt product, attached hereto. |
| 264/12.K.3 | wherein the cord is threaded through the translatable pulley block unit | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 86xt product, attached hereto. |
| 264/12.K.4 | and the fixed pulley block unit | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/12.K.5 | and extends around the bottom guide roller, | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 5, a picture of the Series 86xt product, attached hereto. |
| 264/12.K.6 | the first cord end being attached to the translatable pulley block unit | As shown in Figure 4, the first cord end is attached to the translatable pulley block unit. |
| 264/12.K.7 | and the second cord end being attachable to a jamb. | As shown in Figure 5, the second cord end terminates at a hook, and so is attachable to a jamb. |

13

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/13 | A window balance device comprising: | |
| 264/13.A | a bottom guide adapted to be connected to an end of a window balance channel and adapted to slide in a jamb pocket when installed in a window frame; and | This element is annotated in Figure 3, a picture of the Series 86xt product, attached hereto. |
| 264/13.B | a bottom guide roller rotatably mounted in the bottom guide. | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 3, a picture of the Series 97ez product, attached hereto.

Regardless of claim construction, however, this claim element is also present under the doctrine of equivalents, because the component of Caldwell's Series 86xt product annotated as 13.B in Figure 3 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.

The roller of this claim element functions to allow further travel of the window sash, by being positioned lower in the balance than a conventional roller positioned above the bottom guide, to achieve the result of greater window egress.

Similarly, the element annotated as 13.B is a roller that functions to allow further travel of the window sash, by being positioned lower in the Series 86xt balance (relative to the position of the bottom roller in Caldwell's Series 86 balance), achieving the same result of greater window egress. |

14

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/14 | The device of claim 13 wherein the bottom guide roller is located external to the channel when the bottom guide is attached thereto. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. As shown, at least a part of the bottom guide roller is located outside the channel. |
| 264/15 | The device according to claim 13 wherein at least a portion of the bottom guide is external to the channel when attached thereto. | This element is annotated in Figure 7, a picture of the Series 86xt product, attached hereto. As shown, at least part of the bottom guide is outside of the channel. |
| 264/16 | The device according to claim 13 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. |
| 264/18 | A window balance device comprising: | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 264/18.A | a channel comprising a first end and a second end; | Caldwell admits that this element is present in its Series 86xt product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.

This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |

15

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/18.B | a top guide connected to the first end of the channel; | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a picture of the Series 86xt product, attached hereto. |
| 264/18.C | a bottom guide connected to the second end of the channel and adapted to slide in a jamb pocket when installed in a window frame; and | Caldwell admits that this element is present in its Series 86xt product. <u>See</u> Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 1 and 3, pictures of the Series 86xt product, attached hereto. |

16

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/18.D | a bottom guide roller rotatably mounted in the bottom guide. | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 3, a picture of the Series 97cz product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is also present under the doctrine of equivalents, because the component of Caldwell's Series 86xt product annotated as 18.D in Figure 3 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.<br><br>The roller of this claim element functions to allow further travel of the window sash, by being positioned lower in the balance than a conventional roller positioned above the bottom guide, to achieve the result of greater window egress.<br><br>Similarly, the element annotated as 18.D is a roller that functions to allow further travel of the window sash, by being positioned lower in the Series 86xt balance (relative to the position of the bottom roller in Caldwell's Series 86 balance), achieving the same result of greater window egress. |
| 264/19 | The device of claim 18 wherein the bottom guide roller is located external to the channel. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. |

17

| Claim Element | Amesbury's U.S. Patent No. 6,598,264 | Caldwell's Series 86xt Product |
|---|---|---|
| 264/20 | The device according to claim 18 wherein at least a portion of the bottom guide is external to the channel. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. |
| 264/21 | The device according to claim 18 wherein the bottom guide forms a channel to receive a portion of a window sash when installed. | This element is annotated in Figure 6, a picture of the Series 86xt product, attached hereto. |

18

**Series 86xt – Figure 1**



Series 86xt – Figure 2



1.B, 12.E

3, 10.A

10.B

1.G.1, 12.J.1

**Series 86xt – Figure 3**



6.B

1.H.4
12.K.4

6.C

6.A

1.E, 11,
12.H

1.C, 12.F, 13.A, 18.C

1.D, 12.G, 13.B, 18.D

Series 86xt – Figure 4



1.H.3
12.K.3

1.G.2, 12.J.2

9.C

9.B

9.A

1.F, 12.I

1.H.1, 12.K.1

**Series 86xt – Figure 5**



Series 86xt – Figure 6



5, 16, 21

4, 20

2, 14,19



Series 86xt – Figure 7



4, 15



CALDWELL    Series 86x
BUCKLE TAPE SYSTEM

Extended travel
for sideload applications

C000498

# APPENDIX C

## INFRINGEMENT OF
## AMESBURY'S U.S. PATENT NO. 6,820,368
## BY CALDWELL'S SERIES 97EZ PRODUCT

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/2 | A window balance system comprising: | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 368/2.A | a U-shaped channel comprising a plurality of openings; | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a picture of the Series 97ez product, attached hereto. |
| 368/2.B | a spring connected to a system of pulleys located within the U-shaped channel; | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a picture of the Series 97ez product, attached hereto. |

1

| Claim Element | Amesbury '368 Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/2.C | a cord with | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Series 97ez product, attached hereto. |
| 368/2.C.1 | a first cord end | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Series 97ez product, attached hereto. |
| 368/2.C.2 | and a second cord end, | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 97ez product, attached hereto. |
| 368/2.C.3 | the first cord end connected and threaded through the system of pulleys, | As shown in Figure 2, the first cord end 2.C.1 is connected and threaded through a system of pulleys |
| 368/2.C.4 | the second cord end connected to a jamb mounting attachment; and | As shown in Figure 3, the second cord end 2.C.2 is connected to a device that serves as a jamb mounting attachment. |

2

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/2.D | a balance shoe, wherein the balance shoe comprises: | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/2.D.1 | a frame comprising an enlarged first end | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/2.D.2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/2.D.3 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figures 4 and 5, pictures of the Series 97ez product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is present under the doctrine of equivalents because the component of Caldwell's Series 97ez product annotated as 2.D.3 in Figures 4 |

3

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| | | and 5 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.

One function of the pocket, claimed by this claim element, is to further secure the balance shoe in the channel and to prevent rotation of the balance shoe (carrier) during shipment, handling, and in use. Specifically, when the shoe experiences certain torque forces, the pocket is forced against a rivet or fastener, thereby inhibiting and stopping unwanted rotation of the shoe.

The component labeled 2.D.3 in Figures 4 and 5 performs the same function of preventing unwanted rotation of the shoe (carrier). It performs this function in the same way by contacting a rivet. It achieves the same result of protecting and securing the balance shoe (carrier) in the channel.

Alternatively or additionally, this claim element is literally present and is annotated as 2.D.3' in Figure 4, and this claim element is also present under the doctrine of equivalents as the component labeled as 2.D.3' in Figure 4 performs substantially the same function, in substantially the same way to achieve substantially the same result, for at least the foregoing reasons. |

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/2.D.4 | a locking member proximal to the enlarged first end; | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/2.D.5 | a cam in communication with the locking member, and | Caldwell admits that this element is present in its Series 97ez product. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |

5

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/2.D.6 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 4, a picture of the Series 97ez product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is present under the doctrine of equivalents because the component of Caldwell's Series 97ez product annotated as 2.D.6 in Figure 4 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.<br><br>The connecting device of this claim element functions to attach the balance shoe within the U-Shaped channel. It performs this function by connecting the shoe to the sides of the U-shaped channel and it achieves the result of integrating the shoe with the channel and maintaining the attachment during use.<br><br>The component annotated as 2.D.6 in Figure 4 is a rivet that functions to attach the balance shoe within the U-shaped channel, the same function as the connecting device of this claim. The element annotated as 2.D.6 performs the attaching function in the same way, by connecting the shoe to the sides of the U-shaped channel. It achieves the same result as the connecting device of the claim, of integrating the shoe with the channel and maintaining the attachment during use. |

6

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | As shown in Figure 4, the connecting device 2.D.6 is a rivet. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | As shown in Figure 4, the cam is at least partially housed in the enlarged end. Rotating the cam of the Series 97ez forces the locking member to engaged to a jamb track, when the shoe is installed into a window jamb. |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | |
| 368/7.A | two opposing ends | This element is annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/7.B | integrally connected by a spring member. | This element is annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | As shown in Figure 4, the cam is at least partially housed in the enlarged end. Rotating the cam of the Series 97ez forces the locking member to engaged to a jamb track, when the shoe is installed into a window jamb. |
| 368/11 | The window balance system of claim 2 | |

7

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97ez Product |
|---|---|---|
| 368/11.A | wherein the cam comprises at least one camming surface | This element is annotated in Figure 4, a picture of the Series 97ez product, attached hereto. |
| 368/11.B | and a keyhole opening sized to receive a pivot bar. | This element is annotated in Figure 6, a picture of the Series 97ez product, attached hereto. The annotated opening is sized to receive a pivot bar. |

8

Series 97ez – Figure 1



2.A

2.B



Series 97ez – Figure 2



Series 97ez – Figure 3



Series 97ez – Figure 4



2.D.3

**Series 97ez – Figure 5**



Series 97ez – Figure 6

11.B

## APPENDIX D

## INFRINGEMENT OF
## AMESBURY'S U.S. PATENT NO. 6,820,368
## BY CALDWELL'S SERIES 97I(H) PRODUCTS

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97i(H) Products |
|---|---|---|
| 368/2 | A window balance system comprising: | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A. |
| 368/2.A | a U-shaped channel comprising a plurality of openings; | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a picture of the Series 97i(h) product, attached hereto. |
| 368/2.B | a spring connected to a system of pulleys located within the U-shaped channel; | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 1, a picture of the Series 97i(h) product, attached hereto. |

1

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 971(h) Products |
|---|---|---|
| 368/2.C | a cord with | Caldwell admits that this element is present in its Series 971(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figures 2 and 3, pictures of the Series 971(h) product, attached hereto. |
| 368/2.C.1 | a first cord end | Caldwell admits that this element is present in its Series 971(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Series 971(h) product, attached hereto. |
| 368/2.C.2 | and a second cord end, | Caldwell admits that this element is present in its Series 971(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 971(h) product, attached hereto. |
| 368/2.C.3 | the first cord end connected and threaded through the system of pulleys. | Caldwell admits that this element is present in its Series 971(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 2, a picture of the Series 971(h) product, attached hereto. |

2

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 971i(h) Products |
|---|---|---|
| 368/2.C.4 | the second cord end connected to a jamb mounting attachment; and | Caldwell admits that this element is present in its Series 971i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 3, a picture of the Series 971i(h) product, attached hereto. |
| 368/2.D | a balance shoe, wherein the balance shoe comprises: | Caldwell admits that this element is present in its Series 971i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 971i(h) product, attached hereto. |
| 368/2.D.1 | a frame comprising an enlarged first end | Caldwell admits that this element is present in its Series 971i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 971i(h) product, attached hereto. |

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97i(h) Products |
|---|---|---|
| 368/2.D.2 | and a second end, wherein the second end is adapted to be received by the U-shaped channel, | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.

This element is also annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. |
| 368/2.D.3 | and wherein the second end of the frame of the balance shoe further forms a pocket positioned in the second end of the frame adapted to mate with a rivet; | This element is annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. Each sidewall of the frame forms an opening through which the rivet passes and a central element forms a further opening with an endwall, and a central extension thereof, through which the rivet also passes. |
| 368/2.D.4 | a locking member proximal to the enlarged first end; | Caldwell admits that this element is present in its Series 97i(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.

This element is also annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. |

4

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 971(h) Products |
|---|---|---|
| 368/2.D.5 | a cam in communication with the locking member, and | Caldwell admits that this element is present in its Series 971(h) products. See Def.'s Supp. Answers to Pls.' First Set of Interrogs., Appendix A.<br><br>This element is also annotated in Figure 4, a picture of the Series 971(h) product, attached hereto. |

5

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97i(h) Products |
|---|---|---|
| 368/2.D.6 | a connecting device for attaching the balance shoe within the U-shaped channel of the window balance. | Under Amesbury's claim construction, this claim element is literally present and is annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto.<br><br>Regardless of claim construction, however, this claim element is present under the doctrine of equivalents because the component of Caldwell's Series 97ez product annotated as 2.D.6 in Figure 4 performs at least substantially the same function as this claim element, in at least substantially the same way, to achieve at least substantially the same result.<br><br>The connecting device of this claim element functions to attach the balance shoe within the U-Shaped channel. It performs this function by connecting the shoe to the sides of the U-shaped channel and it achieves the result of integrating the shoe with the channel and maintaining the attachment during use.<br><br>The component annotated as 2.D.6 in Figure 4 is a rivet that functions to attach the balance shoe within the U-shaped channel, the same function as the connecting device of this claim. The element annotated as 2.D.6 performs the attaching function in the same way, by connecting the shoe to the sides of the U-shaped channel. It achieves the same result as the connecting device of the claim, of integrating the shoe with the channel and maintaining the attachment during use. |

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 97i(h) Products |
|---|---|---|
| 368/3 | The window balance system of claim 2 wherein the connecting device comprises a rivet. | This element is annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. |
| 368/6 | The window balance system of claim 2 wherein the cam is at least partially housed within the enlarged first end of the frame; wherein rotating the cam forces the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | As shown in Figure 4, the cam is at least partially housed in the enlarged end. Rotating the cam forces the locking member to engage a jamb track when the shoe is installed in a window jamb. |
| 368/7 | The window balance system of claim 2 wherein the locking member comprises | |
| 368/7.A | two opposing ends | This element is annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. |
| 368/7.B | integrally connected by a spring member. | This element is annotated in Figure 4, a picture of the Series 97i(h) product, attached hereto. |

7

| Claim Element | Amesbury's U.S. Patent No. 6,820,368 | Caldwell's Series 971(h) Products |
|---|---|---|
| 368/8 | The window balance system of claim 7 wherein the cam is at least partially housed within the enlarged first end of the frame, wherein rotating the cam forces the opposing ends of the locking member to engage a jamb track when the balance shoe is installed in a window jamb. | As shown in Figure 4, the cam is at least partially housed in the enlarged end. Rotating the cam forces the locking member to engage a jamb track when the shoe is installed in a window jamb |
| 368/11 | The window balance system of claim 2 | |
| 368/11.A | wherein the cam comprises at least one camming surface | This element is annotated in Figure 5, a picture of the Series 971(h) product, attached hereto. |
| 368/11.B | and a keyhole opening sized to receive a pivot bar. | This element is annotated in Figure 5, a picture of the Series 971(h) product, attached hereto. |

**Series 97ih – Figure 1**





**Series 97ih – Figure 2**

2.C.1

2.C.3

Series 97ih – Figure 3



2.C.4

2.C.2



Series 97ih – Figure 4



Series 97ih – Figure 5

11.B

# EXHIBIT 11

00001

1

2           UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS
3    - - - - - - - - - - - - - - - - - - - -x
     AMESBURY GROUP, INC., and
4    AMESBURY SPRINGS LTD.,
           Plaintiffs,
5
           v.    Civil Action No. 05-10020-DPW
6
     THE CALDWELL MANUFACTURING
7    COMPANY,
           Defendant.
8    - - - - - - - - - - - - - - - - - - -x
          C O N F I D E N T I A L
9
     Videotaped Deposition Upon Oral Examination Of:
10          Thomas F. Batten

11
     Location:    Harris Beach PLLC
12          99 Garnsey Road
          Pittsford, New York  14534
13

14   Date:       November 8, 2005

15

16   Time:       9:37 a.m.

17

18

19   Reported By:  Joanne N. Pero

20          Alliance Shorthand, Inc.

21          Suite 1500 - The Penthouse

22          Alliance Building

23          183 Main Street East

24          Rochester, New York  14604

25

**Batten, Thomas S., 11/08/05**                    **Page 1**

00002

1

2  Appearing on Behalf of Plaintiffs:

3   Neil Slifkin, Esq.
      Harris Beach PLLC
4     99 Garnsey Road
      Pittsford, New York  14534
5

6  Appearing on Behalf of Defendant:

7   Jordan M. Singer, Esq.
      Goodwin Procter LLP
8     Exchange Place
      Boston, Massachusetts  02109
9

10  Videographer:

11   Mark DelMonte
      Electronic Field Productions, Inc.
12     3495 Winton Place, Building D, Suite 3
      Rochester, New York  14623
13

14                 *   *   *

15

16

17

18

19

20

21

22

23

24

25

**Batten, Thomas S., 11/08/05**                    **Page 2**

00074

1

2    A.  In the last several days.

3    Q.  Did you put it together specifically for

4  this deposition?

5    A.  Yes.

6    Q.  We were talking previously about dates

7  for the 97ih, so let's stick with that for a

8  minute.  I see from looking at this document that

9  the design team for the 97ih was formed in

10  approximately October of 2002?

11    A.  Not entirely accurate, no.

12    Q.  What is inaccurate about that statement?

13    A.  There was a predecessor product to ih

14  called 97i.  It was a predecessor to the i hybrid,

15  otherwise known as ih.

16    Q.  What is the difference between the ih or

17  i hybrid and the 97i?

18      MR. SLIFKIN:  Objection.

19    A.  The principal difference is the weight

20  and ranges of the two products.  The sash weight

21  ranges that each carries is a little bit different.

22    Q.  Is there any difference in the shoe

23  between the 97i and the 97ih?

24    A.  No.

25    Q.  So the design team for the 97i was formed

**Batten, Thomas S., 11/08/05**                **Page 74**

00075

1

2  on or about October, 2002?

3      A.  Correct.

4      Q.  Who was on the design team for the 97i?

5      A.  I don't remember all of the names but it

6  would have included again Rick deNormand, Doug

7  Zinter, Russ Kuitems.

8      Q.  Was Dennis O'Donnell on the design team

9  for the 97i?

10     A.  I believe so.

11     Q.  You put that team together yourself?

12     A.  Yes.

13     Q.  Did the composition of that development

14  team for the 97i change over time?

15     A.  It did.

16     Q.  Is this in the same way that the

17  composition for the 86xt design team changed?

18     A.  Yes.

19     Q.  People coming in and out as new issues

20  arose?

21     A.  Uh-huh, that is correct.

22     Q.  Was there a separate design team for the

23  97ih?

24     A.  No.

25     Q.  How did the team for the -- design team

**Batten, Thomas S., 11/08/05**                    **Page 75**